# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.*, <br><br>       *Plaintiffs*, <br><br>   v. <br><br> EXECUTIVE OFFICE OF THE PRESIDENT, *et al.*, <br><br>       *Defendants*. | Civil Action No. 25-0946 (CKK) |
| DEMOCRATIC NATIONAL COMMITTEE, *et al.*, <br><br>       *Plaintiffs*, <br><br>   v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*, <br><br>       *Defendants*. | Civil Action No. 25-0952 (CKK) |
| LEAGUE OF WOMEN VOTERS EDUCATION FUND, *et al.*, <br><br>       *Plaintiffs*, <br><br>   v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*, <br><br>       *Defendants*. | Civil Action No. 25-0955 (CKK) |

## MEMORANDUM IN SUPPORT OF
## LEAGUE[1] AND LULAC[2] PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

---

[1] Plaintiffs League of Women Voters Education Fund, League of Women Voters of the United States, League of Women Voters of Arizona, Hispanic Federation, National Association for the Advancement of Colored People, OCA-Asian Pacific American Advocates, and Asian and Pacific Islander American Vote.

[2] Plaintiffs League of United Latin American Citizens, Secure Families Initiative, and Arizona Students' Association.

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................ 1

I. Constitutional and Federal Law on the Authority to Regulate Federal Elections and Voter Registration ...................................................................................................... 1

II. Congress and the Independent Agencies Consider and Reject Documentary Proof-of-Citizenship Requirement ......................................................................................... 4

III. The Executive Order's Attempt to Direct the EAC to Change the Content of the Federal Form ...................................................................................................... 6

IV. Burdens of Requiring Documentary Proof of Citizenship for U.S. Citizens Registering to Vote or Updating Their Registration ....................................................... 7

V. The Executive Order's Impact on Plaintiffs ................................................... 11

ARGUMENT ................................................................................................................ 18

I. Plaintiffs Are Likely to Succeed on the Merits of their Separation of Powers Claim. ...... 19

A. The Executive Order Usurps Power that the Elections Clause Vests in Congress. ....... 19

B. The Executive Order Unlawfully Purports to Exercise Control over the EAC. ........... 21

II. The Remaining Preliminary Injunction Factors Weigh Heavily in Favor of Plaintiffs. .... 24

A. Plaintiffs Will Be Irreparably Harmed Absent a Preliminary Injunction. .................... 24

B. The Remaining Factors Strongly Favor Plaintiffs. ....................................................... 27

COURT-ORDERED TOPICS ...................................................................................... 29

III. Plaintiffs Have Standing. ................................................................................. 30

A. Injury in Fact .................................................................................................... 30

B. Causation and Redressability ........................................................................... 33

IV. Plaintiffs Have an Equitable Cause of Action. ............................................... 34

V. Plaintiffs Do Not Assert APA Claims as a Basis for Injunctive Relief. ........................... 34

VI. Plaintiffs' Requested Remedy is Proper. ........................................................ 34

CONCLUSION ............................................................................................................. 35

# TABLE OF AUTHORITIES

**Cases**

Aamer v. Obama,
   742 F.3d 1023 (D.C. Cir. 2014) ........................................................ 18

Action NC v. Strach,
   216 F. Supp. 3d 597 (M.D.N.C. 2016) ............................................ 27

Arizona v. Inter Tribal Council of Arizona, Inc.,
   570 U.S. 1 (2013) ............................................................... 2, 10, 19

Armstrong v. Exceptional Child Center, Inc.,
   575 U.S. 320 (2015) ................................................................ 19, 34

Boumediene v. Bush,
   553 U.S. 723 (2008) ................................................................ 19, 34

Buckley v. Valeo,
   424 U.S. 1 (1076) ........................................................................ 23

Center for Sustainable Economy v. Jewell,
   779 F.3d 588 (D.C. Cir. 2015) ................................................ 32, 33

Chamber of Commerce v. Reich,
   74 F.3d 1322 (D.C. Cir. 1996) ...................................................... 34

Changji Esquel Textile Co. Ltd. v. Raimondo,
   40 F.4th 716 (D.C. Cir. 2022) ....................................................... 18

Clinton v. City of New York,
   524 U.S. 417 (1998) ..................................................................... 20

Consumer Energy Council of America v. Federal Energy Regulatory Commission,
   673 F.2d 425 (D.C. Cir. 1982) .................................................. 21, 23

Federal Election Commission v. NRA Political Victory Fund,
   6 F.3d 821 (D.C. Cir. 1993) .......................................................... 22

Florida State Conference of Branches & Youth Units of the NAACP v. Byrd,
   680 F. Supp. 3d 1291 (N.D. Fla. 2023) ......................................... 27

Florida State Conference of the NAACP v. Browning,
   522 F.3d 1153 (11th Cir. 2008) .................................................... 32

Food and Drug Administration v. Alliance for Hippocratic Medicine,
   602 U.S. 367 (2024) ..................................................................... 32

Franklin v. Massachusetts,
   505 U.S. 788 (1992) ..................................................................... 34

Free Enterprise Fund v. Public Company Accounting Oversight Board,
   561 U.S. 477 (2010) ................................................................ 19, 34

Hanson v. District of Columbia,
   120 F.4th 223 (D.C. Cir. 2024) ..................................................... 28

Havens Realty Corp. v. Coleman,
   455 U.S. 363 (1982) ..................................................................... 32

Humphrey's Executor v. United States,
   295 U.S. 602 (1935) ..................................................................... 22

Immigration & Naturalization Service v. Chadha,
   462 U.S. 919 (1983) ..................................................................... 20

iii

*Indiana State Conference of the NAACP v. Lawson,*
   326 F. Supp. 3d 646 (S.D. Ind. 2018) ................................................................. 26

*Kobach v. U.S. Election Assistance Commission,*
   772 F.3d 1183 (10th Cir. 2014) ............................................................................. 4

*League of Women Voters of Florida v. Browning,*
   863 F. Supp. 2d 1155 (N.D. Fla. 2012) ............................................................... 27

*League of Women Voters of Missouri v. Ashcroft,*
   336 F. Supp. 3d 998 (W.D. Mo. 2018) ................................................................ 26

*League of Women Voters of North Carolina v. North Carolina,*
   768 F.3d 224 (4th Cir. 2014) ............................................................................... 25

*League of Women Voters of United States v. Harrington,*
   560 F. Supp. 3d 177 (D.D.C. 2021) ...................................................................... 6

*League of Women Voters of United States v. Newby,*
   838 F.3d 1 (D.C. Cir. 2016) ........................................................................... *passim*

*Loving v. Internal Revenue Service,*
   917 F. Supp. 2d 67 (D.D.C. 2013) ...................................................................... 28

*Lujan v. Defenders of Wildlife,*
   504 U.S. 555 (1992) ............................................................................................. 30

*Luokung Technology Corp. v. Department of Defense,*
   538 F. Supp. 3d 174 (D.D.C. 2021) .................................................................... 29

*Mi Familia Vota v. Fontes,*
   129 F.4th 691 (9th Cir. 2025) ....................................................................... 10, 32

*Morrison v. Olson,*
   487 U.S. 654 (1988) ............................................................................................. 23

*Myers v. United States,*
   272 U.S. 52 (1926) ............................................................................................... 24

*North Carolina State Conference of the NAACP v. North Carolina State Board of Elections,*
   No. 16-cv-1274, 2016 WL 6581284 (M.D.N.C. Nov. 4, 2016) ............................. 27

*National Treasury Employees Union v. Nixon,*
   492 F.2d 587 (D.C. Cir. 1974) ............................................................................ 35

*National Treasury Employees Union v. United States,*
   101 F.3d 1423 (D.C. Cir. 1996) .......................................................................... 30

*Orloski v. Federal Election Commission,*
   795 F.2d 156 (D.C. Cir. 1986) ............................................................................ 21

*Project Vote, Inc. v. Kemp,*
   208 F. Supp. 3d 1320 (N.D. Ga. 2016) ............................................................... 27

*Protect Democracy Project, Inc. v. U.S. Department of Justice,*
   498 F. Supp. 3d 132 (D.D.C. 2020) .................................................................... 27

*Purcell v. Gonzalez,*
   549 U.S. 1 (2006) ................................................................................................. 28

*Seila Law LLC v. Consumer Financial Protection Bureau,*
   591 U.S. 197 (2020) ............................................................................................. 22

*Smiley v. Holm,*
   285 U.S. 355 (1932) ............................................................................................. 19

*Soucie v. David,*
   448 F.2d 1067 (D.C. Cir. 1971) .......................................................................... 34

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014)..................................................................................................... 30
*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021)..................................................................................................... 30
*Travelers United, Inc. v. Hyatt Hotels Corp.*,
    --- F. Supp. 3d ---, No. 1:23-cv-2776, 2025 WL 27162 (D.D.C. Jan. 3, 2025) ...................... 31
*United States v. Alabama*,
    691 F.3d 1269 (11th Cir. 2012) ..................................................................................... 8
*Utah v. Evans*,
    536 U.S. 452 (2002)..................................................................................................... 34
*West v. Lynch*,
    845 F.3d 1228 (D.C. Cir. 2017)..................................................................................... 33
*Whitman-Walker Clinic, Inc. v. U.S. Department of Health & Human Services*,
    485 F. Supp. 3d 1 (D.D.C. 2020) .................................................................................. 31
*Winter v. Natural Resources Defense Coalition, Inc.*,
    555 U.S. 7 (2008)........................................................................................................ 18
*Young v. Trump*,
    506 F. Supp. 3d 921 (N.D. Cal. 2020) ........................................................................... 33
*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952)................................................................................................ 20, 21

**Constitutional Authorities**
U.S. Const. art. I, § 2............................................................................................................ 1
U.S. Const. art. I, § 4...................................................................................................... 1, 19
U.S. Const. art. II, § 1........................................................................................................ 20
U.S. Const. art. II, § 3........................................................................................................ 20

**Statutes**
24 L.P.R.A. § 1325 .............................................................................................................. 9
44 U.S.C. § 3507 ................................................................................................................. 4
49 U.S.C. § 30301 ............................................................................................................... 8
5 U.S.C. § 553 .................................................................................................................... 3
52 U.S.C. § 20501 ............................................................................................................... 2
52 U.S.C. § 20504 ............................................................................................................... 3
52 U.S.C. § 20505 ............................................................................................................... 2
52 U.S.C. § 20506 ............................................................................................................... 3
52 U.S.C. § 20508 ............................................................................................................... 2
52 U.S.C. § 20921 .......................................................................................................... 2, 22
52 U.S.C. § 20922 .......................................................................................................... 4, 23
52 U.S.C. § 20923 ...................................................................................................... 2, 3, 23
52 U.S.C. § 20928 .......................................................................................................... 3, 23
52 U.S.C. § 20929 ................................................................................................. 3, 4, 20, 23
52 U.S.C. § 20942 ............................................................................................................... 4
52 U.S.C. § 20961 ............................................................................................................... 4
52 U.S.C. § 20962 ............................................................................................................... 4
52 U.S.C. § 21001 ............................................................................................................... 4
52 U.S.C. § 21002 ............................................................................................................... 4
52 U.S.C. § 21081 ............................................................................................................... 4

52 U.S.C. § 21132 ............................................................................................... 2

Ariz. Rev. Stat. § 16-166 ................................................................................... 9

**Other Authorities**

59 Fed. Reg. 32,311 (June 23, 1994) ........................................................... 3, 5

90 Fed. Reg. 10,447 (Feb. 18, 2025) ............................................................... 22

H.R. Rep. No. 103-66, at 23 (1993) (Conf. Rep.) ............................................ 5

The Federalist Nos. 59, 60, 61 (A. Hamilton) .............................................. 20

**INTRODUCTION**

The President issued an Executive Order that unconstitutionally directs the U.S. Election Assistance Commission ("EAC") to take action before April 24, 2025. Section 2(a) of the Order would require the EAC to prevent U.S. citizens from registering to vote in federal elections using the national mail-in voter registration form without submitting a passport or other select types of documentary proof of citizenship. The President has no power to command this. Indeed, he has no authority to regulate elections at all: The Constitution's Elections Clause vests Congress and the States—not the President—with authority to set rules for federal elections. Congress in turn entrusted the job of maintaining the national mail-in voter registration form, subject to strict statutory limits, to the EAC, an independent, bipartisan agency insulated from executive control. The President has no role in this scheme, let alone the authority to unilaterally make such sweeping changes to national elections policy.

Plaintiffs are nonprofit, nonpartisan organizations whose core missions and activities center around voter registration, including some Plaintiffs who also focus on voter assistance. If enforced, § 2(a) of the Order will severely burden Plaintiffs' ability to conduct registration drives and deprive their members and the eligible voters they serve of the right to register and vote in federal elections, including in imminent elections in Arizona. Absent an injunction, the Executive Order will cause immediate and irreparable harm to Plaintiffs. Section 2(a)'s mandate that the EAC must modify the Federal Form should be immediately enjoined.

**BACKGROUND**

I. **Constitutional and Federal Law on the Authority to Regulate Federal Elections and Voter Registration**

Federal elections are and always have been governed by the States and Congress. The Constitution provides, *inter alia*, that "[t]he Times, Places and Manner of holding [federal] Elections . . . shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations." U.S. Const. art. I, § 4; *see id.* art. I, § 2.

Pursuant to its constitutional authority, Congress passed the National Voter Registration Act ("NVRA") in 1993. Pub. L. No. 103-31, 107 Stat. 77 (codified as amended at 52 U.S.C. §§ 20501 *et seq.*). It did so to "increase the number of eligible citizens who register to vote in elections for Federal office," 52 U.S.C. § 20501(b)(1), while also recognizing the need to protect the "integrity of the electoral process." *Id.* § 20501(b)(3). It also sought to cure the "direct and damaging effect on voter participation in elections for Federal office and disproportionate[] harm [to] voter participation by various groups, including racial minorities," wrought by "discriminatory and unfair registration laws and procedures." *Id.* § 20501(a)(3).

To help achieve these goals, Congress created a voter registration form (the "Federal Form") that "[e]ach State shall accept and use." *Id.* § 20505(a)(1). Congress set strict parameters on the Federal Form, both as to what it *must* include and what it cannot. And in Section 9(a)(2) of the NVRA, Congress originally delegated the authority to "prescribe such regulations as are necessary" to "develop a mail voter registration application form for elections for Federal office" to the Federal Election Commission ("FEC"), an independent, bipartisan agency, "in consultation with" the States' "chief election officers." 52 U.S.C. § 20508(a)(1)–(2). Regardless of the contents of State voter registration forms, the Federal Form "provides a backstop" that "guarantees . . . a simple means of registering to vote in federal elections will be available." *Arizona v. Inter Tribal Council of Ariz., Inc.* ("*ITCA*"), 570 U.S. 1, 12 (2013).

Congress later transferred authority to maintain the Federal Form to the Election Assistance Commission ("EAC"). *See* 52 U.S.C. § 21132. It created the EAC, like the FEC, as a bipartisan, "independent entity," 52 U.S.C. § 20921, when it enacted the Help America Vote Act of 2002 ("HAVA"). Pub. L. No. 107-252, 116 Stat. 1666, 1726 (codified as amended at 52 U.S.C. §§ 20901 *et seq.*). The EAC has four commissioners, no more than two of whom may be affiliated with the same political party. 52 U.S.C. § 20923(a)(1), (b)(2). The President appoints commissioners, with the Senate's advice and consent, based on recommendations from the Majority and Minority Leaders of the House and Senate. *Id.* § 20923(a)(2). Each appointed member must "have experience with or expertise in election administration or the study of

elections." *Id.* § 20923(a)(3). By law, the EAC may not take "any action" without "the approval of at least three of its members," ensuring that no decision can be made without bipartisan support. *Id.* § 20928.

To maintain the Federal Form, the EAC promulgates formal regulations through notice-and-comment rulemaking. *Id.* § 20929; *see, e.g.*, 59 Fed. Reg. 32,311 (June 23, 1994) (final rules regulating Federal Form). But Congress tightly circumscribed the EAC's authority to make changes to the Federal Form. For one, it instructed that the Federal Form must "contain[] an attestation that the applicant meets" "each eligibility requirement (including citizenship)" that "requires the signature of the applicant, under penalty of perjury." 52 U.S.C. § 20508(b)(2). Every person who registers using the Federal Form must therefore swear under penalty of perjury that they are a U.S. citizen. *Id.* §§ 20504(c)(2)(C), 20506(a)(6)(A), 20508(b)(2). And Congress prohibited "any requirement for notarization or other formal authentication." *Id.* § 20508(b)(3). Congress further authorized the EAC to request "identifying information" and "other information" on the Federal Form only if the information "is necessary to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process." *Id.* § 20508(b)(1).

In addition to these substantive constraints, Congress has placed statutory procedural requirements on the EAC's ability to amend the Federal Form that the Executive Order cannot lawfully override. Changes to the Federal Form require that the EAC engage in notice-and-comment rulemaking under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551 *et seq*. The APA requires that agencies publish a general notice of proposed rulemaking, give interested persons the opportunity to submit written comments for a period of at least 30 days, and consider those comments in its rulemaking. 5 U.S.C. § 553.[3] The EAC must also comply with the Paperwork Reduction Act ("PRA"), 44 U.S.C. §§ 3501 *et seq*. The Federal Form is considered an information collection under the PRA such that changes to the Federal Form would require a

---

[3] The APA, of course, also imposes its own substantive restraints, requiring reasoned decision-making consistent with the relevant authorizing statute. 5 U.S.C. § 706(2).

separate 60-day public comment period, in addition to the comment period the APA requires. After the EAC considered such comments, it would be required to submit an information collection to the Office of Management and Budget ("OMB") and publish a notice for an additional 30-day comment period. 44 U.S.C. § 3507(a)–(b). OMB would then need to approve the information collection to enable the EAC to collect information for up to three years. 44 U.S.C. § 3507(c), (g).

Congress also delegated other—largely advisory—tasks to the EAC for the administration of federal elections. 52 U.S.C. § 20922 (proscribing six limited EAC duties). In carrying out these tasks, Congress specified that the EAC lacks "authority to issue any rule, promulgate any regulation, or take any other action which imposes any requirement on any State or unit of local government, except to the extent permitted under section 20508(a) of this title"—*i.e.*, except to maintain the Federal Form and submit certain reports to Congress regarding NVRA compliance. *Id.* § 20929.

These tasks include adopting voluntary guidance for voting systems—*i.e.*, the equipment and systems under which ballots are cast and counted—with the assistance of a technical guidelines committee also established by statute. *Id.* §§ 20922(5), 20942, 20961, 20962, 21081(b). The EAC is also responsible for disbursing congressionally appropriated federal funds pursuant to formulas established by statute. *See id.* § 20922(4); *see also id.* §§ 21001(a), 21002.

## II.    Congress and the Independent Agencies Consider and Reject Documentary Proof-of-Citizenship Requirement

Congress has specifically rejected a documentary proof-of-citizenship requirement in connection with the Federal Form. In 1993, while considering the NVRA, "[b]oth houses of Congress debated and voted on the specific question of whether to permit states to require documentary proof of citizenship in connection with the Federal Form, and ultimately rejected such a proposal." *Kobach v. U.S. Election Assistance Comm'n*, 772 F.3d 1183, 1195 n.7 (10th Cir. 2014) (citing congressional records). Congress determined that such a requirement was "*not necessary* or consistent with the purposes of this Act," could "permit registration requirements that could effectively eliminate, or seriously interfere with, the mail registration program of the Act,"

and "could also adversely affect the administration of the other registration programs." H.R. Rep. No. 103-66, at 23 (1993) (Conf. Rep.) (emphasis added).

The FEC and the EAC—the two independent agencies that have been responsible for the Federal Form—have likewise declined to add a documentary proof-of-citizenship requirement. In 1994, in the FEC's final rulemaking governing the Federal Form, the agency rejected commenters' requests to require information regarding naturalization, concluding that the "only . . . information . . . necessary," 52 U.S.C. § 20508(b)(1), to determine citizenship qualifications, by law, is the statutorily required attestation. The FEC explained that "[w]hile U.S. citizenship is a prerequisite for voting in every state . . . [t]he issue of U.S. citizenship is addressed within the oath required by the Act and signed by the applicant under penalty of perjury." 59 Fed. Reg. at 32,316.

In the 23 years since Congress delegated limited responsibility over the Federal Form to the EAC, that agency has agreed with its predecessor's decision to not require documentary proof of citizenship. In 2006, the EAC rejected Arizona's requests for a State-specific amendment to accommodate the State's documentary proof-of-citizenship procedure. Ex. 1, U.S. Election Assistance Comm'n, Dkt. No. EAC-2013-0004, Mem. Concerning State Requests to Include Additional Proof-of-Citizenship Instructions on the National Voter Registration Form (Jan. 17, 2014) at 2. The EAC again rejected this request in 2013 when Arizona, Georgia, and Kansas asked it to modify the Federal Form to instruct that applicants in those States provide documentary proof of citizenship. *Id.* And in a 2014 agency decision, the EAC explained that both:

> the FEC and the EAC . . . specifically considered and determined, in their discretion, that the oath signed under penalty of perjury, the words 'For U.S. Citizens Only' and later the relevant HAVA citizenship provisions, *see* 42 U.S.C. § 15483(b)(4)(A) (adding to the Federal Form two specific questions and check boxes indicating the applicant's U.S. citizenship), were all that was necessary to enable state officials to establish the bona fides of a voter registration applicant's citizenship.

Ex. 1 at 22. The EAC rejected these States' efforts to add documentary proof of citizenship to the Federal Form because it "would require applicants to submit more information than is necessary to . . . assess eligibility," while a sworn attestation "provides the necessary means for assessing

applicants' eligibility." *Id.* at 28–30. And when the EAC's former Executive Director unilaterally approved the three States' requests to require documentary proof of citizenship with the Federal Form, the D.C. Circuit preliminarily enjoined that decision, *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 15 (D.C. Cir. 2016), and the district court later awarded judgment to plaintiffs because the Director did not find that the requirement was "necessary" to assess eligibility, as is required under the NVRA. *League of Women Voters of U.S. v. Harrington*, 560 F. Supp. 3d 177, 188–89 (D.D.C. 2021).

### III. The Executive Order's Attempt to Direct the EAC to Change the Content of the Federal Form

On March 25, 2025, the President issued an Executive Order that attempts to unconstitutionally upend nationwide election rules. *See* Ex. 2, Exec. Order No. 14248, 90 Fed. Reg. 14,005 (Mar. 25, 2025), *available at* https://perma.cc/EN47-E37Z (the "Executive Order" or the "Order"). Relevant here, § 2(a) of the Executive Order requires the EAC to, within 30 days, "take appropriate action to require" two changes to the Federal Form. *Id.* § 2(a)(i).

*First*, it directs that the Federal Form be altered to "require . . . documentary proof of United States citizenship." *Id.* The Order defines "documentary proof of citizenship" to include a copy of the following documents:

> (A) a United States passport;
>
> (B) an identification document compliant with the requirements of the REAL ID Act of 2005 (Public Law 109-13, Div. B) that indicates the applicant is a citizen of the United States;
>
> (C) an official military identification card that indicates the applicant is a citizen of the United States; or
>
> (D) a valid Federal or State government-issued photo identification if such identification indicates that the applicant is a United States citizen or if such identification is otherwise accompanied by proof of United States citizenship.

Exec. Order § 2(a)(ii).

*Second*, the Executive Order directs the EAC to change the Federal Form to compel State or local officials to record information specific to the documentary proof of citizenship that each applicant presents when registering with the Form. It mandates that the Federal Form must:

require . . . a State or local official to record on the form the type of document that the applicant presented as documentary proof of United States citizenship, including the date of the document's issuance, the date of the document's expiration (if any), the office that issued the document, and any unique identification number associated with the document as required by the criteria in 52 U.S.C. 21083(a)(5)(A), while taking appropriate measures to ensure information security.

Exec. Order § 2(a)(i)(B).

The Executive Order further directs the EAC to "take all appropriate action to cease providing Federal funds to States" that do not accept and use the Federal Form, "including any requirement for documentary proof of United States citizenship adopted pursuant to section 2(a)(ii) of this order." *Id.* § 4(a).

## IV. Burdens of Requiring Documentary Proof of Citizenship for U.S. Citizens Registering to Vote or Updating Their Registration

The Executive Order defines documentary proof of citizenship to include four different types of documents. Exec. Order § 2(a)(ii). Limiting proof of citizenship to these documents would discourage or prevent millions of eligible citizens from registering to vote.

*First*, a voter can use a U.S. passport. But roughly half of Americans lack a valid passport, including more than two-thirds of Black Americans.[4] For citizens who lack one, obtaining a passport takes considerable time and money: it can cost as much as $165, and take up to two months to arrive.[5]

*Second*, the voter can submit "an identification document compliant with the requirements of the REAL ID Act of 2005 (Public Law 109-13, Div. B) that indicates the applicant is a [United States] citizen." Exec. Order § 2(a)(ii)(B). But the REAL ID Act permits States to issue ID cards

---

[4] Ex. 3, Brennan Center for Justice, *House Bill Would Hurt American Voters*, (Jan. 14, 2025), https://perma.cc/HM66-3H6G; Ex. 4, YouGov, *Adults Under 30 Are More Likely Than Older Americans to Have a Current U.S. Passport*, (Aug. 31, 2023), https://perma.cc/5845-LNRK (survey results reflecting that 43% of Americans have a passport); *see* Ex. 5, Declaration of Tyler Sterling ("Sterling Decl.") ¶ 24.

[5] Ex. 6, Bur. of Consular Affairs, *Passport Fees*, U.S. Dep't of State, https://perma.cc/9BDE-2ANH (last visited Apr. 1, 2025); Ex. 7, Bur. Of Consular Affairs, *Get Your Processing Time*, U.S. Dep't of State, https://perma.cc/L988-P8Y5 (last visited Apr. 1, 2025).

to both citizens and non-citizens with "lawful status,"[6] and, in practice, most REAL IDs do not indicate citizenship status.[7] To the extent "enhanced" driver's licenses—an "alternative to a REAL ID" available only to citizens—satisfy the Executive Order's mandate, such licenses are optional, available only in five States, and come at an additional fee.[8]

*Third*, the voter can present "an official military identification card that indicates the applicant is a citizen of the United States." Exec. Order § 2(a)(ii)(C). Like driver's licenses and REAL ID cards, military identification cards do not always indicate citizenship.[9] And, of course, this option does not apply to voters who are ineligible for a military identification card.

*Fourth*, the Executive Order allows the voter to submit another "valid Federal or State government-issued photo identification if such identification indicates that the applicant is a United States citizen or if such identification is otherwise accompanied by proof of United States citizenship." Exec. Order § 2(a)(ii)(D). But it is unclear what "proof of United States citizenship" would be accepted under this subsection. And other potentially applicable documents, such as birth certificates, pose their own set of challenges for would-be voters. For example, roughly 84 percent of married women and six percent of married men in opposite-sex marriages in the United States

---

[6] REAL ID Act § 202(c)(2)(B) (codified at 49 U.S.C. § 30301 (note)); *see also United States v. Alabama*, 691 F.3d 1269, 1299 (11th Cir. 2012) (noting REAL ID Act does not "require that states verify the citizenship" of a "driver's license or identification card" applicant).

[7] *See* Ex. 8, Bay Area News Grp., *Can California's Real ID Be Used as Proof of U.S. Citizenship?*, Mercury News (Jan. 29, 2025), https://perma.cc/LXJ8-8AF3 (explaining REAL IDs are available to non-citizens and cannot be used as proof of citizenship).

[8] Ex. 9, U.S. Dep't of Homeland Security, *Enhanced Drivers Licenses: What Are They?* (Apr. 27, 2023), https://perma.cc/AJ9Z-Y73N (available only in Michigan, Minnesota, New York, Vermont, and Washington); Ex. 10, Vt. Dep't of Motor Vehicles, *Driver's License Fees* (Sep. 5, 2024), https://perma.cc/6Q5N-GS9P (in Vermont, a REAL ID costs $39, while an enhanced driver's license costs $75).

[9] *See, e.g.*, Ex. 11, U.S. Dept. of Defense, Next Generation Uniformed Services ID Card, https://www.cac.mil/Next-Generation-Uniformed-Services-ID-Card/ (last visited Apr. 3, 2025) (reflecting that legacy Uniformed Services ID cards do not indicate citizenship status, that those cards will "remain valid through their expiration date," and that some legacy Uniformed Services ID have an indefinite expiration date); *see also* Ex. 12, Decl. of Sarah Streyder ("Streyder Decl.") ¶ 13.

changed their name when they got married.[10] According to one survey, one third of voting-age women lack documentary proof of citizenship that reflects their current name.[11] Other examples include those of the roughly 1.3 million American adults who identify as transgender who have changed their legal names.[12] And many other U.S. citizens, especially Black citizens, never received a birth certificate because of racially discriminatory laws that limited their ability to access such documentation.[13] Millions of voting-age people born in Puerto Rico lack a valid birth certificate because the Puerto Rico government invalidated the birth certificates of all persons born in Puerto Rico before July 1, 2010.[14]

These burdens will be felt most acutely and immediately in Arizona, which currently prohibits voters from registering to vote in state and local elections absent documentary proof of citizenship.[15] Ariz. Rev. Stat. § 16-166. The Supreme Court has held that to comply with its obligations under the NVRA, Arizona must permit voters to register for federal elections by

---

[10] Ex. 13, Luona Lin, *About 8 in 10 Women in Opposite-Sex Marriages Say They Took Their Husband's Last Name*, Pew Research Center (Sept. 7, 2023), https://perma.cc/UDK5-EXNM.

[11] Ex. 14, Ian Vandewalker, *Analysis: The Effects of Requiring Documentary Proof of Citizenship to Register to Vote*, Brennan Center for Justice (July 19, 2017), https://perma.cc/W2YC-AZPF.

[12] Ex. 15 UCLA School of Law, Williams Institute, *How Many Adults and Youth Identify as Transgender in the United States?* (June 2022), https://perma.cc/S5LV-LVYG.

[13] Ex. 16, Susan J. Pearson, *The Birth Certificate: An American History* at 257, 259 (Nov. 16, 2021); Ex. 17, Betsy L. Fisher, *Citizenship, Federalism, and Delayed Birth Registration in the United States*, 57 Akron L. Rev. 49, 55–58, 65–73 (2024); *see also* Sterling Decl. ¶ 24.

[14] Ex. 18, U.S. Social Security Administration, Program Operations Manual System, *Acceptance of Puerto Rico Birth Certificates*, GN 00301.065 (last updated Oct. 29, 2010), https://perma.cc/5FGD-UDL2; 24 L.P.R.A. § 1325; Ex. 19, Declaration of Frankie Miranda ("Miranda Decl.") ¶ 14.

[15] Arizona's documentary proof-of-citizenship process is less restrictive than what the Executive Order seeks to mandate. In addition to accepting copies of documents similar to those identified in the Executive Order, Arizona law alternatively allows potential voters to provide identification numbers from any of the following documents on their State form: Arizona driver's license or non-operating license issued after October 1, 1996, Alien Registration Number, Naturalization Certificate Number, Citizenship Certificate Number, Indian Census Number, Bureau of Indian Affairs Number, Tribal Treaty Card Number, or Tribal Enrollment Number. *See* Ariz. Rev. Stat. § 16-166(F); Ex. 20, Ariz. Sec'y of State, *Arizona Voter Registration Instructions* (May 2024), https://perma.cc/ULM9-HWQQ. Arizona election officials then use the voter's identification number to verify citizenship status. *Id.* As a result, there are voters in Arizona who can successfully register to vote under State law without having to track down and photocopy actual documents.

submitting the Federal Form, which, as discussed, does not currently require documentary proof of citizenship. *See ITCA*, 570 U.S. at 20; *Mi Familia Vota v. Fontes*, 129 F.4th 691, 703 (9th Cir. 2025). An individual who registers to vote in Arizona using the Federal Form without providing acceptable documentary proof of citizenship is registered as a federal-only voter, and they vote a ballot that includes only federal elections.[16]

A meaningful number of eligible voters in Arizona would likely be at risk of being disenfranchised by the changes that the Executive Order mandates. In the experience of Plaintiffs League of Women Voters of Arizona ("LWVAZ"), League of United Latin American Citizens ("LULAC"), and Arizona Students' Association ("ASA") conducting voter registration events in the State, individuals who have access to documentary proof of citizenship ordinarily provide that information when they initially register to vote so they can participate in *all* elections.[17] Yet, as of January 2, 2025, there were more than 48,000 individuals registered to vote as federal-only voters in Arizona, at least 40,000 of whom did not provide documentary proof of citizenship at the time of their registration.[18] And approximately 200,000 longtime Arizona registered voters are now likely to be reclassified as "federal-only" voters because they did not, in fact, provide documentary proof of citizenship upon registration but were mislabeled due to Arizona's own longstanding errors tracking documentary proof of citizenship.[19] For any Arizonans who lack the requisite documentation, the Executive Order would prevent them from registering as federal-only voters

---

[16] Ex. 21, Ariz. Sec'y of State, *Registration Requirements*, https://azsos.gov/elections/voters/registration-requirements (last visited Apr. 1, 2025).

[17] Ex. 22, Declaration of Pinny Sheoran ("Sheoran Decl.") ¶¶ 23–24; Ex. 23, Decl. of Juan Proaño ("Proaño Decl.") ¶ 45; Ex. 24, Decl. of Kyle Nitschke ("Nitschke Decl.") ¶¶ 3, 5, 7.

[18] Ex. 25, Ariz. Sec'y of State, *Federal Only Registrants as of January 2, 2025* (last visited Apr. 5, 2025), https://perma.cc/N5MV-5PUL.

[19] Ex. 26, Jen Fifield, *Longtime Arizona Voters Receive Letters Asking for Proof of Citizenship*, VoteBeat (Mar. 31, 2025), https://perma.cc/Q99W-W6WF. *See also* Ex. 27, Wayne Schutsky, *Arizona Counties Are Contacting 200,000 Voters Who Haven't Provided Proof of Citizenship*, KJZZ (Apr. 2, 2025), https://perma.cc/F3E5-SP29 (reporting that election officials have been unclear if these 200,000 voters will be changed to federal-only voters if they cannot provide documentary citizenship).

and, as a result, from voting in federal elections. And it would block current federal-only voters from updating their registration to account for changes of address, name, and party affiliation.

## V.     The Executive Order's Impact on Plaintiffs

Plaintiffs are nonpartisan, nonprofit organizations whose core missions and activities center around empowering voters, safeguarding the right to vote, and promoting an accountable democracy through voter education, public outreach, and voter registration. Sterling Decl. ¶¶ 3–4, 8–9, 15; Miranda Decl. ¶¶ 4–6; Sheoran Decl. ¶¶ 5, 8; Proaño Decl. ¶¶ 2, 9–10, 12–14; Streyder Decl. ¶ 3, 5–6, 19; Nitschke Decl. ¶¶ 3–4; Ex. 28, Decl. of Celina Stewart ("Stewart Decl.") ¶¶ 2–4; Ex. 29, Decl. of Thu Nguyen ("Nguyen Decl.") ¶¶ 3, 7–9; Ex. 30, Decl. of Christine Chen, ("Chen Decl.") ¶¶ 3–7. To accomplish their missions, Plaintiffs regularly organize and conduct voter registration events to help eligible citizens register to vote—including using the Federal Form—and educate the public about the importance of voter registration and political participation. Stewart Decl. ¶¶ 4–7; Sheoran Decl. ¶¶ 8–10, 12–13, 21; Miranda Decl. ¶¶ 5–8, 11, 15; Sterling Decl. ¶¶ 8–11; Nguyen Decl. ¶¶ 9–12; Chen Decl. ¶¶ 6–9; Proaño Decl. ¶¶ 9–10, 12–13, 15; Nitschke Decl. ¶¶ 4–5, 7. Each year, Plaintiffs collectively help thousands register to vote. Stewart Decl. ¶ 7; Sheoran Decl. ¶ 13; Miranda Decl. ¶ 15; Nitschke Decl. ¶ 4. In addition to hosting voter registration events, Plaintiffs educate and assist their members in navigating the voter registration process and encourage their members to participate in the political process. Streyder Decl. ¶ 19; Stewart Decl. ¶ 6; Sterling Decl. ¶ 9.

If the EAC enforces § 2(a) of the Executive Order, Plaintiffs' missions and core voter registration activities will be frustrated because Plaintiffs will be unable to register untold numbers of eligible citizens who lack the requisite documentation using the Federal Form. Stewart Decl. ¶¶ 9, 14, 20–22; Sheoran Decl. ¶¶ 16, 25–26, 33; Miranda Decl. ¶¶ 20–21; Sterling Decl. ¶¶ 24–26; Chen Decl. ¶ 12. The core missions and activities of Plaintiffs including the Hispanic Federation, the National Association for the Advancement of Colored People ("NAACP"), and LULAC will be particularly harmed by the Executive Order, because eligible voters in the Black and Latino communities they primarily serve disproportionately lack access to documentary proof of

citizenship. Miranda Decl. ¶¶ 5, 14, 16; Sterling Decl. ¶¶ 7–8, 24; Proaño Decl. ¶¶ 19, 33. Plaintiff Secure Families Initiative's ("SFI") mission will similarly be frustrated because fewer of its members and fewer military family members overall will be able to register to vote. Streyder Decl. ¶ 27.

Section 2(a)'s enforcement will also force Plaintiffs to stop using the Federal Form to register even those potential voters who *do* possess compliant documentation, further frustrating their missions. This is true for three distinct reasons.

*First*, because the Executive Order requires potential voters to submit copies of actual documents showing their citizenship status along with their voter registration form, LWVAZ, LULAC, and other Plaintiffs' members and volunteers would need to collect copies of voters' sensitive personal documents such as passports to assist them. *See, e.g.*, Sheoran Decl. ¶¶ 27–33; Proaño Decl. ¶¶ 20, 48. But LWVAZ, LULAC, and other Plaintiffs lack "the resources or institutional expertise to copy, scan or print these materials, store them securely, and submit them to the proper election authorities all while maintaining the confidentiality of private documents and adhering to all applicable laws." Sheoran Decl. ¶ 32; *see* Proaño Decl. ¶ 49.

*Second*, in the experience of LWVAZ and LULAC volunteers, voters are often appropriately concerned about giving vitally important personal information and sensitive personal documents to any third parties, even trusted voter registration organizations. *See* Sheoran Decl. ¶¶ 28–31; Proaño Decl. ¶ 48. Asking voters to provide copies of such documents would jeopardize LWVAZ's and LULAC's well-earned reputations as trusted organizations and would likely make voters less willing to participate in their registration events. Sheoran Decl. ¶¶ 28–29; Proaño Decl. ¶¶ 42, 48. LWVAZ, for example, does not collect or retain applicants' information from an applicant's voter registration form. Sheoran Decl. ¶¶ 28–29.

*Third*, even if LWVAZ, LULAC, and other Plaintiffs' volunteers were willing to copy registrants' highly sensitive information, they would be unable to advise prospective voters about what types of documentation satisfy the Executive Order because of its ambiguity. Sheoran Decl. ¶ 31; Proaño Decl. ¶¶ 17–18. For example, the Executive Order refers to identification compliant

with "the REAL ID Act of 2005," but most REAL IDs do not denote citizenship. *See supra* at 7–8; Proaño Decl. ¶ 18. The Executive Order's ambiguity regarding military identification poses the same difficulty for Plaintiffs' volunteers, who would be forced to risk giving registrants inaccurate advice—potentially prompting their disenfranchisement—if they used the Federal Form. *See supra* at 8; *see also* Sheoran Decl. ¶ 31; Proaño Decl. ¶ 18.

Enforcement of § 2(a) of the Executive Order will further severely burden Plaintiffs' ability to conduct registration drives more broadly because it will directly impair Plaintiffs' existing methods for registering voters. Sheoran Decl. ¶¶ 16, 25–26, 32–33; Miranda Decl. ¶¶ 11–12; Chen Decl. ¶¶ 10–12, 15–18; Stewart Decl. ¶¶ 11–14, 22; Sterling Decl. ¶¶ 17–19, 24–25; Proaño Decl. ¶¶ 12–16; Nitschke Decl. ¶¶ 5, 13; Nguyen Decl. ¶ 15. For example, Plaintiff Asian Pacific Islander American Vote ("APIAVote"), in partnership with Rock the Vote, has created a national, multilingual voter registration portal based on the Federal Form. Chen Decl. ¶¶ 8–9. That portal enables eligible citizens who speak Bengali, Chinese, Hindi, Ilocano, Japanese, Korean, Tagalog, Thai, Urdu, and Vietnamese to register to vote in compliance with the Federal Form in their primary language. *Id.* ¶ 9. Importantly, APIAVote's portal includes the Federal Form in languages not available from the EAC, such as Ilocano, Thai, and Urdu. *Id.* OCA-Asian Pacific American Advocates ("OCA") relies on APIAVote's platform to register voters. Nguyen Decl. ¶ 10. The League of Women Voters[20] ("LWV" or "the League") also has a website—VOTE411.org—that relies on Rock the Vote's registration portal. Stewart Decl. ¶ 10. As part of its voter registration efforts, Hispanic Federation uses the TurboVote portal, which, like Rock the Vote, is a user-friendly interface with the Federal Form. Miranda Decl. ¶ 19. And NAACP uses a similar portal with a user-friendly interface with the Federal Form, Vote.Org. Sterling Decl. ¶¶ 11–14. However, none of these portals is designed to collect copies of documents showing proof of citizenship, as the Executive Order would require. *See* Chen Decl. ¶ 10; Miranda Decl. ¶ 19; Stewart Decl. ¶ 13;

---

[20] Plaintiff League of Women Voters ("LWV" or "the League") includes its two entities: the League of Women Voters Education Fund ("LWVEF") and the League of Women Voters of the United States ("LWVUS").

Sterling Decl. ¶ 18. As a result, "if the Federal Form is changed to require documentary proof of citizenship, APIAVote's Asian language voter registration portal will be immediately defunct," throttling Plaintiffs' missions and efforts to help Asian American and Pacific Islander communities register to vote. Chen Decl. ¶ 12; *see also* Stewart Decl. ¶ 13; Nguyen Decl. ¶¶ 10, 15; Miranda Decl. ¶ 20 (addressing the same issue with TurboVote): Sterling Decl. ¶¶ 18, 27 (describing the same issue with Vote.Org, used by NAACP).

The impact of enforcing § 2(a) of the Executive Order will be particularly acute for Plaintiffs who operate in Arizona, where an election is imminent. As explained above, Plaintiffs will be unable to use the Federal Form to register eligible Arizona residents who lack documentary proof of citizenship and these eligible Arizona residents will have no method to register to vote. These changes to the Federal Form, therefore, would thwart one of the core missions of the Plaintiff organizations operating in Arizona—to help ensure that every eligible U.S. citizen in Arizona is registered to vote, and can participate in elections. Sheoran Decl. ¶¶ 5, 16, 25–26, 33; Proaño Decl. ¶ 47; Nitschke Decl. ¶¶ 2–3, 12. And that harm will be immediate. In anticipation of the 2025 Special Congressional Election—with the primary scheduled for July 15 and the general election for September 23—LWVAZ and LULAC are planning voter registration events over the next few months before the impending June 16, 2025, voter registration deadline for those elections. Sheoran Decl. ¶¶ 14, 26, 39; Proaño Decl. ¶ 55; *see* Ex. 31, Ariz. Sec'y of State, *2025 Congressional District 7 Special Primary and Special General Election Information: Important Dates*, https://perma.cc/Y6AK-WUKC (last visited Apr. 3, 2025). Similarly, ASA is currently planning spring voter registration activities on Arizona campuses and summer voter registration trainings in advance of the fall general election. Nitschke Decl. ¶¶ 11, 15, 17. These activities are directly impacted by the Executive Orders's announced changes to the Federal Form.

In addition to the direct and irreparable harms that implementation of the Executive Order would inflict on Plaintiffs' core mission and activities, Plaintiffs have already been, and will continue to be, required to divert significant resources to address the mandated changes to the Federal Form. Plaintiffs are already planning to divert resources from existing projects because of

the Executive Order's documentary proof-of-citizenship requirement, which would force Plaintiffs to expend considerable resources in order to, at a minimum: conduct a comprehensive evaluation of what changes the organizations need to implement in voter registration efforts across the country, educate their members and the public on how to comply with such a requirement, and assist the individuals they register to ensure adequate compliance with the Order. Sterling Decl. ¶¶ 16, 19–23, 27; Stewart Decl. ¶¶ 12–13, 15–19, 21; Sheoran Decl. ¶¶ 34–36, 38; Nguyen Decl. ¶¶ 15–16; Chen Decl. ¶¶ 13, 16–18; Miranda Decl. ¶¶ 10, 20–21; Proaño Decl. ¶¶ 13–17, 28; Streyder Decl. ¶¶ 20–26; Nitschke Decl. ¶¶ 13–14.

For example, in response to the Executive Order, Plaintiffs will have to expend resources toward educating their members and the public about the changes in documentary proof-of-citizenship requirements, including by updating their many existing voter registration resources. Stewart Decl. ¶¶ 15–20; Sheoran Decl. ¶¶ 34–36, 38; Sterling Decl. ¶¶ 16, 19–21, 27; Nguyen Decl. ¶¶ 15–16; Chen Decl. ¶¶ 13, 16–18; Miranda Decl. ¶¶ 10, 20; Proaño Decl. ¶¶ 13–17, 28; Streyder Decl. ¶¶ 19–26; Nitschke Decl. ¶ 13. The League will have to overhaul educational materials that it hosts on VOTE411.org—a crucial resource on which thousands of voters rely for trusted bilingual information about registration requirements, registration status checks, and to register to vote—to avoid the harm caused by providing incorrect or incomplete information. Stewart Decl. ¶¶ 13, 15–21. Likewise, to get its Asian language voter registration portal running again, APIAVote will be forced to commit resources to substantially change that portal, both "to instruct registrants to provide documentary proof of citizenship" and "create guides in multiple Asian languages about how to register to vote using state voter registration processes so that it can provide information useful to all AAPI voters, even those without documentary proof of citizenship." Chen Decl. ¶¶ 13, 16. Doing so "will be a burdensome task that will divert resources away from . . . APIAVote's other core activities," including its advocacy efforts to provide "in-language materials to local election officials." *Id.* ¶ 18. Until APIAVote's portal is restored, other organizations that rely on that portal, including OCA, will similarly have to pull resources from their regular, core activities toward developing a new method of registration to replace or

supplement APIAVote's portal. Nguyen Decl. ¶¶ 10, 15–16; *see also* Chen Decl. ¶ 11. The League and LULAC will likewise have to overhaul their online voter registration resources, which currently rely on Rock the Vote and its use of the Federal Form. Stewart Decl. ¶ 21; Proaño Decl. ¶¶ 13–16. Hispanic Federation and NAACP will also have to reevaluate their usage of voter registration portals that rely on the Federal Form. Miranda Decl. ¶ 20; Sterling Decl. ¶ 19.

Similarly, SFI will be forced to overhaul its training and educational resources in response to the Federal Form's documentary proof-of-citizenship requirement. Streyder Decl. ¶¶ 21–22. For example, SFI has not traditionally focused on the distinction between state voter registration forms and the Federal Form in assisting its members who register to vote outside of the Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA") process. Streyder Decl. ¶ 21. The Executive Order will force SFI to develop specific expertise in advising its members on registration using state voter registration options and develop more detailed training and educational materials for its members registering outside of UOCAVA. *Id.* ¶ 21.

To update these and similar resources, Plaintiffs will need to divert resources from other core activities. For example, LWVAZ is a member- and volunteer-run organization with a small number of interns and consultants who are paid hourly, and LWVAZ only has financial resources to pay them for a limited number of hours—meaning time spent by volunteers and paid staff updating training and public information materials is time diverted from LWVAZ's other core work, such as registering voters, preparing information about candidates in upcoming elections, and helping with candidate forums. Sheoran Decl. ¶¶ 11, 34–35; *see also* Proaño Decl. ¶ 55 (LULAC's Arizona Council, comprised of unpaid volunteers, must redirect its limited resources away from "helping community members tackle immigration related challenges, a pressing issue in Arizona given the state's demographics and proximity to the U.S.-Mexico border"). Indeed, some Plaintiffs have already begun to "expend[] significant staff time and resources" to counteract the Executive Order, including by diverting resources away from their regular activities to provide ongoing guidance to staff, canvassers, community partners, members, volunteers, and the public on how the Executive Order will affect voter registration efforts throughout the country. Miranda

Decl. ¶ 10; *see* Stewart Decl. ¶¶ 23, 26; Sheoran Decl. ¶¶ 34–36, 39; Chen Decl. ¶¶ 13, 16–18; Proaño Decl. ¶¶ 24–28, 55; Streyder Decl. ¶¶ 20–26.

This resource drain, too, is particularly harsh in Arizona. For example, many of LWVAZ's member volunteers were very recently trained to conduct voter registration events, including in several trainings in the fall of 2024 after the U.S. Supreme Court issued a stay changing some of the voter registration practices in Arizona. Sheoran Decl. ¶¶ 15, 20, 35. Because of these recent trainings, most current volunteers would now need new training to conduct voter registration events in advance of the 2025 Special Congressional Elections. *Id*. But if there are changes to the requirements of the Federal Form, LWVAZ members and volunteers will need to be retrained in advance of conducting any voter registration events. *Id.* ¶¶ 34–35. LWVAZ will not be able to conduct as many voter registration events because it will have to divert resources away from actual time registering to voters to conduct additional trainings. *Id.* ¶¶ 34–36, 38–39. Similarly, ASA is already diverting time and resources away from upcoming voter registration activities and planning its annual Grassroots Organizing Weekend and Student Voting Summit to focus on retraining staff and volunteers for fall voter registration and "determining how to change [its] operations in response" to the Executive Order. Nitschke Decl. ¶¶ 14–17.

Further, the Executive Order has already and will continue to cause confusion for volunteers and voters (including Plaintiffs' members), harming Plaintiffs' core missions twice over. First, uncertainty regarding the Executive Order's enforcement has already sewn misunderstanding and trepidation among volunteers and members of Plaintiff organizations. Stewart Decl. ¶¶ 23–25; Sheoran Decl. ¶ 38; Nitschke Decl. ¶¶ 8–9; *see* Miranda Decl. ¶¶ 10, 13. Volunteers of Plaintiff organizations are understandably concerned about the specter of collecting copies of sensitive documents that prove voters' citizenship. Stewart Decl. ¶ 24; Sheoran Decl. ¶ 31; Proaño Decl. ¶ 20. Even for individuals willing to help voters navigate the Executive Order's documentary proof-of-citizenship requirement, the ambiguity in what kinds of documentation would satisfy the Order threatens to impair Plaintiffs' work registering voters and force them to divert resources to conduct further research. Sheoran Decl. ¶¶ 31, 34–36; *see* Sterling Decl.

¶¶ 19–21, 27; Miranda Decl. ¶¶ 10, 13; Nitschke Decl. ¶¶ 8, 16. The fear and uncertainty regarding the Order also harms Plaintiffs' recruitment and retention of volunteers, and in turn, their core mission of registering voters. Stewart Decl. ¶ 24; Sheoran Decl. ¶ 38; Proaño Decl. ¶ 21.

Second, voter confusion caused by the Executive Order will make it more difficult for Plaintiffs to register voters, including their own members. Individuals who understand the Executive Order will require them to provide documentary proof of citizenship—which many do not have—will likely be hesitant to register to vote. Stewart Decl. ¶¶ 22, 25; Sheoran Decl. ¶ 37; Nguyen Decl. ¶ 15; Nitschke Decl. ¶¶ 8–9. Not only that, voters hailing from families that are comprised of members with different immigration statuses will likely not register to vote at all using the Federal Form if documentary proof of citizenship is required. Proaño Decl. ¶¶ 50–52. To address this chilling effect, Plaintiffs will be forced to expend additional resources encouraging voter registration. Stewart Decl. ¶¶ 23–24; Sheoran Decl. ¶¶ 34, 36–38; Nguyen Decl. ¶¶ 15–16; Sterling Decl. ¶¶ 19–20; Nitschke Decl. ¶ 16. To dispel voter confusion, Plaintiffs have already begun reformulating voter education materials; this demand will only multiply if the Order takes effect. Stewart Decl. ¶ 15; *see* Chen Decl. ¶ 19; Miranda Decl. ¶¶ 10, 20. And staff and volunteers at Plaintiff organizations have already devoted time to preparing for the Executive Order and educating leaders of local organizations and advocates for impacted communities about its likely effect. Stewart Decl. ¶¶ 23, 26–27; Sheoran Decl. ¶ 39; Miranda Decl. ¶ 10.

## ARGUMENT

A preliminary injunction is appropriate when the plaintiff "establish[es] that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Changji Esquel Textile Co. Ltd. v. Raimondo*, 40 F.4th 716, 721 (D.C. Cir. 2022) (quoting *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008)). "The primary purpose of a preliminary injunction is to preserve the object of the controversy in its then existing condition—to preserve the status quo." *Aamer v. Obama*, 742 F.3d 1023, 1043 (D.C. Cir. 2014) (quotation marks omitted).

Plaintiffs seek preliminary relief because the Executive Order unconstitutionally directs the EAC to take action within 30 days, in a way that has already and will continue to irreparably harm Plaintiffs. To the extent that all Defendants will stipulate to the Court that they do not intend to make any change to the Federal Form relating to documentary proof of citizenship within 30 days, and that they will comply with notice-and-comment and other procedural requirements under the APA, HAVA, NVRA and PRA, Plaintiffs would be willing to withdraw their expedited motion for a preliminary injunction and seek relief on a less urgent timetable. Unless or until such time, however, a preliminary injunction is urgently needed to remediate the ongoing and certainly impending irreparable harms Plaintiffs face due to § 2(a) of the Executive Order.

I.      **Plaintiffs Are Likely to Succeed on the Merits of their Separation of Powers Claim.**

Plaintiffs are likely to prevail on the merits of their claim because the Executive Order violates the constitutional separation of powers. Plaintiffs have "ability to sue to enjoin unconstitutional actions by state and federal officers." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015). Such claims "reflect[] a long history of judicial review of illegal executive action, tracing back to England." *Id.* Thus, Plaintiffs have an equitable cause of action to "enforce separation-of-powers principles" in federal court. *See Boumediene v. Bush*, 553 U.S. 723, 743 (2008); *see Free Enter. Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010) ("[I]t is established practice for this Court to sustain the jurisdiction of federal courts to issue injunctions to protect rights safeguarded by the Constitution.").

A.  **The Executive Order Usurps Power that the Elections Clause Vests in Congress.**

The Constitution's Elections Clause empowers Congress and the States to regulate the "Times, Places, and Manner" of conducting federal elections. *See* U.S. Const. art. I, § 4. The Supreme Court has long recognized that Congress's powers under the Elections Clause are exceedingly broad, "embrac[ing] authority to provide a complete code for congressional elections,' including, as relevant here . . . regulations relating to 'registration.'" *ITCA*, 570 U.S. at 8 (quoting *Smiley v. Holm*, 285 U.S. 355, 366 (1932)).

The President has no role in making rules for federal elections under this carefully constructed "design for the separation of powers." *Immigr. & Naturalization Serv. v. Chadha*, 462 U.S. 919, 946 (1983).[21] Indeed, the Constitution does not permit the President to *make* law at all, but only to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 1; *id.* art. II, § 3; *see Clinton v. City of New York*, 524 U.S. 417, 438 (1998) ("There is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes."). "In the framework of our Constitution, the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587 (1952).

In enacting the NVRA, Congress expressly declined to include a documentary proof-of-citizenship requirement on the Federal Form. *See supra* Background Part II. Instead, Congress determined that the Federal Form should specify the eligibility requirements, "including citizenship," and require voters to sign an attestation that they meet those requirements "under penalty of perjury." 52 U.S.C. § 20508(b)(2). Congress also made clear that the Federal Form may require additional "identifying information" only if that information "is necessary to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process." *Id.* § 20508(b)(1). Congress further prohibited "any requirement for notarization or other formal authentication" to appear on the form. *Id.* § 20508(b)(3). And Congress mandated that any change to the form occur through notice-and-comment rulemaking under the APA, *id.* § 20929, and is subject to the requirements of the PRA, which are impossible to do in the thirty-day timeframe set out in the Executive Order.

Clearly, then, the Executive Order would not simply implement Congress's policy, which is precisely the opposite of what § 2(a) contemplates. *See Youngstown*, 343 U.S. at 588. Rather, the Executive Order usurps Congress's law-making power; it "directs that a presidential policy be

---

[21] In Federalist Papers 59, 60, and 61, Alexander Hamilton explained the careful balance of power that the Constitution struck between States and Congress regarding regulation of elections. In his discussion about election administration across three separate Federalist Papers, Hamilton mentioned no role for the President. The Federalist Nos. 59, 60, 61 (A. Hamilton).

executed in a manner prescribed by the President." *Id.* The Order thus violates the Constitution, which "did not subject this law-making power of Congress to presidential . . . supervision or control." *Id.*

The Executive Order bears the hallmarks of legislation. Like the executive order struck down in *Youngstown*, it contains a "preamble . . . like that of many statutes," which "sets out reasons why the President believes certain policies should be adopted." *Id.* As in *Youngstown*, the Order "proclaims these policies as rules of conduct to be followed," *id.*, in requiring that voters need a citizenship document to register to vote in federal elections using the Federal Form. And the Executive Order, "like a statute, authorizes a government official to promulgate additional rules and regulations . . . needed to carry that policy into execution." *Id.* That is, the Order directs the EAC to take swift action to add a citizenship requirement to the Federal Form.

### B. The Executive Order Unlawfully Purports to Exercise Control over the EAC.

Because the Constitution clearly does not authorize the President to regulate federal elections, the President's assertion of authority to issue the Executive Order can be sustained only if Congress delegated such authority to the President. *See Youngstown*, 343 U.S. at 585. Congress plainly did no such thing.

Given the importance of impartial election rules, Congress has jealously guarded its Elections Clause authority. When Congress has entrusted another entity with responsibility over federal elections, Congress has been careful to make sure that the entity is insulated from the political process—*i.e.*, that the power is delegated to an "independent agency not subject to executive control." *Consumer Energy Council of Am. v. FERC*, 673 F.2d 425, 470 (D.C. Cir. 1982). For example, Congress delegated various powers concerning campaign finance regulation to the FEC, an independent and "inherently bipartisan agency." *Orloski v. FEC*, 795 F.2d 156, 164 (D.C. Cir. 1986).

Congress was likewise careful to ensure that the maintenance of the Federal Form would be insulated from the political process. As mentioned, it first assigned that task to the FEC. *See supra* Background, Section I. Congress then transferred that task to the EAC, which Congress

created to be a bipartisan, "independent entity." 52 U.S.C. § 20921. Congress's decision to assign this responsibility to the EAC is not separable from the agency's congressionally mandated independent status and structure.

Given Congress's decision to entrust sensitive election-related duties only to bipartisan, independent agencies, it is unsurprising that the President does not identify in the Executive Order any federal statute that would authorize him to exercise control over the Federal Form. Instead, the President appears to believe that, regardless of Congress's intention in creating the EAC as a bipartisan, independent agency, the Constitution nevertheless authorizes the President to supervise and control the agency. *Cf.* Ensuring Accountability for All Agencies, 90 Fed. Reg. 10,447 (Feb. 18, 2025). Here, the President attempts to assert that authority over a bipartisan, independent agency to regulate in an area of law that the Constitution specially delegates to Congress and where the record is crystal clear that Congress did not intend the President to have any such authority. He cannot do so.

The Supreme Court has repeatedly affirmed that Congress may create such independent agencies, so long as they are "multimember expert agencies that do not wield substantial executive power." *Seila Law LLC v. Consumer Fin. Protection Bureau*, 591 U.S. 197, 218 (2020) (citing *Humphrey's Executor v. United States*, 295 U.S. 602, 619–20, 624 (1935)) (concerning President's removal powers vis-a-vis the heads of multi-member and single-member independent agencies). Such agencies may be (1) comprised of multiple members; (2) from both political parties; (3) appointed to staggered terms; (4) empowered to act with impartiality; (5) and assigned duties that call for trained judgment and expertise, not political judgment. *See Seila Law*, 591 U.S. at 216. And the D.C. Circuit has specifically blessed the independence of the FEC as a "classic independent regulatory agency sanctioned . . . in *Humphrey's Executor v. United States*, 295 U.S. 602 (1935)." *FEC v. NRA Political Victory Fund*, 6 F.3d 821, 826 (D.C. Cir. 1993).

The EAC is just such a "multimember expert agenc[y] that do[es] not wield substantial executive power." *Seila Law*, 591 U.S. at 218. To start, Congress directed that the EAC would be comprised of four members, appointed to staggered terms by the President upon the

recommendations from majority and minority leadership of Congress, so that it would be bipartisan. 52 U.S.C. § 20923(a). Congress also made clear that—other than regulating the Federal Form—the EAC has no "authority to issue any rule, promulgate any regulation, or take any other action which imposes any requirement on any State or unit of local government." *Id.* § 20929. And even then, the EAC may carry out the limited actions Congress authorized it to take only with consent of at least three of its members, underscoring the importance of partisan balance and Congress's clear directive that the commission exercise nonpolitical judgment. *Id.* § 20928. Further, Congress tasked the EAC with carrying out highly technical duties and mandated that its members must "have experience with or expertise in election administration or the study of elections." *Id.* § 20923(a)(3).[22] Ultimately because the President has no constitutional authority to regulate the Federal Form, the fact that Congress tasked the EAC to do so in a bipartisan manner can in no way "impede the President's ability to perform his constitutional duty." *Morrison v. Olson*, 487 U.S. 654, 691 (1988).

Nevertheless, the President attempts to usurp power that Congress gave the EAC, and further to require that such power be exercised in disregard of all the binding mandates of the NVRA, HAVA, the APA, and the PRA. This is inconsistent with the separation of powers "at the heart of our Constitution," *Buckley v. Valeo*, 424 U.S. 1, 119 (1976), "[t]he fundamental purpose of [which] is to check the extent of power exercisable by any one branch of Government in order to protect the people from oppression." *Consumer Energy Council of Am.*, 673 F.2d at 471. In other words, as Justice Brandeis explained, the Founders adopted the separation of powers to "preclude the exercise of arbitrary power" and, "by means of the inevitable friction incident to the

---

[22] In addition to its duty to develop the Federal Form pursuant to the NVRA, Congress tasked the EAC with the following, highly technical duties: (1) adopting voluntary voting system guidelines; (2) testing, certification, decertification, and recertification of voting system hardware and software; (3) conducting studies and carrying out other activities to promote the effective administration of Federal elections; (4) providing election assistance, including grants for research and development of voting equipment and technology; (5) adopting voluntary guidance on voting systems standards, provisional voting and voting information requirements, and computerized statewide voter registration list requirements and requirements for voters who register by mail; and (6) developing and carrying out the Help America Vote College Program, to assist in programs that encourage students to participate as poll workers. 52 U.S.C. § 20922.

distribution of governmental powers among three departments, to save the people from autocracy." *Myers v. United States*, 272 U.S. 52, 293 (1926) (Brandeis, J., dissenting). Section 2(a) of the Executive Order is irreconcilable with the separation of powers.

Plaintiffs are thus likely to prevail on their claim that § 2(a) is unconstitutional.

## II.     The Remaining Preliminary Injunction Factors Weigh Heavily in Favor of Plaintiffs.

### A.  Plaintiffs Will Be Irreparably Harmed Absent a Preliminary Injunction.

In *League of Women Voters of United States v. Newby*, the D.C. Circuit held that the League suffered irreparable harm due to the addition of a documentary proof-of-citizenship requirement on the Federal Form because it "unquestionably make[s] it more difficult for the League to accomplish their primary mission of registering voters." 838 F.3d 1, 9 (D.C. Cir. 2016). That binding precedent governs this analogous case.

In *Newby*, plaintiffs including the League, several state Leagues, and the Georgia NAACP[23] challenged the EAC's decision to permit Alabama, Georgia, and Kansas to include a documentary proof-of-citizenship requirement on the Federal Form in those States. *Id.* at 6. The League of Women Voters of Kansas ("LWVKS") attested that the requirement harmed their voter registration efforts both because "often potential voters didn't have citizenship documents with them," and "even if they did, the League didn't have the equipment to copy those documents." *Id.* at 8. At the time *Newby* was decided, it was "unclear whether Alabama or Georgia [were] currently enforcing their proof-of-citizenship laws." *Id.* The court found that the Leagues faced irreparable harm due to the proof-of-citizenship requirement in all three States because it had made it harder for LWVKS to register voters and because it was foreseeable that the same would be true for the League of Women Voters of Alabama ("LWVAL") and Georgia ("LWVGA"). *Id.* at 9. The court held that the laws harmed "their primary mission of registering voters," and that the harm was irreparable because once the registration deadline for the next election passed, "there can be no do

---

[23] The Georgia NAACP is a unit of the Plaintiff National NAACP in this above-captioned case.

over and no redress." *Id.* (quoting *League of Women Voters of N.C. v. North Carolina*, 768 F.3d 224, 247 (4th Cir. 2014)).

*Newby* is remarkably like this case. Here, some of the same and similarly situated plaintiffs seek the same relief (a preliminary injunction) against officers of the same agency (EAC) challenging essentially the same unlawful action mandated by this Executive Order: requiring documentary proof of citizenship on the Federal Form. The League and LWVAZ have identified the same harm that existed in *Newby*: they "will be forced to stop registering voters without documentary proof of citizenship" and "will be unable to assist [voters who do have documentary proof of citizenship] with their registration,"[24] both of which "would thwart [the League's] core mission of registering as many eligible voters as possible." Sheoran Decl. ¶¶ 16, 25, 26; Stewart Decl. ¶¶ 9, 14, 22. *Newby* alone mandates a finding of irreparable harm in this case.

Even if this Court independently re-ran the two-part test outlined in *Newby* to assess irreparable harm, it would reach the same result. The first step assesses whether "actions taken by the defendant have perceptibly impaired the organization's programs." *Newby*, 838 F.3d at 8 (quotation marks omitted). As just noted, Defendants' actions have perceptibly impaired and will continue to impair Plaintiffs' core mission: voter registration and education. Sheoran Decl. ¶¶ 16, 25–26, 33–39; Stewart Decl. ¶¶ 21–25; Miranda Decl. ¶¶ 9, 12, 16, 18, 20–21; Chen Decl. ¶¶ 12–14, 16–17; Nguyen Decl. ¶¶ 9, 14–15, Sterling Decl. ¶¶ 17, 19–25; Proaño Decl. ¶¶ 28, 56; Streyder Decl. ¶¶ 20–26; Nitschke Decl. ¶¶ 11, 17. This harm is imminent and indeed "beyond remediation." *Newby*, 838 F.3d at 8 (quotation marks omitted). As Plaintiffs' representatives make clear, they have planned voter registration drives using the Federal Form in advance of the upcoming Congressional Special Election in Arizona. *See* Sheoran Decl. ¶¶ 14, 22, 26, 39; Stewart Decl. ¶ 19; Proaño Decl. ¶ 55; Nitschke Decl. ¶¶ 11, 17. The registration deadline for that election is June 16, 2025—upcoming shortly but beyond the 30-day implementation deadline specified in

---

[24] Plaintiffs do not have the institutional resources or expertise to collect, store, and transmit sensitive personal information contemplated by the Executive Order, such as copies of unredacted passports, without exposing their members to legal liability. *See* Sheoran Decl. ¶ 32.

the Executive Order. And as in elections past, Plaintiffs intend to continue registering voters with the Federal Form for elections to come, beyond the Congressional Special Election.

It is no answer that Plaintiffs may register voters without documentary proof of citizenship in this uncertain interim, prior to any EAC agency action. In *Newby*, the Court found irreparable harm as to LWVAL and LWVGA, even though the Court recognized it was unclear whether documentary proof-of-citizenship requirements were even being enforced in those States, because the irreparable harm was foreseeable. *See* 838 F.3d at 8–9 (noting "a preliminary injunction requires only a *likelihood* of irreparable injury" and "Damocles's sword does not have to actually fall on all appellants before the court will issue an injunction") (emphasis added).

Plaintiffs also meet *Newby*'s second step, which requires that Plaintiffs "must . . . also show that the defendant's actions directly conflict with the organization's mission." *Id.* at 8 (quotation marks omitted). This "second step is required to ensure that organizations cannot engage in activities simply to create an injury." *Id.* Here, as in *Newby*, Defendants' actions directly impede Plaintiffs' voter registration and education activities, which are at the core of their missions. *See* Sheoran Decl. ¶¶ 16, 25–26, 33–39; Stewart Decl. ¶¶ 15, 20–22; Miranda Decl. ¶¶ 12, 16, 18, 20–21; Chen Decl. ¶¶ 12–14, 16–17; Nguyen Decl. ¶¶ 14–15, Sterling Decl. ¶¶ 19, 24–25; Proaño Decl. ¶¶ 12–16; Streyder Decl. ¶¶ 19–26; Nitschke Decl. ¶¶ 12–15. And far from manufacturing injury, Plaintiffs here are engaging in the exact same voter registration and education activities that they engaged in before the Executive Order; the Order threatens to make those activities far less effective, if not impossible, because of the documentary proof-of-citizenship requirement.

*Newby* is not alone: "courts across the country routinely recognize that organizations suffer irreparable harm when a defendant's conduct causes them to lose opportunities to conduct election-related activities, such as voter registration and education." *League of Women Voters of Mo. v. Ashcroft*, 336 F. Supp. 3d 998, 1005 (W.D. Mo. 2018) (collecting cases).[25] This accords with the

---

[25] *See Ind. State Conf. of the NAACP v. Lawson*, 326 F. Supp. 3d 646, 662–63 (S.D. Ind. 2018) (agreeing that conduct that interferes with an organization's voter registration efforts by forcing it to divert resources constitutes irreparable harm); *Project Vote, Inc. v. Kemp*, 208 F. Supp. 3d 1320,

well-grounded observation in *Newby* that plaintiffs can obtain equitable relief for imminent harm without waiting to suffer injury. 838 F.3d at 8–9.

Irreparable harm does not end with Plaintiffs' voter registration efforts. Voters, likely including Plaintiffs' members, *see* Proaño Decl. ¶¶ 31–34; Streyder Decl. ¶¶ 8–18, face irreparable harm from the Federal Form's documentary proof-of-citizenship requirement. This includes Plaintiffs' members in Arizona who will likely be registering to vote prior to the upcoming special election. Proaño Decl. ¶¶ 40–42, 53–55; Streyder Decl. ¶ 18; Nitschke Decl. ¶ 11. As evidenced by the thousands of voters who registered with the Federal Form in Arizona in 2024, Nitschke Decl. ¶ 4, there are meaningful numbers of citizens eligible to vote who likely lack documentary proof of citizenship. And even for citizens who have documentary proof of citizenship, it can often be difficult or costly to locate. *See* Streyder Decl. ¶¶ 12, 14–17; Nitschke Decl. ¶¶ 7–8.

Plaintiffs have thus demonstrated irreparable harm.

## B.    The Remaining Factors Strongly Favor Plaintiffs.

The remaining two preliminary injunction factors—balance of equities and the public interest—weigh heavily in Plaintiffs' favor. "Where the federal government is the opposing party, the balance of equities and public interest factors merge." *Protect Democracy Project, Inc. v. U.S. Dep't of Justice*, 498 F. Supp. 3d 132, 137 (D.D.C. 2020). In practice, a court analyzing these two factors together "must carefully balance the equities by weighing the harm to the moving party

---

1350 (N.D. Ga. 2016) ("conduct that limits an organization's ability to conduct voter registration activities constitutes an irreparable injury"); *Action NC v. Strach*, 216 F. Supp. 3d 597, 642–42 (M.D.N.C. 2016) (finding irreparable harm where organizational "Plaintiffs continue to divert resources to voter registration, sacrificing other voter mobilization and voter education efforts"); *N.C. State Conf. of the NAACP v. N.C. State Bd. of Elections*, No. 16-cv-1274, 2016 WL 6581284, at *9 (M.D.N.C. Nov. 4, 2016) (finding irreparable harm when NAACP "had to divert its finite and limited resources away from its planned voter-protection and education efforts") (quotation marks omitted); *League of Women Voters of Fla. v. Browning*, 863 F. Supp. 2d 1155, 1167 (N.D. Fla. 2012) (holding that the plaintiffs' lost opportunity to register voters is irreparable harm). In another case brought by Plaintiffs Hispanic Federation, NAACP, and the League, the court recognized that injunctive relief must issue where Plaintiffs' "voter registration operations will be substantially interrupted once the challenged provisions take effect." *Fla. State Conf. of Branches & Youth Units of the NAACP v. Byrd*, 680 F. Supp. 3d 1291, 1321 (N.D. Fla. 2023).

and the public if there is no injunction against the harm to the government and the public if there is." *Hanson v. Dist. of Columbia*, 120 F.4th 223, 246 (D.C. Cir. 2024).

Denying an injunction will cause significant harm to both Plaintiffs and the public for several reasons. *First*, an injunction preserves the ability for nonpartisan voter registration organizations to conduct their core duties and register eligible voters to ensure robust political participation in upcoming elections, including in Arizona. As the D.C. Circuit has found, Congress has already "emphasized the importance of the use of the Federal Form in 'organized voter registration programs' held by 'private entities,' as among the 'procedures that will increase the number of eligible citizens who register to vote in elections for Federal office.'" *Newby*, 838 F.3d at 13 (quoting 52 U.S.C. § 20505(b)). As such, any "substantially diminished ability of the League[] to use the Federal Form in voter registration drives . . . runs contrary to what Congress, in enacting the NVRA, declared to be the public interest." *Newby*, 838 F.3d at 13; *see also* Sheoran Decl. ¶¶ 25–26, 33; Stewart Decl. ¶¶ 9, 14, 22; Proaño Decl. ¶¶ 12–17; Nitschke Decl. ¶¶ 12–15.

*Second*, injunctions that respect separation of powers and federal law serve the public interest. "[T]here is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *Newby*, 838 F.3d at 12 (citation and quotation marks omitted); *see also Loving v. I.R.S.*, 917 F. Supp. 2d 67, 81 (D.D.C. 2013).

*Third*, "[t]he public has a 'strong interest in exercising the fundamental political right to vote,'" *Newby*, 838 F.3d at 12 (quoting *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006)), and "the public interest therefore favors permitting as many qualified voters to vote as possible," *id.* (citations, quotation marks, and alterations omitted). The Executive Order's proof-of-citizenship requirement will have a significant disenfranchising effect—both because millions of voters do not have adequate qualifying-citizenship documentation or will have difficulty providing it, *see supra* Background, Section IV, and because the requirement "make[s] it substantially more difficult for groups like the [Plaintiffs] to register otherwise qualified voters," *Newby*, 838 F.3d at 12–13; *see* Sheoran Decl. ¶¶ 25–26, 28–33; Stewart Decl. ¶¶ 9, 14, 22; Miranda Decl. ¶¶ 12, 16, 18, 20–21; Chen Decl. ¶¶ 12–14; Nguyen Decl. ¶¶ 14–15, Sterling Decl. ¶¶ 17–20, 22, 24–25; Proaño Decl.

¶¶ 12–17; Nitschke Decl. ¶¶ 12–15. For example, in one State alone—Kansas—a documentary proof-of-citizenship requirement "abridg[ed] . . . the right to vote" for tens of thousands of registrants seeking to use the Federal Form to register. *Newby*, 838 F.3d at 13.

Granting a preliminary injunction, on the other hand, would pose little-to-no hardship for Defendants or the public. An injunction poses no harm to the EAC or any of its officers because the agency has no independent stake in the President's Executive Order. If anything, granting an injunction benefits the EAC and its officers—both because the Executive Order imposes upon them significant duties and administrative burdens that an injunction would postpone or outright cancel, and because the order infringes on their autonomy as an independent agency.

An injunction simply freezes a status quo that has been in place for years, including during Defendant Trump's first Administration. By definition, "the government cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required." *Luokung Tech. Corp. v. Dep't of Def.*, 538 F. Supp. 3d 174, 195 (D.D.C. 2021) (citations and quotation marks omitted). To the extent any Defendants claim that the Executive Order furthers an interest in preventing non-citizens from voting, there is no indication—in the Executive Order itself or otherwise—that requiring documentary proof of citizenship on the Federal Form will improve election integrity. There is "precious little record evidence" that injunctions against documentary proof-of-citizenship requirements "permit[] fraudulent registration by non-citizens," and thus any "harm to election integrity appears minimal" when courts grant such injunctions. *Newby*, 838 F.3d at 13–14.

### COURT-ORDERED TOPICS

On April 1, 2025, this Court ordered that any parties seeking preliminary relief in this matter should at least address the four following issues:

> (1) the Plaintiffs' standing to pursue each claim and form of relief requested; (2) the source of the Plaintiffs' cause of action for each claim; (3) whether any action challenged under the Administrative Procedure Act is a "final agency action for which there is no other adequate remedy in a court," *see* 5 U.S.C. § 704; and (4) whether the requested remedies are appropriately tailored to the Plaintiffs' specific claim(s), the relevant provision(s) of the President's Executive Order, and the relevant Defendant(s) before the Court.

ECF 15 (No. 25-cv-952). Plaintiffs address these issues, in order, below.

## III. Plaintiffs Have Standing.

To demonstrate standing, Plaintiffs "must show (1) an 'injury in fact,' (2) a sufficient 'causal connection between the injury and the conduct complained of,' and (3) a 'likel[ihood]' that the injury 'will be redressed by a favorable decision.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157–58 (2014) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). Plaintiffs make that showing.

### A. Injury in Fact

An injury in fact must be "(a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1427 (D.C. Cir. 1996) (quoting *Lujan*, 504 U.S. at 560). Plaintiffs establish this requirement in two independent ways.

*First*, the Executive Order's mandate that the EAC require documentary proof of citizenship imminently threatens Plaintiffs' core activities—voter registration and education programming—by making it impossible for them to register voters using the Federal Form. *See supra* Argument, Section II.A. Plaintiffs need not wait until they suffer that harm before going to court. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 435 (2021) (plaintiffs can sue to "prevent the harm from occurring," so long as the "risk of harm is sufficiently imminent and substantial"); *Driehaus*, 573 U.S. at 158 (actual "enforcement action is not a prerequisite to challenging the law"). The Executive Order threatens imminent harm because it demands the EAC act "[w]ithin 30 days of this order [*i.e.*, by April 24, 2025]." *See* Exec. Order § 2(a). The moment it does, Plaintiffs will face substantial harm. As explained *supra*, the D.C. Circuit has already held that this "programmatic injury" is sufficient not only for irreparable harm but also to confer standing. *Newby*, 838 F.3d at 9; *see also supra* Background, Section V; Argument, Section II.A.

*Second*, Plaintiffs are *already* diverting their resources in anticipation of the Order's impending implementation and the various ways it will harm their core mission of registering voters. Stewart Decl. ¶¶ 23–24, 26–27; Miranda Decl. ¶¶ 10, 13; Nitschke Decl. ¶¶ 9, 17; Streyder

Decl. ¶¶ 20, 24. And these declarations further show that the Executive Order's imminent enforcement will require Plaintiffs to divert even more resources in the near future to counteract that harm. *See* Stewart Decl. ¶¶ 16–20, 23–24, 27; Sheoran Decl. ¶¶ 34–38; Miranda Decl. ¶¶ 10, 13, 21; Chen Decl. ¶¶ 16–19; Nguyen Decl. ¶¶ 15–16, Sterling Decl. ¶¶ 16, 19–23, 27; Proaño Decl. ¶¶ 28, 53–56; Nitschke Decl. ¶¶ 13–17; Streyder Decl. ¶¶ 21–23, 25–26. These actual and imminent expenditures satisfy the two-part test that this Court adopted to assess whether an organization's injury is concrete and demonstrable: first, the defendant's action or omission to act must injure the organization's interest, and second, the organization must use its resources to counteract that harm. *Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 485 F. Supp. 3d 1, 19 (D.D.C. 2020) (quotation marks omitted); *see also Travelers United, Inc. v. Hyatt Hotels Corp.*, --- F. Supp. 3d ---, No. 1:23-cv-2776, 2025 WL 27162, at *11 (D.D.C. Jan. 3, 2025) (describing the test employed in these cases as "consistent with the Supreme Court's more recent holding in *Alliance for Hippocratic Medicine*").

Here, Plaintiffs have shown that enforcement of the Executive Order would harm their interests in registering voters by thwarting their ability to use the Federal Form and that, to counteract this harm, Plaintiffs have to divert resources from their other regular activities toward providing new services to continue registering voters—including redeveloping an existing web-based portal to register voters, Chen Decl. ¶¶ 13, 18; translating the shifting voter registration requirements into additional languages for language-minority populations, *id.* ¶¶ 16–17; Nguyen Decl. ¶¶ 11, 15, retraining members and staff on how to lawfully register voters in advance of an imminent voter registration deadline, Sheoran Decl. ¶¶ 34–35 , Nitschke Decl. ¶¶ 13–14, 17; and answering questions from and providing education to potential voters about compliance with the Federal Form, Stewart Decl. ¶¶ 23, 26–27; Miranda Decl. ¶¶ 10, 20; Sterling Decl. ¶¶ 19–21; Streyder Decl. ¶¶ 21–22. The record here shows that Defendants' "conduct prompted the plaintiff organizations to divert resources toward providing additional *direct services* designed to offset the harmful effects of the challenged conduct," which suffices to establish injury in fact. *Travelers United*, 2025 WL 27162 at *10. Those direct services are analogous to ones provided by the

plaintiffs in *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 368–79 (1982)—while the *Havens* plaintiffs provided housing counseling, Plaintiffs' core business here is providing *voting* counseling in the form of voter registration assistance and other services. *See Food and Drug Administration v. Alliance for Hippocratic Medicine* ("*AHM*"), 602 U.S. 367, 395 (2024) (relying on *Havens* in explaining that an organization suffers a cognizable injury when a defendant's actions have "directly affected and interfered with [the plaintiff organization's] core business activities").

Separately, several Plaintiffs have established standing on behalf of their members because "(1) [their] members would otherwise have standing to sue in their own right; (2) the interests [they] seek[] to protect are germane to the organization[s'] purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588, 596 (D.C. Cir. 2015) (quotation marks omitted).

Here, there is no question that many members of Plaintiff organizations would have individual standing to sue. First, some members will be unable to register to vote because of the documentary proof-of-citizenship requirement. Proaño Decl. ¶¶ 31–33; Streyder Decl. ¶¶ 8–13; Nitschke Decl. ¶¶ 7–9. That harm is especially stark for those who will be unable to register before the June 16 registration deadline preceding this summer's congressional primary election in Arizona, including those who may relocate to Arizona in the near future and cannot register earlier. *See* Nitschke Decl. ¶¶ 7, 11; Streyder Decl. ¶ 18; *see, e.g.*, *Mi Familia Vota*, 129 F.4th at 708–09 (membership organization had associational standing because Arizona law put members' right to vote at risk); *Fla. State Conf. of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1163–64 (11th Cir. 2008) (plaintiffs had associational standing because, based on number of voters likely affected by State law, "at least one member face[d] a realistic danger of having his or her application rejected"). Even those who can obtain the documentary proof of citizenship in time to register will be harmed because they will have to spend money and/or time obtaining or locating the necessary documents, or they will face uncertainty and confusion about what they need to obtain. *See* Nitschke Decl. ¶¶ 9–11; Streyder Decl. ¶¶ 14–17. Further, countless members who tirelessly work to register

voters will be harmed because they will be unable to register many voters who are prevented from registering due to the documentary proof-of-citizenship requirement. *See* Nitschke Decl. ¶¶ 7, 11–12. Nor is there any question that the interests Plaintiffs seek to protect in this lawsuit are germane to their organizational purposes—in their everyday work, Plaintiffs seek to register voters and to ensure that their members are registered so that more people have a voice in American democracy, and this lawsuit seeks to maintain their ability to do that. *See* Nitschke Decl. ¶ 3; Streyder Decl. ¶¶ 5, 19, 27.[26]

### B. Causation and Redressability

Causation and redressability are closely tied but still distinct: "causation focuses on the connection between the assertedly unlawful conduct and the alleged injury whereas redressability focuses on the connection between the alleged injury and the judicial relief requested." *West v. Lynch*, 845 F.3d 1228, 1235–36 (D.C. Cir. 2017) (quotation marks omitted). The harms that Plaintiffs face from the documentary proof-of-citizenship requirement are traceable to the two sets of Defendants: (1) "the President [who] enacted the [Executive Order]," and (2) the federal agency and officers, sued in their official capacity, "tasked with implementing the [Executive Order]." *Young v. Trump*, 506 F. Supp. 3d 921, 935 (N.D. Cal. 2020).

Plaintiffs' injuries would be redressed by the relief they seek. Plaintiffs requested two types of relief: injunctive and declaratory. They seek injunctive relief against the EAC and its officers, not the President. An injunction preventing the EAC and its officers from acting pursuant to the Order to implement the documentary proof-of-citizenship requirement would redress Plaintiffs' harms from those injuries. Plaintiffs also seek declaratory judgment against all Defendants. The Supreme Court has held that a declaratory judgment against high-level executive officials can redress a plaintiff's injuries in lieu of injunctive relief, in large part because "it is substantially

---

[26] Nor is there any reason individual members of Plaintiff organizations need to participate in this lawsuit individually—many members are similarly situated and similarly harmed by the documentary proof-of-citizenship requirement. *See Ctr. for Sustainable Econ.* 779 F.3d at 597 ("Member participation is not required where a suit raises a pure question of law and neither the claims pursued nor the relief sought require the consideration of the individual circumstances of any aggrieved member of the organization.") (quotation marks omitted).

likely that the President and other executive and congressional officials would abide by an authoritative interpretation of the . . . statute and constitutional provision [in question] by the District Court, even though they would not be directly bound by such a determination." *Franklin v. Massachusetts*, 505 U.S. 788, 803 (1992); *see also Utah v. Evans*, 536 U.S. 452, 460–61 (2002).

## IV. Plaintiffs Have an Equitable Cause of Action.

As discussed in detail *supra* at 19, Plaintiffs have an equitable cause of action to "sue to enjoin unconstitutional actions by . . . federal officers." *Armstrong*, 575 U.S. at 327; *see Boumediene*, 553 U.S. at 743 (plaintiffs "litigating in [federal] courts can seek to enforce separation-of-powers principles"); *see also Free Enter. Fund*, 561 U.S. at 491 n.2.

## V. Plaintiffs Do Not Assert APA Claims as a Basis for Injunctive Relief.

Plaintiffs do not move for injunctive relief on the basis of any APA claims at this juncture. LWV Plaintiffs have brought no APA claims at all in this litigation; LULAC Plaintiffs do not rely on such claims at this juncture and instead rely only on their equitable cause of action.

## VI. Plaintiffs' Requested Remedy is Proper.

Plaintiffs' motion is limited to § 2(a)'s mandate that the EAC take action to add a documentary proof-of-citizenship requirement to the Federal Form by April 24, 2025. Plaintiffs have amply documented how that requirement threatens imminent and irreparable harm to their core activity of registering voters. It has also caused and will continue to cause Plaintiffs to divert resources and endure programmatic injury to counteract that harm. To prevent that injury, Plaintiffs seek a preliminary injunction against enforcement of § 2(a). Plaintiffs request that the injunction barring implementation of § 2(a)'s mandate run against the EAC, its Commissioners, and Executive Director. That relief is proper because "'[r]eview of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive.'" *Chamber of Com. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996) (quoting *Franklin*, 505 U.S. at 815 (Scalia, J., concurring in part and concurring in the judgment)). Indeed, this Court can "compel subordinate executive officials to disobey illegal Presidential commands." *Id.* (quoting *Soucie v. David*, 448 F.2d 1067, 1072 n.12 (D.C. Cir. 1971)).

Plaintiffs do not seek a preliminary injunction against President Trump. He nonetheless is a proper defendant because Plaintiffs may obtain declaratory relief against him. *See, e.g.*, *Nat'l Treasury Emps. Union v. Nixon*, 492 F.2d 587, 616 (D.C. Cir. 1974) (court had jurisdiction to issue writ of mandamus against the President but "opt[ed] instead" to issue declaration).

## CONCLUSION

Plaintiffs respectfully request that the Court preliminarily enjoin the implementation of § 2(a) of the Executive Order.

Dated: April 7, 2025                            Respectfully submitted,

                                                */s/ Megan C. Keenan*
Wendy R. Weiser*                                Megan C. Keenan (D.C. Bar No. 1672508)
Sean Morales-Doyle*                             Sarah Brannon**** (D.C. Bar No. 90024493)
Eliza Sweren-Becker*                            Adriel I. Cepeda Derieux** (D.C. Bar No.
Jasleen K. Singh*                               90026636)
BRENNAN CENTER FOR JUSTICE AT                   Jacob Van Leer (DC Bar No. 1742196)
NYU SCHOOL OF LAW                               AMERICAN CIVIL LIBERTIES UNION
120 Broadway, Suite 1750                        FOUNDATION
New York, NY 10271                              915 15th St. NW
(646) 292-8310                                  Washington, DC 20001
weiserw@brennan.law.nyu.edu                     (740) 632-0671
morales-doyles@brennan.law.nyu.edu              mkeenan@aclu.org
sweren-beckere@brennan.law.nyu.edu              sbrannon@aclu.org
singhj@brennan.law.nyu.edu                      acepedaderieux@aclu.org
                                                jvanleer@aclu.org
Leah C. Aden**
John S. Cusick**                                Sophia Lin Lakin*
Brenda Wright**                                 Ethan Herenstein*
NAACP LEGAL DEFENSE &                           Jonathan Topaz*
EDUCATIONAL FUND, INC.                          Clayton Pierce*
40 Rector Street, 5th Floor                     Davin Rosborough*
New York, NY 10006                              AMERICAN CIVIL LIBERTIES UNION
(212) 965-2200                                  FOUNDATION
laden@naacpldf.org                              125 Broad St., 18th Floor
jcusick@naacpldf.org                            New York, NY 10004
bwright@naacpldf.org                            (212) 549-2500
                                                slakin@aclu.org
Miranda Galindo**                               eherenstein@aclu.org
Cesar Z. Ruiz**                                 jtopaz@aclu.org
                                                cpierce@aclu.org

Delmarie Alicea**
LATINO JUSTICE PRLDEF
475 Riverside Drive, Suite 1901
New York, NY 10115
(212) 392-4752
mgalindo@latinojustice.org
cruiz@latinojustice.org
dalicea@latinojustice.org

drosborough@aclu.org

Michael Perloff (D.C. Bar No. 1601047)
Scott Michelman (D.C. Bar No. 1006945)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
OF THE DISTRICT OF COLUMBIA
529 14th Street NW, Suite 722
Washington, D.C. 20045
(202) 457-0800
mperloff@acludc.org
smichelman@acludc.org

Niyati Shah (D.C. Bar No. 1659560)
Alizeh Ahmad (D.C. Bar No. 90018919)
ASIAN AMERICANS
ADVANCING JUSTICE-AAJC
1620 L Street, NW, Suite 1050
Washington, D.C. 20036
(202) 296-2300
nshah@advancingjustice-aajc.org
aahmad@advancingjustice-aajc.org

*Counsel for Plaintiffs League of Women Voters
Education Fund, League of Women Voters of
the United States, League of Women Voters of
Arizona, Hispanic Federation, National
Association for the Advancement of Colored
People, OCA-Asian Pacific American
Advocates, and Asian and Pacific Islander
American Vote*

*Admitted pro hac vice
**Application for pro hac vice admission
forthcoming
*** D.D.C. application pending
****Application for D.D.C. admission
forthcoming*

/s/ Norman L. Eisen
Norman L. Eisen (D.C. Bar No. 435051)
Tianna J. Mays (D.C. Bar No. 90005882)**
Pooja Chaudhuri (D.C. Bar No. 888314523)
STATE DEMOCRACY DEFENDERS FUND
600 Pennsylvania Avenue SE #15180
Washington, D.C. 20003
(202) 601-8678
norman@statedemocracydefenders.org
tianna@statedemocracydefenders.org
pooja@statedemocracydefenders.org

*Counsel for Plaintiffs League of United Latin American Citizens, Secure Families Initiative, and Arizona Students Association*

**Application for pro hac vice admission forthcoming*
*** *D.D.C. application pending*
****Application for D.D.C. admission forthcoming*

/s/ Danielle Lang
Danielle Lang (DC Bar No. 1500218)
Jonathan Diaz (DC Bar No. 1613558)
Robert Brent Ferguson (DC Bar No. 1782289)***
Anna Baldwin (DC Bar No. 998713)***
Heather Szilagyi (DC Bar No. 90006787)
Benjamin Phillips (DC Bar No. 90005450)****
CAMPAIGN LEGAL CENTER
1101 14th St. NW, Suite 400
Washington, D.C. 20005
(202) 736-2200
dlang@campaignlegalcenter.org
jdiaz@campaignlegalcenter.org
bferguson@campaignlegalcenter.org
abaldwin@campaignlegalcenter.org
hszilagyi@campaignlegalcenter.org
bphillips@campaignlegalcenter.org