# Exhibit 1

**Civil Action No. 25-0955 (CKK)**



**U. S. ELECTION ASSISTANCE COMMISSION**
1335 East West Highway, Suite 4300
Silver Spring, MD 20910

# MEMORANDUM OF DECISION CONCERNING STATE REQUESTS TO INCLUDE ADDITIONAL PROOF-OF-CITIZENSHIP INSTRUCTIONS ON THE NATIONAL MAIL VOTER REGISTRATION FORM (DOCKET NO. EAC-2013-0004)

The United States Election Assistance Commission (hereinafter "EAC" or

"Commission") issues the following decision with respect to the requests of Arizona, Georgia,

and Kansas (hereinafter, collectively, "States") to modify the state-specific instructions on the

National Mail Voter Registration Form ("Federal Form").  Specifically, the States request that

the EAC include in the applicable state-specific instructions on the Federal Form a requirement

that, as a precondition to registering to vote in federal elections in those states, applicants must

provide additional proof of their United States citizenship beyond that currently required by the

Federal Form.  For the reasons set forth herein, we deny the States' requests.[1]

## I.   INTRODUCTION

### A.   State Requests

#### 1.   Arizona

In 2004, Arizona voters approved ballot Proposition 200 amending Arizona's election

laws, as relevant here, by requiring voter registration applicants to furnish proof of U.S.

citizenship beyond the attestation requirement of the Federal Form.  Ariz. Rev. Stat. Ann. § 16-

---

[1] As explained below, this decision follows a court order in *Kobach v. EAC*, No. 5:13-cv-4095 (D. Kan. Dec. 13, 2013) remanding the matter to the agency and a subsequent request for public comment.  The undersigned Acting Executive Director has determined that the authority exists to act on the requests and therefore issues this decision on behalf of the agency.

166(F).  According to the state law, a county recorder must "reject any application for registration that is not accompanied by satisfactory evidence of United States citizenship."  *Id.*

On March 6, 2006, the Commission, acting through its Executive Director, denied Arizona's original 2005 request to include additional proof of citizenship instructions on the Federal Form, finding, *inter alia*, that the form already required applicants to attest to their citizenship under penalty of perjury and to complete a mandatory checkbox indicating that they are citizens of the United States.  EAC000002-04.  Further, the Commission observed that Congress itself had found that a documentary proof-of-citizenship requirement was "not necessary or consistent with the purposes of" the National Voter Registration Act ("NVRA").  *Id.*

In July 2006, after receiving several letters of protest from Arizona's Secretary of State, the EAC's then-chairman requested that the EAC commissioners accommodate the State by reconsidering the agency's final decision and granting Arizona's request.  EAC000007-08, EAC00000011, EAC00000013-14.  On July 11, 2006, the EAC commissioners denied the chairman's motion for an accommodation by a tie vote of 2-2.  EAC000010.[2]

Subsequently, Arizona refused to register Federal Form applicants who did not provide the documentation required by Proposition 200.  Private parties filed suit against Arizona, challenging Arizona's compliance with the NVRA.  In June 2013, the Supreme Court ruled that the NVRA preempts inconsistent state law and states must accept and use the Federal Form to register voters for federal elections without requiring any additional information not requested on the Form.  *Arizona* v. *Inter Tribal Council of Arizona, Inc.,*__ U.S. __, 133 S. Ct. 2247, 2253-60 (2013) (hereinafter "*Inter Tribal Council*").  The Court further stated, "Arizona may, however,

_____

[2] Arizona did not seek to challenge the EAC's final decision on the 2006 request under the APA, and the time for doing so has now expired. *See* 28 U.S.C. § 2401(a).

request anew that the EAC include such a requirement among the Federal Form's state-specific instructions, and may seek judicial review of the EAC's decision under the Administrative Procedure Act." *Id*. at 2260.

On June 19, 2013, Arizona's Secretary of State again requested that the EAC include state-specific instructions on the Federal Form relating to Arizona's proof-of-citizenship requirements.  On July 26, 2013, Arizona's Attorney General submitted a follow-up letter in support of the state's request.  EAC000034-35; EAC000044-46.  In a letter dated August 13, 2013, the Commission informed Arizona that its request would be deferred until the reestablishment of a quorum of EAC commissioners, in accordance with the November 9, 2011, internal operating procedure issued by the EAC's then-Executive Director, Thomas Wilkey ("Wilkey Memorandum").  EAC000048.  That memorandum set forth internal procedures for processing state requests to modify the state-specific instructions on the Federal Form, instructing that "[r]equests that raise issues of broad policy concern to more than one State . . . be deferred until the re-establishment of a quorum [of EAC commissioners]."  EAC000049-50.

### 2. Georgia

By letter dated August 1, 2013, Georgia's Secretary of State requested, *inter alia*, that the EAC revise the Georgia state-specific instructions of the Federal Form due to a 2009 Georgia law that requires voter registration applicants to provide "satisfactory evidence of United States citizenship so that the board of registrars can determine the applicant's eligibility."  EAC001856-57; Ga. Code Ann. § 21-2-216(g).  The Commission responded to Georgia's request on August 15, 2013, by informing the state that its request would be deferred in accordance with the Wilkey Memorandum.  EAC001859-60.

3.    **Kansas**

On August 9, 2012, Kansas's Election Director requested, *inter alia*, that the EAC

provide an instruction on the Federal Form that "[a]n applicant must provide qualifying evidence

of U.S. citizenship prior to the first election day after applying to register to vote."  EAC000099;

Kan. Stat. Ann. § 25-2309(*l*).  The EAC responded to the state by letter dated October 11, 2012,

indicating that a decision on Kansas's request regarding proof of citizenship would be deferred in

accordance with the Wilkey Memorandum.  EAC000101-02.

On June 18, 2013, after the Supreme Court decision in *Inter Tribal Council*, Kansas

Secretary of State Kris Kobach renewed the state's August 9, 2012, request to provide an

instruction on the Federal Form regarding the state's proof of citizenship requirements.

EAC000103.  In a follow-up August 2, 2013 letter, Mr. Kobach clarified that he had instructed

county election officials to accept the Federal Form without proof of citizenship, but that those

registrants would be eligible to vote only in federal elections.  EAC000112-13.  The EAC again

deferred Kansas's request in accordance with the Wilkey Memorandum.  EAC000116-17.

Kansas and Arizona subsequently filed suit against the EAC in the United States District

Court for the District of Kansas, challenging the EAC's deferral of these requests.  *See Kobach*

v. *EAC,* No. 5:13-cv-4095 (D. Kan. filed Aug. 21, 2013).  On December 13, 2013, the district

court remanded the Kansas and Arizona matters to the EAC with instructions to render a final

agency action by January 17, 2014.[3]  The Georgia request is not part of this pending federal

---

[3] Although the EAC's Executive Director had been delegated the authority to act for the Commission in responding to the States' requests, the current Acting Executive Director initially followed her predecessor's internal operating procedure (i.e., the Wilkey Memorandum), which stated that such requests should be deferred until there was a quorum of commissioners available to provide additional policy guidance.  The Acting Executive Director believed that deferring the requests in accordance with the Wilkey Memorandum was the prudent course, and in the pending litigation the Commission argued that the district court should give deference to her decision.  The district court determined that the Commission had unreasonably delayed in deciding Arizona's and Kansas's requests and therefore directed the Commission to take final action on those requests by January 17, 2014.

4

court litigation; however, as it presents similar issues, the Commission proceeds to take final action on that request as well.

### B.   Summary of Public Comments

On December 19, 2013, the EAC issued a Notice and Request for Public Comment ("Notice") on the Arizona, Georgia, and Kansas requests.  EAC210-11; 78 Fed. Reg. 77666 (Dec. 24, 2013).  The Commission also emailed its public comment request to its list of NVRA stakeholders and published the Notice on its website.  In response to its request, the Commission received 423 public comments:  one on behalf of the Arizona Secretary of State, one from the Kansas Secretary of State, twenty-two from public officials at thirteen different agencies at various levels of government, 385 from individual citizens, four from the groups of individuals and advocacy organizations that intervened in the pending lawsuit, and ten from other advocacy groups.[4]  Neither the Georgia Secretary of State nor any other Georgia state official submitted comments.

### 1.   Arizona submission

The Office of the Solicitor General for the State of Arizona submitted Arizona's comments in support of its request to add Arizona's documentary proof of citizenship requirements to its state-specific instructions on the Federal Form.  EAC001700-02.  Arizona included in its submission:  Proposition 200, the initiative passed by the Arizona electorate establishing the voter registration citizenship requirements at issue here, EAC001626-30; the 2004 official canvassing showing the percentage of the electorate that voted in favor of Proposition 200, EAC001632-49; and the district court's findings of fact and conclusions of law

---

[4] The above count excludes one comment which was a prank and three sets of supporting documents that were uploaded as separate comments.  Thus, the website through which the public commenting process is managed shows a total of 427 comments received.  See http://www.regulations.gov/#!documentDetail;D=EAC-2013-0004-0001.

in *Gonzales v. State of Arizona*, Civ. Action No. 06-128 (D. Ariz. Aug. 20, 2008) (ECF No. 1041) (district court case culminating in *Arizona v. ITCA*), denying a permanent injunction against the enforcement of Arizona's documentary proof of citizenship requirements, EAC001651-99.  Arizona also submitted declarations of various Arizona state and county officials purporting to demonstrate the undue burden that would result from the maintenance of a dual voter registration system (i.e., maintaining separate voter registration lists for federal elections and state elections), which Arizona argues would be required by Arizona law if the EAC does not accede to Arizona's request, and instances in which the Arizona officials indicate they determined that non-citizens had registered to vote, or actually had voted.  EAC001703-48. Finally, Arizona submitted documents showing that the Department of Defense Federal Voting Assistance Program granted Arizona's request to add Arizona's documentary proof of citizenship requirements to the Federal Post Card Application, a voter registration and absentee ballot application created under the Uniformed and Overseas Citizens Absentee Voting Act. EAC001749-1802.

### 2. Kansas submission

The Kansas Secretary of State reiterated Kansas's request that the EAC include the state's documentary proof of citizenship requirements on the Federal Form, based on the Secretary's view that under the Supreme Court's decision in *Inter Tribal Council,* the EAC has a non-discretionary duty under the U.S. Constitution to do so.  EAC000563-65; EAC000578-610. Kansas provided affidavits and supporting documents from various state and local election officials that purport to demonstrate the number of non-citizens who illegally registered to, and did, vote in Kansas elections and to support Kansas's position that additional proof of citizenship is necessary to enforce its voter qualification requirements.  EAC000611-68.  Kansas further

argued that unless the EAC adds the requested language to the Federal Form, the state will be required to implement a costly dual registration system.

### 3.   *Kobach v. EAC* intervenor submissions

The four groups of individuals and advocacy organizations that intervened as defendants in the pending litigation each submitted public comments in response to the EAC's Notice. EAC000710-20, EAC000723-51, EAC000754-887 (League of Women Voters group); EAC000910-1256, EAC001260-1542 (Valle del Sol group); EAC001809-26 (Project Vote); EAC001546-94 (ITCA group).  The League of Women Voters and Valle del Sol groups argued that the EAC lacks authority to grant the states' requests because it lacks the requisite quorum of commissioners.  The Valle del Sol and Project Vote groups argued that the requested changes were inconsistent with the NVRA's purpose and that the states had not demonstrated a need for additional proof of citizenship to prevent fraudulent registrations.  Project Vote contended that the documentary requirements would burden voter registration applicants, reduce the number of eligible voters, and violate the NVRA's prohibition on formal authentication of eligibility requirements.  The Inter Tribal Council of Arizona group conceded that the EAC has authority to grant or deny the states' requests, but agreed with the other intervenor-defendant groups that the states have not demonstrated the necessity for their instructions because they have other means of verifying voter eligibility.

### 4.   Other advocacy group submissions

Of the ten comments from advocacy groups that have not intervened in the pending litigation, four supported and six opposed the states' requests.  True the Vote cited to voter registration processes in Canada and Mexico to support its claim that the instructions at issue are necessary for the states to assess voter eligibility and suggested that the requested state-specific instructions would lead to greater perceived legitimacy in the electoral process.  EAC000707-09.

Similarly, Judicial Watch argued that if the EAC failed to update the form, it would undermine Americans' confidence in the fairness of U.S. elections and thwart states' ability to comply with the provisions of Section 8 of the NVRA regarding maintenance of voter rolls.  EAC000474-80. Judicial Watch and the Federation for American Immigration Reform both suggested that the denial of the states' requests would hinder individual states' ability to maintain the integrity of elections.  EAC001605-09.  The Immigration Reform Law Institute argued that the EAC should grant the states' requests because, in its view, the Supreme Court ruling in *Inter Tribal Council* requires it to do so.  EAC001543-45.

The ACLU was one of seven non-intervenor advocacy groups that opposed the states' requests.  It argued that the documentation requirement would be overly burdensome, would violate the NVRA, and would discourage voter registration.  EAC000888-96.  The Asian American Legal Defense and Education Fund argued that Arizona, Georgia, and Kansas have histories of discrimination against Asian Americans, and argued that the true intent of the states' laws was to disenfranchise eligible citizens.  EAC001598-1603.  The Coalition of Georgia Organizations contended that the additional requirements would make the registration process harder instead of simplifying it, as they contend the NVRA intended.  EAC001838-40.

Communities Creating Opportunity argued that the proposed requirement would adversely impact vulnerable and marginalized communities (low-income and people of color) the most.  Further, the group asserted that the requested change would be costly and unnecessary, and would complicate, delay, and deter participation in the electoral process.  EAC000699-700. Demos pointed to the decrease in voter registration since the enactment of Arizona's Proposition 200 and contended that the requested instructions would impair community voter registration drives by requiring documents that many citizens do not generally carry with them and may not

8

possess at all.  EAC000900-07.  The League of United Latin American Citizens ("LULAC") shares that view and cited data purporting to show the small number of voter fraud cases between 2000 and 2011 in Arizona compared to the millions of ballots cast in that timeframe.  EAC000701-03.

### 5.     State and local official submissions

Officials from Arizona's Apache (EAC000560-61), Cochise (EAC000218), Mohave (EAC000226-34) and Navajo (EAC000219) counties and Kansas's Ford (EAC000220), Harvey (EAC000421-23), Johnson (EAC001831-33) and Wyandotte (EAC001258-59) counties urged the EAC to grant the States' requests.  Angie Rogers, the Commissioner of Elections for the Louisiana Secretary of State, supported the States' requests because she believes states have "the constitutional right, power and privilege to establish voting qualifications, including voter registration requirements[.]"  EAC000216.

Rep. Martin Quezada of the Arizona House of Representatives and defendant-intervenor Sen. Steve Gallardo of the Arizona State Senate opposed Arizona's request because they contend that the warnings and advisories contained on the Federal Form already deter non-citizens from voting, that there is no evidence of voter registration fraud, and that the requirement for additional proof of citizenship would burden citizens who do not possess the documents and would contravene the NVRA's goal of creating a uniform, national voter registration process.  EAC000704-05; EAC001618-21.  Mark Ritchie, the Minnesota Secretary of State, asserted that some senior citizens in Minnesota do not have and cannot obtain proof of citizenship, that the expense of obtaining relevant documents might be tantamount to a poll tax, and that implementing the States' proposals in his state would make it more difficult for citizens to register and could be an equal protection violation.  EAC001804.  U.S. Representative Robert Brady of Pennsylvania argued that the States' requests are an attempt to disenfranchise eligible

voters and that the Federal Form already adequately requires applicants to affirm their citizenship.  EAC001595.

### 6.    Individual citizen submissions

Of the 385 citizen comments, the vast majority of which were made by Kansas residents, 372 were in favor of the States' requests.  Several respondents expressed "high support" for the requests as crucial to preventing voter fraud, and argued that failure to grant the requests would create "havoc" in future elections, presumably because the States may be required to create separate registration databases for federal and state registrants.  Others argued that the right to vote should not be hindered by what they consider incorrect and outdated state-specific instructions.  Other citizens expressed the desire for elections to be orderly and their view that the EAC's denial of the States' requests would violate what they believe is the States' exclusive power to set voter qualifications.  Hans A. von Spakovsky, an attorney, former member of the Federal Election Commission, and former local election official in Fairfax County, Virginia, argued that the EAC has no authority to refuse to approve state-specific instructions that deal with the eligibility and qualification of voters and that extant citizenship provisions on the Federal Form have been ineffective in discouraging non-citizens from illegally registering and voting.  EAC000680-85.

Thirteen citizen commenters opposed the States' requests because they believed that the proposals were unconstitutional, would limit and suppress the vote of certain classes of disadvantaged Americans, would make the voting process more restrictive, would discourage legitimate voters from voting, and were otherwise unnecessary.

## II.    CONSTITUTIONAL, STATUTORY, AND REGULATORY BACKGROUND

### A.    Constitution

The Qualifications Clause of the United States Constitution, Art. I, § 2, cl. 1, provides

that in each state, electors for the U.S. House of Representatives "shall have the Qualifications

requisite for Electors of the most numerous Branch of the State Legislature."  *See also* U. S.

Const. amend. XVII (same for the U.S. Senate).  This clause and the Seventeenth Amendment

long have been held to give exclusive authority to the states to determine the qualifications of

voters for federal elections.  *Inter Tribal Council*, 133 S. Ct. at 2258.

By contrast, the Elections Clause of the Constitution provides that "[t]he Times, Places

and Manner of holding Elections for Senators and Representatives, shall be prescribed in each

State by the Legislature thereof; but the Congress may at any time by Law make or alter such

Regulations, except as to the Places of chusing Senators."  U.S. Const. art. I, § 4, Cl. 1.  In *Inter*

*Tribal Council*, the Supreme Court held that the Election Clause's "substantive scope is broad."

*Inter Tribal Council,* 133 S. Ct. at 2253.  "'Times, Places, and Manner,' [the Supreme Court has]

written, are 'comprehensive words,' which 'embrace authority to provide a complete code for

congressional elections,' including, *as relevant here . . . regulations relating to 'registration*.'"

*Id.* at 2253 (quoting *Smiley v. Holm,* 285 U.S. 355, 366 (1932) (emphasis added)).  Thus, in its

latest decision on the Elections Clause, the Supreme Court reaffirmed its long held determination

that the Elections Clause gives Congress plenary authority over voter registration regulations

pertaining to federal elections.  Although the states remain free to regulate voter registration

procedures for state and local elections,[5] they must yield to federal regulation of voter

---

[5] Such regulations, however, may not violate other provisions of the Constitution, such as by discriminating against United States citizens on the basis of their race, color, previous condition of servitude, sex, or age over 18 years.  U.S. Const. amends. XIV, XV, XIX, XXVI.

registration procedures for federal elections.  *Id.*; *see also Cook v. Gralike,* 531 U. S. 510, 523

(2001); *Roudebush v. Hartke,* 405 U.S. 15, 24 (1972).

### B.    *National Voter Registration Act and Help America Vote Act*

Exercising its authority under the Elections Clause, Congress enacted the NVRA in 1993

in response to its concern that "discriminatory and unfair registration laws and procedures can

have a direct and damaging effect on voter participation in elections for Federal office."  42

U.S.C. § 1973gg(a)(3).  As originally enacted, the NVRA assigned authority to the Federal

Election Commission "in consultation with the chief election officers of the States" to "develop a

mail voter registration application form for elections for Federal office" and to "prescribe such

regulations as are necessary to carry out" this responsibility, and further provides that "[e]ach

State shall accept and use the mail voter registration application form prescribed by the [FEC]."

42 U.S.C. §§ 1973gg-4(a)(1), 1973gg-7(a)(2).  The FEC undertook this responsibility, in

consultation with the States, and issued the original regulations on the Federal Form in 1994.

NVRA Final Rule Notice, 59 Fed. Reg. 32,311 (June 23, 1994).  In the Help America Vote Act

of 2002 ("HAVA"), all of the NVRA functions originally assigned to the FEC were transferred

to the EAC.  42 U.S.C. § 15532.  Congress mandated in part the contents of the Federal Form

and explicitly limited the information the EAC may require applicants to furnish on the Federal

Form.  In particular, the form "may require *only* such identifying information . . . *as is necessary*

to enable the appropriate State election official to assess the eligibility of the applicant and to

administer voter registration and other parts of the election process."  42 U.S.C. § 1973gg-

7(b)(1) (emphasis added).  Further, it "may not include any requirement for notarization or other

formal authentication."  42 U.S.C. § 1973gg-7(b)(3).  The Federal Form must, however, "include

a statement that . . . specifies each eligibility requirement (including citizenship)"; "contains an

attestation that the applicant meets each such requirement"; and "requires the signature of the

applicant, under penalty of perjury." 42 U.S.C. § 1973gg-7(b)(2). Additionally, pursuant to

HAVA, the Federal Form must include two specific questions and check boxes for the applicant

to indicate whether he meets the U.S. citizenship and age requirements to vote. 42 U.S.C. §

15483(b)(4)(A).

>       ### C.       *The Federal Form*

Pursuant to its rulemaking authority, the EAC has promulgated the requirements for a

Federal Form that meets NVRA and HAVA requirements. *See* 11 C.F.R. part 9428

(implementing regulations); 42 U.S.C. §§ 1973gg-7(a), 15329. The form consists of three basic

components: the application, general instructions, and state-specific instructions. 11 C.F.R. §§

9428.2 (a), 9428.3 (a); *see also* EAC000073-97. The application portion of the Federal Form

"[s]pecif[ies] each eligibility requirement," including "U.S. Citizenship," which is "a universal

eligibility requirement." 11 C.F.R. § 9428.4(b)(1). To complete the form, an applicant must

sign, under penalty of perjury, an "attestation . . . that the applicant, to the best of his or her

knowledge and belief, meets each of his or her state's specific eligibility requirements." 11

C.F.R. §§ 9428.4(b)(2), (3). The state-specific instructions for Arizona, Georgia and Kansas

include the requirement that applicants be United States citizens. *See* EAC000081, EAC000083,

EAC000085.

Neither the NVRA nor the EAC regulations specifically provide a procedure for states to

request changes to the Federal Form. The NVRA simply directs the EAC to develop the Federal

Form "in consultation with the chief election officers of the States." 42 U.S.C. §§

1973gg-7(a)(2). To that end, the regulations provide that states "shall notify the Commission, in

writing, within 30 days of any change to the state's voter eligibility requirements[.]" 11 C.F.R. §

9428.6(c). The regulations leave it solely to the EAC's discretion whether and how to

incorporate those changes. Indeed, the Supreme Court has described the EAC's authority and

13

duty to determine the contents of the Federal Form, including any state-specific instructions

included therein, as "validly conferred *discretionary* executive authority." *Inter Tribal Council*,

133 S. Ct. at 2259 (emphasis added). Thus, the EAC is free to grant, deny, or defer action on

state requests, in whole or in part, so long as its action is consistent with the NVRA and other

applicable federal law. The EAC (and before it the FEC) received and acted upon numerous

requests over the years from States to modify the Federal Form's State-specific instructions in

various respects.

### III.   THE COMMISSION'S ABILITY TO ACT ON THE REQUESTS IN THE ABSENCE OF A QUORUM OF COMMISSIONERS

Sections 203 and 204 of HAVA provide that the Commission shall have four members,

appointed by the President with the advice and consent of the Senate, as well as an Executive

Director, General Counsel, and such additional personnel as the Executive Director considers

appropriate. 42 U.S.C. §§ 15323, 15324. Section 208 of HAVA provides that "[a]ny action

which the Commission is authorized to carry out under [HAVA] may be carried out only with

the approval of at least three of its members." *Id.* § 15328. Finally, Section 802(a) of HAVA

directs that the functions previously exercised by the Federal Election Commission under Section

9(a) of the NVRA, *id.* § 1973gg-7(a), would be transferred to the EAC. *Id.* § 15532.

All four of the appointed commissioner seats are currently vacant. Accordingly, several

commenters have suggested that the EAC presently lacks the authority, in whole or in part, to act

on the States' requests for modifications to the state-specific instructions on the Federal Form.[6]

Notably, the States do not assert that the Commission currently lacks authority to act on their

---

[6] The Valle del Sol group of commenters, for example, asserts the Commission's staff cannot take any action on the requests in the absence of a quorum. *See* EAC001448-55. The League of Women Voters and Project Vote commenters, by contrast, argue that the Commission's staff may act to deny the requests and thus maintain the Federal Form as it stands, but not to grant them and thus change the Form. *See* EAC000764-66; EAC001810-13.

requests; indeed, the States believe that the EAC has a nondiscretionary duty to grant their

requests.  EAC000564-65, EAC000593-97.  As explained below, under current EAC policy, as

previously established in 2008 by a quorum of EAC commissioners, EAC staff has the authority

to act on all state requests for modifications to the instructions on the Federal Form.

> **A.**   **_The 2008 Roles and Responsibilities Policy Delegates Federal Form_**
> **_Maintenance Responsibilities to the Executive Director._**

In 2008, the three EAC commissioners who were then in office unanimously adopted a

policy entitled, "The Roles and Responsibilities of the Commissioners and Executive Director of

the U.S. Election Assistance Commission." *See* EAC000064-72 ("R&R Policy").  This policy

"supersede[d] and replace[d] any existing EAC policy that [was] inconsistent with its

provisions."  EAC000072.  "The purpose of the policy," according to the commissioners, was "to

identify the specific roles and responsibilities of the [EAC's] Executive Director and its four

Commissioners in order *to improve the operations of the agency*."  EAC000065 (emphasis

added).

The commissioners were well aware of and cited to the general quorum requirements

contained in Section 208 of HAVA, as well as the notice and public meeting requirements

contained in the Government in the Sunshine Act, 5 U.S.C. § 552b(a)(2), which apply whenever

a quorum of commissioners meets to discuss official agency business.  EAC000065.  Further, the

commissioners were cognizant of the practical reality that, "[u]ltimately, if all functions of the

Commission (large and small) were performed by the commissioners, the onerous public

meeting process would make the agency unable to function in a timely and effective matter [sic].

Recognizing these facts, HAVA provides the EAC with an Executive Director and staff. (42

U.S.C. § 15324)."  EAC000065.  Finally, the commissioners recognized that "HAVA says little

about the roles of the Executive Director and the Commissioners," but that "a review of the

statute, the structure of the EAC and EAC's mission suggest a general division of responsibility"

among them, whereby the commissioners would set policy for the agency, and the Executive

Director would implement that policy and otherwise take operational responsibility for the

agency.  EAC000065.

More specifically, under the R&R Policy, the commissioners are responsible for

developing agency policy, which is defined as "high-level determination, setting an overall

agency goal/objective or otherwise setting rules, guidance or guidelines at the highest level."

EAC000064.  The Commission "only makes policy through the formal voting process" of the

commissioners.  *Id.*  Among the policy matters specifically reserved to the commissioners, for

example, are "[a]doption of NVRA regulations" and "[i]ssuance of Policy Directives."

EAC000065.

The EAC commissioners delegated the following responsibilities (among others) to the

Executive Director under the R&R policy: "[m]anage the daily operations of EAC consistent

with Federal statutes, regulations, and EAC policies"; "[i]mplement and interpret policy

directives, regulations, guidance, guidelines, manuals and other policies of general applicability

issued by the commissioners"; "[a]nswer questions from stakeholders regarding the application

of NVRA or HAVA consistent with EAC's published Guidance, regulations, advisories and

policy"; and "[m]aintain the Federal Voter Registration Form consistent with the NVRA and

EAC Regulations and policies."  EAC000070-71.

The Executive Director was further directed to "issue internal procedures which provide

for the further delegation of responsibilities among program staff and set procedures (from

planning to approval) for all program responsibilities."[7]  EAC000072.  Finally, while the R&R

policy directs the Executive Director to keep the commissioners informed of "all significant

issues presented and actions taken pursuant to the authorities delegated [by the R&R policy]," it

also specifically provides that "*the commissioners will not directly act on these matters.*"  *Id.*

(emphasis added).  Rather, the commissioners will use the information provided by the

Executive Director to "provide accurate information to the media and stakeholders" and to

determine "when the issuance of a Policy Directive is needed to clarify or set policy."  *Id.*

### B.   *The Commissioners' Delegation of Federal Form Maintenance Responsibilities to EAC Staff is Presumptively Valid Under Federal Law and Does Not Contravene HAVA.*

The three EAC commissioners' unanimous adoption of the 2008 Roles and

Responsibilities policy, wherein agency policy implementation and operational responsibilities

(including Federal Form maintenance responsibilities) were delegated to the Executive Director,

was "carried out . . . with the approval of at least 3 of [the EAC's] members," as required by

Section 208 of HAVA.  As a general matter, "[w]hen a statute delegates authority to a federal

officer or agency, subdelegation to a subordinate federal officer or agency is presumptively

permissible absent affirmative evidence of a contrary congressional intent."  *U.S. Telecom Ass'n*

*v. F.C.C.*, 359 F.3d 554, 565 (D.C. Cir. 2004).  "Express statutory authority is not required for

delegation of authority by an agency; delegation generally is permitted where it is not

inconsistent with the statute."  *National Ass'n of Psychiatric Treatment Centers for Children v.*

---

[7] The Valle del Sol commenters mistakenly cite to the 2011 Wilkey Memorandum as the source of the Executive Director's authority to act on requests for modifications to the Federal Form's instructions. EAC001448-55.  In fact, the Executive Director derives authority to act on Federal Form maintenance matters from the 2008 R&R policy.  The 2011 Wilkey Memorandum was merely an internal operating procedure that described how the then-executive director sought to exercise and delegate (or temporarily refrain from acting upon) the responsibilities that the Commission had delegated to him. That memorandum did not and could not have limited the scope of the commissioners' original delegation to the Executive Director, which included plenary authority to implement the EAC's NVRA regulations and NVRA and HAVA requirements, and to maintain the Federal Form consistent therewith.

*Mendez*, 857 F. Supp. 85, 91 (D.D.C. 1994); *accord Ashwood Manor Civic Ass'n v. Dole*, 619 F. Supp. 52, 65-66 (E.D. Pa. 1985).

In the absence of an express statutory authorization for an agency to delegate authority to a subordinate official, one must look to "the purpose of the statute" to determine the parameters of the delegation authority. *Inland Empire Public Lands Council v. Glickman*, 88 F.3d 697, 702 (9th Cir. 1996). Obviously, "[i]f Congress clearly expresses an intent that no delegation is to be permitted, then that intent must be carried out." *Ashwood Manor Civic Ass'n*, 619 F. Supp. at 66. On the other hand, in the absence of a specific statutory prohibition or limitation of an agency's delegation authority, the default rule is that an agency can do so. *See, e.g., Loma Linda University v. Schweiker*, 705 F.2d 1123, 1128 (9th Cir. 1983) (upholding delegation of HHS Secretary's statutory review authority to subordinate official where "Congress did not specifically prohibit delegation").

As the EAC commissioners themselves recognized in the R&R policy, "HAVA says little about the roles of the Executive Director and the Commissioners," but the statute and the EAC's structure suggest that there should be a "general division of responsibility" as between the commissioners and the Executive Director. EAC000064. Additionally, HAVA contains no provisions which speak directly to the issue of delegation. As Congress noted, HAVA was enacted, in part, "to establish the Election Assistance Commission to assist in the administration of Federal elections and to otherwise provide assistance with the administration of certain Federal election laws and programs." H.R. Rep. No. 107-730, at 2 (Oct. 8, 2002) (Conf. Rep.). There is nothing about that statutory purpose that suggests that it would be inappropriate for the EAC to delegate agency functions to the agency's staff. Indeed, as the EAC commissioners acknowledged, such division of responsibilities would "improve the operations of the agency"

18

and avoid creating situations where the agency was "unable to function in a timely and effective [manner]."

Thus, the delegations of authority to the Executive Director in the R&R policy do not appear to conflict with HAVA.  In particular, the existence of a quorum provision in Section 208 of HAVA does not prohibit the Commission from delegating administrative and implementing authority to its subordinate staff, so long as such delegation of authority is "carried out . . . with the approval of at least 3 of its members," as it was in this instance.  *Cf.* 42 U.S.C. § 15328.[8] The R&R policy does not cede policymaking authority to EAC staff; rather, it directs the staff to "implement and interpret" the agency's policies consistent with federal law and EAC regulations.

Included within the general duty to implement and interpret the agency's policies is the specific duty to "[m]aintain the Federal Voter Registration Form consistent with the NVRA and EAC Regulations and policies."  EAC000072.  "Maintain" means "to keep (something) in good condition by making repairs, correcting problems, etc." *See* Merriam-Webster Online, http://www.merriam-webster.com/dictionary/maintain (last visited Jan. 12, 2014).  In the context of the Federal Form, "maintain" includes making such changes to the general and state-specific instructions as is necessary to ensure that they accurately reflect the requirements for registering to vote in federal elections.

---

[8] In similar circumstances, courts have upheld agency delegations of authority to subordinate staff, even when, at the time the staff takes the action in question, the agency lacks its statutorily required quorum.  *See, e.g., Overstreet v. NLRB*, 943 F. Supp. 2d 1296, 1297-1303 (D.N.M. 2013) (upholding NLRB general counsel's limited exercise of agency's enforcement authority, pursuant to a previous delegation by a qualifying quorum, and stating that such prior delegation "survives the loss of a quorum"); *California Livestock Prod. Credit Ass'n v. Farm Credit Admin.*, 748 F. Supp. 416, 421-22 (E.D. Va. 1990) (agency's sole board member was authorized to act, even in absence of statutorily required quorum based on previous delegation of authority by a qualifying quorum).

The EAC's regulations do not prescribe and have never prescribed the text of the Federal Form's general and state-specific instructions. Rather, they mandate that in addition to the actual application used for voter registration, the Federal Form shall contain such instructions, and they partially define what should be included within those instructions. *See* 11 C.F.R. § 9428.3. EAC staff (and before it, FEC staff) has always had the responsibility and discretion to develop and, where necessary, revise and modify the text of the Federal Form's instructions in a manner that comports with the requirements of federal law and the EAC's regulations and policies. That remains the case whether or not a quorum of commissioners exists at any given time.

Having determined, based on the foregoing, that the Commission has the authority to act on these requests even in the absence of a quorum of commissioners, we proceed to address the merits of the States' requests.

## IV. ANALYSIS

### A. *Congress Specifically Considered and Rejected Proof-of-Citizenship Requirements When Enacting the NVRA.*

In determining whether and how to implement state-requested revisions to the Federal Form, the EAC has been guided in part by the NVRA's legislative history. When considering the NVRA, Congress deliberated about—but ultimately rejected—language allowing states to require "presentation of documentary evidence of the citizenship of an applicant for voter registration." *See* H.R. Rep. No. 103-66, at 23 (1993) (Conf. Rep.). In rejecting the Senate version of the NVRA that included this language, the conference committee determined that such a requirement was "*not necessary* or consistent with the purposes of this Act," could "permit registration requirements that could effectively eliminate, or seriously interfere with, the mail registration program of the Act," and "could also adversely affect the administration of the other registration programs . . . ." *Id.* (emphasis added). Congress's rejection of the very requirement

20

that Arizona, Georgia, and Kansas seek here is a significant factor the EAC must take into

account in deciding whether to grant the States' requests.  *See, e.g., Hamdan v. Rumsfeld*, 548

U.S. 557, 579-80 (2006) ("Congress' rejection of the very language that would have achieved the

result the [States] urge[] here weighs heavily against the [States'] interpretation.").[9]

### B.    The Requested Proof-of-Citizenship Instructions Are Inconsistent With the EAC's NVRA Regulations.

In promulgating regulations under the NVRA, the FEC "considered what items are

deemed necessary to determine eligibility to register to vote and what items are deemed

necessary to administer voter registration and other parts of the election process in each state."

59 Fed. Reg. 32311 (June 23, 1994) (NVRA Final Rules).  The FEC observed that it was

"charged with developing a single national form, to be accepted by all covered jurisdictions, that

complies with the NVRA, and that . . . specifies each eligibility requirement (including

citizenship)."  Further, while determining that the "application identify U.S. Citizenship (the only

eligibility requirement that is universal)," the FEC rejected public comments proposing that

naturalization information be collected by the Federal Form because the basis of citizenship was

deemed irrelevant.  As the FEC explained:

> The issue of U.S. citizenship is addressed within the oath required by the Act and
> signed by the applicant under penalty of perjury.  To further emphasize this
> prerequisite to the applicant, the words "For U.S. Citizens Only" will appear in
> prominent type on the front cover of the national mail voter registration form.  For
> these reasons, the final rules do not include th[e] additional requirement [that the
> Federal Form collect naturalization information].

59 Fed. Reg. at 32316.  Furthermore, in response to other public comments suggesting that states

could simplify their eligibility requirements so that they can be listed on the Federal Form along

---

[9] In addition to Congress's specific rejection of the type of instructions the States now seek, the text of the
statute as enacted prohibits the Federal Form from requiring "formal authentication."  42 U.S.C. § 1973gg-7(b)(3).
As Project Vote notes in its comment, requiring additional proof of citizenship would be tantamount to requiring
"formal authentication" of an individual's voter registration application.  EAC001820-21.

with citizenship, the FEC expressed a concern not to "unduly complicate the application" in light of the "variations in state eligibility requirements[.]" *Id.* at 32314.

As a result of HAVA, the FEC and the EAC engaged in joint rulemaking transferring the NVRA regulations from the FEC to the EAC, but made "no substantive changes to those regulations." 74 Fed. Reg. 37519 (July 29, 2009). Accordingly, the FEC and the EAC, in their implementing regulations, specifically considered and determined, in their discretion, that the oath signed under penalty of perjury, the words "For U. S. Citizens Only" and later the relevant HAVA citizenship provisions, *see* 42 U.S.C. § 15483(b)(4)(A) (adding to the Federal Form two specific questions and check boxes indicating the applicant's U.S. citizenship), were all that was necessary to enable state officials to establish the *bona fides* of a voter registration applicant's citizenship. Thus, granting the States' requests here would contravene the EAC's deliberate rulemaking decision that additional proof was not necessary to establish voter eligibility.

### C.  The Requested Proof-of-Citizenship Instructions Are Inconsistent With the EAC's Prior Determinations.

In addition, the EAC, both by the staff and a duly-constituted quorum of commissioners, has already denied the very same substantive request that is at issue here. As set forth above, by letter dated March 6, 2006, the Commission rejected Arizona's December 2005 request to add its citizenship documentation requirement to the state-specific instructions for the Federal Form. EAC000002-04. We explained that the "NVRA requires States to both 'accept' and 'use' the Federal Form," and that "[a]ny Federal Registration Form that has been properly and completely filled out by a qualified applicant and timely received by an election official must be accepted in full satisfaction of registration requirements." EAC000004. We concluded that a "state may not mandate additional registration procedures that condition the acceptance of the Federal Form." *Id.*

Arizona's then-Secretary of State, Jan Brewer, wrote several letters of protest to the EAC's then-Chairman, Paul DeGregorio, who recommended to his fellow commissioners that they grant Arizona an "accommodation" and include Arizona's proof of citizenship requirements in the state-specific instructions on the Federal Form.  *See* EAC000007-08, EAC000011, EAC000013-14.  The four sitting Commissioners rejected Chairman DeGregorio's proposal by a 2-2 vote.  EAC000010.  By virtue of this decision not to amend the decision, the EAC established a governing policy for the agency, consistent with the NVRA, HAVA, and EAC regulations, that the EAC will not grant state requests to add proof of citizenship requirements to the Federal Form.

The States' current requests for inclusion of additional proof-of-citizenship instructions on the Federal Form are substantially similar to Arizona's 2005 request.  (Indeed, Arizona's request is essentially the same request, involving the exact same state law.)  As discussed herein, the States have not submitted sufficiently compelling evidence that would support the issuance of a decision contrary to the one that the Commission previously rendered with respect to Arizona in 2006.

### D.   The Supreme Court's Inter-Tribal Council *Opinion Guides the EAC's Assessment of the States' Requests.*

As noted above, several organizations challenged Arizona's implementation of its proof-of-citizenship requirement, culminating in the Supreme Court's 2013 ruling in *Inter Tribal Council*, 133 S. Ct. 2247.  It is clear from *Inter Tribal Council* that the EAC's task in responding to the States' requests is to determine whether granting their requests is necessary to enable state officials to assess the eligibility of Federal Form applicants.

23

### 1.     The scope of the Elections Clause is broad.

The Supreme Court began its analysis in *Inter Tribal Council* by observing that the Elections Clause "imposes the duty . . . [on States] to prescribe the time, place, and manner of electing Representatives and Senators" but "confers [on Congress] the power to alter those regulations or supplant them altogether." *Id.* at 2253.  "The Clause's substantive scope is broad," the Court continued.  "'Times, Places, and Manner' . . . are 'comprehensive words,' which 'embrace authority to provide a complete code for congressional elections,' including, as relevant here . . . , regulations relating to 'registration.'" *Id.* at 2253 (citing, *inter alia, Smiley v. Holm,* 285 U.S. 355, 366 (1932)).

### 2.     The NVRA requirement that states accept and use the Federal Form preempts the States' proof-of-citizenship requirements.

Having established that the Elections Clause empowers Congress to regulate voter registration procedures for federal elections, the Court examined the text of the NVRA's provisions governing the Federal Form.  It noted that in addition to creating the Federal Form and requiring states to "accept and use" it, the statute also authorizes states "to create their own, state-specific voter-registration forms, which can be used to register voters in both state and federal elections." *Id.* at 2255 (citing 42 U.S.C. § 1973gg-4(a)(2)).  Any state form must "meet all of the criteria" of the Federal Form "for the registration of voters in elections for Federal office." 42 U.S.C. §§ 1973gg-4(a)(2).  The authority given to states to develop their own form for use in state and federal elections "works in tandem with the requirement that States 'accept and use' the Federal Form. States retain the flexibility to design and use their own registration forms, but the Federal Form provides a backstop: No matter what procedural hurdles a state's own form imposes, the Federal Form guarantees that a simple means of registering to vote in federal elections will be available." *Id.* at 2255.

Thus, the Court "conclude[d] that the fairest reading of the [NVRA] is that a State-imposed requirement of evidence of citizenship not required by the Federal Form is 'inconsistent with' the NVRA's mandate that States 'accept and use' the Federal Form." *Id.* at 2257. The Court also noted that "while the NVRA forbids States to demand that an applicant submit additional information beyond that required by the Federal Form, it does not preclude States from 'deny[ing] registration based on information in their possession establishing the applicant's ineligibility.'" *Id.* at 2257 (citing Brief of the United States as *Amicus Curiae* at 24).

### 3. The NVRA provisions governing the contents of the Federal Form are consistent with the Constitution's allocation of power over federal elections.

In reaching its ruling, the Court was cognizant of the Constitution's clauses in Article I and the Seventeenth Amendment empowering states to set voter qualifications for federal elections. "Prescribing voting qualifications," it stated, "'forms no part of the power to be conferred upon the national government' by the Elections Clause." *Id.* at 2258 (quoting The Federalist No. 60, at 371 (A. Hamilton)). The Court characterized the voter qualification clauses and the Elections Clause as an "allocation of authority" that "sprang from the Framers' aversion to concentrated power." *Id.* at 2258.

In other words, the Court recognized some potential tension between the Elections Clause and the voter qualification clauses. In particular, it noted that "[s]ince the power to establish voting requirements is of little value without the power to enforce those requirements, . . . it would raise serious constitutional doubts if a federal statute precluded a State from obtaining the information necessary to enforce its voter qualifications." *Id.* at 2258-59.

The Court concluded, however, that the NVRA, as interpreted by the United States, did not run afoul of this limitation on Congress's power because it compels the Federal Form to require from applicants "such . . . information . . . as is necessary to enable the appropriate State

election official to assess the eligibility of the applicant . . . ."  42 U.S.C. § 1973gg-7(b)(1); *see*

*Inter Tribal Council*, 133 S. Ct. at 2259.  As a result of this requirement, the Court concluded, "a

State may request that the EAC alter the Federal Form to include information the State deems

necessary to determine eligibility" and may challenge a rejection of such a request under the

Administrative Procedure Act.  *Id.* at 2259.  Therefore, "no constitutional doubt is raised" by the

statute.  *Id.* at 2259.

> **4.      The EAC is bound by both the NVRA and the Court's opinion in *Inter Tribal Council* to determine whether the States' requests are necessary to enable them to assess the eligibility of Federal Form applicants.**

As described above, while Congress provided that the EAC must consult with the

nation's chief state election officials in the development of the Federal Form, it is the EAC that

ultimately has the responsibility and discretionary authority to determine the Federal Form's

contents, to prescribe necessary regulations relating to the Federal Form, and to "provide

information to the States with respect to the responsibilities of the States under [the NVRA]."  *Id.*

§ 1973gg-7.

This discretionary authority, however, is limited by the terms of the statute, which

provide, among other things, that the Federal Form may only require from applicants "such . . .

information . . . as is necessary to enable the appropriate State election official to assess the

eligibility of the applicant . . . ."  *Id.* § 1973gg-7(b)(1).

Kansas and Arizona argue that the Constitution's voter qualification clauses as

interpreted by the Court in *Inter Tribal Council* bestow on the EAC a nondiscretionary duty to

grant the States' requests and relieve the agency of its obligation to develop the form consistent

with the NVRA's limitations.  EAC000564, EAC000593-97.  However, neither the language of

the Constitution nor of *Inter Tribal Council* supports such an argument.

26

First, the States claim that the Constitution "expressly" grants to states "the power to establish *and enforce* voter qualifications for federal elections" and does so "to the exclusion of Congress." EAC000590 (emphasis added). To the contrary, nothing in the Constitution prohibits the federal government from also enforcing state-established voter qualifications relating to federal elections, so long as the states are not precluded from doing so. Second, the Court describes the NVRA's delegation of authority to the EAC to develop the Federal Form subject to the prescribed limitations as "validly conferred discretionary executive authority." *Id.* at 2259. The Court uses this phrase in approving the United States' interpretation of the NVRA as requiring the Federal Form to contain the information necessary to enable states to enforce their voter qualifications, as well as limiting the Form to that information. *See id.* at 2259. In the EAC's judgment, the States attempt to impose an unnatural reading on the Court's language. Furthermore, the language of the NVRA confers on the agency the authority and the duty to exercise its discretion in carrying out the statute's provisions. The agency will not adopt such a strained reading of this brief passage to circumvent statutory language by which it would otherwise be bound.

We conclude that the States' contention that the EAC is under a nondiscretionary duty to grant their requests is incorrect. Rather, as the Court explained in *Inter Tribal Council*, the EAC is obligated to grant such requests only if it determines, based on the evidence in the record, that it is necessary to do so in order to enable state election officials to enforce their states' voter qualifications. If the States can enforce their citizenship requirements without additional proof-of-citizenship instructions, denial of their requests for such instructions does not raise any constitutional doubts.

E.     *The Requested Proof-of-Citizenship Instructions Would Require Applicants to Submit More Information Than is Necessary to Enable Election Officials to Assess Eligibility.*

The States' primary argument in support of their requests is that the EAC is under a constitutional, nondiscretionary duty to grant those requests, *see* EAC000563-65, which as discussed above, is incorrect.  However, both Arizona and Kansas also indicate that they believe their requested changes are necessary to enforce their citizenship requirements and not merely a reflection of their legislative policy preferences.  *See* EAC000044-46, EAC000564.  Therefore, to ensure that the Federal Form continues to comply with the constitutional standard set out in *Inter Tribal Council* and the statutory standard set out in the NVRA, the Commission must consider whether the States have demonstrated that requiring additional proof of citizenship is necessary for the States to enforce their citizenship requirements.  For the reasons discussed below, we conclude that the States have not so demonstrated.

**1.     The Federal Form currently provides the necessary means for assessing applicants' eligibility.**

The Federal Form already provides safeguards to prevent noncitizens from registering to vote.  The Form requires applicants to mark a checkbox at the top of the Form answering the question, "Are you a citizen of the United States of America," and directs applicants (in bold red text) that they must not complete the Form if they check "No" in response to the question.  Should applicants proceed to complete the application, they are also required to sign at the bottom of the Form an attestation that "I am a United States citizen" and "The information I have provided is true to the best of my knowledge under penalty of perjury.  If I have provided false information, I may be fined, imprisoned, or (if not a U.S. citizen) deported from or refused entry to the United States."  EAC000078.  In addition, the cover page for the Form states in large, boldface type, "For U.S. Citizens."  EAC000073.

In Arizona's correspondence with the EAC and in the States' brief filed in *Kobach v. EAC*, the States argue that a sworn statement such as that required by the Federal Form is "virtually meaningless" and "not proof at all." EAC000045; EAC000605. In support of this argument, the States rely on a remark made by a Supreme Court justice during oral argument in *Inter Tribal Council*. However, remarks by justices at oral argument have no force of law and cannot serve as the basis for this agency's decision-making.

In fact, a written statement made under penalty of perjury is considered reliable evidence for many purposes. *See, e.g.*, Fed. R. Civ. P. 56(c)(1)(A) (permitting parties in civil cases to cite written affidavits or declarations in support of an assertion that a fact is not in genuine dispute); *United States v. Reed*, 719 F.3d 369, 374 (5th Cir. 2013) (criminal defendant's affidavit "constitutes competent evidence sufficient, if believed, to establish" facts in support of his ineffective assistance of counsel claim); *United States v. Haymond*, 672 F.3d 948, 959 (10th Cir. 2012) (FBI agent's affidavit provided sufficient evidence of probable cause to search criminal defendant's home); *Siddiqui v. Holder*, 670 F.3d 736, 742-743 (7th Cir. 2012) (amnesty applicant may satisfy his burden of proof by submitting credible affidavits sufficient to establish the facts at issue); 26 U.S.C. § 6065 (requiring any tax return, declaration, statement, or other document required under federal internal revenue laws or regulations to be made under penalty of perjury).

The overwhelming majority of jurisdictions in the United States have long relied on sworn statements similar to that included on the Federal Form to enforce their voter qualifications, and the EAC is aware of no evidence suggesting that this reliance has been misplaced. As discussed below, the evidence submitted by Arizona and Kansas in connection with their requests does not change this conclusion. Rather, the EAC finds that the possibility of

potential fines, imprisonment, or deportation (as set out explicitly on the Federal Form) appears to remain a powerful and effective deterrent against voter registration fraud.  As several commenters note, Arizona, Kansas, and Georgia all relied on such sworn statements for many years prior to their recent enactment of additional requirements.  EAC000769; EAC001816-17.

Additionally, two commenters note that Arizona election officials have previously recognized that the benefit to a non-citizen of fraudulently registering to vote is distinctly less tangible than the loss of access to his or her home, job, and family that would come with deportation.  *See* EAC001820; EAC001558 (citing Letter from Office of the Secretary of State of Arizona, July 18, 2001, Joint Appendix at 165-66, *Inter Tribal Council*, 133 S. Ct. 2247 (No. 12-71), 2012 WL 6198263 ("It is generally believed that the strong desire to remain in the United States and fear of deportation outweigh the desire to deliberately register to vote before obtaining citizenship.  Those who are in the country illegally are especially fearful of registering their names and addresses with a government agency for fear of detection and deportation.")); *see also* EAC001558-59, EAC001571 (citing 30(b)(6) Dep. of Maricopa County Elections Dep't (through Karen Osborne) at 29:16-23, Jan. 14, 2008, *Gonzalez v. Arizona*, No. 06-CV-1268 (D. Ariz.) ("I cannot believe that [any noncitizen] would want to jeopardize their situation after having lived here for many years, make their reports every year to the INS, pay their taxes, and do everything, I cannot believe that they would want to jeopardize, especially at the cost of a felony, and then the thought of not being able to stay and not get citizenship . . . .")).

Finally, as also noted by one commenter, Arizona and Kansas still accept sworn statements as sufficient for certain election-related purposes—for example, for an in-county

change of address in Arizona,[10] an in-state change of address in Kansas,[11] or an application for permanent advance voting status in Kansas due to disability.[12]  EAC000893.

The EAC finds that the evidence in the record is insufficient to support the States' contention that a sworn statement is "virtually meaningless" and not an effective means of preventing voter registration fraud.

### 2.     Evidence submitted by Arizona and Kansas

In further support of their requests, Arizona and Kansas submit evidence in the form of declarations and affidavits by several state and county election officials, letters from the Kansas Secretary of State referring several matters to county attorneys, and documents reflecting heavily redacted voter registration and motor vehicle records.  EAC001738-40, EAC000611-68. Georgia did not submit any evidence or arguments in support of its request other than a description of its voter registration procedures, either at the time of its request or in response to the EAC's Notice requesting public comment.  EAC001856-57.  With the exception of the referral letters and documents reflecting voter registration and motor vehicle records at EAC000629-68, all of the evidence submitted by Arizona and Kansas was included in public court filings prior to the start of the public comment period.[13]  The evidence is summarized as follows:

> Arizona
> - According to an election official in Maricopa County, Arizona, between 2003 and 2006, at least 37 individuals contacted the recorder's office in Maricopa County and indicated that they were in the process of applying for U.S. citizenship, but were found to have previously registered to vote in Arizona.  EAC001739 ¶ 8.

---

[10] *See* http://www.azsos.gov/election/VoterRegistration.htm.

[11] *See* http://www.kssos.org/forms/Elections/voterregistration.pdf.

[12] *See* Kan. Stat. § 25-1122d(c); http://www.kssos.org/forms/Elections/AV2.pdf.

[13] *See Kobach v. EAC*, No. 13-CV-4095 (D. Kan.), ECF Nos. 19, 20, 25, 101-1, 103.

- According to the Maricopa County election official, in 2005, the recorder's office in Maricopa County referred evidence to the county attorney indicating that some individuals who had registered to vote in the county may have been noncitizens. To the best of the official's recollection, there were 159 individuals implicated. A large number of these individuals had submitted statements to the jury commissioner that they were not citizens. The county attorney brought felony charges against ten noncitizens for filing false voter registration forms. EAC001740 ¶ 10.

Kansas
- According to an election official in the Kansas Secretary of State's office, the office is able to review state driver license data to determine whether individual registrants may have been unlawfully registered to vote. For example, in 2009 and 2010, the office obtained a list of individuals who had obtained temporary driver's licenses in Kansas, which are issued only to noncitizens, and compared that list to its list of registered voters. EAC000611 ¶ 2.

- According to the Kansas election official, upon comparing the temporary license and voter lists in 2009, the Kansas Secretary of State's office identified 13 individuals who had been issued temporary driver's licenses and were also registered to vote. EAC000611-12 ¶ 3. One of these individuals provided a naturalization number on his/her voter registration application. EAC000619 ¶¶ 3-4.

- According to referral letters sent in 2009 by the Kansas Secretary of State to four county attorneys, the information for these 13 individuals matched on name, date of birth, and last four digits of social security number. EAC000632; EAC000637; EAC000640; EAC000659. Documentation provided with the letters indicates that 9 of these individuals had submitted completed Kansas Voter Registration Application forms, EAC000634, -38, -42, -44, -46, -48, -61, -63, -66, and 2 had submitted voter registration applications through the Division of Motor Vehicles, EAC000650, -54. The documents do not indicate how the remaining 2 individuals registered.

- According to the Kansas election official, upon comparing the temporary license and voter lists in 2010, the Kansas Secretary of State's office identified 6 individuals who had been issued temporary driver's licenses and were registered to vote. EAC000620 ¶ 5. No additional information about these individuals has been submitted.

- According to the Kansas election official, in 2010, the election commissioner for Sedgwick County, Kansas, notified the Kansas Secretary of State's office that he had been contacted by the U.S. Department of Homeland Security and provided the name of a noncitizen who was found to have registered to vote in Kansas. EAC000612 ¶ 4.

- According to the election commissioner for Sedgwick County, Kansas, in 2013, her office received a voter registration application submitted through the Kansas Division of Motor Vehicles by an individual who subsequently informed the office that he/she is not a U.S. citizen.  EAC000625-26.

- According to the county clerk for Finney County, Kansas, in 2013, an individual submitted to her office a completed and signed Kansas Voter Registration Application form along with copies of a foreign birth certificate and a U.S. Permanent Resident Card.  EAC000627-31.

The States argue that this evidence demonstrates that requiring additional proof of citizenship is necessary to enable them to enforce their citizenship requirements.  EAC000564. However, we conclude that this is incorrect because (a) the evidence fails to establish that the registration of noncitizens is a significant problem in either state, sufficient to show that the States are, by virtue of the Federal Form, currently precluded from assessing the eligibility of Federal Form applicants, and (b) the evidence reflects the States' ability to identify potential non-citizens and thereby enforce their voter qualifications relating to citizenship, even in the absence of the additional instructions they requested on the Federal Form.

The States argue that the evidence submitted demonstrates generally that noncitizens have registered to vote in Arizona and Kansas, EAC000605, and specifically that 20 noncitizens have registered to vote in Kansas, EAC000564-65.  Several commenters question the reliability of the States' contentions.[14]  For present purposes, however, we assume that Arizona has demonstrated that 196 noncitizens were registered to vote in that state and that Kansas has demonstrated that 21 noncitizens were registered to vote or attempted to register in that state.

---

[14] The commenters point to two specific shortcomings:  (1) they note that statements made to a jury commissioner are not always reliable, since some citizens may falsely claim to be non-citizens in order to avoid jury service, EAC001560, EAC001589; EAC001475, EAC001145; and (2) they point out that it is possible that the driver license database information that Kansas relied upon may include citizens who became naturalized after obtaining their license, EAC001560-61; *see also* EAC001473-74.

This data nevertheless fails to demonstrate that the States' requests must be granted in order to enable them to assess the eligibility of Federal Form applicants.

At the time Kansas's new proof-of-citizenship requirement took effect in January 2013, there were 1,762,330 registered voters in the state.[15]  Thus Kansas's evidence at most suggests that 21 of 1,762,330 registered voters, approximately 0.001 percent, were unlawfully registered noncitizens around the time its new proof-of-citizenship requirement took effect.  EAC001561-62; *see also* EAC000770; EAC001472.

At the time Proposition 200 took effect in January 2005, there were 2,706,223 active registered voters in Arizona.[16]  Thus Arizona's evidence at most suggests that 196 of 2,706,223 registered voters, approximately 0.007 percent, were unlawfully registered noncitizens around the time that Proposition 200 took effect.  EAC001561.

There were 1,598,721 active registered voters in Maricopa County at this time,[17] so these 196 noncitizens comprised just 0.01 percent of registered voters in Maricopa County, also a very small percentage.  *See* EAC000770; EAC001475.  Additionally, as noted in one comment, during the *Inter Tribal Council* litigation, election officials from three other Arizona counties gave deposition testimony stating that they were not able to find any evidence of noncitizens registering to vote between 1996 and 2006.  EAC001476, EAC001236-46.

By any measure, these percentages are exceedingly small.  Certainly, the administration of elections, like all other complex functions performed by human beings, can never be

---

[15] *See* State of Kansas Office of the Secretary of State, 2013 January 1st (Unofficial) Voter Registration Numbers, *available at* http://www.kssos.org/elections/elections_registration_voterreg.asp (last visited Jan. 12, 2014).

[16] *See* State of Arizona Registration Report, January 2005, http://azsos.gov/election/voterreg/2005-01-01.pdf.

[17] *See* State of Arizona Registration Report, January 2005, http://azsos.gov/election/voterreg/2005-01-01.pdf.

completely free of human error.  In the context of voter registration systems containing millions

of voters, the EAC finds that the small number of registered noncitizens that Arizona and Kansas

point to is not cause to conclude that additional proof of citizenship must be required of

applicants for either state to assess their eligibility, or that the Federal Form precludes those

states from enforcing their voter qualifications.

Our conclusion that some level of human error is inevitable is reinforced by the evidence

Kansas submitted suggesting that three noncitizens have registered to vote by submitting

applications through the state's Division of Motor Vehicles.  As one comment notes, Kansas

requires driver's license applicants to provide documentation of their citizenship status.

EAC001559-60 (citing http://www.ksrevenue.org/dmvproof.html).  Thus, these registrants were

already required to show, apparently at the time they were applying to register to vote (in

connection with their simultaneous driver license transaction), the type of citizenship evidence

the States now seek to require and yet they were still offered the opportunity to register to vote

and their registrations were still accepted, both presumably as a result of human error.  These

cases provide no support for the proposition that Kansas's requested instruction is necessary to

enable it to enforce its citizenship requirement.

Finally, we note, as have several commenters, that the proof-of-citizenship laws enacted

in Arizona, Kansas, and Georgia all exempt individuals who were registered at the time the laws

took effect from complying with the new proof-of-citizenship requirements.  These laws

therefore treat previously registered voters differently from voters yet to register, but the States

have not provided any evidence suggesting that voters attempting to register before the laws took

effect were any more or less likely to be noncitizens than those attempting to register after the

laws took effect.  This suggests that the information required by the Federal Form has

historically been considered sufficient to assess voter eligibility, even in the recent past. EAC001817.  In conjunction with the paucity of evidence provided by the States regarding noncitizens registering to vote, this aspect of the laws suggests that the new requirements reflect the States' legislative policy preferences and are not based on any demonstrated necessity. EAC001562; EAC000892.

### 3.    Additional evidence noted by comments

Several comments note evidence of noncitizens registering to vote in other states.  *See, e.g.*, EAC001607-08; EAC001544; EAC000683-84.  Other comments note that efforts in other states have identified only small numbers of noncitizens on the voter rolls, *see* EAC1474-75, and that voter fraud generally is rare, *see* EAC001620.  The evidence submitted does not suggest that there have been significant numbers of noncitizens found to have registered to vote in other states.  Rather, the evidence appears similar in magnitude to that which Arizona and Kansas have submitted.  In any event, we find that the limited anecdotal evidence from other states does not establish that Arizona, Kansas, and Georgia will be precluded from assessing the eligibility of Federal Form applicants if the Commission denies their requested instructions.

### 4.    Additional means of enforcing citizenship requirements

Occasional occurrences of unlawful registrations are no more reflective of the inefficacy of the existing oaths and attestations for voter registration than are the occasional violations of any other laws that rely primarily on oaths and attestations, such as those prohibiting the filing of false or fraudulent tax returns.  As long as a state is able to identify illegal registrations and address any violations (whether through removal from the voter rolls, criminal prosecution, and/or other means), and the occurrence of such violations is rare, then the state is able to enforce its voter qualifications.  And as the Supreme Court noted in *Inter Tribal Council*, nothing

precludes a State from "deny[ing] registration based on information in their possession establishing the applicant's ineligibility." *Inter Tribal Council*, 133 S. Ct. at 2257.[18]

As discussed below, the States have a myriad of means available to enforce their citizenship requirements without requiring additional information from Federal Form applicants.

### a)      Criminal prosecution

Section 8 of the NVRA mandates that states inform voter registration applicants of the "penalties provided by law for submission of a false voter registration application." 42 U.S.C. § 1973gg-6(a)(5)(B).  Section 9 of the NVRA and EAC regulations likewise require that information regarding criminal penalties be provided on the Federal Form "in print that is identical to that used in the attestation portion of the application." *Id.* § 1973gg-7(b)(4)(i); 11 C.F.R. § 9428.4(b)(4).  Federal law and the laws of Arizona, Georgia, and Kansas all impose serious (usually felony-level) criminal penalties for false or fraudulent registration and voting.[19] Additionally, unlawful registration or voting by a non-citizen can result in deportation or inadmissibility for that non-citizen.  *See* 8 U.S.C. §§ 1227(a)(3)(D), (a)(6), 1182(a)(6)(C)(2), (a)(10)(D).

---

[18] The converse is also true: absent any evidence in the state's possession that contradicts the specific information on the voter registration application, to which the applicant has attested under penalty of perjury, the registration official should accept the sworn application as sufficient proof of the applicant's eligibility and register that applicant to vote in Federal elections in accordance with Section 8(a)(1) of the NVRA. *See* 42 U.S.C. § 1973gg-6(a)(1) (requiring States to "ensure that any eligible applicant is registered to vote" in Federal elections "if the valid voter registration form of the applicant" is submitted or received by the close of registration).

[19] *See, e.g.,* 18 U.S.C. § 1015(f) (false claim of citizenship in connection with voter registration or voting; imprisonment for 5 years and a $250,000 fine); 42 U.S.C. § 15544(b) (same); 18 U.S.C. § 611 (Class A misdemeanor penalty for voting by aliens; imprisonment for 1 year and a $100,000 fine); 42 U.S.C. § 1973gg-10(2) (false or fraudulent registration or voting generally; imprisonment for 5 years and a $250,000 fine); 18 U.S.C. § 911 (false and willful misrepresentation of citizenship; imprisonment for 3 years and a $250,000 fine); Ariz. Rev. Stat. §§ 16-182 (false registration; class 6 felony), 16-1016 (illegal voting; class 5 felony); Ga. Code Ann. §§ 21-2-561 (false registration; felony; imprisonment for 10 years and a $100,000 fine), 21-2-571 (unlawful voting; felony; imprisonment for 10 years and a $100,000 fine); Kan. Stat. §§ 25-2411 (election perjury; felony), 25-2416 (voting without being qualified; misdemeanor).

The evidence submitted by Arizona and Kansas shows that the States are able to enforce their voter qualifications through the initiation of criminal investigations and/or prosecutions under their state criminal laws, where necessary.  EAC000632-68; EAC001738-40.  To be sure, the numbers of these criminal investigations and prosecutions appear to be quite small; however, there is no evidence in the record to suggest that the small number of criminal referrals is attributable to anything other than the strength of the deterrent effect resulting from the existence of these criminal laws.[20]  Indeed, as the ITCA commenters point out, Arizona officials have previously acknowledged this very fact.  EAC001558-60 & n.12.

### b)      Coordination with driver licensing agencies

One available measure is suggested by Kansas's own evidence describing procedures to identify potential non-citizens on its voter rolls by comparing the list with a list of Kansas residents who hold temporary driver's licenses issued to noncitizens.  EAC000611-12 ¶¶ 2-3; EAC000620 ¶ 5.  Using accurate, up-to-date, and otherwise reliable data, this procedure could potentially be applied to prospective registrants.  Indeed, Section 202 of the REAL ID Act of 2005, Pub. L. No. 109-13, 119 Stat. 231, 312-15 (2005), requires state driver licensing agencies that wish for their IDs to be honored by federal agencies to collect documentary proof of citizenship for U.S. citizens, verify it, and retain copies of it in their databases.[21]  Section 303 of HAVA requires that voter registrants provide their driver's license number or the last four digits

---

[20] The ITCA commenters also note that the vast majority of these criminal investigations do not result in prosecutions.  EAC001559-62.

[21] Georgia and Kansas have reported that they are fully compliant with the REAL ID Act.  *See* Department of Homeland Security, *REAL ID Enforcement in Brief* (Dec. 20, 2013), http://www.dhs.gov/sites/default/files/publications/REAL-ID-IN-Brief-20131220.pdf (last accessed Jan. 12, 2014). And while Arizona has not yet reported its full compliance with the REAL ID Act, Arizona law nevertheless mandates that the state may not "issue to or renew a driver license or nonoperating identification license for a person who does not submit proof satisfactory to the department that the applicant's presence in the United States is authorized under federal law."  Ariz. Rev. Stat. § 28-3153(D); Ariz. Dep't of Transp., Motor Vehicle Div., *Identification Requirements*, Form 96-0155 R09/13, http://www.azdot.gov/docs/default-source/mvd-forms-pubs/96-0155.pdf?sfvrsn=2 (last accessed Jan. 12, 2014).

of their Social Security number if they have one, and mandates that state election agencies

coordinate with state driver licensing agencies to share certain database information relevant to

voter registration.  42 U.S.C. § 15483.  While HAVA does not require states to seek to verify

citizenship as part of database comparisons, states have the discretion to undertake such a

comparison as an initial step in identifying possible non-citizens, bearing in mind that the

information in driver license databases may be older than that in voter registration databases.[22]

### c)    Comparison of juror responses

Another measure is suggested by Arizona's submission: using information provided to a

jury commissioner.  A person's response under oath to a court official that he or she is not a

citizen would certainly provide probable cause for an election official to investigate whether the

person, if registered as a voter, does not meet the citizenship qualification. Such responses

relating to citizenship therefore provide election officials with another means of enforcing their

voter qualifications.

### d)    The SAVE database

The United States Citizenship and Immigration Services agency maintains a database of

the immigration/citizenship status of lawful noncitizen and naturalized citizen residents of the

United States.  *See* USCIS, *SAVE Program*, http://www.uscis.gov/save (last accessed Jan. 12,

2014).   Government agencies may apply to use and access the federal SAVE database as one

potential means of attempting to verify applicants' immigration/citizenship status under

appropriate circumstances.  *Id.*  Several Arizona county election offices are already using this

database to attempt to verify citizenship of voter registration applicants.  EAC000771.

---

[22] As the ITCA commenters note, a driver's citizenship status at the time he or she initially applies for a driver's license is not necessarily determinative of his or her citizenship status at the time of that driver's registration to vote.  EAC001560-61.

### e)      Requesting and verifying birth record data

The National Association for Public Health Statistics and Information Systems

(NAPHSIS), a national association of state vital records and public health statistics offices, has

developed and implemented an electronic system called Electronic Verification of Vital Events

(EVVE).  The EVVE system allows member jurisdictions to immediately confirm birth record

information for citizens virtually anywhere in the United States.  Currently 50 of 55 U.S. states

and territories are either online or in the process of getting online with the EVVE birth record

query system.[23]  Thus, to the extent election officials are unable to confirm an applicant's oath

and attestation of citizenship on the voter registration application through coordinating with a

driver licensing bureau or using the SAVE Database, they could follow up directly with the

affected applicant and request additional information that would enable them to make a query

through the EVVE system (such as place of birth, mother's maiden name, etc.).

The above methods appear to provide effective means for identifying individuals whose

citizenship status may warrant further investigation.[24]

In conclusion, the Commission finds, based on the record before it, that the States are not

"precluded…from obtaining the information necessary to enforce their voter qualifications," and

that the required oaths and attestations contained on the Federal Form are sufficient to enable the

States to effectuate their citizenship requirements.  *Cf. Inter-Tribal Council*, 133 S. Ct. at 2259-

60.  Thus, the States have not shown that the EAC is under a "nondiscretionary duty," *id.* at

---

[23] *See* NAPHSIS, *EVVE Vital Records Implementation: Birth Queries (December 2013)*, http://www.naphsis.org/about/Documents/EVVE_Implementation_Dec_2013%20Birth%20Queries%20with%20years.pptx (last accessed Jan. 12, 2014).

[24] Federal law also provides states with additional tools for verifying voter registration applications by mail. The NVRA allows states to require first-time registrants by mail to vote in person the first time (with limited exceptions).  42 U.S.C. § 1973gg-4(c).  HAVA also requires states to take certain verification steps with regard to first time registrants by mail (with limited exceptions). 42 U.S.C. § 15483.

2260, to include the States' requested instructions despite Congress's previous determination, when it enacted the NVRA, that such instructions are generally "*not necessary* or consistent with the purposes of this Act," could "permit registration requirements that could effectively eliminate, or seriously interfere with, the mail registration program of the Act," and "could also adversely affect the administration of the other registration programs…." H.R. Rep. No. 103-66, at 23 (1993) (Conf. Rep.).

### F.     *The Requested Changes Would Undermine the Purposes of the NVRA.*

#### 1.     **The States' requested changes would hinder voter registration for Federal elections.**

As discussed above, Congress enacted the NVRA in part to "increase the number of eligible citizens who register to vote in elections for Federal office" and to "enhance[] the participation of eligible citizens as voters in elections for Federal office." 42 U.S.C. § 1973gg(b). In enacting the statute, Congress found that "the right of citizens of the United States to vote is a fundamental right" and that "it is the duty of the Federal, State, and local governments to promote the exercise of that right." *Id.* § 1973gg(a).

The district court in the *Inter Tribal Council* litigation found that between January 2005 and September 2007, over 31,000 applicants were "unable (initially) to register to vote because of Proposition 200." *Gonzalez v. Arizona*, No. 06-CV-1268, slip op. at 13 (D. Ariz. Aug. 20, 2008), EAC001663. The court further found that of those applicants, only about 11,000 (roughly 30 percent) were subsequently able to register. *Id.* at 14, EAC001664. Several comments provide additional evidence showing that implementation of Arizona's and Kansas's heightened proof-of-citizenship requirements has hindered the registration of eligible voters for federal elections. The requirements impose burdens on all registrants, and they are especially burdensome to those citizens who do not already possess the requisite documentation.

41

EAC001821-23; EAC001465-71; EAC000771-73; EAC001563; EAC000705; EAC000895;

EAC000901-07; EAC001620; EAC001804; EAC001839; EAC001601, EAC001603.  Such

burdens do not enhance voter participation, and they could result in a decrease in overall

registration of eligible citizens.  *See, e.g.*, EAC0001823 (referencing news reports that since

Kansas's law took effect in January 2013, between 17,000 to 18,500 applicants have been placed

in "suspense" status, mostly because of failure to satisfy the new citizenship proof requirements).

Based on this evidence, the EAC finds that granting the States' requests would likely

hinder eligible citizens from registering to vote in federal elections, undermining a core purpose

of the NVRA.

> ### 2.    The States' requested changes would thwart organized voter registration programs.

It is also clear from the text of the NVRA that one purpose of the statute's mail

registration provisions is to facilitate voter registration drives.  Specifically, Section 6(b) requires

state election officials to make mail voter registration forms, including the Federal Form,

"available for distribution through governmental and private entities, with particular emphasis on

making them available for organized voter registration programs."  42 U.S.C. § 1973gg-4(b); *see

also Charles H. Wesley Educ. Found. v. Cox*, 408 F.3d 1349, 1353 (11th Cir. 2005) (NVRA

encourages and protects community-based voter registration drives and obligates states to

register eligible citizens if their valid registration forms are received by the registration deadline,

thus "limit[ing] the states' ability to reject forms meeting [the NVRA's] standards").

A number of comments state that the heightened proof of citizenship requirements

imposed by Arizona and Kansas have led to a significant reduction in organized voter

registration programs during the time those requirements have been in effect.  The comments

indicate that this is due primarily to the logistical difficulties in providing the required proof,

even for those that already possess it.  EAC000772, EAC000710-19, EAC000737-42;

EAC001466-67, EAC001469-70, EAC001176-80; EAC001620; EAC001825; EAC000904-07.

      Based on the evidence submitted, the EAC finds that granting the States' requests could

discourage the conduct of organized voter registration programs, undermining one of the

statutory purposes of the Federal Form.

      **G.**    ***The Requested Proof-of-Citizenship Instructions Are Not Similar to Louisiana's Request for Modifications to the State-Specific Instructions.***

      Arizona and Kansas contend that it would be unfair or arbitrary for the Commission to

approve Louisiana's 2012 request to modify the Federal Form's state-specific instructions to

include HAVA-compliant language, and not to approve Arizona's and Kansas's requests to

include additional proof-of-citizenship instructions.[25]  In August 2012, the EAC approved

Louisiana's July 16, 2012, request to amend the state-specific instructions for Louisiana to

provide that if the applicant lacks a Louisiana driver's license or special identification card, or a

Social Security number, he or she must attach to the registration application a copy of a current,

valid photo identification, or a utility bill, bank statement, government check, paycheck, or other

government document that shows the name and address of the applicant.  EAC000167-71.

      HAVA provides that federal voter registration applicants must provide their driver's

license number, if they have one, or the last four digits of their Social Security number.  42

U.S.C. § 15483(a)(5)(A)(i).  If they do not provide such information at the time of registration

and they are registering by mail for the first time in a state, they will generally be required to

show one of the following forms of identification the first time they vote in a federal election,

irrespective of state law: a "current and valid photo identification" or "a copy of a current utility

---

[25] The Louisiana Secretary of State's Office supports the States' requests in this regard.  EAC000216.

bill, bank statement, government check, paycheck, or other government document that shows the name and address of the voter." *Id.* § 15483(b)(2)(A).  One of the ways voters who register by mail can fulfill the HAVA ID requirement is to submit a copy of one of the HAVA-compliant forms of identification with their registration application. *Id.* § 15483(b)(3)(A).

Louisiana's request to modify the state-specific instructions thus largely flowed from HAVA's identification requirements.[26]  By contrast, the States' requests here seek to require federal voter registration applicants to supply additional proof of their United States citizenship beyond the oaths and affirmations already included on the Federal Form, even though such a requirement had already specifically been rejected by Congress when it enacted the NVRA. These are fundamentally different types of requests, and the EAC does not act unfairly and arbitrarily by reasonably treating them differently.

> **H.      The Decision by the Federal Voting Assistance Program to Grant Arizona's Request Has No Bearing on the States' Requests to the EAC.**

Arizona notes that after passage of Proposition 200, the Federal Voting Assistance Program ("FVAP") at the Department of Defense granted its request to add instructions regarding its proof-of-citizenship requirement to the Federal Post Card Application, a voter registration and absentee ballot application form for overseas citizens developed pursuant to the Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA"), 42 U.S.C. § 1973ff(b)(2). EAC001702, EAC001750-51.  However, the UOCAVA is a separate statute from the NVRA and contains no language similar to the NVRA's limitation that the Federal Form "may require only

---

[26] The League of Women Voters' comments argue that Louisiana's requested instructions regarding HAVA ID, *see* EAC000168, 000196, and the relevant portions of the Louisiana Election Code, *see* La. Rev. Stat. § 18:104(A)(16), (G), are not in full compliance with HAVA or the NVRA.  EAC000760.  The EAC will consider the issues the comments have raised.  After consulting with Louisiana officials, the Commission will consider whether there are necessary and appropriate modifications to item 6 of the state-specific instructions for Louisiana on the Federal Form to clarify any lingering confusion and to ensure the instruction is in full compliance with the requirements of HAVA relating to federal elections.

such identifying information . . . as is necessary to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process."  42 U.S.C. § 1973gg-7(b)(1).  The FVAP's decision therefore has no bearing on the States' requests to the EAC.

> ### I. The EAC's Regulations Do Not Require Inclusion of State-Specific Instructions Relating Only to State and Local Elections.

Finally, Kansas contends that the EAC is required by its own regulations to include information relating to the state's proof-of-citizenship requirements.  EAC000565.  Specifically, Kansas invokes 11 C.F.R. § 9428.3(b), which provides that "the [Federal Form's] state-specific instructions shall contain . . . information regarding the state's specific voter eligibility and registration requirements."  By the terms of the NVRA, the Federal Form is a "mail voter registration application form *for elections for Federal office*."  42 U.S.C. § 1973gg-7(a)(2) (emphasis added).  Thus, the EAC's regulatory provision quoted above can only require the Form's state-specific instructions to include voter eligibility and registration requirements relating to registration *for Federal elections*.

As discussed above, the Commission has determined, in accordance with Section 9 of the NVRA and EAC regulations and precedent, that additional proof of citizenship is not "necessary . . . to enable the appropriate State election official to assess the eligibility of the applicant," *cf.* 42 U.S.C. § 1973gg-7(b)(1), and will not be required by the Federal Form for registration for federal elections.  Accordingly, the EAC is under no obligation to include Kansas's requested instruction because it would relate only to Kansas's state and local elections.

## V.  CONCLUSION

For the foregoing reasons, the Commission **DENIES** the States' requests.

*Final Agency Action*:  This Memorandum of Decision shall constitute a final agency action within the meaning of 5 U.S.C. § 704.  Notice of the issuance of this decision will be published in the Federal Register and posted on the EAC's website, and copies of this decision will be served upon the chief election officials of the States of Arizona, Georgia, and Kansas, as well as all parties to the pending *Kobach v. EAC* litigation in the U.S. District Court for the District of Kansas.

**Done at Silver Spring, Maryland, this 17th day of January, 2014.**

**THE UNITED STATES ELECTION ASSISTANCE COMMISSION**

BY: _____

Alice P. Miller
Chief Operating Officer and
Acting Executive Director

46