# Exhibit 16

**Civil Action No. 25-0955 (CKK)**

CHAPTER 8

# WE ARE SIMPLY ALL AMERICANS

For Walter Plecker and his program of racial purification, the surge in demand for delayed birth registrations during World War II was both a hardship and an opportunity. On the one hand, like vital registration offices everywhere, the Virginia Bureau of Vital Statistics (BVS) was overwhelmed by new work during the war. The skyrocketing number of requests for certificates made it more difficult, Plecker believed, for the clerks to maintain their customary vigilance about racial passing. He did, however, catch one case, a birth certificate on which the child was identified, mistakenly he believed, as white. Plecker sent the certificate back to the attending physician and explained that the child's family was one of those that was near-white and trying to pass. "In the terrible rush of war work, we have not been able to watch them, and many certificates such as this have slipped by without being caught," he lamented.[1] Decades of careful scrutiny dedicated to ensuring the accuracy of new birth registrations and to "correcting" mistaken registrations of the past might go down the tubes as clerks rushed to process, but not check, the birth certificates that they had to produce on an unprecedented scale. This was the hardship.

On the other hand, the same high demand for proof of age and citizenship presented an opportunity. Existing certificates could be checked for accurate racial classification and, if necessary, issued with corrections appended on the rear face. The demand for delayed birth certificates also meant that the BVS had a whole new, previously unregistered population to scrutinize for racial classification. These were adults, some of whom had been outside Virginia for decades, some of whom may have been regarded as white where they lived. For Plecker, it was just these cases that were an especial sort of prize, since it was these would-be racial interlopers that posed the starkest threat to white purity. Like other states, Virginia also had to scramble to create new legislation for standards and procedures pertaining to delayed birth registration.

Copyright © 2021. University of North Carolina Press. All rights reserved.

Pearson, Susan J.. The Birth Certificate : An American History, University of North Carolina Press, 2021. ProQuest Ebook Central,
    http://ebookcentral.proquest.com/lib/nyulibrary-ebooks/detail.action?docID=6793683.
Created from nyulibrary-ebooks on 2025-04-03 15:55:20.

In Virginia, the legislature specified that applicants for a delayed birth certificate could submit evidence of their birth to the state registrar, but if he deemed the evidence unsatisfactory, a local judge could adjudicate the matter and "set forth the date and place of the person's birth as so proven, together with the sex, height, weight, color of hair and eyes, and any distinguishing physical mark or characteristic of the person." Importantly, race was left out of the "distinguishing" physical marks that courts were allowed to determine. This was by design. The original bill establishing procedures for delayed registration would have allowed the courts to determine race in addition to date and place of birth. But Plecker argued to the bill's author, Mr. Campbell, that "judges were not in position to establish that fact as well as is the Bureau of Vital Statistics, with all of our records and experience." Campbell was persuaded by this line of argument and removed race from the bill. In the bill that passed, only the BVS had the power to make that determination, ensuring that the genealogical method and the use of documentary evidence would prevail over the vagaries of local racial reputation. Plecker believed that this preserved the intent of the Racial Integrity Act (RIA), which had made the BVS into the state's paramount authority on the race of its citizens.[2]

As requests for birth certificates—both existing and delayed—poured in, Plecker and his clerks used their power to purify the population. Wartime demand for birth certificates allowed the RIA to extend its reach far beyond Virginia's borders. Applicants born in Virginia but residing in Maryland, Tennessee, North Carolina, Kentucky, Michigan, Indiana, Ohio, New York, New Jersey, and Pennsylvania all had their birth certificates "corrected" or rejected by the BVS during the war.[3] In August 1944, for example, Plecker wrote to Solomon Collins of Niagara Falls, New York. Collins had sent in an application for a delayed birth registration, which Plecker refused to issue "until the question of your pedigree is established." As he explained to Collins, the BVS would not issue any certificates "as long as we have any doubt as to the correctness of any part of them." In Collins's case, the information about his grandparents was contradictory. Plecker suspected that they had come to Virginia via North Carolina and Tennessee, but "since we do not have access to the North Carolina and Tennessee records, we cannot trace your ancestry and cannot accept a birth certificate without such knowledge."[4] In other words, unless Collins could provide positive proof that his ancestors were all "pure" white, or unless Plecker himself could prove this through Virginia's "old records," he would not issue Collins a birth certificate of any kind. Plecker, in effect, denied Collins the ability to establish his citizenship, let alone his race.

Copyright © 2021. University of North Carolina Press. All rights reserved.

In other cases, Plecker was willing to issue a birth certificate but only if the applicant agreed to be identified as "colored." William Cleveland from Muncie, Indiana, had sent in a request for his wife's birth certificate, but Plecker wrote that because his wife's family was known to be mixed race in spite of many having registered successfully as "white," he could only issue her birth certificate with "the racial pedigree noted on the back."[5] Plecker had always hoped that all states would pass their own RIAs, but even in the absence of a uniform legal definition of race across the country, he could use his office to impose RIA standards on Virginia-born residents of other states, effectively making them "colored" whether or not they would be considered as such in their adopted states. And when applicants refused to accept a birth certificate on the terms proffered by Plecker—that they be identified as Black—he effectively denied them equal access to citizenship.

Plecker's use of delayed registration to police racial lines was not the only way that birth certificates enforced white supremacy in the mid-twentieth-century United States. Whenever employers demanded that job candidates submit birth certificates as a condition of employment, African Americans were at a disadvantage. This was not only because employers could use racial classification to discriminate by refusing to interview and hire candidates labeled as nonwhite but also because African Americans were less likely to have birth certificates in the first place. The inability of Black job seekers to establish their official identity made them ineligible to apply for many jobs and stymied their ability to seek rights including schooling and voting.

By the middle of the twentieth century, the unmistakable role of birth certificates in maintaining white supremacy led civil rights organizations to launch a multipronged attack on the problem. In one phase, activists tried to simply increase African American and Native American access to birth registration to prevent the administrative denial of identity. This dovetailed with targeted federal campaigns to achieve full birth registration among both African Americans and Native Americans. On the other hand, African American activists also challenged racial classification on vital documents. Like those who argued for removing birth status from registration documents, local advocates in cities such as New York and Chicago, and national organizations such as the NAACP, argued that race served no purpose other than to stigmatize nonwhites. This campaign was successful, and by 1968 the standard certificate of live birth issued by the U.S. Census Bureau had moved "race/color" to the confidential, medical section of the certificate (where it remains today). This was the same compromise procedure used several decades earlier

Copyright © 2021. University of North Carolina Press. All rights reserved.

Pearson, Susan J.. The Birth Certificate : An American History, University of North Carolina Press, 2021. ProQuest Ebook Central,
    http://ebookcentral.proquest.com/lib/nyulibrary-ebooks/detail.action?docID=6793683.
Created from nyulibrary-ebooks on 2025-04-03 15:55:20.

in the case of illegitimacy, and as in that earlier case, it represented a conflict between the legal and the statistical uses of birth certificates. Where race now appeared to many, like birth status once had, as a "stigma" that the state should not participate in perpetuating on its own forms of legal identification, others fervently believed that race, like illegitimacy, was an important social fact, the knowledge of which was essential to combat the ill effects of structural racism. Likewise, as in the case of illegitimacy, the campaign to end racial identification showed that the more imbricated in all forms of public administration that birth certificates became, the more their basic categories were subject to contestation and revision.

----------------------

Even after the army reversed its requirement that potential workers in war industry plants provide birth certificates as proof of citizenship, employers across the country hewed to the new standard. Thus, being denied a birth certificate, or being issued one as "colored," might affect a person's ability to find work. Here the issue was less proof of age, as in the case of child labor laws, and more the entwined proof of citizenship and race. The issue was suggested by a correspondence between Plecker and Clayton Pugh of Amherst, Virginia. Pugh had requested his birth certificate from the BVS. Upon being issued one that identified him as "negro," he returned it, contesting his racial designation. Plecker sent him back the same one, this time with "a statement on the back referring to the evidence showing that your mother is of negro descent." Plecker closed his letter to Pugh by saying, "There are plenty of jobs open for colored people. You need have no trouble about that."[6] Pugh had obviously been worried that if Plecker forced him to present an employer with a birth certificate identifying him as "colored," he would be denied a job or denied the specific job he sought.

Pugh's concerns about his employment prospects had merit, and the experiences of countless African Americans like him eventually led civil rights organizations to try to curtail the administrative power of birth certificates. Employment discrimination was widespread, and during World War II it was tied to the practice of using birth certificates to establish the facts of identity. African Americans had experienced disproportionately high rates of unemployment during the Great Depression and naturally hoped that with the increased production and economic activity of the war years, that would change. But it did not. African Americans were less likely to be hired or, when hired, were given unskilled jobs with less pay. The 1940 census showed that whereas

Copyright © 2021. University of North Carolina Press. All rights reserved.

Pearson, Susan J.. The Birth Certificate : An American History, University of North Carolina Press, 2021. ProQuest Ebook Central,
    http://ebookcentral.proquest.com/lib/nyulibrary-ebooks/detail.action?docID=6793683.
Created from nyulibrary-ebooks on 2025-04-03 15:55:20.

only 21.5 percent of white workers were employed in unskilled, service, or agricultural labor, 64.5 percent of all African Americans were employed in these sectors. Such disparity continued into the war years and reflected not just previous patterns of employment but also discrimination in the training programs created to fill the unmet demand for wartime production. In the earliest years of the war, vocational training programs placed some 15,455 workers—only fifty of whom were nonwhite. Major wartime employers such as aviation companies made it clear they would consider African Americans only for janitorial jobs regardless of training.[7]

Given that there was an acute manpower shortage in many key industries, these disparities in employment could only be explained by discrimination. In February 1941, A. Philip Randolph, the head of the International Brotherhood of Sleeping Car Porters, called together leaders from the NAACP, the YMCA, the National Council of Negro Women, the Urban League, and the Council of Churches of Christ in America to discuss the problem. Led by Randolph, the group settled on a tactic that became known as the March on Washington Movement. The idea was to put pressure on the federal government to end employment discrimination by holding mass meetings in urban areas and, barring an adequate response to those, organizing 10,000 African Americans to march in the nation's capital. March on Washington Movement chapters organized in cities across the nation, held local demonstrations, and vowed to send thousands to the D.C. march, scheduled for 1 July 1941. But the march was never held. On 25 July 1941, President Roosevelt issued Executive Order 8802, which prohibited discrimination in defense industries. The order also created a Fair Employment Practice Committee (FEPC) to hear complaints and make redress. In 1943, a second executive order transformed the FEPC into an independent agency with twelve regional offices. By the end of the 1940s, ten states and twenty-eight cities had enacted bans on employment discrimination. By 1960, seven more states had joined the original ten.[8]

Birth certificates played a role both in employment discrimination and its prohibition. As the case of Clayton Pugh suggests, employers demanded proof of name, age, and citizenship, and they often asked that prospective employees establish these facts with a birth certificate. In Pugh's case, his family seems to have been known and registered as white; thus the requirement for a birth certificate would have changed his employment prospects. As soon as national civil rights organizations such as the NAACP become involved in the March on Washington Movement, and as soon as offices of the FEPC were established, complaints of discrimination involving birth certificates began to roll

Copyright © 2021. University of North Carolina Press. All rights reserved.

Pearson, Susan J.. The Birth Certificate : An American History, University of North Carolina Press, 2021. ProQuest Ebook Central,
          http://ebookcentral.proquest.com/lib/nyulibrary-ebooks/detail.action?docID=6793683.
Created from nyulibrary-ebooks on 2025-04-03 15:55:20.

in. One of these was from Charles Norris, who wrote to the NAACP in 1941. Norris, born in Virginia, was a resident of Paterson, New Jersey. He reported to the NAACP that he had been accepted into a vocational training program run by the State Employment Service and designed to funnel its graduates into jobs at a local aviation company. After being accepted, Norris was directed to bring his social security card and his birth certificate to an interview at the Edison Vocational School. After the interview and the presentation of his documents, Norris's place in the program was withdrawn. Allegedly this was because he already had a job, but he reported that since unemployment was not a condition for the training program, he could only conclude that "the final refusal to accept my application is based on the fact that through my birth certificate, my identity as a Negro was disclosed."[9] Likewise, Donald McRaven of Minneapolis complained to the FEPC that after he signed a contract for employment, his offer was rescinded when his birth certificate revealed that he was not white. While it was unclear whether Norris had a racial reputation as white in New Jersey, the Chicago regional office of the FEPC described McRaven "as an individual, who appears to be white."[10] In both cases, the requirement for documentary proof of identity functioned in the service of racial discrimination, now officially illegal.

Birth certificates excluded African Americans from jobs not just because they marked an applicant's race but also because employers frequently required birth certificates as a condition of employment. This was certainly true for young people once documentary proof of age was required across all states, and it was also true for adults seeking employment in many industries. During the 1930s, in order to work in an aircraft plant, for example, employees had to have their names verified by birth certificate.[11] Moreover, once employers started giving out pensions, and once they were obligated to have employees register for social security as part of their employment, proof of age for adults became as important as it was for adolescents. And just as in the case of child labor, it was employers and employees in southern states in particular who found it hardest to comply with requirements for documentary proof of age. "What will be considered to be 'satisfactory evidence' [of age] for white and colored employees in the States of Virginia, North Carolina, South Carolina, Georgia and Kentucky[?]," Vance Terrell of the Imperial Tobacco Company asked the Social Security Board in 1936.[12] Reports from the Works Progress Administration during the Depression era likewise noted that it was hardest for African Americans to obtain social security and other benefits, because they lacked proof of birth. "A great many [African American] persons

Copyright © 2021. University of North Carolina Press. All rights reserved.

Pearson, Susan J.. The Birth Certificate : An American History, University of North Carolina Press, 2021. ProQuest Ebook Central,
     http://ebookcentral.proquest.com/lib/nyulibrary-ebooks/detail.action?docID=6793683.
Created from nyulibrary-ebooks on 2025-04-03 15:55:20.

complain they are refused WPA employment, general relief, and social security benefits because they cannot produce credentials to substantiate their age, marriage, and residential claims," wrote one Works Progress Administration field agent to his superiors in Washington.[13]

Lack of documentation continued to dog African Americans during the period when the War Department required that anyone working in a plant with a government contract provide documentary proof of citizenship. In a series of letters to William Hastie, the civilian aide to the secretary of war, Sidney Williams, the executive secretary of the Cleveland branch of the Urban League, explained the problem. "The birth certificate problem I find is hounding Negro workers here in Cleveland just as it did in St. Louis," he reported. Williams estimated that more than 70 percent of African Americans living and working in the North "were born in southern states before these states adopted the practice of issuing birth certificates." Thus the demand for documentation of birth put African American applicants "at a sever[e] disadvantage." Williams reminded Hastie that "southern-born Negro workers are suffering because of state governments over which they had absolutely no control." Indeed, "if they could have voted, this would have changed the picture slightly."[14] Civil rights organizations such as the NAACP and the Urban League argued not only that southern states had been slow to register births but also that they were particularly neglectful when it came to registering Black babies. "Southern cities are notoriously lax in registering Negro babies," claimed a press release from the Associated Negro Press.[15] As these complaints suggested, lax birth registration was a function of politics, not just poor administration. Disfranchised and undocumented, African American workers fleeing racist home rule and seeking economic opportunity in northern war industries found that their states' exclusion of them followed them northward. In response, local branches of the Urban League advertised that they could help African Americans navigate the process of receiving a delayed birth certificate.[16]

Like African Americans, Native Americans were disproportionately represented among the millions of unregistered Americans. In spite of efforts such as the Save the Babies campaign run by the Office of Indian Affairs (OIA), Native Americans on reservations remained, like other nonwhite and rural populations, less likely to have their births registered throughout the twentieth century. In 1940, only 68 percent of Indian babies had their births registered; by 1950, 85 percent of Indian births were registered nationally, compared to 93.4 percent of nonwhite births as a whole and 98.5 percent of white births.[17] Unlike many African Americans, however, Native Americans

Copyright © 2021. University of North Carolina Press. All rights reserved.

Pearson, Susan J.. The Birth Certificate : An American History, University of North Carolina Press, 2021. ProQuest Ebook Central,
    http://ebookcentral.proquest.com/lib/nyulibrary-ebooks/detail.action?docID=6793683.
Created from nyulibrary-ebooks on 2025-04-03 15:55:20.

often had recourse to other government-issued documents to establish their identity. Correspondence with the Bureau of Indian Affairs (BIA) shows that Indians sought proof of identity for the same reasons as any other Americans. More often than not, however, the BIA supplied that information from allotment rolls and censuses, not vital registration documents. During the World War I draft, for example, draft boards and individual Native Americans had used tribal rolls to establish eligibility for service.[18] After social security was established, Native Americans used federal records to access those benefits. In 1939, a group of allotted Pottawatomie Indians met and "decided to ask the Commissioner of Indian Affairs to furnish the business committee with a copy of the allotment roll. . . . It is felt that this would be a great help to our old people in receiving Old Age Assistance, as birth certificates are impossible to procure."[19] The Pottawatomie clearly understood the importance that federal records had for them and acted as a group to gain access to them. Most evidence suggests, however, that individuals sought documentary evidence of their identity on a case-by-case basis. Chickasaw member Ada Phillips Trout Heaston, for example, wrote to the BIA in the 1940s seeking her birth information. "Will you please tell me how get a Birth Certificate," she asked. She explained that she had her "papers from Muskogee," meaning her enrollment papers, but she wondered, "Is this official & will it ans [*sic*] for Birth Certificate every place?" Now living in Los Angeles, Heaston was trying to get an old-age pension. The OIA wrote Heaston back explaining that the tribal roll was "official and accepted as proof of age by all state departments of public welfare for use in establishing eligibility for old age assistance."[20]

During World War II, Indians used allotment rolls and tribal censuses to establish age and citizenship to serve in the military and work in the war industries.[21] These records were considered valid in spite of the fact that for decades the OIA had acknowledged that its tribal censuses were incomplete and haphazard and in spite of the fact that the roll recorded the person's age in years on a particular date but did not record a birth date. Still, this was acceptable to state and federal agencies because, like a birth certificate, the roll was a creature of the state. A 1945 article in the *Registrar*, a publication of the Census Bureau, recognized this. "The Indian does have . . . an Indian Census roll record," the article explained, and "nine times out of ten a certification of this record is used, accompanied by a form letter, and these are always acceptable to the Army, Navy, and other agencies." The record created from the roll could give many of the same facts as a birth certificate—name, surname, sex, tribe, date of birth or age, "degree of Indian blood," and family relationships

Copyright © 2021. University of North Carolina Press. All rights reserved.

Pearson, Susan J.. The Birth Certificate : An American History, University of North Carolina Press, 2021. ProQuest Ebook Central,
        http://ebookcentral.proquest.com/lib/nyulibrary-ebooks/detail.action?docID=6793683.
Created from nyulibrary-ebooks on 2025-04-03 15:55:20.

(mother and father)—as well as things not supplied by the birth certificate such as marital status.[22] On some agencies, however, superintendents used tribal documents to help Native Americans obtain state-issued delayed birth certificates in order to find work in defense industries.[23] Like African Americans, Indians also needed proof of birth and citizenship, but unlike many born during the first half of the twentieth century, they had access to government-issued documents even when they had no birth certificate on file.

The War Department did eventually relax its rules for proof of citizenship, but employers did not always follow suit. At an October 1942 meeting of the Metropolitan Council on Fair Employment Practice in New York City, representatives from organizations such as the NAACP, the Urban League, and the American Jewish Congress discussed "the difficulties experienced by Negroes and other groups of native-born American citizens unable to obtain birth certificates." These difficulties persisted because "very few companies" were accepting the War Department's "alternate procedure."[24] As employers continued to ask applicants for birth certificates, these requirements disproportionately excluded African Americans. "Many employers are using the birth certificates as a convenient excuse for not employing Negroes," lamented the Cleveland *Call and Post*. Even after Executive Order 8802 and the establishment of the FEPC, the *Atlanta Daily World* reported that Cleveland manufacturers were finding ways to evade the orders. "Smart anti-Negro employers had their personnel managers send in orders for Negro men between 45 and 60 years old." When the men showed up to apply for work, managers told them that they would be employed only if they could present a birth certificate. But, the paper noted, "since most of the colored population is from the south where there are few birth records of Negroes of that age," almost no men were actually hired. The employers, meanwhile, "use this as 'proof' of their willingness to hire colored."[25] E. W. Bailey of Norwich, New York, described a similar strategy in a 1942 letter to the NAACP. Bailey opened his letter by asking, "Why is it just about impossible for a Race member to secure employment in Defense work?" He immediately connected this to the requirement for birth certificates. "Why do they not tell applicants when first contact is made," he went on, "that a Certificate of Birth or Affidavit is required instead of the dangling method which is used?"[26] The "dangling method" accords with the report on Ohio factories in the *Atlanta Daily World*. Employers "dangled" jobs before African Americans and then denied them for a bureaucratic reason: lack of proper documentation. The NAACP likewise reported on the case of a woman in Detroit who, after being hired at the Hudson Naval Arsenal, was

Copyright © 2021. University of North Carolina Press. All rights reserved.

Pearson, Susan J.. The Birth Certificate : An American History, University of North Carolina Press, 2021. ProQuest Ebook Central,
    http://ebookcentral.proquest.com/lib/nyulibrary-ebooks/detail.action?docID=6793683.
Created from nyulibrary-ebooks on 2025-04-03 15:55:20.

denied her job once her employer discovered that she was "colored." Officially, however, "the 'excuse' given was that she had no birth certificate."[27] Thelma Cleage of Springfield, Ohio, reported a similar story to a regional office of the federal FEPC in Ohio.[28]

Not only were African Americans less likely than whites to have their birth registered in the first place, but also obtaining a delayed birth certificate could be more difficult for African Americans than for those presumed to be white. In his *Pittsburgh Courier* column, George Schuyler of the NAACP reported a dispatch he'd received from FP, "a colored man of San Diego." Here, in a major center of naval operations and war production, FP reported that "it is getting increasingly harder to get delayed certificates for colored people from States in the South." Texas was reputed to be the "worst offender."[29] While FP did not say what made it "increasingly harder," even the routine backlog created by the wartime demand for delayed birth certificates would have hit African Americans more squarely than it did whites. African Americans were both more likely to need a delayed certificate and more likely to face an ironclad requirement to present a birth certificate to an employer. Thus, whether or not southern registrars intentionally made it harder for African Americans to obtain delayed registration—and we know that some such as Plecker did— even seemingly ordinary bureaucratic procedures on both the production and consumption side of birth registration acted to keep African Americans from fully participating in the wartime economic boom.

There is evidence that increased demand for birth certificates as a condition of employment affected other minority groups as well. American Jews, for example, had long adopted anglicized surnames to avoid discrimination in employment and higher education. For the first several decades of the twentieth century, this was done informally rather than legally. During the 1940s, however, the number of legal name changes among American Jews skyrocketed. This was in no small part because of the increasingly common requirement that official documentation, such as a birth certificate, accompany applications for a variety of things, including employment. In this case, American Jews needed to have official documents that matched their informal, anglicized names. Thus they flooded courts with requests for legal name changes that would produce new birth certificates with their new names.[30] Unlike African Americans, Jews could use legal procedures to pass, at least on paper. For those who did not avail themselves of this option, American Jewish advocacy organizations worked with the NAACP, the Urban League, and others to help usher in the federal and state FEPCs.

Copyright © 2021. University of North Carolina Press. All rights reserved.

Pearson, Susan J.. The Birth Certificate : An American History, University of North Carolina Press, 2021. ProQuest Ebook Central,
     http://ebookcentral.proquest.com/lib/nyulibrary-ebooks/detail.action?docID=6793683.
Created from nyulibrary-ebooks on 2025-04-03 15:55:20.

The civil rights organizations that pressured the federal government to create the FEPC, and who worked to pass similar measures in states and municipalities, clearly recognized the role that documentation of identity could play in discrimination. While the federal FEPC adjudicated complaints about discrimination, the state FEPCs promulgated clear rules about what constituted discriminatory hiring practices. Among other things, state rules specified what kinds of questions employers could ask and what kinds of identification they could seek as part of the hiring process. In Massachusetts, for example, employers were forbidden from asking applicants for "a photograph, birth certificate, discharge papers and other such personal documents as disclosed information concerning race, color, religion or national origin." Most other state FEPCs adopted similar rules and published guides for employers, directing them to the questions and proof of identification that they could and could not require during the hiring process.[31] As such laws took effect in states, corporations incorporated fair employment practices into their hiring procedures. In Michigan, for example, after the state adopted an antidiscrimination law in 1955, the Chrysler Corporation's manuals for supervisors clearly reminded them that they could not seek a birth certificate from a job applicant until *after* he had been hired.[32]

As the experience of World War II–era employment discrimination suggests, the increasingly common requirement on the part of institutions that people present birth certificates to verify their identity helped maintain white supremacy. This was the case not just when institutions used positive racial identification to sort people for the purpose of unequally distributing resources such as jobs or schooling but also when birth certificates were entirely absent. This was true for African Americans seeking employment during the war years—when not having a birth certificate could become a disqualification—and it was true when civil rights organizations sought to breach other barriers as well. In 1939, for example, the Young Men's Civic Club of Savannah, Georgia, wrote to the NAACP for help. At the time, a fellow Savannahian, Walter White, was the national president of the NAACP. The Young Men's Civic Club had been founded in 1938, organized by African American longshoremen who worked on the city's docks.[33] As the club described itself to the NAACP, it was "organized for the sole purpose of getting more Negroes to become registered voters" in Savannah. In just four months, the club had increased the number of African American voters from 600 to 1,000. But now its efforts were being stonewalled. Suddenly the registrar began to demand "such forms as birth certificates, insurance policies, and the old Family Bible" as proof of age to

Copyright © 2021. University of North Carolina Press. All rights reserved.

Pearson, Susan J.. The Birth Certificate : An American History, University of North Carolina Press, 2021. ProQuest Ebook Central,
          http://ebookcentral.proquest.com/lib/nyulibrary-ebooks/detail.action?docID=6793683.
Created from nyulibrary-ebooks on 2025-04-03 15:55:20.

vote. As the club's letter pointed out, "birth certificates have only been issued to Negroes about 17 years ago." The club helped registrants to find these documents—and to answer the detailed questions posed by registrars—but found that registrars simply made the requirements more stringent. "As we neared the 400 mark . . . the qualifications became more exact, they wanted only birth certificates." Of course, even when registrants could produce birth certificates, registrars found other ways to disqualify them.[34] Nonetheless, many Black Georgians could not produce birth certificates, and this apparently neutral requirement helped form the edifice of disfranchisement.

The Young Men's Civic Club was a pioneer in the effort to boost Black voter rolls, but even when national organizations such as the NAACP and the Student Nonviolent Coordinating Committee fanned out across southern states in the mid-1960s, birth certificates were still used to keep African Americans from voting. The field reports from an NAACP summer voter registration project in Mississippi, for example, noted that the Jones County registrar "demonstrated a high degree of ingenuity in requiring Negro applicants to furnish birth certificates to prove age, real property deeds to prove residency." In one case, a sixty-seven-year-old woman who could prove her residency with her electric bill was turned away for want of a birth certificate.[35] There's little doubt that she appeared too young to vote. Congress of Racial Equality (CORE) fieldworker Ronnie Sigal described teaching African Americans in St. Helena Parish, Louisiana, to fill out voter registration forms. Each applicant had to prove that she was twenty-one years of age. "A great grandmother might come to register, but if she didn't have a birth certificate stating she was 21, she was refused."[36] As in Savannah, so too in Jones County and St. Helena Parish documentary requirements formed an allegedly race-neutral barrier.

Public officials also used birth certificates to slow down school integration. Progressives in the U.S. Children's Bureau and state registrars across the country had viewed the requirement for children to present birth certificates to enroll in school as a way to both protect children and promote vital registration. Now that such requirements were integrated into the administrative machinery of school districts, the requirement could be strategically deployed as it was in the cases of employment and voting. In Louisiana, the legislature adopted a new law after the Supreme Court's 1954 *Brown v. Board of Education* decision. According to a report by the Associated Negro Press, the new law required that a student applying to attend a new school "must furnish proof of his date of birth, place of birth, sex, and race."[37] All of these were, of course, items reported on a birth certificate, and the requirement to provide

Copyright © 2021. University of North Carolina Press. All rights reserved.

Pearson, Susan J.. The Birth Certificate : An American History, University of North Carolina Press, 2021. ProQuest Ebook Central,
       http://ebookcentral.proquest.com/lib/nyulibrary-ebooks/detail.action?docID=6793683.
Created from nyulibrary-ebooks on 2025-04-03 15:55:20.

documentation of them in the wake of *Brown* was clearly an attempt to turn the stream of integration into a trickle. Such efforts were not isolated. Field reports from Mississippi to the national office of the Student Nonviolent Coordinating Committee in 1965 described efforts at school integration. In Panola County, African American children attempting to register at a "white school" were "turned away for not having proper birth certificates." In Holmes County, 289 African American children registered to attend a formerly all-white school. Roughly one-third were turned away for lack of documentation—forty-five for not having a birth certificate and another forty-seven for not having proof of legal guardianship.[38] In Winston County, Mississippi, when a delegation of African American parents sought to learn the requirements to apply for a school transfer, the superintendent of schools refused to tell them "what kinds of inoculation records would be needed or if we would have to produce permanent record birth certificates."[39]

Compared to the violent intimidation faced by many African Americans who sought to vote or attend white schools, a registrar's or school official's request for a birth certificate might seem a mild affront. Yet the presence of these accounts of administrative discrimination alongside those of overt violence demonstrates that documentation and violence are not opposed but exist on a continuum. And as birth certificates came to play an unmistakable role in enforcing state-sanctioned segregation, prosecuting antimiscegenation laws, and bolstering disfranchisement, birth registration became a civil rights issue. Civil rights organizations came to see registration as a path to the entitlements of equal citizenship, and they saw it as within their purview to assist their constituents with the process.

·····················

The importance of documentation to strategies of segregation not only resulted in rules such as those created under state FEPCs—which banned employers from requiring birth certificates as part of an application for employment—but also meant that civil rights organizations had to confront the role documentation played in denying access to other state and federal entitlements. Even as agencies of the federal government targeted African American communities, civil rights organizations began to incorporate birth registration into their work. On the most basic level, they understood that lack of documentation hampered African American efforts to gain access to the polling place, the integrated school, and other entitlements. The Coordinating Council of New Orleans ran a voter registration drive in 1963. Irvin S.

Copyright © 2021. University of North Carolina Press. All rights reserved.

Pearson, Susan J.. The Birth Certificate : An American History, University of North Carolina Press, 2021. ProQuest Ebook Central,
         http://ebookcentral.proquest.com/lib/nyulibrary-ebooks/detail.action?docID=6793683.
Created from nyulibrary-ebooks on 2025-04-03 15:55:20.

Daniel, the director of voter education in charge of the drive, reported that more than 800 people applied for registration. "Most of the Negro applicants were turned away for insufficient identification; yet these applicants have presented such documents as driver's license, marriage license, birth certificates, credit cards, charge plates, bank book, personal mail, rent receipts, etc."[40] The fact that Daniel had his registrants show up with such documents illustrates how civil rights organizations were preparing ordinary people to fight back against documentation's role in preserving white supremacy. Likewise, at the CORE annual meeting in 1962, the Education Workshop advised CORE chapters on how to conduct local school integration campaigns. It was important to make sure parents were organized and prepared for the obstacles that white schools would throw up as parents tried to register their children for transfers. "Be sure parents committed to the transfer know the procedure, and have all the necessary documents and information (birth certificates, etc.)," CORE leadership told those gathered.[41] As CORE's advice suggests, part of the work that civil rights organizations had to do at the local level was assist African Americans in securing documentation, whether that meant obtaining delayed registration or ordering a copy of an original birth certificate. In the summer of 1967, for example, a branch of the NAACP in Autauga County, Alabama, reported helping Mrs. Rosa Motley secure her birth certificate in order to apply for social security. This was after the NAACP had also filed complaints of discrimination against "Pensions and Security offices" in fourteen Alabama counties.[42]

Civil rights organizations' efforts to assist their constituencies with registration dovetailed with efforts on the part of federal agencies that worked throughout the 1940s to improve birth registration among nonwhites. The Census Bureau, for example, encouraged African Americans to register births as a path to full citizenship and enlisted Black institutions to help deliver the message. In 1945, the Children's Bureau and the Census Bureau cooperated to make the annual May 1 celebration of Child Health Day into a promotion of birth registration. In their material explaining the campaign, the two bureaus argued that it was especially important to target "Negro and Spanish-speaking groups" in the South and Southwest because these populations were disproportionately underregistered.[43] In internal memos, Census Bureau staff discussed the best ways to reach African Americans, whom they characterized as more likely to be rural, illiterate, and suspicious of official record keeping. Staff member Elisabeth Clayton recommended getting local race leaders to participate—"namely minister, school teacher, Lawyer, physician and

Copyright © 2021. University of North Carolina Press. All rights reserved.

Pearson, Susan J.. The Birth Certificate : An American History, University of North Carolina Press, 2021. ProQuest Ebook Central,
    http://ebookcentral.proquest.com/lib/nyulibrary-ebooks/detail.action?docID=6793683.
Created from nyulibrary-ebooks on 2025-04-03 15:55:20.

midwives." Clayton also recommended reaching out to the NAACP, which she characterized as "a very active body of Colored leaders organized to help the negro where ever possible." She felt sure the NAACP would help, "since one of our biggest registration problems is with the Colored people in the South."[44]

As field agents from the Census Bureau traveled throughout the South and Southwest organizing events for May Day 1945, they attempted to put Clayton's suggestions in place. Evelyn Halpin described her trip to Alabama and reported that while there, she gave speeches to "colored public health nurses" and prepared "in cooperation with the Negro public health education consultant, a letter to accompany literature to colored leaders."[45] Katharine Lenroot, the chief of the Children's Bureau, also sent a letter to "Negro Leaders" imploring them to aid their states' health departments in the campaign for complete birth registration.[46] In 1946, the Census Bureau created a pamphlet for distribution to African American midwives. Entitled *A Birth Certificate for Baby*, it explained the importance of birth registration for the individual child and the steps that a midwife would have to take to register a birth (figure 8.1).[47] Some of this outreach was effective. The National Medical Association, the premier organization of Black doctors, printed an article about the May Day campaign and the importance of birth registration in its journal.[48] The *Atlanta Daily World* likewise reproduced a letter from the Georgia Congress of Colored Parents and Teachers on 1 May 1945 that urged parents to see that their children were registered. The advantages of birth registration were framed by the congress in terms of both public health and citizenship. While a birth certificate is not used to "check up on people," the letter explained, it does entitle each person "to all the privileges and protections of citizenship."[49]

The Census Bureau also worked with the OIA to try to bolster Native American birth registration. This was not a new idea. Throughout the 1930s, employees in the Census Bureau's Division of Vital Statistics recommended coordination with the OIA to improve registration of Indians both on and off the reservation.[50] But nothing seems to have come of these suggestions until the 1940s, when the bureau and the OIA partnered to improve Indian birth registration. In 1940, the Division of Vital Statistics in the Census Bureau sent out a field agent to speak at an annual meeting of reservation staff from the Southwest, supplied the agencies with Census Bureau–issued materials promoting birth registration, and commissioned the superintendent of the Pueblo Indian Agency in New Mexico to write an account of how he, unlike most southwestern agencies, succeeded in registering vital events among reservation Indians. In 1942, the OIA sent yet another circular letter to its

Copyright © 2021. University of North Carolina Press. All rights reserved.

Pearson, Susan J.. The Birth Certificate : An American History, University of North Carolina Press, 2021. ProQuest Ebook Central,
        http://ebookcentral.proquest.com/lib/nyulibrary-ebooks/detail.action?docID=6793683.
Created from nyulibrary-ebooks on 2025-04-03 15:55:20.





Figure 8.1. *A Birth Certificate for Baby* (1946)

The U.S. Census Bureau's pamphlet promoting birth registration to African Americans emphasized interactions with the state. A midwife brings her certificate to the registrar, and a young boy brings his to enroll in school. Source: Records of the U.S. Census Bureau, National Archives and Records Administration, Washington, D.C.

superintendents imploring them to follow state rules for reporting births and deaths.[51]

That same year, the Census Bureau sent three different fieldworkers to the southwestern states with Navajo reservations. The Navajo had the lowest rates of registration among all minority groups. Field agents met with state officials,

Copyright © 2021. University of North Carolina Press. All rights reserved.

Pearson, Susan J.. The Birth Certificate : An American History, University of North Carolina Press, 2021. ProQuest Ebook Central,
    http://ebookcentral.proquest.com/lib/nyulibrary-ebooks/detail.action?docID=6793683.
Created from nyulibrary-ebooks on 2025-04-03 15:55:20.

reservation officials, and representatives from the Interior Department.[52] The next year, the New Mexico BVS announced a campaign to promote birth registration among Indians. The campaign was run by a visiting nurse of the Indian Health Service who also served as a field agent for the New Mexico State Department of Health. Her approach was to try to reach parents through their children. She delivered talks at Indian schools and gave children pamphlets about the benefits of birth registration. "It is felt that the children can be depended on to talk over the situation at home, and to assure their parents of the importance of filing vital records with the State Bureau of Vital Statistics."[53]

Finally, as part of the 1945 May Day campaign that also promoted registration among African Americans, the Census Bureau worked with the State of New Mexico and the OIA to promote registration among Indians, and the Navajo in particular. Though the OIA instructed all its personnel to participate in the May Day campaign and promote birth registration on the agencies, in meetings between OIA officials and those from the Census Bureau, the OIA defended rates of Indian registration. OIA representatives were willing to concede only that the Navajo were particularly bad, and they reminded Census Bureau officials that though some agency staff were dilatory in filing birth reports, state health officials were often uninterested in Indian registration. Everyone present could agree, however, that reaching the Navajo would require something more than distributing the usual pamphlets. Darcy McNickle, the head of the OIA, recommended enlisting the support of tribal councils and producing promotional materials in the Navajo language. The Census Bureau recommended that babies be registered when they were entered on the tribal roll and that the number of registrars be expanded.[54]

In 1946 and 1947, the National Office of Vital Statistics (NOVS), in collaboration with several other federal agencies and the State of New Mexico, rolled out promotional materials in the Navajo language. Some of these were what the NOVS newsletter, the *Registrar*, described as "humorous stories" published in the Navajo-language newspapers sponsored by the agency. The stories appropriated the "manner and style of the Coyote cycle of Navajo mythology" to promote birth registration. In the sample story printed in the *Registrar*, called "Why Old Man Coyote's Children Didn't Go to School," Coyote is a layabout who lives "way out among the junipers and pinons," sitting under a tree and singing songs while his four wives work hard and give birth to four new children each year. Coyote prizes his isolation and his independence and ignores a cousin who warns him that unless he registers his children's births, they won't have a school to go to when they get old enough. Sure enough, when the time

Copyright © 2021. University of North Carolina Press. All rights reserved.

Pearson, Susan J.. The Birth Certificate : An American History, University of North Carolina Press, 2021. ProQuest Ebook Central,
     http://ebookcentral.proquest.com/lib/nyulibrary-ebooks/detail.action?docID=6793683.
Created from nyulibrary-ebooks on 2025-04-03 15:55:20.

comes to put his thirty older children in school, Coyote marches them down into the town only to be told that the school is full and he must wait until a new school is built to house all his children.[55] Coyote's failure to register his children's births, then, not only was a result of his laziness but also showed that he did not grasp the basics of rational planning, could not understand cause and effect inside a system of linear time, and did not have either abstract or concrete conceptions of population, public health, or the common good. His lack of work, his marital patterns, and his neglect of vital registration all went hand in hand.

In addition to the ersatz Coyote stories, NOVS made a pamphlet and a film in Navajo. Both had the title *A Birth Certificate Tells the Facts*, or *Áwéé binaltsoos beedáhazingo adenchsin*. The film was, the NOVS boasted, narrated by a Navajo tribal councilman and was the first ever "talking picture" in Navajo. It was meant to help address the fact that three-quarters of Navajo did not speak English and were illiterate in any language.[56] The pamphlet was bilingual and illustrated with photographs of Navajo people. The first page showed a mother holding her baby in a traditional cradleboard with the caption "Of course you love your baby. Do you know how much it needs a right name and a certificate as soon as it is born?" In an effort that had begun some sixty years earlier with the advent of allotment, the campaign for birth registration among the Navajo was in part an effort to convince them to adopt Western naming practices. Throughout the pamphlet, the concept of the "right name" is used. "As soon as your baby is born, give it a right name" and make sure that is the same name you tell the doctor and the registrar. The pamphlet also stressed that though birth registration may not seem important to the baby, it would help in the future. Echoing the Coyote story, the pamphlet explained that the birth certificate would help the child go to school. Not only will the school need to know "the permanent name of your child," but also "Washington needs to know how many" schools to build. When the child grows up, he may leave the reservation for a job, and he will need to show his name, "what people he comes from, and how old he is." When he is older, the certificate may help him get his social security or his pension or help his dependents get veterans' benefits. The pamphlet closed with a photo of a Navajo couple staring lovingly down at their baby, swaddled and held in his mother's arms. "Make his life easier," the text urged, "by giving him a right name, and getting a certificate for him, as soon as he is born."[57] Though the pamphlet presented birth registration as an act of parental love, it could not hide the fact that registration was entirely about interfacing with the state, which came with a white face.

Copyright © 2021. University of North Carolina Press. All rights reserved.

Pearson, Susan J.. The Birth Certificate : An American History, University of North Carolina Press, 2021. ProQuest Ebook Central,
       http://ebookcentral.proquest.com/lib/nyulibrary-ebooks/detail.action?docID=6793683.
Created from nyulibrary-ebooks on 2025-04-03 15:55:20.

Photographs in the pamphlet showing Navajos reporting a birth to a registrar, attending school, using the bank, and collecting a pension or veterans' benefits all embodied the government in the person of an Anglo.

Though such campaigns had some success, success was also hard to measure. Between 1940 and 1950, registration among the Navajo doubled. Even so, it hovered around 50 percent. But as the federal government had to admit, it did not actually know what percentage of Navajo babies were registered. That was because, as J. Nixon Hadley, a statistician for the Indian Health Service, explained, birth registration completeness was measured by matching an existing birth certificate with a card filled out during a test period for an infant under the age of one. In the case of the Navajo, this meant that measures of birth registration "represent the degree of success in matching names between two records for an illiterate and non-record-conscious people whose culture allows for easy change of name."[58] Testing methods could not account for these cultural differences. Even more to the point, Hadley wrote in another article, the federal government did not really know how many "Indians" there were in the United States to begin with—"no clear-cut definition of 'Indian' is readily available." The Census Bureau's own definitions were not stable over time, and tribal membership lay largely within the control of tribal councils. Myriad treaties and laws defined "Indian" in particular ways for purposes of specific agreements.[59] The problem was circular: improving nonwhite registration led straight back to the problem of racial classification in the first place.

Ensuring better registration was only one piece of the puzzle, however. While organizations such as the Census Bureau had their own, largely statistical, reasons for wanting to improve registration among Native Americans and Black Americans, civil rights organizations applied multiple strategies to untie the knot tying documentation to discrimination. Even as they took on the task of helping ensure that more African Americans had their births registered, and even as they helped those already registered to obtain proof of birth, advocates also continued to promote the idea, born of the FEPC, that birth certificates should not be used as a gatekeeping device in the first place. Walter White, the journalist and longtime head of the NAACP, reported favorably in 1952 about Brandeis University's policy for admissions. Brandeis, White wrote, was a place where "students of every race, religion or place of birth could come, on merit and merit alone, to study." Brandeis made admission by "merit alone" because its application forms "scrupulously exclude questions not only of race and religion but those about birthplace, birth certificate, change of name, language spoken at home, mother's maiden

Copyright © 2021. University of North Carolina Press. All rights reserved.

Pearson, Susan J.. The Birth Certificate : An American History, University of North Carolina Press, 2021. ProQuest Ebook Central,
        http://ebookcentral.proquest.com/lib/nyulibrary-ebooks/detail.action?docID=6793683.
Created from nyulibrary-ebooks on 2025-04-03 15:55:20.

name, nationality, birthplace of parents or name of pastor."[60] As White's list suggested, birth certificates were among the most efficient tools by which institutions could determine race and ethnicity—with the exception of language spoken at home, change of name, or name of pastor, most of the potentially discriminating data that Brandeis avoided were condensed on the birth certificate. To allow applicants to be considered without a birth certificate, and without asking the proxy questions that would substitute for it, was, in White's mind, to allow meritocracy to trump status. Because they recorded and disseminated information that could be used to discriminate, birth certificates were instruments of status rather than integration and merit.

As they had with the FEPC, civil rights organizations after the war also sought to create public rules about the use of birth certificates to create gates in and out of institutions. The 1964 Civil Rights Act was an opportunity to create national standards for school integration that might overcome the state and local use of myriad tactics of delay and obstruction, including schools' demands for specific kinds of documentation. Civil rights organizations successfully argued for the inclusion of schools in the "public accommodations" covered by the 1964 Civil Rights Act. The act gave the U.S. Justice Department the power to bring suits against school districts, and it resulted in federal rules governing integration plans used by districts under both voluntary and court-ordered desegregation.[61] In 1966, the U.S. Department of Health, Education, and Welfare created a series of rules for communities seeking to implement "school choice" plans. These federal rules made it clear that a student could not be denied admission to school or denied a transfer under school choice because she lacked a birth certificate. In its "Notice of School Desegregation Plan under Title VI of the Civil Rights Act of 1964," the Department of Health, Education, and Welfare supplied school districts with text that they were legally required to publicly post before implementing school choice plans. Section 13 of the notice limited how schools could assign students to new schools. "No choice of school will be denied because of failure at the time of choice to provide any health record, birth certificate, or other document," it read.[62] Just as requiring a birth certificate for employment became prohibited under the state FEPCs, some twenty years later the same conditions were applied to school registration in an effort to disable one of the tools used by school districts to limit integration.

-----------------------

If one tactic in the fight against discrimination was limiting the role that birth certificates could play in gatekeeping access to fundamental institutions of

Copyright © 2021. University of North Carolina Press. All rights reserved.

Pearson, Susan J.. The Birth Certificate : An American History, University of North Carolina Press, 2021. ProQuest Ebook Central,
       http://ebookcentral.proquest.com/lib/nyulibrary-ebooks/detail.action?docID=6793683.
Created from nyulibrary-ebooks on 2025-04-03 15:55:20.

citizenship, a more radical strategy was confronting the role of birth registration in maintaining the fiction of race itself. Beginning in the 1950s, both local and national civil rights organizations challenged the use of birth certificates to establish racial identity. Like the child welfare advocates who had argued that birth status did not belong on birth certificates, civil rights leaders argued that racial identification should be eliminated. Though never as coordinated and large-scale as their campaigns against segregation and discrimination in employment (and thus harder to find in the documentary record), civil rights organizations nonetheless chipped away at racial identification by confronting the practice where it originated: at the municipal and state levels, where boards of health controlled vital registration practices.

In July 1950, the *Chicago Defender* reported that a physician from Harrisburg, Pennsylvania, Leonard Z. Johnson, had decided to write "human" in the box for "race." Johnson, an African American and the son of a Howard University professor and prominent minister from Washington, D.C., wrote a letter to his state department of health explaining his decision. "I have decided that hereafter I will sign all such certificates" with the race marked only as "human" because "it is my opinion that all such statistics are not necessary, and, in fact, are detrimental to the solution of the racial problem in this country."[63] In Johnson's view, recording an infant's race served no legitimate or statistical purpose but did serve to make life more difficult for ordinary African Americans. This was a radical move. For while some ethnic or racial groups had successfully lobbied to change their categorization in the U.S. Census—Mexican Americans, for example, ended their separate enumeration and were counted as white beginning in 1940—none had suggested that the state abandon racial classification altogether.[64] In 1951, another African American physician called attention to the matter. Dr. A. Maceo Mercer of Chicago asked the Chicago health department "for a statement of the law regarding 'What is a Negro' in the state of Illinois." Mercer, described later by the NAACP as a "conscientious objector to indications of race on public records," was presumably not asking for a Virginia-style set of rules about blood quantum but rather asking so as to reveal the absurdity of using a medical form to populate a category—race—that had no biological reality. Indeed, according to the *Journal of the National Medical Association*, Mercer told the health department that if state law required him to designate race on birth certificates, "he would never deliver another baby." Mercer also refused to "correct" the birth certificate returned to him by the state because he had written "human" in the box for race. Mercer later addressed his protests to the Illinois State Department of Health and the U.S. Public Health Service. At the state level, a bill to

Copyright © 2021 . University of North Carolina Press. All rights reserved.

Pearson, Susan J.. The Birth Certificate : An American History, University of North Carolina Press, 2021. ProQuest Ebook Central,
    http://ebookcentral.proquest.com/lib/nyulibrary-ebooks/detail.action?docID=6793683.
Created from nyulibrary-ebooks on 2025-04-03 15:55:20.

remove race from the state's birth certificates had passed the house but failed in the senate. The head of the state Department of Health, Dr. Roland Cross, did not support removing race from birth certificates. He claimed, first, that the Census Bureau created the certificates and he had no control over their content and, second, that recording race was integral to correlating "health data" with conditions of "the minority races."[65]

Though Johnson's and Mercer's protests were reported as the work of lone individuals, the National Medical Association supported their actions and believed that racial designation served no legitimate public health purpose.[66] National civil rights organizations soon reached similar conclusions. In a 1952 meeting of the NAACP's National Medical Committee, the gathered physicians discussed "the necessity of racial identification on birth certificates." Like Johnson and Mercer, many on the committee believed that race did not belong. Minutes from the meeting reported that "it was the general opinion of the group that a statement of race had negligible scientific value and only served to lend a social stigma to an individual." One of those present, Dr. W. Montague Cobb, pointed out that race was a social fiction—"anthropologists had proven there was no biological difference between Negroes and whites"—and thus racial designation had no place on a birth certificate. Still, despite the "general opinion" against racial categorization on birth certificates, some committee members had qualms. Their arguments were not unlike the arguments of those who had wanted to preserve a record of birth status. Dr. Ernest Boas, for example, was reluctant to give up the possibility that racial classification on birth records was "of value in compiling statistical data regarding incidence of TB and other diseases among particular groups." Was it worth giving up the ability to aggregate data linking race and disease? As had been the case when child welfare advocates debated removing illegitimacy from the face of birth certificates, here too the public health value of vital registration butted up against the use of registration documents as forms of identification that could reveal stigmatizing information about individuals.

Others on the committee cautioned that advocating for the removal of racial designations from birth records might be politically premature. One physician pointed out that were the NAACP to adopt this position it would occasion "great controversy" because it was "such a departure from an accepted convention." Likewise, another worried that it would paint the NAACP as "radical with extremists [sic] views." Was it worth the political cost, particularly when the political landscape was changing? Dr. Herbert Marshall argued that at present it might be a disadvantage to be marked as "negro," but

Copyright © 2021. University of North Carolina Press. All rights reserved.

Pearson, Susan J.. The Birth Certificate : An American History, University of North Carolina Press, 2021. ProQuest Ebook Central,
    http://ebookcentral.proquest.com/lib/nyulibrary-ebooks/detail.action?docID=6793683.
Created from nyulibrary-ebooks on 2025-04-03 15:55:20.

"in future generations the term Negro will bear less and less stigma." Why subject the committee and the NAACP to ridicule and controversy over the terms of birth certificates when the progress of history might alter "the connotation of Negro" all on its own? Such cautionary notes notwithstanding, the committee decided to go on record "as being opposed to racial identification on birth certificates."[67]

Though the documentary record does not make clear what the NAACP's National Medical Committee did to broadcast its view that racial identification had no place on birth records, within a decade of its resolution, local chapters and lawyers had some success at the municipal level. In 1959, for example, the Legal Redress Committee of the St. Paul, Minnesota, branch filed suit against the St. Paul Bureau of Public Health for "inclusion of term black, as racial designation on birth certificate." The committee reported that the suit resulted in a change from "black" to "negro" on the particular birth certificate in question, but that "problem regarding policy on this issue remains to be settled."[68] Three years earlier, Mrs. Shelton B. Granger of Minneapolis, Minnesota, had refused to fill out her and her husband's races on her son's birth certificate. Though there is no evidence that she did so in coordination with the same NAACP chapter that filed suit against her Twin Cities neighbor, her actions prompted rebuke from the state Bureau of Public Health.[69]

In 1960, the action shifted to New York City. Attorney Newton Greenberg assisted Mr. and Mrs. Gregory Simms in challenging their racial designation on their daughter's birth certificate. In his challenge to the New York City Department of Health, Greenberg sought the advice of NAACP chief counsel Robert L. Carter. The Simmses requested that their daughter's birth certificate be changed to reflect the race of the father (item 9) as "ruddy" and the race of the mother (item 14) as "fair." A hospital official had filled them in as "negro" and "white," respectively.[70] In correspondence with the Department of Health, Greenberg challenged the department's authority to determine the Simmses' races as "negro" and "white" rather than "ruddy" and "fair." He averred that if the primary purpose of including the race of parents was identification, then "ruddy" and "fair" would be more accurate than "negro" and "white." The department insisted that in order for Mr. and Mrs. Simms to change their racial identification on their daughter's birth certificate, they would have to submit "appropriate proof of the true ethnological background of the parents," namely "certified copies of their own birth records" showing their race at birth. Moreover, the department explained that racial identification on birth records was not primarily for identification, as Greenberg and Simms

Copyright © 2021. University of North Carolina Press. All rights reserved.

Pearson, Susan J.. The Birth Certificate : An American History, University of North Carolina Press, 2021. ProQuest Ebook Central,
    http://ebookcentral.proquest.com/lib/nyulibrary-ebooks/detail.action?docID=6793683.
Created from nyulibrary-ebooks on 2025-04-03 15:55:20.

assumed. Rather, it served a public health purpose. Carl Erhardt, the director of the Bureau of Records and Statistics for the City of New York, wrote to Greenberg that the purpose was to obtain "ethnological" data that would be used for "compilation of statistical facts extremely important in planning the department's public health program." Like those on the NAACP's National Medical Committee who expressed skepticism, Erhardt connected racial identification on birth records to ameliorative public health policy. "Mortality and natality date for various ethnic and other groups are frequently used," he went on, "to show which groups are at a disadvantage" and thus which might need "special attention and help" from public agencies. With that, Erhardt dismissed the Simmses and Greenberg as mistaking the true purpose of racial classification and thus illegitimately questioning the department's authority to collect and record race.[71]

Though Erhardt mounted a firm defense of racial classification on vital documents, he and other registration officials knew that the trickle of protests against the practice would only grow in strength. As early as 1956, the American Association of Registration Executives and the NOVS began discussing the matter behind the scenes. Led by Jerome Brower, the deputy director of the Minnesota State Department of Health, the American Association of Registration Executives asked the NOVS to conduct a survey to see how many municipalities or states included "color" or "race" on the face of birth certificates. The answer was that they all did—hardly surprising given that it was also part of the Census Bureau's standard certificate of live birth. The NOVS also prepared a report defending the use of race in vital statistics. The report analyzed a single issue of the *Journal of Negro Education* from 1949 and argued that "examination of the issue as a whole demonstrates the reliance placed by the contributors on tabulations of vital statistics classified by race," most of which "derived originally from race items on birth and death certificates."[72] In other words, even the leading African American intellectuals relied on race classification to understand racial problems. This argument, developed in 1956, was essentially the same as that presented by New York City four years later.

Its defense of racial identification as benign and palliative notwithstanding, New York City did eliminate race from the face of its birth records. The policy, announced by Dr. Leona Baumgartner, took effect on 1 January 1961. As states and cities across the country had done with birth status, New York City's policy stripped race from the front of its birth certificates but recorded it on the rear face with "medical" and "confidential" information and where it would not be reproduced as part of a certified copy. The official rationale

Copyright © 2021. University of North Carolina Press. All rights reserved.

Pearson, Susan J.. The Birth Certificate : An American History, University of North Carolina Press, 2021. ProQuest Ebook Central,
     http://ebookcentral.proquest.com/lib/nyulibrary-ebooks/detail.action?docID=6793683.
Created from nyulibrary-ebooks on 2025-04-03 15:55:20.

for continuing to record race was, as Erhardt had suggested, to help direct public policy. According to Shad Polier, the chairman of the American Jewish Congress's Commission on Law and Social Action, the change was the result of pressure from the Urban League, the NAACP, and the American Jewish Congress.[73] No doubt Greenberg's letters with Erhardt played a role as well. Though Greenberg acted only on behalf of the Simmses and without official sponsorship from of any of these organizations, his letters made clear that the Department of Health had no statutory basis for engaging in racial classification.

In November 1961, the American Public Health Association annual meeting hosted a panel discussion on racial identification on vital documents, prompted in large part by New York City's decision. As part of this panel, Carl Erhardt, who had not long before fended off the Simmses and their attorney, explained the New York City Department of Health's action in terms that revealed that the decision was at once principled, political, and administrative. On principle, Erhardt argued that eliminating race from vital statistics documents was consistent with the State Commission against Discrimination's guidelines, which required "justification of the need for stating race or color on any state form where such an item is included." The City of New York had similar policies, and together state and city regulations suggested that the inclusion of race on vital registration forms had to serve a real, nondiscriminatory purpose. But, as Erhardt pointed out, "the major private purposes for which copies of birth records are needed do not seem to require any statement of color or race in most areas."[74] Thus there was in fact little justification for a practice that seemed on its face to violate principle. Though Erhardt did not say so, this principle was political: state policies against discrimination were the result of political agitation going back to the March on Washington Movement, the creation of federal and state FEPCs, and the court battle against school desegregation that established antidiscrimination norms in employment, schooling, housing, and beyond.

Beyond the politics that produced the city's and state's official nondiscrimination policies, Erhardt also detailed more immediate skirmishes. Without naming the Simmses, he alluded to a number of parents who had recently tried to enter racial designations such as "pink" or "human," as well as a number who refused to enter any race at all. Moreover, he claimed that the Puerto Ricans of the city refused to be identified as either white or Black, so hospitals often wrote "Puerto Rican" for race or color, which the city subsequently coded as white. Still, Erhardt pointed out that Puerto Ricans themselves were

Copyright © 2021. University of North Carolina Press. All rights reserved.

Pearson, Susan J.. The Birth Certificate : An American History, University of North Carolina Press, 2021. ProQuest Ebook Central,
       http://ebookcentral.proquest.com/lib/nyulibrary-ebooks/detail.action?docID=6793683.
Created from nyulibrary-ebooks on 2025-04-03 15:55:20.

divided on the issue, with some apparently preferring to be identified as white and some insisting on identification by national origin. All of this pointed to what Erhardt called "administrative factors" in the health department's decision to remove racial identification. When parents refused to cooperate with racial classification, or when some Puerto Ricans might choose "white" while others might choose another category, this disrupted the smooth functioning of the vital registration system and created potential conflict between the different constituencies involved. If parents refused to name an acceptable race on the form, would the Department of Health then require the hospital or attending physician to fill out the category? Erhardt worried that "such action would lead to considerable controversy between hospital authorities, attending physicians, Department of Health, and parents." Like with Plecker's adjudication of racial status in Virginia, dissenters from existing categories raised the possibility that divination of race might be taken away from those being identified and handed instead to physicians and city bureaucrats. This clearly made the Department of Health uncomfortable. In order to avoid disrupting the "cordial relations" that ensured high rates of birth registration in the city, better to just eliminate the source of controversy by making race medical and confidential.[75]

The Department of Health was also trying to avoid what it considered worse political outcomes—a lawsuit or action by the state legislature. These quietly simmering controversies had so far, Erhardt explained, involved only individuals, but it seemed likely that "active group representations" might be on the horizon, by which he presumably meant agitation by civil rights organizations. And though he did not say so, newspaper and documentary records indicate that such groups had already started to press the matter with the city. Erhardt's comments before the American Public Health Association suggest that he and the Department of Health saw the writing on the wall. He told conference attendees that he sensed it was only a matter of time before activists would move the issue squarely onto the political stage. Already, the New York legislature had considered, but not passed, a bill to remove race from marriage licenses, and the Massachusetts house had taken up, but not passed, a bill to remove race from birth certificates. Erhardt and the department feared that if they did not act soon, the legislature would. Worrying that the legislature would cave to political pressure to remove race entirely, the department decided to act preemptively in order to preserve race for statistical purposes in the medical/confidential section. "Thus," Erhardt concluded his presentation, "fears that information on race or color will be used to the

Copyright © 2021. University of North Carolina Press. All rights reserved.

detriment of the individual are alleviated and political or other pressures that might force complete elimination of the item are relieved." Erhardt pointed explicitly to the example of illegitimacy as a model for how to strike the balance between protection of individual privacy, the social good of equal treatment, and the state's desire to use population statistics for public health and welfare programs. But in New York, unlike in most of the rest of the nation, the state legislature had decades earlier acted to eliminate any collection of birth status, even in the medical section of the birth certificate. This was what the department wanted to avoid in the case of race.[76]

The Baltimore *Sun* endorsed the move, expressing relief that New York City did not "do what some extremists ask and abolish all record of race in births and deaths."[77] But Lester Granger, head of the Urban League, recognized that while Baumgartner's stance was an improvement, he declared that it was "still a violation of principle."[78] The *New York Amsterdam News* similarly congratulated Baumgartner for the new policy and said it "took courage." At the same time, the *News* said that it wasn't "really true" that it was necessary for public health and social work to record race for statistical purposes. This was a dodge that would probably be eliminated in due course. As soon as other cities and states followed New York City's example, "race as a matter of record, will disappear from the records of true Americanism." This was a way station on the road to the true destination, a time when "we are simply all Americans!"[79] The *News* editorial suggested that, like ending segregation and employment discrimination, removing race from birth certificates was a way of dismantling the legacy of slavery and Jim Crow and moving Americans toward full equality.

Not everyone agreed that removing race from birth records was a step in the right direction. While civil rights organizations and the Black press heralded the change, the preservation of racial categories in any form, even as part of statistics gathering, remained controversial. In part, this controversy reflected the fact that racial classification on birth certificates was a species of a larger set of questions about universalism, particularism, and civil rights in the post–World War II United States. As the United States positioned itself as the bulwark of universal human rights against totalitarian, fascist, and communist regimes, the government was pushed at home to dismantle Jim Crow laws and create a color-blind legal order. In fields such as anthropology, which had long trucked in the delineation of difference, scholars also began to insist that all humans were the same everywhere.[80] This was what Dr. A. Maceo Mercer of Chicago had insisted on when he filled in "human" on the birth

Copyright © 2021. University of North Carolina Press. All rights reserved.

Pearson, Susan J.. The Birth Certificate : An American History, University of North Carolina Press, 2021. ProQuest Ebook Central,
       http://ebookcentral.proquest.com/lib/nyulibrary-ebooks/detail.action?docID=6793683.
Created from nyulibrary-ebooks on 2025-04-03 15:55:20.

certificates of the babies he delivered. Yet this kind of universalism did not satisfy everyone. Even as many civil rights activists—and legislation such as the 1964 Civil Rights Act—sought to create color-blind institutions, leaders such as the National Urban League's Whitney Young began to argue that true justice required the sort of quantitative, race-conscious, ameliorative action that would ultimately result in affirmative action.[81]

Though their reasoning differed in its particulars, most dissenters agreed that New York's birth certificate policy prematurely denied that race was a salient social fact in 1960s America. The conservative columnist for the *Los Angeles Times*, Morrie Ryskind, called the gesture "silly and childish" because it would do nothing to stop racial identification, while it suggested, at the same time, that being nonwhite was a "shameful secret" rather than something to be proud of.[82] Howard University sociologist G. Franklin Edwards also criticized the move as a naïve political gesture but from a slightly different angle. He believed that eliminating race from vital documents would actually make it more difficult to document patterns of discrimination in health and social policy by "undermining the factual basis from which inequities could be questioned." He pointed to the 1959 report of the U.S. Civil Rights Commission, which had complained that it was hard to assess the pace of desegregation in those parts of the country "where race had been removed from the school records."[83] In a private meeting, the executive committee of the NAACP discussed a similar concern with how lack of race-based data could obscure discrimination; the organization's general counsel urged it to reconsider its opposition to racial identification.[84] Leona Baumgartner reported, meanwhile, that she received a "mixed reaction" from health commissioners in other cities alongside a number of "really vicious" letters denouncing the policy change. Among those municipal health commissioners who did not support Baumgartner, New Orleans's Dr. Walter Gardiner took his complaints public. He vowed that no one born in New York City would be able to marry in New Orleans so long as he was around to enforce Louisiana's miscegenation law, which required that marriage licenses be granted only after the applicants could submit birth certificates to prove their race.[85] Gardiner's dissent acted to shore up white supremacy while Edwards's was meant to help collect data to undermine it, but both shared a belief with Ryskind that race continued to structure the world whether racial liberals wanted it to or not.

Though people from across the political spectrum lamented it, New York City's compromise solution became a model for the nation. The same year that the change took effect in New York City, the State of New York announced

Copyright © 2021. University of North Carolina Press. All rights reserved.

Pearson, Susan J.. The Birth Certificate : An American History, University of North Carolina Press, 2021. ProQuest Ebook Central,
      http://ebookcentral.proquest.com/lib/nyulibrary-ebooks/detail.action?docID=6793683.
Created from nyulibrary-ebooks on 2025-04-03 15:55:20.

it would follow suit. And ten years after Dr. A. Maceo Mercer had protested his state's use of racial classification on birth documents, Illinois announced a similar change for its birth certificates. Even a state legislator in far-flung Alaska took note. James Fisher, a representative from Anchorage, wrote the national American Civil Liberties Union that after learning of New York City's move, he had "begun an inquiry into the reason for entering race on birth certificates in the State of Alaska."[86] Still, the move raised concerns among registrars and public health officials who sought to catch up with and control the direction of change. Hazel Aune from the National Vital Statistics Division of the U.S. Public Health Service worried that as states and municipalities started to individually make changes to registration documents, the carefully crafted system of national uniformity would crumble. (Aune's concerns ignored the fact that across the states there was no stable definition of "white" and "Black" to begin with.) At a meeting of the American Public Health Association, Aune pleaded with state registrars to wait for the next revision of the standard certificate of live birth rather than make changes piecemeal.[87]

Planning for the new standard certificate began in 1962, and the new form was implemented in 1968 (figure 8.2). In 1963, the Public Health Conference on Records and Statistics formed a study group to advise the National Center for Health Statistics (NCHS) on the form and content of revisions. The study group surveyed over 1,000 people and organizations about possible revisions, including to racial identification. Fifty-six percent of all those who responded approved of the proposed relocation of race to the medical/confidential section of the birth certificate. The percentage was slightly lower when state registrars' responses were disaggregated from the total pool—only 48 percent welcomed the change. In 1964, at a meeting of the Public Health Conference on Records and Statistics, the federal Public Health Service proposed moving "color or race from the top portion of the certificate to the lower portion" on the U.S. standard certificate of birth.[88] This would effectively nationalize the New York City model. The proposed revisions were also discussed at national meeting of the American Association for Vital Records and Public Health Statistics in 1965 and endorsed by a number of other national organizations including the National Urban League, the American Statistical Association, the American Public Health Association, the American Sociological Association, and the Association of State and Territorial Health Officers. In 1966, the Eleventh National Meeting of the Public Health Conference on Records and Statistics devoted two workshops to discussing the proposed new standard certificate; conference proceedings reported that the proposal to move race to

Copyright © 2021 . University of North Carolina Press. All rights reserved.

Pearson, Susan J.. The Birth Certificate : An American History, University of North Carolina Press, 2021. ProQuest Ebook Central,
        http://ebookcentral.proquest.com/lib/nyulibrary-ebooks/detail.action?docID=6793683.
Created from nyulibrary-ebooks on 2025-04-03 15:55:20.



Figure 8.2. The standard certificate of live birth (1968)

The 1968 revision of the standard certificate moved the "race" of the child's mother and father to the section that includes "confidential information for medical and health use only." It joined birth status, or legitimacy, as a piece of "confidential" information that had been removed from the public face of the birth certificate. Source: Grover, *1968 Revision*.

the confidential section of the birth certificate was "accepted without objection."[89] The next year, the U.S. Census Bureau released the new certificate in preparation for use in 1968.[90] The NCHS also issued manuals for hospitals and physicians instructing them how to fill out the new certificates.[91] By 1968, the NCHS reported that thirty-eight states had adopted either the new standard certificate or the practice of recording race only in the "restricted sections" of their birth certificates.[92]

Of course, the end of legal identification of race only came to those born after the new standard certificate was adopted. Because of this, some states made the change retroactive as well. In 1969, for example, Massachusetts made it possible

Copyright © 2021. University of North Carolina Press. All rights reserved.

Pearson, Susan J.. The Birth Certificate : An American History, University of North Carolina Press, 2021. ProQuest Ebook Central,
    http://ebookcentral.proquest.com/lib/nyulibrary-ebooks/detail.action?docID=6793683.
Created from nyulibrary-ebooks on 2025-04-03 15:55:20.

for a person born before 1968 to obtain a new birth certificate stripped of all references to race.[93] In 1978, California removed race or color from certified copies of all birth certificates and, in 1989, enabled individuals to have their original birth certificates sealed if the original "contained a term which, in the individual's opinion, was a slur or otherwise offensive."[94] Likewise, in Virginia in 1979 the state declared that birth certificates filed before 1960 would henceforth be issued without racial designation.[95] Even Louisiana eventually came around. In 1979 the state legislature directed the state registrar to exclude race from certified copies of birth certificates.[96] In all these instances, registrars performed a sleight of hand like the one they had objected to when it came to illegitimate births: they agreed to issue certified copies of certificates that were different in some measurable way from those that were originally filed.

The bifurcation of the birth certificate—into a public-facing section, which would become the basis for the portable identity document required for so many institutions of American life, and a private-facing "health and medical" section used only to gather public health and population statistics—made it a document that could solve thorny political and philosophical problems in ways that few other instruments of governmental policy could. The line separating the facts of identification from "health and welfare" meant that the state could regard its population, at least on its paper forms, as both universal and particular. Through the dotted line of the bureaucratic form, the state could know, but not show, the race of its citizens, on one hand committing to making every baby born a deracinated "human" and, on the other hand, locating the population into groups defined by particular histories.

------------------------

While states and municipalities acted over the course of several decades to remove race from vital documents, this hardly ended racial classification or spelled the end of a role for documentary evidence of racial identity. As states and cities ceased to publish racial classification on vital documents, health officials still recorded the race of those who were born, married, and died so that vital events and other measures of personal and social health could be sorted by race. After 1989, most states followed elaborate formulae provided by the NCHS to determine the racial classification of newborn infants. And though the NCHS classifications were kept off the face of certificates, they were recorded on the long-form birth certificate and might be referenced later. Like the "corrections" made by Plecker and Davis, an NCHS formula could often produce a racial classification that was quite distant from an individual's

Copyright © 2021. University of North Carolina Press. All rights reserved.

Pearson, Susan J.. The Birth Certificate : An American History, University of North Carolina Press, 2021. ProQuest Ebook Central,
        http://ebookcentral.proquest.com/lib/nyulibrary-ebooks/detail.action?docID=6793683.
Created from nyulibrary-ebooks on 2025-04-03 15:55:20.

racial self-identification.[97] Recent studies comparing the racial classification of infants who died under the age of one, for example, found that Native American infants were almost always racially misclassified, usually as white, at birth. While such misclassifications do not form the basis for racial identification, they skew infant mortality rates and underrepresent the health hazards faced by Native American children.[98]

Beyond recording race under the "health" section of vital registration documents, state policies continued to "file" humans according to race and continued to rely on documents to establish racial identity. The legacy of the Indian Reorganization Act (IRA) of 1934, for example, meant that Native American nations were often vested in the vexed process of defining membership according to rules about blood quantum. Though the IRA offered a legal definition of "Indian" based on blood quantum, it also restored a degree of tribal sovereignty by allowing the organization of tribal councils that could, in turn, establish their own criteria for membership. In spite of the fact that Indians may have relied less on birth certificates than other Americans, and in spite of the fact that much of what the federal government wanted to know about them was imperfectly recorded on those records, Native American nations, like civil rights organizations, saw the importance of such documents both to their own members and to their internal administration. Like allotment policy itself, the determination of membership often turned on questions of blood quantum and descent. Tribal councils faced the task of deciding who could be enrolled, who would be purged, and how new applicants for enrollment would be judged. All of these questions involved the issue of proof. Under what terms would descent and degree of blood be established? Tribal councils had the authority to determine this themselves.

The meeting minutes of the executive committee of the Minnesota Chippewa provide an example of this process at work. In 1941, when the committee met to consider establishing rules for enrollment, they discussed whether to include all descendants of the Chippewa, whether to create a blood quantum cutoff, and how to corroborate descent. A proposal created by a subcommittee on enrollment provided that all descendants of Chippewa enrolled according to the terms of an 1889 treaty with the U.S. government were eligible for enrollment in the present. This was no matter whether they had been born on or off the reservations and no matter the blood quantum. Making descent the rule, rather than descent in combination with blood quantum, helped address the concern among some Chippewa that the IRA's rule of one-half blood quantum was too strict. The proposal also provided that applicants for enrollment

Copyright © 2021. University of North Carolina Press. All rights reserved.

Pearson, Susan J.. The Birth Certificate : An American History, University of North Carolina Press, 2021. ProQuest Ebook Central,
     http://ebookcentral.proquest.com/lib/nyulibrary-ebooks/detail.action?docID=6793683.
Created from nyulibrary-ebooks on 2025-04-03 15:55:20.

"must file a birth certificate and other supporting evidence so that it will be possible for the tribe and the agency to definitely establish the fact that they are rightfully entitled to enrollment." Though committee members disagreed about whether they should create a blood quantum standard in addition to requiring proof of descent, no one questioned that descent and its proof were the main administrative apparatus governing enrollment in the future. The Minnesota Chippewa agreed, in the end, that they would admit all those who could prove lineal descent from signers of the 1889 treaty. The BIA, however, recommended that the secretary of the Interior reject their constitution because it did not include a blood quantum minimum in addition to proof of descent. For this reason, the Minnesota Chippewa had no constitution until the 1960s, when they agreed to include a blood quantum requirement.[99]

The Cheyenne-Arapaho of Oklahoma, by contrast, included a blood quantum minimum in their very first constitution, adopted in 1937. The constitution's enrollment rules specified lineal descent from someone on the original tribal roll plus a minimum of one-fourth Cheyenne-Arapaho "blood." The constitution also provided that "the burden of proof as to quantum of blood of the Cheyenne-Arapaho Tribes of Oklahoma will be on the claimant for enrollment in each case." In 1959, the tribe amended the enrollment rules to require that "all applications for membership for enrollment of persons born after June 26, 1936, shall be supported by a copy of a birth certificate or other record such as is recognized by State and Federal recorders." After they passed this amendment in 1959, the Cheyenne-Arapaho spent the next several years trying to reconcile the membership lists with the birth certificates they had on file. Members of the tribal council were given lists of enrollees in their districts and asked to check that each person born after 1936 had a birth certificate on file in the tribal office. In specific cases, the enrollment committee also recommended adopting new members who had previously been rejected or purged from the roles. In these cases, "they have been screened and have birth certificates to prove eligibility."[100] As a part of tribal self-governance, birth certificates could be a useful administrative tool.

There is evidence that many nations considered them essential to the enrollment process. Like the Cheyenne River Sioux who used racial designations on birth certificates to reject applicants for enrollment, other Indian nations insisted that applicants' birth records show they met basic criteria. Many sent back applicants who had no birth records.[101] Multiple records of tribal council meetings also show that applicants who had previously been rejected reapplied after having their birth certificates changed.[102] Though the council

Copyright © 2021. University of North Carolina Press. All rights reserved.

Pearson, Susan J.. The Birth Certificate : An American History, University of North Carolina Press, 2021. ProQuest Ebook Central,
       http://ebookcentral.proquest.com/lib/nyulibrary-ebooks/detail.action?docID=6793683.
Created from nyulibrary-ebooks on 2025-04-03 15:55:20.

minutes do not specify how the certificates were changed, it's likely that these changes were meant to show proper lineal descent, by including previously unacknowledged paternity, for instance, or by correcting the racial designation or blood quantum shown on the original certificate.

Having members provide birth certificates as part of enrollment, and having the tribal office keep such certificates on file, made tribal administration easier overall. Besides streamlining enrollment, birth certificates saved labor in other areas. This is demonstrated by a discussion that took place at a meeting of the advisory committee of the Navajo Tribal Council in early 1950. In a discussion of how the upcoming federal census would be conducted in Navajo country, the conversation quickly turned to the importance of accurate population knowledge and accurate vital registration. Wilbur Morgan, a tribal member who headed the Navajo Welfare Office, reported that his office spent a great deal of time making out birth affidavits for Navajo so that they could enroll in school, obtain social security or other pensions, get veterans' benefits, and so on. In the absence of birth records, the office often spent weeks chasing down information and people who could swear to the facts of the case.[103] On the one hand, the fact that Morgan's office made birth affidavits for the Navajo, and that these were accepted by state and federal agencies and private employers, shows that the Navajo were served even without birth registration. On the other hand, Morgan and members of the advisory committee agreed that making out birth affidavits delayed Navajo access to benefits and created more work for the tribal offices. They wanted this to change.

The federal government, for its part, also had to create mechanisms by which it could establish who met the blood-quantum-based definition of "Indian" for purposes of federal programs under the IRA. Particularly in the early years after the IRA was passed, BIA officials were aware that there would often be little documentation to establish blood quantum for individuals. This was particularly the case among those who fell into the third category of the IRA's definition of "Indian": those who were not a member of a federally recognized tribe or the descendant of a member but who wished to be recognized as "Indian" based on blood quantum alone. The BIA recognized that screening such applicants was an "administrative problem of some complexity." This was not only because there was, according to the BIA, no "scientific proof" of Indian blood but also because there was no legal standard of proof either. The bureau had no expectation that applicants would submit birth certificates showing their degree of blood. Instead, the bureau created a hierarchy of documentation that descended from tribal rolls and affidavits to physical

Copyright © 2021. University of North Carolina Press. All rights reserved.

inspection by an anthropologist.[104] The bureau strongly preferred evidence from either tribal rolls or physical anthropologists to affidavits, however, since it felt that applicants would all claim blood quantum of one-half "for the purpose of complying with the legal requirement." The problem, however, was that many tribal rolls had not included blood quantum information because it was membership and descent, not blood, that made one an Indian in the IRA's definition.[105] Like opponents of child labor who had suspected that parents would lie in order to have their children work, BIA bureaucrats mistrusted Indians to tell the truth about themselves and their relatives. Yet the bureau had little other reliable documentation to substitute for oral testimony and self-identification.

After the IRA was passed, the BIA issued instructions for how to establish the blood quantum of individuals, and it issued letters to individuals that served, in lieu of other documents, as evidence of their blood quantum for purposes of accessing federal entitlements. Though the date is unclear, at some point after the 1930s the BIA began to issue a document that is still in use, the federal Certificate of Degree of Indian Blood (CDIB). The CDIB was created for the purpose of federal programs, but the federal government also contracts out the issuance of CDIBs to many Indian nations, and several nations require that applicants obtain a CDIB as part of the enrollment process.[106] In the present, CDIBs are issued based on an applicant's ability to prove lineal descent from an enrolled member of a federally recognized Indian nation. The BIA's instructions specify that applicants must provide birth certificates that show their relationship to their parents or, if their parents were not enrolled, that show the relationship of their parents to any enrolled grandparents.[107] Like Walter Plecker's efforts to prove that the "Indians" of Virginia were really "Negroes" trying to pass over into whiteness, the logic of both tribal enrollment and the CDIB depends on the ability of governments to establish lineage through documents. Of course as Thomas Cromwell's 1538 edict establishing parish records acknowledged, establishing lineage for the transmission of estates was among the very first reasons that churches and governments began to record births. Thanks to state and federal policies that allocated access to citizenship along racial lines, in the United States racial identity became, like any other form of wealth, a property to pass along.

------------------------

As polities designed to serve their members, Indian nations had to provide their citizens with proof of birth and age so that they could navigate state

Copyright © 2021. University of North Carolina Press. All rights reserved.

Pearson, Susan J.. The Birth Certificate : An American History, University of North Carolina Press, 2021. ProQuest Ebook Central,
           http://ebookcentral.proquest.com/lib/nyulibrary-ebooks/detail.action?docID=6793683.
Created from nyulibrary-ebooks on 2025-04-03 15:55:20.

and federal bureaucracies. They also had to balance their duty to preserve the integrity of the tribe with their desire not to allow it to wither away by making enrollment requirements overly strict. Requirements such as lineal descent, blood quantum, and residence or birth on tribal land were, in one combination or another, criteria that most tribes adopted. Birth certificates were an efficient administrative tool for reckoning these qualifications. Yet they were also part of a colonial legacy, promoted as a central tool in allotment policies designed to remake Indian families, destroy tribal relations, and acculturate Native Americans to Euro-American norms of property and kinship. That birth certificates later became an administrative tool for tribal sovereignty is but a particular example of a larger pattern: to be known by the state is at once a marker of citizenship and a sign of subordination. This paradox confronted not just the tribal councils who had to draw up membership criteria and enforce standards of proof but also reformers who wanted to establish that race was a fiction while documenting the effects of racial discrimination. How to see the latter without investing in the former?

Including race on birth certificates in the first place had been part of the larger quest on the part of statists, demographers, legislators, and government administrators to know the population in order to govern it. Such population knowledge was always bound up with colonialism and racial science as early modern kings and their advisors sought to figure out how much land their populations could conquer and how fast they could reproduce compared to Native inhabitants. When the United States broke away from England, it lacked the institutional structures necessary to answer these questions definitely, but over time the new states, together with an expanding federal bureaucracy, built the infrastructure not only to aggregate the population, but also to subdivide it into categories of race, nativity, region, legitimacy, age, and others. This same birth registration infrastructure also provided policy makers the ability to locate particular individuals within these larger categories, to identify them as members of a race, as born to certain kinds of parents—white, Black, Irish, Chinese, married, unmarried—or as over or under a certain age. As the modern state built more and more policies that depended on its ability to know these facts about its population and each and every person in it, birth certificates became an indispensable tool, an authoritative and seemingly efficient way to fix identity while also creating aggregate knowledge.

The case of the rise and (partial) fall of racial classification on the face of birth certificates demonstrates, however, that such documents were never the neutral and stable providers of epistemological certainty and "accuracy

Copyright © 2021. University of North Carolina Press. All rights reserved.

Pearson, Susan J.. The Birth Certificate : An American History, University of North Carolina Press, 2021. ProQuest Ebook Central,
       http://ebookcentral.proquest.com/lib/nyulibrary-ebooks/detail.action?docID=6793683.
Created from nyulibrary-ebooks on 2025-04-03 15:55:20.

in the tables" that dreamers from Lemuel Shattuck forward hoped that they would be. Though it took more than a century, the states built the capacity to register all births; veracity, however, remained chimerical. Indeed, the more widespread and integral to basic functioning birth certificates became, the more the people who used them contested them. Though ordinary Americans came to believe that birth certificates represented them, they did not always like what they saw.

Copyright © 2021. University of North Carolina Press. All rights reserved.

Pearson, Susan J.. The Birth Certificate : An American History, University of North Carolina Press, 2021. ProQuest Ebook Central,
        http://ebookcentral.proquest.com/lib/nyulibrary-ebooks/detail.action?docID=6793683.
Created from nyulibrary-ebooks on 2025-04-03 15:55:20.

*This page intentionally left blank*

Copyright © 2021 . University of North Carolina Press. All rights reserved.

Pearson, Susan J.. The Birth Certificate : An American History, University of North Carolina Press, 2021. ProQuest Ebook Central,
        http://ebookcentral.proquest.com/lib/nyulibrary-ebooks/detail.action?docID=6793683.
Created from nyulibrary-ebooks on 2025-04-03 15:55:20.