**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, et al., | |
| Plaintiffs, | |
| v. | Civil Action No. 25-0946 (CKK) |
| EXECUTIVE OFFICE OF THE PRESIDENT, et al., | |
| Defendants. | |
| DEMOCRATIC NATIONAL COMMITTEE, et al., | |
| Plaintiffs, | |
| v. | Civil Action No. 25-cv-0952 (CKK) |
| DONALD J. TRUMP, in his official capacity as President of the United States, et al., | |
| Defendants. | |
| LEAGUE OF WOMEN VOTERS EDUCATION FUND, et al., | |
| Plaintiffs, | |
| v. | Civil Action No. 25-0955 (CKK) |
| DONALD J. TRUMP, in his official capacity as President of the United States, et al., | |
| Defendants. | |

**DEMOCRATIC PARTY PLAINTIFFS' MEMORANDUM OF POINTS AND**
**AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

**ELIAS LAW GROUP LLP**
Marc E. Elias (DC 442007)
Aria C. Branch (DC 1014541)
Lalitha D. Madduri (DC 1659412)
Christopher D. Dodge (DC 90011587)
Jacob D. Shelly (DC 90010127)
James J. Pinchak (NY 5965397)*
Julie Zuckerbrod (DC 1781133)
250 Massachusetts Ave. NW, Suite 400
Washington, DC 20001
T: (202) 968-4652

Tyler L. Bishop (DC 90014111)
1700 Seventh Ave. Suite 2100
Seattle, WA 98101
T: (206) 656-0177

*Admitted pro hac vice*

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

BACKGROUND ................................................................................................... 2

I. The E.O. purports to dictate sweeping changes to election laws across the country, without any grant of constitutional or statutory authority. ................................. 2

 A. The E.O. imposes the President's policy preferences on States with extended ballot receipt deadlines, threatening mass disenfranchisement............................ 3

 B. The E.O. imposes burdensome and unnecessary documentary proof of citizenship requirements........................................................................................ 4

 C. The E.O. forces federal agencies to share sensitive voter information with DOGE and state officials.................................................................................................. 7

II. Democratic Party Plaintiffs' Lawsuit......................................................................... 7

STANDARD OF REVIEW ...................................................................................... 8

ARGUMENT ........................................................................................................ 9

I. The Democratic Party Plaintiffs have standing as to each provision they challenge. ................................................................................................................ 9

 A. The Democratic Party Plaintiffs have standing based on direct harm to their electoral prospects. ................................................................................................ 9

 B. The Party Organizations have associational standing based on harm to their members' and constituents' voting and privacy rights........................................ 13

 C. The Party Organizations have standing based on harm to their mission and the need to divert resources away from core activities to combat that harm. .............................................................................................. 16

 D. The remaining prongs of the standing inquiry are satisfied. .............................. 20

II. Plaintiffs are likely to succeed on the merits. .................................................... 20

 A. The Supreme Court has long recognized claims against action that is *ultra vires* and that violates the separation of powers........................................................... 21

 B. The Receipt Deadline provisions are *ultra vires* and violate the separation of powers. ................................................................................................................ 22

C.    The DPOC provisions are *ultra vires* and violate the separation of powers. ................................................................................................ 29

D.    The Data-Sharing provisions are *ultra vires*. ...................................... 34

III.   The remaining preliminary injunction factors are satisfied. ............................ 36

A.    Plaintiffs are suffering irreparable harm. .............................................. 36

B.    The public interest favors an injunction. ................................................ 43

IV.   Plaintiffs request appropriately tailored preliminary relief. ............................ 44

CONCLUSION ........................................................................................................................ 45

# TABLE OF AUTHORITIES

Page(s)

## CASES

*All. for Retired Ams. v. Bessent*,
2025 WL 740401 (D.D.C. Mar. 7, 2025)......................................................................... 20, 41

*\*Am. Forest Res. Council v. United States*,
77 F.4th 787 (D.C. Cir. 2023) ........................................................................................ 21

*Arcia v. Fla. Sec'y of State*,
772 F.3d 1335 (11th Cir. 2014) ...................................................................................... 17

*\*Arizona v. Inter Tribal Council of Ariz., Inc.*,
570 U.S. 1 (2013) ................................................................................................... *passim*

*Black Voters Matter Fund v. Raffensperger*,
478 F. Supp. 3d 1278 (N.D. Ga. 2020) ........................................................................... 20

*Bognet v. Degraffenreid*,
141 S. Ct. 2508 (2021) ................................................................................................... 25

*Bognet v. Sec'y Commonwealth of Pa.*,
980 F.3d 336 (3d Cir. 2020) ........................................................................................... 25

*Bond v. United States*,
564 U.S. 211 (2011) ................................................................................................. 21, 22

*Bost v. Ill. State Bd. of Elections*,
684 F. Supp. 3d 720 (N.D. Ill. 2023) ........................................................................ 24, 25

*Burke v. State Bd. of Canvassers*,
107 P.2d 773 (Kan. 1940) .............................................................................................. 28

*C.G.B. v. Wolf*,
464 F. Supp. 3d 174 (D.D.C. 2020) ................................................................................ 43

*Carey v. FEC*,
791 F. Supp. 2d 121 (D.D.C. 2011) ................................................................................ 42

*Coleman v. Miller*,
307 U.S. 433 (1939) ....................................................................................................... 14

*Collins v. Yellen*,
 594 U.S. 220 (2021).............................................................................................. 21

*Common Cause Ind. v. Lawson*,
 937 F.3d 944 (7th Cir. 2019) ............................................................................. 17

*County of Santa Clara v. Trump*,
 250 F. Supp. 3d 497 (N.D. Cal. 2017) ............................................................... 23

*Craig v. Simon*,
 493 F. Supp. 3d 773 (D. Minn.)........................................................................... 40

*Crawford v. Marion Cnty. Election Bd.*,
 472 F.3d 949 (7th Cir. 2007) ....................................................................... 13, 17

*Dalton v. Specter*,
 511 U.S. 462 (1994).............................................................................................. 30

*Dart v. United States*,
 828 F.2d 217 (D.C. Cir. 1988) ............................................................................ 29

*Dep't of Com. v. New York*,
 588 U.S. 752 (2019).............................................................................................. 20

*DNC v. Wis. State Legis.*,
 141 S. Ct. 28 (2020)......................................................................................... 1, 25

*Donald J. Trump for President, Inc. v. Way*,
 492 F. Supp. 3d 354 (D.N.J. 2020) ............................................................... 24, 25

*Elec. Privacy Info. Ctr. v. Pres. Advisory Comm'n on Elec. Integrity*,
 878 F.3d 371 (D.C. Cir. 2017) .............................................................................. 9

*Elrod v. Burns*,
 427 U.S. 347 (1976).............................................................................................. 42

*Emineth v. Jaeger*,
 901 F. Supp. 2d 1138 (D.N.D. 2012)................................................................... 41

*Ex parte Siebold*,
 100 U.S. 371 (1879)........................................................................................ 23, 26

*Fish v. Schwab*,
 957 F.3d 1105 (10th Cir. 2020) .......................................................................... 18

*Fla. Democratic Party v. Scott*,
 215 F. Supp. 3d 1250 (N.D. Fla. 2016) ............................................................ 13

*Fla. State Conf. of NAACP v. Browning*,
 522 F.3d 1153 (11th Cir. 2008) ..................................... 14, 15, 19, 20

*Food & Drug Admin. v. All. for Hippocratic Med.*,
 602 U.S. 367 (2024) ................................................................ 16, 17, 18

*Foster v. Love*,
 522 U.S. 67 (1997) ................................................................ 23, 26, 27

*Franklin v. Massachusetts*,
 505 U.S. 788 (1992) .......................................................................... 44

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
 561 U.S. 477 (2010) .................................................................... 21, 22

*In re Ga. S.B. 202*,
 No. 1:21-CV-01259-JPB, 2023 WL 5334582 (N.D. Ga. Aug. 18, 2023) .......................... 39

*Gallagher v. N.Y. State Bd. of Elections*,
 477 F. Supp. 3d 19 (S.D.N.Y. 2020) ............................................................ 11, 12

*Garey v. James S. Farrin*,
 35 F.4th 917 (4th Cir. 2022) ................................................................ 15, 41

*Gonzalez v. Arizona*,
 677 F.3d 383 (9th Cir. 2012) ................................................................ 34

*Goodell v. Judith Basin County*,
 224 P. 1110 (1924) .......................................................................... 28

*Guedes v. ATF*,
 920 F.3d 1 (D.C. Cir. 2019) ................................................................ 43

*Harris v. Fla. Elections Canvassing Comm'n*,
 122 F. Supp. 2d 1317 (N.D. Fla.) ............................................................ 25

*Harris v. Fla. Elections Comm'n*,
 235 F.3d 578 (11th Cir. 2000) ................................................................ 25

*Havens Realty Corp. v. Coleman*,
 455 U.S. 363 (1982) .................................................................... 16, 18

*Hunt v. Wash. State Apple Advert. Comm'n,*
    432 U.S. 333 (1977) ................................................................. 13, 16

*Jones v. U.S. Postal Serv.,*
    488 F. Supp. 3d 103 (S.D.N.Y. 2020) ........................................... 15

*Kobach v. U.S. Election Assistance Comm'n,*
    772 F.3d 1183 (10th Cir. 2014) ..................................................... 33

*LaRoque v. Holder,*
    650 F.3d 777 (D.C. Cir. 2011) ...................................................... 22

*League of United Latin American Citizens v. Executive Office of the President,*
    No. 1:25-cv-00946 (D.D.C. 2025) ................................................... 8

*League of Women Voters Education Fund v. Trump,*
    No. 1:25-cv-00955 (D.D.C. 2025) ................................................... 8

*League of Women Voters of Mo. v. Ashcroft,*
    336 F. Supp. 3d 998 (W.D. Mo. 2018) ......................................... 36

*League of Women Voters of S.C. v. Andino,*
    497 F. Supp. 3d 59 (D.S.C. 2020) ................................................. 15

*League of Women Voters of U.S. v. Newby,*
    838 F.3d 1 (D.C. Cir. 2016) .................................................. *passim*

*Louisiana v. Biden,*
    622 F. Supp. 3d 267 (W.D. La. 2022) ..................................... 32, 33

*LUPE v. Abbott,*
    No. 5:21–CV–0844, 2024 WL 4488082 (W.D. Tex. Oct. 11, 2024) ............... 17

*Maddox v. Bd. of State Canvassers,*
    149 P.2d 112 (1944) ...................................................................... 27

*Mass. Coal. for Immigr. Reform v. DHS,*
    752 F. Supp. 3d 13 (D.D.C. 2024) ................................................ 20

*Mecinas v. Hobbs,*
    30 F.4th 890 (9th Cir. 2022) ...................................................... 9, 12

*Mi Familia Vota v. Fontes,*
    No. CV-22-00509-PHX-SRB, 2024 WL 2244338 (D. Ariz. May 2, 2024) .......... 40

*Mi Familia Vota v. Fontes,
    129 F.4th 691 (9th Cir. 2025) ....................................................................... 15, 19, 32, 40, 42

Mi Familia Vota v. Fontes,
    719 F. Supp. 3d 929 (D. Ariz. 2024) ................................................................... 15

Mi Familia Vota v. Fontes,
    No. CV-22-00509, 2024 WL 2244338, (D. Ariz. May 2, 2024) ........................................ 40

Millsaps v. Thompson,
    259 F.3d 535 (6th Cir. 2001) ...................................................................... 26, 27

*Minnesota v. Mille Lacs Band of Chippewa Indians,
    526 U.S. 172 (1999) .................................................................................. 23

N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen,
    597 U.S. 1 (2022) ..................................................................................... 26

Nat. Law Party of U.S. v. FEC,
    111 F. Supp. 2d 33 (D.D.C. 2000) ...................................................................... 12

Nelson v. Warner,
    472 F. Supp. 3d 297 (S.D. W. Va. 2020) ................................................................. 10

Newberry v. United States,
    256 U.S. 232 (1921) ................................................................................... 27

Nielsen v. DeSantis,
    469 F. Supp. 3d 1261 (N.D. Fla. 2020) ................................................................. 14

Nken v. Holder,
    556 U.S. 418 (2009) .................................................................................... 8

Open Cmtys. All. v. Carson,
    286 F. Supp. 3d 148 (D.D.C. 2017) ...................................................................... 43

In re Opinion of the Justices,
    113 A. 293 (N.H. 1921) ................................................................................ 28

Pa. Democratic Party v. Boockvar,
    238 A.3d 345 ........................................................................................... 25

Pacito v. Trump,
    No. 2:25-CV-255, 2025 WL 655075 (Feb. 28, 2025) .................................................. 31, 33

*PFLAG, Inc. v. Trump*,
2025 WL 685124 (D. Md. Mar. 4, 2025)................................................................. 23, 32, 34

*Pursuing Am.'s Greatness v. FEC*,
831 F.3d 500 (D.C. Cir. 2016) ....................................................................................... 8

*Raines v. Byrd*,
521 U.S. 811 (1997)..................................................................................................... 14

*Randolph v. ING Life Ins. & Annuity Co.*,
973 A.2d 702 (D.C. 2009) ...................................................................................... 15, 41

*Republican Nat'l Comm. v. Burgess*,
No. 3:24-CV-00198-MMD-CLB, 2024 WL 3445254 (D. Nev. July 17, 2024)................. 25

*Republican Nat'l Comm. v. N.C. State Bd. of Elections*,
120 F.4th 390 (4th Cir. 2024) ............................................................................ 16, 17, 18

*Republican Nat'l Comm. v. Wetzel*,
No. 24-60395, 2025 WL 917346 (5th Cir. Mar. 14, 2025)............................................ 26

*Republican Nat'l Comm. v. Wetzel*,
120 F.4th 200 (5th Cir. 2024) ............................................................................ 25, 26, 27

*Republican Nat'l Comm. v. Wetzel*,
742 F. Supp. 3d 587 (S.D. Miss. 2024)........................................................................ 25

*Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*,
547 U.S. 47 (2006)....................................................................................................... 9

*Sandusky Cnty. Democratic Party v. Blackwell*,
387 F.3d 565 (6th Cir. 2004) ...................................................................................... 13

*\*Shays v. FEC*,
414 F.3d 76 (D.C. Cir. 2005) ............................................................................ 9, 11, 12

*Sherley v. Sebelius*,
644 F.3d 388 (D.C. Cir. 2011) ....................................................................................... 8

*Sherley v. Sebelius*,
689 F.3d 776 (D.C. Cir. 2012) ..................................................................................... 44

*Smiley v. Holm*,
285 U.S. 355 (1932).................................................................................................... 24

*State v. Meadows*,
    88 F.4th 1331 (11th Cir. 2023) ................................................................. 30

*Tex. Children's Hosp. v. Burwell*,
    76 F. Supp. 3d 224 (D.D.C. 2014) ........................................................... 43

*\*Tex. Democratic Party v. Benkiser*,
    459 F.3d 582 (5th Cir. 2006) ........................................................ 9, 12, 14

*Thomas More L. Ctr. v. Obama*,
    651 F.3d 529 (6th Cir. 2011) ................................................................... 33

*Tolbert-Smith v. Chu*,
    714 F. Supp. 2d 37 (D.D.C. 2010) ........................................................... 35

*Travelers United, Inc. v. Hyatt Hotels Corp.*,
    No. CV 23-2776, 2025 WL 27162 (D.D.C. Jan. 3, 2025) ....................... 16

*Turner v. U.S. Agency for Glob. Media*,
    502 F. Supp. 3d 333 (D.D.C. 2020) ........................................................... 9

*U.S. Chamber of Com. v. Reich*,
    74 F.3d 1322 (D.C. Cir. 1996) .......................................................... 21, 29

*United Food & Com. Workers Union Local 751 v. Brown Group*,
    517 U.S. 544 (1996) ................................................................................ 16

*Univ. of Tex. v. Camenisch*,
    451 U.S. 390 (1981) ................................................................................ 44

*Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*,
    485 F. Supp. 3d 1 (D.D.C. 2020) .................................................. 36, 36, 43

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ...................................................................................... 8

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952) ................................................................................ 32

*Zivotofsky ex rel. Zivotofsky v. Kerry*,
    576 U.S. 1 (2015) .................................................................................... 32

## US CONSTITUTIONAL PROVISIONS

Article I, § 4 ................................................................. 23, 24, 29, 30, 34

Article II, § 1 ................................................................................................ 24, 29, 30, 34

**STATUTES**

2 U.S.C § 7 .................................................................................................... *passim*

3 U.S.C. § 1 .................................................................................................. *passim*

3 U.S.C. § 21 ...................................................................................................... 26

5 U.S.C. § 55 ...................................................................................................... 34

5 U.S.C. § 552a .............................................................................................. 35, 36

8 U.S.C. § 1182 .................................................................................................. 18

18 U.S.C. § 611 .................................................................................................. 18

52 U.S.C. § 10502 .............................................................................................. 28

52 U.S.C. § 20303 .......................................................................................... 24, 28

52 U.S.C. § 20501 ..................................................................................... 4, 5, 6, 7

52 U.S.C. § 20506 .............................................................................................. 45

52 U.S.C. § 20508 .................................................................................. 30, 31, 32

52 U.S.C. § 20921 .............................................................................................. 23

52 U.S.C. § 20921 .............................................................................................. 34

52 U.S.C. § 20923 .............................................................................................. 34

52 U.S.C. § 20928 .............................................................................................. 34

52 U.S.C. § 21001 .............................................................................................. 23

Ala. Code 17.11.18 .............................................................................................. 3

Alaska Stat. 15.20.081 ......................................................................................... 3

Ariz. A.R.S. 16.121.01 ....................................................................................... 40

Ark. Code. Ann. 7.5.411 ...................................................................................... 3

Cal. Elec. Code § 3020 ................................................................................................ 3

D.C. Code 1.1001.05 .................................................................................................. 3

Fla. Stat. 101.6952 ..................................................................................................... 3

Ga. Code Ann. 21.2.386 .............................................................................................. 3

Ind. Code 3.1.17 ......................................................................................................... 3

Mass. Gen. Laws 54.93 ............................................................................................... 3

Md. Code Ann., Elec. Law § 9-309 ............................................................................ 3

Mich. Comp. Laws 168.759a ...................................................................................... 3

Miss. Code Ann. 23.15.637 ........................................................................................ 3

Mo. Rev. Stat. § 115.920 ............................................................................................ 3

Mont. Code 13.21.226 .............................................................................................. 28

N.D. Cent. Code Ann. 16.1.07.09 .............................................................................. 3

N.J. Stat. § 19:63-22(a) .............................................................................................. 3

N.Y. Elec. Law § 8-412(1) .......................................................................................... 3

Nev. Rev. Stat. 293.269921 ........................................................................................ 3

Ohio Rev. Code 3509.05 ............................................................................................. 3

Or. Rev. Stat. 254.470 ................................................................................................. 3

25 Pa. Cons. Stat. § 3511 ............................................................................................ 3

Pub. L. No. 93-579, 88 Stat. 1896 (1974).................................................................. 34

R.I. Gen. Laws 17.20.16 ............................................................................................. 3

S.C. Code 7.15.700 ..................................................................................................... 3

Tex. Elec. Code Ann. § 86.007 ................................................................................... 3

Va. Code 24.2.709 ...................................................................................................... 3

W. Va. Code 3.5...................................................................................................... 3

Wash. Rev. Code 29A.40.091.................................................................................. 3

**OTHER AUTHORITIES**

147 Cong. Rec. S13681-02, 2001 WL 1628058 (Dec. 19, 2001) ............................... 31

148 Cong. Rec. S797-01, 2002 WL 225992 (Feb. 14, 2002) ..................................... 31

Bay Area News Grp., *Can California's Real ID Be Used as Proof of U.S. Citizenship?*, Mercury News (Jan. 29, 2025), https://perma.cc/DBB9-BVHJ ................................................................................ 5

Ariz. Sec'y of State, *Congressional District 7 Special Primary and Special General Election Information Important Dates* (2025), https://azsos.gov/sites/default/files/docs/2025-Special-Election-Schedule.pdf.................. 40

Dep't of Homeland Sec., *Enhanced Drivers' Licenses: What Are They?* (last updated Apr. 27, 2023), https://perma.cc/5QUT-FELG ............................... 5

Dep't of Defense, Federal Voting Assistance Program, Report to Congress (2020), https://www.fvap.gov/uploads/FVAP/Reports/FVAP-2020-Report-to-Congress_20210916_FINAL.pdf..................................................................... 11

Exec. Order No. 14160, *Protecting the Meaning and Value of American Citizenship*, (Jan. 20, 2025)..................................................................................................... 6

Exec. Order No. 14248, *Preserving and Protecting The Integrity of American Elections*, (Mar. 25, 2025) ............................................................................................*passim*

H.R. Conf. Rep. No. 103-66, 1993 WL 235764 (Apr. 28, 1993) ................................................................ 32

List of Voter Registration Agencies (June 20, 2024), https://www.michigan.gov/whitmer/-/media/Project/Websites/Whitmer/Documents/Exec-Directives/ED-20243-signed.pdf?rev=1600c3de9ee74cc493c70467e5f4395b&hash=757453EA390A89DB900 1D2B46757BF03 ................................................................................................ 45

Md. State Bd. of Elections, *Canvassing*, https://perma.cc/RZ8M-W6JK (accessed Apr. 7, 2025)..................................... 3

Mich. Dep't of State, *Enhanced license and ID*, https://www.michigan.gov/sos/all-services/enhanced-license-and-id (accessed Apr. 7, 2025) ...................................................................................................... 5

Mich. Dep't of State, *First-time license or ID*,
https://www.michigan.gov/sos/all-services/first-time-license-or-id (accessed Apr. 7, 2025) ................................................................................................................................... 5

Minn. Dep't of Pub. Safety,
https://dps.mn.gov/divisions/dvs/license-and-id/dl-and-id-card-fees ................................... 5

N.Y. State, Enhanced or REAL ID,
https://dmv.ny.gov/driver-license/enhanced-or-real-id# (accessed Apr. 7, 2025) ................ 5

Nat'l Conf. of State Legis.*, Voting Outside the Polling Place Report, Table 11: Receipt and Postmark Deadlines for Absentee/Mail Ballots* (last updated Mar. 24, 2025),
https://www.ncsl.org/elections-and-campaigns/table-11-receipt-and-postmark-deadlines-for-absentee-mail-ballots ............................................................................................... 3

Press Release, *Interior Department Takes Steps to Increase Voter Registration in Indigenous Communities*, U.S. Dep't of the Interior (Mar. 24, 2022),
https://www.doi.gov/pressreleases/interior-department-takes-steps-increase-voter-registration-indigenous-communities ................................................................................. 45

U.S. Dep't of Justice, *Overview of the Privacy Act of 1974* (updated Feb. 24, 2021),
https://www.justice.gov/archives/opcl/policy-objectives ..................................................... 35

U.S. Embassy & Consulates in Japan, *Proof of U.S. Citizenship*,
https://perma.cc/WU9M-4TQ8 ............................................................................................. 5

Vt. Dep't of Motor Vehicles, *Driver's License Fees*,
https://dmv.vermont.gov/licenses/fees (accessed Apr. 7, 2025) ........................................... 5

Wash. State Dep't of Licensing, *Driver Licensing Fees*,
https://dol.wa.gov/driver-licenses-and-permits/driver-licensing-fees (accessed Apr. 7, 2025) ................................................................................................................................... 5

Wash. Sec'y of State Steve Hobbs, Statement Reacting to Presidential Executive Order on Elections (Mar. 26, 2025),
https://perma.cc/Y622-EMT9 ............................................................................................. 44

## INTRODUCTION

The excessive accumulation of powers in the same hands, the Framers warned, "may justly be pronounced the very definition of tyranny." The Federalist No. 47 (James Madison). To protect against this existential risk to democracy, the Framers created a decentralized system that divided the federal powers relating to the administration of elections among the leaders elected by—and closest to—the people. They gave the President *no* role in this constitutional design for setting election rules.

President Trump's recent Executive Order No. 14248 (the "E.O.") seeks to override that deliberate and careful separation of powers in a way that is emblematic of the very dangers that concerned the Framers. Falsely claiming that sweeping alterations to election laws across the country are necessary to ensure that elections "determine[e] the rightful winner[s]," E.O. § 1, President Trump asserts unprecedented and entirely illegitimate authority to declare by executive fiat which Americans may vote and which ballots may be counted. In the process, he threatens retribution against any State that persists in asserting its own rightful authority to administer its own elections, and in the process, he violates federal laws duly enacted by Congress. The result is an E.O. that is entirely *ultra vires* and fundamentally irreconcilable with the separation of powers.

President Trump has *no* authority to require enforcement action against States that exercise their rightful "policy choice" to count mail ballots received by election officials after election day. *DNC v. Wis. State Legis.*, 141 S. Ct. 28, 34 (2020) (Kavanaugh, J., concurring); *but see* E.O. § 7. He has *no* authority to require the Election Assistance Commission, an independent agency, to amend the national mail voter registration form to require documentary proof of citizenship, or to instruct other officials to withhold that form arbitrarily from recipients of public assistance. *But*

*see* E.O. § 2(a), (d). And he has *no* authority to require DOGE and other administrative agencies to broadly disseminate sensitive personal data. *But see id.* § 2(b).

President Trump's illegitimate attempts to subvert American elections and remake both state and federal laws with the sweep of his pen will cause severe and irreparable harm to Democratic Party Plaintiffs—the DNC, DGA, DSCC, and DCCC, as well as their members and voters, Leader Schumer, and Leader Jeffries. They move for immediate preliminary relief against the portions of the E.O. that threaten imminent harm: that is, Sections 2(a), 2(b), 2(d), 7(a), and 7(b).

Absent prompt relief, Plaintiffs will be forced to compete under election rules designed to benefit their opponents, including rules that make it harder for their supporters to register to vote and have their votes counted. Plaintiffs will also be forced to redirect scarce resources to protect their tens of millions of members and constituents from the President's unlawful actions. The equities and public interest also weigh decisively in Plaintiffs' favor, as the President's naked pursuit of partisan advantage undermines the integrity of American elections while risking mass voter disenfranchisement. The Democratic Party Plaintiffs' motion for a preliminary injunction should be granted.

## BACKGROUND

I.  **The E.O. purports to dictate sweeping changes to election laws across the country, without any grant of constitutional or statutory authority.**

On March 25, President Trump issued Executive Order 14248, titled *Preserving and Protecting the Integrity of American Elections*. As relevant here, the E.O. mandates federal agency action aimed at prohibiting the counting of timely cast mail ballots, E.O. § 7, requiring voters to provide documentary proof of citizenship when registering, *id.* §§ 2(a), (d), and sharing sensitive

personal data stored in federal databases with DOGE and state and local election officials across the country, *id.* § 2(b) (collectively for purposes of this motion, the "Challenged Provisions").

### A.    The E.O. imposes the President's policy preferences on States with extended ballot receipt deadlines, threatening mass disenfranchisement.

Nearly thirty States allow for the counting of ballots that voters mark and place in the mail by election day, even if USPS does not deliver them to local election officials until after the polls close.[1] These laws protect the timely cast ballots of voters—especially servicemembers, Americans living overseas, and older voters—who may otherwise be disenfranchised because of mail delays beyond their control. In Section 7 of the E.O., President Trump falsely claims that all of these laws are invalid for lacking compliance "with the Federal laws that set the uniform day for appointing Presidential electors and electing members of Congress." E.O. § 7(a) (citing 2 U.S.C § 7 and 3 U.S.C. § 1). He then directs the Attorney General to "take all necessary action to enforce 2 U.S.C. 7 and 3 U.S.C. 1 against States that violate these provisions by" counting "absentee or mail-in ballots received after Election Day" in federal elections, and the EAC to withhold federal

---

[1] *See* Ala. Code § 17-11-18(b); Alaska Stat. § 15.20.081; Ark. Code. Ann. § 7-5-411(a)(1)(A)(ii); Cal. Elec. Code § 3020(b); D.C. Code § 1-1001.05.(a)(10B); Fla. Stat. § 101.6952(5); Ga. Code Ann. § 21-2-386(a)(1)(G); 10 Ill. Comp. Stat. 5/19-8, 10 Ill. Comp. Stat. 5/18A-15; Ind. Code § 3-12-1-17(b); Mass. Gen. Laws ch. 54 § 93; Md. Code Ann., Elec. Law, § 9-309; Maryland State Board of Elections, *Canvassing*, https://perma.cc/RZ8M-W6JK (last visited Apr. 7, 2025); Mich. Comp. Laws § 168.759a(18); Miss. Code Ann. § 23-15-637(1)(a); Mo. Rev. Stat. § 115.920(1); Nev. Rev. Stat. § 293.269921(1)(b), (2); N.J. Stat. § 19:63-22(a); N.Y. Elec. Law § 8-412(1); N.D. Cent. Code Ann. § 16.1-07-09; Ohio Rev. Code § 3509.05(D)(2)(a); Or. Rev. Stat. § 254.470(6)(e)(B); 25 Pa. Cons. Stat. § 3511(a); R.I. Gen. Laws § 17-20-16; S.C. Code § 7-15-700(A); Tex. Elec. Code Ann. § 86.007(a)(2); Va. Code § 24.2-709(B); Wash. Rev. Code § 29A.40.091; W. Va. Code § 3-3-5(g)(2); *see also* Nat'l Conf. of State Legis., *Voting Outside the Polling Place Report, Table 11: Receipt and Postmark Deadlines for Absentee/Mail Ballots* (last updated Mar. 24, 2025), https://www.ncsl.org/elections-and-campaigns/table-11-receipt-and-postmark-deadlines-for-absentee-mail-ballots.

funding from States that do not adopt a "ballot receipt deadline of Election Day for all methods of voting." *Id*. § 7(a), (b) (the "Receipt Deadline provisions").

The imposition of a national election day ballot receipt deadline will disenfranchise countless voters among the Democratic Party Plaintiffs' members and constituents—including members of the military, their families, and others who rely on mail voting. Ex. 1, Decl. of Hakeem S. Jeffries ("Jeffries Decl.") ¶ 9–10; Ex. 2, Decl. of Charles E. Schumer ("Schumer Decl.") ¶ 5; Ex. 3, Decl. of Liberty Schneider ("Schneider Decl.") ¶ 9; Ex. 4, Decl. of Jillian Edelman ("Edelman Decl.") ¶ 9; Ex. 5, Decl. of Lillie Snyder ("Snyder Decl.") ¶ 8; Ex. 6, Decl. of Erik Ruselowski ("Ruselowski Decl.") ¶ 9. Over the past several election cycles it has increasingly become the case that supporters of the Democratic Party use mail voting at higher rates than their Republican counterparts. Jeffries Decl. ¶ 12; Schumer Decl. ¶ 6–9; Schneider Decl. ¶ 28; Edelman Decl. ¶ 10; Snyder Decl. ¶ 6, 26; Ruselowski Decl. ¶ 7, 28. The impact of this part of the E.O. will accordingly fall particularly hard on Democratic voters, especially in States where elections are conducted primarily by mail, such as California, Nevada, Oregon, Utah, and Washington—all of which have extended receipt deadlines, and many of which have elections that are regularly decided by small margins. Schumer Decl. ¶ 7; Schneider Decl. ¶ 9; Snyder Decl. ¶ 8; Ruselowski Decl. ¶ 9.

### B.    The E.O. imposes burdensome and unnecessary documentary proof of citizenship requirements.

The E.O. also mandates new burdens on voters who register using the "National Mail Voter Registration Form" (commonly known as the "Federal Form") prescribed by Congress in the National Voter Registration Act, 52 U.S.C. § 20501 *et seq.* ("NVRA"), and assigned to the EAC to develop in consultation with the States, *id.* §§ 20501, 20508; *see also* E.O. §§ 2(a), 2(d) (the "DPOC provisions"). These provisions of the E.O. are based on the false claim that American

elections are not adequately protected against noncitizen voting and that voters should be required to show documentary proof of citizenship ("DPOC").

First, the E.O. directs the EAC, *within 30 days* (or by April 24, 2025), to amend the Federal Form to require that all voters provide DPOC to register, while simultaneously restricting such "proof" to a narrow set of documents that millions of Americans do not possess. *See* E.O. § 2(a)(i). Namely, voters may only "prove" citizenship under the E.O. if they can produce (A) a U.S. passport; (B) a REAL ID or (C) an official military identification card, but only if the REAL or military IDs "indicate[] the applicant is a citizen of the United States"; or (D) a valid Federal or State government-issued photo identification if it indicates that the applicant is a U.S. citizen or is accompanied by proof of U.S. Citizenship. *See id.* § 2(a)(ii). Several forms of identification listed in the E.O.—including REAL IDs and military identification cards—do *not* necessarily establish a person's U.S. citizenship.[2] Only five States—Michigan, Minnesota, New York, Vermont, and Washington—offer more expensive "enhanced" driver's licenses that indicate citizenship.[3] And the E.O. does ***not*** include as acceptable DPOC other documents including adoption certificates,

---

[2] *See, e.g.*, Bay Area News Grp., *Can California's Real ID Be Used as Proof of U.S. Citizenship?*, Mercury News (Jan. 29, 2025), https://perma.cc/DBB9-BVHJ; U.S. Embassy & Consulates in Japan, *Proof of U.S. Citizenship*, https://perma.cc/WU9M-4TQ8.

[3] Dep't of Homeland Sec., *Enhanced Drivers' Licenses: What Are They?* (last updated Apr. 27, 2023), https://perma.cc/5QUT-FELG. *Compare* Mich. Dep't of State, *Enhanced license and ID*, https://www.michigan.gov/sos/all-services/enhanced-license-and-id ($45 enhanced license), *with* Mich. Dep't of State, *First-time license or ID*, https://www.michigan.gov/sos/all-services/first-time-license-or-id ($25 first-time license); Minn. Dep't of Pub. Safety, https://dps.mn.gov/divisions/dvs/license-and-id/dl-and-id-card-fees ($15 fee for enhanced license); N.Y. State, *Enhanced or REAL ID*, https://dmv.ny.gov/driver-license/enhanced-or-real-id#:~:text=Enhanced%3A%20The%20additional%20fee%20for,or%20non%2Ddriver%20ID%20transaction ($30 fee for enhanced license); Vt. Dep't of Motor Vehicles, *Driver's License Fees*, https://dmv.vermont.gov/licenses/fees ($36 fee for enhanced two-year license); Wash. State Dep't of Licensing, *Driver Licensing Fees*, https://dol.wa.gov/driver-licenses-and-permits/driver-licensing-fees ($28 fee for four-year license).

Consular Reports of Birth Abroad issued by the Secretary of State, naturalization documents issued by DHS, American Indian Cards issued by DHS indicating citizenship, or even birth certificates.[4] *See* E.O. § 2(a)(ii). Millions of U.S. citizens, including the Democratic Party Plaintiffs' constituents and voters, lack qualifying documents and accordingly will be unable to register using the Federal Form—and, in some cases, that means they will be unable to register to vote at all. Schneider Decl. ¶ 19; Edelman Decl. ¶ 13; Snyder Decl. ¶ 18; Ruselowski Decl. ¶ 20; Schumer Decl. ¶ 12; Jeffries Decl. ¶ 14. This problem most heavily affects lower-income voters who lack the resources or ability to obtain a passport, as well as women, because most women who get married change their last name upon marriage, such that their legal name often does not match their citizenship document. Snyder Decl. ¶ 18; *see also* Schneider Decl. ¶ 19; Edelman Decl. ¶ 13; Ruselowski Decl. ¶ 20.

Second, the E.O. requires the EAC to amend the Federal Form to require "a State or local official to record on the form the type of document that the applicant presented as" DPOC, including the date, office, and other information about the voter's provision of such documentation. E.O. § 2(a)(i)(B).

Third, the E.O. forces federal agencies designated to serve as voter registration agencies to "assess citizenship" for "enrollees of public assistance programs"—but no one else—before they may even provide them with the Federal Form, discriminating against the most vulnerable Americans. *See id.* § 2(d). Nowhere does the E.O. explain what it means for these officials to "assess" citizenship, how federal agencies should conduct this assessment, or how it can be done

---

[4] The President's exclusion of a valid birth certificate as DPOC comes on the heels of Executive Order 14160, which contests the citizenship status of children born on American soil (and thus provided a birth certificate issued within the United States). *See* E.O. No. 14160, *Protecting the Meaning and Value of American Citizenship* (Jan. 20, 2025).

reliably. Nor does the E.O. explain why only those who receive public assistance, but no one else, should be subject to citizenship checks before they can be given the Federal Form. *See id.*

### C.    The E.O. forces federal agencies to share sensitive voter information with DOGE and state officials.

The E.O. directs several federal agencies and officers to grant third parties unauthorized access to federal systems and databases containing the personal information of American citizens, including the Party Organizations' tens of millions of members, constituents, and supporters, as well as Leader Schumer and Leader Jeffries. For example, it directs the Department of Homeland Security ("DHS") to grant the "DOGE Administrator" access to "Federal immigration databases" to "review each State's publicly available voter registration list and available records concerning voter list maintenance activities," E.O. § 2(b)(iii); the Secretary of DHS to "ensure that State and local officials have . . . access to appropriate systems for verifying the citizenship or immigration status of individuals registering to vote or who are already registered," *id.* § 2(b)(i); and the Secretary of State to "make available information from relevant databases to State and local election officials engaged in verifying the citizenship of individuals registering to vote or who are already registered." *Id.* § 2(b)(ii) (collectively, the "Data-Sharing provisions").

## II.    Democratic Party Plaintiffs' Lawsuit

Six days after the President signed the E.O., on March 31, 2025, the DNC, DGA, DSCC, DCCC (collectively, the "Party Organizations"), and the Democratic leaders of the U.S. Senate and House, Charles E. Schumer and Hakeem S. Jeffries respectively, promptly filed a Complaint in the U.S. District Court for the District of Columbia challenging the President's unprecedented and sweeping E.O. The Complaint alleges in eleven counts that the E.O.'s vast overreach violates myriad constitutional provisions and federal laws. Relevant here are the Democratic Party Plaintiffs' claims that the E.O. constitutes *ultra vires* action by the President and violates the

Constitution's protections to ensure separation of powers. *See* Compl. ¶¶ 126–33 (Count I – *Ultra Vires* Presidential Action); *id.* ¶¶ 134–41 (Count II – Separation of Powers – Unlawful Intrusion Upon Congressional Authority); *id.* 142–45 (Count III – Separation of Powers– Unlawful Intrusion Upon State Authority), ECF No. 1.

Two other groups of plaintiffs also filed suit against the E.O. in this District. *See League of United Latin American Citizens v. Executive Office of the President*, No. 1:25-cv-00946; *League of Women Voters Education Fund v. Trump*, No. 1:25-cv-00955. On April 3, the Court consolidated the three actions. *See* ECF No. 12.

## STANDARD OF REVIEW

To obtain a preliminary injunction, Plaintiffs must show that "four factors, taken together, warrant relief: likely success on the merits, likely irreparable harm in the absence of preliminary relief, a balance of the equities in [their] favor, and accord with the public interest." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016) (citation omitted). When a preliminary injunction is sought against the government, the final two factors merge. *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016); *see also Nken v. Holder*, 556 U.S. 418, 435 (2009). Before the Supreme Court's decision in *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008), courts in this Circuit applied a "sliding-scale analysis" under which "a strong showing on one factor could make up for a weaker showing on another." *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011). The D.C. Circuit has declined to resolve "whether the 'sliding scale' approach remains valid after *Winter*." *Newby*, 838 F.3d at 7; *see also Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, --- F. Supp. ----, No. CV 25-239, 2025 WL 597959, at *12 (D.D.C. Feb. 25, 2025).

## ARGUMENT

**I.    The Democratic Party Plaintiffs have standing as to each provision they challenge.**

The Democratic Party Plaintiffs have standing to seek preliminary relief against the E.O. because the record shows that they are substantially likely to satisfy each prong of the inquiry— an "injury-in-fact" that is "traceable to the conduct of the" defendants and "likely to be redressed"—as to each claim against each provision at issue. *Turner v. U.S. Agency for Glob. Media*, 502 F. Supp. 3d 333, 357 (D.D.C. 2020) (citing *Elec. Privacy Info. Ctr. v. Pres. Advisory Comm'n on Elec. Integrity*, 878 F.3d 371, 377 (D.C. Cir. 2017)). "[O]ne party with standing is sufficient to satisfy Article III's case-or-controversy requirement." *Rumsfeld v. F. for Acad. & Institutional Rts., Inc*., 547 U.S. 47, 52 n.2 (2006). Here, all have standing.

### A.    The Democratic Party Plaintiffs have standing based on direct harm to their electoral prospects.

President Trump's E.O. is designed to—and, unless enjoined, is guaranteed to—inflict harm to the Democratic Party Plaintiffs' electoral prospects, including by burdening their voters' access to the franchise and forcing Plaintiffs to expend resources to counteract these and other harms. It is well settled that any threat to the electoral prospects of a political party's candidates stemming from change in election rules constitutes a concrete and particularized injury for purposes of Article III. *E.g.*, *Mecinas v. Hobbs*, 30 F.4th 890, 898 (9th Cir. 2022) (holding regulations that "make[] the competitive landscape worse for a candidate or that candidate's party than it would otherwise be if the regulation[s] were declared unlawful" inflict cognizable harm); *Tex. Democratic Party v. Benkiser*, 459 F.3d 582, 587 & n.4 (5th Cir. 2006) (similar, collecting "[v]oluminous persuasive authority"); *see also e.g.*, *Shays v. FEC*, 414 F.3d 76, 85–86 (D.C. Cir. 2005) (holding candidates had standing to challenge regulation that would "alter the environment in which rival parties defend their concrete interests . . . in winning reelection") (cleaned up);

*Nelson v. Warner*, 472 F. Supp. 3d 297, 306–07 (S.D. W. Va. 2020) (collecting cases from "[s]everal circuits" finding candidate and party committee standing). Plaintiffs have direct standing to challenge each of the Challenged Provisions on these grounds.

*First*, the Receipt Deadline provisions disproportionately disenfranchise and burden voters who vote for Democrats, placing Plaintiffs at a competitive disadvantage relative to Republicans. Mail voting has been a cornerstone of the Party Organizations' electoral strategy in recent years and—in the current landscape—it is well understood that voters who support Democrats make up the largest share of mail voters. *See* Jeffries Decl. ¶ 7; Schumer Decl. ¶¶ 6, 9; Schneider Decl. ¶ 7; Edelman Decl. ¶ 11; Snyder Decl. ¶ 6; Ruselowski Decl. ¶ 7.[5] Furthermore, many of the States where the Democratic Party Plaintiffs compete for election have adopted extended ballot receipt deadlines. Schumer Decl. ¶ 7; *see also* Edelman Decl. ¶¶ 8, 11. Many of these States also have high levels of mail voting and extremely close elections. Schneider Decl. ¶ 9; Ruselowski Decl. ¶¶ 9–10; Schneider Decl. ¶ 9. Extended receipt deadlines are essential both to ensure that qualified voters are not disenfranchised due to mail delays, and to ensure that the outcome of any given election truly reflects the will of the voters who participate in it. The President's attempt to impose a nationwide election day receipt deadline threatens to disqualify hundreds of thousands of ballots in States where they otherwise would be counted, making it harder for Democrats to win elections. Schneider Decl. ¶¶ 9–12, 28; Edelman Decl. ¶¶ 9–10; Snyder Decl. ¶¶ 8–10, 26; Ruselowski Decl.

---

[5] Ex. 7, Pew Rsch. Ctr., *Voters' and Nonvoters' Experiences With the 2024 Election* (Dec. 4, 2024), https://perma.cc/BXR3-L2GJ (showing that in the 2024 general election 44 percent of Democratic candidates' voters voted by mail or absentee ballot compared to 26 percent of Republican candidates' voters); *see also* Ex. 8, @realDonaldTrump, Twitter (May 28, 2020, 9:00 PM) (asserting mail-in voting will "lead to the end" of the Republican Party (all-caps removed)), available at https://x.com/realDonaldTrump/status/1266172570983940101.

¶¶ 9–12, 28.[6] The Receipt Deadline provisions further risk mass confusion among Democratic mail voters about what deadline applies, significantly increasing the likelihood that their ballots will be rejected, to the benefit of the President's political party. Jeffries Decl. ¶ 8; Schumer Decl. ¶¶ 6, 9; Schneider Decl. ¶ 11; Edelman Decl. ¶¶ 9, 10; Snyder Decl. ¶ 9; Ruselowski Decl. ¶¶ 11–12. The Receipt Deadline provisions thus dramatically "alter the [electoral] environment"—to the Democratic Party Plaintiffs' clear detriment. *Shays*, 414 F.3d at 85–86. For the same reasons, the Receipt Deadline provisions tilt the playing field against Plaintiffs Schumer and Jeffries, as well as the Party Organizations' members who are Democratic candidates for office. *Gallagher v. N.Y. State Bd. of Elections*, 477 F. Supp. 3d 19, 35 (S.D.N.Y. 2020) ("Candidates have an interest not only in winning or losing their elections, but also in ensuring that the final vote tally accurately reflects the votes cast."); *see* Schumer Decl. ¶ 9; Jeffries Decl. ¶ 12; Edelman Decl. ¶¶ 10–11.

*Second*, the burdens imposed by the DPOC provisions will fall disproportionately on citizens that are more likely to support Democrats—including lower-income voters, enrollees of public assistance programs, and women. Despite being citizens and eligible voters, members of these groups are far more likely to lack the particular forms of documentation that the E.O. declares acceptable to "prove" citizenship, thus making it impossible for them to vote, directly harming the Democratic Party Plaintiffs' electoral prospects. Schneider Decl. ¶ 19; Edelman Decl. ¶ 13; Snyder

---

[6] Of all of the rejected UOCAVA ballots in 2020, "[m]issing the deadline was the most common reason" for rejection—over 40 percent were rejected by election officials for arriving late. *See* Dep't of Defense, Federal Voting Assistance Program, Report to Congress at 57 (2020), https://www.fvap.gov/uploads/FVAP/Reports/FVAP-2020-Report-to-Congress_20210916_FINAL.pdf.

Decl. ¶ 18; Ruselowski Decl. ¶ 20.[7] Here, too, the President's "illegal structuring of [the] competitive environment" degrades Plaintiffs' electoral prospects. *See Shays*, 414 F.3d at 85–86; *see Nat. Law Party of U.S. v. FEC*, 111 F. Supp. 2d 33, 44 (D.D.C. 2000); *Mecinas*, 30 F.4th at 898; *Benkiser*, 459 F.3d at 587 & n.4; *Gallagher*, 477 F. Supp. 3d at 35.

*Third*, the Data-Sharing provisions will also disproportionately harm Democratic voters. These voters are especially sensitive to the risks that their personal data will be targeted for dissemination given President Trump's frequent and hysterical accusations about cheating by Democratic voters.[8] *See* Schneider Decl. ¶ 24; Edelman Decl. ¶ 19; Snyder Decl. ¶ 23; Ruselowski Decl. ¶ 25. Indeed, many eligible Democrats may refrain from registering to vote altogether if the price of registration is that DOGE and other Republican officials will receive unlawful access to sensitive personal information. Schneider Decl. ¶ 24; Edelman Decl. ¶ 19; Snyder Decl. ¶ 23; Ruselowski Decl. ¶ 25. That disengagement will be costly for the Party Organizations—both financially as they dedicate additional resources to registration efforts, and at the ballot box, where the reluctance of supporters will place Democratic candidates at a disadvantage. Schneider Decl. ¶¶ 24–25; Edelman Decl. ¶ 19; Snyder Decl. ¶¶ 23–24; Ruselowski Decl. ¶¶ 25–26.

---

[7] *See also* Ex. 9, Pew Rsch. Ctr., *Party Affiliation of U.S. Voters by Gender, Orientation, Marital Status* (Apr. 9, 2024), https://perma.cc/YY9B-H7TS; Ex. 10, Pew Rsch. Ctr., *Party Affiliation of U.S. Voters by Family Income, Home Ownership, Union Membership and Veteran Status* (Apr. 9, 2024), https://perma.cc/RLA6-YDUM.

[8] *See, e.g.*, Ex. 11, Amy Sherman, *Fact-Checking Trump's False Claims About Voter Fraud and 'Rigged' Elections,* PBS (Oct. 5, 2024), https://www.pbs.org/newshour/politics/fact-checking-trumps-false-claims-about-voter-fraud-and-rigged-elections.

**B.      The Party Organizations have associational standing based on harm to their members' and constituents' voting and privacy rights.**

Separate and independent from their standing based on their direct harm to their electoral prospects, the Party Organizations also have associational standing based on the harms the Challenged Provisions threaten to the voting and privacy rights of their members and constituents. *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977) (holding an organization may bring suit on behalf of its members when: (1) its members "would otherwise have standing to sue in their own right"; (2) "the interests it seeks to protect are germane to the [its] purpose"; and (3) "neither the claim asserted nor the relief requested requires the participation of individual members"). It is well settled that political parties have associational standing on behalf of their voter members when they are challenging state laws that would make it more difficult for their members to engage in the political process. *See, e.g.*, *Crawford v. Marion Cnty. Election Bd.*, 472 F.3d 949, 951 (7th Cir. 2007) (holding the "Democratic Party also has standing to assert the rights of those of its members who will be prevented from voting by the new [photo ID] law"); *Sandusky Cnty. Democratic Party v. Blackwell*, 387 F.3d 565, 573–74 (6th Cir. 2004) (similar); *Fla. Democratic Party v. Scott*, 215 F. Supp. 3d 1250, 1254 (N.D. Fla. 2016) (similar).

The Plaintiffs' members and constituents have standing to sue in their own right. The Receipt Deadline provisions directly threaten the voting rights of the Party Organizations' members and constituents by attempting to truncate the period during which mail voters may return their ballots in nearly 30 states. And they make it far more likely that those members and constituents—including, in particular, voters in States where elections are conducted primarily with mail voting, military voters, and others who are disproportionately reliant on mail voting— will have their ballots rejected entirely. Jeffries Decl. ¶¶ 8–10; Schumer Decl. ¶ 8; Schneider Decl. ¶ 9; Edelman Decl. ¶ 9; Snyder Decl. ¶ 8; Ruselowski Decl. ¶ 9. These risks are all the more acute

because of increasing, often unpredictable, mail delays. Jeffries Decl. ¶ 10; Schneider Decl. ¶¶ 13–14. Given the Party Organizations' substantial memberships, it is a statistical certainty that at least one member will have their mail ballot rejected because it will arrive after election day. *See, e.g.*, *Fla. State Conf. of NAACP v. Browning*, 522 F.3d 1153, 1163 (11th Cir. 2008); *see also* Snyder Decl. ¶ 6 (noting that many of DSCC's elected members vote by mail).

And the harm is not just the risk of disenfranchisement: the Receipt Deadline provisions deprive voters of the full election period to consider how to vote, and the Democratic Party Plaintiffs of the full election period to persuade them. *See, e.g.*, *Nielsen v. DeSantis*, 469 F. Supp. 3d 1261, 1266 (N.D. Fla. 2020) ("The individual plaintiffs who wish to vote by mail and wish to do so closer in time to election day than would be prudent under the ballot-receipt deadline have standing to challenge that deadline.").

Finally, DGA's members are further injured by the Receipt Deadline provisions because the E.O. usurps their authority and influence. These provisions effectively "nullif[y]" their right to influence their State's policy on mail voting, as they have long been able to do. *Raines v. Byrd*, 521 U.S. 811, 824 (1997) (citing *Coleman v. Miller*, 307 U.S. 433, 438 (1939)); *cf. Benkiser*, 459 F.3d at 587 ("While power may be less tangible than money, threatened loss of that power is still a concrete and particularized injury sufficient for standing purposes."); Edelman Decl. ¶ 8.

The Party Organizations also have associational standing to challenge the DPOC provisions, which burden their constituents' ability to register to vote. For some of Plaintiffs' constituents, the best option to register to vote is by completing the Federal Form because, consistent with Congress's design, that Form has streamlined the registration process. Compl. ¶ 111; Ex. 12 (the Federal Form); *see also* Schneider Decl. ¶ 18; Snyder Decl. ¶ 16; Ruselowski Decl. ¶ 18. Millions of the Party Organizations' constituents, who are citizens and eligible voters,

lack DPOC altogether. Snyder Decl. ¶ 18; Schneider Decl. ¶ 19; Ruselowski Decl. ¶ 20. As a result, they will be unable to reregister to vote using the Federal Form. *See Mi Familia Vota v. Fontes*, 719 F. Supp. 3d 929, 987 (D. Ariz. 2024) (finding associational standing to challenge proof of residency law where tribe's "members face[d] a realistic danger of sustaining a direct injury due to the [] [r]equirement"). And, in Arizona, where the state registration form also requires producing DPOC, these constituents will be unable to register *at all*. Edelman Decl. ¶ 15; *see infra* III.A (irreparable harm). Courts routinely find that voters have standing to challenge laws that put them at risk of disenfranchisement or otherwise impose new restrictions on the right to vote. *See Jones v. U.S. Postal Serv.*, 488 F. Supp. 3d 103, 122 (S.D.N.Y. 2020), *order clarified*, No. 20 CIV. 6516 (VM), 2020 WL 6554904 (S.D.N.Y. Sept. 29, 2020); *League of Women Voters of S.C. v. Andino*, 497 F. Supp. 3d 59, 75 (D.S.C. 2020), *appeal dismissed and remanded*, 849 F. App'x 39 (4th Cir. 2021) (finding voters had standing where they alleged that their absentee ballots were at risk of being rejected on the basis of unlawful signature matching procedures).

Finally, each of the Party Organizations' members are injured by Section 2(b)'s mandatory disclosure of their personal information located within federal databases because such disclosures offend long-standing notions of privacy. *Randolph v. ING Life Ins. & Annuity Co.*, 973 A.2d 702, 710 (D.C. 2009); *Garey v. James S. Farrin*, 35 F.4th 917, 919–20 (4th Cir. 2022). They are also injured by the risks associated with error-prone scrutiny of their registrations. *See Mi Familia Vota*, 129 F.4th at 705; *Browning*, 522 F.3d at 1165; Schneider Decl. ¶ 24–25; Edelman Decl. ¶ 18; Snyder Decl. ¶ 24; Ruselowski Decl. ¶ 26. For the same reasons that the Party Organizations' members would have individual standing to challenge Section 2(b) on their own, Plaintiffs Schumer and Jeffries have individual standing to challenge the provision given the threat to their own privacy rights. *See* Jeffries Decl. ¶ 15; Schumer Decl. ¶ 14.

15

The interests that the Party Organizations seek to protect are clearly germane to their organizational purpose. *See Hunt*, 432 U.S. at 343. To effectively pursue their mission of electing Democratic candidates at the federal, state, and local levels, the Party Organizations must encourage and assist Democratic Party members and constituents in registering to vote and in casting ballots and ensuring those ballots count. Schneider Decl. ¶ 3; Edelman Decl. ¶ 4; Snyder Decl. ¶ 3; Ruselowski Decl. ¶ 4.[9] Accordingly, each *Hunt* factor is satisfied.

### C.    The Party Organizations have standing based on harm to their mission and the need to divert resources away from core activities to combat that harm.

The Party Organizations also have organizational standing because, in order to mitigate the competitive injuries the E.O. imposes and the resulting burdens on Democratic voters threatened by the Challenged Provisions, they will be forced to redirect critical resources reserved for other core programs to address the Order's impact on their voters. *See Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024) (explaining organizations may establish standing by showing challenged act or law "perceptibly impair[s]" their "core . . . activities" (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378 (1982)); *Republican Nat'l Comm. v. N.C. State Bd. of Elections* ("*RNC*"), 120 F.4th 390, 397 (4th Cir. 2024) (holding party committee had standing where it diverted resources in response to alleged federal violations, impairing its mission of "organizing lawful voters and encouraging them to support Republican[s]" (citing *All. for*

---

[9] There is no reason why the Party Organizations' individual members would have to participate in this action. *See Hunt*, 432 U.S. at 343; *United Food & Com. Workers Union Local 751 v. Brown Group*, 517 U.S. 544, 546 (1996). Plaintiffs are not, for example, seeking damages that would require individualized proof. *Cf. Travelers United, Inc. v. Hyatt Hotels Corp.*, No. CV 23-2776 (CKK), 2025 WL 27162, at *12 (D.D.C. Jan. 3, 2025).

*Hippocratic Med.*, 602 U.S. at 395)).[10]

The Party Organizations have invested in encouraging and helping voters to vote by mail in accordance with the relevant state laws that govern that process, and their ability to fulfill their mission of electing Democratic candidates currently depends significantly on those programs. Schneider Decl. ¶ 8; Snyder Decl. ¶ 7; Ruselowski Decl. ¶ 8. In response to the Ballot Receipt provisions, the Party Organizations will be forced to revise these programs and implement new programs in dozens of states in advance of the 2026 elections. Schneider Decl. ¶¶ 13–17; Snyder Decl. ¶¶ 9-15; Ruselowski Decl. ¶¶ 9-16; Edelman Decl. ¶ 12. This effort will come at a significant cost and at the expense of other planned programs. Schneider Decl. ¶ 17; Edelman Decl. ¶ 12; Snyder Decl. ¶ 15; Ruselowski Decl. ¶ 16; Jeffries Decl. ¶ 9; Schumer Decl. ¶ 16. The Party Organizations will have to budget for these sweeping changes and scale back or cut their other initiatives. Schneider Decl. ¶ 17; Edelman Decl. ¶ 12; Snyder Decl. ¶ 15; Ruselowski Decl. ¶ 17.

The Party Organizations are also directly harmed by the DPOC provisions, which

---

[10] Federal courts—before and after *Alliance for Hippocratic Medicine*—have routinely concluded that party committees and other groups whose missions focus on elections can establish organizational standing to challenge laws and practices that impede their core voter advocacy efforts by threatening harm on voters. *LUPE v. Abbott*, No. 5:21–CV–0844, 2024 WL 4488082, at *36 (W.D. Tex. Oct. 11, 2024) (discussing *Alliance for Hippocratic Medicine* and concluding that, "[a]s in *Havens*, the organizational injury here is a perceptible impairment of one of Plaintiffs' core services—voter assistance—resulting from violations of a federal law"); *RNC*, 120 F.4th at 397 (holding party had standing to challenge alleged violation of HAVA where it alleged diversion from other priorities to new "fraud"-prevention programming (citing *All. for Hippocratic Med.*, 602 U.S. at 395)); *Common Cause Ind. v. Lawson*, 937 F.3d 944, 950 (7th Cir. 2019) (explaining "a voting law can injure an organization enough to give it standing 'by compelling [it] to devote resources' to combatting the effects of [a] law that [harms] organization's mission) (citations omitted); *Crawford*, 472 F.3d at 951 (holding Democratic Party committees had standing to challenge voter ID law), *aff'd*, 553 U.S. 181 (2008) ("we agree"))); *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1341–42 (11th Cir. 2014) (holding organizations engaged in voter registration as part of core mission had standing to challenge program designed to remove non-citizens from the roll because they diverted resources to addressing problematic misidentification of noncitizens that impeded core mission of getting out the vote).

undermine the efficacy of their "core" voter education programs. *All. for Hippocratic Med.*, 602 U.S. at 395 (citing *Havens*, 455 U.S. at 378). The Party Organizations have invested in voter registration, directly and indirectly, and as upcoming elections approach, the Party Organizations will work to ensure that all eligible voters are registered and maintain their registrations. Snyder Decl. ¶ 20; Ruselowski Decl. ¶ 18. These efforts will become more costly due to the DPOC provisions, and will necessarily come at the expense of other initiatives they have planned to persuade and mobilize voters.

The President's attempt to impose sweeping changes to protect against noncitizen voting is superfluous: existing law already makes it illegal for non-citizens to register and vote, and there is no evidence of significant voting by non-citizens in U.S. elections. Schneider Decl. ¶ 19; Edelman Decl. ¶ 14; Snyder Decl. ¶ 17; Ruselowski Decl. ¶ 19; *see* 18 U.S.C. § 611; 8 U.S.C. § 1182(a)(6)(C)(ii), (a)(10)(D); *see also Fish v. Schwab*, 957 F.3d 1105, 1134 (10th Cir. 2020) (noting "weak" evidence of noncitizen registration around the country based on "misleading and false assertions" (quotation omitted)). Instead, what the E.O.'s new (and entirely unnecessary) requirements for the Federal Form will actually do is "directly affect and interfere with" the Party Organizations' ability to ensure their members and constituents—qualified citizens—can register and remain registered to vote. *RNC*, 120 F.4th at 397 (citing *All. for Hippocratic Med.*, 602 U.S. at 395). The same is true of the E.O.'s mandate that federal voter registration agency heads "assess" public assistance beneficiaries' citizenship before they are given a Federal Form. Schneider Decl. ¶ 19; Edelman Decl. ¶ 13; Snyder Decl. ¶ 18; Ruselowski Decl. ¶ 20.

In addition to imposing unnecessary and burdensome new obligations on voters, the DPOC provisions are also likely to cause significant confusion, which "will create a disincentive for citizens who would otherwise attempt to register to vote." *Newby*, 838 F.3d at 13; *see* Jeffries Decl.

¶ 14; Schumer Decl. ¶ 12–13; Schneider Decl. ¶ 19; Edelman Decl. ¶ 15. As a result, the Party Organizations will be forced to divert resources away from other critical priorities to instead aid voters attempting to comply with the DPOC requirement. Jeffries Decl. ¶ 14, 17; Schumer Decl. ¶ 16; Schneider Decl. ¶ 21; Edelman Decl. ¶ 16; Snyder Decl. ¶ 20; Ruselowski Decl. ¶ 23. These efforts will come at the cost of other critical planned activities and expenditures in the months leading up to the upcoming elections. Schneider Decl. ¶ 23; Edelman Decl. ¶ 17; Snyder Decl. ¶ 21; Ruselowski Decl. ¶ 24.

Finally, the Party Organizations are also directly harmed by the Data-Sharing provisions. The specter of unauthorized scrutiny of personal records in federal databases works to dissuade prospective voters from registering to vote. Schneider Decl. ¶ 24; Edelman Decl. ¶ 18; Snyder Decl. ¶ 22–23; Ruselowski Decl. ¶ 25–26. The disclosure of this often outdated and erroneous information will also lead to unlawful investigation of entirely qualified voters and purging of the voter rolls based on "false mismatches." *Browning*, 522 F.3d at 1165; *Mi Familia Vota*, 129 F.4th at 705; Jeffries Decl. ¶ 15; Schumer Decl. ¶ 15. Distrust of the system further erodes the Party Organizations' ability to effectively register new voters, fundraise for the party, and recruit new candidates, all of which affects the Party Organizations' bottom lines. Jeffries Decl. ¶ 16; Schumer Decl. ¶ 15.[11] All of this comes at a direct cost to the efficacy of the Party Organizations' core voter mobilization programs, forcing them to redirect scarce resources reserved for other functions toward developing new programming aimed at persuading voters to register despite the risks to

---

[11] Ex. 13, *Majority of Voters Disapprove of Elon Musk, Believe He Has Too Much Influence on the Trump Administration*, Groundwork Collaborative (Feb. 5, 2025), https://groundworkcollaborative.org/news/majority-of-voters-disapprove-of-elon-musk-believe-he-has-too-much-influence-on-the-trump-administration/ (finding a majority of voters are concerned with DOGE's unregulated access to government records and IT systems).

their privacy interests and supporting voters whose registrations are affected by unwarranted investigations and unlawful purges. Schneider Decl. ¶ 24; Edelman Decl. ¶ 18; Snyder Decl. ¶ 23; Ruselowski Decl. ¶ 26; *see Newby*, 838 F.3d at 13; *Browning*, 522 F.3d at 1165; *see also Black Voters Matter Fund v. Raffensperger*, 478 F. Supp. 3d 1278, 1302 (N.D. Ga. 2020).

>          **D.**    **The remaining prongs of the standing inquiry are satisfied.**

Plaintiffs' injuries are traceable to the officials that the E.O. charges with enforcement. *See infra* IV. Even where state or local officials play some role in implementing the Challenged Provisions, traceability is established because there is a clear "predictable effect of Government action on the decisions of third parties." *Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019); *see also Mass. Coal. for Immigr. Reform v. DHS*, 752 F. Supp. 3d 13, 32 (D.D.C. 2024) (surveying "thirty years of D.C. Circuit caselaw illustrat[ing] how standing may rest 'on the predictable effect of Government action on the decisions of third parties'" (citation omitted)). Finally, the requested equitable relief would redress Plaintiffs' injuries by preventing them altogether. *See, e.g.*, *All. for Retired Ams. v. Bessent*, No. 25-0313 (CKK), 2025 WL 740401, at *18 (D.D.C. Mar. 7, 2025) (recognizing "the requested relief—an injunction prohibiting Defendants from continuing to allow that access—would undoubtedly redress the alleged injur[ies] to [plaintiffs'] members").

## II.   Plaintiffs are likely to succeed on the merits.

President Trump's E.O. unlawfully attempts to impose his preferred election policies across the country. But the power and responsibility to regulate elections rests squarely with the States, subject only to preemption by Congress. By attempting to hijack both state and federal election administration to serve his own preferred policy preferences, the President transgresses bedrock separation of powers principles. Plaintiffs are accordingly likely to succeed on their claims that each of his *ultra vires* commands in Sections 2(a), 2(b), 2(d), 7(a), and 7(b) of the unlawful E.O. violates the Constitution.

### A.    The Supreme Court has long recognized claims against action that is *ultra vires* and that violates the separation of powers.

Democratic Party Plaintiffs' first three causes of action—for equitable relief from *ultra vires* executive action and violations of the separation of powers—are well-established under precedent from the Supreme Court and the D.C. Circuit. *See* Compl. ¶ 140 (citing authority).

Starting with Plaintiffs' *ultra vires* claim (Count I), the rule in this Circuit is that "[w]hen an executive acts *ultra vires*, courts are normally available to reestablish the limits on his authority." *U.S. Chamber of Com. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996) (quotation omitted). Indeed, the D.C. Circuit recently expressly reaffirmed that, "*a claim alleging that the President acted in excess of his statutory authority* is judicially reviewable even absent an applicable statutory review provision." *Am. Forest Res. Council v. United States*, 77 F.4th 787, 796 (D.C. Cir. 2023) (emphasis added) (citing *Reich*, 74 F.3d at 1326–28), *cert. denied*, 144 S. Ct. 1110 (2024). If anything, *ultra vires* review is all the more appropriate here because the Democratic Party Plaintiffs allege that the E.O. is also "inconsistent with an independent statute" in numerous respects. *Am. Forest Res. Council*, 77 F.4th at 787; *see also* Compl. ¶ 131 (explaining how the E.O. is contrary to NVRA, HAVA, and the Election Day Statutes).

Plaintiffs' separation of powers claims (Counts II–III) are equally well-established. The Supreme Court has held that "whenever a separation-of-powers violation occurs, any aggrieved party with standing may file a constitutional challenge." *Collins v. Yellen*, 594 U.S. 220, 245 (2021); *see also Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010) (recognizing "an implied private right of action directly under the Constitution to challenge governmental action under . . . separation-of-powers principles"). Thus, private organizations and individuals are free to pursue separation of powers claims when an alleged violation injures them, as here. *See Bond v. United States*, 564 U.S. 211, 223–24 (2011) (observing that "the claims of

individuals," rather than "Government departments," have "been the principal source of judicial decisions concerning separation of powers and checks and balances"). These same principles hold true for claims concerning violations of the "vertical" separation of powers between "the federal government . . . and the states and the people[.]" *LaRoque v. Holder*, 650 F.3d 777, 792 (D.C. Cir. 2011) (citing *Free Enter. Fund*, 561 U.S. at 491 n.2). "Fidelity to principles of federalism is not for the States alone to vindicate." *Bond*, 564 U.S. at 222. "An individual has a direct interest in objecting to laws that upset the constitutional balance between the National Government and the States." *Id.* Accordingly, there is no doubt as to "the source of the Plaintiffs' cause of action for each claim" in Counts I–III of their complaint. ECF No. 15 at 2.

### B. The Receipt Deadline provisions are *ultra vires* and violate the separation of powers.

The Democratic Party Plaintiffs are likely to prevail on their *ultra vires* (Count I) and separation of powers claims (Counts II & III) challenging Sections 7(a) and (b) of the EO, which command federal officials, including the Attorney General and the EAC, to intrude upon a matter of election regulation—the time by which timely cast ballots must be *received* by state election officials—that both the Constitution and Congress have assigned to the States. Notwithstanding the President's personal (and unfounded) grievances with mail voting, neither the Constitution nor any act of Congress permit him to meddle with state laws governing mail ballot receipt deadlines.

Section 7 of the E.O. requires the Attorney General to "take all necessary action to enforce 2 U.S.C. 7 and 3 U.S.C. 1 against States" that count "absentee or mail-in ballots received after Election Day," and Section 7(b) orders the EAC to punish those States that resist this effort by withholding election funds. E.O. § 7(a), (b). Both are *ultra vires* because neither the Constitution nor federal law entitles the President to regulate federal elections. It is "black letter law" that the President's power to issue orders "must stem either from an act of Congress or from the

Constitution itself." *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 188–89 (1999). The Constitution "invests the *States*," not the Executive, "with responsibility for the mechanics of congressional elections." *Foster v. Lova*, 522 U.S. 67, 69 (1997) (citing U.S. Const. art. I, § 4, cl. 1). Only "the action of Congress," not the President, may "supersede[]" contrary state law. *Ex parte Siebold*, 100 U.S. 371, 384 (1879) (emphasis added). The President simply has no constitutional authority to displace state laws governing elections. Nor has Congress granted him such authority; nothing in the statutes cited by Section 7(a) of the E.O. confers the President with power to do so. *See* E.O. § 7(a) (citing 2 U.S.C. § 7; 3 U.S.C. § 1).

Likewise, the President has no power to order the EAC to withhold taxpayer money from States that continue to count ballots in accordance with their state laws. The EAC is an "independent entity," 52 U.S.C. § 20921, and the President has no power to dictate the actions of the Commission in a manner inconsistent with Congress's design. Nowhere does federal law allow the President—or even the EAC itself—to condition funds based on the President's preferred policies, let alone require States to disobey their own laws. *See* 52 U.S.C. §§ 21001–03 (setting out the precise formula for calculating and conditioning grants). This *ultra vires* attempt to "wield Congress' exclusive spending power" violates "the Constitution's separation of powers principles." *PFLAG, Inc. v. Trump*, No. CV 25-337-BAH, 2025 WL 685124, at *15 (D. Md. Mar. 4, 2025) (holding executive orders cannot place "new conditions on federal funds" not provided for by Congress) (quoting *County of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 531 (N.D. Cal. 2017)).

By injecting the Executive Branch into the regulation of federal elections to suit the President's political interests, Section 7(a) and (b) are more than just *ultra vires* violations of the separation of powers between Article I and Article II—they also violate the *vertical* separation of

powers between the federal government and the States. The States have responsibility for regulating "elections for the federal government" in "the first instance." The Federalist No. 59 (Alexander Hamilton); *see also* U.S. Const. art. I, § 4, cl. 1; *id.* art II., § 1, cl. 2. This constitutional authority includes matters about the timing and manner of elections for federal office. *See Arizona v. Inter Tribal Council of Ariz., Inc.* ("*ITCA*"), 570 U.S. 1, 8 (2013); *see also Smiley v. Holm,* 285 U.S. 355, 366 (1932) (explaining the Elections Clause includes "comprehensive words" that grant States authority "to provide a complete code for congressional elections"). As such, there is no doubt that States possess the constitutional authority to enact laws permitting ballots that are *cast* by election day to be received by a specified time thereafter under state law.

Congress has done nothing to displace States' authority through its Elections Clause power, nor does the Constitution permit the President to do it himself. As several courts to consider the question have observed, federal law is "silent on methods of determining the timeliness of ballots." *Donald J. Trump for President, Inc. v. Way*, 492 F. Supp. 3d 354, 372 (D.N.J. 2020); *see also Bost v. Ill. State Bd. of Elections*, 684 F. Supp. 3d 720, 736 (N.D. Ill. 2023), *aff'd on other grounds* 114 F.4th 634 (7th Cir. 2024). In the face of this silence, dozens of States have enacted ballot receipt deadlines that allow for the counting of mail ballots if they are marked by the voter by election day but delivered to local election officials within some set period afterward. *Supra* III.A. "Despite these ballot receipt deadline statutes being in place for many years in many states, Congress has never stepped in and altered the rules." *Bost*, 684 F. Supp. 3d at 736. Quite to the contrary, Congress has repeatedly passed statutes, like UOCAVA, that directly acknowledge and *incorporate* into federal law these state "*deadline[s] for receipt of the State absentee ballot under State law*." 52 U.S.C. § 20303(b)(3) (emphasis added); *see also id.* § 20304(b)(1) (requiring officials to count overseas and military ballots for federal elections if received by "*the date by*

*which an absentee ballot must be received in order to be counted in the election*.”). State ballot

receipt deadlines are fundamentally unremarkable—they simply reflect a reasonable “policy

choice” States may make under their reserved sovereign authority and the Elections Clause. *Wis.*

*State Leg.*, 141 S. Ct. at 34 (Kavanaugh, J., concurring). Indeed, these laws are so unremarkable

that they existed for over a *century* before anyone even suggested that the Election Day Statutes

(2 U.S.C. § 7 and 3 U.S.C. § 1)—which have existed in some form for more than 150 years—

conflicts with them. Compl. ¶¶ 45-46.

Only in recent years have Republicans and their allies pressed the novel idea that the

Election Day Statutes preempt all state ballot receipt laws. Their efforts have met with

overwhelming failure.[12] The reason why is clear: Nothing in the Election Day Statutes speaks to

when timely cast ballots must be received. They say only that election day for congressional races

is “[t]he Tuesday next after the 1st Monday in November, in every even numbered year,” 2 U.S.C.

---

[12] *See Pa. Democratic Party v. Boockvar*, 238 A.3d 345, 368 n.23 (Pa. 2020) (concluding Election Day Statutes are consistent with extended ballot receipt deadlines); *Bognet v. Sec'y Commonwealth of Pa.*, 980 F.3d 336, 353–54 (3d Cir. 2020), *cert. granted, judgment vacated sub nom. Bognet v. Degraffenreid*, 141 S. Ct. 2508 (2021) (“Federal law does not provide for when or how ballot counting occurs,” and extended receipt deadlines and the Election Day Statutes “can, and indeed do, operate harmoniously.”); *Way*, 492 F. Supp. 3d at 369 (rejecting the RNC's and others' challenges to New Jersey post-election mail ballot receipt deadline); *Bost*, 684 F. Supp. 3d at 736 (rejecting challenge to Illinois's 14-day ballot receipt deadline); *Republican Nat'l Comm. v. Wetzel*, 742 F. Supp. 3d 587, 601 (S.D. Miss.), *rev'd in part, vacated in part*, 120 F.4th 200 (5th Cir. 2024) (concluding Election Day Statutes are not violated “by allowing a reasonable interval for ballots cast and postmarked by election day to arrive by mail”); *Republican Nat'l Comm. v. Burgess*, No. 3:24-CV-00198-MMD-CLB, 2024 WL 3445254, at *2 (D. Nev. July 17, 2024) (concluding Republican organizations and voters lacked standing to challenge Nevada's ballot receipt deadline); *see also Harris v. Fla. Elections Canvassing Comm'n*, 122 F. Supp. 2d 1317, 1325 (N.D. Fla.), *aff'd sub nom. Harris v. Fla. Elections Comm'n*, 235 F.3d 578 (11th Cir. 2000) (“Congress did not intend 3 U.S.C. § 1 to impose irrational scheduling rules on state and local canvassing officials, and certainly did not intend to disenfranchise voters whose only reason for not being able to have their ballots arrive by the close of election day is that they were serving their country overseas.”).

§ 7, and "the Tuesday next after the first Monday in November, in every fourth year," 3 U.S.C. § 21(1). The Supreme Court has explained these laws require that voters "make a final selection" in their choices for federal office by "election day." *Foster*, 522 U.S. at 73. Voters comply with that requirement when they *cast* their mail ballots by election day, thus making their "final selection" on or before the date set in federal law—which is precisely what state ballot receipt laws require. Nothing in the text of the Election Day Statutes imposes any greater limitation on state discretion—there is "no reason to think that simply because Congress established a federal election day it displaced all State regulation of the times for holding federal elections." *Millsaps v. Thompson*, 259 F.3d 535, 549 (6th Cir. 2001). Indeed, any contrary reading that strains to discover a hidden *receipt*—rather than selection—deadline in the Election Day Statute ignores that Congress exercises its Elections Clause authority only "so far as it is exercised, and no farther." *ITCA*, 570 U.S. at 9 (quoting *Ex parte Siebold*, 100 U.S. at 371).

Courts had uniformly held as much until a panel of the Fifth Circuit broke with this chorus of authority just days before the 2024 election, overturning a well-reasoned decision of the district court on the merits. *See generally Republican Nat'l Comm. v. Wetzel*, 120 F.4th 200 (5th Cir. 2024). To do so, the *Wetzel* Court casually dismissed a century of longstanding and widespread State practice—of which Congress was well aware—as nothing but a few "outliers," *Id.* at 211 (quoting *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 70 (2022)).[13] Most critically, the *Wetzel* panel's decision is not at all grounded in the text of the Election Day Statutes. In fact, it buried the dictionary definition of the term "election"—the key word in the Election Day

---

[13] The errors contained within the panel's decision are legion, as five judges noted in voting to rehear the case *en banc*. *Republican Nat'l Comm. v. Wetzel*, No. 24-60395, 2025 WL 917346, at *3 (5th Cir. Mar. 14, 2025) (Graves, J., dissenting from denial of rehearing *en banc*); *see also id.*, at *12 (Higginson, J., similar).

Statutes—in a footnote, suggesting such definitions "shed no light" on the term's meaning. *Id.* at 206 n.5. That conclusion is baffling because the Supreme Court reached precisely the opposite determination in *Foster*, relying upon contemporaneous dictionaries to construe the Election Day Statutes. *See* 522 U.S. at 71 (citing N. Webster, An American Dictionary of the English Language 433 (C. Goodrich & N. Porter eds. 1869)). In doing so, the Supreme Court emphasized that an "election" is the "[t]he act of *choosing* a person to fill an office." *Id.* (emphasis added). Hence the Supreme Court's conclusion in *Foster* that the Election Day Statutes impose only a date for "final selection" by voters. *Foster*, 522 U.S. at 73; *see also Newberry v. United States*, 256 U.S. 232, 250 (1921) (defining "election" as the "final choice of an officer by the duly qualified electors"). The panel's decision in *Wetzel* circularly concluded that because dictionary definitions of the term 'election' "make no mention of deadlines or ballot receipt," those definitions must be irrelevant. *Wetzel*, 120 F.4th at 206 n.5. But the Election Day Statutes do not answer every conceivable question about election timing. *Millsaps*, 259 F.3d at 549. The fact that the dictionary definition of the term "election" says nothing about ballot receipt only confirms the lack of preemption.

Compounding the error, the *Wetzel* panel relied on a single authority——a 1944 Montana state court decision resolved under Montana law—for the proposition that, as a matter of *federal* law, a voter's "final selection" requires ballot receipt by election officials. *Wetzel*, 120 F.4th at 208 (citing *Maddox v. Board of State Canvassers*, 149 P.2d 112 (1944)). But that decision held only that mail ballots had to be received by election day "*since the state law* provides for voting by ballots deposited with the election officials" by that day. *Maddox*, 149 P.2d at 115 (further explaining that *Montana law* required that ballots be "delivered to the election officials and deposited in the ballot box before the closing of the polls on election day"). Nothing in *Maddox* suggested this rule was *federalized* through the Election Day Statutes. In fact, *Maddox* extensively

discusses an earlier Montana decision—*Goodell v. Judith Basin County*, 224 P. 1110, 1112 (1924)—recognizing that other States, like New Hampshire, had different rules. In those States, "the elector parts with all control over his ballot and has in fact voted when the ballot is marked and deposited in the mail addressed to the proper election officer." *Goodell*, 224 P. at 1113 (quoting *In re Opinion of the Justices*, 113 A. 293 (N.H. 1921)); *see also Burke v. State Bd. of Canvassers*, 107 P.2d 773, 778 (Kan. 1940) (explaining that in Kansas a "vote is cast when the ballot is marked . . . [and] placed in envelopes and mailed on election day"). More ironic still, *Maddox* is no longer even good law *within Montana* because the Legislature there has amended state law to permit post-election day receipt for overseas and military voters. *See* Mont. Code 13-21-226(1). The *Wetzel* Court—which grappled with none of this—therefore had no basis at all to cite the case as establishing a universal election day *receipt* rule under federal law.

The decision's many other errors warrant brief recitation. For one, the decision nowhere explains why other federal courts, such as those in *Way*, *Bost*, and *Bognet*, were wrong to construe the Election Day Statutes as imposing no ballot receipt deadline. The *Wetzel* Court simply ignored those decisions entirely. The decision also badly misreads other federal laws like UOCAVA, puzzlingly suggesting that law "permits post-Election Day balloting, but it does so through its statutory text." *Id.* at 213. What text within UOCAVA the panel is referring to is a mystery. In reality, the only portion of UOCAVA that permits post-election day receipt of military and overseas ballots is where it references and incorporates *state laws enabling such post-election receipt*. *See* 52 U.S.C. §§ 10502(d), 20303(b)(3). The text of UOCAVA makes plain as day that Congress chose to incorporate preexisting "deadline[s] for receipt of the State absentee ballot under State law" as the default deadlines for UOCAVA voters. *Id.* § 20303(b)(3). Congress adopted this language knowing that, by the time of its adoption in 1986, "[t]welve [States] ha[d]

extended the deadline for the receipt of voted ballots to a specified number of days after the election." *Uniformed and Overseas Citizens Absentee Voting: Hearing on H.R. 4393*, 99th Cong. 21 (Feb. 6, 1986) (Statement of Henry Valentino, Director, Federal Voting Assistance Program).

Based on nothing more than his belief that the *Wetzel* court alone got it right, President Trump purports to now require that the Attorney General "take all necessary action to enforce 2 U.S.C. § 7 and 3 U.S.C. § 1" as that case interprets them—and against States that include absentee or mail-in ballots received after election day. E.O. § 7(a). He then orders the EAC to further punish those States that resist this effort by withholding election funds from them. E.O. § 7(b). In reality, both the President and the Attorney General (as well as the EAC) lack *any* authority to "enforce" their misreading of federal law against the States. To do so in the absence of any clear command from Congress is not only *ultra vires* but violates prerogatives the Constitution commits firmly to the States themselves. *See* The Federalist No. 59 (Alexander Hamilton); *see also* U.S. Const. art. I, § 4, cl. 1; *id.* art II., § 1, cl. 2; *ITCA*, 570 U.S. at 1, 8. Democratic Party Plaintiffs are therefore likely to prevail on the merits of these claims.

### C.    The DPOC provisions are *ultra vires* and violate the separation of powers.

The Democratic Party Plaintiffs are likely to prevail in their challenges to the DPOC provisions found in Sections 2(a), (b), and (d) of the E.O. Just as the Constitution and congressional grants of authority do not authorize the President to override state ballot receipt deadlines, they do not authorize him to add new DPOC requirements to the federal voter registration form. *See* E.O. § 2(a). Because the DPOC provisions find no basis in law, the Court must "reestablish the limits on [the President's] authority," *Reich*, 74 F.3d at 1328 (quoting *Dart v. United States*, 828 F.2d 217, 224 (D.C. Cir. 1988)), and preliminarily enjoin Defendants' enforcement of these provisions.

As relevant here, the E.O. includes three unlawful provisions relating to DPOC. First, it states that the EAC must, "within thirty days," take "appropriate action to require, in its national

mail voter registration form" DPOC. E.O. § 2(a)(i)(A). Second, it requires "a State or local official to record on the form the type of document that the applicant presented as" DPOC. *Id.* § 2(a)(i)(B). Third, it imposes citizenship checks by federal agency officials for a discrete group of voters by directing the "head of each Federal voter registration executive department or agency" to "assess citizenship" of "enrollees of public assistance programs" prior to providing them with the Federal Form. *Id.* § 2(d). Each of these commands is *ultra vires* and violates the constitutional separation of powers, *see* Compl. ¶¶ 126–45; as such, they must be enjoined because the President cannot act "unconstitutionally or beyond his statutory powers." *Dalton v. Specter*, 511 U.S. 462, 472 (1994) (quotation omitted).

The E.O. cites no source of constitutional authority for the President to mandate any of the DPOC provisions. That is because there is none. *See supra* IV.B. Simply put, the Constitution does not give the President *any* authority to preempt or interfere with States' regulation of the times, places, and manner of elections, including as to voter registration. *See* U.S. Const. art. I, § 4; *id.* art. II, § 1. Instead, it "empowers *Congress* to pre-empt state regulations governing" federal elections, not the President. *ITCA*, 570 U.S. at 8 (emphasis added). The President lacks any "direct control" over "the individuals—members of Congress and state officials—who conduct federal elections," and has "no authority" to "interfere[] with state election procedures based solely on the federal executive's own initiative." *State v. Meadows*, 88 F.4th 1331, 1347 (11th Cir. 2023). The President thus lacks authority to foist his preferred DPOC mandates upon the States.

In search of legitimacy elsewhere, the E.O. cites a provision of the NVRA, 52 U.S.C. § 20508, as authority for the President's attempt to dictate the contents of the Federal Form. But that provision does not even mention the President. Instead, it makes clear that only the EAC can change the Federal Form and only "in consultation" with the States. *Id.* § 20508(a). Given the

imperative that the regulation and administration of federal elections be free from partisan bias or political machinations, Congress expressly created the EAC as an "independent entity." *Id.* § 20921.[14] It is led by four members who are appointed by the President with the Senate's advice and consent, no more than two of whom may be affiliated with the same political party, and it may only act with the approval of at least three members. *Id.* § 20923(a)–(b). Once the President appoints Commissioners, he has no authority to dictate the EAC's decision-making. And while the NVRA permits "*a State* [to] request that the EAC alter the Federal Form to include information the State deems necessary to determine eligibility," *ITCA*, 570 U.S. at 19; 52 U.S.C. § 20508, nowhere does it allow the President to alter the Federal Form by decree. Likewise, the NVRA does not authorize the President to place additional administrative burdens for state and local officials in documenting the types of DPOC used to prove citizenship. *See* E.O. § 2(a)(i)(B). By unilaterally ordering the EAC to change the federal form "within 30 days," the President's E.O. "eviscerates an entire statutory scheme," unlawfully "replacing it with the President's unfettered discretion" instead. *Pacito v. Trump*, No. 2:25-CV-255-JNW, 2025 WL 655075, at *10 (W.D. Wash. Feb. 28, 2025) (granting preliminary injunction where President's suspension of statutory refugee admissions was *ultra vires*).

Not only are the E.O.'s DPOC provisions not authorized by the Constitution or statute, they *directly conflict* with the NVRA's substantive provisions. "When 'the President takes measures incompatible with the expressed or implied will of Congress . . .  he can rely only upon his own

---

[14] As HAVA-sponsor Sen. Mitch McConnell explained, a key principle behind the creation of the EAC was the "establishment of an independent, bipartisan commission appointed by the President to provide nonpartisan election assistance to the states." 147 Cong. Rec. S13681-02, 2001 WL 1628058, at *S13684 (Dec. 19, 2001) (statement of Sen. McConnell); *see also* 148 Cong. Rec. S797-01, 2002 WL 225992, at *S811 (Feb. 14, 2002) (similar from Sen. Brownback).

constitutional powers minus any constitutional powers of Congress over the matter.'" *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 10 (2015) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. at 579, 635–38 (1952) (Jackson, J., concurring)). Here, the President has *no* constitutional power of his own to regulate elections, so when he strays from congressional authorization, Article II provides him no safety net. *See PFLAG*, 2025 WL 685124, at *22 (finding *ultra vires* action where executive order conflicted with statute); *Louisiana v. Biden*, 622 F. Supp. 3d 267, 288 (W.D. La. 2022) (holding executive order was *ultra vires* where Congress had "sole authority" in area of regulation and did not "grant authority to the President to make revisions" to applicable statute).

The DPOC provisions are incompatible with the NVRA itself. The NVRA mandates that the Federal Form prescribed by the EAC "may require *only* such identifying *information* (including the signature of the applicant) and other information (including data relating to previous registration by the applicant), as is *necessary* to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process." 52 U.S.C. 20508(b)(1) (emphases added). The NVRA specifies what information is necessary to establish "citizenship": "the signature of the applicant, under penalty of perjury," attesting "that the applicant meets each such requirement." *Id.* 20508(b)(2). And it is clear that the Federal Form "may *not* include any requirement for notarization *or other formal authentication*." *Id.* § 20508(b)(3) (emphases added). That tracks with the NVRA's Conference Committee Report, which concluded that requiring DPOC in connection with the Federal Form was "*not necessary or consistent with the purposes of this Act*." H.R. Conf. Rep. No. 103-66, 1993 WL 235764 (Apr. 28, 1993), at *23–*24 (emphasis added); *c.f. Mi Familia Vota v. Fontes*, 129 F.4th 691, 719 (9th Cir. 2025) ("The ordinary meaning of 'necessary' is 'essential,' and the

challenged requirement of DPOC . . . is not 'essential' because the checkbox requirement already gives proof of citizenship."). This is why when Arizona and Kansas separately sought to force the EAC to add DPOC to the Federal Form, their efforts were rejected; DPOC has never been "necessary" to assess eligibility. *See, e.g.*, *Kobach v. U.S. Election Assistance Comm'n*, 772 F.3d 1183, 1189 (10th Cir. 2014)*.* By requiring DPOC, Section 2(a) conflicts with the will of Congress, the text of the NVRA, and these well-reasoned decisions.

Likewise, the NVRA is irreconcilable with the EO's directive that the "head of each Federal voter registration executive department or agency" "assess citizenship" of "enrollees of public assistance programs" *prior* to providing them with the Federal Form. *See* E.O. § 2(d). The text of the NVRA is clear here as well; it leaves no discretion for federal agencies to withhold voter registration forms from individuals based on vague, ad-hoc determinations about their eligibility. Voter registration agencies, as the NVRA states, "*shall*" provide the Federal Form to all voters who receive their services unless the voter declines to register to vote in writing. *Id.* § 20506(a)(4)(A); *id.* § 20506(a)(6)(A). Officials *cannot*, under the NVRA, pre-screen registrants with ill-defined, citizenship "assessments" before providing them with the mandated registration form. Here too, by replacing Congress's "'carefully considered policy judgments' with his own," the President unlawfully "overrides" the NVRA "with a 'different and inconsistent' approach." *Pacito*, 2025 WL 655075, at *11.

Finally—in addition to being *ultra vires*—the DPOC provisions are unlawful for another related reason: they violate the separation of powers by intruding upon Congress's prerogatives. *See Thomas More L. Ctr. v. Obama*, 651 F.3d 529, 564 (6th Cir. 2011) (Sutton, J., concurring in part). Congress designed the EAC as "an independent entity," *id.* § 20921, and required that the EAC design the Federal Form through its own independent judgment, in a bipartisan manner, *id.*

§ 20923(a)-(b), based on its Commissioners' "experience with or expertise in election administration," 52 U.S.C. § 20923(c), and "in consultation with the chief election officers of the States," *id.* § 20508; *see also Gonzalez v. Arizona*, 677 F.3d 383, 403 (9th Cir. 2012), *aff'd sub nom. ITCA*, 570 U.S. at 1; *see also* 52 U.S.C. §§ 20921–20923, 20928–20929. This is consistent with the Constitution's express grant of authority; the Elections Clause "gives Congress the last word on how" the EAC shall carry out its congressionally mandated duties. *Gonzalez*, 677 F.3d at 403. By overriding the EAC's independent, bipartisan, and majority-based decision-making procedures, the DPOC Provisions run roughshod over Congress's Elections Clause authority and violate the separation of powers. *See* U.S. Const. art. I, § 4; *id.* art. II, § 1.

### D.    The Data-Sharing provisions are *ultra vires*.

Plaintiffs are also likely to prevail on their claim that the E.O.'s Data-Sharing provisions are unlawful because they are "*ultra vires* in that they conflict with statutory law." *PFLAG*, 2025 WL 685124, at *21; *see* Compl. ¶¶ 126–33. The E.O.'s directives that (i) the DHS Secretary grant State and local officials access to systems for citizenship verification; (ii) the Secretary of State share information with State and local election officials for citizenship verification; and (iii) individuals at DOGE be given access to DHS's database, E.O. § 2(b), all conflict with the Privacy Act.

The Privacy Act of 1974 was passed on the heels of the Watergate scandal to "regulate the collection, maintenance, use, and dissemination of information" by "federal agencies," and to "provide certain safeguards for an individual against an invasion of personal privacy by requiring Federal agencies" to, among other things, "collect, maintain, use, or disseminate any record of identifiable personal information in a manner that assures that such action is for a necessary and lawful purpose . . . and that adequate safeguards are provided to prevent misuse of such information." Pub. L. No. 93-579, §2(a)(1), (5), 2(b), (4), 88 Stat. 1896, (1974) *as amended*, 5

U.S.C. § 552a. In passing the Act, Congress was "concerned with curbing the illegal surveillance and investigation of individuals by federal agencies that had been exposed during the Watergate scandal," along with "potential abuses presented by the government's increasing use of computers to store and retrieve personal data by means of a universal identifier – such as an individual's social security number."[15]

To protect members of the public from, in part, politically motivated overreach by the Executive Branch, the statute prohibits federal agencies and officers from disclosing "*any record which is contained in a system of records by any means of communication to any person, or to another agency*, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains," except in specific limited circumstances. 5 U.S.C. § 552a(b) (emphases added). This prohibition includes granting access to databases containing personal information to individuals who are not authorized by law to access or use the information. *See Tolbert-Smith v. Chu*, 714 F. Supp. 2d 37, 43 (D.D.C. 2010).

The records the President orders to be shared here—"[f]ederal immigration databases" and "information from relevant databases," E.O. § 2(b)(ii), (iii)—are covered by the Privacy Act. A record kept in a database or system maintained by DHS or DOS, or that provides information about individuals pertaining to their immigration status, is necessarily "information about an individual that is maintained by an agency," 5 U.S.C. § 552a(a)(4), and is a "record . . . contained in a system of records," *id.* § 552a(b). As such, Section 2(b) of the Order is incompatible with the will of Congress—expressed through the Privacy Act, under which DHS cannot grant the "DOGE Administrator" access to, among other things, "Federal immigration databases" as part of efforts

---

[15] U.S. Dep't of Justice, *Overview of the Privacy Act of 1974* (updated Feb. 24, 2021), https://www.justice.gov/archives/opcl/policy-objectives.

to "review each State's publicly available voter registration list and available records concerning voter list maintenance activities." E.O. § 2(b)(iii). Nor can the Order lawfully direct the DHS Secretary or Secretary of State to grant State and local officials—who are not under any clear obligation to keep such information confidential—access to systems for citizenship verification. *See id.* § 2 (b)(i)-(ii). These directives are outside of the President's legal authority and incompatible with federal law.

## III.    The remaining preliminary injunction factors are satisfied.

### A.    Plaintiffs are suffering irreparable harm.

Plaintiffs are already suffering irreparable harm due to the E.O. and will continue to suffer such harm absent a preliminary injunction. The E.O. (1) imposes an illegally structured competitive environment on all Plaintiffs; (2) puts the Party Organizations' members at imminent risk of disenfranchisement; and (3) harms Plaintiffs' ability to conduct core election activities.

Obstacles that make it more difficult for an organization to accomplish its primary mission both satisfy Article III's injury-in-fact requirement and constitute irreparable harm. *Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 485 F. Supp. 3d 1, 56 (D.D.C. 2020) (quoting *Newby*, 838 F.3d at 9). Where the injury arises in the electoral context, the irreparable harm is all the more acute. *See, e.g.*, *League of Women Voters of Mo. v. Ashcroft*, 336 F. Supp. 3d 998, 1005 (W.D. Mo. 2018) ("Courts routinely recognize that organizations suffer irreparable harm when a defendant's conduct causes them to lose opportunities to conduct election-related activities.") (collecting cases)). The Challenged Provisions of the E.O. each irreparably harm the Democratic Party Plaintiffs by forcing them to compete under election rules that will make it harder for them to succeed electorally, place new burdensome requirements on voters that are likely to injure Democratic voters disproportionately, and frustrate the Party Organizations' core programs. *Whitman-Walker Clinic*, 485 F. Supp. 3d at 56.

***Receipt Deadline provisions.*** The E.O. directs that States refrain from counting large swaths of mail ballots that otherwise would have been counted consistent with the duly-enacted election laws of nearly 30 states. These include many of the states where the DGA's members are currently serving as Governor. Schumer Decl. ¶ 7; *see also* Edelman Decl. ¶¶ 8–9. And, in several of the impacted states, voters cast their ballots primarily or even almost entirely by mail. Schumer Decl. ¶ 7. The E.O.'s Receipt Deadline provisions are a seismic disruption and highly consequential transformation of how elections are administered across these states. And its effect will be to disenfranchise voters who are disproportionately Democratic. Jeffries Decl. ¶ 9–12; Schumer Decl. ¶¶ 6 , 9; Schneider Decl. ¶ 28; Edelman Decl. ¶ 10; Snyder Decl. ¶ 26; Ruselowski Decl. ¶ 28. As a result, the Receipt Deadline provisions will irreparably harm (1) the Democratic Party Plaintiffs' electoral prospects in elections that they are already beginning to prepare for, (2) their members' and constituents' fundamental voting rights, both by burdening those rights and, in many cases, causing their disenfranchisement altogether, and (3) the Party Organizations' core missions, forcing them to fundamentally change their voter education and turnout programs, to the severe detriment of other mission-critical programs.

First, the Receipt Deadline provisions threaten to disenfranchise voters in the upcoming congressional special elections and in the gubernatorial elections in New Jersey and Virginia scheduled for this year, and as such, harm Democratic Party Plaintiffs' electoral prospects. *See* Edelman Decl. ¶ 21. Some of these seats will be fiercely contested by both major parties, such that the Receipt Deadline may be dispositive to the outcome by disenfranchising mail voters who tend to support Democratic candidates. Thus, Plaintiffs' candidates may win the support of a plurality of eligible voters, but nonetheless lose the elections because their voters were disenfranchised by

the unlawful Receipt Deadline. *Cf.* Schumer Decl. ¶ 9 (describing a recent race that was decided by far fewer votes than ballots received and cured after election day).

Second, that irreparable injury will accrue not only to the parties and candidates who are deprived of electoral victories, but also to the individual Democratic voters—the Plaintiff Organizations' members and constituents—who will have their ballots rejected if USPS does not deliver them in time, and who will be deprived in any event of the benefit of making their decision about who to vote for near the end of the election.

And third, the Receipt Deadline provisions will irreparably harm the Party Organizations by forcing them to divert resources to ensure voters understand the EO's new election day deadline, notwithstanding what the law says in their respective States. *See, e.g.*, Schneider Decl. ¶ 26; Edelman Decl. ¶ 11–12. Given the likelihood of mail delays, the Party Organizations will now be forced to spend resources encouraging voters to return their ballots far sooner than they previously have, and without the benefit of a clear election day deadline for placing their ballots in the mail. Schneider Decl. ¶ 14; Snyder Decl. ¶ 12; Ruselowski Decl. ¶ 14. These decisions are happening ***now***—not next month, and not next year. To the determinant of the Party Organizations' competitiveness, they will impact the funds the Party Organizations have available this election cycle; the Party Organizations will need to reallocate money earmarked for other programming toward ensuring voters return their ballots by election day. Schneider Decl. ¶¶ 14–17; Edelman Decl. ¶ 20; Snyder Decl. ¶ 15; Ruselowski Decl. ¶ 17. Absent relief, the Party Organizations will miss out on critical opportunities to persuade and mobilize their members and constituents ahead of upcoming elections. And in States that have previously counted ballots that arrive after election day, the change also means that mail voters have less time to make their final decisions about which candidates to support, and the Party Organizations consequently have less time to persuade

and mobilize them, directly undermining their primary missions. Jeffries Decl. ¶ 11; Schumer Decl. ¶ 7; Schneider Decl. ¶ 14; Edelman Decl. ¶ 11; Snyder Decl. ¶ 14; Ruselowski Decl. ¶ 14. In the competitive field of electoral politics, such "mobilization opportunities cannot be remedied once lost," *In re Ga. S.B. 202*, No. 1:21-CV-01259-JPB, 2023 WL 5334582, at *11 (N.D. Ga. Aug. 18, 2023) (quotation omitted), because after the elections pass, "there can be no do over and no redress." *League of Women Voters*, 838 F.3d at 9.

    ***DPOC provisions.*** Voter registration deadlines in states with 2025 elections are fast approaching—meanwhile the E.O.'s DPOC requirement for the Federal Form continues to tick down from its 30-day deadline. Groups that are more likely to support Democrats, including low-income individuals, enrollees of public assistance programs, and women will be disproportionately affected by the DPOC provisions. *See* Snyder Decl. ¶ 18; Schumer Decl. 13; Jeffries Decl. ¶ 14; Exs. 11, 12. As a result, by suddenly changing the rules, and now requiring (among other things) DPOC to register with the Federal Form, the DPOC provisions threaten to irreparably harm (1) the Democratic Party Plaintiffs' electoral prospects in elections that they are already beginning to prepare for, (2) their members' and constituents' fundamental voting rights, making it far more burdensome—and in some cases, impossible—for them to participate in elections that they are eligible, have a right to, and would otherwise participate in, and (3) the Party Organizations' core missions, forcing them to revamp their voter education and turnout programs. Schneider Decl. ¶ 21; Snyder Decl. ¶ 20; Ruselowski Decl. ¶ 23.

    To give just a few examples of upcoming elections where the DPOC provisions threaten the Party Organizations, there is a special congressional primary election scheduled to take place in Arizona on July 15, 2025, and a general election on September 23, 2025. Schneider Decl. ¶ 20, 22; Ruselowski Decl. ¶ 22. Voter registration for the primary and general election will close on

June 16, 2025 and August 25, 2025, respectively.[16] Unlike voters in many other states, Arizonans

without DPOC currently have only one option to register to vote: the Federal Form. That is because

Arizona imposed a DPOC requirement to vote in state elections. *See* A.R.S. § 16-121.01(C). But

after a federal court concluded that the state's effort to impose DPOC in federal elections was

unlawful, Arizona is still required to allow citizens to register with the Federal Form and vote in

federal elections without providing proof of citizenship.[17] With President Trump's new mandate

that Federal Form users also submit DPOC, citizens in Arizona will be left with zero options to

register if they lack DPOC. Indeed, persons enrolled in public assistance who seek to register may

not receive the Federal Form at all in light of the EO's vague, ill-defined, arbitrary, and unreliable

citizenship "assess[ment]" that the President seeks to impose before such registrants could even

be *provided* a form. *See* E.O. § 2(d).

Because this sea change in election administration inflicts significant harm on voters in

their constituencies, the Democratic Party Plaintiffs will be forced to compete in an illegally

structured environment intended to advantage their competitors. *See Craig v. Simon*, 493 F. Supp.

3d 773, 786 (D. Minn.) (holding a potential loss of votes and need to spend extra time campaigning

constituted irreparable harm), *aff'd*, 980 F.3d 614 (8th Cir. 2020). The Democratic Party's

minority-status in the House of Representatives is the slimmest seat margin in nearly one hundred

years. Losing *any* congressional election in the House of Representatives because lawful citizens—

---

[16] *See* Ariz. Sec'y of State, *2025 Congressional District 7 Special Primary and Special General Election Information Important Dates*, https://azsos.gov/sites/default/files/docs/2025-Special-Election-Schedule.pdf (last accessed Apr. 7, 2025).

[17] Arizona has attempted to impose DPOC in federal elections in whole or in part, twice. *See generally ITCA*, 570 U.S. 1. More recently, it sought to preventvoters from voting by mail and in presidential elections absent DPOC, but that law was also enjoined. *Mi Familia Vota v. Fontes*, No. CV-22-00509-PHX-SRB, 2024 WL 2244338, at *1 (D. Ariz. May 2, 2024), *aff'd in part, vacated in part, remanded*, 129 F.4th 691 (9th Cir. 2025).

lower-income voters, enrollees of public assistance programs, and women—could not vote is simply not reparable. "While there will be other elections, no future election will be *this* election." *Emineth v. Jaeger*, 901 F. Supp. 2d 1138, 1142 (D.N.D. 2012) (emphasis in original)). The Party Organizations will experience the same irreparable competitive injuries in upcoming gubernatorial elections in Virgina and New Jersey because citizens registering in those states with the Federal Form will likewise be subject to the E.O.'s DPOC mandates.

Apart from their irreparable electoral injury resulting from the injuries to their voters—unless the DPOC provisions are enjoined—the Party Organizations will be required to use crucial limited resources on programs to account for the changes that President Trump's E.O. makes to elections. To do so, the Party Organizations will need to divert resources away from other critical priorities. Schneider Decl. ¶¶ 21–23; Edelman Decl. ¶ 20; Snyder Decl. ¶ 25; Ruselowski Decl. ¶ 24.

***Data-Sharing Provisions.*** The E.O.'s data-sharing provisions further threaten irreparable harm to Plaintiffs, their members, and their constituents by disclosing their personal information, on a mass basis, to unauthorized entities and individuals. *See Garey*, 35 F.4th at 919–20; *see also, e.g.*, *Randolph*, 973 A.2d at 710.[18] The disclosures at issue are not circumstances in which access is provided to just a "small number" of federal officials in a controlled environment, *Bessent*, 2025 WL 740401, at *21, but rather involve access being granted to hundreds of state and local election

---

[18] Plaintiffs acknowledge that this Court, in *Bessent*, found that the plaintiffs failed to establish irreparable harm resulting imminent unlawful disclosures of personal information to a handful of DOGE officials, even though they established an injury-in-fact based on the same unlawful disclosures. 2025 WL 740401, at *18, *21. However, the widespread nature of the mandated disclosures here (which extend outside of the federal government), combined with the risks associated with using the information in those databases for purposes of the list-maintenance and the imminence of upcoming elections, significantly magnifies the threatened harm in this case compared to the allegations in *Bessent*. *See id.*, at *21.

officials, in addition to DOGE. Further, the E.O. subjects voters who are already registered (and thus already proved their qualifications) to intrusive reviews. As a result, these violations threaten harm to the Party Organizations' ability to effectively persuade voters, many of whom are reluctant to subject their personal data to review by DOGE and other unauthorized third parties, for their support. Jeffries Decl. ¶ 15; Schumer Decl. ¶ 15; Schneider Decl. ¶ 24; Edelman Decl. ¶¶ 18, 19; Snyder Decl. ¶¶ 22–23; Ruselowski Decl. ¶ 25. Further, matching information contained in federal databases to voter registration data is an extremely error-prone endeavor for several reasons, not the least because federal databases are often not "up to date." *Mi Familia Vota*, 129 F.4th at 705. The risk of erroneous identification, investigation, and improper removal from voter rolls by state officials only compounds the harm resulting from unlawful disclosure.

*      *      *

These harms are not hyperbole or conjecture: they are actual, imminent, and urgent. *See Newby*, 838 F.3d at 7–8. There are several elections in 2025, including two special congressional elections and two gubernatorial elections, in which the Party Organizations have candidates competing on a playing field tilted towards their opponents, at the expense of American citizens. Jeffries Decl. ¶ 15; Edelman Decl. ¶ 21; Ruselowski Decl. ¶¶ 6, 22. Party Organizations must make budget decisions now, which will impact their ability inform voters about candidates and persuade them to vote for Democrats. Schneider Decl. ¶ 26-27; Edelman Decl. ¶ 20; Snyder Decl. ¶¶ 20, 25; Ruselowski Decl. ¶ 27; *see also Carey v. FEC*, 791 F. Supp. 2d 121, 134 (D.D.C. 2011) (concluding in June 2011 that "the political season for the [2012] presidential election is already underway and the time to participate is *now*" (emphasis in original)); *cf. Elrod v. Burns*, 427 U.S. 347, 374 n.29 (1976) ("The timeliness of political speech is particularly important."). And as the foregoing examples illustrate, Plaintiffs will miss out on critical electoral work because they will

be forced to mitigate the effects of the E.O. Schneider Decl. ¶¶ 13–16, 21–24, 26; Edelman Decl. ¶¶ 12, 16-17, 20; Snyder Decl. ¶¶ 14-15, 20, 25; Ruselowski Decl. ¶ 13-17, 23-27; *see also* Jeffries Decl. ¶ 16; Schumer Decl. ¶ 16. Accordingly, the harms the Party Organizations are suffering— and will continue to suffer—"are far from speculative. And they will be serious in terms of their effects on Plaintiffs," jeopardizing their electoral prospects in upcoming elections. *Whitman-Walker*, 485 F. Supp. 3d at 57 (cleaned up).

### B. The public interest favors an injunction.

The public interest unquestionably favors the issuance of a preliminary injunction. In weighing the equities, courts are required to "balance the competing claims of injury and . . . consider the effect on each party of the granting or withholding of the requested relief." *Tex. Children's Hosp. v. Burwell*, 76 F. Supp. 3d 224, 245 (D.D.C. 2014) (quotation omitted). When, as here, the "Government is the opposing party," the court's assessment of the equities and the public interest "merge." *Guedes v. ATF*, 920 F.3d 1, 10 (D.C. Cir. 2019).

The equities weigh sharply in favor of granting a preliminary injunction. First, the Defendants will not face any harm should the Court temporarily enjoin the specific provisions of the E.O. at issue while the parties litigate to final judgment. Enjoining Defendants from enforcing an unconstitutional E.O. cannot harm them in any cognizable way; it is "well established that the Government 'cannot suffer harm from an injunction that merely ends an unlawful practice.'" *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 218 (D.D.C. 2020) (quoting *Open Cmtys. All. v. Carson*, 286 F. Supp. 3d 148, 179 (D.D.C. 2017)); *cf. Newby*, 838 F.3d at 12 ("There is generally no public interest in the perpetuation of unlawful agency action.").

On the other side of the ledger, the public interest decidedly favors a preliminary injunction. As the D.C. Circuit held in *Newby*, the equities favor plaintiffs where, as here, "absent an injunction," there was a "substantial risk that citizens" would be "disenfranchised." 838 F.3d at

12. The challenged provisions create a "substantial risk" of disenfranchisement here. To start, the Receipt Deadline provisions alone will place hundreds of thousands, if not millions, of ballots in jeopardy.[19] Moreover, the equities tip in favor of injunctive relief where "[c]onfusion [] create[s] a disincentive for citizens who would otherwise attempt to register," or "a large number of Federal Form registrants" are "very likely" to not be "registered to vote for failure to provide proof of citizenship." *Id.* at 13. Here, "[t]he substantially diminished ability" of Plaintiffs to register voters, "including in communities that generally have little access to voter registration services," is "contrary to what Congress, in enacting the NVRA, declared to be the public interest." *Id.* In that respect, "the programmatic harm" to Plaintiffs "dovetails with the public interest." *Id.* at 12–13. The balance of equities and public interest weigh sharply in favor of preliminary relief.

## IV. Plaintiffs request appropriately tailored preliminary relief.

The preliminary injunction that Plaintiffs request is appropriately tailored to the claims that are the subject of this motion. Plaintiffs seek no more than a "stopgap measure, generally limited as to time, and intended to maintain a status quo or 'to preserve the relative positions of the parties until a trial on the merits can be held.'" *Sherley v. Sebelius*, 689 F.3d 776, 781–82 (D.C. Cir. 2012) (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)). For each challenged provision of the Executive Order, Plaintiffs ask the Court to enjoin only those officials and respective departments or agencies that the text of the provision tasks with enforcement.[20]

- The injunction of Section 2(a) of the E.O. should run against the EAC and its Commissioners because the provision tasks these Defendants with requiring States to comply with the documentary proof of citizenship requirement. *See* E.O. § 2(a).

---

[19] *See* Wash. Sec'y of State, Secretary of State Steve Hobbs' Statement Reacting to Presidential Executive Order on Elections (Mar. 26, 2025), https://perma.cc/Y622-EMT9.

[20] Plaintiffs do not seek an injunction against President Trump or the Executive Office of the President. *See Franklin v. Massachusetts*, 505 U.S. 788, 802–03 (1992) (plurality).

- The injunction of Section 2(b)(i) should run against DHS and Secretary Noem; the injunction of Section 2(b)(ii) should run against DOS and Secretary Rubio; and the injunction of Section 2(b)(iii) should run against DHS, Secretary Noem, DOGE, and Administrator Gleason because these provisions task these Defendants with *ultra vires* data sharing. *See id.* § 2(b).

- The injunction of Section 2(d) should run against DOD, the VA, DOI, and Small Business Administration—along with their leaders Secretary Hegseth, Secretary Collins, Secretary Burgum, and Administrator Loeffler, respectively—because certain states have designated offices of these agencies as federal voter registration agencies subject to this provision's requirements. *See id.* § 2d; 52 U.S.C. § 20506(c) (requiring the designation of armed forces recruitment centers); Cal. Exec. Order W-98-94; Mich. Exec. Directive No. 2024-3 (designating the VA and Small Business Administration)[21]; Press Release, *Interior Dep't Takes Steps to Increase Voter Registration in Indigenous Communities*, U.S. Dep't of Interior (Mar. 24, 2022) (recognizing designation of Department of Interior-operated institutions in Kansas and New Mexico).[22]

- The injunction of Section 7(a) should run against the Department of Justice and Attorney General Bondi, and the injunction of Section 7(b) should run against the EAC and its Commissioners because these provisions task these agencies and officials with unlawful actions regarding States' ballot receipt deadlines.

## CONCLUSION

For the reasons stated above, the Court should grant the preliminary injunction requested by the Democratic Party Plaintiffs.

Dated: April 7, 2025                                Respectfully submitted,

---

[21] Mich. Off. of the Governor, Exec. Directive No. 2024-3, *Updating Michigan's List of Voter Registration* Agencies (June 20, 2024), https://www.michigan.gov/whitmer/-/media/Project/Websites/Whitmer/Documents/Exec-Directives/ED-20243-signed.pdf?rev=1600c3de9ee74cc493c70467e5f4395b&hash=757453EA390A89DB9001D2B46757BF03.

[22] Press Release, *Interior Department Takes Steps to Increase Voter Registration in Indigenous Communities*, U.S. Dep't of the Interior (Mar. 24, 2022), https://www.doi.gov/pressreleases/interior-department-takes-steps-increase-voter-registration-indigenous-communities.

*/s/ Marc E. Elias*
**ELIAS LAW GROUP LLP**
Marc E. Elias (DC 442007)
Aria C. Branch (DC 1014541)
Lalitha D. Madduri (DC 1659412)
Christopher D. Dodge (DC 90011587)
Jacob D. Shelly (DC 90010127)
James J. Pinchak (NY 5965397)*
Julie Zuckerbrod (DC 1781133)
250 Massachusetts Ave. NW, Suite 400
Washington, DC 20001
T: (202) 968-4652

Tyler L. Bishop (DC 90014111)
1700 Seventh Ave. Suite 2100
Seattle, WA 98101
T: (206) 656-0177

*Admitted pro hac vice*

46