# Exhibit 4

Civil Action No. 25-cv-0952 (CKK)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.*,<br><br>        Plaintiffs,<br><br>v.<br><br>EXECUTIVE OFFICE OF THE PRESIDENT, *et al.*,<br><br>        Defendants. | Civil Action No. 25-0946 (CKK) |
| DEMOCRATIC NATIONAL COMMITTEE, *et al.*,<br><br>        Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>        Defendants. | Civil Action No. 25-cv-0952 (CKK) |
| LEAGUE OF WOMEN VOTERS EDUCATION FUND, *et al.*,<br><br>        Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>        Defendants. | Civil Action No. 25-0955 (CKK) |

**DECLARATION OF JILLIAN EDELMAN IN SUPPORT OF
DEMOCRATIC PARTY PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

I, Jillian Edelman, declare as follows:

1. I am over the age of 18, am competent to testify, and have personal knowledge of the facts and information set forth in this declaration.

2. I am the Chief Operating Officer of the Democratic Governors Association, also known as DGA. I joined DGA in February 2022 in this role and have served in it ever since. I support DGA's day-to-day operations and oversee its operations. In particular, I handle DGA's operational planning, meaning that I make strategic decisions regarding staffing, budgeting, contracts with vendors, expenditures, and more.

3. DGA is a political organization dedicated to supporting Democratic Governors and electing Democratic gubernatorial candidates across the United States. DGA currently provides support to sitting Governors in 23 states and 4 territories, as well as the Mayor of the District of Columbia, who together constitute DGA's formal membership.[1] DGA serves as a clearinghouse for best practices and policies, including but not limited to policies regarding management, administration, and budgeting for federal, state, and local elections.

4. To advance its mission of supporting the election of Democrats to governorships across the country, DGA provides funding used to educate and assist Democratic voters on how to vote and ensure that those votes are counted. Such programs include voter registration and turnout programs, programs aimed at protecting the registration statuses of Democratic Party

---

[1] These members include Andy Beshear (Kentucky), Muriel Bowser (Washington, D.C.), Albert Bryan, Jr. (U.S. Virgin Islands), Tony Evers (Wisconsin), Bob Ferguson (Washington), Josh Green (Hawaii), Maura Healey (Massachusetts), Katie Hobbs (Arizona), Kathy Hochul (New York), Laura Kelly (Kansas), Tina Kotek (Oregon), Ned Lamont (Connecticut), Lou Leon Guerrero (Guam), Michelle Lujan Grisham (New Mexico), Dan McKee (Rhode Island), Matt Meyer (Delaware), Janet Mills (Maine), Wes Moore (Maryland), Phil Murphy (New Jersey), Gavin Newsom (California), Jared Polis (Colorado), JB Pritzker (Illinois), Josh Shapiro (Pennsylvania), Josh Stein (North Carolina), Tim Walz (Minnesota), and Gretchen Whitmer (Michigan).

voters, voter education and outreach programs aimed at encouraging mail voting, and ballot cure programs to help ensure that mail ballots rejected by election officials for minor technicalities are still counted. In the last few years, DGA has grown significantly and expanded its support for these programs.

5. DGA invests heavily in campaigns and political parties, and those campaigns and parties in turn run voter registration and assistance programs to ensure that voters are able to register and cast ballots that will be counted. DGA has also developed and worked to execute ballot cure programs and will likely do so again in upcoming elections. In these cure programs, DGA identifies qualified voters whose mail ballots are slated for rejection due to a non-substantive defect, such as a missing signature on an envelope, and works with those voters to timely correct the errors so that their ballots can be counted.

6. DGA is actively planning, preparing, budgeting, and strategizing for imminent gubernatorial elections in New Jersey and Virginia in 2025, in addition to 36 more races coming up in 2026.[2] Many of DGA's members will be or are likely to be candidates in 2026, including but not limited to, Governor Hobbs of Arizona, Governor Hochul of New York, Governor Kotek of Oregon, Governor McKee of Rhode Island and Governor Walz of Minnesota.

7. In the midst of these efforts, President Trump issued Executive Order 14248, *Preserving and Protecting the Integrity of American Elections*, on March 25, 2025. The Order directs various federal officers and the U.S. Election Assistance Commission to adopt and enforce

---

[2] Gubernatorial races in 2026 include Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Florida, Georgia, Hawaii, Idaho, Illinois, Iowa, Kansas, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nebraska, Nevada, New Hampshire, New Mexico, New York, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, Tennessee, Texas, Vermont, Wisconsin, Wyoming, the District of Columbia, Guam., Northern Mariana Islands, and the U.S. Virgin Islands.

certain election policies preferred by the President.

8. The Order harms DGA's members because it effectively usurps their authority related to elections. DGA has long understood that the regulation of elections is largely left up to the states. A significant aspect of many of DGA's members' power and authority in their states stems from their constitutional and statutory authority to influence, support, and sign state election laws. The Executive Order improperly claims the ability to displace that authority, impinging on DGA's members' authority and diluting their policy influence in their states.

9. The election day receipt deadline also harms DGA by threatening its members and voters with disenfranchisement. President Trump's imposition of a national election day ballot receipt deadline will directly disenfranchise DGA's members and voters by requiring states to reject ballots not received by election day, even where state law provides a longer period for receipt. Several governors who are members of DGA have voted by mail in past elections. However, ensuring that their ballot is returned to the Postal Service ahead of election day will no longer be enough to have confidence that their ballots will be timely and counted by local officials. The new election day receipt deadline thus harms DGA's members' interests in being able to vote up to election day. DGA's members, like many others who wish to vote by mail, will be put to the choice of accepting the risk that their ballots will be invalidated and their votes won't count, or abandoning mail voting altogether. The Order is also sure to cause confusion as to whether the rule in the Order or state law applies, and voters who reasonably follow their own state law may nevertheless be entirely disenfranchised. In addition to directing the U.S. Attorney General to "enforce" the election day receipt deadline against states, the Order directs the EAC to withhold "any available funding" from states that do not comply with the President's demand. Federal grants account for a large portion of states' election budgets, funding critical activities related to election

security, mail ballot preparation and processing, and staffing. In total, since 2003, the EAC has administered more than $4.35 billion in HAVA funding to states and territories throughout the country, and $1.4 billion from 2018 to 2024 alone. When these funding streams disappear, states will be unable to administer upcoming elections as planned, inflicting harm on DGA's members.

10. The Order's changes to election rules place Democrats at a significant competitive disadvantage compared to their Republican counterparts. In the last several election cycles, Democrats have become more likely to vote by mail. Because of demographics, Democrats are also disproportionately likely to lack qualifying proof of citizenship and to be wrongly suspected of not being a citizen. By dictating these new rules for federal elections, President Trump is restructuring the election environment to make it more difficult for Democrats to vote in elections, and therefore more difficult for Democrats to win.

11. The election day receipt deadline also undermines DGA's investments in mail voting programs, such as ballot cure programs. DGA has made those investments in part because, particularly since the pandemic, a significantly greater portion of mail voters are Democrats compared to Republicans. These programs have been developed based on the understanding that, unless a state has put in place a different rule, a qualified voter's ballot will be counted if the voter drops it off with the proper election official or office or places it in the mail by election day, so long as the ballot reaches the proper official by the state's applicable deadline. These state laws ensure that voters have the full election period to consider the candidates on their ballot, and that candidates and party organizations have the full election period to persuade voters to support them.

12. Implementation of the Executive Order's election day receipt deadline would override these protections and force the restructuring of mail voting programs supported by DGA. For example, DGA would need to divert existing investments toward programs aimed at ensuring

that voters return their ballots to the proper election official or office by election day, making sure to account for issues such as mail delays, because the U.S. Postal Service has been subject to budget cuts and resource constraints that have impacted mail delivery services. In past elections, DGA's members have joined efforts to prevent such deficiencies from causing mail ballots to be delivered too late to be counted. DGA will also need to develop new materials and programs encouraging the use of other methods of voting (aside from mail voting) to minimize the risk of disenfranchisement. And, finally, DGA will be forced to prepare to implement an entirely new ballot cure program to account for the risk that election officials will refuse to allow timely ballots to be cured past election day.

13. The Executive Order also contains provisions directing the EAC to add a documentary proof of citizenship requirement to the federal NVRA voter registration form—often called the "Federal Form"—before such voters can register and vote. The Order further mandates additional citizenship checks of prospective voters who receive public assistance before they can even receive a registration form (and only those voters) and also seeks to pressure states into imposing their own burdensome proof of citizenship requirements. These new requirements also directly harm DGA by making it harder for voters who support Democratic gubernatorial candidates to register and remain registered to vote. Millions of American citizens, including many of the DGA's voters, lack qualifying proof of citizenship documents and will be unable to register to vote using the Form going forward. For example, DGA's voters include lower-income voters who do not possess qualifying documents, such as a passport, and lack the money and resources or ability to obtain one. Separately, a large share of DGA's voters are women, and women are disproportionately likely to be unable to satisfy the requirement because most women who get married change their last name upon marriage, meaning that their legal name often does not match

their citizenship document.

14. Existing law already makes it illegal for foreign nationals to register and vote in our elections, and our existing laws prevents non-citizens from voting. In fact, DGA's members know that these laws are successful: there is no evidence of widespread voting by non-citizens, and incidents of non-citizen voting are otherwise exceedingly rare. Investigations of the President's claims to the contrary have been consistently debunked. President Trump's unnecessary imposition of these citizenship requirements will make it significantly harder for voters who support Democratic gubernatorial candidates—qualified U.S. citizens—to register and remain registered to vote.

15. The burdens imposed by the documentary proof of citizenship requirement will be particularly acute in Arizona, the home state of Governor Hobbs, a DGA member. Arizona will hold a gubernatorial election in 2026. Arizona has imposed a documentary proof of citizenship requirement to vote in state elections, but until President Trump's Order, allowed voters to register with the Federal Form and vote in federal elections without providing proof of citizenship. All voters who register using the Federal Form (known as "federal-only" voters) attest to their citizenship.  With President Trump's mandate that Federal Form users also submit documentary proof of citizenship, all voter registrants in Arizona will be required to submit such documentation, regardless of the form they use to register. As of July 2023, there were nearly 20,000 active federal-only voters in Arizona who were registered without documentary proof of citizenship, and around 30,000 currently. And that number does not account for the thousands of citizens who are eligible to vote in Arizona, but are not yet registered and now will be unable to register because they lack the required proof of citizenship. DGA further fears that the Executive Order will spur some to question the registrations of voters who have registered to vote using the prior Federal From,

causing confusion and mass chaos among voters.

16. These harms threaten to undermine DGA's mission-critical efforts to support Democratic candidates. In response, DGA will be forced to divert significant resources away from other important priorities in the middle of two critical and competitive elections, and these resource allocation decisions will have to take place immediately. For example, rather than carry out its planned investments in contributions to candidates or television ad buys, DGA will be forced to focus on developing new programs aimed at educating voters about the new proof of citizenship requirement.

17. Because DGA's resources are limited, these efforts necessarily come at the cost of other critical priorities and already-planned expenses in the coming months. And these changes to our plans for 2025 are urgent, as the Order sets a 30-day deadline for the creation of a new Federal Form—which we understand means that a form requiring documentary proof of citizenship will imminently begin to apply to registrations, ahead of the November 2025 election.

18. DGA's members are further harmed by the Executive Order's directives for federal agencies and officers to grant unauthorized third parties with access to federal databases containing the personal information of millions of Americans for the purpose of scrutinizing state voter registration records for suspected non-citizens. The databases include information about DGA's members themselves, as well as DGA's voters, all of whom are directly harmed by these disclosures of their personal information. This information, in DGA's understanding, includes social security numbers, address information, and other identifying data. DGA's members are extremely concerned by the brazen and unauthorized disclosures beyond the authorized federal employees. In our understanding, DOGE employees as well as hundreds and potentially thousands of local election officials throughout the country will have newfound access to federal databases

that are intended only for use by federal officials for different purposes.

19. Voter registration efforts supported by DGA will be further upended by President Trump's Order granting third parties unauthorized access to federal systems and databases containing the personal information of DGA's voters. These unauthorized disclosures will subject DGA's voters to unlawful investigation and possible removal from the voter rolls based on false suspicion of not being U.S. citizens. In turn, it will be more difficult to register new voters who reasonably fear that their personal identifying information will be disclosed to third parties.

20. The Executive Order's ballot receipt deadline, proof of citizenship requirement, and unauthorized data-sharing provisions impose imminent harm on DGA. As explained above, DGA will need to redirect significant amounts of its limited resources to thwart the harmful effects of these massive changes to voting and election rules. Decisions to adjust the budget must begin now, and once those resources are diverted toward unplanned programming, they cannot be used to persuade voters to elect Democratic candidates ahead of the 2025 and 2026 elections—directly undermining DGA's mission.

21. In fact, these changes are extremely urgent in light of the imminent elections in Virginia and New Jersey. Both of these states have laws that require counting mail ballots so long as the voter places it in the mail by election day, and the ballot is received by the applicable state deadline: within three days in Virginia, and within six days in New Jersey. Both states also have laws that permit voters to cure ballots with minor deficiencies beyond election day.

22. Finally, the Executive Order's usurpation of DGA's members' responsibility in state elections also directly harms DGA as an organization because DGA supports Democratic Governors in developing and implementing election policies that ensure all qualified voters are able to cast a ballot that is counted. Those efforts are significantly undermined if the President can

usurp state authority to change the rules of elections in ways that favor his party. The Order will also make it harder for DGA to effectively recruit strong candidates to run for office. Candidates want to know that the rules of the road are clear, and they want to know that they have a fair shot of winning if they invest their time and money in a race. It is difficult to convince potential candidates to run for office when the President has unfairly changed the election rules in a way that tilts the playing field heavily in favor of Republicans. As a result, DGA will need to develop entirely new approaches and programs centered around the DGA's members' role in state election policy as well as candidate recruitment and support.

    I declare under penalty of perjury that the foregoing is true and correct.

Executed on:   4/7/2025

*Jillian Edelman*

**Jillian Edelman, Chief Operating Officer**
**DGA**