# Exhibit 6

Civil Action No. 25-cv-0952 (CKK)

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.*,<br><br>　　　　　Plaintiffs,<br><br>　v.<br><br>EXECUTIVE OFFICE OF THE PRESIDENT, *et al.*,<br><br>　　　　　Defendants. | Civil Action No. 25-0946 (CKK) |
| DEMOCRATIC NATIONAL COMMITTEE, *et al.*,<br><br>　　　　　Plaintiffs,<br><br>　v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>　　　　　Defendants. | Civil Action No. 25-cv-0952 (CKK) |
| LEAGUE OF WOMEN VOTERS EDUCATION FUND, *et al.*,<br><br>　　　　　Plaintiffs,<br><br>　v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>　　　　　Defendants. | Civil Action No. 25-0955 (CKK) |

**DECLARATION OF ERIK RUSELOWSKI IN SUPPORT OF
DEMOCRATIC PARTY PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

I, Erik Ruselowski, declare as follows:

1. I am over the age of 18, am competent to testify, and have personal knowledge of the facts and information set forth in this declaration.

2. I am the Chief Operating Officer of DCCC.

3. I first joined DCCC in September 2016. I have served as Chief Operating Officer since February 2022.

4. DCCC, also known as the Democratic Congressional Campaign Committee, is the Democratic Party's national congressional committee. Its mission is to elect candidates of the Democratic Party from across the country to the U.S. House of Representatives. In support of this mission, DCCC seeks to encourage and assist Democratic Party members and constituents in casting ballots and having those ballots count; to register new voters as Democratic Party members and constituents; to preserve the lawful registration status of Democratic Party members and other Democratic Party constituents; to protect registered Democratic Party members and constituents from unlawful retaliation or intimidation; and to preserve the legal rights of our voters. DCCC's members and constituents are grassroots Democratic voters in all 50 states.

5. In my role, I support DCCC's day-to-day operations and manage committee-level initiatives, budgeting, technology, and administration. I engage on an as-needed basis with all of DCCC's activities, and I interact with DCCC's officers and employees at all levels.

6. DCCC is actively planning, preparing, budgeting, and strategizing for the upcoming 2026 midterm elections as well as special elections that will occur between now and then. Through its Frontline program, DCCC provides Democratic Members of Congress from competitive seats both the resources and support to execute effective reelection campaigns. For the 2026 election, DCCC is currently supporting 26 candidates in 15 states, including California, Connecticut, Indiana, Maine, Michigan, North Carolina, New Jersey, New Mexico, Nevada, New

York, Ohio, Oregon, Texas, Virginia, and Washington. DCCC is planning to spend resources to defeat Republicans in competitive congressional districts around the country including, for example, in Arizona, Colorado, Florida, Iowa, Michigan, Missouri, Nebraska, and Pennsylvania. DCCC expects to compete in additional Republican-held districts as well.

7. As we get closer to election day, DCCC heavily focuses on encouraging Democratic voters to vote, including by mail, and making sure they have the knowledge and resources to do so effectively. Particularly since the pandemic, DCCC has expended significant resources to encourage voters to vote by mail, because that method is often the most convenient or accessible way for voters to participate.

8. In recent years, DCCC has developed a comprehensive education, assistance, and ballot-cure program to ensure Democratic voters are able to cast mail ballots and have them counted. In many districts, these programs were built with the understanding that voters' ballots will be counted if they are postmarked by election day and returned by the Postal Service to the proper state election official or office by their state's deadline, which, in many states, extends past election day. Through ballot-cure programs, DCCC and others identify qualified voters whose mail ballots are slated for rejection due to a non-substantive defect, such as a missing signature on a ballot envelope, and work with those voters to correct the errors and timely return their ballots to be counted.

9. President Trump's imposition of a national election day ballot receipt deadline will directly disenfranchise DCCC's constituents—including members of the military, their families, and countless others who rely on voting by mail—by requiring states to reject ballots not received by election day, even where state law provides a longer period for receipt. The impact will fall particularly hard on many DCCC constituents including, in particular, voters in states where

elections are conducted primarily by mail, such as California, Nevada, Oregon, Utah, and Washington—all of which have mail ballot receipt deadlines past election day, and many of which have competitive districts that are regularly decided by small margins. The same is true in New York, which recently expanded mail voting to all voters.

10. Congressional elections in California, in particular, will be heavily impacted by an election day ballot receipt deadline given the sheer size of the state and the widespread use of mail ballots. California currently accepts mail ballots that arrive up to seven days after election day. And in recent elections, an overwhelming majority of California voters submitted their ballots by mail—in the 2022 general election, more than 9 million mail ballots were submitted, comprising nearly 90% of all votes. And in 2024, over 13 million mail ballots were submitted, accounting for more than 80% of all votes. California also has 52 congressional districts—the most of any state, and several of which have had extremely close elections in past cycles. In 2024, the election in California's 13th congressional district was the closest congressional race in the country, decided by a margin of .09%—just 187 votes. Given these numbers, shortening the mail ballot receipt deadline by a week will negatively impact a substantial number of voters and is likely to impact the outcome of congressional elections.

11. The imposition of a national election day receipt deadline will cause significant confusion among voters as to which deadline applies – election day, per the President's Executive Order, or state law. Voters may follow their own state's law only to be disenfranchised as a result. DCCC further fears that the requirement could call into question state laws that permit voters to "cure" timely mail ballots with minor technical errors in the days after election day, undermining DCCC's planned post-election ballot cure program.

12. Voters often get accustomed to voting a certain way by a certain deadline, and in

4

fact, DCCC encourages developing voting habits so that voting becomes routine for its constituents. Because it is difficult to change voters' habits, and because of mail delays that are usually outside of the voters' control, DCCC expects that, despite its best efforts, the new mail ballot receipt deadline will inevitably lead to voter disenfranchisement and cause DCCC candidates to lose votes because ballots will arrive after the deadline. Other voters may not vote at all, even if they have a ballot in hand, if they believe that the ballot is not likely to arrive before the deadline, or are confused about the deadline in general.

13. In an effort to thwart the harmful effects of President Trump's Order and to ensure voters are not disenfranchised, DCCC will have to revise its existing mail-voter assistance and education program to ensure voters are educated about the election day deadline decreed by President Trump. The Postal Service and state officials typically advise voters to build in seven days or more for a ballot to be delivered, and even that window is often not sufficient. The Postal Service also recently announced a plan to cut 10,000 jobs, reduce work hours, and close facilities, all of which will slow down mail service.

14. Given the likelihood of mail delays, DCCC will need to spend resources aimed at encouraging voters to return their ballots far sooner than they have in the past, and without the benefit of a clear election day deadline for placing their ballots in the mail. DCCC will also need to consider standing up additional voter education and engagement programming to encourage voters to use other methods of voting to minimize the risk of disenfranchisement. And in states that have previously counted ballots that arrive after election day, the change also means that mail voters have less time to make their final decisions about which candidates to support, and DCCC consequently has less time to persuade and mobilize them. This time crunch will inevitably impact when and how DCCC spends its resources to persuade and mobilize voters.

15. DCCC will be further forced to prepare, and eventually implement, a revised ballot cure program to account for the risk that election officials will refuse to allow timely ballots to be cured past election day. DCCC's resources are extremely limited in the weeks leading up to election day, as we are prioritizing turning out as many voters as possible and persuading any last minute, undecided voters. If ballots must be cured by election day, DCCC will necessarily have to divert resources away from getting out the vote and persuading voters when that work is most critical.

16. These programs, which will need to be implemented in dozens of states, come at a significant cost. Consider California again. Due to the sheer size of the state and the overwhelming prevalence of mail voting, DCCC will need to run a massive voter education campaign on the issue in multiple congressional districts.

17. Decisions on budgeting begin now for November 2026, and DCCC seeks to maximize the resources it has for persuading and mobilizing our members and constituents to elect Democratic candidates to Congress. For example, a large portion of DCCC's budget for the 2026 election cycle is allocated for persuasion and getting out the vote. This effort will require significant expenditures on advertisements, peer-to-peer texting, and canvassing. Because DCCC now must consider using those resources for voter education in many states on an earlier mail ballot deadline, we will necessarily have to take resources away from these crucial persuasion and get-out-the-vote activities.

18. DCCC is also working to ensure that all eligible Democratic voters and voters who are likely to support Democratic candidates are registered to vote, and that their registrations are current. DCCC often invests in voter registration programs, either directly or indirectly, to encourage our constituents in states across the country to register to vote in the most accessible

way. For some of our constituents, the most accessible option for registering to vote is the National Mail Voter Registration Form, commonly referred to as the "Federal Form." This form streamlines the voter registration process and does not require voters to gather or submit any additional documentation in order to be successfully registered to vote.

19. Existing law already makes it illegal for foreign nationals to register and vote in our elections, and our existing law prevents non-citizens from voting. There is zero evidence of widespread voting by non-citizens in U.S. elections. President Trump's unnecessary imposition of a documentary proof of citizenship requirement will make it significantly harder for DCCC's constituents—qualified U.S. citizens—to register and remain registered to vote.

20. Millions of American citizens, including many of DCCC's citizen-constituents, lack qualifying proof of citizenship documents, and as a result, will be unable to register to vote using the Federal Form. Many of DCCC's lower-income constituents and voters who do not travel out of the country are likely to lack qualifying citizenship documents—like a passport—or the ability to easily obtain them. President Trump's proof of citizenship requirement also singles out recipients of public assistance for additional citizenship assessments before even receiving a Federal Form. Additionally, a majority of DCCC's constituents are women, many of whom have changed their last name upon marriage, such that their legal name does not match their citizenship documents. It will therefore be more difficult for married women to provide documentary proof of citizenship to register to vote as well.

21. The Order's burdensome documentary proof of citizenship requirement makes no exception for overseas and military voters, who are often located in remote areas without access to a copy machine or printer. The proof of citizenship requirement will therefore make it virtually impossible for many eligible voters, including those serving our country, to send proof of their

citizenship to their county election board, and they will be prohibited from exercising their fundamental right to vote.

22. The burdens imposed by the documentary proof of citizenship requirement will be particularly acute in Arizona, where there is a special congressional primary election in Arizona Congressional District 7 on July 15, 2025, and a general election on September 23, 2025. Voter registration for the primary and general election close on June 16, 2025 and August 25, 2025, respectively. Arizona has imposed a documentary proof of citizenship requirement to vote in *state* elections, but until President Trump's Order, allowed voters to register with the Federal Form and vote in federal elections without providing proof of citizenship. Such voters who use the Federal Form and do not provide proof of citizenship are known as "federal-only" voters. With President Trump's mandate that Federal Form users also submit documentary proof of citizenship, all voter registrants in Arizona will be required to submit such documentation, regardless of the form they use to register. As of July 2023, there were nearly 20,000 active federal-only voters in Arizona who were registered without documentary proof of citizenship. And that number does not account for the thousands of citizens who are eligible to vote in Arizona, but are not yet registered and now will be unable to register because they lack the required proof of citizenship.

23. When making budget decisions, DCCC will now need to consider the work that will be required to help prospective voters comply with the documentary proof of citizenship requirement. For example, in states where DCCC helps with voter registration programs, it will need to spend resources to ensure eligible voters are aware that all new registrants must provide qualifying proof of citizenship when registering with the Federal Form. This effort may result in DCCC spending resources so eligible voters are informed that only certain documents qualify as proof of citizenship under President Trump's Order, and have assistance in obtaining such

documents if they do not already have them.

24. In elections, the resources a political party committee has are limited as the committee works to expend its resources to elect its candidates in any given election cycle. Resources that must be diverted to responding to a seismic change like those contained in President Trump's Order necessarily come at the cost of other of DCCC's mission-critical planned activities and expenditures.

25. DCCC's voter registration efforts will be further upended by President Trump's Order granting third parties—including DOGE—unauthorized access to federal systems and databases containing the personal information of DCCC's constituents. These unauthorized disclosures may subject DCCC's members and constituents to unlawful investigation and possible removal from the voter rolls based on false suspicion of not being U.S. citizens. In turn, it may be harder for DCCC to register new voters who reasonably fear that their personal identifying information will be disclosed to third parties. Some of our constituents are extremely concerned about protecting their private information and mistrust DOGE, so much so that they will be willing to forgo registering and exercising their right to vote to ensure that their information is protected from DOGE. That means that DCCC will need to tailor its voter registration efforts in light of these privacy concerns.

26. Additionally, granting such unauthorized disclosures will put DCCC's constituents at risk of being wrongly removed from the voter rolls. DCCC will therefore need to consider how to provide guidance to voters on checking their registrations and the process of restoring their registrations—including by complying with the new DPOC requirements—if they have been wrongly removed.

27. The Order's ballot receipt deadline, proof of citizenship requirement, and

unauthorized data-sharing provisions impose imminent harm on DCCC. As explained above, DCCC will need to redirect significant amounts of its limited resources to thwart the harmful effects of these massive changes to voting and election rules, and those budget allocation decisions are being made now. Once resources are diverted toward unplanned programming, they cannot be used to persuade voters to elect Democratic candidates, directly undermining DCCC's mission.

28.     This reality puts DCCC at a competitive disadvantage. In the last several election cycles, Democrats have become more likely to vote by mail. Because of demographics, Democrats are disproportionately likely to lack qualifying proof of citizenship and to be wrongly suspected of not being a citizen. By dictating these new rules for federal elections, President Trump is therefore making it more difficult for DCCC's members and constituents to vote in elections, and for the candidates that DCCC supports to compete.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: 4/7/2025 _____

*Erik Ruselowski*
_____
Erik Ruselowski, Chief Operating Officer
DCCC