# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.*,<br><br>    Plaintiffs,<br><br>    v.<br><br>EXECUTIVE OFFICE OF THE PRESIDENT, *et al.*,<br><br>    Defendants. | Civil Action No. 25-0946 (CKK) |
| DEMOCRATIC NATIONAL COMMITTEE, *et al.*,<br><br>    Plaintiffs,<br><br>    v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>    Defendants. | Civil Action No. 25-0952 (CKK) |
| LEAGUE OF WOMEN VOTERS EDUCATION FUND, *et al.*,<br><br>    Plaintiffs,<br><br>    v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>    Defendants. | Civil Action No. 25-0955 (CKK) |

## DEFENDANTS' RESPONSE IN OPPOSITION TO DEMOCRATIC PARTY PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

**TABLE OF CONTENTS**

I.      INTRODUCTION ............................................................................................. 1

II.     BACKGROUND ............................................................................................. 2

   A.   Executive Order 14,248 ............................................................................ 2

   B.   Procedural History .................................................................................... 3

      1.  Plaintiffs' Complaints .......................................................................... 3

      2.  Democratic Party Plaintiffs' Motion for Preliminary Injunction ....................... 5

   C.   EAC Background ....................................................................................... 5

   D.   DHS Background ....................................................................................... 7

   E.   Other Agencies .......................................................................................... 7

III.    STANDARD OF REVIEW ............................................................................. 8

IV.     ARGUMENT .................................................................................................. 9

   A.   Plaintiffs Do Not Have Standing ............................................................... 9

      1.  Plaintiffs' Alleged Harm is Neither Actual nor Imminent, nor Caused by the Executive Order ..................................................................................................... 11

      2.  Plaintiffs Do Not Have Competitive Standing .......................................... 15

      3.  Plaintiffs' Diversion of Resources Does Not Confer Standing ...................... 18

      4.  Plaintiffs Have Not Established Associational Standing ............................. 19

   B.   Plaintiffs Are Not Entitled To Injunctive Relief ....................................... 22

      1. Likelihood of Success on Merits ............................................................ 22

         a.  Ultra Vires/Separation of Powers Claims ........................................ 23

         b.  Ultra Vires/Separation of Powers – DPOC provisions EO §§ 2(a), 2(d) .......... 24

         c.  Ultra Vires/Separation of Powers – Receipt Deadline, EO §§ 7(a), (b) ......... 26

      2.  Plaintiffs Have Failed to Show Irreparable Harm ...................................... 30

         a.  The Party Organizations fail to demonstrate irreparable harm ................. 33

         b.  Any harm here would not be "beyond remediation" ........................... 35

      3.  The Balance of Equities and Public Interest Favor Defendants ..................... 37

   C.   Plaintiffs' Claims Lack Prudential Ripeness Necessary for Judicial Review ............... 39

   D.   Plaintiffs' Requested Relief is Not Narrowly Tailored to the Harm Alleged ............... 43

   E.   The Court Must Require a Bond if it Issues a Preliminary Injunction ..................... 45

V.      CONCLUSION ............................................................................................. 45

## TABLE OF AUTHORITIES

**Cases**

*A.B.-B. v. Morgan*, 548 F. Supp. 3d 209 (D.D.C. 2020).................................................. 8

*Am. Fed. of Gov't Emps., AFL-CIO v. Trump*, 318 F. Supp. 3d 370 (D.D.C. 2018), ................. 23

*Am. Fed'n of Gov't Emps., AFL-CIO v. Reagan*, 870 F.2d 723 (D.C. Cir. 1989)................. 14, 40

*Am. Petroleum Inst. v. E.P.A.*, 683 F.3d 382 (D.C. Cir. 2012)..................................... 39

*Ancient Coin Collectors Guild v. U.S. Customs & Border Prot., Dep't of Homeland Sec.*, 698
 F.3d 171 (4th Cir. 2012)................................................................................. 23

*Arcia v. Fla. Sec'y of State*, 772 F.3d 1335 (11th Cir. 2014) ....................................... 28

*Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1 (2013)................................. 26

*Arpaio v. Obama*, 797 F.3d 11 (D.C. Cir. 2015) ......................................................... 10

*Ass'n of Flight Attendants-CWA v. U.S. Dep't of Transp.*, 564 F.3d 462 (D.C. Cir. 2009)........ 10

*AstraZeneca Pharms. LP v. Food & Drug Admin.*, 850 F. Supp. 2d 230 (D.D.C. 2012) ............ 23

*Attias v. CareFirst, Inc.*, 865 F.3d 620 (D.C. Cir. 2017)............................................... 9

*Bill Barrett Corp. v. U.S. Dep't of Interior*, 601 F. Supp. 2d 331 (D.D.C. 2009) ........................ 8

*Bldg. & Const. Trades Dep't, AFL-CIO v. Allbaugh*, 295 F.3d 28 (D.C. Cir. 2002)............. 24, 25

*Brown v. District of Columbia*, 888 F. Supp. 2d 28 (D.D.C. 2012) ............................... 30

*Bruesewitz v. Wyeth LLC*, 562 U.S. 223 (2011) .......................................................... 25

*Bruni v. Hughes*, 468 F. Supp. 3d 817 (S.D. Tex. 2020) ............................................. 15

*Buchholz v. Meyer Njus Tanick, PA*, 946 F.3d 855 (6th Cir. 2020) ................................. 16

*Center for Democracy & Technology v. Trump*, 507 F. Supp. 3d 213 (D.D.C. 2020)................ 12

*Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290 (D.C. Cir. 2006)*............. passim

*Church v. Biden*, 573 F. Supp. 3d 118 (D.D.C. 2021)*............................................ 22, 39, 40, 41

*Citizens for Responsibility and Ethics in Washington v. Fed. Elec. Comm'n*, 993 F.3d 880 (D.C.
 Cir. 2021) ................................................................................................. 13, 32

*Clapper v. Amnesty Int'l. USA*, 568 U.S. 398 (2013)* ............................................ 9, 10, 11, 18

*Cmty. For Creative Non-Violence v. Pierce*, 786 F.2d 1199 (D.C. Cir. 1986)...................... 13

*Common Cause v. Trump*, 506 F. Supp. 3d 39 (D.D.C. 2020)* ...................................... 25

*Ctr. for Biological Diversity v. McAleenan*, 404 F. Supp. 3d 218 (D.D.C. 2019)................. 23

*Defs. of Wildlife v. Perciasepe*, 714 F.3d 1317 (D.C. Cir. 2013) ................................... 12

*Donald J. Trump for President, Inc. v. Cegavske*, 488 F. Supp. 3d 993 (D. Nev. 2020) ............ 15

*DSE, Inc. v. United States*, 169 F.3d 21 (D.C. Cir. 1999) ............................................ 45

*Elec. Priv. Info. Ctr. v. Pres. Adv. Comm. on Election Integrity*, 878 F.3d 371 (D.C. Cir. 2017) 22

*Fed. Express Corp. v. U.S. Dep't of Com.*, 486 F. Supp. 3d 69 (D.D.C. 2020) ................... 23, 24

*Finca Santa Elena, Inc. v. U.S. Army Corps of Eng'rs*, 873 F. Supp. 2d 363 (D.D.C. 2012)...... 41

*Fla. Audubon Soc. v. Bentsen*, 94 F.3d 658 (D.C. Cir. 1996)........................................ 16

*Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905 (D.C. Cir. 2015)................................ 8

*Food and Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367 (2024)*....................... 15, 18

*Gilliard v. McWilliams*, 315 F. Supp. 3d 402 (D.D.C. 2018)...................................... 36

*Hall v. District of Columbia Bd. of Elections*, 2024 WL 1212953 (D.D.C. 2024).................... 15

*Hanson v. Dist. of Columbia*, 120 F.4th 223 (D.C. Cir. 2024) ................................... 37

*Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333 (1977) .......................... 19

*Labrador v. Poe by and through Poe*, 144 S.Ct. 921 (2024) ............................................... 44

*League of Women Voters of Mo. v. Ashcroft*, 336 F. Supp. 3d 998 (W.D. Mo. 2018) ................ 34

*League of Women Voters of the United States v. Newby*, 195 F. Supp. 3d 80 (D.D.C.).............. 42

*League of Women Voters of U.S. v. Newby*, 838 F.3d 1 (D.C. Cir. 2016)* .......................... passim

*Linda R.S. v. Richard D.*, 410 U.S. 614 (1973) ......................................................... 13

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) ................................................... 1, 11, 21

*Marx v. General Revenue Corp.*, 568 U.S. 371 (2013) ................................................. 24

*Morgan Drexen, Inc. v. CFPB*, 785 F.3d 684 (D.C. Cir. 2015) ....................................... 10

*Munaf v. Geren*, 553 U.S. 674 (2008)................................................. 1, 8, 22, 36

*Myers v. United States*, 272 U.S. 52 (1926)............................................................ 24

*Nat'l Ass'n of Home Builders v. EPA*, 667 F.3d 6 (D.C. Cir. 2011)............................... 10

*Nat'l Fair Hous. All. v. Carson*, 330 F. Supp. 3d 14 (D.D.C. 2018) ....................... 34, 36

*Nat'l Park Hosp. Ass'n v. Dep't of the Interior*, 538 U.S. 803 (2003) ..................... 39, 42

*Newdow v. Roberts*, 603 F.3d 1002 (D.C. Cir. 2010).................................................. 24

*Nken v. Holder*, 556 U.S. 418 (2009) .................................................................. 37

*Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726 (1998) ................................. 42

*Open Soc'y Just. Initiative v, Trump*, 510 F. Supp. 3d 198 (S.D.N.Y. 2021).............................. 25

*Platte River Whooping Crane Critical Habitat Maint. Tr. v. FERC*, 962 F.2d 27 (D.C. Cir. 1992) ................................................................................................. 12

*Pub. Citizen Health Rsch. Grp. v. Acosta*, 363 F. Supp. 3d 1 (D.D.C. 2018) ...................... 31

*Purcell v. Gonzalez*, 549 U.S. 1 (2006) ............................................................... 38

*Raines v. Byrd*, 521 U.S. 811 (1997) ............................................................ 10, 15

*Reno v. Catholic Social Servs.*, 509 U.S. 43 (1993) ................................................. 42

*Republican Nat'l Comm. v. Burgess*, No. 3:24-cv-198, 2024 WL 3445254 .......................... 16

*Republican Nat'l Comm. v. Wetzel*, 120 F.4th 200 (5th Cir. 2024)............................. 32, 37

*Saline Parents v. Garland*, 88 F.4th 298 (D.C. Cir. 2023)........................................... 10

*Sandoz, Inc. v. Food and Drug Admin.*, 439 F. Supp. 2d 26 (D.D.C. 2006) .......................... 1, 8

*Sataki v. Broad. Bd. of Governors*, 733 F. Supp. 2d 22 (D.D.C. 2010)............................... 8

*Save Jobs USA v. U.S. Dep't of Homeland Sec.*, 105 F. Supp. 3d 108 (D.D.C. 2015)................ 37

*Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197 (2020) ............................... 27

*Sherley v. Sebelius*, 644 F.3d 388 (D.C. Cir. 2011)......................................... 8, 43

*Sierra Club v. U.S. Army Corps of Eng'rs*, 990 F. Supp. 2d 9 (D.D.C. 2013) ..................... 30

*Summers v. Earth Island Inst.*, 555 U.S. 488 (2009) .............................................. 20

*Texas v. United States*, 523 U.S. 296 (1998) ........................................................ 43

*Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994)............................................... 36

*Travelers United, Inc. v. Hyatt Hotels Corp.*, — F. Supp. 3d —, 2025 WL 27162 (D.D.C. 2025)* ................................................................................. 19, 21, 22

*Trump v. Hawaii*, 585 U.S. 667 (2018)............................................................... 44

*United Presbyterian Church in the U.S.A. v. Reagan*, 738 F.2d 1375 (D.C. Cir. 1984) ............ 12

*United States v. Chem. Found.*, 272 U.S. 1 (1926)........................................ 14, 27, 40

*United States v. Fokker Servs. B.V.*, 818 F.3d 73 (D.C. Cir. 2016)..................... 13, 32

*Whitmore v. Arkansas*, 495 U.S. 149 (1990) ......................................................... 12

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ................................... 1, 8

*Wis. Gas Co. v. FERC*, 758 F.2d 669 (D.C. Cir. 1985) ................................................................ 30

**Statutes**

2 U.S.C. § 7 ............................................................................................................................ passim
3 U.S.C. § 1 ............................................................................................................................ passim
44 U.S.C. § 3501 ........................................................................................................................... 4
44 U.S.C. § 3507 ........................................................................................................................... 8
5 U.S.C. § 552a ....................................................................................................................... 5, 34
5 U.S.C. § 553 ........................................................................................................................ 7, 49
5 U.S.C. § 704 ........................................................................................................................ , 43
5 U.S.C. § 706 ............................................................................................................................... 4
52 U.S.C § 20508 .................................................................................................................. passim
52 U.S.C. § 20505 .................................................................................................................. 6, 52
52 U.S.C. § 20506 ......................................................................................................................... 9
52 U.S.C. § 20507 .......................................................................................................... 8, 35, 36
52 U.S.C. § 20901 ......................................................................................................................... 6
52 U.S.C. § 20921 ......................................................................................................................... 6
52 U.S.C. § 20928 ....................................................................................................................... 49
52 U.S.C. § 20929 .................................................................................................................. 6, 32
52 U.S.C. § 21001 ....................................................................................................................... 33
52 U.S.C. § 21003 ....................................................................................................................... 33
52 U.S.C. § 21081 ....................................................................................................................... 33

**Other Authorities**

Executive Order 14,248, "Preserving and Protecting the Integrity of American Elections," 90 Fed. Reg. 14005 (Mar. 25, 2025)* ................................................................................................ passim

**Rules**

Fed. R. Civ. P. 65(c) .................................................................................................................. 54

**Regulations**

78 Fed. Reg. 69864-01, 69869 (Nov. 21, 2013) ........................................................................ 29

**Constitutional Provisions**

art. I, § 1 ..................................................................................................................................... 16
art. II, § 1 .................................................................................................................................... 47
art. II, § 3 ...................................................................................................................... 16, 32, 39, 47

## I.    INTRODUCTION

Defendants[1] request that this Court deny Democratic Party Plaintiffs'[2] demand for preliminary injunctive relief to enjoin the implementation of President Trump's Executive Order 14,248, which protects the integrity of United States elections.

Plaintiffs fail to meet the very high bar required for the extraordinary relief they seek.  A preliminary injunction is an "extraordinary and drastic remedy" *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008) and "must be sparingly granted" *Sandoz, Inc. v. Food and Drug Admin.*, 439 F. Supp. 2d 26, 30 (D.D.C. 2006).  Plaintiffs must show they are "likely to succeed on the merits" and "likely to suffer irreparable harm in the absence of preliminary relief[.]"  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  Plaintiffs cannot demonstrate a likelihood of success on the merits; their claims amount to nothing more than a politically motivated design to stop the President's Executive Order.

Plaintiffs also provide no nexus between the Presidential Executive Order and the injury that they speculate will befall unnamed and unidentified voters.  An "injury in fact" must be "concrete and particularized," "actual or imminent" and not "conjectural" or "hypothetical." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).  It is telling that of all the Plaintiffs in this case, *none* are individually named voters who claim they would be injured but for this

---

[1] Defendants in this motion include Donald J. Trump, in his official capacity as President of the United States, Department of Justice, Department of Defense, Department of State, Department of Homeland Security, Department of Veterans Affairs, Small Business Administration, Department of the Interior, Social Security Administration, Department of Government Efficiency Service, Election Assistance Commission, Federal Voting Assistance Program, Pamela Bondi, Peter B. Hegseth, Marco Rubio, Kristi Noem, Douglas A. Collins, Kelly Loeffler, Doug Burgum, Leland Dudek, Amy Gleason, Benjamin Hovland, Donald L. Palmer, Thomas Hicks, Christy McCormick, J. Scott Wiedmann, and Brianna Schletz.

[2] Democratic Party Plaintiffs include Democratic National Committee, Democratic Governors Association, DSCC, DCCC, U.S. Senate Minority Leader Charles E. Schumer, and U.S. House of Representatives Minority Leader Hakeem S. Jeffries.

Court's immediate intervention.  And these Plaintiffs have thus far been unable to identify by name the voters they purport to represent.

Plaintiffs cannot point to a *single* action taken to implement this Executive Order that has caused harm remediable by this Court.  Because their alleged harms are hypothetical and speculative, Plaintiffs cannot establish standing to assert them.  Moreover, this Court cannot substitute its judgment for the Attorney General's prosecutorial discretion in determining whether and when to bring enforcement actions regarding the Election Day statutes.  Preliminary injunctive relief is an extraordinary remedy, and the burden lies on Plaintiffs to show that they have a substantial likelihood of success, that they would suffer irreparable harm, and that the balance of the equities lies in their favor.  They fail at every turn.  This Court should deny Plaintiffs' Motion.

## II.     BACKGROUND

### A.  Executive Order 14,248

On March 25, 2025, President Trump issued Executive Order 14,248, entitled "Preserving and Protecting the Integrity of American Elections," 90 Fed. Reg. 14005 (Mar. 25, 2025) ("Executive Order"; sections cited as "EO § n").[3]  The Executive Order explains that "[f]ree, fair, and honest elections unmarred by fraud, errors, or suspicion are fundamental to maintaining our constitutional Republic.  The right of American citizens to have their votes properly counted and tabulated, without illegal dilution, is vital to determining the rightful winner of an election."  *Id.* § 1.  "Under the Constitution, State governments must safeguard American elections in compliance with Federal laws that protect Americans' voting rights and

---

[3] Federal Register, Preserving and Protecting the Integrity of American Elections (Mar. 28, 2025), https://www.federalregister.gov/documents/2025/03/28/2025-05523/preserving-and-protecting-the-integrity-of-american-elections.

guard against dilution by illegal voting, discrimination, fraud, and other forms of malfeasance and error." *Id.*

President Trump declared that "[i]t is the policy of [his] Administration to enforce Federal law and to protect the integrity of our election process." *Id.*  For example, while "[s]everal Federal laws, including 18 U.S.C. §§ 1015 and 611, prohibit foreign nationals from registering to vote or voting in Federal elections . . . States fail adequately to vet voters' citizenship, and, in recent years, the Department of Justice has failed to prioritize and devote sufficient resources for enforcement of these provisions." *Id.*  Further, "Federal law establishes a uniform Election Day across the Nation for Federal elections, 2 U.S.C. § 7 and 3 U.S.C. § 1[,]" setting "the day by which ballots must be both cast by voters and received by state officials[,]" "as the United States Court of Appeals for the Fifth Circuit recently held in *Republican National Committee v. Wetzel* (2024)." *Id.*  And accordingly, "[i]t is the policy of [President Trump's] Administration to enforce those statutes and require that votes be cast and received by the election date established in law." *Id.*

The Executive Order, which issued several directives in furtherance of those policies, further directed that "[n]othing in [this Executive Order]" is to "be construed to impair or otherwise affect . . . the authority granted by law to an executive department or agency, or the head thereof[.]" *Id.* § 1(a)(i).  And the Executive Order must "be implemented consistent with applicable law[.]" *Id.* § 11(b).

### B.  Procedural History

#### 1.  Plaintiffs' Complaints

On March 31, 2025, Plaintiffs League of United Latin American Citizens, Secure Families Initiative, and Arizona Students' Association ("LULAC Plaintiffs") filed a complaint in this Court challenging, *inter alia*, the President's legal authority to direct EAC to require

documentary proof of citizenship ("DPOC") pursuant to EO § 2, under an *ultra vires* separation of powers constitutional claim. *League of United Latin American Citizens v. Executive Office of the President*, No. 1:25-cv-00946 (D.D.C. Mar. 31, 2025). With respect to that claim, LULAC Plaintiffs named as defendants President Trump, the EAC, and the four EAC Commissioners. *Id.* LULAC Plaintiffs also made several other claims related to EO § 2 under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2), and the Paperwork Reduction Act ("PRA"), 44 U.S.C. § 3501, *et seq.* On March 31, 2025, Plaintiffs Democratic National Committee, Democratic Governors Association, DSCC, DCCC, U.S. Senate Minority Leader Charles E. Schumer, and U.S. House of Representatives Minority Leader Hakeem S. Jeffries ("Democratic Party Plaintiffs") filed a complaint in this Court challenging several sections of the Executive Order, including EO § 2, on constitutional grounds as well as under the APA and the Privacy Act, 5 U.S.C. § 552a, and naming numerous defendants, including President Trump, the EAC, and the EAC Commissioners. *Democratic Nat'l Comm. v. Trump*, No. 1:25-cv-00952 (D.D.C. Mar. 31, 2025). And on April 1, 2025, Plaintiffs League of Women Voters Education Fund, League of Women Voters of the United States, League of Women Voters of Arizona, Hispanic Federation, National Association for the Advancement of Colored People, OCA – Asian Pacific American Advocates, and Asian and Pacific Islander American Vote ("League Plaintiffs") filed a complaint in this Court against President Trump, the EAC, and the EAC Commissioners. *League Of Women Voters Education Fund v. Trump*, No. 1:25-cv-00955 (D.D.C. Apr. 1, 2025). The League Plaintiffs challenge EO §§ 2 and 4, claiming those sections violate federal law and seeking equitable relief.

**2.  Democratic Party Plaintiffs' Motion for Preliminary Injunction**

On April 7, 2025, Democratic Party Plaintiffs filed a motion for preliminary injunction.
Party Plaintiffs' Mot. Prelim. Inj., ECF No. 53.; *see also* Democratic Party Plaintiffs' Mem.
Supp. Mot. Prelim. Inj., ECF No. 53-1 ("Mem."); [Proposed] Order, ECF No. 34-15.  In their
motion, Plaintiffs ask this Court to preliminarily enjoin the EAC and its Commissioners from
implementing EO §§ 2(a) and 7(b); the Department of Homeland Security ("DHS") and DHS
Secretary Kristi Noem from implementing EO § 2b(i); the Department of State and Secretary of
State Marco Rubio from implementing EO § 2(b)(ii); DHS, Secretary Noem, Department of
Government Efficiency, and Administrator Gleason from implementing EO § 2(b)(iii);
Department of Defense, Department of Veterans Affairs, Department of Interior, and Small
Business Administration—along with their leaders Secretary Peter B. Hegseth, Secretary
Douglas A. Collins, Secretary Doug Burgum, and Administrator Kelly Loeffler—from
implementing Section EO § 2(d); and the Department of Justice and Attorney General Pamela
Bondi from implementing EO § 7(a).  Mem. 44–45.

**C.  EAC Background**

The National Voter Registration Act of 1993 (NVRA) requires States to "accept and use"
a uniform federal form ("Federal Form") to register voters for federal elections.  52 U.S.C. §
20505(a)(1).  The Federal Form is developed by the EAC, a bipartisan, "independent entity," 52
U.S.C. § 20921, created under the Help America Vote Act of 2002 ("HAVA").  Pub. L. No.
107–252, 116 Stat. 1666, 1726 (codified as amended at 52 U.S.C. § 20901 *et seq*.).

The EAC has limited rulemaking authority and cannot issue any rule, promulgate any
regulation, or take any other action that imposes any requirement on any State or unit of local
government, except to the extent permitted under 52 U.S.C § 20508(a).  52 U.S.C. § 20929.  The
EAC is statutorily required to perform the following duties:

(1) in consultation with the chief election officers of the States, shall prescribe such regulations as are necessary to carry out paragraphs (2) and (3);

(2) in consultation with the chief election officers of the States, shall develop a mail voter registration application form for elections for Federal office;

(3) not later than June 30 of each odd-numbered year, shall submit to the Congress a report assessing the impact of this chapter on the administration of elections for Federal office during the preceding 2-year period and including recommendations for improvements in Federal and State procedures, forms, and other matters affected by this chapter; and

(4) shall provide information to the States with respect to the responsibilities of the States under this chapter.

52 U.S.C. § 20508(a).  The EAC thus conducts changes to the Federal Form consistent with 52 U.S.C. § 20508(a).

To implement EO § 2(a) and add a DPOC requirement, the EAC must follow certain statutory procedures.  52 U.S.C. § 20508(a).  The EAC must first prepare an update to the regulations to allow for new content on the form.  Ex. 1, Schletz Decl. ¶ 2.  Implementing new regulations requires approval of at least three Commissioners.  Ex. 1, Schletz Decl. ¶ 3; *see also* 52 U.S.C. § 20928.  The regulations update must then follow the Administrative Procedure Act's (APA) notice-and-comment rulemaking procedures.  Ex. 1, Schletz Decl. ¶ 4; *see also* 5 U.S.C. § 553.  The EAC must also consult with the chief election officers of the States to prescribe the content of the Federal Form.  Ex. 1, Schletz Decl. ¶ 4; *see also* 52 U.S.C. § 20508(a)(1).  This consultation requirement may be satisfied by the public comment period provided in a notice of proposed rulemaking.  Ex. 1, Schletz Decl. ¶ 4; *see also* 75 F.R. 47729.  Following the public comment period, the EAC must consult with the chief election officers to develop a revised Federal Form.  Ex. 1, Schletz Decl. ¶ 5; *see also* 52 U.S.C. § 20508(a)(2).  Following consultation, three Commissioners must then approve the issuance of a revised Federal Form.  Ex. 1, Schletz Decl. ¶ 6; *see also* U.S.C. § 20928.  And the EAC must comply with the

Paperwork Reduction Act requirement that the EAC submit the new form as an information

collection to the Director of the Office of Management and Budget for approval. Ex. 1, Schletz

Decl. ¶ 2; *see also* 44 U.S.C. § 3507(a)–(b); 90 Fed. Reg. 11159.

### D. DHS Background

The Department of Homeland Security ("DHS") is an executive department of the United

States created by the Department of Homeland Security Act of 2002, Pub. L. 107–296, 116 Stat.

2135. Its mission, in part, is to prevent terrorist attacks within the United States and reduce the

vulnerability of the United States to terrorism. The Executive Order directs DHS and DHS

Secretary Kristi Noem, in order "[t]o identify unqualified voters registered in the States," to,

"consistent with applicable law, ensure that State and local officials have, without the

requirement of the payment of a fee, access to appropriate systems for verifying the citizenship

or immigration status of individuals registering to vote or who are already registered." EO §

2b(i). Further, DHS, "in coordination with the DOGE Administrator, shall review each State's

publicly available voter registration list and available records concerning voter list maintenance

activities as required by 52 U.S.C. § 20507, alongside Federal immigration databases and State

records requested, including through subpoena where necessary and authorized by law, for

consistency with Federal requirements." EO § 2b(iii).

### E. Other Agencies

Other federal agencies and agency heads implicated by the Executive Order include the

Department of Defense, Department of Veterans Affairs, and Small Business Administration.

The Department of Defense is a federal agency created by the National Security Act

Amendments of 1949, Pub. L. No. 81—216, 63 Stat. 578. The Small Business Administration

was created by the Small Business Act of 1953, Pub. L. No. 83—163, 67 Stat. 232. The

Veterans Affairs Act of 1988, Pub. L. 100—527, 102 Stat. 2635, elevated the former Veterans

Administration to the cabinet-level executive agency Department of Veterans Affairs.  The

Executive Order instructs agencies such as these to "assess citizenship prior to providing a

Federal voter registration form to enrollees of public assistance programs[.]" EO § 2(d); *see also*

52 U.S.C. § 20506(a)(3)(B)(ii).

## III.    STANDARD OF REVIEW

"A preliminary injunction is an ***extraordinary and drastic remedy***.  It is never awarded as

of right," *Munaf*, 553 U.S. at 689–90 (cleaned up) (emphasis added), and "must be sparingly

granted," *Sandoz, Inc. v. Food and Drug Admin.*, 439 F. Supp. 2d 26, 30 (D.D.C. 2006) (citation

omitted) (finding merely economic harm insufficient to justify injunctive relief), *aff'd sub nom.*

*Sandoz Inc. v. F.D.A.*, No. 06-5204, 2006 WL 2591087 (D.C. Cir. Aug. 30, 2006).

This "very high" standard for granting injunctive relief is "very well established." *Sataki*

*v. Broad. Bd. of Governors*, 733 F. Supp. 2d 22, 44 (D.D.C. 2010).  "A plaintiff seeking a

preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to

suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his

favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555

U.S. 7, 20 (2008).[4]

Plaintiffs must do more than merely show the possibility of prevailing on the merits;

rather Plaintiffs must show "a substantial likelihood of success on the merits." *Food & Water*

*Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015).  Plaintiffs also must establish

---

[4] The D.C. Circuit has taken no position as to whether the "sliding scale" approach to weighing the four factors for injunctive relief, which "allow[s] that a strong showing on one factor could make up for a weaker showing on another," *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011), has been abandoned in light of *Winter*. *See, e.g.*, *A.B.-B. v. Morgan*, 548 F. Supp. 3d 209, 218–19 (D.D.C. 2020).  Regardless, "the movant must, at a minimum, 'demonstrate that irreparable injury is *likely* in the absence of an injunction.'"  *Bill Barrett Corp. v. U.S. Dep't of Interior*, 601 F. Supp. 2d 331, 334–35 (D.D.C. 2009) (quoting *Winter*, 555 U.S. at 22).

irreparable harm, as failure to do so is "grounds for refusing to issue a preliminary injunction, even if the other three factors entering the calculus merit such relief." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). This too is a "high standard." *Id.* First, the injury "must be both certain and great; it must be actual and not theoretical." *Id.* "The moving party must show the injury complained of is of such *imminence* that there is a 'clear and present' need for equitable relief to prevent irreparable harm." *Id.* (citations omitted) (emphasis in original). "Second, the injury must be beyond remediation." *Id.* .

## IV.    ARGUMENT

The Executive Order only directs agencies to act according to their normal duties and statutory authority, and no final action has yet been taken. Therefore, Plaintiffs have not established any injury sufficient for standing; they have not established that the President has exceeded the scope of his power to enforce statutory requirements or that they meet any of the other requirements for a preliminary injunction; and there is no ripe controversy. Moreover— even if Plaintiffs had alleged an actionable injury, their requested preliminary injunction is not narrowly tailored to the harm that they conjecture may occur. In the unlikely event that this Court issues a preliminary injunction, the Court should exercise its discretion to issue more limited relief than requested, and it must require a sufficient bond.

### A.  Plaintiffs Do Not Have Standing

"Standing is a prerequisite to the existence of a 'Case[]' or 'Controvers[y],' which is itself a precondition to the exercise of federal judicial power." *Attias v. CareFirst, Inc.*, 865 F.3d 620, 625 (D.C. Cir. 2017) (alterations in original) (citation omitted) (relying on *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410-414 (2013) to find no standing where "harm could only occur through the happening of a series of contingent events[.]"). "The 'irreducible

constitutional minimum of standing contains three elements': (1) injury-in-fact, (2) causation, and (3) redressability." *Ass'n of Flight Attendants-CWA v. U.S. Dep't of Transp.*, 564 F.3d 462, 464 (D.C. Cir. 2009) (citation omitted). "Thus, to establish standing, a litigant must demonstrate a personal injury fairly traceable to the opposing party's allegedly unlawful conduct and likely to be redressed by the requested relief." *Nat'l Ass'n of Home Builders v. EPA*, 667 F.3d 6, 11 (D.C. Cir. 2011) (alterations and citation omitted).

"[A] showing of standing is an essential and unchanging predicate to any exercise of [federal court] jurisdiction." *Id.* (citation omitted). That includes actions for "prospective declaratory and injunctive relief." *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015). Because Plaintiffs seek "forward-looking relief," they "must show [they are] suffering an ongoing injury or face an immediate threat of injury." *Morgan Drexen, Inc. v. CFPB*, 785 F.3d 684, 689 (D.C. Cir. 2015) (citation omitted). To claim standing based on alleged future harm, a plaintiff must show that the threatened harm is "certainly impending," or there is a "substantial risk" that the injury will occur." *Clapper*, 568 U.S. at 409, 414 n.5. This injury requirement "helps to ensure that the plaintiff has a personal stake in the outcome of the controversy." *Saline Parents v. Garland*, 88 F.4th 298, 304 (D.C. Cir. 2023), *cert. denied*, 145 S. Ct. 144 (2024) (cleaned up).

Moreover, "the law of Art[icle] III standing is built" on fundamental separation-of-powers principles, *Raines v. Byrd*, 521 U.S. 811, 820 (1997) (citation omitted), and "serves to prevent the judicial process from being used to usurp the powers of the political branches." *Clapper*, 568 U.S. at 408. Accordingly, application of Article III standing requirements must be "especially rigorous when," as here, "reaching the merits of the dispute would force [a court] to decide whether an action taken by [another] branch[] of the Federal Government was unconstitutional." *Raines*, 521 U.S. at 819–20.

### 1.  Plaintiffs' Alleged Harm is Neither Actual nor Imminent, nor Caused by the Executive Order

An "injury in fact" for standing purposes must be "concrete and particularized," "actual or imminent" and not "conjectural" or "hypothetical." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).  Threatened injury must be "certainly impending" or present a "substantial risk." *Clapper*, 568 U.S. at 410; *id*. at 414 n.5.  These are high standards, and a mere "objectively reasonable likelihood" is not sufficient.  *Id*. at 410.

Plaintiffs complain that Democratic voters will be disproportionately harmed by a documentary proof of citizenship requirement to register to vote using the Federal Form, and that they themselves will be unable to engage in their core mission of registering voters.  Mem. 11–12, 14–15, 17–19.  But the Executive Order itself does *not* add a DPOC requirement to the Federal Form; it acknowledges that any update must be made by the EAC.  *See* EO § 2(a).  And Plaintiffs cannot dispute that the EAC has clear statutory authority to prescribe such forms.  *See* 52 U.S.C. § 20508(a)(2) (the EAC "shall develop a mail voter registration application form").  Plaintiffs have not established that the EAC has begun—let alone finished—the process to update the Federal Form, nor have Plaintiffs established when it might do so.  *See* Ex. 1, Schletz Decl. (describing process).  Plaintiffs' abstract concerns—that the forms the EAC will eventually issue will "burden their constituents' ability to register to vote," cause them competitive injury, and force them to divert resources, Mem. 14–20—are inherently speculative.[5]

Courts have repeatedly held that claimed harm based on potential agency actions that

---

[5] The U.S. House of Representatives recently passed the "Safeguard American Voter Eligibility Act" or the "SAVE Act."  H.R. 22, 119th Cong. (2025).  The SAVE Act, if approved by the U.S. Senate, would amend the NVRA to require proof of United States citizenship to register to vote in Federal elections.  *Id.*  Thus, DPOC may be congressionally *mandated* in the near future.

have not yet occurred—indeed may *never* occur—is insufficient for Article III standing. "Article III standing requires more than the possibility of potentially adverse regulation." *Defs. of Wildlife v. Perciasepe*, 714 F.3d 1317, 1324–25 (D.C. Cir. 2013); *see also Platte River Whooping Crane Critical Habitat Maint. Tr. v. FERC*, 962 F.2d 27, 35 (D.C. Cir. 1992) ("Allegations of injury based on predictions regarding future legal proceedings are, however, 'too speculative to invoke the jurisdiction of an Art[icle] III Court.'" (alteration in original) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 157 (1990)). For example, in *United Presbyterian Church in the U.S.A. v. Reagan*, 738 F.2d 1375 (D.C. Cir. 1984) (Scalia, J.), the D.C. Circuit rejected standing based on a claim that an executive order could lead to agencies taking future adverse actions against them. *Id*. at 1378–81. Likewise, in *Center for Democracy & Technology v. Trump*, 507 F. Supp. 3d 213 (D.D.C. 2020), *vacated as moot sub nom*. *Center for Democracy & Technology v. Biden*, No. 21-5062, 2021 WL 11659822 (D.C. Cir. Aug. 9, 2021),[6] the court found that the potential that an agency would promulgate adverse regulations in implementing an executive order was insufficient for standing, explaining: "To be sure, the government might issue regulations that CDT does not like. But it is just as possible that it will not. 'Article III standing requires more than the possibility of potentially adverse regulation.'" *Id*. at 223 (quoting *Perciasepe*, 714 F.3d at 1324–25). Plaintiffs' claim for standing fails this well-established case law.

Plaintiffs also argue that they and their voters will be harmed by the Executive Order's ballot-receipt provisions. Mem. 10–11, 13–14, 17. Section 7(a) interprets 2 U.S.C. § 7 and 3 U.S.C. § 1 to require a national ballot receipt deadline and instructs the Attorney General to

---

[6] The D.C. Circuit dismissed the appeal and vacated the judgment as moot because the President rescinded the executive order at issue during the pendency of the appeal.

"take all necessary action to enforce [the statutes] against States that violate" them.  This instruction to the Attorney General is obviously a matter of prosecutorial discretion, and therefore not subject to judicial review.  *See, e.g.*, *Citizens for Responsibility and Ethics in Washington v. Fed. Elec. Comm'n*, 993 F.3d 880, 887–88 (D.C. Cir. 2021) ("The vesting of all executive power in the President as well as his constitutional obligation to 'take Care that the Laws be faithfully executed,' U.S. CONST., art. I, § 1; art. II, § 3, has been understood to leave enforcement and nonenforcement decisions exclusively with the Executive Branch."); *United States v. Fokker Servs. B.V.*, 818 F.3d 733, 741 (D.C. Cir. 2016) ("Decisions [whether] to initiate charges . . . 'lie[] at the core of the Executive's duty to see to the faithful execution of the laws.'") (citing *Cmty. For Creative Non-Violence v. Pierce*, 786 F.2d 1199, 1201 (D.C. Cir. 1986). And even if the exercise of prosecutorial discretion were subject to judicial review, the Executive Order itself directs the Attorney General only to enforce those statutes "against States," EO § 7(a), none of which are parties to these cases.  *See Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973) ("[A] citizen lacks standing to contest the policies of the prosecuting authority when he himself is neither prosecuted nor threatened with prosecution.").

Similarly, the DNC Plaintiffs also challenge the ability of the EAC to condition funding to States depending on compliance with 2 U.S.C. § 7 and 3 U.S.C. § 1.  Mem. 3–4.  EO § 7(b) again specifically deals with states who are not a party to this lawsuit.  The EAC has not denied funds to any state based on non-compliance with 2 U.S.C. § 7 and 3 U.S.C. § 1.  Ex. 1, Schletz Decl. ¶ 8.  Plaintiffs' concerns are speculative at best, and again fail long-settled standing tests.

Finally, Plaintiffs complain of theoretical violations of privacy rights stemming from the Executive Order's direction to the Department of Homeland Security to review certain state and federal records to confirm states' compliance with federal voter list maintenance laws and the

directive to the Attorney General to enter into information-sharing agreements with state election officials or agencies to aid in prosecuting election crimes.  Mem. 12, 15, 19–20.  Plaintiffs posit this requirement would make protected personal information available to DOGE and state officials without authorization to view such information, as well as creating a risk that individuals will incorrectly be removed from the voter rolls.  *Id*. at 2–3, 7, 12.

Not only does that theory of harm rest on speculation, but it also runs afoul of the longstanding presumption of regularity.  "The presumption of regularity supports the official acts of public officers, and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties."  *United States v. Chem. Found.*, 272 U.S. 1, 14–15 (1926).  This "familiar presumption of regularity . . . has been recognized since the early days of the Republic."  *Am. Fed'n of Gov't Emps., AFL-CIO v. Reagan*, 870 F.2d 723, 727 (D.C. Cir. 1989); s*ee also*, *id*. at 727 n.33 (collecting cases).  The presumption applies to actions of the President and executive officers.  *See, e.g.*, *id*. at 728 (applying presumption to the President); *Chem. Found.*, 272 U.S. at 14 (applying presumption to a counselor for the Department of State).  Yet Plaintiffs' claimed injury rests on the idea that the Department of Homeland Security and the Attorney General, in complying with the Executive Order's statement to act "to the maximum extent possible," will cease compliance with all applicable data privacy laws that govern individuals' personal information.  Not so.  Without even an announcement from the Attorney General or Department of Homeland Security related to such information-sharing endeavors to consider, Plaintiffs' only option to contrive claimed harms is to imagine worst-case-scenario compliance with the Executive Order.  Such harms, based on nothing but speculation, are insufficient to establish Article III standing.

### 2.  Plaintiffs Do Not Have Competitive Standing

A plaintiff must raise more than a "generalized grievance."  A generalized grievance exists where plaintiffs "object as a matter of policy" to the challenged action, "but their votes will not receive less weight or be treated differently," "they are not losing representation in any legislative body," and their votes have not been "divide[d], concentrate[d], or devalue[d]."  *Hall v. District of Columbia Bd. of Elections*, 2024 WL 1212953, *4 (D.D.C. 2024), *appeal docketed*, No. 24-7050 (D.C. Cir. Apr. 18, 2024) & No. 24-7065 (D.C. Cir. May 1, 2024).  Here, the political plaintiffs and the members they purport to represent may have strong policy objections to an Executive Order issued by their political opponent, but their voters (and their voters' votes) are subject to the same rules as everyone else.  It is not just Democrat voters who will be harmed (or not) by the changes, nor are Democrat voters singled out for application of the Executive Order.  Every voter will be subject to the same requirements.  Thus, Plaintiffs have not been "singled out for specially unfavorable treatment."  *Raines*, 521 U.S. at 821; s*ee also Donald J. Trump for President, Inc. v. Cegavske*, 488 F. Supp. 3d 993, 1003 (D. Nev. 2020) (rejecting competitive standing where "candidates face no harms that are unique from their electoral opponent"); *cf. Food and Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024) ("Article III standing screens out plaintiffs who might have only a general legal, moral, ideological, or policy objection to a particular government action.").

Courts routinely refuse to credit speculation that facially neutral election rules favor one party over another.  *See, e.g.*, *Bruni v. Hughes*, 468 F. Supp. 3d 817, 827 (S.D. Tex. 2020) (challenging prohibition on "straight ticket voting").  And particularly relevant here, at least one court has specifically rejected speculation about who is "more likely to cast mail ballots that are received after Election Day" and concluded that the "effect of [a] mail ballot receipt deadline on

15

electoral outcomes is 'not sufficiently predictable' to meet Article III's causation requirement." *Republican Nat'l Comm. v. Burgess*, No. 3:24-cv-198, 2024 WL 3445254, at *2 (D. Nev. July 17, 2024) (challenging mail ballot receipt deadline), *appeal docketed*, No. 24-5071 (9th Cir. Aug. 19, 2024).

Moreover, even if this Court were to find a competitive injury, Plaintiffs' claims fail at the second stage of the standing inquiry: causation or traceability. This inquiry "examines whether it is substantially probable . . . that the challenged acts of the defendant, not of some absent third party, will cause the particularized injury of the plaintiff." *Fla. Audubon Soc. v. Bentsen*, 94 F.3d 658, 663 (D.C. Cir. 1996) (internal citations omitted). A plaintiff's "anxiety falls short of the injury-in-fact requirement because it amounts to an allegation of fear of something that may or may not occur in the future," *Buchholz v. Meyer Njus Tanick*, *PA*, 946 F.3d 855, 866-67 (6th Cir. 2020), and even more so here where that anxiety-based allegation of injury is dependent on the actions of non-parties after the challenged action. All of Plaintiffs' alleged competitive injuries fail (again) at this point.

First, Plaintiffs allege that the vote-by-mail receipt deadline places them "at a competitive disadvantage relative to Republicans" because Democrat voters "make up the largest share of mail voters," and many mail ballots will be disqualified, thus "making it harder for Democrats to win elections." Mem. 10. As explained above, courts have declined to consider such arguments. But even assuming *arguendo* that Plaintiffs' factual allegations are true, the competitive injury they claim would be caused by (a) a disproportionate percentage of Democrat voters failing to mail their ballots prior to election day or too close to Election Day, or (b) the United States Postal Service disproportionately failing to timely deliver mail ballots in Democrat-leaning jurisdictions. If a jurisdiction changes when it must receive ballots (Election Day versus after

Election Day), logic compels the conclusion that voters may also change their behavior. These causes are both too speculative and too far removed from the Executive Order to confer standing.

Second, Plaintiffs allege that the documentary proof of citizenship requirement "directly harm[s] the Democratic Party Plaintiffs' electoral prospects" because citizens without the necessary documentation "are more likely to support Democrats." Mem. 11. The actual cause of the alleged injury, then, is individuals who are not parties to the instant litigation exercising their own right to make decisions about whether to obtain documentary proof of citizenship, whether to register using the Federal Form instead of a state form, and whether to not register at all if the Federal Form is unavailable to them.

Finally, Plaintiffs allege that "many eligible Democrats *may* refrain from registering to vote altogether" due to the data-sharing provisions, which will hurt Plaintiffs "at the ballot box, where the reluctance of supporters will place Democratic candidates at a disadvantage." Mem. 12 (emphasis added). Plaintiffs engage in more speculation here, as indicated by their use of the word "may." But even assuming *arguendo* that they are correct, the harm to Plaintiffs depends on (a) States determining that the "sensitive personal information" referred to by Plaintiffs, Mem. 12, is part of the "publicly available voter registration list," EO § 2(b)(iii), because the voter registration information made publicly-available varies according to state law; (b) a disproportionate percentage of would-be Democrat registrants understanding that their sensitive information is being provided or at risk of being provided to the Federal government; and (c) a disproportionate percentage of would-be Democrat registrants fearing their information being shared with a government entity, even though the information being shared both came from a government entity (whichever entity issued the documentary proof of citizenship) and has already been provided by the registrant to a government entity (the voter registration authority).

17

In short, the competitive injuries that Plaintiffs claim do not involve unequal treatment, are too speculative for this Court to entertain, and are too dependent on the action or inaction of third parties, to confer standing. *See also Clapper*, 568 U.S. at 416 (rejecting Second Circuit's finding of injury where plaintiff's fear is not "fanciful, paranoid, or otherwise unreasonable" because such a standard "improperly waters down the fundamental requirements of Article III").

### 3.  Plaintiffs' Diversion of Resources Does Not Confer Standing

Plaintiffs' next attempt to manufacture standing is the asserted injury that "they will be forced to redirect critical resources reserved for *other* core programs to address the [Executive] Order's impact on their voters." Mem. 16 (emphasis added); *see also id.* at 17–20 (detailing anticipated spending). Plaintiffs complain, therefore, not that they will be prevented from engaging in parts of their core mission related to the Executive Order, but rather that they would have to spend more money on some parts of their core mission than they currently do. *See id.* at 17–20 (detailing anticipated spending); *id.* at 17 (plaintiffs' "ability to fulfill their mission of electing Democratic candidates currently depends significantly" on their vote-by-mail programs); *id.* at 17–18 (describing voter education programs as "core"); *id.* at 19 (describing voter mobilization programs as "core").

The Supreme Court has recently and firmly rejected the notion that "standing exists when an organization diverts its resources in response to a defendant's actions." *Food and Drug Administration v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024). If that were enough, it "would mean that all the organizations in America would have standing to challenge almost every federal policy that they dislike, provided they spend a single dollar opposing those policies." *Id.* Thus, the Supreme Court has distinguished (and rejected) a diversion of resources theory from the "unusual" situation where a defendant provided false information that directly

impaired an organization's ability to engage in its related core business activities.  *Id.* at 395–96

(distinguishing between the facts before the Court and the Court's opinion in *Havens Realty*

*Corp. v. Coleman*, 455 U.S. 363 (1982)).  Unlike in *Havens*, the Executive Order does not

directly prevent or impair Plaintiffs from engaging in their core activities.  Indeed, they assert

that they will continue to engage in vote-by-mail, voter education, and voter mobilization

programs. Mem. 17–20.  Accordingly, Plaintiffs' diversion of resources theory also fails.  *See*

*also All. for Hippocratic Med.*, 602 U.S. at 394 (noting that "an organization that has not

suffered a concrete injury caused by a defendant's action cannot spend its way into standing

simply by expending money to gather information and advocate against the defendant's action,"

where plaintiff was an advocacy organization and therefore it diverted resources to engage in a

core business activity).

### 4.  Plaintiffs Have Not Established Associational Standing

An organization may establish associational standing by showing that "(a) its members

would otherwise have standing to sue in their own right; (b) the interests [the organization] seeks

to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the

relief requested requires the participation of individual members in the lawsuit."  *Hunt v.*

*Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).  "[A]ll three requirements

are jurisdictional, and unless each is satisfied . . . associational standing is not a valid basis for a

federal court's exercise of subject-matter jurisdiction over the case."  *Travelers United, Inc. v.*

*Hyatt Hotels Corp.*, — F. Supp. 3d —, 2025 WL 27162 (D.D.C. 2025) (citation omitted); *Arpaio*

*v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015)).

Plaintiffs entirely fail to show that their members would have standing to sue in their own

right.  Indeed, they make no showing at all that any individual member has been or will be

injured, instead relying on general and formulaic statements from persons representing the

organizations. *See, e.g.*, Schneider Decl. ¶ 9; Edelman Decl. ¶ 9; Snyder Boss Decl. ¶ 8;

Ruselowski Decl. ¶ 9.[7]  They also rely on "a statistical certainty that at least one member will

have their mail ballot rejected because it will arrive after election day."  Mem. 14.

　　　　These allegations are insufficient to confer jurisdiction.  Indeed, a court cannot simply

"accept[] the organization's self-description of the activities of its members" and determine that

"there is a statistical probability that some of those members are threatened with concrete

injury." *Summers v. Earth Island Inst.*, 555 U.S. 488, 497 (2009) (rejecting the dissent's

proposal).  Accepting such claims would "make a mockery" of Supreme Court precedent

"requir[ing] plaintiff-organizations to make specific allegations establishing that at least one

identified member had suffered or would suffer harm." *Id.* at 498.  The "requirement of naming

the affected members has never been dispensed with in light of statistical probabilities, but only

where *all* the members of the organization are affected by the challenged activity." *Id.* at 498–

99.[8]  "In part because of the difficulty of verifying the facts upon which such probabilistic

standing depends, the Court has required plaintiffs claiming an organizational standing to

identify members who have suffered the requisite harm[.]" *Id.* at 499.

---

[7] Plaintiffs' declarations make the same allegations nearly verbatim. *See, e.g.*, Schneider Decl. ¶
9 ("President Trump's imposition of a national election day ballot receipt deadline will
disenfranchise the DNC's members and constituents[.]"); Edelman Decl. ¶ 9 ("President
Trump's imposition of a national election day ballot receipt deadline will directly disenfranchise
DGA's member and voters . . . ."); Snyder Boss Decl. at ¶ 8 ("President Trump's imposition of a
national election day ballot receipt deadline will directly disenfranchise DSCC's
constituents[.]"); Ruselowski Decl. ¶ 9 ("President Trump's imposition of a national election day
ballot receipt deadline will directly disenfranchise DCCC's constituents[.]").
[8] Plaintiffs cannot meet this high standard.  They have no way of showing that *all* of their
members will want to register to vote using the Federal Form, or will choose to cast a ballot by
mail, or will be so concerned about potential data-sharing that they would consider refraining
entirely from being a registered voter.

In *Travelers United v. Hyatt Hotels Corp.*, — F. Supp. 3d —, 2025 WL 27162 (D.D.C. 2025), this Court held that the plaintiff failed to establish associational standing in a case for injunctive relief because it did not establish that any member had standing in his or her own right.  *Id.* at *15.  In particular, because the plaintiff had sued a hotel chain, plaintiff would have needed to name even one member who had a specific plan to book a hotel room at that chain at a definite point in the future.  *Id.; see also Lujan*, 504 U.S. at 564 (holding that generalized "'some day' intentions—without any description of concrete plans, or indeed any specification of when the some day will be—do not support a finding of the 'actual or imminent' injury" that is necessary to show Article III standing).  In this case, that means that Plaintiffs—at the *very least*—must name a member without qualifying documentary proof of citizenship and with a specific plan to register to vote using the Federal Form at a definite point in the future; a member who is a UOCAVA voter whose ballot was accepted after Election Day in 2024; and a member who has a specific plan to not register to vote or to cancel their voter registration due to concern about data-sharing.

In addition to failing to establish that any members would have standing in their own right, Plaintiff Organizations here also fail to establish that the relief requested does not require the participation of individual members in the lawsuit.  The *Travelers United* court held that plaintiffs could have done this by filing affidavits or declarations from some members establishing the requisite standing, but instead the plaintiff had "not alleged or shown that *anyone*, let alone any of its own members, plan[ned] to book a Hyatt hotel room in the future." 2025 WL 27162, at *15.  Absent "any indication that any of [plaintiff's] members have standing to pursue injunctive relief," the court would "eventually need to consider additional, member-specific facts to determine whether at least one member has standing to seek injunctive relief."

*Id.* at *16.  As the court recognized, this created a significantly different situation from other cases "in which courts have allowed organizations to pursue non-monetary relief on behalf of their individual members," because at least one member declaration had been filed in those cases.  *Id.*  Because organizational Plaintiffs here have not filed any declarations making the required showings, they have not established associational standing.

### B.  Plaintiffs Are Not Entitled To Injunctive Relief

#### 1. Likelihood of Success on Merits

Plaintiffs are unlikely to succeed on the merits because they have failed to establish standing or ripeness, *see infra*, and this Court accordingly need not address the substance of their claims.  *Church v. Biden*, 573 F. Supp. 3d 118, 136 (D.D.C. 2021) (citing *Elec. Priv. Info. Ctr. v. Pres. Adv. Comm. on Election Integrity*, 878 F.3d 371, 375 n.2 (D.C. Cir. 2017) (affirming denial of preliminary injunction where plaintiff failed to show substantial likelihood of standing)); *see also Munaf*, 553 U.S. 674, 690 (noting that "[a] difficult question as to jurisdiction" makes success on the merits" more *unlikely* due to potential impediments to even reaching the merits").  "[T]he 'merits' on which plaintiff must show a likelihood of success encompass not only substantive theories but also establishment of jurisdiction."  *Obama v. Klayman*, 800 F.3d 559, 565 (D.C. Cir. 2015) (opinion of Williams, J.) (citation omitted) (holding that speculation of future scope of and motive for defendants' actions does not create standing).  Because Plaintiffs lack standing under any theory, they are "*ipso facto* unlikely to succeed."  *See Elec. Priv. Info. Ctr.*, 878 F.3d at 375 n.2; *DCCC v. Federal Election Comm'n*, No. 24-cv-2935, 2024 WL 4650907, at *6 (D.D.C. Nov. 1, 2024) (plaintiff must establish standing to show likelihood of success on merits); *see also Munaf*, 553 U.S. at 690 (2008) (noting that "[a] difficult question as to jurisdiction" makes success on the merits "more unlikely due to potential impediments to even reaching the merits").  Their failure to establish ripeness is likewise fatal to their claim for

injunctive relief. *See AstraZeneca Pharms. LP v. Food & Drug Admin.*, 850 F. Supp. 2d 230, 241-42 (D.D.C. 2012) (denying preliminary injunction because plaintiffs' claim was not ripe and thus unlikely to succeed on the merits). This Court should dismiss the Motion on these bases alone.

### a. Ultra Vires/Separation of Powers Claims

Because Plaintiffs cannot bring their claim for preliminary injunction under the APA—no final agency action—all of their claims depend on this Court's inherent equitable powers to provide a cause of action to strike down *ultra vires* executive conduct. *See* 5 U.S.C. § 704 (actions reviewable). But review under the *ultra vires* standard is necessarily narrow. *Fed. Express Corp. v. U.S. Dep't of Com.*, 486 F. Supp. 3d 69, 81 (D.D.C. 2020) (citation omitted), *aff'd*, 39 F.4th 756 (D.C. Cir. 2022); *Ancient Coin Collectors Guild v. U.S. Customs & Border Prot., Dep't of Homeland Sec.*, 698 F.3d 171, 179 (4th Cir. 2012) (explaining under the ultra vires review standard, the court "may not dictate how government goes about its business but [rules] only [on] whether a public entity has acted within the bounds of its authority or overstepped them" (citation omitted)). And "in the context of *ultra vires* and constitutional separation of powers claims, there are no questions of fact, because whether or not a statute or the Constitution grants the [Executive Branch] the power to act in a certain way is a pure question of law." *Ctr. for Biological Diversity v. McAleenan*, 404 F. Supp. 3d 218, 233 (D.D.C. 2019) (quoting *Am. Fed. of Gov't Emps., AFL-CIO v. Trump*, 318 F. Supp. 3d 370, 394 (D.D.C. 2018), *rev'd on other grounds*, 929 F.3d 748 (D.C. Cir. 2019)). "The same can be said of any questions of interpretation that a federal court may have to answer in parsing out the meaning of any relevant statutes[.]" *Am. Fed. of Gov't Emps., AFL-CIO*, 318 F. Supp. 3d at 394.

23

Plaintiffs make an *ultra vires* claim that the President lacks constitutional/statutory authority to issue his Executive Order or direct agencies to implement his agenda. Mem. *passim*. To begin, such a claim must fail because "[w]ith regard to the President, courts do not have jurisdiction to enjoin him." *Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010). Regardless, the Executive Order is not *ultra vires*. The President's authority to direct subordinate agencies to implement his agenda, subject to those agencies' own statutory authorities, is well-established. *See Bldg. & Const. Trades Dep't, AFL-CIO v. Allbaugh*, 295 F.3d 28, 32 (D.C. Cir. 2002) ("[T]he President's power necessarily encompasses 'general administrative control of those executing the laws.'" (quoting *Myers v. United States*, 272 U.S. 52, 164 (1926)). The relevant question, therefore, is whether the actions directed by the Executive Order are "so plainly beyond the bounds of . . . statutory authority" so as "to warrant the immediate intervention of an equity court." *Fed. Express Corp.*, 39 F.4th at 764. The answer is straightforwardly no. Each of the Defendant officers are authorized to take the actions the Executive Order directs. Plaintiffs' *ultra vires* claims must fail on the merits.

### b. Ultra Vires/Separation of Powers – DPOC provisions EO §§ 2(a), 2(d)

First, the President's Executive Order presents no infringement on separation-of-powers guarantees because it directs the EAC to "take *appropriate* action," EO § 2(a)(i) (emphasis added), that is "consistent with applicable law," EO § 11(b), and that should not be construed to impair "the authority granted by law" to the agency, EO § 11(a)(i). Federal voter registration executive department or agency heads acting pursuant to EO § 2(d) must act also act consistently with applicable law, EO § 11(b), and pursuant to their statutory authority, EO § 11(a)(i). Courts should interpret an executive order in a manner that "gives effect to every word," *Marx v. General Revenue Corp.*, 568 U.S. 371, 385 (2013), rather than in a way that gives meaning to

one passage "only at the expense of rendering the remainder . . . superfluous." *Bruesewitz v. Wyeth LLC*, 562 U.S. 223, 236 (2011).

The court's conclusion in *Common Cause v. Trump*, 506 F. Supp. 3d 39 (D.D.C. 2020) is instructive here. The executive order in that case directed the Secretary of Commerce to provide the President with "information to support excluding illegal aliens, to the extent feasible, from the enumeration used to apportion the House of Representatives." *Id.* at 41. In so doing, the executive order instructed the Secretary "to take 'appropriate action, consistent with the Constitution and other applicable law,' providing information permitting the President to carry out the policy 'to the extent practicable.'" *Id.* at 47 (citation omitted). "And it end[ed] with a general instruction that '[t]his memorandum shall be implemented consistent with applicable law.'" *Id.* (citation omitted). The court there determined that it "[could not] ignore these repeated and unambiguous qualifiers imposing lawfulness and feasibility constraints on implementing the memorandum." *Id.* (citation omitted). The Executive Order here similarly instructs the EAC to follow the law, and it would be speculative to suggest that the President or EAC intends to do otherwise. *See Bldg. & Constr. Trades Dep't, AFL-CIO*, 295 F.3d at 33; *Open Soc'y Just. Initiative v, Trump*, 510 F. Supp. 3d 198, 215–16 (S.D.N.Y. 2021).

Plaintiffs are correct that Congress outlines the EAC's authority to make changes to the Federal Form, but they cannot argue that the President has ordered the EAC to deviate from the statutory procedures required to make such changes. The Executive Order explicitly says otherwise: "Nothing in [the Executive Order]" is to "be construed to impair or otherwise affect . . . the authority granted by law to an executive department or agency, or the head thereof[.]" EO § 11(a)(i). And the Executive Order must "be implemented consistent with applicable law[.]" EO § 11(b). EAC is statutorily authorized to include a DPOC requirement if, after consultation with

the States, the EAC deems such a requirement necessary to enable State election officials to assess eligibility.  52 U.S.C. §§ 20508(a)(2), (b)(1).

As the Supreme Court recognized in *Arizona v. Inter Tribal Council of Ariz., Inc.* ("*ITCA*"), 570 U.S. 1, 17 (2013), "it would raise a serious constitutional question 'if a federal statute precluded a State from obtaining the information necessary to enforce its voter qualifications.'"  *League of Women Voters of U.S. v. Newby* ("*Newby*"), 838 F.3d 1, 11 (D.C. Cir. 2016).  Section 9(b) of the NVRA, 52 U.S.C. § 20508(b)(1), requires the EAC to include information shown to be "necessary."  Thus, "if the proposed change to the Federal [Form] is 'necessary' to enforce voter qualifications, then the NVRA and probably the Constitution require its inclusion; if not, the NVRA does not permit its inclusion and the Constitution is silent." *Newby*, 838 F.3d at 11.

While the FEC and the EAC previously determined that the attestation regarding citizenship was sufficient previously, the EAC is entitled to undergo the same rulemaking procedures it previously conducted to reassess the necessity of DPOC.  And the NVRA makes no express prohibition against an agency finding that DPOC is necessary to determine eligibility. *See ITCA*, 570 U.S. 19, 19 n.10.  Similarly, there is no tension between the Executive Order and the notice-and-comment requirement under the APA, 52 U.S.C. § 20929, or the PRA requirements for information collection, nor is there a delegation of authority, as the EAC already resides within the executive branch.  Plaintiffs' claims as to EO §§ 2(a), (d) fail on their merits.

### c.  Ultra Vires/Separation of Powers – Receipt Deadline, EO §§ 7(a), (b)

The Constitution vests all executive power in the President and charges him with faithfully executing the laws.  U.S. Const. art. II, § 3; *see also Seila Law LLC v. Consumer Fin.*

*Prot. Bureau*, 591 U.S. 197, 203 (2020).  Section 7 of the Executive Order comports with that authority by enforcing 2 U.S.C. § 7 and 3 U.S.C. § 1 under the most recent circuit court decision to consider ballot-receipt deadlines.  *See* EO § 1 (citing *Republican Nat'l Comm. v. Wetzel*, 120 F.4th 200 (5th Cir. 2024)).  The Attorney General has prosecutorial discretion under the Executive Order, EO §§ 7(a) ("all necessary action), 11(a)(1), to decide what actions should be taken against any particular State to enforce the Election Day statutes.  And as for conditioning of HAVA funds, EO § 7(b), nowhere in 52 U.S.C. §§ 21001–03 is the President prohibited from expressing his views on priorities for EAC funding grants.  In fact, the EAC is authorized by law—indeed, required—to condition State eligibility for receipt of funds on compliance with the Federal mandate to "adopt uniform and nondiscriminatory standards that define what constitutes a vote and what will be counted as a vote for each category of voting system used in the State." *See* 52 U.S.C. § 21081(a)(6); *see also* 52 U.S.C. § 21003.

### d.  Ultra Vires/Privacy Act – Data-Sharing provisions 2(b)

Plaintiffs contend that the Executive Order's directives that "(i) the DHS Secretary grant State and local officials access to systems for citizenship verification; (ii) the Secretary of State share information with State and local election officials for citizenship verification; and (iii) individuals at DOGE be given access to DHS's database, E.O. § 2(b), all conflict with the Privacy Act."  Mem. 34.  Not so.  DHS and Secretary of State officials are entitled to the presumption of regularity regarding the performance of their official duties.  *United States v. Chem. Found.*, 272 U.S. 1, 14–15 (1926); *see also supra* pp. 13.  Plaintiffs cannot refute this presumption before any action has been taken in connection with the Executive Order.

First, EO § 2(b)(i) directs the Homeland Security Secretary to, "consistent with applicable law, ensure that State and local officials have . . . access to appropriate systems for

verifying the citizenship or immigration status of individuals registering to vote or who are already registered[.]"  EO § 2(b)(i).  The inclusion of "consistent with applicable law" demonstrates the President's intention that this coordination with State and local officials abide by applicable statutory guidelines, including Privacy Act guarantees.  And to be sure, the language directs that the action be taken "consistent with applicable law," *i.e.*, there is no attempt to circumvent Privacy Act guarantees.

U.S. Citizenship and Immigration Services ("USCIS"), a component of DHS, already provides voter verification services to federal, state, and local entities through the Systematic Alien Verification for Entitlements ("SAVE") program.  *See Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1339–40 (11th Cir. 2014) (describing use of SAVE).  SAVE is an online service implemented broadly in 1986 to assist agencies in determining certain point-in-time immigration and citizenship information for individuals seeking benefits and licenses.  U.S. Citizenship and Immigration Services, *SAVE*, https://www.uscis.gov/save (last visited April 10, 2025).

The Privacy Act does limit the disclosure for systems of records maintained by federal agencies.  5 U.S.C. § 552a(b).  However, USCIS may disclose covered records with written consent from subject individuals or pursuant to a statutory exception. § 552a(b).  One such statutory exception is for "a routine use," meaning that the record is disclosed for a use that "is compatible with the purpose for which it was collected."  § 552a(a)(7).  The USCIS Alien File SORN meets that definition.  It contains a routine use for disclosure: "[t]o a Federal, State, local, tribal, or territorial government agency seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law."  Alien File, Index, and National File Tracking System of Records, 78 Fed. Reg. 69864-01, 69869 (Nov. 21, 2013).  Such routine use, like the ten state Secretaries of State

28

who currently use SAVE for voter verification, is sanctioned by statute and federal regulation.

In short, there is already a prescribed statutory procedure by which States may engage in voter

verification services, and EO § 2(b)(i) reflects the President's lawful authority to enforce said

statutory procedures.

The next two sections also demonstrate a command to implement the Executive Order

lawfully.  EO § 2(b)(ii) directs the Secretary of State to "*take all lawful and appropriate action*

to make available information from relevant databases to State and local election officials

engaged in verifying citizenship of individuals registering to vote or those already registered[,]"

again referencing the need to act lawfully.  EO § 2(b)(ii) (emphasis added).  EO § 2(b)(iii)

commands the Department of Homeland Security and DOGE Administrator to coordinate in

"review[ing] each State's publicly available voter registration list and available records

concerning voter list maintenance activities as required by 52 U.S.C. § 20507, alongside Federal

immigration databases and State records requested, including through subpoena where necessary

and authorized by law, for consistency with Federal requirements."  These directives to DHS

thus reference "publicly available" information, *i.e.*, nonconfidential information not subject to

the Privacy Act, and available records that are already required by the NVRA.  The NVRA

already requires States to "maintain for at least 2 years and shall make available for public

inspection and, where available, photocopying at a reasonable cost, all records concerning the

implementation of programs and activities conducted for the purpose of ensuring the accuracy

and currency of official lists of eligible voters, except to the extent that such records relate to a

declination to register to vote or to the identity of a voter registration agency through which any

particular voter is registered."  52 U.S.C. § 20507(i)(1).  EO 2(b)(iii) does not go beyond the

States' existing obligations under the NVRA.  There is no separation-of-powers violation.

### 2.  Plaintiffs Have Failed to Show Irreparable Harm

Plaintiffs have failed to establish that a preliminary injunction is necessary to prevent irreparable harm, which is alone grounds to deny their motion for preliminary injunction. Plaintiffs have not shown that they will face a "certain and great," "actual and not theoretical" injury "of such *imminence* that there is a 'clear and present' need for equitable relief." *Chaplaincy*, 454 F.3d at 297 (citation omitted) (emphasis in original).  "[I]t is well established that 'perhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered.'" *Sierra Club v. U.S. Army Corps of Eng'rs*, 990 F. Supp. 2d 9, 38 (D.D.C. 2013) (citation omitted).  Plaintiffs' irreparable harm claims all fail for the same reason that they fail the other injunctive relief standards here—there has been no *action*, and all Plaintiffs' feared actions resulting from the EO are either wildly speculative or authorized by law.

The requirement for imminent irreparable harm is arguably more onerous than the requirement for Article III injury in fact, requiring the movant to "provide proof that the harm has occurred in the past and is likely to occur again, or proof indicating that the harm is certain to occur in the near future." *Brown v. District of Columbia*, 888 F. Supp. 2d 28, 32 (D.D.C. 2012) (quoting *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)).  Plaintiffs have failed to do so.  Instead, Plaintiffs offer "[b]are allegations" of what they speculate "is likely to occur," which "are of no value" in supporting a motion for preliminary injunction.  *Id.*  Indeed, the very high standard for granting a preliminary injunction is "quite high," *Brown,* 888 F. Supp. 2d at 31 (citing *Chaplaincy*, 454 F.3d at 2970), as the irreparable injury must 'be both certain and great,'" *Brown*, 888 F. Supp. 2d at 31 (quoting *Wis. Gas Co.*, 758 F.2d at 674).

But Plaintiffs urge this Court to put the cart before the horse.  Plaintiffs' claimed injury

first rests on speculation about future actions the EAC may take pursuant to EO §§ 2(a) and 7(b),

and future actions they, Plaintiffs, *may* take as a result.  Mem. 36.  By April 24, 2025, the EAC

"shall take appropriate action" that would be "consistent with applicable law."  EO §§ 2(a)(i),

11(b); *see also* Ex. 1, Schletz Decl. (describing process).  Under that presumption of regularity,

*see supra* pp. 13, EO § 2(a) will be implemented according to its own statutes under HAVA,

NVRA, the APA, and the PRA.  And irreparable harm, if any, would not spontaneously manifest

the day that a rulemaking process begins, despite Plaintiffs' hand-wringing.  Mem. 36; *see also*

*Pub. Citizen Health Rsch. Grp. v. Acosta*, 363 F. Supp. 3d 1, 21 (D.D.C. 2018) (denying

preliminary injunction even after agency began rulemaking process).[9]  Similarly, under EO §

7(b), no action has occurred.  This reasoning resonates with the remaining challenges under EO §

2.  No action has occurred, and those tasked with acting under the Executive Order are bound to

comply with applicable law.  *See supra* pp. 21-28.

Plaintiffs also fail to demonstrate that irreparable harm would result from EO § 7(a) and

(b), absent a preliminary injunction.  Plaintiffs greatly exaggerate in arguing that the receipt

deadline provisions would be a "seismic disruption and highly consequential transformation of

how elections are administered across these states."  Mem. 37.  In fact, the majority of U.S.

States—33—already impose election-day deadlines for election official receipt of absentee

ballots.  *See* Nat'l Conf. of State Legis., *Voting Outside the Polling Place Report, Table 11:*

*Receipt and Postmark Deadlines for Absentee/Mail Ballots* (last updated Mar. 24, 2025),

https://www.ncsl.org/elections-and-campaigns/table-11-receipt-and-postmark-deadlines-for-

---

[9] And any effect relating to Arizona's upcoming special congressional election would be purely
speculative.

absentee-mail-ballots ("Thirty-three states require absentee/mail ballots returned by mail to be received on or before Election Day."); *but see* Mem. 3, 13 ("nearly 30 States allow" otherwise). Regardless of the numbers (33 versus "nearly 30"), if so many of these States' self-imposed deadlines are innocuous, Plaintiffs cannot argue that uniformity across the nation to meet the same standard incorporated by those States would result in any harm. *See Chaplaincy*, 454 F.3d at 297.

This Court need not relitigate *Republican Nat'l Comm. v. Wetzel*, 120 F.4th 200 (5th Cir. 2024), as Plaintiffs would have it do, *see* Mem. 26–29, as the legality of a uniform federal election day is not in question here. In *Wetzel*, the Fifth Circuit held that a Mississippi statute permitting the receipt of absentee ballots for up to five days after the uniform federal election day was preempted by federal law fixing a uniform time for appointing presidential electors, 3 U.S.C. § 1 and 2 U.S.C. § 7. The President is entitled to adopt a policy reflecting his Administration's goal to faithfully execute federal law consistent with the holding of a federal circuit court. U.S. Const. art. II, § 3.

Because there has been no action on the Executive Order, and the Executive Order explicitly requires compliance with applicable law, EO § 11, Plaintiffs can offer only speculation on what harms *may* befall them. The Executive Order directs the Attorney General to enforce those statutes only "against *States*," EO § 7(a) (emphasis added), none of which are parties to these cases. Moreover, the exercise of prosecutorial discretion is not subject to judicial review. *See, e.g.*, *Citizens for Responsibility and Ethics in Washington*, 993 F.3d at 887–88; *Fokker Servs. B.V.*, 818 F.3d at 741; *supra* pp. 10-14. There is no case or controversy present for which a State could articulate a particularized harm.

a.    **The Party Organizations fail to demonstrate irreparable harm**

The "Party Organizations," Mem. *passim*, have not demonstrated the organizational harm required by *Newby* to satisfy a showing of irreparable harm.  An organization is harmed if (1) the "'actions taken by [the defendant] have 'perceptibly impaired' the organization's programs'"— the initial question being whether a defendant's conduct has made the organization's activities more difficult.  *Newby*, 838 F.3d at 8 (citation omitted).  If so—to ensure that organizations cannot engage in activities simply to create an injury—(2) "the organization must then also show that the defendant's actions 'directly conflict with the organization's mission.'"  *Id*. (citation omitted).  *Newby*'s test requires not an analysis of a hypothetical future action, but instead an evaluation of "actions" and "conduct" taken by "the defendant."  *Id*.  None of the *Defendants* here have taken any of the challenged actions.  Thus, this Court has no conduct or action to review, and no basis for determining that the Party Organizations have suffered any harm under *Newby*'s organizational standard.

For the same reason, Defendants' actions could not have "perceptibly impaired" Plaintiffs' organizational ability to carry out their missions.  *Id.*  And no Defendant's actions have caused a "direct[] conflict" with their mission or caused lost opportunities to conduct election-related activities.  *Id.*  The Federal Form has not been changed, maintaining the status quo.  The EAC's challenged future action is not in *direct conflict* with Plaintiffs' mission-driven activities, as incorporating DPOC would not prohibit voter registration.  And the Executive Order sections providing for a uniform national election day, again, not acted upon, will have no more effect on Party Organizations' mission than that of the more than 30 States already complying with federal law.  Where the challenged conduct affects an organization's activities but is neutral with respect to its substantive mission (*i.e.*, not "at loggerheads"), then it is

"entirely speculative" whether the challenged practice will actually impair the organization's activities. *Nat'l Fair Hous. All. v. Carson*, 330 F. Supp. 3d 14, 42 (D.D.C. 2018) (cleaned up).

This same reasoning also applies to the several other cases Plaintiffs cited in support, where challenges were made not to pending, theoretical, or hypothetical actions, but instead to current processes and existing statutes and rules being enforced. Mem. 36 (citing *League of Women Voters of Mo. v. Ashcroft*, 336 F. Supp. 3d 998, 1005 (W.D. Mo. 2018) for "collecting cases").[10] Among those collected cases is *Greater Birmingham Ministries v. State*, 161 F. Supp. 3d 1104, 1117 (N.D. Ala. 2016). But that case only proves Defendants' point. There, the plaintiffs claimed that Alabama's voter ID law forced them to "divert significant amounts of their scarce resources from their regular activities to protecting the rights of those affected voters." *Greater Birmingham Ministries,* 161 F. Supp. 3d at 1117. The State's voter ID law, which requires "some form of photo identification before casting a ballot," *id.* at 1107, had been implemented and enforced for more than a year prior to the plaintiffs' motion for preliminary injunction. Nonetheless, the district court concluded that the plaintiffs in that case failed to demonstrate irreparable injury because their supposed harms "amount[ed] to no more than a loss of money and time, which is generally not irreparable harm in the preliminary injunction

---

[10] *League of Women Voters of Mo. v. Ashcroft*, 336 F. Supp. 3d 998, 1002 (W.D. Mo. 2018) (challenge to "current processes"); *Ind. State Conf. of the NAACP v. Lawson*, 326 F. Supp. 3d 646, 658 (S.D. Ind. 2018) (challenge to existing state statute providing specific voter registration procedures); *Action NC v. Strach*, 216 F. Supp. 3d 597, 610 (M.D.N.C. 2016) (challenge to alleged failure to comply with existing statute's procedures (NVRA)); *Project Vote, Inc. v. Kemp*, 208 F. Supp. 3d 1320,1332 (N.D. Ga. 2016) (challenging alleged failure to comply with disclosure requirements of existing statute (NVRA)); *N.C. State Conf. of the NAACP v. N.C. State Bd. of Elections*, No. 16-cv-1274, 2016 WL 6581284 (M.D.N.C. Nov. 4, 2016) (challenging voter removal under NVRA); *League of Women Voters of Fla. v. Browning*, 863 F. Supp. 2d 1155, 1157 (N.D. Fla. 2012) (challenging state statute and rule that regulated organizations that conduct voter-registration drives); *Fla. State Conf. of Branches & Youth Units of the NAACP v. Byrd*, 680 F. Supp. 3d 1291, 1299 (N.D. Fla. 2023) (challenge to existing state statute with clear requirements and effective date of those requirements).

context." *Id.* Thus, the district court denied the plaintiffs' preliminary injunction motion. If the *Greater Birmingham Ministries* plaintiffs could not show irreparable harm in challenging an existing, implemented, and enforced voter ID law, the Party Organizations certainly cannot demonstrate irreparable harm stemming from an executive order which has not yet been implemented by agencies which have not yet acted. If the *Greater Birmingham* plaintiffs failed to show irreparable injury, so do the Plaintiffs in this case. Here, Plaintiffs' argument for irreparable injury is *even weaker*. Not only is their alleged injury mainly in the vein of a loss of "resources," Mem. 9, 16, but they also cannot even show that those injuries are likely or caused by the Executive Order. Unlike the Alabama law, the Executive Order *has not even begun to be implemented*.

And Plaintiffs' claims of harm stemming from the data-sharing provisions of the Executive Order, *see, e.g.*, Mem. 12, 19–20, are too speculative for this Court to entertain, and are too dependent on the action or inaction of third parties to meet the stringent irreparable harm. *See supra* pp. 9-20. And moreover, because directives to DHS reference "publicly available," EO § 2(b)(iii), information and available records that are already required by the NVRA, Plaintiffs cannot show that their speculative harm is imminent and derivative from the Executive Order. *See supra* pp. 25-28.

### b.    Any harm here would not be "beyond remediation"

The speculative harm feared by Plaintiff has not come to pass. Indeed, there has been *no action* and there is no harm, much less imminent harm. Necessarily, there is no harm that is "beyond remediation." *Chaplaincy*, 454 F.3d at 297. Final agency actions are reviewable in district court under the Administrative Procedure Act's general judicial review provision. *See* 5 U.S.C. § 704. Plaintiffs fear injury resulting from a *future* adverse administrative action, *e.g.*,

"*risk* of disenfranchisement" from a future DPOC requirement on the Federal Form, Mem. 36.
But that EAC action would be subject to further review under the APA and thus their speculative
harms are "redressable" because no action has been made and nothing has been implemented.
*Chaplaincy*, 454 F.3d at 298.  Plaintiffs therefore do not allege an irreparable harm.  *Id.*  It is "far
too speculative to warrant preliminary injunctive relief."  *Id.*

While Plaintiffs could argue that "complying with a regulation later held invalid almost
*always* produces the irreparable harm of nonrecoverable compliance costs," *Thunder Basin Coal
Co. v. Reich*, 510 U.S. 200, 220–21 (1994) (Scalia, J., Thomas, J., concurring in part) (emphasis
in original), that's just not the situation here.  In this case, there is no comparable regulation
because no action has been taken on the Executive Order.  *Cf. Newby*, 838 F.3d at 8–9 (finding
irreparable harm after the decision to change Federal Form had already occurred, and the change
already implemented).  Plaintiffs cannot complain that they have been forced to expend costs,
Mem. 9, 16, to comply with a non-existent regulation.  Nor have they adequately explained why
"present circumstances" warrant their preemptive diversion of resources to address a speculative
harm.  *Gilliard v. McWilliams*, 315 F. Supp. 3d 402, 417 (D.D.C. 2018).  And so Plaintiffs fail to
show that such expenditures "constitute such an extraordinary matter," *id.*, that can be resolved
with only an "extraordinary and drastic" remedy.  *Munaf*, 553 U.S. at 689–90.  That logic
therefore must also apply to anticipated expenditure of resources.

Moreover, in "fail[ing] to establish Article III standing because they have failed to
establish an injury in fact," *see supra*, "[P]laintiffs have not suffered the higher threshold of
'irreparable harm' that is required for a preliminary injunction."  *Nat'l Fair Hous. All. v. Carson*,
330 F. Supp. 3d 14, 63 (D.D.C. 2018) (citing *Newby*, 838 F.3d at 7).

For the foregoing reasons, Plaintiffs do not make a showing of irreparable harm, and the
Motion should be denied.  *See Chaplaincy*, 454 F.3d at 290; *see also Save Jobs USA v. U.S.
Dep't of Homeland Sec.*, 105 F. Supp. 3d 108, 112 (D.D.C. 2015) (denying preliminary
injunction because, *inter alia*, "[t]he court is left to speculate as to the magnitude of the
injury[.]").

### 3.   The Balance of Equities and Public Interest Favor Defendants

The balance of the equities and public interest weigh decidedly against injunctive relief.
These last two factors "merge when the Government is the opposing party."  *Nken v. Holder*, 556
U.S. 418, 435 (2009); *see also Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d
500, 511 (D.C. Cir. 2016).  A court analyzing the two factors together "must carefully balance
the equities by weighing the harm to the moving party and the public if there is no injunction
against the harm to the government and the public if there is."  *Hanson v. Dist. of Columbia*, 120
F.4th 223, 246 (D.C. Cir. 2024) (citing *Newby*, 838 F.3d at 12–14).

There is a "fundamental" public interest in "maintaining our constitutional Republic" by
ensuring that federal elections are "[f]ree, fair, and honest," and "unmarred by fraud, errors, or
suspicion."  EO § 1.  President Trump's Executive Order setting forth his Administration's
policy aims to satisfy that public interest by "achiev[ing] full compliance with the Federal laws
that set the uniform day for appointing Presidential electors and electing members of Congress."
EO § 7.  This is consistent with the "uniform Election Day" determination by the Fifth Circuit in
*Wetzel*, 120 F. 4th at 213, and the Administration accepts that ruling as the correct interpretation
of federal law, 2 U.S.C. § 7 and 3 U.S.C. § 1.  *See* EO § 1.  And it is supported by Supreme
Court precedent recognizing that "[c]onfidence in the integrity of our electoral processes is

essential to the functioning of our participatory democracy." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006).

Further, separation-of-powers concerns do not tip the scale of equities in Plaintiffs' favor because the Executive Order directs the agencies to act pursuant to the Executive Order "consistent with applicable law," EO § 11(b); *see supra* pp. 21-28.  This directive is reflected throughout the Executive Order with respect to the agencies and agency heads tasked with acting on the challenged provisions:  the EAC's actions must be "appropriate," EO § 2(a)(i) and consistent with applicable law, EO § 7(b); the Secretary of Homeland Security's actions must be "consistent with applicable law," EO §§ 2(b)(i), 2(c); the Secretary of State's actions must all be "lawful and appropriate," EO § 2(b)(ii); the Department of Homeland Security's actions are to be taken pursuant to federal statute (52 U.S.C. § 20507), "including through subpoena where necessary and authorized by law, for consistency with Federal requirements," EO § 2(b)(iii); and federal voter registration executive department or agency heads acting pursuant to EO § 2(d) must act consistently with applicable law, EO § 11(b), in consideration of the Executive Order's provision that nothing in the Executive Order "shall be construed to impair or otherwise affect . . . the authority granted by law to an executive department or agency, or the head thereof."  EO § 11(a)(i).

An injunction would also restrain the President from overseeing the Executive Branch, and would restrain both the President and his chosen, Senate-confirmed Attorney General from opining on legal issues.  EO § 7(a); Mem. 45.  This would harm the public interest, given the American people's decision to elect President Trump, and the Framers' decision to vest all of "[t]he executive Power" in the President and entrust him with the sole constitutional responsibility to "take Care that the Laws be faithfully executed."  U.S. Const. art. II, § 1, cl. 1;

38

*id.* § 3.  The Executive Order is part of the President's effort to ensure compliance with federal laws that protect Americans' voting rights and guard against dilution by illegal voting, discrimination, fraud, and other forms of malfeasance and error.  *See, e.g.*, EO § 1.

Comparatively, Plaintiffs' interest is minimal, because they seek to prevent putative harm based on speculation about a series of future contingencies.  The balance of harms and the public interest weigh in favor of denying Plaintiffs' request for extraordinary injunctive relief when they have alleged hypothetical harm.  And their *ultra vires* claims suffer the flaw of running headlong into the presumption of regularity, appropriately considered here where the Executive Order repeatedly prescribes that its directives will be carried out "consistent with applicable law" and other statutes.  *See, e.g.*, EO § 11; *see also supra* pp. 9-20.

### C.  Plaintiffs' Claims Lack Prudential Ripeness Necessary for Judicial Review

Even if this Court finds that Plaintiffs have standing, their request for preliminary injunctive relief should be rejected as prudentially unripe without reaching the merits.  *Church v. Biden*, 573 F. Supp. 3d 118, 135 (D.D.C. 2021) ("Even if a case is constitutionally ripe" under Article III standing, "there may still be prudential reasons for refusing to exercise jurisdiction.") (cleaned up).  "The ripeness doctrine requires that the federal courts reserve judicial power for resolution of concrete and fully crystalized disputes."  *In re Al-Nashiri*, 47 F.4th 820, 826 (D.C. Cir. 2022) (cleaned up).  This principle "prevent[s] the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements."  *Nat'l Park Hosp. Ass'n v. Dep't of the Interior*, 538 U.S. 803, 807 (2003) (quotation marks omitted).  To determine whether a claim satisfies prudential ripeness, courts consider: (1) the "fitness of the issues for judicial decision"; and (2) the "extent to which withholding a decision will cause hardship to the parties.'"  *Church*, 573 F. Supp. 3d at 135 (quoting *Am. Petroleum Inst. v. E.P.A.*, 683 F.3d 382, 387 (D.C. Cir. 2012)).  Assessing whether an issue is "fit" for adjudication requires courts to

consider whether the issue "is purely legal, whether consideration of the issue would benefit from a more concrete setting, and whether the agency's action is sufficiently final." *Id.* (citation omitted).

### 1. EO § 2(a)

Plaintiffs fail to establish the first prong for prudential ripeness because no concrete legal dispute fit for adjudication exists here.  At the outset, EO § 2(a) states that the EAC "shall take appropriate action" to require documentary proof of citizenship in the Federal Form within 30 days of the Executive Order.  *See* Ex. 1, Schletz Decl. (describing process); EO § 2(a).  The Executive Order's direction that the EAC's action be "appropriate" underscores the President's intention that said action be conducted lawfully and in accordance with the agency's regular rulemaking procedures set forth by statute.  As mentioned earlier, the "presumption of regularity," which requires courts to presume that public officers have "properly discharged their official duties" absent evidence to the contrary, supports this reading of EO § 2(a).  *Chem. Found.*, 272 U.S. at 14–15; *see also Am. Fed'n of Gov't Emps., AFL-CIO*, 870 F.2d at 727; *see also supra* pp. 9-20.

Under that presumption, EO § 2(a) will be implemented according to its own statutes under HAVA, NVRA, the APA, and the PRA.  But, importantly, as of the date of this filing, many steps in the process to change a form have not been completed.  Ex. 1, Schletz Decl. (describing process).  The EAC needs to prepare a proposed, updated regulation and approve it by a vote of at least three Commissioners.  *Id.* ¶ 2-3; *see also* 52 U.S.C. § 20928.  There are a number of additional steps that need to be completed after the regulation has received approval, such as going through the APA's required notice-and-comment process for rulemaking and consulting with chief election officers for the states.  *Id.* ¶ 4–5; *see also* 5 U.S.C. § 553; 52

U.S.C. § 20508(a)(1)-(2).  Three Commissioners would need to approve the issuance of the new form.  *Id.* ¶ 6; *see also* 52 U.S.C. § 20928.  And finally, the new form must be submitted as an information collection to the Director of the Office of Management and Budget for approval.  *Id.* ¶ 7.

In sum, EO § 2(a) has not yet led to any changes to the Federal Form or any other substantive measures affecting voter registration, nor is there any indication that any such changes are imminent.  As such, "this is plainly a case in which further development of the factual record is required" to determine whether Plaintiffs are entitled to relief for the harm they allege.  *Church*, 573 F. Supp. 3d at 136.  "The absence of any factual record" forming the basis for any violation of HAVA, NVRA, APA, or PRA "hamstrings the Court's ability to evaluate the merits of the Complaint's constitutional and statutory claims."  *Id.*

Given that the EAC has not yet taken any final agency action violative of its statutory requirements, Plaintiffs likewise fail to show that "delayed judicial review would cause them 'immediate and significant' hardship" to satisfy the second prong for prudential ripeness.  *Id.* (citing *Finca Santa Elena, Inc. v. U.S. Army Corps of Eng'rs*, 873 F. Supp. 2d 363, 371 (D.D.C. 2012)).  Premature adjudication of the EAC's actions in the way Plaintiffs desire "denies the agency an opportunity to . . . apply its expertise" in implementing the DPOC requirement consistent with its regular rulemaking procedures.  *See Finca Santa Elena, Inc.*, 873 F. Supp. 2d at 369 (citation omitted).

Although Plaintiffs rely heavily on *Newby*, factual distinctions between the two cases show just how unripe the present circumstances are.  In *Newby*, the EAC's executive director— not the Commission itself—approved three States' requests to add a DPOC requirement to their state-specific instructions.  838 F.3d at 6.  Three days after his approval, the modified version of

the state-specific instructions went into effect and the revised Federal Form was posted on the EAC's website. *League of Women Voters of the United States v. Newby*, 195 F. Supp. 3d 80, 83 (D.D.C.), *rev'd sub nom. League of Women Voters of United States v. Newby*, 671 F. App'x 820 (D.C. Cir. 2016), and *rev'd sub nom. League of Women Voters of United States v. Newby*, 838 F.3d 1 (D.C. Cir. 2016). Plaintiffs correctly note that it was unclear whether two of the states were enforcing their proof-of-citizenship laws. But unlike in the present context, the executive director took a unilateral action contrary to statutory procedures, resulting in an evident change, and thus was ripe for the court's review. No such actions have occurred in the present context. For these reasons, and for those reasons set forth further *supra* pp. 28-33 on irreparable harm, Plaintiffs' challenge to EO § 2(a) is not ripe for adjudication.

## 2. EO §§ 2(b), 2(d), 7(a), and 7(b)

Plaintiffs' claims challenging EO §§ 2(b), 2(d), 7(a), and 7(b) are similarly unripe. These sections of the Executive Order direct several agencies and agency heads to take appropriate action to ensure necessary safeguards for American elections by enforcing the law as it currently exists. Under the presumption of regularity, *see supra* p. 13, courts should presume that both the President and these agency heads will carry out these duties lawfully absent evidence to the contrary. And like the Executive Order's direction to the EAC, Plaintiffs cannot point to a single action taken by these agencies and agency heads to refute that presumption. The factual record is underdeveloped, and there is no justiciable claim for this Court to review.

Even further, challenges to intra-governmental directives are not ripe where such directives alone do not prescribe conduct but rather allow some agency discretion on how to best effectuate the directive. *Nat'l Park*, 538 U.S. at 810; *see also Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 737 (1998); *Reno v. Catholic Social Servs.*, 509 U.S. 43, 58–61 (1993). In

other words, the Executive Order does not give rise to a justiciable claim because it is "too speculative" whether the actions Plaintiffs predict will ever need solving. *Texas v. United States*, 523 U.S. 296, 302 (1998). When no one has taken *any* action at all, Plaintiffs are improperly asking this Court to engage in guesswork. The Court should find these claims unripe for adjudication.

### D.  Plaintiffs' Requested Relief is Not Narrowly Tailored to the Harm Alleged

Plaintiffs claim to seek only to maintain the status quo in their request for injunctive relief. Mem. 44 (citing *Sherley v. Sebelius*, 689 F.3d 776, 781–82 (D.C. Cir. 2012)). However, the scope of their requested relief is overly broad, based on harms that are speculative at best, and unnecessarily obstructive of the statutory duties Defendants are obligated to perform.

Plaintiffs' proposed remedies are each overly burdensome. In seeking to enjoin EO § 2(a), Plaintiffs seek to stop modifications to a single form that is used nationwide. *See* 52 U.S.C. § 20505(a)(1) (requiring "Each State" to "accept and use" the Federal Form). Because any such injunction would have nationwide effect, it would for all practical purposes be a nationwide injunction. But the only time-sensitive reason Plaintiffs give for requesting a preliminary injunction is that Arizona has an upcoming special election. Mem. 39–40. Therefore, in the unlikely event that this Court finds Plaintiffs have standing and are entitled to a preliminary injunction, Defendants respectfully submit that the injunction should be limited to only Arizona. For example, this Court might order that if the EAC does modify the form prior to the upcoming voter registration deadline for Arizona's special primary election, that it shall include an instruction in the state instructions for Arizona to the effect that Arizona registrants need not submit documentary proof of citizenship. *See* National Mail Voter Registration Form, https://www.eac.gov/sites/default/files/eac_assets/1/6/Federal_Voter_Registration_ENG.pdf (state instructions begin at page 3). A more limited order would be both within this Court's

discretion and judgment, and in keeping with concerns raised by current Supreme Court justices about the Constitutional validity of nationwide injunctions. *See, e.g. Labrador v. Poe by and through Poe*, 144 S.Ct. 921 (2024) (Mem.) (J. Gorsuch, concurring) (noting that preliminary injunctions ordinarily "may go no further than necessary to provide interim relief to the parties"); *Trump v. Hawaii*, 585 U.S. 667, 713-21 (2018) (J. Thomas, concurring) (questioning in detail district court's Constitutional authority to enter "universal" or "nationwide" injunctions and concluding that "universal injunctions are legally and historically dubious. If federal courts continue to issue them, this Court is dutybound to adjudicate their authority to do so.").

Plaintiffs' requested relief as to EO § 2(b)(i) against DHS and DHS Secretary Noem; EO § 2(b)(ii) against DOS and Secretary Rubio; as to EO § 2(b)(iii) against DHS, Secretary Noem, DOGE, and Administrator Gleason; and as to EO § 2(d) over federal voter registration executive department or agency heads are overly burdensome to agency heads carrying out existing statutory obligations and procedures. *See supra* pp. 23-25 on EO § 2(b)'s merits. They do not seek to maintain the status quo because, as noted above, the President's challenged directives are consistent with their existing statutory duties. Should this Court enter injunctive relief as to EO § 2(b), Defendants respectfully submit that it should be limited to allow for existing inter-agency coordination regarding data sharing authorized by statute be allowed to proceed. Such relief would indeed preserve the status quo. As for EO § 2(d)'s directive to certain agencies to "assess citizenship," this instruction is currently undefined and thus too uncertain to determine foreseeable harm. Without additional guidance that may be provided as to the Executive Order's implementation, relief sought against these agencies and agency heads is improper. Further, relief that would enjoin the implementation of EO § 7(a) against DOJ and Attorney General Pamela Bondi is not appropriately tailored because the President's direction in EO § 7(a) was

lawful exercise of executive authority.  *See supra* p. 25 on EO § 7(a)'s merits.  Lastly, should

action be taken by the EAC regarding EO § 7(b)'s directive for ballot receipt deadlines, a

separate lawsuit challenging its application to a specific State's ballot receipt deadline would be

the appropriate avenue to confront that issue.

### E.  The Court Must Require a Bond if it Issues a Preliminary Injunction

"The court may issue a preliminary injunction . . . only if the movant gives security in an

amount that the court considers proper to pay the costs and damages sustained by any party

found to have been wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c).  District courts

have "broad discretion . . . to determine the appropriate amount of an injunction bond."  *DSE,*

*Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999).  Accordingly, Defendants request that

this Court require a bond if it grants a preliminary injunction.

## V.    CONCLUSION

For these reasons, Defendants respectfully request that this Court deny Plaintiffs' Motion

for Preliminary Injunction.

Date: April 14, 2025                    Respectfully Submitted,


                                        HARMEET K. DHILLON
                                        Assistant Attorney General
                                        Civil Rights Division

                                        /s/__*Michael E. Gates*_____
                                        MICHAEL E. GATES
                                        (CA Bar No. 258446)
                                        Deputy Assistant Attorney General
                                        Civil Rights Division
                                        United States Department of Justice
                                        950 Constitution Avenue, NW
                                        Room 5744
                                        Washington, DC 20530
                                        Telephone: (202) 616-3790
                                        E-mail:
                                        Michael.Gates2@usdoj.gov

ANDREW M. DARLINGTON
(FL Bar No. 1018895)
Counsel
Civil Rights Division
United States Department of Justice
950 Constitution Avenue, NW
Washington, DC 20530

R. TAMAR HAGLER
Chief, Voting Section
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Ave. NW
Washington, D.C. 20530
Phone: (202) 305-5451
Fax: (202) 307-3961
E-mail:  Tamar.Hagler@usdoj.gov

*Attorneys for all Defendants*

46