**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> EXECUTIVE OFFICE OF THE PRESIDENT, *et al.*, <br><br> Defendants. | Case No. 1:25-cv-00946-CKK |
| DEMOCRATIC NATIONAL COMMITTEE, *et al,*, <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*, <br><br> Defendants. | Case No. 1:25-cv-00952-CKK |
| LEAGUE OF WOMEN VOTERS EDUCATION FUND, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*, <br><br> Defendants. | Case No. 1:25-cv-00955-CKK |

**[PROPOSED] BRIEF OF BIPARTISAN FORMER STATE SECRETARIES OF STATE
AS AMICI CURIAE IN SUPPORT OF LEAGUE AND LULAC PLAINTIFFS'
<u>JOINT MOTION FOR PRELIMINARY INJUNCTION (ECF No. 34)</u>**

# TABLE OF CONTENTS

**INTEREST OF AMICI** .................................................................................................................. 1

**INTRODUCTION** ........................................................................................................................ 3

**ARGUMENT** ................................................................................................................................ 4

    I.     The Constitution ensures that states play an irreplaceable and primary role in election regulation and administration. ........................................................................................ 5

        A.    The states' role in regulating and administering elections is constitutionally mandated. .................................................................................................................... 5

        B.    The Constitution reflects an intentional choice to prioritize the states' accountability to voters.................................................................................................................... 6

        C.    Because state officials are responsible for enacting and executing election laws, their election expertise surpasses that of the President. ............................................... 7

    II.    The President has no standalone power to regulate or administer elections................. 8

    III.   The Executive Order violates federalism and the separation of powers by infringing on the Elections and Electors Clauses. ................................................................................ 9

**CONCLUSION** ........................................................................................................................ 14

# **TABLE OF AUTHORITIES**

**Cases**

*Am. C.R. Union v. Philadelphia City Commissioners*,
   872 F.3d 175 (3d Cir. 2017) .................................................................................................. 13

*Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*,
   576 U.S. 787 (2015) ................................................................................................................ 3

*Ariz. v. Inter Tribal Council of Ariz., Inc.*,
   570 U.S. 1 (2013) ............................................................................................... 5, 6, 7, 11, 12

*Ass'n of Cmty. Orgs. for Reform Now (ACORN) v. Edgar*,
   56 F.3d 791 (7th Cir. 1995) .................................................................................................... 6

*Bellitto v. Snipes*,
   935 F.3d 1192 (11th Cir. 2019) ............................................................................................ 13

*Bond v. United States*,
   564 U.S. 211 (2011) ................................................................................................................ 8

*Bush v. Gore*,
   531 U.S. 98 (2000) .................................................................................................................. 7

*Clinton v. City of New York*,
   524 U.S. 417 (1998) .............................................................................................................. 10

*Colorado v. DeJoy*,
   No. 20-CV-2768, 2020 WL 5513567 (D. Colo. Sept. 14, 2020) ............................................. 9

*Georgia v. Clark*,
   119 F.4th 1304 (11th Cir. 2024) ............................................................................................. 8

*Georgia v. Meadows*,
   692 F. Supp. 3d 1310 (N.D. Ga. 2023) ................................................................................... 8

*Gonzalez v. Arizona*,
   677 F.3d 383 (9th Cir. 2012) .................................................................................................. 6

*Gregory v. Ashcroft*,
   501 U.S. 452 (1991) .............................................................................................................. 10

*Harkless v. Brunner*,
   545 F.3d 445 (6th Cir. 2008) .................................................................................................. 6

*League of Women Voters of U.S. v. Newby*,
   838 F.3d 1 (D.C. Cir. 2016) .................................................................................................. 12

*Libertarian Party of Va. v. Alcorn*,
   826 F.3d 708 (4th Cir. 2016) .................................................................................................. 6

*Moore v. Harper*,
   600 U.S. 1 (2023) ..................................................................................................................... 6

*Patchak v. Zinke*,
   583 U.S. 244 (2018) ............................................................................................................... 15

*Roudebush v. Hartke*,
   405 U.S. 15 (1972) ................................................................................................................... 8

*Sandusky Cnty. Democratic Party v. Blackwell*,
   387 F.3d 565 (6th Cir. 2004) .................................................................................................. 12

*Smiley v. Holm*,
   285 U.S. 355 (1932) ................................................................................................................. 5

*State v. Meadows*,
   88 F.4th 1331 (11th Cir. 2023) .......................................................................................... 8, 11

*Storer v. Brown*,
   415 U.S. 724 (1974) ................................................................................................................. 7

*U.S. Term Limits, Inc. v. Thornton*,
   514 U.S. 779 (1995) ................................................................................................................. 5

*U.S. v. Gradwell*,
   243 U.S. 476 (1917) ............................................................................................................. 6, 7

*Youngstown Sheet & Tube Co. v. Sawyer*,
   343 U.S. 579 (1952) ............................................................................................................... 11

**Statutes**

52 U.S.C. § 20507 ........................................................................................................................ 13

52 U.S.C. § 20508 ................................................................................................................. 11, 12

52 U.S.C. § 20962 ........................................................................................................................ 14

52 U.S.C. § 21083 ........................................................................................................................ 13

**Constitutional Provisions**

U.S. Const. art. I, § 4, cl. 1 ............................................................................................................ 5

U.S. Const. art. II, § 1 ................................................................................................................... 5

**Other Authorities**

3 Records of the Federal Convention of 1787 (M. Farrand ed. 1911) .......................................... 7

Lisa Marshall Manheim, *Presidential Control of Elections*, 74 Vand. L. Rev. 385 (2021) ......... 11

Mitch McConnell, *Trump Gives Democrats a Voting Gift*, Wall Street Journal (Apr. 7, 2025) ... 9, 12

Patrick Marley and Yvonne Wingett Sanchez, *Trump's order could force states to buy costly new voting machines*, Wash. Post (April 13, 2025) .................................................................. 13, 14

Presidential Statement on Signing the National Voter Registration Act of 1993 (May 20, 1993) ................................................................................................................... 12

The Federalist No. 47 (C. Rossiter ed. 1961) ............................................................................... 15

The Federalist No. 59 (C. Rossiter ed. 1961) ................................................................................. 7

U.S. Dep't of Just., Just. Manual § 9-85.300 (2022) ..................................................................... 8

**INTEREST OF AMICI**

Amici are a bipartisan group of former state secretaries of state.[1] As the former chief election administrators in their respective states, they are uniquely familiar with states' crucial role in regulating and administering federal elections. And although Amici may not always have agreed about what constitute the best election policies, Amici nonetheless share a common commitment to ensuring that elections are free and fair, and Amici are unified in their understanding of states' pivotal role in enacting and executing election laws, as set forth in the U.S. Constitution. Amici are:

- **Former Secretaries of the Commonwealth of Pennsylvania** – the Secretary of the Commonwealth is the chief state election official in Pennsylvania and leads the Pennsylvania Department of State. The Department of State is responsible for ensuring the security, integrity, and accessibility of the electoral process in Pennsylvania, by overseeing free, fair, and accurate elections.

    o **Kathy Boockvar** served as the Secretary of the Commonwealth from 2019 until 2021, and before that as Senior Advisor on election security to Governor Tom Wolf. Boockvar was also co-chair of the National Association of Secretaries of State (NASS)'s Elections Committee from 2019-2020, and a NASS Representative on the Election Infrastructure Subsector Government Coordinating Council (EIS-GCC), a collaboration among federal, state, and local officials. During her tenure, Boockvar co-chaired Pennsylvania's Inter-Agency Election Security and Preparedness Workgroup, strengthened election security and voting rights measures across the state, and oversaw secure and accessible elections amidst a global pandemic, marked by unparalleled transparency and voter participation. In prior years, Boockvar served as a poll worker and as a voting-rights attorney for a national civil rights organization and has been dedicated to public service throughout her career.

    o **Leigh M. Chapman** served as the acting Secretary of the Commonwealth from January 2022 until January 2023. Chapman also previously held the position of Policy Director for the Pennsylvania Department of State, from July 2015 until May 2017. In that role, Chapman managed the Department's policy and regulatory development process in coordination with the Governor's Office of Policy, including in the elections program area. Chapman also has served as the

---

[1] Amici state that no counsel for a party has authored this brief in whole or in part and that no person or entity, other than Amici or their counsel, has made a monetary contribution to the preparation or submission of this brief.

1

      Executive Director for Deliver My Vote, the Voting Rights Program Director at The Leadership Conference on Civil and Human Rights, as a Senior Policy Advisor at Let America Vote, and as a Staff Attorney at the Advancement Project in the Voter Protection Program.

- **Former Secretary of State for the State of Colorado** – The Colorado Secretary of State is an elected member of the Executive Branch of Colorado's state government. The Secretary of State serves as the chief executive of an office that oversees and administers many laws, including the Colorado Election Code, Voter Registration Law, and Campaign Finance Laws. As a result, the Secretary of State supervises elections, maintains the statewide voter registration file, and verifies initiative petition signatures.
    - **Mary Estill Buchanan** was a public servant in Colorado for many years and a tireless advocate for democracy and women in public service. Most relevant here, Buchanan served two terms as Colorado's Secretary of State—from 1974 to 1983—as a Republican. She was the first woman to hold that office in the State's then-98-year existence. During her tenure as Colorado's Secretary of State, Buchanan was the only Republican in statewide office, working across the aisle to ensure efficient, effective administration of Colorado's elections. As Secretary, Buchanan advocated for and implemented reforms to improve transparency for elections and public office. Before being elected Secretary of State, Buchanan served on the Colorado Board of Agriculture and the Colorado Commission on the Status of Women, for which she created and served as chair for the Women in Government Committee to recruit and elect women to serve in public office.
- **Former Secretary of State for the State of Minnesota** – The Secretary of State of Minnesota is an elected constitutional officer serving in the State's Executive Branch. One of the office's primary responsibilities is overseeing statewide elections and operating the statewide voter registration system.
    - **Joan Anderson Growe** served first in the Minnesota House of Representatives before being elected as Minnesota Secretary of State as a Democrat. When she was elected Minnesota Secretary of State, Growe became the first woman to be elected to a Minnesota statewide office without having been appointed first. During her six-term tenure, Growe was tireless in her advocacy of voter participation, and, for most of her tenure, Minnesota led the nation in voter turnout. In addition to her work as Secretary of State, Growe also has served as an international election observer in Romania, South Africa, and Azerbaijan and as a member of the advisory committee for the Hubert H. Humphrey Institute of Public Affairs at the University of Minnesota.

2

## INTRODUCTION

Amici—a bipartisan group of former secretaries of state—faithfully oversaw elections across the "laboratories" of electoral democracy: the states. *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 817 (2015). In their roles, Amici witnessed firsthand the Framers' wisdom in giving states' authority to enact election laws and administer elections, as set forth in the Elections Clause and Electors Clause of the U.S. Constitution. That is because, as the Supreme Court recognized in reaffirming the states' role under the Elections Clause, "[d]eference to state lawmaking allows local policies more sensitive to the diverse needs of a heterogeneous society, permits innovation and experimentation, enables greater citizen involvement in democratic processes, and makes government more responsive by putting the States in competition for a mobile citizenry." *Id.* at 817 (cleaned up).

The March 25, 2025, Executive Order—"Preserving and Protecting the Integrity of American Elections" (the "Executive Order")—seeks to upend this constitutional order by using *mandatory* language to (purportedly) *require*: unilaterally adding new requirements to the federal voter registration form; federalizing some voter roll list maintenance; requiring the review and potential decertification of certain voting systems; and prohibiting states from processing absentee and mail-in ballots received after Election Day. Contrary to the federalism and separation of powers principles codified in the Constitution's Elections and Electors Clauses, the Executive Order would unilaterally coronate *the President* as the country's chief election policymaker and administrator. To Amici's successors and every state legislator in the country, the Executive Order therefore represents an existential threat. Unless it enjoins enforcement of the Executive Order, the Court would not just permit the President and Executive Branch to immediately usurp the authority of lawmakers and officials constitutionally responsible for

3

making and enforcing election policy, it also would write any President a blank check to further arrogate to themselves powers that the Constitution explicitly reserves for the states and Congress.

## ARGUMENT

When Amici served in their roles, they were links in a chain of election administrators reaching back centuries to the enactment of the Constitution itself. In all aspects of their work, Amici respected and incorporated a deep historical understanding of the states' crucial role in enacting and enforcing election laws. Drawing from this experience, Amici have no doubt that the Executive Order is unconstitutional.

*First*, under the Elections and Electors Clauses, states play an irreplaceable role in election regulation and administration. Recognizing this, the Supreme Court has held the U.S. Constitution permits only the states and Congress to regulate the time, places, and manner of federal elections, the qualifications for voter registration, and the manner of appointing presidential electors.

*Second*, caselaw reaffirms that the President plays no standalone role in regulating elections.

*Third*, to the extent the Executive Order attempts to draw power from federal laws enacted by Congress, none of the laws at issue have displaced states' traditional role in elections—indeed those laws explicitly reserve powers for states that the Executive Order disregards.

At bottom, the Executive Order intrudes on the states' and Congress's powers and attempts to seize for the Executive Branch power that it does not and cannot exercise.

I. **The Constitution ensures that states play an irreplaceable and primary role in election regulation and administration.**

A. **The states' role in regulating and administering elections is constitutionally mandated.**

The Constitution explicitly gives states the responsibility to enact election laws and administer elections. The Elections Clause provides: "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed *in each State by the Legislature thereof*; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators." U.S. Const. art. I, § 4, cl. 1 (emphasis added). Similarly, the Electors Clause states: "Each state shall appoint, in such Manner as the *Legislature thereof may direct*, a Number of Electors, equal to the whole Number of Senators and Representatives to which the State may be entitled in the Congress." U.S. Const. art. II, § 1 (emphasis added).[2]

These provisions endow the states with expansive authority to enact election laws, subject only to the rest of the Constitution and preemption by Congress. The Elections Clause's "substantive scope is broad. 'Times, Places, and Manner,' . . . are '*comprehensive* words,' which 'embrace authority to provide a *complete* code for congressional elections. . . .'" *Ariz. v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 8-9 (2013) ("ITCA") (quoting *Smiley v. Holm*, 285 U.S. 355, 366 (1932)) (emphasis added). The Elections Clause therefore "has two functions. [1] Upon the States it imposes the duty ('shall be prescribed') to prescribe the time, place, and manner of electing Representatives and Senators; [2] upon Congress it confers the power to alter those regulations or supplant them altogether." *Id.* at 8 (citing *U.S. Term Limits*, 514 U.S. at 804-05);

---

[2] A state's "duty" under the Elections Clause "parallels the duty" described in the Electors Clause. *U.S. Term Limits, Inc. v. Thornton,* 514 U.S. 779, 804-05 (1995).

5

*see also Moore v. Harper*, 600 U.S. 1, 29 (2023) (States hold a "constitutional duty to craft the rules governing federal elections.").

In addition to giving the states and Congress the power to regulate elections, it is indisputable that, under the current regime enacted pursuant to the Elections and Electors Clauses, states are responsible for administering federal elections. The Elections Clause "places the burden of administering federal elections on the states." *Ass'n of Cmty. Orgs. for Reform Now (ACORN) v. Edgar*, 56 F.3d 791, 796 (7th Cir. 1995); *Harkless v. Brunner*, 545 F.3d 445, 454 (6th Cir. 2008); *accord Gonzalez v. Arizona*, 677 F.3d 383, 391 (9th Cir. 2012) ("[A] state's role in the creation and implementation of federal election procedures . . . is to administer the elections through its own procedures . . . .") *aff'd sub nom. ITCA*, 570 U.S. 1; *ITCA*, 570 U.S. at 41 (Alito, J., dissenting) (The Elections Clause "reserve[es] to the States default responsibility for administering federal elections . . . .").

In sum, it is "clearly established" that the Constitution "leave[s] the conduct of [federal elections] to state laws, administered by state officers," and separately Congress may also "assume[] to regulate such elections . . . by positive and clear statutes." *U.S. v. Gradwell*, 243 U.S. 476, 485 (1917).

### B. The Constitution reflects an intentional choice to prioritize the states' accountability to voters.

The Elections Clause reflects the Framers' view that states are well situated to regulate and administer federal elections, subject to Congressional preemption. That is because of state officials' accountability and proximity to local needs. "All other things being equal, it is generally better for states to administer elections. . . . [L]ocal administration . . . allows for greater individual input and accountability; a distant bureaucracy is in danger of appearing out of reach and out of touch." *Libertarian Party of Va. v. Alcorn*, 826 F.3d 708, 715-16 (4th Cir. 2016)

6

(Wilkinson, J.). As James Madison explained, "[i]t was found necessary to leave the regulation of [federal elections], in the first place, to the state governments, as being best acquainted with the situation of the people." 3 Records of the Federal Convention of 1787, p. 312 (M. Farrand ed. 1911); *Gradwell*, 243 U.S. at 484; *ITCA*, 570 U.S. at 41 (Alito, J., dissenting). Indeed, even ardent federalist Alexander Hamilton conceded that, because the states are closer to the people, state regulation of federal elections is "in ordinary cases . . . both more convenient and more satisfactory." The Federalist No. 59, p. 360 (C. Rossiter ed. 1961) (A. Hamilton); *accord Gradwell*, 243 U.S. at 485; *ITCA*, 570 U.S. at 41 (Alito, J., dissenting). Of course, Madison and Hamilton also agreed that under the Elections Clause, Congress—*but not the President*—was a necessary check on potential abuses by state legislatures. *See Gradwell*, 243 U.S. at 484-85.

### C. Because state officials are responsible for enacting and executing election laws, their election expertise surpasses that of the President.

In practice, the Elections Clause creates a regime in which state officials like Amici possess unique expertise in local election procedures that the Federal Government and in particular the President simply does not have. "[T]here must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Storer v. Brown*, 415 U.S. 724, 730 (1974). As a result, states have "comprehensive, and in many respects complex, election codes regulating in most substantial ways, with respect to both federal and state elections, the time, place, and manner of holding primary and general elections, the registration and qualifications of voters, and the selection and qualification of candidates." *Id.* In turn, it is state and local officials like Amici—*i.e.*, those charged with developing and operationalizing those comprehensive election codes—who possess the "expertise" necessary to implement such a complex system. *Bush v. Gore*, 531 U.S. 98, 109 (2000).

7

**II.      The President has no standalone power to regulate or administer elections.**

"The Constitution empowers *only* the states and Congress to 'regulate the conduct of [federal] elections.'" *State v. Meadows*, 88 F.4th 1331, 1346 (11th Cir. 2023) (emphasis added), *cert. denied*, 145 S. Ct. 545 (2024) (quoting *Roudebush v. Hartke*, 405 U.S. 15, 24 (1972)). As a result, because the "Constitution clearly grants the States the power to manage elections under the Elections Clause[,]" the Executive Branch cannot declare, on its own initiative, "power to involve itself in States' election procedures[.]" *Georgia v. Meadows*, 692 F. Supp. 3d 1310, 1327-28 (N.D. Ga. 2023) (quoting *Bond v. United States*, 564 U.S. 211, 221 (2011)).

The Executive Branch does not, because it cannot, have constitutional authority to exercise—let alone usurp—the states' and Congress's Constitutionally delegated power to regulate and administer elections. Rather, federal courts have consistently found that "neither the Constitution, nor statutory law, nor precedent" support a broad authority to "superintend the states' administration of elections." *Meadows*, 88 F.4th at 1346. Indeed, Executive Branch officials have themselves "long recognized that the States – *not the federal government* – are responsible for administering elections, determining the validity of votes, and tabulating the results, with challenges handled by the appropriate election administrators, officials, legislatures, and courts." U.S. Dep't of Just., Just. Manual § 9-85.300 (2022) (emphasis added); *accord Georgia v. Clark*, 119 F.4th 1304, 1315 (11th Cir. 2024) (Rosenbaum, J., concurring). Or as Senator Mitch McConnell bluntly stated in a recent article: "[D]elegation of authority over

8

election administration is crystal clear. Elections may have national consequences but the power to conduct them rests in state capitols."[3]

To the extent Executive Branch *agencies or commissions* play any role in the states' administration of elections, their authority to do so is strictly limited to the parameters set by Congress under the Elections Clause. *See Colorado v. DeJoy*, No. 20-CV-2768, 2020 WL 5513567, at *2 (D. Colo. Sept. 14, 2020) ("Although the Constitution allows Congress to override a State's authority regarding its elections, it does not extend the same authority to the Postal Service – an agency of the federal executive branch"). When a similar conflict of authority arose in *Colorado v. DeJoy*, concerning whether a federal executive official of the Postal Service could implement policy that would intrude on the state's power to administer its election, the court enjoined the policy because if found no caselaw that "would permit this constitutional authority, specifically delegated to Congress, to be massively enlarged so as to cloak [a federal agency] and its agents with the power over-ride the election functions of a state sovereign." *Id.* The Executive Order at issue here attempts to do exactly this, epitomizing unconstitutional executive overreach of the highest and most alarming degree.

### III.     The Executive Order violates federalism and the separation of powers by infringing on the Elections and Electors Clauses.

Irrespective of Amici's views about the policy decisions reflected in the Executive Order, Amici all agree that the Executive Order violates the Constitution, and its implementation would represent a cataclysmic sea change in election administration. "Perhaps the principal benefit of the federalist system is a check on abuses of government. 'The constitutionally mandated balance of power between the States and the Federal Government was adopted by the Framers to ensure

---

[3] Mitch McConnell, *Trump Gives Democrats a Voting Gift*, Wall Street Journal (Apr. 7, 2025), https://archive.ph/30TWq.

the protection of our fundamental liberties.'" *Gregory v. Ashcroft*, 501 U.S. 452, 458 (1991) (citation omitted). "Just as the separation and independence of the coordinate branches of the Federal Government serve to prevent the accumulation of excessive power in any one branch, a healthy balance of power between the States and the Federal Government will reduce the risk of tyranny and abuse from either front." *Id.*

The Executive Order represents the Executive Branch mounting a direct assault on these principles by claiming for the President powers reserved for the states and Congress under the Elections and Electors Clauses. Put differently, "by increasing the power of the President beyond what the Framers envisioned," the Executive Order "compromises the political liberty of our citizens, liberty which the separation of powers seeks to secure." *Clinton v. City of New York*, 524 U.S. 417, 452 (1998) (Kennedy J., concurring). Amici are particularly sensitive to the risks inherent in the Executive Order's reallocation of power over elections. Election administration is already intricate and demanding; it requires an enormous amount of manpower and careful coordination, with preparation beginning months if not years in advance. Allowing the President to change election rules and procedures on that one single person's whim whenever they see fit, without any input from the election administrators charged with executing those rules and without the checks and balances provided by Congress, would be equivalent to dropping an anvil onto the carefully balanced scales of justice.

Fortunately, the law clearly shows that the president has no such authority. To start, the Executive Order purports to require—in mandatory terms—that various executive agencies and the Elections Assistance Commission ("EAC") unilaterally execute policy changes that neither the states nor Congress have enacted in accordance with the Elections Clause. *See*, *e.g.*,

Executive Order, §§ 2, 4, 7 (using the verb "shall" to direct action).[4] But of course, as established above, "[t]he President has no 'direct control' over the individuals—members of Congress and state officials—who conduct federal elections." *Meadows*, 88 F.4th at 1347. Though the Executive Order attempts to obscure the President's attempt to exercise of unilateral control over the election administration by directing the EAC to do the President's dirty work, that nonetheless stretches the separation of powers past its breaking point. "In the framework of our Constitution, the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587 (1952). That is especially true "in the field of election administration," where "Congress appears to have granted the president vanishingly little power to exercise unilateral control." Lisa Marshall Manheim, *Presidential Control of Elections*, 74 Vand. L. Rev. 385, 435 (2021).

Moreover, the Executive Order directly conflicts with statutes that Congress *did* in fact enact using its authority under the Elections Clause—statutes that maintain states' central role in election administration. For example, Executive Order § 2 would require the EAC to unilaterally make changes to the federal national mail voter registration form. *See* Executive Order, § 2(a)(i) ("[T]he Election Assistance Commission shall take" action to change to the federal voter registration form). But according to federal law enacted under the Elections Clause, the EAC "*shall* develop a mail voter registration application form" "*in consultation with the chief election officers of the States*." 52 U.S.C. § 20508(a)(2) (emphasis added); *see also ITCA*, 570 U.S. at 5 ("The EAC is explicitly instructed, however, to develop the Federal Form 'in consultation with the chief election officers of the States.'"). The President cannot carve the states out of a process in which federal law requires them to be involved.

---

[4] The LULAC and League Plaintiffs only seek to preliminarily enjoin Executive Order § 2(a).

The statutory division of responsibility between the EAC and states regarding the federal form makes sense, as Congress created the federal form in the National Voter Registration Act ("NVRA") and established the EAC in the Help America Vote Act ("HAVA"), which both ensure states' continued role in election administration. "Nowhere in the language or structure of HAVA as a whole is there any indication that the Congress intended to strip from the States their traditional responsibility to administer elections . . . ." *Sandusky Cnty. Democratic Party v. Blackwell*, 387 F.3d 565, 576 (6th Cir. 2004); *see also* McConnell *supra* n. 5 ("When we wrote the Help America Vote Act, we took care to reinforce—not undermine—the limits of federal involvement in America's elections."). And under the NVRA, the very "purpose of the federal form is *not* to supplant the States' authority in this area but to facilitate interstate voter registration drives." *ITCA*, 570 U.S. at 46 (Alito, J., dissenting) (emphasis added); *see also League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016) ("[T]he Federal Form requires registrants to supply information as part of their application only insofar as it is '*necessary* to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process.'" (quoting 52 U.S.C. § 20508(b)(1))); Presidential Statement on Signing the National Voter Registration Act of 1993 (May 20, 1993) (describing NVRA's "implementation by States").[5] Executive Order § 2(a) therefore contravenes both the text and intent of HAVA and the NVRA, by stripping from federal law the mandatory role that secretaries of state like Amici must play in developing the federal voter registration form.

---

[5] https://www.presidency.ucsb.edu/documents/remarks-signing-the-national-voter-registration-act-1993.

Similarly, Executive Order § 2(b)(iii) would improperly federalize other election functions that are left up to the states, by directing that the Department of Homeland Security and DOGE "shall" "review each State's publicly available voter registration list and available records concerning voter list maintenance activities . . . for consistency with Federal requirements." Under the NVRA and HAVA, states—*not* Executive agencies—are responsible for voter roll list maintenance. The NVRA's "text unambiguously mandates that the *states* maintain a 'general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of' only two things: death or change of address." *Bellitto v. Snipes*, 935 F.3d 1192, 1200 (11th Cir. 2019) (quoting 52 U.S.C. § 20507(a)(4)) (emphasis added). And "[s]imilar to the NVRA, the HAVA requires *states* to 'perform list maintenance' of the computerized voting rolls." *Am. C.R. Union v. Philadelphia City Commissioners*, 872 F.3d 175, 181 (3d Cir. 2017) (quoting 52 U.S.C. § 21083(a)(2)(A)) (emphasis added). The Executive Order ignores and is directly contrary to the fact that the Executive Branch plays no role in conducting list maintenance.

Finally, Executive Order § 4 seeks to impose on states, through unilateral executive fiat, an enormous unfunded mandate. By directing that the EAC "shall" "review and, if appropriate, re-certify voting systems," *see* Executive Order, § 4(b)(ii), the Executive Order attempts to force states to eliminate and replace what would likely amount to hundreds of thousands of voting systems, "hurl[ing] 2026 into turmoil by forcing states to hand-count ballots or scramble to spend millions of dollars on voting systems that aren't yet on the market."[6] Without passing on the merits of whether such systems should be *reviewed* and potentially replaced *over time*, Amici

---

[6] *See* Patrick Marley and Yvonne Wingett Sanchez, *Trump's order could force states to buy costly new voting machines*, Wash. Post (April 13, 2025), https://archive.ph/XKWyf#selection-391.0-409.22.

13

underscore that implementing this mandate would potentially cripple state and local election administration. Administering elections is extremely complicated and expensive, so funding for elections is carefully allocated with little wiggle room—and certainly no ability to swallow such an enormous imposition.[7]

This directive is not just bad policy, it also is unlawful. Executive Order § 4(b) requires that the EAC "*shall* provide that voting systems should not use a ballot in which a vote is contained within a barcode or quick-response code in the vote counting process except where necessary to accommodate individuals with disabilities and should provide a voter-verifiable paper record to prevent fraud or mistake." Executive Order, § 4(b)(i). But 52 U.S.C. § 20962 requires that, to adopt new voting system standards, the EAC *must* follow specific processes including providing notice and opportunities for public comment as well as receiving and considering review and feedback from their Technical Guidelines Development Committee, Board of Advisors, and Standards Board, before any changes may occur.[8] Importantly, states can choose to participate in the notice and comment process to ensure they have a seat at the table. Notice and comment can take months or years, and it may take even longer for voting system manufacturers to create and stock new voting systems that meet the new standards, thus allowing jurisdictions to begin the procurement process. A President cannot crop states out of this picture, just as a President cannot superimpose themself in.

## CONCLUSION

As shown above, the Executive Order seeks to fundamentally reorder the Constitution's clear allocation of control over elections. The President plays no role in election regulation and

---

[7] *See id.*

[8] 52 U.S.C. § 20962(a)-(d).

14

administration—the Constitution explicitly leaves those tasks to the states and Congress. But if the Court does not grant Plaintiffs' targeted request to enjoin some of the most onerous portions of the Executive Order now, the snowball of executive overreach will grow swiftly and exponentially. And then it is only a matter of time until the regime created by the Elections and Electors Clauses is buried under an avalanche of Presidential power—"an accumulation that would pose an inherent 'threat to liberty.'" *Patchak v. Zinke*, 583 U.S. 244, 250 (2018) (Plurality Op.) (Thomas, J.) (citation omitted); *see also* The Federalist No. 47, p. 301 (C. Rossiter ed. 1961) (J. Madison) ("The accumulation of all powers, legislative, executive, and judiciary, in the same hands, whether of one, a few, or many, and whether hereditary, self-appointed, or elective, may justly be pronounced the very definition of tyranny."). The Court should not countenance the Executive Order's attempted unconstitutional power grab by the President.

For the foregoing reasons, Amici respectfully request that the Court grant the League of Women Voters and LULAC Plaintiffs' motion for preliminary injunction.

Dated: April 16, 2025

Respectfully submitted,
*/s/ Kalyn Mizelle McDaniel*
Kalyn Mizelle McDaniel (D.C. Bar No. 90027120)
John B. Hill (PA Bar No. 328340)*
Donald K. Sherman (D.C. Bar No. 90031810)*
CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON
P.O. Box 14596
Washington, D.C. 20044
Telephone: (202) 408-5565
kmcdaniel@citizensforethics.org
jhill@citizensforethics.org
dsherman@citizensforethics.org
* *pro hac vice* motion forthcoming
*Counsel for Amici*