**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.*, | |
| *Plaintiffs*, | |
| v. | Civil Action No. 25-0946 (CKK) |
| EXECUTIVE OFFICE OF THE PRESIDENT, *et al.*, | |
| *Defendants*. | |
| DEMOCRATIC NATIONAL COMMITTEE, *et al.*, | |
| *Plaintiffs*, | |
| v. | Civil Action No. 25-0952 (CKK) |
| DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*, | |
| *Defendants*. | |
| LEAGUE OF WOMEN VOTERS EDUCATION FUND, *et al.*, | |
| *Plaintiffs*, | |
| v. | Civil Action No. 25-0955 (CKK) |
| DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*, | |
| *Defendants*. | |

**REPLY MEMORANDUM IN SUPPORT OF**
**LEAGUE[1] AND LULAC[2] PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

---

[1] Plaintiffs League of Women Voters Education Fund, League of Women Voters of the United States, League of Women Voters of Arizona, Hispanic Federation, National Association for the Advancement of Colored People, OCA-Asian Pacific American Advocates, and Asian and Pacific Islander American Vote.

[2] Plaintiffs League of United Latin American Citizens, Secure Families Initiative, and Arizona Students' Association.

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

   I.   Defendants Do Not Deny That the EAC Will Implement Section 2(a)............................. 3

   II.   Defendants Do Not Defend the Constitutionality of the Executive Order......................... 5

   III.   Defendants' Various Jurisdictional Arguments Are Meritless. ...................................... 6

      A.   Plaintiffs' Claims are Justiciable Because the Executive Order Mandates that the EAC Imminently Add a Documentary Proof-of-Citizenship Requirement to the Federal Form. ................................................................... 7

      B.   Plaintiffs Have Demonstrated Irreparable Harm, Standing, and Ripeness. ................. 10

   IV.   The Balance of the Equities and Public Interest Support a Preliminary Injunction. .... 20

   V.   This Court Should Deny Defendants' Request for an Injunction Bond........................... 21

CONCLUSION................................................................................................................. 22

## TABLE OF AUTHORITIES

**Cases**

*Alabama Legislative Black Caucus v. Alabama,*
   575 U.S. 254 (2015) ........................................................................................... 16, 17

*Apprio, Inc. v. Zaccari,*
   104 F.4th 897 (D.C. Cir. 2024) ..................................................................................... 6

*Armstrong v. Exceptional Child Center,*
   575 U.S. 320 (2015) ....................................................................................................... 5

*Bridgeport Hospital v. Becerra,*
   108 F.4th 882 (D.C. Cir. 2024) ..................................................................................... 7

*Building & Construction Trades Department v. Allbaugh,*
   295 F.3d 28 (D.C. Cir. 2002) ................................................................................... 9, 10

*Center for Democracy & Technology v. Trump,*
   507 F. Supp. 3d 213 (D.D.C. 2020) .............................................................................. 8

*City & County of San Francisco v. Trump,*
   897 F.3d 1225 (9th Cir. 2018) ................................................................................. 9, 10

*City of Atlanta v. Metropolitan Atlanta Rapid Transit Authority,*
   636 F.2d 1084 (5th Cir. 1981) ..................................................................................... 22

*Common Cause v. Trump,*
   506 F. Supp. 3d 39 (D.D.C. 2020) .............................................................................. 10

*Consolidation Coal Co. v. Federal Mine Safety & Health Review Commission,*
   824 F. 2d 1071 (D.C Cir. 1987) ................................................................................... 20

*Council on American-Islamic Relations v. Gaubatz,*
   667 F. Supp. 2d 67 (D.D.C. 2009) .............................................................................. 21

*County of Santa Clara v. Trump,*
   250 F. Supp. 3d 497 (N.D. Cal. 2017) .......................................................................... 8

*Curling v. Raffensperger,*
   491 F. Supp. 3d 1289 (N.D. Ga. 2020) ....................................................................... 22

*Democratic Party of Virginia v. Brink,*
   599 F. Supp. 3d 346 (E.D. Va. 2022) .......................................................................... 16

*Department of Commerce v. New York,*
   588 U.S. 752 (2019) ..................................................................................................... 18

*Doe v. McHenry,*
   No. 1:25-cv-286-RCL, 2025 WL 388218 (D.D.C. Feb. 4, 2025) .................................. 7

*Doe v. Trump,*
   No. 25-cv-10135, 2025 WL 485070 (D. Mass. Feb. 13, 2025) .................................... 7

*DSE, Inc. v. United States,*
   169 F.3d 21 (D.C. Cir. 1999) ....................................................................................... 21

*FEC v. Akins,*
   524 U.S. 1 (1998) .......................................................................................................... 19

*Federal Prescription Service, Inc. v. American Pharmaceutical Association,*
   636 F.2d 755 (D.C. Cir. 1980) ..................................................................................... 21

*Food and Drug Administration v. Alliance for Hippocratic Medicine*,
   602 U.S. 367 (2024)...................................................................................... 12, 13, 15

*Free Enterprise Fund v. Public Company Accounting Oversight Board*,
   561 U.S. 477 (2010) .................................................................................................... 18

*Havens Realty Corp. v. Coleman*,
   455 U.S. 363 (1982) ........................................................................... 12, 13, 15, 16

*HIAS, Inc. v. Trump*,
   985 F.3d 309 (4th Cir. 2021) ..................................................................................... 9

*League of Women Voters of United States v. Newby*,
   838 F.3d 1 (D.C. Cir. 2016) ............................................................................. *passim*

*Louisiana v. Biden*,
   622 F. Supp. 3d 267 (W.D. La. 2022) ...................................................................... 9

*MedImmune, Inc. v. Genentech, Inc.*,
   549 U.S. 118 (2007) ................................................................................................... 20

*Mi Familia Vota v. Fontes*,
   129 F.4th 691 (9th Cir. 2025) ................................................................................... 17

*National Kidney Patients Association v. Sullivan*,
   958 F.2d 1127 (D.C. Cir. 1992) ............................................................................... 21

*New Hampshire Indonesian Community Support v. Trump*,
   No. 25-cv-38, 2025 WL 457609 (D.N.H. Feb. 11, 2025) ..................................... 7

*New York v. Department of Commerce*,
   351 F. Supp. 3d 502 (S.D.N.Y. 2019) ..................................................................... 20

*New York v. Trump*,
   --- F.4th ---, No. 25-1236, 2025 WL 914788 (1st Cir. March 26, 2025)................... 9

*Online Merchants Guild v. Cameron*,
   995 F.3d 540 (6th Cir. 2021) ................................................................................... 15

*Open Society Justice Initiative v. Trump*,
   510 F. Supp. 3d 198 (S.D.N.Y. 2021) ...................................................................... 8

*Parents Involved in Community Schools v. Seattle School Dist. No. 1*,
   551 U.S. 701 (2007) ................................................................................................... 17

*PFLAG, Inc. v. Trump*,
   --- F. Supp. 3d ---, No. 25-337-BAH, 2025 WL 510050 (D. Md. Feb. 14, 2025) ................. 7, 9

*Seila Law LLC v. Consumer Financial Protection Bureau*,
   591 U.S. 197 (2020)............................................................................................. 18, 19

*Summers v. Earth Island Institute*,
   555 U.S. 488 (2009)............................................................................................. 16, 17

*Susan B. Anthony List v. Driehaus*,
   573 U.S. 149 (2014)................................................................................................... 20

*Travelers United, Inc. v. Hyatt Hotels Corp.*,
   No. 23-cv-2776 (CKK), 2025 WL 27162 (D.D.C. Jan. 3, 2025) ..................... 13, 17

*Trump v. Hawaii*,
   585 U.S. 667 (2018)................................................................................................... 19

*Youngstown Sheet & Tube Co. v. Sawyer*,
343 U.S. 579 (1952).............................................................................................. 6

**Constitutional Provisions**

U.S. Const. art. I, § 4.............................................................................................. 5

**Statutes**

52 U.S.C. § 20929.................................................................................................. 5

**Other Authorities**

85 Fed. Reg. 44,679 (July 21, 2020)................................................................... 10

**INTRODUCTION**

The President issued an Executive Order directing that the Election Assistance Commission ("EAC") require documentary proof of citizenship from applicants who use the Federal Form to register to vote. That mandate is an unconstitutional violation of the Elections Clause and the separation of powers. Defendants' opposition obfuscates the President's unconstitutional action and instead offers a study in strategic ambiguity.

Defendants point to statutory processes that *should* prevent the harms Plaintiff filed this case to avert—indeed, the very statutory processes that the Executive Order directs the EAC to flout, as Plaintiffs have explained. But Defendants never *commit* to abide by these processes rather than the Executive Order's unlawful directives. Defendants try to have it both ways. They suggest hypothetical barriers against justiciability to defeat Plaintiffs' motion. Yet they never disclaim the ability to implement the Executive Order if this Court does not grant Plaintiffs' requested relief.

Defendants also suggest that the EAC commissioners are independent actors, pointing to statutory requirements relating to agency decision-making. But they never commit to the principle that the commissioners need not reach the conclusion the President directs. To the contrary, Defendants argue elsewhere in this consolidated action that the President has "authority to direct subordinate agencies to implement his agenda," ECF No. 84, Defs.' Rep. in Opp. to Democratic Party Pls.' Mot. for Prelim. Inj. at 24—indicating that Defendants maintain that the President can direct the EAC to act as outlined in Section 2(a) of the Executive Order.

Yesterday, Plaintiffs learned that, on April 11, 2025—three days before Defendants represented in their opposition to Plaintiffs' preliminary injunction motions that "the Executive Order *has not even begun to be implemented*," ECF No. 85, Defs.' Resp. in Opp. to League and LULAC Pls.' Mot. for Prelim. Inj. ("Opp.") at 25 (emphasis in original)—the EAC Executive Director wrote to States to begin implementing the Executive Order. *See* ECF No. 95-1, Ex. 32, Declaration of Jennette Sawyer (authenticating and attaching correspondence from EAC Executive Director Brianna Schletz to Chief Election Officials). Thus, although Defendants failed to mention it, the author of the declaration Defendants submitted with their opposition had *already* taken steps

to consult States about implementation of the President's demands, citing the Executive Order as providing "instruction" to the agency. *Id.* at 5–6.

Defendants' words and actions make plain they have declined Plaintiffs' proposed stipulation (*see* ECF No. 34-1, Mem. in Support of League and LULAC Pls.' Mot. for Prelim. Inj. ("Mot.") at 19) to follow the requisite statutory processes and to refrain from implementing the Executive Order's contradictory commands for 30 days. As a result, it is critical that this Court address the constitutional violation at the heart of this motion: the President's attempt to command a change in election law by directing an independent, bipartisan agency to do his bidding. The Court should enjoin implementation of this unlawful scheme *now*, before the agency continues to be coerced into action that cannot easily be unraveled and harms Plaintiffs' core missions and services.

On the central issue in this motion—the scope of the President's powers over elections—Defendants offer no argument. Nothing in the Constitution, National Voter Registration Act ("NVRA"), Help America Vote Act ("HAVA"), or any other federal law permits the President to regulate how people vote. And although Defendants seem to believe that the President can compel the EAC to do what he wants, they make no substantive argument to support that view and have thus forfeited argument on the separation-of-powers question at the heart of Plaintiffs' claims. Instead, Defendants focus on a question Plaintiffs did not raise: whether the EAC could, of its own accord, impose a documentary proof-of-citizenship requirement on the Federal Form. Opp. at 18–19. To be sure, the EAC cannot unilaterally make that change. *See* Mot. at 20. But that is not the question at issue. For purposes of this motion, the Court need only answer a narrower question: Can the President compel the EAC to take this action? The answer is no.

With the EAC already taking steps to enforce the President's directive in Section 2(a), the Court can and should order proper relief to stop this ongoing separation-of-powers violation. It should conclude that Plaintiffs are likely to succeed on the merits, and that the harms and equities favor a preliminary injunction.

## I.    Defendants Do Not Deny That the EAC Will Implement Section 2(a).

Acting outside his constitutional authority, President Trump issued the Executive Order *directing* changes to federal election law by demanding that the independent agency Congress entrusted with the Federal Form take actions, by a date certain, in order to implement his desired policies. Now, Defendants ask this Court to deny Plaintiffs relief on the basis that follow-through on the Executive Order's mandate to the Election Assistance Commission is "inherently speculative." Opp. at 10. The evidence is to the contrary.

The Executive Order says: "*Within 30 days of the date of this order*, the Election Assistance Commission *shall take appropriate action* to require" two items "in its national mail voter registration form": (A) "documentary proof of United States citizenship," and (B) "a State or local official to record on the form the type of document that the applicant presented as documentary proof of United States citizenship, including the date of the document's issuance, the date of the document's expiration (if any), the office that issued the document, and any unique identification number associated with the document." ECF No. 34-3, Ex. 2, Exec. Order No. 14248 (the "Executive Order" or the "Order") § 2(a), 90 Fed. Reg. 14,005 (Mar. 25, 2025) (emphasis added).

Nothing in the EAC Executive Director's declaration alters the Order's textual command. The declaration sets forth only boilerplate recitations of federal law and appears to concede that Plaintiffs have correctly identified the procedural steps the EAC must take to amend the Federal Form. ECF No. 85-1, Declaration of Brianna Schletz ("Schletz Decl.") ¶¶ 2–7. Defendants' suggestion that this proves Plaintiffs' harms are not ongoing and imminent is wrong for two reasons. *See* Opp. at 20.

First, the declaration ignores that the statutory scheme it outlines—particularly under the Administrative Procedure Act ("APA") and HAVA, requiring notice-and-comment rulemaking and independent discretion from the EAC—cannot be reconciled with the Order's text, which inflexibly directs the EAC to take action within 30 days toward a predetermined outcome: documentary proof of citizenship on the Federal Form. Nor does the declaration represent *which* set of commands the EAC will follow: those it must follow by statute, or those the President

mandates. The declaration does not explicitly affirm that Defendants will not attempt to cut corners as to APA and Paperwork Reduction Act ("PRA") requirements or otherwise engage in "emergency" agency action to implement the President's directive. Nor does it concede that Defendants will refrain from changing the Federal Form before completing the processes that the APA and the PRA require. Indeed, Defendants do not identify any alternative timeline (*e.g.*, 60, 90, or 180 days) upon which the EAC could carry out Section 2(a). If they did, this Court could presumably work under a different timeline for relief. Instead, Defendants simultaneously suggest *both* that any change in the Federal Form will require notice and comment under the APA and further proceedings under the PRA, *see* Opp. at 28–29, *and* that "any effect relating to Arizona's upcoming special congressional election would be purely speculative," Opp. at 22. Both things cannot be true. The voter registration deadline for Arizona's upcoming special Congressional primary election is June 16. If Defendants were serious about complying with all the steps outlined in their brief—none of which, they claim, has been completed yet—they should more concretely explain that the Executive Order will have *no* effect on at least that primary election. Their equivocation is telling.

Second, the EAC Executive Director's declaration neglects that, on April 11, she signed a letter sent to States' Chief Election Officials to consult on whether and how the EAC can add documentary proof-of-citizenship requirements to the Federal Form. In the letter, Defendant Schletz writes that the Executive Order "provides instruction to the EAC," indicating her understanding that the President has directed the commissioners of an independent agency to act. *See* Ex. 32 at 5. In a follow-up email, Defendant Schletz set a feedback deadline of May 2, 2025, and indicated that further consultation will occur prior to implementation. Ex. 32 at 9. Ultimately, Defendant Schletz's declaration and her correspondence with State officials fail to provide sufficient assurance that the EAC will ignore Section 2(a)'s clear, mandatory directives to implement the changes to the Federal Form that the President ordered.

In their opening brief, Plaintiffs offered to withdraw the preliminary-injunction motion if Defendants stipulated that they would not "make . . . change[s] to the Federal Form relating to

documentary proof of citizenship within 30 days," and that they would "comply with notice-and-comment and other procedural requirements," including under the APA, HAVA, NVRA, and PRA. Mot. at 19. Obtaining that stipulation was critical to Plaintiffs' offer, and to the prospect of relief on a less urgent timeline. Had Defendants stipulated to refrain from taking action toward adding a documentary proof-of-citizenship requirement on the Federal Form until after the April 24 deadline, this case could have proceeded on a less expedited schedule that would have allowed full briefing and a decision before implementation began. As of at least April 11, however, Defendants have taken steps to implement a directive that the President has no authority to make. These steps blur the line between independence and compliance, and any further action that the EAC takes pursuant to the Executive Order's command will become only more difficult to unravel at a later date. To maintain the status quo, a preliminary injunction enjoining Section 2(a) of the Executive Order is necessary to prevent irreparable harm and to stop the EAC from taking further steps to implement the President's directive while the Court resolves the question of whether that directive was lawless.

## II.    Defendants Do Not Defend the Constitutionality of the Executive Order.

As Plaintiffs have explained, Mot. at 19–24, the Executive Order violates the Elections Clause and the separation of powers because it directs the timing and manner in which the EAC must exercise power to maintain the Federal Form. The Constitution gives the power to regulate federal elections to Congress and the States, not the President. *See* U.S. Const. art. I, § 4. Congress established detailed policies regarding voter registration in federal elections, including through the Federal Form. Congress has delegated limited power to maintain the Federal Form to the EAC—an independent, bipartisan agency whose conduct is not subject to presidential supervision. *See* 52 U.S.C. § 20929. The President's attempt to supervise and dictate that conduct is patently unconstitutional, as is his attempt to establish new federal elections policies. Federal courts have the authority to enjoin federal officers—including, here, the commissioners and executive director of the EAC—to prevent such unconstitutional action. *Armstrong v. Exceptional Child Ctr.*, 575 U.S. 320, 327 (2015).

Defendants do not address—much less rebut—any part of this argument. They do not identify a single constitutional provision or federal statute that purports to authorize the President to set the rules for federal elections. Nor do they attempt to explain how the President can exercise control over an independent, bipartisan agency that was designed to be insulated from the political process. The President's failure to identify a source of law that authorizes the Executive Order renders the Order unlawful. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587 (1952). Defendants have forfeited any argument to the contrary. *See Apprio, Inc. v. Zaccari*, 104 F.4th 897, 910 (D.C. Cir. 2024).

Instead, Defendants insist that the EAC has the authority to add a documentary proof-of-citizenship requirement to the Federal Form. *See* Opp. at 18–19. That is a red herring. At this juncture, Plaintiffs do not ask this Court to decide that the EAC would violate the law if it adds a documentary proof-of-citizenship requirement to the Federal Form, though it would. Rather, Plaintiffs argue that the President has *already* broken the law by asserting control over the manner in which the EAC maintains the Federal Form. It appears to be working, given the April 11 correspondence from the EAC Executive Director to the States at the behest of the Executive Order's commands. *See* Ex. 32 at 5–6.

In other words, Plaintiffs, at this time, do not seek an injunction prohibiting the EAC from ever adding a documentary proof-of-citizenship requirement to the Federal Form; what Plaintiffs seek is an injunction prohibiting the EAC from effectuating directives that the President lacks authority to issue.

### III.    Defendants' Various Jurisdictional Arguments Are Meritless.

Instead of defending the Executive Order's constitutionality, Defendants assert that Plaintiffs lack standing (Opp. at 8–13), irreparable harm (Opp. at 20–25), and ripe claims (Opp. at 27–30). All those arguments, however, follow from the faulty premise at the heart of Defendants' opposition: that it is somehow "speculative" whether the Executive Order will lead the EAC to add a documentary proof-of-citizenship requirement to the Federal Form. In other words, Defendants try to insulate the Executive Order from judicial review by suggesting the Order may

be ineffectual. But nothing in Defendants' opposition—or in their actions, *see* Ex. 32—suggests this is the case.

### A. Plaintiffs' Claims are Justiciable Because the Executive Order Mandates that the EAC Imminently Add a Documentary Proof-of-Citizenship Requirement to the Federal Form.

Defendants describe the Executive Order as a take-or-leave suggestion from the President to the EAC. *See* Opp. at 18–19. That cannot be squared with its text. The Executive Order *mandates* that the EAC "shall" within 30 days "take appropriate action to require" documentary proof of citizenship on the Federal Form. Exec. Order § 2(a); *see generally Bridgeport Hosp. v. Becerra*, 108 F.4th 882, 887 (D.C. Cir. 2024) ("[T]he word 'shall' generally signals a mandatory duty."). The upshot is clear: the Executive Order directs the EAC to act—and act soon—"to require" changes to the Federal Form in a way that will irreparably harm Plaintiffs. Indeed, nothing in Defendants' declaration indicates the EAC will refrain from enforcing Section 2(a), and the evidence shows that Defendants have already started implementing this command. *See* Ex. 32.

Plaintiffs need not wait until the EAC completes that process to sue. Courts routinely grant injunctions to prevent enforcement of similar executive orders that mandate imminent, harmful agency action. For example, in *PFLAG, Inc. v. Trump*, the court preliminarily enjoined an executive order directing the withdrawal of funds from hospitals that provide medical care for transgender people under nineteen, even though the Government claimed it had "not yet taken the steps necessary to revoke funding." --- F. Supp. 3d ---, No. 25-337-BAH, 2025 WL 510050, at *5 (D. Md. Feb. 14, 2025). Other recent cases are also illustrative. *See N.H. Indonesian Community Support v. Trump*, No. 25-cv-38, 2025 WL 457609 (D.N.H. Feb. 11, 2025) (enjoining executive order overturning birthright citizenship, even though the order would not take effect until eight days later); *Doe v. McHenry*, No. 1:25-cv-286-RCL, 2025 WL 388218, at *5 (D.D.C. Feb. 4, 2025) (enjoining executive order denying hormone therapy to transgender people who are incarcerated in federal prisons, even though the agency had not yet "formulated its new policy on hormone therapy pursuant to the Executive Order"); *Doe v. Trump*, No. 25 Civ. 10135, 2025 WL 485070, at *13 & n.22 (D. Mass. Feb. 13, 2025) (enjoining executive order overturning birthright citizenship

and rejecting defendants' argument "that the plaintiffs wait and see how the [executive order] will be implemented"); *Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 517–18 (N.D. Cal. 2017) (enjoining executive order directing the withdrawal of funds from sanctuary cities, even though the Government "ha[d] not yet designated the [plaintiff counties] as 'sanctuary jurisdictions' or withheld funds").

The cases Defendants cite are not to the contrary. They concern preemptive challenges to future agency action not *mandated* to occur. For example, the executive order at issue in *Center for Democracy & Technology v. Trump* directed an agency to "*consider* taking action, as appropriate and consistent with applicable law, to prohibit unfair or deceptive acts or practices in or affecting commerce"; "*consider* whether complaints [about online platform censorship] allege violations of law"; and "*consider* developing a report describing such complaints." 507 F. Supp. 3d 213, 217 (D.D.C. 2020) (quotation marks omitted) (emphasis added). The same is true with *Open Society Justice Initiative v. Trump*, which addressed a challenge to an executive order that required executive officers to make a "discretionary" determination. 510 F. Supp. 3d 198, 209 (S.D.N.Y. 2021). Here, the President has not asked the EAC to *consider* taking action, nor has he vested any discretion with the agency. Rather, the Executive Order mandates that the EAC "*shall* take" action "to require" a specific result, and sets a mandatory deadline by which that action must occur. Exec. Order § 2(a)(i) (emphasis added).[3] To wit, the EAC Executive Director's April 11 letter demonstrates that the EAC has begun to take steps in furtherance of the Executive Order's command to the agency to change the Federal Form to require documentary proof of citizenship. *See* Ex. 32 at 5–6. In fact, the EAC's public agenda for its 2025 Standards Board Annual Meeting indicates that on April 24—the deadline by which Section 2(a) requires action toward

---

[3] The other cases that Defendants cite fail for similar reasons. *See Defs. of Wildlife v. Perciasepe*, 714 F.3d 1317 (D.C. Cir. 2013) (no standing to challenge consent decree that required an agency to "conduct a rulemaking and then decide whether to promulgate a new rule—the content of which is not in any way dictated by the consent decree—using a specific timeline"); *River Whooping Crane Critical Habitat Maintenance Trust v. FERC*, 962 F.2d 27, 35 (D.C. Cir. 1992) (no standing to challenge agency rule that does not apply to plaintiff simply because the agency might later apply a similar rule to plaintiff).

implementation—the Board intends to hold a "discussion of the Implementation of the Executive Order to Protect the Integrity of American Elections." Ex. 33, U.S. Elec. Assistance Comm'n, Agenda, Standards Board 2025 Annual Meeting, *available at* https://perma.cc/T8JH-X5NH.

Defendants also contend that the Executive Order will not injure Plaintiffs because it contains boilerplate language, known as a "savings clause," that the EAC should take "appropriate action" "consistent with applicable law." *See* Opp. at 17–18 (quoting Exec. Order. §§ 2(a), 11(b)). But "courts have repeatedly rejected the argument that simply including 'consistent with applicable law' or a similar boilerplate phrase inoculates an otherwise unconstitutional executive order from judicial review." *PFLAG*, 2025 WL 685124, at *15; *see also, e.g.*, *HIAS, Inc. v. Trump*, 985 F.3d 309, 325 (4th Cir. 2021) (rejecting government's attempt to "immunize the Order from review through a savings clause which, if operational, would nullify the 'clear and specific' substantive provisions of the Order"); *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1240 (9th Cir. 2018) ("If 'consistent with law' precludes a court from examining whether the Executive Order is consistent with law, judicial review is a meaningless exercise, precluding resolution of the critical legal issues."); *New York v. Trump*, --- F.4th ---, No. 25-1236, 2025 WL 914788, at *14 (1st Cir. Mar. 26, 2025) (denying motion to stay preliminary injunction against executive order imposing funding freeze, noting that the district court "found that the undisputed evidence before [it] [wa]s that adding the 'consistent with the law' caveat was nothing more than window dressing on an unconstitutional directive by the Executive" (alterations in original) (quotation marks omitted)); *Louisiana v. Biden*, 622 F. Supp. 3d 267, 289 (W.D. La. 2022) (declining to give effect to an executive order's boilerplate, savings clause language where the order used unambiguous, commanding language).

Again, Defendants rely on inapposite cases. In *Building & Construction Trades Department v. Allbaugh*, 295 F.3d 28 (D.C. Cir. 2002), the D.C. Circuit considered an executive order with a savings clause, holding that "[t]he mere possibility that some agency might make a legally suspect decision to award a contract or to deny funding for a project does not justify an injunction against enforcement of a policy that, so far as the present record reveals, is above

9

suspicion in the ordinary course of administration." *Id.* at 33. But unlike *Allbaugh*, the Executive Order here "unambiguously commands action" such that there is much "more than a 'mere possibility that some agency might make a legally suspect decision.'" *City & Cnty. of San Francisco*, 897 F.3d at 1240 (citing and distinguishing *Allbaugh*, 295 F.3d at 33). And, in this case, it is the Presidential command to an independent agency *itself* that is the unlawful act, as opposed to a command to subordinate agencies in *Allbaugh*.

Likewise, *Common Cause v. Trump* involved an executive order that mandated the Secretary of Commerce to exclude undocumented immigrants from the congressional apportionment basis, but only "to the extent feasible." 506 F. Supp. 3d 39, 47 (D.D.C. 2020) (quoting 85 Fed. Reg. 44,679, 44,680 (July 21, 2020)). The court declined to review the legality of the executive order because it was unclear, "based on available information," "the extent of exclusion that is feasible." *Id.*. Unlike the executive order at issue in that case, Section 2(a) here does not contain any caveat for feasibility or practicability. And, in any event, unlike *Common Cause*, Defendants do not indicate that it will be infeasible for the EAC to make a change to the Federal Form.

### B.  Plaintiffs Have Demonstrated Irreparable Harm, Standing, and Ripeness.

Both Section 2(a), which mandates imminent enforcement without any agency discretion, and the clear evidence that the EAC has begun to take steps to give effect to the President's commands, *see* Exs. 32, 33, demonstrate that enforcement threatens imminent, irreparable harm that can be redressed only through a preliminary injunction.

### 1.  The Executive Order Threatens Injury-In-Fact for Purposes of Standing and Irreparable Harm for Purposes of a Preliminary Injunction.

Under *League of Women Voters of United States v. Newby*, 838 F.3d 1 (D.C. Cir. 2016), the irreparable harm that Section 2(a) will impose on Plaintiffs' core voter registration activities "provide[s] injury for purposes both of standing and irreparable harm." *Id.* at 9. Plaintiffs also have standing because the Executive Order has forced them to divert resources to counteract the harm

caused to their voter registration activities. In addition, some Plaintiffs have standing on behalf of their members who would have standing to sue in their own right.

### a. Under *Newby*, the Executive Order Threatens Injury-in-Fact and Irreparable Harm.

Despite Defendants' claim otherwise, *Newby* points the way. There, the D.C. Circuit found that adding a documentary proof-of-citizenship requirement to the Federal Form in several states would irreparably harm organizational plaintiffs' core voter registration activities. *See* Mot. at 24–27; *Newby*, 838 F.3d at 8–9. Notably, the D.C. Circuit found that voter registration organizations faced irreparable harm even in Georgia and Alabama, where it was "unclear" whether those states "currently enforce[d]" the documentary proof-of-citizenship requirement. *Id.* at 8. The court explained that plaintiff organizations would face injury "when those States decide to enforce their laws." *Id.* Its conclusion that voter registration organizations operating in those states faced irreparable harm, even though it did not know when those states may require documentary proof of citizenship to vote, supports a finding of irreparable harm here. And Defendants do not contest that injury to Plaintiffs' voter registration activities would constitute irreparable harm, nor do they even contest that the EAC adding the documentary proof-of-citizenship requirement set out in the Executive Order would harm Plaintiffs' activities. Opp. at 20–22.

*Newby* also supports a finding that Plaintiffs have satisfied organizational standing because "new obstacles" that "make it more difficult for the Leagues to accomplish their primary mission of registering voters . . . provide injury for purposes both of standing and irreparable harm." *Newby*, 838 F.3d at 9. Once again, Defendants do not contest that harm to an organization's core voter registration activities is enough to demonstrate an injury in fact. They just argue that Plaintiffs' harm is too speculative. Opp. at 9–11. As noted above, Section 2(a)'s plain text (*e.g.*, "shall"), which requires the EAC to change the Federal Form, rebuts any such claim.

### b. Plaintiffs Independently Have Standing Based on Diversion of Resources and on Behalf of Their Members.

Because the imminent and irreparable programmatic injuries detailed *supra*, Section III.B.1.a, suffice to show standing, this Court need not address Defendants' arguments that

Plaintiffs have failed to show diversion-of-resources and associational standing as well. *See* Opp. at 11–16. To the extent this Court reaches these independent bases for standing, Defendants' arguments miss the mark.

**Diversion of Resources.** Plaintiffs have established organizational standing because the Executive Order has already and will continue to require them to divert their resources to counteract the harms that Defendants' unlawful conduct will inflict on the core activities and services they provide. *See* Mot. at 30–32. Defendants' contention that such harms are not cognizable under *Food and Drug Administration v. Alliance for Hippocratic Medicine* ("*AHM*"), 602 U.S. 367 (2024), is incorrect.

In *AHM*, the Supreme Court reaffirmed that *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), governs whether organizations have standing "to sue on their own behalf for injuries they have sustained." *AHM*, 602 U.S. at 393, 395 (quoting *Havens*, 455 U.S. at 379 n.19). And the Court reiterated that an organization suffers a cognizable injury when a defendant's actions have "directly affected and interfered with [the plaintiff organization's] core business activities." *Id.* at 395 (citing *Havens*, 455 U.S. 363).

In *Havens*, the Court held that an organization that provided housing-counseling services had standing to sue an apartment-complex owner engaged in "racial steering"—providing Black individuals with false information about the availability of rental units. 455 U.S. at 366–68, 378–79. The organization ("HOME") alleged that "its efforts to assist equal access to housing through counseling and other referral services" had been frustrated because it "had to devote significant resources to identify and counteract the defendant's racially discriminatory steering practices." *Id.* at 379. The Court concluded that, if "[defendants]' steering practices have perceptibly impaired HOME's ability to provide counseling and referral services for low-and moderate-income homeseekers," that was a cognizable injury in fact—a "concrete and demonstrable injury to the organization's activities . . . with the consequent drain on the organization's resources" and "more than simply a setback to the organization's abstract social interests." *Id.*

*AHM* applied that same standard but held that the organizational plaintiffs in *AHM* fell short. The Court found that the *AHM* plaintiffs failed to show that any defendant's action caused any impediment to their preexisting business activities; instead, the plaintiffs claimed only that they chose to expend resources "engaging in public advocacy and public education" to "oppose [the defendant's] actions." 602 U.S. at 394–95. Consistent with *Havens*, the Court held that an organization that has not otherwise suffered a concrete injury cannot "spend its way into standing simply by expending money to gather information and advocate against the defendant's action." *Id.* The Court recognized that such concerns about manufactured standing are misplaced, however, when an organization must expend resources not to advocate in opposition to a policy, but because that policy impacts its core services. *Id.* In the latter situation, the harm is concrete and particularized. *Id.* (citing *Havens*, 455 U.S. at 379).

This case is unlike *AHM* and squarely in line with *Havens*. "Critically," like in *Havens*— and unlike in *AHM*—each Plaintiff here is "not only 'an issue-advocacy organization,' but also a provider of 'a . . . service.'" *Travelers United, Inc. v. Hyatt Hotels Corp.*, No. 23-cv-2776 (CKK), 2025 WL 27162, at *10 (D.D.C. Jan. 3, 2025) (quoting *AHM*, 602 U.S. at 395). Plaintiffs provide voter education, registration, and assistance services. ECF No. 43-1, Ex. 5, Declaration of Tyler Sterling ("Sterling Decl.") ¶¶ 8–10; ECF No. 34-20, Ex. 19, Declaration of Frankie Miranda ("Miranda Decl.") ¶¶ 5–7; ECF No. 34-23, Ex. 22, Declaration of Pinny Sheoran ("Sheoran Decl.") ¶¶ 5, 8; ECF No. 34-24, Ex. 23, Decl. of Juan Proaño ("Proaño Decl.") ¶¶ 9–10; ECF No. 34-13, Ex. 12, Decl. of Sarah Streyder ("Streyder Decl.") ¶¶ 5–6, 19; ECF No. 34-25, Ex. 24, Decl. of Kyle Nitschke ("Nitschke Decl.") ¶¶ 3–4; ECF 34-29, Ex. 28, Decl. of Celina Stewart ("Stewart Decl.") ¶¶ 2–4; ECF No. 34-30, Ex. 29, Decl. of Thu Nguyen ("Nguyen Decl.") ¶¶ 7–10; ECF No. 34-31, Ex. 30, Decl. of Christine Chen ("Chen Decl.") ¶¶ 4–9. And the EAC's implementation of the Executive Order will directly interfere with Plaintiffs' preexisting activities and require Plaintiffs "to divert resources toward providing additional *direct services* designed to offset the harmful effects of the challenged conduct," which suffices to establish injury in fact. *Travelers United*, 2025 WL 27162, at *10; *see* Sheoran Decl. ¶¶ 16, 25–26, 32–36, 38; Miranda Decl. ¶¶ 10–

12, 20–21; Chen Decl. ¶¶ 10–13, 15–18; Stewart Decl. ¶¶ 11–14, 15–22; Sterling Decl. ¶¶ 16–25, 27; Proaño Decl. ¶¶ 12–17, 28; Nitschke Decl. ¶¶ 5, 13–15; Nguyen Decl. ¶¶ 15–16; Streyder Decl. ¶¶ 20–26.

Specifically, as explained in detail in Plaintiffs' opening brief, enforcement of Section 2(a) of the Executive Order will render Plaintiffs unable to register untold numbers of eligible U.S. citizens using the Federal Form, including citizens who lack the requisite documentation, Stewart Decl. ¶¶ 9, 14, 20–22; Sheoran Decl. ¶¶ 16, 25–26, 32–33; Miranda Decl. ¶¶ 20–21; Sterling Decl. ¶¶ 24–26; Chen Decl. ¶ 12, and even some who *do* possess compliant documentation, Sheoran Decl. ¶¶ 27–33; Proaño Decl. ¶¶ 17–18, 20, 48–49. Further, enforcement of Section 2(a) of the Order will severely burden Plaintiffs' ability to conduct registration drives more broadly because it will directly impair Plaintiffs' existing methods for registering voters, including APIAVote's multilingual voter registration portal, Chen Decl. ¶¶ 8–12; Nguyen Decl. ¶ 10; the League's VOTE411.org website, Stewart Decl. ¶¶ 10–11; Hispanic Federation's TurboVote portal, Miranda Decl. ¶ 19; and NAACP's Vote.Org portal, Sterling Decl. ¶¶ 11–14. None of these portals is designed to collect copies of documents showing proof of citizenship, as the Executive Order would require. *See* Chen Decl. ¶ 10; Miranda Decl. ¶ 19; Stewart Decl. ¶ 13; Sterling Decl. ¶ 18. Implementation of the Executive Order would render these portals "immediately defunct." Chen Decl. ¶ 12; *see also* Stewart Decl. ¶ 13; Nguyen Decl. ¶¶ 10, 15; Miranda Decl. ¶ 20; Sterling Decl. ¶¶ 18, 27.

Plaintiffs would need to expend considerable resources to counteract these harms to their services, including through the provision of additional direct services: *i.e.*, counseling their members and the public on how to register without running afoul of the Order, assisting the individuals they register to ensure adequate compliance with the Order, developing new methods of registration to replace or supplement their existing portals, overhauling their many other voter registration resources to ensure that they provide accurate information, and helping their members and other voters obtain documentary proof of citizenship. Sterling Decl. ¶¶ 16, 19–23, 27; Stewart Decl. ¶¶ 12–13, 15–22; Sheoran Decl. ¶¶ 34–36, 38; Nguyen Decl. ¶¶ 10, 15–16; Chen Decl. ¶¶ 11,

13, 16–18; Miranda Decl. ¶¶ 10, 20–21; Proaño Decl. ¶¶ 13–17, 28; Streyder Decl. ¶¶ 19–26; Nitschke Decl. ¶¶ 9, 13–15.

There is no credible argument that Plaintiffs have manufactured these harms. Plaintiffs' core voter education, registration, and assistance services necessarily require Plaintiffs to respond to incoming questions to address the confusion and uncertainty created by the Executive Order, counsel their members and the public on how to register to vote in compliance with the Executive Order's new mandates, and provide accurate and effective information and services to the public and the people they assist. Stewart Decl. ¶¶ 3, 6–7, 11, 21–23; Sheoran Decl. ¶¶ 9–10, 20, 27, 35; Chen Decl. ¶¶ 6–8, 17; Miranda Decl. ¶¶ 7–8, 17; Sterling Decl. ¶¶ 9–10, 19–22; Nguyen Decl. ¶¶ 10–12; Proaño Decl. ¶¶ 13–15, 22, 28; Streyder Decl. ¶¶ 19–23; Nitschke Decl. ¶¶ 3, 13, 15. Plaintiffs can no more 'choose' to abandon their core work in the face of Section 2(a) of the Executive Order than the plaintiff organization in *Havens* could have 'chosen' to no longer engage in housing counseling when faced with the defendant's provision of false information. *Havens*, 455 U.S. at 379. Thus, unlike in *AHM*, where the "FDA's actions relaxing regulation of mifepristone" imposed no "impediment" to the plaintiff organizations' "advocacy businesses," the challenged provisions here "directly affect[] and interfer[e] with" Plaintiffs' "core business activities." *AHM*, 602 U.S. at 395.

Defendants' remaining argument—that Plaintiffs' diversion of resources from pre-existing core activities toward other activities that are consistent with their core mission cannot constitute an injury in fact—contradicts "Supreme Court precedent [that] affirm[s] that within-mission organizational expenditures are enough to establish direct organizational standing." *Online Merchs. Guild v. Cameron*, 995 F.3d 540, 548–49 (6th Cir. 2021) (relying on *Havens* and its progeny in rejecting argument that "there is no diversion of resources and thus no injury-in-fact" if organizational plaintiff's new expenditures "are actually part of the organization's mission"). After all, *Havens* itself concluded that an organization with a mission to "assist equal access to housing" had direct standing to sue because of its diversion of resources toward identifying and

counteracting a racially discriminatory housing practice. 455 U.S. at 379. Defendants fail to muster any precedent to support their contrary position.

**Associational Standing.** Plaintiffs have also demonstrated associational standing because they have established that (1) individual members would have standing to sue in their own right; (2) the interest the members seek to protect are germane to the purpose of Plaintiff organizations; and (3) there is no need for individual members to participate in the lawsuit. *See* Mot. at 32–33. Contrary to Defendants' assertion, Plaintiffs do not rely on "general and formulaic statements," Opp. at 14—they describe in detail the harm that Plaintiffs' members will face. For example, the Declaration of Kyle Nitschke explains that the Arizona Students' Association ("ASA") registered 3,500 students in person last year using specific methods of registration; that ASA used the Federal Form for about half of those registrations due to students' lack of available documentary proof of citizenship and plans to do the same before the upcoming June voter registration deadline for the special Congressional primary election; that Mr. Nitschke knows of dozens of ASA members who lack documentary proof of citizenship or lack easy access to it; and that those members will be unable to register or will have to spend money and time locating documentary proof of citizenship. Nitschke Decl. ¶¶ 4–8, 11; *see also* Proaño Decl. ¶¶ 29–37.

Defendants rely principally on *Summers v. Earth Island Institute*, 555 U.S. 488 (2009), to contend that Plaintiffs must provide individual declarations from members who lack documentary proof of citizenship to establish that individual members would have standing. *See* Opp. at 14. But they largely ignore cases decided after *Summers* and fail to consider the differences between that case and this one. For example, a later Supreme Court case, *Alabama Legislative Black Caucus v. Alabama*, 575 U.S. 254 (2015), "moderates [*Summers*] slightly in that a prominent political organization need not identify individual members so long as a reasonable inference can be drawn that such individuals exist." *Democratic Party of Va. v. Brink*, 599 F. Supp. 3d 346, 356, n.10 (E.D. Va. 2022). In *Alabama Legislative Black Caucus*, the Supreme Court held that the declaration of the leader of a political organization that described its membership was sufficient to confer standing. 575 U.S. at 270–71. The Court did not require individual members to file affidavits. *Id.*;

*see also Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 718 (2007) (accepting a lodged affidavit from an organizational leader in similar circumstances). Thus, it is unsurprising that the Ninth Circuit recently held that an Arizona organization had associational standing when some of its 1,000 members were naturalized citizens and a state law threatened them with improper removal from the voter rolls. *See Mi Familia Vota v. Fontes*, 129 F.4th 691, 708–09 (9th Cir. 2025). Importantly, the *Mi Familia Vota* Court explicitly held that the plaintiff organization "need not identify by name its members who would be injured." *Id*. at 709.

This case is fundamentally unlike *Summers*, where there was uncertainty about whether certain members "plan[ned] to make use of specific sites" maintained by the National Forest Service, and whether those same people would "find their recreation burdened" if they did visit those sites. 555 U.S. at 499. Rather, as in *Alabama Legislative Black Caucus* and *Mi Familia Vota*, "it is clear and not speculative that a member of" Plaintiff organizations would be unable to register to vote if the Order were implemented. 129 F.4th at 708.[4] Therefore, Plaintiffs have established associational standing.

### 2. Plaintiffs' Harm Is Traceable to the Executive Order and Would be Redressed by a Preliminary Injunction.

Defendants alternatively argue that any injury stemming from the documentary proof-of-citizenship requirement is not traceable to Defendants, but rather "intervening individual choices" of voters—namely, voters choosing whether to procure proof of citizenship and convey it to third-party voter registration organizations. Opp. at 11. But Supreme Court precedent precludes this argument.

In *Department of Commerce v. New York*, the plaintiffs sued to enjoin the Department of Commerce's proposed addition of a citizenship question to the 2020 Census, which plaintiffs

---

[4] Defendants' reliance on *Travelers United*, *see* Opp. at 15, is misplaced. There, the plaintiff sought to avoid federal jurisdiction and remand the case to the District of Columbia Superior Court, but did "not *allege[] or show[]*" that any member had future, specific plans to book a room at a particular hotel chain. 2025 WL 27162, at *15 (emphasis added). Here, Plaintiffs' allegations and declarations make it "clear" that many members lack documentary proof of citizenship and therefore will be harmed by the Order, and that Defendants "do[] not need to know the identity of a particular member to respond to [Plaintiffs'] claim of injury." *Mi Familia Vota*, 129 F.4th at 709.

established would result in noncitizen households disproportionately declining to complete the decennial form. 588 U.S. 752, 766–67 (2019). The Government argued that the citizenship question did not result in harm sufficient to confer injury-in-fact "because such harm depends on" both "the independent action of third parties choosing to violate their legal duty to respond to the census" and the Government itself "break[ing] the law itself by using noncitizens' answers against them for law enforcement purposes." *Id.* at 767. Yet, the Supreme Court reasoned that the harm was still traceable to the Government, as the plaintiffs had shown that noncitizen households were less likely to respond to the Census with a citizenship question. The Court explained that the plaintiffs' injury was sufficient under Article III because it "does not rest on mere speculation about the decisions of third parties; it relies instead on the predictable effect of Government action on the decisions of third parties." *Id.* at 768.

Here, Plaintiffs have submitted unrebutted evidence—including from federal government databases—that scores of voters, including their own members, are unlikely to have access to documentary proof-of-citizenship. Mot. at 7–11. And Plaintiffs have submitted declarations from experienced voter registration staff who note that voters are often concerned about turning over sensitive citizenship documents to third-party voter registration organizations, which impedes their respective organizations' work. *Id.* at 12. Thus, as in *Department of Commerce*, the challenged Order will have a "predictable effect" on third parties: it will make it harder for voters to register and for Plaintiffs to carry out their core voter registration activities. This, in turn, supports a finding that Plaintiffs have and will suffer organizational injury akin to that suffered by the plaintiffs in *Newby*.

In addition, Plaintiffs' requested relief would redress Plaintiffs' harm. The Supreme Court has "held that a litigant challenging governmental action as void on the basis of the separation of powers is not required to prove that the Government's course of conduct would have been different in a 'counterfactual world' in which the Government had acted with constitutional authority." *Seila Law LLC v. Consumer Fin. Protection Bureau*, 591 U.S. 197, 211 (2020) (quoting *Free Enterprise Fund v. Public Co. Accounting Oversight Bd.* 561 U.S. 477, 512 n.12 (2010)). It is "sufficient that

the challenger 'sustain[s] injury' from an executive act that allegedly exceeds the official's authority." *Id.* (quoting *Bowsher v. Synar*, 478 U.S. 714, 721 (1986)); *see also FEC v. Akins*, 524 U.S. 1, 25 (1998) (holding that a plaintiff has "standing to complain that the agency based its decision upon an improper legal ground," even though "the agency (like a new jury after a mistrial) might later, in the exercise of its lawful discretion, reach the same result for a different reason").

Plaintiffs may thus seek an injunction prohibiting implementation of the Executive Order's mandate that the EAC adopt a documentary proof-of-citizenship requirement, regardless of whether the EAC would try to independently do so in an exercise of its own discretion. Plaintiffs have already suffered harm—and will imminently suffer more harm—because of the Executive Order's mandate that the EAC adopt a documentary proof-of-citizenship requirement. *See* Mot. 11–18. A ruling in Plaintiffs' favor will ensure that the EAC does not adopt such a requirement on an "improper legal ground"—*i.e.*, pursuant to the President's command. *Akins*, 524 U.S. 1 at 25. That relief will redress Plaintiffs' harms regardless of whether the EAC might later "reach the same result for a different reason." *Id.*

As to the Court's question about the scope of relief, Plaintiffs respectfully request that this Court not "limit any preliminary relief in this case to cover only the State of Arizona." ECF No. 88 at 2. This is not a case about nationwide injunctions and none of Defendants' citations are apposite. Plaintiffs seek a narrow injunction against the EAC and its officers from taking one action: implementing Section 2(a) of the Executive Order. Once changed, the Federal Form would require documentary proof of citizenship in every state. The only way to prevent that harm from occurring anywhere, including Arizona, is to prevent the EAC from changing the Federal Form pursuant to the Executive Order. Even if the Court concluded that only voters in Arizona faced an imminent threat of irreparable harm (which is not the case, *see* Mot. at 11–18, 24–27), that would not undermine the appropriateness of Plaintiffs' requested relief because any benefit that would accrue to voters outside Arizona would be "merely a consequence of providing relief to" voters in Arizona. *Trump v. Hawaii*, 585 U.S. 667, 717 (2018) (Thomas, J., concurring); *see also New York v. Dep't of Commerce*, 351 F. Supp. 3d 502, 677 (S.D.N.Y. 2019) (enjoining government from

adding citizenship question to the decennial census and rejecting the Government's request to limit injunction to the plaintiffs because "these cases do not involve the case-by-case enforcement of a particular policy or statute" but instead "concern a single decision about a single questionnaire, to be used on a single census throughout the nation"), *aff'd in part, rev'd in part on other grounds*, 588 U.S. 752.

### 3. Plaintiffs' Claims Are Ripe.

For substantially the same reasons that Plaintiffs have standing, their claims are ripe for judicial review. *See supra* Section III.B.1. Even in a pre-enforcement context, "the Article III standing and ripeness issues in this case 'boil down to the same question.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 n.5 (2014) (quoting *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128 n.8 (2007)); *see Consol. Coal Co. v. Fed. Mine Safety & Health Review Comm'n*, 824 F. 2d 1071, 1081 (D.C. Cir. 1987) (finding that for ripeness inquiry, "[i]t is enough that petitioner show it has suffered sufficient hardship to pass the Article III threshold"). It is well settled that Plaintiffs need not wait until the precise moment of enforcement to seek relief in court. *See Driehaus,* 573 U.S. at 158 (actual "enforcement action is not a prerequisite to challenging the law"); *Newby*, 838 F.3d at 8–9 ("Damocles's sword does not have to actually fall on all appellants before the court will issue an injunction"). Rather, Article III empowers Plaintiffs to seek "pre-enforcement review under circumstances that render the threatened enforcement sufficiently imminent." *Driehaus*, 573 U.S. at 159.

Here, Plaintiffs are already enduring ongoing harm related to Section 2(a) and face additional harm from its imminent enforcement, given that Defendants do not deny that the EAC will enforce it. Further, given the steps the EAC Executive Director already has taken to implement Section 2(a), this posture should be viewed as more than a purely pre-enforcement action. *See* Exs. 32, 33. These claims are ripe for review.

### IV. The Balance of the Equities and Public Interest Support a Preliminary Injunction.

Finally, Defendants say little about the balance of the equities and public interest, failing even to mention the D.C. Circuit's binding precedent that any "substantially diminished ability of

the League[] to use the Federal Form in voter registration drives . . . runs contrary to what Congress, in enacting the NVRA, declared to be the public interest." *Newby*, 838 F.3d at 13. Defendants, who do not even attempt to defend the actual legality of Section 2(a), *see supra* Section II, also do not contest that it is in the public interest for governmental agencies to follow federal law. Mot. at 28. Instead, Defendants argue solely that the Executive Order seeks to preserve voter confidence and election integrity, Opp. at 26–27—but offer no evidence that Section 2(a) will have any effect on either of those things. In fact, D.C. Circuit case law is clear that "harm to election integrity appears minimal" when courts grant injunctions against documentary proof-of-citizenship requirements. *Newby*, 838 F.3d at 13–14.

## V.    This Court Should Deny Defendants' Request for an Injunction Bond.

This Court should exercise its broad discretion to deny Defendants' request for an injunction bond under Federal Rule of Civil Procedure 65. As Defendants note, "District Courts have 'broad discretion . . . to determine the appropriate amount of an injunction bond.'" Opp. at 30 (quoting *DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999)); *see* Fed. R. Civ. P. 65(c). Defendants neglect to address, however, that this includes courts' discretion to "conclude[] that no security is necessary" where "it does not appear that Defendants would be substantially injured" by temporary equitable relief. *Council on Am.-Islamic Rels. v. Gaubatz*, 667 F. Supp. 2d 67, 81 (D.D.C. 2009); *see Fed. Prescription Serv., Inc. v. Am. Pharm. Ass'n*, 636 F.2d 755, 759 (D.C. Cir. 1980). Rule 65(c) allows courts to impose an injunction bond "for the precise purpose of assuring compensation of the defendant for the resulting losses if the injunction proves to have been wrongfully granted." *Nat'l Kidney Patients Ass'n v. Sullivan*, 958 F.2d 1127, 1134 (D.C. Cir. 1992). Defendants have not alleged any plausible loss—much less substantial injury—resulting from an injunction issued by this Court against an unlawful executive order. Nor could they. More generally, there is a longstanding exception to the security requirement in public-interest cases like this one. *See generally City of Atlanta v. Metro. Atlanta Rapid Transit Auth.*, 636 F.2d 1084, 1094 (5th Cir. 1981) ("[P]ublic-interest litigation [constitutes] an area in which the courts have recognized an exception to the Rule 65 security requirement."). And because "[w]aiving the bond

requirement is particularly appropriate where a plaintiff alleges the infringement of a fundamental constitutional right," this Court should exercise its discretion to deny Defendants' bond injunction request. *Curling v. Raffensperger*, 491 F. Supp. 3d 1289, 1326 n.25 (N.D. Ga. 2020) (quotation omitted), *vacated on other grounds*, 50 F.4th 1114 (11th Cir. 2022).

## CONCLUSION

For the foregoing reasons, and those detailed in their opening brief, Plaintiffs respectfully request that this Court preliminarily enjoin implementation of Section 2(a) of the Executive Order.

Dated: April 16, 2025                                      Respectfully submitted,

|  |  |
|---|---|
| Wendy R. Weiser* | */s/ Sophia Lin Lakin* |
| Sean Morales-Doyle* | Sophia Lin Lakin* |
| Eliza Sweren-Becker* | Ethan Herenstein* |
| Jasleen K. Singh* | Jonathan Topaz* |
| BRENNAN CENTER FOR JUSTICE AT | Clayton Pierce* |
| NYU SCHOOL OF LAW | Davin Rosborough* |
| 120 Broadway, Suite 1750 | AMERICAN CIVIL LIBERTIES UNION |
| New York, NY 10271 | FOUNDATION |
| (646) 292-8310 | 125 Broad St., 18th Floor |
| weiserw@brennan.law.nyu.edu | New York, NY 10004 |
| morales-doyles@brennan.law.nyu.edu | (212) 549-2500 |
| sweren-beckere@brennan.law.nyu.edu | slakin@aclu.org |
| singhj@brennan.law.nyu.edu | eherenstein@aclu.org |
|  | jtopaz@aclu.org |
|  | cpierce@aclu.org |
| Leah C. Aden* | drosborough@aclu.org |
| John S. Cusick* |  |
| Brenda Wright* | Megan C. Keenan (D.C. Bar No. 1672508) |
| NAACP LEGAL DEFENSE & | Sarah Brannon*** (D.C. Bar No. 90024493) |
| EDUCATIONAL FUND, INC. | Adriel I. Cepeda Derieux*** (D.C. Bar No. |
| 40 Rector Street, 5th Floor | 90026636) |
| New York, NY 10006 | Jacob Van Leer (DC Bar No. 1742196) |
| (212) 965-2200 | AMERICAN CIVIL LIBERTIES UNION |
| laden@naacpldf.org | FOUNDATION |
| jcusick@naacpldf.org | 915 15th St. NW |
| bwright@naacpldf.org | Washington, DC 20001 |
|  | (740) 632-0671 |
| Miranda Galindo* | mkeenan@aclu.org |
| Cesar Z. Ruiz* | sbrannon@aclu.org |

Delmarie Alicea*
LATINO JUSTICE PRLDEF
475 Riverside Drive, Suite 1901
New York, NY 10115
(212) 392-4752
mgalindo@latinojustice.org
cruiz@latinojustice.org
dalicea@latinojustice.org

acepedaderieux@aclu.org
jvanleer@aclu.org

Michael Perloff (D.C. Bar No. 1601047)
Scott Michelman (D.C. Bar No. 1006945)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
OF THE DISTRICT OF COLUMBIA
529 14th Street NW, Suite 722
Washington, D.C. 20045
(202) 457-0800
mperloff@acludc.org
smichelman@acludc.org

Niyati Shah (D.C. Bar No. 1659560)
Alizeh Ahmad (D.C. Bar No. 90018919)
ASIAN AMERICANS
ADVANCING JUSTICE-AAJC
1620 L Street, NW, Suite 1050
Washington, D.C. 20036
(202) 296-2300
nshah@advancingjustice-aajc.org
aahmad@advancingjustice-aajc.org

*Counsel for Plaintiffs League of Women Voters Education Fund, League of Women Voters of the United States, League of Women Voters of Arizona, Hispanic Federation, National Association for the Advancement of Colored People, OCA-Asian Pacific American Advocates, and Asian and Pacific Islander American Vote*

*\*Admitted pro hac vice*
*\*\*\* D.D.C. application pending*

/s/ Norman L. Eisen
Norman L. Eisen (D.C. Bar No. 435051)
Tianna J. Mays (D.C. Bar No. 90005882)**
Pooja Chaudhuri (D.C. Bar No. 888314523)
Sofia Fernandez Gold (D.C. Bar No. 90010196)
STATE DEMOCRACY DEFENDERS FUND
600 Pennsylvania Avenue SE #15180
Washington, D.C. 20003
(202) 601-8678
norman@statedemocracydefenders.org
tianna@statedemocracydefenders.org
pooja@statedemocracydefenders.org
sofia@ statedemocracydefenders.org

*Counsel for Plaintiffs League of United Latin American Citizens, Secure Families Initiative, and Arizona Students Association*


** Application for pro hac vice admission forthcoming*
**** D.D.C. application pending*

/s/ Danielle Lang
Danielle Lang (DC Bar No. 1500218)
Jonathan Diaz (DC Bar No. 1613558)
Robert Brent Ferguson (DC Bar No. 1782289)***
Anna Baldwin (DC Bar No. 998713)***
Heather Szilagyi (DC Bar No. 90006787)
Benjamin Phillips (DC Bar No. 90005450)***
CAMPAIGN LEGAL CENTER
1101 14th St. NW, Suite 400
Washington, D.C. 20005
(202) 736-2200
dlang@campaignlegalcenter.org
jdiaz@campaignlegalcenter.org
bferguson@campaignlegalcenter.org
abaldwin@campaignlegalcenter.org
hszilagyi@campaignlegalcenter.org
bphillips@campaignlegalcenter.org