**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, et al., | |
| Plaintiffs, | |
| v. | Civil Action No. 25-0946 (CKK) |
| EXECUTIVE OFFICE OF THE PRESIDENT, et al., | |
| Defendants. | |
| DEMOCRATIC NATIONAL COMMITTEE, et al., | |
| Plaintiffs, | |
| v. | Civil Action No. 25-cv-0952 (CKK) |
| DONALD J. TRUMP, in his official capacity as President of the United States, et al., | |
| Defendants. | |
| LEAGUE OF WOMEN VOTERS EDUCATION FUND, et al., | |
| Plaintiffs, | |
| v. | Civil Action No. 25-0955 (CKK) |
| DONALD J. TRUMP, in his official capacity as President of the United States, et al., | |
| Defendants. | |

**DEMOCRATIC PARTY PLAINTIFFS' REPLY**
**IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

**ELIAS LAW GROUP LLP**
Marc E. Elias (DC 442007)
Aria C. Branch (DC 1014541)
Lalitha D. Madduri (DC 1659412)
Christopher D. Dodge (DC 90011587)
Jacob D. Shelly (DC 90010127)
James J. Pinchak (NY 5965397)*
Julie Zuckerbrod (DC 1781133)
250 Massachusetts Ave. NW, Suite 400
Washington, DC 20001
T: (202) 968-4652

Tyler L. Bishop (DC 90014111)
1700 Seventh Ave. Suite 2100
Seattle, WA 98101
T: (206) 656-0177

*Admitted pro hac vice*

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

ARGUMENT .................................................................................................................... 2

I.    Plaintiffs' claims are justiciable. ....................................................................... 2

    A.    Plaintiffs have standing. ........................................................................ 2

    B.    Plaintiffs' claims are ripe. ................................................................... 10

II.    Plaintiffs are likely to succeed on the merits. .................................................. 12

    A.    The Receipt Deadline provisions are *ultra vires* and violate the separation of powers. ................................................................................................ 13

    B.    The DPOC provisions are *ultra vires* and violate the separation of powers. ................................................................................................ 16

    C.    The Data-Sharing provisions are *ultra vires*. .................................... 20

III.    The remaining preliminary injunction factors are satisfied. ............................ 22

    A.    Plaintiffs are suffering irreparable harm. ............................................ 22

    B.    The balance of equities and public interest favor an injunction. ......... 23

IV.    Plaintiffs request appropriately tailored preliminary relief. ............................ 24

CONCLUSION ............................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Action NC v. Strach*,
216 F. Supp. 3d 597 (M.D.N.C. 2016) ...................................................................22

*In re Aiken Cnty.*,
725 F.3d 255 (D.C. Cir. 2013) ...........................................................................14

*All. for Retired Ams. v. Bessent*,
2025 WL 740401 (D.D.C. Mar. 7, 2025) ...............................................................6

*Am. Fed'n of Tchrs. v. Bessent*,
2025 WL 895326 (D. Md. Mar. 24, 2025) ............................................................21

*Andrade v. Lauer*,
729 F.2d 1475 (D.C. Cir. 1984) .........................................................................10

*Anglers Conservation Network v. Pritzker*,
809 F.3d 664 (D.C. Cir. 2016) ............................................................................4

*Arizona v. Inter Tribal Council of Ariz., Inc.*,
570 U.S. 1 (2013) .................................................................................18, 25

*Ass'n of Cmty. Cancer Ctrs. v. Azar*,
509 F. Supp. 3d 482 (D. Md. 2020) .....................................................................25

*Axon Enterp., Inc. v. FTC*,
598 U.S. 175 (2023) ........................................................................................11

*Bay Cnty. Democratic Party v. Land*,
347 F. Supp. 2d 404 (E.D. Mich. 2004) ................................................................5

*Bldg. & Const. Trades Dep't, AFL-CIO v. Allbaugh*,
295 F.3d 28 (D.C. Cir. 2002) .......................................................................12, 18

*Butte County v. Hogen*,
609 F. Supp. 2d 20 (D.D.C. 2009) ......................................................................20

*Carey v. FEC*,
791 F. Supp. 2d 121 (D.D.C. 2011) .....................................................................22

*Carpet, Linoleum & Resilient Tile Layers, Loc. Union No. 419, Bhd. of Painters
& Allied Trades, AFL-CIO v. Brown*,
656 F.2d 564 (10th Cir. 1981) ............................................................................14

*Cent. Ala. Fair Hous. Ctr. v. Magee*,
   2011 WL 6010501 (M.D. Ala. Dec. 1, 2011) .......................................................21

*Chrysler Corp. v. Brown*,
   441 U.S. 281 (1979)...................................................................................................4

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
   401 U.S. 402 (1971)...................................................................................................20

*City & County of S.F. v. Trump*,
   897 F.3d 1225 (9th Cir. 2018) ..............................................................................4, 17

*Common Cause v. Trump*,
   506 F. Supp. 3d 39 (D.D.C. 2020)........................................................................18

*Crawford v. Marion Cnty. Election Bd.*,
   472 F.3d 949 (7th Cir. 2007) .................................................................................6

*Ctr. for Democracy & Tech. v. Trump*,
   507 F. Supp. 3d 213 (D.D.C. 2020), *vacated as moot sub nom. Ctr. for Democracy & Tech. v. Biden*, 2021 WL 11659822 (D.C. Cir. Aug. 9, 2021)..........................4

*Dalton v. Specter*,
   511 U.S. 462 (1994).................................................................................................13

*Defs. of Wildlife v. Perciasepe*,
   714 F.3d 1317 (D.C. Cir. 2013) ...........................................................................4

*Elrod v. Burns*,
   427 U.S. 347 (1976)................................................................................................22

*FDA v. All. for Hippocratic Med.*,
   602 U.S. 367 (2024)..............................................................................................2, 3

*FEC v. Akins*,
   524 U.S. 11 (1998)..................................................................................................14

*Fund For Animals v. Norton*,
   281 F. Supp. 2d 209 (D.D.C. 2003) .....................................................................20

*Gonzalez v. Arizona*,
   677 F.3d 383 (9th Cir. 2012), *aff'd sub nom. Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1 (2013) ..............................................................................15

*Hanson v. D.C.*,
   120 F.4th 223 (D.C. Cir. 2024) .............................................................................23

*Hernandez v. Ashcroft*,
    345 F.3d 824 (9th Cir. 2003) .................................................................15

*HIAS, Inc. v. Trump*,
    985 F.3d 309 (4th Cir. 2021) .................................................................17

*Hunt v. Wash. State Apple Advert. Comm'n*,
    432 U.S. 333 (1977)..................................................................................6

*Ind. State Conf. of the NAACP v. Lawson*,
    326 F. Supp. 3d 646 (S.D. Ind. 2018)...................................................22

*Indigenous Env't Network v. Trump*,
    428 F. Supp. 3d 296 (D. Mont. 2019)......................................................4

*Kobach v. U.S. Election Assistance Comm'n*,
    772 F.3d 1183 (10th Cir. 2014) .............................................................19

*League of Women Voters of Fla. v. Browning*,
    863 F. Supp. 2d 1155 (N.D. Fla. 2012)..................................................22

*League of Women Voters of Mo. v. Ashcroft*,
    336 F. Supp. 3d 998 (W.D. Mo. 2018) .............................................22, 23

*League of Women Voters of N.C. v. North Carolina*,
    769 F.3d 224 (4th Cir. 2014) .................................................................22

*League of Women Voters of U.S. v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016)......................................................18, 23, 24

*Lee v. Va. State Bd. of Elections*,
    155 F. Supp. 3d 572 (E.D. Va. 2015) ......................................................5

*Mi Familia Vota v. Fontes*,
    129 F.4th 691 (9th Cir. 2025) ................................................................19

*N.C. State Conf. of the NAACP v. N.C. State Bd. of Elections*,
    2016 WL 6581284 (M.D.N.C. Nov. 4, 2016).........................................22

*N.H. Democratic Party v. Gardner*,
    2018 WL 5929044 (N.H. Super. Apr. 10, 2018) ......................................5

*NAACP v. Trump*,
    298 F. Supp. 3d 209 (D.D.C. 2018).........................................................7

*Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*,
    2025 WL 573764 (D. Md. Feb. 21, 2025), *opinion clarified*, 2025 WL 750690
    (D. Md. Mar. 10, 2025).........................................................................12

*Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*,
   2025 WL 597959 (D.D.C. Feb. 25, 2025) ......................................................................11, 25

*Nat'l Treasury Emps. Union v. United States*,
   101 F.3d 1423 (D.C. Cir. 1996) ...................................................................................10

*New York v. Trump*,
   2025 WL 914788 (1st Cir. Mar. 26, 2025) ................................................................20

*NRDC v. U.S. Fish & Wildlife Service*,
   719 F. Supp. 3d 1 (D.D.C. 2023) ..................................................................................8

*Open Soc'y Just. Initiative v. Trump*,
   510 F. Supp. 3d 198 (S.D.N.Y. 2021) ...........................................................................18

*Owen v. Mulligan*,
   640 F.2d 1130 (9th Cir. 1981) ......................................................................................5

*Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*,
   461 U.S. 190 (1983) .....................................................................................................12

*PFLAG, Inc. v. Trump*,
   2025 WL 510050 (D. Md. Feb. 14, 2025) ..............................................................11, 17

*PFLAG, Inc. v. Trump*,
   2025 WL 685124 (D. Md. Mar. 4, 2025)...........................................................11, 24, 25

*Platte River Whooping Crane Critical Habitat Maint. Tr. v. FERC*,
   962 F.2d 27 (D.C. Cir. 1992) .........................................................................................4

*Project Vote, Inc. v. Kemp*,
   208 F. Supp. 3d 1320 (N.D. Ga. 2016) .......................................................................22

*R.I.L.R v. Johnson*,
   80 F. Supp. 3d 164 (D.D.C. 2015) ...............................................................................23

*Republican Nat'l Comm. v. Wetzel*,
   2025 WL 917346 (5th Cir. Mar. 14, 2025).................................................................13

*Republican Nat'l Comm. v. Wetzel*,
   742 F. Supp. 3d 587 (S.D. Miss.), *rev'd on other grounds*, 120 F.4th 200 (5th
   Cir. 2024) ......................................................................................................................5

*Seila Law LLC v. CFPB*,
   591 U.S. 197 (2020)......................................................................................................11

*Shays v. FEC*,
   414 F.3d 76 (D.C. Cir. 2005) .........................................................................................5

*Stone v. Trump*,
    280 F. Supp. 3d 747 (D. Md. 2017) ................................................................12, 23

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009) ..........................................................................................7

*Tolbert-Smith v. Chu*,
    714 F. Supp. 2d 37 (D.D.C. 2010) ...................................................................21

*Travelers United, Inc. v. Hyatt Hotels Corp.*,
    2025 WL 27162 (D.D.C. Jan. 3, 2025) .............................................................8

*U.S. Air Tour Ass'n v. FAA*,
    298 F.3d 997 (D.C. Cir. 2002) .........................................................................10

*U.S. Lines, Inc. v. Fed. Mar. Comm'n*,
    584 F.2d 519 (D.C. Cir. 1978) .........................................................................20

*U.S. Postal Serv. v. Nat'l Ass'n of Letter Carriers, AFL-CIO*,
    9 F.3d 138 (D.C. Cir. 1993) .............................................................................21

*United Presbyterian Church in the U.S.A. v. Reagan*,
    738 F.2d 1375 (D.C. Cir. 1984) .......................................................................4

*Washington v. Trump*,
    2025 WL 509617 (W.D. Wash. Feb. 16, 2025) ................................................4

*Washington v. Trump*,
    2025 WL 659057 (W.D. Wash. Feb. 28, 2025) ................................................24

*Yazdanpanahderav v. U.S. Dep't of State*,
    2024 WL 3010874 (D.D.C. June 14, 2024) .................................................19, 22

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952) ....................................................................................12, 15

**Statutes**

2 U.S.C. 7 .................................................................................................................14

3 U.S.C. 1 .................................................................................................................14

5 U.S.C. § 552a ........................................................................................................21

52 U.S.C. § 20501 ....................................................................................................25

52 U.S.C. § 20508 ....................................................................................................18

52 U.S.C. § 21081 ....................................................................................................15

**Other Authorities**

Alien File, Index, and National File Tracking System of Records, 78 Fed. Reg.
    69864-01 (Nov. 21, 2013)..........................................................................................22

Exec. Order No. 14215, 90 Fed. Reg. 10447 (Feb. 24, 2025) .............................................3, 15, 17

Exec. Order No. 14248, 90 Fed. Reg. 14005 (Mar. 25, 2025)......................3, 4, 14, 15, 16, 17, 21

H.R. Conf. Rep. 103-66 (Apr. 28, 1993) ...................................................................19

U.S. Const. art. I, § 4.................................................................................14

## INTRODUCTION

To avoid reckoning with the Executive Order's serial violations of statutory and constitutional law, Defendants take the remarkable position that the Order's clear commands mean nothing, and therefore Plaintiffs lack standing, a ripe cause of action, or a likely prospect of irreparable harm. According to them, there is just no telling whether executive branch agencies will, in fact, comply with the President's explicit commands. But just three days after Plaintiffs moved for emergency relief, the Election Assistance Commission began acting on the Order's commands by sending letters to elections officials nationwide concerning the E.O.'s "implement[ation]." Ex. 1. That is hardly surprising. The plain terms of the E.O. demand a top-to-bottom restructuring of election administration in a manner aimed at systematically disadvantaging the Democratic Party, including its national committees and organizations, its congressional leaders and other candidates, and its voters. And those terms leave no room for future factual contingencies that could ameliorate the straightforward legal deficiencies. The E.O. explicitly *mandates* that each Defendant agency make voter registration more difficult, mail voting more precarious, or personal data less private, all in violation of the law. Because Defendants' brief conspicuously lacks any suggestion that any Defendant may disregard the President's formal directives, preliminary relief is necessary to preserve the status quo and avoid further injury to Plaintiffs' competitive, organizational, and associational interests.

Defendants' cursory discussion of the merits does nothing to explain how the President, with his limited authority over elections, can impose such sweeping changes by fiat. On the Receipt Deadline provisions, they suggest the Attorney General has "discretion" to execute the President's order. That not only ignores the plain text of the President's commands, but also pretends the E.O. does not mandate a predetermined (and unlawful) outcome—the imposition of a "uniform day" for ballot receipt found nowhere in federal law. Defendants point only to single outlying federal

1

decision to support their view of the law yet cannot muster even a single word in that decision's defense beyond noting that it is "recent." On the DPOC provisions, the Government fails to defend Section 2(d) altogether, a provision that targets people receiving public assistance who are likely to favor Democratic candidates. As for adding a DPOC requirement to the Federal Form, Defendants seek to hide behind the EAC's decision-making procedures, even as President Trump makes clear his view that EAC Commissioners have no choice but to obey him. And, in any event, the NVRA bars precisely the modification that President Trump seeks to impose. Finally, the Government's defense of the Data-Sharing provisions are equally flimsy, ignoring that in the ordinary course State and local officials may access sensitive federal data only by request and subject to strict rules. The E.O. turns this on its head, commanding federal agencies to open the floodgates of protected personal data held by the federal government, notwithstanding the Privacy Act's limitations. Each of these unlawful acts grossly exceeds President Trump's authority and offends the separation of powers. The Court should preliminarily enjoin this unlawful usurpation.

## ARGUMENT

## I.     Plaintiffs' claims are justiciable.

### A.     Plaintiffs have standing.

Plaintiffs satisfy each of the elements required to establish Article III standing. They have suffered, and continue to suffer, concrete and particularized injuries that "directly affect[] and interfere[] with [their] core . . . activities." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024). The E.O. initiates a "predictable chain of events leading from th[at] government action to

the asserted injury." *Id.* at 385.[1] And Plaintiffs' ongoing injuries will be redressed by enjoining Defendants from implementing the unlawful provisions that the E.O. assigns to them. *Id.* at 380.

Defendants' primary response is to recast the Executive Order as a mere Executive Suggestion, positing that there is no way to know whether agency heads commanded under the E.O. will, in fact, comply with its terms. *See* Resp. 11–14. Thus, they argue, any injury that is conditional on that compliance is too speculative for Article III. *See id.* But this argument runs headlong into the President's own commands. President Trump has already declared that "[t]he President and the Attorney General's opinions on questions of law are controlling on all employees in the conduct of their official duties," and "[n]o employee of the executive branch acting in their official capacity may advance an interpretation of the law as the position of the United States that contravenes the President or the Attorney General's opinion on a matter of law." Exec. Order No. 14215 § 7, 90 Fed. Reg. 10447, 10448–49 (Feb. 24, 2025). That order provides no exception for EAC Commissioners or the other Defendants here. Moreover, each of E.O. 14248's challenged provisions asserts the President's legal interpretation in the form of a command: the EAC "shall" modify the Federal Form to require narrowly defined DPOC, E.O. § 2(a); heads of DHS, DOS, and DOGE "shall" share personal data, *id.* § 2(b); heads of federal voter registration agencies "shall assess citizenship prior to providing a Federal voter registration form to enrollees of public assistance programs," *id.* § 2(d); the Attorney General "shall" enforce the President's preferred election day ballot-receipt deadline, *id.* § 7(a); and the EAC "shall condition any available funding

---

[1] *Alliance for Hippocratic Medicine* explicitly recognizes that parties have standing to challenge government regulation of third parties where it is "likely that the government's regulation . . . of someone else will cause a concrete and particularized injury in fact to the unregulated plaintiff." 602 U.S. at 385 n.2. Because the Attorney General's enforcement of an election day ballot-receipt deadline against States would injure Plaintiffs, *see* Mem. 10–11, 13–14, 17, Plaintiffs have standing to sue the Attorney General regardless of whether any States are parties to the action. *Contra* Resp. 13.

to a State" on that State's compliance with the President's preferred ballot-receipt deadline, *id.* § 7(b); *Anglers Conservation Network v. Pritzker*, 809 F.3d 664, 671 (D.C. Cir. 2016) (recognizing the common rule that "*shall* is mandatory"). None of these provisions can be read to provide Defendants with a choice for the directives that Plaintiffs have identified as unlawful.

By their nature, executive orders are more than mere recommendations; wherever there is "a nexus between the [order] and some delegation of the requisite legislative authority by Congress," an executive order carries the force of law. *Chrysler Corp. v. Brown*, 441 U.S. 281, 304 (1979). Defendants cannot simultaneously insist that Executive Orders have legal force while proposing that agency compliance "may *never* occur." Resp. 12. When the President purports to promulgate a new law in no uncertain terms, parties who will foreseeably be injured by that law's operation have standing. *See City & Cnty. of S.F. v. Trump*, 897 F.3d 1225, 1236 (9th Cir. 2018) (holding plaintiffs had standing to challenge executive order notwithstanding "the possibility of non-enforcement"); *Washington v. Trump*, 2025 WL 509617, at *4 (W.D. Wash. Feb. 16, 2025) (recognizing standing in pre-enforcement challenge to executive order where plaintiffs "intend to engage in a course of conduct in conflict with" the order); *Indigenous Env't Network v. Trump*, 428 F. Supp. 3d 296, 306 (D. Mont. 2019) (same, notwithstanding contingency of future agency action, because agencies "report directly to the President").[2]

---

[2] Defendants only cite cases where, unlike here, agencies were not required to take any substantive action that would injure plaintiffs. *See United Presbyterian Church in the U.S.A. v. Reagan*, 738 F.2d 1375, 1380 (D.C. Cir. 1984) (emphasizing that executive order merely "*authorize[d]*" the challenged surveillance activities and did not "*direct*" them); *Center for Democracy & Technology v. Trump*, 507 F. Supp. 3d 213, 222 (D.D.C. 2020) (emphasizing that order merely instructed agencies to "*propose*," "*review*," and "*consider*" various actions), *vacated as moot sub nom. Center for Democracy & Technology v. Biden*, 2021 WL 11659822 (D.C. Cir. Aug. 9, 2021); *Defs. of Wildlife v. Perciasepe*, 714 F.3d 1317, 1324–25 (D.C. Cir. 2013) (emphasizing that challenged consent decree did not "*require*" agency "to promulgate a new, stricter rule"); *Platte River Whooping Crane Critical Habitat Maint. Tr. v. FERC*, 962 F.2d 27, 35 (D.C. Cir. 1992) (injury was contingent on speculative court-ordered conditions on hydroelectric licenses).

1.    **The Democratic Party Plaintiffs have competitive standing.**

Defendants misunderstand the doctrine of competitive standing, suggesting that such standing does not exist where voters from both major parties will be "subject to the same requirements." Resp. 15. In cases finding competitive standing, however, few of the challenged laws facially discriminated against voters based on their party affiliation. Rather, the decisions recognized that political parties may challenge laws that "arguably promote [their opponents'] electoral prospects." *Owen v. Mulligan*, 640 F.2d 1130, 1133 (9th Cir. 1981); *see also, e.g.*, *Shays v. FEC*, 414 F.3d 76, 85–86 (D.C. Cir. 2005) (recognizing competitive standing to challenge campaign finance rules that subjected everyone to the same requirements); *Lee v. Va. State Bd. of Elections*, 155 F. Supp. 3d 572, 578 (E.D. Va. 2015) (same as to voter ID law); *Bay Cnty. Democratic Party v. Land*, 347 F. Supp. 2d 404, 423 (E.D. Mich. 2004) (same as to provisional ballot rules); *New Hampshire Democratic Party v. Gardner*, 2018 WL 5929044, at *2 (N.H. Super. Apr. 10, 2018) (same as to voter registration rules).[3]

As to the specific provisions that Plaintiffs challenge, Defendants second-guess facts in Plaintiffs' sworn declarations and other exhibits without identifying any contrary evidence. On the Receipt Deadline provisions, Plaintiffs marshaled extensive support for their allegations that Democratic voters make up the largest share of mail voters in key states with extended ballot receipt deadlines, and that an earlier deadline will systematically increase the rejection rate of this Democratic-skewing category of ballots. *See* Dem. Party Pls.' Mem. in Supp. of Mot. for Prelim. Inj. at 10–11, ECF No. 53-1 ("Mem."). Defendants' unsupported hypothesis that some voters may

---

[3] It is particularly dubious for Defendants to decry "generalized grievance[s]" as to the Receipt Deadline provisions when their sole authority on the merits of that issue *rejected* the argument that the party plaintiffs' grievances were generalized. *See Republican Nat'l Comm. v. Wetzel*, 742 F. Supp. 3d 587, 595 (S.D. Miss.), *rev'd on other grounds*, 120 F.4th 200 (5th Cir. 2024).

change their behavior to cast an earlier ballot ignores the unpredictability of mail delays—an element beyond the voter's control—and that the disenfranchisement of only some voters can still affect electoral outcomes. *Id.* On the DPOC provisions, Defendants do not dispute that Democratic voters are more likely to be harmed, but assert instead that a requirement to obtain documents to vote does not inflict an injury for standing. *See* Resp. 17. Courts have already held otherwise. *E.g.*, *Crawford v. Marion Cnty. Election Bd.*, 472 F.3d 949, 951 (7th Cir. 2007). And on the Data-Sharing provisions, Defendants, again, do not dispute that "a disproportionate share of would-be Democrat[ic] registrants" will fear the nonconsensual sharing of their personal information—the very premise of the competitive injury. Resp. 17. At each turn, Defendants contemplate the hypothetical consequences of an imaginary record where declarations did not precisely document the injuries to Democrats' electoral interests. But Plaintiffs' clear injuries are not speculative merely because Defendants engage in such idle, counterfactual speculation.

### 2.    The Party Organizations have associational standing.

Defendants fail to undermine the Party Organizations' associational standing. *See Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977) (holding an organization has such standing if (1) "its members would otherwise have standing to sue," (2) the "interests it seeks to protect are germane" to its purpose, and (3) "participation of individual members" is not required). They challenge only the first and third prongs, Resp. 19–22, and are wrong on both.

Defendants first assert that the Party Organizations have made "no showing" that any named "member has been or will be injured," which Defendants appear to assume is a prerequisite for obtaining a preliminary injunction. Resp. 19–20 (citing *Summers v. Earth Island Inst.*, 555 U.S.

488, 497 (2009)).[4] But Defendants are just wrong that the Party Organizations have not identified injured members, even assuming their view of *Summers* is right. For example, DGA named *all* its formal members. *See* Edelman Decl. ¶¶ 4, 6, 10, 20 (identifying members). And all of the declarants, including Leader Jeffries and Leader Schumer, as well as DGA's members, are also members of the DNC. *See* Schneider Decl. ¶¶ 4–5. As to each provision Plaintiffs seek to enjoin, "at least one" member is injured. *Summers*, 555 U.S. at 498.

To begin, and as already explained, all three categories of the E.O. provisions that Plaintiffs challenge harm the electoral prospects of members who are candidates—including Leader Jeffries, Leader Schumer, and at least five specifically named members of DGA. Mem. 10–11, Edelman Decl. ¶ 6. The Receipt Deadline provisions also injure members who vote by mail by shortening the time they have to consider candidates and return their ballots, and by placing them at a greater risk of disenfranchisement. Mem. 13–14; *see* Edelman Decl. ¶¶ 4, 9; Snyder Decl. ¶ 6. They further harm DGA's members by usurping their personal influence and authority within their states. Mem. 14. And the Data-Sharing provisions offend the privacy of all the above-named members and similarly impose risks associated with error-prone scrutiny of their registrations. Mem. 15.

Ignoring these member-specific injuries, Defendants seek to move the goalposts as to what counts as an injury. They claim that Plaintiffs must "at the *very least* . . . name a member without qualifying documentary proof of citizenship and with a specific plan to register to vote using the Federal Form at a definite point in the future; a member who is a UOCAVA voter whose ballot

---

[4] As this Court recently observed, "the manner and degree of evidence required" to establish associational standing "varies 'at the successive stages of the litigation.'" *All. for Retired Ams. v. Bessent*, 2025 WL 740401, at *13 (D.D.C. Mar. 7, 2025) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)). It is thus not clear that *Summers*, a case decided at summary judgment, requires "names" at the preliminary injunction stage. *Cf. NAACP v. Trump*, 298 F. Supp. 3d 209, 225–26 & n.10 (D.D.C. 2018). In any event, the Court need not resolve the issue because the Party Organizations have identified injured members.

was accepted after Election Day in 2024; and a member who has a specific plan to not register to vote or to cancel their voter registration due to concern about data-sharing." Resp. 21 (emphasis in original). Plaintiffs agree that such members *also* possess individual standing to seek the same relief against the E.O. based on the same claims;[5] Defendants' simply fail to appreciate that the injuries suffered by members Plaintiffs have identified also satisfy standing's requirements. *E.g.*, *NRDC v. U.S. Fish & Wildlife Service*, 719 F. Supp. 3d 1, 11 (D.D.C. 2023).

Finally, Defendants' argument that Plaintiffs cannot show that participation of members is unnecessary (i.e., prong three) depends entirely on the false assertion that Plaintiffs have "not alleged or shown that *anyone*, let alone any of its own members" are injured. Resp. 21 (quoting *Travelers United, Inc. v. Hyatt Hotels Corp.*, 2025 WL 27162, at *15 (D.D.C. Jan. 3, 2025)). That argument fails for the same reasons already described. In any event, this Court's decision in *Travelers United* is inapposite. That was a class-action removal case involving alleged violations of state consumer-protection laws in which the *defendant*—because of their choice to seek removal—bore the burden of establishing federal jurisdiction, and sought to do so by ascribing injuries to purported individual members that the plaintiff organization did not even claim. 2025 WL 27162, at *1, 15. Here, in contrast, the Party Organizations alleged and established multiple injuries to identified members stemming from each challenged provision—and, as next explained, also to themselves as organizations.

### 3.    The Party Organizations have organizational standing.

Defendants also fail to rebut the Party Organizations' showing of organizational standing, entirely disregarding the parts of the preliminary injunction record that demonstrate how the

---

[5] Indeed, the record even at this early stage shows that Party Organization members also fall into these categories of concededly injured voters. *See* Schneider Decl. ¶¶ 9–12, 19–20, 24–25; Snyder Decl. ¶¶ 8–10, 18–19, 22–23; Ruselowski Decl. ¶¶ 9–12, 18–22, 25.

challenged provisions of the E.O. directly and perceptibly impair the Party Organizations' core activities and missions. None of that harm is surprising—the E.O. is purposefully designed to serve as a broadside attack on President Trump's political opponents.

The Receipt Deadline provisions, for instance, directly undermine the Party Organizations' core mail voting, education, and turnout efforts by creating a rule that is inconsistent with several state laws—including those where voting by mail is the norm—guaranteeing voter confusion and disenfranchisement of members and constituents who have benefited from these efforts. Mem. 17; *see* Schneider Decl. ¶¶ 8–16; Edelman Decl. ¶¶ 8–12; Snyder Decl. ¶¶ 6–12; Ruselowski Decl. ¶¶ 7–12, 15. Likewise, the DPOC provisions directly undermine the Party Organization's core voter registration, education, and turnout efforts by making it more difficult for their members and constituents (qualified voters and U.S. citizens) to register and remain registered to vote, including those citizens who currently lack qualifying proof altogether—especially in Arizona, where voters will have no option to register without producing such proof. Mem. 18; *see also* Schneider Decl. ¶¶ 18–21; Edelman Decl. ¶¶ 13–15; Snyder Decl. ¶¶ 16–20; Ruselowski Decl. ¶¶ 18–23. And the Data-Sharing provisions undermine their voter registration and turnout efforts by making it more difficult to register privacy-sensitive voters and by placing their members and constituents at an increased risk of improper removal from the rolls based on flawed matching systems. *See* Mem. 19. Defendants offer nothing but their say-so to refute this extensive evidence.

The challenged provisions of the E.O. therefore strike at the very core of the Party Organizations' missions, especially given that mail voters tend to support Democratic candidates more than other candidates. Mem. 10–12. The same is true of those voters most likely to be targeted and harmed by unnecessary DPOC requirements. *Id.* Thus, it is precisely *because* the provisions directly and perceptibly impair the Party Organizations' core activities that they must divert critical

resources away from other priorities to counteract *those* harms—and they must do so even as they are "actively planning, preparing, budgeting, and strategizing" for rapidly approaching elections. Schneider Decl. ¶¶ 6, 22; *see* Mem. 16–19, 36–43. Defendants make no meaningful argument to the contrary. *See* Resp. 18–19. And given that failure, it is unsurprising that Defendants are unable to offer any response whatsoever to the growing swell of cases—before and after *Alliance for Hippocratic Medicine*—holding that plaintiffs evidencing similar impairments to core activities (and resulting resource diversions) meet Article III's standing threshold. *Compare* Mem. 17 n.10 (collecting cases), *with* Resp. 18–19. Plaintiffs have organizational standing.

### B.    Plaintiffs' claims are ripe.

The E.O. presents a ripe dispute for the same reasons it inflicts current and ongoing injuries that confer standing. When evaluating whether a claim is ripe for review, courts consider (1) "the fitness of the issues for judicial decision" and (2) "the hardship to the parties of withholding court consideration." *Andrade v. Lauer*, 729 F.2d 1475, 1480 (D.C. Cir. 1984). Ripeness concerns dissipate when an action presents a "purely legal issue." *U.S. Air Tour Ass'n v. FAA*, 298 F.3d 997, 1014 (D.C. Cir. 2002). And when "a threatened injury is sufficiently 'imminent' to establish standing, the constitutional requirements of the ripeness doctrine will necessarily be satisfied." *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1428 (D.C. Cir. 1996).

Here, as Defendants concede, Resp. 23, Plaintiffs' challenge to the scope of presidential power presents a series of purely legal issues: Does the President have authority to dictate orders to the independent EAC? May he require agency heads to turn over private data to State and local officials? May he arbitrarily condition the provision of registration forms to enrollees of public assistance programs? May he order the Attorney General to enforce a ballot receipt deadline that has no basis in any federal statute? Each of these legal questions can be readily resolved now without any further factual development—the U.S. Constitution, U.S. Code, and U.S. Reports

provide all that is necessary to determine that the President exceeded his authority. And Plaintiffs have already established concrete, particularized, and non-speculative injuries that "loom over Plaintiffs to this day." *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, 2025 WL 597959, at *11 (D.D.C. Feb. 25, 2025). In contrast, Defendants cannot identify any factual contingencies that could affect the E.O.'s lawfulness.

The fact that additional agency action remains forthcoming does not alter the analysis. When a challenged law "violates the separation of powers," as Plaintiffs allege, "it inflicts a 'here-and-now' injury on affected third parties that can be remedied by a court." *Seila Law LLC v. CFPB*, 591 U.S. 197, 212 (2020); *see also Axon Enterp., Inc. v. FTC*, 598 U.S. 175, 192 (2023) (holding that plaintiffs may challenge an "unconstitutionally structured decisionmaking process" before suffering final agency action). Defendants' concern that adjudication now would deprive the EAC of the opportunity to "apply its expertise" in implementing the DPOC requirement, Resp. 41, altogether ignores that the central thrust of section 2(a)—and the source of Plaintiffs' injury—is its command that the EAC *forfeit* its expertise and robotically implement the President's preferred DPOC policy. Similarly, Defendants argue that challenges to agency directives must await further development where the directives "do not prescribe conduct but rather allow some agency discretion on how to best effectuate the directive." Resp. 42. But what does the challenged E.O. do if not "prescribe conduct"? *See* E.O. §§ 2, 7 (prescribing what each Defendant "shall" do). None of these commands permits any discretion that would allow the Defendant agencies to avoid the head-on collision with contrary statutes. For all their clamoring for further factual development,

Defendants cannot even *hypothesize* a potential lawful implementation of the E.O.[6]

Instead, Defendants' April 15 filing suggests that there have not been any steps towards implementing the E.O., and faults Plaintiffs for "not establish[ing]" that the EAC has even "begun" the process of updating the Federal Form. Resp. 11. But four days *prior*, the EAC's Executive Director and declarant sent a letter to state officials explaining that the E.O. "instructs" DPOC "be required" on the Federal Form and purporting to seek their "input" in implementation. Ex. 1.

## II.    Plaintiffs are likely to succeed on the merits.

Once Defendants' threshold jurisdictional arguments are set aside, they have relatively little to say on the merits. *See* Resp. 23–29. Their arguments as to each of the three merits issues— the E.O.'s ballot receipt deadline, DPOC, and data-sharing commands—boil down to the unfettered assertion that the President has king-like authority to issue commands to federal agencies. *See id.* at 24 (citing *Bldg. & Const. Trades Dep't, AFL-CIO v. Allbaugh*, 295 F.3d 28, 32 (D.C. Cir. 2002)). Yet their own authority confirms that the President's power is "not without limits" and that his obligation "to see that the laws are faithfully executed refutes the idea that he

---

[6] Decisions in other recent challenges to executive orders, including orders that required funding to be revoked, confirm that plaintiffs need not await the full implementation of the challenged order before bringing suit. *See, e.g.*, *PFLAG, Inc. v. Trump*, 2025 WL 510050, *6 (D. Md. Feb. 14, 2025); *PFLAG, Inc. v. Trump*, 2025 WL 685124, at *8 (D. Md. Mar. 4, 2025) (recognizing that "ripeness cannot hinge on the actual revocation of funding because the *threat* of revocation of funding was enough to compel the [plaintiffs to alter their behavior]"); *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, 2025 WL 573764, *13 (D. Md. Feb. 21, 2025) (holding challenge to executive orders requiring termination of grants was ripe because plaintiffs' maintained "reasonable fears" about how the orders would be implemented), *opinion clarified*, 2025 WL 750690 (D. Md. Mar. 10, 2025); *Stone v. Trump*, 280 F. Supp. 3d 747, 767 (D. Md. 2017) (holding challenge to presidential memorandum was ripe because the only uncertainties were "how, not if, the policy will be implemented"); *see also Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 201–02 (1983) (holding dispute ripe where industry plaintiffs needed to make planning decisions that would be affected by the challenged law and to "require the industry to proceed without knowing whether the [law] is valid would impose a palpable and considerable hardship on the[m]").

is to be a lawmaker." *Allbaugh*, 295 F.3d at 32 (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587 (1952)). As longstanding precedent confirms, the President's power to command executive officers "must stem either from an act of Congress or from the Constitution itself." *Youngstown*, 343 U.S. at 585. And the President lacks *any* authority to command that agencies act "unconstitutionally *or* beyond his statutory powers." *Dalton v. Specter*, 511 U.S. 462, 472 (1994) (quoting *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 691 n.11 (1949)). Because Defendants fail to identify any source of authority for the President's lawless commands in the E.O., the Court must enjoin any effort on the part of Defendants to carry out such edicts.

## A.     The Receipt Deadline provisions are *ultra vires* and violate the separation of powers.

The Government's defense of Section 7 of the E.O. rests upon three propositions: (1) that it is in accordance with the Fifth Circuit's holding in *Wetzel*; (2) that the E.O. grants the Attorney General "prosecutorial discretion" as to how to enforce "the Election Day statutes" against the States; and (3) that the EAC is "required" to condition State eligibility for certain funds on certain federal standards. *See* Resp. 27. Each of these claims is misguided, and none answer the underlying merits issue: What grant of constitutional or statutory authority permits the President or his Attorney General to "enforce" their view of federal law on the States, where Congress has in fact chosen *not* to displace reserved State authority? No such grant exists.

*First*, Defendants note that Section 7 relies upon "the most recent circuit court decision to consider ballot-receipt deadlines." Resp. 27 (citing *Wetzel*, 120 F.4th at 200). But that decision's recency does nothing to remedy its flawed *reasoning*, which Defendants do not spend even a single sentence trying to defend. Nor could they. *Wetzel* is rife with error from top to bottom: in its flawed textual analysis (*see* Mem. 26–27); its gross reliance on a single irrelevant state law decision (*id.* at 27–28); its improper construction of related statutes that recognize and incorporate States' post-

election ballot receipt deadlines (*id.* at 28–29); and its casual dismissal of longstanding State practice (*id.* at 25; Compl. ¶¶ 45–46); *see also Republican Nat'l Comm. v. Wetzel*, 2025 WL 917346, at *3 (5th Cir. Mar. 14, 2025) (Graves, J., dissenting from denial of rehearing en banc) (recounting these errors); *id.*, at *12 (Higginson, J., similar).  Defendants do not dispute *any* of these points. Nor—like *Wetzel* itself—do they grapple with the weight of authority that contradicts this novel reading of the Election Day Statutes. Mem. 25 n.12 (collecting authority).[7]

*Second*, Defendants insist that there is no problem here because the Attorney General "has prosecutorial discretion" in how to "enforce the Election Day Statutes." Resp. 27. In reality, the Attorney General lacks *any* discretion under the E.O., which commands in no uncertain terms that she "*shall* take *all* necessary action to enforce 2 U.S.C. 7 and 3 U.S.C. 1 against States" with post-election ballot receipt deadlines. E.O. § 7(a). (emphasis added).[8] Such a command is clearly "mandatory." *Carpet, Linoleum & Resilient Tile Layers, Loc. Union No. 419, Bhd. of Painters & Allied Trades, AFL-CIO v. Brown*, 656 F.2d 564, 568 (10th Cir. 1981) (concluding that "the Secretary shall . . . take such action as may be necessary" was mandatory order, and that reference to "necessary" action "did not permit disobedience to the initial directive").

Even if the Attorney General did possess some discretion under the E.O.'s text, it unambiguously orders her to impose an unlawful reading of the Election Day Statutes on the States, in violation of their reserved constitutional authority over election rules. *See* U.S. Const. art. I, § 4, cl. 1. "Prosecutorial discretion does not include the power to disregard other statutory obligations that apply to the Executive Branch," *In re Aiken Cnty.*, 725 F.3d 255, 266 (D.C. Cir.

---

[7] Indeed, until the E.O., the United States consistently took the view that the Election Day Statutes do *not* preclude States from adopting post-election day receipt laws. *See* Compl. ¶ 48.

[8] Notably, unlike many other commands within the E.O., Section 7(a) does not even pretend to limit the Attorney General to "lawful" or "appropriate" actions, ordering her only to take all "necessary" actions to achieve the President's unlawful imposition on the States. E.O. § 7(a).

2013), including the plain text meaning of the Election Day Statutes. Even where federal officials possess discretion in how to act, they may not do so based on an "improper legal ground" or "misinterpret[ation] of the law." *FEC v. Akins*, 524 U.S. 11, 25 (1998) (explaining agency discretion does not immunize it from unlawful action). That is precisely what Section 7 of the E.O. *requires* the Attorney General to do, commanding her to act in a manner that presupposes the President's incorrect reading of the Election Day Statutes can preempt valid State laws. *See* Mem. 22–25. The E.O.'s opacity as to *how* the Attorney General will carry out the *ultra vires* duty assigned to her is thus beside the point—it plainly requires that she "shall" act, any form of which is *ultra vires* and contrary the vertical separation of powers. *See* Mem. 22–25. Yet she "has no discretion to act in a manner contrary to law," *Hernandez v. Ashcroft*, 345 F.3d 824, 829 (9th Cir. 2003), and should promptly be enjoined from doing so, *accord Youngstown*, 343 U.S. at 585.

*Third*, and finally, Defendants offer a flawed defense of Section 7(b) that does not comport with its plain text. They note first that the President is free to "express[] his views on priorities for EAC funding grants." Resp. 27. But that is not what Section 7(b) says or does. It states that the EAC "shall condition" grants to the State on "each State adopt[ing] . . . a uniform and nondiscriminatory ballot receipt deadline of Election Day[.]" E.O. § 7(b). It thus commands the EAC to withhold funds to States that do not acquiesce to the President's reading of the Election Day Statutes. *Id.* The President lacks any authority to issue such a command and the EAC should be enjoined from obeying it, particularly given the President's insistence that EAC Commissioners "may [not] advance an interpretation of the law . . . that contravenes the President." *See* E.O. 14215, § 7 (claiming "control[]" over all "all employees in the conduct of their official duties").

For similar reasons, the EAC's duty to ensure that States "adopt uniform and nondiscriminatory standards that define what constitutes a vote," 52 U.S.C. § 21081(a)(6), does

not vindicate Section 7(b). Congress exercised its Elections Clause authority to "delegate[] to the EAC"—not the President—the responsibility to enforce this duty. *Gonzalez v. Arizona*, 677 F.3d 383, 403 (9th Cir. 2012), *aff'd sub nom. Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1 (2013). In any event, Defendants nowhere explain how § 21081(a)(6)—which simply requires States to adopt uniform and nondiscriminatory definitions of what constitutes a "vote"—conflicts with State laws permitting post-election day receipt of mail ballots. *See* Resp. 27. Such laws apply equally to *all* voters within a State and are thus, by definition, "uniform and nondiscriminatory."[9]

**B.     The DPOC provisions are *ultra vires* and violate the separation of powers.**

The Government's defense of the E.O.'s DPOC provisions is similarly thin. Its chief riposte is that the President is not violating the separation of powers because he has only asked the EAC to take "appropriate" action. *See* Resp. 24–25. That cramped argument invites this Court to yet again ignore the E.O.'s actual text, which commands that the EAC "*shall*" act within 30 days to reach a predetermined outcome, namely "to require, in its national mail voter registration form issued under 52 U.S.C. 20508 . . . (A) documentary proof of United States citizenship," with such proof expressly limited to documents handpicked by the President. E.O. § 2(a). Evidence now shows the agency is doing just that, notwithstanding its claims to the contrary. *See* Ex. 1. Nothing in the Constitution or NVRA empowers the President to give that command or to impose such an outcome on the EAC—notwithstanding his own view that he may do so. *See* Mem. 30–32.

This conclusion is not changed by the E.O.'s inclusion of boilerplate language in an entirely separate provision stating the E.O. should be carried out in a manner "consistent with applicable

---

[9] Some States extend post-election day receipt deadlines exclusively to UOCAVA voters. *See* Compl. ¶ 44. But Section 7(b) does not even purport to withhold grants to such States, E.O. § 7(b) (excluding "ballots cast in accordance with [UOCAVA]" from subsection 7(b) specifically); *but see also* Compl. ¶ 76 (explaining President Trump's reading of the Election Day Statutes would preempt even these State laws).

law." E.O. § 11(b); *see* Resp. 24–26 (asserting this argument). The inclusion of such a generic disclaimer is not the get-out-of-jail-free card Defendants claim it is; it does nothing to erase the E.O.'s far more specific—and *ultra vires*—command that the EAC take specific action on the President's dictated time-frame and reach his dictated outcome. To accept such an argument "would simply lead [the Court] into an intellectual cul-de-sac." *City & Cnty. of S.F.*, 897 F.3d at 1240. If the E.O.'s proclamation that it is "'consistent with law' precludes a court from examining whether the Executive Order is consistent with law, judicial review is a meaningless exercise, precluding resolution of the critical legal issues." *Id.* (further explaining that an "Executive Order's savings clause does not and cannot override its meaning"). Courts have therefore "repeatedly rejected the argument that simply including 'consistent with applicable law' or a similar boilerplate phrase inoculates an otherwise unconstitutional Executive Order from judicial review." *PFLAG*, 2025 WL 510050, at *15; *see also HIAS, Inc. v. Trump*, 985 F.3d 309, 325 (4th Cir. 2021) (rejecting "the government's attempt to immunize the Order from review through a savings clause which, if operational, would nullify the 'clear and specific' substantive provisions of the Order" (quoting *City & Cnty of S.F.*, 897 F.3d at 1239)).

Section 2 itself contains no such qualifying language or any instruction telling the EAC to follow its ordinary protocols—it is an unadorned command to accept the President's diktat. *See* E.O. § 2. "Because the Executive Order unambiguously commands action"—namely, the EAC's amendment of the Federal Form to suit President Trump's wishes—"there is more than a mere possibility that some agency might make a legally suspect decision." *City & Cnty. of S.F.*, 897 F.3d at 1240 (cleaned up). That concern is confirmed by the President's own expressed view that his orders bind and control *all* agency officials, even those Congress imbued with independence. *See* E.O. 14215, § 7. Defendants are therefore wrong to say the President has not

17

"ordered the EAC to deviate from the statutory procedures required to make such changes." Resp. 25. He has made clear his view that any deviation from his command is a violation of his proclaimed authority.

This case is therefore nothing like *Common Cause v. Trump* (Resp. 25), in which the President's more specific command contained qualifying language that is entirely absent from Section 2 of the E.O. *See* 506 F. Supp. 3d 39, 43, 47 (D.D.C. 2020) (emphasizing the "repeated and unambiguous qualifiers" in the relevant provision). That qualifying language imbued federal officials with wide discretion as to how to execute the "general policy" announced in the order. *Id.* Not so here, where Section 2 dictates the *specific* way the EAC *must* modify the Federal Form.[10]

Defendants' last gasp on this point is to insist that the EAC could choose to add a DPOC requirement anyways. *See* Resp. 25–26. That, of course, is not what the E.O. says or does.[11] It is also wrong as a matter of statute. *See* Mem. 32–33. The NVRA states that the Federal Form "may require *only* such identifying *information* (including the signature of the applicant) and other information (including data relating to previous registration by the applicant), as is *necessary* to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process." 52 U.S.C. § 20508(b)(1)

---

[10] Defendants' other cases on this score are irrelevant for the same reason. *See Allbaugh*, 295 F.3d at 33 (citing E.O. 13202, where challenged provision began with "To the extent permitted by law" language); *Open Soc'y Just. Initiative v. Trump*, 510 F. Supp. 3d 198, 215 (S.D.N.Y. 2021) (similar, where E.O. expressly instructed agencies to comply with underlying statute).

[11] For this reason, *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 11 (D.C. Cir. 2016) does not help Defendants here. Resp. 26. That decision echoed the Supreme Court's observation that it would raise constitutional doubt if a federal law precluded a state from enforcing its voter qualifications. *Newby*, 838 F.3d at 11 (citing *ITCA*, 570 U.S. at 17). No such doubt exists because the NVRA permits States to petition the EAC to include "necessary" information. *Id.* But as *ITCA* makes clear, that necessity determination is *the EAC's to make*—not the President's. 570 U.S. at 17–20.

(emphases added). The NVRA then specifies the information necessary to establish U.S. citizenship: "the signature of the applicant, under penalty of perjury," attesting "that the applicant meets each such requirement." *Id.* § 20508(b)(2). This necessary information was not an idle choice by Congress. The Senate specifically proposed amending the NVRA to state that "nothing in this Act shall prevent a State from requiring presentation of documentation relating to citizenship of an applicant for voter registration." H.R. Conf. Rep. 103-66, at *23 (Apr. 28, 1993). But the act's conferees ultimately "agree[d] with the House bill" and "d[id] not include this provision from the Senate amendment" because it was "not necessary or consistent with the purposes of th[e] Act." *Id.* The Conference Report then described the various ways such a requirement could "interfere with" or "adversely affect" voter registration. *Id.* at *23–24.

Defendants have no answer to this statutory text or legislative history. *See* Resp. 25–26. They simply insist that the EAC may impose a DPOC requirement if "necessary" to confirm voter qualification, ignoring that the NVRA's text expressly says that it is not. *See Mi Familia Vota v. Fontes*, 129 F.4th 691, 719 (9th Cir. 2025) (concluding DPOC not "necessary" under NVRA); *cf. Kobach v. U.S. Election Assistance Comm'n*, 772 F.3d 1183, 1196 (10th Cir. 2014). Section 2 is in every respect an unlawful assertion of power the President does not possess, to achieve an end the NVRA does not permit. The EAC should be enjoined from carrying out its command.

Finally, the Defendants' response entirely ignores Section 2(d), which requires the heads of federal voter registration agencies to "assess citizenship" before providing the Federal Form to public assistance recipients (but no one else)—an arbitrary and discriminatory command, contrary to the NVRA, upon which Democratic Party Plaintiffs clearly seek relief. *See* Mem. 33; *but see* Resp. 24–26 (purporting to address Section 2(d) but nowhere addressing it). Defendants have therefore conceded that Democratic Party Plaintiffs will likely prevail on the merits as to Section

2(d). *E.g.*, *Yazdanpanahderav v. U.S. Dep't of State*, 2024 WL 3010874, at *3 (D.D.C. June 14, 2024) ("The Court may treat an argument to which a party fails to respond as conceded.").

    **C.**    **The Data-Sharing provisions are *ultra vires*.**

    Finally, the Government's arguments as to the E.O.'s Data-Sharing provisions contort its own obligations under the Privacy Act. *See* Resp. 27–29. Defendants' first argument is that the various officials named in Section 2(b) are entitled to a "presumption of regularity" as to how they will carry out the E.O.'s command to open the floodgates to the private information of millions of Americans, Resp. 27, a crutch they rely on throughout their brief, *e.g. id.* 14, 31, 39–42. But they repeatedly strain that presumption beyond its breaking point, ignoring that it cannot "shield [agency] action from a thorough, probing, in-depth review." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971). Even where courts apply that presumption, "the court must determine whether [an] agency act[s] within its statutory authority." *U.S. Lines, Inc. v. Fed. Mar. Comm'n*, 584 F.2d 519, 526 (D.C. Cir. 1978) (further noting courts must ensure compliance with "applicable statutory and constitutional requirements"). Defendants elsewhere concede that *ultra vires* and separation of powers claims like those at issue boil down to that exact same "question of law," namely whether executive officials have "the power to act in a certain way." Resp. 23. It is therefore not clear what benefit Defendants believe the presumption affords them here, where the Court must in all events "engage in a substantial inquiry" into whether Defendants have lawful authority to implement the E.O. *Butte County v. Hogen*, 609 F. Supp. 2d 20, 27 (D.D.C. 2009) (quoting *Volpe*, 401 U.S. at 415).[12]

---

[12] Nor does this presumption aid Defendants in staving off preliminary relief. *See, e.g.*, *New York v. Trump*, 2025 WL 914788, at *17 (1st Cir. Mar. 26, 2025) (declining to grant stay over Administration's request invoking the presumption); *Fund For Animals v. Norton*, 281 F. Supp. 2d 209, 230 (D.D.C. 2003) (finding plaintiffs likely to succeed on the merits and granting preliminary injunction over invocation of presumption).

As to the Data-Sharing provisions, Defendants *lack* statutory authority to carry out the E.O.'s commands. The Privacy Act bars "disclos[ing] *any* record which is contained in a system of records by *any* means of communication to *any person*" absent consent or an exception. 5 U.S.C. § 552a(b). Such "disclosure" occurs upon an agency "granting access to record," regardless of how officials subsequently handle the information. *See Am. Fed'n of Tchrs. v. Bessent*, 2025 WL 895326, at *19 (D. Md. Mar. 24, 2025) (collecting authority); *Tolbert-Smith v. Chu*, 714 F. Supp. 2d 37, 43 (D.D.C. 2010) (similar). The E.O. commands just such granting of access. *See* E.O. § 2(b). Defendants fail to explain how the agencies subject to this command can conceivably obey the order in *any* manner that comports with the Privacy Act.

Defendants' next tack is to point to an online service—the Systematic Alien Verification for Entitlements program ("SAVE")—that a few States already use to query a person's citizenship status. Resp. 28. But those States have access to SAVE through memoranda of understanding specifically negotiated with the federal government—as SAVE requires. *See* Ex. 2 ("To use this service, an agency must execute a Memorandum of Agreement with SAVE.") (emphasis in original). Access to "SAVE is not automatic." *Cent. Ala. Fair Hous. Ctr. v. Magee*, 2011 WL 6010501, at *2 (M.D. Ala. Dec. 1, 2011) (explaining state agencies must apply for access and enter into a memorandum of understanding). Once more, the E.O. turns this rule on its head, mandating that federal agencies automatically disclose information to State and local officials.

The Government next points to a separate database maintained by USCIS, suggesting it falls within the "routine use" exception in the Privacy Act. *See* Resp. 28 (citing 5 U.S.C. § 552a(a)(7)); *see generally U.S. Postal Serv. v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 9 F.3d 138 (D.C. Cir. 1993) (describing routine use). But the sole published routine use notice it cites to concerns State and local agencies "*seeking*" information from USCIS, Resp. 28 (citing Alien File,

21

Index, and National File Tracking System of Records, 78 Fed. Reg. 69864-01, 69869 (Nov. 21, 2013)), which is once more the reverse of what the E.O. does. Even then, the routine use notice is restricted to ascertaining the citizenship status of individuals within the "jurisdiction of the agency for any purpose authorized by law." 78 Fed. Reg. at 69869. Defendants point to no authorization granting DOGE, for example, the authority to ascertain the citizenship status of individuals.

Defendants suggest that Section 2(b)(iii) cannot violate the Privacy Act because it references "publicly available" information that States must maintain under the NVRA. Resp. 29. That misapprehends Plaintiffs' claim, which is that this provision requires granting DOGE access to *non-public* DHS information in violation of the Privacy Act. *See* Mem. 35–36. Defendants ignore this point, effectively conceding it. *Yazdanpanahderav*, 2024 WL 3010874, at \*3.

## III.    The remaining preliminary injunction factors are satisfied.

### A.    Plaintiffs are suffering irreparable harm.

Defendants' response to Plaintiffs' showing of irreparable harm merely repeats various standing, ripeness, and merits arguments that are no more compelling the second time around. *See* Resp. 30–35. Defendants' only argument specific to the irreparable harm inquiry is their assertion that the identified harms are not irreparable because agency action may be "subject to further review under the APA." *Id*. at 36. To be sure, Plaintiffs stand ready to seek relief upon their APA claims in due course, but they have sought preliminary relief because the E.O. is harming them *now*. As courts have repeatedly held, campaign- and election-related injuries like those documented here are, by their nature, irreparable.[13] Elections are won or lost based on candidate

---

[13] *E.g.*, *Elrod v. Burns*, 427 U.S. 347, 374 n.29 (1976); *Carey v. FEC*, 791 F. Supp. 2d 121, 133–34 (D.D.C. 2011); *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014); *League of Women Voters of Mo. v. Ashcroft*, 336 F. Supp. 3d 998, 1005 (W.D. Mo. 2018); *Ind. State Conf. of the NAACP v. Lawson*, 326 F.Supp.3d 646, 662–63 (S.D. Ind. 2018); *Action*

recruiting, campaign strategizing, and voter registration efforts that plaintiffs are engaged in now—and will continue to engage in every day—as this case progresses to judgment. *See* Mem. 36–43. Because an election, once lost, cannot be re-run, the injuries inflicted by the E.O. are plainly irreparable. And contrary to Defendants' representations, pre-enforcement preliminary injunctions are an ordinary feature of executive order litigation. *E.g.*, *Stone*, 280 F. Supp. 3d at 769.

### B. The balance of equities and public interest favor an injunction.

Preliminary relief is further warranted because the balance of the equities and the public interest strongly weigh in Plaintiffs' favor. "[T]he 'Government cannot suffer harm from an injunction that merely ends an unlawful practice.'" *R.I.L.R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015) (quoting *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013)). Moreover, "there is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'" *Newby*, 838 F.3d at 12 (citation omitted). Plaintiffs' high likelihood of success, *supra* Section II, is therefore "a strong indicator that a preliminary injunction would serve the public interest" by preventing the enforcement of an executive order that violates federal law. *Newby*, 838 F.3d at 12.

The public interest will also be served by an injunction because the E.O. creates a substantial risk that citizens will be disenfranchised. *See id.* at 12. "[E]nsuring qualified voters exercise their right to vote is always in the public interest." *Ashcroft*, 336 F. Supp. 3d at 1006 (quoting *Strach*, 216 F. Supp. 3d at 648); *see also Hanson v. D.C.*, 120 F.4th 223, 247 (D.C. Cir. 2024) (holding "[t]he public interest favors the protection of constitutional rights").

---

*NC v. Strach*, 216 F. Supp. 3d 597, 642–43 (M.D.N.C. 2016); *Project Vote, Inc. v. Kemp*, 208 F. Supp. 3d 1320, 1350 (N.D. Ga. 2016); *N.C. State Conf. of the NAACP v. N.C. State Bd. of Elections*, 2016 WL 6581284, at *9 (M.D.N.C. Nov. 4, 2016); *League of Women Voters of Fla. v. Browning*, 863 F. Supp. 2d 1155, 1167 (N.D. Fla. 2012).

Defendants dispute none of this. Nor do they successfully explain how a preliminary injunction pending full merits consideration would cause them meaningful harm. *See* Resp. 37–39. They rely chiefly on the E.O.'s own stated objectives—ensuring compliance with federal law, protecting voting rights, and guarding against illegal voting—but fail to explain *how* the E.O. meaningfully advances those interests. *See id.* at 38–39. As the Government's terse defense of the merits shows, it plainly does not. Finally, Defendants argue that an injunction would harm the public interest by "restrain[ing] the President from overseeing the Executive Branch" in violation of Article II. *Id.* at 38. But "[s]eeking to effectively enact legislation by executive order clearly exceeds the bounds of Article II and thus does not serve the public interest." *PFLAG*, 2025 WL 685124, at *29. And there is no public or equitable interest in lawless executive action. *Newby*, 838 F.3d at 12. Indeed, if this Court were to accept Defendants' argument that an injunction should not issue because it would limit the President's ability to enact his policy agenda, "then no act of the executive branch asserted to be inconsistent with" the Constitution's limits on executive power "could be the subject of a preliminary injunction. That cannot be so." *Washington v. Trump*, 2025 WL 659057, at *27 (W.D. Wash. Feb. 28, 2025) (cleaned up).

## IV.    Plaintiffs request appropriately tailored preliminary relief.

Defendants argue that Plaintiffs' requested relief is overbroad because the Challenged Provisions "are consistent with [the agency heads'] existing statutory duties" and the "lawful exercise of executive authority." Resp. 44–45 (citing E.O. §§ 2(b), 7(a)). Enjoining these provisions, they claim, would burden their ability to carry out "lawful" duties. *Id.* This argument gets it backwards. The Court will issue an injunction if it finds Plaintiffs are likely to *succeed* on the merits of their claims—*i.e.*, that the Challenged Provisions are unlawful. Such an injunction must be tailored to relieve the irreparable harm flowing from imminent or ongoing actions the Court finds unlawful; it plainly need not preserve Defendants' ability to pursue lawless activities.

Defendants further argue that any injunction as to the DPOC Provision "should be limited to only Arizona" given its upcoming special congressional election. Resp. 43. To be sure, that imminent election warrants prompt relief, *see* Mem. 15, but the need for prompt relief does not stop there. Congress created the Federal Form "as a mandatory 'backstop' to state registration forms." *Newby*, 838 F.3d at 10. "No matter what procedural hurdles a State's own form imposes, the Federal Form guarantees that a simple means of registering to vote in federal elections will be available." *ITCA*, 570 U.S. at 12. It serves as a key part of Congress's stated goal in the NVRA "to establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal office." 52 U.S.C. § 20501(b)(1). And it does so by permitting *any* qualified voter in *any* State at *any* time to register to vote for the highest public offices in our nation. Restricting relief to Arizona would deprive untold *millions* of Americans of this crucial backstop. Given that clear harm, the Court should not accept the Government's invitation to grant "piecemeal" relief, *PFLAG*, 2025 WL 685124, at *30, that may well confuse voters subject to the DPOC requirement in other States while litigation proceeds, *Ass'n of Cmty. Cancer Centers v. Azar*, 509 F. Supp. 3d 482, 504 (D. Md. 2020).[14]

## CONCLUSION

The Court should grant the preliminary injunction requested by the Democratic Party Plaintiffs. The Court should not require Plaintiffs to post a bond because—as they fail to contest—Defendants will face "no monetary injury from the injunction." *Nat'l Council of Nonprofits*, 2025 WL 597959, at *19 (declining to require security).

---

[14] Defendants also briefly echo their serial argument that certain issues must be addressed through State-specific litigation. Resp. 45 (discussing Section 7(b)). For the reasons already stated, that is wrong. Section 7(b) is injurious to Plaintiffs—who include nationwide political committees—as enforced against *any* State; an injunction barring the EAC from carrying out its unlawful command affords properly tailored relief.

Dated: April 16, 2025

Respectfully submitted,

*/s/ Marc E. Elias*
**ELIAS LAW GROUP LLP**
Marc E. Elias (DC 442007)
Aria C. Branch (DC 1014541)
Lalitha D. Madduri (DC 1659412)
Christopher D. Dodge (DC 90011587)
Jacob D. Shelly (DC 90010127)
James J. Pinchak (NY 5965397)*
Julie Zuckerbrod (DC 1781133)
250 Massachusetts Ave. NW, Suite 400
Washington, DC 20001
T: (202) 968-4652

Tyler L. Bishop (DC 90014111)
1700 Seventh Ave. Suite 2100
Seattle, WA 98101
T: (206) 656-0177

*Admitted pro hac vice*

26