**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.*,<br><br>           Plaintiffs,<br><br>    v.<br><br>EXECUTIVE OFFICE OF THE PRESIDENT, *et al.*,<br><br>           Defendants. | Civil Action No. 25-0946 (CKK) |
| DEMOCRATIC NATIONAL COMMITTEE, *et al.*,<br><br>           Plaintiffs,<br><br>    v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>           Defendants. | Civil Action No. 25-0952 (CKK) |
| LEAGUE OF WOMEN VOTERS EDUCATION FUND, *et al.*,<br><br>           Plaintiffs,<br><br>    v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>           Defendants. | Civil Action No. 25-0955 (CKK) |

**MEMORANDUM OPINION**
(April 24, 2025)

These consolidated cases are about the separation of powers.  On March 25, 2025, President Donald J. Trump issued an executive order purporting to change the rules of federal elections.  Five provisions of the President's executive order are at issue in this Memorandum Opinion.

1

First, Section 2(a) orders the Election Assistance Commission—a bipartisan, independent regulatory commission—to amend the standardized national voter registration form to require documentary proof of U.S. citizenship.  Second, Section 2(b) orders the Department of Homeland Security and the Department of State to open certain databases to the United States DOGE Service and the States to search for non-citizens who have registered to vote.  Third, Section 2(d) orders federal voter registration agencies to "assess" the citizenship of individuals who receive public assistance before providing them a voter registration form.  Fourth, Section 7(a) orders the Attorney General to "enforce" two statutes "against States" that do not adopt the President's view that mail-in ballots must be received by election day to be counted.  Fifth, Section 7(b) orders the Election Assistance Commission to withhold certain federal grants from States that do not comply.

Three groups of plaintiffs filed motions for preliminary injunctions arguing that the President lacks the power to issue those orders.  They contend that under our Constitution and the relevant law, the President has no role in regulating federal elections.  Their motions do not call upon the Court to decide whether the President's executive order reflects good policy choices or even whether the policies it describes would be legal if implemented.  Rather, this Court's task is to decide whether the President can dictate those policies unilaterally, or whether that power is reserved to Congress and the States alone.

The many defendants in these consolidated cases—federal officers and agencies—say little about that question.  They have offered almost no defense of the President's order on the merits.  Instead, they argue that these suits have been brought by the wrong plaintiffs at the wrong time.

Because the Court agrees with those threshold arguments in some instances, the Court shall deny the plaintiffs' requests for preliminary injunctive relief as to Sections 2(b), 7(a), and 7(b).  On the present record, challenges to those provisions are premature or properly presented not by

these plaintiffs but by the States themselves. In fact, many States are already bringing those challenges elsewhere. *See California v. Trump*, 25-cv-10810 (D. Mass. filed Apr. 3, 2025); *Washington v. Trump*, 25-cv-0602 (W.D. Wash. filed Apr. 4, 2025).

But the defendants' threshold arguments falter with respect to the plaintiffs' challenges to Sections 2(a) and 2(d). And on the merits, the plaintiffs are substantially likely to prevail: Our Constitution entrusts Congress and the States—not the President—with the authority to regulate federal elections. Consistent with that allocation of power, Congress is currently debating legislation that would effect many of the changes the President purports to order. *See* Safeguard American Voter Eligibility Act, H.R. 22, 119th Cong. (2025). And no statutory delegation of authority to the Executive Branch permits the President to short-circuit Congress's deliberative process by executive order.

The plaintiffs have also shown that implementation of Sections 2(a) and 2(d) by the Election Assistance Commission and other federal agencies would cause them irreparable harm and would not be in the public interest. As a result, they are entitled to a preliminary injunction against that implementation.

Below, the Court explains its reasoning in reaching these conclusions.[1]

---

[1] The Court's consideration has focused on the following documents, including the attachments and exhibits thereto:

- The Plaintiffs' Complaints, ECF No.1 (Case No. 25-cv-0946), ECF No. 1 (Case No. 25-cv-0952), ECF No. 1 (Case No. 25-cv-0955);
- The Memorandum in Support of the Nonpartisan Plaintiffs' Joint Motion for a Preliminary Injunction ("Nonpartisan Pls.' Mot."), ECF No. 34-1;
- The Memorandum in Support of the Democratic Party Plaintiffs' Motion for a Preliminary Injunction ("Dem. Pls.' Mot."), ECF No. 53-1;
- The Defendants' Opposition to the Nonpartisan Plaintiffs' Joint Motion ("Defs.' Opp'n"), ECF No. 85;
- The Defendants' Opposition to the Democratic Party Plaintiffs' Motion (Defs.' Opp'n"), ECF No. 84;
- The Nonpartisan Plaintiffs' Reply in Support of their Joint Motion ("Nonpartisan Pls.' Reply"), ECF No. 96;
- The Democratic Party Plaintiffs' Reply in Support of their Motion ("Dem. Pls.' Reply"), ECF No. 97; and
- The Supplemental Declaration of Jenette Sawyer ("Sawyer Decl."), ECF No. 95-1.

## TABLE OF CONTENTS

I. BACKGROUND ......................................................................................................... 6

  A.  **Constitutional and Statutory Framework** ....................................................... 6

    1.  The Constitution on Elections ................................................................... 6

    2.  The Framers on Election Regulation......................................................... 9

    3.  The National Voter Registration Act ...................................................... 11

      a.  The Federal Form ............................................................................. 11

      b.  Voter Registration Agencies ........................................................... 12

    4.  The Help America Vote Act ..................................................................... 15

      a.  The Election Assistance Commission............................................... 15

      b.  Federal Election Requirements Payment Program ............................ 18

    5.  The Privacy Act......................................................................................... 19

  B.  **Facts and Proceedings** .................................................................................. 21

    1.  Executive Order No. 14,248..................................................................... 21

    2.  Parties ....................................................................................................... 22

    3.  Proceedings .............................................................................................. 25

II. LEGAL STANDARD ............................................................................................. 26

III. ANALYSIS............................................................................................................. 28

  A.  **Preliminary Issues** ........................................................................................ 28

    1.  Judicial Review of Presidential Orders .................................................. 28

      a.  Cause of Action................................................................................. 30

      b.  Timing: Ripeness and Standing ........................................................ 33

      c.  Saving Clauses and the Presumption of Regularity........................... 36

    2.  Article III Standing ................................................................................. 40

      a.  Organizational Standing.................................................................... 42

      b.  Associational Standing...................................................................... 44

      c.  Political-Competitor Standing ........................................................... 46

    3.  Prudential Standing to Raise Separation-of-Powers Challenges ................. 47

  B.  **Section 2(a): Directing the EAC to Add a "Documentary Proof of Citizenship" Requirement to the Federal Form**........................................................................ 48

    1.  Likelihood of Success on the Merits........................................................ 49

      a.  Timing of Review ............................................................................. 49

      b.  Standing ............................................................................................ 57

       c.    Merits ................................................................................. 67

   2.   Irreparable Harm ........................................................................ 77

   3.   Balance of Equities and the Public Interest.................................. 80

**C.  Section 2(b): Directing Agencies to Identify "Unqualified" Voters ........................... 82**

**D.  Section 2(d): Directing Federal Agencies to "Assess" Citizenship Before Providing the Federal Form to Recipients of Public Assistance .................................. 87**

   1.   Likelihood of Success on the Merits ........................................... 88

       a.    Standing ............................................................................. 88

       b.    Merits ................................................................................. 92

   2.   Irreparable Harm ........................................................................ 94

   3.   Balance of Equities and the Public Interest.................................. 95

**E.  Section 7(a): Directing the Attorney General to "Enforce" the Election Day Statutes "Against" States That Count Ballots Received After Election Day ........................... 96**

**F.  Section 7(b): Directing the EAC to "Condition" Funding to States on Not Counting Ballots Received After Election Day .................................. 100**

**G.  Scope of Relief .................................................................................. 108**

   1.   The *Purcell* Principle .................................................................. 108

   2.   Severability ................................................................................. 110

   3.   Scope of Injunctive Relief........................................................... 111

**H.  Rule 65(c) Injunction Bond .............................................................. 116**

**IV. CONCLUSION ........................................................................................ 119**

# I. BACKGROUND

## A.    Constitutional and Statutory Framework

### 1.    The Constitution on Elections

Our Constitution vests control over federal elections in the States, subject to some oversight by Congress.  Below, the Court examines two aspects of that arrangement: the allocation of power to determine voter eligibility and the allocation of power to regulate federal elections.

*First*, the Constitution empowers the States to decide who is qualified to vote in federal elections.  Under the Voter Qualifications Clause, Members of the U.S. House of Representatives must be elected by voters who "have the Qualifications requisite for Electors of the most numerous Branch of the State Legislature."  U.S. Const. art. I, § 2, cl. 1.[2]  The Seventeenth Amendment likewise prescribes that voters for U.S. Senators "shall have the qualifications requisite for electors of the most numerous branch of the State legislatures."  U.S. Const. amend. XVII.  Because the States determine who is eligible to vote for their state legislators, the Constitution indirectly grants the States authority to determine who is eligible to vote for federal legislators as well.

The logic is simpler for presidential elections.  The President is elected by vote of the Electoral College.  *See* U.S. Const. amend. XII.  And the Electors Clause empowers each State to appoint Electors to the Electoral College "in such Manner as the Legislature thereof may direct."  U.S. Const. art. II, § 1, cl. 2.  Every State now directs that its Electors be appointed by popular vote of qualified voters.  *See Chiafalo v. Washington*, 591 U.S. 578, 584 (2020).

Although States determine voter-eligibility requirements, their discretion to do so is, of course, restricted by the Constitution itself.  *E.g.*, U.S. Const. amend. XIX ("The right of citizens of the United States to vote shall not be denied or abridged . . . on account of sex.").

---

[2] Article I of the Constitution refers to voters in congressional elections as "Electors."  Article II uses the same term to refer to different people: the Members of the Electoral College.

*Second*, the Constitution grants the States broad regulatory authority over the conduct of federal elections but reserves final, supervisory authority to Congress.

Start with the States' power. The Elections Clause provides that the "Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof." U.S. Const. art. I, § 4, cl. 1. "The Clause's substantive scope is broad." *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 8 (2013) ("*ITCA*"). The terms "Times, Places, and Manner" are "comprehensive words" that "embrace authority to provide a complete code for congressional elections." *Smiley v. Holm*, 285 U.S. 355, 366 (1932). States are tasked with regulating, among other things, voter registration (*see id.*), recounts (*Roudebush v. Hartke*, 405 U.S. 15 (1972)), primaries (*United States v. Classic*, 313 U.S. 299 (1941)), and the form and content of ballots (*see Munro v. Socialist Workers Party*, 479 U.S. 189 (1986)).

But this grant of authority to the States is only "a default provision." *Foster v. Love*, 522 U.S. 67, 69 (1997). Under the Elections Clause, the States prescribe regulations in the first instance, "but the Congress may at any time by Law make or alter such Regulations." U.S. Const. art. I, § 4, cl. 1.[3] Put differently, the Elections Clause "grants Congress 'the power to override state regulations' by establishing uniform rules for federal elections, binding on the States." *Foster*, 522 U.S at 69 (quoting *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 833 (1995)).

Congress's Elections Clause power to establish those rules is supreme over, but coextensive with, the States' own regulatory power under the same clause. *See Ex parte Siebold*, 100 U.S. 371, 384–86 (1879). For that reason, determining voter qualifications "forms no part of the power to be conferred upon the national government" by the Elections Clause. *ITCA*, 570 U.S.

---

[3] The Elections Clause excepts from Congress's supervisory authority the power to determine "the Places of chusing Senators." U.S. Const. art. I, § 4, cl. 1. The Seventeenth Amendment, which dictates that Senators be popularly elected rather than chosen by state legislatures, moots this exception. *See* U.S. Const. amend. XVII.

at 17 (quoting The Federalist No. 60, at 371 (A. Hamilton) (C. Rossiter ed. 1961)).  As explained, that power flows from elsewhere in the Constitution.  And "nothing in th[ose] provisions lends itself to the view that voting qualifications in federal elections are to be set by Congress."  *Id.* at 16 (quoting *Oregon v. Mitchell*, 400 U.S. 112, 210 (1970) (Harlan, J., concurring in part)).  The precise boundary between Congress's regulatory authority and the States' voter-eligibility authority is contested, but irrelevant here.  *See id.* at 25–36 (Thomas, J. dissenting).

Although the Elections Clause power—whether exercised by the States or Congress—is sweeping, it is not limitless.  "The power to regulate the time, place, and manner of elections does not justify, without more, the abridgment of fundamental rights . . . ."  *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 217 (1986); *accord Burdick v. Takushi*, 504 U.S. 428, 433 (1992).

Careful readers will note that this Court initially raised the power to regulate federal elections but that the Elections Clause governs only the "Elections for Senators and Representatives."  U.S. Const. art. I, § 4, cl. 1.  What about *presidential* elections, then?  The Electors Clause empowers States to determine the "Manner" of electing the President but (unlike the Elections Clause) does not explicitly reserve supervisory authority to Congress.  U.S. Const. art. II, § 1, cl. 2.[4]  Nevertheless, whether as a matter of practice[5] or as a function of the Necessary and Proper Clause,[6] "the broad power given to Congress over congressional elections has been extended to presidential elections."  *Voting Rts. Coal. v. Wilson*, 60 F.3d 1411, 1414 (9th Cir. 1995).  Throughout, the Court refers to the Elections Clause with this context in mind.

---

[4] The Electoral Votes Clause directs that "Congress may determine the Time of chusing the Electors."  U.S. Const. art. II, § 1, cl. 4.  But this power is self-evidently narrower than the authority over the time, *place*, *and manner* of congressional elections granted by the Elections Clause.

[5] Congressional and presidential elections occur simultaneously.  2 U.S.C. § 7; 3 U.S.C. § 1.  So regulations of the former effectively regulate the latter.  *Cf. Ex parte Coy*, 127 U.S. 731, 751–52 (1888) (Congress's power to ensure the integrity of federal elections extends to concurrent state elections).

[6] *See Burroughs v. United States*, 290 U.S. 534, 545–48 (1934); *Buckley v. Valeo*, 424 U.S. 1, 90 (1976) (per curiam).

2.    The Framers on Election Regulation

The Constitution's allocation of authority over federal elections between Congress and the States may not be intuitive.  But it is no accident.  Instead, this design was the product of carefully considered compromises among our Constitution's Framers.

The appropriate eligibility requirements for the franchise were, of course, a subject of vigorous debate at the Founding.  "In the American colonies, under their charters and laws, no uniform rules in regard to the right of suffrage existed."  J. Story, *Commentaries on the Constitution of the United States* 416 (4th ed. 1878).  The Framers attempted to reconcile these competing rules.  *E.g.*, 2 *The Records of the Federal Convention of 1789*, at 151 (M. Farrand ed. 1911) (text of one proposal).  But they abandoned the effort.  The task proved "difficult to the convention," and any "uniform rule would probably have been as dissatisfactory to some of the States."  The Federalist No. 52 (J. Madison).  In other words, adopting a universal approach would have "put at hazard" the ratification and risked a "great embarrassment."  Story, *supra*, at 419.  In the end, leaving this power with the States was the only practical solution.  *See* Federalist No. 52 ("The provision made by the convention, appears . . . to be the best that lay within their option.").

Allocating regulatory authority over elections also required compromise.  Recognizing the impossibility of a single regulation "which would have been always applicable to every probable change in the situation of the country," the Framers resolved "that a discretionary power over elections ought to exist somewhere."  The Federalist No. 59 (A. Hamilton).  But where?

Antifederalists feared that if Congress wielded this authority alone, it would manipulate elections to accumulate power in itself at the expense of the more popularly responsive States.  *See* Federal Farmer No. 2; Federal Farmer No. 12.  For their part, Federalists decried the "abuses that might be made" of an unchecked power over elections in the States, who could "take care so to mould their regulations as to favor" their "local conveniency or prejudices" rather than the national

"common interest."  Farrand, *supra*, at 240–41 (remarks of J. Madison).  Indeed, Federalists feared that, if given the chance, the States would wield their regulatory authority to prevent federal elections altogether.  Federalist No. 59 ("They could at any moment annihilate [the national government] by neglecting to provide for the choice of persons to administer its affairs.").

The Elections Clause was forged in this crucible.  The Framers "submitted the regulation of elections for the federal government, in the first instance," to the States where such regulation would "be both more convenient and more satisfactory."  Federalist No. 59.  But they "reserved to [Congress] a right to interpose" regulations of its own where the need arose.  *Id.*  As Theophilus Parsons (later Chief Justice of the Massachusetts Supreme Judicial Court) explained, this diffusion of power would "preserve and restore to the people their equal and sacred rights of election" against "the influence of ambitious or popular characters, or in times of popular commotion, and when faction and party spirit run high."[7]  In short, as they so often did, the Framers chose balance.

Before turning to the modern Elections Clause statutes that star in this litigation, the Court pauses to note a conspicuous absence from the legal and historical context thus far provided.  The States have initial authority to regulate elections.  Congress has supervisory authority over those regulations.  The President does not feature at all.  In fact, Executive regulatory authority over federal elections does not appear to have crossed the Framers' minds:

> [T]here were only three ways in which this power could have been reasonably modified and disposed: that it must either have been lodged wholly in the national legislature, or wholly in the State legislatures, or primarily in the latter and ultimately in the former.

Federalist No. 59.[8]

---

[7] The Massachusetts Convention: Convention Debates (Jan. 16, 1788), *reprinted in* 6 *Ratification of the Constitution by the States: Massachusetts*, at 1217–18 (J. Kaminski *et al.* eds., 2000).

[8] *See also* Debate in Massachusetts Ratifying Convention, *in* 2 *The Founders' Constitution* 255 (P. Kurland & R. Lerner eds., 1987) ("I know of but two bodies wherein [the power to regulate federal elections] can be lodged—the legislatures of the several states, and the general Congress." (statement of Caleb Strong)).

3.    The National Voter Registration Act

In 1993, Congress exercised its Elections Clause authority to regulate federal elections by enacting the National Voter Registration Act ("NVRA"), Pub. L. No. 103-31, 107 Stat. 77 (codified, as amended, at 52 U.S.C. §§ 20501–20511).  Congress's stated purposes in enacting the NVRA included "establish[ing] procedures that will increase the number of eligible citizens who register to vote in elections for Federal office," helping officials at all levels of government implement the Act's requirements "in a manner that enhances the participation of eligible citizens as voters in elections for federal office," "protect[ing] the integrity of the electoral process," and ensuring the maintenance of "accurate and correct voter registration rolls."  52 U.S.C. § 20501(b).

The NVRA established a baseline set of voter registration procedures for federal elections that every State must implement, alongside "any other method of voter registration provided for under State law."  52 U.S.C. § 20503(a).  For example, the NVRA requires that States allow people to apply for voter registration when applying for drivers' licenses.  *See id.* § 20503(a)(1).  The NVRA also requires each State to "accept and use" a standard federal "mail voter registration form" (the "Federal Form").  *Id.* § 20505(a)(1).

a.    *The Federal Form*

The Federal Form consists of three components: an application (the portion of the Federal Form that a would-be voter must fill out); general instructions for completing the application; and appended state-specific instructions.  *See* 11 C.F.R. § 9428.3.  The NVRA sets strict limits on the contents of the Federal Form.  Most relevantly, the application section:

> may require only such identifying information (including the signature of the applicant) and other information (including data relating to previous registration by the applicant), as is necessary to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process.

52 U.S.C. § 20508(b)(1). The state-specific instructions must "specif[y] each eligibility requirement (including citizenship)" set by state law. *Id.* § 20508(b)(2)(A). And the application must verify an applicant's eligibility under state law through an "attestation that the applicant meets each such requirement[s]" that "requires the signature of the applicant, under penalty of perjury." *Id.* § 20508(b)(2)(B)–(C). The Federal Form "may not include any requirement for notarization or other formal authentication." *Id.* § 20508(b)(3).

The Conference Committee on the bill that became the NVRA considered and rejected an amendment proposed in the Senate that would have expressly allowed States to "requir[e] presentation of documentation relating to citizenship of an applicant for voter registration." *See* H.R. Rep. No. 103–66, at 23 (1993) (Conf. Rep.). The Conference Committee concluded that such an amendment was "not necessary or consistent with the purposes of this Act" and "could be interpreted by States to permit registration requirements that could effectively eliminate, or seriously interfere with, the mail registration program of the Act." *Id.*

Congress initially assigned responsibility for maintaining the Federal Form and developing regulations for its use to the Federal Election Commission ("FEC"), a federal agency that Congress created as an independent, bipartisan commission. *See* Pub. L. No. 103-31 § 6(a), 107 Stat. 77, 79 (1993) (codified at 52 U.S.C. § 20505(a)(1); *id.* § 9(a), 107 Stat. 77, 87 (1993) (codified, as amended, at 52 U.S.C. § 20508(a)); *see also* 52 U.S.C. § 30106(a) (establishing the FEC).

### b.    *Voter Registration Agencies*

States must "accept and use" the Federal Form "for the registration of voters in elections for Federal office." 52 U.S.C § 20505(a)(1). But that mandate is meaningless unless would-be voters can access the Federal Form. So the NVRA requires that certain state and federal agencies distribute the Federal Form. *Id.* §§ 20506(a)(1), (a)(4), (a)(6). An agency subject to this requirement is a "voter registration agency." *Id.* § 20502(5).

The NVRA designates some entities as voter registration agencies automatically. For example, a "recruitment office of the Armed Forces of the United States shall be considered to be a voter registration agency." 52 U.S.C. § 20506(c)(2). Likewise, States must treat certain of their own agencies as voter registration agencies, including "all offices in the State that provide public assistance" and "all offices in the State that provide State-funded programs primarily engaged in providing services to persons with disabilities." *Id.* § 20506(a)(2)(A)–(B).

A Senate amendment to the bill that became the NVRA would have given States discretion whether to designate their public-assistance and disability-services offices as voter registration agencies. *See* H.R. Rep. No. 103–66, at 18 (1993) (Conf. Rep.). But the Conference Committee rejected that amendment. *Id.* The "principle [sic] place to register under" the NVRA is a State's department of motor vehicles. *Id.* at 19. And the Conference Committee expressed concern that, if a State provided the Federal Form *only* at the DMV, it would "exclude a segment of its population from those for whom registration will be convenient and readily available—the poor and persons who do not have driver's licenses and will not come into contact with" the DMV. *Id.* "The only way to [en]sure that no State [could] create an agency registration program that discriminates against a distinct portion of its population" was to "require that the agencies designated in each State include an agency that has regular contact with those who do not have driver's licenses." *Id.* And the Conference Committee determined that "those agencies that provide public assistance and services to persons with disabilities" were "most likely to have such contact and complement the motor vehicle registration program" at the NVRA's core. *Id.*

But the NVRA contemplates the establishment of voter registration agencies beyond those it expressly mandates. The NVRA directs the States to "designate other offices within the State as voter registration agencies," which "may include" additional State or local government offices

as well as "Federal and nongovernmental offices, with the agreement of such offices." 52 U.S.C. § 20506(a)(3). The federal agencies that operate those offices must, "to the greatest extent practicable, cooperate with the States" when they receive a request to serve as a voter registration agency. *Id.* § 20506(b).

Several of the agency Defendants in this matter serve as voter registration agencies. The NVRA mandates that the Department of Defense do so because DoD operates "recruitment office[s] of the Armed Forces of the United States." 52 U.S.C. § 20506(c)(2). And the Department of Veterans Affairs, Department of Interior, and Small Business Administration each operate offices that have reached agreements to serve as voter registration agencies in certain States.[9]

The NVRA imposes duties on voter registration agencies. Voter registration agencies must distribute the Federal Form, assist applicants in completing the Federal Form, and transmit completed Federal Forms to the appropriate State election official. 52 U.S.C. § 20506(a)(4). A voter registration agency's duty to provide the Federal Form is mandatory. The NVRA provides that "[d]istribution of" the Federal Form is among the services that "shall be made available" at every voter registration agency. *Id.* § 20506(a)(4)(A)(i). The NVRA further provides that any voter registration agency that "provides service or assistance in addition to" registering voters "shall . . . distribute with each application for such service" the Federal Form. *Id.* § 20506(a)(6)(A)(i). The *only* circumstance in which a voter registration agency may withhold the Federal Form is when "the applicant, in writing, declines to register to vote." *Id.* § 20506(a)(6).

---

[9] *See* Dem. Pls.' Mot. at 45. Although some of these federal offices provide public assistance, they are distinct from the "offices in the State that provide public assistance" referred to elsewhere in the NVRA. 52 U.S.C. § 20506(a)(2)(A). As explained, those public-assistance offices are *State* offices.

4.        The Help America Vote Act

Congress later enacted the Help America Vote Act of 2002 ("HAVA"), Pub. L. No. 107-252, 116 Stat. 1666, partly in response to the election-administration challenges that arose during the Presidential election in 2000.  *See* H.R. Rep. 107-329, at 32 (2001).  HAVA made two changes to federal election law relevant to the pending motions: (a) it created a new independent agency to set standards and share best practices related to some aspects of federal elections, and (b) it established a system of federal payments to States to help cover the costs of improving federal election administration.  *See* Pub. L. No. 107-252, Title II, § 201, 116 Stat. 1666, 1673 (codified at 52 U.S.C. § 20921); *id.* §§ 251–53, 116 Stat. 1666, 1692–96 (codified, as amended, at 52 U.S.C. §§ 21001–21003).

a.        *The Election Assistance Commission*

HAVA created a new "independent entity" called the Election Assistance Commission ("EAC").  52 U.S.C. § 20921.  Congress established the EAC as a primarily advisory body "serv[ing] as a national clearinghouse and resource for the compilation of information and review of procedures with respect to the administration of Federal elections."  *Id.* § 20922.

The EAC is composed of four Members appointed by the President with the advice and consent of the Senate.  *See* 52 U.S.C. § 20923(a)(1).  Each Member must "have experience with or expertise in election administration or the study of elections."  *Id.* § 20923(a)(3).  Members serve staggered four-year terms in two groups, such that two vacancies arise on the EAC every two years in the normal course.  *See id.* §§ 20923(b)(1)–(2).  After their four-year terms expire, Members may be reappointed to serve one additional term.  *Id.* § 20923(b)(1).  Members elect among themselves a chair and vice chair, who each serve a one-year term in that role that cannot be renewed during their four-year term as Members.  *Id.* § 20923(c).  And Members also appoint, by majority vote, an Executive Director, who serves a four-year term.  *Id.* § 20924(a).

15

Congress designed the EAC to be both partisan (*i.e.*, explicitly linked to political parties) and bipartisan (*i.e.*, balanced equally between the two major political parties). *See* H.R. Rep. 107-329, at 59 (2001) (describing the EAC as a "four-member, bipartisan commission"). But that design comes to fruition somewhat indirectly. For example, before the President nominates a potential Member, the Majority and Minority Leaders of both the House and Senate "shall each submit to the President a candidate recommendation" for the position "affiliated with the political party of the Member of Congress involved." 52 U.S.C. § 20923(a)(2). This recommendation is a recommendation only; HAVA does not explicitly require that the President nominate the person so recommended. *See id.*

But other provisions of HAVA implicitly require partisan balancing. For example, when the first crop of four Members took office, two Members had to serve shortened two-year terms to achieve Congress's desired staggered-term structure. Congress required that "not more than one" of the Members relegated to these abbreviated terms "be affiliated with the same political party." 52 U.S.C. § 20923(b)(2)(A). When Members select their chair and vice chair, they are similarly restricted: "[T]he chair and vice chair may not be affiliated with the same political party." *Id.* § 20923(c)(1). Because the chair and vice chair may serve in that role for only one year of their four-year term, and because there are only two political parties whose members have occupied the roles of Majority and Minority Leader of the House and Senate since HAVA's enactment, compliance with this provision necessarily requires that the President cannot nominate more than two Members from his own political party to the EAC.

By statute, the EAC may not take "[a]ny action" without "the approval of at least three of its members." 52 U.S.C. § 20928. In practice, this requirement ensures that the EAC may only take actions that have bipartisan support.

HAVA reassigned responsibility for maintaining the Federal Form from the FEC to the newly-created EAC.  Pub. L. No. 107-252, Title VIII, § 802, 116 Stat. 1666, 1726 (2002); *see* 52 U.S.C. § 20508(a).  The EAC is therefore responsible for "develop[ing]" the Federal Form "in consultation with the chief election officers of the States," 52 U.S.C. § 20508(a)(2), reporting to Congress periodically on the NVRA's "impact . . . on the administration of elections for Federal office," *id.* § 20508(a)(3), and prescribing any regulations that are "necessary to carry out" those duties, *id.* § 20508(a)(1).  The EAC also must "provide information to the States" about each State's responsibilities under the NVRA.  *Id.* § 20508(a)(4).

The EAC lacks any rulemaking authority, "except to the extent permitted under" the section of the NVRA allowing rulemaking regarding the contents of the Federal Form and periodic reports to Congress on the impact of the NVRA.  52 U.S.C. § 20929; *see* 52 U.S.C. § 20508(a); *see also* H.R. Rep. No. 107-730, at 69 (2002) (Conf. Rep.) (explaining that HAVA "[p]rohibits" the EAC "from imposing any rule, regulation, or taking any action that imposes requirements on State or local governments except as permitted under the [NVRA]").  Exercising this limited rulemaking authority, the EAC may alter the Federal Form by promulgating regulations through notice-and-comment rulemaking.  *See* 52 U.S.C. § 20929; *cf. Final Rules: National Voter Registration Act of 1993*, 59 Fed. Reg. 32,311 (June 23, 1994) (implementing regulations promulgated by the EAC's predecessor in this role, the FEC).

The EAC's rulemaking process is as follows.  If the EAC determines that a change to the Federal Form is necessary, it must develop that change as a proposed rule, which must be approved by at least three EAC Members.  *See* 52 U.S.C. § 20928.  Once the EAC has approved a proposed rule, it must comply with the Administrative Procedure Act by issuing a notice of proposed rulemaking and receiving public comments.  5 U.S.C. § 553.  The EAC must also "consult[] with

the chief election officers of the States" regarding its proposed changes to the Federal Form. 52 U.S.C. § 20508(a)(2). Once the EAC has received feedback from the public and the States, it must consider revisions to its proposed rule, and any revisions must again be approved by at least three EAC Members. *See* 5 U.S.C. § 553(c); 52 U.S.C. § 20928. Following any revisions, the EAC then promulgates the finalized rule amending the Federal Form. *See* 5 U.S.C. § 553(c).

Finally, because the Federal Form is, at bottom, government-mandated paperwork, the EAC must treat it as a "collection of information" under the Paperwork Reduction Act. 44 U.S.C. § 3502(3). As a result, the EAC must conduct certain internal administrative reviews and an additional public comment period. *See id.* § 3506(c). The EAC must also submit the collection of information for approval by the Office of Information and Regulatory Affairs within the Office of Management and Budget. *See id.* § 3507(a)(2). But because the EAC is an "independent regulatory agency . . . administered by 2 or more members of a commission," it "may by majority vote void" any disapproval of its collection of information by OIRA. *Id.* § 3507(f)(1)(A).

### b.    *Federal Election Requirements Payment Program*

To help States cover the cost of implementing new standards for federal elections, HAVA established a federal program providing matching funds, called "requirements payments," to the States. *See* 52 U.S.C. §§ 21001–21003. HAVA provides that the EAC "shall make a requirements payment each year in an amount determined under" one of its provisions "to each State which meets the conditions described in" another of its provisions. *Id.* § 21001(a)); *see also* H.R. Rep. No. 107-730, at 71 (2002) (Conf. Rep.) (explaining that HAVA "[r]equires" the EAC "to make yearly payments to qualifying States").

HAVA mandates that requirements payments be distributed pursuant to a statutory formula. *See* 52 U.S.C. § 21002. The amount of the payment is determined by multiplying the total annual appropriation for requirements payments and each State's share of the Nation's voting-

age population.  *Id.* §§ 21002(a)–(b).  The only discretion the EAC may exercise in allocating funds is a pro rata reduction of each State's disbursement to ensure that all States and the District of Columbia receive at least 0.5% of the total appropriation.  *Id.* § 21002(c)(1).[10]

But a State's entitlement to requirements payments is not unconditional.  To receive requirements payments, each State must file with the EAC a "State plan."  52 U.S.C. § 21003.  The State plan must, among other things, explain how the State will use its requirements payment, describe how the State will adopt voting system guidelines, and inform the EAC of any changes from prior State plans.  *Id.* § 21004.  The State plan must also certify the State's compliance with six, listed federal laws related to voting rights.  *See id.* § 21003(b)(3).  The laws with which States must certify compliance are (1) the Voting Rights Act of 1965, 52 U.S.C. § 10301 *et seq.*; (2) the Voting Accessibility for the Elderly and Handicapped Act, 52 U.S.C. § 20101 *et seq.*; (3) the Uniformed and Overseas Citizens Absentee Voting Act, 52 U.S.C. § 20301 *et seq.*; (4) the NVRA; (5) the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.*; and (6) the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.*  52 U.S.C. § 21145(a).

States are not required to certify their compliance with any other law.  And HAVA dictates in no uncertain terms that "[t]he specific choices on the methods of complying with the elements of a State plan shall be left to the discretion of the State."  52 U.S.C. § 21003(c).  Other than the certification requirement, HAVA contemplates no supervisory role for the EAC, nor does it delegate discretion to the EAC in prioritizing or qualifying eligibility for requirements payments.

### 5.    The Privacy Act

This Court has recently discussed the Privacy Act of 1974, 5 U.S.C. § 552a, at length elsewhere.  *See All. for Retired Ams. v. Bessent*, --- F. Supp. 3d ----, 2025 WL 740401, at *1–3

---

[10] Puerto Rico, Guam, American Samoa, and the U.S. Virgin Islands must receive 0.1%.  52 U.S.C. § 21002(c)(2).

(D.D.C. 2025) (CKK).  The Act "was designed to provide individuals with more control over the gathering, dissemination, and accuracy of agency information about themselves."  *Greentree v. U.S. Customs Serv.*, 674 F.2d 74, 76 (D.C. Cir. 1982).  To that end, the Act imposes burdens on federal agencies and creates rights for individuals when those agencies collect, maintain, use, or disseminate individuals' personal information.

The Privacy Act is structured around two units of analysis.  First, the Act protects individuals' interests in their "record[s]," meaning "any item, collection, or grouping of information about an individual that is maintained by an agency."  5 U.S.C. § 552a(a)(4).  Second, the Act protects those interests by regulating how agencies manage "system[s] of records," meaning "group[s] of any records under the control of any agency from which information is retrieved by the name of the individual or by some identifying number, symbol, or other identifying particular."  *Id.* § 552a(a)(5).

Much of the Privacy Act concerns procedures for ensuring the accuracy of records.  *See All. for Retired Ams.*, 2025 WL 740401, at *2.  But, as relevant here, the Act also prohibits federal agencies from sharing individuals' records, except under certain limited circumstances:

> No agency shall disclose any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains, unless [an enumerated exception applies].

5 U.S.C. § 552a(b).

The Act allows for intra-agency disclosure on a need-to-know basis.  That is, an agency may disclose a record "to those officers and employees of the agency which maintains the record who have a need for the record in the performance of their duties."  5 U.S.C. § 552a(b)(1).

Inter-agency and extra-agency disclosure is more carefully circumscribed.  For example, an agency may disclose a record to "another agency or to an instrumentality of any governmental

jurisdiction . . . for a civil or criminal law enforcement activity," but only upon a "written request to the agency which maintains the record specifying the particular portion desired and the law enforcement activity for which the record is sought."  5 U.S.C. § 552a(b)(7).

Agencies may also disclose records "for a routine use."  5 U.S.C. § 552a(b)(3).  A routine use is the use of a record "for a purpose which is compatible with the purpose for which it was collected."  *Id.* § 552a(a)(7).  But agencies cannot invent routine uses on the fly.  Instead, any time they establish or revise a system of records, they must "publish in the Federal Register" a notice containing a list of "each routine use of the records contained in the system, including the categories of users and the purpose of such use."  *Id.* § 552a(e)(4)(D).  If that systems of record notice ("SORN") announces "any new use," the agency must give notice to the public thirty days in advance and "provide an opportunity for interested persons to submit written data, views, or arguments" about the new routine uses.  *Id.* § 552a(e)(11).

The Privacy Act does not specifically provide a remedy for violations of its prohibition on disclosure.  Instead, that prohibition is enforced through a catch-all remedial provision.  5 U.S.C. § 552a(g)(1)(D).  If the unlawful disclosure has "an adverse effect on an individual," that individual may bring a civil suit in federal district court.  *Id.*  And if the disclosure "was intentional or willful," the plaintiff may recover attorney's fees and the greater of their actual damages or $1,000.  *Id.* § 552a(g)(4).

### B.    Facts and Proceedings

#### 1.    Executive Order No. 14,248

On March 25, 2025, President Donald J. Trump signed an Executive Order entitled "Preserving and Protecting the Integrity of American Elections."  Exec. Order 14,248, 90 Fed. Reg. 14005 (Mar. 25, 2025).  The President's Executive Order directs a variety of federal officials to take actions that the President proffers will help ensure that federal elections are "honest and

worthy of the public trust." *Id.* § 1. Among other things, the Executive Order directs the EAC to "take appropriate action" within 30 days "to require" people registering to vote using the Federal Form to submit "documentary proof of United States citizenship." *Id.* § 2(a). It directs the heads of various federal agencies to take action to "identify unqualified voters registered in the States" by sharing information in federal databases with State officials and the U.S. DOGE Service. *Id.* § 2(b). It further directs the heads of any federal agencies designated as voter registration agencies under the NVRA to "assess citizenship" before providing the Federal Form to "enrollees of public assistance programs." *Id.* § 2(d). It directs the Attorney General to "enforce" two federal statutes, 2 U.S.C. § 7 and 3 U.S.C. § 1, "against States" that count ballots received after Election Day in federal elections. Exec. Order 14,248 § 7(a). And it directs the EAC to "condition any available funding to a State on that State's compliance with" a rule requiring that States only count ballots received on or before Election Day, subject to limited exceptions for certain ballots cast by servicemembers and other Americans living abroad. *Id.* § 7(b).

  2. <u>Parties</u>

Soon after President Trump issued this Executive Order, three groups of Plaintiffs promptly filed suit in this District seeking injunctive and declaratory relief against various executive officers and agencies to block implementation of provisions of the President's Executive Order. *See* Compl., ECF No. 1 (Case No. 25-cv-0946), ¶ 1 & at 49; Compl., ECF No. 1 (Case No. 25-cv-0952), ¶ 4, at 68–69 & Ex. A; Compl., ECF No. 1 (Case No. 25-cv-0955), ¶ 1 & at 33.

Two of the groups of Plaintiffs in these actions consist of nonpartisan, not-for-profit organizations. The first group to file includes the League of United Latin American Citizens ("LULAC"), the Secure Families Initiative, and the Arizona Students' Association (collectively, the "LULAC Plaintiffs"). Compl., ECF No. 1 (Case No. 25-cv-0946), ¶¶ 7–21. The second group includes the League of Women Voters Education Fund, the League of Women Voters of the United

States, the League of Women Voters of Arizona, the Hispanic Federation, the National Association

for the Advancement of Colored People ("NAACP"), OCA – Asian Pacific American Advocates,

and Asian and Pacific Islander American Vote (collectively, the "League Plaintiffs").  Compl.,

ECF No. 1 (Case No. 25-cv-0955), ¶¶ 11–22.  In this Memorandum Opinion, the Court refers to

these two groups collectively as the "Nonpartisan Plaintiffs."

The other group of Plaintiffs includes several national organizations affiliated with the

Democratic Party—the Democratic National Committee (DNC), Democratic Governors

Association (DGA), Democratic Senatorial Campaign Committee (DSCC), and Democratic

Congressional Campaign Committee (DCCC)—as well as the individual leaders of the Democratic

Caucuses in the U.S. Senate and the U.S. House of Representatives, Charles E. Schumer and

Hakeem S. Jeffries.  Compl., ECF No. 1 (Case No. 25-cv-0952), ¶¶ 9, 12–17.  The Court will refer

to these parties collectively as the "Democratic Party Plaintiffs."

Many of the Nonpartisan Plaintiffs are membership organizations with members and

supporters throughout the Nation, including at least one organization—the League of Women

Voters of the United States—that is organized in every State and the District of Columbia.[11]  Each

of the Nonpartisan Plaintiffs asserts an interest in helping eligible citizens register to vote in federal

elections.[12]  Several of the Nonpartisan Plaintiffs assert specific interests in helping eligible

---

[11] *See, e.g.*, Decl. of Celina Stewart ("Stewart Decl."), ECF No. 34-29, ¶ 2 (stating that Plaintiff League of Women Voters of the United States "has more than a million members and supporters and is organized in nearly 800 communities and in every state and the District of Columbia"); Decl. of Tyler Sterling ("Sterling Decl."), ECF No. 34-6, ¶¶ 4, 6 (stating that Plaintiff NAACP "has state and regional conferences representing 48 states and the District of Columbia, with nearly 2,200 units across the United States" and "over two million supporters and members, including voters throughout the United States"); Decl. of Sarah Streyder ("Streyder Decl."), ECF No. 34-13, ¶¶ 4, 6 (stating that Plaintiff Secure Families Initiative has "over 44,000 members" and "has members registered to vote in all 50 states"); Decl. of Juan Proaño ("Proaño Decl."), ECF No. 34-24, ¶ 2 (stating that Plaintiff LULAC is a "nationwide" organization with "525 councils (local chapters) and over 325,000 members").

[12] *See* Proaño Decl. ¶ 12 (LULAC); Streyder Decl. ¶ 19 (Secure Families Initiative); Decl. of Kyle Nitschke ("Nitschke Decl."), ECF No. 34-25, ¶ 3 (Arizona Students' Association); Stewart Decl. ¶¶ 3–4 (League of Women Voters Education Fund and League of Women Voters of the United States); Decl. of Pinny Sheoran ("Sheoran Decl."), ECF

23

citizens register to vote in an upcoming federal election in Arizona for which the registration deadline is June 16, 2025.[13]  Several of the Nonpartisan Plaintiffs also offer online voter registration tools and written materials in several languages that are designed to help eligible voters register using the Federal Form.[14]  Finally, some of the Nonpartisan Plaintiffs also assert that their individual members have legally protected interests in using the Federal Form to register to vote in federal elections.[15]

Some of the Democratic Party Plaintiffs are also active in every State.[16]  Each of the Democratic Party Plaintiffs asserts an interest in fair, lawful competition for federal elective office.[17]  And two of the Democratic Party Plaintiffs—Hakeem Jeffries and Charles Schumer—

---

No. 34-23, ¶ 8 (Leage of Women Voters of Arizona); Decl. of Frankie Miranda ("Miranda Decl."), ECF No. 34-20, ¶ 5 (Hispanic Federation); Sterling Decl. ¶ 8 (NAACP); Decl. of Thu Nguyen ("Nguyen Decl."), ECF No. 34-30, ¶¶ 8–9 (OCA – Asian Pacific American Advocates); Decl. of Christine Chen ("Chen Decl."), ECF No. 34-31, ¶¶ 5–7 (Asian and Pacific Islander American Vote).

[13] *See, e.g.*, Sheoran Decl. ¶¶ 26, 29 (explaining that the League of Women Voters of Arizona plans to assist eligible Arizonans to register to vote using the Federal Form in anticipation of the 2025 Special Congressional Election for Arizona's Seventh Congressional District); Proaño Decl. ¶¶ 54–55 (explaining that LULAC plans to help register Arizona voters ahead of the primary and general elections in this special election); Nitschke Decl. ¶ 11 (explaining that the Arizona Students' Association plans to register Arizona voters ahead of the registration deadline for the primary in this special election); *see also* Nonpartisan Pls.' Ex. 31, ECF No. 34-32 (stating that the registration deadline for the primary in this special election is June 16, 2025).

[14] *See, e.g.*, Proaño Decl. ¶¶ 13–15, 28 (LULAC); Streyder Decl. ¶ 19 (Secure Families Initiative); Stewart Decl. ¶¶ 3, 7, 10–19, 21–22 (League of Women Voters Education Fund and League of Women Voters of the United States); Sheoran Decl. ¶¶ 10, 36 (League of Women Voters of Arizona); Miranda Decl. ¶¶ 15–16, 19 (Hispanic Federation); Sterling Decl. ¶¶ 10–19 (NAACP); Nguyen Decl. ¶¶ 10–11, 15 (OCA – Asian Pacific American Advocates); Chen Decl. ¶¶ 8–16 (Asian and Pacific Islander American Vote).

[15] *See, e.g.*, Proaño Decl. ¶¶ 29–30 (LULAC); Streyder Decl. ¶¶ 8–9 (Secure Families Initiative); Nitschke Decl. ¶¶ 7–11.

[16] *See, e.g.*, Decl. of Liberty Schneider ("Schneider Decl."), ECF No. 53-4, ¶ 6 (stating that Plaintiff DNC "provides support and resources to thousands of candidates at the local, state, and federal level in every state across the country"); Decl. of Erik Ruselowski ("Ruselowski Decl."), ECF No. 53-7, ¶ 4 (stating that Plaintiff DCCC's "members and constituents are grassroots Democratic voters in all 50 states"); *see also* Decl. of Lillie Snyder Boss ("Boss Decl."), ECF No. 53-6, ¶¶ 3, 5 (stating that Plaintiff DSCC's "mission is to elect candidates of the Democratic Party across the country to the U.S. Senate" and that it is actively "supporting ten incumbent Democratic Senators and non-incumbent Democratic candidates in up to an additional twelve states" ahead of the 2026 midterm elections).

[17] *See, e.g.*, *See* Schneider Decl. ¶¶ 3, 18–23 (DNC); Decl. of Jillian Edelman ("Edelman Decl."), ECF No. 53-5, ¶¶ 4, 13–17 (DGA); Boss Decl. ¶¶ 3, 16–21 (DSCC); Ruselowski Decl. ¶¶ 4, 18–24 (DCCC); Decl. of Hakeem Jeffries

are active candidates for federal elective office.[18]  The Democratic Party Plaintiffs collectively represent millions of eligible voters throughout the United States, some of whom they say will be unable to register to vote or would be dissuaded from registering if documentary proof of citizenship were required as a condition of voter registration[19] or would be at risk of having their lawfully-cast ballots not counted if States imposed a ballot-receipt deadline of Election Day.[20]

### 3.    Proceedings

On April 1, 2025, the Clerk of the Court randomly assigned the Democratic Party Plaintiffs' case to this Court pursuant to Local Rule of Civil Procedure 40.3(a).  The Nonpartisan Plaintiffs' cases were later assigned to this Court as "related case[s]" pursuant to Local Rule of Civil Procedure 40.5(c).  These three cases are "related" because they "grow out of the same event or transaction"—the issuance of Executive Order No. 14,248—and "involve common issues of fact" related to the effect of that Executive Order.  *See* LCvR 40.5(a)(3).

Given the extensive commonalities among the factual and legal issues among the three cases, this Court directed the Democratic Party Plaintiffs to meet and confer with the parties in all three related cases to determine each parties' position on whether the cases should be consolidated and, if appropriate, file a motion to consolidate the cases.  *See* Order, ECF No. 15 (Case No. 25-cv-0952); *see also* Fed. R. Civ. P 42(a)(2) (allowing consolidation of multiple civil cases presenting "a common question of law or fact").  The Democratic Party Plaintiffs then filed a motion to consolidate the cases, with the consent of all parties.  *See* Mot. to Consolidate Cases,

---

("Jeffries Decl."), ECF No. 53-2, 3–4, 18–19; Decl. of Charles Schumer ("Schumer Decl."), ECF No. 53-3, ¶¶ 2–3, 16–17, 19.

[18] *See* Jeffries Decl. ¶ 3; Schumer Decl. ¶ 2.

[19] *See, e.g.*, Jeffries Decl. ¶¶ 10–12; Schumer Decl. ¶¶ 11–13; *see also* Schneider Decl. ¶¶ 4, 19–20.

[20] *See, e.g.*, Jeffries Decl. ¶¶ 6–12; Schumer Decl. ¶¶ 5–10; *see also* Schneider Decl. ¶¶ 4, 7–12.

ECF No. 16 (Case No. 25-cv-0952). This Court granted the motion and consolidated the three cases, directing the parties to consolidate their briefing "to the greatest extent practicable," while recognizing that some aligned parties may need to "request different relief" from one another. *See* Mem. Op. & Order, ECF No. 20 (Case No. 25-cv-0952), at 4–5.

Shortly thereafter, the Nonpartisan Plaintiffs requested that the Court set an expedited schedule for briefing on motions for preliminary injunction. *See* Emergency Mot. for Clarification of the Consolidation Order and to Expedite Hearing and Briefing, ECF No. 30. The Nonpartisan Plaintiffs also requested leave to file briefs separately from the Democratic Party Plaintiffs, given their nonpartisan status and differing interests in these cases. *See id.* The Court granted both requests and ordered all Plaintiffs to file their Motions for Preliminary Injunctions on or before April 7, Defendants to file any responses to those Motions on or before April 14, and Plaintiffs to file any replies in support of their Motions on or before April 16.[21] *See* Order, ECF No. 31. On April 17, the Court held a hearing on Plaintiffs' Motions with all parties present. *See generally* Tr. of Apr. 17, 2025 Mot. Hr'g ("Tr."), ECF No. 100. Plaintiffs' Motions for Preliminary Injunctions are now ripe for decision.

## II. LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy that should be granted only when the party seeking the relief, by a clear showing, carries the burden of persuasion." *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004). The purpose of a preliminary injunction "is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Chaplaincy of Full*

---

[21] The Court denied without prejudice a subsequent request from the LULAC Plaintiffs to alter this briefing schedule as to the LULAC Plaintiffs' and Democratic Party Plaintiffs' claims regarding Section 7 of the Executive Order, which the LULAC Plaintiffs suggested could be briefed on a more extended schedule. *See* Min. Order (Apr. 10, 2025).

*Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)).

To obtain a preliminary injunction, Plaintiffs must establish (1) that they are "likely to succeed on the merits," (2) that they are "likely to suffer irreparable harm in the absence of preliminary relief," (3) that "the balance of equities tips in [their] favor," and (4) that "an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "[W]hen the Government is the opposing party," as it is in these consolidated cases, the balance-of-equities and public-interest factors "merge," and courts address those factors together. *Nken v. Holder*, 556 U.S. 418, 435 (2009); *Singh v. Berger*, 56 F.4th 88, 107 (D.C. Cir. 2022). To obtain a preliminary injunction, "the movant has the burden to show that all four [*Winter*] factors, taken together, weigh in favor of the injunction." *Abdullah v. Obama*, 753 F.3d 193, 197 (D.C. Cir. 2014) (quoting *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1292 (D.C. Cir. 2009)).

Before the Supreme Court announced its decision in *Winter v. Natural Resources Defense Council*, 555 U.S. 7 (2008), courts in this Circuit applied a "sliding-scale" approach to the preliminary-injunction factors, under which "a strong showing on one factor could make up for a weaker showing on another." *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011). In the years since the *Winter* decision, the U.S. Court of Appeals for the D.C. Circuit has repeatedly declined to decide "whether the sliding-scale approach remains valid." *See Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 726 (D.C. Cir. 2022). However, it has held variously that a failure to show a substantial likelihood of standing, *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015), success on the merits, *Ark. Dairy Co-op Ass'n v. USDA*, 573 F.3d 815, 832 (D.C. Cir. 2009), or irreparable harm, *Alpine Sec. Corp. v. Fin. Indus. Regul. Auth.*, 121 F.4th 1314, 1336–37 (D.C. Cir. 2024), are each independently fatal to a request for injunctive relief.

### III. ANALYSIS

**A.    Preliminary Issues**

    1.    <u>Judicial Review of Presidential Orders</u>

These three consolidated actions call upon the Court to review the legality of an executive order. This form of litigation has become *de rigeur* in this District and others—due in no small part to the virtually unprecedented pace with which the President has issued executive orders since taking office.[22] But direct and immediate challenges to the legality of executive orders, including in suits naming the President as a defendant, are a relatively unusual occurrence in American law. *See* L. Manheim & K. Watts, *Reviewing Presidential Orders*, 86 U. Chi. L. Rev. 1743, 1762–91 (2019). As a result, and as the Supreme Court has itself acknowledged, "the decisions of the Court in this area have been rare, episodic, and afford little precedential value for subsequent cases." *Dames & Moore v. Regan*, 453 U.S. 654, 661 (1981). Mindful that courts have often failed to address these cases "in a particularly theorized way," Manheim & Watts, *supra*, at 1774, the Court begins with some doctrinal review.

"The President's power, if any, to issue [an executive] order must stem either from an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952). This is "black letter law." *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 188–89 (1999). And the reason is simple: "In the framework of our Constitution, the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker." *Youngstown*, 343 U.S. at 587. He cannot make new law or devise new authority for himself—by executive order or otherwise. He may only wield those powers granted to him by Congress or by the Constitution.

---

[22] *See Executive Orders by President*, Univ. Cal. Santa Barbara, Am. Presidency Project, https://perma.cc/E3RJ-58FE.

For that reason, it is useful to conceive of executive orders of two types: "Article I orders" and "Article II orders."[23]   Article I orders are rooted in authority granted to the President by Congress.  For example, a statute may empower the President to determine how to dispose of certain federal properties—a power ordinarily reserved to Congress itself.  *See Dalton v. Specter*, 511 U.S. 462, 464–66 (1994) (describing an executive order issued pursuant to such a delegation).  Article II orders, by contrast, arise from the President's own inherent authority.  For example, the President may invoke his inherent "supervisory authority over the Executive Branch" to direct lawful action by his subordinates.  *Building & Const. Trades Dept., AFL-CIO v. Allbaugh*, 295 F.3d 28, 33 (D.C. Cir. 2002).

In practice though, neat categorization is often elusive.  Presidents, and their executive orders, frequently invoke authority imprecisely.  *See, e.g.*, *Nestor v. Hershey*, 425 U.S. 504, 515–16 (D.C. Cir. 1969) (determining under which statutory provision an executive order was issued).  Further, Presidents may claim, and courts may find, that the authority for an order flows both from some Article II power *and* from a statutory delegation.  *E.g.*, *Old Dominion Branch No. 496 v. Austin*, 418 U.S. 264, 273 n.5 (1974) (authority for executive order in President's Article II "responsibility for the efficient operation of the Executive Branch" and in "express statutory authorization" providing that the "President may prescribe regulations").

This interplay between congressional authorization and Article II powers informs Justice Robert H. Jackson's influential concurrence in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 634 (1952).  "When the President acts pursuant to an express or implied authorization of Congress, his authority is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate."  *Id.* at 635.  "When the President acts in absence of either a

---

[23] *See* E. Newland, Note, *Executive Orders in Court*, 124 Yale L.J. 2026, 2049–51 (2015) (providing a helpful discussion of this taxonomy).

congressional grant or denial of authority, he can only rely on his own independent powers" in a "zone of twilight in which he and Congress may have concurrent authority." *Id.* at 637.  And "[w]hen the President takes measures incompatible with the express or implied will of Congress, his power is at its lowest ebb, for then he can only rely upon his own constitutional powers minus any constitutional powers of Congress over the matter." *Id.*

But while *Youngstown* provides a framework for ascertaining whether an executive order is lawful, it says very little about how judicial review should function in practice.  Below, the Court sets forth its understanding of a few key elements of such review relevant to this litigation.

a.    *Cause of Action*

A claim in federal court requires a valid cause of action.  *See Davis v. Passman*, 442 U.S. 228, 236–41 (1979).  But many opinions addressing executive orders elide this fundamental requirement.  *See* Manheim & Watts, *supra*, at 1774–76.  (*Youngstown*, for instance, nowhere identifies the cause of action supporting the plaintiffs' claims.)  Ordinarily, plaintiffs look to statutes for their causes of action.  And the natural starting point when challenging Executive action is the Administrative Procedure Act.  But because "the President is not an agency within the meaning of" the APA, his issuance of an executive order is not a final agency action.  *Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992).  As a consequence, the APA does not supply a cause of action to challenge an executive order.  More broadly, the power of the courts to issue either declaratory or injunctive relief against the President is, at most, cabined to extraordinarily narrow circumstances.  *See McCray v. Biden*, 574 F. Supp. 3d 1, 8–11 (D.D.C. 2021) (RDM).

Nonetheless, American courts have continuously reviewed, construed, and revised executive orders from the Civil War (*Ex parte Merryman*, 17 F. Cas. 144, 151 (C.D. Md. 1861) (Taney, C.J.)), to the *Lochner* era (*Panama Refining Co. v. Ryan*, 293 U.S. 388, 431 (1935)), through the Second World War (*Ex parte Endo*, 323 U.S. 283, 298 (1944)), and beyond (*Dames*

& *Moore*, 453 U.S. at 668).  Often, this review is made possible through two steps: first, invoking the courts' equitable powers; and second, moving down a rung on the Executive-Branch ladder from the President to his subordinate officers and agencies.

The D.C. Circuit has recognized that plaintiffs "are entitled to bring a non-statutory cause of action questioning the legality of [an] Executive Order." *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1327 (D.C. Cir. 1996).  This recognition follows from the availability of causes of action in equity to enjoin unlawful Executive action both before and after the APA.  *See id.* at 1328 (citing *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94 (1902) and collecting cases).  The power to issue an injunction against "unconstitutional actions by . . . federal officers is the creation of courts of equity, and [it] reflects a long history of judicial review of executive action." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015) (Scalia, J.); *see also id.* at 337 (Sotomayor, J., dissenting) ("That parties may call upon the federal courts to enjoin unconstitutional government action is not subject to serious dispute."); *cf. Ex parte Young*, 209 U.S. 123, 155 (1908) (recognizing implied, equitable cause of action to obtain an anti-enforcement injunction against State officials).

Not every unlawful directive is the proper subject of a non-statutory equitable challenge. As the Supreme Court has explained, "[t]he power of federal courts of equity to enjoin unlawful executive action is subject to express and implied statutory limitations." *Armstrong*, 575 U.S. at 327.  For example, when Congress creates a "detailed remedial scheme" in a particular area of law, the availability of statutory remedies can foreclose equitable suits about the same subject matter.  *See Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 74 (1996).  But if Congress has provided no explicit avenue for judicial review, or if it has merely authorized certain federal lawsuits without placing "restrictions on the relief a court can award" or specifying "whom [a] suit

31

is to be brought against," an equitable action may go forward. *See Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 647 (2002).

Without a doubt, the centrality of the President in a challenge to an executive order is cause for judicial modesty. But any "conflict between the desire to avoid confronting the elected head of a coequal branch of government and to ensure the rule of law can be successfully bypassed, because the injury at issue can be rectified by injunctive relief against subordinate officials." *Swan v. Clinton*, 100 F.3d 973, 978 (D.C. Cir. 1996). Put differently, "[r]eview of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive . . . just as unlawful legislative action can be reviewed . . . by enjoining those congressional (or executive) agents who carry out Congress's directive." *Franklin*, 505 U.S. at 828–29 (Scalia, J., concurring in part) (citations omitted).

Nor does sovereign immunity bar suits in equity to enjoin *ultra vires* action by subordinate officers acting pursuant to an executive order. "The APA's waiver of sovereign immunity applies to any suit [for declaratory or injunctive relief against a federal agency or officer] whether under the APA or not." *Reich*, 74 F.3d at 1328; *see also* 5 U.S.C. § 702 (waiving sovereign immunity against any suit for "relief other than money damages and stating a claim that an agency or officer or thereof acted or failed to act . . . under color of legal authority"). And in any event, if the officer against whom injunctive relief is sought "allegedly acted in excess of his legal authority, sovereign immunity does not bar a suit" because *ultra vires* actions "are considered individual and not sovereign actions." *Reich*, 74 F.3d at 1329 (quoting *Larson v. Domestic & For. Com. Corp.*, 337 U.S. 682, 689 (1949)).

In sum, "courts have power to compel subordinate executive officials to disobey illegal Presidential commands." *Reich*, 74 F.3d at 1328 (quoting *Soucie v. David*, 448 F.2d 1067, 1072

n.12 (D.C. Cir. 1971)).  And when the President has issued an unlawful order, "the proper course is to seek to enjoin a member of the executive branch from carrying out the executive order at issue."  *McCray*, 574 F. Supp. 3d at 11.  That is exactly what Plaintiffs have done here.[24]

But the existence of an equitable cause of action is still only the beginning of the matter. Equity, unlike the APA, does not provide clear rules of decision or standards of review.  Nor does equity supply precise criteria for determining when an equitable claim is ripe for judicial resolution or when an equitable cause of action may be foreclosed by the availability of other forms of relief. In this vacuum, courts tasked with reviewing executive orders have looked elsewhere—principally to doctrines imported from the realm of administrative law—for guidance.  *See* Manheim & Watts, *supra*, at 1800–15 (surveying this trend).  This Court will follow suit.

b.    *Timing: Ripeness and Standing*

Article III doctrines, like standing and ripeness, doubtlessly apply in the context of equitable challenges to executive orders.  And Defendants have invoked both doctrines here.  *See* Defs.' Opp'n, ECF No. 85, at 14.  In a case like this one involving a pre-enforcement challenge to executive action, "[c]onstitutional ripeness is subsumed into the Article III requirement of standing, which requires a [plaintiff to show] an injury-in-fact that is imminent or certainly impending."  *POET Biorefining, LLC v. EPA*, 970 F.3d 392, 403 (D.C. Cir. 2020) (internal quotation marks omitted) (quoting *Am. Petrol. Inst. v. EPA*, 683 F.3d 382, 386 (D.C. Cir. 2012)).

---

[24] At one point, Defendants argue that the Democratic Party Plaintiffs' *ultra vires* claims "must fail because '[w]ith regard to the President, courts do not have jurisdiction to enjoin him.'"  Defs.' Opp'n, ECF No. 84, at 24 (quoting *Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010)).  But Defendants are mistaken.  The Democratic Party Plaintiffs have not moved for an injunction against the President.  *See* Proposed Order, ECF No. 53-15.

But ripeness has an additional prudential (rather than constitutional) component.  *See Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003).[25]  Prudential ripeness took shape in the seminal administrative-law case *Abbott Laboratories v. Gardner*, 387 U.S. 136 (1967), and its development has been inextricably intertwined with review of agency action under the APA.  As the Supreme Court explained, the "basic rationale" of prudential ripeness:

> is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.

*Id.* at 148–49.  Over decades of development, and many competing articulations, the prudential ripeness doctrine has arrived at a two-part balancing test.  *See Sprint Corp. v. FCC*, 331 F.3d 952, 957 (D.C. Cir. 2002) (observing that "the fundamentals of the analysis remain the same" regardless of the verbiage).  On one hand, the Court must consider institutional reasons for deferring review, like whether agency action is tentative and ongoing (as opposed to final) and whether further factual development is necessary.  *Am. Petrol. Inst.*, 683 F.3d at 387.  On the other, the Court must consider whether delaying review would cause hardship to the plaintiffs.  *Id.* at 390.

A three-judge panel in this District recently applied the doctrine of prudential ripeness to a non-APA challenge to an executive order.[26]  *See Common Cause v. Trump*, 506 F. Supp. 3d 39, 45–53 (D.D.C. 2020) (three-judge panel) (Katsas, J.).  The executive order at issue announced a policy of excluding aliens from census apportionment and directed the Secretary of Commerce "to

---

[25] The Supreme Court has cast doubt on the enduring vitality of the prudential ripeness doctrine.  *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 167 (2014).  As has at least one member of the D.C. Circuit.  *See Indus. Energy Consumers of Am. v. FERC*, 125 F.4th 1156, 1163–67 (D.C. Cir. 2025) (Henderson, J., concurring).  But neither court has definitively abandoned prudential ripeness.  And this Court cannot do so on its own.

[26] More precisely, the challenge was to a "presidential memorandum."  *Common Cause*, 506 F. Supp. 3d at 46.  But the difference in nomenclature is immaterial.  *See Legal Effectiveness of a Presidential Directive, as Compared to an Executive Order*, 24 Op. O.L.C. 29 (2000) (opinion of then-Acting Assistant Attorney General Randolph D. Moss).

provide information permitting the President" to effect that policy. *Id.* at 43. Before the Secretary had done so, plaintiffs filed suit arguing that excluding aliens was unconstitutional. *Id.* at 43–44. A divided panel concluded that, because the executive order "neither demand[ed] any particular apportionment base nor exclude[d] any specific categories of aliens" and was "several steps removed" from such action, prudential ripeness required dismissal to avoid "disturb[ing] the ongoing and reticulated process" of apportionment. *Id.* at 46.

Weeks later and in less detail, the Supreme Court concluded that a similar challenge to the same order was unripe because "[w]e simply do not know whether and to what extent the President might direct the Secretary to 'reform the census' to implement his general policy with respect to apportionment." *Trump v. New York*, 592 U.S. 125, 132 (2020) (citation omitted).

These discussions of ripeness in the context of executive orders recall an aspect of the more robust corpus of administrative law in which the ripeness doctrine has developed: the distinction between legislative rules and guidance. Simply stated, agency action that purports to create binding obligations or prohibitions is a legislative rule; agency action that merely provides a general statement of policy (perhaps alluding to legislative rules to come) is guidance. *See Nat'l Min. Ass'n v. McCarthy*, 758 F.3d 243, 251–22 (D.C. Cir. 2014) (Kavanaugh, J.). And while legislative rules "may be subject to pre-enforcement review"; guidance may not. *Id.*

As then-District Judge Ketanji Brown Jackson once recognized, executive orders are susceptible to similar categorization. *See Am. Fed'n of Gov't Emps. v. Trump*, 318 F. Supp. 3d 370, 437–38 (D.D.C. 2018) ("*Am. Fed'n*"), *rev'd on other grounds*, 929 F.3d 748 (D.C. Cir. 2019). Some executive orders, like legislative rules, purport to create binding, enforceable obligations on their own. *See, e.g.*, *Amalgamated Meat Cutters v. Connally*, 337 F. Supp. 737, 743 (D.D.C. 1971) (executive order freezing wages). Others, like guidance, merely state a general policy aim and

direct others to begin the process of formalizing that goal in an enforceable way.  *See, e.g.*, *Common Cause*, 506 F. Supp. 3d at 43; *Trump*, 592 U.S at 132.

Analogizing the distinction between executive orders that "dictate particular outcomes" and those that "do not have any independent operative legal effect," *Am. Fed'n*, 318 F. Supp. 3d at 437–38, to the distinction between legislative rules and guidance offers a useful and doctrinally rich framework for assessing issues of timing (whether grounded in ripeness or standing) in the context of executive orders.  The Court proceeds with this background in mind.

c.    *Saving Clauses and the Presumption of Regularity*

Other issues arise when the Court reaches the merits of a challenge to an executive order. When courts interpret a statute, they must "apply their 'judgment' *independent* of the political branches" and may not "disregard[] that responsibility just because an Executive Branch agency views a statute differently." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024).  When courts interpret ambiguous regulations promulgated through notice and comment rulemaking, some deference to the agency's view of its own rule is due.  *Kisor v. Wilkie*, 588 U.S. 558, 573 (2019).  But what deference, if any, is due to the President's interpretation of an executive order? The scope of this deference takes shape though two mechanisms: saving clauses and the presumption of regularity.  The Court takes each in turn.

***Saving Clauses.***  Legislatures employ saving clauses to create "exemption[s] from a statute's general operation."  2A N. Singer, *Sutherland Statutes and Statutory Construction* § 47:12 (7th ed 2024).  These clauses take familiar, lawyerly forms like "nothing in this chapter shall be construed or interpreted as" (42 U.S.C. § 9614(a)) or "[n]othing in this section shall be construed to affect any authority of the Commission under any other provision of law" (15 U.S.C. § 57b(e)).  In the statutory context, courts "usually strictly construe saving clauses."  2A N. Singer, *supra*, § 47:12.  And the Supreme Court has "long rejected interpretations of sweeping saving

36

clauses that prove 'absolutely inconsistent with the provisions of the act' in which they are found." *Atl. Richfield Co. v. Christian*, 590 U.S. 1, 23 (2020) (quoting *AT&T Co. v. Cent. Off. Tel., Inc.*, 542 U.S. 214, 228 (1998)). "In other words, the act cannot be held to destroy itself" through a saving clause. *Tex. & Pac. Ry. Co. v. Abilene Cotton Co.*, 204 U.S. 426, 446 (1907).

As executive orders became more common—and more potent—Presidents, too, began to employ saving clauses. The prevailing boilerplate in the Executive Office of the President appears to be: "This order shall be implemented consistent with applicable law and subject to the availability of appropriations." Exec. Order 14019, 86 Fed. Reg. 13623 (Mar. 7, 2021) § 12(b); Exec. Order 14148, 90 Fed. Reg. 8237 (Jan. 20, 2025) § 4(b). The Executive Order at issue here uses the same verbiage. Exec. Order 14,248, 90 Fed. Reg. 14005 (Mar. 25, 2025) § 14(b).

Courts treat saving clauses in executive orders much as they do saving clauses in statutes. For example, if an executive order containing a saving clause directs a subordinate to achieve some goal, and that goal could be achieved in multiple ways—some of which would be legal and some of which would be illegal—a reviewing court will interpret the order in light of the saving clause to direct only permissible action. *Common Cause*, 506 F. Supp. 3d, 49–50, 53 n.8; *see also Trump*, 592 U.S. at 131. "The mere possibility that some agency might make a legally suspect decision" and ignore a saving clause's command to follow the law when implementing an executive order "does not justify an injunction against enforcement" of that order. *Allbaugh*, 295 F.3d at 34.

But executive orders, like statutes, "cannot be held to destroy themselves through saving clauses." *Common Cause*, 506 F. Supp. 3d at 53 n.8 (quoting *FTC v. Credit Bureau Ctr., LLC*, 937 F.3d 765, 755 (7th Cir. 2019)). And for good reason: "If 'consistent with law' precludes a court from examining whether the Executive Order is consistent with law, judicial review is a meaningless exercise, precluding resolution of the critical legal issues." *City & Cnty. of San*

*Francisco v. Trump*, 897 F.3d 1225, 1240 (9th Cir. 2018).  Accordingly, if an executive order

unambiguously "command[s] . . . action that a saving[] clause purports to negate," a reviewing

court must ignore the saving clause and read the order's operative provision to mean what it says.

*Common Cause*, 506 F. Supp. 3d at 53 n.8.  Courts have affirmed this principle repeatedly.[27]

As a result, the force of a saving clause is somewhat contingent on the nature of the

plaintiff's challenge.  When a plaintiff mounts a facial attack on an executive order, arguing that

the order is invalid in *all* possible applications, the saving clause does not preclude review.  *See*

*Allbaugh*, 295 F.3d at 33 (citing *Reno v. Flores*, 507 U.S. 292, 301 (1993)).  If the executive order

cannot possibly be implemented consistent with applicable law, a command to do so in a saving

clause is meaningless.

***Presumption of Regularity.***  The presumption of regularity may also influence how a court

interprets an executive order.  This presumption has common-law origins.  *See Chi., Burlington,*

*& Quincy Ry. Co. v. Babcock*, 204 U.S. 585 (1907).  And it frequently arises in the context of

agency action or action by subordinate executive officers.  *See, e.g.*, *Citizens to Pres. Overton*

*Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971).

When applied to agency action, the presumption of regularity often takes two forms.  *See*

Note, *The Presumption of Regularity in Judicial Review of the Executive Branch*, 131 Harv. L.

Rev. 2431, 2433–34 (2018).  First, agencies benefit from a presumption of *motivational* regularity.

For  example,  courts  presume  that  administrative  law  judges  are  unbiased  and  that  their

---

[27] *New York v. Trump*, 133 F.4th 51, 71 (1st Cir. 2025) (denying stay of TRO pending appeal where district court found that a saving clause "caveat was nothing more than window dressing on an unconstitutional directive by the Executive"); *HIAS, Inc. v. Trump*, 985 F.3d 309, 325 (4th Cir. 2021) (rejecting "the government's attempt to immunize [an executive order] from review though a savings clause which, if operational, would nullify the 'clear and specific' substantive provisions of the Order" (citation omitted)); *Louisiana v. Biden*, 622 F. Supp. 3d 267, 289 (W.D. La. 2022) ("Savings clauses must be read in context and cannot avoid judicial review when the agencies would have to override clear and specific language in an Executive Order."); *PFLAG, Inc. v. Trump*, --- F. Supp. 3d ----, 2025 WL 685124, at *18 (D. Md. 2025) ("There are no magic words that can override an executive order's plain meaning.").

adjudications are not tainted by partiality. *See Schweiker v. McClure*, 456 U.S. 188, 195 (1982). Second, agencies are entitled to a presumption of *procedural* regularity. When an agency is required to act through specific procedures, courts sometimes presume that the agency followed those procedures before acting. *See* ABA Section of Admin. L. & Regul. Prac., *A Blackletter Statement of Federal Administrative Law*, 54 Admin. L. Rev. 1, 44 (2002).

In both forms, the presumption operates as a razor for resolving factual disputes, simplifying the court's task when the "why" or "how" of agency action is in question. Neither application reaches the underlying legality of the agency action. The effect of the "presumption is not to shield [agency] action from a thorough, probing, in-depth review." *Overton Park*, 401 U.S. at 415. A reviewing court must still determine for itself "whether the agency acted within its statutory authority" and whether its procedures "comply with applicable statutory and constitutional requirements." *U.S. Lines, Inc. v. Fed. Marit. Comm'n*, 584 F.2d 519, 526 (D.C. Cir. 1978); *cf. Latif v. Obama*, 666 F.3d 746, 748–50 (D.C. Cir. 2011) (attaching the presumption of regularity to the accuracy of a summary but not to the truth of the underlying statement). And of course, the presumption of regularity is only a presumption; it may be rebutted by "clear evidence" to the contrary. *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 174 (2004); *see also Dep't of Com. v. New York*, 588 U.S. 752, 781–85 (2019).

Courts have extended the presumption of regularity to the President as well. In the context of presidential action, the presumption functions just as it does in the context of agency action. Accordingly, the President is entitled to a presumption of motivational regularity when he "exercises an authority confided to him by law," even in the face of a plaintiff's "allegations of partisan motives." *Trump v. Thompson*, 20 F.4th 10, 39 (D.C. Cir. 2024). Absent compelling

evidence of impermissible intent, courts assume that the President's authority "is exercised in pursuance of law." *Id.* (quoting *Martin v. Mott*, 25 U.S. (12 Wheat.) 19, 32–33 (1827)).

Likewise, Presidents are entitled to a presumption of procedural regularity. Courts will presume that Presidents, like other officials, have "followed the appropriate procedures when performing their official duties." *Estate of Parsons v. Palestinian Auth.*, 651 F.3d 118, 130 (D.C. Cir. 2011) (Henderson, J., concurring in part). For example, where a statute expressly delegates to the President discretion to take an action conditional on his making findings prescribed by statute, and the President takes the action through an executive order citing the statute, the presumption of regularity applies against a challenge that the order is unlawful because it did not make the statutory findings explicit. *See Am. Fed'n of Gov't Emps., AFL-CIO v. Reagan*, 870 F.2d 723, 726–28 (D.C. Cir. 1989) ("*Reagan*"); *see also Martin*, 25 U.S. at 33 ("It is not necessary to aver, that the act which he may rightfully do, was so done.").

But again, these presumptions resolve factual questions downstream of the initial lawfulness of a presidential action. The presumption of regularity does not require a court to assume that the President's exercise of power is lawful. Instead, the presumption attaches only *after* the Court concludes that the President is "exercis[ing] an authority confided to him by law." *Thompson*, 20 F.4th at 39 (quoting *Martin*, 25 U.S. at 32–33); *cf. Reich*, 74 F.3d at 1331–32 (proposition that courts should not interrogate whether a President has abused statutorily delegated discretion is irrelevant to claim that the statute "delegates no authority to the President" at all).

### 2. Article III Standing

Federal courts are courts of limited jurisdiction. *See Murthy v. Missouri*, 603 U.S. 43, 56–57 (2024); U.S. Const. art. III, § 2, cl. 1. One necessary condition for a claim to come within this Court's limited subject-matter jurisdiction is that the plaintiff must have standing to advance the claim. *Attias v. Carefirst, Inc.*, 865 F.3d 620, 624 (D.C. Cir. 2017). To have standing, the plaintiff

must have suffered an "injury in fact" that is "concrete and particularized," "actual or imminent," and "fairly . . . trace[able] to the challenged action of the defendant," which "likely" will be "redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (alterations in original) (first quoting *Allen v. Wright*, 468 U.S. 737, 756 (1984); then quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990); and then quoting *Simon v. Eastern Ky. Welfare Rts. Org.*, 426 U.S. 26, 41–42 (1976)).

A party must have standing "for each claim that [it] press[es] and for each form of relief that [it] seek[s]." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021). For a plaintiff to have standing to pursue "forward-looking" relief such as an injunction, the plaintiff must "face 'a real and immediate threat of repeated injury.'" *Murthy*, 603 U.S. at 58 (quoting *O'Shea v. Littleton*, 414 U.S. 488, 496 (1974)). The party asserting standing must show that each of these requirements is satisfied "with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561. At the preliminary-injunction stage, the movant has the burden of showing a "substantial likelihood" of standing. *Food & Water Watch*, 808 F.3d at 913.

Most Plaintiffs in these cases are organizations, rather than individuals. Organizations can claim standing to sue in federal court in two ways. See *Abigail All. for Better Access to Developmental Drugs v. Eschenbach*, 469 F.3d 129, 132 (D.C. Cir. 2006). First, an organization can have standing "on its own behalf," which is called "organizational standing." *Id.* (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378–79 (1982); and *Warth v. Seldin*, 422 U.S. 490, 511 (1975)). Second, an organization can have standing to advance a claim "on behalf of its members," which is called "associational standing." *Id.* (citing *United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 553 (1996); and *Hunt v. Wash.*

*State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)); *Elec. Priv. Info. Ctr. v. U.S. Dep't of Com.*, 928 F.3d 95, 101 (D.C. Cir. 2019) ("*EPIC*").

Before turning to the several specific claims and forms of relief requested in these consolidated cases, the Court will briefly summarize the general principles of organizational standing and associational standing. The Court will also introduce the doctrine of "political-competitor standing," on which the Democratic Party Plaintiffs rely.

a.    *Organizational Standing*

To have standing "in its own right," an organization must make "the same showing required of individuals: an actual or threatened injury in fact that is fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by a favorable court decision." *Am. Anti-Vivisection Soc'y v. U.S. Dep't of Agric.*, 946 F.3d 615, 618 (D.C. Cir. 2020) (first quoting *Abigail All.*, 469 F.3d at 132; and then quoting *ASPCA v. Feld Ent., Inc.*, 659 F.3d 13, 24 (D.C. Cir. 2011)). "To demonstrate injury in fact, an organization must allege a 'concrete and demonstrable injury to the organization's activities' that is 'more than simply a setback to the organization's abstract social interests.'" *Id.* (quoting *Havens*, 455 U.S. at 379).

In the foundational decision establishing the contours of organizational standing, *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), the Supreme Court considered whether an organization that provided "counseling and referral services for low-and moderate-income homeseekers" had standing to challenge discriminatory housing practices that the organization alleged had "perceptibly impaired" its ability to provide its services. *Id.* at 379. In its opinion, the Court emphasized that the alleged interference with the organization's services was "far more than simply a setback to the organization's abstract social interests." *Id.* Instead, it was a "concrete and demonstrable injury to the organization's activities" that resulted in a "drain on the

organization's resources." *Id.* On those facts, the Court concluded that the organization had standing to challenge the discriminatory practices at issue. *Id.*

However, as the Supreme Court recently emphasized in *Food & Drug Administration v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024), "*Havens* was an unusual case," and the Court "has been careful not to extend the *Havens* holding beyond its context." *Id.* at 396. "Critically," the Court explained, the organizational plaintiff in *Havens* was not only "an issue-advocacy organization," but also a provider of "a housing counseling service." *Id.* at 395. The organization's standing in *Havens* arose not from any harm to its abstract social objectives, but rather from an injury to "core business activities" like its counseling service. *Id.*

Applying that understanding of the holding in *Havens*, the Court held in *Alliance for Hippocratic Medicine* that several medical associations lacked organizational standing to challenge the Food and Drug Administration's approval of mifepristone, a drug used to perform abortions. 602 U.S. at 396. The Court acknowledged the medical associations' allegations that the agency's actions had caused them to expend "considerable resources" on research, advocacy, and public education related to mifepristone and abortion. *Id.* at 394. But it held that under Article III, an organization "cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action." *Id.*

Prior circuit precedent is consistent with the organizational-standing principles articulated in *Alliance for Hippocratic Medicine*. For example, the D.C. Circuit has concluded that efforts by civil rights organizations to investigate discriminatory practices and "increas[e] legal pressure" on defendants to change those practices are not sufficient to confer standing in the absence of some impairment to the plaintiff organizations' core service programs. *See Equal Rts. Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1138, 1142 (D.C. Cir. 2011); *Fair Emp. Council of Greater*

*Washington, Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268, 1276–77 (D.C. Cir. 1994). If the rule were otherwise, "the time and money that plaintiffs spend in bringing suit against a defendant would itself constitute a sufficient 'injury in fact,' a circular position that would effectively abolish the [standing] requirement altogether." *Fair Emp. Council*, 28 F.3d at 1277. Instead, the D.C. Circuit has analyzed organizational standing by focusing on whether a defendant's conduct prompted a plaintiff organization to divert resources toward providing additional *direct services* designed to offset the harmful effects of the challenged conduct. *See id.* at 1277 (distinguishing expenditures of resources on an organization's core service programs, which can support standing, from expenditures on "the allied efforts at increasing legal pressure on civil-rights violators," which cannot support standing); *Equal Rts. Ctr.*, 633 F.3d at 1141–42 & n.4 (analyzing standing by focusing on the "diversion of resources to programs designed to counteract the injury," including "increased educational and counseling efforts").

In sum, because a party cannot "spend its way into standing," mere "issue-advocacy" activities are not sufficient to support organizational standing. *All. for Hippocratic Med.*, 602 U.S. at 395–96. However, organizations can have standing to challenge practices that directly interfere with their core activities, such as direct services programs. *See id.* at 394–96; *Equal Rts. Ctr.*, 633 F.3d at 1141–42 & n.4.

### b.    *Associational Standing*

Regardless of whether an organization has standing to pursue a claim on its own behalf, it may have associational standing to sue on behalf of its members. This path to standing is always available to a "voluntary membership organization with identifiable members" that "represents [its members] in good faith." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 201 (2023). An organization not meeting that description may also have associational standing, but to do so, it "must have" at least "the 'indicia of a traditional membership

44

association.'" *Viasat, Inc. v. FCC*, 47 F.4th 769, 781 (D.C. Cir. 2022) (quoting *Sorenson Commc'ns v. FCC*, 897 F.3d 214, 225 (D.C. Cir. 2018)).    When determining whether these "indicia" are present, courts weigh multiple "considerations," including "whether members finance the organization, guide its activities, or select its leadership." *Id.*   "[I]t is not enough for putative members simply to read a group's publications, subscribe to its e-mail list, or follow its Facebook page." *Id.* (collecting cases).

If these threshold requirements are satisfied, a party may show that an organization has associational standing by showing that "(a) its members would otherwise have standing to sue in their own right; (b) the interests [the organization] seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt*, 432 U.S. at 343; *EPIC*, 928 F.3d at 101.

To satisfy the first prong of the associational-standing analysis, an organization "must show, for each of its claims, that at least one of its members has standing." *EPIC*, 928 F.3d at 101. One way an organization can make this showing is by producing declarations from individual members setting forth the facts that establish their standing. *See, e.g.*, *Students for Fair Admissions*, 600 U.S. at 201; *Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588, 596 (D.C. Cir. 2015).   The Supreme Court has also recognized associational standing based on declarations from leaders of organizations describing their organizations' membership in sufficient detail to support a finding of standing. *See Ala. Legis. Black Caucus v. Alabama*, 575 U.S. 254, 271 (2015); *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 718 (2007).   Consistent with this practice, the U.S. Court of Appeals for the Ninth Circuit recently held that a membership organization had established its standing without identifying any of its members by name where

the opposing parties did not "need to know the identity of a particular member to respond to [the organization]'s claim of injury." *Mi Familia Vota v. Fontes*, 129 F.4th 691, 709 (9th Cir. 2025).

### c.    *Political-Competitor Standing*

Political competitors may have Article III standing to challenge the "illegal structuring of a competitive environment" in which "rival parties defend their concrete interests." *Shays v. Fed. Election Comm'n*, 414 F.3d 76, 85–87 (D.C. Cir. 2005).[28]    This theory of standing is relevant primarily when a plaintiff challenges an improper benefit to a competitor:  Although parties usually lack standing to challenge benefits to others, political-competitor standing—like the analogous doctrine of economic-competitor standing—recognizes that certain benefits predictably inflict concrete harms on the head-to-head competitors of their beneficiaries. *See id.*

Political candidates' standing to challenge unlawful rules shaping the "competitive environment" for elections derives from the principle that "parties defending concrete interests" suffer a cognizable harm when they are denied fair opportunities to protect those interests. *Shays*, 414 F.3d at 87.  In the election context, as in other regulated arenas, the D.C. Circuit has recognized that "regulated litigants suffer legal injury when agencies set the rules of the game in violation of statutory directives." *Id.* at 85.

Because political-competitor standing is based on political candidates' underlying interest in the "retention of elected office," *see Shays*, 414 F.3d at 87, it is available primarily to candidates with "concrete plans to run for office in the future," *see Nader v. Fed. Election Comm'n*, 725 F.3d

---

[28] *See also, e.g.*, *Mecinas v. Hobbs*, 30 F.4th 890, 898 (9th Cir. 2022) ("If an allegedly unlawful election regulation makes the competitive landscape worse for a candidate or that candidate's party than it would otherwise be if the regulation were declared unlawful, those injured parties have the requisite concrete, non-generalized harm to confer standing."); *Texas Democratic Party v. Benkiser*, 459 F.3d 582, 587 (5th Cir. 2006) (recognizing political party's associational standing "on behalf of its candidate" to challenge action that allegedly "threaten[ed] [the candidate's] election prospects and campaign coffers"); *Fulani v. League of Women Voters Educ. Fund*, 882 F.2d 621, 626 (2d Cir. 1989) (recognizing standing to challenge the exclusion of a candidate from a political debate, which "palpably impaired [the candidate's] ability to compete on an equal footing with other significant presidential candidates").

226, 229 (D.C. Cir. 2013).  At least one court in this District has also concluded that the "party affiliate" of active candidates for political office may have political-competitor standing.  *See Nat. L. Party of U.S. v. F.E.C.*, 111 F. Supp. 2d 33, 47 (D.D.C. 2000) (ESH).  By contrast, courts have declined to extend political-competitor standing to political action committees, reasoning that such organizations do not "compete" in elections in the relevant sense.  *See Gottlieb v. Fed. Election Comm'n*, 143 F.3d 618, 621 (D.C. Cir. 1998); *AB PAC v. Fed. Election Comm'n*, No. 22-cv-2139, 2023 WL 4560803, at *4 (D.D.C. July 17, 2023) (TJK).

### 3.  Prudential Standing to Raise Separation-of-Powers Challenges

Many of Plaintiffs' claims in these consolidated cases rest on claims that the challenged actions violate separation-of-powers principles by encroaching on the prerogatives of Congress and the States.  Plaintiffs' right to raise these claims arises from two exceptions to the prudential rule that a party "must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties."  *See Warth*, 422 U.S. at 499.

First, although no Plaintiff represents the institutional interests of the entire Congress, "any aggrieved party with standing may file a constitutional challenge" to a violation of the separation of powers between Congress and the Executive Branch.  *Collins v. Yellen*, 594 U.S. 220, 245 (2021); *see also Seila Law LLC v. CFPB*, 591 U.S. 197, 212 (2020) (concluding that when a provision insulating an executive officer from removal "violates the separation of powers[,] it inflicts a 'here-and-now' injury on affected third parties that can be remedied by a court" in an action brought by the third party (quoting *Bowsher v. Synar*, 478 U.S. 714, 720 (1986))).

Second, although no Plaintiff is itself a State, the Supreme Court has instructed that "[f]idelity to principles of federalism is not for the States alone to vindicate."  *Bond v. United States*, 564 U.S. 211, 222 (2011); *see also LaRoque v. Holder*, 650 F.3d 777, 792 (D.C. Cir. 2011) (holding that a plaintiff who otherwise satisfies the requirements of Article III standing may raise

an individual separation-of-powers challenge to federal action that "endangers the liberty-protecting structure of our federal system").

*    *    *

With these threshold considerations in mind, the Court turns to Plaintiffs' five discrete claims for preliminary relief.

### B.    Section 2(a): Directing the EAC to Add a "Documentary Proof of Citizenship" Requirement to the Federal Form

The Nonpartisan Plaintiffs and the Democratic Party Plaintiffs each move for preliminary injunctions barring implementation of Section 2(a) of the Executive Order.  *See* Nonpartisan Pls.' Mot. at 35; Dem. Pls.' Mot. at 44.  Section 2(a) provides:

> (i) Within 30 days of the date of this order, the Election Assistance Commission shall take appropriate action to require, in its national mail voter registration form issued under 52 U.S.C. [§] 20508:
>
> > (A) documentary proof of United States citizenship, consistent with 52 U.S.C. [§] 20508(b)(3); and
> >
> > (B) a State or local official to record on the form the type of document that the applicant presented as documentary proof of United States citizenship, including the date of the document's issuance, the date of the document's expiration (if any), the office that issued the document, and any unique identification number associated with the document as required by the criteria in 52 U.S.C. [§] 21083(a)(5)(A), while taking appropriate measures to ensure information security.
>
> (ii) For purposes of subsection (a) of this section, "documentary proof of United States citizenship" shall include a copy of:
>
> > (A) a United States passport;
> >
> > (B) an identification document compliant with the requirements of the REAL ID Act of 2005 (Pub. L. [No.] 109-13, Div. B) that indicates the applicant is a citizen of the United States;
> >
> > (C) an official military identification card that indicates the applicant is a citizen of the United States; or
> >
> > (D) a valid Federal or State government-issued photo identification if such identification indicates that the applicant is a United States citizen or if such

48

> identification is otherwise accompanied by proof of United States citizenship.

Exec. Order 14,248, 90 Fed. Reg. 14005 (Mar. 25, 2025) § 2(a).  The Nonpartisan Plaintiffs request an injunction of this provision that runs against the EAC, its Commissioners, and its Executive Director.  *See* Nonpartisan Pls.' Mot. at 34–35.  The Democratic Party Plaintiffs request a similar injunction that runs only against the EAC and its Commissioners.  *See* Dem. Pls.' Mot. at 44.

For the reasons that follow, the Court concludes that both the Nonpartisan Plaintiffs and the Democratic Party Plaintiffs are likely to succeed on the merits of their challenges to Section 2(a), that they are likely to suffer irreparable harm in the absence of preliminary relief against that provision, that the balance of equities tips in their favor, and that an injunction against implementation of Section 2(a) is in the public interest.  *See Winter*, 555 U.S. at 20.  The Court shall therefore grant both the Nonpartisan Plaintiffs' and the Democratic Party Plaintiffs' Motions as to Section 2(a).

1.    Likelihood of Success on the Merits

a.    *Timing of Review*

Defendants principally argue that Plaintiffs are unlikely to succeed in challenging Section 2(a) because their claims are premature.  This argument appears in sections of Defendants' Oppositions dedicated to standing, ripeness, and the underlying merits.  *See* Defs.' Opp'n, ECF No. 84, at 11–12, 24–26, 31, 39–43; Defs.' Opp'n, ECF No. 85, at 9–11, 17–18, 20–22, 27–30.  But the argument is the same in each context.  So the Court will treat, and reject, Defendants' contention that Plaintiffs' challenge to Section 2(a) is premature at the outset for ease of reference.

Defendants' argument proceeds as follows:  Section 2(a) orders that the EAC take "appropriate action" to require documentary proof of citizenship on the Federal Form.  And Section 11(b)'s saving clause directs that the order "shall be implemented consistent with

applicable law."  The applicable law—HAVA and the NVRA—empowers the EAC to make changes to the Federal Form.  So, applying a presumption of regularity and in light of the saving clause, the Court should read the Section 2(a) as little more than a suggestion that the EAC require documentary proof of citizenship, which suggestion the EAC can adopt or reject in its ordinary course of rulemaking.  That ordinary course takes time and has not even begun.  As a result, conclude Defendants, Plaintiffs' fears about Section 2(a) are entirely speculative, the record requires further factual development, and their claims are unripe and fail on the merits.

This argument fails to persuade because it misconceives (and in one instance misrepresents) the Executive Order, Plaintiffs' claims, the law, and the facts.

Start with the Executive Order itself.  In Defendants' telling, it is entirely unclear what the Executive Order requires of the EAC or whether it requires anything at all.  They suggest the addition of a documentary-proof-of-citizenship requirement "may *never* occur," and that Plaintiffs are engaged in nothing more than "speculation about future actions the EAC may take." Defs.' Opp'n, ECF No. 84, at 11–12, 31; Defs.' Opp'n, ECF No. 85, at 10, 20.

But this account cannot be squared with the plain text of the Executive Order.  Section 2(a) mandates that the EAC take action to require documentary proof of citizenship on the Federal Form.  It states that mandate in no uncertain terms:  "By the authority vested in me as President . . . it is hereby *ordered* [that]: . . the Election Assistance Commission *shall take* appropriate action to *require* . . . documentary proof of citizenship" on the Federal Form.   Exec. Order 14,248 § 2(a)(i)(A) (emphasis added).  Section 2(a) imposes a deadline for such action:  The EAC must act "[w]ithin 30 days of the date of this order."  *Id.* § 2(a)(i).  And Section 2(a) dictates the precise contours of the mandated requirement, defining what forms of documentary proof will be sufficient (passports, REAL ID-compliant IDs that indicate citizenship, and official military IDs

that indicate citizenship, *id.* § 2(a)(ii)) and even prescribing recordkeeping requirements for the States (States must record the date of issuance and expiration, the issuing office, and any unique identification number, *id.* § 2(a)(i)(B)). In short, there is no mystery about what Section 2(a) purports to require or whether Section 2(a) purports to require it.

For this reason, the four cases Defendants cite for the proposition that "the potential that an agency would promulgate adverse regulations in implementing an executive order [is] insufficient [to show the imminence of any injury] for standing" are inapposite. Defs.' Opp'n, ECF No. 84, at 12; Defs.' Opp'n, ECF No. 85, at 10–11. Two of those cases took pains to emphasize that the plaintiffs were bringing pre-enforcement challenges to executive orders that *did not* mandate a particular agency action. *United Presbyterian Church in the U.S.A. v. Reagan*, 738 F.2d 1375, 1380 (D.C. Cir. 1984) ("[T]his order does not *direct* [agency action] . . . but merely *authorizes* [it]." (original emphasis)); *Ctr. for Democracy & Tech. v. Trump*, 507 F. Supp. 3d 213, 222 (D.D.C. 2020) (TNM) (The executive order at issue "directs various government actors to 'file *a petition* for rulemaking . . . *requesting* that the FCC expeditiously *propose* regulations,' to '*review* . . . Federal spending,' to '*consider* taking action,' to '*consider* developing a report,' to 'establish a *working group*,' and to 'develop a *proposal* for Federal legislation.'" (original alterations and emphases)).

And the other two cases—which do not involve executive orders at all—similarly emphasize the uncertainty attending the plaintiffs' pre-enforcement challenges. *Defs. of Wildlife v. Perciasepe*, 714 F.3d 1317, 1324 (D.C. Cir. 2013) (concluding that the challenged "consent decree does not *require* EPA to promulgate a new, stricter rule" but "merely requires that EPA conduct a rulemaking and then decide whether to promulgate a new rule—the content of which is not in any way dictated by the consent decree" (original emphasis)); *Platte River Whooping Crane Critical*

*Habitat Main. Tr. v. FERC*, 962 F.2d 27, 35 (no standing where injury was contingent on the content of an Article III court's as-yet unissued injunction).

But Section 2(a) does not merely "*authorize*" the EAC to change the Federal Form, *United Presbyterian*, 738 F.2d at 1380, or suggest that it "*consider*" doing so, *Ctr. for Democracy & Tech.*, 507 F. Supp. 3d at 222. Instead, it purports to require the EAC to amend the Federal Form and dictate the precise contents of the new rule. *Contra Perciasepe*, 714 F.3d at 1324. Under these circumstances, if requiring documentary proof of citizenship on the Federal Form in the manner described in Section 2(a) would inflict a cognizable injury on Plaintiffs, *see* Part III.B.1.b, *infra*, that injury is "sufficiently imminent" to support their standing to seek "forward-looking" injunctive relief, *TransUnion LLC v. Ramirez*, 594 U.S. 413, 435 (2021) (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 (2013)).

Defendants' prematurity argument fares no better in the context of prudential ripeness. Recall that the doctrine of prudential ripeness may require the Court to abstain from exercising its jurisdiction when the details of a challenged agency action following from an executive order are uncertain and when further factual development is necessary. *See supra* Part III.A.1.b. But those causes for judicial restraint are lacking here.

As the Court has just explained, Section 2(a) leaves no uncertainty about what it requires from the EAC. And for that reason, the lead case in this District on prudential ripeness in the context of executive orders, *Common Cause v. Trump*, 506 F. Supp. 3d 39 (D.D.C. 2020) (three-judge panel), is inapposite. There, the panel majority found that a challenge to an executive order was prudentially unripe where the order at issue "neither demand[ed] any particular apportionment base nor exclude[d] any specific categories of aliens" from census apportionment. *Id.* at 46. Instead, (like agency guidance) the order merely "announce[d] a general policy" while remaining

"several steps removed from" final action and leaving "basic uncertainty" about what form that final action would take. *Id.* at 46, 47, 50. But here, (like a legislative rule) Section 2(a) dictates a particular outcome and leaves no uncertainty by prescribing the substance of the documentary-proof-of-citizenship requirement it purports to mandate. *See Am. Fed'n*, 318 F. Supp. 3d at 437.

Further, the *Common Cause* court grounded its holding in the executive order's repeated admonitions that any action thereunder be taken only "to the extent feasible" and "to the extent practicable." 506 F. Supp. 3d at 47. Given "the jumble of possible data" that might inform such action, and the enormous complexity of the task at issue, the court determined that these qualifiers presented "genuinely open questions" that required "further factual development." *Id.* at 47–48.

But here, Section 2(a) contains no similar feasibility or practicality qualifiers, and there is no reason to believe that amending the Federal Form would be infeasible. Nor do Plaintiffs' claims—which contend that President's order itself rather than its outcome it unlawful—require further factual development. As Defendants themselves put it: "[I]n the context of *ultra vires* and constitutional separation of powers claims, there are no questions of fact, because whether or not a statute or the Constitution grants [the Executive Branch] the power to act in a certain way is a pure question of law." Defs.' Opp'n, ECF No. 84, at 23 (second alteration original) (quoting *Ctr. for Biological Diversity v. McAleenan*, 404 F. Supp. 3d 218, 233 (D.D.C. 2019) (KBJ)).

Next, Defendants' talismanic invocation of the Executive Order's saving clause cannot shield Section 2(a) from review. As the Court has explained, *see supra* Part III.A.1.c, courts sometimes read saving clauses in executive orders to thwart pre-enforcement challenges to those orders contingent on "[t]he mere possibility that some agency might make a legally suspect decision," *Allbaugh*, 295 F.3d at 33. But here, the Executive Order's saving clause cannot resolve any uncertainty about future agency action in Defendants' favor because there is no uncertainty

about what the EAC has been ordered to do. Because Section 2(a) "unambiguously commands action" by the EAC, the saving clause "does not and cannot override its meaning." *City & Cnty. of San Francisco*, 897 F.3d at 1240 (distinguishing *Allbaugh* on this basis).

*Common Cause* is again unavailing for similar reasons. That case concerned the enumeration and reapportionment process attending the decennial census. *Common Cause*, 506 F. Supp. 3d at 42. And Congress has delegated broad discretion in conducting the census to the Secretary of Commerce, while reserving to the President a virtually unchecked final authority to determine the population. *See id.* (citing *Dep't of Com.*, 588 U.S. at 769; *Franklin*, 505 U.S. at 797–99). Because the plaintiffs' challenges addressed the lawfulness of the undetermined *outcome* of that process, and because the President and the Secretary of Commerce could wield their authority to arrive at a lawful outcome, the *Common Cause* court relied on the challenged executive order's saving clause to conclude that judicial review was premature. *Id.* at 47–53, 53 n.8.

But here, Plaintiffs argue that *no* lawful outcome can possibly result from implementation of Section 2(a) because the President lacks any authority to dictate changes to the Federal Form. It is no answer to that facial challenge to say that the saving clause requires the EAC to follow the law while following the President's order. If the President lacks statutory or constitutional authority to issue the order, Section 2(a) necessarily "command[s] . . . action that [the] saving[] clause purports to negate." *Common Cause*, 506 F. Supp. 3d at 53 n.8. And Section 2(a) "cannot be held to destroy itself" through the saving clause to avert judicial review. *Tex. & Pac. Ry.*, 204 U.S. at 446. Indeed, the D.C. Circuit has helpfully clarified this distinction in reviewability between cases in which plaintiffs challenge "the President's exercise" of a discretionary authority that "a statute entrusts . . . to the President" and cases in which plaintiffs allege that "the presidential action—not one, it should be added, even contemplated by Congress—independently

violates . . . a statute that delegates no authority to the President to interfere." *Reich*, 74 F.3d at 1331–32 (distinguishing *Dalton*, 511 U.S. 462).

The presumption of regularity is no help to Defendants either. Plaintiffs' claims do not implicate the President's motivation for issuing Section 2(a). *Contra Thompson*, 20 F.4th at 39. Nor are there any procedural requirements for the President to follow in issuing Section 2(a) that the Court can presume were followed. *Contra Reagan*, 870 F.2d at 726–28. The Court might presume that the EAC will follow its normal course of rulemaking in implementing Section 2(a). But again, that is no impediment to Plaintiffs' claims, which flow from the premise that the President lacks authority to require such implementation at all.

Finally, Defendants' timing arguments run aground on the facts in the record. Throughout their Oppositions, Defendants made a critical factual representation in support of their contention that Plaintiffs' claims are premature: Nothing is happening at the EAC. On April 14, 2025, Defendants represented to the Court that Section 2(a) "*has not even begun to be implemented.*" Defs.' Opp'n, ECF No. 85, at 30 (original emphasis). Indeed, Defendants stressed that such implementation "may *never* occur." *Id.* at 15 (original emphasis). And Defendants faulted Plaintiffs for "not establish[ing] that the EAC has begun" the process of implementing Section 2(a) or "establish[ing] when it might do so." Defs.' Opp'n, ECF No. 84, at 11.

Unfortunately, three days *before* Defendants hitched their argument to this factual contention, on April 11, the EAC began taking action in response to Section 2(a). That day, the EAC's Executive Director Brianna Schletz sent a letter on EAC letterhead to the chief election officials of each State "seeking consultation on development of" the Federal Form. Decl. of Jeannette Sawyer ("Sawyer Decl."), ECF No. 95-1, Ex. A. That letter reads:

> Executive Order 14248 . . . provides instruction to the EAC. Section 2 of EO 14248 instructs that the following be required in the national mail voter registration form:

[Text of Sections 2(a)(i)(A)–(B) requiring documentary proof of citizenship and imposing recordkeeping requirements on States].

Section 2 of EO 14248 also instructs that "documentary proof United States citizenship" shall include a copy of:

[Text of Sections 2(a)(ii)(A)–(D) prescribing acceptable forms of ID].

*Id.* The letter goes on to request information from the States on how they would implement these instructions "if required." *Id.*

In short, the letter reveals that—contrary to Defendants' representations to the Court—the EAC has, in fact, already begun to implement Section 2(a).[29] The letter further reveals that—contrary to Defendants' arguments in their Oppositions—the EAC is not interpreting Section 2(a) as an open-ended suggestion to consider including a documentary-proof-of-citizenship requirement of an unknown form. Instead, the EAC, like the Court and Plaintiffs, reads Section 2(a) as an "instruction" to adopt the precise documentary-proof-of-citizenship requirement outlined in the Executive Order. Sawyer Decl. Ex. A.

At the hearing on Plaintiffs' Motions, Defendants' counsel made an effort to explain away the EAC's letter. First, counsel argued that the letter seeking consultation from the States "is not any step at all that's contemplated" in the EAC rulemaking process and "had nothing to do with and did not commence the rulemaking process under the APA." Tr. 11:10–22. But consultation with the States is, in fact, a statutorily required component of the EAC's rulemaking process under HAVA and the NVRA. 52 U.S.C. § 20508(a)(2). And even if Defendants' counsel were correct,

---

[29] The contradiction between Defendants' factual representations and the facts on the ground is particularly striking because Executive Director Schletz authored a declaration supporting Defendants' Oppositions that was filed three days after she sent the letter to the States. *See* ECF Nos. 84-1, 85-1. When pressed, counsel for Defendants asserted that he "had no knowledge of the letter." Tr. 11:3. Indeed, even after receiving a copy of the letter from Plaintiffs' counsel, counsel for Defendants appeared to be operating under the "understanding that the letter is dated three days after we submitted our opposition." *Id.* 10:6–7. When the Court explained to counsel that he had the dates exactly backwards, he replied: "Fair enough." *Id.* 10:19. The Court is not currently of the mind that counsel for Defendants intentionally misrepresented the facts by failing to mention a letter authored by a declarant with whom he surely consulted. But the Court must remark that this exchange does not reflect the level of diligence the Court expects from any litigant—let alone the United States Department of Justice.

an argument that the EAC is taking instruction from the President to implement Section 2(a) by diverging from its ordinary procedures rather than following the statutorily prescribed process is hardly helpful to Defendants.

Next, counsel for Defendants argued that the EAC's letter was essentially meaningless because it contained "no proposed language" for revising the Federal Form and "nothing specific." Tr. 12:17–18; *see also id.* 13:23–24 ("There's nothing specific.  There's no particular rule.").  But the letter does, in fact, contain proposed language for a particular rule:  It quotes verbatim the content of the revision to the Federal Form mandated by Section 2(a).

Ultimately though, counsel for Defendants abandoned the effort.  Reversing course on the position articulated over and over in the Oppositions, he argued that "documentary proof [of citizenship] is required" on the Federal Form because that is what "the President has ordered." Tr. 71:25–72:1, 74:14–15.  Whether the President may lawfully issue that order to the EAC is the legal question presented by Plaintiffs' claims.  That question is ripe for the Court's review.  And if requiring documentary proof of citizenship on the Federal Form will injure Plaintiffs, there is no question that "the threatened injury is certainly impending." *Clapper*, 568 U.S. at 401–02.

b.    *Standing*

Both the Nonpartisan Plaintiffs and the Democratic Party Plaintiffs have shown a substantial likelihood of standing to challenge the Executive Order's directive that the EAC alter the Federal Form to require documentary proof of citizenship.

***Nonpartisan Plaintiffs.***    *First*, the Nonpartisan Plaintiffs have shown a substantial likelihood that they have organizational standing to challenge the implementation of Section 2(a) of the Executive Order because that provision would directly interfere with their core activities, including providing voter registration services throughout the Nation.  Each of the Nonpartisan Plaintiffs has introduced evidence that registering eligible voters for federal elections is a core part

of its mission.[30]  And as the D.C. Circuit has squarely held, implementing a documentary-proof-of-citizenship requirement would "unquestionably make it more difficult for [organizations like the Nonpartisan Plaintiffs] to accomplish their primary mission[s] of registering voters." *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016).

The burden that a documentary-proof-of-citizenship requirement would impose on the Nonpartisan Plaintiffs would be "far more than simply a setback to [their] abstract social interests." *See All. for Hippocratic Med.*, 602 U.S. at 394 (quoting *Havens*, 455 U.S. at 379).  Instead, it would be a direct impediment to one of the organizations' "core business activities": registering eligible voters. *Id.* at 395.  For example, a documentary-proof-of-citizenship requirement would render obsolete several of the online tools that the Nonpartisan Plaintiffs have developed and routinely use to help eligible people register to vote, requiring the organizations to either update or replace those tools.[31]  Similarly, adding such a requirement would force the Nonpartisan Plaintiffs to update educational information that they provide to prospective voters, much of which they have translated into multiple languages.[32]  A documentary-proof-of-citizenship requirement would also require the Nonpartisan Plaintiffs to invest additional resources in training their staff and volunteers, both to understand the new requirement and to handle the sensitive personal

---

[30] *See* Proaño Decl. ¶ 12 (LULAC); Streyder Decl. ¶ 19 (Secure Families Initiative); Nitschke Decl. ¶ 3 (Arizona Students' Association); Stewart Decl. ¶¶ 3–4 (League of Women Voters Education Fund and League of Women Voters of the United States); Sheoran Decl. ¶ 8 (League of Women Voters of Arizona); Miranda Decl. ¶ 5 (Hispanic Federation); Sterling Decl. ¶ 8 (NAACP); Nguyen Decl. ¶¶ 8–9 (OCA – Asian Pacific American Advocates); Chen Decl. ¶¶ 5–7 (Asian and Pacific Islander American Vote).

[31] *See, e.g.*, Stewart Decl. ¶¶ 3, 7, 10–16, 21–22 (League of Women Voters Education Fund and League of Women Voters of the United States); Sheoran Decl. ¶¶ 10, 36 (League of Women Voters of Arizona); Miranda Decl. ¶¶ 15–16, 19 (Hispanic Federation); Sterling Decl. ¶¶ 10–19 (NAACP); Nguyen Decl. ¶¶ 10, 15 (OCA – Asian Pacific American Advocates); Chen Decl. ¶¶ 8–16 (Asian and Pacific Islander American Vote).

[32] *See, e.g.*, Proaño Decl. ¶¶ 13–15, 28 (LULAC); Streyder Decl. ¶ 19 (Secure Families Initiative); Stewart Decl. ¶¶ 11, 17–19 (League of Women Voters Education Fund and League of Women Voters of the United States); Nguyen Decl. ¶¶ 11, 15 (OCA – Asian Pacific American Advocates); Chen Decl. ¶¶ 8, 15 (Asian and Pacific Islander American Vote).

information contained in passports and other documents listed in the Executive Order as acceptable proof of citizenship.[33]

Section 2(a) would also make existing voter registration efforts less effective. For example, voter registration drives held at churches, grocery stores, and in other public places will be less effective if the EAC implements a documentary-proof-of-citizenship requirement because many people who are eligible to register to vote do not carry their passport or other citizenship documents with them as they go about their daily routines.[34] This loss of effectiveness would interfere with the Nonpartisan Plaintiffs' voter-registration missions and force them to invest resources in additional voter-registration services to achieve their missions.[35] *See Newby*, 838 F.3d at 9. For all these reasons, the Nonpartisan Plaintiffs have shown a substantial likelihood that they have organizational standing to challenge the Executive Order's directive to the EAC to act to "require" documentary proof of citizenship from users of the Federal Form.

Defendants argue that because Section 2(a) "would not prohibit voter registration," the provision is "neutral with respect to [Plaintiffs'] substantive missions" and it is "'entirely speculative' whether the challenged practice will actually impair the organization[s'] activities." *See* Defs.' Opp'n, ECF No. 85, at 23 (quoting *Nat'l Fair Hous. All. v. Carson*, 330 F. Supp. 3d 14, 42 (D.D.C. 2018) (BAH)); Defs.' Opp'n, ECF No. 84, at 33–34 (raising the same argument in

---

[33] *See* Proaño Decl. ¶ 13, 17, 21–22 (LULAC); Streyder Decl. ¶ 21–23 (Secure Families Initiative); Nitschke Decl. ¶¶ 13–14 (Arizona Students' Association); Stewart Decl. ¶¶ 23–26 (League of Women Voters Education Fund and League of Women Voters of the United States); Sheoran Decl. ¶¶ 34–35 (League of Women Voters of Arizona); Miranda Decl. ¶¶ 8, 10, 13 (Hispanic Federation); Sterling Decl. ¶¶ 19–21 (NAACP); Nguyen Decl. ¶ 15 (OCA – Asian Pacific American Advocates); Chen Decl. ¶ 17 (Asian and Pacific Islander American Vote).

[34] *See* Proaño Decl. ¶ 43 (LULAC); *see also* Tr. at 27:20–28:5, 37:20–38:1.

[35] *See* Proaño Decl. ¶ 28 (LULAC); Streyder Decl. ¶ 24–26 (Secure Families Initiative); Nitschke Decl. ¶ 15 (Arizona Students' Association); Stewart Decl. ¶ 27 (League of Women Voters Education Fund and League of Women Voters of the United States); Sheoran Decl. ¶¶ 34, 38 (League of Women Voters of Arizona); Miranda Decl. ¶ 20 (Hispanic Federation); Sterling Decl. ¶¶ 22, 27 (NAACP); Nguyen Decl. ¶ 15 (OCA – Asian Pacific American Advocates); Chen Decl. ¶¶ 13, 16, 19 (Asian and Pacific Islander American Vote).

response to the Democratic Party Plaintiffs). This argument relies on an unworkably cramped theory of what it means to "impair" an organization's mission that is inconsistent with precedent. The plaintiff organization in *Havens*, the seminal case recognizing organizational standing, was not challenging a law that "prohibit[ed]" its housing counseling service. *Compare* Defs.' Opp'n, ECF No. 84, at 33, *and* Defs.' Opp'n, ECF No. 85, at 23, *with Havens*, 455 U.S. at 378–79. Instead, the organization challenged unlawful racial steering practices that it had "devote[d] significant resources" to "counteract." *Havens*, 455 U.S. at 379. Just as the plaintiff organization in *Havens* had standing to challenge the harmful effects of racial steering on its mission of helping provide equal access to housing, so too Plaintiffs here have standing to challenge the burdens that Section 2(a) would impose on their missions of registering and turning out eligible voters. *See id.*

*Second*, and in the alternative, several Nonpartisan Plaintiffs have shown a substantial likelihood that they have associational standing to challenge Section 2(a) of the Executive Order because that provision would directly harm the concrete interests of their individual members in registering to vote and having their votes counted in upcoming federal elections.[36]

At the hearing on Plaintiffs' Motions, the Nonpartisan Plaintiffs proffered that that they could, if required, produce a pseudonymous declaration from a member of the Arizona Students' Association showing that the declarant is eligible to vote but would have difficulty complying with a documentary-proof-of-citizenship requirement. *See* Tr. at 95:8–23. The Nonpartisan Plaintiffs further proffered that there are many other similarly situated members of their organizations. *See id.* Because Defendants in these consolidated cases do not "need to know the identity of a particular member to respond to [Plaintiffs'] claim[s] of injury," the Court concludes that the Nonpartisan Plaintiffs' declarations from organizational leaders and on-the-record proffer of

---

[36] *See* Proaño Decl. ¶¶ 2, 29–37 (LULAC); Streyder Decl. ¶¶ 3, 8–18 (Secure Families Initiative); Nitschke Decl. ¶¶ 2, 7–11 (Arizona Students' Association).

evidence from at least one specifically aggrieved member is a sufficient basis for holding, in the alternative, that the Nonpartisan Plaintiffs have shown a substantial likelihood of associational standing to challenge Section 2(a). *See Mi Familia Vota*, 129 F.4th at 709.

The Nonpartisan Plaintiffs' preliminary showing sufficiently establishes that, as their cases proceed, they will be able to demonstrate associational standing "with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992); *cf. Travelers United, Inc. v. Hyatt Hotels Corp.*, No. 23-cv-2776, --- F. Supp. 3d ----, 2025 WL 27162, at *16 (D.D.C. 2025) (CKK) (rejecting assertion of associational standing where the party invoking federal jurisdiction had not made any showing that any identifiable member of the plaintiff organization had standing).

In sum, these organizations' individual members would have standing to challenge Section 2(a) in their own right.[37] their challenge is germane to the organizations' purposes,[38] and the individual members' participation is not required to resolve any issue in these consolidated case. Therefore, the Nonpartisan Plaintiffs challenging Section 2(a) on behalf of their individual members have shown a substantial likelihood of associational standing to advance that challenge. *See Hunt*, 432 U.S. at 343; *EPIC*, 928 F.3d at 101.

***Democratic Party Plaintiffs.*** The Democratic Party Plaintiffs have also shown a substantial likelihood of standing to challenge the implementation of Section 2(a) of the Executive Order.

*First*, many of the Democratic Party Plaintiffs have organizational standing to challenge this provision based on its effect on their ability to register new voters as members and supporters

---

[37] *See* Proaño Decl. ¶¶ 29–37 (LULAC); Streyder Decl. ¶¶ 8–18 (Secure Families Initiative); Nitschke Decl. ¶¶ 7–11 (Arizona Students' Association).

[38] *See* Proaño Decl. ¶ 12 (LULAC); Streyder Decl. ¶ 19 (Secure Families Initiative); Nitschke Decl. ¶ 3 (Arizona Students' Association).

of the Democratic Party, which they do in service of their mission of electing Democratic candidates to office throughout the country.[39]  The DNC, DGA, DSCC, and DCCC have each shown that the implementation of Section 2(a) would make it more difficult for them to register voters who are likely to support Democratic candidates, forcing them to divert additional resources toward further voter registration efforts.[40]  These expenditures of resources would trade off directly against investments in other time-sensitive, election-related activities that the organizations would otherwise make, including developing and paying to distribute political advertisements in competitive races.[41]

As is true of the Nonpartisan Plaintiffs, the burden that Section 2(a) would impose on the Democratic Party Plaintiffs is therefore "far more than simply a setback to [their] abstract social interests."  *See All. for Hippocratic Med.*, 602 U.S. at 394 (quoting *Havens*, 455 U.S. at 379).  It would directly impair their "core business activities" of registering and turning out supporters of Democratic candidates to elect those candidates to office.  *Id.* at 395.  Therefore, the implementation of Section 2(a) would inflict a concrete harm on the DNC, DGA, DSCC, and DCCC, and those Plaintiffs have organizational standing to challenge it.

*Second*, as an alternative basis for standing, the DNC has also shown a substantial likelihood of associational standing to challenge Section 2(a).  The DNC counts among its members each of the many voters across the country who are registered as Democrats.[42]  Many of

---

[39] *See* Schneider Decl. ¶¶ 3, 18–23 (DNC); Edelman Decl., ¶¶ 4, 13–17 (DGA); Boss Decl. ¶¶ 3, 16–21 (DSCC); Ruselowski Decl. ¶¶ 4, 18–24 (DCCC).

[40] *See* Schneider Decl. ¶¶ 21–22 (DNC); Edelman Decl. ¶¶ 15–16 (DGA); Boss Decl. ¶¶ 17–20 (DSCC); Ruselowski Decl. ¶¶ 20–22 (DCCC).

[41] *See* Schneider Decl. ¶ 23 (DNC); Edelman Decl. ¶ 17 (DGA); Boss Decl. ¶ 21 (DSCC); Ruselowski Decl. ¶¶ 23–24 (DCCC).

[42] *See* Schneider Decl. ¶ 4.  The DNC's identification of these voters as "members" for purposes of associational standing is consistent with precedent.  Registered Democrats are "identifiable members" who the DNC "represents in

these individuals lack documentary proof of citizenship that would satisfy Section 2(a)'s requirements or would have difficulty accessing that documentary proof to register to vote if they move to a new address or otherwise need to renew their registrations.[43]  The implementation of Section 2(a) would therefore hinder these members' ability to register to vote, inflicting a cognizable harm that is directly traceable to the Executive Order.  *See Mi Familia Vota*, 129 F.4th at 709.  Those members would therefore have standing to challenge Section 2(a) in their own right. Those members' interest in registering to vote and voting is plainly germane to the DNC's mission of helping to elect Democrats by registering and turning out voters.  And those individual members' participation is not necessary to the resolution of any issue in these consolidated cases. Accordingly, the DNC has shown a substantial likelihood of associational standing to raise the same challenge.  *See Hunt*, 432 U.S. at 343; *EPIC*, 928 F.3d at 101.

*Third*, as a further alternative basis for standing, several of the Democratic Party Plaintiffs have shown a substantial likelihood of political-competitor standing on the theory that Section 2(a) would cause the "illegal structuring of a competitive environment" in which "rival parties defend their concrete interests."  *Shays*, 414 F.3d at 85–87.  Two of the Democratic Party Plaintiffs— Jeffries and Schumer—have made clear showings of political-competitor standing to challenge Section 2(a) of the Executive Order based on their active candidacies for reelection to federal office.[44]  Jeffries and Schumer each aver that some of their constituents and likely supporters may be unable to register to vote or may be dissuaded from registering if Section 2(a) is implemented because, although they are eligible to vote, they lack easy access to documentary proof of

---

good faith."  *See Students for Fair Admissions*, 600 U.S. at 201.  These members also "guide [the organization's] activities" and shape its strategy by selecting particular Democratic leaders for public offices, some of whom in turn become organizational leaders of the DNC.  *See Viasat*, 47 F.4th at 781.

[43] *See* Schneider Decl. ¶ 19.

[44] *See* Jeffries Decl. ¶ 3; Schumer Decl. ¶ 2.

citizenship.[45]  Implementing this provision would alter the "competitive environment" in which Plaintiffs Jeffries and Schumer compete for elective office.  *See Shays*, 414 F.3d at 87.  Plaintiffs Jeffries and Schumer therefore have shown a substantial likelihood of political-competitor standing to challenge Section 2(a) of the Executive Order.  And because a "party affiliate" of an active candidate may also exercise political-competitor standing, *see Nat. L. Party*, 111 F. Supp. 2d at 47, the Democratic Party Plaintiffs affiliated with Plaintiffs Jeffries and Schumer and other active Democratic candidates throughout the country have a substantial likelihood of standing to raise the same challenge.

Defendants argue that the Democratic Party Plaintiffs' competitive standing arguments are inapt because Plaintiffs "have not been 'singled out for specially unfavorable treatment'" and cannot show that they will lose votes as a result of Section 2(a) of the President's Executive Order. Defs.' Opp'n, ECF No. 84, at 15 (quoting *Raines v. Byrd*, 521 U.S. 811, 821 (1997)).  But the D.C. Circuit has explained that unlawful changes to the competitive environment can support standing for political candidates even when those changes apply to plaintiff candidates "as well as to their competitors."  *See Am. Inst. of Certified Pub. Accts. v. I.R.S.*, 804 F.3d 1193, 1197 (D.C. Cir. 2015) (citing *Shays*, 414 F.3d at 87).  And a candidate proceeding under a theory of "illegally structured" political competition "has no obligation to demonstrate definitively that he has less chance of victory" under the challenged rules than he would under some alternative scheme.  *LaRoque*, 650 F.3d at 787.  Therefore, contrary to Defendants' arguments, the Democratic Party Plaintiffs' standing does not depend on "speculation that facially neutral election rules favor one party over another."  Defs.' Opp'n, ECF No. 84, at 15–16.  Instead, their standing rests properly on the

---

[45] *See* Jeffries Decl. ¶¶ 13–14; Schumer Decl. ¶¶ 11–13.

asserted, non-speculative interference with their right to compete for election under lawful "rules of the game." *Shays*, 414 F.3d at 85.

***All Plaintiffs.*** Some of Defendants' arguments bear on the standing inquiry for all Plaintiffs. For example, Defendants argue that Plaintiffs have not shown any harm redressable by a favorable decision because "nothing has been implemented." *See* Defs.' Opp'n, ECF No. 84, at 36; Defs.' Opp'n, ECF No. 85, at 25. Similarly, Defendants argue that the Executive Order does not inflict any competitive harm on the Democratic Party Plaintiffs because it does not directly change the content of the Federal Form. *See* Defs.' Opp'n, ECF No. 84, at 11; Defs.' Opp'n, ECF No. 85, at 9–10. For all the reasons described in the preceding discussion of timing of review, these arguments miss the mark. As the D.C. Circuit has made clear, "Damocles's sword does not have to actually fall . . . before the court will issue an injunction." *Newby*, 838 F.3d at 9. Under the circumstances presented here, the threatened harm to both the Nonpartisan Plaintiffs' and the Democratic Party Plaintiffs' various interests is "sufficiently imminent and substantial" to satisfy the injury-in-fact requirement and support their standing to seek "forward-looking" injunctive relief against the implementation of Section 2(a). *See TransUnion*, 594 U.S. at 435 (citing *Clapper*, 568 U.S. at 414).

Defendants also raise a handful of cross-cutting arguments against both the Nonpartisan Plaintiffs' and Democratic Party Plaintiffs' standing to challenge Section 2(a) that sound in traceability and redressability, but these arguments are unpersuasive. Specifically, Defendants argue that each of Plaintiffs' claimed injuries-in-fact is the result of "individuals exercising their own right to make decisions" about matters like whether to obtain documentary proof of citizenship, whether to carry that proof with them in public, and whether to share that proof with

nonprofit organizations that offer to help them register to vote.  *See* Defs.' Opp'n, ECF No. 84, at 17; Defs.' Opp'n, ECF No. 85, at 11.

But as the Nonpartisan Plaintiffs correctly note, the Supreme Court's decision in *Department of Commerce v. New York*, 588 U.S. 752 (2019), forecloses this argument.  *See* Nonpartisan Pls.' Reply at 17–18.  In that case, the Supreme Court considered an allegation that adding a question about citizenship to the census would result in lower response rates.  *See Dep't of Com.*, 588 U.S. at 766–67.  The Government argued that the plaintiffs lacked standing because any decline in response rates was not fairly traceable to the proposed change in the census questionnaire.  *Id.* at 767–78.  Instead, the Government contended, any decline was the result of "the independent action of third parties choosing to violate their legal duty to respond to the census" based on "unfounded fears" that the Government would use the responses for law enforcement purposes.  *Id.*  The Supreme Court roundly rejected that argument, holding instead that a theory of standing based on "the predictable effect of Government action on the decisions of third parties" satisfies the traceability requirement for Article III standing.  *Id.*

So too here: Because each of Plaintiffs' asserted injuries from Section 2(a) flows from the "predictable effect" that a burdensome new federal requirement for voter registration will have on eligible voters' behavior, those injuries satisfy the traceability requirement.  *See id.*

In sum, both the Nonpartisan Plaintiffs and the Democratic Party Plaintiffs have shown a substantial likelihood that each of the injuries-in-fact that they have identified is "fairly . . . trace[able] to" Section 2(a) of the Executive Order and would "likely" be "redressed by a favorable decision" from this Court enjoining the implementation of that section.  *See Lujan*, 504 U.S. at 560.  Plaintiffs have therefore carried their burden of showing a substantial likelihood of standing to challenge Section 2(a).

66

       c.     *Merits*

On the merits, the Nonpartisan Plaintiffs and the Democratic Party Plaintiffs each raise the same, straightforward challenge to Section 2(a) of the Executive Order:  They argue that the provision is invalid because neither the Constitution nor the NVRA grants the President the authority to direct the EAC to change the content of the Federal Form.  *See* Nonpartisan Pls.' Mot. at 19–24; Dem. Pls.' Mot. at 29–34.  This separation-of-powers argument is substantially likely to succeed on the merits.

"The President's power, if any, to issue the [Executive O]rder must stem either from an act of Congress or from the Constitution itself."  *Youngstown*, 343 U.S. at 585; *see also Dalton*, 511 U.S. at 473.  But neither the Constitution nor any statute explicitly grants the President the power to dictate the contents of the Federal Form.  On the contrary, both the Constitution's Elections Clause and the NVRA vest control over federal election regulation in other actors, leaving no role for the President.  *See* U.S. Const. art. I, § 4, cl. 1; 52 U.S.C. §§ 20505, 20508.

Start with the Constitution.  The Elections Clause provides that the "Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof."  U.S. Const. art. I, § 4, cl. 1.  The broad scope of this provision empowers States to establish a comprehensive regulatory framework for federal elections.  *ITCA*, 570 U.S. at 8.  The Elections Clause provides that Congress—not the President—is the check on States' authority to regulate federal elections, allowing that "the Congress may at any time by Law make or alter" States' election rules.  U.S. Const. art. I, § 4, cl. 1; *see also Foster*, 522 U.S at 69.  Meanwhile, the power to determine voter qualifications is left entirely with the States, subject only to the requirement that each State must adopt the same qualifications for congressional elections as it does for elections to "the most numerous branch" of its own legislature.  U.S. Const. art. I, § 2, cl. 1; U.S. Const. amend. XVII.  The Constitution vests none of these powers in the President.

Consistent with this constitutional separation of powers, Congress enacted the NVRA to require a uniform, baseline set of federal voter registration procedures that complement other procedures provided under State law.  *See* Pub. L. No. 103-31, 107 Stat. 77 (1993) (codified, as amended, at 52 U.S.C. §§ 20501–20511).  One of these mandatory procedures requires States to "accept and use" the Federal Form.  52 U.S.C. § 20505(a)(1).  And the NVRA strictly limits the contents of this form to "require *only*" information that "is *necessary* to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process."  *Id.* § 20508(b)(1) (emphasis added).

The NVRA further specifies a procedure for determining what information is necessary to the Federal Form.  The agency responsible for maintaining the Federal Form, "in consultation with the chief election officers of the States," sets the content of the Federal Form by promulgating regulations through notice-and-comment rulemaking.  *See id.* § 20508(a)(1)–(2); *see also id.* § 20929.  Congress originally assigned this responsibility to the FEC, an independent, bipartisan commission.  *See* Pub. L. No. 103-31 § 6(a)(1), 107 Stat. 77, 79 (1993) (codified at 52 U.S.C. § 20505(a)(1); *id.* § 9(a), 107 Stat. 77, 87 (1993) (codified, as amended, at 52 U.S.C. § 20508(a)); *see also* 52 U.S.C. § 30106(a) (establishing the FEC).  When Congress later enacted HAVA, it reassigned this responsibility to the EAC, a newly created "independent entity" that, like the FEC, is made up of a bipartisan panel of commissioners.  *See* Pub. L. No. 107-252, Title II, §§ 201–03, 116 Stat. 1666, 1673–75 (2002) (codified at 52 U.S.C. §§ 20921–20923); *id.* Title VIII, § 802, 116 Stat. 1666, 1726 (2002).  And the EAC may revise the Federal Form "only with the approval of at least three" of its four bipartisan members.  52 U.S.C. § 20928.

Critically, Congress has never assigned any responsibility for the content of the Federal Form to the President or to any other individual in the Executive Branch with the power to act

unilaterally.  The power to alter the Federal Form is—and always has been—delegated solely to a bipartisan, independent commission with a duty to make changes only "in consultation with the chief election officers of the States."  52 U.S.C. § 20508(a)(2); *see also* Pub. L. No. 103-31, § 9(a)(2), 107 Stat. 77, 87 (1993) (assigning responsibility to the FEC); Pub. L. No. 107-252, Title VIII, § 802, 116 Stat. 1666, 1726 (2002) (reassigning responsibility to the EAC).  Accordingly, the President has no express statutory authority to alter the content of the Federal Form.

In the absence of any clear grant of authority to the President, the scope of his power to order alterations to the Federal Form depends on the scope of the powers vested in Congress and the extent to which Congress has implicitly delegated or withheld those powers.  *See Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 10 (2015).  When "the President takes measures incompatible with the expressed or implied will of Congress . . . he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter."  *Id.* (quoting *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring)).  In this realm, the President's power is "at its lowest ebb," and his actions "must be scrutinized with caution, for what is at stake is the equilibrium established by our constitutional system."  *Youngstown*, 343 U.S. at 639 (Jackson, J., concurring).

Here, the President's power is "at its lowest ebb" because his unilateral instruction to add a documentary-proof-of-citizenship requirement to the Federal Form is contrary to the manifest will of Congress, as expressed in the text, structure, and context of the NVRA and HAVA.  *See Youngstown*, 343 U.S. at 639 (Jackson, J., concurring).  Each of those statutes, which passed with bipartisan support in two different sessions of Congress nearly a decade apart,[46] reflects a careful

---

[46] *See* U.S. House of Representatives Roll Call No. 462 (107th Congress, 2d Sess.), H.R. 3295 Conf. Rep. (357-48), https://perma.cc/W6K2-8KHC; U.S. Senate Roll Call No. 238 (107th Congress, 2d. Sess.), H.R. 3295 Conf. Rep. (92-2), https://perma.cc/PD82-9ZV3; U.S. House of Representatives Roll Call No. 154 (103d Congress, 1st Sess.), H.R. 2 Conf. Rep. (259-164), https://perma.cc/JHC6-4QLB; U.S. Senate Roll Call No. 118 (103d Congress, 1st Sess.), H.R. 2 Conf. Rep. (62-36), https://perma.cc/TGZ7-D95T.

allocation of regulatory power to a bipartisan panel of experts, accompanied by a requirement for consultation with the States. *See* Pub. L. No. 103-31, § 9(a)(2), 107 Stat. 77, 87 (1993); Pub. L. No. 107-252, Title VIII, § 802, 116 Stat. 1666, 1726 (2002). This design implicitly forbids any individual member of the Executive Branch from unilaterally exercising the delegated power to regulate State voter registration programs. Moreover, when enacting the NVRA, Congress considered and rejected a proposal that would have allowed States to impose exactly the kind of documentary-proof-of-citizenship requirement that the President's Executive Order now directs the EAC to adopt, concluding that such a requirement was "not necessary or consistent with the purposes of [the] Act." H.R. Rep. No. 103–66, at 23 (1993) (Conf. Rep.). In short, the instruction in Section 2(a) "is incompatible with the expressed or implied will of Congress." *Zivotofsky*, 576 U.S. at 10 (quoting *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring)). Nothing in either statute delegates to the President the power to issue that instruction.

Nor would it be appropriate for the Court to strain the text of HAVA or the NVRA to find implicit presidential authority to revise the Federal Form therein. When the Executive Branch claims to "discover in a long-extant statute an unheralded power" that would mark a "transformative expansion" of its regulatory authority, the Court must "hesitate before concluding that Congress meant to confer" such power. *West Virginia v. EPA*, 597 U.S. 607, 724–25 (internal quotation marks and citations omitted). Instead, the Court must identify a "clear congressional authorization" for the claimed power. *Id.* at 732 (quoting *Util. Air. Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014)). Judicial modesty is especially warranted where, as here, the power at issue is of great "political significance," *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000), and would "intrude[] into an area that is the particular domain of state law," *Ala. Ass'n of Realtors v. Dep't of Health & Human Servs.*, 594 U.S. 758, 764 (2021). And the Court must guard

against Executive attempts to "work around the legislative process" through unilateral action where, as here, Congress has "considered and rejected" bills that would achieve the same end. *West Virginia*, 597 U.S. at 743 (Gorsuch, J., concurring).  Lacking any clear statement of presidential power over the Federal Form, the Court will not find an "elephant[] in [a] mousehole[]." *See Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 468 (2001).

Because no statute grants the President authority to require the EAC to add a documentary-proof-of-citizenship requirement to the Federal Form, his ability to do so relies "upon his own constitutional powers minus any constitutional powers of Congress over the matter." *Zivotofsky*, 576 U.S. at 10 (quoting *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring)).  Therefore, to sustain the lawfulness of Section 2(a), Defendants must show that the President has powers that are "both 'exclusive' and 'conclusive' on the issue," *id.* (quoting *Youngstown*, 343 U.S. at 637–38 (Jackson, J., concurring)), and "the Court can sustain his actions 'only by disabling the Congress from acting upon the subject.'" *Dames & Moore*, 453 U.S. at 669 (quoting *Youngstown*, 343 U.S. at 637–38 (Jackson, J., concurring)).

But the President lacks such power.  For all the reasons explained, the President has no constitutional power over election regulation that would support this unilateral exercise of authority.  The Constitution vests that power in the States and Congress alone.  *See* U.S. Const. art. I, § 4, cl. 1; *id.* art. I, § 2, cl. 1; *id.* amend. XVII.

Defendants argue that Section 2(a) is lawful because the EAC could, acting on its own, adopt a documentary-proof-of-citizenship requirement after following all the required procedures. *See* Defs.' Opp'n, ECF No. 84, at 25–26; Defs.' Opp'n, ECF No. 85, at 18–19.  But this argument is unresponsive to Plaintiffs' Motions.  At this stage, no Plaintiff is asking the Court to declare that the EAC cannot add a documentary-proof-of-citizenship requirement to the Federal Form.  Instead,

they are challenging the *President's* claimed unilateral authority to direct the EAC to take that action. *See* Nonpartisan Pls.' Mot. at 35; Dem. Pls.' Mot. at 44. Although both the Nonpartisan Plaintiffs and the Democratic Party Plaintiffs respond that Defendants are mistaken about whether it would be proper for the EAC to impose such a requirement, *see* Nonpartisan Pls.' Reply at 6; Dem. Pls.' Reply at 18–19, the EAC's authority to act on its own through its ordinary procedures is not at issue in the pending motions.

At the hearing on Plaintiffs' Motions, Defendants advanced a sweeping argument—not raised in either of their briefs—about the scope of the President's authority to direct the EAC to take the actions at issue in these consolidated cases. *See* Tr. at 101:16–102:22. Specifically, they argued that the Article II Vesting Clause empowers the President with "plenary authority" to direct the EAC to "enforce the law" according to his interpretation and requires the EAC to obey his commands. *See id.*; *see also* U.S. Const. art. II, § 1, cl. 1. This argument is unavailing for two reasons.

First, in the absence of exceptional circumstances, "arguments raised for the first time at oral argument are forfeited," and Defendants have identified no circumstances whatsoever that excuse their failure to raise this far-reaching and consequential argument in their briefing. *U.S. ex rel. Davis v. District of Columbia*, 793 F.3d 120, 127 (D.C. Cir. 2015).[47] The Court could end its analysis of this argument there.

---

[47] In both of their Oppositions, Defendants might be taken to have alluded to this argument in the vaguest possible terms. One sentence in each brief reads: "[T]here is no tension between the Executive Order and [the laws cabining the EAC's ability to act], nor is there a delegation of authority, as the EAC already resides within the executive branch." Defs.' Opp'n, ECF No. 84, at 26; Defs.' Opp'n, ECF No. 85, at 19. To the extent this single line was intended to advance a first-of-its-kind argument that Article II vests the President with power to dictate the outcome of an independent regulatory agency's notice-and-comment rulemaking proceedings in the absence of *any* statutory delegation of such power and in the face of unambiguous constitutional and statutory context excluding the President from the process at issue, Defendants' presentation of that argument was insufficient. "A party forfeits an argument by mentioning it only 'in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones.'" *Gov't of Manitoba v. Bernhardt*, 923 F.3d 173, 179 (D.C. Cir. 2019) (quoting *Schneider v. Kissinger*, 412 F.3d 190, 200 n.1 (D.C. Cir. 2005)).

Second, even if Defendants had not forfeited this argument, the Court would reject it because it is untethered from precedent and unsupported by even a maximalist view of "the executive Power" under our Constitution.  *See* U.S. Const. art. II, § 1, cl. 1.

The Vesting Clause implies that the President must have some supervisory authority over subordinate executive officers.  For example, the President must have the power to remove an Executive Branch official who, like the Director of the Consumer Financial Protection Bureau, is empowered to "dictate and enforce policy for a vital segment of the economy affecting millions of Americans."  *Seila Law*, 591 U.S. at 225; *see also Free Enter. Fund v. PCAOB*, 561 U.S. 477, 484 (2010) (invalidating multi-level removal protection for an inferior officer who "determines the policy and enforces the laws of the United States").

But the President's supervisory authority has limits.  Subordinate officers subject to the President's supervision must follow the President's directives, but only "to the extent allowed by the law" as embodied in the Constitution or enacted by Congress.  *See Allbaugh*, 295 F.3d at 32–33.  Accordingly, the Supreme Court has instructed, "the real question" that courts must ask when determining the scope of the President's power under the Vesting Clause is not whether there are *any* restrictions on the President's supervisory authority, but whether those restrictions "are of such a nature that they impede the President's ability to perform his constitutional duty."  *Morrison v. Olson*, 487 U.S. 654, 691 (1988).  If the restrictions at issue do not "unduly interfere with the functioning of the Executive Branch," they may be upheld.  *See Seila Law*, 591 U.S. at 217.

Holding that the President lacks the authority to direct the EAC to make specific, predetermined changes to the Federal Form is consistent with the proper limits on his supervisory authority and presents no impediment to "the President's ability to perform his constitutional duty."  *See Morrison*, 487 U.S. at 691.

First, the President has no constitutional duty to prescribe the content of election regulations. *Cf.* U.S. Const. art. I, § 4, cl. 1. Our Constitution assigns responsibility for regulating elections to the States, subject only to preemption by Congress. *See id.*

Second, any restriction on the President's ability to set the content of election regulation does not impair his ability to "take Care that the Laws be faithfully executed." U.S. Const. art I. § 3. As another provision of the Executive Order recognizes, Congress has enacted criminal statutes that empower the Executive to take enforcement action against non-citizens who vote or register to vote in federal elections in violation of State voter-qualifications laws. *See* Exec. Order. 14,248 § 2(e) (citing 18 U.S.C. §§ 611, 1015(f)). But "[i]n the framework of our Constitution," the President's role in the lawmaking process is limited to "the recommending of laws he thinks wise and the vetoing of laws he thinks bad." *Youngstown*, 343 U.S. at 587. His duty to "see that the laws are faithfully executed refutes the idea that he is to be a lawmaker," and he therefore has no constitutional duty to set regulations unless instructed to do so by Congress. *See id.*

Third, to the extent the EAC exercises executive power vested in the President, the President retains the power to "oversee [those] officers through removal."[48] *Free Enter. Fund*, 561 U.S. at 492. "[B]ecause that traditional executive power [has not been] 'expressly taken away, it remain[s] with the President.'" *Id.* (quoting Letter from James Madison to Thomas Jefferson (June 30, 1789), 16 *Documentary History of the First Federal Congress* 893 (2004)).

The President is free to state his views about what policies he believes that Congress, the EAC, or other federal agencies should consider or adopt. *See Youngstown*, 343 U.S. at 587. But

---

[48] Separately, to the extent that the "quasi-legislative" character of an agency's responsibilities and activities continues to inform the analysis of the extent to which the agency may be insulated from direct presidential control, the EAC's activities—making regulations about the content of the Federal Form, conducting studies, developing voluntary guidelines, writing reports to Congress, and distributing grants according to formulas set by Congress—would clearly be best characterized as "quasi-legislative" rather than "purely executive." *See Humphrey's Ex'r v. United States*, 295 U.S. 602, 629, 632 (1935); 52 U.S.C. § 20922. *But see Seila Law*, 591 U.S. at 216 n.2.

in this case, the President has done much more than state his views:  He has issued an "Order" directing that an independent commission "shall" act to "require" changes to an important document, the contents of which Congress has tightly regulated.  *See* Exec. Order 14,248 § 2(a). That command exceeds the President's authority.

At the hearing on Plaintiffs' Motions, Defendants affirmed that the Executive Order means what it says:  The EAC *must* add a documentary-proof-of-citizenship requirement to the Federal Form, regardless of the feedback it receives from the States or other participants in the notice-and-comment process or of its own conclusions about whether such proof is "necessary" to allow States to assess voter qualifications.  *See* Tr. at 71:13–18, 72:17–73:9, 73:13–74:17; *cf.* 52 U.S.C. § 20508(a)(1)–(2), (b)(1).  Critically, Defendants did *not* argue that the Executive Order's use of the phrases "appropriate action" and "consistent with applicable law" leave the EAC with discretion to add a documentary-proof-of-citizenship requirement to the Federal Form only if it concludes that doing so is necessary and consistent with the NVRA.  *Cf.* Tr. at 73:13–74:17. According to Defendants, Section 2(a) divests the EAC of its statutory prerogative to make that decision, leaving it discretion only to decide ministerial details about how the documentary-proof-of-citizenship requirement is to be embodied in the form itself.  *See id.*  As the Democratic Party Plaintiffs aptly summarized, in Defendants' view, Section 2(a) leaves the EAC with discretion over little more than "whether documentary proof of citizenship needs to be stapled to the registration form or paper-clipped."  Tr. at 96:10–11.

Even the Office of Legal Counsel, ever the zealous advocate for expansive presidential power over agencies, has rejected the view that the President may direct a predetermined outcome from a notice-and-comment rulemaking process by an independent regulatory commission.  For example, when President Reagan issued an executive order requiring agencies to submit some

proposed rules to the Office of Management and Budget for review, OLC disclaimed any presidential authority to "divest the officer of ultimate statutory authority" or to "reject an agency's ultimate judgment delegated to it by law . . . that priorities under the statute compel a particular course of action." *Proposed Executive Order Entitled "Federal Regulation,"* 5 Op. O.L.C. 59, 62 (1981). OLC took a similar position during President Trump's first term, concluding that an executive order requiring independent agencies to submit rules for OMB review was valid in part because it "preserves an agency's ultimate discretion and thus respects Congress's judgment to entrust particular rulemakings to a commission rather than a traditional executive agency." *Extending Regulatory Review Under Executive Order 12866 to Independent Agencies*, 43 Op. O.L.C. 232, 256 (2019). Defendants' contentions at oral argument, which they failed to brief or substantiate in any meaningful way, give no persuasive reason for this Court to go where even OLC has not gone. The President lacks the authority to direct the outcome of the rulemaking process that Congress has assigned to the EAC.

Finally, even if the Article II Vesting Clause did require that any power delegated by Congress to an independent regulatory commission must be under the complete, unilateral control of the President, vitiating the EAC's independence is not the obvious response to that conclusion. The text, structure, and context of the NVRA and HAVA show that Congress would not have delegated its Elections Clause authority to regulate the content of the Federal Form to the EAC if that authority could be exercised unilaterally by the President. As discussed above, both the NVRA and HAVA delegated that power to bipartisan, independent panels—first the FEC, and later the EAC. *See* Pub. L. No. 103-31, § 9(a)(2), 107 Stat. 77, 87 (1993); Pub. L. No. 107-252, Title VIII, § 802, 116 Stat. 1666, 1726 (2002). Congress has also provided that the EAC may act only with a three-fourths majority vote of its commissioners, ensuring that it can act only with

bipartisan support.  *See* 52 U.S.C. § 20928.  If the President, acting alone, could dictate the content of the Federal Form, Congress's careful structural choices would be for naught.  This Court would not lightly override Congress's clearly expressed preference that power to modify the Federal Form be exercised only through the bipartisan consensus of a multimember panel.  *See Free Enter. Fund*, 561 U.S. at 509; *Seila Law*, 591 U.S. at 234–35, 236 (plurality opinion of Roberts, C.J.).

No statute expressly or impliedly grants the President authority to require documentary proof of citizenship on the Federal Form.  Nor does any provision of the Constitution vest the President with that authority.  Accordingly, both the Nonpartisan Plaintiffs and the Democratic Party Plaintiffs have shown a substantial likelihood of success on the merits of their separation-of-powers challenges to Section 2(a) of the Executive Order.

### 2.    Irreparable Harm

To obtain a preliminary injunction against Section 2(a), Plaintiffs next must show a likelihood of irreparable harm from that provision that is "both certain and great," not merely "theoretical," and sufficiently "imminen[t]" to demonstrate a "clear and present need" for equitable relief.  *See Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985).  Both the Nonpartisan Plaintiffs and the Democratic Party Plaintiffs have carried this burden.

The Nonpartisan Plaintiffs have shown a strong likelihood that the implementation of Section 2(a) of the Executive Order would cause them irreparable harm by interfering with their "primary mission of registering voters" ahead of upcoming elections.  *Newby*, 838 F.3d at 9.  "[T]hat harm is irreparable because after the registration deadlines . . . pass, 'there can be no do over and no redress.'"  *Id.* (quoting *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014)).

This impending irreparable harm is particularly salient for the Nonpartisan Plaintiffs operating in Arizona, which has an upcoming federal voter registration deadline of June 16, 2025.[49]    Because Arizona currently requires documentary proof of citizenship for registration on its State voter registration form, the Federal Form provides the only means for eligible voters to register for federal elections in Arizona without providing that proof.  *See* Ariz. Rev. Stat. § 16-166(F) (stating that a voter-registration application must be "accompanied by satisfactory evidence of United States citizenship"); *Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1, 20 (2013) (holding that the NVRA "precludes Arizona from requiring a Federal Form applicant to submit information beyond that required by the form itself," including documentary proof of citizenship). The Nonpartisan Plaintiffs have made a strong showing that any action to implement Section 2(a) under these circumstances would increase voter confusion and interfere with their ongoing voter registration efforts.

The Democratic Party Plaintiffs have shown a strong likelihood of irreparable injury from Section 2(a) for a similar reason.  The Democratic Party Plaintiffs are actively planning and preparing for upcoming elections across the country.[50]  If Section 2(a) is implemented, they will be forced to divert resources from their other electoral efforts to counteract the provision's effects on their voter-registration and mobilization efforts.[51]  Like the Nonpartisan Plaintiffs, the Democratic Party Plaintiffs face an especially acute threat of near-term harm in Arizona because

---

[49] *See* Nonpartisan Pls.' Ex. 31, ECF No. 34-32; Proaño Decl. ¶ 54 (LULAC); Streyder Decl. ¶ 18 (Secure Families Initiative); Nitchke Decl. ¶ 11 (Arizona Students' Association); Sheoran Decl. ¶ 39 (League of Women Voters of Arizona).

[50] *See* Schneider Decl. ¶ 23 (DNC); Edelman Decl. ¶ 16 (DGA); Boss Decl. ¶ 21 (DSCC); Ruselowski Decl. ¶¶ 23–24 (DCCC); Jeffries Decl. ¶ 3; Schumer Decl. ¶ 2.

[51] *See* Schneider Decl. ¶¶ 21–23 (DNC); Edelman Decl. ¶¶ 15–17 (DGA); Boss Decl. ¶¶ 17–21 (DSCC); Ruselowski Decl. ¶¶ 20–24 (DCCC); Jeffries Decl. ¶ 14, 16–19; Schumer Decl. ¶ 13, 16–19.

of the looming June deadline to register to vote in the special congressional election in that State.[52]
And because each day presents an opportunity to recruit candidates, persuade voters, and galvanize
supporters that cannot be restored once lost, the implementation of a documentary-proof-of-
citizenship requirement in response to Section 2(a) would irreparably harm the Democratic Party
Plaintiffs' interests throughout the country. *See Newby*, 838 F.3d at 9.[53]  Because this Court can
neither postpone an election nor turn back the clock to give Plaintiffs additional time to pursue
their campaigns, this is not a case in which "adequate compensatory or other corrective relief will
be available at a later date." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297
(D.C. Cir. 2006) (quoting *Wis. Gas Co.*, 758 F.2d at 674).  The only way to provide complete relief
to the Plaintiff is to award a preliminary injunction.

Defendants argue that Plaintiffs have not carried their burden of showing irreparable harm
because their asserted injuries rest on mere speculation about what the EAC might do in the future.
*See* Defs.' Opp'n, ECF No. 84, at 31; Defs.' Opp'n, ECF No. 85, at 21–22.  This argument is
unpersuasive for two reasons.  First, as discussed at length above, Defendants' argument that the
harm to Plaintiffs is merely speculative is belied by both the text of the Executive Order and the
factual record before this Court.  *See supra* Part III.B.1.a.  Second, the D.C. Circuit has expressly
recognized that a "likely" threat of future enforcement of a documentary-proof-of-citizenship rule
suffices to show "irreparable harm" to voter-registration organizations before the enforcement of
such a rule has begun.  *See Newby*, 838 F.3d at 8–9 (concluding that plaintiffs operating in Alabama
and Georgia had shown a sufficient likelihood of irreparable harm to challenge a proof-of-

---

[52] *See* Schneider Decl. ¶ 20 (DNC); Edelman Decl. ¶¶ 15 (DGA); Ruselowski Decl. ¶ 22.

[53] *See also, e.g.*, *League of Women Voters of N.C.*, 769 F.3d at 247 & n.5 (describing injuries to voters' ability to participate in an election was "completely irreparable" and stating that a district court's contrary conclusion was an abuse of discretion); *Ga. Coal. for People's Agenda, Inc. v. Kemp*, 347 F. Supp. 3d 1251, 1268 (N.D. Ga. 2018); *League of Women Voters of Fla. v. Cobb*, 447 F. Supp. 2d 1314, 1339 (S.D. Fla. 2006).

citizenship requirement in their States, even though it was "unclear whether Alabama and Georgia [were] currently enforcing their proof-of-citizenship laws). In short, both the facts in the record and binding precedent undercut Defendants' argument that Plaintiffs' asserted injuries are too speculative to show irreparable harm.

For all these reasons, both the Nonpartisan Plaintiffs and the Democratic Party Plaintiffs have carried their burden of showing that the implementation of Section 2(a) would cause them an irreparable harm that is sufficiently "certain and great" to support a preliminary injunction. *See Wis. Gas Co.*, 758 F.2d at 674.

### 3. Balance of Equities and the Public Interest

Plaintiffs' final hurdle to obtaining a preliminary injunction against the implementation of Section 2(a) is that they must show that "the balance of equities tips in [their] favor" and that "an injunction is in the public interest." *Winter*, 555 U.S. at 20. Because Defendants in these consolidated cases are federal officials and agencies, the balance-of-equities and public-interest factors "merge," and the Court will address them together. *See Nken*, 556 U.S. at 435. When applying these factors, the Court's duty is to "balance the equities by weighing the harm to the moving party and the public if there is no injunction against the harm to the government and the public if there is." *Hanson v. District of Columbia*, 120 F.4th 223, 246 (D.C. Cir. 2024).

The balance-of-equities and public-interest analyses in these consolidated cases mirror those in *League of Women Voters of the United States v. Newby*, 838 F.3d 1 (D.C. Cir. 2016), in which the D.C. Circuit found that these factors favored granting a preliminary injunction. *Id.* at 12–14. The similar facts of these cases support the same result.

*First*, Plaintiffs' "extremely high likelihood of success on the merits is a strong indicator that a preliminary injunction would serve the public interest." *Newby*, 838 F.3d at 12. "[T]here is a substantial public interest 'in having governmental agencies abide by the federal laws that govern

80

their existence and operations.'" *Id.* (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994)). Defendants, meanwhile, "cannot suffer harm from an injunction that merely ends an unlawful practice." *Open Cmtys. All. v. Carson*, 286 F. Supp. 3d 148, 179 (D.D.C. 2017) (BAH) (quoting *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013)).

*Second*, as in *Newby*, Plaintiffs in these consolidated cases have shown a "substantial risk" that, "absent an injunction, . . . citizens will be disenfranchised in the present federal election cycle." 838 F.3d at 12. Because "[t]he public interest . . . favors permitting as many qualified voters to vote as possible," this fact weighs strongly in favor of awarding an injunction. *Id.* (alteration in original) (quoting *Obama for Am. v. Husted*, 697 F.3d 423, 437 (6th Cir. 2012)); *see also League of Women Voters of N.C.*, 769 F.3d at 247.

*Third*, as the D.C. Circuit concluded in *Newby*, any interference with "'organized voter registration programs' held by 'private entities'" would "run[] contrary to" a specific goal that "Congress, in enacting the NVRA, declared to be in the public interest": "[I]ncreas[ing] the number of eligible citizens who register to vote in elections for Federal office." *Newby*, 838 F.3d at 13 (quoting 52 U.S.C. § 20505(b)); *see also* 52 U.S.C. § 20501(b)(1) (declaring that one of the purposes of the NVRA is to "increase the number of eligible citizens who register to vote in elections for Federal office.").

*Fourth*, although there is undoubtedly a public interest in "preserving the integrity of [the] election process," there is "precious little record evidence"—as was true in *Newby*—that an injunction in Plaintiffs' favor would harm that interest. *Newby*, 838 F.3d at 13 (quoting *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006)). The Conference Committee on the NVRA expressly concluded that a proposed amendment allowing States to adopt documentary-proof-of-citizenship requirements for the Federal Form was "not necessary or consistent with the purposes of [the]

Act." H.R. Rep. No. 103–66, at 23 (1993) (Conf. Rep.).  Those purposes include "protect[ing] the integrity of the electoral process."  52 U.S.C. § 20501(b)(3).  In the absence of contrary evidence, this Court will not second-guess Congress's judgment about the relative weight to be given to the potential election-integrity benefits of a documentary-proof-of-citizenship requirement.  Any public interest in implementing such a requirement consistent with Section 2(a) does not outweigh the considerable public interest in granting the injunction that Plaintiffs seek.

On balance, here, as in *Newby*, the equities and the public interest decisively favor granting a preliminary injunction in Plaintiffs' favor.  *See* 838 F.3d at 12–14.

*        *        *

Having concluded that both the Nonpartisan Plaintiffs and the Democratic Party Plaintiffs are likely to succeed on the merits of their challenges to Section 2(a), that the implementation oof that provision would cause Plaintiffs irreparable harm, and the balance of equities and the public interest favor an injunction, the Court shall enjoin the EAC, its Commissioners, and its Executive Director from taking any action to implement or give effect to Section 2(a) of Executive Order 14,248.

### C.    Section 2(b): Directing Agencies to Identify "Unqualified" Voters

The Democratic Party Plaintiffs move for a preliminary injunction against several federal agencies and officials barring them from implementing Section 2(b) of the Executive Order.  *See* Dem. Pls.' Mot. at 45.  Section 2(b) provides:

To identify unqualified voters registered in the States:

(i) the Secretary of Homeland Security shall, consistent with applicable law, ensure that State and local officials have, without the requirement of the payment of a fee, access to appropriate systems for verifying the citizenship or immigration status of individuals registering to vote or who are already registered;

82

(ii) the Secretary of State shall take all lawful and appropriate action to make available information from relevant databases to State and local election officials engaged in verifying the citizenship of individuals registering to vote or who are already registered; and

(iii) the Department of Homeland Security, in coordination with the DOGE Administrator, shall review each State's publicly available voter registration list and available records concerning voter list maintenance activities as required by 52 U.S.C. 20507, alongside Federal immigration databases and State records requested, including through subpoena where necessary and authorized by law, for consistency with Federal requirements.

Exec. Order 14,248, 90 Fed. Reg. 14005 (Mar. 25, 2025) § 2(b).  Consistent with the division of directions in the subparagraphs of this provision, as to Section 2(b)(i), the Democratic Party Plaintiffs request an injunction against the Department of Homeland Security and Secretary of Homeland Security Kristi Noem, in her official capacity; as to Section 2(b)(ii), they request an injunction against the Department of State and Secretary of State Marco Rubio, in his official capacity; and as to Section 2(b)(iii), they request an injunction against the Department of Homeland Security, Secretary Noem, in her official capacity, the U.S. DOGE Service, and Acting DOGE Administrator Amy Gleason, in her official capacity.  *See* Dem. Pls.' Mot. at 45.

The Democratic Party Plaintiffs have not carried their burden of establishing entitlement to a preliminary injunction against enforcement of Section 2(b).  On the present record and briefing, the Court cannot conclude that the Democratic Party Plaintiffs are likely to succeed on the merits of their claim.  *See Ark. Dairy Co-op Ass'n*, 573 F.3d at 832 (holding that alone is sufficient to defeat motion for preliminary injunction).  Further, because the Court's assessment of the Democratic Party Plaintiffs' challenge to Section 2(b) would benefit from further factual development, this portion of their request for preliminary injunctive relief may be prudentially unripe. *See Common Cause*, 506 F. Supp. 3d at 47.

The Democratic Party Plaintiffs' challenge to Section 2(b) is quite unlike their challenge to Section 2(a).  They do not argue that the fact of the President's orders to DHS, the Department of State, and the U.S. DOGE Service is unlawful or that the President lacks authority to direct information sharing among Executive Branch agencies.  *See* Dem. Pls.' Mot. at 34–36.[54]  Instead, they argue that Section 2(b) is *ultra vires* because those agencies will violate the Privacy Act by disclosing protected records when they implement Section 2(b)'s directives.  *Id.*  For the reasons that follow, this distinction is pivotal.

First, it is not clear that the Democratic Party Plaintiffs can present their challenge through an equitable *ultra vires* cause of action.  Non-statutory *ultra vires* review "is a doctrine of last resort."  *Schroer v. Billington*, 525 F. Supp. 2d 58, 65 (D.D.C. 2007) (JR).  As the Court explained above (*see supra* Part III.A.1.a), when Congress creates a "detailed remedial scheme" in a particular area of law, the availability of statutory remedies may foreclose equitable suits in the same arena.  *Seminole Tribe of Fla.*, 517 U.S. at 74.  Here, the Privacy Act provides an individual damages remedy for violations of its prohibition on disclosure.  5 U.S.C. §§ 552a(g)(1)(D), (g)(4).  And another court in this District has concluded that the Administrative Procedure Act offers injunctive relief against agency-wide information-disclosure policies that violate the Privacy Act wholesale.  *See AFL-CIO v. Dep't of Lab.*, No. 25-cv-336, 2025 WL 1129227, at *12–22 (D.D.C. Apr. 16, 2025) (JDB); *see also All. for Retired Ams.*, 2025 WL 740401, at *18–19 (this Court concluding that subject-matter jurisdiction lies over such a claim).  The Democratic Party Plaintiffs

---

[54] Multiple courts in this District have concluded that the U.S. DOGE Service is a federal agency over the Department of Justice's strenuous objections to the contrary.  *See, e.g.*, *CREW v. U.S. DOGE Serv.*, --- F. Supp. 3d ----, 2025 WL 752367, at *10 (D.D.C. 2025) (CRC); *AFL-CIO v. Dep't of Lab.*, --- F. Supp. 3d ----, 2025 WL 542825, at *4 (D.D.C. 2025) (JDB).  Here, Defendants appear to concede that the U.S. DOGE Service is an agency, while the Democratic Party Plaintiffs resist that conclusion.  Tr. 77:3–4, 97:3–7.  But neither party briefed the issue, so the Court will assume, for present purposes, that the U.S. DOGE Service is an agency.

have not thoroughly briefed this issue, and the Court will not express a definitive view here. But this uncertainty undermines the Democratic Party Plaintiffs' likelihood of success on the merits.

Second, the Democratic Party Plaintiffs are unlikely to succeed in showing that at least some contemplated implementations of Section 2(b) violate the Privacy Act. The parties agree that the DHS and Department of State "databases," "systems," and "records" described in Section 2(b) are systems of records within the meaning of the Privacy Act. *See* Defs.' Opp'n, ECF No. 84, at 33. As a result, the parties further agree that disclosure of any records contained in those systems would violate the Privacy Act unless the person to whom the record pertains consents to the disclosure in writing or an enumerated exception applies. 5 U.S.C. § 552a(b). One of those exceptions allows an agency to disclose protected records for a "routine use" identified in a systems of record notice (SORN) published in the Federal Register. *Id.* §§ 552a(a)(7), (e)(4)(D).

Here, Defendants have identified a SORN listing a routine use that appears to authorize some of the disclosures by DHS contemplated in Sections 2(b)(i) and 2(b)(iii) of the Executive Order. That SORN governs the "Alien File" maintained by the U.S. Citizenship and Immigration Services (USCIS), a component of DHS. *See* 78 Fed. Reg. 69864 (Nov. 21, 2013). And it authorizes USCIS to disclose the contents of the Alien File "[t]o a federal, state, local, tribal, or territorial government agency seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law." *Id.* at 69869. Notably though, Defendants have pointed the Court to *no* routine use that would authorize the disclosures by the Department of State contemplated in Section 2(b)(ii) of the Executive Order. Nor have they explained why the USCIS SORN would permit disclosures to the U.S. DOGE Service, which does not have jurisdiction over any individual.

But third, to the extent there is lingering uncertainty about how DHS, the Department of State, and the U.S. DOGE Service will implement Section 2(b) in compliance with the Privacy Act, that uncertainty cautions against the Court's intervention at this early stage. *See Common Cause*, 506 F. Supp. 3d at 47. Unlike Section 2(a), Section 2(b) does not direct any particular action by the agencies it addresses. Section 2(b) describes no specific systems of records or procedures for disclosure. Instead, it leaves the details to the agencies while repeatedly admonishing those agencies to act "consistent with applicable law" and to take only "lawful and appropriate action." Exec. Order 14,248 §§ 2(b)(i)–(ii).

In light of these saving clauses and the presumption of regularity due to federal agencies, the Court "cannot simply assume" that those agencies will decide to violate the Privacy Act. *Common Cause*, 506 F. Supp. 3d at 49. Nor does the "mere possibility that some agency might make a legally suspect decision" while implementing Section 2(b) "justify an injunction against enforcement of that order." *Allbaugh*, 295 F.3d at 34. Because the merits of the Democratic Party Plaintiffs' challenge to Section 2(b) "depend on how broadly [Section 2(b)] is implemented," that challenge "needs further factual development before [the Court] can confidently decide it." *Common Cause*, 506 F. Supp. 3d at 50, 51. And preliminarily enjoining enforcement of Section 2(b) at this stage would risk the Court "entangling [itself] in abstract disagreements over administrative policies" before any "administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Laby's*, 387 U.S. at 148–49.

That is not to say that the Democratic Party Plaintiffs' claim lacks merit entirely. Once the record is developed, and once Defendants' plans to implement Section 2(b) are clear, the Democratic Party Plaintiffs may be able to seek appropriate relief under either the Privacy Act or the Administrative Procedure Act. *See AFL-CIO*, 2025 WL 1129227, at *12–22. If, at such time,

the Democratic Party Plaintiffs can also demonstrate that Defendants have a specific, imminent plan to share personal information in violation of the Privacy Act, they "are free to return to federal court to seek any proper emergency remedy." *All. for Retired Ams.*, 2025 WL 740401, at *24. "Nothing in today's opinion should be understood to foreclose or in any way prejudge any future request for such relief." *Id.* But for now, the Court concludes that the Democratic Party Plaintiffs have not carried their heavy burden of demonstrating a likelihood of success on the merits of their challenge to Section 2(b). Accordingly, the Court shall deny their request to preliminarily enjoin the implementation of Section 2(b).

### D.    Section 2(d): Directing Federal Agencies to "Assess" Citizenship Before Providing the Federal Form to Recipients of Public Assistance

The Democratic Party Plaintiffs next move for a preliminary injunction against several federal agencies and officials barring them from implementing Section 2(d) of the Executive Order. *See* Dem. Pls.' Mot. at 45. Section 2(d) provides:

> The head of each Federal voter registration executive department or agency (agency) under the National Voter Registration Act, 52 U.S.C. [§] 20506(a), shall assess citizenship prior to providing a Federal voter registration form to enrollees of public assistance programs.

Exec. Order 14,248, 90 Fed. Reg. 14005 (Mar. 25, 2025) § 2(d). The Democratic Party Plaintiffs request an injunction against four specific federal agencies that some states have designated as "federal voter registration agencies," as well as the heads of those agencies: the Department of Defense; Secretary of Defense Peter Hegseth, in his official capacity; the Department of Veterans Affairs; Secretary of Veterans Affairs Douglas Collins, in his official capacity; the Department of the Interior; Secretary of the Interior Douglas Burgum, in his official capacity; the U.S. Small Business Administration; and Small Business Administrator Kelly Loeffler, in her official capacity. *See* Dem. Pls.' Mot. at 45.

For the reasons that follow, the Court concludes that the Democratic Party Plaintiffs are likely to succeed on the merits of their challenges to Section 2(d), that they are likely to suffer irreparable harm in the absence of preliminary relief against that provision, that "the balance of equities tips in [their] favor," and that an injunction against implementation of Section 2(d) is in the public interest. *See Winter*, 555 U.S. at 20. The Court shall therefore grant the Democratic Party Plaintiffs' Motion as to Section 2(d).

1.    <u>Likelihood of Success on the Merits</u>

a.    *Standing*

The Democratic Party Plaintiffs have shown a substantial likelihood of standing to challenge Section 2(d) of the Executive Order for many of the same reasons they have standing to challenge Section 2(a). *See supra* Part III.B.1.b.

*First*, the DNC, DGA, DSCC, and DCCC have shown a substantial likelihood of organizational standing to challenge Section 2(d) because limiting eligible voters' access to the Federal Form at federal offices would require these organizations to invest additional resources in registering eligible voters who are likely to support Democratic candidates for federal office, forcing them to divert resources from other time-sensitive, election-related activities in service of their mission of electing Democratic candidates to federal office.[55] The implementation of Section 2(d), like that of Section 2(a), would therefore hinder these Plaintiffs' "core business activities." *See All. for Hippocratic Med.*, 602 U.S. at 395. Further, because Section 2(d) purports to direct the heads of federal agencies to begin implementing its provisions immediately, the injury to the Plaintiffs' organizational interests is "sufficiently imminent and substantial" to satisfy the injury-in-fact requirement and support their standing to seek "forward-looking" injunctive relief

---

[55] *See* Schneider Decl. ¶¶ 21–23 (DNC); Edelman Decl. ¶¶ 15–17 (DGA); Boss Decl. ¶¶ 17–21 (DSCC); Ruselowski Decl. ¶¶ 20–24 (DCCC).

against the implementation of that provision. *See TransUnion*, 594 U.S. at 435. This injury is "fairly . . . trace[able] to" Section 2(d) of the Executive Order and would "likely" be "redressed by a favorable decision" from this Court enjoining the implementation of that section. *See Lujan*, 504 U.S. at 560. Accordingly, the DNC, DGA, DSCC, and DCCC have shown a substantial likelihood of organizational standing to challenge Section 2(d).

*Second*, as an alternative basis for standing, the DNC has shown a substantial likelihood of associational standing to challenge Section 2(d) on behalf of their members—registered Democratic voters—who may be denied statutorily required opportunities to update or renew their voter registrations at federal offices if Section 2(d) is implemented.[56] In order to have associational standing on behalf of these members, the DNC must show that "(a) its members would otherwise have standing to sue in their own right; (b) the interests [the organization] seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt*, 432 U.S. at 343; *EPIC*, 928 F.3d at 101.

The DNC's members would have standing to challenge the provision at issue here. Specifically, they would have standing to challenge the denial of a procedural right guaranteed by statute (the right to receive the Federal Form from State-designated voter registration agencies) because Congress created that right to protect a separate concrete, substantive interest (the right to register and vote in federal elections). *See* 52 U.S.C. § 20506(a)(4), (a)(6); *see also Lujan*, 504 U.S. at 572 & n.7. Plaintiffs' underlying interest in registering and voting in federal elections "free of arbitrary impairment by state action" has long been recognized as "concrete" for purposes of Article III standing. *See, e.g.*, *Baker v. Carr*, 369 U.S. 186, 207–08 (1962); *see also TransUnion*,

---

[56] *See* Schneider Decl. ¶¶ 4, 19; *see also supra* note 42 (explaining that the DNC's "members," for purposes of associational standing, include all registered Democrats).

594 U.S. at 425 (recognizing that "intangible harms" with "a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts" or "specified by the Constitution itself" can be "concrete" injuries that support Article III standing).

At the hearing on Plaintiffs' Motions, Defendants briefly argued that the denial of a statutorily required opportunity to register to vote was not a concrete injury sufficient to support standing. *See* Tr. at 85:11–86:7. This argument overlooks the fact that the Supreme Court has recognized that "procedural rights" like the one that the DNC asserts on behalf of its members here are entitled to "special" treatment in the Article III standing analysis: A person may assert a procedural right that protects an underlying concrete interest "without meeting all the normal standards for redressability and immediacy." *Lujan*, 504 U.S. at 572 n.7; *see also Sierra Club v. Perry*, 373 F. Supp. 3d 128, 140 (D.D.C. 2019) (EGS). However, the "chain of causation between the alleged procedural violation and the concrete interest" must not be purely "speculative." *Ctr. for L. & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1159 (D.C. Cir. 2005).

Here, the DNC has shown a substantial likelihood that its members would have standing to challenge Section 2(d) because that provision orders the heads of federal agencies to disregard their statutory right to receive the Federal Form at offices of State-designated voter registration agencies. *Compare* Exec. Order 14,248 § 2(d), *with* 52 U.S.C. § 20506(a)(4), (a)(6). The connection between that procedural right and the members' underlying concrete interest is far from "speculative." *Cf. Ctr. for L. & Educ.*, 396 F.3d at 1159. On the contrary, an eligible voter who receives the Federal Form as required by law can secure the underlying concrete interest—the right to participate in federal elections with an up-to-date voter registration—by simply filling out the

one-page form and returning it to the agency.[57]  *See* 52 U.S.C. § 20506(a)(4)(A)(iii) (providing

that voter registration agencies must "[a]ccept[] . . . completed voter registration application forms

for transmittal to the appropriate State election official").  And the members' procedural injury is

"fairly . . . trace[able] to" Section 2(d) of the Executive Order and would "likely" be "redressed

by" an injunction prohibiting the implementation of that section.  *See Lujan*, 504 U.S. at 560.

Accordingly, the DNC's individual members would have standing to challenge Section 2(d) in

their own right.

The DNC also satisfies the remaining requirements for associational standing to challenge

Section 2(d) on behalf of its members: Its challenge to Section 2(d) is germane to its mission of

helping to elect Democrats by registering and turning out voters, and individual members'

participation is not necessary to the resolution of any issue in these consolidated cases.  *See Hunt*,

432 U.S. at 343; *EPIC*, 928 F.3d at 101.  Therefore, the DNC has shown a substantial likelihood

of associational standing to challenge Section 2(d) on behalf of its members.

*Third*, as a further alternative basis for standing, several of the Democratic Party Plaintiffs

have shown a substantial likelihood of political-competitor standing on the grounds that the

implementation of Section 2(d) would amount to the "illegal structuring of a competitive

environment" in which "rival parties defend their concrete interests."  *Shays*, 414 F.3d at 85–87.

Specifically, Plaintiffs Jeffries and Schumer have political-competitor standing to challenge

Section 2(d) based on their active candidacies for reelection to federal office, which will be

hampered if some of their supporters are denied statutorily required opportunities to register to

vote or update their voter registration at federal offices.[58]  This competitive burden is heightened

---

[57] *See* Schneider Decl. ¶ 18 (noting that the Federal Form "streamlines the voter registration process and does not require voters to gather or submit any additional documentation").

[58] *See* Jeffries Decl. ¶ 3, 13–14; Schumer Decl. ¶ 2, 11–13.

by the fact that enrollees of public assistance programs——the only people for whom Section 2(d) directs federal agencies to "assess citizenship"—are both more likely to support Democratic candidates and less likely to have documentary proof of citizenship than other voters, even if they are eligible to vote.[59]

And the burden is both "fairly . . . trace[able] to" Section 2(d) and "likely" to be "redressed by a favorable decision" from this Court enjoining the implementation of that section. *See Lujan*, 504 U.S. at 560. Finally, because a "party affiliate" of an active candidate may also exercise political-competitor standing, *see Nat. L. Party*, 111 F. Supp. 2d at 47, the Democratic Party Plaintiffs affiliated with Plaintiffs Jeffries and Schumer and other active Democratic candidates throughout the country have a substantial likelihood of standing to raise the same challenge.

In sum, the Democratic Party Plaintiffs have shown a substantial likelihood of standing to challenge the implementation of Section 2(d) of Executive Order 14,248.

> b.    *Merits*

On the merits, the Democratic Party Plaintiffs argue that Section 2(d)'s instruction that federal agencies "assess citizenship" before providing the Federal Form to "enrollees of public assistance programs" is "irreconcilable" with the NVRA's mandate that covered federal agencies "shall" provide the Federal Form to each voter who receives their services, unless the voter declines in writing. *See* Dem. Pls.' Mot. at 33; *compare* Exec. Order 14,248 § 2(d), *with* 52 U.S.C. § 20506(a)(4)(A), (a)(6)(A). This argument is substantially likely to succeed.

The NVRA requires that each State-designated voter registration agency, including several federal agencies that are Defendants here, "shall" make the Federal Form available and provide it "with each application" for "service or assistance" unless the applicant declines "in writing" to

---

[59] *See* Schneider Decl. ¶ 19; Edelman Decl. ¶ 13; Boss Decl. ¶ 18; Ruselowski Decl. ¶ 20; *see also* Dem. Pls.' Ex. 9, ECF No. 53-10; Dem. Pls.' Ex. 10, ECF No. 53-11.

register to vote.  52 U.S.C.  § 20506(a)(4)(A)(i), (6)(A)(i).  This mandatory duty leaves no discretion for agencies to "assess citizenship" before providing the Federal Form to "enrollees of public assistance programs," as Section 2(d) of the Executive Order purports to require.[60]

Defendants failed to raise any defense of the merits of Section 2(d) in their brief in opposition.  *See generally* Defs.' Opp'n, ECF No. 84; *see also* Dem. Pls.' Reply at 19–20.  They merely asserted, without elaboration, that "[f]ederal voter registration executive department or agency heads acting pursuant to [Section] 2(d) must act . . . consistently with applicable law," citing the Executive Order's saving clause.  *See* Defs.' Opp'n, ECF No. 84, at 24.  But as with Section 2(a), the saving clause is not a persuasive defense of Section 2(d)'s lawfulness because there is no meaningful way to give effect to the saving clause without rendering Section 2(d) a nullity.  *See supra* Section III.B.1.a.  Like Section 2(a), Section 2(d) "unambiguously commands action" that is contrary to the NVRA, and the saving clause "does not and cannot override its meaning."  *City & Cnty. of San Francisco*, 897 F.3d at 1240.  Therefore, Section 2(d)'s command is contrary to the NVRA, notwithstanding the saving clause.

At the hearing on Plaintiffs' Motions, Defendants argued, again without elaboration or support, that Section 2(d) is "consistent with federal law" because eligibility for some public assistance programs requires identification.  Tr. at 80:13–82:16, 83:25–84:9.  This argument misses the mark.  The NVRA imposes a mandatory duty to provide the Federal Form "with each

---

[60] Notably, Section 2(d) offers no explanation for singling out "enrollees of public assistance programs" for citizenship assessments.  *See* Exec. Order 14,248 § 2(d).  The NVRA requires federal agencies to distribute the Federal Form to many people who do not receive public assistance.  For example, the Act makes every "recruitment office of the Armed Forces of the United States" a "voter registration agency" and requires those offices to provide the Federal Form to every applicant for their "services."  *See* 52 U.S.C. § 20506(a)(4), (a)(6)(A)(i), (c).  The Democratic Party Plaintiffs have challenged the Executive Order's unexplained disparate treatment of people based on their enrollment in public assistance programs as a violation of the Equal Protection Clause of the Fifth Amendment.  *See* Compl., ECF No. 1 (Case No. 25-cv-0952), ¶¶ 186–94.  However, because the Democratic Party Plaintiffs have not relied on Equal Protection arguments in support of their Motion for a Preliminary Injunction against the implementation of Section 2(d), the Court does not reach those arguments here.  *See* Dem. Pls.' Mot. at 29–33.

*application*" for "service or assistance." 52 U.S.C. §§ 20506(a)(4), (a)(6) (emphasis added). *Applicants* for public assistance programs are entitled to the Federal Form—not *recipients* of public assistance who have complied with whatever identification requirements those public assistance programs impose.

Further, the NVRA provides that the Federal Form "may not include any requirement for notarization or other formal authentication." 52 U.S.C. § 20508(b)(3). Instead, it contains—as Defendants note—a question about citizenship, along with a required "attestation," "under penalty of perjury," that the applicant meets each requirement for voter registration. *Id.* § 20508(b)(2).

Collectively, these provisions make clear that voter registration agencies' *only* role in enforcing States' citizenship requirement for voting is to provide the Federal Form to the applicant, who must then self-certify citizenship by signing the application "under penalty of perjury." 52 U.S.C. §§ 20506(a)(4), (a)(6), 20508(b)(2)–(3). The statute leaves no role for agencies to "assess citizenship," and the President lacks any lawful authority to contravene the NVRA by requiring agencies to do so. *Cf.* Exec. Order 14,248 § 2(d).

For all these reasons, the Democratic Party Plaintiffs are likely to succeed on the merits of their challenge to Section 2(d) of Executive Order 14,248.

2.    Irreparable Harm

The Democratic Party Plaintiffs have shown a sufficient likelihood of irreparable harm to support a preliminary injunction against the implementation of Section 2(d) for many of the same reasons that support the Court's finding of irreparable harm from Section 2(a). *See supra* Part III.B.2. If Section 2(d) is implemented, the Democratic Party Plaintiffs will be forced to divert resources from their other electoral efforts around the country to counteract the provision's

negative effects on registration of voters who are enrolled in public assistance programs.[61]  This diversion of resources will negatively affect the Democratic Party Plaintiffs' ongoing efforts to plan and prepare for upcoming elections.[62]  That harm is imminent and irreparable—especially, but not only, for the Democratic Party Plaintiffs preparing for the upcoming special election in Arizona[63]—because this Court cannot provide a "do-over" or any other meaningful form of redress for lost competitive opportunities to register and mobilize voters in the inherently time-limited environment of an election cycle.  *See Newby*, 838 F.3d at 9 (quoting *League of Women Voters of N.C.*, 769 F.3d at 247).  The Democratic Party Plaintiffs have therefore carried their burden of showing a likelihood of irreparable harm from Section 2(d) that is "both certain and great," not merely "theoretical," and sufficiently "imminen[t]" to demonstrate a "clear and present need" for equitable relief.  *See Wis. Gas Co.*, 758 F.2d at 674.

### 3. Balance of Equities and the Public Interest

As with standing and irreparable harm, the Democratic Party Plaintiffs carry their burden of showing that the balance of equities and the public interest favor an injunction against Section 2(d) for many of the same reasons they carry the same burden as to Section 2(a).  *See supra* Part III.B.3.  The public interest favors injunctions against unlawful agency practices, and agencies have no countervailing interest in perpetuating those practices.  *See Newby*, 838 F.3d at 12; *Open Cmtys. All.*, 286 F. Supp. 3d at 179.  The public interest also "favors permitting as many qualified voters to vote as possible," which weighs in favor of an injunction against any unlawful practice that may disenfranchise qualified voters.  *Newby*, 838 F.3d at 12.  And although there is a

---

[61] *See* Schneider Decl. ¶¶ 21–23 (DNC); Edelman Decl. ¶¶ 15–17 (DGA); Boss Decl. ¶¶ 17–21 (DSCC); Ruselowski Decl. ¶¶ 20–24 (DCCC); Jeffries Decl. ¶ 14, 16–19; Schumer Decl. ¶ 13, 16–19.

[62] *See* Schneider Decl. ¶ 23 (DNC); Edelman Decl. ¶ 16 (DGA); Boss Decl. ¶ 21 (DSCC); Ruselowski Decl. ¶¶ 23–24 (DCCC); Jeffries Decl. ¶ 3; Schumer Decl. ¶ 2.

[63] *See* Schneider Decl. ¶ 20 (DNC); Edelman Decl. ¶¶ 15 (DGA); Ruselowski Decl. ¶ 22.

strong public interest in "preserving the integrity of [the] election process," the present record does not show that an injunction against Section 2(d) would disserve that interest. *See id.* at 13. Congress determined in the NVRA that "the signature of the applicant, under penalty of perjury," certifying the applicant's eligibility to vote, without "any requirement for notarization or other formal authentication," was sufficient to protect the public interest in "the integrity of the electoral process." *See* 52 U.S.C. §§ 20501(b)(3), 20508(b)(2)(B)–(C), (b)(3). Without any contrary evidence in the record, this Court will not upset that judgment by concluding that election-integrity concerns outweigh the public interest in faithful application of the NVRA. On balance, the equities and the public interest favor an injunction against the implementation of Section 2(d).

*    *    *

Having concluded that the Democratic Party Plaintiffs are likely to succeed on the merits of their challenges to Section 2(d), that the implementation of that provision would cause the Democratic Party Plaintiffs irreparable harm, and the balance of equities and the public interest favor an injunction, the Court shall enjoin the EAC Defendants from taking any action to implement or give effect to Section 2(d) of Executive Order 14,248.

### E.    Section 7(a): Directing the Attorney General to "Enforce" the Election Day Statutes "Against" States That Count Ballots Received After Election Day

The Democratic Party Plaintiffs move for a preliminary injunction against the U.S. Department of Justice and Attorney General Pam Bondi, in her official capacity, barring them from implementing Section 7(a) of the Executive Order. *See* Dem. Pls.' Mot. at 45. Section 7(a) provides:

> The Attorney General shall take all necessary action to enforce 2 U.S.C. [§] 7 and 3 U.S.C. [§] 1 against States that violate these provisions by including absentee or mail-in ballots received after Election Day in the final tabulation of votes for the appointment of Presidential electors and the election of members of the United States Senate and House of Representatives.

Exec. Order 14,248, 90 Fed. Reg. 14005 (Mar. 25, 2025) § 7(a).  For the reasons that follow, the Democratic Party Plaintiffs are not entitled to a preliminary injunction against enforcement of Section 7(a) on the present record.

Section 7(a) is best understood in the context of a recent decision by the U.S. Court of Appeals for the Fifth Circuit, *Republican National Committee v. Wetzel*, 120 F.4th 200 (5th Cir. 2024), which is cited in the Executive Order's opening statement of purpose and policy.  *See* Exec. Order 14,248 § 1; *see also* Defs.' Opp'n, ECF No. 84, at 27.  In that case, the Fifth Circuit held that two federal statutes setting the date of the federal Election Day—2 U.S.C. § 7 and 3 U.S.C. § 1 (together, the "Election Day Statutes")—preempted a Mississippi statute that allowed mail-in ballots postmarked on or before Election Day but received up to five days thereafter to be counted in federal elections.  *See Wetzel*, 120 F.4th at 203–05, 215.

The *Wetzel* decision is the latest in a series of federal court decisions that have considered whether the Election Day Statutes preempt State laws setting mail-in ballot receipt deadlines after Election Day.  Some of these decisions have—contrary to the panel decision in *Wetzel*—upheld State laws that allow ballots to be counted if received soon after Election Day.[64]  Because the Supreme Court has not yet had occasion to consider this issue, the lower courts remain divided.

Against this backdrop, Section 7(a) directs the Attorney General to "enforce" the Election Day Statutes "against States" that count ballots received after Election Day in federal elections, consistent with the Fifth Circuit's holding in *Wetzel* and contrary to some district court decisions from other circuits.  *See* Exec. Order 14,248 § 7(a).

---

[64] *See, e.g.*, *Bost v. Illinois State Bd. of Elections*, 684 F. Supp. 3d 720, 736 (N.D. Ill. 2023) (upholding Illinois law allowing ballots postmarked on or before Election Day to be counted if received up to 14 days thereafter, concluding that this provision "is facially compatible with the relevant federal statutes"), *aff'd on other grounds*, 114 F.4th 634 (7th Cir. 2024); *Donald J. Trump for President, Inc. v. Way*, 492 F. Supp. 3d 354, 372 (D.N.J. 2020) (concluding that "the Federal Election Day Statutes are silent on methods of determining the timeliness of ballots" and therefore do not preempt a New Jersey law allowing ballots lacking a postmark to be counted if cast with 48 hours after polls close).

The primary difficulty with this instruction is that it is not clear what it means to "enforce" the Election Day Statutes. The Election Day Statutes themselves are terse. 2 U.S.C. § 7 provides that "[t]he Tuesday next after the 1st Monday in November, in every even numbered year" is Election Day for Members of Congress. 3 U.S.C. § 1 provides that "[t]he electors of President and Vice President" are to be "appointed" on Election Day. And both Election Day Statutes appear in Chapters of the U.S. Code that establish internal administrative procedures for Congress. *See, e.g.*, 2 U.S.C. § 2b (setting the number of Representatives for each State); 3 U.S.C. § 15 (outlining how Congress shall count electoral votes).

At the hearing on Plaintiffs' Motions, Defendants argued that the Attorney General could "enforce" the Election Day Statutes, as directed in Section 7(a), by initiating criminal or civil actions. Tr. at 87:12–13, 89:5–6. It is not obvious that either criminal or civil enforcement actions, in fact, are available means for the Attorney General to "enforce" the Election Day Statutes. First, the Election Day Statutes do not define any criminal offenses, and Defendants have not identified any other statute that criminalizes the counting of ballots in accordance with State laws regarding ballot-receipt deadlines. Nor can the Court readily imagine how a criminal enforcement action could be brought "against States" as Section 7(a) directs. Second, unlike the many other election-related statutes under which the Department of Justice routinely brings civil actions, the Election Day Statutes do not contain any explicit provisions for civil enforcement actions.[65]

However, there are at least some actions that the Attorney General could take to "enforce" the Election Day Statutes that would be lawful and consistent with the Executive Order. Defendants have identified at least one: The Attorney General could "send letters" to the States

---

[65] *Compare* 2 U.S.C. § 7, *and* 3 U.S.C. § 1, *with* 52 U.S.C. § 10101(c) (Civil Rights Act of 1964), 52 U.S.C. §§ 10308(d)–(e), 10504, 10701 (Voting Rights Act of 1965), 52 U.S.C. § 20307(a) (Uniformed and Overseas Citizens Absentee Voting Act), 52 U.S.C. § 20510(a) (NVRA), *and* 52 U.S.C. § 21111 (HAVA).

to "encourage compliance" with the President's interpretation of the Election Day Statutes and to change their ballot-counting practices accordingly. *See* Tr. at 87:16–17.

The existence of a lawful means of enforcing Section 7(a) distinguishes this provision from Sections 2(a) and 2(d) in an important way: Unlike either of those provisions, Section 7(a) can be interpreted through the lens of the Executive Order's saving clause without "overrid[ing] its meaning." *See City & Cnty. of San Francisco*, 897 F.3d at 1240; *cf. supra* Parts III.B.1.c, III.D.1.b. The Attorney General therefore must implement Section 7(a), as the Executive Order says, "consistent with applicable law." Exec. Order § 14,248. This Court "cannot simply assume" that the Attorney General will disregard the "requirement of lawful implementation." *See Common Cause*, 506 F. Supp. 3d at 49; *see also Allbaugh*, 295 F.3d at 34. Therefore, unlike Section 2(a) and 2(d), it is unclear on the present record whether Section 7(a) will lead imminently to any unlawful action.

Moreover, there is reason to doubt that this Court could award the equitable relief that the Democratic Party Plaintiffs have requested in the current posture of the case. The Democratic Party Plaintiffs have argued that this Court can redress the harm that Section 7(a) causes to their interests by enjoining the Attorney General from taking enforcement action. *See* Dem. Pls.' Mot. at 21, 45. But Section 7(a) directs enforcement "against" States, not private parties like the Democratic Party Plaintiffs. *See* Exec. Order 14,248 § 7(a). And equitable actions for anti-enforcement injunctions blocking civil or criminal suits by the government are typically brought by the party that would be the defendant in the enforcement action, rather than by a third party that may suffer collateral harm from enforcement. *See Armstrong*, 575 U.S. at 326; *Ex parte Young*, 209 U.S. at 155–56. Therefore, the most natural parties to seek an injunction against enforcement under Section 7(a) are the States themselves, not the Democratic Party Plaintiffs.

For all these reasons, the Democratic Party Plaintiffs have not, at this early stage, shown that they are likely to succeed on the merits of their challenge to Section 7(a). Because a failure to show likelihood of success on the merits is sufficient grounds to deny a preliminary injunction regardless of a party's showing on the other *Winter* factors, the Court shall deny the Democratic Party Plaintiffs' Motion as to Section 7(a). *See Ark. Dairy Co-op Ass'n*, 573 F.3d at 832.

### F.    Section 7(b): Directing the EAC to "Condition" Funding to States on Not Counting Ballots Received After Election Day

Finally, the Democratic Party Plaintiffs move for a preliminary injunction against the EAC and its Commissioners, barring them from implementing Section 7(b) of the Executive Order. *See* Dem. Pls.' Mot. at 45. Section 7(b) provides:

> Consistent with 52 U.S.C. [§] 21001(b) and other applicable law, the Election Assistance Commission shall condition any available funding to a State on that State's compliance with the requirement in 52 U.S.C. [§] 21081(a)(6) that each State adopt uniform and nondiscriminatory standards within that State that define what constitutes a vote and what will be counted as a vote, including that, as prescribed in 2 U.S.C. [§] 7 and 3 U.S.C. [§] 1, there be a uniform and nondiscriminatory ballot receipt deadline of Election Day for all methods of voting, excluding ballots cast in accordance with 52 U.S.C. [§] 20301 *et seq.*, after which no additional votes may be cast.

Exec. Order 14,248, 90 Fed. Reg. 14005 (Mar. 25, 2025) § 7(b).

Section 7(b)'s instruction to place conditions on funding to States appears to be in tension with HAVA, which requires that the EAC "shall make" certain payments "each year" to "each State which meets" certain enumerated conditions, "in an amount determined" by statute. *See* 52 U.S.C. §§ 21001–21003; *see also supra* Part I.A.4.b.

Section 7(b) notes the requirement that States must adopt "uniform and nondiscriminatory standards that define what constitutes a vote," which is one of the conditions with which States must comply to receive the payments described in HAVA. *See* Exec. Order 14,248 § 7(b) (citing 52 U.S.C. § 21081(a)(6)); *see also* 52 U.S.C. § 21003 (describing conditions). But understood in

the context in which Congress enacted this provision—soon after the presidential election of 2000 and the Supreme Court's decision in *Bush v. Gore*, 531 U.S. 98 (2000)—the reference to "uniform and nondiscriminatory standards" appears to refer to uniformity *within* each State, not among the several States.  *See* H.R. Rep. 107-329, at 39 (2001).

Moreover, Congress appears to have designed the requirement that States decide "what counts as a vote" to ensure uniform treatment within each State of issues like whether a ballot with a so-called "hanging chad" should be counted as a vote, not whether every State has adopted the same ballot-receipt deadline as every other State.  *See* H.R. Rep. 107-329, at 39 (2001).

However, for the reasons that follow, the Court concludes that the Democratic Party Plaintiffs have not shown a "substantial likelihood" of standing to challenge Section 7(b).  *See Food & Water Watch*, 808 F.3d at 913.  Therefore, the Court must deny the Democratic Party Plaintiffs' Motion as to that section.  *See id.*

The Democratic Party Plaintiffs' arguments and evidence support four plausible theories of standing to challenge Section 7(b) of the Executive Order.  First, the Democratic Party Plaintiffs predict that if Section 7(b) is implemented, some States will respond by altering their ballot-receipt deadlines, which they argue will concretely harm their members' and constituents' ability to vote by mail and shorten the amount of time they may take to decide how to vote.[66]  *See* Dem. Pls.' Mot. at 13–14.  Second, they suggest that any efforts to implement Section 7(b) will inevitably cause voter confusion and concern about ballot-receipt deadlines, forcing them to invest additional resources in educating and mobilizing eligible voters who are likely to vote by mail in support of Democratic candidates.[67]  *Id.* at 11, 16–17.  Third, they argue that the DGA has standing to

---

[66] *See* Schneider Decl. ¶¶ 4, 9–12; Edelman Decl. ¶¶ 3, 9.

[67] *See* Schneider Decl. ¶¶ 3, 7–17 (DNC); Edelman Decl. ¶¶ 3, 5–12 (DGA); Boss Decl. ¶¶ 3, 6–15 (DSCC); Ruselowski Decl. ¶¶ 4, 6–17 (DCCC).

challenge Section 7(b) on behalf of its members—governors who are members of the Democratic Party—who stand to lose some control over their States' election policies if Section 7(b) is implemented.[68] *Id.* at 14. Fourth, they argue that if Section 7(b) is implemented, it will impose an unlawful burden on their ability to compete for federal elective office by creating uncertainty about an important category of State election rules for which they must plan far in advance, forcing them to divert resources from other time-sensitive, election-related efforts.[69] *Id.* at 9–11.

The first, second, and third of these theories are inadequate to show the "substantial likelihood" of standing that is required to support a preliminary injunction. *Food & Water Watch*, 808 F.3d at 913.

As to the first theory, Plaintiffs have not shown that the underlying harm—a burden on their members' and constituents' ability to vote based on a projected future change to State ballot-receipt deadlines—is "actual or imminent." *See TransUnion*, 594 U.S. at 423. The Democratic Party Plaintiffs argue that if Section 7(b) is implemented, it is "a statistical certainty that at least one member will have their mail ballot rejected" because it will arrive after a State-imposed ballot-receipt deadline. Dem. Pls.' Mot. at 14. But on the present record, the threat that States will respond to Section 7(b) by altering their ballot receipt deadlines is "too speculative to support Article III standing" for the Democratic Party Plaintiffs based solely on the downstream effect that such a policy change would have on voters. *TransUnion*, 594 U.S. at 438.

Although the "predictable effect of Government action on the decisions of third parties" can form a basis for standing, "mere speculation" cannot. *Dep't of Com.*, 588 U.S. at 768. Here,

---

[68] *See* Edelman Decl. ¶¶ 3, 8, 22; Tr. at 53:20–54:17.

[69] *See* Schneider Decl. ¶¶ 6–8, 14, 17, 26–28 (DNC); Edelman Decl. ¶¶ 4, 10–12, 20–22 (DGA); Boss Decl. ¶¶ 6, 11–13, 15, 25–26 (DSCC); Ruselowski Decl. ¶¶ 6–7, 13–14, 16–17, 27–28 (DCCC); Jeffries Decl. ¶ 7, 16–19; Schumer Decl. ¶¶ 7, 16–19.

the Democratic Party Plaintiffs have not yet established that Section 7(b) will have the "predictable effect" of causing States to change their ballot-receipt deadlines. *See id.* Instead, States may choose to leave their own laws in place and either accept the loss of funds threatened in Section 7(b) or challenge the validity of that provision in court.[70]

Because any injury that Section 7(b) may inflict on Plaintiffs' individual members' ability to vote will arise only if States respond to the threat of having their funding cut by changing their ballot-receipt deadlines, their injury is, on the present record, too speculative to support Article III standing. Therefore, Plaintiffs have not shown a substantial likelihood of standing based on Section 7(b)'s direct effects on their members and constituents' ability to vote.

As to the second theory—harm based on voter confusion and concern—Plaintiffs have not shown a likelihood that their asserted injury would be redressable by a favorable decision from this Court. *Cf. Lujan*, 504 U.S. at 561. Even if this Court were to enjoin the implementation of Section 7(b), the Executive Order would still declare that the Election Day Statutes, 2 U.S.C. § 7 and 3 U.S.C. § 1, "set 'the day by which ballots must be both cast by voters and received by state officials.'" Exec. Order 14,248 § 1 (quoting *Wetzel*, 120 F.4th at 204). And that statement would still accurately describe current law in the Fifth Circuit. *See Wetzel*, 120 F.4th at 204, 215. Against that backdrop, it is not clear that an injunction against the implementation of Section 7(b) would be likely to prevent voters from being confused or concerned about their States' ballot-receipt deadlines. The Democratic Party Plaintiffs have not shown, at this early stage, that it is "'likely,' as opposed to merely 'speculative,' that the injury" they allege based on voter confusion "will be 'redressed by'" a preliminary injunction against the implementation of Section 7(b). *See Lujan*, 504 U.S. at 561 (quoting *Simon v. Eastern Ky. Welfare Rights Organization*, 426 U.S. 26, 38, 43

---

[70] Two groups of States are already doing the latter. *See California v. Trump*, 25-cv-10810 (D. Mass. filed Apr. 3, 2025); *Washington v. Trump*, 25-cv-0602 (W.D. Wash. filed Apr. 4, 2025).

(1976)).  Therefore, they have not shown a substantial likelihood of standing based on a voter-confusion theory.

As to the third theory—associational standing for DGA on behalf of the governors who are its members—the Democratic Party Plaintiffs have not yet developed a sufficient factual record to show a concrete injury to individual governors' interests.  DGA's claim on behalf of its members depends on an injury to those members' "authority and influence" over their States' policies regarding voting by mail.  *See* Dem. Pls.' Mot. at 14; *see also* Edelman Decl. ¶ 8.  But apart from a general statement that the DGA's members have State-law authority to "influence, support, and sign [S]tate election laws," the Democratic Party Plaintiffs have not provided any specific evidence or argument about the extent to which the DGA's members are responsible for election regulation and administration in their States.  *See* Edelman Decl. ¶ 8.  Nor have they explained exactly how Section 7(b)'s threat of cutting off State election funding would hinder their ability to discharge those responsibilities.  *See id.*; *cf. Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 581 (2012) (invalidating condition on federal grant funding because the condition amounted to "a gun to the head").  Because the "abstract dilution" of official power is not a sufficiently concrete injury to give individual officeholders the "personal stake" that is necessary to support Article III standing, the present record is insufficient to show that the DGA's members have standing to challenge Section 7(b).  *See Raines*, 521 U.S. at 826, 830.

The fourth theory of standing to support the Democratic Party Plaintiffs' challenge Section 7(b) presents a closer question.  On this theory, the Executive Order's purported condition on State grant funding unlawfully injects uncertainty into otherwise-settled matters of State

election law, hindering the Democratic Party Plaintiffs' ability to recruit candidates and make other necessary early investments in their campaigns and voter-mobilization efforts.[71]

The Democratic Party Plaintiffs offer several kinds of evidence in support of this theory. First, Plaintiffs Jeffries and Schumer represent that uncertainty about State election rules makes it more difficult for them to recruit strong candidates to run for office as Democrats.[72] The Democratic Party Plaintiffs also explain that if States change their ballot-receipt deadlines in response to Section 7(b), Plaintiffs will need to spend money to educate voters about the change.[73] And they further explain that they need to make budgeting decisions for upcoming elections "now," including setting aside funds for "unplanned" expenditures based on the Executive Order, which will make those funds unavailable for other investments in persuading or mobilizing voters.[74] The Democratic Party Plaintiffs argue that the uncertainty about State ballot-receipt deadlines arising from Section 7(b) of the Executive Order is therefore directly harming their interests in electing Democrats to office and amounts to "illegal structuring of a competitive environment" in which "rival parties defend their concrete interests." *See Shays*, 414 F.3d at 85–87.

This final argument for the Democratic Party Plaintiffs' standing to challenge Section 7(b) has some merit. Because Plaintiffs are already facing the uncertainty of which they are complaining, their asserted injury is not merely "speculative." *Cf. TransUnion*, 594 U.S. at 438.

---

[71] *See* Schneider Decl. ¶¶ 6–8, 14, 17, 26–28 (DNC); Edelman Decl. ¶¶ 4, 10–12, 20–22 (DGA); Boss Decl. ¶¶ 6, 11–13, 15, 25–26 (DSCC); Ruselowski Decl. ¶¶ 6–7, 13–14, 16–17, 27–28 (DCCC); Jeffries Decl. ¶ 7, 16–19; Schumer Decl. ¶¶ 7, 16–19.

[72] Jeffries Decl. ¶ 18; Schumer Decl. ¶ 17.

[73] *See* Schneider Decl. ¶ 17 (DNC); Edelman Decl. ¶ 16 (DGA); Boss Decl. ¶ 15 (DSCC); Ruselowski Decl. ¶ 17 (DCCC); *see also* Jeffries Decl. ¶ 16; Schumer Decl. ¶ 16.

[74] *See* Schneider Decl. ¶ 26 (DNC); Edelman Decl. ¶ 20 (DGA); Boss Decl. ¶ 25 (DSCC); Ruselowski Decl. ¶ 27 (DCCC).

However, courts in this District have repeatedly declined to recognize standing based on exposure to "uncertainty" alone, concluding that such an injury is not sufficiently "concrete" to form the basis of an Article III case or controversy. *See, e.g.*, *Gerber Prods. Co. v. Perdue*, 254 F. Supp. 3d 74, 81 (D.D.C. 2017) (APM); *Mylan Pharms. Inc. v. FDA*, 789 F. Supp. 2d 1, 10 (D.D.C. 2011) (JEB); *ViroPharma, Inc. v. Hamburg*, 777 F. Supp. 2d 140, 147 & n.3 (D.D.C. 2011) (ESH), *aff'd*, 471 F. App'x 1 (D.C. Cir. 2012).

In one representative case, Judge Amit P. Mehta considered whether a bidder for State contracts had standing to challenge a federal agency's "inconsistent approach" to advising State officials and intervening in State bid processes. *See Gerber Prods. Co.*, 254 F. Supp. 3d at 80–81. The plaintiff argued that it was suffering an ongoing injury in the form of "great uncertainty and [an] un-level playing field" caused by the agency's action. *Id.* at 80. Judge Mehta rejected that argument, concluding that "[b]usiness uncertainties that arise from regulatory decisions are not the kind of concrete and particularized injuries sufficient to establish an injury in fact." *Id.* at 81.

Similar reasoning controls this case. Although the Democratic Party Plaintiffs have offered persuasive evidence that uncertainty about how States will respond to Section 7(b) will hinder their efforts to prepare for upcoming elections, they have not shown that this uncertainty alone is a sufficiently "concrete" injury to demonstrate a "substantial likelihood" of standing. *See Food & Water Watch*, 808 F.3d at 913.

A contrary rule allowing standing based on uncertainty alone would be unworkable because it would confer standing based on harms that are "so generalized as to be applicable to almost any competitive business situation." *See Mylan Pharms.*, 789 F. Supp. 2d at 10. Such a rule would allow almost any business to bring a pre-enforcement challenge to agency action based on speculation about how third parties might react to a new regulation and how those reactions

might affect the business's competitive interests. That result would be inconsistent with the principle that an Article III case or controversy must arise from a "concrete and particularized injury." *TransUnion LLC*, 594 U.S. at 423. Therefore, this Court will not find that the Democratic Party Plaintiffs have standing based on uncertainty alone.

Finally, although the D.C. Circuit has recognized that a political competitor may have standing based on a "threat" from the federal government that "prevent[s]" local election officials from implementing duly enacted State election laws, the Democratic Party Plaintiffs have not yet shown that Section 7(b) will in fact "prevent[]" any State from following its own ballot-receipt deadlines. *See LaRoque*, 650 F.3d at 787. Therefore, on the present record, the Democratic Party Plaintiffs have not shown that Section 7(b) is "illegally structur[ing]" the environment in which they must compete for elective office. *See id.* (quoting *Shays*, 414 F.3d at 90). Accordingly, at this early stage, the "threat" of future enforcement against the States is not sufficient to show a "substantial likelihood" that the Democratic Party Plaintiffs have standing to challenge Section 7(b). *See id.*; *Food & Water Watch*, 808 F.3d at 913.

One final point bears clarification. The Court's conclusion is limited to the Democratic Party Plaintiffs and the present record, under the standard required for a preliminary injunction. *See Food & Water Watch*, 808 F.3d at 913. The Court's analysis should not be taken to decide any issue more broadly than that. The standing of other Plaintiffs in these consolidated cases or other parties not before this Court—for example, the States that stand to lose federal funding for their election programs if Section 7(b) is implemented—is a question for another day.

In sum, on the present record, the Democratic Party Plaintiffs have not shown the "substantial likelihood" of standing that is necessary to obtain a preliminary injunction. *See Food & Water Watch*, 808 F.3d at 913. Because "an inability to establish a substantial likelihood of

standing requires denial of the motion for preliminary injunction," this Court must deny the Democratic Party Plaintiffs' Motion as to Section 7(b), notwithstanding the strength of their arguments on the substantive merits[75] or any of the other *Winter* factors. *See id.*

### G.    Scope of Relief

For all the reasons explained above, the Court shall grant the Nonpartisan Plaintiffs' and the Democratic Party Plaintiffs' requests for a preliminary injunction against implementation of Section 2(a) of the Executive Order. The Court shall further grant the Democratic Party Plaintiffs' request for a preliminary injunction against implementation of Section 2(d) of the Executive Order. Here, the Court pauses to address the scope of the resulting equitable relief.

### 1.    The *Purcell* Principle

Sections 2(a) and 2(d) of the Executive Order both purport to alter federal regulations regarding voter registration. Arizona is scheduled to hold a federal primary election on July 15, 2025, and voters in that election must register to vote by June 16, 2025. *See* Nonpartisan Pls.' Ex. 31, ECF No. 34-32. In other words, this Court's injunction will bear on an election scheduled to take place about three months from the time of writing. This temporal proximity warrants consideration of the "*Purcell* principle."

The *Purcell* principle takes its name from *Purcell v. Gonzalez*, 594 U.S. 1 (2006) (per curiam), in which the Supreme Court vacated a Ninth Circuit injunction barring Arizona from enforcing a documentary-proof-of-citizenship requirement imposed by state law. *Id.* at 2. Although that law had been approved by ballot measure in 2004, the Ninth Circuit did not issue its injunction until October 2006—weeks before the upcoming general election. *Id.* at 2–3. The Ninth Circuit "offered no explanation or justification for its order." *Id.* at 3. And it sustained that

---

[75] *See* Dem. Pls.' Mot. at 23 (citing 52 U.S.C. §§ 21001–21003).

order even after the district court issued an opinion concluding that the plaintiffs had not "shown a strong likelihood" of success on the merits. *Id.*

"In view of the impending election, the necessity of clear guidance to the State of Arizona," and the Supreme Court's conclusion that the Ninth Circuit had erred by issuing an unexplained order, the Supreme Court vacated the injunction. *Purcell*, 594 U.S. at 8. In doing so, the Court stressed that lower courts should be mindful that "orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls. As an election draws closer, that risk will increase." *Id.* at 4–5.

In the years since, the *Purcell* principle has been invoked on rare occasions, though with increasing frequency. *See* H. Dodsworth, *The Positive and Negative* Purcell *Principle*, 2022 Utah L. Rev. 1081, 1091–1104 (2022). By nature, the *Purcell* principle is largely confined to the Supreme Court's emergency docket, and few controlling opinions on the topic have been issued. *See id.* Nonetheless, some guidelines emerge from the extant law. None counsels against this Court issuing the preliminary injunctive relief contemplated herein.

First, the *Purcell* principle directs lower courts to "consider the importance of preserving the status quo" in the realm of elections to avoid voter confusion. *Veasey v. Perry*, 769 F.3d 890, 892 (5th Cir. 2014). That is all this Court's injunctions will do. The Executive Order, not this Court's order, purports to disturb the status quo by directing changes to the content and accessibility of the Federal Form. Indeed, implementation of Sections 2(a) and 2(d) of the Executive Order would upend decades of established practice on which voters have come to rely.

Second, the *Purcell* principle instructs lower courts to consider the fairness of its injunction with regard to timing. Lower courts should avoid intervening "in the period close to an election," particularly when the plaintiffs have "unduly delayed bringing the complaint to court." *Merril v.*

*Milligan*, 142 S. Ct. 879, 881 (2022) (Kavanaugh, J., concurring in grant of application for stay).

No such delay is present here: Plaintiffs in these consolidated cases filed suit promptly after the

Executive Order was issued. And the Court is unaware of any case in which the *Purcell* principle

has been applied to stay injunctive relief this far from an election. *See, e.g.*, *id.* at 880 (one month).

Third, the *Purcell* principle vindicates, at least in part, a federalism interest. *See*

*Democratic Nat'l Comm. v. Wisc. State Legislature*, 141 S. Ct. 28, 31 (2020) (Kavanaugh, J.,

concurring in denial of application to vacate stay) ("It is one thing for state legislatures to alter

their own election rules . . . . It is quite another thing for a federal district court to swoop in and

alter carefully considered and democratically enacted state election rules . . . ."). But this Court's

injunctions run against federal officials who have been unilaterally directed to change course by

an executive order which itself contravenes principles of federalism and the separation of powers.

The Court is unaware of any case in which the *Purcell* principle has been applied in this context.

Finally, *Purcell* instructs that when lower courts weigh in on election regulations, they

should explain themselves. 594 U.S. at 3. The Court has done so at great length. The *Purcell*

principle is no bar to this Court's issuance of preliminary injunctive relief.

### 2.    Severability

The Court has concluded that some, but not all, provisions of the Executive Order cannot

lawfully be implemented and warrant the issuance of a preliminary injunction. The Executive

Order itself contains a severability clause providing that:

> If any provision of this order, or the application of any provision to any agency,
> person, or circumstance, is held to be invalid, the remainder of this order and the
> application of its provisions to any other agencies, persons, or circumstances shall
> not be affected thereby.

Exec. Order 14,248 § 10. But the Supreme Court has "never addressed whether Executive Orders

can be severed into valid and invalid parts, and if so, what standard should govern the inquiry."

*Mille Lacs Band*, 526 U.S. at 191 (emphasis removed).  It has instead "assume[d], *arguendo*, that the severability standard for statutes also applies to Executive Orders."  *Id.*  Because the parties here have operated under the same assumption, this Court will follow suit.

When analyzing the severability of statutes, courts apply a presumption in favor of severability and give effect to express severability clauses "unless there is strong evidence that Congress intended otherwise."  *Seila Law*, 591 U.S. at 234 (plurality opinion of Roberts, C.J.) (quoting *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 686 (1987)); *see also Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610, 624 (2020) (plurality opinion of Kavanaugh, J.) (concluding that courts should "adhere to the text of" a severability clause, "[a]t least absent extraordinary circumstances").  Applying this standard here requires the Court to give effect to the Executive Order's severability clause unless the President has somehow manifested a contrary intent.

Nothing in the Executive Order or the record suggests that the President would prefer that the Executive Order be invalidated in full rather than in part.  Accordingly, the Court shall sever the portions for which Plaintiffs have made the required showings to support injunctive relief from the remainder of the Executive Order and award relief that is tailored to those provisions.

### 3.    Scope of Injunctive Relief

Any preliminary remedy in these consolidated cases, as in all cases, must be both "limited to the inadequacy that produced the injury in fact that the [Plaintiffs have] established," *Gill v. Whitford*, 585 U.S. 48, 68 (2018) (quoting *Lewis v. Casey*, 518 U.S. 343, 357 (1996)), and not "more burdensome [to the Defendants] than necessary" to provide complete redress to the Plaintiffs, *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).  And the Court is mindful of the ongoing debate over the scope of injunctive relief that a single district court may properly issue. *See, e.g.*, *Labrador v. Poe*, 144 S. Ct. 921, 923 (2024) (Gorsuch, J., concurring in the grant of stay)

(opining that a district court's entry of a "universal injunction" "strayed from equity's traditional bounds"). The Court has carefully considered these issues, as explained below.

*Section 2(a).* The Court determined that Section 2(a) of the Executive Order was issued *ultra vires* and cannot lawfully be implemented. Section 2(a) purports to require action by the Election Assistance Commission, which is composed of four Members who oversee an Executive Director. The EAC, its four Members, and its Executive Director are all Defendants to this suit. As the Court has explained, if those Defendants took the action ordered by Section 2(a), Plaintiffs would be irreparably harmed. Accordingly, the only adequate remedy is an injunction barring the EAC, its Members, and its Executive Director from implementing Section 2(a).

That injunction is neither "nationwide" nor "universal." It is a remedy tailored to the irreparable harm that Plaintiffs in these consolidated case would suffer in the absence of an injunction. To the extent the Court's "injunction advantage[s] nonparties, that benefit [is] merely incidental." *Trump v. Hawaii*, 585 U.S. 667, 717 (2018) (Thomas, J., concurring). That is so for a simple reason: There is only one Federal Form.

Even if the Court had concluded that only those Plaintiffs in Arizona face irreparable harm (which it did not), the Court could not, as Defendants request, issue an injunction that is "limited to only Arizona." Defs.' Opp'n, ECF No. 84, at 43. Plaintiffs' challenges to Section 2(a) "do not involve case-by-case enforcement of a particular policy" but instead "concern a single decision about a single [requirement], to be used on a single [form] throughout the nation." *New York v. U.S. Dep't of Com.*, 351 F. Supp. 3d 502, 677 (S.D.N.Y. 2019), *aff'd in part, rev'd in part on other grounds*, 588 U.S. 752 (2019). Were the Court to hold that its injunction should apply only in Arizona, it would be "drawing a line that the [EAC] itself has never drawn," *Harmon v.*

*Thornburgh*, 878 F.2d 484, 494–95 (D.C. Cir. 1989), and undermining the national uniformity of the Federal Form central to Congress's design.

Moreover, because the Court's injunction applies to nonparties only collaterally, it sounds in longstanding equitable tradition. Consider the doctrine of nuisance. A firm intends to build a bridge across a river, but the deck will be too low for boats to pass underneath. A shipper, certain to be injured by this hindrance to his navigation, brings suit in nuisance to enjoin the construction. If a court grants the injunction, all the other shippers who did not sue will benefit. But it does not follow that the injunction's scope is improper; the remedy is tailored to the injury of the lone prevailing party. *See Pennsylvania v. Wheeling Belmont Bridge Co.*, 54 U.S. (13 How.) 518, 564 (1852); *see also* A. Woolhandler & C. Nelson, *Does History Defeat Standing Doctrine?*, 102 Mich. L. Rev. 689, 702 (2004).

So too in the realm of election law. A State proposes to redraw its legislative districts. An individual resident sues and argues successfully that the proposed districts are unconstitutional. It would be impossible for the court to craft an injunction requiring that valid districts be drawn for the plaintiff while allowing invalid districts to remain in force for everyone else in the state. Again, equity requires a form of relief with incidental effects on nonparties. *See* M. Morely, *De Facto Class Actions? Plaintiff- and Defendant-Oriented Injunctions in Voting Rights, Election Law, and Other Constitutional Cases*, 39 Harv. J.L. & Pub. Pol'y 487, 525 (2016).

In these unique circumstances, an injunction tailored to the Plaintiffs before the Court is coextensive with an injunction tailored to the Defendants before the Court, who happen to be actors with the power to influence the content of the Federal Form nationwide.

Finally, nothing in this Memorandum Opinion or the Court's preliminary injunction should be taken to restrain the EAC or its Members from independently determining whether or not

documentary proof of citizenship is or is not "necessary to enable" State election officials to assess voters' eligibility or from revising the Federal Form with the assent of three Members and following the appropriate notice-and-comment rulemaking process. *See* 52 U.S.C. §§ 20508(b)(1), 20928, 20929. As the Court has explained, its holding here is limited to the conclusion that the President cannot unilaterally mandate that action by executive order.

***Section 2(d).*** The Court determined that Section 2(d) of the Executive Order was issued *ultra vires* and cannot lawfully be implemented. Section 2(d) purports to require the head of each federal voter registration agency within the meaning of the NVRA to "assess citizenship prior to providing" the Federal Form to "enrollees of public assistance programs." Exec. Order 14,248 § 2(d). The Democratic Party Plaintiffs have shown, and Defendants do not dispute, that the Department of Defense, the Department of Veterans Affairs, the Department of Interior, and the Small Business Administration all serve as voter registration agencies. Those agencies and the heads of those agencies are all Defendants to this suit. As the Court has explained, if those Defendants took the action ordered by Section 2(d), the Democratic Party Plaintiffs would be irreparably harmed. Accordingly, the only adequate remedy is an injunction barring the relevant Defendants from implementing Section 2(d).

Many of the Democratic Party Plaintiffs operate nationwide.[76] And many of the Democratic Party Plaintiffs are membership organizations with individual members who reside and register to vote in states across the country. As a consequence, the Democratic Party Plaintiffs and the members they represent face nationwide irreparable harms that this Court must remedy.

---

[76] *See, e.g.*, Schneider Decl. ¶ 6 (stating that Plaintiff DNC "provides support and resources to thousands of candidates at the local, state, and federal level in every state across the country"); Ruselowski Decl. ¶ 4 (stating that Plaintiff DCCC's "members and constituents are grassroots Democratic voters in all 50 states"); Boss Decl. ¶¶ 3, 5 (stating that Plaintiff DSCC's "mission is to elect candidates of the Democratic Party across the country to the U.S. Senate" and that it is actively "supporting ten incumbent Democratic Senators and non-incumbent Democratic candidates in up to an additional twelve states" ahead of the 2026 midterm elections).

The Democratic Party Plaintiffs' challenge to Section 2(d) thus presents the rare, "occasional case" that requires the Court to "entertain a facial challenge" to a policy with nationwide sweep and craft an injunction attuned to that policy's nationwide effects. *United States v. Nat'l Treasurty Emps. Union*, 513 U.S. 454, 477–78 (1995). Nationwide relief is not warranted merely because the illegality of implementing Section 2(d) extends across the country— although it does. Rather, nationwide relief is necessary to remedy the irreparable harm to the parties before the Court because "the plaintiffs are dispersed throughout the United States." *Florida v. Dep't of Health & Human Servs.*, 19 F.4th 1271, 1282 (11th Cir. 2021).

Although it would be theoretically possible to tailor an injunction barring implementation of Section 2(d) only to the Democratic Party Plaintiffs, such an approach would be impracticable. The Democratic Party Plaintiffs have associational standing to represent millions of members who cannot feasibly be cataloged *in toto* by either this Court or the named Defendants against whom the Court's injunction would run. Moreover, such an injunction would not provide complete relief for the irreparable harms to the Democratic Party Plaintiffs in their organizational or political-competitor capacities. And even attempting to craft such relief would undermine Congress's fundamental objective in providing the Federal Form: the availability of a uniform, practical system for voter registration that takes no heed of party affiliation.

Defendants' only argument on the scope of relief with regard to Section 2(d) is that the Democratic Party Plaintiffs' request is "overly burdensome to agency heads carrying out existing statutory obligations." Defs.' Opp'n, ECF No. 84, at 49. This fails to persuade for two reasons.

First, it is difficult to conceive how agency heads would be burdened by an order enjoining implementation of Section 2(d). Agency heads have precious little to do with distributing the Federal Form. Would-be voters receive the Federal Form when they interact with front-line

government workers in field offices across the country.  To the extent those employees are burdened by the Federal Form, an order enjoining implementation of Section 2(d) relieves them of the (unlawfully imposed) additional burden of assessing whether an individual receives public assistance and is a U.S. citizen before handing them a packet of papers.  And Defendants cannot credibly argue that agency heads would be burdened by the effort of reversing some long-extant policy of assessing citizenship that would remain in effect but for an injunction.  Defendants have insisted that there is no such policy and that Section 2(d)'s "instruction is currently undefined and thus too uncertain" to even surmise what that policy would be.  Defs.' Opp'n, ECF No. 84, at 44.

Second, Defendants' argument that an order enjoining implementation of Section 2(d) would prevent agency heads from "carrying out existing statutory obligations" begs the question this Court has already answered in the Democratic Party Plaintiffs' favor.  Defs.' Opp'n, ECF No. 84, at 44.  The existing statutory obligation of a voter registration agency is to distribute the Federal Form "with each application" for "service or assistance" unless the applicant declines "in writing" to register to vote.  52 U.S.C. §§ 20506(a)(4)(A)(i), (a)(6)(A)(i).  No statute obligates— or even authorizes—voter registration agencies to assess citizenship before distributing the Federal Form.  So an injunction does not inhibit any voter registration agency's lawful functions.

"[T]aking account of 'what is necessary, what is fair, and what is workable,'" *North Carolina v. Covington*, 581 U.S. 486, 488 (2017) (per curiam) (citation omitted), the Court concludes that the appropriate remedy for the injury in fact the Democratic Party Plaintiffs have established is an injunction barring implementation of Section 2(d) that runs against those named Defendants who serve as voter registration agencies wherever they serve in that capacity.

### H.    Rule 65(c) Injunction Bond

Finally, the Court shall deny Defendants' request that the Court require Plaintiffs to post an injunction bond.  *See* Defs.' Opp'n, ECF No. 84, at 45; Defs.' Opp'n, ECF No. 85, at 30.  The

Federal Rules of Civil Procedure allow a district court to require a party obtaining a preliminary injunction to "give[] security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c).

District courts have "broad discretion . . . to determine the appropriate amount of an injunction bond." *DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999). Exercising that discretion, federal courts typically require substantial bonds only in suits between private parties with significant monetary interests at stake. *See* 11A C. Wright & A. Miller, *Federal Practice and Procedure* § 2954 nn.15–20 (3d ed. 2025) (collecting cases). The D.C. Circuit has also held that district courts have the discretion to "dispense with any security requirement whatsoever" when there has been no showing that the absence of a bond would prejudice the defendants. *Fed. Prescription Serv., Inc. v. Am. Pharm. Ass'n*, 636 F.2d 755, 759 (D.C. Cir. 1980).

Accordingly, multiple courts in this District have recently declined to require plaintiffs to post any bond as a condition of obtaining an injunction against agencies or officers of the federal government. *See Widakuswara v. Lake*, --- F. Supp. 3d ----, 2025 WL 1166400, at *17 (D.D.C. 2025) (RCL); *Climate United Fund v. Citibank, N.A.*, --- F. Supp. 3d ----, 2025 WL 1131412, at *21 (D.D.C. 2025) (TSC); *Associated Press v. Budowich*, --- F. Supp. 3d ----, 2025 WL 1039572, at *19 (D.D.C. 2025) (TNM); *Aviel v. Gor*, --- F. Supp. 3d ----, 2025 WL 1009035, at *12 n.7 (D.D.C. 2025) (LLA).

Defendants have not shown or argued that they will suffer any material harm or monetary loss from the injunctions the Court issues today. *Cf.* Defs.' Opp'n, ECF No. 84, at 45; Defs.' Opp'n, ECF No. 85, at 30. Moreover, requiring a bond as a condition of obtaining an injunction against unlawful executive action under the circumstances presented here would risk deterring

other litigants from pursuing their right to judicial review of unlawful executive action. In short, requiring Plaintiffs to post a bond in these consolidated cases would "contravene the interests of justice." *See Aviel*, 2025 WL 1009035, at *12 n.7. The Court therefore declines to require any Plaintiffs in these consolidated cases to post any bond.

*      *      *

## IV. CONCLUSION

For the foregoing reasons, the Court shall **GRANT** the Nonpartisan Plaintiffs' [34] Motion for a Preliminary Injunction and **GRANT IN PART** and **DENY IN PART** the Democratic Party Plaintiffs' [53] Motion for a Preliminary Injunction as follows:

The Court shall **GRANT** Plaintiffs' Motions as to Section 2(a) of Executive Order 14,248 and **PRELIMINARILY ENJOIN** Defendants U.S. Election Assistance Commission ("EAC"); Donald L. Palmer in his official capacity as Chairman and Commissioner of the EAC; Thomas Hicks, Benjamin W. Hovland, and Christy McCormick, in their official capacities as Commissioners of the EAC; and Brianna Schletz, in her official capacity as Executive Director of the EAC, from taking any action to implement or give effect to Section 2(a) of Executive Order 14,248, including taking any action based on the Executive Order to modify the content of the federal voter registration application form described in 52 U.S.C. § 20508(a)(2) to require documentary proof of United States citizenship.

The Court shall **GRANT** the Democratic Party Plaintiffs' Motion as to Section 2(d) of Executive Order 14,248 and **PRELIMINARILY ENJOIN** Defendants Department of Defense, Department of Veterans Affairs, Department of the Interior, Small Business Administration, Peter Hegseth in his official capacity as Secretary of Defense, Douglas Collins in his official capacity as Secretary of Veterans Affairs, Douglas Burgum in his official capacity as Secretary of the Interior, and Kelly Loeffler in her official capacity as Small Business Administrator, from taking any action to implement or give effect to Section 2(d) of Executive Order 14,248, including failing to provide the federal voter registration application form described in 52 U.S.C. § 20508(a)(2) or an equivalent form to any applicant for service or assistance based on an inability to "assess citizenship."

The Court shall **DENY** the Democratic Party Plaintiffs' Motion as to Sections 2(b), 7(a), and 7(b) of the Executive Order.

No Plaintiff shall be required to post an injunction bond or any other security as a condition of obtaining the injunctions described in this Memorandum Opinion.

Nothing in this Memorandum Opinion or the accompanying Order shall prevent Defendants from taking any lawful action that is not based on Sections 2(a) or 2(d) of Executive Order 14,248 or any substantially similar instruction by the President.

An appropriate Order accompanies this Memorandum Opinion.

**Dated:**  April 24, 2025



COLLEEN KOLLAR-KOTELLY
United States District Judge