**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.*,<br><br>        *Plaintiffs*,<br>    v.<br><br>EXECUTIVE OFFICE OF THE PRESIDENT, *et al.*,<br><br>        *Defendants*. | Civil Action No. 25-0946 (CKK) |
| DEMOCRATIC NATIONAL COMMITTEE, *et al.*,<br><br>        *Plaintiffs*,<br>    v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>        *Defendants*. | Civil Action No. 25-0952 (CKK) |
| LEAGUE OF WOMEN VOTERS EDUCATION FUND, *et al.*,<br><br>        *Plaintiffs*,<br>    v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>        *Defendants*. | Civil Action No. 25-0955 (CKK) |

**MEMORANDUM IN SUPPORT OF**
**<u>LEAGUE AND LULAC PLAINTIFFS' MOTION FOR PARTIAL SUMMARY</u>**
**<u>JUDGMENT</u>**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................. 2

    I.   Legal Background ..................................................................................................... 2

        A.   Constitutional and Federal Law on the Authority to Regulate Federal Elections and Voter Registration .......................................................................................... 2

        B.   Congress and the Independent Agencies Consider and Reject Documentary Proof-of-Citizenship Requirement ............................................................................ 5

    II.  Factual Background ................................................................................................. 7

        A.   Section 2(a) of the Executive Order Commands the EAC to Change the Content of the Federal Form ............................................................................................ 7

        B.   The EAC Begins to Implement Section 2(a). .................................................... 8

        C.   Section 2(a)'s Impact on Plaintiffs .................................................................. 9

    III. Procedural History ................................................................................................ 18

ARGUMENT ..................................................................................................................... 20

    I.   Section 2(a) Violates the Elections Clause and the Constitutional Separation of Powers. ................................................................................................................... 20

        A.   Plaintiffs Have an Equitable Cause of Action to Enjoin Unconstitutional Action by Federal Officers. ............................................................................................ 20

        B.   The President Has No Power to Command Changes to the Federal Form. .................. 21

    II.  Plaintiffs' Claims are Ripe and Fully Justiciable. ................................................. 29

        A.   Plaintiffs' Claims Are Ripe. ............................................................................. 29

        B.   Plaintiffs Have Standing. ................................................................................. 32

    III. A Permanent Injunction Barring Implementation of Section 2(a) of the Executive Order Is Necessary to Prevent Ongoing and Future Irreparable Harm. ........................... 37

        A.   The Irreparable Harm that Section 2(a) Would Cause Can Only Be Remedied Through the Issuance of Permanent Injunctive Relief. .................................................... 37

        B.   The Balance of Equities and the Public Interest Support Permanent Injunctive Relief. ............................................................................................................. 39

        C.   The Court's Preliminary Injunction Was Appropriate and Should Be Made Permanent. ...................................................................................................... 40

CONCLUSION ................................................................................................................. 41

# TABLE OF AUTHORITIES

*\* Authorities upon which this brief chiefly relies are marked with an asterisk.*

**Cases**

*Abbott Laboratories v. Gardner*,
   387 U.S. 136 (1967) .......................................................................................... 30

*Ali v. Regan*,
   111 F.4th 1264 (D.C. Cir. 2024) ...................................................................... 20

*Allen v. Milligan*,
   599 U.S. 1 (2023) .............................................................................................. 41

*American Anti-Vivisection Society v. U.S. Department of Agriculture*,
   946 F.3d 615 (D.C. Cir. 2020) ......................................................................... 32

*American Federation of Government Employees, AFL-CIO v. Carmen*,
   669 F.2d 815 (D.C. Cir. 1981) ......................................................................... 26

*American Petroleum Institute v. Environmental Protection Agency*,
   683 F.3d 382 (D.C. Cir. 2012) ......................................................................... 30

*Anatol Zukerman & Charles Krause Reporting, LLC. v. U.S. Postal Service*,
   64 F.4th 1354 (D.C. Cir. 2023) ........................................................................ 37

*\*Arizona v. Inter Tribal Council of Arizona, Inc.*,
   570 U.S. 1 (2013) ........................................................................................ passim

*Armstrong v. Exceptional Child Center, Inc.*,
   575 U.S. 320 (2015) .......................................................................................... 20

*Bell v. Hood*,
   327 U.S. 678 (1946) .......................................................................................... 21

*Boumediene v. Bush*,
   553 U.S. 723 (2008) .......................................................................................... 21

*Bowsher v. Synar*,
   478 U.S. 714 (1986) .......................................................................................... 36

*Burroughs v. United States*,
   290 U.S. 534 (1934) .......................................................................................... 21

*\*California v. Trump*,
   No. 25-cv-10810, 2025 WL 1667949 (D. Mass. Jun. 13, 2025) ................... passim

*Center for Biological Diversity v. McAleenan*,
  404 F. Supp. 3d 218 (D.D.C. 2019) ............................................................... 30

*Center for Sustainable Economy v. Jewell*,
  779 F.3d 588 (D.C. Cir. 2015) ...................................................................... 35

*Chamber of Commerce of U.S. v. Reich*,
  74 F.3d 1322 (D.C. Cir. 1996) ...................................................................... 21

*City & County of San Francisco v. Trump*,
  897 F.3d 1225 (9th Cir. 2018) ........................................................................ 8

*Clinton v. City of New York*,
  524 U.S. 417 (1998) ...................................................................................... 22

*Common Cause v. Trump*,
  506 F. Supp. 3d 39 (D.D.C. 2020) ............................................................... 31

*Consumer Energy Council of America v. Federal Energy Regulatory Commission*,
  673 F.2d 425 (D.C. Cir. 1982) ...................................................................... 40

*Dart v. United States*,
  848 F.2d 217 (D.C. Cir. 1988) ...................................................................... 21

*Department of Commerce v. New York*,
  588 U.S. 752 (2019) ...................................................................................... 32

*Elecronic Privacy Information Center v. U.S. Department of Commerce*,
  928 F.3d 95 (D.C. Cir. 2019) ........................................................................ 35

*Equal Rights Center v. Post Properties, Inc.*,
  633 F.3d 1136 (D.C. Cir. 2011) .................................................................... 33

*Federal Election Commission v. Akins*,
  524 U.S. 11 (1998) ........................................................................................ 37

*Federal Election Commission v. National Rifle Association Political Victory Fund*,
  6 F.3d 821 (D.C. Cir. 1993) .......................................................................... 29

*Fish v. Kobach*,
  189 F. Supp. 3d 1107 (D. Kan. 2016) ............................................................ 6

*Fish v. Schwab*,
  957 F.3d 1105 (10th Cir. 2020) ............................................................... 10, 39

*Food & Drug Administration v. Alliance for Hippocratic Medicine*,
  602 U.S. 367 (2024) ................................................................................. 33, 34

*Fourth Estate Public Benefit Corp. v. Wall-Street.com, LLC*,
  586 U.S. 296 (2019) ........................................................................................... 24

*Franklin v. Massachusetts*,
  505 U.S. 788 (1992) ........................................................................................... 36

*Free Enterprise Fund v. Public Co. Account Oversight Board*,
  561 U.S. 477 (2010) ..................................................................................... 21, 36

*Havens Realty Corp. v. Coleman*,
  455 U.S. 363 (1982) ................................................................................ 32, 33, 34

*Hunt v. Washington State Apple Advertising Commission*,
  432 U.S. 333 (1977) ........................................................................................... 35

*Immigration and Naturalization Service v. Chadha*,
  462 U.S. 919 (1983) ........................................................................................... 26

*Kendall v. Stokes*,
  37 U.S. (12 Pet.) 524 (1838) ............................................................................. 26

*Kiakombua v. Wolf*,
  498 F. Supp. 3d 1 (D.D.C. 2020) ...................................................................... 39

*Kobach v. U.S. Election Assistance Commission*,
  772 F.3d 1183 (10th Cir. 2014) ........................................................................... 6

*League of United Latin American Citizens v. Executive Office of the President*,
  No. 25-cv-0946, 2025 WL 1187730 (D.D.C. Apr. 24, 2025) ......................... passim

*League of Women Voters of U.S. v. Harrington*,
  560 F. Supp. 3d 177 (D.D.C. 2021) .................................................................... 7

*League of Women Voters of U.S. v. Newby*,
  838 F.3d 1 (D.C. Cir. 2016) ............................................................................ passim

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) ........................................................................................... 32

*Main Street Legal Services., Inc. v. National Security Council*,
  811 F.3d 542 (2d Cir. 2016) ............................................................................... 27

*Mi Familia Vota v. Fontes*,
  129 F.4th 691 (9th Cir. 2025) ....................................................................... 35, 38

*Morrison v. Olson*,
  487 U.S. 654 (1988) ........................................................................................... 25

*Myers v. United States,*
 272 U.S. 52 (1926) ........................................................................................ 26, 27

*National Mining Association v. U.S. Army Corps of Engineers,*
 145 F.3d 1399 (D.C. Cir. 1998) .............................................................................. 37

*National Treasury Employees Union v. United States,*
 101 F.3d 1423 (D.C. Cir. 1996) .............................................................................. 32

*New York v. U.S. Department of Commerce,*
 351 F. Supp. 3d 502 (S.D.N.Y. 2019) ...................................................................... 40

*Nken v. Holder,*
 556 U.S. 418 (2009) ................................................................................... 37, 39

*Seila Law LLC v. Consumer Financial Protection Bureau,*
 591 U.S. 197 (2020) ................................................................................... 29, 36

*Shaw v. Hunt,*
 517 U.S. 899 (1996) ........................................................................................... 41

*Smiley v. Holm,*
 285 U.S. 355 (1932) ........................................................................................... 22

*Susan B. Anthony List v. Driehaus,*
 573 U.S. 149 (2014) ........................................................................................... 32

*Trump v. CASA, Inc.,*
 No. 24A886, 2025 WL 1773631 (Jun. 27, 2025) ......................................... 40, 41

*Trump v. Hawaii,*
 585 U.S. 667 (2018) ........................................................................................... 41

*Trump v. Wilcox,*
 145 S. Ct. 1415 (2025) ............................................................................... 28, 29

*Utah v. Evans,*
 536 U.S. 452 (2002) ........................................................................................... 36

*Village of Arlington Heights v. Metropolitan Housing Development Corp.,*
 429 U.S. 252 (1977) ........................................................................................... 32

*West v. Lynch,*
 845 F.3d 1228 (D.C. Cir. 2017) .............................................................................. 36

*West Virginia v. Environmental Protection Agency,*
 597 U.S. 607 (2022) ........................................................................................... 25

*Whitman-Walker Clinic, Inc. v. U.S. Department of Health & Human Services*,
  485 F. Supp. 3d 1 (D.D.C. 2020) ................................................................. 33

*Witman v. American Trucking Associations, Inc.*,
  531 U.S. 457 (2001) ..................................................................................... 25

*Young v. Trump*,
  506 F. Supp. 3d 921 (N.D. Cal. 2020) ......................................................... 36

*\*Youngstown Sheet & Tube Co. v. Sawyer*,
  343 U.S. 579 (1952) ................................................................. 21, 22, 23, 26

*Zivotofsky ex rel. Zivotofsky v. Kerry*,
  576 U.S. 1 (2015) ......................................................................................... 23

**Constitutional Authorities**

U.S. Const. art. I, § 2 ........................................................................................ 2

*U.S. Const. art. I, § 4 ..................................................................... 2, 21, 26

U.S. Const. art. II, § 1 ..................................................................................... 21

U.S. Const. art. II, § 2 ..................................................................................... 25

U.S. Const. art. II, § 3 .............................................................................. 22, 26

**Statutes**

1 U.S.C. § 112b(e) ........................................................................................... 28

5 U.S.C. § 551 .................................................................................................. 4

5 U.S.C. § 553 .................................................................................................. 4

5 U.S.C.§ 706 ................................................................................................... 4

7 U.S.C. § 610(c) ............................................................................................. 28

16 U.S.C. § 459r .............................................................................................. 28

44 U.S.C. § 3501 .......................................................................................... 4, 24

44 U.S.C. § 3502 .............................................................................................. 4

44 U.S.C. § 3507 .............................................................................................. 4

52 U.S.C. § 20501 ....................................................................................... 2, 22

52 U.S.C. § 20502 ........................................................................................................... 4

52 U.S.C. § 20503 ........................................................................................................... 4

52 U.S.C. § 20504 ........................................................................................................... 3

52 U.S.C. § 20505 .................................................................................................. 2, 4, 22

52 U.S.C. § 20506 ................................................................................................... 3, 4, 5

*52 U.S.C. § 20508 ............................................................................................... passim

*52 U.S.C. § 20921 ................................................................................... 3, 23, 25, 28

52 U.S.C. § 20922 ........................................................................................................... 5

52 U.S.C. § 20923 .................................................................................................... 3, 25

52 U.S.C. § 20928 .................................................................................................... 3, 25

52 U.S.C. § 20929 .................................................................................................... 3, 24

52 U.S.C. § 20942 ........................................................................................................... 5

52 U.S.C. § 20961 ........................................................................................................... 5

52 U.S.C. § 20962 ........................................................................................................... 5

52 U.S.C. § 21001 ........................................................................................................... 5

52 U.S.C. § 21002 ........................................................................................................... 5

52 U.S.C. § 21081 ........................................................................................................... 5

52 U.S.C. § 21132 ........................................................................................................... 3

Ariz. Rev. Stat. § 16-166 ............................................................................................. 14

24 L.P.R.A. § 1325 ....................................................................................................... 11

**Regulations**

59 Fed. Reg. 32,311 (June 23, 1994) ...................................................................... 3, 6

**Rules**

Fed. R. Civ. P. 56(a) .................................................................................................... 20

**Other Authorities**

1 *Annals of Congress* 581 (1789)...............................................................................26

Debate in Massachusetts Ratifying Convention,
　2 *The Founders' Constitution* (P. Kurland & R. Lerner eds., 1987) ......................22

Extending Regulatory Review Under Executive Order 12866 to Independent Agencies,
　43 Op. O.L.C. 232 (2019).......................................................................................27

H.R. Rep. No. 103-66 (1993)................................................................................6, 24

H.R. Rep. No. 103-9 (1993)...................................................................................5, 40

Proposed Executive Order Entitled "Federal Regulation,"
　5 Op. O.L.C. 59 (1981).............................................................................................27

S. Rep. No. 103-6 (1993)..............................................................................................5

The Federalist No. 59 (Alexander Hamilton) ..............................................................22

The President and Accounting Officers,
　1 Op. Att'y Gen. 624 (1823).......................................................................................27

**INTRODUCTION**

On March 25, 2025, the President issued an Executive Order that unconstitutionally overhauls American elections. As relevant here, Section 2(a) directs the U.S. Election Assistance Commission ("EAC") to require U.S. citizens registering to vote in federal elections using the national mail-in voter registration form ("Federal Form") to submit a passport or another specified type of documentary proof of citizenship. This Court preliminarily enjoined that part of the Executive Order because "[o]ur Constitution entrusts Congress and the States—not the President—with the authority to regulate federal elections." *League of United Latin Am. Citizens v. Exec. Off. of the President* ("*LULAC*"), No. 25-cv-0946, 2025 WL 1187730, at *1 (D.D.C. Apr. 24, 2025). Congress has jealously guarded its authority to regulate the Federal Form, entrusting the task to the independent, bipartisan EAC to insulate the Federal Form from partisan control. No "statutory delegation of authority to the Executive Branch permits the President" to unilaterally command sweeping changes to the Federal Form. *Id.*

Thus, in its thorough preliminary injunction opinion, this Court held that the President's *ultra vires* command violates the Elections Clause and the constitutional separation of powers and that its implementation threatens Plaintiffs and their members with irreparable harm. That analysis is correct and requires no further factual development. *Id.* at *28. The Court should now grant summary judgment in Plaintiffs' favor on their challenge to Section 2(a) and permanently enjoin its implementation.[1]

---

[1] For purposes of this brief, the term "Plaintiffs" refers to the Nonpartisan Plaintiffs. The Nonpartisan Plaintiffs are the "League Plaintiffs" (League of Women Voters Education Fund, League of Women Voters of the United States, League of Women Voters of Arizona, Hispanic Federation, National Association for the Advancement of Colored People, OCA-Asian Pacific American Advocates, and Asian and Pacific Islander American Vote) and the "LULAC Plaintiffs" (League of United Latin American Citizens, Secure Families Initiative, and Arizona Students' Association).

## BACKGROUND

I.    **Legal Background**

   A.  **Constitutional and Federal Law on the Authority to Regulate Federal Elections and Voter Registration**

Federal elections are and always have been governed by Congress and the States, not the President. The Elections Clause provides in relevant part that "[t]he Times, Places and Manner of holding [federal] Elections . . . shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations." U.S. Const. art. I, § 4; *see also id.* art. I, § 2.

Exercising its constitutional authority, Congress passed the National Voter Registration Act ("NVRA") in 1993. Pub. L. No. 103-31, 107 Stat. 77 (1993) (codified as amended at 52 U.S.C. § 20501 *et seq.*). It did so to "increase the number of eligible citizens who register to vote in elections for Federal office," 52 U.S.C. § 20501 (b)(1), while also recognizing the need to protect the "integrity of the electoral process," *id.* § 20501(b)(3). Congress also sought to cure the "direct and damaging effect on voter participation in elections for Federal office and disproportionate[] harm [to] voter participation by various groups, including racial minorities," wrought by "discriminatory and unfair registration laws and procedures." *Id.* § 20501(a)(3).

To help achieve these goals, Congress created a voter registration form (the "Federal Form") that "[e]ach State shall accept and use." *Id.* § 20505(a)(1). But Congress set strict parameters for the Federal Form, both as to what it must include and what it cannot. *See id.* § 20508(b). Regardless of the contents of State voter registration forms, the "uniform" Federal Form "provides a backstop" that "guarantees . . . a simple means of registering to vote in federal elections will be available." *Arizona v. Inter Tribal Council of Ariz., Inc.* ("*ITCA*"), 570 U.S. 1, 4, 12 (2013). Within that framework, Congress originally delegated the authority to "prescribe such regulations as are necessary" to "develop" the Federal Form to the Federal Election Commission ("FEC"), an independent, bipartisan agency, "in consultation with" the States' "chief election officers." 52 U.S.C. § 20508(a)(1)–(2).

2

Congress later transferred authority over the Federal Form to the EAC. *See* 52 U.S.C. § 21132. It created the EAC, like the FEC, as a bipartisan, "independent entity," 52 U.S.C. § 20921, when it enacted the Help America Vote Act of 2002 ("HAVA"). Pub. L. No. 107-252, 116 Stat. 1666, 1726 (2002) (codified as amended at 52 U.S.C. § 20901 *et seq.*). The EAC has four commissioners, no more than two of whom may be affiliated with the same political party. 52 U.S.C. § 20923(a)(1), (b)(2). The President has a limited role in relation to the EAC: he appoints commissioners, with the Senate's advice and consent, based on recommendations from the Majority and Minority Leaders of the House and Senate. *Id.* § 20923(a)(2). Each appointed EAC member must "have experience with or expertise in election administration or the study of elections." *Id.* § 20923(a)(3). Congress designed the EAC such that it may not take "[a]ny action" without "the approval of at least three of its members," ensuring that no decision can be made without bipartisan support. *Id.* § 20928.

To maintain the Federal Form, the EAC promulgates formal regulations through notice-and-comment rulemaking. *Id.* § 20929; *see, e.g.*, 59 Fed. Reg. 32,311 (June 23, 1994) (final rules regulating the Federal Form). But Congress tightly circumscribed the EAC's authority to make changes to the Federal Form. For one, it instructed that the Federal Form must "contain[] an attestation that the applicant meets" "each eligibility requirement (including citizenship)" that "requires the signature of the applicant, under penalty of perjury." 52 U.S.C. § 20508(b)(2). Every person who registers using the Federal Form must therefore swear under penalty of perjury that they are a U.S. citizen. *Id.* §§ 20504 (c)(2)(C), 20506(a)(6)(A), 20508(b)(2). And Congress prohibited "any requirement for notarization or other formal authentication." *Id.* § 20508(b)(3). Congress further authorized the EAC to request "identifying information" and "other information" on the Federal Form *only if* the information "is necessary to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process." *Id.* § 20508(b)(1).

In addition to these substantive constraints, Congress imposed a mandatory procedure that the EAC must follow before amending the Federal Form. As described above, the EAC must

engage in notice-and-comment rulemaking under the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.*; *see* Decl. of Brianna Schletz ("Schletz Decl."), ECF No. 85-1 ¶ 4 (Defendants acknowledging that APA applies).[2] The APA requires that agencies publish a general notice of proposed rulemaking, give interested persons the opportunity to submit written comments for a period of at least 30 days, and consider those comments in its rulemaking. 5 U.S.C. § 553.[3]

The EAC must also comply with the Paperwork Reduction Act ("PRA"), 44 U.S.C. § 3501 *et seq.*; *see also* Schletz Decl. ¶ 7 (Defendants acknowledging that PRA applies). The Federal Form is considered a "collection of information" under the PRA such that changes to it require a separate 60-day public comment period, in addition to the minimum 30-day comment period the APA would still require otherwise. 44 U.S.C. §§ 3502(3), 3507(c)–(d). After the EAC considers such comments, it must submit the revised Federal Form to the Office of Management and Budget ("OMB") and publish a notice for an additional 30-day comment period. 44 U.S.C. § 3507(a)–(b). OMB would then need to approve the revised form. 44 U.S.C. § 3507(c), (g).

Congress also added requirements to ensure that the Federal Form enables voter registration for eligible applicants. In addition to the requirement that States must "accept and use" the Federal Form, 52 U.S.C. § 20505(a)(1), the NVRA requires that States allow for voter registration as part of the driver's license application process, *id.* § 20503(a)(1). It also mandates that certain State offices distribute the Federal Form. *Id.* §§ 20506(a)(1), (a)(4), (a)(6). Such offices are designated as "voter registration agenc[ies]." *Id.* § 20502(5). These include "all offices in the State that provide public assistance" and those "that provide State-funded programs primarily engaged in providing services to persons with disabilities." *Id.* § 20506(a)(2). The NVRA further directs the States to "designate other offices within the State as voter registration agencies," which "may include" additional State or local government offices as well as "Federal and

---

[2] Citations to "ECF" herein refer to filings in the consolidated action, *LULAC*, No. 1:25-00946.

[3] The APA also imposes its own substantive restraints, requiring reasoned decision-making consistent with the relevant authorizing statute. 5 U.S.C. § 706(2).

nongovernmental offices, with the agreement of such offices." *Id.* § 20506(a)(3). As part of the duties specified under the NVRA, a voter registration agency must distribute the Federal Form or its equivalent, assist applicants with completing the Federal Form, and accept and transmit the completed Federal Form for transmission to the appropriate State election official. *Id.* § 20506(a)(4).

Congress also delegated other—largely advisory—tasks to the EAC for the administration of federal elections. 52 U.S.C. § 20922 (prescribing six limited EAC duties). In carrying out these tasks, Congress specified that the EAC lacks "authority to issue any rule, promulgate any regulation, or take any other action which imposes any requirement on any State or unit of local government, except to the extent permitted under section 20508(a) of this title"—*i.e.*, except to maintain the Federal Form and submit certain reports to Congress regarding NVRA compliance. *Id.* § 20929. These tasks include adopting voluntary guidance for voting systems—*i.e.*, the equipment and systems under which ballots are cast and counted—with the assistance of a technical guidelines committee also established by statute. *Id.* §§ 20922(5), 20942, 20961, 20962, 21081(b). The EAC is also responsible for disbursing congressionally appropriated federal funds pursuant to formulas established by statute. *See id.* § 20922(4); *see also id.* §§ 21001(a), 21002.

### B. Congress and the Independent Agencies Consider and Reject Documentary Proof-of-Citizenship Requirement.

Congress considered and rejected a documentary proof-of-citizenship requirement in connection with the Federal Form. In 1993, while Congress considered the NVRA's passage, members raised concerns about noncitizens using the Federal Form to register to vote. However, the Senate report specifically notes that Congress found that the NVRA "provides sufficient safeguards to prevent noncitizens from registering to vote." S. Rep. No. 103-6, at 9 (1993). Congress reached this conclusion because the NVRA requires that "every application for voter registration must include a statement [setting forth the citizenship requirement] and requires that the applicant sign an attestation clause, under penalty of perjury." *Id.*; *see also* H.R. Rep. No. 103-9, at 10 (1993) ("The Committee believes that these provisions [to set forth citizenship

requirements and require an attestation under penalty of perjury] are sufficient to deter fraudulent registration."). In other words, Congress considered the NVRA's protections against noncitizen voting sufficient—without documentary proof of citizenship.

When the NVRA reached conference, Congress specifically rejected a proposed amendment that would have allowed States to require documentary proof of citizenship. H.R. Rep. No. 103-66 (1993) (Conf. Rep.), *as reprinted in* 1993 U.S.C.C.A.N. 140, 146. The Conference Report found that the amendment was "not necessary or consistent with the purpose of this Act." *Id.* It emphasized that the proposed amendment would "effectively eliminate, or seriously interfere, with the mail registration program of the Act [and] could also adversely affect the administration of the other registration programs." *Id.*[4]

The FEC and the EAC—the two bipartisan, independent agencies that have been responsible for the Federal Form—have likewise declined to add a documentary proof-of-citizenship requirement. In 1994, in the FEC's final rulemaking governing the Federal Form, the agency rejected commenters' requests to require information regarding naturalization, concluding that, by law, the only information necessary to determine citizenship qualifications is the statutorily required attestation. *See Final Rules: National Voter Registration Act of 1993*, 59 Fed. Reg. 32,311, 32,316 (June 23, 1994). The FEC explained that "[w]hile U.S. citizenship is a prerequisite for voting in every state . . . [t]he issue of U.S. citizenship is addressed within the oath required by the Act and signed by the applicant under penalty of perjury." *Id.*

In the 23 years since Congress delegated limited responsibility over the Federal Form to the EAC, that agency has never disturbed its predecessor's decision to not require documentary proof of citizenship. In 2006, the EAC rejected Arizona's requests for a state-specific amendment to accommodate Arizona's documentary proof-of-citizenship procedure. Ex. 28, U.S. Election Assistance Comm'n, Mem. of Decision Concerning State Requests to Include Additional Proof-

---

[4] Courts have relied on this legislative history in rejecting previous attempts to add documentary proof-of-citizenship requirements to voter registration processes covered by the NVRA. *See Fish v. Kobach*, 189 F. Supp. 3d 1107, 1114–15 (D. Kan. 2016); *Kobach v. U.S. Election Assistance Comm'n*, 772 F.3d 1183, 1195 n.7 (10th Cir. 2014).

of-Citizenship Instructions on the National Form, Dkt. No. EAC-2013-0004 (Jan. 17, 2014) at 2. The EAC again rejected this request in 2014 when Arizona, Georgia, and Kansas asked it to modify the Federal Form to instruct that applicants in those States provide documentary proof of citizenship. *See id.* In the 2014 decision, the EAC explained that both:

> the FEC and the EAC . . . specifically considered and determined, in their discretion, that the oath signed under penalty of perjury, the words 'For U.S. Citizens Only' and later the relevant HAVA citizenship provisions, *see* 42 U.S.C. § 15483(b)(4)(A) (adding to the Federal Form two specific questions and check boxes indicating the applicant's U.S. citizenship), were all that was necessary to enable state officials to establish the bona fides of a voter registration applicant's citizenship.

*Id.* at 22. The EAC rejected these States' efforts to add documentary proof of citizenship to the Federal Form because it "would require applicants to submit more information than is necessary to . . . assess eligibility," while a sworn attestation of citizenship status "provides the necessary means for assessing applicants' eligibility." *Id.* at 28–31. And in 2015, when a new EAC Executive Director tried to unilaterally approve the three States' requests to require documentary proof of citizenship with the Federal Form, the D.C. Circuit preliminarily enjoined that decision, *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 15 (D.C. Cir. 2016), and a district court later awarded summary judgment to the plaintiffs because the EAC had made no determination as to whether the requirement was "necessary" to assess eligibility, as Congress required under the NVRA, *League of Women Voters of U.S. v. Harrington*, 560 F. Supp. 3d 177, 188–89 (D.D.C. 2021).

## II.    Factual Background

### A.  Section 2(a) of the Executive Order Commands the EAC to Change the Content of the Federal Form.

On March 25, 2025, the President issued Executive Order 14,248 ("Executive Order") that, among other things, required the EAC to, within 30 days, "take appropriate action to require . . . documentary proof of United States citizenship" with the Federal Form. Ex. 1, Exec. Order No. 14,248 § 2(a)(i), 90 Fed. Reg. 14,005 (Mar. 25, 2025), https://perma.cc/F55X-RYFN; *see also* League & LULAC Plaintiffs' Statement of Undisputed Material Facts ("SUMF") ¶¶ 1–2. The

Executive Order defines "documentary proof of citizenship" to include a copy of the following documents:

> (A) a United States passport;
>
> (B) an identification document compliant with the requirements of the REAL ID Act of 2005 (Public Law 109-13, Div. B) that indicates the applicant is a citizen of the United States;
>
> (C) an official military identification card that indicates the applicant is a citizen of the United States; or
>
> (D) a valid Federal or State government-issued photo identification if such identification indicates that the applicant is a United States citizen or if such identification is otherwise accompanied by proof of United States citizenship.

Exec. Order § 2(a)(ii); *see also* SUMF ¶ 3.

Section 2(a)(i)(B) of the Executive Order further directs the EAC to change the Federal Form to compel State or local officials to record information specific to the documentation that each applicant presents when registering with the Form. It mandates that the Federal Form must:

> require . . . a State or local official to record on the form the type of document that the applicant presented as documentary proof of United States citizenship, including the date of the document's issuance, the date of the document's expiration (if any), the office that issued the document, and any unique identification number associated with the document as required by the criteria in 52 U.S.C. 21083(a)(5)(A), while taking appropriate measures to ensure information security.

Exec Order § 2(a)(i)(B); *see also* SUMF ¶ 5.

As this Court explained, "Section 2(a) leaves no uncertainty about what it requires from the EAC." *LULAC*, 2025 WL 1187730, at *28. It "unambiguously commands" the EAC to amend the Federal Form to require that applicants provide one of the limited forms of citizenship documents the Executive Order specifies. *See id.* (quoting *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1240 (9th Cir. 2018)).

**B.  The EAC Begins to Implement Section 2(a).**

Consistent with the Executive Order's mandate and 30-day deadline for action, the EAC took immediate steps to implement its terms. On April 11, EAC's Executive Director Brianna Schletz sent a letter on EAC letterhead to each State's chief election official "seeking consultation on development of" the Federal Form in response to the Executive Order's "instruction" that

documentary proof of citizenship "be required." SUMF ¶¶ 6–7. The NVRA requires the EAC to consult with State chief election officers as part of the Commission's process to develop or amend the Federal Form. *See* 52 U.S.C. § 20508(a)(2). The letter thus demonstrates that the EAC had "already begun to implement Section 2(a)." *LULAC*, 2025 WL 1187730, at *30.[5]

Consistent with the Executive Order's plain meaning and the Schletz letter, Defendants represented at this Court's preliminary-injunction hearing that "documentary proof [of citizenship] is required" on the Federal Form because that is what "the President has ordered." SUMF ¶ 8. Thus, Section 2(a) leaves the EAC no discretion with respect to whether a documentary proof-of-citizenship requirement will be added to the Federal Form. SUMF ¶ 11.

### C. Section 2(a)'s Impact on Plaintiffs

Plaintiffs are nonpartisan, nonprofit organizations whose core missions and activities center around empowering voters, safeguarding the right to vote, and promoting an accountable democracy through voter education, public outreach, and voter registration. SUMF ¶¶ 12–13. To accomplish their missions, Plaintiffs regularly organize and conduct voter registration events to help eligible citizens register to vote—including using the Federal Form—and educate the public about the importance of voter registration and political participation. SUMF ¶¶ 14–15.

Each year, Plaintiffs collectively help thousands register to vote. SUMF ¶ 18. In addition to hosting voter registration events, Plaintiffs educate and assist their members in navigating the voter registration process and encourage their members to participate in the political process.

---

[5] Three days after Executive Director Schletz circulated the April 11 letter, Defendants inaccurately represented that Section 2(a) *has not even begun to be implemented*," Defs.' Resp. in Opp'n to League and LULAC Pls.' Mot. for Prelim. Inj., ECF No. 85, at 30, and stressed that such implementation "may *never* occur," *id.* at 15. Defendants' counsel subsequently asserted that he "had no knowledge of the letter." Ex. 3, Tr. of Oral Arg. on Pls.' Mot. for Prelim. Inj. ("PI Tr.") 11:3. Defendants' counsel went on to insist that the letter "is not any step at all that's contemplated by the APA in the rulemaking process." *Id.* at 11:8–12. More recently, however, at a public meeting of the EAC's Technical Guidelines Development Committee on July 2, 2025, the EAC's general counsel acknowledged that the letter seeking to consult with the States was "required by the NVRA process" that the EAC had initiated in response to the Executive Order. Ex. 29, U.S. Election Assistance Comm'n, *Technical Guidelines Development Committee Meeting* (July 2, 2025), transcript at 51:14–20 (transcribed by Planet Depos, from video at https://www.youtube.com/watch?v=fls42gHmKj8).

SUMF ¶ 16. The "Federal Form is a singularly essential resource" because it enables Plaintiffs "to register voters with one consistent form in almost all states." SUMF ¶¶ 21–22. For example, Plaintiff Hispanic Federation relies on the Federal Form to register voters at "in-person events with out-of-state attendees because people from various states attend those events." SUMF ¶ 23. This "allows [them] to give the same voter registration form to every attendee, without attempting to distinguish between residents of different states," which "would be impracticable." SUMF ¶¶ 24–25.

If the EAC implements Section 2(a) of the Executive Order, Plaintiffs' missions and core voter registration activities would be frustrated because they would be unable to register many eligible citizens who lack the requisite documentation using the Federal Form. SUMF ¶ 26. Millions of U.S. citizens—whom Plaintiffs could otherwise help register to vote—lack or cannot easily obtain one of the four types of documentary proof of citizenship Section 2(a) requires. *See, e.g.*, *Newby*, 838 F.3d at 9 (characterizing documentary proof-of-citizenship requirements as "new obstacles [that] unquestionably make it more difficult" for organizations to register voters); *Fish v. Schwab*, 957 F.3d 1105, 1128 (10th Cir. 2020). Less than half of eligible citizens hold a valid passport, with Black people disproportionately likely to lack one, and it can cost as much as $160 and take up to two months to arrive. SUMF ¶¶ 78–81. And over 60% of foreign-born Asian Americans are naturalized citizens,[6] including those who naturalize alongside their parents while children; for many, obtaining a naturalization certificate is a costly and lengthy process—upwards of $500[7] and over five and a half months to obtain.[8] Most REAL IDs do not indicate citizenship status, and those that do are available in only five States and for an additional fee. SUMF ¶¶ 82–84.

---

[6] Ex. 32, U.S. Census Bureau, *The Foreign-Born Population in the United States: 2022*, at 7 (2024), https://perma.cc/2QPX-KTF7.

[7] Ex. 33, U.S. Citizenship & Immigration Servs., *G-1055, Fee Schedule* https://perma.cc/SC3W-H3GD.

[8] Ex. 34, U.S. Citizenship & Immigr. Servs., *Case Processing Times*, https://egov.uscis.gov/processing-times/ (select "N-565 | Application for Replacement Naturalization/Citizenship Document" from dropdown; then "U.S. citizen applying for a replacement of a naturalization or citizenship certificate"; then "Nebraska Service Center").

Likewise, not all military identification cards indicate citizenship, as Defendants admit, and voters are not eligible for a military card unless they have a qualifying relationship to the military. SUMF ¶¶ 85–86. And millions of Americans do not have a birth certificate that matches their current legal name[9] (assuming birth certificates even qualify as proof of citizenship under Section 2(a)), and many (including disproportionate numbers of Black and Brown citizens) lack one altogether.[10]

The core missions and activities of Plaintiffs including Hispanic Federation, the National Association for the Advancement of Colored People ("NAACP"), and League of United Latin American Citizens ("LULAC") would be particularly harmed by Section 2(a)'s implementation because eligible voters in the Black and Latino communities they primarily serve disproportionately lack access to documentary proof of citizenship. SUMF ¶¶ 30–33. Plaintiff Secure Families Initiative's ("SFI") mission would similarly be frustrated because fewer of its members and fewer military family members overall would be able to register to vote. SUMF ¶ 41; *see* SUMF ¶¶ 34–40. And the core mission and activities of Plaintiff Arizona Students' Association ("ASA") would be harmed because ASA would be unable to register students to vote who lack documentary proof of citizenship. SUMF ¶¶ 13, 26–29.

---

[9] Ex. 35, Luona Lin, *About 8 in 10 Women in Opposite-Sex Marriages Say They Took Their Husband's Last Name*, Pew Research Center (Sept. 7, 2023), https://perma.cc/UDK5-EXNM (Roughly 84 percent of married women and six percent of married men in opposite-sex marriages in the United States changed their name when they got married.); Ex. 36, UCLA Sch. of L., Williams Inst., *How Many Adults and Youth Identify as Transgender in the United States?* (June 2022), https://perma.cc/S5LV-LVYG.

[10] Many Black citizens never received a birth certificate because of racially discriminatory laws that limited their ability to access such documentation. *See* Ex. 37, Susan J. Pearson, *The Birth Certificate: An American History* 257, 259 (Nov. 16, 2021); Ex. 38, Betsy L. Fisher, *Citizenship, Federalism, and Delayed Birth Registration in the United States*, 57 Akron L. Rev. 49, 55–58, 65–73 (2024), https://perma.cc/8MQ8-YGWY; *see also* Ex. 8, Suppl. Decl. of Tyler Sterling ¶ 49. Millions of voting-age people born in Puerto Rico lack a valid birth certificate because the Puerto Rico government invalidated the birth certificates of all persons born in Puerto Rico before July 1, 2010. *See* Ex. 39, U.S. Soc. Sec. Admin., Program Operations Manual Sys. *Acceptance of Puerto Rico Birth Certificates*, GN 00301.065 (last updated Oct. 29, 2010), https://perma.cc/5FGD-UDL2; *see also* 24 L.P.R.A. § 1325; Ex. 9, Decl. of Jessica Guttlein ¶ 14.

Section 2(a)'s implementation would also force Plaintiffs to stop using the Federal Form to register even those potential voters who do possess compliant documentation, further frustrating their missions. This is true for three distinct reasons.

*First*, because Section 2(a) requires potential voters to submit copies of actual documents showing their citizenship status along with Federal Form, the League of Women Voters of Arizona ("LWVAZ"), LULAC, and other Plaintiffs' members and volunteers would need to collect copies of voters' sensitive personal documents such as passports to assist them, requiring Plaintiffs to purchase copiers or scanners. SUMF ¶ 62–63. But LWVAZ, LULAC, the NAACP, and other Plaintiffs do not have the resources or institutional expertise to scan and securely store copies of proof-of-citizenship documents and transmit them to election authorities. SUMF ¶ 66. Moreover, voter registration drives held at churches, college campuses, grocery stores, and in other public places would be less effective because many people who are eligible to register to vote do not carry their passport or other citizenship documents as they go about their daily routines. SUMF ¶¶ 67, 69–70. Indeed, the U.S. State Department advises passport holders to "store [your passport] in a secure location to prevent pets or children from damaging your passport." SUMF ¶ 68. And at voter registration drives on school campuses, ASA would need to hire additional staff to handle the lengthier voter registration process for each individual without creating long lines, which would discourage students from registering. SUMF ¶¶ 64–65.

*Second*, in the experience of LWVAZ, LULAC, and NAACP volunteers, voters are often concerned about giving vitally important personal information and sensitive personal documents to any third parties, even trusted voter registration organizations. SUMF ¶ 71. Asking voters to provide copies of such documents would jeopardize LWVAZ's, LULAC's, and NAACP's longstanding reputations as trusted organizations and would likely make voters less willing to participate in their registration events. SUMF ¶¶ 72–73. LWVAZ, for example, does not collect or retain applicants' information from an applicant's voter registration form. SUMF ¶ 74.

*Third*, even if LWVAZ, LULAC, NAACP, and other Plaintiffs' volunteers were willing to copy registrants' highly sensitive information, they would be unable to advise prospective voters

12

about what types of documentation satisfy the Executive Order because of its confusing nature. SUMF ¶ 65. For example, the Executive Order refers to identification compliant with "the REAL ID Act of 2005," but most REAL IDs do not denote citizenship. *See supra* at 10; SUMF ¶ 82.

Section 2(a)'s implementation would further severely burden Plaintiffs' ability to conduct registration drives because it would impair their existing methods for registering voters. SUMF ¶¶ 42–61. For example, Plaintiff Asian Pacific Islander American Vote ("APIAVote"), in partnership with Rock the Vote, has created a national, multilingual voter registration portal based on the Federal Form. SUMF ¶¶ 43–44. That portal enables eligible citizens who speak Bengali, Chinese, Hindi, Ilocano, Japanese, Korean, Tagalog, Thai, Urdu, and Vietnamese to register to vote in compliance with the Federal Form in their primary language. SUMF ¶ 45. Importantly, APIAVote's portal includes the Federal Form in languages not available from the EAC, such as Ilocano, Thai, and Urdu. SUMF ¶ 46. OCA-Asian Pacific American Advocates ("OCA") relies on APIAVote's platform to register voters. SUMF ¶ 48. The League of Women Voters ("the League") also has a website—VOTE411.org—that relies on Rock the Vote's registration portal. SUMF ¶¶ 49–50. As part of its voter registration efforts, Hispanic Federation uses the TurboVote portal, which, like Rock the Vote, is a user-friendly interface with the Federal Form. SUMF ¶¶ 52–53. And NAACP uses a similar portal with a user-friendly interface with the Federal Form, Vote.org, as well as physical copies of the Federal Form during in-person voter registration. SUMF ¶¶ 54–56. However, none of these portals is designed to collect copies of documents showing proof of citizenship, as the Executive Order requires. SUMF ¶ 57. As a result, "if the Federal Form is changed to require documentary proof of citizenship, APIAVote's Asian language voter registration portal will be immediately defunct," SUMF ¶ 58, undermining Plaintiffs' missions and efforts to help Asian American and Pacific Islander communities register to vote. This change would similarly harm NAACP and Hispanic Federation as it would disrupt, if not eliminate, Rock the Vote and Vote.org. SUMF ¶¶ 59–60.

The impact of implementing Section 2(a) would be particularly acute for Plaintiffs who operate in Arizona. There, State law prohibits voters from registering to vote in State and local

elections absent documentary proof of citizenship (as defined under State law), *see* Ariz. Rev. Stat. § 16-166, but individuals who lack documentary proof of citizenship can still register as "federal-only" voters using the Federal Form and cast a ballot that includes only federal elections, *see ITCA*, 570 U.S. at 20. For any Arizonans who lack the requisite documentation, the Executive Order would prevent them from registering as federal-only voters and, as a result, from voting in federal elections. SUMF ¶ 123*; see also* SUMF ¶¶ 118, 122, 124. New voters (or new-to-Arizona voters) without the required documents could not register; nor could current voters who lack the relevant papers but need to update their registration after moving to a new county in Arizona. *See* Ariz. Rev. Stat. § 16-166(G), (H) (requiring individuals who move counties to update their registration and provide documentary proof of citizenship when doing so).

Organizations that routinely register voters in Arizona, such as Plaintiffs LWVAZ and LULAC, encourage voters who have access to documentary proof of citizenship to provide it when registering so that they can vote in State and local elections, not just federal ones. SUMF ¶ 125. ASA uses the Federal Form when registering student voters in Arizona who lack documentary proof of citizenship. SUMF ¶ 120. Of the 3,500 students registered at a recent ASA voter registration drive, "about half" used the Federal Form. SUMF ¶ 121.

In LWVAZ's and LULAC's experience, these voters typically provide proof of citizenship when they have access to it. SUMF ¶ 126. Often, Arizona voters will provide an identification number rather than documentation itself. SUMF ¶ 130.[11] Even so, as of January 2, 2025, there were more than 48,000 federal-only voters in Arizona, at least 40,000 of whom did not provide

---

[11] Arizona's documentary proof-of-citizenship process is less restrictive than what the Executive Order seeks to mandate. In addition to accepting copies of documents similar to those identified in the Executive Order, Arizona law alternatively allows potential voters to provide identification numbers from any of the following documents on their State form: Arizona driver's license or nonoperating license issued after October 1, 1996, Alien Registration Number, Naturalization Certificate Number, Citizenship Certificate Number, Indian Census Number, Bureau of Indian Affairs Number, Tribal Treaty Card Number, or Tribal Enrollment Number. *See* SUMF ¶ 127. Arizona election officials then use the voter's identification number to verify citizenship status. *See* SUMF ¶ 128. As a result, the majority of Arizonans that meet the documentary proof-of-citizenship requirement do so by providing an identification number without having to track down and photocopy actual documents. *See* SUMF ¶ 129.

documentary proof of citizenship when they registered. SUMF ¶ 131. And an additional 200,000 voters did not provide proof of citizenship when they registered to vote but were classified as full voters and may soon be reclassified as federal-only voters. SUMF ¶¶ 132–35.

But Plaintiffs would be unable to use the Federal Form to register eligible Arizona residents who lack documentary proof of citizenship and these eligible Arizona residents would have no method to register to vote or update their registration. These changes to the Federal Form, therefore, would thwart one of the core missions of the Plaintiff organizations operating in Arizona—to help ensure that every eligible U.S. citizen in Arizona is registered to vote and can participate in elections. SUMF ¶ 119. Indeed, ASA has members in Arizona who are eligible to vote but would have difficulty complying with Section 2(a)'s documentary-proof-of-citizenship requirement because they do not have a passport, their birth certificate is inaccessible or unavailable, and they lack other qualifying documentation. SUMF ¶ 136.

In addition to the direct and irreparable harms that implementation of Section 2(a) would inflict on Plaintiffs' core mission and activities, Plaintiffs have already been, and would continue to be, required to divert significant resources to address the mandated changes to the Federal Form. Plaintiffs have already diverted, and are planning to divert additional resources from existing projects because of the Executive Order's documentary proof-of-citizenship requirement, which would force them to expend considerable resources to, at a minimum: conduct a comprehensive evaluation of what changes the organizations need to implement in voter registration efforts across the country, educate their members and the public on how to comply with such a requirement, and assist the individuals they register to ensure compliance with the Executive Order. SUMF ¶ 87.

For example, in response to the Executive Order, Plaintiffs have expended, and will continue to expend, resources toward educating their members and the public about the changes in documentary proof-of-citizenship requirements, including by updating their many existing voter registration resources. SUMF ¶¶ 88–110. The League would have to overhaul educational materials that it hosts on VOTE411.org—a crucial resource on which thousands of voters rely for trusted bilingual information about registration requirements, registration status checks, and to

register to vote—to avoid the harm caused by providing incorrect or incomplete information. SUMF ¶¶ 50, 89. Likewise, to revive its Asian language voter registration portal, APIAVote would be forced to commit resources to substantially change that portal, both "to instruct registrants to provide documentary proof of citizenship" and "create guides in multiple Asian languages about how to register to vote using State voter registration processes so that it can provide information useful to all AAPI voters, even those without documentary proof of citizenship." SUMF ¶ 90. Doing so "will be a burdensome task that will divert resources away from . . . APIAVote's other core activities," including its advocacy efforts to provide "in-language materials to local election officials." SUMF ¶ 91. Until APIAVote's portal is restored, other organizations that rely on that portal, including OCA, would similarly have to pull resources from their regular, core activities toward developing a new method of registration to replace or supplement APIAVote's portal. SUMF ¶ 92. The League and LULAC would likewise have to overhaul their online voter registration resources, which currently rely on Rock the Vote and its use of the Federal Form. SUMF ¶ 93. Hispanic Federation and NAACP would also have to reevaluate their usage of voter registration portals that rely on the Federal Form. SUMF ¶ 94.

Similarly, SFI has already been forced to overhaul its training and educational resources in response to Section 2(a)'s documentary proof-of-citizenship requirement. SUMF ¶ 95. For example, SFI has not traditionally focused on the distinction between State voter registration forms and the Federal Form in assisting its members who register to vote outside of the Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA") process. SUMF ¶ 97. SFI has begun to revise its "Voting Ambassadors" toolkit in response to the Executive Order, and implementation of Section 2(a) would continue to force SFI to develop specific expertise in advising its members on registration using State voter registration options and develop more detailed training and educational materials for its members registering outside of UOCAVA. SUMF ¶¶ 95, 98.

To update these and similar resources, Plaintiffs would need to divert resources from other core activities. For example, LWVAZ is a member- and volunteer-run organization with a small number of interns and consultants who are paid hourly, and LWVAZ has financial resources to

pay them for only a limited number of hours—meaning time spent by volunteers and paid staff updating training and public information materials is time diverted from LWVAZ's other core work, such as registering voters, preparing information about candidates in upcoming elections, and helping with candidate forums. SUMF ¶¶ 99–101; *see also id.* ¶¶ 102–03 (similar with LULAC's Arizona Council). Indeed, some Plaintiffs have already begun to "expend[] significant staff time and resources" to counteract Section 2(a), including by diverting resources away from their regular activities to provide ongoing guidance to staff, canvassers, community partners, members, volunteers, and the public on how Section 2(a) would affect voter registration efforts throughout the country. SUMF ¶¶ 104–06.

This resource drain, too, is particularly harsh in Arizona. For example, many of LWVAZ's member volunteers were recently trained to conduct voter registration events, including in several trainings in the fall of 2024 after the U.S. Supreme Court issued a stay changing some of the voter registration practices in Arizona. SUMF ¶ 107. But if there are additional and significant changes to the Federal Form's requirements, such as the need to require documentary proof of citizenship, LWVAZ members and volunteers would need to be retrained before conducting any voter registration events. SUMF ¶ 108. LWVAZ would not be able to conduct as many voter registration events because it would have to spend time conducting additional trainings instead of registering voters. SUMF ¶ 109. Similarly, ASA has diverted time and resources away from its voter registration activities and from planning its annual Grassroots Organizing Weekend and Student Voting Summit to focus on retraining staff and volunteers for fall voter registration and "determining how to change [its] operations in response" to the Executive Order. SUMF ¶ 110.

Further, the Executive Order has already and will continue to cause confusion for volunteers and voters (including Plaintiffs' members), harming Plaintiffs' core missions twice over. *First*, uncertainty regarding the Executive Order's implementation has already sewn misunderstanding and trepidation among volunteers and members of Plaintiff organizations. SUMF ¶ 111. Volunteers of Plaintiff organizations are understandably concerned about the specter of collecting copies of sensitive documents that prove voters' citizenship. SUMF ¶ 112. The fear

17

and uncertainty regarding the Executive Order also harms Plaintiffs' recruitment and retention of volunteers, and in turn, their core mission of registering voters. SUMF ¶ 113.

*Second*, voter confusion caused by implementation of the Executive Order would make it more difficult for Plaintiffs to register voters, including their own members. SUMF ¶ 114. Some individuals who possess documentary proof of citizenship are unlikely to register to vote using a modified Federal Form because of concern with providing copies of their documentary proof of citizenship and uncertainty regarding how those copies would be secured. SUMF ¶¶ 39, 71, 73. To address this chilling effect, Plaintiffs would be forced to expend additional resources encouraging voter registration. SUMF ¶ 115. To dispel voter confusion, Plaintiffs have already begun reformulating voter education materials; this demand will only multiply if the Executive Order takes effect. SUMF ¶¶ 87–89, 95–96, 104. And staff and volunteers at Plaintiff organizations have already devoted time to preparing for the Executive Order and educating leaders of local organizations and advocates for impacted communities about its likely effect. SUMF ¶ 116.

## III.    Procedural History

Within one week of its signing, the League and LULAC Plaintiffs challenged various provisions of the Executive Order. *See* Compl., *LULAC*, No. 1:25-cv-00946 (D.D.C. Mar. 31, 2025), ECF No. 1; Compl., *League of Women Voters Educ. Fund v. Trump*, No. 1:25-cv-00955 (D.D.C. Apr. 1, 2025). The LULAC Plaintiffs challenged Sections 2(a), 3(d), 4(a), and 7 of the Executive Order, while the League Plaintiffs challenged Section 2(a). The Democratic Party Plaintiffs also filed a lawsuit challenging Sections 2(a), 2(b)(iii), 2(d), 4(a), 4(b), 4(c), 7(a), and 7(b). Compl., *Democratic Nat'l Comm. v. Trump*, No. 1:25-cv-00952 (D.D.C. Mar. 31, 2025).[12] The Court consolidated the League, LULAC, and Democratic Party Plaintiffs' complaints. Mem. Op. & Order, ECF No. 12. Given their distinct interests as nonpartisan organizations, the Court

---

[12] The Democratic National Committee, Democratic Governors Association, Democratic Senatorial Campaign Committee, Democratic Congressional Campaign Committee, U.S. Senate Minority Leader Charles E. Schumer, and U.S. House of Representatives Minority Leader Hakeem S. Jefferies are referred to collectively as "Democratic Party Plaintiffs."

permitted the League and LULAC Plaintiffs (collectively, the "Nonpartisan Plaintiffs") to brief issues separately from the Democratic Party Plaintiffs. *See* Order, ECF No. 31.

On April 7, Plaintiffs moved to preliminarily enjoin Section 2(a) of the Executive Order. *See* Nonpartisan Pls.' Mot., ECF No. 34. The Democratic Party Plaintiffs moved for a preliminary injunction of Sections 2(a), 2(b), 2(d), and 7. *See* Democratic Party Pls.' Mot., ECF No. 53. Defendants filed their opposition to both motions on April 14. Defs.' Resp. in Opp'n to Democratic Party Pls.' Mot., ECF No. 84; Defs.' Resp. in Opp'n to Nonpartisan Pls.' Mot., ECF No. 85.

On April 21, this Court granted Plaintiffs' motions for preliminary injunction of Sections 2(a) and 2(d) of the Executive Order. *See LULAC*, 2025 WL 1187730, at *62.[13] With respect to Section 2(a) specifically, the Court held that Plaintiffs had a substantial likelihood of standing and that their claims were ripe because the challenged provision "leaves no uncertainty about what it requires from the EAC." *Id.* at *28; *see id.* at *26–35. On the merits, the Court held that Plaintiffs were likely to succeed because "the President lacks the authority to direct the EAC to make specific, predetermined changes to the Federal Form." *Id.* at *40. Defendants declined to appeal. *See* Order, ECF No. 122.

After the Court issued its preliminary injunction, the Republican National Committee ("RNC") moved to intervene as a defendant. RNC Mot. to Intervene, ECF No. 125. The Court granted the motion in part, allowing the RNC to intervene against Plaintiffs' claims regarding Sections 2(a), 2(b), 2(d), 3(a), and 7(a), but cabining its involvement to those claims. Mem. Op. & Order, ECF No. 135.

On June 20, this Court issued a scheduling order providing for summary judgment briefing on Plaintiffs' Section 2(a) claims without discovery and separate briefing and discovery on all other claims. Scheduling Order, ECF No. 141. The Court recognized that "[a]ll parties agree that

---

[13] The Court also denied the Democratic Party Plaintiffs' preliminary injunction motion as to Sections 2(b), 7(a), and 7(b). *LULAC*, 2025 WL 1187730, at *62. But in a lawsuit brought by a collection of states, another district court granted a preliminary injunction against Sections 7(a) and 7(b), in addition to Sections 2(a) and 2(d). *See California v. Trump*, No. 25-cv-10810, 2025 WL 1667949, at *21–22 (D. Mass. Jun. 13, 2025).

Plaintiffs' challenges to Section 2(a) of Executive Order 14,248 can be resolved without discovery on cross-motions for summary judgment." *Id.* ¶ 3.

## ARGUMENT

Plaintiffs are entitled to summary judgment on their claim that Section 2(a) violates the Elections Clause and the constitutional separation of powers and is therefore *ultra vires*.[14] A court should grant summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Ali v. Regan*, 111 F.4th 1264, 1273 (D.C. Cir. 2024) (quoting Fed. R. Civ. P. 56(a)). Here, Defendants concede that Plaintiffs' claims "present pure legal issues" that "can and should be decided without discovery." Joint Civil Rule 16.3 Report to the Ct., ECF No. 137, at 11. The Court has likewise recognized that Plaintiffs' Section 2(a) claim does not "require further factual development." *LULAC*, 2025 WL 1187730, at *28. Summary judgment is therefore appropriate to consider whether Section 2(a) violates the Elections Clause and the constitutional separation of powers.

I.    **Section 2(a) Violates the Elections Clause and the Constitutional Separation of Powers.**

This Court correctly held that Plaintiffs' separation-of-powers claim is "substantially likely to succeed on the merits." *LULAC*, 2025 WL 1187730, at *35. That remains true. For substantially the same reasons, the Court should grant summary judgment on that claim.

A.    **Plaintiffs Have an Equitable Cause of Action to Enjoin Unconstitutional Action by Federal Officers.**

This Court properly held that Plaintiffs have an equitable cause of action to enjoin the implementation of Section 2(a) of the Executive Order. *Id.* at *16–17. The Supreme Court has recognized that plaintiffs have the "ability to sue to enjoin unconstitutional actions by state and federal officers." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015). Such claims "reflect[] a long history of judicial review of illegal executive action, tracing back to England." *Id.* Plaintiffs thus have an equitable cause of action to "enforce separation-of-powers principles" in

---

[14] The League Plaintiffs challenge only Section 2(a) and therefore respectfully request that the Court enter final judgment in their favor.

federal court. *Boumediene v. Bush*, 553 U.S. 723, 743 (2008); *see Free Enter. Fund v. Public Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010) ("[I]t is established practice for this Court to sustain the jurisdiction of federal courts to issue injunctions to protect rights safeguarded by the Constitution.") (quoting *Bell v. Hood*, 327 U.S. 678, 684 (1946)); *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1327 (D.C. Cir. 1996) (plaintiffs are "entitled to bring a non-statutory cause of action questioning the legality of [an] Executive Order").[15]

**B.  The President Has No Power to Command Changes to the Federal Form.**

The President's power "to issue the [Executive O]rder must stem either from an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952). As this Court explained, "[n]either the Constitution nor any statute explicitly grants the President the power to dictate the contents of the Federal Form." *LULAC*, 2025 WL 1187730, at *36. "On the contrary, both the Constitution's Elections Clause and the NVRA vest control over federal election regulation in other actors, leaving no role for the President." *Id.* Section 2(a) therefore violates the constitutional separation of powers.

**1.  Under the Constitution, the President Has No Power to Regulate Federal Elections.**

The Elections Clause vests Congress and the States—not the President—with authority to set rules for congressional elections. It provides that the "Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof." U.S. Const. art. I, § 4. The Electors Clause likewise empowers Congress and the States to regulate presidential elections. U.S. Const. art. II, § 1; *Burroughs v. United States*, 290 U.S. 534, 544–45 (1934). The Supreme Court has long recognized that Congress's powers under these

---

[15] The LULAC Plaintiffs do not seek summary judgment on their separate APA claims in this motion. The fact that Plaintiffs could bring separate APA claims to challenge the EAC's final agency action if it implements the President's unlawful order does not foreclose their equitable claims, which the Court has already held are ripe and likely meritorious. It is black letter law that the APA "does not repeal" the existence of an equitable cause of action. *Reich*, 74 F.3d at 1328. When the President issues an unconstitutional executive order, "courts are normally available to reestablish the limits on his authority." *Id.* at 1328 (quoting *Dart v. United States*, 848 F.2d 217, 224 (D.C. Cir. 1988)). That is especially true here where the challenged Executive Order itself—regardless of the manner in which it is implemented—violates the law.

Clauses are exceedingly broad, "embrac[ing] authority to provide a complete code for congressional elections,' including, as relevant here . . . regulations relating to 'registration.'" *ITCA*, 570 U.S. at 8–9 (quoting *Smiley v. Holm*, 285 U.S. 355, 366 (1932)).

Crucially, "[t]he Constitution vests none of these powers in the President." *LULAC*, 2025 WL 1187730, at *36. While the Framers debated who should regulate elections, weighing the balance of power between Congress and the States, mention of the President was "conspicuous[ly] absen[t]." *Id.* at *5. Indeed, the notion that the Executive would have power to regulate federal elections "does not appear to have crossed the Framers' minds." *Id.* (citing The Federalist No. 59 (Alexander Hamilton)); *see also* Debate in Massachusetts Ratifying Convention, in 2 *The Founders' Constitution* 255 (P. Kurland & R. Lerner eds., 1987) ("I know of but two bodies wherein [the power to regulate federal elections] can be lodged—the legislatures of the several states, and the general Congress." (statement of Caleb Strong)). "Congress, not the President, has the ultimate constitutional authority over elections." *California*, 2025 WL 1667949, at *8.

In fact, "[t]here is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes." *Clinton v. City of New York*, 524 U.S. 417, 438 (1998). Instead, the President's role is to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3. And "the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker." *Youngstown*, 343 U.S. at 587. Lawmaking is Congress's role.

## 2. Congress Has Jealously Guarded its Elections Clause Power and Shielded Federal Election Regulation from Partisan Interference.

Not only did Congress refrain from delegating authority to the President to regulate the Federal Form, but it specifically insulated the Federal Form from partisan interference from both state and federal actors. Congress enacted the NVRA to "increase the number of eligible citizens who register to vote in elections for Federal office." 52 U.S.C. § 20501(b)(1). One way it did that was by requiring States to "accept and use" the Federal Form to register voters for federal elections. *Id.* § 20505(a)(1). To ensure that the form worked to increase voter registrations, Congress limited the information requested on the form to what is "necessary" to assess voter eligibility, *id.*

§ 20508(b)(1), and tasked a bipartisan multimember agency to "prescribe such regulations as are necessary" to "develop" the form "in consultation with" the States' "chief election officers," *id.* § 20508(a)(1)–(2).

Congress was careful to ensure that the maintenance of the Federal Form would be insulated from partisan control. It first assigned that task to the FEC and then to the EAC, which was created as a bipartisan, "independent entity." 52 U.S.C. § 20921; *see supra* Background Section II.B. Congress did not provide the President in either the NVRA or HAVA any say whatsoever over the Federal Form. The President thus "has no express statutory authority to alter the content of the Federal Form." *LULAC*, 2025 WL 1187730, at *37.

Because a "clear grant of authority" to the President is "absen[t]," "the scope of his power to order alterations to the Federal Form depends on the scope of the powers vested in Congress and the extent to which Congress has implicitly delegated or withheld those powers." *Id.* (citing *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 10 (2015)). Where, as here, "'the President takes measures incompatible with the expressed or implied will of Congress,'" his "power is 'at its lowest ebb,' and his actions 'must be scrutinized with caution, for what is at stake is the equilibrium established by our constitutional system.'" *Id.* (quoting *Youngstown*, 343 U.S. at 638 (Jackson, J., concurring)).

The President's directed changes to the Federal Form would upend that equilibrium. His unilateral mandate to add a documentary proof-of-citizenship requirement to the Federal Form is contrary to Congress's manifest will, as expressed in the text, structure, and context of the NVRA and HAVA. These all confirm that Congress has jealously guarded its Elections Clause authority, delegating power to regulate the Federal Form only "to a bipartisan panel of experts, accompanied by a requirement for consultation with the States," who may change the form only through consensus. *LULAC*, 2025 WL 1187730, at *37. The NVRA and HAVA, "which passed with bipartisan support in two different sessions of Congress nearly a decade apart . . . implicitly forbid[] any individual member of the Executive Branch from unilaterally exercising the delegated power

to regulate State voter registration programs." *Id*. Thus, the President's very act of unilaterally ordering changes to the Federal Form is incompatible with Congress's will.

Indeed, "Congress considered and rejected a proposal that would have allowed States to impose exactly the kind of documentary proof-of-citizenship requirement that the President's Executive Order now directs the EAC to adopt." *Id.* During debates over the NVRA, Congress "conclud[ed] that such a requirement was 'not necessary or consistent with the purposes of [the] Act.'" *Id.* (quoting H.R. Rep. No. 103-66, at 23 (1993) (Conf. Rep.)). The rejected amendment was less burdensome than Section 2(a) of the Executive Order: Whereas the rejected amendment would have *allowed* States to require documentary proof of citizenship, Section 2(a) *mandates* that they do so. *See id.* If Congress rejected the former as inconsistent with the purpose of the NVRA, it would surely reject the latter as well. *See, e.g.*, *Fourth Est. Pub. Benefit Corp. v. Wall-Street.com, LLC*, 586 U.S. 296, 307 (2019) (relying on the fact that Congress considered and "rejected proposals that would have eliminated [copyright] registration" in interpreting a statute).

Instead, Congress determined that the Federal Form should specify the eligibility requirements, "including citizenship," and require voters to sign an attestation that they meet those requirements "under penalty of perjury." 52 U.S.C. § 20508(b)(2). Congress also made clear that the Federal Form may require additional "identifying information," but *only if* that information "is necessary to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process." *Id.* § 20508(b)(1). It further prohibited "any requirement for notarization or other formal authentication" to appear on the form. *Id.* § 20508(b)(3). And it mandated that any change to the form occur through notice-and-comment rulemaking under the APA, *id.* § 20929, satisfy the requirements of the PRA, 44 U.S.C. § 3501 *et seq.*, and, as noted, receive support from a bipartisan majority of commissioners. Clearly, then, Congress did not explicitly or implicitly delegate power to the President to modify the Federal Form by adding a documentary proof-of-citizenship requirement.

A contrary interpretation of the statutes would, among other things, read an unprecedented amount of presidential authority into a statute that does not even mention the Executive and run

afoul of the major-questions doctrine. *See LULAC*, 2025 WL 1187730, at *37–38. Given that Section 2(a) would effect a sea change in the conduct of federal elections, "[t]he Court must identify a 'clear congressional authorization' for the claimed power." *Id.* at *38 (quoting *West Virginia v. EPA*, 597 U.S. 607, 732 (2022)). Because there is not "any clear statement of presidential power over the Federal Form," this Court should decline to "find an 'elephant[] in [a] mousehole[].'" *Id.* (quoting *Witman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 468 (2001) (alteration in quotation)).

### 3. The President Has No Inherent Authority to Command Unilateral Changes to the Federal Form.

Unable to muster constitutional or statutory authority in their favor, Defendants have suggested that the President has inherent authority to order changes to the Federal Form—regardless of how explicitly Congress insulates it from partisan control. *See, e.g.*, 52 U.S.C. §§ 20921, 20923(a)(1), (b)(2) (creating the EAC as an "independent entity" with bipartisan membership who serve staggered terms); *id.* § 20928(b)(2) (requiring bipartisan consensus for the EAC to take "[a]ny action"). To be sure, the President can nominate EAC commissioners, U.S. Const. art. II, § 2, cl. 2; 52 U.S.C. § 20923 (a)(1); recommend that the EAC consider taking certain measures, U.S. Const. art. II, § 2; *see LULAC*, 2025 WL 1187730, at *40; and take care that the congressionally enacted laws that the EAC superintends are faithfully executed, U.S. Const. art. II, § 3. But Defendants' more expansive argument—that the President can modify the Federal Form as he pleases, even though Congress requires changes to be approved by a bipartisan majority of commissioners through APA and PRA processes—is "untethered from precedent and unsupported by even a maximalist view of 'the executive Power' under our Constitution." *LULAC*, 2025 WL 1187730, at *39.

*First*, the fact that "the President lacks the authority to direct the EAC to make specific, predetermined changes to the Federal Form is consistent with the proper limits on his supervisory authority and presents no impediment to 'the President's ability to perform his constitutional duty.'" *Id.* at *40 (quoting *Morrison v. Olson*, 487 U.S. 654, 691 (1988)). That is because, as

discussed, "the President has no constitutional duty to prescribe the content of election regulations." *Id.* The Elections Clause instead assigns that task to Congress and the States, to the exclusion of the President. U.S. Const. art. I, § 4. Therefore, "any restriction on the President's ability to set the content of election regulation does not impair his ability to 'take Care that the Laws be faithfully executed.'" *Id.* (quoting U.S. Const. art. II, § 3); *see also California*, 2025 WL 1667949, at *8.

*Second*, the Executive Order elsewhere recognizes that Congress has enacted criminal statutes that empower the Executive to take enforcement action against noncitizens who vote or register to vote in federal elections in violation of State law. *See LULAC*, 2025 WL 1187730, at *40 (citing Exec. Order § 2(e)). Where Congress has enacted criminal statutes to address a problem, the Executive may set enforcement priorities. But enforcement authority is not lawmaking authority. Under "the framework of our Constitution," the President's role in lawmaking is limited to "the recommending of laws he thinks wise and the vetoing of laws he thinks bad." *Youngstown*, 343 U.S. at 587. The President's duty to "see that the laws are faithfully executed refutes the idea that he is to be a lawmaker," and "he therefore has no constitutional duty to set regulations unless instructed to do so by Congress." *Id.*

*Third*, regardless of whether the President can remove EAC commissioners, he "lacks the authority to direct the outcome of the rulemaking process that Congress has assigned to the EAC." *LULAC*, 2025 WL 1187730, at *41. "The Constitution provides Congress with abundant means to oversee and control its administrative creatures," including the authority to specify the procedures an agency must follow before acting. *See INS v. Chadha*, 462 U.S. 919, 955 n.19 (1983); *see also Myers v. United States*, 272 U.S. 52, 128 (1926) ("The Legislature creates the office [and] defines the powers." (quoting 1 *Annals of Congress* 581, 582 (1789) (Statement of Rep. James Madison))). And courts have long recognized Congress's ability to impose specific duties on executive officials that "grow out of and are subject to the control of the law, and not to the direction of the President." *Kendall v. United States ex rel. Stokes*, 37 U.S. (12 Pet.) 524, 610 (1838); *see also Am. Fed. of Gov. Emp., AFL-CIO v. Carmen*, 669 F.2d 815, 823 (D.C. Cir. 1981) (Ginsburg, R.B., J.)

26

(suggesting that the President may not "overrule or revise" an officer's interpretation of statutory duty when that duty is "peculiarly and specifically committed to the discretion of a particular officer" (quoting *Myers*, 272 U.S. at 135)); *Main Street Legal Servs., Inc. v. Nat'l Sec. Council*, 811 F.3d 542, 558 (2d Cir. 2016) (explaining that when Congress "grants . . . authority to executive departments or agencies," the President "can usually fire a recalcitrant agency head" but "cannot take away the agency's statutory authority or exercise it himself").

These congressional powers are well-established and consistent with even maximalist views of presidential power. Indeed, from the founding to the modern era, lawyers working in the Executive Branch have recognized this very point. *See LULAC*, 2025 WL 1187730, at *41. During the Monroe Administration, the Attorney General advised the President that "[w]ere the President to perform [a statutory duty assigned to another], he would not only be not taking care that the laws were faithfully executed, but he would be violating them himself." *See* The President and Accounting Officers, 1 Op. Att'y Gen. 624, 625 (1823). Likewise, during the Reagan Administration, the Office of Legal Counsel ("OLC") approved an executive order that required agencies to submit certain proposed rules to the OMB for review, but made clear that the President lacked power to "divest the [agency] of ultimate statutory authority" or to "reject an agency's ultimate judgment delegated to it by law." Proposed Executive Order Entitled "Federal Regulation," 5 Op. O.L.C. 59, 62 (1981). And, in the First Trump Administration, OLC concluded that an executive order requiring agencies to submit rules for OMB review was valid in part because the order did not allow OMB "to veto a proposed action" or "reject an agency's ultimate judgment," and so "the authority to make the ultimate decision rests where Congress has placed it—in the relevant agency." Extending Regulatory Review Under Executive Order 12866 to Independent Agencies, 43 Op. O.L.C. 232, 243 (2019) (internal quotation marks omitted).

Here, Section 2(a) contravenes the rules that Congress has imposed on the EAC's processes. As noted, Congress put in place procedures to insulate the Federal Form from partisan control, including by assigning responsibility for its maintenance to a bipartisan, multimember commission. To that end, as the D.C. Circuit has held, the EAC cannot change the Federal Form

unless the agency itself makes a finding that the change is necessary to assess voter eligibility. *See Newby*, 838 F.3d at 9–10. Yet, at the hearing on Plaintiffs' preliminary injunction motion, Defendants' counsel agreed that "the end result will be that [Section] 2(a) will be adopted by EAC even if EAC decides . . . that they do not think it's needed [and] *they wouldn't put it in except for the president's order*." PI Tr. at 73:22–74:3 (emphasis added). Moreover, like all agencies, the EAC must comply with the procedural requirements of the APA and PRA; but Section 2(a) has predetermined the result of those procedures, making a mockery of Congress's intent. "[I]t has been decided by the executive order," Defendants' counsel stated on behalf of both the President *and* EAC, that it will be required for registrants "to provide the [documentary proof of citizenship]"—full stop. PI Tr. at 70:7–10.

If Congress wanted the President to control the EAC's regulation of the Federal Form, it knew how to say so. In other statutes delegating power to agencies, Congress has explicitly carved out such a role for the President. *See, e.g.*, 7 U.S.C. § 610(c) ("The Secretary of Agriculture is authorized, *with the approval of the President*, to make such regulations with the force and effect of law as may be necessary to carry out the powers vested in him by this chapter." (emphasis added)); 16 U.S.C. § 459r (granting the Secretary of the Interior, "with the approval of the President," the authority to convey recreational lands); 1 U.S.C. § 112b(e) ("[T]o promote achievement of full employment under this chapter and the Employment Act of 1946, *the President, through the Secretary of Labor*, shall develop policies and procedures and, as necessary, recommend programs for providing employment . . . ." (emphasis added)). Here, though, the NVRA and HAVA establish that Congress had precisely the opposite intent: Congress designed the EAC as an "independent entity," required a bipartisan consensus before the agency could act, and declined to carve out any role for the President. 52 U.S.C. § 20921. Article II does not authorize the President to disregard these statutory commands.

For these reasons, the Supreme Court's order in *Trump v. Wilcox*, 145 S. Ct. 1415 (2025), has no bearing on the analysis. There, relying on *Seila Law*, the Court granted interim relief allowing the President to remove executive officers of multimember agencies that appeared to

"exercise considerable executive power." *Id.* at 1415 (citing *Seila Law LLC v. CFPB*, 591 U.S. 197 (2020)). But the EAC does not wield considerable executive power, *see LULAC*, 2025 WL 1187730, at *40 n.48, and the D.C. Circuit has specifically recognized the agency previously tasked with maintaining the Federal Form—the FEC—as a "classic independent regulatory agency." *FEC v. NRA Political Victory Fund*, 6 F.3d 821, 826 (D.C. Cir. 1993). In any event, the President would not be authorized to direct the outcome of the EAC's rulemaking process *regardless of* the EAC's independent status. The authority to remove officers is not tantamount to authority to force them to disregard the law and reach a predetermined outcome. As discussed, history and precedent make clear that the President may do no such thing.

Finally, even if the scope of the President's Article II supervisory powers were so limitless as to allow the President to usurp the discretion that Congress vested in the EAC, the proper resolution here would not be to uphold Section 2(a) of the Executive Order, but to limit the contents of the Federal Form to what Congress has explicitly sanctioned. *See LULAC*, 2025 WL 1187730, at *41. That is because "[t]he text, structure, and context of the NVRA and HAVA show that Congress would not have delegated its Elections Clause authority to regulate the content of the Federal Form to the EAC if that authority could be exercised unilaterally by the President." *Id.* Congress was careful to delegate power over the Federal Form "to bipartisan, independent panels." *Id.* "If the President, acting alone, could dictate the content of the Federal Form, Congress's careful structural choices would be for naught." *Id.* There is thus no resolution of this case which can, consistent with the text, purpose, and structure of the NVRA and HAVA, allow the President to unilaterally set election rules.

## II.    Plaintiffs' Claims are Ripe and Fully Justiciable.

### A.  Plaintiffs' Claims Are Ripe.

There are no prudential concerns that weigh against this Court making a final determination as to Section 2(a)'s legality. The legal dispute as to whether the President lacks the authority to issue Section 2(a) is ripe for decision.

As both this Court and the Supreme Court have previously explained, the purpose of the prudential ripeness doctrine:

> is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.

*LULAC*, 2025 WL 1187730, at *17–18 (quoting *Abbott Laby's v. Gardner*, 387 U.S. 136, 148–49 (1967)). The two-part test for assessing prudential ripeness asks (1) whether further factual development is necessary because the challenged agency action is either tentative or still unfolding, and (2) whether delayed review would cause hardship to the plaintiffs. *Id.* at *18 (citing *Am. Petrol. Inst. v. EPA*, 683 F.3d 382, 390 (D.C. Cir. 2012)). Both prongs definitively weigh in favor of full adjudication now.

Everyone agrees further factual development is unnecessary. The Executive Order sets out a clear, final, and binding mandate, stating that "By the authority vested in me as President . . . it is hereby ordered [that] . . . the Election Assistance Commission shall take appropriate action to require . . . documentary proof of citizenship" on the Federal Form. Exec. Order § 2(a)(i)(A); *see also* SUMF ¶ 2. Section 2(a) further dictates both when the EAC was to act (within 30 days), as well as the exact forms of documentary proof that are to be required. Exec. Order § 2(a)(i)–(ii); *see also* SUMF ¶¶ 2–4. As this Court previously explained, "there is no mystery about what Section 2(a) purports to require or whether Section 2(a) purports to require it." *LULAC*, 2025 WL 1187730, at *27. Indeed, Defendants have essentially conceded that there are no factual disputes to be resolved before final adjudication, asserting that "in the context of . . . constitutional separation of powers claims, there are no questions of fact, because whether or not a statute or the Constitution grants [the Executive Branch] the power to act in a certain way is a pure question of law." Defs.' Opp'n, ECF No. 84, at 23 (quoting *Ctr. for Biological Diversity v. McAleenan*, 404 F. Supp. 3d 218, 233 (D.D.C. 2019)) (alteration in original).

That the Executive Order contains a boilerplate savings clause, stating that the EAC should take "appropriate action" "consistent with applicable law," cannot salvage Section 2(a), nor does

it weigh against final adjudication now. Exec. Order § 2(a). As this Court recognized, "if an executive order unambiguously 'command[s] . . . action that a saving[] clause purports to negate,' a reviewing court must ignore the saving clause and read the order's operative provision to mean what it says.'" *LULAC*, 2025 WL 1187730, at *19–20 (quoting *Common Cause v. Trump*, 506 F. Supp. 3d 39, 53 n.8 (D.D.C. 2020) (three-judge panel)); *see also id.* at *20 n.27 (collecting cases).

That is precisely the case here. "[T]he Executive Order's saving clause cannot resolve any uncertainty about future agency action in Defendants' favor because there is no uncertainty about what the EAC has been ordered to do." *LULAC*, 2025 WL 1187730, at *28. Section 2(a) states "in no uncertain terms" that "the EAC take action to require documentary proof of citizenship on the Federal Form," imposes a strict timeline by which that action must occur, and, by specifying the acceptable, required documentary proof of citizenship, "dictates the precise contours of the mandated requirement." *Id.* at *27.

What is more, "Defendants affirmed that the Executive Order means what it says: The EAC *must* add a documentary-proof-of-citizenship requirement to the Federal Form, regardless of the feedback it receives from the States or other participants in the notice-and-comment process or of its own conclusions about whether such proof is 'necessary' to allow States to assess voter qualifications." *LULAC*, 2025 WL 1187730, at *40 (citing PI Tr. at 71:13–18, 72:17–73:9, 73:13–74:17). And, "[c]ritically, Defendants did not argue that the Executive Order's use of the phrases 'appropriate action' and 'consistent with applicable law' leave the EAC with discretion to add a documentary-proof-of-citizenship requirement to the Federal Form only if it concludes that doing so is necessary and consistent with the NVRA." *Id.*[16]

The second prong of the prudential ripeness inquiry is whether the Plaintiffs would be injured if the Court were to withhold review and allow Section 2(a) to take effect. *LULAC*, 2025 WL 1187730, at *18. As discussed further below, *see infra* Argument Section II.B., Plaintiffs have been and will continue to be injured by Section 2(a) until it is permanently enjoined.

---

[16] As the Massachusetts district court held, Defendants are judicially estopped from walking back that admission now. *See California*, 2025 WL 1667949, at *8.

**B. Plaintiffs Have Standing.**

To demonstrate standing, plaintiffs "must show (1) an 'injury in fact,' (2) a sufficient 'causal connection between the injury and the conduct complained of,' and (3) a 'likel[ihood]' that the injury 'will be redressed by a favorable decision.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157–58 (2014) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). Plaintiffs make these showings.

First, Plaintiffs have demonstrated injury as a result of Section 2(a). An injury in fact must be "(a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1427 (D.C. Cir. 1996) (quoting *Lujan*, 504 U.S. at 560). Here, Plaintiffs are harmed in their own right and also have members who are harmed.

To start, Plaintiffs have suffered organizational injuries that give rise to Article III standing.[17] "To have standing 'in its own right,' an organization must make 'the same showing required of individuals: an actual or threatened injury in fact that is fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by a favorable court decision.'" *LULAC*, 2025 WL 1187730, at \*22 (quoting *Am. Anti-Vivisection Soc'y v. USDA*, 946 F.3d 615, 618 (D.C. Cir. 2020)).

Plaintiffs satisfy the requirements for organizational standing under the foundational decision establishing its contours. In *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), the Supreme Court considered whether an organization that provided "counseling and referral services for low-and moderate-income homeseekers" had standing to challenge discriminatory housing practices that the organization alleged had "perceptibly impaired" its ability to provide its services. *Id.* at 379. The Court found that the challenged practices were more than "a setback to the organization's abstract social interests," and instead caused a "concrete and demonstrable injury

---

[17] When one plaintiff has standing to sue on a claim, the Court "need not consider whether the other . . . plaintiffs have standing to maintain the suit." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264 n.9 (1977); *see also Dep't of Com. v. New York*, 588 U.S. 752, 766 (2019) ("For a legal dispute to qualify as a genuine case or controversy, at least one plaintiff must have standing to sue."). In any case, each Nonpartisan Plaintiff has standing here.

to the organization's activities" that resulted in a "drain on the organization's resources" such that it had standing to challenge those practices. *Id.*

In *Food & Drug Administration v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024), the Supreme Court emphasized that organizational standing in *Havens* was proper because of an injury to the organization's "core business activities" like its counseling services, and not just its abstract objectives or issue advocacy. *Id*. at 396*.* In addition, courts have properly understood that a cognizable injury arises when (1) the defendant's action or omission injures the organization's interest, and (2) the organization must divert its resources to counteract that harm. *See Equal Rts. Ctr. v. Post Props*., *Inc*., 633 F.3d 1136, 1138, 1141–42 & n.4 (D.C. Cir. 2011) (analyzing standing by focusing on the "diversion of resources to programs designed to counteract the injury," including "increased educational and counseling efforts"); *Whitman-Walker Clinic, Inc. v. HHS*, 485 F. Supp. 3d 1, 19 (D.D.C. 2020) (same).

As this Court concluded at the preliminary injunction stage, Section 2(a)'s mandate that the EAC require documentary proof of citizenship imminently threatens Plaintiffs' core activities—voter registration and education programming—by making it impossible for them to register some voters using the Federal Form. *LULAC*, 2025 WL 1187730, at *31–33; *see also supra* Background Section II.C. Plaintiffs here have also demonstrated Article III injury because they have had to divert resources toward providing new and additional services to eligible and registered voters to counteract the harms to their core activities caused by the Executive Order. *LULAC*, 2025 WL 1187730, at *58; *see also supra* Background Section II.C. This Court's prior holding on standing was thus correct.

More fundamentally, it was mandated by Circuit precedent. In *Newby*, the D.C. Circuit held that the League and other non-profit organizations (including several state Leagues and the Georgia NAACP) suffered an Article III injury due to the addition of a documentary proof-of-citizenship requirement on the Federal Form because it "unquestionably make[s] it more difficult for the League to accomplish their primary mission of registering voters." 838 F.3d at 9. In *Newby*, plaintiffs including the League, several state Leagues, and the Georgia NAACP challenged the

EAC's decision to permit Alabama, Georgia, and Kansas to include a documentary proof-of-citizenship requirement on the Federal Form in those States. *Id.* at 6. The League of Women Voters of Kansas ("LWVKS") attested that the requirement harmed their voter registration efforts both because "often potential voters didn't have citizenship documents with them," and "even if they did, the League didn't have the equipment to copy those documents." *Id.* at 8. At the time *Newby* was decided, it was "unclear whether Alabama or Georgia [were] currently enforcing their proof-of-citizenship laws." *Id.* The court found that the Leagues faced a risk of harm sufficient to confer standing due to the proof-of-citizenship requirement in all three States because it had made it harder for LWVKS to register voters and because it was foreseeable that the same would be true for the Leagues of Alabama and Georgia. *Id.* at 9. The D.C. Circuit found it probative that the record showed that voters often did not have their citizenship documents on their person; that even if they did, registration groups lacked the ability to copy them; and that potential voters balked at the idea of sharing sensitive documents with voter registration volunteers. *Id.* at 8.

*Newby*'s reasoning demonstrates why standing has been established here. The burden that a documentary proof-of-citizenship requirement would impose on Plaintiffs would be "far more than simply a setback to [their] abstract social interests." *See All. for Hippocratic Med.*, 602 U.S. at 394 (quoting *Havens*, 455 U.S. at 379). As this Court previously concluded, Section 2(a) poses a "direct impediment" to one of Plaintiffs' "core business activities," namely, registering eligible voters. *LULAC*, 2025 WL 1187730, at *31 (citing *All. for Hippocratic Med.*, 602 U.S. at 395). If Section 2(a) were implemented, Plaintiffs would have to divert resources from their other core programmatic activities toward providing new services to continue registering voters. The record here demonstrates that Plaintiffs would have to redevelop existing web-based portals to register voters; translate the shifting voter registration requirements into additional languages for language-minority populations; retrain members and staff on how to lawfully register voters in advance of upcoming voter registration deadlines; and devote staff and volunteer time to answering questions from and providing education to potential voters about compliance with the Federal Form. *See supra* Background Section II.C.

34

As this Court previously found, Section 2(a) "would also make existing voter registration efforts less effective." *LULAC*, 2025 WL 1187730, at *32; *see supra* Background Section II.C. Public voter registration drives at "churches, grocery stores, and in other public places will be less effective" if the EAC implements Section 2(a) "because many people who are eligible to register to vote do not carry their passport or other citizenship documents with them as they go about their daily routines." *Id.* As a result, Plaintiffs would be forced to invest resources in additional voter registration services to achieve their missions. *See supra* Background Section II.C.

In addition to being harmed in their own right, ASA has associational standing on behalf of their members because "(1) [their] members would otherwise have standing to sue in their own right; (2) the interests [they] seek[] to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588, 596 (D.C. Cir. 2015) (internal quotation marks omitted). There are members of ASA who are eligible to vote but would have difficulty complying with a documentary proof-of-citizenship requirement. *See* SUMF ¶ 136.[18] These members could challenge Section 2(a) in their own right and, as a result, their injuries support associational standing. *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977); *Elec. Priv. Info. Ctr. v. U.S. Dep't of Com.*, 928 F.3d 95, 101 (D.C. Cir. 2019).

Plaintiffs have also demonstrated sufficient causation and redressability. Causation and redressability are closely tied but still distinct: "causation focuses on the connection between the assertedly unlawful conduct and the alleged injury whereas redressability focuses on the

---

[18] As this Court previously held, Defendants "need not know the identity of a particular member to respond to [the organization's] claims of injury." *LULAC*, 2025 WL 1187730, at *24 (quoting *Mi Familia Vota v. Fontes*, 129 F.4th 691, 709 (9th Cir. 2025)). Two members of ASA who are eligible to vote but would have difficulty complying with Section 2(a)'s documentary proof-of-citizenship requirement because they do not have a passport, their birth certificate is inaccessible or unavailable, and they lack other qualifying documentation have submitted declarations about the injuries that they would suffer if they were required to re-register. *See* Ex. 12, Suppl. Decl. of Kyle Nitschke ¶¶ 8–10; Ex. 26, Decl. of J. Doe 1 ¶¶ 4–7; Ex. 27, Decl. of J. Doe. 2 ¶¶ 6–9; *see also* Min. Order (July 11, 2025) (granting leave to file the two declarations pseudonymously).

connection between the alleged injury and the judicial relief requested." *West v. Lynch*, 845 F.3d 1228, 1235–36 (D.C. Cir. 2017) (internal quotation marks omitted).

The harms that Plaintiffs face from the documentary proof-of-citizenship requirement are traceable to the two sets of Defendants: (1) "the President [who] enacted the [Executive Order]," and (2) the federal agency and officers, sued in their official capacity, "tasked with implementing the [Executive Order]." *Young v. Trump*, 506 F. Supp. 3d 921, 935 (N.D. Cal. 2020).

Plaintiffs' injuries would be redressed by the declaratory and injunctive relief they seek. Plaintiffs seek permanent injunctive relief against the EAC and its officers (and not the President or the Executive Office of the President). An injunction preventing these Defendants from acting pursuant to Section 2(a) would redress Plaintiffs' injuries. *See, e.g.*, SUMF ¶¶ 27–29 (explaining that ASA stopped voter registration when the Executive Order was issued, resumed when the Court preliminarily enjoined Section 2(a), but would "stop or dramatically reassess [its] voter registration activities" if "the injunction were to end"). Plaintiffs also seek a declaratory judgment, which the Supreme Court has held can redress a plaintiff's injuries because "it is substantially likely that the President . . . would abide by an authoritative interpretation of the . . . statute and constitutional provision [in question] by the District Court, even though [he] would not be directly bound by such a determination." *Franklin v. Massachusetts*, 505 U.S. 788, 803 (1992); *see also Utah v. Evans*, 536 U.S. 452, 460–61 (2002).

In addition, the Supreme Court has "held that a litigant challenging governmental action as void on the basis of the separation of powers is not required to prove that the Government's course of conduct would have been different in a 'counterfactual world' in which the Government had acted with constitutional authority." *Seila Law*, 591 U.S. at 211 (quoting *Free Enter. Fund*, 561 U.S. at 512 n.12). In other words, Plaintiffs need not make any showing about what actions the EAC would or would not have considered or taken had the President not issued Section 2(a). Instead, it is "sufficient that the challenger 'sustain[s] injury' from an executive act that allegedly exceeds the official's authority." *Id.* (quoting *Bowsher v. Synar*, 478 U.S. 714, 721 (1986)). Plaintiffs are thus entitled to a permanent injunction prohibiting implementation of the Executive

36

Order's mandate to the EAC that it adopt a documentary proof-of-citizenship requirement, regardless of whether the EAC would try to do so independently. A ruling in Plaintiffs' favor will ensure that the EAC does not adopt such a requirement on an "improper legal ground"—*i.e.*, to comply with the President's unlawful command. *See FEC v. Akins*, 524 U.S. 11, 25 (1998). Relief that invalidates and enjoins Section 2(a) will redress Plaintiffs' harms regardless of whether the EAC might later "reach the same result for a different reason." *Id.*

## III.    A Permanent Injunction Barring Implementation of Section 2(a) of the Executive Order Is Necessary to Prevent Ongoing and Future Irreparable Harm.

This Court should declare that Section 2(a) of the Executive Order is unlawful and grant a permanent injunction barring its implementation because it was issued *ultra vires* in violation of the Elections Clause and constitutional separation of powers. A movant entitled to summary judgment may obtain a permanent injunction by showing: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Anatol Zukerman & Charles Krause Reporting, LLC. v. USPS*, 64 F.4th 1354, 1364 (D.C. Cir. 2023) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)). Each of those factors is met here.

### A.    The Irreparable Harm that Section 2(a) Would Cause Can Only Be Remedied Through the Issuance of Permanent Injunctive Relief.

The first two injunctive relief factors are easily satisfied. These factors are often considered together as a showing of "irreparable injury . . . is merely one possible basis for showing the inadequacy of the legal remedy." *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (internal quotation marks omitted). Under binding D.C. Circuit precedent, Plaintiffs have made that showing here.

Again, in *Newby*, the D.C. Circuit held that the League suffered irreparable harm due to the addition of a documentary proof-of-citizenship requirement on the Federal Form because it "unquestionably make[s] it more difficult for the League[] to accomplish their primary mission of

registering voters." 838 F.3d at 9. On the record here and under the law as established in *Newby*, Plaintiffs have shown that implementation of Section 2(a) would cause them irreparable harm by interfering with their "primary mission of registering voters" ahead of upcoming elections. *Id*. That harm is irreparable because "after the registration deadlines . . . pass, there can be no do over and no redress." *Id*. (internal quotation marks omitted).

Plaintiffs have shown that implementation of Section 2(a) "would increase voter confusion and interfere with their ongoing voter registration efforts." *LULAC*, 2025 WL 1187730, at *41. That is so because required documentary proof of citizenship is not readily available to many eligible voters, and requiring such documentation will make voter registration drives much more difficult for Plaintiffs. *See supra* Background Section II.C.

These burdens will be felt most acutely and immediately in Arizona. As discussed, the Supreme Court has held that to comply with its obligations under the NVRA, Arizona must permit voters to register for federal elections by submitting the Federal Form, which does not currently require documentary proof of citizenship. *See ITCA*, 570 U.S. at 20; *Mi Familia Vota*, 129 F.4th at 703. An individual who registers to vote in Arizona using the Federal Form without providing acceptable documentary proof of citizenship is thus registered as a federal-only voter, and they may vote in federal elections. *See supra* Background Section II.C.

A meaningful number of eligible voters in Arizona would likely be at risk of being disenfranchised by the significant changes that the Executive Order mandates. In the experience of LWVAZ and LULAC conducting voter registration events in the State, individuals who have access to citizenship documentation ordinarily provide that information when they initially register to vote so they can participate in all elections. SUMF ¶ 126. Yet, as of April 1, 2025, there were more than 46,000 individuals registered to vote as federal-only voters in Arizona, at least 40,000 of whom did not provide documentary proof of citizenship at the time of their registration. SUMF ¶ 131. And an additional 200,000 longtime Arizona registered voters are now likely to be reclassified as "federal-only" voters because they did not, in fact, provide documentary proof of

citizenship upon registration but were mislabeled due to Arizona's own longstanding errors tracking documentary proof of citizenship. SUMF ¶¶ 132–35.

For any Arizonans who lack the requisite documentation, the implementation of Section 2(a) would prevent them from registering as federal-only voters and, as a result, from voting in federal elections. Such disfranchisement is a grave injury, undercutting Plaintiffs' mission and harming Plaintiff LWVAZ's, LULAC's, and ASA's members.

**B. The Balance of Equities and the Public Interest Support Permanent Injunctive Relief.**

Because Defendants here are federal officials and agencies, the balance-of-equities and public-interest factors "merge." *Nken*, 556 U.S. at 435. These factors also overwhelmingly favor permanent injunctive relief.

Absent an injunction there is "'a substantial risk' that . . . 'citizens will be disenfranchised in the present federal election cycle'" as well as future election cycles. *LULAC*, 2025 WL 1187730, at *43 (quoting *Newby*, 838 F.3d at 12); *see also California*, 2025 WL 1667949, at *20. Because the public interest "favors permitting as many qualified voters to vote as possible," such disfranchisement is plainly not in the public interest and strongly weighs in favor of injunctive relief. *Id.* (quoting *Newby*, 838 F.3d at 12).

There are no valid governmental interests outweighing the clear need for an injunction here. While there is a public interest in "preserving the integrity of [the] election process," there is no record evidence that an injunction here would harm that interest. *LULAC*, 2025 WL 1187730, at *43 (quoting *Newby*, 838 F.3d at 13); *see also California*, 2025 WL 1667949, at *20; *Fish*, 957 F.3d at 1142 (affirming that, after a trial on the merits, defendants had not shown "that substantial numbers of noncitizens successfully registered to vote" under the NVRA's attestation procedures). Instead, what matters is that "the government cannot suffer harm from an injunction that merely ends an unlawful practice." *Kiakombua v. Wolf*, 498 F. Supp. 3d 1, 57–58 (D.D.C. 2020) (Jackson, J.) (internal quotation marks omitted). There is no public interest in the "perpetuation of unlawful

agency action," *Newby*, 838 F.3d at 12, or in the violation of the constitutional separation of powers, *Consumer Energy Council of Am. v. FERC*, 673 F.2d 425, 471 (D.C. Cir. 1982).

### C. The Court's Preliminary Injunction Was Appropriate and Should Be Made Permanent.

This Court preliminarily enjoined the EAC Defendants "from taking any action to implement or give effect to Section 2(a) of Executive Order 14,248." *LULAC*, 2025 WL 1187730, at *63. The Supreme Court's recent decision regarding universal injunctions in *Trump v. CASA, Inc.*, No. 24A886, 2025 WL 1773631 (Jun. 27, 2025), does not call this Court's injunction into question. As this Court previously explained, its preliminary injunction is "neither 'nationwide' nor 'universal'" in scope and is instead "tailored to the irreparable harm that Plaintiffs in these consolidated case[s] would suffer in the absence of an injunction." *LULAC*, 2025 WL 1187730, at *59.

There is one Federal Form. It is used nationwide, and it must be "uniform." *ITCA*, 570 U.S. at 4.[19] As such, "Plaintiffs' challenges to Section 2(a) 'do not involve case-by-case enforcement of a particular policy' but instead 'concern a single decision about a single [requirement], to be used on a single [form] throughout the nation.'" *LULAC*, 2025 WL 1187730, at *59 (quoting *New York v. U.S. Dep't of Com.*, 351 F. Supp. 3d 502, 677 (S.D.N.Y. 2019), *aff'd in part, rev'd in part on other grounds*, 588 U.S. 752 (2019)); *see also California*, 2025 WL 1667949, at *21 n.20 (granting a similar injunction against Section 2(a) while making clear the relief is tailored to the plaintiffs' harms). Therefore, "[t]o afford the [Plaintiffs] complete relief, the court has only one feasible option": enjoin the EAC Defendants from changing that single form in response to the Executive Order's instruction in Section 2(a). *See CASA*, 2025 WL 1773631, at *11. Any benefit

---

[19] Indeed, one of the purposes of the Federal Form is "to facilitate interstate voter registration drives," which are made possible because "volunteers distributing voter registration materials at a shopping mall in Yuma can give a copy of the same form to every person they meet without attempting to distinguish between residents of Arizona and California." *ITCA*, 570 U.S. at 12 n.4; *see also* H.R. Rep. No. 103-9, at 10 (1993) ("Uniform mail forms will permit voter registration drives through a regional or national mailing, or for more than one State at a central location, such as a city where persons from a number of neighboring States work, shop or attend events.").

to non-parties would be "merely incidental.'" *Id.* (quoting *Trump v. Hawaii*, 585 U.S. 667, 717 (2018) (Thomas, J., concurring)).[20]

This result is not unusual. In a discriminatory vote dilution case, the remedy is redistricting—not just for the voters who sued, but for everyone in the impacted districts. *Allen v. Milligan*, 599 U.S. 1, 41 (2023); *see also CASA*, 2025 WL 1773631, at *11 n.12 (citing with approval the remedy issued in *Shaw v. Hunt*, 517 U.S. 899 (1996)). There is only one map, so nothing else would redress the plaintiffs' injuries. Likewise here, by law, there is only one form. The only way to redress Plaintiffs' injuries is to enjoin Defendants from implementing Section 2(a).

The Court should accordingly make permanent its preliminary injunction prohibiting the implementation of Section 2(a) of the Executive Order.

## CONCLUSION

Plaintiffs respectfully request that the Court enter judgment in favor of Plaintiffs on their Section 2(a) claims and permanently enjoin the implementation of Section 2(a) of the Executive Order.

---

[20] The EAC General Counsel recognized as much when he explained at the July 2 meeting that this Court's preliminary injunction against the enforcement of Section 2(a) is consistent with the *CASA* opinion because "there's a singular federal form." *EAC Technical Guidelines Development Committee Meeting* Tr. at 55:16–21.

Dated: July 11, 2025

Wendy R. Weiser*
Sean Morales-Doyle*
Eliza Sweren-Becker*
Jasleen K. Singh*
Andrew B. Garber*
BRENNAN CENTER FOR JUSTICE AT
NYU SCHOOL OF LAW
120 Broadway, Suite 1750
New York, NY 10271
(646) 292-8310
weiserw@brennan.law.nyu.edu
morales-doyles@brennan.law.nyu.edu
sweren-beckere@brennan.law.nyu.edu
singhj@brennan.law.nyu.edu
garbera@brennan.law.nyu.edu

Leah C. Aden*
John S. Cusick*
Brenda Wright*
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, NY 10006
(212) 965-2200
laden@naacpldf.org
jcusick@naacpldf.org
bwright@naacpldf.org

Miranda Galindo*
Cesar Z. Ruiz*
Delmarie Alicea*
LATINO JUSTICE PRLDEF
475 Riverside Drive, Suite 1901
New York, NY 10115
(212) 392-4752
mgalindo@latinojustice.org
cruiz@latinojustice.org
dalicea@latinojustice.org

Niyati Shah (D.C. Bar No. 1659560)
Alizeh Ahmad (D.C. Bar No. 90018919)
ASIAN AMERICANS
ADVANCING JUSTICE-AAJC
1620 L Street, NW, Suite 1050
Washington, D.C. 20036
(202) 296-2300

Respectfully submitted,

*/s/ Sophia Lin Lakin*
Sophia Lin Lakin*
Ethan Herenstein*
Jonathan Topaz*
Clayton Pierce*
Davin Rosborough*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad St., 18th Floor
New York, NY 10004
(212) 549-2500
slakin@aclu.org
eherenstein@aclu.org
jtopaz@aclu.org
cpierce@aclu.org
drosborough@aclu.org

Megan C. Keenan (D.C. Bar No. 1672508)
Sarah Brannon (D.C. Bar No. 90024493)
Adriel I. Cepeda Derieux (D.C. Bar No.
90026636)
Jacob Van Leer (D.C. Bar No. 1742196)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
915 15th St. NW
Washington, DC 20001
(740) 632-0671
mkeenan@aclu.org
sbrannon@aclu.org
acepedaderieux@aclu.org
jvanleer@aclu.org

Michael Perloff (D.C. Bar No. 1601047)
Scott Michelman (D.C. Bar No. 1006945)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
OF THE DISTRICT OF COLUMBIA
529 14th Street NW, Suite 722
Washington, D.C. 20045
(202) 457-0800
mperloff@acludc.org
smichelman@acludc.org

*Counsel for Plaintiffs League of Women Voters
Education Fund, League of Women Voters of
the United States, League of Women Voters of
Arizona, Hispanic Federation, National
Association for the Advancement of Colored*

nshah@advancingjustice-aajc.org
aahmad@advancingjustice-aajc.org

*People, OCA-Asian Pacific American
Advocates, and Asian and Pacific Islander
American Vote*

*\*Admitted pro hac vice*

/s/ *Norman L. Eisen*
Norman L. Eisen (D.C. Bar No. 435051)
Tianna J. Mays (D.C. Bar No. 90005882)
Pooja Chaudhuri (D.C. Bar No. 888314523)
Sofia Fernandez Gold (D.C. Bar No. 90010196)
DEMOCRACY DEFENDERS FUND
600 Pennsylvania Avenue SE #15180
Washington, D.C. 20003
(202) 601-8678
norman@statedemocracydefenders.org
tianna@statedemocracydefenders.org
pooja@statedemocracydefenders.org
sofia@statedemocracydefenders.org

*Counsel for Plaintiffs League of United Latin
American Citizens, Secure Families Initiative,
and Arizona Students Association*

/s/ *Danielle Lang*
Danielle Lang (D.C. Bar No. 1500218)
Jonathan Diaz (D.C. Bar No. 1613558)
Robert Brent Ferguson (D.C. Bar No. 1782289)
Anna Baldwin (D.C. Bar No. 998713)
Heather Szilagyi (D.C. Bar No. 90006787)
Benjamin Phillips (D.C. Bar No. 90005450)
CAMPAIGN LEGAL CENTER
1101 14th St. NW, Suite 400
Washington, D.C. 20005
(202) 736-2200
dlang@campaignlegalcenter.org
jdiaz@campaignlegalcenter.org
bferguson@campaignlegalcenter.org
abaldwin@campaignlegalcenter.org
hszilagyi@campaignlegalcenter.org
bphillips@campaignlegalcenter.org