# Exhibit 5

**Civil Action No. 25-0955 (CKK)**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


LEAGUE OF UNITED LATIN          .
AMERICAN CITIZENS, et al.,      .
                                .   CA No. 25-0946 (CKK)
          Plaintiffs,           .
                                .
     v.                         .
                                .
EXECUTIVE OFFICE OF THE         .   Washington, D.C.
PRESIDENT, et al.,              .   Thursday, April 17, 2025
                                .   1:37 p.m.
          Defendants.           .
. . . . . . . . . . . . . . . .


PRELIMINARY INJUNCTION HEARING
BEFORE THE HONORABLE COLLEEN KOLLAR-KOTELLY
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For LULAC Plaintiffs:          DANIELLE M. LANG, ESQ.
                               Campaign Legal Center
                               1101 14th Street NW
                               Washington, DC 20005

For Nonpartisan               SOPHIA L. LANKIN, ESQ.
Plaintiffs:                    American Civil Liberties
                               Union Foundation
                               125 Broad Street
                               New York, NY 10004

For Democratic Party          ARIA C. BRANCH, ESQ.
Plaintiffs:                    Elias Law Group LLP
                               250 Massachusetts Avenue NW
                               Washington, DC 20001

For Defendants:               MICHAEL GATES, ESQ.
                               U.S. Department of Justice
                               950 Pennsylvania Avenue NW
                               Washington, DC 20530

Court Reporter:               BRYAN A. WAYNE, RPR, CRR
                               U.S. Courthouse, Room 4704-A
                               333 Constitution Avenue NW
                               Washington, DC 20001

P R O C E E D I N G S

THE DEPUTY CLERK:  Civil case 25-946, League of
United Latin American Citizens, et al., League of Women Voters
Education Fund, et al., and Democratic National Committee, et
al., versus the Executive Office of the President, et al.

THE COURT:  Let me start with the defendant, if we
could have counsel for the defendant.  If you could introduce
yourself.

MR. GATES:  Thank you, Your Honor.  Michael Gates with
the Department of Justice on behalf of defendants President
Donald J. Trump, Attorney General Pam Bondi, the Election
Assistance Commission, and the other three named defendants
in the federal lawsuits.

THE COURT:  Good afternoon.  And for plaintiffs, I'll
call them LULAC, if I may, Secure Families Initiatives, and
Arizona Students' Association.

MS. LANG:  Danielle Lange for the LULAC plaintiffs, and
I'm joined by my colleagues, Heather Szilagyi, Jonathan Diaz
and Pooja Chaudhuri, and I believe Norman Eisen is in the
courtroom as well.

THE COURT:  Good afternoon.  And then for plaintiffs
League of Women Voters and the group with that, if you would
identify yourself.

MS. LAKIN:  Good morning, Your Honor.  Sophia Lakin for
League of Women Voters plaintiffs.  I'm joined by a number of

1   attorneys: Megan Keenan, Jonathan Topaz, Ethan Herenstein,

2   Clayton Pierce, Michael Perloff, Jasleen Singh, Leah Aden,

3   Niyati Shah, Alizeh Ahmed, Cesar Ruiz, and Sarah Brannon.

4        THE COURT:  Okay.  Good afternoon to all of you.

5        MS. BRANCH:  Good afternoon, Your Honor.  My name is

6   Aria Branch for the Democratic Party plaintiffs DNC, DFCC,

7   DCCC, DGA, Leaders Schumer and Jeffries, and I'm joined by

8   my colleagues, Lalitha Madduri, Julie Zuckerbrod, Christopher

9   Dodge, James Pinchak, and Jacob Shelly.

10       THE COURT:  All right.  Good afternoon.

11       MS. BRANCH:  Thank you.

12       THE COURT:  All right.  Because we are going to be

13  using a public line for today's hearing, I want to make sure

14  that you speak clearly and into the microphone, and you'll

15  need to come up to the podium.  We have microphones at the

16  table, but they don't really work well enough in terms of

17  everybody being able to hear you.  Counsel can also remove

18  your masks, as you have, in terms of speaking.

19       So we're here on a joint hearing on two motions for

20  preliminary injunctions filed by the plaintiffs in these

21  consolidated cases.  So the first motion was filed by a group

22  of plaintiffs that I'm going to be calling the nonpartisan

23  plaintiffs.  I'm grouping you together in terms of the

24  questions and whoever's going to be responding to them.

25       So the nonpartisan plaintiffs are the League of United

1    Latin American Citizens, the Secure Families Initiative, the

2    Arizona Students' Association, the League of Women Voters

3    Education Fund, the League of Women Voters of the United

4    States, the League of Women Voters of Arizona, the Hispanic

5    Federation, the National Association for the Advancement of

6    Colored People, OCA Asian Pacific American Advocates, and

7    Asian and Pacific Islander American Vote.

8        The second motion was filed by a group of plaintiffs

9    that I'm going to be calling the Democratic Party plaintiffs,

10   and the Democratic Party plaintiffs are Democratic National

11   Committee, Democratic Governors Association, Democratic

12   Senatorial Campaign Committee, and Democratic Congressional

13   Campaign Committee, as well as the individual leaders of the

14   Democratic caucuses in the U.S. Senate ad the U.S. House of

15   Representatives, Charles E. Schumer and Hakeem S. Jeffries.

16       Now, before we begin, I'm going to set out a very brief

17   history of the case.  Counsel will know this, but just to put

18   everything into context and to some degree for the benefit of

19   the public attending either in the courtroom or on the public

20   line.

21       So on April 1st of this year, the Clerk of the Court

22   randomly assigned the Democratic Party plaintiffs case to

23   me pursuant to Local Rule of Civil Procedure 40.3(a).

24       Two cases filed by the nonpartisan plaintiffs were later

25   assigned to me as related cases pursuant to Local Rule of

1    Civil Procedure 40.5(c).

2        These three cases are related to one another under the

3    local rules because they grow out of the same event or

4    transaction, the issuance of Executive Order No. 14248, and

5    they involve common issues of fact related to the effect of

6    that executive order.  So I will be calling President Trump's

7    Executive Order 14248 just "the executive order."

8        Given the commonalities among the factual and legal

9    analysis of the three cases, and with consent of the parties,

10    I consolidated the three cases.

11        The nonpartisan plaintiffs then requested that I set an

12    expedited schedule for briefings on motions for preliminary

13    injunctions, and the nonpartisan plaintiffs also requested

14    leave to file briefs separately from the Democratic Party

15    plaintiffs given their nonpartisan status and differing

16    interests in these cases.

17        I granted both requests and set a briefing schedule, and

18    the nonpartisan plaintiffs and the Democratic Party plaintiffs

19    each filed motions for preliminary injunctions, and the

20    defendants oppose both of those motions.  So as of yesterday,

21    April 16, all briefing on these motions has been completed.

22        Before turning to the pending motions, I want to make clear

23    what issues are and are not, following more specifically,

24    before the court today.  Later on I'll confirm with counsel as

25    to whether you would agree with this.

1    So the motions that we will be discussing are based on

2    separation of powers arguments.  The plaintiffs argue that

3    the president lacks the power to order some of the changes to

4    federal election rules described in a recent executive order

5    which I've identified.  The plaintiffs argue that the power to

6    make those rules rests with Congress and the states and not

7    with the president.

8    What I am not discussing is neither of the pending motions

9    ask me to decide whether a documentary proof of citizenship

10   requirement for voter registration would be constitutional if

11   enacted by Congress or any state.

12   No one has asked me to decide whether a documentary proof

13   of citizenship requirement for voter registration would be a

14   good or effective policy, and no one is asking me to decide

15   whether foreign interference in federal elections or voter

16   fraud are serious issues, although these issues are raised in

17   the executive order that's at issue.  The focus today will be

18   on the separation of powers issues.  With that background,

19   we're going to be going forward.

20   Let me just set out a couple of rules of the road.

21   For some of you, I know that this is the first time you've

22   appeared before me, certainly with a hearing.  So this hearing's

23   not an opportunity for an appellate-style oral argument

24   summarizing your briefs.  I read the briefs and all of the

25   materials, so I'm familiar with all of that.

r

7

     There are specific issues that I want to have more clarity
on or want to confirm my understanding of what your arguments
are, and I have specific questions that I'd like you to answer
related to those issues.  So this proceeding's going to be
basically questions and answers.

     I know this case presents complex and novel legal issues.
There are five sections of the executive order that are at
issue.  So as I indicated in my order consolidating these cases,
if you feel someone else would be better poised to answer one
of my questions, feel free to switch off counsel at the podium.
So I would expect to have the one counsel for the government,
the nonpartisan will have one lawyer, unless you switch off
because somebody is more attuned to the answer that I need,
and one from the partisans.

     I just ask for my benefit, when you come up to the podium,
please speak into the microphone, identify yourself -- and the
government doesn't need to identify himself as to who the
clients are, but I'd ask that the others just so that -- you
don't need to go through each one of these, but as to your name
and whether you're the nonpartisan or the Democratic or whatever
so that we have a record going forward.

     Now, some of the answers are going to be just a yes or no
that's expected or a short explanation.  I don't expect lengthy
presentations of arguments.  I've read your materials, and all
of these arguments presumably are included in some way in your

pleadings.  There will be some questions that go outside the

pleadings of events that have happened more recently, but in

order to move this along and to be effective, figure out how

much information I actually need, understanding I've read your

pleadings.

So, in terms of the order in which we're going to be

proceeding, I do have some preliminary questions for the

defendants, then I'll have some questions for the nonpartisan

plaintiffs, followed by the Democratic Party plaintiffs, and

I'll go back to the defendants more on the full argument.  The

first part for them is some preliminary issues that have arisen.

Finally, I will allow both the nonpartisan plaintiffs and the

Democratic Party plaintiffs to come back and provide a brief

response, if you wish to, to new arguments.  I don't want you to

repeat what you've already argued that has already been raised.

I'm having you come back since the burden is on the plaintiff at

this stage.  At the end of the hearing, we can then discuss next

steps and schedule any further proceedings that are necessary.

So anything anybody at this point needs to ask me a question

or bring to my attention?  If not, we'll proceed with the

questions.  I don't see anybody getting up, so let me start with

some opening questions.  Mr. Gates, if you could come on up.

Mr. Gates, before we begin, I just want to make sure you have

no disagreements with my scope of the issues not presented in

the motions that we're going to be discussing today.

1        MR. GATES:  No disagreement, Your Honor.

2        THE COURT:  All right.  Do you agree that neither

3   of the pending motions ask me to decide these various things,

4   the documentary proof of citizenship and all of those?  I

5   assume that you're not going to be addressing any of those

6   issues.  Am I correct?

7        MR. GATES:  Not unless Your Honor has questions.

8        THE COURT:  Nope.  All right.

9      Now, turning to the merits, it would be helpful to

10  understand at the outset the scope of any ongoing or imminent

11  action to implement the provisions of the executive order that

12  are challenged in the pending motions, and I have a few

13  questions at the outset about how, if at all, the executive

14  order is being implemented.

15     Now, you represented in your briefs that the executive

16  order -- and I'm going to quote what was in the brief -- "has

17  not even begun to be implemented."  That's at page 25 of your

18  opposition to the nonpartisan plaintiffs' motion, page 35 to

19  the Democrat Party motion.

20     You also said in both briefs that "no action has been made

21  and nothing has been implemented," but the plaintiffs have

22  produced a letter dated April 11 from the executive director

23  of the Election Assistance Commission, which I'm going to call

24  "EAC" going forward, to the states "seeking consultation on

25  how states would propose to implement Section 2 of the

Executive Order 14248 if required."  That letter also

describes the executive order as a -- and this is a quote

again -- "instruction" to the EAC.

   Now, you filed your briefs and the declaration from the

director, and it's S-C-H-L-E-T-Z.  I don't want to butcher how

she pronounces it.  It was dated three days after she sent the

letter to the states, but your briefs and her declaration

don't mention the letter at all.  So were you or any defense

counsel aware of the letter at the time you filed your

opposition briefs on April 14?

        MR. GATES:  So, Your Honor, I think we're probably both

under the same understanding that the letter is dated three

days after we submitted our opposition.  Is that correct?

        THE COURT:  No.  The letter was dated April 11 and you

submitted it after.

        MR. GATES:  Okay.

        THE COURT:  So your brief came after.  That's why I'm

raising the question.

        MR. GATES:  Fair enough.  And so on the one hand, we

didn't know about the letter, but on the other, I since now

have an explanation in the context of this rulemaking process

under the APA, if Your Honor would indulge me.

        THE COURT:  Well, I think -- I'll get into that.  At

the time that the letter was sent from the executive director,

she didn't consult with you or anybody else before it was

1    sent?

2           MR. GATES:  Well, I guess what I would say, Your Honor,

3    is I had no knowledge of the letter.  But if those are also

4    communication -- those would be communications if they

5    occurred between, obviously, my client and myself, but I will

6    represent to you that there was no communication about the

7    letter.

8        Having said that, the letter itself, after getting further

9    clarification from the EAC, is not any step at all that's

10    contemplated by the APA in the rulemaking process.  It's not a

11    step.  The letter asked for consultation from other elections

12    officials with regard to the --

13           THE COURT:  A particular section of the executive

14    order, which --

15           MR. GATES:  Correct.

16           THE COURT:  And you're saying to me that isn't part of

17    the process?

18           MR. GATES:  The first significant process under the APA

19    is to actually propose rule language and have that circulated.

20    So this consultation was an early consultation.  It had

21    nothing to do and it did not commence the rulemaking process

22    under the APA.

23           THE COURT:  So let me see if I understand your

24    argument.  Even though the letter refers to a particular

25    section of the executive order and indicates -- let's see

1    where we are -- "seeking consultations of how states would

2    propose to implement" -- implement means started or follow it

3     -- Section 2 of the particular executive order and describes

4    the executive order as an instruction to EAC.  And you don't

5    see that as starting the process to reach out to the states to

6    start to talk to them about Section 2(a), which is users of

7    the federal form in terms of relating to the federal form

8    itself?

9         MR. GATES:  No.  The usual fashion or the usual

10    approach under the APA for a situation where the EAC, the

11    Elections Assistance Commission, is going to start to endeavor

12    new rules is to actually propose the language of the new rule

13    and then circulate that, get consultation, put it out for

14    notice, put it out for comment, put it out for feedback.

15    This, in the unusual circumstance, is just a consultation

16    request.  But other than citing the section of the EO, there's

17    no specifics.  There's no proposed language.  There's nothing

18    specific.  It was represented that it was more or less a

19    brainstorming and an initial first blush to get feedback from

20    elections officials about their initial thoughts.

21    And it was also represented that as the feedback came in,

22    that would start to, or may start to, inform or dictate the

23    language of the rule.  The process under the APA that the EAC

24    normally embarks on is listed in the declaration presented by

25    defendants, as you indicated, by Brianna Schletz of the EAC.

1      That is the normal process.

2              THE COURT:  So she just reached out and did this, and

3      this is not part of the --

4              MR. GATES:  It's of no moment.  It didn't have to

5      happen to start the process.

6              THE COURT:  Whether it didn't have to happen or not,

7      the point is that she did.  The chief election officials, a

8      carbon copy of the national mail voter registration form is

9      available, talks about, is seeking consultation on how states

10     would propose to implement it, seeking feedback on the impact

11     of implementation on voter registration in your state, etc.,

12     will consider responses, etc.  You don't see this as starting

13     the process on voter registration?

14             MR. GATES:  No, Your Honor.  It is an extra step, and

15     that's how it was explained to me.  The rules and the process

16     you just laid out there normally occurs after a proposed

17     language has already been circulated.  There is no proposed

18     language at this point.  The proposed language is the first

19     step that starts the APA process.

20         That's not what happened here.  This is just an early

21     letter asking for thoughts and initial feedback, and it says

22     on the last page of the letter that "the EAC looks forward to

23     your input."  But it's just general input.  There's nothing

24     specific.  There's no particular rule.  Again, under the

25     normal process under other circumstances, the EAC actually

1    starts with proposed language, circulates that, gets feedback.

2    Once they update the language, modify it, and sort of the

3    stakeholders are generally approved, then they put it out for

4    notice for 60 days; then it's out for public comment for

5    another 30 days --

6         THE COURT:  I understand all of the rest of it.  So you

7    view this as something she decided to do on her own without

8    consultation and it's not the beginning of the process,

9    putting it in very summary form.

10        MR. GATES:  I think that's accurate.  And it is not

11   even the first step in the APA process.

12        THE COURT:  Okay.  So what I would like -- if you could

13   sit down for a quick second, I'll give you an opportunity to

14   -- I'll start with the nonpartisan and then move to the

15   partisan, or either way, if you want to respond to whether you

16   view it as he has described it.

17        MS. LAKIN:  Good afternoon, Your Honor.  Sophia Lakin

18   for the nonpartisan plaintiffs.

19      I think that the defendants' counsel is trying to parse

20   this very finely.  At the end of the day, the April 11th

21   letter cites as its motivating, or impetus, the executive

22   order.  It is a step to implement the executive order.

23      I'd also point out that under the National Voter

24   Registration Act, the EAC is required to consult with the

25   chief elections officials of the states in developing changes

1    to the federal form.  And whether it happens -- whenever it

2    happens, even if it happens usually in the ordinary course

3    at a different time or it could happen multiple times, this

4    consultation with the chief election officials of the states,

5    a term of art in the NVRA itself, is part of the statutory

6    process required to change the federal form.

7            THE COURT:  All right.

8        Counsel, anything you want to respond to?

9            MS. BRANCH:  Thank you, Your Honor.  Aria Branch for

10   the Democratic Party plaintiffs.  I think the key thing to

11   keep in mind here is that the government has made arguments

12   that our claims are not ripe and that preliminary relief is

13   not warranted because nothing has happened.  And that's just

14   fundamentally not true because of this letter, and I think

15   the nonpartisan plaintiffs also submitted an email with their

16   brief yesterday that indicates that the process is moving

17   forward.

18     So the EAC is taking steps pursuant to the executive

19   order to implement DPOC, documentary proof of citizenship.

20   So that is what the letter shows.  I think it underscores the

21   fact that relief is needed now because the process has begun.

22     And the fact that the letter may have been sent outside of

23   the normal process for APA notice and comment I think further

24   underscores the need for relief because that means that the

25   government isn't actually even following the process set forth

1    in the APA.  So I think the sending of the letter indicates that

2    the process is moving and relief is needed now, our claims are

3    ripe.

4              THE COURT:  All right.

5              MS. BRANCH:  Thank you.

6              THE COURT:  So I have everybody's argument on this

7    issue.  I will just add in terms of the email indicating that

8    "Please note this is an initial consultation.  Chief election

9    officials will also be consulted on any proposed changes to

10    the EAC implementing regulations with a form prior to

11    implementation.  The purpose of this initial consultation is

12    to guide the EAC and any proposed changes which require

13    further comment."

14        So I'll leave this issue at this point and move on.  I do

15    have quick other questions in terms of these initial things,

16    Mr. Gates.

17        So have any of the defendants, just to clarify, other than

18    President Trump and the Executive Office of the President,

19    taken any action or any other actions, whether you view them

20    as implementing it or not, but taking actions relating to this

21    executive order in terms of implementing or taking forward the

22    direction from the executive order to sections 2(a), 2(b),

23    2(d), 7(a), or 7(b) of the executive order, which are the

24    provisions that are at issue in this pending motion?  So

25    anything else out there besides this letter and email?

1       MR. GATES:  No, Your Honor.  And may I briefly offer

2  a reply to what I just heard from opposing counsel?

3       THE COURT:  Go ahead.

4       MR. GATES:  Thank you, Your Honor.  Again, the letter,

5  if anything, suggests that this is a process.

6       THE COURT:  Right.

7       MR. GATES:  Nothing has occurred yet.  And the process,

8  there are mandatory time requirements built into the APA,

9  mandatory 60 days plus 30 days.  That's at least 90 days.

10  At lightning speed, nothing could be effectuated under the

11  rulemaking process for at least 120 days.  I just want to make

12  that clear.

13       THE COURT:  Oh, I understand that.  This is really more

14  a matter of whether -- the briefs seem to indicate nothing had

15  happened, the executive order was issued, and that was it.

16  Nobody had done anything.  And I'm pointing out that there was

17  something that was done.  It does take time.  And I'll get to

18  some of those other questions.

19      I do understand that there's a process and there's a time

20  frame for this process and that, as she has indicated, it's an

21  initial one.  But it isn't, as the brief suggested, that

22  nothing has happened with the executive order or moving

23  forward with considering EAC at least starting to consider --

24  they haven't taken steps.  I fully agree if that's your point.

25  They've taken no steps other than reaching out relating to the

1    executive order.  Would you agree with that much at least?

2          MR. GATES:  I'm actually going to disagree, Your Honor,

3    on this one point.

4          THE COURT:  Okay.

5          MR. GATES:  The brief, ad nauseam, and at least

6    defendants' opposing brief in the DNC case, the partisan case,

7    ad nauseam talks about the partisan process.  So when we talk

8    about what is done, what is actionable, we're talking about at

9    the end of that line of when the rule is actually presented.

10      We're speculating right now, Your Honor.  We're all

11    speculating.  I'm speculating.  Plaintiff counsel is

12    speculating.  We're all speculating what's going to be at the

13    end of this line.  So when they're asking for preliminary

14    injunction and they're asking for relief because of action,

15    just because this may have started a conversation with

16    elections officials doesn't mean anything's happened.  We're

17    still speculating as to what it might be.

18          THE COURT:  Well, you can't say nothing's happened.

19    It says -- you put in there, and I'm not going to belabor this

20    more; we've got a lot to talk about -- has not even begun to

21    be implemented.  I agree that there hasn't been the final

22    process.  There is a whole process you have to go through.

23      But I think you would have to agree that at least the

24    executive order has been brought to the attention of the

25    states who are -- and there are going to be consultations

1    between EAC and the states.  And she has brought up the

2    executive order and indicates in it seeking consultations

3    to implement.  Okay?  So it hasn't been implemented, but

4    consulting about the implementation.  So the subject of

5    implementing this executive order has been raised specifically

6    with the states.  You would agree with that, right?

7         MR. GATES:  I would, and I would also add that this

8    early consultation is not even the first step under the APA.

9         THE COURT:  It doesn't matter, as a practical matter,

10   formalized ways maybe of doing it.  But the point is the

11   states are now on notice that the EAC is planning on proposing

12   what's in, or at least discussing, consulting.  They haven't

13   made any decisions, I fully agree, but they raised the

14   topic -- I'll put it that way -- raised the topic of the

15   executive order and specifically Section 2.  I think you could

16   agree to that.

17        MR. GATES:  And I will also agree, Your Honor, and

18   submit to the court that all state election officials were on

19   notice on March 25 when the presidential executive order was

20   issued in the first place.

21        THE COURT:  Okay, I'm sure, but this is a more formal

22   one coming from the EAC, the executive director.

23      Okay.  One more little set of things, and this relates to

24   -- and I just want to clarify whether this is still on the

25   table or not, and this relates to the stipulation.

1    On page 19 of the motion, the nonpartisan plaintiffs

2    offered to withdraw their motion if the defendants would

3    stipulate that they, quote, do not intend to make any change

4    to the federal form relating to documentary proof of

5    citizenship within 30 days, and that they will comply with

6    notice and comment and other procedural requirements before

7    making any such changes in the future.  And the relevant

8    requirements would include those under the Administrative

9    Procedure Act, the Help America Vote Act, the National Voter

10   Registration Act, and the Paperwork Reduction Act.

11   Now, your opposition to the nonpartisan plaintiffs' motion

12   references the offer to withdraw, but you don't take any clear

13   position on whether you would agree -- the relevant defendants

14   would agree to the stipulation.  So we only have this letter

15   that's been sent out on April 11.

16   So are the EAC defendants, which would mean the EAC

17   commissioners, executive director, now prepared to stipulate

18   that they will not make any changes within 30 days to the

19   federal form to require documentary proof of citizenship?

20   MR. GATES:  Yes, Your Honor.

21   THE COURT:  I'm sorry?

22   MR. GATES:  Yes, Your Honor.

23   THE COURT:  Okay.  And would they stipulate that

24   they'll comply with all applicable procedure requirements

25   before making such changes to the federal form in the future?

1    MR. GATES:  Yes, and as mandated by the executive order

2    itself.

3        THE COURT:  And as mandated.  All right.

4    So let me just see at this point the nonpartisan, whether

5    you at this point, since the landscape has changed somewhat,

6    whether you're still of that position or not.

7        MR. GATES:  Your Honor, before I leave the podium,

8    would you like me to address question No. 2?  It's very

9    similar.

10        THE COURT:  Yes, sure.

11        MR. GATES:  Okay.  Likewise -- so I'm taking 1 and 2

12    together, but likewise with our response to No. 1, No. 2, the

13    response is because the EAC will comply with a notice and

14    comment and other procedural requirements under the

15    Administrative Procedure Act and other applicable statutes

16    making any such changes to the required documentary proof of

17    citizenship is not possible within 30 days or even 90 days

18    under any circumstances.  So just for clarification.

19        THE COURT:  Well, I'm glad you've agreed with that.

20        MR. GATES:  Thank you, Your Honor.

21        THE COURT:  But let me just ask -- I don't know whether

22    in terms of the nonpartisan, whether you want to think about

23    it or not.  I'm not asking you to withdraw right now, but I am

24    asking what your position is.

25        MS. LAKIN:  Sophia Lakin for the nonpartisan

1    plaintiffs.

2          THE COURT:  I wanted, since it was sitting out there,

3    to bring it up and make sure.  They've agreed.  You'd

4    obviously have to work out language, etc., but I'm going to

5    proceed with the hearing as if we're going forward anyway with

6    questions.  But I want to know whether at this point you're in

7    a position to still agree with that or you want some

8    modifications or some others.

9          MS. LAKIN:  Unfortunately, given the circumstances,

10   now that we know there has been some action taken pursuant to

11   the executive order, which I would point out our challenge is

12   to the executive order itself, and any steps taken to implement

13   it are tainted by the initial unlawful conduct in the first

14   instance.  And so because we know at this point in time, which

15   is not what we were aware of when we put forward this proposal

16   in our opening brief, that's not a viable situation for our

17   clients at this point.

18      At this point we know that it's being implemented in some

19   fashion.  Steps are being taken.  Further action to implement

20   the executive order's directive, which is a mandate here to

21   add a requirement to the federal form, not just to engage in

22   conduct, steps to do that ultimate, preordained outcome will

23   only continue and become increasingly difficult to unravel if

24   not --

25         THE COURT:  Okay.  A stipulation is an agreement

1    between two parties.  I have nothing to do with it.  You all

2    have to decide whether you want to agree.  So I wanted to

3    raise the issue since it was in the pleadings.  I will leave

4    it at this point if you want to have a further discussion

5    about this.  Obviously, it won't be happening right today and

6    as part of this hearing, but everybody's taken their

7    positions.

8        So let me move on to -- at this point, it doesn't sound

9    like you're ready to go forward with it, but I'll leave it to

10   you and the government to have further discussions if the two

11   sides wish to do so.

12           MS. LAKIN:  I appreciate that.

13           THE COURT:  As I said, I bring it up because it was in

14   the pleadings.  I don't get involved with what is stipulated

15   to other than making sure that everybody understands what

16   they've agreed to.

17           MS. LAKIN:  I appreciate that, Your Honor.  If I may

18   respond just to one item that you brought up with defendants'

19   counsel which was related to any additional steps or actions

20   that had been taken pursuant to the executive order, in

21   addition to the email, which I will point out also has a

22   May 2nd response date to that initial response for the --

23           THE COURT:  Right.

24           MS. LAKIN:  -- suggesting they're moving somewhat

25   quickly here, there is also -- and we have this as Exhibit 33

1    to our reply brief -- the agenda for the EAC standards board

2    that is having a meeting on April 24 in which they are going

3    to be discussing implementation of the executive order.  So

4    there are further actions being taken, further conversations.

5    Things are occurring under this executive order.

6         THE COURT:  All right.  That's noted for the record.

7    Let me move to my questions, and frankly I'm going to start

8    with you.

9         MS. LAKIN:  Okay.

10        THE COURT:  So with each of these questions, I'm going

11   to give a little background information so you understand why

12   I'm asking.

13   So, as I understand it, the nonpartisan plaintiffs have

14   moved for a preliminary injunction against implementation

15   specifically of Section 2(a) of the executive order which

16   directs the EAC to, quote, "take appropriate action," unquote,

17   within 30 days to "require" users of the federal forum to

18   provide "documentary proof of citizenship" which state and

19   local officials must then record on the form.

20   So as counsel well knows, in terms of the preliminary

21   injunction, the burden is going to be you have to show likely

22   to succeed on the merits, likely to show irreparable harm in

23   absence of preliminary relief, balance of equities tips in

24   your favor, and an injunction is in the public interest.

25   Now, when the government is an opposed party, which it

1    is in this case, the balance of equities and public interest

2    charges usually merge.  So I would be addressing that

3    together.

4        So let me start with standing.  And to show that you're

5    likely to succeed on the merits, the nonpartisan plaintiffs

6    must show a substantial likelihood of standing supported by

7    affidavits or other credible evidence.  As I understand it,

8    there are two theories of standing that you're raising:

9    organizational standing and associational standing.  So my

10   first focus is going to be on the organizational standing.

11       So to have organizational standing, an organization must

12   make "the same showing as an individual an actual or

13   threatened injury in fact that is fairly traceable to the

14   defendants' allegedly unlawful conduct and unlikely to be

15   redressed by a favorable court decision."  So that's sort

16   of the definition.

17       So the parties understandably focus on the injury in fact,

18   but I also need to make findings regarding causation and

19   redressability.  So, briefly, how is Section 2(a) causally

20   linked to the harm you allege to your clients' interest, and

21   how would a favorable decision on your motion redress that

22   harm?

23           MS. LAKIN:  So I'm going to take a moment to pass the

24   podium to my colleague, Ms. Lang.

25           THE COURT:  Not a problem.  I told you that's not an

issue.

MS. LANG:  Thank you, Your Honor.  Danielle Lange for the nonpartisan plaintiffs.  The question of causation I think is a rather clear one, which is that the injury that our clients are facing is an injury that would arise from the addition of a documentary proof of citizenship requirement.

And as my colleague just pointed out, the executive order, in very plain terms, mandates the addition of a documentary proof of citizenship requirement.  When it says "take appropriate action" to require the documentary proof of citizenship requirement, this court needs to give meaning to all of those words.

So appropriate action might take several different forms.  I think the defendants have now admitted that action would be required to go through various procedural mechanisms.  But appropriate action does not mean no action.  It is a demand to take action and for that action to end in a result, which is to require documentary proof of citizenship.  And once there is such a requirement, all of the harms that our clients are facing will become realized, and that is impending.

There is an argument about causation in the defendants' brief that focuses on a claim that third-party choices are somehow going to impact the injury to our clients because folks might refuse to provide documentary proof of citizenship or not bother to go get it, and I think that that's mistaken

1    for a couple of reasons.

2        One, Supreme Court precedent just rejects that argument

3    altogether.  So if you look at *Department of Commerce v.*

4    *New York*, for example, which was about the addition of a

5    citizenship question to the census, the government made a very

6    similar argument that, well, all of your harms are going to

7    arise from folks who will shy away from the census because

8    of this question; those are individual choices.

9        But the Supreme Court rejected that argument because it

10    was the action of adding the question that was going to have

11    a predictable effect.  And same thing here.  We know that the

12    addition of a documentary proof of citizenship requirement is

13    going to have predictable effects on many voters.

14        But quite frankly, the point here is even more straight-

15    forward because even if every voter had the opportunity

16    or ability to provide documentary proof of citizenship, the

17    addition of a documentation requirement to registration makes

18    voter registration activities themselves far more cumbersome,

19    far more difficult, and far less effective.

20        So, for example, if you are a League of Women Voters or

21    LULAC volunteer at the grocery store conducting a voter

22    registration drive, in order to do so with the federal form if

23    it has a documentary proof of citizenship requirement, every

24    person you encounter you would need to ask do they have these

25    types of documentation.  Not just do they have it in general,

1    but do they have it on their person right now.  And even if

2    they did, which is very unlikely, they would have to have a

3    manner of capturing that — taking a copy, printing it — in

4    order to perform their basic functions.  So the causation here

5    is much more straightforward, Your Honor.

6         THE COURT:  Okay.  And how would a favorable decision,

7    should I rule in your favor, redress the harm that you've

8    talked about?

9         MS. LANG:  Yes.  So if we have an injunction that

10   stops the Election Assistance Commission from acting on this

11   mandate, that will redress our harm.  Right now the plaintiffs'

12   concern is that there is going to be an imminent addition of a

13   documentary proof of citizenship requirement for an

14   unconstitutional reason, which is that the president has taken

15   over authority to dictate election rules.

16        And here I would point you to *Seila Law* as I think an

17   important point about redressability, which is there the court

18   said that a litigant challenging governmental action as void

19   on the basis of separation of powers is not required to prove

20   that the government's course of conduct would be different in

21   a counterfactual world in which the government had acted with

22   constitutional authority.

23        So right now there is a mandate for the EAC to add

24   documentary proof of citizenship.  Whether they do it in

25   10 days or 120 days, this is an imminent action coming from

the president that is unconstitutional, and that action is
going to harm our clients.  And if you enjoin that action and
you let the EAC know that they do not have to bend to the will
of the president's mandate which is in violation of separation
of powers, that will remedy our harm.

THE COURT:  Okay.  Anything of particular -- wait.
Without getting into what you've already put in your motion,
reply, etc., anything else of particular note that you want
me to consider in making this decision as to whether you've
shown a substantial likelihood of organizational standing to
challenge this section?

MS. LANG:  Just a couple more comments, Your Honor.
On the redressability point, I do want to make another comment
on *Seila Law*, which I think the case for *Seila Law* for
standing is much harder.  There the government had a
reasonable argument that regardless of -- so there the issue
was whether or not the CFPB director should have been subject
to removal at will or for cause, and a regulated party who,
you know, has an enforcement action against them by the CFPB
said that was injuring them.  And there the government had a
very good argument that the outcome for that individual
probably would have been the same as far as the enforcement
action regardless of whether the CFPB director was removable
for cause or not.

Here the evidence is quite to the contrary, right?  The

1   Election Assistance Commission has been asked before if it

2   thinks it's a good idea to -- or if it's consistent with the

3   NVRA to add a documentary proof of citizenship requirement,

4   and it has always declined to do so.  So we have no reason to

5   believe that the Election Assistance Commission would ever

6   take this step absent this executive order.  And the letter,

7   for example, only highlights that they're only taking this

8   action in response to the executive order.

9       The one area that I did want to address about organizational

10  -- well, I was going to move on to talk about associational

11  standing, but perhaps you wanted to focus --

12          THE COURT:  No, that's fine.  I've picked the different

13  topics that I need additional information on.

14          MS. LANG:  You got it.

15          THE COURT:  So we're not finished yet, but I'm not sure

16  which one of you wants to address the next thing, which is

17  likelihood of success on the merits.  And that's -- it directs

18  the EAC to take appropriate action within 30 days to "require

19  users of the federal form to provide documentary proof of

20  citizenship," which then they're recording.

21      So your principal argument, as I understand it, the

22  president simply lacks the authority to direct the EAC to

23  take any action to alter the regulation of federal elections,

24  if I understand your argument.  If I were to agree with that

25  argument, is there anything else I need to consider to decide

1    whether you're likely to succeed on the merits?

2        (Pause.)

3      If there's anything else you want to highlight.  If not,

4    there are other arguments you have, but just to point that

5    out.  There may not be.  I'm not expecting something; I just

6    want to make sure I've covered everything.

7        MS. LANG:  Fair enough.  I pause in part because I want

8    to make sure I'm not missing anything.  But I do think the

9    constitutional merits argument is just that straightforward.

10   The president has no authority to make these commands.  The

11   defendants point to no such authority anywhere in their papers

12   in response.

13       THE COURT:  Okay.  As I said, just wanted to make

14   sure.  So let me move on to then the defendants emphasize

15   in their pleadings the executive order's use of phrases like

16   "appropriate action" and "consistent with law."  Their

17   argument, as I understand it, is that you can't show that

18   Section 2(a) is unlawful because of these -- they're usually

19   considered "saving phrases," because the phrases mean that the

20   executive order can have only lawful effects.

21     You do discuss this in your reply, but very briefly.  So

22   if you could, why are you likely to succeed in showing Section

23   2(a) is unlawful despite these, quote, saving phrases?  So put

24   it in the context of saving phrases.

25       MS. LANG:  My colleague, Ms. Lakin, is going to take

1    that one.  Thank you, Your Honor.

2            THE COURT:  Okay.

3            MS. LAKIN:  So to your question --

4            THE COURT:  The argument -- their argument, the

5    government's argument, is that you can't show that 2(a)

6    is unlawful based on these saving phrases, which say "take

7    appropriate action," has to be "consistent with law."

8        So you discuss it in passing, but I wanted to see if there

9    was anything else you wanted to add to it.  So why are you

10   likely to succeed in showing that Section 2(a) is unlawful

11   even though we have these what I'll call "saving phrases" in

12   the executive order?

13           MS. LAKIN:  Yes, Your Honor.  We lay this out in our

14   reply brief, so please stop me if I'm repeating.  But the

15   savings clause has no impact on our preliminary relief because

16   courts have repeatedly rejected the argument that a facially

17   illegal executive order, which we have here, can be salvaged

18   with boilerplate language about following the law.

19       The rule is that, if it's impossible for the EO to be

20   implemented consistent with the law, then the savings clause

21   must be disregarded.  And here you have it's impossible for

22   Section 2(a) of this executive order, for the reasons that

23   Ms. Lang has pointed out with respect to the separation of

24   powers concerns, for that to be implemented consistent with

25   applicable law.

1      It's the order itself that's unconstitutional, and any

2      command from the president to the independent, bipartisan

3      Election Assistance Commission is unlawful.  So the savings

4      clause here would nullify the executive order as a result,

5      and so it can't save it.

6           THE COURT:  Okay.  What about in terms of we have

7      the letter from the executive director and the email which

8      obviously makes it clear EAC is not going to be finishing this

9      within the 30 days that's discussed in the executive order.

10     How does this all factor in, from your perspective, in terms

11     of your argument, if at all?

12          MS. LAKIN:  It factors only to the extent there is

13     some attempt to have some process and some steps that involve

14     before the president's mandate is carried out, but it does

15     nothing.  The amount of process, the facts of any sort of

16     process, cannot launder the unconstitutionality of the mandate

17     in the first instance to require, ultimately, this preordained

18     conclusion that documentary proof of citizenship be required

19     as part of registering to vote on the federal form.

20          THE COURT:  Okay.  So as I asked your colleague,

21     anything else -- again, I've looked at your motion and the

22     reply.  Anything else of particular note that you think I need

23     to consider in this?  Doesn't have to be.  I just want to make

24     sure.

25          MS. LAKIN:  One quick note, and it's related to a prior

1    issue that you asked Ms. Lang about the merits.  The separation

2    of powers argument is simply, as we note in our reply brief,

3    defendants haven't said anything to the contrary in their

4    briefs and, we would submit, have forfeited any arguments to

5    the contrary as a result.

6        THE COURT:  Okay.  Let me move then to irreparable

7    harm, whoever's going to argue that.

8        MS. LAKIN:  I think that might be me.

9        THE COURT:  Okay.  So irreparable harm -- we're still

10   talking about Section 2(a).  So the D.C. Circuit, unlike some

11   other circuits, sets a very high standard for showing of

12   irreparable harm that's necessary to support a preliminary

13   injunction.

14       The threatened injury has to be beyond remediation, and

15   injunctive relief will not be granted against something merely

16   feared as liable to occur at some indefinite time, nor will

17   such relief be granted against an injury that's just

18   theoretical.  So very briefly, why is the burden at Section

19   2(a) we place on the nonpartisan plaintiffs beyond remediation

20   and not merely theoretical?

21       MS. LAKIN:  For several reasons, Your Honor.

22   Defendants have already been, as we discussed, implementing,

23   at least taking steps to implement the president's mandate,

24   and without a preliminary injunction or any efforts to pause

25   moving forward to that preordained result, we know that

1    unfortunately there will be a documentary proof of citizenship

2    requirement on the federal form.  That is what the mandate

3    requires.

4        *Newby* is very instructive here, and it makes very clear

5    that even where the documentary proof of citizenship

6    requirement isn't yet in place, the harm to the ability to

7    help voters get registered that a documentary proof of

8    citizenship requirement imposes, which Ms. Lang has discussed

9    in depth, that form imposes -- that harm is irreparable

10   because this is part -- that action harms the League's program

11   or our clients' programmatic activities and that that harm

12   directly impairs our clients' core missions.

13           THE COURT:  Is it remedial?

14           MS. LAKIN:  It is not remedial if you have lost the

15   ability to register a voter, especially where we have -- in

16   our country there's always another election.  They're not able

17   to gain that opportunity back following a loss of registration

18   and an election that takes place with an individual unable to

19   participate in that election.

20           THE COURT:  Okay.  Moving to another section, would

21   implementation of Section 2(a) of the executive order cause

22   irreparable harm to the nonpartisan plaintiffs in states other

23   than Arizona?

24           MS. LAKIN:  Yes.  Absolutely.  As I mentioned, we point

25   to Arizona because that is an election that is coming upon us

1    very quickly.  But there are a number of elections that are

2    occurring shortly after that, and year after year, month after

3    month, there's going to be another election.

4        Our clients are going to be continuing to try to register

5    as many voters as they possibly can, assist as many voters as

6    they possibly can through the voting process, and the

7    documentary proof of citizenship requirement will require them

8    to take a number of different kinds of actions to counteract

9    the difficulties in registering people to vote where you have

10   a requirement to show documentation.

11       And that's going to occur in Arizona, will occur later

12   this year in Texas.  We could continue documenting all the

13   additional elections that are going to occur for the

14   foreseeable future.

15       THE COURT:  All right.  The defendants argue that given

16   the compelling public interest in fair, trustworthy, federal

17   elections, the balance of equities and public interest are in

18   their favor.  So you're asking me to reach the opposite

19   conclusion.  In summary form, why?

20       MS. LAKIN:  Your Honor, there's simply -- that's an

21   assertion of what this executive order is going to accomplish.

22   There's no evidence.  In fact, if we were to look at anything

23   that has come before that Congress has considered in the past,

24   what the Election Assistance Commission has considered in the

25   past, all evidence is to the contrary.  Requiring a documentary

1    proof of citizenship requirement will just make it more

2    difficult for individuals to get registered to vote, with no

3    evidence whatsoever put forward except an assertion that this

4    will somehow create more secure elections.

5        THE COURT:  All right.  Okay.  Then let me move on to

6    the Democratic Party plaintiffs.

7        MS. LANG:  Your Honor, if you would indulge me on the

8    Arizona question on scope of relief?

9        THE COURT:  Sure.

10        MS. LANG:  I just want to add some comments on the

11    comparison to nationwide injunctions made by defendants here.

12        THE COURT:  Okay.

13        MS. LANG:  So as my colleague, Ms. Lakin, already

14    pointed out -- well, let me back up.  When this court

15    considers what relief to grant, the question is what would

16    provide complete relief to the plaintiffs, and if that

17    complete relief to the plaintiffs has some incidental impact

18    on others, that has never been a bar to the complete relief to

19    the plaintiffs.

20        And the plaintiffs here, both the Democratic Party

21    plaintiffs and the nonpartisan plaintiffs, are national

22    actors.  And I can tell you, LULAC and the League of Women

23    Voters and others are engaging in voter registration all the

24    time, not just in the run-up to a specific election.  And once

25    you've lost the opportunity at the grocery store to register

1    someone to vote, there is no way to remedy that harm.

2        But this is just not a nationwide injunction case, right?

3    So a good example again is the census citizenship question

4    case.  At the district court level, when considering the scope

5    of relief, the court pointed out that that case didn't involve

6    a case-by-case enforcement of a policy or a statute against

7    various people.  Instead, it was about a single decision about

8    a single questionnaire.  And we have the same question here.

9    We have a question about a single decision made by the EAC

10   about a single form.

11       And quite frankly, the NVRA's point in creating a federal

12   form was to have one form for national use; and it would be

13   contrary to the NVRA to be springing up different federal

14   forms for different states, and it would not provide complete

15   relief to the plaintiffs.

16       And cases like *Labrador v. Poe*, where there was a

17   concurrence from Justice Gorsuch, are just entirely

18   inapposite, right?  That was a case where the district court

19   had enjoined an entire law and its application to everyone,

20   even provisions that were completely unrelated to the

21   plaintiff's needs.  Here the question is simple.  It's about

22   one action by one set of actors about one form, and enjoining

23   that action is necessary to provide complete relief.

24       And the last comment on balance on equities that I would

25   make is, as Ms. Lakin pointed out, that is the -- those are

1    the policy beliefs of the president.  But it is not in the

2    interest of the public to allow the president to usurp the

3    policy decisions of Congress and the states, policy decisions

4    that the Constitution provided to Congress and the states.

5        So the president might have a set of policy views, but

6    what's in the public interest is enforcing that separation of

7    powers and allowing the congress and the states to exercise

8    their own power over election rules.

9            THE COURT:  All right.

10           MS. LANG:  Thank you, Your Honor.

11           THE COURT:  Let me do just one quick thing.  Okay.

12       All right.  Could you give us your name again, please?

13           MS. BRANCH:  Yes.  Good afternoon.  Aria Branch for the

14   Democratic Party plaintiffs.

15           THE COURT:  All right.  The Democratic Party plaintiffs

16   have moved for preliminary injunction, and it's against five

17   different provisions of the executive order including the one

18   we've just been talking about, the 2(a).  There's some

19   overlap, so some of my questions may overlap a little bit with

20   what's been asked for by the nonpartisan plaintiffs.

21       So let me just set out, as I understand it, the challenges

22   that you're raising.  2(a) directs the EAC to take appropriate

23   action within 30 days, to require users of the federal form to

24   provide documentary proof of citizenship, and then the state

25   and local officials have to record it on the form.

2(b) directs several federal agencies and officers to take action to "identify unqualified voters registered in the states," primarily by granting access to information in federal databases.

Third, 2(d) directs federal agencies to "assess citizenship" before providing the federal form to enrollees of public assistance programs.

Fourth, 7(a) directs the attorney general to take all necessary action to enforce 2 U.S.C. § 7 and 3 U.S.C. § 1 against states that count ballots received after the election day in federal elections.

And the last provision was 7(b), directs the EAC to condition any available funding to states, specifically on those states acting to set a ballot receipt deadline of election day for all methods of voting except for ballots by service members or other voters.

Obviously, I'm not going to go through all of the requirements under *Winter* about preliminary injunction, so let me move to each of the aspects that we need to get to.

So let me start with standing.  Plaintiffs have the burden of showing again a substantial likelihood of standing.  There are three theories, as I understand it, of standing that you have raised: organizational standing, associational standing like the nonpartisan plaintiffs, as well as political competitor standing.  Am I correct about that?

1          MS. BRANCH:  That is correct, Your Honor.

2          THE COURT:  Okay.  Then let me move to organizational

3     standing.  To have organizational standing in its own right,

4     an organization has to make "the same showing required of

5     individuals an actual or threatened injury in fact that is

6     fairly traceable to the defendant's allegedly unlawful conduct

7     and likely to be redressed by a favorable court decision."

8        So I take it from your declarations that each of your

9     organizational clients considers it part of its mission to

10    register eligible voters for federal elections and to help

11    eligible voters have their ballots counted at least to the

12    extent that doing so helps elect Democratic candidates.  So

13    I'm assuming that's your position.  Is that correct?

14         MS. BRANCH:  That is correct, Your Honor.

15         THE COURT:  Okay.  So your standing arguments for most

16    of the challenged provisions are quite clear in your motion

17    and reply, but briefly, how is Section 2(d) of the executive

18    order, which requires federal agencies to assess citizenship

19    before providing it to a public assistance program, the

20    enrollment, causally linked to the harm you allege to your

21    organizational clients' interest, and how would a favorable

22    decision on your motion by me redress that harm?  So if you'd

23    focus on that one.

24         MS. BRANCH:  Sure, Your Honor.  So as you mentioned,

25    Section 2(d) requires federal agencies that are designated as

1    voter registration agencies under the National Voter

2    Registration Act to, quote-unquote, assess citizenship before

3    they can even provide the federal registration form to

4    enrollees of public assistance programs, and only enrollees

5    of public assistance programs, no one else.

6        And so we have submitted declarations from all of the

7    Democratic Party organizations as well as the leaders of the

8    Democratic caucuses and the Congress that talk about the ways

9    in which low-income voters who may submit themselves to these

10   voter registration agencies and desire to register to vote

11   would be subject to these citizenship assessments before they

12   can be even be given the federal form.

13       And so in our declarations, we have the declarants talking

14   about how low-income voters who qualify for assistance

15   programs support Democratic candidates to the tune of 20-plus

16   percent more than their Republican counterparts.

17       I would point Your Honor to Exhibit 10, which is the Pew

18   Research on Party Affiliation, talks about how low-income

19   voters are more likely to support Democratic candidates.  And

20   so this provision has real potential to cause competitive harm

21   to Democratic candidates because it will decrease the ability

22   of Democratic-affiliated voters to be able to use the federal

23   form to register to vote.

24       That, in and of itself, will cause organizational harm

25   because my clients are in the business of running elections

1    and winning elections.  And so everything that they do, day

2    in and day out, 365 days of the year, is focused on that.

3    It's focused on registering Democratic voters.  It's focused

4    on turning voters out to vote.  It's focused on ensuring that

5    voters know how to cast a ballot and that that ballot will be

6    counted once it's submitted.

7        And if Democratic-affiliated voters can't register to vote

8    at these voter registration agencies, that means that my

9    clients will have to step in and fill the void.  That will

10    cause organizational harm to them because they will have to

11    divert resources from persuasion efforts, all of the different

12    things — programs, turnout programs, even advertising that are

13    listed in the declarations — in order to make sure that

14    enrollees of public assistance programs can register to vote.

15        I would point Your Honor also to the 2007 GAO report that's

16    referenced in our brief, which the court can take judicial

17    notice of.  It's a government report, and it talks about how

18    citizenship checks have discouraged participation in public

19    assistance programs by eligible individuals.

20        So there's a real concern that this provision, this command

21    of the president, which is unlawful for all of the reasons in

22    our briefs, will discourage Democratic-affiliated voters from

23    registering to vote, and that will hurt my clients both at the

24    ballot box, and it will cause them competitive harm --

25            THE COURT:  Leaving that aside, just the organizational

1    one.

2          MS. BRANCH:  Yes, Your Honor.  Because they will have

3    to divert resources from other programs, other core activities,

4    to fill the void and counteract the harms of the president's

5    unlawful command.

6          THE COURT:  All right.  Anything else that you think

7    of note that you want to add, again talking strictly about the

8    substantial likelihood of organizational standing, that

9    argument.

10          MS. BRANCH:  The only thing I would say is, on the

11    ripeness point, these are injuries that are happening now

12    because, as I mentioned, my clients are in the business of

13    registering voters 365 days of the year.  And so to the extent

14    that Democratic-affiliated voters can't register to vote, that

15    is causing them harm now.  It will be irreparable because the

16    resources that they spend to counteract this harm can't be

17    recouped.

18       And there are lots of court decisions that talk about how

19    campaign- and election-related injuries like the ones we have

20    articulated are irreparable, because once the election is

21    over, there can't be a do-over and there can't be any redress

22    to recoup resources that have been diverted to counteract this

23    harm.

24          THE COURT:  All right.  Let's move to associational

25    standing.  That requires that the membership organization has

1    to show its members would otherwise have standing to sue in

2    their own right and the interests the organization seeks to

3    protect are germane to the organization's purpose, and neither

4    the claim asserted nor the relief requested requires the

5    participation of individual members in the lawsuit.  So who

6    exactly are your organizational clients' members for purposes

7    of associational standing?

8         MS. BRANCH:  Sure.  And this is detailed in the

9    declarations, but I represent the Democratic National

10   Committee, which has a formal membership of state party

11   leaders and Democratic leaders.  It also considers every

12   registered Democratic voter to be a member.

13        So to the government's argument that we have not identified

14   individual members who will be affected is just incorrect

15   because we have identified and we have declarations that we've

16   submitted from both Leader Schumer and Leader Jeffries, both

17   of whom are members of the DNC.

18        The Democratic Governors Association also has a formal

19   membership of all the Democratic governors in the country.

20   We have listed the names of all of those governors in our

21   declaration.  The DCCC and the DSCC similarly consider

22   Democratic voters to be among their membership and their

23   constituency, and each of the commands that the president

24   has set forward in this executive order will impact those

25   constituencies and those members in harmful ways which we've

1    detailed in the declarations.

2         THE COURT:  You mentioned the Democratic Governors

3    Association members.  Are they in their individual capacities

4    or members in their official capacities as governors?  What

5    capacity?

6         MS. BRANCH:  In terms of their membership --

7         THE COURT:  Yes.

8         MS. BRANCH:  -- in the organization?  I believe it's

9    in their official capacities as governors.  And also, I mean,

10   as voters, right?  They are individuals who cast ballots in,

11   I think it's 26 states in the country.  So I think they have

12   standing both as individuals, and then they're also members of

13   the DGA in their official capacities.

14        THE COURT:  Okay.  The political competitor standing.

15   Our D.C. Circuit has recognized that political competitors can

16   have standing to challenge illegal structuring of a competitive

17   environment in which rival parties identify their concrete

18   interests.  It's available primarily to candidates with

19   concrete plans to run for office in the future.

20        And obviously, two of your clients — Representative

21   Jeffries and Senator Schumer — are individual, active

22   candidates for federal office, and it appears likely that they

23   have political competitor standing to challenge actions that

24   directly affect their elections.  So I think I would agree

25   with that.

1          Do organizational clients have political competitor

2     standing as well?

3          MS. BRANCH:  They absolutely do, Your Honor, and I

4     would point Your Honor to a case -- I think it's from the D.C.

5     Circuit.  I think it's the *Natural Law Party* case.  And I'll

6     check the case name of that, but that specifically recognizes

7     that political parties can also have competitor standing

8     because they suffer electoral harm if they are not able to

9     elect their candidates at the ballot box.

10         And so the DCCC, the DGA, and the DSCC as well as the

11    DNC are all in the business of electing Democrats to elected

12    office.  And because the executive order's election-day

13    receipt provision and command and its requirement that the EAC

14    impose documentary proof of citizenship would both decrease

15    the number of Democratic voters who can become registered and

16    would make it more difficult for Democratic voters to have

17    their ballots counted, including in states like California

18    where the DCCC has a number of -- and every cycle has a number

19    of competitive congressional races and 80 percent of the

20    voters in California vote by mail, I think that under current

21    law, ballots can be received I think up to seven to 10 days

22    after the election.

23         If that changes, that is a sea change in election law in

24    California and across the country.  It would have an enormous

25    impact on the party committees' and particularly the DCCC's

1    ability to win elections.  And so the party committees

2    actually have competitor standing, and the executive order

3    imposes unlawful command on various agencies that would hurt

4    their ability to elect Democratic candidates.

5            THE COURT:  What's the best precedent?  Is it the case

6    you're hoping to check?

7            MS. BRANCH:  That the parties --

8            THE COURT:  Yes.  In other words, what's the best

9    precedent from this circuit, not from some other circuit --

10           MS. BRANCH:  Yes, it is from this circuit, and I think

11   the *Shays* case may speak to this as well, *Shays v. FEC*.  But I

12   think it's the *Natural Law Party* --

13           THE COURT:  I see your colleague nodding.

14           MS. BRANCH:  Apologies.

15           THE COURT:  So do any of your organizational clients

16   have as members active candidates for federal elective office

17   in the state of Arizona?  And if so --

18           MS. BRANCH:  Absolutely.  Absolutely, Your Honor.  So

19   the DGA, Governor Hobbs, who is the governor of Arizona, is a

20   member of the DGA, and then the DCCC has a number of candidates

21   who hold office in Arizona and who will be running for

22   re-election.

23           THE COURT:  If I directed you to get affidavits, would

24   you be able to do so, and how quickly, from these individuals?

25           MS. BRANCH:  I can certainly do my best.  Can we follow

1    up on that?

2              THE COURT:  Yes.

3              MS. BRANCH:  I mean, I do think that the affidavits we

4    submitted -- and we've referenced Governor Hobbs, I believe,

5    in the DGA affidavit as the governor of Arizona, a member of

6    the DGA.  But certainly, if Your Honor would request further

7    affidavits, we can work on that.

8              THE COURT:  All right.  Then moving to 2(d), which

9    directs federal agencies to assess citizenship before

10   providing the federal form to enrollees of public assistance

11   programs, how would that affect the competitive environment

12   for candidates for federal elective office?

13             MS. BRANCH:  So as I mentioned earlier, Your Honor, and

14   we've submitted declarations and both the Pew Research Center

15   study on this, the studies show that lower-income voters are

16   more likely to vote for and support Democratic candidates.

17         And so to the extent that they are not able to register

18   to vote or they're discouraged from being able to register to

19   vote at federal agencies using the federal form that Congress

20   has, you know, set forth under the National Voter Registration

21   Act, that will -- that will ensure that there are fewer

22   Democratic voters who can cast ballots for Democratic

23   candidates.  And so that will cause competitive and electoral

24   harm for all of my clients.

25             THE COURT:  All right.  Let me move to the likelihood

1    of success on the merits.  One of the arguments that you make

2    about Section 2(b), instructions on data sharing, that it's

3    *ultra vires* because implementing those instructions would

4    violate the Privacy Act.  The defendants in turn argue that

5    there's at least one routine use allowed under the Privacy

6    Act that would cover the kind of data sharing described in

7    Section 2(b).

8        Specifically, they cite a routine use listed in the USCIS

9    alien file System of Records Notice, or SORN, which covers

10   disclosures "to a federal, state, local, tribal, or territorial

11   government agency seeking to verify or ascertain the citizenship

12   or immigration status of any individual within the jurisdiction

13   of the agency for any purpose authorized by law."

14       Do you disagree with their interpretation of the routine use?

15           MS. BRANCH:  I do, Your Honor.

16           THE COURT:  Okay.

17           MS. BRANCH:  And the first thing I would point out is

18   that the executive order commands that this personal, private

19   data be shared with DOGE, and there's no exception that the

20   government has pointed to that would allow for such data

21   sharing.

22       With respect to the routine use, there are two requirements

23   that have to be invoked in order to advance that exception.

24   The first is that the agency has to publish the routine use in

25   the Federal Register.  The second is that disclosure of the

1    relevant record has to be compatible for the purpose for which

2    the record was collected.

3        And the government points to a single published routine

4    use for this data, and even then only to a single database.

5    That routine use, which we pointed out in our reply brief,

6    is limited to when state and local officials affirmatively

7    request information about said citizenship from the federal

8    government.

9        So it does not allow for a broad disclosure of citizenship

10   data with state and local officials across this country.

11   There are 300 local election officials across this country,

12   many of whom are election deniers, and the Privacy Act is put

13   in place to prohibit just this kind of broad disclosure.

14       We're not just talking about disclosure to a couple of

15   employees at DOGE, although that is unauthorized.  We're

16   talking about disclosure to all state and local officials,

17   and the routine use that the government points to allows for

18   disclosure when state and local officials request it, not

19   pursuant to an unlawful command by the president.

20       THE COURT:  Okay.  Moving to 7(a), why are your

21   clients the proper plaintiffs to challenge 7(a) which directs

22   enforcement actions against states?  Aren't the states the

23   proper plaintiffs to raise those claims in an *Ex parte Young*

24   style equitable action for an anti-enforcement injunction?

25       MS. BRANCH:  I think states could bring such a claim,

1    but our plaintiffs also have standing to do so as well because

2    they will be injured by the ballot receipt, the election-day

3    ballot receipt provisions.  And so they are seeking an

4    injunction against the attorney general from prohibiting

5    states from engaging in changing their laws to comply with the

6    president's unlawful demand.  Because that will inflict harm on

7    our plaintiffs, they have standing to challenge the provision.

8         THE COURT:  So would I have equitable power to enjoin

9    the attorney general from filing a suit against a nonpartisan,

10   and can you point me to some case that says so if you think

11   that I would have that power?

12        MS. BRANCH:  Well, I think the important thing to note

13   here is that the executive order is quite broad.  It commands

14   the attorney general to enforce the law in any way she sees

15   possible.  It's not clear that that's limited to filing

16   lawsuits, but certainly that might be one way that she may

17   see fit to enforce the law.  And I think -- yes, I think Your

18   Honor does.  Because that provision is *ultra vires*, it

19   violates the separation of powers, I think Your Honor does

20   have the power to enjoin that provision.

21        The president simply doesn't have authorization from the

22   Constitution or any federal law to force the attorney general

23   to enforce a flawed and incorrect view of federal law.  The

24   states are under the Election Clause.  Both the states and

25   Congress have control over elections, and the states have

1    taken their -- they have followed their policy choice in

2    enacting state ballot receipt deadlines that may be after

3    election day, and that is completely consistent with their

4    power under the Elections Clause.

5        The election-day statutes do not have any bearing on that.

6    They speak to when elections are to be held, when voters must

7    make their final choice in an election.  They don't speak to

8    when ballots must be received.  And so the claim here is that

9    the president simply doesn't have the power to force the

10   attorney general to enforce a flawed view of the law that

11   violates the separation of powers.  And so that is what we

12   are asking Your Honor to consider and to enjoin.

13       THE COURT:  Do you have any kind of case that you can

14   cite to relating to this?

15       MS. BRANCH:  I will check on that.

16       THE COURT:  Okay.

17       MS. BRANCH:  I don't recall one off top of my head in

18   our reply brief, but if Your Honor will permit me to follow up

19   on reply, I can do that, or rebuttal.

20       THE COURT:  Okay.  Now we'll move to 7(b).  Why are

21   your clients the proper plaintiffs to challenge 7(b), which

22   directs the EAC to withhold funding from states under certain

23   conditions?  Again, shouldn't the states be the ones to bring

24   those claims?

25       MS. BRANCH:  Again, I think the states could be the

1    ones to bring those claims, but my clients also are harmed by

2    the provision — in particular, the governors who are members

3    of the DGA, the Democratic Governors Association — because the

4    president's acting unlawfully by commanding the EAC to

5    withhold funding from state officials to run their elections.

6        That will have -- if they decide not to comply with his

7    unlawful command to reject ballots received after election

8    day and the EAC withholds funds as a result, that will have

9    enormous impact on election administration in states, which

10   will impact voters and the way that elections are run.

11       It will also impact the governors, and it will certainly

12   impact the party organizations who will have to step in and

13   fill the void.  They will have to engage in and try to help

14   with election administration tasks that states are no longer

15   able to handle because the EAC has unlawfully withheld funds.

16   And so my clients absolutely are being injured by 7(b), and

17   they have standing to sue as a result.

18           THE COURT:  So talking about both sections 7(a) and

19   7(b), what would be the thinking about private parties who

20   basically are asserting claims to protect states or sovereign

21   entities from federal infringement on their sovereign

22   prerogatives in terms of your almost acting on behalf of the

23   states?

24           MS. BRANCH:  I don't think that's what's happening here.

25           THE COURT:  Okay.

1          MS. BRANCH:  Because I think that, as I've articulated,

2     the plaintiffs that we represent, in particular the governors,

3     are going to be injured because of the president's unlawful

4     command for these states to reject ballots received after

5     election day.

6        So I don't think it's necessary to even reach that

7     question, because I don't think this is a situation where the

8     plaintiffs are acting on behalf of states.  They're acting on

9     behalf of their own interest, which will be injured because of

10     the president's unlawful command.

11          THE COURT:  All right.  The last one is obviously

12     irreparable harm, and as I indicated before with the

13     nonpartisan plaintiffs, it's a very high standard.  It's

14     not one that all the circuits have in terms of showing

15     irreparable harm.  It has to be beyond remediation, it can't

16     be theoretical, and won't be granted against something merely

17     feared is liable to occur at some indefinite time in the

18     future.

19        So very briefly, why is the burden that each provision

20     of the executive order would place on the Democratic parties

21     beyond remediation and not merely theoretical?  And I'll leave

22     you to figure out how you want to discuss it in the context of

23     the provisions.

24          MS. BRANCH:  Sure.  So the election-day receipt

25     deadline provisions are undermining the party organization's

1  ability to plan for and compete in the upcoming '25 and '26

2  elections.  Instead of mapping out persuasion strategies and

3  ad strategies and working on turning out voters, they're

4  spending their limited time and resources planning on how to

5  revise their mail voting programs to ensure that their members

6  and constituents can submit their ballots on time.  That's

7  time, money, and organizational resources and strategy that

8  can't be recouped.

9      And with elections, as I'm sure Your Honor knows, every

10  single day is important.  Like we're on a ticking clock to

11  election day every cycle, and every moment that my clients are

12  spending planning for counteracting the harm of the receipt

13  deadline provision or counteracting the harm of the president

14  commanding documentary proof of citizenship is time that

15  they're not spending persuading voters to support Democratic

16  candidates.

17      And courts have said that these types of election- and

18  political-related injuries are irreparable and they can't be

19  redressed later because you can't get that time and you can't

20  get that money back.  And so these are precious resources that

21  my clients are having to spend now in order to counteract the

22  unlawful provisions in this executive order, and that will

23  impact them both at the ballot box and in terms of elections

24  and their ability to turn out voters going forward.

25          THE COURT:  In terms of -- is there irreparable damages

1    as this case has set out that's specific to any of these --

2    that's a more general one that you discussed as I assume you

3    would say affects all of the sections.  Are there particular

4    ones that are related to a specific section that's at issue?

5          MS. BRANCH:  I think with respect to the data-sharing

6    provisions and the Privacy Act violations, those provisions

7    further threaten irreparable harm because they require the

8    disclosure of personal information of Democratic Party members

9    and constituents to state and local officials and including

10   DOGE.

11         And I think that provision will impact the -- and we talked

12   about in our declarations the fact that Democratic voters are

13   particularly concerned about their data being shared with DOGE

14   and other federal agencies given the president's discussions

15   and accusations of cheating by Democratic voters.

16         The data-sharing provisions in particular will make it more

17   difficult for the party committees to register voters because

18   voters are going to be more hesitant to share their personal

19   information to register to vote if they know that that

20   information will be shared with state and local officials,

21   it'll be shared with DOGE, it could potentially result in them

22   being disqualified to vote or removed from the voter rolls

23   mistakenly.

24         But in general, I think the organizational harm and the

25   associational harm is irreparable here.  In Leader Jeffries'

1    and Leader Schumer's declarations, they talk about the impact

2    these provisions have on the ability to recruit candidates

3    because candidates want to know that the rules of the road are

4    clear and that the rules that apply to Democratic voters won't

5    hurt their ability to get elected.

6        And so these provisions are causing all sorts of harm right

7    now because candidate recruitment is something that's going on

8    right now, and if a candidate decides they're not going to run

9    for office because it's too difficult because there's too much

10   uncertainty, because in California, for instance, ballots

11   won't be able -- or across the country, frankly, ballots won't

12   be able to be returned after election day, and that will cause

13   mass confusion and chaos amongst voters.

14       That's a harm that's occurring right now, and that can't be

15   recouped because you can't -- once a candidate decides they're

16   not going to run for office because of this and the candidate

17   deadlines for declaring for office have passed, you can't go

18   back and recruit that candidate.

19       So that's just a small -- that's one example that's

20   discussed in the declarations as the way that these provisions

21   are harming both the organizations and the party leaders right

22   now, and that harm is irreparable.

23           THE COURT:  In terms of the last one, which is the

24   balance of equities in public interest, why do they tip in

25   your favor?  And again, we're looking at all of the sections.

1    So you give one overall or pick particular sections that you

2    think you want to address it with.

3        MS. BRANCH:   Sure.   I mean, I would join the arguments

4    that the nonpartisan plaintiffs made as well, which is, one,

5    the government doesn't have an interest in enforcing laws that

6    are unconstitutional.   And so I think when you look at the

7    balance of the equities, it's very clear that these provisions

8    were -- they're *ultra vires*, they violate separation of powers,

9    and the government doesn't have an interest in enforcing them.

10        On the other side of the balance, you have the threat of

11    disenfranchisement of Democratic voters, and courts have held

12    that it is in the public interest for lawful citizens, which

13    is all we're talking about here, to be able to cast ballots

14    and have that ballot counted.

15        And so I think the balance of the equities weighs very

16    heavily on our side, especially with respect to the ballot

17    receipt deadline which would result in disenfranchisement of

18    voters whose ballots are received by states after election

19    day, even if it's through no fault of their own due to post

20    office delays or other issues the government just says, oh,

21    well, that doesn't matter.

22        And that certainly is not -- that is not within the spirit

23    of the NVRA, which the entire purpose of the NVRA is to

24    encourage voter participation.   That is why Congress enacted

25    it.   That's why the federal registration form exists.   So I

1    think the balance of the equities is very clearly on our side.

2    I think an injunction here is certainly within the public

3    interest because it would make it easier for people to vote.

4    And because what the president has done here is so unlawful,

5    it is a clear violation of the separation of powers both with

6    respect to the states and Congress who have the power over

7    elections.  The president plays no role, and his commandeering

8    of the EAC and trying to override state laws on elections is

9    absolutely *ultra vires* and should be enjoined.  And that would

10   be consistent with the public interest.

11            THE COURT:  All right.  What I'm going to do at this

12   point is, before we start with the defendants, I'm going to

13   take a break so the court reporter has a break here instead of

14   going through the rest of the afternoon.  So it's 3:15.  We'll

15   come back at 3:30, and we'll pick up at that point.

16            MS. BRANCH:  Thank you, Your Honor.

17       (Recess from 3:15 p.m. to 3:39 p.m.)

18            THE COURT:  All right.  Mr. Gates, I have some

19   questions for you.

20            MR. GATES:  Thank you very much, Your Honor.

21            THE COURT:  All right.  The 2(a) directs that the EAC

22   take appropriate action within 30 days to require users of the

23   federal form to provide documentary proof of citizenship,

24   which state and local officials must then put on the form.

25   I take it from our colloquy at the beginning of the arguments

today that you would agree that making a change to the federal
form is going to take more than 30 days, so that provision
isn't going to be specifically implemented.  Would you agree
with that?

MR. GATES:  That's correct, Your Honor.  Not within 30
days.

THE COURT:  So let's put aside for the moment arguments
about standing.  I understand your principal defense of
Section 2(a) to center on the "appropriate action" language
and then Section 11(b)'s "consistent with applicable law"
language, and I'll call those the "savings clauses" for short.

MR. GATES:  Yes, Your Honor.

THE COURT:  And your argument, as I understand it,
basically comes down to saying you must read the savings
clauses to remove anything illegal from the order.  Under that
reading, Section 2(a) only orders actions that are legal, so
plaintiffs have no claim and face no irreparable harm.

Would that be a good summary of what you said?  I think
that's how you worded it.

MR. GATES:  Yes.  And if you're referring to our
briefing, I think we --

THE COURT:  Yes.

MR. GATES:  -- briefed this pretty extensively.  And
I would underscore, too, that the EAC, pursuant to 52 U.S.C.
20921, is a bipartisan organization.

1          THE COURT:  Right.

2          MR. GATES:  It's an independent entity, and it is part

3     of the Executive Branch under the purview of the President of

4     the United States.  So the executive order is properly placed

5     giving direction to the agencies that are contemplated in the

6     executive order, whether it's DHS, attorney general, and the

7     EAC.

8          THE COURT:  So you're indicating it's not really an

9     independent agency; it's basically the president can tell them

10    what to do?

11         MR. GATES:  Well, the president's executive order

12    applies to the EAC.

13         THE COURT:  I understand.  But if I understand your

14    argument, I understand that the executive order relates to or

15    purports to tell the EAC what he wants done, if I understand

16    your argument, and you're indicating that because it's

17    considered part of the Executive Branch, he legally can do it.

18    Is that what you're arguing?

19         MR. GATES:  Well, if I could make my argument --

20         THE COURT:  Well, it's not a question I asked, but you

21    brought it up.

22         MR. GATES:  That's fair.

23         THE COURT:  I'm trying to figure out whether you're

24    making some argument in terms of it's not really an

25    independent agency or some other thing, which I didn't see in

1    your brief, but I'm happy to hear what it is.

2         MR. GATES:  It is -- I believe it is noted in our

3    brief, Your Honor.  I don't have the page cite, but what's

4    important and responsive to your question is that the --

5         THE COURT:  Responsive to which question?

6         MR. GATES:  To the question about the lawfulness, the

7    EAC shall implement according to the applicable laws.  There's

8    a whole host of statutes that the EAC must comply with, and

9    they are expected to comply with them.

10        THE COURT:  Oh, I -- there's no dispute about that.

11   I mean, EAC has different obligations and different procedures

12   that it needs to go through.  I'm not disagreeing with that.

13   What I was trying to get to in your argument is if for some

14   reason that the savings clause in essence saves any potential

15   issues, that whatever is being ordered would be considered

16   legal and that the savings clause makes it clear that whatever

17   is being ordered has to be legal.

18        MR. GATES:  Yeah, and --

19        THE COURT:  Would you agree that's your argument,

20   that the savings clause sort of saves what it is that's being

21   ordered because it's expected to comply with the law?

22        MR. GATES:  And -- yes, and the executive order is

23   directing the agencies that the president has purview over to

24   enforce the laws that are already on the books that Congress

25   passed.  Specifically, if I may, according to existing federal

1    law, it's a federal crime to vote if you're a noncitizen.

2    That's 18 U.S.C. --

3         THE COURT:  Right.  I'm not disputing that, but I'm

4    just -- let me do it this way, okay?  And then I'll let you

5    get back to it.

6         MR. GATES:  Okay.

7         THE COURT:  Let me do my hypothetical for a second

8    in terms of sort of seeing how the savings clause and the

9    "consistent with applicable law" language is used, as I

10   understand your argument, that it sort of saves any -- and

11   makes it clear that any actions that are going to be ordered

12   are going to be legal because it has to comply with applicable

13   law and basically has to be done legally.

14   And let me make it clear that I'm doing a hypothetical

15   that has nothing to do with elections, and it should not

16   be concluded that this is actually going to happen or is

17   happening just because, evidently, other people, when they've

18   done hypotheticals, they've somehow taken it for granted that

19   this is correct.  This isn't.

20   This is strictly to not draw a comparison between the

21   hypothetical facts and the facts in this case.  It's basically

22   to see how the legal arguments would apply to different facts

23   but to make a point.  Okay?  I'm doing it as sort of a caveat

24   out here since, evidently, some other hypotheticals people

25   have taken to be correct.  This isn't, hopefully, correct.

1        So imagine an executive order that said, "The General

2   Services Administration shall, in five days, bar all women

3   from entering federal buildings."  The order would plainly

4   violate the Fifth Amendment.  And assuming standing and venue

5   and everything else, a woman could come into court and enjoin

6   the GSA from enforcing that order.  Okay?

7        Now imagine the order says, "Consistent with applicable

8   law, the General Services Administration shall, in five days,

9   bar all women from entering federal buildings."  The ordered

10   action is exactly the same and completely unconstitutional.

11   The only difference is that it's consistent with applicable

12   law.

13        So, in other words, the first hypothetical just simply

14   says, "The General Services Administration shall, in five

15   days, bar all women from entering federal buildings."  The

16   next order says, "Consistent with applicable law," part of the

17   savings clause, "the General Services Administration shall, in

18   five days, bar all women from entering federal buildings."

19        So it has the savings-clause language which you've

20   indicated.  And if the savings clause meant the order didn't

21   direct anything illegal to happen, then the order wouldn't

22   direct anything at all.  Right?  Because the only thing the

23   order directs in this particular hypothetical is something

24   illegal.  So, in other words, it's legally impossible to

25   enforce the order consistent with the order in this

1    hypothetical consistent with applicable law.  Would you agree

2    with that?

3            MR. GATES:  Yes.

4            THE COURT:  So as I see the law in the cases, and

5    exercising some common sense, would it be irrational to say

6    that a woman still couldn't come into court and seek an

7    injunction against the GSA, barring enforcement of the order?

8    Of course they could.  Right?

9            MR. GATES:  In your hypothetical, the order is patently

10   unconstitutional.  In this case --

11           THE COURT:  Wait a minute, wait a minute.  Let me

12   finish my hypothetical, and then you can move on.  So the

13   applicable language "consistent with applicable law" doesn't

14   save it because it's illegal.  So even though they have

15   language in there, "consistent with applicable law," etc., it

16   doesn't save an illegal action.  Am I correct?  Would you

17   agree with that?

18           MR. GATES:  I would, Your Honor.

19           THE COURT:  Okay.

20           MR. GATES:  But that's not what we have here.

21           THE COURT:  Well, that is something in terms of an

22   argument in terms of whether or not what he has ordered is

23   legal or not and whether it's saved by the language of

24   "applicable" or "conforming with the law."

25       The reason I raise this is you argued, as part of your

1    argument, that the savings clause is important to be

2    considered along with the action; and I'm pointing out that it

3    certainly should be considered, but it does not do anything if

4    the law that's at issue is illegal.  So I'm just trying to get

5    an argument to make sure that we're all on the same page that

6    the savings clause doesn't help and doesn't save an illegal

7    order.

8        We disagree as to whether what the president has done

9    is illegal.  And I understand that, and I understand your

10   argument.  All the point I was trying to make is to make sure

11   that we agreed that if the order is illegal to start with,

12   the savings clause doesn't save it, and you've agreed to that.

13   So let me move on.

14        MR. GATES:  Your Honor, may I please make a distinction?

15        THE COURT:  If you're going to argue whether the order

16   is legal or not, I know what your arguments are, and I have

17   other questions that I'd like to ask.  And I know what your

18   arguments are, and I haven't made a decision about it.  But

19   let me ask my questions, and at the end, if it doesn't cover

20   it, we can get to it.  Okay?

21        MR. GATES:  Would you allow me, so the record's clear,

22   just to make a quick distinction?  The savings clause for our

23   part isn't there to suggest -- we're not arguing that it makes

24   what appears to be to others as an illegal order legal.

25   That's not what we're saying.

1          We only argued the savings clause because plaintiffs have

2     said that the president is usurping congressional power to

3     regulate time, place, and manner in conducting federal

4     elections; the president has claimed the exercise of unlawful

5     control over the EAC; and the president has claimed *ultra*

6     *vires* separation of powers including claims the EO is directed

7     by the president without any constitutional or statutory

8     authority.

9          THE COURT:  Okay.  Mr. Gates, I don't like interrupting

10    counsel, but let me say, you're getting to an argument that I

11    understand their argument and I understand yours, okay?  And I

12    don't have a question about what the arguments are.  I haven't

13    made a decision about them.  What I wanted to find out is

14    generally how savings clause are used.  I understand your

15    arguments, and you set them all out, and I will review those

16    carefully, that what the president has done is legal, and I

17    understand their argument that it isn't.  That's not what I

18    was getting at.

19         So I understand the argument.  I'm in no way indicating

20    that you have somehow agreed in any way that the executive

21    order is somehow illegal.  I understand that.  So that's not

22    a problem.  I was just trying to make sure that we had an

23    agreement to how savings clauses only work so far and they

24    don't really save something, that if the court determines,

25    should I determine that the actions are illegal, the savings

1    clause doesn't help.  That was the only point I was trying to

2    make.  So let me move on to my questions.

3        Now, would it be appropriate and consistent with law for

4    the EAC to start a notice and comment process to revise the

5    federal form if the EAC had decided in advance that the

6    outcome of that process would be to add a documentary proof

7    of citizenship requirement regardless of the content of the

8    comments received?

9        In other words, would it be appropriate for the EAC to call

10   for notice and comment if it had already decided the outcome

11   in advance, in other words, deciding that the efforts that you

12   need to go through, that EAC is expected to go through, would

13   be to come to a conclusion about what the form, etc., and how

14   they should be doing things, it would not be expected that it

15   would make an advance decision, a determination based already

16   on what the president had in his order.

17       In other words, this would be an independent review and not

18   informed or set up as their being required in their notice and

19   comments and all the other things to adopt what the president

20   wants.  That is what I was trying to get at.  So would you

21   agree that it would not be appropriate to have them determine

22   before they start the whole process what the end result is?

23   Would you agree with that?

24            MR. GATES:  Well, can I explain, Your Honor --

25            THE COURT:  Okay.  Can you answer my question, and

1    then I'll let you explain.  Yes or no?

2         MR. GATES:  Okay.  It is appropriate in this

3    circumstance --

4         THE COURT:  Okay.

5         MR. GATES:  -- because the documentary proof is binary.

6    You're either going to be required to provide it or not, and

7    it has been decided by the executive order to provide the

8    documentary --

9         THE COURT:  I understand.

10        MR. GATES:  -- proof of citizenship, which is binary.

11        THE COURT:  So let me understand it.  As you are

12   describing it, it would appear that the president has set out

13   an executive order, what it is that he has ordered, and he

14   expects that the EAC is going to adopt it.  They're going to

15   go through the notice and comment.  Doesn't matter what's

16   going to come back because the end result is going to be what

17   the president wants.  Is that what you're saying?

18        MR. GATES:  No.  If I can explain, Your Honor.

19        THE COURT:  Okay.

20        MR. GATES:  The issue of whether there's documentary

21   proof is binary.  The way in which the language on the form,

22   which I have a copy before me, is manifest.  The language, the

23   words chosen, the way the form is designed, all of that is a

24   compilation of input from all the stakeholders.

25        THE COURT:  I understand.

1          MR. GATES:  So to answer your question, Your Honor,

2     that's why they go through the process, to get all of this

3     input.

4          THE COURT:  And that's my question.  You're not

5     answering my question.  My question is, they go through all of

6     this, the stakeholders and everybody else, and then they come

7     back and they -- let's say they decide they disagree with the

8     president on 2(a).  So would the expectation be that EAC would

9     say, no, we're not going to do that, or would the expectation

10    be, because of the executive order, that no matter what

11    process they went through and whoever said what, the end

12    result would be what the president wants?

13         MR. GATES:  Well, it's going to be that there's going

14    to be documentary proof because it's contemplated by the

15    executive order, and proof of citizenship is also contemplated

16    by Congress in about a dozen different statutes.  The

17    citizenship requirement is absolutely required by Congress by

18    legislation in order to vote.  You have to --

19         THE COURT:  Right.  But the question is, does it have

20    to be on the form, and do they have to provide proof of it?

21         MR. GATES:  The question for voter eligibility is

22    whether you're a citizen.

23         THE COURT:  Of course.  I'm not disputing that,

24    Mr. Gates.

25         MR. GATES:  And the only thing the president has

1    ordered is a mechanism to prove what the statutes passed

2    by Congress require.

3        THE COURT:  The point is, Mr. Gates, at this point the

4    expectation is that, yes, you have to be a citizen in order to

5    vote.  We all agree on that.

6        MR. GATES:  That's the law.

7        THE COURT:  So the question is whether the additional

8    provision in 2(a) should be added or not.  So you're ducking

9    my question.

10        MR. GATES:  I don't mean to.

11        THE COURT:  No, you are, sir.

12        MR. GATES:  I didn't intend to.

13        THE COURT:  You may not intend it, but you are.  So let

14    me just put it this way again, and then we'll move on:  Your

15    view is that what the president is requiring in 2(a) is legal.

16        MR. GATES:  Yes.

17        THE COURT:  Okay.  That's fine.  And you also agree

18    that they're going to go through the process of notice and

19    comment, they're going to be adding all these extra

20    consultations, etc.

21        MR. GATES:  Yes.

22        THE COURT:  And let's assume, at the end of what

23    they're required to do, they disagree with what the president

24    wants added to the form.  Okay?  Let's assume that that

25    happens.  The question for you is whether, if the expectation

1    is that despite their conclusion -- you seem to have decided

2    they can't conclude anything else.  But let us assume that

3    actually they could conclude at the end that there isn't a

4    need for it, or for whatever reason.  Would the expectation

5    be from your argument that it wouldn't matter if they decided

6    that it didn't need to be there as the president wanted in

7    terms of the proof, EAC would still be required to do this

8    because the president has ordered it?  Is that your view?

9         MR. GATES:  Yes, and I'm not ducking --

10        THE COURT:  Okay.  You answered my question.

11        MR. GATES:  Can I please explain?  The executive order

12   is binding --

13        THE COURT:  No, no.  You've answered my question.  It

14   goes to -- if I could follow up with this.  So as a practical

15   matter, the president has decided that this 2(a), with the

16   requirements that are in 2(a), should be something that EAC

17   should adopt and that --

18        MR. GATES:  Proof of citizenship.

19        THE COURT:  Okay.  And EAC is expected to go through

20   the process that's set out by statute and otherwise, okay?

21   And the expectation on the president's part, because he's

22   ordered it, is that the end result will be that 2(a) will be

23   adopted by EAC even if EAC decides, after they go through all

24   of their process, that they do not think it's needed, required,

25   or whatever their reason is, they wouldn't put it in except

1      for the president's order.  So would you agree that that's

2      your position?

3              MR. GATES:  Yes, but we don't know what the form is

4      ultimately going to look like.

5              THE COURT:  I agree.  I'm putting it totally in a

6      hypothetical form.  I'm trying to figure out whether from

7      your perspective that the EAC is expected to adopt 2(c) no

8      matter what process they go through.

9              MR. GATES:  That's the directive --

10             THE COURT:  And I don't know what the answer is.

11             MR. GATES:  Well, that --

12             THE COURT:  Yes or no?  This is a yes or no.  You can

13     explain, but it's a yes-or-no question.

14             MR. GATES:  I think it's a yes because the documentary

15     proof is required, but what the form is going to look like or

16     what information's going to be presented on the form won't be

17     in final form until the APA process has been completed.

18             THE COURT:  Right.  But I'm just saying to you, you go

19     through the APA process, and at the bottom, at the end, the

20     EAC decides that they do not want to adopt 2(a).  But your

21     view, as I understand it, and the president's view is that he

22     has mandated that it be included, that 2(a) be adopted; and

23     therefore, they can go through the whole process, but the

24     bottom line is 2(a) is going to be adopted by EAC.  Am I

25     correct?  Yes or no.

1            MR. GATES:  Yes.  And the EAC could actually require

2      documentary proof if the executive order didn't ever exist.

3      The EAC could, on its own, knowing that citizenship is

4      required by law, could require it on their own.

5            THE COURT:  They could require it.  I'm not saying

6      that they couldn't.  If they decided on their own and it was

7      consistent with the president, that's fine.  My question is,

8      if they concluded differently than the president, would the

9      president's direction and order -- basically, it's sort of the

10      prior determination as to the outcome.

11            MR. GATES:  I think you're assuming what questions

12      are going to be presented to the stakeholders and what their

13      feedback is going to be.

14            THE COURT:  I'm telling you the bottom line.  I'm

15      telling you the end.  I think I've gotten enough of a sense

16      of what you're arguing, so let me move on to some other

17      things.

18            MR. GATES:  Okay.

19            THE COURT:  So 2(b), let's move to that, directs

20      several federal agencies and officers to take action to

21      identify unqualified voters registered in the states by

22      granting access to information in federal databases, and

23      Section 2(b)(iii) in particular directs the Department of

24      Homeland Security to coordinate with a DOGE administrator

25      to review each state's publicly available voter registration

 1      list alongside federal immigration databases, among other

 2      records.  So what's the source of the president's authority

 3      to issue the instruction, Section 2(b)?

 4              MR. GATES:  Law.  It's already part of the law.  I'm

 5      looking for the citation.  It's already required under 52

 6      U.S.C. 20507, which I believe is the NVRA, the National Voter

 7      Registration Act, which was signed into law in 1993.  These

 8      requirements are already in the NVRA.  And, Your Honor, they

 9      apply to 44 states.

10              THE COURT:  That includes DOGE?

11              MR. GATES:  Well, that part was added, but the

12      requirements for the enforcement and information sharing,

13      that's already in the NVRA, and we put that in our papers

14      as well.  That has been the law of the land for decades.

15              THE COURT:  Let me ask it in a slightly different way.

16      You've argued that there's a routine listed in USCIS, the

17      alien file system of records notice, the SORN, that allows

18      the kind of data sharing directed in Section 2(b)(i).

19          And this routine use covers -- this is an argument you

20      made -- discloses "to a federal, state, local, tribal, or

21      territorial government agency seeking to verify or ascertain

22      the citizenship or immigration status of any individual within

23      the jurisdiction of the agency for any purpose authorized by

24      law."  So that certainly allows it.

25          Is DOGE Service a federal government agency within the

1    scope of this routine use?  Otherwise, it wouldn't seem to

2    allow DOGE to get access to it.

3        MR. GATES:  It is, and that's why it's contemplated

4    by the order.  What is --

5        THE COURT:  Answer my question.

6        MR. GATES:  Yes.

7        THE COURT:  Since the routine use, which you argue

8    that this routine use applied, this routine use, DOGE is not

9    a federal, state, local, tribal, territorial, a government

10   agency.  So are you saying that they're a government agency

11   within the scope?

12       MR. GATES:  They are designated -- they are proper

13   parties to the implementation of the executive order because

14   they've been designated by the president.

15       THE COURT:  Are they listed in the routine use?

16   Somewhere.

17       MR. GATES:  I would have to go verify that.

18       THE COURT:  Well, just look at what it says in terms of

19   the routine use sets out the disclosure and who can have this

20   information disclosed to.

21       MR. GATES:  I understand that.  I guess I misunderstood

22   your --

23       THE COURT:  It's an argument you made.

24       MR. GATES:  I guess I misunderstood your previous

25   question.  It is.

1          THE COURT:  So I'm just trying to find out in terms

2     of DOGE, at least in terms of this SORN, where DOGE fits in.

3     It doesn't seem to fit within a government agency, unless

4     you're making the argument it is a government agency.

5          MR. GATES:  Well, it is to the extent that the

6     president has designated DOGE to work with multiple federal

7     agencies --

8          THE COURT:  All I'm asking is, in your view, are you

9     telling me that they're a government agency, in which case,

10    therefore, they fall under this routine use.

11         MR. GATES:  They're not a government agency like DHS

12    or DOJ, but they are designated as a government agent.  And

13    presidents in the past have designated those outside of formal

14    government agencies --

15         THE COURT:  I'm not saying they can't delegate it.

16    My question is, in this particular routine use which you

17    pointed to, it doesn't seem to include DOGE if you're

18    indicating they're not a government agency the way this is set

19    out.  You're the one who brought up this issue about it falls

20    under this routine use.  So I'm just asking -- I'm not arguing

21    about the rest; I'm just asking whether DOGE is or is not a

22    government agency for purposes of this routine use.

23         MR. GATES:  For purposes of the routine use, I maintain

24    that it is.

25         THE COURT:  Okay.  Moving along.

79

 1        The executive order also refers separately to the
 2    Department of State databases.
 3              MR. GATES:  Yes.
 4              THE COURT:  In your brief, you don't identify any
 5    established routine use that would allow the Department of
 6    State to share information from any of its databases outside
 7    the federal government such as with the states.  So is there
 8    some routine use that would apply to the Department of State's
 9    systems use for that purpose?
10              MR. GATES:  We explain it, Your Honor, on page 27
11    and 28.
12              THE COURT:  Okay.  And what's the routine use?
13              MR. GATES:  That the federal government, through
14    the SAVE program, the Systematic Alien Verification for
15    Entitlements program, shares information with states all the
16    time, and they have under the NVRA for decades.  And they have
17    under HAVA since 2002.
18              THE COURT:  Okay.  Let's move on --
19              MR. GATES:  What I want to underscore is the
20    president's executive order is literally just telling its
21    executive agencies, his executive agencies, to follow the law.
22    So everything we're talking about has been the law for decades.
23              THE COURT:  Okay.  And that's your view, and I
24    understand it.  I'm just poking at it a little bit to make
25    sure I'm confirming what your view is.

1          MR. GATES:  That's fair.  And what I would underscore,

2     Your Honor, that if the plaintiffs wanted to challenge these

3     processes, they would sue the NVRA.  They would sue HAVA.  To

4     sue over the executive order, to sue the president, to sue the

5     federal government over the executive order claiming that

6     something's amiss here, that something's *ultra vires* or beyond,

7     it's -- they -- he's asking to enforce federal statutes that

8     have been on the books for decades.

9          THE COURT:  I can't believe you're inviting another

10    lawsuit, but anyway.

11         MR. GATES:  No, but I mean these are long-standing

12    statutes.  They're older than some of the folks in the room.

13         THE COURT:  I understand.  I understand your argument,

14    so let's move on to Section 2(d).  Again, I'm just trying to

15    clarify things.  I understand the rest of your arguments.  If

16    I haven't asked about them, I understand what they are.

17       Section 2(d) directs federal agencies to assess citizenship

18    before providing the form to enrollees of federal assistance

19    programs.  So they don't get to fill it out until there's been

20    an assessment as to their citizenship.  Again, what's the

21    source of the president's authority to issue this particular

22    one?

23         MR. GATES:  It's consistent with federal law.  If

24    you're going to get -- if anyone is going to get public

25    assistance, they have to prove -- they have to show a series

1     of IDs and prove who they are, where they live.  It's

2     absolutely consistent --

3             THE COURT:  What I'm asking for is -- nobody's

4     suggesting that anybody but a citizen should vote.  So the

5     question really gets to what's his authority to require that

6     that be shown before they get the form.

7             MR. GATES:  It's consistent with other federal law

8     including --

9             THE COURT:  What law?  Tell me.

10            MR. GATES:  The public assistance programs require

11    identification.

12            THE COURT:  Right.  Okay.

13            MR. GATES:  And many of them --

14            THE COURT:  But if they're already on the public

15    assistance rolls, presumably there's been some checking to

16    find out why they're there.  So if they're already on the

17    roll, why are you doing an additional assessment, presumably,

18    before they get the form?

19            MR. GATES:  The federal voter registration application,

20    that's the very first question, is whether you're a citizen or

21    not.

22            THE COURT:  I understand that.  I understand.

23            MR. GATES:  You're going to be asked all the time

24    whether you're a citizen.

25            THE COURT:  Right.  But it's not just filling it out.

1    If that was all that was needed, the president wouldn't need

2    to do 2(d).  So what he's asking for is not just you're on

3    public assistance where you have to be a citizen, presumably,

4    or that you've marked off that you're a citizen, there has to

5    be a special assessment; in other words, a review, a

6    consideration, some additional steps taken to assess whether

7    they're actually citizens before you give them the form.  At

8    least that's the way I would interpret it.

9        MR. GATES:  And that's literally what the NVRA and HAVA

10   both require under 52 U.S.C. 205 --

11       THE COURT:  But do they require it now before you get

12   the form, or is it already assumed that if you're on the

13   public assistance programs, if you're filling in the form,

14   that you are a citizen?

15       MR. GATES:  An assessment is contemplated under the

16   NVRA and HAVA.

17       THE COURT:  All right.  I'm curious to have the

18   plaintiffs respond to that.  Let me move to my next question.

19       The NVRA provides that voter registration agencies shall

20   make the federal form available and provide the federal form

21   "with each application for services or assistance unless the

22   applicant, in writing, declines to register to vote."  So the

23   federal form is provided under NVRA with each application for

24   services or assistance.  So it's provided at the present time

25   with it so that they would be in expectation that you would

1    know that they were citizens.  And that language is mandatory.

2         So how can an agency comply with the direction to assess

3    citizenship before providing the form and follow the NVRA?

4    The NVRA requires the form be given at the time that they're

5    asking for the services, and presumably a determination as to

6    their citizenship, and you're asking that they can't give it

7    until they find it out beforehand.  Doesn't there seem to be

8    an inconsistency here?

9         MR. GATES:  Not exactly.  The form itself asks the very

10   first question, whether you're a citizen or not, and the next

11   instruction is if the answer is no, do not complete the form.

12        THE COURT:  Okay.  But I'm talking about the NVRA.

13        MR. GATES:  I understand.

14        THE COURT:  Not that form.  The NVRA says they make

15   the form with each application for service.  In other words,

16   if you're asking for public assistance, you get the form to

17   fill out at the same time.  Presumably, they would be making

18   some determination relating to the citizenship at that point,

19   and that's mandatory.  So tell me how the agency complies with

20   2(d) to assess citizenship before providing the federal form

21   and still follow the NVRA.  So they don't have the federal

22   form at that point.

23        MR. GATES:  Well, I would have to --

24        THE COURT:  Although the NVRA says that they should.

25        MR. GATES:  I would have to consult the exact language

1    and get back, but the requirement under the NVRA and the

2    requirement under HAVA that a citizenship status assessment

3    occur is absolutely required.  And on the form, you can't

4    even complete the form until you say yes to the very first

5    question, which is a self-reporting assessment.

6        When you go to register in many states for a driver's

7    license, for instance, a lot of it is electronic, and folks

8    just click a number of buttons and there's no third-party

9    assessment or verification --

10            THE COURT:  We're not talking about driver's licenses.

11            MR. GATES:  I understand.

12            THE COURT:  We're talking about --

13            MR. GATES:  Well, except the NVRA is --

14            THE COURT:  -- and NVRA.  Okay?  Let's move on to the

15    next question.  In your brief, you describe the instruction in

16    Section 2(d) as undefined and too uncertain to determine

17    foreseeable harm.  That's the argument you made.  But suppose

18    that a federal voter registration agency declined to provide

19    the federal form to an eligible person because the agency was

20    unable to assess citizenship.

21        Wouldn't that be a cognizable harm?  I mean, who's going

22    to be doing this assessment if there -- there certainly are

23    federal voter registration agencies, and they're not going to

24    do it because they can't figure it out.  But the person

25    actually is a citizen.  Isn't that a harm?

1          MR. GATES:  Well, on the one hand, we've talked a

2     lot about different harms today.  We've got 16 plaintiff

3     organizations --

4          THE COURT:  Just answer the question, the harm I've

5     talked about.

6          MR. GATES:  I don't -- so let me understand the

7     hypothetical.  You're saying that somebody goes to register --

8          THE COURT:  Okay.  Let me read it again to make sure

9     that we're on the same page.

10          MR. GATES:  Okay.

11          THE COURT:  In your argument -- I'm getting at your

12     argument that 2(d) somehow is too uncertain to decide about

13     foreseeable harm.  A federal voter registration agency, which

14     they are, declines to provide the federal form to an eligible

15     person because the agency has no way of being able to assess

16     the citizenship.  Wouldn't that be a cognizable harm?  Because

17     you're making it a precondition to their actually getting the

18     form.

19          MR. GATES:  No.

20          THE COURT:  Okay.  Tell me how.

21          MR. GATES:  What's going to constitute a harm -- first

22     of all, the cases, all of them, talk about a substantial

23     injury in order to impose a preliminary injunction --

24          THE COURT:  You don't think that somebody who is

25     eligible to vote but that they won't --

1          MR. GATES:  They can go down the street --

2          THE COURT:  -- do the precondition and therefore you

3     don't get the voter form?

4          MR. GATES:  It's inconvenient.  They can go down the

5     street to the DMV.  They can go --

6          THE COURT:  In other words, they can go to a different

7     agency that somehow would be able to assess it.

8          MR. GATES:  I'm assuming --

9          THE COURT:  Is that your point?

10         MR. GATES:  Well, let's assume that your hypothetical

11    even exists.  If your hypothetical even exists, yes, there are

12    alternatives, and inconvenience is not a harm.

13         THE COURT:  I agree that inconvenience isn't, but

14    that's not what I actually asked.  But anyway.  Okay.  I

15    know what your answer is.

16       So let me move to 7(a).  This again directs the attorney

17    general to "take all necessary action to enforce 2 U.S.C. § 7

18    and 3 U.S.C. § 1 against states that count ballots received

19    after election day in federal elections."

20       So what's the source of the president's authority to issue

21    the instruction in 7(a) to enforce the election-day statutes?

22    What's the authority?

23         MR. GATES:  2 U.S.C. § 7.

24         THE COURT:  Okay.

25         MR. GATES:  And, Your Honor, plaintiffs talk about harm

1    in this regard.  Only the states have standing in a claim like

2    this on the one hand.  On the other hand, 33 states, including

3    Arizona, have already adopted election-day ballot receipt

4    deadline requirements.

5        THE COURT:  I understand that.  You're bringing extra

6    arguments out, but they're not really what I was trying to

7    get at.  So let me get on to the rest of it.  I don't disagree

8    with what you said, and that is in the pleadings.

9      What actions could the attorney general take consistent

10   with applicable law to enforce the election-day statutes?

11   Does that mean lawsuits?

12       MR. GATES:  Any number of actions, including criminal

13   actions.

14       THE COURT:  Okay.  So it's bringing lawsuits or taking

15   court actions.  Right?

16       MR. GATES:  Any number of actions.  You could send

17   letters to correct -- to encourage compliance --

18       THE COURT:  I'm asking if one of the things would be

19   lawsuits, in other words.

20       MR. GATES:  Well, you and I have to look into our

21   crystal ball and make a prediction.

22       THE COURT:  Okay.  Let me move on a little bit as to

23   why I was getting to this.  So let me talk about lawsuits.

24   The Voting Rights Section of the DOJ Civil Rights Division has

25   always been historically responsible for bringing lawsuits on

1    behalf of the United States relating to election law rights.

2    I believe that's correct, and you're not going to disagree

3    with that.

4        So I had one of my law clerks look into the many lawsuits

5    your office has brought over the years, and what we found was

6    that DOJ has sued states and local governments under the

7    Voting Rights Act, which has explicit civil enforcement

8    provisions; the NVRA, which has explicit civil enforcement

9    provisions; The Uniformed and Overseas Citizens Absentee

10    Voting Act, which has an explicit civil enforcement provision;

11    HAVA, which has an explicit civil enforcement provision; and

12    the Civil Rights Act of 1964, which has an explicit civil

13    enforcement provision.

14        What I did not see is a single case in which the U.S.

15    brought a suit to enforce the election-day statutes, neither

16    of which has a civil enforcement provision, explicit or

17    otherwise.  So with that in mind, what would be the United

18    States' cause of action to enforce the election-day statutes

19    against the state?

20        MR. GATES:  Again, we'd have to look into our crystal

21    ball to try to anticipate --

22        THE COURT:  I'm asking you --

23        MR. GATES:  She's got a whole host -- a whole host of

24    recourse.  Like I said --

25        THE COURT:  What I asked about is statutes.  We're

1    talking about lawsuits.  All of the lawsuits they brought

2    to enforce have all been under statutes that have a civil

3    enforcement provision.  The ones you're talking about, as far

4    as I can tell, don't have any civil enforcement.

5         MR. GATES:  And I'm not denying that she could continue

6    to bring civil action.  I'm not --

7         THE COURT:  I'm asking you -- what I was asking you

8    is under what statute you'd be bringing the suit to enforce

9    the election-day statutes.  The election-day statutes don't

10   have enforcement provisions, explicit or otherwise, while all

11   of these other statutes that have been brought to enforce the

12   various rights, etc., or to enforce making sure that the

13   voting is done correctly and according to the law have a

14   specific enforcement.  So is it just that the president has

15   decided to grant this authority, or is there something else

16   they would be relying on?

17        MR. GATES:  Well, the attorney general would only

18   operate under lawful authority and this EO.  This executive

19   order has not been implemented yet.  I don't know that the

20   attorney general at this point has given any thought to what

21   her recourse or what her options would be to enforce.

22        THE COURT:  Okay.  So at this point, although it's in

23   the executive order, we don't know how that would actually be

24   enforced.  Would that be fair?

25        MR. GATES:  Not with certainty, no, Your Honor.  We

1    could sit here and hypothesize, and it would depend on a

2    case-by-case basis, but this has not been implemented yet.

3    This is all to the point.  All of these hypotheticals, we're

4    relying on hypotheticals because none of this has been --

5         THE COURT:  It's not a hypothetical.  The president has

6    indicated and said that the attorney general is going to do

7    this.  I would have thought that they would have considered

8    how the attorney general's going to do it.  You've indicated

9    that there may be options, but at least at this point you

10   don't know how it's going to get implemented.  Would that be

11   fair?

12        MR. GATES:  I don't know the full portfolio of options

13   that the attorney general could take to enforce this provision

14   at this point.

15        THE COURT:  Okay.  And my last question -- no, not

16   quite my last question.  Sorry.  Is there any party, other

17   than the states, who would be a proper defendant in a case

18   brought to enforce the election-day statutes?

19      I'll repeat that:  Is there any party, other than the

20   states, who would be a proper defendant in a case brought to

21   enforce the election-day statutes, which has to do with the

22   states actually deciding on this?

23        MR. GATES:  It's really another hypothetical.  Anybody

24   who can come into court and demonstrate that they have

25   standing under Article III would be a proper party to bring.

1          THE COURT:  Okay.  So you couldn't identify anybody,

2     a particular type of defendant, other than the states.

3          MR. GATES:  Any type of plaintiff?

4          THE COURT:  No.  I asked about defendants.

5          MR. GATES:  Okay.  Repeat the question again,

6     Your Honor?

7          THE COURT:  Okay.  Is there any party, other than the

8     state, who would be a proper defendant in a case brought to

9     enforce the election-day statutes?  Obviously, the states who

10    would be dealing with when you could count the ballots in

11    terms of the election day and the election-day statute.  But

12    besides the state, is there any other defendant that you can

13    identify that would be able to do this?

14         MR. GATES:  Well, to the extent -- I mean, I'd have to

15    give this some thought.  To the extent it's required by law

16    pursuant to an act of Congress, I would have to give that some

17    thought.  The states are the first ones to come to mind, but

18    there may be others.

19         THE COURT:  Okay.  7(b) --

20         MR. GATES:  It's in federal law.

21         THE COURT:  7(b) directs EAC to "condition any

22    available funding" to states on those states acting to set a

23    "ballot receipt deadline of election day for all methods of

24    voting," except for certain ballots by service members and

25    other voters living abroad.

1        So HAVA provides that the EAC "shall make a requirements

2   payment each year" to each state which meets the conditions

3   described in the statute in an amount determined by the

4   statute, and that's 52 U.S.C. § 21001(a).  Is compliance with

5   the election-day statutes, 2 U.S.C. § 7 or 3 U.S.C. § 1, one

6   of the conditions specified in HAVA?

7        MR. GATES:  I would have to go back and look at the

8   language of HAVA, but the concept of holding back funding to

9   states who are not following federal law is at issue there,

10  and I'm not sure what the --

11       THE COURT:  So you don't know one way or the other

12  whether it's a condition specified in HAVA.

13       MR. GATES:  I would have to look that up.  I didn't

14  see that as one of the questions on your list, so I wasn't

15  prepared --

16       THE COURT:  Well, I was just trying to give areas so

17  people wouldn't come wondering what they should be prepared

18  to talk about.  Okay.

19       MR. GATES:  I understand, Your Honor.  Thank you.

20       THE COURT:  Would it be consistent with the law for

21  the EAC to impose additional conditions on the distribution

22  of those funds beyond the conditions that Congress created in

23  HAVA?

24       MR. GATES:  Well, it depends on what you mean by

25  "conditions."

1          THE COURT:  Well, the conditions we're talking about is

2     the requirement payments in terms of the preconditions before

3     payments are made.  The answer, by the way, is compliance with

4     election-day statutes, one of the conditions specified in

5     HAVA, the answer's no.  But I'll give you an opportunity to

6     look.  But I'm asking you whether it would be consistent for

7     the EAC to add conditions about distribution of funds if it's

8     not beyond the conditions that Congress put in HAVA.

9          MR. GATES:  Your Honor, just because it doesn't appear

10     in HAVA, it appears in 2 U.S.C. 7.  It appears in other

11     federal statutes.

12          THE COURT:  Okay.  I'm just speaking -- I'm just

13     talking about HAVA.

14          MR. GATES:  Those receiving federal funds under the

15     executive order pursuant to elections have to be following all

16     federal laws.  If they're going to be violating this law or

17     that law, they may be at risk of losing funding.  The fact

18     that all of that isn't restated in HAVA doesn't undermine the

19     authority to impose that requirement.  Election day is

20     2 U.S.C. 7.

21          THE COURT:  Right.  I understand.  Okay.

22          MR. GATES:  All right.

23          THE COURT:  I'm finished with my questions.  Let me

24     give, very quickly, the plaintiffs an opportunity to not

25     repeat arguments already made, but if there's something in

1    particular you want to bring to my attention that's come up

2    that's new that we didn't talk about that you want to respond

3    to the government since you have the burden.  You, plaintiffs.

4         MS. LANG:  Thank you, Your Honor.

5    I think that defendants' presentation was very helpful for

6    this court to be able to resolve some of the questions that

7    were raised in the briefing, specifically around speculation.

8         It is not speculative whether or not a documentary proof of

9    citizenship requirement will be added to the federal form as

10   defendants' briefing suggested, but Mr. Gates said that while

11   the exact language on the form might change depending on

12   notice or comment, that the outcome is predetermined.

13        It is a requirement of the executive order, which is of

14   course exactly how the language of the executive order reads.

15   And therefore, any question about speculation I think has

16   entirely dissipated.  That was precisely why we brought this

17   case, and it is immediately apparent now that there is no

18   speculation.

19        I think that we are now also on all fours with the *League

20   of Women Voters v. Newby* case, and because there is no

21   speculation, the D.C. Circuit held that a documentary proof of

22   citizenship requirement on the federal form --

23        THE COURT:  You need to slow down.

24        MS. LANG:  Thank you, Your Honor.

25   Quote, "unquestionably makes it more difficult for the

1    leagues to accomplish their primary mission of registering

2    voters.  They provide injury for both purposes of standing and

3    irreparable harm."

4        And so that is binding D.C. Circuit case law about both

5    irreparable harm and injury for purposes of standing that is

6    on all fours with this case and I think makes your decision,

7    Your Honor, on questions of standing much easier.

8        One of your questions in your order was related to

9    associational standing.  I did want to let the court know that

10    we have identified a member of Arizona Students' Association

11    who would be willing to put forth a declaration under a

12    pseudonym, explaining their difficulties providing documentary

13    proof of citizenship if they were required to do so anytime

14    they need to update their voter registration.

15        That is just one of many Arizona students that Arizona

16    Students' Association has worked with.  The declaration that's

17    already in evidence demonstrates that about 50 percent of all

18    registrants that Arizona Students' Association works with

19    cannot provide documentary proof of citizenship and so rely

20    on the federal form.

21        So I don't know if Your Honor needs that, but I did want

22    you to know that we have that available; but we would need to

23    move to file that under a pseudonym.

24            THE COURT:  All right.  Let me think about it.

25            MS. LANG:  Thank you, Your Honor.

1          THE COURT:  All right.  Anything else?

2      Anything you want to add?

3          MS. BRANCH:  Yes.  I agree that I think the ripeness

4      and speculation questions have been dissipated and answered.

5      I think defense counsel has made clear that the EAC does not

6      have discretion not to adopt a documentary proof of

7      citizenship requirement.

8      It seems to me like the only things that are outstanding

9      are really like administrative issues — for instance, maybe

10     whether documentary proof of citizenship needs to be stapled

11     to the registration form or paper-clipped.  The EAC does not

12     have discretion to decide whether or not documentary proof of

13     citizenship is actually required and should be required under

14     NVRA.  And as we've briefed it, it is not permissible.

15     I wanted to follow up on some of Your Honor's questions

16     from earlier, particularly with respect to case law regarding

17     whether political parties have competitive standing, and the

18     case I was referring to earlier, I have the name correct.

19     It's *Natural Law Party v. FEC*.  It is a district court case

20     from the District of Columbia from 2000.  And the citation --

21     we actually cite it on page 12 of our opening preliminary

22     injunction brief.  The citation is 111 F.Supp 2.

23         THE COURT:  That's the case that you were not sure was

24     the correct one.  Okay.

25         MS. BRANCH:  That's correct.  I had the name correct,

1  but that is the correct case.

2         THE COURT:  Okay.  That's fine.

3         MS. BRANCH:  With respect to the privacy issues,

4  defense counsel asked -- you asked defense counsel whether

5  or not DOGE is a federal agency, and I would submit it is not.

6  I don't know that we got a fully clear answer, but it seemed

7  like defense counsel provided that it may be.

8     But I want to point Your Honor to another point of the

9  privacy part, particularly the exception that counsel is

10  relying on for routine use, and that is, even if the entity

11  that is going to receive the personal data or privacy

12  information falls into the routine-use exception, that routine

13  use has to be authorized by law.  And that is in the statute.

14     So even if you're a federal agency, you have to be

15  requesting the information for a reason authorized by law.

16  The government has not said where DOGE is authorized by law to

17  inquire about citizenship, and I would submit that it is not.

18  There's no provision of federal law that allows for that.

19     With respect to the argument that data sharing is already

20  provided for under the NVRA, there was mention of 52 U.S.C.

21  20507.  That is the correct citation for the NVRA, but that

22  provision in the NVRA specifically talks about sharing public

23  data.  And we're not saying that DOGE can't look at public

24  data.  What we're saying is that it cannot run -- it cannot

25  run public data that is provided for under the NVRA against

private data which is the immigration databases that the
executive order commands DOGE to have access to.  Those
are two different things.  The NVRA does not so much as
contemplate the sharing of private data or running it against
public data.

The final -- I think it's the final point I want to make
regarding one of Your Honor's questions earlier related to the
ballot receipt deadline issue, and the question seemed to be
can I grant an injunction against the attorney general when
she can only enforce the law against the state, and my clients
are not states.

And I would point Your Honor to the Virginia booksellers
case on this issue where the booksellers were the ones who
sued.  They sued -- it was a First Amendment claim based on
selling obscene materials, and they were the ones who sued.

But the court found that relief would run to book buyers,
too, even though they were not parties to the suit and they
weren't at risk of the anti-obscenity law.  They were still
injured because they lost the opportunity to buy the obscene
books despite no enforcement risk.  So the booksellers were
the foreseeable and predictable beneficiary of the injunction
that prevented suits against the booksellers.

The same is true here.  That's correct, we can't have
7(a) enforced against us because we're not the states, but
my clients are the predictable beneficiaries of such an

1    injunction because our voters rely on mail ballots both to

2    cast them, and the party organizations rely on mail ballots

3    to fulfill their organizational missions.

4        Your Honor asked earlier about whether or not you can

5    enjoin the attorney general from bringing lawsuits with

6    respect to 7(a), and I want to just highlight what the

7    government said earlier, which is that -- and it's clear it's

8    reinforced by the text of the executive order which says that

9    the attorney general can take all necessary action to enforce

10   the election-day statutes against the states.

11       So that is not limited to bringing lawsuits, as defense

12   counsel conceded.  The attorney general has all types of

13   power, can issue subpoenas, begin investigations.  And so

14   at least this court should be able to exercise its equitable

15   power to enjoin the attorney general from taking those types

16   of actions because they are not consistent with federal law

17   and the president doesn't have the power to do what he's done.

18       And the final thing I would just underscore is the

19   *Youngstown* case and the *Axon Enterprise* cases, which really

20   I think just reinforce what is happening here, which is the

21   executive order violates separation of powers.  And merely

22   being subject to a proceeding that violates separation of

23   powers is here-and-now injury.  The *Youngstown* case says that

24   once there's a violation of separation of powers, the action

25   is void from the beginning.

1      And so I think with respect to 7(a) and all of the sections

2      that we've challenged and move for preliminary injunction on,

3      those principles apply.  There is no factual development that

4      is needed for this court to enjoin those provisions because

5      they violate the constitution on their face, and that is

6      sufficient under the *Youngstown* case and other Supreme Court

7      cases on separation of powers.

8               THE COURT:  All right.

9               MS. BRANCH:  Thank you, Your Honor.

10              THE COURT:  Thanks, everybody.  What I'd like to do

11     before I go to further proceedings, I have a lot of notes, as

12     you can see through the papers.  I want to run back for about

13     10 minutes and make sure that I've asked all of the questions,

14     and then I'll come out and we'll talk about -- because I'm

15     obviously going to take this under advisement and talk about

16     next steps.

17         But I want to make sure -- I've tried to divide the topics

18     up, but things have come up in the answers that have made me

19     sort of shift around, and I want to make sure I've covered

20     everything.  And it's getting late.  It's twenty of.  So at

21     ten of 5:00 I'll be right back out, and we'll pick up from

22     there unless I have something I need to ask.

23         (Recess from 4:39 p.m. to 4:53 p.m.)

24              THE COURT:  Well, it's a good thing I went over my

25     notes.  When we were talking, Mr. Gates, about 2(a), I said

1    we'll put a pin in an argument you wanted to make about the

2    authority of the president, and I have it in my notes and I

3    didn't give you that chance.  So you have the floor.

4         MR. GATES:  I appreciate Your Honor.  Can you represent

5    the question?

6         THE COURT:  I'm sorry.  No, no, no.  You started to

7    make an argument when we were discussing 2(a) relating to the

8    authority of the president, and I said we'd put a pin in it.

9         MR. GATES:  Okay.

10        THE COURT:  And we moved off it.  So I'm just letting

11   you go ahead.  I told you I'd let you make the argument, so

12   I want to make sure you get your chance.

13        MR. GATES:  Well, I very, very much appreciate it.

14   I have to catch a flight, so I'm going to make it very quick.

15        THE COURT:  Okay.

16        MR. GATES:  The president, under Article II of the U.S.

17   Constitution, has plenary authority over the Executive Branch,

18   and it's his duty or her duty to take care to enforce all the

19   laws of the land.  The executive order, if you read through it

20   and look up the statutes it cites and he relies upon, we will

21   all see that he is simply directing his federal agencies, his

22   executive agencies, to enforce the law, to enforce the laws

23   that Congress passed.  He's really doing nothing more.

24        When we see new things like documentary proof of

25   citizenship, that's simply a mechanism to enforce the laws

1    that are already on the books, the ones that Congress has long

2    passed, whether it's the NVRA of 1993, HAVA of 2002, or the

3    election-day statutes and so on and so forth.

4        So there isn't much new.  If you peel back the layers and

5    look at those statutes in the executive order, he's literally

6    directing his agencies to enforce law, and he has to because

7    for really the past couple decades, those agencies really have

8    not been enforcing those laws, including the fact that how

9    many criminal prosecutions do we know of that have occurred

10   against illegal aliens who have voted or who attempted to vote

11   through fraudulent means, I don't know of any.  That's just

12   one easy example of where the federal agencies have not been

13   enforcing the law.

14       The executive order basically says, hey, federal agencies,

15   you're under my purview, this is the executive branch, go

16   enforce the law.  Go enforce the NVRA, go enforce HAVA, go

17   enforce election day, go enforce the criminal statutes on

18   elections and false statements in order to attempt to become

19   eligible to vote and so on and so forth.

20       It's the constitutional authority of Article II that I'm

21   relying on.  The executive order, as I said, doesn't create

22   really anything new.  It says, go out and enforce the laws.

23       And with that, Your Honor, I would respectfully request

24   this court deny the preliminary injunction.  It's early.

25   Even if, as you said, the president's directive to EAC is to

1    require documentary proof, that's not going to show up on

2    the form for at least 120 days anyway.  So even if it is a

3    foregone conclusion, Your Honor, it's not going to show up

4    on the form and nobody's going to be harmed.

5        Counsel for DNC came up and implored this court, people

6    are being harmed today, they're being harmed every day.

7    Those were her words.  Yet the executive order hasn't been

8    implemented, and the federal form won't be updated for many,

9    many, many months.  That alone undermines the need for a

10   preliminary injunction.

11       It's extraordinary means, on top of the fact that none of

12   these plaintiffs, none of the 16 plaintiffs have standing,

13   Article III standing.  Article III standing is extremely rigid

14   and narrow, and it doesn't allow for these plaintiffs to be

15   here in this action and request this relief.  And with that,

16   Your Honor, I will submit.

17          THE COURT:  All right.  Then I've given you your

18   opportunity.

19       The plaintiffs have requested that I rule before April 24,

20   which is the executive order's deadline for the EAC to take

21   certain steps.  Are you asking for any different timelines

22   here, or are we still with that timeline?  I'm going to take

23   it under advisement, and I'm going to get it out before that

24   if that's it.  I just want to make sure, in terms of the date,

25   the date.

1     And I'd ask that you not file anything else, please, no

2     one, and just go with what we've got so that I can actually

3     get it out.  I think between what you have filed and very

4     extensive motions on all parts of the parties, as well as the

5     discussions today, have been very helpful.  So I don't need

6     anything else.  If I need anything, I will certainly ask for it.

7         So the other question that I have -- so is the April 24th

8     date the deadline you still want?

9         MS. LAKIN:  I think what we would say, now that we know

10    that the executive order is being implemented, that April 24th

11    is a good target, but as soon as possible.

12        THE COURT:  Okay.  I'll make the effort.  I just wanted

13    to make sure there wasn't some other deadline or some other

14    way that you wanted to handle this.

15        Looking ahead for a few questions about planning, do the

16    defendants at some point, if you know, intend to file a motion

17    to dismiss in these cases?  I'm not going to set deadlines

18    now, just to get a sense of how it's going to proceed.

19        MR. GATES:  What I would say is this, Your Honor,

20    without obviously revealing all of our deliberative

21    considerations, is in part it depends on what the court's

22    decision looks like, how it reads.  I'll just leave it at that.

23        THE COURT:  All right.  And as I said, I don't know how

24    I'm going to rule.  I'm going to go back and look and review

25    everything.  I believe the nonpartisan plaintiffs indicated

1    that at some point you were going to move for summary

2    judgment, and I think I would suggest that you all wait till

3    I issue whatever I'm going to issue before doing that.

4        Anybody asking for discovery, at least at this point?

5    I'm just trying to plan stuff.

6        MS. LANG:  Speaking for the nonpartisan plaintiffs, I

7    don't think there's any plan to move for kind of expedited --

8        THE COURT:  Okay.  This isn't set in stone.  I'm just

9    trying to get a sense today.

10       MS. LANG:  I do imagine that there may be some

11   discovery here, but that's something we need to discuss, and

12   I don't think there's any imminent plan to move for any

13   expedited discovery.

14       THE COURT:  Okay.

15       MS. BRANCH:  And Aria Branch for the Democratic Party

16   plaintiffs, and we're of the same mind.  No imminent need for

17   discovery, but we may seek discovery down the road.

18       THE COURT:  All right.  So I will take it under

19   advisement.  I will consider the deadline which has been set,

20   which is the April 24th, and after I make whatever decision I

21   make, then I will contact you-all about what next steps you

22   want to take in terms of timing and everything else.

23       All right.  Thank you all.  The papers that have been filed

24   on everybody's part have been very helpful, very well done.

25   I thank you for that.  It always makes the job easier for the

1    judge.  And I appreciate your taking the time and not finding

2    it difficult to follow the format of answering questions,

3    which when I was a lawyer I was not enthused about.

4        All right.  Take care.  Parties are excused.

5        (Proceedings adjourned at 5:00 p.m.)

\* \* \* \* \* \*

CERTIFICATE

I, BRYAN A. WAYNE, Official Court Reporter, certify that the foregoing pages are a correct transcript from the record of proceedings in the above-entitled matter.

*/s/ Bryan A. Wayne*
Bryan A. Wayne