**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, et al., <br><br>             Plaintiffs, <br><br> v. <br><br> EXECUTIVE OFFICE OF THE PRESIDENT, et al., <br><br>             Defendants. | Civil Action No. 25-0946 (CKK) |
| DEMOCRATIC NATIONAL COMMITTEE, et al., <br><br>             Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States, et al., <br><br>             Defendants. | Civil Action No. 25-cv-0952 (CKK) |
| LEAGUE OF WOMEN VOTERS EDUCATION FUND, et al., <br><br>             Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States, et al., <br><br>             Defendants. | Civil Action No. 25-0955 (CKK) |

**DEMOCRATIC PARTY PLAINTIFFS' MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT
AS TO SECTION 2(A) OF EXECUTIVE ORDER 14248**

**ELIAS LAW GROUP LLP**
Marc E. Elias (DC 442007)
Aria C. Branch (DC 1014541)
Lalitha D. Madduri (DC 1659412)
Christopher D. Dodge (DC 90011587)
Jacob D. Shelly (DC 90010127)
James J. Pinchak (DC 90034756)*
250 Massachusetts Ave. NW, Suite 400
Washington, DC 20001
T: (202) 968-4652

Tyler L. Bishop (DC 90014111)
1700 Seventh Ave. Suite 2100
Seattle, WA 98101
T: (206) 656-0177

*Admitted pro hac vice*

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

BACKGROUND ............................................................................................................. 2

    I.    Legal Background ............................................................................................. 2

        A.  The Constitution grants only Congress and the States authority over election administration. ......................................................................................... 2

        B.  Congress delegated limited responsibility to the EAC to promulgate the Federal Form. ............................................................................................. 3

    II.   Factual and Procedural Background............................................................... 5

        A.  President Trump's Executive Order dictates a documentary proof of citizenship requirement for voters using the Federal Form. ........................... 5

        B.  Implementation of Section 2(a) would inflict significant harm on voters and the Democratic Party Plaintiffs. ........................................................... 6

        C.  The Democratic Party Plaintiffs and other groups of Plaintiffs obtained preliminary injunctions blocking enforcement of Section 2(a). ...................... 8

SUMMARY JUDGMENT STANDARD................................................................... 9

ARGUMENT............................................................................................................. 10

    I.    The Democratic Party Plaintiffs are entitled to summary judgment on their claims challenging Section 2(a) of the Executive Order as *ultra vires* and unconstitutional. 10

        A.  The Supreme Court has long recognized causes of action challenging *ultra vires* and unconstitutional executive action. ....................................... 11

        B.  Section 2(a) is *ultra vires* and violates the separation of powers. ............... 12

            1.  No constitutional or statutory provision authorizes the unilateral exercise of authority attempted by Section 2(a)............................................ 12

            2.  Section 2(a) directly conflicts with the NVRA's substantive provisions. ...... 15

            3.  Section 2(a) violates the separation of powers because it directly intrudes on Congress's Elections Clause authority........................................ 16

    II.   The Court has subject matter jurisdiction, and Plaintiffs' claims are ripe for final resolution............................................................................................... 17

        A.  The Democratic Party Plaintiffs' claims against Section 2(a) are constitutionally and prudentially ripe............................................................ 17

        B.  The Democratic Party Plaintiffs have standing to challenge Section 2(a). .................. 20

            1.  The Democratic Party Plaintiffs have standing based on direct harm to their electoral prospects. ......................................................................... 20

            2.  The Party Organizations have associational standing based on harm to their members' and constituents' voting rights............................................ 22

            3.  The Party Organizations have standing based on harm to their core activities, which requires them to divert resources to combat the harm. ........ 24

            4.  The remaining prongs of the standing inquiry are satisfied............................ 26

   III.   Permanent injunctive relief is warranted................................................................... 26

       A.  Absent an injunction, the Democratic Party Plaintiffs will suffer irreparable harm
           for which there is no adequate legal remedy.................................................................. 27

       B.  The equities and public interest favor a permanent injunction. .................................. 28

   CONCLUSION................................................................................................................................ 29

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Am. Fed'n of Gov't Emps. v. Trump*,
  318 F. Supp. 3d 370 (D.D.C. 2018) ................................................................... 18

*Am. Forest Res. Council v. United States*,
  77 F.4th 787 (D.C. Cir. 2023) ............................................................................ 11

*Am. Freedom L. Ctr. v. Obama*,
  821 F.3d 44 (D.C. Cir. 2016) .............................................................................. 20

*Am. Petrol. Inst. v. EPA*,
  683 F.3d 382 (D.C. Cir. 2012) ............................................................................ 18

*Amalgamated Meat Cutters v. Connally*,
  337 F. Supp. 737 (D.D.C. 1971) ................................................................... 18, 19

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ............................................................................................ 10

*Arcia v. Fla. Sec'y of State*,
  772 F.3d 1335 (11th Cir. 2014) .......................................................................... 25

*Arizona v. Inter Tribal Council of Ariz., Inc.*,
  570 U.S. 1 (2013) ...................................................................................... 3, 6, 16

*Ass'n of Flight Attendants-CWA v. U.S. Dep't of Transp.*,
  564 F.3d 462 (D.C. Cir. 2009) ............................................................................ 19

*Bond v. United States*,
  564 U.S. 211 (2011) ..................................................................................... 12, 16

*C.G.B. v. Wolf*,
  464 F. Supp. 3d 174 (D.D.C. 2020) .................................................................... 28

*California v. Trump*,
  No. 25-cv-10810, 2025 WL 1667949 (D. Mass. June 13, 2025) ................... 1, 12

*Collins v. Yellen*,
  594 U.S. 220 (2021) ............................................................................................ 11

*Common Cause Ind. v. Lawson*,
    937 F.3d 944 (7th Cir. 2019) ........................................................................... 25

*Common Cause/Ga. v. Billups*,
    554 F.3d 1340 (11th Cir. 2009) ....................................................................... 23

*Congress v. Gruenberg*,
    643 F. Supp. 3d 203 (D.D.C. 2022) ................................................................... 9

*Crawford v. Marion Cnty. Election Bd.*,
    472 F.3d 949 (7th Cir. 2007) ..................................................................... 22, 25

*Dart v. United States*,
    848 F.2d 217 (D.C. Cir. 1988) ......................................................................... 11

*Davis v. District of Columbia*,
    158 F.3d 1342 (D.C. Cir. 1998) ....................................................................... 28

*Democracy N.C. v. N.C. State Bd. of Elections*,
    476 F. Supp. 3d 158 (M.D.N.C. 2020) ............................................................ 23

*Democratic Nat'l Comm. v. Trump*,
    No. 25-cv-0952 (D.D.C. filed Mar. 21, 2025) ................................................... 8

*Dep't of Com. v. New York*,
    588 U.S. 752 (2019) ......................................................................................... 26

*Doe v. Mattis*,
    928 F.3d 1 (D.C. Cir. 2019) ............................................................................. 27

*eBay Inc. v. MercExchange*,
    547 U.S. 388 (2006) ......................................................................................... 27

*Elrod v. Burns*,
    427 U.S. 347 (1976) ......................................................................................... 28

*Ex parte Siebold*,
    100 U.S. 371 (1879) ................................................................................... 15, 17

*Fish v. Kobach*,
    840 F.3d 710 (10th Cir. 2016) ......................................................................... 14

*Fish v. Schwab*,
    957 F.3d 1105 (10th Cir. 2020) ....................................................................... 23

*Fla. Democratic Party v. Scott*,
    215 F. Supp. 3d 1250 (N.D. Fla. 2016) ................................................................. 22

*Food & Drug Admin. v. All. for Hippocratic Med.*,
    602 U.S. 367 (2024) ........................................................................... 24, 25, 26

*Foster v. Love*,
    522 U.S. 67 (1997) .......................................................................................... 3

*Frank v. Walker*,
    17 F. Supp. 3d 837 (E.D. Wis. 2014) .............................................................. 23

*Franklin v. Massachusetts*,
    505 U.S. 788 (1992) ........................................................................................ 27

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
    561 U.S. 477 (2010) ........................................................................................ 11

*Garcia v. Stewart*,
    531 F. Supp. 3d 194 (D.D.C. 2021) ................................................................. 20

*Gonzalez v. Arizona*,
    677 F.3d 383 (9th Cir. 2012) ........................................................................... 16

*Gordon v. Holder*,
    721 F.3d 638 (D.C. Cir. 2013) ......................................................................... 28

*Havens Realty Corp. v. Coleman*,
    455 U.S. 363 (1982) .................................................................................. 24, 25

*Holcomb v. Powell*,
    433 F.3d 889 (D.C. Cir. 2006) ......................................................................... 10

*Hunt v. Wash. State Apple Advert. Comm'n*,
    432 U.S. 333 (1977) .................................................................................. 22, 24

*INS v. Chadha*,
    462 U.S. 919 (1983) ........................................................................................ 16

*Jones v. U.S. Postal Serv.*,
    488 F. Supp. 3d 103 (S.D.N.Y. 2020) ............................................................. 23

*Kobach v. U.S. Election Assistance Comm'n*,
    772 F.3d 1183 (10th Cir. 2014) .................................................................... 4, 16

*Krulewich v. United States*,
    336 U.S. 440 (1949) ............................................................................................ 16

*League of Women Voters Educ. Fund v. Trump*,
    No. 25-cv-0955 (D.D.C. filed Apr. 1, 2025) .................................................... 8

*League of Women Voters of Mo. v. Ashcroft*,
    336 F. Supp. 3d 998 (W.D. Mo. 2018) ............................................................. 28

*League of Women Voters of S.C. v. Andino*,
    497 F. Supp. 3d 59 (D.S.C. 2020) .................................................................... 23

*League of Women Voters of U.S. v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016) ........................................................................ 25, 29

*Louisiana v. Biden*,
    622 F. Supp. 3d 267 (W.D. La. 2022) ............................................................. 17

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ................................................................................... 20, 26

*LULAC v. Exec. Off. of the President*,
    No. 25-cv-0946, 2025 WL 1187730 (D.D.C. Apr. 24, 2025) ..................... *passim*

*LUPE v. Abbott*,
    753 F. Supp. 3d 515 (W.D. Tex. 2024) ............................................................ 25

*Mass. Coal. for Immigr. Reform v. DHS*,
    752 F. Supp. 3d 13 (D.D.C. 2024) ................................................................... 26

*Mecinas v. Hobbs*,
    30 F.4th 890 (9th Cir. 2022) ............................................................................ 21

*Merck Sharp & Dohme Corp. v. Lee*,
    75 F. Supp. 3d 16 (D.D.C. 2014) ..................................................................... 19

*Mi Familia Vota v. Fontes*,
    129 F.4th 691 (9th Cir. 2025) .......................................................................... 16

*Mi Familia Vota v. Fontes*,
    719 F. Supp. 3d 929 (D. Ariz. 2024) ............................................................... 23

*Mills v. District of Columbia*,
    571 F.3d 1304 (D.C. Cir. 2009) ....................................................................... 28

*Nat. L. Party of U.S. v. FEC*,
    111 F. Supp. 2d 33 (D.D.C. 2000) ............................................................. 21, 22

*Nelson v. Warner*,
    472 F. Supp. 3d 297 (S.D. W. Va. 2020) ......................................................... 21

*Open Cmtys. All. v. Carson*,
    286 F. Supp. 3d 148 (D.D.C. 2017) ................................................................. 28

*People First of Ala. v. Merrill*,
    467 F. Supp. 3d 1179 (N.D. Ala. 2020) .......................................................... 23

*POET Biorefining, LLC v. EPA*,
    970 F.3d 392 (D.C. Cir. 2020) ........................................................................ 18

*Republican Nat'l Comm. v. N.C. State Bd. of Elections*,
    120 F.4th 390 (4th Cir. 2024) ............................................................ 24, 25, 26

*Rumsfeld v. F. for Acad. & Inst. Rts.*,
    547 U.S. 47 (2006) ........................................................................................... 20

*Sandusky Cnty. Democratic Party v. Blackwell*,
    387 F.3d 565 (6th Cir. 2004) ........................................................................... 22

*Shays v. FEC*,
    414 F.3d 76 (D.C. Cir. 2005) .................................................................... 20, 22

*Sprint Corp. v. FCC*,
    331 F.3d 952 (D.C. Cir. 2003) ......................................................................... 18

*State v. Meadows*,
    88 F.4th 1331 (11th Cir. 2023) ........................................................................ 13

*Susman Godfrey LLP v. Exec. Off. of President*,
    No. 25-1107, 2025 WL 1779830 (D.D.C. June 27, 2025) ........................... 10, 12

*Tex. Democratic Party v. Benkiser*,
    459 F.3d 582 (5th Cir. 2006) ........................................................................... 21

*Travelers United, Inc. v. Hyatt Hotels Corp.*,
    761 F. Supp. 3d 97 (D.D.C. 2025) ................................................................... 24

*U.S. Chamber of Com. v. Reich*,
    74 F.3d 1322 (D.C. Cir. 1996) ......................................................................... 11

*U.S. Term Limits, Inc. v. Thornton,*
    514 U.S. 779 (1995)..................................................................................... 3

*United Food & Com. Workers Union Local 751 v. Brown Group,*
    517 U.S. 544 (1996)................................................................................... 24

*W & T Travel Servs. v. Priority One Servs.,*
    69 F. Supp. 3d 158 (D.D.C. 2014)............................................................. 10

*Washington v. Trump,*
    No. 2:25-cv-00602 (W.D. Wash. filed Apr. 4, 2025)................................. 9

*Youngstown Sheet & Tube Co. v. Sawyer,*
    343 U.S. 579 (1952)...................................................................... 10, 13, 14

*Zivotofsky ex rel. Zivotofsky v. Kerry,*
    576 U.S. 1 (2015)...................................................................................... 14

## CONSTITUTIONAL PROVISIONS

U.S. Const. art. I, § 4...................................................................... *passim*

U.S. Const. art. II, § 1............................................................................ 13, 17

## STATUTES

52 U.S.C. § 20501.................................................................................. 2, 3

52 U.S.C. § 20505..................................................................................... 6

52 U.S.C. § 20508.............................................................. 4, 13, 14, 15, 16

52 U.S.C. § 20921............................................................................. 14, 16

52 U.S.C. § 20923............................................................................. 14, 16

52 U.S.C. § 20929..................................................................................... 4

Pub. L. No. 103-31, 107 Stat. 77 (1993)................................................... 3

Pub. L. No. 107-252, 116 Stat. 1666 (2002)................................. 4, 14, 25

## FEDERAL RULES

Fed. R. Civ. P. 56..................................................................................... 9

**STATE RULES**

D.C. Local R. 7(h)..................................................................................................... 5

**OTHER AUTHORITIES**

147 Cong. Rec. S13681-02, 2001 WL 1628058 (Dec. 19, 2001).................................................. 14

148 Cong. Rec. S797-01, 2002 WL 225992 (Feb. 14, 2002) ...................................................... 14

Exec. Order No. 14160, *Protecting the Meaning and Value of American Citizenship* (Jan. 20, 2025) .......................................................................................................... 6

Exec. Order No. 14248, *Preserving and Protecting the Integrity of American Elections* (Mar. 25, 2025) ........................................................................................... *passim*

H.R. Rep. No. 103–66, 1993 WL 235764 (Apr. 28, 1993) (Conf. Rep.) ................................ 4, 16

The Federalist No. 47 (James Madison) (Clinton Rossiter ed., 1961) ........................................... 2

## INTRODUCTION

When this Court preliminarily enjoined enforcement of Section 2(a) of the Executive Order, it correctly stated that "the President has no constitutional power over election regulation that would support [his] unilateral" mandate that the Election Assistance Commission ("EAC") require documentary proof of citizenship in the national voter registration form. *LULAC v. Exec. Off. of the President*, No. 25-cv-0946 (CKK), 2025 WL 1187730, at *38 (D.D.C. Apr. 24, 2025). "The Constitution vests that power [to regulate elections] in the States and Congress alone." *Id.* (citing U.S. Const. art. I, § 4, cl. 1; *id.* art. I, § 2, cl. 1; *id.* amend. XVII).

A month ago, another court in the District of Massachusetts agreed, concluding that the President's command—found in Section 2(a) of Executive Order 14248—exceeded his authority. *California v. Trump*, No. 25-cv-10810 (DJC), 2025 WL 1667949, at *7 (D. Mass. June 13, 2025) (citing *LUCAC*, 2025 WL 1187730, at *35). That court recognized, like this one, that "Congress, not the President, has the ultimate constitutional authority over elections." *Id.* at *8. It therefore also held that Section 2(a) is unlawful and preliminarily enjoined the EAC from enforcing it. Since then, nothing has changed: the evidence—and the Constitution—remains unequivocal. Because there are no material factual disputes that bear on the separation of powers and *ultra vires* claims against Section 2(a), summary judgment is warranted, and the Court should enter final declaratory and injunctive relief against this unconstitutional provision of the Executive Order.

Any contrary result would bulldoze the separation of powers principles that protect fair, democratic elections in the United States. Exercising its express authority under the Elections Clause of the U.S. Constitution, Congress enacted the National Voter Registration Act ("NVRA") in 1993 with the stated goals of increasing the number of citizens who register to vote and enhancing participation in federal elections, while also promoting integrity of the election process.

1

52 U.S.C. § 20501(b). In doing so, Congress intentionally granted an independent commission (since 2002, the EAC) responsibility to promulgate a national voter registration form ("Federal Form") in consultation with the States. The EAC has never determined documentary proof of citizenship to be necessary for the Federal Form, and the form has therefore never required such documentation from applicants. In fact, Congress rejected a proposal to require documentary proof of citizenship with the Federal Form, concluding it was incompatible with the NVRA's aims. Instead, Congress expressly specified in the NVRA how an applicant establishes their citizenship: by attesting to that requirement under penalty of perjury. The President has no authority to rewrite the NVRA, to override Congress's Elections Clause authority, or to compel the EAC to amend the Federal Form's requirement.

As the Framers warned, and as this Court has now recognized, an excessive accumulation of powers in the President's hands "may justly be pronounced the very definition of tyranny." The Federalist No. 47, at 301 (James Madison) (Clinton Rossiter ed., 1961). This risk is especially true in the context of election administration, where a leader liberated from checks and balances could systematically manipulate voting rules to entrench his own power. For this reason, the Constitution gives no direct authority to the President to set election rules—and Congress has delegated him no authority to revise the Federal Form. The Court should grant partial summary judgment to Plaintiffs and permanently enjoin the EAC from enforcing Section 2(a) of the E.O.

## BACKGROUND

### I. Legal Background

#### A. The Constitution grants only Congress and the States authority over election administration.

The Elections Clause of the U.S. Constitution provides that the "Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the

Legislature thereof." U.S. Const. art. I, § 4, cl. 1. "The Clause's substantive scope is broad." *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 8 (2013) ("*ITCA*"). It confers on States the "authority to provide a complete code for congressional elections," including regulations relating to voter registration. *Id.* at 8–9; *see also LULAC*, 2025 WL 1187730, at *3.

This grant of authority to the States, however, is only "a default provision." *Foster v. Love*, 522 U.S. 67, 69 (1997). Under the Elections Clause, "the Congress may at any time by Law make or alter such Regulations." U.S. Const. art. I, § 4, cl. 1. Thus, the Elections Clause "grants Congress 'the power to override state regulations' by establishing uniform rules for federal elections, binding on the States." *Foster*, 522 U.S. at 69 (quoting *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 832–33 (1995)).

**B.    Congress delegated limited responsibility to the EAC to promulgate the Federal Form.**

In 1993, Congress exercised its Elections Clause authority to enact the NVRA, which (among other things) regulates the voter registration process for federal elections. *See* Pub. L. No. 103-31, 107 Stat. 77 (codified at 52 U.S.C. §§ 20501–11). Congress's purposes for adopting the NVRA included "establish[ing] procedures that will increase the number of eligible citizens who register to vote in elections for Federal office," helping officials at all levels of government implement the law's requirements "in a manner that enhances the participation of eligible citizens as voters in elections for Federal office," while also maintaining the integrity of the election process. 52 U.S.C. § 20501(b).

The NVRA requires States subject to the law to "accept and use" the Federal Form "for the registration of voters in elections for Federal office." *Id.* § 20505(a)(1). Congress initially assigned the Federal Election Commission ("FEC") responsibility for maintaining the Federal Form and developing regulations for its use, *see* Pub. L. No. 103-31, § 6(a)(1), 107 Stat. at 79–80, and

reassigned that authority to the EAC after creating that agency through the Help America Vote Act of 2002 ("HAVA"), Pub. L. No. 107-252, § 802, 116 Stat. 1666, 1726. *See* 52 U.S.C. § 20508(a). The NVRA, as amended, specifies how the EAC may determine what information the Federal Form must require. To start, the EAC must set the content of the Federal Form "in consultation with the chief election officers of the States" by promulgating regulations through formal notice-and-comment rulemaking. *See id.* § 20508(a)(1)–(2); *see also id.* § 20929. And the EAC may revise the Federal Form "only with the approval of at least three" of its four bipartisan members. *Id.* § 20928.

The NVRA also imposes strict substantive limits on the contents of the Federal Form. Most relevant here, the application section "may require only such identifying information (including the signature of the applicant) and other information (including data relating to previous registration by the applicant), as is necessary to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process." *Id.* § 20508(b)(1).

The Conference Committee that finalized the NVRA specifically rejected a provision adopted by the Senate that would have allowed States to "requir[e] presentation of documentation relating to citizenship of an applicant for voter registration." *See* H.R. Rep. No. 103–66, at 23 (1993) (Conf. Rep.). The Committee concluded that such a requirement was "not necessary or consistent with the purposes of this Act" and "could be interpreted by States to permit registration requirements that could effectively eliminate, or seriously interfere with, the mail registration program of the Act." *Id.* At no point has the EAC (or the FEC before it) ever determined that such documentation is "necessary" to permit State officials to determine an applicant's eligibility. *See, e.g.*, *Kobach v. U.S. Election Assistance Comm'n*, 772 F.3d 1183, 1188-89 (10th Cir. 2014).

## II.    Factual and Procedural Background

Plaintiffs the Democratic National Committee ("DNC"), the Democratic Governors Association ("DGA"), the Democratic Senatorial Campaign Committee ("DSCC"), the Democratic Congressional Campaign Committee ("DCCC") (collectively, "Party Organizations"), and the Democratic leaders of the U.S. Senate and U.S. House, Charles E. "Chuck" Schumer and Hakeem S. Jeffries, respectively (together with the Party Organizations, "Democratic Party Plaintiffs") set forth the undisputed facts in the attached Statement of Material Facts as to which there is no genuine dispute ("SOF") required by Local Rule 7(h). The Democratic Party Plaintiffs briefly summarize the relevant factual background here.

### A.    President Trump's Executive Order dictates a documentary proof of citizenship requirement for voters using the Federal Form.

On March 25, Defendant President Donald J. Trump issued Executive Order 14248, titled *Preserving and Protecting the Integrity of American Elections*. SOF ¶ 1. The Executive Order is based on the false premise that noncitizens participate in American elections in massive numbers and asserts that voters must be required to show documentary proof of citizenship to keep noncitizens off the rolls. SOF ¶¶ 5, 11. As relevant to this motion, the Executive Order directed the EAC to take "appropriate action" by April 24, 2025, "to require, in [the Federal Form] documentary proof of United States citizenship." SOF ¶ 5.

The Executive Order also restricted the acceptable documentation for this novel requirement to a narrow set of materials that millions of Americans do not possess. SOF ¶¶ 5–9, 30–32. Namely, voters who wish to register using the Federal Form must present (A) a U.S. passport; (B) a REAL ID "that indicates the applicant is a citizen of the United States"; (C) an official military identification card that indicates the same; or (D) a valid Federal or State government-issued photo identification if it indicates that the applicant is a U.S. citizen or is

accompanied by proof of U.S. Citizenship. SOF ¶ 5. Most REAL IDs, and many military IDs, do not affirmatively indicate a person's citizenship. SOF ¶¶ 7–9. And the Executive Order does not include as acceptable documentary proof of citizenship several other documents—including U.S. birth certifications, adoption certificates, Consular Reports of Birth Abroad issued by the Secretary of State, naturalization documents issued by DHS, or American Indian Cards issued by DHS indicating citizenship. SOF ¶ 6.[1]

### B. Implementation of Section 2(a) would inflict significant harm on voters and the Democratic Party Plaintiffs.

In the decades since it was created by Congress, millions of Americans have used the Federal Form to register to vote, including many of the Democratic Party Plaintiffs' members and supporters. SOF ¶ 29. The Federal Form provides a streamlined registration option for these voters. As Justice Scalia put it, "the Federal Form guarantees that a simple means of registering to vote in federal elections will be available." *ITCA*, 570 U.S. at 12; *see also* 52 U.S.C. § 20505(a)(1). For these reasons, the Federal Form has often been the best option for many of the Democratic Party Plaintiffs' members and constituents to register to vote. SOF ¶ 29. If the President succeeds in compelling the EAC to implement Section 2(a), however, the new Federal Form would no longer provide the "simple means" for registration intended by Congress, instead imposing burdensome requirements that leave many voters disenfranchised. SOF ¶¶ 29–44. Such an impediment to voter registration directly harms the Democratic Party Plaintiffs in several ways.

---

[1] The President's choice to exclude birth certificates as a valid form of proof of citizenship comes on the heels of Executive Order 14160, which contests the citizenship status of children born on American soil (and thus possess a birth certificate issued within the United States). SOF ¶ 15; *see* E.O. No. 14160, *Protecting the Meaning and Value of American Citizenship* (Jan. 20, 2025). In other words, his exclusion of birth certificates as proof of citizenship appears to be part-and-parcel with his broader attack on what is commonly termed "birthright citizenship."

To start, adding a narrow documentary proof of citizenship requirement to the Federal Form would directly harm individual voters who intend to support the Democratic Party and its candidates. Millions of Americans—including members and constituents of the Democratic Party Plaintiffs—lack documents that would qualify as proof of citizenship under the Executive Order. SOF ¶¶ 30–34. As a result, some eligible voters would be unable to register to vote for federal elections if documentary proof of citizenship were required as a condition of completing the Federal Form. SOF ¶ 35. In States that have adopted their own documentary proof of citizenship requirements for state voter registration forms, such as Arizona and Louisiana, these voters would have no option to register to vote for *any elections* without presenting documentary proof of citizenship that they lack. SOF ¶ 36. Further, many eligible voters would be confused or otherwise dissuaded from investing the time and money necessary to complete the registration process if documentary proof of citizenship were required as a condition of completing the Federal Form. SOF ¶¶ 37–38.

Groups that are more likely to support Democrats, including low-income individuals and women (who are more likely to change their last names in a manner that makes their legal name a mismatch with a qualifying document) would be disproportionately affected by these burdens. SOF ¶¶ 31–34. As a result, the Party Organizations stand to be significantly harmed by Section 2(a) of the Executive Order. SOF ¶¶ 38–42. In particular, Section 2(a) would make it more difficult for the mission-critical programs that DNC, DGA, DSCC and DCCC have invested in to register voters who are likely to support Democratic candidates. SOF ¶¶ 41–42. And, when fewer of their members and constituents are able to register to vote, the Democratic Party Plaintiffs' electoral prospects are harmed. SOF ¶¶ 38–41.

Because implementation of Section 2(a) threatens the DNC, DGA, DSCC and DCCC's ability to carry out their core voter registration efforts and to compete effectively, implementation of Section 2(a) would require the Party Organizations to divert their mission-critical resources toward new efforts to counteract the harmful effects of the new requirement. SOF ¶¶ 39–41. These efforts necessarily come at the cost of other time-sensitive, essential election-related activities—in the current election cycle and beyond—that the organizations would otherwise invest in and execute. SOF ¶ 42.

### C. The Democratic Party Plaintiffs and other groups of Plaintiffs obtained preliminary injunctions blocking enforcement of Section 2(a).

Soon after President Trump issued the Executive Order, three groups of Plaintiffs promptly filed suit in this District seeking injunctive and declaratory relief against certain provisions of the Executive Order, including Section 2(a). *See* Compl. ¶ 1 & at 49, ECF No. 1 ("*LULAC* Compl."); Compl. ¶ 4, at 68–69 & Ex. A, *Democratic Nat'l Comm. v. Trump*, No. 25-cv-0952 (D.D.C. Mar. 31, 2025), ECF No. 1 ("*DNC* Compl."); Compl. ¶ 1 & at 33, *League of Women Voters Educ. Fund v. Trump*, No. 25-cv-0955 (D.D.C. Apr. 1, 2025), ECF No. 1 ("*LWV* Compl."). The Democratic Party Plaintiffs' Complaint alleges, among other things, that Section 2(a) is *ultra vires* and violates the separation of powers. *See DNC* Compl. ¶¶ 126–33 (Count I – Ultra Vires Presidential Action); *id.* ¶¶ 134–41 (Count II – Separation of Powers – Unlawful Intrusion Upon Congressional Authority). On April 3, the Court consolidated the three actions and set briefing on the Plaintiffs' motions for preliminary injunction. *See* ECF No. 12.

On April 11, 2025, the EAC's Executive Director, Brianna Schletz, sent a letter to the chief election officials of each State "seeking consultation on development of" the Federal Form. SOF ¶ 45. The letter reads, in relevant part, that "Executive Order 14248 . . . provides instruction to the EAC" to add a documentary proof of citizenship requirement to the Federal Form. SOF ¶ 46. At

the hearing on the motion for a preliminary injunction, defense counsel took the position that "documentary proof [of citizenship] is required" on the Federal Form under Section 2(a) because that is what "the President has ordered," regardless of any feedback the EAC receives from the States or other participants in the promulgation process. SOF ¶ 48.

On April 24, 2025, this Court issued a preliminary injunction enjoining, among other things, the EAC's implementation of Section 2(a) of the Executive Order. SOF ¶ 49. Nearly two months later, a coalition of States obtained a similar preliminary injunction in the District of Massachusetts blocking enforcement of Section 2(a) of the Executive Order. SOF ¶ 50.[2] The Democratic Party Plaintiffs now move for summary judgment on their *ultra vires* and separation of powers claims against Section 2(a).[3]

## SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment must be granted where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The "mere existence of some factual dispute is insufficient on its own to bar summary judgment; the dispute must pertain to a 'material' fact." *Congress v. Gruenberg*, 643 F. Supp. 3d 203, 215 (D.D.C. 2022) (quoting Fed. R. Civ. P. 56(a)).

---

[2] Washington and Oregon separately filed an action seeking to permanently enjoin parts of the E.O. in the Western District of Washington. Those two States have filed a motion for partial summary judgment, as to Section 2(a) and other provisions of the E.O., that will be fully briefed on August 20, 2025. *Washington v. Trump*, No. 2:25-cv-00602 (W.D. Wash.), ECF Nos. 37, 55.

[3] The Democratic Party Plaintiffs also bring claims under the Administrative Procedure Act ("APA") alleging that the EAC's implementation of Section 2(a) is arbitrary and capricious, contrary to law, and contrary to constitutional rights. *See DNC* Compl. ¶¶ 171–78 (Count VI), 205–12 (Count X), 213–19 (Count XI). Plaintiffs understand "Phase One" of the Court's June 20, 2025 Scheduling Order at 2, ECF No. 141, to include their *ultra vires* and constitutional claims, upon which the preliminary injunction is based. Plaintiffs reserve their rights to move for summary judgment on their APA claims, if necessary, at an appropriate time.

A material fact is one that could "affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" only if "the evidence" is such that a reasonable factfinder could "return a verdict for the nonmoving party." *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006) (quoting *Anderson*, 477 U.S. at 247–48). When, as here, the parties agree that the only disputes on the merits of a claim are legal in nature, the claim "is 'particularly amenable to resolution on summary judgment' because all that remains is the application of law." *Susman Godfrey LLP v. Exec. Off. of President*, No. 25-1107 (LLA), 2025 WL 1779830, at *7 (D.D.C. June 27, 2025) (quoting *W & T Travel Servs. v. Priority One Servs.*, 69 F. Supp. 3d 158, 164 (D.D.C. 2014)).

## ARGUMENT

### I.    The Democratic Party Plaintiffs are entitled to summary judgment on their claims challenging Section 2(a) of the Executive Order as *ultra vires* and unconstitutional.

The President, through Section 2(a) of the Executive Order, is attempting to unilaterally impose his own policy preferences on voters by demanding unnecessary and burdensome documentary proof of citizenship on the Federal Form. But his effort to do so is unlawful because neither the Constitution, nor any statute, grants him such authority. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952) ("The President's power, if any, to issue the [Executive O]rder must stem either from an act of Congress or from the Constitution itself.").

Instead, the Constitution assigns the power and responsibility to regulate elections to the States, subject only to Congress's power to "make or alter such Regulations." U.S. Const., art. I, § 4, cl. 1. Congress, in turn, carefully crafted the NVRA to *prohibit* precisely this kind of presidential dictate. Thus, as this Court has already concluded, Section 2(a) of the Executive Order is unconstitutional, *ultra vires*, and incompatible with federal law.

Because there is no genuine dispute over any fact material to these claims, the Democratic

Party Plaintiffs are entitled to judgment as a matter of law. The Court should declare Section 2(a)

unlawful and permanently enjoin the EAC and its Commissioners from implementing it.

### A.    The Supreme Court has long recognized causes of action challenging *ultra vires* and unconstitutional executive action.

The Democratic Party Plaintiffs' twin causes of action at issue in this motion—*ultra vires*

action and a violation of the separation of powers—are well-established. As this Court noted, and

as Defendants did not contest previously, these claims present "pure questions of law" requiring

no factual determinations. *See LULAC*, 2025 WL 1187730, at *28 (citation omitted).

Starting with the *ultra vires* claim (Count I), this Court has already recognized the general

rule that "[w]hen an executive acts *ultra vires*, courts are normally available to reestablish the

limits on his authority" through equitable causes of action. *See Dart v. United States*, 848 F.2d

217, 224 (D.C. Cir. 1988); *see also U.S. Chamber of Com. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir.

1996); *Am. Forest Res. Council v. United States*, 77 F.4th 787, 796 (D.C. Cir. 2023) (reaffirming

that "a claim alleging that the President acted in excess of his statutory authority is judicially

reviewable even absent an applicable statutory review provision" (citing *Reich*, 74 F.3d at 1326–

28)), *cert. denied*, 144 S. Ct. 1110 (2024); *LULAC*, 2025 WL 1187730, at *16 (recognizing these

principles). And *ultra vires* review is especially appropriate where, as here, Plaintiffs claim that

the Executive Order is also "inconsistent with an independent statute" in numerous respects. *Am.

Forest Res. Council*, 77 F.4th at 787.

The same is true for Plaintiffs' separation of powers claim (Count II). The Supreme Court

has held that "whenever a separation-of-powers violation occurs, any aggrieved party with

standing may file a constitutional challenge." *Collins v. Yellen*, 594 U.S. 220, 245 (2021); *see also

Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010) (recognizing "an

implied private right of action directly under the Constitution to challenge governmental action under . . . separation-of-powers principles"). Thus, private organizations and individuals are free to pursue separation of powers claims where an alleged violation injures them. *See Bond v. United States*, 564 U.S. 211, 222–23 (2011) (observing that "the claims of individuals," rather than "Government departments," have "been the principal source of judicial decisions concerning separation of powers and checks and balances").

This Court was therefore correct to conclude that "plaintiffs are entitled to bring a non-statutory cause of action questioning the legality of [the] Executive Order," *LULAC*, 2025 WL 1187730, at *16 (quotation omitted) (noting that this conclusion "follows from the availability of causes of action in equity to enjoin unlawful Executive action both before and after the APA"); *accord California*, 2025 WL 1667949, at *7; *see also Susman Godfrey LLP*, 2025 WL 1779830, at *1 (collecting cases granting summary judgment in challenges to the President's unlawful Executive Orders, including on separation of powers and *ultra vires* grounds).

**B.    Section 2(a) is *ultra vires* and violates the separation of powers.**

Because the President lacks any source of authority, under the Constitution or any federal statute, to mandate a documentary proof of citizenship requirement on the Federal Form, Section 2(a) amounts to unlawful *ultra vires* executive action and violates the separation of powers. *See LULAC*, 2025 WL 1187730, at *41; *California*, 2025 WL 1667949, at *7. Indeed, while the President's lack of authority is enough to resolve the instant claims, his effort to impose a documentary proof of citizenship mandate clashes with the requirements of the NVRA itself.

**1.    No constitutional or statutory provision authorizes the unilateral exercise of authority attempted by Section 2(a).**

Section 2(a) of the President's Executive Order is *ultra vires*—it cites no source of legal authority, under the Constitution or any federal statute, for the President's mandate. Pressed to

identify such authority in this litigation, Defendants have come up empty. The reason why is clear: the Constitution does not give the President authority to dictate the manner of federal elections, including voter registration. *See* U.S. Const. art. I, § 4; *id.* art. II, § 1; *see also State v. Meadows*, 88 F.4th 1331, 1347 (11th Cir. 2023) (finding the President lacks any "direct control" over "the individuals—members of Congress and state officials—who conduct federal elections," and has "no authority" to "interfere[] with state election procedures based solely on the federal executive's own initiative").

Instead, the Elections Clause empowers States to establish their own regulatory frameworks for federal elections, and the same clause "provides that Congress—not the President—is the check on States' authority" to regulate elections: "Congress may at any time by Law make or alter" States' election rules. *LULAC*, 2025 WL 1187730, at *15 (quoting U.S. Const. art. I, § 4, cl. 1). None of these powers is vested in the President. *Id.* And to the extent Defendants now seek to argue that Article II's Vesting Clause, U.S. Const. art. II, § 1, cl. 1, somehow empowers the President with plenary authority to direct the EAC to "enforce the law" according to his interpretation, this Court has already thoroughly rejected that "sweeping" theory on its merits. *LULAC*, 2025 WL 1187730, at *38–41.

Nor has Congress chosen to delegate any of its Elections Clause authority to the President by statute. *See Youngstown*, 343 U.S. at 585 (noting the President's authority must "stem either from an act of Congress or from the Constitution itself"). To the contrary, the Executive Order cites to a provision of the NVRA that grants *the EAC* authority to prescribe the Federal Form. E.O. § 2(a) (citing 52 U.S.C. § 20508). Congress expressly created the EAC as an "independent entity" to serve the imperative that the regulation and administration of federal elections be free from

13

partisan bias or political machinations. 52 U.S.C. § 20921.[4] And it structured the EAC specifically to prevent it from adopting policy based on the President's whim, allowing the Commission to act only with the consent of three of its four members. *See id.* § 20923(a)–(b). By granting this body the responsibility to promulgate the Federal Form, *see id.* § 20508(a)(2), Congress exercised its own authority to require that the contents and requirements of the form be free from unilateral presidential dictates.

Thus, as this Court recognized, the "power to alter the Federal Form is—and always has been—delegated solely to a bipartisan, independent commission with a duty to make changes only 'in consultation with the chief election officers of the States.'" *LULAC*, 2025 WL 1187730, at *38 (citing NVRA, Pub. L. No. 103-31, § 9(a)(2), 107 Stat. at 87; HAVA, Pub. L. No. 107-252, § 802, 116 Stat. at 1726). This carefully crafted design "implicitly forbids any individual member of the Executive Branch from unilaterally exercising the delegated power to regulate State voter registration programs." *Id.* Accordingly, the President has neither constitutional nor statutory authorization to alter the content of the Federal Form. Not only is his authority here "at its lowest ebb" because he has acted contrary to express congressional direction, *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 10 (2015) (quoting *Youngstown*, 343 U.S. at 635–38 (Jackson, J., concurring)), but when addressing the context of the time, place, and manner of conducting federal elections, he has no independent constitutional authority on which to rely. *See also Fish v. Kobach*, 840 F.3d 710, 728 (10th Cir. 2016) (noting Congress's "plenary power under the Elections

---

[4] As HAVA-sponsor Sen. Mitch McConnell explained, a key principle behind the creation of the EAC was the "establishment of an independent, bipartisan commission appointed by the President to provide nonpartisan election assistance to the states." 147 Cong. Rec. S13681-02, 2001 WL 1628058, at *S13684 (Dec. 19, 2001) (statement of Sen. McConnell); *see also* 148 Cong. Rec. S797-01, 2002 WL 225992, at *S811 (Feb. 14, 2002) (similar from Sen. Brownback).

clause"); *accord Ex parte Siebold*, 100 U.S. 371, 387 (1879) (describing Congress's "general supervisory power over the whole subject" of election rules).

> **2.      Section 2(a) directly conflicts with the NVRA's substantive provisions.**

The President's lack of constitutional and statutory authority to prescribe requirements for the Federal Form suffices to resolve the Democratic Party Plaintiffs' *ultra vires* claim. But Section 2(a) is *ultra vires* for a separate, additional reason: the President's documentary proof of citizenship mandate runs directly contrary to the NVRA's substantive provisions.

The NVRA mandates that the Federal Form "may require *only* such identifying information (including the signature of the applicant) and other information (including data relating to previous registration by the applicant), as is *necessary* to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process." 52 U.S.C. § 20508(b)(1) (emphases added). The NVRA then makes clear what information is necessary to establish "citizenship": "the signature of the applicant, under penalty of perjury," attesting "that the applicant meets each such requirement." *Id.* § 20508(b)(2). Congress further clarified that the Federal Form "may *not* include any requirement for notarization *or other formal authentication*." *Id.* § 20508(b)(3) (emphases added).

Thus, even apart from the President's lack of authority to demand such a requirement, the NVRA's plain terms prohibit it. Requiring formalized documentary proof of citizenship is not "necessary" to enable State officials to assess eligibility; the applicant's affirmance under penalty of perjury suffices. *Id.* § 20508(b)(1). Consistent with that understanding, the NVRA specifically prohibits additional "authentication." *Id.* § 20508(b)(3) ("The mail voter registration form . . . may not include any requirement for notarization or other formal authentication."). That is consistent with the understanding of the NVRA Conference Committee, which concluded that requiring documentary proof of citizenship in connection with the Federal Form was "not necessary or

15

consistent with the purposes of this Act." H.R. Rep. No. 103-66, 1993 WL 235764, at *23–24 (Apr. 28, 1993) (Conf. Rep.); *see also Mi Familia Vota v. Fontes*, 129 F.4th 691, 719 (9th Cir. 2025) ("The ordinary meaning of 'necessary' is 'essential,' and the challenged requirement of [documentary proof of citizenship] . . . is not 'essential.'"); *cf. Krulewich v. United States*, 336 U.S. 440, 454 (1949) (Jackson, J., concurring) (recognizing that uncorroborated testimony under oath may support a criminal conviction). That is why when Arizona and Kansas separately requested that the EAC add documentary proof of citizenship to the Federal Form's state-specific instructions, their efforts were rejected. *See, e.g.*, *Kobach*, 772 F.3d at 1189. Such a requirement has never been "necessary" to assess eligibility.

### 3.    Section 2(a) violates the separation of powers because it directly intrudes on Congress's Elections Clause authority.

In addition to being *ultra vires*, Section 2(a) violates basic separation of powers principles by intruding upon Congress's constitutional prerogatives. *See, e.g.*, *INS v. Chadha*, 462 U.S. 919, 951 (1983); *Bond*, 564 U.S. at 222.

As explained, Congress designed the EAC as "an independent entity," 52 U.S.C. § 20921, and required that the EAC design the Federal Form through its own independent judgment, in a bipartisan manner, *id.* § 20923(a)–(b). The Form should reflect the Commissioners' "experience with or expertise in election administration," *id.* § 20923(c), and be made "in consultation with the chief election officers of the States," *id.* § 20508; *see also Gonzalez v. Arizona*, 677 F.3d 383, 403 (9th Cir. 2012), *aff'd sub nom. ITCA*, 570 U.S. at 1. The Executive Order seeks to replace congressionally-prescribed institutional independence with presidential fiat. The Elections Clause, however, "gives Congress the last word on how" the EAC shall carry out its assigned duties. *Gonzalez*, 677 F.3d at 403; *see also LULAC*, 2025 WL 1187730, at *15 (citing U.S. Const. art. I, § 4, cl. 1).

By overriding Congress's "general supervisory power" under the Elections Clause, *Siebold*, 100 U.S. at 387, Section 2(a) violates the separation of powers and intrudes upon a domain the Constitution assigns to Congress, *see* U.S. Const. art. I, § 4; *id.* art. II, § 1. And because the President has no constitutional power of his own to regulate elections, neither the vesting clause nor any other provision in Article II remedies the unconstitutionality of the Executive Order. *See, e.g.*, *Louisiana v. Biden*, 622 F. Supp. 3d 267, 288 (W.D. La. 2022) (holding executive order was *ultra vires* where Congress had "sole authority" in area of regulation and did not "grant authority to the President to make revisions" to applicable statute). Section 2(a)'s violation of the separation of powers therefore provides yet another basis upon which to permanently enjoin its implementation.

## II.    The Court has subject matter jurisdiction, and Plaintiffs' claims are ripe for final resolution.

This Court already determined at the preliminary injunction stage that the Democratic Party Plaintiffs' claims against Section 2(a) are ripe and that they satisfied the Article III standing requirement to challenge the provision. The Democratic Party Plaintiffs only briefly address these threshold issues to demonstrate that there remains no genuine issue of material fact as to these issues that would prevent the Court from entering final judgment as a matter of law.

### A.    The Democratic Party Plaintiffs' claims against Section 2(a) are constitutionally and prudentially ripe.

Defendants have chiefly contended in defense of Section 2(a) that the Democratic Party Plaintiffs' claims are premature. But as this Court has already concluded, the claims at issue are purely legal and require no further development. *LULAC*, 2025 WL 1187730, at *28. Indeed, Defendants have effectively conceded any hypothetical facts that could possibly make an argument against ripeness even remotely persuasive. *See* SOF ¶ 48; *LULAC*, 2025 WL 1187730, at *28.

"Ripeness" generally has two components: constitutional and prudential. Where, as here, plaintiffs lodge a facial challenge to the validity of an executive order on *ultra vires* and constitutional grounds, "constitutional ripeness is subsumed into the Article III requirement of standing, which requires [the plaintiffs] to allege *inter alia* an injury-in-fact that is imminent or certainly impending." *POET Biorefining, LLC v. EPA*, 970 F.3d 392, 403 (D.C. Cir. 2020) (cleaned up); *Am. Petrol. Inst. v. EPA*, 683 F.3d 382, 386 (D.C. Cir. 2012). Thus, the Section 2(a) claims are constitutionally ripe for the same reasons Article III standing is satisfied. *Infra* Argument § II.B.

Prudential ripeness, on the other hand, generally assesses whether (1) there are institutional reasons for deferring review, such as whether the action at issue is ongoing or whether further factual development is required to resolve the legal issue; and (2) whether delaying review would cause hardship to the plaintiffs. *Am. Petrol. Inst.*, 683 F.3d at 387; *see also Sprint Corp. v. FCC*, 331 F.3d 952, 957 (D.C. Cir. 2003). As this Court recognized at the preliminary injunction stage, courts in this Circuit have recognized a distinction between executive orders that "dictate particular outcomes," and those that "do not have any independent operative legal effect." *Am. Fed'n of Gov't Emps. v. Trump*, 318 F. Supp. 3d 370, 437–38 (D.D.C. 2018) (Jackson, J.), *rev'd on other grounds*, 929 F.3d 748 (D.C. Cir. 2019). Executive orders that fall into the former category are held to "create binding, enforceable obligations on their own" and are more likely to be immediately reviewable, whereas the latter category typically involves only the beginning of an agency process that may later be challenged. *LULAC*, 2025 WL 1187730, at *18 (citing *Amalgamated Meat Cutters v. Connally*, 337 F. Supp. 737, 743 (D.D.C. 1971)).

Here, the plain text of Section 2(a) "dictates a particular outcome and leaves no uncertainty by prescribing the substance of the documentary-proof-of-citizenship requirement it purports to

18

mandate." *Id.* at \*28. And because the Democratic Party Plaintiffs' *ultra vires* and separation of powers claims "facially" challenge that pre-ordained outcome, there is no cause for prudential concerns about premature judicial intervention. *Id.* ("As Defendants themselves put it: '[I]n the context of *ultra vires* and constitutional separation of powers claims, there are no questions of fact, because whether or not a statute or the Constitution grants [the Executive Branch] the power to act in a certain way is a pure question of law.'" (quoting ECF No. 84 at 23 (citation omitted)).

Moreover, the record here confirms that, absent an injunction, the EAC would carry out Section 2(a) precisely as commanded. Even after Defendants rested their ripeness argument on the notion that the EAC might never take action to enforce Section 2(a), or that it might not be implemented in the manner the Executive Order contemplates, a letter from the EAC's Executive Director sent to the chief election officials of each State demonstrated that the EAC understands Section 2(a) as an "instruction"—which is precisely the reading that makes it unlawful. SOF ¶ 46; *see also LULAC*, 2025 WL 1187730, at \*28 ("Section 2(a) leaves the EAC with discretion over little more than whether documentary proof of citizenship needs to be stapled to the registration form or paper-clipped." (citation omitted)). While Defendants initially resisted that conclusion, they ultimately conceded it: at oral argument, they stated that "documentary proof [of citizenship] is required" on the Federal Form under Section 2(a), and did so multiple times. SOF ¶ 48. Defendants cannot retreat from that concession now. *See Merck Sharp & Dohme Corp. v. Lee*, 75 F. Supp. 3d 16, 28–29 (D.D.C. 2014) (defendants will generally "not be permitted to [later] escape from [an earlier] concession" (citation omitted)); *see also Ass'n of Flight Attendants-CWA v. U.S. Dep't of Transp.*, 564 F.3d 462, 466 (D.C. Cir. 2009) (a party cannot create a genuine dispute merely by offering conclusory factual allegations).

In short, there are no ripeness or other prematurity concerns with proceeding to final judgment on the Democratic Party Plaintiffs' claims against Section 2(a).

**B.      The Democratic Party Plaintiffs have standing to challenge Section 2(a).**

The Democratic Party Plaintiffs continue to have Article III standing to challenge Section 2(a) for all the same reasons this Court already found during the preliminary injunction stage of this case. *LULAC*, 2025 WL 1187730, at *33–34. Standing requires an "(1) injury-in-fact, (2) causation, and (3) redressability." *Am. Freedom L. Ctr. v. Obama*, 821 F.3d 44, 48 (D.C. Cir. 2016) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). At the summary judgment stage, a plaintiff may establish standing by setting forth facts in an "affidavit or other evidence" such "that there exists no genuine issue of material fact as to justiciability." *Garcia v. Stewart*, 531 F. Supp. 3d 194, 204–05 (D.D.C. 2021) (citation omitted). "[O]ne party with standing is sufficient to satisfy Article III's case-or-controversy requirement." *Rumsfeld v. F. for Acad. & Inst. Rts.*, 547 U.S. 47, 52 n.2 (2006).

**1.      The Democratic Party Plaintiffs have standing based on direct harm to their electoral prospects.**

Section 2(a) is consistent with President Trump's effort to inflict harm to the Democratic Party Plaintiffs' electoral prospects through the Executive Order, including by burdening their voters' access to the franchise and forcing Plaintiffs to expend resources to counteract these and other harms throughout the entire country. The undisputed record evidence shows that this result is inevitable unless the provision is enjoined.

It is well-settled that a threat to a political party's electoral prospects stemming from a change in election rules constitutes a concrete and particularized injury. *See Shays v. FEC*, 414 F.3d 76, 85–86 (D.C. Cir. 2005) (holding candidates had standing to challenge regulation that would "alter the environment in which rival parties defend their concrete interests . . . in winning

20

reelection"); *Nat. L. Party of U.S. v. FEC*, 111 F. Supp. 2d 33, 47 (D.D.C. 2000) (same for party committees); *see also, e.g.*, *Mecinas v. Hobbs*, 30 F.4th 890, 898 (9th Cir. 2022); *Tex. Democratic Party v. Benkiser*, 459 F.3d 582, 587 & n.4 (5th Cir. 2006); *Nelson v. Warner*, 472 F. Supp. 3d 297, 306–07 (S.D. W. Va. 2020).

For several reasons, the Democratic Party Plaintiffs have direct standing to challenge Section 2(a) on this ground. The burdens imposed by the documentary proof of citizenship requirement would fall disproportionately on citizens across the country who are most likely to support Democrats—including lower-income voters, enrollees of public assistance programs, and women. SOF ¶ 31–34. Despite being citizens and eligible voters, members of these groups are far more likely to lack the forms of documentation that Section 2(a) declares acceptable to "prove" citizenship, thus making it impossible for some of them to vote, directly harming the Democratic Party Plaintiffs' electoral prospects. SOF ¶¶ 30–34. Further, even where the requirement does not entirely disenfranchise voters, it is likely to confuse and discourage some from taking the steps necessary to register. SOF ¶¶ 37–38. That loss of voter engagement harms the Party Organizations—both financially, as they dedicate additional resources to registration efforts, as well as at the ballot box, where the reluctance of supporters to register will place the Party Organizations at a competitive disadvantage. SOF ¶¶ 39–42.

Thus, consistent with this Court's earlier, straightforward conclusion, there is no genuine question here that Section 2(a)'s "illegal structuring of [the] competitive environment" will degrade Plaintiffs' electoral prospects and force it to compete on unlawful terms if it is allowed to

go into effect. *Shays*, 414 F.3d at 85–86; *see Nat. L. Party*, 111 F. Supp. 2d at 44; *accord LULAC*, 2025 WL 1187730, at *34.[5]

> ### 2.    The Party Organizations have associational standing based on harm to their members' and constituents' voting rights.

Separate and independent from their standing based on the direct harm to their electoral prospects, the Party Organizations also have associational standing based on the harms that Section 2(a) would impose on their members and constituents. Groups like the Party Organizations may bring suit on behalf of their members when (1) their members "would otherwise have standing to sue in their own right"; (2) "the interests [they] seek[] to protect are germane to [their] purpose"; and (3) "neither the claim asserted nor the relief requested requires the participation of individual members." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). Courts have frequently found that political parties have associational standing on behalf of their voter members when they are challenging state laws that would make it more difficult for their members to engage in the political process. *See Crawford v. Marion Cnty. Election Bd.*, 472 F.3d 949, 951 (7th Cir. 2007) (holding the "Democratic Party also has standing to assert the rights of those of its members who will be prevented from voting by the new [photo ID] law"); *Sandusky Cnty. Democratic Party v. Blackwell*, 387 F.3d 565, 573–74 (6th Cir. 2004) (similar); *Fla. Democratic Party v. Scott*, 215 F. Supp. 3d 1250, 1254 (N.D. Fla. 2016) (similar).

-----

[5] If any doubt existed as to this harm at the preliminary injunction stage, such doubts have been put to rest by the intervention of the Republican National Committee ("RNC") in this case. The RNC—a direct competitor of the Democratic Party Organizations—claims its political and electoral efforts *benefit* from the implementation of the documentary proof of citizenship requirement. *See* ECF No. 125-1 ¶¶ 5, 26 (stating that the RNC's mission is to "elect Republican candidates to state and federal office" and that enjoining the "proof-of-citizenship requirement for upcoming elections" will require RNC to pursue its mission in other ways). That claim confirms that the converse is true; the Democratic Party Organizations stand to suffer a competitive injury if Section 2(a) is permitted to stand.

Here, the Party Organizations plainly have established associational standing to challenge Section 2(a), which burdens their constituents' ability to register to vote. First, the Plaintiffs' members and constituents have standing to sue in their own right. For some of Plaintiffs' constituents, the best option to register to vote is by completing the Federal Form because, consistent with Congress's design, that Form has streamlined the registration process. SOF ¶ 29. Indeed, millions of the Party Organizations' constituents, who are citizens and eligible voters in every state throughout the country, lack qualifying documentary proof of citizenship altogether. SOF ¶¶ 20–22, 30. As a result, they will be unable to register to vote using the Federal Form. *See Mi Familia Vota v. Fontes*, 719 F. Supp. 3d 929, 987 (D. Ariz. 2024) (finding associational standing to challenge voting laws where tribe's "members face[d] a realistic danger of sustaining a direct injury due to [a documentary proof of residency] [r]equirement" (quotation omitted)). And in states like Arizona and Louisiana, where the state registration form also requires producing documentary proof of citizenship, these individuals will be unable to register at all. SOF ¶¶ 35–36. Courts routinely find that voters have standing to challenge laws that put them at risk of disenfranchisement or otherwise impose new restrictions on their right to vote. *Fish v. Schwab*, 957 F.3d 1105, 1126 (10th Cir. 2020) (holding voter had standing to challenge documentary proof of citizenship requirement); *see also, e.g.*, *Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1351 (11th Cir. 2009); *Frank v. Walker*, 17 F. Supp. 3d 837, 866 (E.D. Wis.), *rev'd on other grounds*, 768 F.3d 744 (7th Cir. 2014); *Democracy N.C. v. N.C. State Bd. of Elections*, 476 F. Supp. 3d 158, 184 (M.D.N.C. 2020); *People First of Ala. v. Merrill*, 467 F. Supp. 3d 1179, 1198 (N.D. Ala. 2020); *Jones v. U.S. Postal Serv.*, 488 F. Supp. 3d 103, 122 (S.D.N.Y. 2020); *League of Women Voters of S.C. v. Andino*, 497 F. Supp. 3d 59, 75 (D.S.C. 2020), *appeal dismissed and remanded*, 849 F. App'x 39 (4th Cir. 2021).

The interests that the Party Organizations seek to protect by challenging Section 2(a) are also germane to their organizational purpose. *See Hunt*, 432 U.S. at 343. To effectively pursue their mission of electing Democratic candidates at the federal, state, and local levels, the Party Organizations must encourage and assist Democratic Party members and constituents in registering to vote and in casting ballots and ensuring those ballots count. SOF ¶¶ 16–19. And there is no reason why the Party Organizations' individual members would have to participate in this action. *See Hunt*, 432 U.S. at 343; *United Food & Com. Workers Union Local 751 v. Brown Group*, 517 U.S. 544, 546 (1996). Plaintiffs are not, for example, seeking damages that would require individualized proof. *Cf. Travelers United, Inc. v. Hyatt Hotels Corp.*, 761 F. Supp. 3d 97, 117–128 (D.D.C. 2025). Each *Hunt* factor is therefore satisfied.

### 3. The Party Organizations have standing based on harm to their core activities, which requires them to divert resources to combat the harm.

Finally, the Party Organizations have established organizational standing because Section 2(a) will harm their core activities of registering Democratic voters and turning those voters out to vote. In order to mitigate that harm, and the resulting competitive injuries that Section 2(a) imposes, the Party Organizations will be forced to redirect critical resources reserved for other core programs to address the Order's impact on their voters. *See Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024) (explaining organizations may establish standing by showing challenged act or law "perceptibly impair[s]" their "core . . . activities" (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378 (1982)); *Republican Nat'l Comm. v. N.C. State Bd. of Elections* ("*RNC*"), 120 F.4th 390, 397 (4th Cir. 2024) (holding party committee had standing where it diverted resources in response to alleged federal violations, impairing its mission of "organizing lawful voters and encouraging them to support Republican[s]" (citing *All. for*

*Hippocratic Med.*, 602 U.S. at 395)).[6]

Section 2(a) directly undermines the efficacy of their "core" voter education programs. *All. for Hippocratic Med.*, 602 U.S. at 395 (citing *Havens*, 455 U.S. at 378). As this Court has already recognized, the Party Organizations have invested in voter registration, directly and indirectly, and as upcoming elections approach, the Party Organizations will work to ensure that all eligible voters are registered and maintain their registrations. SOF ¶¶ 16–19, 27, 40. These efforts would become more costly if Section 2(a) were to go into effect, and those costs would necessarily come at the expense of other initiatives they have planned to persuade and mobilize voters. SOF ¶¶ 39, 41–42; *LULAC*, 2025 WL 1187730, at *33. Further still, the documentary proof of citizenship requirement would also likely cause significant confusion, which "will create a disincentive for citizens who would otherwise attempt to register to vote." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 13 (D.C. Cir. 2016); SOF ¶¶ 37–38. This voter confusion would force the Party Organizations to divert resources away from other critical priorities to instead aid voters attempting to comply

---

[6] Federal courts—before and after *Alliance for Hippocratic Medicine*—routinely hold that political party committees and other groups dedicated to voter registration or voter assistance are injured by laws and practices that impede such efforts. *See, e.g.*, *LUPE v. Abbott*, 753 F. Supp. 3d 515, 562 (W.D. Tex. 2024) (discussing *Alliance for Hippocratic Medicine* and concluding that, "[a]s in *Havens*, the organizational injury here is a perceptible impairment of one of Plaintiffs' core services—voter assistance—resulting from violations of a federal law"); *RNC*, 120 F.4th at 397 (holding party had standing to challenge alleged violation of HAVA where it alleged diversion from other priorities to new programming targeting "fraud" (citing *All. for Hippocratic Med.*, 602 U.S. at 395)); *Common Cause Ind. v. Lawson*, 937 F.3d 944, 950 (7th Cir. 2019) (explaining "a voting law can injure an organization enough to give it standing 'by compelling [it] to devote resources' to combatting the effects of [a] law that [harms] organization's mission") (citations omitted); *Crawford*, 472 F.3d at 951 (holding Democratic Party committees had standing to challenge voter ID law); *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1341–42 (11th Cir. 2014) (holding organizations engaged in voter registration as part of core mission had standing to challenge program designed to remove non-citizens from the roll because they diverted resources to addressing problematic misidentification of noncitizens that impeded core mission of getting out the vote).

with the new requirement, all at the cost of other critical planned activities and expenditures in the months leading up to the upcoming elections and beyond. SOF ¶¶ 39, 42.

In short, there is no genuine dispute that Section 2(a), if allowed to become effective, would "directly affect[] and interfere[] with" the Party Organizations' mission-critical programs and their ability to ensure their members and constituents—qualified citizens—can register and remain registered. *RNC*, 120 F.4th at 397 (citing *All. for Hippocratic Med.*, 602 U.S. at 395).

### 4. The remaining prongs of the standing inquiry are satisfied.

The remaining standing factors are similarly satisfied. Plaintiffs' injuries are traceable to the EAC and its Commissioners, whom Section 2(a) charges with enforcement. And as this Court has already noted, even if other officials ultimately play some role in implementing the provision, or if the injuries also partly stem from voter behavior, traceability is established because there is a clear "predictable effect of [this] Government action on the decisions of third parties." *Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019); *see also Mass. Coal. for Immigr. Reform v. DHS*, 752 F. Supp. 3d 13, 32 (D.D.C. 2024) (surveying "[t]hirty years of D.C. Circuit caselaw illustrat[ing] how standing may rest 'on the predictable effect of Government action on the decisions of third parties'" (citation omitted)); *accord LULAC*, 2025 WL 1187730, at *34. Finally, there is no question that the requested declaratory and equitable relief would redress Plaintiffs' injuries by preventing them altogether. *See LULAC*, 2025 WL 1187730, at *35 (citing *Lujan*, 504 U.S. at 112); *see also* SOF ¶¶ 43–44.

## III.   Permanent injunctive relief is warranted.

Because Plaintiffs have shown they are entitled to summary judgment on their *ultra vires* and separation of powers claims challenging Section 2(a), the Court should permanently enjoin

the EAC and its Commissioners from implementing the provision.[7] To obtain a permanent injunction, the Democratic Party Plaintiffs must show "(1) an irreparable injury; (2) that remedies available at law . . . are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange*, 547 U.S. 388, 391 (2006). For largely the same reasons the preliminary injunction was warranted, permanent relief should now be entered. *See LULAC*, 2025 WL 1187730, at *41; *cf. Doe v. Mattis*, 928 F.3d 1, 7 (D.C. Cir. 2019) (noting that the same equitable factors apply to both preliminary and permanent injunctions).

### A. Absent an injunction, the Democratic Party Plaintiffs will suffer irreparable harm for which there is no adequate legal remedy.

Section 2(a), if implemented, would irreparably harm the Democratic Party Plaintiffs for largely the same reasons that this Court already concluded warranted a preliminary injunction, as the facts surrounding the grave harm the provision would inflict have not changed.

Specifically, the Democratic Party Plaintiffs would suffer irreparable harm to (1) their electoral prospects in elections that they are already preparing for due to illegal changes in the rules, SOF ¶¶ 25–28, 40–42; (2) the fundamental voting rights of their members and constituents, SOF ¶¶ 22–24, 29–38; and (3) their core activities, forcing them to revamp their education and turnout programs across the country, SOF ¶¶ 18–21, 39–42; *accord LULAC,* 2025 WL 1187730, at *42 ("[B]ecause each day presents an opportunity to recruit candidates, persuade voters, and galvanize supporters that cannot be restored once lost, the implementation of a documentary-proof-

---

[7] Plaintiffs do not seek an injunction against President Trump. *See Franklin v. Massachusetts*, 505 U.S. 788, 802–03 (1992) (plurality).

of-citizenship requirement in response to Section 2(a) would irreparably harm the Democratic Party Plaintiffs' interests throughout the country."). Thus, clear record evidence establishes the Democratic Party Plaintiffs' irreparable harm.

Substantial case law does as well, as courts "routinely recognize that organizations suffer irreparable harm when a defendant's conduct causes them to lose opportunities to conduct election-related activities." *League of Women Voters of Mo. v. Ashcroft*, 336 F. Supp. 3d 998, 1005 (W.D. Mo. 2018) (collecting cases); *see also Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) ("It has long been established that the loss of constitutional freedoms, 'for even minimal periods of time, unquestionably constitutes irreparable injury.'" (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); *see also Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) ("[S]uits for declaratory and injunctive relief against the threatened invasion of a constitutional right do not ordinarily require proof of any injury other than the threatened constitutional deprivation itself." (quoting *Davis v. District of Columbia*, 158 F.3d 1342, 1346 (D.C. Cir. 1998))); *cf. Elrod*, 427 U.S. at 374 n.29.

### B.    The equities and public interest favor a permanent injunction.

The public interest and equities weigh sharply in favor of granting a permanent injunction. Permitting Section 2(a) to be enforced would harm the fundamental voting rights of the public and the Democratic Party Plaintiffs' members and supporters. *See* SOF ¶¶ 16–44. Further, it would undermine fair and competitive elections across the country, granting the President's own political party an unlawful advantage. *See id.* In contrast, Defendants will not face any harm from a permanent injunction. Because Section 2(a) is unlawful, *supra* Argument § I, enjoining Defendants from implementing it cannot harm them in any way: "the Government 'cannot suffer harm from an injunction that merely ends an unlawful practice.'" *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 218 (D.D.C. 2020) (quoting *Open Cmtys. All. v. Carson*, 286 F. Supp. 3d 148, 179 (D.D.C. 2017)); *cf.*

*Newby*, 838 F.3d at 12 ("There is generally no public interest in the perpetuation of unlawful agency action.").

Further still, this Court concluded at the preliminary injunction stage that there is "precious little" evidence "that an injunction in Plaintiffs' favor would harm" election integrity. *LULAC*, 2025 WL 1187730, at *43. That conclusion remains well-founded—Defendants have not introduced any record evidence explaining how changes to the Federal Form are needed to maintain election integrity. Moreover, Congress's choices in drafting the NVRA reflect its disagreement with any contrary claim. The "NVRA expressly concluded that a proposed amendment allowing States to adopt documentary-proof-of-citizenship requirements for the Federal Form was 'not necessary or consistent with the purposes of [the] Act.'" *LULAC*, 2025 WL 1187730, at *43 (citing H.R. Rep. No. 103–66 at 23 (1993)); *see also* SOF ¶ 10. Defendants have yet to offer any basis for second-guessing Congress's judgment on that score, reinforcing that the public interest and equities weigh in favor of enjoining such a pointlessly burdensome addition to the Federal Form.

## CONCLUSION

The Court should grant the Democratic Party Plaintiffs' partial motion for summary judgment, declare that Section 2(a) is *ultra vires* and unconstitutional, and permanently enjoin the EAC and its Commissioners from enforcing it.


Dated: July 11, 2025                          Respectfully submitted,

                                              */s/ Marc E. Elias*
                                              **ELIAS LAW GROUP LLP**
                                              Marc E. Elias (DC 442007)
                                              Aria C. Branch (DC 1014541)
                                              Lalitha D. Madduri (DC 1659412)
                                              Christopher D. Dodge (DC 90011587)

Jacob D. Shelly (DC 90010127)
James J. Pinchak (DC 90034756)*
250 Massachusetts Ave. NW, Suite 400
Washington, DC 20001
T: (202) 968-4652

Tyler L. Bishop (DC 90014111)
1700 Seventh Ave. Suite 2100
Seattle, WA 98101
T: (206) 656-0177

*Admitted pro hac vice