**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.*,<br><br>                Plaintiffs,<br><br>     v.<br><br>EXECUTIVE OFFICE OF THE PRESIDENT, *et al.*,<br><br>                Defendants. | Civil Action No. 25-0946 (CKK) |
| DEMOCRATIC NATIONAL COMMITTEE, *et al.*,<br><br>                Plaintiffs,<br><br>     v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>                Defendants. | Civil Action No. 25-cv-0952 (CKK) |
| LEAGUE OF WOMEN VOTERS EDUCATION FUND, *et al.*,<br><br>                Plaintiffs,<br><br>     v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>                Defendants. | Civil Action No. 25-0955 (CKK) |

**DECLARATION OF ARIA C. BRANCH IN SUPPORT OF
DEMOCRATIC PARTY PLAINTIFFS' MOTION FOR PARTIAL SUMMARY
JUDGMENT**

1.      I am an attorney admitted to practice law in the District of Columbia. I am a partner at the law firm of Elias Law Group LLP, and I represent Plaintiffs the Democratic National Committee ("DNC"), the Democratic Governors Association ("DGA"), the Democratic Senatorial Campaign Committee ("DSCC"), the Democratic Congressional Campaign Committee ("DCCC") (collectively, "Party Organizations"), and the Democratic leaders of the U.S. Senate and U.S. House of Representatives, Charles E. "Chuck" Schumer and Hakeem S. Jeffries, respectively (together with the Party Organizations, "Democratic Party Plaintiffs") in this action.

2.      I respectfully submit this declaration in support of the Democratic Party Plaintiffs' motion for partial summary judgment.

3.      I am over the age of 18 and competent to make this declaration. I have personal knowledge of the facts set forth in this declaration and, if called and sworn as a witness, could and would competently testify to them.

4.      Attached hereto as **Exhibit 1** is a true and correct copy of an April 7, 2025 document first filed by Elias Law Group titled "Declaration of Hakeem S. Jeffries in Support of Democratic Party Plaintiffs' Motion for Preliminary Injunction." An identical copy is on the docket at ECF No. 53-2.

5.      Attached hereto as **Exhibit 2** is a true and correct copy of an April 7, 2025 document first filed by Elias Law Group titled "Declaration of Charles E. Schumer in Support of Democratic Party Plaintiffs' Motion for Preliminary Injunction." An identical copy is on the docket at ECF No. 53-3.

6.      Attached hereto as **Exhibit 3** is a true and correct copy of an April 7, 2025 document first filed by Elias Law Group titled "Declaration of Liberty Schneider in Support of Democratic Party Plaintiffs' Motion for Preliminary Injunction." An identical copy is on the docket at ECF No. 53-4.

7.     Attached hereto as **Exhibit 4** is a true and correct copy of an April 7, 2025 document first filed by Elias Law Group titled "Declaration of Jillian Edelman in Support of Democratic Party Plaintiffs' Motion for Preliminary Injunction." An identical copy is on the docket at ECF No. 53-5.

8.     Attached hereto as **Exhibit 5** is a true and correct copy of an April 7, 2025 document filed by Elias Law Group titled "Declaration of Lillie Snyder Boss in Support of Democratic Party Plaintiffs' Motion for Preliminary Injunction." An identical copy is on the docket at ECF No. 53-6.

9.     Attached hereto as **Exhibit 6** is a true and correct copy of an April 7, 2025 document filed by Elias Law Group titled "Declaration of Erik Ruselowski in Support of Democratic Party Plaintiffs' Motion for Preliminary Injunction." An identical copy is on the docket at ECF No. 53-7.

10.    Attached hereto as **Exhibit 7** is a true and correct copy of a webpage from the U.S. Government Services Administration titled "How to Get a Real ID and Use It for Travel," as downloaded from the U.S. Government Services Administration's website at https://perma.cc/673J-LR89.

11.    Attached hereto as **Exhibit 8** is a true and correct copy of a webpage from the U.S. Department of Homeland Security titled "Enhanced Drivers' Licenses: What Are They?" as downloaded from the U.S. Department of Homeland Security's website at https://perma.cc/5QUT-FELG.

12.    Attached hereto as **Exhibit 9** is a true and correct copy of a webpage from the Michigan Department of State titled "Enhanced License and ID," as downloaded from the Michigan Department of State's website at https://perma.cc/D5GC-EVZK.

13.    Attached hereto as **Exhibit 10** is a true and correct copy of a webpage from the

Michigan Department of State titled "First-time License or ID," as downloaded from the Michigan Department of State's website at https://perma.cc/6XSR-V3NK.

14.    Attached hereto as **Exhibit 11** is a true and correct copy of a Minnesota Department of Public Safety webpage, which lists driver's license and identification card fees, as downloaded from the Minnesota Department of Public Safety's website at https://perma.cc/Y56Z-8ME6.

15.    Attached hereto as **Exhibit 12** is a true and correct copy of a New York Department of Motor Vehicles webpage titled "Enhanced or REAL ID," as downloaded from the New York Department of Motor Vehicles' website at https://perma.cc/4BUW-8XB4.

16.    Attached hereto as **Exhibit 13** is a true and correct copy of a Vermont Department of Motor Vehicles webpage titled "Driver's License Fees," as downloaded from the Vermont Department of Motor Vehicles' website at https://perma.cc/JA2X-H733.

17.    Attached hereto as **Exhibit 14** is a true and correct copy of a U.S. Embassy & Consulates in Japan webpage titled "Proof of U.S. Citizenship," as downloaded from the U.S. Embassy and Consulates in Japan's website at https://perma.cc/5WRV-SBSS.

18.    Attached hereto as **Exhibit 15** is a true and correct copy of Appendix 2 ("Topology Specifications") to 32 C.F.R. § 161.7 (Identification Cards for Members of the Uniformed Services, Their Dependents, and Other Eligible Individuals), as downloaded from the Government Printing Office at https://perma.cc/PR39-MQGE.

19.    Attached hereto as **Exhibit 16** is a true and correct copy of a U.S. Election Assistance Commission ("EAC"), National Voter Registration Form, as downloaded from the EAC's website at https://perma.cc/DX5M-ARN7.

20.    Attached hereto as **Exhibit 17** is a true and correct copy of Clare Foran, Annette Choi, and Haley Talbot's article for CNN, as updated April 8, 2025 titled "Speaker Johnson has a bit more room in his historically narrow House majority," as downloaded from CNN's website at

https://perma.cc/S34E-B5D2.

21.     Attached hereto as **Exhibit 18** is a true and correct copy of a U.S. House of Representatives Press Gallery webpage titled "Party Breakdown," as downloaded from the U.S. House of Representatives Press Gallery's website on July 11, 2025 at https://perma.cc/WXE6-WNMB.

22.     Attached hereto as **Exhibit 19** is a true and correct copy of a June 2007 Report to Congressional Requesters from the U.S. Government Accountability Office, numbered GAO-07-889, titled "MEDICAID" and subtitled "States Reported That Citizenship Documentation Requirement Resulted in Enrollment Declines for Eligible Citizens and Posed Administrative Burdens," as downloaded from the Government Accountability Office's website at https://perma.cc/A6RZ-VT22.

23.     Attached hereto as **Exhibit 20** is a true and correct copy of a September 7, 2023 Pew Research Center report titled "How Many Women Take Their Husband's Last Name When They Marry?" as downloaded from the Pew Research Center's website, at https://perma.cc/UU7C-6KQD.

24.     Attached hereto as **Exhibit 21** is a true and correct copy of an April 9, 2024 Pew Research Center webpage titled "Partisanship by Family Income, Home Ownership, Union Membership and Veteran Status," as downloaded from the Pew Research Center's website at https://perma.cc/RLA6-YDUM.

25.     Attached hereto as **Exhibit 22** is a true and correct copy of an April 9, 2024 Pew Research Center webpage titled "Partisanship by Gender, Orientation, Marital and Parental Status," as downloaded from the Pew Research Center's website at https://perma.cc/YY9B-H7TS.

26.     Attached hereto as **Exhibit 23** is a true and correct copy of a Letter from EAC Executive Director Brianna Schletz to Chief Election Officials, dated April 11, 2025.

27.    Attached hereto as **Exhibit 24** is a true and correct copy of the transcript of the Preliminary Injunction Hearing held in this case on April 17, 2025.

28.    Attached hereto as **Exhibit 25** is a true and correct copy of a webpage from the Washington State Department of Licensing titled "Driver licensing fees," as downloaded from the Washington State Department of Licensing's website at https://perma.cc/JSW9-EVN9.


I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on July 11, 2025 in Washington, DC,


*/s/ Aria C. Branch*
Aria C. Branch
(DC 1014541)

# Exhibit 1

Civil Action No. 25-cv-0952 (CKK)
(Lead Case: No. 25-cv-00946 (CKK))

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> EXECUTIVE OFFICE OF THE PRESIDENT, *et al.*, <br><br> Defendants. | Civil Action No. 25-0946 (CKK) |
| DEMOCRATIC NATIONAL COMMITTEE, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*, <br><br> Defendants. | Civil Action No. 25-cv-0952 (CKK) |
| LEAGUE OF WOMEN VOTERS EDUCATION FUND, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*, <br><br> Defendants. | Civil Action No. 25-0955 (CKK) |

**DECLARATION OF HAKEEM S. JEFFRIES IN SUPPORT OF
DEMOCRATIC PARTY PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

I, Hakeem S. Jeffries, declare as follows:

1.      I am over the age of 18, am competent to testify, and have personal knowledge of the facts and information set forth in this declaration.

2.      I am the U.S. House Representative from New York's 8th Congressional District. I am the Minority Leader of the House of Representatives and am the Leader of the House Democratic Caucus.

3.      I have been elected to the U.S. House of Representatives seven times. I am also a candidate, up for reelection in 2026. I am a citizen of the United States, a resident of the State of New York, and an individual voter in federal, state, and local elections.

4.      As Leader of the House Democratic Caucus, I am responsible for helping elect Democratic candidates to the U.S. House in races across the country. This responsibility is critical to the success of the Caucus and to the mission of the Democratic Party as a whole. Given that the Caucus's ability to pass and influence legislation in the U.S. House depends on the size of its membership, increasing the size of the Caucus by electing new Democratic Representatives and reelecting incumbent Democratic Representatives is a large part of my responsibility as the Leader. In my role, I provide direct support to Democratic House campaigns, often in highly competitive battleground states, by helping to fundraise, speaking at campaign events, and engaging in other important campaign work. I also work closely with DCCC to help develop strategies and marshal resources to elect Democratic House candidates.

5.      On March 25, 2025, President Trump issued Executive Order 14248, titled *Preserving and Protecting the Integrity of American Elections*, which directs various federal officers and the Election Assistance Commission to adopt election policies of the President's choosing. The President's unprecedented Order, which claims authority that the U.S.

Constitution's Elections Clause expressly reserves for members of Congress, or for the states, inflicts severe and immediate harm on Democratic House candidates and the Democratic Caucus, and potentially impedes my ability to carry out my duties as Leader.

6.    In particular, President Trump's imposition of a national election day ballot receipt deadline directly harms qualified voters—including members of the military, their families, and countless others—who rely on voting by mail by requiring states to reject ballots not received by election day, even where state law (including New York's) provides a longer period for receipt.

7.    Since the pandemic, Democrats have increasingly encouraged voters to vote by mail, because that method is often the most convenient or accessible way for voters to participate. As a result, in many states, a greater share of voters who vote by mail are Democrats, including in New York State and New York City. The Executive Order's effort to unilaterally impose a nationwide election-day ballot receipt deadline—which would result in throwing out mail ballots received after election day regardless of the reason for the delay—appears to be designed to benefit the President's own party at Democrats' expense. The Order would have a devastating impact on Democratic voters and would severely threaten Democratic voters' fundamental right to vote.

8.    The Order stands to create confusion among voters: will their ballot count if they follow state law, or will they be disenfranchised if their ballot is not received by election day because of the Order? When there is chaos and confusion, voters are disenfranchised. And in my experience, when voters are unfairly disenfranchised, they lose faith in our election system.

9.    It will be very difficult to ensure that *all* voters are aware of a new election day receipt rule, especially in states that have universal vote by mail programs. Many states have expanded access to mail voting in recent years, like my home state of New York. In many states, huge portions of the electorate vote by mail. As of last year, for example, every voter in New York

3

who is registered to vote is now eligible to vote by mail pursuant to the Early Mail Voter Act, a 2023 landmark pro-voter law in my state. It has been reported that in the 2024 general election, nearly 700,000 New Yorkers cast ballots by mail. It will take an enormous and resource-intensive effort to educate voters about the election day receipt deadline.

10.    Even when voters place their ballots in the mail well before election day, those ballots often arrive after election day for reasons almost entirely outside the voter's control. I am aware of significant and ongoing Postal Service delays at processing facilities throughout the country, as well as frequent delays at Postal Service facilities in my own district. In recent elections, I have been forced to call attention to operational shortcomings, such as insufficient mail sorting machines and staffing shortages, all of which threaten the timeliness of mail ballots. Unfortunately, I fear changes at the Postal Service will only worsen these issues. When these delays occur, mail ballots can take several additional days—sometimes even weeks—to be delivered. States like New York have enacted laws to mitigate the effects of these issues by counting ballots that are cast by the voter so long as the ballot is postmarked on or before election day. The Executive Order, however, would effectively override New York law and result in disenfranchisement of voters who otherwise comply with New York law.

11.    In states like New York that have previously counted ballots that are postmarked by but arrive after election day, the election day ballot receipt deadline also means that voters have less time to make their final choices on which candidates to support compared to voters who cast their ballots in person. Consequently, the Party's candidates will have less time to persuade and mobilize mail voters.

12.    In many places, including my own District, Republican voters do not rely as heavily on mail voting as much as Democrats do now, so Republicans may by design gain an electoral

advantage if tens of thousands of mail ballots that skew Democratic will be invalidated and not counted every election cycle. Some House races are decided on small margins (tens or hundreds of ballots), and every improperly invalidated ballot matters.

13.     The Executive Order also contains provisions directing the Election Assistance Commission to add a documentary proof of citizenship requirement to the federal voter registration form required by the National Voter Registration Act (NVRA)—often called the "Federal Form"—before such voters can register and vote. The Order further mandates additional citizenship checks of prospective voters who receive public assistance (and *only* those voters) before they can even receive a registration form, and also seeks to pressure states into imposing their own burdensome proof of citizenship requirements.

14.     To be clear, existing law already makes it illegal for foreign nationals to register and vote in our elections, and our existing law prevents non-citizens from voting. The implementation of these burdensome provisions will make it extremely difficult for qualified U.S. citizens to vote, and furthers harms Democratic House candidates, making it harder for me to perform my duties as Leader. Millions of U.S. citizens, including many in my own district, lack a passport or the ability to easily obtain one. I also understand that women have had difficulty proving their citizenship because their married name may not match their name on their citizenship documents. These voters will not be able to register to vote or may be dissuaded from voting because of the President's Order. Given that these groups of voters make up large portions of the constituency of the Democratic House Caucus, the imposition of overly burdensome requirements inflict significant harm on  our constituency, and further restructures the election system to the benefit of the President's party.

15.     Finally, the Executive Order directs federal officers to grant unauthorized third

parties, including DOGE, the ability to scrutinize federal databases containing the personal information of millions of Americans—including information about me and other Democratic Party voters. I value our country's long-held commitment to protecting privacy and am extremely concerned about the unauthorized disclosure of this information to DOGE. I also fear these unauthorized disclosures will harm DCCC and our party's voter registration efforts, as it will be harder to convince voters who reasonably fear scrutiny of their private information by unauthorized individuals to register to vote and participate in elections.

16.     The Executive Order significantly undermines my ability to effectively carry out my responsibilities as the Leader of the House Democratic Caucus. Nothing is more important than ensuring that our voters and constituents are able to vote and have their vote counted. To protect our voters' right to vote, DCCC and Democratic campaigns throughout the country will have to make monumental and unprecedented investments to ensure that voters (including those in my district) are not disenfranchised as a result of the Order's unprecedented top-down changes to our elections.

17.     By restructuring election rules in a manner that benefits Republicans and significantly disadvantages Democrats, the Order harms the electoral prospects of Democratic House candidates.

18.     The unfairness, uncertainty, and confusion around the election rules imposed by the Order will make it harder for me to effectively recruit strong candidates to run for office. Candidates want to know that the rules of the road are clear, and they want to know that they have a fair shot of winning if they invest their time and money in a race. It is difficult to convince potential candidates to run for office as Democrats when the President has unfairly changed the election rules in a way that tilts the playing field heavily in favor of Republicans.

19.     The Order also comes at a particular cost for me in my role as the Leader of the House Democratic Caucus. It will mean that I will have less time to focus on the other critical issues facing our country because I will have to spend more of my time and efforts pushing back against voter suppression efforts connected to the executive order.

20.     I declare under penalty of perjury that the foregoing is true and correct.


Executed on: _4/7/2025_____


_____

**Hakeem S. Jeffries**
**U.S. House Minority Leader**

# Exhibit 2

Civil Action No. 25-cv-0952 (CKK)
(Lead Case: No. 25-cv-00946 (CKK))

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> EXECUTIVE OFFICE OF THE PRESIDENT, *et al.*, <br><br> Defendants. | Civil Action No. 25-0946 (CKK) |
| DEMOCRATIC NATIONAL COMMITTEE, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*, <br><br> Defendants. | Civil Action No. 25-cv-0952 (CKK) |
| LEAGUE OF WOMEN VOTERS EDUCATION FUND, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*, <br><br> Defendants. | Civil Action No. 25-0955 (CKK) |

**DECLARATION OF CHARLES E. SCHUMER IN SUPPORT OF
DEMOCRATIC PARTY PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

I, Charles E. Schumer, declare as follows:

1.      I am over the age of 18, am competent to testify, and have personal knowledge of the facts and information set forth in this declaration.

1.      I am the senior U.S. Senator from New York, the Senate Minority Leader and the Leader of the Senate Democratic Caucus.

2.      I have been elected to the U.S. Senate five times and was elected to the U.S. House of Representatives nine times prior to that. I am also a current candidate for U.S. Senate. I am a citizen of the United States, a resident of the State of New York, and an individual voter in federal, state, and local elections.

3.      As the Leader of the Senate Democratic Caucus, I am responsible for helping to elect Democratic Party candidates in U.S. Senate elections across the country. This responsibility is critical to the success of the Caucus and to the mission of the Democratic Party as whole, given that the Caucus's ability to influence the legislative agenda in the U.S. Senate depends on the size of its membership. I play a direct role in helping to increase the size of the Caucus. In my role as Leader, I provide direct support to Democratic Senate campaigns, often in highly competitive battleground states, by helping to fundraise, weighing in on strategy and messaging, speaking at campaign events, and engaging in other important campaign work. I work closely with DSCC throughout the entire election cycle to recruit new candidates, craft messaging, prioritize party investments and develop strategies to elect Democratic Senate candidates.

4.      On March 25, 2025, the President issued Executive Order 14248, *Preserving and Protecting the Integrity of American Elections*, which mandates various federal officers and the Election Assistance Commission to adopt several of the President's preferred election policies. The Order, which usurps authority that the U.S. Constitution reserves for members of Congress,

or for the states, severely and immediately harms Democratic Senate candidates and the Senate Caucus, and it impedes my ability to carry out my duties as Leader.

5. In particular, President Trump's imposition of a national election day ballot receipt deadline will directly disenfranchise the Democratic Party's members and constituents—including members of the military, their families, and countless others who rely on voting by mail—by requiring states to reject ballots not received by election day, even where state law (including New York's) provides a longer period for receipt.

6. Particularly since the pandemic, Democrats have expended significant resources to encourage legal voters to vote by mail, because that method is often the most convenient or accessible way for voters to participate. The Democratic Party has invested significant resources to educate voters on how to vote by mail and make sure their ballots get counted. Those efforts advise voters to follow state law, and many state laws allow for the counting of ballots received after election day, so long as they are placed in a dropbox or in the mail by election day. The imposition of a nationwide election-day receipt deadline would drastically change the way many Democratic voters vote. No matter how many resources Democrats pour into education efforts to reeducate voters on this change, some voters are likely to be going to be confused, cast their ballots in accordance with state law deadlines, and will be disenfranchised as a result. The Executive Order severely threatens Democratic voters' fundamental right to vote.

7. It will be very difficult to ensure that *all* voters are aware of a new election day receipt rule, especially in states that have longstanding universal vote by mail programs like Washington, Oregon, California, and Colorado. Many other states, including my home state of New York, have expanded access to mail voting in recent years. In these states, huge portions of the electorate vote by mail. It will take an enormous and resource-intensive effort on the part of

the Party to educate voters about the need to ensure that their ballots have been *received* by election officials by election day. The election day receipt deadline will also mean that many Democratic voters will be at an information disadvantage because they will be forced to make their final choices on which candidates to support well before election day, whereas voters who cast their ballots in person will have more time to evaluate candidates and their policy positions before making their final choices. In turn, the Party will have less time to persuade mail voters to support Democratic candidates for Senate. The Party will also be required to invest more resources in encouraging voters to use other methods of voting, including to develop a plan to vote in person at the polls.

8.     Requiring ballots to be received by election day in order to be counted will result in the disenfranchisement of voters for reasons that are completely out of the voters' control. For instance, even when voters place their ballot in the mail well before election day, timely cast ballots often arrive after election day because of mail delays. I am aware of significant mail delays at the Postal Service that routinely cause some ballots to take several days—sometimes even weeks—to be delivered. In the 2024 election, several of my colleagues in the U.S. Senate sent a letter to the U.S. Postmaster General expressing concern about the United States Postal Service's implementation of its "Delivering for America" plan, which had led to significant delivery issues nationwide. States like New York have enacted laws to mitigate the effects of these issues by counting ballots that are cast by the voter so long as the ballot is postmarked on or before election day. The Executive Order, however, would effectively override New York law and *require* disenfranchisement.

9.     If large numbers of mail ballots that skew Democratic are invalidated, Republicans will gain an electoral advantage. Under the President's ballot receipt deadline, this will occur every

election cycle. Senate races can sometimes be decided on small margins—so every one of these improperly invalidated ballots matters to Democratic Senate candidates' electoral prospects and my mission to grow the size of the Democratic Caucus in the Senate. For example, the 2022 U.S. Senate race in Nevada was decided by fewer than 8,000 votes—and in that election *alone*, Clark County received more than more than 27,000 valid ballots on the day after the election, more than 36,000 two days after the election, and around 2,000 more during the final days of the permissible period for receiving ballots.

10.    I also fear that the Order's election day ballot receipt deadline could call into question state laws that permit voters to "cure" timely mail ballots with minor technical errors in the days after election day, undermining our Party's planned post-election ballot cure programs. In the 2022 Nevada race, for example, more than 12,000 ballots that could be cured were initially rejected—more than the margin that decided the race.

11.    The President's Order also directs the Election Assistance Commission, an independent agency, to add a documentary proof of citizenship requirement to the federal voter registration form required by the National Voter Registration Act (NVRA)—the "Federal Form." Under this provision, any voter using the form who lacks acceptable proof of citizenship is barred from registering and voting. The Order also directs certain federal agencies to conduct citizenship checks of any prospective voter who receives public assistance before providing them with a registration form, even though other voters are not treated this way. The Order further seeks to pressure states into imposing their own proof of citizenship requirements.

12.    Foreign nationals are already barred from attempting to register or vote in the United States, and existing law already prevents it. The implementation of these unnecessarily burdensome provisions will make it extremely difficult for a large number of qualified U.S.

5

citizens to vote, and inflict further harms on Democratic Senate candidates, making it harder for me to perform my duties as Leader.

13.    That is because millions of U.S. citizens, including among my constituency in New York, lack documentary proof of citizenship, such as a passport, or the ability to easily obtain it. I also understand that women have had difficulty proving their citizenship because their married name may not match their name on their citizenship documents. These voters will not be able to register to vote or will be dissuaded from voting because of the President's Order. These groups of voters make up large portions of the constituencies of the Democratic Party and Democratic candidates for Senate. As a result, the imposition of overly burdensome proof of citizenship requirements inflicts significant harm on the Democratic Party and our constituency, and further restructures the election system to the benefit of the President's party over ours.

14.    Finally, the Order gives unauthorized third parties, inside and outside of the federal government, direct access to federal databases containing the personal information of millions of Americans—including me and other Democratic Party voters. This unauthorized disclosure of information beyond the individuals in the federal government who are entrusted by law to handle it flies in the face of our longstanding commitment to privacy rights in this country.

15.    These unauthorized disclosures harm DSCC and our candidates' and party's voter registration efforts because it is harder to convince people to register to vote when they are legitimately concerned and fearful that their private information will be shared with unauthorized individuals. Our voters have expressed fear and skepticism of DOGE, so much so that some may be willing to forgo registering and exercising their right to vote if they learn that DOGE will get access to their personal information. For similar reasons, the DSCC will face additional fundraising hurdles. If voters do not trust the election system, they are far less likely to donate, harming

DSCC's bottom line. This will occur at a time when the Party will be forced to invest an enormous amount of resources to educate voters on the new requirements imposed by the President's Order, including explaining to voters how their personal information will be used and convincing them to register to vote despite the privacy risks.

16.     The President's Order undermines my ability to carry out my responsibilities as Leader of the Senate Democratic Caucus. One of my top priorities is to protect the voting rights of voters and constituents. DSCC and Democratic campaigns (including my own) will have to make monumental investments and changes to their programs all over the country to ensure that our voters are able to cast their ballots and have them counted. Additionally, our donors know that mail voting is important to the success of Democratic candidates, and I fear that this Order will erode their faith in our candidates electoral prospects and deprive DSCC and our campaigns of critical funding going into a major mid-term election cycle.

17.     The unfairness, uncertainty, and confusion around the election rules imposed by the Order also make it harder for me to effectively recruit strong candidates to run for office. Candidates want to know that the rules of the road are clear, and they want to know that they have a fair shot of winning if they invest their own time and money in a race. It is difficult to convince potential candidates to run for office as Democrats when the President has unfairly changed the election rules in a way that tilts the playing field heavily in favor of Republicans.

18.     By restructuring election rules in a manner that benefits our competitors and significantly disadvantages Democrats, the Order harms the electoral prospects of Democratic Senate candidates.

19.     The Order comes at a particular cost for me in my role as the Leader of the Senate Democratic Caucus. It will mean that I will have to spend more of my time and efforts attempting

to raise additional funds for the DSCC, identifying and recruiting candidates to join in our effort to grow the size of the Caucus, and contemplating additional campaign strategies to support Senate candidates. This will come at the expense of time spent dealing with other critical issues facing our country.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on:  4/7/2025

_Charles E. Schumer_

**Charles E. Schumer**
**U.S. Senate Minority Leader**

# Exhibit 3

Civil Action No. 25-cv-0952 (CKK)
(Lead Case: No. 25-cv-00946 (CKK))

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.*, | |
| Plaintiffs, | |
| v. | Civil Action No. 25-0946 (CKK) |
| EXECUTIVE OFFICE OF THE PRESIDENT, *et al.*, | |
| Defendants. | |
| DEMOCRATIC NATIONAL COMMITTEE, *et al.*, | |
| Plaintiffs, | |
| v. | Civil Action No. 25-cv-0952 (CKK) |
| DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*, | |
| Defendants. | |
| LEAGUE OF WOMEN VOTERS EDUCATION FUND, *et al.*, | |
| Plaintiffs, | |
| v. | Civil Action No. 25-0955 (CKK) |
| DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*, | |
| Defendants. | |

**DECLARATION OF LIBERTY SCHNEIDER IN SUPPORT OF**
**DEMOCRATIC PARTY PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

I, Liberty Schneider, declare as follows:

1.      I am over the age of 18, am competent to testify, and have personal knowledge of the facts and information set forth in this declaration.

2.      I am currently the Deputy Executive Director at the Democratic National Committee, or the "DNC." Before I was promoted to my current role, I served as the DNC's Chief of Staff.

3.      The DNC is the Democratic Party's national committee and is dedicated to electing Democratic candidates at the national, state, and local levels. In support of our mission, the DNC seeks to register new voters as Democratic Party members and supporters; to preserve the lawful registration status of Democratic Party members and other Democratic Party supporters; to encourage and assist Democratic Party members and supporters in casting ballots and having those ballots count; to protect registered Democratic Party members and supporters from unlawful retaliation or intimidation; and to preserve the legal rights of our voters.

4.      The DNC has approximately 450 formal members who are party officials, including State Party leaders, elected officials, and Democratic voters. The DNC also considers any registered Democrat to be a member of the DNC and the Democratic Party, because Democratic voters influence and ultimately determine the DNC's strategic and political direction by electing certain DNC members and Democratic candidates to local, state, and federal offices.

5.      In my role as Deputy Executive Director, I oversee many of the DNC's program teams, including organizing, communications, training, fundraising, political strategy, and coalitions. In my previous role as Chief of Staff, I was also heavily involved in programming, committee-wide initiatives, and the DNC's day-to-day operations.

6.      The DNC is actively planning, preparing, budgeting, and strategizing for upcoming gubernatorial elections in New Jersey and Virginia, along with the 2026 midterm elections. As the

backbone of the Democratic Party, the DNC provides support and resources to thousands of candidates at the local, state, and federal level in every state across the country.

7.      In preparation for upcoming elections, the DNC is heavily focused on encouraging Democratic voters to vote, including by mail, and making sure they have the knowledge and resources to do so correctly. Particularly since the pandemic, the DNC has expended significant resources to encourage voters to vote by mail, because that method is often the most convenient or accessible way for voters to participate.

8.      In recent years, the DNC has developed, in partnership with our state parties, a comprehensive outreach, assistance, and ballot-cure program to ensure Democratic voters are able to cast mail ballots and have them counted. In cure programs, the DNC and others identify qualified voters whose mail ballots are slated for rejection for a non-substantive defect, such as a missing signature on a ballot envelope, and work with those voters to correct the errors and return their ballots before the state's applicable deadline. These programs were built with the understanding that voters' ballots will be counted if they are returned by the Postal Service to the proper state election official or office by their state's deadline, which, in many states, extends past election day. And the DNC's ability to fulfill our mission of electing Democratic candidates currently depends significantly on those programs.

9.      President Trump's imposition of a national election day ballot receipt deadline will disenfranchise the DNC's members and constituents—including members of the military, their families, and countless others who rely on voting by mail—by requiring states to reject ballots not received by election day, even where state law provides a longer period for receipt. This impact will fall particularly hard on Democratic voters in states where elections are conducted primarily by mail, such as California, Nevada, Oregon, Utah, and Washington—all of which have mail ballot

receipt deadlines past election day, and many of which have competitive districts that are regularly decided by small margins. The same is true in New York, which recently expanded mail voting to all voters.

10. Elections in California, in particular, will be heavily impacted by an election day ballot receipt deadline given the sheer size of the state and the widespread use of mail voting. California currently accepts mail ballots that arrive up to seven days after election day. And in recent elections, an overwhelming majority of California voters submitted their ballots by mail— in the 2022 general election, more than 9 million mail ballots were submitted, comprising nearly 90% of all votes. And in 2024, over 13 million mail ballots were submitted, accounting for more than 80% of all votes. Given these numbers, shortening the mail ballot receipt deadline by a week will necessarily negatively impact a substantial number of voters in future elections.

11. The imposition of a national election day receipt deadline will cause significant confusion among voters as to which deadline applies – election day, per the President's Executive Order, or the one provided by state law. Voters may follow their own state's law only to be disenfranchised as a result. The DNC further fears that the election day receipt deadline could call into question state laws that permit voters to "cure" timely mail ballots with minor technical errors in the days after election day, undermining the DNC's planned post-election ballot cure program.

12. Voters often get accustomed to voting a certain way by a certain deadline, and in fact, the DNC encourages developing voting habits so that voting becomes routine for its constituents. Because it is difficult to change voters' habits, the DNC expects that, despite its best efforts, the new mail ballot receipt deadline will inevitably lead to voter disenfranchisement and cause Democratic candidates to lose votes because ballots will arrive after the deadline. Other voters may not vote at all, even if they have a ballot in hand, if they believe that the ballot is not

likely to arrive before the deadline.

13.     In an effort to thwart the harmful effects of President Trump's Order and to ensure voters are not disenfranchised, the DNC will be forced to redirect its limited resources toward new mail voting and ballot cure programs. For example, the DNC will have to replace its existing mail-voter assistance and outreach programming with programming aimed at ensuring voters return their ballots by election day. The Postal Service and state officials typically advise voters to build in seven days or more for a ballot to be delivered, and even that window is often not sufficient. The Postal Service also recently announced a plan to cut 10,000 jobs, reduce work hours, and close facilities, all of which will slow down mail service.

14.     Given the likelihood of mail delays, the DNC will need to develop new voter education programs, including but not limited to social media campaigns and direct outreach aimed at encouraging voters to return their ballots far sooner than they have in the past, and without the benefit of a clear election day deadline for placing their ballots in the mail. And in states that have previously counted ballots that arrive after election day, the change also means that mail voters have less time to make their final decisions about which candidates to support, and the DNC consequently has less time to persuade and mobilize them. The DNC will be further forced to stand up additional voter education and engagement programming to encourage voters to use other methods of voting to minimize the risk of disenfranchisement.

15.     The DNC hosts and manages a voter protection hotline, which voters often use to speak with trained DNC staff and volunteers about their registration status, how to vote, and how to cure their ballots in the weeks leading up to election day. Due to the risk that voters will be confused about mail ballot deadlines, the DNC will need to train its voter protection hotline volunteers on the new mail ballot deadline to ensure voters have the information they need to

ensure their votes are counted.

16.    Finally, the DNC will be forced to prepare to implement an entirely new ballot cure program to account for the risk that election officials will refuse to allow timely ballots to be cured past election day.

17.    These programs, which will need to be implemented in dozens of states, come at a significant cost. Because the DNC has not budgeted for these new, widespread programs, we will be required to scale back or cut the initiatives we currently have planned for persuading and mobilizing supporters to elect Democratic candidates to local, state, and federal offices across the country. For example, a large portion of the DNC's budget for the 2026 election cycle will be allocated for getting out the vote. This will require significant expenditures on advertisements, peer-to-peer texting, and canvassing. But because we will need to unexpectedly spend money to educate voters in many states on an earlier mail ballot deadline, we will necessarily have to scale back these get-out-the-vote activities.

18.    The DNC is also working to ensure that all eligible Democratic voters (and voters who are likely to support Democratic candidates) are registered to vote, and that their registrations are current. For example, the DNC maintains a website that provides voters in all fifty states with the information they need to register to vote and check their registrations. The DNC also routinely sends voters targeted emails and text messages with information on registering to vote in their state. For many of our members and constituents, the most accessible option for registering to vote is the National Mail Voter Registration Form, commonly referred to as the "Federal Form." This form streamlines the voter registration process and does not require voters to gather or submit any additional documentation.

19.    Existing law already makes it illegal for foreign nationals to register and vote in our

elections, and our existing law prevents non-citizens from voting. And there is no evidence of widespread voting by non-citizens in U.S. elections. The Order's unnecessary documentary proof of citizenship requirement will make it significantly harder for the DNC's members and constituents—qualified U.S. citizens—to register and remain registered to vote. For example, millions of American citizens, including many of the DNC's members and constituents, lack qualifying proof of citizenship documents, and as a result, will be unable to register to vote using the Federal Form. The DNC's lower-income members and constituents who do not travel out of the country may lack qualifying citizenship documents—like a passport—or the ability to easily obtain them. President Trump's proof of citizenship requirement also singles out recipients of public assistance for additional citizenship assessments before even receiving a Federal Form. Additionally, women make up a majority part of the DNC's coalition, many of whom have changed their last name upon marriage, such that their legal name does not match their citizenship documents. It will therefore be more difficult for married women to provide documentary proof of citizenship to register to vote as well.

20.    The burdens imposed by the documentary proof of citizenship requirement will be particularly acute in Arizona, where there is a special congressional primary election in Arizona Congressional District 7 on July 15, 2025, and a general election on September 23, 2025. Voter registration for the primary and general election close on June 16, 2025 and August 25, 2025, respectively. Arizona has imposed a documentary proof of citizenship requirement to vote in state elections, but until President Trump's Order, allowed voters to register with the Federal Form and vote in federal elections without providing proof of citizenship. Such voters who use the Federal Form and do not provide proof of citizenship are known as "federal-only" voters. With President Trump's mandate that Federal Form users also submit documentary proof of citizenship, all voter

registrants in Arizona will be required to submit such documentation, regardless of the form they use to register. As of July 2023, there were nearly 20,000 active federal-only voters in Arizona who were registered without documentary proof of citizenship. And that number does not account for the thousands of citizens who are eligible to vote in Arizona, but are not yet registered and now will be unable to register because they lack the required proof of citizenship.

21.    To counteract the burdens the documentary proof of citizenship requirement imposes on DNC members and constituents, the DNC will be forced to divert resources away from other critical priorities to aid voters attempting to comply or complete a different means of registering. For example, the DNC will have to conduct a nationwide voter education campaign to ensure eligible voters are aware that all new registrants must provide qualifying proof of citizenship when registering with the Federal Form. The DNC will also need to engage in direct outreach to eligible voters to inform them that only certain documents qualify as proof of citizenship under President Trump's order, and assist them in obtaining such documents if they do not already have them.

22.    This work will need to begin soon, ahead of the gubernatorial elections that are taking place in just a few months, given that the New Jersey and Virginia voter registration deadlines are fast approaching. And looking ahead to 2026, it will take a substantial amount of time, resources, and infrastructure needed to build these programs in time for them to be effective before the midterm elections.

23.    Because the DNC's resources are limited, these efforts will necessarily come at the cost of other critical planned expenditures in the months leading up to the upcoming elections. For example, the DNC (along with DCCC) recently launched a billboard campaign in Republican-controlled districts encouraging residents to demand their representatives hold town halls. The

billboards were placed in these districts to kick off a "People's Town Hall" series to hold Republican elected officials accountable. The DNC planned to continue with similar advertising and voter engagement campaigns throughout the 2026 election cycle, but it will have fewer funds available to do so if it is forced to make unplanned expenditures educating voters on new voter registration requirements.

24.      The DNC's voter education efforts will be further upended by President Trump's order granting third parties unauthorized access to federal systems and databases containing the personal information of DNC members and constituents. These unauthorized disclosures will subject the DNC's members and constituents to unlawful investigation and possible removal from the voter rolls based on false suspicion of not being U.S. citizens. As a result, it will be harder for the DNC to register new voters who reasonably fear that their personal identifying information will be disclosed to third parties. Some of our members and constituents are extremely concerned about protecting their private information, so much so that they may be willing to forgo registering and exercising their right to vote to ensure that their information is protected. That means the DNC will need to spend significant resources to initiate a program to persuade voters to register despite these privacy concerns.

25.      Additionally, granting such unauthorized disclosures will put the DNC's members and constituents at risk of being wrongly removed from the voter rolls. The DNC will therefore need to conduct outreach to remind voters to check their registrations and aid voters through the process of restoring their registrations—including by complying with the new documentary proof of citizenship requirements—if they have been wrongly removed. The DNC will also have to staff its voter protection hotline much earlier this election cycle due to the risk that voters will be removed from the rolls and confused about how to re-register. This will require a significant

investment in staff time and resources to recruit and train volunteers on the changes in the law and how to aid affected voters.

26.     The Order's ballot receipt deadline, proof of citizenship requirement, and unauthorized data-sharing provisions will impose imminent harm on the DNC. As explained above, the DNC will need to redirect significant amounts of its limited resources to thwart the harmful effects of these massive changes to voting and election rules, and those budget allocation decisions will need to be made now.

27.     In elections, the resources a political party committee has are limited as the committee works to expend its resources to elect its candidates in any given election cycle. Resources that must be diverted to responding to a seismic change like those contained in President Trump's Order necessarily come at the cost of the DNC's other mission-critical planned activities and expenditures. And once those resources are diverted toward unplanned programming, they cannot be used to persuade voters to elect Democratic candidates, directly undermining the DNC's mission.

28.     This puts the DNC at a competitive disadvantage. In the last several election cycles, Democrats have become more likely to vote by mail. Because of demographics, Democrats are disproportionately likely to lack qualifying proof of citizenship and to be wrongly suspected of not being a citizen. By dictating these new rules for federal elections, President Trump is therefore making it more difficult for the DNC's members and constituents to vote in elections, and for the candidates the DNC supports to compete. And when fewer Democrats hold elected office, the DNC raises (and therefore spends) less money, inflicting further harm on our organization and limiting our ability to increase our resources to counteract the effects of these new requirements.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: 4/7/2025
_____

_Libby Schneider_
_____

Liberty Schneider, Deputy Executive Director
Democratic National Committee

# Exhibit 4

Civil Action No. 25-cv-0952 (CKK)
(Lead Case: No. 25-cv-00946 (CKK))

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> EXECUTIVE OFFICE OF THE PRESIDENT, *et al.*, <br><br> Defendants. | Civil Action No. 25-0946 (CKK) |
| DEMOCRATIC NATIONAL COMMITTEE, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*, <br><br> Defendants. | Civil Action No. 25-cv-0952 (CKK) |
| LEAGUE OF WOMEN VOTERS EDUCATION FUND, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*, <br><br> Defendants. | Civil Action No. 25-0955 (CKK) |

**DECLARATION OF JILLIAN EDELMAN IN SUPPORT OF
DEMOCRATIC PARTY PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

I, Jillian Edelman, declare as follows:

1.      I am over the age of 18, am competent to testify, and have personal knowledge of the facts and information set forth in this declaration.

2.      I am the Chief Operating Officer of the Democratic Governors Association, also known as DGA. I joined DGA in February 2022 in this role and have served in it ever since. I support DGA's day-to-day operations and oversee its operations. In particular, I handle DGA's operational planning, meaning that I make strategic decisions regarding staffing, budgeting, contracts with vendors, expenditures, and more.

3.      DGA is a political organization dedicated to supporting Democratic Governors and electing Democratic gubernatorial candidates across the United States. DGA currently provides support to sitting Governors in 23 states and 4 territories, as well as the Mayor of the District of Columbia, who together constitute DGA's formal membership.[1] DGA serves as a clearinghouse for best practices and policies, including but not limited to policies regarding management, administration, and budgeting for federal, state, and local elections.

4.      To advance its mission of supporting the election of Democrats to governorships across the country, DGA provides funding used to educate and assist Democratic voters on how to vote and ensure that those votes are counted. Such programs include voter registration and turnout programs, programs aimed at protecting the registration statuses of Democratic Party

---

[1] These members include Andy Beshear (Kentucky), Muriel Bowser (Washington, D.C.), Albert Bryan, Jr. (U.S. Virgin Islands), Tony Evers (Wisconsin), Bob Ferguson (Washington), Josh Green (Hawaii), Maura Healey (Massachusetts), Katie Hobbs (Arizona), Kathy Hochul (New York), Laura Kelly (Kansas), Tina Kotek (Oregon), Ned Lamont (Connecticut), Lou Leon Guerrero (Guam), Michelle Lujan Grisham (New Mexico), Dan McKee (Rhode Island), Matt Meyer (Delaware), Janet Mills (Maine), Wes Moore (Maryland), Phil Murphy (New Jersey), Gavin Newsom (California), Jared Polis (Colorado), JB Pritzker (Illinois), Josh Shapiro (Pennsylvania), Josh Stein (North Carolina), Tim Walz (Minnesota), and Gretchen Whitmer (Michigan).

voters, voter education and outreach programs aimed at encouraging mail voting, and ballot cure programs to help ensure that mail ballots rejected by election officials for minor technicalities are still counted. In the last few years, DGA has grown significantly and expanded its support for these programs.

5.      DGA invests heavily in campaigns and political parties, and those campaigns and parties in turn run voter registration and assistance programs to ensure that voters are able to register and cast ballots that will be counted. DGA has also developed and worked to execute ballot cure programs and will likely do so again in upcoming elections. In these cure programs, DGA identifies qualified voters whose mail ballots are slated for rejection due to a non-substantive defect, such as a missing signature on an envelope, and works with those voters to timely correct the errors so that their ballots can be counted.

6.      DGA is actively planning, preparing, budgeting, and strategizing for imminent gubernatorial elections in New Jersey and Virginia in 2025, in addition to 36 more races coming up in 2026.[2] Many of DGA's members will be or are likely to be candidates in 2026, including but not limited to, Governor Hobbs of Arizona, Governor Hochul of New York, Governor Kotek of Oregon, Governor McKee of Rhode Island and Governor Walz of Minnesota.

7.      In the midst of these efforts, President Trump issued Executive Order 14248, *Preserving and Protecting the Integrity of American Elections*, on March 25, 2025. The Order directs various federal officers and the U.S. Election Assistance Commission to adopt and enforce

---

[2] Gubernatorial races in 2026 include Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Florida, Georgia, Hawaii, Idaho, Illinois, Iowa, Kansas, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nebraska, Nevada, New Hampshire, New Mexico, New York, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, Tennessee, Texas, Vermont, Wisconsin, Wyoming, the District of Columbia, Guam., Northern Mariana Islands, and the U.S. Virgin Islands.

certain election policies preferred by the President.

8.      The Order harms DGA's members because it effectively usurps their authority related to elections. DGA has long understood that the regulation of elections is largely left up to the states. A significant aspect of many of DGA's members' power and authority in their states stems from their constitutional and statutory authority to influence, support, and sign state election laws. The Executive Order improperly claims the ability to displace that authority, impinging on DGA's members' authority and diluting their policy influence in their states.

9.      The election day receipt deadline also harms DGA by threatening its members and voters with disenfranchisement. President Trump's imposition of a national election day ballot receipt deadline will directly disenfranchise DGA's members and voters by requiring states to reject ballots not received by election day, even where state law provides a longer period for receipt. Several governors who are members of DGA have voted by mail in past elections. However, ensuring that their ballot is returned to the Postal Service ahead of election day will no longer be enough to have confidence that their ballots will be timely and counted by local officials. The new election day receipt deadline thus harms DGA's members' interests in being able to vote up to election day. DGA's members, like many others who wish to vote by mail, will be put to the choice of accepting the risk that their ballots will be invalidated and their votes won't count, or abandoning mail voting altogether. The Order is also sure to cause confusion as to whether the rule in the Order or state law applies, and voters who reasonably follow their own state law may nevertheless be entirely disenfranchised. In addition to directing the U.S. Attorney General to "enforce" the election day receipt deadline against states, the Order directs the EAC to withhold "any available funding" from states that do not comply with the President's demand. Federal grants account for a large portion of states' election budgets, funding critical activities related to election

4

security, mail ballot preparation and processing, and staffing. In total, since 2003, the EAC has administered more than $4.35 billion in HAVA funding to states and territories throughout the country, and $1.4 billion from 2018 to 2024 alone. When these funding streams disappear, states will be unable to administer upcoming elections as planned, inflicting harm on DGA's members.

10.    The Order's changes to election rules place Democrats at a significant competitive disadvantage compared to their Republican counterparts. In the last several election cycles, Democrats have become more likely to vote by mail. Because of demographics, Democrats are also disproportionately likely to lack qualifying proof of citizenship and to be wrongly suspected of not being a citizen. By dictating these new rules for federal elections, President Trump is restructuring the election environment to make it more difficult for Democrats to vote in elections, and therefore more difficult for Democrats to win.

11.    The election day receipt deadline also undermines DGA's investments in mail voting programs, such as ballot cure programs. DGA has made those investments in part because, particularly since the pandemic, a significantly greater portion of mail voters are Democrats compared to Republicans. These programs have been developed based on the understanding that, unless a state has put in place a different rule, a qualified voter's ballot will be counted if the voter drops it off with the proper election official or office or places it in the mail by election day, so long as the ballot reaches the proper official by the state's applicable deadline. These state laws ensure that voters have the full election period to consider the candidates on their ballot, and that candidates and party organizations have the full election period to persuade voters to support them.

12.    Implementation of the Executive Order's election day receipt deadline would override these protections and force the restructuring of mail voting programs supported by DGA. For example, DGA would need to divert existing investments toward programs aimed at ensuring

that voters return their ballots to the proper election official or office by election day, making sure to account for issues such as mail delays, because the U.S. Postal Service has been subject to budget cuts and resource constraints that have impacted mail delivery services. In past elections, DGA's members have joined efforts to prevent such deficiencies from causing mail ballots to be delivered too late to be counted. DGA will also need to develop new materials and programs encouraging the use of other methods of voting (aside from mail voting) to minimize the risk of disenfranchisement. And, finally, DGA will be forced to prepare to implement an entirely new ballot cure program to account for the risk that election officials will refuse to allow timely ballots to be cured past election day.

13.     The Executive Order also contains provisions directing the EAC to add a documentary proof of citizenship requirement to the federal NVRA voter registration form—often called the "Federal Form"—before such voters can register and vote. The Order further mandates additional citizenship checks of prospective voters who receive public assistance before they can even receive a registration form (and only those voters) and also seeks to pressure states into imposing their own burdensome proof of citizenship requirements. These new requirements also directly harm DGA by making it harder for voters who support Democratic gubernatorial candidates to register and remain registered to vote. Millions of American citizens, including many of the DGA's voters, lack qualifying proof of citizenship documents and will be unable to register to vote using the Form going forward. For example, DGA's voters include lower-income voters who do not possess qualifying documents, such as a passport, and lack the money and resources or ability to obtain one. Separately, a large share of DGA's voters are women, and women are disproportionately likely to be unable to satisfy the requirement because most women who get married change their last name upon marriage, meaning that their legal name often does not match

their citizenship document.

14.    Existing law already makes it illegal for foreign nationals to register and vote in our elections, and our existing laws prevents non-citizens from voting. In fact, DGA's members know that these laws are successful: there is no evidence of widespread voting by non-citizens, and incidents of non-citizen voting are otherwise exceedingly rare. Investigations of the President's claims to the contrary have been consistently debunked. President Trump's unnecessary imposition of these citizenship requirements will make it significantly harder for voters who support Democratic gubernatorial candidates—qualified U.S. citizens—to register and remain registered to vote.

15.    The burdens imposed by the documentary proof of citizenship requirement will be particularly acute in Arizona, the home state of Governor Hobbs, a DGA member. Arizona will hold a gubernatorial election in 2026. Arizona has imposed a documentary proof of citizenship requirement to vote in state elections, but until President Trump's Order, allowed voters to register with the Federal Form and vote in federal elections without providing proof of citizenship. All voters who register using the Federal Form (known as "federal-only" voters) attest to their citizenship.  With President Trump's mandate that Federal Form users also submit documentary proof of citizenship, all voter registrants in Arizona will be required to submit such documentation, regardless of the form they use to register. As of July 2023, there were nearly 20,000 active federal-only voters in Arizona who were registered without documentary proof of citizenship, and around 30,000 currently. And that number does not account for the thousands of citizens who are eligible to vote in Arizona, but are not yet registered and now will be unable to register because they lack the required proof of citizenship. DGA further fears that the Executive Order will spur some to question the registrations of voters who have registered to vote using the prior Federal From,

causing confusion and mass chaos among voters.

16.     These harms threaten to undermine DGA's mission-critical efforts to support Democratic candidates. In response, DGA will be forced to divert significant resources away from other important priorities in the middle of two critical and competitive elections, and these resource allocation decisions will have to take place immediately. For example, rather than carry out its planned investments in contributions to candidates or television ad buys, DGA will be forced to focus on developing new programs aimed at educating voters about the new proof of citizenship requirement.

17.     Because DGA's resources are limited, these efforts necessarily come at the cost of other critical priorities and already-planned expenses in the coming months. And these changes to our plans for 2025 are urgent, as the Order sets a 30-day deadline for the creation of a new Federal Form—which we understand means that a form requiring documentary proof of citizenship will imminently begin to apply to registrations, ahead of the November 2025 election.

18.     DGA's members are further harmed by the Executive Order's directives for federal agencies and officers to grant unauthorized third parties with access to federal databases containing the personal information of millions of Americans for the purpose of scrutinizing state voter registration records for suspected non-citizens. The databases include information about DGA's members themselves, as well as DGA's voters, all of whom are directly harmed by these disclosures of their personal information. This information, in DGA's understanding, includes social security numbers, address information, and other identifying data. DGA's members are extremely concerned by the brazen and unauthorized disclosures beyond the authorized federal employees. In our understanding, DOGE employees as well as hundreds and potentially thousands of local election officials throughout the country will have newfound access to federal databases

that are intended only for use by federal officials for different purposes.

19.     Voter registration efforts supported by DGA will be further upended by President Trump's Order granting third parties unauthorized access to federal systems and databases containing the personal information of DGA's voters. These unauthorized disclosures will subject DGA's voters to unlawful investigation and possible removal from the voter rolls based on false suspicion of not being U.S. citizens. In turn, it will be more difficult to register new voters who reasonably fear that their personal identifying information will be disclosed to third parties.

20.     The Executive Order's ballot receipt deadline, proof of citizenship requirement, and unauthorized data-sharing provisions impose imminent harm on DGA. As explained above, DGA will need to redirect significant amounts of its limited resources to thwart the harmful effects of these massive changes to voting and election rules. Decisions to adjust the budget must begin now, and once those resources are diverted toward unplanned programming, they cannot be used to persuade voters to elect Democratic candidates ahead of the 2025 and 2026 elections—directly undermining DGA's mission.

21.     In fact, these changes are extremely urgent in light of the imminent elections in Virginia and New Jersey. Both of these states have laws that require counting mail ballots so long as the voter places it in the mail by election day, and the ballot is received by the applicable state deadline: within three days in Virginia, and within six days in New Jersey. Both states also have laws that permit voters to cure ballots with minor deficiencies beyond election day.

22.     Finally, the Executive Order's usurpation of DGA's members' responsibility in state elections also directly harms DGA as an organization because DGA supports Democratic Governors in developing and implementing election policies that ensure all qualified voters are able to cast a ballot that is counted. Those efforts are significantly undermined if the President can

usurp state authority to change the rules of elections in ways that favor his party. The Order will also make it harder for DGA to effectively recruit strong candidates to run for office. Candidates want to know that the rules of the road are clear, and they want to know that they have a fair shot of winning if they invest their time and money in a race. It is difficult to convince potential candidates to run for office when the President has unfairly changed the election rules in a way that tilts the playing field heavily in favor of Republicans. As a result, DGA will need to develop entirely new approaches and programs centered around the DGA's members' role in state election policy as well as candidate recruitment and support.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: _____4/7/2025_____

_____*Jillian Edelman*_____

**Jillian Edelman, Chief Operating Officer
DGA**

10

# Exhibit 5

Civil Action No. 25-cv-0952 (CKK)
(Lead Case: No. 25-cv-00946 (CKK))

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.*,<br><br>             Plaintiffs,<br><br>   v.<br><br>EXECUTIVE     OFFICE     OF     THE PRESIDENT, *et al.*,<br><br>             Defendants. | Civil Action No. 25-0946 (CKK) |
| DEMOCRATIC NATIONAL COMMITTEE, *et al.*,<br><br>             Plaintiffs,<br><br>   v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>             Defendants. | Civil Action No. 25-cv-0952 (CKK) |
| LEAGUE OF WOMEN VOTERS EDUCATION FUND, *et al.*,<br><br>             Plaintiffs,<br><br>   v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>             Defendants. | Civil Action No. 25-0955 (CKK) |

## DECLARATION OF LILLIE SNYDER BOSS IN SUPPORT OF
## DEMOCRATIC PARTY PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

I, Lillie Snyder Boss, declare as follows:

1.      I am over the age of 18, am competent to testify, and have personal knowledge of the facts and information set forth in this declaration.

2.      I am the Chief Operating Officer of DSCC. I have served in this role since March 2021.

3.      DSCC, also known as the Democratic Senatorial Campaign Committee, is the Democratic Party's national senatorial committee. Its mission is to elect candidates of the Democratic Party across the country to the U.S. Senate. In support of this mission, DSCC seeks to register new voters as Democratic Party members and constituents; to preserve the lawful registration status of Democratic Party members and other Democratic Party supporters; to encourage and assist Democratic Party members and constituents in casting ballots and having those ballots count; to protect registered Democratic Party members and constituents from unlawful retaliation or intimidation; and to preserve the legal rights of our voters.

4.      In my role, I oversee DSCC's day-to-day operations. This includes managing the Committee's staff and processes, budget, operations, and initiatives, as well as engaging with all of DSCC's activities as needed. I interact with DSCC's officers and employees at all levels. I also help campaigns from time to time on their compliance and budget needs.

5.      DSCC is actively planning, preparing, budgeting, and strategizing for the 2026 midterm elections. In 2026, DSCC is supporting ten incumbent Democratic Senators and non-incumbent Democratic candidates in up to an additional twelve states.

6.      In preparation for these elections, DSCC is heavily focused on encouraging Democratic voters to vote, including by mail, and making sure they have the knowledge and resources to do so effectively. Particularly since the pandemic, DSCC has expended significant resources to encourage voters to vote by mail, because that method is often the most convenient

or accessible way for voters to participate. In fact, many Democratic Senators themselves have voted by mail in past elections and are likely to do so again in future elections, especially in light of their busy travel schedules.

7.     In recent years, DSCC has developed a comprehensive education, assistance, and ballot-cure program to ensure Democratic voters are able to cast mail ballots and have them counted. Each cycle, the DSCC invests millions of dollars in these programs. In cure programs, DSCC, in coordination with state Democratic parties and Democratic candidates, identify qualified voters whose mail ballots are slated for rejection due to a non-substantive defect, such as a missing signature on a ballot envelope, and work with those voters to correct the errors and return their ballots in time to be counted. These programs were built with the understanding that voters' ballots will be counted if they are returned by the Postal Service to the proper state election official or office by their state's deadline, which, in many states, extends past election day.

8.     President Trump's imposition of a national election day ballot receipt deadline will directly disenfranchise DSCC's constituents—including members of the military, their families, and countless others who rely on voting by mail—by requiring states to reject ballots not received by election day, even where state law provides a longer period for receipt. This impact will fall particularly hard on Democratic voters in states where elections are conducted primarily by mail, such as California, Nevada, Oregon, Utah, and Washington—all of which have mail ballot receipt deadlines past election day. The same is true in New York, which recently expanded mail voting to all voters.

9.     An election day ballot receipt deadline will be particularly disruptive to DSCC in the 2026 election cycle. There are ten states with a Senate election in 2026 that currently accept mail ballots after election day. A national election day receipt deadline is sure to cause confusion

among voters as to which deadline applies – election day, per the President's Executive Order, or state law. Voters may follow their own state's law only to be disenfranchised because of the President's Order. DSCC further fears that the requirement could call into question state laws that permit voters to "cure" timely mail ballots with minor technical errors in the days after election day, undermining DSCC's planned post-election ballot cure program.

10.    Voters often get accustomed to voting a certain way by a certain deadline, and in fact, DSCC encourages developing voting habits so that voting becomes routine for its constituents. Because it is difficult to change voters' habits, and because of mail delays that are often outside of the voters' control, DSCC expects that, despite its best efforts, the new mail ballot receipt deadline will inevitably lead to voter disenfranchisement and cause Democratic Senate candidates to lose votes because timely-cast ballots of lawful, qualified voters will arrive after the deadline. Other voters may not vote at all, even if they have a ballot in hand, if they believe that the ballot is not likely to arrive before the deadline.

11.    In an effort to thwart the harmful effects of President Trump's Order and to ensure voters are not disenfranchised in the upcoming elections, DSCC will be forced to redirect its limited resources toward new mail voting and ballot cure programs. For example, DSCC will have to replace its existing mail-voter assistance and outreach program with one aimed at ensuring voters return their ballots by election day. The Postal Service and state officials typically advise voters to build in seven days or more for a ballot to be delivered, and even that window is often not sufficient. The Postal Service also recently announced a plan to cut 10,000 jobs, reduce work hours, and close facilities, all of which will slow down mail service.

12.    Given the likelihood of mail delays, DSCC will need to develop new and expanded voter education programs, including but not limited to social media campaigns and direct outreach

aimed at encouraging voters to return their ballots far sooner than they have in the past, and without the benefit of a clear election day deadline for placing their ballots in the mail. And in states that have previously counted ballots that arrive after election day, the change also means that mail voters have less time to cast ballots, and DSCC consequently has less time to persuade them to vote for Democratic candidates and mobilize them to submit their votes. DSCC will be further forced to stand up additional voter education and engagement programming to encourage voters to use other methods of voting, including creating a voting plan to vote in person at the polls, to minimize the risk of disenfranchisement.

13.     This change is significant. Because voting by mail is more convenient for many of our members and constituents, it is often more time-consuming and expensive to mobilize voters to vote in person. For example, in certain states, voting by mail has historically been far less burdensome than voting in person. In Ohio, mail voters may satisfy the state's identification requirements with the last four digits of their social security number. But when voting in person, voters need to provide a photo ID, and a student ID does not qualify. Last cycle, DSCC therefore encouraged out-of-state students to vote by mail, and DSCC planned to do so again in 2026. But we will now need to develop a plan to ensure such students can vote in person if they are unable to get their ballots returned by election day. This will require significantly more resources than encouraging students to vote by mail. In addition, in states where many voters vote by mail, there are fewer polling locations. This means that if more voters are required to vote in person due to the risk that their mail ballot will not arrive by election day, they may end up waiting in long lines, if they are able to access a polling location at all.

14.     DSCC will also be forced to prepare to implement an entirely new ballot cure program to account for the risk that election officials will refuse to allow timely ballots to be cured

past election day. DSCC's resources are extremely limited in the weeks leading up to election day, as we are prioritizing turning out as many voters as possible and persuading any last minute, undecided voters. If ballots must be cured by election day, DSCC will necessarily have to divert resources away from getting out the vote and persuading voters when that work is most critical.

15.    These programs, which will need to be implemented in up to ten states with a U.S. Senate election in 2026, come at a significant cost. Because DSCC has not budgeted for these new, widespread programs, we will have to scale back or cut the initiatives we currently have planned for persuading and mobilizing our members and constituents to elect Democratic candidates to the Senate. For example, a large portion of DSCC's budget for the 2026 election cycle is allocated for getting out the vote in the months and weeks leading up to election day. This will require significant expenditures on volunteer recruitment and training, peer-to-peer texting, and canvassing. But if we will instead need to now spend money to educate voters in many states on an earlier mail ballot deadline or to assist voters in curing issues with their mail ballots prior to election day, we will necessarily have to scale back these get-out-the-vote activities.

16.    DSCC is also working to ensure that all eligible Democratic voters and voters who are likely to support Democratic candidates are registered to vote, and that their registrations are current. DSCC has long invested in a nationwide voter registration program to encourage our members and constituents in states across the country to register to vote in the most accessible way, and we provide tools to help them do so. DSCC routinely sends targeted emails and text messages to voters with specific information about registering to vote in their state. For many of our members and constituents, the most accessible option for registering to vote is the National Mail Voter Registration Form, commonly referred to as the "Federal Form." This form streamlines the voter registration process and does not require voters to gather or submit any additional

6

documentation in order to be successfully registered to vote.

17.    Existing law already makes it illegal for foreign nationals to register and vote in our elections, and our existing law prevents non-citizens from voting. And there is zero evidence of widespread voting by non-citizens in U.S. elections. President Trump's unnecessary imposition of a documentary proof of citizenship requirement will make it significantly harder for DSCC's members and constituents—qualified U.S. citizens—to register and remain registered to vote.

18.    Millions of American citizens, including many of DSCC's members and constituents, lack qualifying proof of citizenship documents, and as a result, will be unable to register to vote using the Federal Form under the new burdensome restrictions imposed by the President's EO. DSCC's many lower-income members and constituents who do not travel out of the country may lack qualifying citizenship documents—like a passport—or the ability to easily obtain them. President Trump's proof of citizenship requirement also singles out recipients of public assistance for additional citizenship assessments before even receiving a Federal Form. Additionally, a majority of DSCC's members and constituents are women, many of whom have changed their last name upon marriage, such that their legal name does not match their citizenship documents. It will therefore be more difficult for married women to provide documentary proof of citizenship to register to vote under the EO, as well.

19.    This issue is personal to me, as my passport currently lists my maiden name, even though I legally changed my last name when I got married and am registered to vote in my married name. I do not have any of the other documents listed in President Trump's Order to provide as proof of citizenship. While I plan to update my passport as soon as possible, I can personally appreciate the burdens this requirement places on women like me—and more importantly, women with fewer time and resources available to obtain a new passport.

20.     To counteract the burdens the documentary proof of citizenship requirement imposes on DSCC's members and constituents, DSCC will be forced to divert resources away from other critical priorities to aid voters attempting to comply or complete a different means of registering. For example, DSCC will have to work with coordinated campaigns to conduct a nationwide voter education campaign to ensure eligible voters are aware that all new registrants must provide qualifying proof of citizenship when registering with the Federal Form. DSCC will also need to work with coordinated campaigns to engage in direct outreach to eligible voters to inform them that only certain documents qualify as proof of citizenship under President Trump's order, and assist them in obtaining such documents if they do not already have them. Communicating these radical changes to millions of voters will be no small feat. This work will need to begin now, given the extensive time, resources, and infrastructure needed to build these programs in time for them to be effective before the midterm elections.

21.     Because DSCC's resources are limited, these efforts will necessarily come at the cost of other critical planned expenditures in the months leading up to the upcoming elections. For example, DSCC allocates a significant portion of its budget on digital and television advertisements. But because DSCC will be forced to spend money educating voters on new voter registration requirements as a result of the President's EO, it will have fewer funds available to run the full suite of advertisements it has planned to place online and on TV. This will significantly harm DSCC and Democratic Senate candidates because traditional media remains the most effective way to get candidates' messaging out to voters.

22.     DSCC's voter registration efforts will be further upended by President Trump's order granting third parties—including DOGE—unauthorized access to federal systems and databases containing the personal information of DSCC members and constituents. These

unauthorized disclosures will subject DSCC's members and constituents to unlawful investigation and possible removal from the voter rolls based on false suspicion of not being U.S. citizens. In turn, it will be harder for DSCC to register new voters who reasonably fear that their personal identifying information will be disclosed to third parties.

23.     Some of our members and constituents are extremely concerned about protecting their private information and mistrust DOGE. They will therefore be worried about disclosing information that could be accessed by DOGE, so much so that they may be willing to forgo registering and exercising their right to vote to ensure that their information is protected. That means that DSCC will need to initiate a program to persuade voters to register in light of these privacy concerns.

24.     Additionally, granting such unauthorized disclosures will put DSCC's members and constituents at risk of being wrongly removed from the voter rolls. DSCC will therefore need to conduct outreach to remind voters to check their registrations and aid voters through the process of restoring their registrations—including by complying with the new documentary proof of citizenship requirements—if they have been wrongly removed.

25.     The Order's ballot receipt deadline, proof of citizenship requirement, and unauthorized data-sharing provisions will impose imminent, irreparable harm on DSCC. As explained above, DSCC will need to redirect significant amounts of its limited resources to thwart the harmful effects of these massive changes to voting and election rules. Decisions to adjust the budget must begin now, and once those resources are diverted toward unplanned programming, they cannot be used to persuade voters to elect Democratic candidates, a drain on resources that will have the effect of directly undermining DSCC's mission.

26.     This puts DSCC at a competitive disadvantage. In the last several election cycles,

Democrats have become more likely to vote by mail. Because of demographics, Democrats are disproportionately likely to lack qualifying proof of citizenship and to be wrongly suspected of not being a citizen. By dictating these new rules for federal elections, President Trump is therefore making it more difficult for DSCC's members and constituents to vote in elections, and for the candidates that DSCC supports to compete. And when fewer Democrats hold elected office, DSCC raises (and therefore spends) less money, inflicting further harm on our organization and limiting our ability to increase our resources to counteract the effects of these new requirements.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: _4/7/2025_____

_Lili Snyder_____
Lillie Snyder Boss, Chief Operating Officer
DSCC

10

# Exhibit 6

Civil Action No. 25-cv-0952 (CKK)
(Lead Case: No. 25-cv-00946 (CKK))

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> EXECUTIVE OFFICE OF THE PRESIDENT, *et al.*, <br><br> Defendants. | Civil Action No. 25-0946 (CKK) |
| DEMOCRATIC NATIONAL COMMITTEE, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*, <br><br> Defendants. | Civil Action No. 25-cv-0952 (CKK) |
| LEAGUE OF WOMEN VOTERS EDUCATION FUND, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*, <br><br> Defendants. | Civil Action No. 25-0955 (CKK) |

**DECLARATION OF ERIK RUSELOWSKI IN SUPPORT OF
DEMOCRATIC PARTY PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

I, Erik Ruselowski, declare as follows:

1.      I am over the age of 18, am competent to testify, and have personal knowledge of the facts and information set forth in this declaration.

2.      I am the Chief Operating Officer of DCCC.

3.      I first joined DCCC in September 2016. I have served as Chief Operating Officer since February 2022.

4.      DCCC, also known as the Democratic Congressional Campaign Committee, is the Democratic Party's national congressional committee. Its mission is to elect candidates of the Democratic Party from across the country to the U.S. House of Representatives. In support of this mission, DCCC seeks to encourage and assist Democratic Party members and constituents in casting ballots and having those ballots count; to register new voters as Democratic Party members and constituents; to preserve the lawful registration status of Democratic Party members and other Democratic Party constituents; to protect registered Democratic Party members and constituents from unlawful retaliation or intimidation; and to preserve the legal rights of our voters. DCCC's members and constituents are grassroots Democratic voters in all 50 states.

5.      In my role, I support DCCC's day-to-day operations and manage committee-level initiatives, budgeting, technology, and administration. I engage on an as-needed basis with all of DCCC's activities, and I interact with DCCC's officers and employees at all levels.

6.      DCCC is actively planning, preparing, budgeting, and strategizing for the upcoming 2026 midterm elections as well as special elections that will occur between now and then. Through its Frontline program, DCCC provides Democratic Members of Congress from competitive seats both the resources and support to execute effective reelection campaigns. For the 2026 election, DCCC is currently supporting 26 candidates in 15 states, including California, Connecticut, Indiana, Maine, Michigan, North Carolina, New Jersey, New Mexico, Nevada, New

York, Ohio, Oregon, Texas, Virginia, and Washington. DCCC is planning to spend resources to defeat Republicans in competitive congressional districts around the country including, for example, in Arizona, Colorado, Florida, Iowa, Michigan, Missouri, Nebraska, and Pennsylvania. DCCC expects to compete in additional Republican-held districts as well.

7.    As we get closer to election day, DCCC heavily focuses on encouraging Democratic voters to vote, including by mail, and making sure they have the knowledge and resources to do so effectively. Particularly since the pandemic, DCCC has expended significant resources to encourage voters to vote by mail, because that method is often the most convenient or accessible way for voters to participate.

8.    In recent years, DCCC has developed a comprehensive education, assistance, and ballot-cure program to ensure Democratic voters are able to cast mail ballots and have them counted. In many districts, these programs were built with the understanding that voters' ballots will be counted if they are postmarked by election day and returned by the Postal Service to the proper state election official or office by their state's deadline, which, in many states, extends past election day. Through ballot-cure programs, DCCC and others identify qualified voters whose mail ballots are slated for rejection due to a non-substantive defect, such as a missing signature on a ballot envelope, and work with those voters to correct the errors and timely return their ballots to be counted.

9.    President Trump's imposition of a national election day ballot receipt deadline will directly disenfranchise DCCC's constituents—including members of the military, their families, and countless others who rely on voting by mail—by requiring states to reject ballots not received by election day, even where state law provides a longer period for receipt. The impact will fall particularly hard on many DCCC constituents including, in particular, voters in states where

elections are conducted primarily by mail, such as California, Nevada, Oregon, Utah, and Washington—all of which have mail ballot receipt deadlines past election day, and many of which have competitive districts that are regularly decided by small margins. The same is true in New York, which recently expanded mail voting to all voters.

10.     Congressional elections in California, in particular, will be heavily impacted by an election day ballot receipt deadline given the sheer size of the state and the widespread use of mail ballots. California currently accepts mail ballots that arrive up to seven days after election day. And in recent elections, an overwhelming majority of California voters submitted their ballots by mail—in the 2022 general election, more than 9 million mail ballots were submitted, comprising nearly 90% of all votes. And in 2024, over 13 million mail ballots were submitted, accounting for more than 80% of all votes. California also has 52 congressional districts—the most of any state, and several of which have had extremely close elections in past cycles. In 2024, the election in California's 13th congressional district was the closest congressional race in the country, decided by a margin of .09%—just 187 votes. Given these numbers, shortening the mail ballot receipt deadline by a week will negatively impact a substantial number of voters and is likely to impact the outcome of congressional elections.

11.     The imposition of a national election day receipt deadline will cause significant confusion among voters as to which deadline applies – election day, per the President's Executive Order, or state law. Voters may follow their own state's law only to be disenfranchised as a result. DCCC further fears that the requirement could call into question state laws that permit voters to "cure" timely mail ballots with minor technical errors in the days after election day, undermining DCCC's planned post-election ballot cure program.

12.     Voters often get accustomed to voting a certain way by a certain deadline, and in

fact, DCCC encourages developing voting habits so that voting becomes routine for its constituents. Because it is difficult to change voters' habits, and because of mail delays that are usually outside of the voters' control, DCCC expects that, despite its best efforts, the new mail ballot receipt deadline will inevitably lead to voter disenfranchisement and cause DCCC candidates to lose votes because ballots will arrive after the deadline. Other voters may not vote at all, even if they have a ballot in hand, if they believe that the ballot is not likely to arrive before the deadline, or are confused about the deadline in general.

13.    In an effort to thwart the harmful effects of President Trump's Order and to ensure voters are not disenfranchised, DCCC will have to revise its existing mail-voter assistance and education program to ensure voters are educated about the election day deadline decreed by President Trump. The Postal Service and state officials typically advise voters to build in seven days or more for a ballot to be delivered, and even that window is often not sufficient. The Postal Service also recently announced a plan to cut 10,000 jobs, reduce work hours, and close facilities, all of which will slow down mail service.

14.    Given the likelihood of mail delays, DCCC will need to spend resources aimed at encouraging voters to return their ballots far sooner than they have in the past, and without the benefit of a clear election day deadline for placing their ballots in the mail. DCCC will also need to consider standing up additional voter education and engagement programming to encourage voters to use other methods of voting to minimize the risk of disenfranchisement. And in states that have previously counted ballots that arrive after election day, the change also means that mail voters have less time to make their final decisions about which candidates to support, and DCCC consequently has less time to persuade and mobilize them. This time crunch will inevitably impact when and how DCCC spends its resources to persuade and mobilize voters.

15.     DCCC will be further forced to prepare, and eventually implement, a revised ballot cure program to account for the risk that election officials will refuse to allow timely ballots to be cured past election day. DCCC's resources are extremely limited in the weeks leading up to election day, as we are prioritizing turning out as many voters as possible and persuading any last minute, undecided voters. If ballots must be cured by election day, DCCC will necessarily have to divert resources away from getting out the vote and persuading voters when that work is most critical.

16.     These programs, which will need to be implemented in dozens of states, come at a significant cost. Consider California again. Due to the sheer size of the state and the overwhelming prevalence of mail voting, DCCC will need to run a massive voter education campaign on the issue in multiple congressional districts.

17.     Decisions on budgeting begin now for November 2026, and DCCC seeks to maximize the resources it has for persuading and mobilizing our members and constituents to elect Democratic candidates to Congress. For example, a large portion of DCCC's budget for the 2026 election cycle is allocated for persuasion and getting out the vote. This effort will require significant expenditures on advertisements, peer-to-peer texting, and canvassing. Because DCCC now must consider using those resources for voter education in many states on an earlier mail ballot deadline, we will necessarily have to take resources away from these crucial persuasion and get-out-the-vote activities.

18.     DCCC is also working to ensure that all eligible Democratic voters and voters who are likely to support Democratic candidates are registered to vote, and that their registrations are current. DCCC often invests in voter registration programs, either directly or indirectly, to encourage our constituents in states across the country to register to vote in the most accessible

way. For some of our constituents, the most accessible option for registering to vote is the National Mail Voter Registration Form, commonly referred to as the "Federal Form." This form streamlines the voter registration process and does not require voters to gather or submit any additional documentation in order to be successfully registered to vote.

19.      Existing law already makes it illegal for foreign nationals to register and vote in our elections, and our existing law prevents non-citizens from voting. There is zero evidence of widespread voting by non-citizens in U.S. elections. President Trump's unnecessary imposition of a documentary proof of citizenship requirement will make it significantly harder for DCCC's constituents—qualified U.S. citizens—to register and remain registered to vote.

20.      Millions of American citizens, including many of DCCC's citizen-constituents, lack qualifying proof of citizenship documents, and as a result, will be unable to register to vote using the Federal Form. Many of DCCC's lower-income constituents and voters who do not travel out of the country are likely to lack qualifying citizenship documents—like a passport—or the ability to easily obtain them. President Trump's proof of citizenship requirement also singles out recipients of public assistance for additional citizenship assessments before even receiving a Federal Form. Additionally, a majority of DCCC's constituents are women, many of whom have changed their last name upon marriage, such that their legal name does not match their citizenship documents. It will therefore be more difficult for married women to provide documentary proof of citizenship to register to vote as well.

21.      The Order's burdensome documentary proof of citizenship requirement makes no exception for overseas and military voters, who are often located in remote areas without access to a copy machine or printer. The proof of citizenship requirement will therefore make it virtually impossible for many eligible voters, including those serving our country, to send proof of their

citizenship to their county election board, and they will be prohibited from exercising their fundamental right to vote.

22.    The burdens imposed by the documentary proof of citizenship requirement will be particularly acute in Arizona, where there is a special congressional primary election in Arizona Congressional District 7 on July 15, 2025, and a general election on September 23, 2025. Voter registration for the primary and general election close on June 16, 2025 and August 25, 2025, respectively. Arizona has imposed a documentary proof of citizenship requirement to vote in *state* elections, but until President Trump's Order, allowed voters to register with the Federal Form and vote in federal elections without providing proof of citizenship. Such voters who use the Federal Form and do not provide proof of citizenship are known as "federal-only" voters. With President Trump's mandate that Federal Form users also submit documentary proof of citizenship, all voter registrants in Arizona will be required to submit such documentation, regardless of the form they use to register. As of July 2023, there were nearly 20,000 active federal-only voters in Arizona who were registered without documentary proof of citizenship. And that number does not account for the thousands of citizens who are eligible to vote in Arizona, but are not yet registered and now will be unable to register because they lack the required proof of citizenship.

23.    When making budget decisions, DCCC will now need to consider the work that will be required to help prospective voters comply with the documentary proof of citizenship requirement. For example, in states where DCCC helps with voter registration programs, it will need to spend resources to ensure eligible voters are aware that all new registrants must provide qualifying proof of citizenship when registering with the Federal Form. This effort may result in DCCC spending resources so eligible voters are informed that only certain documents qualify as proof of citizenship under President Trump's Order, and have assistance in obtaining such

documents if they do not already have them.

24.     In elections, the resources a political party committee has are limited as the committee works to expend its resources to elect its candidates in any given election cycle. Resources that must be diverted to responding to a seismic change like those contained in President Trump's Order necessarily come at the cost of other of DCCC's mission-critical planned activities and expenditures.

25.     DCCC's voter registration efforts will be further upended by President Trump's Order granting third parties—including DOGE—unauthorized access to federal systems and databases containing the personal information of DCCC's constituents. These unauthorized disclosures may subject DCCC's members and constituents to unlawful investigation and possible removal from the voter rolls based on false suspicion of not being U.S. citizens. In turn, it may be harder for DCCC to register new voters who reasonably fear that their personal identifying information will be disclosed to third parties. Some of our constituents are extremely concerned about protecting their private information and mistrust DOGE, so much so that they will be willing to forgo registering and exercising their right to vote to ensure that their information is protected from DOGE. That means that DCCC will need to tailor its voter registration efforts in light of these privacy concerns.

26.     Additionally, granting such unauthorized disclosures will put DCCC's constituents at risk of being wrongly removed from the voter rolls. DCCC will therefore need to consider how to provide guidance to voters on checking their registrations and the process of restoring their registrations—including by complying with the new DPOC requirements—if they have been wrongly removed.

27.     The Order's ballot receipt deadline, proof of citizenship requirement, and

unauthorized data-sharing provisions impose imminent harm on DCCC. As explained above, DCCC will need to redirect significant amounts of its limited resources to thwart the harmful effects of these massive changes to voting and election rules, and those budget allocation decisions are being made now. Once resources are diverted toward unplanned programming, they cannot be used to persuade voters to elect Democratic candidates, directly undermining DCCC's mission.

28.     This reality puts DCCC at a competitive disadvantage. In the last several election cycles, Democrats have become more likely to vote by mail. Because of demographics, Democrats are disproportionately likely to lack qualifying proof of citizenship and to be wrongly suspected of not being a citizen. By dictating these new rules for federal elections, President Trump is therefore making it more difficult for DCCC's members and constituents to vote in elections, and for the candidates that DCCC supports to compete.

I declare under penalty of perjury that the foregoing is true and correct.

4/7/2025

Executed on: _____

*Erik Ruselowski*

_____
Erik Ruselowski, Chief Operating Officer
DCCC

# Exhibit 7

Civil Action No. 25-cv-0952 (CKK)
(Lead Case: No. 25-cv-00946 (CKK))

# How to get a REAL ID and use it for travel

 usa.gov/real-id



The REAL ID Act is a law that sets higher security standards for state-issued driver's licenses and identification cards (IDs).

## How to get a REAL ID

When you apply for or renew your driver's license or state identification card, you can choose to make it REAL ID-compliant. When you receive your new card, it will have the REAL ID star marking at the top right.

The process of getting a REAL ID and what documents you must provide depends on your state. In most cases, your state driver's licensing agency will require you to bring:

- **Proof of identity** - To prove your identity, you can bring a U.S. birth certificate, U.S. passport, or Permanent Resident Card (Green Card) if you are a non-U.S. citizen.
- **Proof of a Social Security number** - You can provide your Social Security card, Form W-2, which shows your earnings for tax purposes, or a pay stub or paycheck from your job.
- **Proof of residency** - Your state department of motor vehicles may ask you for a deed, mortgage statement, lease agreement, utility bill, or bank statement to prove you are a state resident.

Look up and visit your state's driver's licensing agency website to learn how to apply and what documentation you need.

## Why upgrade your license to a REAL ID?

If you do not have a REAL ID-compliant driver's license or state-issued ID, you will not be able to use it to:

- Board federally regulated commercial aircraft

- Access federal government facilities or military installations

- Enter nuclear power plants

Visit the REAL ID website for more details and frequently asked questions.

## Check to see if your license or state ID is already REAL ID-compliant

If your driver's license or state ID has a star in the upper right-hand corner, it is already REAL-ID-compliant. There is nothing more you need to do.

## Can I fly without a REAL ID?

Yes. If you do not upgrade your license or state ID, you can use a passport or one of these other acceptable forms of identification to fly.

## Can you still get a non-REAL ID-compliant license or state ID?

You will still be able to get a driver's license or state ID card that is not REAL ID-compliant. But you will not be able to use it for air travel or to get into federal facilities or military installations. Look up and visit your state's driver's licensing agency website to see how to get a non-REAL ID-compliant license or state ID.

# Exhibit 8

Civil Action No. 25-cv-0952 (CKK)

 An official website of the United States government  Here's how you know ⌄

 Homeland Security

MENU

Home » Topics » Border Security » Western Hemisphere Travel Initiative » Enhanced Drivers Licenses: What Are They?

# Enhanced Drivers Licenses: What Are They?



Enhanced Drivers Licenses (EDLs) are state-issued enhanced drivers licenses that provide proof of identity and U.S. citizenship when crossing the U.S. border in a vehicle. They are issued in a secure process, and include technology that makes travel easier. EDLs are a low-cost, convenient option for entering the United States from Canada, Mexico or the Caribbean through a land or sea port of entry, in addition to serving as a permit to drive.

DHS has been working with individual states to enhance their drivers licenses and identification documents to comply with travel rules under the Western Hemisphere Travel Initiative (WHTI), effective June 1, 2009.

EDL's are available in the following states:

- Michigan
- Minnesota
- New York
- Vermont
- Washington

⤢ Close all    ⤢ Open all

| How to Apply for an Enhanced Driver's License? | + |
| --- | --- |

| Benefits of an EDL | + |
| --- | --- |

| Alternative to Canadian Passport | + |
| --- | --- |

| Privacy Protection | + |
| --- | --- |

**Topics**

BORDER SECURITY

**Keywords**

BORDER SECURITY

Last Updated: 04/27/2023

Was this page helpful?

| Privacy Protection | + |
| --- | --- |

**Topics**

BORDER SECURITY

**Keywords**



BORDER SECURITY

Last Updated: 04/27/2023


Security


DHS.gov
**An official website of the U.S. Department of Homeland Security**

About DHS

Accessibility

Budget and Performance

DHS Components

FOIA Requests

No FEAR Act Data

Privacy Policy

Site Links

Vulnerability Disclosure Program

Office of Inspector General

The White House

USA.gov



# Exhibit 9

Civil Action No. 25-cv-0952 (CKK)
(Lead Case: No. 25-cv-00946 (CKK))

---

⚠️ **Scam alert**

The Michigan Department of State / Secretary of State will never ask people to send money or personal information via text message. Please contact the Michigan Department of Attorney General for more information on how to identify scams and to file a complaint.

---

 **Michigan Department of State**                                    🔍

| All services | Elections ⌄ | License & ID ⌄ | Vehicle ⌄ | Industry services ⌄ | Resources ⌄ | Notary ⌄ | FAQs | Languages ⌄ |



# Enhanced license and ID

🏠 › Enhanced license and ID

---

ℹ️ **Michigan driver's licenses and IDs have been redesigned!**

Michigan's new driver's licenses and IDs with higher security features are now in circulation. Residents will receive the new license or ID design if applying for their first card or when renewing/replacing their current card. There is no additional cost for the new card and all valid features, designations, and endorsements on a current license or ID will transfer to the new one. Michigan's old card design featuring the Mackinac Bridge is valid until expiration and will phase out over the next four years.

To receive your first-time REAL ID-compliant license or ID, an office visit and further documentation are required.

**Download flyer** ›

## What is an enhanced license or ID?

Unlike a standard Michigan license or ID, an enhanced license or ID can be used in place of a U.S. passport to re-enter the United States **by land or sea** from Canada, Mexico, Bermuda, or the Caribbean.

## How can I apply for an enhanced driver's license or state ID?

7/11/25, 10:48 AM
home-extensionContent.helpcommanifestconfigjmeolj/pages/screenshot.html
Case 1:25-cv-00946-CKK Document 146-3 Filed 07/11/25 Page 77 of 317



### Online
Unavailable for this transaction

Unavailable

### By mail
Unavailable for this transaction

Unavailable

### Self-service station
Unavailable for this transaction

Unavailable

### Office visit
Complete your business in an average of 20 minutes

Schedule an office visit

## What do I need to apply for an enhanced license or ID at a Secretary of State office? (Choose tab)

Proof of legal presence

Name change document (if applicable)

Social Security number

Proof of identity

Michigan residency

Payment

You are required to provide one of the following legal presence documents:

- Valid, unexpired U.S. passport or passport card
- Certified birth certificate with stamp or raised seal issued by a U.S. government unit or U.S. territory government office
- Consular Report of Birth Abroad issued by the U.S. State Department (FS-240, DS-1350 or FS-545)
- Certificate of Citizenship (N-560 or N-561)
- Certificate of Naturalization (N-550, N-570, N-578)

Documents may need to be verified by the federal Systematic Alien Verification for Entitlements (SAVE) System.

As part of your enhanced license or ID application, you will be asked a series of questions about your legal presence document.

Accepted documents

## Frequently asked questions (FAQs)

What are the fees associated with an enhanced driver's license or state ID card? ⌄

How do I renew my enhanced license or ID? ⌄

I have an enhanced driver's license, but it doesn't have a star. Is it REAL ID-compliant? ⌄

What is the RFID chip on my enhanced license or ID? ⌄

Do I need to pass any written knowledge or driving skills tests to get an enhanced driver's license?

## Still have questions?

More FAQs



Follow us

### Services
Online services
Schedule an office visit
Contact the department
Transparency and FOIA

### Resources
Organ donation
Report fraud
Forms and publications
MDOS jobs
MDOS Title VI policy
News

### Translation and interpreter services
العربية    Español    普通话

Language services

### MI Voter Information Center
Get personalized voter information on early voting and other topics.

Michigan.gov/Vote

Copyright 2025 State of Michigan |    Mi.gov Home |    Policies |  Accessibility |    Disability Resources |    Statewide FOIA Directory |    Departments

# Exhibit 10

Civil Action No. 25-cv-0952 (CKK)
(Lead Case: No. 25-cv-00946 (CKK))

⚠ **Scam alert**

The Michigan Department of State / Secretary of State will never ask people to send money or personal information via text message. Please contact the Michigan Department of Attorney General for more information on **how to identify scams and to file a complaint**.

 **Michigan Department of State**      🔍

| All services | Elections ˅ | License & ID ˅ | Vehicle ˅ | Industry services ˅ | Resources ˅ | Notary ˅ | FAQs | Languages ˅ |



# First-time license or ID

🏠 › First-time license or ID



ℹ **Michigan driver's licenses and IDs have been redesigned!**

Michigan's new driver's licenses and IDs with higher security features are now in circulation. Residents will receive the new license or ID design if applying for their first card or when renewing/replacing their current card. There is no additional cost for the new card and all valid features, designations, and endorsements on a current license or ID will transfer to the new one. Michigan's old card design featuring the Mackinac Bridge is valid until expiration and will phase out over the next four years.

To receive your first-time REAL ID-compliant license or ID, an office visit and further documentation are required.

**Download flyer** ›

## How can I apply for a first-time Michigan license or ID?



| **Online** | **By mail** | **Self-service station** | **Office visit** |
| Unavailable for this | Unavailable for this | | Complete your |



| transaction | transaction | Unavailable for this transaction | business in an average of 20 minutes |
|---|---|---|---|
| Unavailable | Unavailable | Unavailable | Schedule an office visit |

## Steps for getting a first-time Michigan license or ID

1. **Gather all required documents.**
   Photocopies won't be accepted and all documents must be in English or include an English translation.

2. **Pre-apply for your license or ID online.**
   Submit your license or ID application before your office visit.

   [Go to Online Services]

3. **Visit a Secretary of State office.**
   Present all required documents and take a photo. Those applying for a license must complete a vision exam. If you are 18 or older and applying for a first-time license, you'll also take the driver knowledge exam during your visit.

   [Schedule an office visit]

4. **If applying for a first-time license, pass and complete additional requirements.**
   *Drivers under 18:* After your office visit, complete and pass Segment 2 of driver's education and the on-road driver skills test. Visit our New Driver (under 18 web page) for more information.

   *Drivers 18 and older:* Upon passing the driver knowledge exam at your office visit, practice driving with a licensed adult for at least 30 days before completing and passing the driving skills test. Visit our New Driver (18 and older) web page for more information.

## What do I need to apply for a license or ID at a Secretary of State office? (Choose tab)

| Legal presence | You are required to provide one of the following legal presence documents: |
|---|---|
| Name change document (if applicable) | • Valid, unexpired U.S. passport or passport card |
| Social Security number | • Certified birth certificate issued by the vital records office of the state of birth. Birth certificates can only be accepted if they have the following information: |
| Proof of identity | ○ U.S. government unit (city, county, state, U.S. territory) that issued the record |
| Michigan residency | ○ Applicant's full name, date of birth, and place of birth |
| Payment | ○ Parents' names (at least one parent must be listed) |
| | ○ Date the record was filed with the registrar's office |
| | ○ Certification statement and signature from the registrar |

Payment

indicating the original record is on file with the registrar's office
   ○ Seal or stamp indicating the document is a certified record (not
     a photocopy)

   **NOTE:**

   ▪ Delayed foreign birth certificates aren't acceptable (these are
     issued to customers who were adopted from another
     country). These applicants are eligible to apply for a U.S.
     passport, passport card, or Certificate of Citizenship.
   ▪ Hospital birth certificates aren't acceptable.
   ▪ Adoption records aren't accepted as birth certificates.
   ▪ Puerto Rico birth certificates must have been issued on or
     **after July 1, 2010**

- Consular Report of Birth Abroad issued by the U.S. State
  Department (FS-240, DS-1350 or FS-545)
- Certificate of Citizenship (N-560 or N-561)
- Certificate of Naturalization (N-550, N-570 or N-578)
- Permanent Resident Card (Green Card)
- Valid, unexpired Permanent Resident Card (I-551) or other evidence
  of permanent residency (I-551 visa/stamp in passport or on I-94)
- Valid Employment Authorization Document (I-766)
- Valid, unexpired foreign passport with U.S. visa and evidence of
  entry:
  - F-visa holders: Form I-20
  - J-visa holders: DS-2019
  - **Not** acceptable: B1 and B2 visas and WB, and WT visa stamps
- Other immigration documents that show legal presence and/or
  ability to work in the U.S., including Form I-94, State Department
  bio-data form, and supervision documents (other documents may
  be accepted)
- Expired immigration documents along with Form I-797 (Notice of
  Action) showing that new documents have been applied for

Documents may need to be verified by the federal Systematic Alien
Verification for Entitlements (SAVE) System. Per state and federal law,
we are required to verify an individual's immigration status through
the U.S. Citizenship and Immigration Service SAVE verification system
before issuing or renewing a Michigan license or ID.

Unfortunately, there has recently been an increase in delays in
processing SAVE cases. In most situations, we are finding that cases
are taking approximately 40 days between intake and processing.

Because SAVE is a federal program, it does not always work at the
speed we would like it to, nor does it leave much room for our
intervention. In some cases, congressional offices can submit a special
request to expedite review of a SAVE case.

## Frequently asked questions (FAQs)

How much will my first license or ID cost?                    ⌄

Do I need a license or ID?                                    ⌄

What is the difference between a standard card a REAL ID compliant card and an enhanced card? ⌄

Is there anything else I should know before I visit an office to apply for my license or ID? ⌄

What do I need to prepare for my first Michigan drivers license? ⌄

Will my license or ID card be issued at my office visit? ⌄

Can I use a P.O. Box as the address on my license or ID? ⌄

When applying for a driver's license or ID, can I provide a photocopy of my required documents instead of the original? ⌄

Do all new Michigan drivers need to complete driver education? ⌄

My license or ID hasn't come in the mail yet. What should I do? ⌄

## Still have questions?

[ More FAQs ]



Follow us

### Services

Online services
Schedule an office visit
Contact the department
Transparency and FOIA

### Resources

Organ donation
Report fraud
Forms and publications
MDOS jobs
MDOS Title VI policy
News

### Translation and interpreter services

العربية    Español    普通话

[ Language services ]

### MI Voter Information Center

Get personalized voter information on early voting and other topics.

[ Michigan.gov/Vote ]

7/11/25, 10:49 AM
Case 1:25-cv-00946-CKK    Document 146-3    Filed 07/11/25    Page 84 of 317
chrome-extension://ohlencieiipommannpdfcmfdpjjmeolj/pages/screenshot.html

Copyright 2025 State of Michigan |    Mi.gov Home |    Policies |  Accessibility |    Disability Resources |    Statewide FOIA Directory |    Departments

# Exhibit 11

Civil Action No. 25-cv-0952 (CKK)
(Lead Case: No. 25-cv-00946 (CKK))

# Minnesota Department of Public Safety

 **dps.mn.gov**/divisions/dvs/license-and-id/dl-and-id-card-fees

*Available at driver exam stations only.
**Fee does not include the cost of a new license.

| Driver's licenses | Fee |
|---|---|
| Class A | $65 |
| Class A, renewal | $60 |
| Class A, under age 21 | $45 |
| Class A, under age 21, renewal | $40 |
| Class B | $57 |
| Class B, renewal | $52 |
| Class C | $50 |
| Class C, renewal | $45 |
| **School Bus processing fee - original and renewal applications | $4 |
| Class D | $46 |
| Class D, renewal | $41 |
| Provisional driver's license | $32.50 |
| Class D provisional license upgrade to under age 21 driver's license-no violations on record, renewal | $37.50 |
| Duplicate driver's license - all classes | $26 |
| **Enhanced driver's license (in addition to applicable driver's license card fee) | $15 |

| Identification cards | Fee |
|---|---|
| Under age 65 | $35.50 |
| Under age 65, renewal | $30.50 |
| Age 65 and older | $32 |
| Age 65 and older, renewal (Enhanced ID) | $30.50 |

| Identification cards | Fee |
|---|---|
| Age 65 and older, renewal (REAL ID) | $27 |
| Physical disability, developmental disability or qualified mental illness | $0.50 |
| Homeless youth (documentation required) | FREE |
| ** Enhanced identification card (in addition to applicable ID card fee) | $15 |

| Permits/endorsements | Fee |
|---|---|
| Class D instruction permit (valid for 2 years) | $29.50 |
| Class D instruction permit (valid for 2 years), renewal | $24.50 |
| *Class A, B or C instruction permit | $26.75 |
| *Endorsement examination fees | $2.50 |
| *Motorcycle instruction permit/endorsement fee | $29 |
| **Motorcycle endorsement renewal (2-wheel only) | $17 |
| **Standby or temporary custodian designation | $4.25 |

| **Fast track (expedited) services | Fee |
|---|---|
| Driver's License and Identification Card | $20 |

Certain applications do not qualify for fast track services, these include but are not limited to: Enhanced driver's license and ID cards, and any first-time applications.

Note: Driver's license and ID cards will be processed within three (3) business days. Customer should receive the card via UPS (United Parcel Service) within 10 business days. Refer to DVS Office Locations to see participating offices.

| Reinstatement | Fee |
|---|---|
| **Revoked licenses: alcohol/drugs/criminal vehicular operation (7/1/03) | $680 |
| Other revocation offenses, including revocation for no-fault insurance | $30 |
| **Suspended license | $20 |
| No-Fault insurance (suspended) | $20 |
| CDL disqualification | $20 |

| Motorized bicycle operator's permit fee | Fee |
|---|---|
| *Knowledge test and 30-day instruction permit | $6.75 |
| Motorized bicycle operator's permit before age 21 and valid to age 21 | $25.75 |
| Duplicate permit | $16.25 |
| Renewal, age 21 or older | $26.75 |
| Age 21 or older first-time operator's permit | $31.75 |

| Retesting | Fee |
|---|---|
| *Third and subsequent written test after failing first two | $10 |
| *Third and subsequent road test after failing first two | $20 |
| No show (road test) fee | $20 |

# Exhibit 12

Civil Action No. 25-cv-0952 (CKK)
(Lead Case: No. 25-cv-00946 (CKK))

# Enhanced or REAL ID

🔗 **dmv.ny.gov**/driver-license/enhanced-or-real-id



REAL ID-compliant identification is now required to fly within the U.S. If you have a passport (or other REAL-compliant document), and are not due to renew your driver license or ID card, you do not need to upgrade right away.

Driver License

## About

If your New York State license or ID **does not** have a star or a flag on it, then you **do not** have a REAL ID-compliant document.

A REAL ID is a federally compliant DMV-issued driver license, learner permit, or non-driver ID that is required to board a domestic flight (within the U.S.) or enter certain federal buildings, unless you have a valid passport.

Learn more about how to get a REAL ID in the DMV's Youtube video.

### The REAL ID Act

Passed by Congress in 2005, the REAL ID Act establishes minimum security standards for state-issued driver licenses, permits, and ID cards. The Act also prohibits federal agencies, like the Transportation Security Administration (TSA), from accepting cards for official purposes from states that do not meet these standards.

A REAL ID is optional and is **not** needed for the following:

- Being licensed to drive
- Voting or registering to vote
- Entering Federal facilities that do not require a person to present identification
- Applying for or receiving Federal benefits
- Accessing health or life-preserving services (including hospitals and health clinics), law enforcement, or constitutionally protected activities (including a defendant's access to court proceedings)
- Participating in law enforcement proceedings or investigations

## Enhanced Photo Document

If you are a U.S. citizen and New York State resident, you can apply for a New York State Enhanced License, Permit, or Non-Driver ID that can be used instead of a passport to return to the US by land or sea from Canada, Mexico, and some countries in the Caribbean. An Enhanced Photo Document is **not acceptable for air travel** between these countries.

A New York State Enhanced Photo Document complies with the Western Hemisphere Travel Initiative (WHTI).

*We recommend you contact your travel agent, your cruise line, or the specific countries of destination to verify your travel document requirements*

## How to Apply

### Step 1: Determine which ID is right for you

| ID Features | Standard | Real ID | Enhanced |
|---|---|---|---|
| **Can use for Photo ID purposes** | Yes | Yes | Yes |
| **Is acceptable for Federal REAL ID purposes** | No | Yes | Yes |
| **Can use to board a domestic flight (within the U.S.)** | No | Yes | Yes |
| **Can use to enter a Federal building or military base** | No | Yes | Yes |

| ID Features | Standard | Real ID | Enhanced |
|---|---|---|---|
| **Can use to cross U.S. border from Canada, Mexico, and some Caribbean countries (by land or sea only)** | No | No | Yes |
| **Shows your residential address (where you live)** | Shows mailing address if different from residential address | Yes | Yes |
| **Requires an office visit to get one (if getting a photo document for the first time)** | Yes | Yes | Yes |
| **Requires an office visit to replace or renew** | No | No, unless you are changing from a standard or updating your lawful status | No, unless you are changing from a standard or Real ID |
| **Cost (in addition to regular transaction fees)** | No | No | Yes, $30 |
| **Displays on the front of document** | NOT FOR FEDERAL PURPOSES | See a "Real ID" photo document sample | See a "Enhanced" photo document sample |

*Detailed comparison of Enhanced, REAL ID, or Standard License/ID types*

## Step 2. Gather the necessary documentation

The DMV's online document guide shows you exactly what documents you need to apply for a REAL ID or Enhanced document. It creates an individualized checklist of all the documents you need to bring to the DMV such as a utility bill, Social Security card, and more. **Expired or outdated documents will not be accepted.** Certified copies of both birth and marriage certificates are accepted. Complete this guide to be sure you have the proof of identity you need to get a license, permit, or ID before you go to a DMV office.

Find out what documents you need

You can have your REAL ID / Enhanced document application securely pre-screened before you visit a DMV office to have your photo taken and complete your document upgrade.

Confirming your application and identity documents are approved before you arrive at the DMV will ensure that you complete your transaction with just a single office visit.

After you submit your application for pre-screening, we will contact you. You will receive notifications that will include instructions and describe the next steps in the process. Once your application is approved, we will alert you to schedule your in-person visit at a participating DMV location on a date and time that is convenient for you. You will also be able to check your application status 24/7.

Submit your REAL ID / Enhanced document application

## Step 3. Visit a DMV office

Submit all your documentation to a DMV office.

See instructions and reservation information for your county

After you apply you will receive a temporary document. It takes about 2 weeks for your new Enhanced and REAL ID document to arrive in the mail.

# Fees

**REAL ID**: There is no additional fee for a REAL ID.  All normal transaction fees still apply.

**Enhanced**: The additional fee for an enhanced driver licensed (EDL) or enhanced non-driver ID card (ENDID) is $30.00.  The fee is added to the other fees for the driver license or non-driver ID transaction.

# Tips to Avoid Mistakes

## Provide Appropriate Proof of Residency

If you are applying for a REAL ID or Enhanced document you must provide **two proofs of New York State residency**. A New York State license, permit or non-driver id card, a recent bank statement, or a recent pay stub showing your current New York State address are just some of the acceptable proofs of residency. DMV will accept certain electronic documents such as a utility bill, a credit card statement, or a pay stub if they are printed. **Documents with a P.O. Box listed cannot be accepted.**

Additionally, any documents issued more than one year before your office visit will not be accepted. For example, a bank statement or utility bill that is provided as proof of residency must have been issued within the last 365 days of the customer's visit to the DMV.

## Bring Proof of Your Full, Legal Name

DMV may only print your legal name on a REAL ID or Enhanced document.  A nickname, like an abbreviated or alternate version of your legal name, is not allowed.  If a nickname, abbreviated name, or confirmation name appears on any of your proof documents, additional proof of full, legal name, or proof of a court-ordered name change, must be shown.

If your name has changed once or multiple times due to marriage or divorce, for example, proof of each change, such as a marriage certificate or divorce decree, must be provided to show the connection.

## Early Renewal With Conversion to a REAL or Enhanced Photo Document

You can normally only renew a New York State driver's license or non-driver ID card within 12 months or less before the expiration date. However, you can apply for renewal earlier than normal to convert to a REAL or Enhanced License or ID.

To renew early and convert to an enhanced document your license or ID must

- be valid, not expired, and issued more than 6 months ago
- not expire within the next 12 months
- not be in a conditional or restricted status

You **must also meet the proof of lawful status, identity, and residency requirements** for a REAL or Enhanced photo document.

The early renewal fees with conversion to REAL or Enhanced photo document fees are based on

- the class of your driver's license or the type of your new photo document, and
- how many **full or partial 6-month periods** there are between the **exact date you apply** and your next birthday (the month and the day) and the year of expiration

If you get a REAL or Enhanced photo document through an early renewal, the year your license expires and your total fee will be different than if you renewed on a normal schedule. The fee can be higher because your license is issued for more months than a normal renewal.

Our online calculator can tell you the fee you would need to pay.

*NOTE: The calculator provides the fee you would pay **if your application were processed on the same day you use the calculator**. If you apply at a later date, **the fee may change**.*

To calculate the fee to convert to an enhanced document, you must have the DMV ID Number (Client ID Number) from your New York State driver's license, learner permit, or non-driver ID card.

## Related Documents

- **MV-44: Application for Permit, Driver License or Non-Driver ID Card (PDF)**

  English
  Use to apply for a learner permit, driver license or non-driver ID. Also use to renew your license or non-driver ID.

  Download
- **ID-44: How to Apply for A New York: Learner Permit, Driver License, Non-Driver ID Card (PDF)**

  English
  Provides information and instructions for how to apply for a New York learner permit, driver license, or non-driver ID card and lists the proof documents that are required.

  Download

Skip survey header
***Questions marked with an asterisk (*) are required to submit feedback.***

Additional questions will appear after answering the first survey question.

# Was the information on this page helpful? **This question is required.**

# Exhibit 13

Civil Action No. 25-cv-0952 (CKK)
(Lead Case: No. 25-cv-00946 (CKK))

# Driver's License Fees

📈 **dmv.vermont.gov**/licenses/fees

September 5, 2024

**LICENSE PHOTOS**

If you are given only the option to replace your credential, it is more than likely you need an updated picture

**The Vermont Department of Motor Vehicles (DMV) is warning residents about an increase in scam messages falsely claiming that drivers are at risk of license suspension.**

- The Vermont DMV **does not send unsolicited messages demanding immediate payment**
- Official DMV notices come via **mail or direct communication from verified sources**.
- **Do not click links** or provide personal information if you receive an unexpected message about payments.

Check out this article for more information: **Beware of Scams: Fraudulent Messages Targeting Vermont Drivers | Department of Motor Vehicles**

Driver's License & Learner's Permit Fees

| **Credential Type** | **Duration** | **New**/**Renew** | **With Motorcycle*** | **Replacement** |
|---|---|---|---|---|
| Driver's License (DL) | 2 Years | $39.00 | $47.00 | $24.00 |
| | 4 Years | $62.00 | $78.00 | $24.00 |
| Driver's Privilege Card (DPC) | 2 Years | $39.00 | $47.00 | $24.00 |
| | 4 Years | $62.00 | $78.00 | $24.00 |
| Enhanced Driver's License (EDL)** | 2 Years | $75.00 | $83.00 | $60.00 |
| | 4 Years | $98.00 | $114.00 | $60.00 |
| Junior Driver's License (JUN) | 2 Years | $39.00 | $47.00 | $24.00 |
| Learner's Permit (LRN) | 2 Years | $24.00 | N/A | $24.00 |
| Motorcycle Learner's Permit | 120 Days | $24.00 | N/A | $24.00 |

| Credential Type | Duration | New/Renew | With Motorcycle* | Replacement |
|---|---|---|---|---|
| Non-Driver ID | 4 Years | $29.00 | N/A | $24.00 |
| Non-Driver ID SSI Reduced Fee*** | 4 Years | $10.00* | N/A | S5.00* |
| Restricted Driver's License (RDL) | 1 Year | $125.00 | N/A | $24.00 |
| Commercial Driver's License (CDL) | See CDL page | | | |

**\*Motorcycle Endorsement is an additional fee of $4 per year**

**\*\*EDL is an additional fee of $36**

**\*\*\*Non-Driver ID SSI Reduced Fee**

SSI/SSD Reduced Fees (Non-Driver ID only): An individual who is currently on Supplemental Security Income (SSI) or Social Security Disability (SSD) is eligible for a reduced fee for a Non-Driver ID. Proof of SSI or SSD is required at the time of the service. This can be done by submitting a benefit verification letter to this Department. A copy of the benefit verification letter can be obtained by contacting Social Security by phone, mail, or in person.

## **Reinstatement of Suspended License**

$96.00

## Driver's License Exam Fees

- Driver's License, Road Test - *$23.00*
- Learner Permit, Knowledge Test - *$39.00*
- Motorcycle Learner Permit, Knowledge Test - *$11.00*
- Motorcycle, Road Test - *$23.00*

## Driver Training Fees

- Driver Training Instructor Application - *$126.00*
- Driver Training Instructor License, New/Renew - *$90.00*
- Driver Training License, Replacement - *$10.00*
- Driver Training School Application - *$180.00*
- Driver Training School License, New/Renew - *$270.00*

# Exhibit 14

Civil Action No. 25-cv-0952 (CKK)

 An official website of the United States government    Here's how you know ⌄

✈ **Travel Advisory Level 1**: Exercise Normal Caution Read More... ⧉


**U.S. EMBASSY & CONSULATES IN JAPAN**

Country/Area ⌄    Search 🔍    Menu ☰    Language 🔤

## Emergency Information for American Citizens

# PROOF OF U.S. CITIZENSHIP

Proof of U.S. Citizenship can be demonstrated by the following documents below. Military ID cards and social security numbers are **NOT** proof of citizenship.

Note: all documents must be **original** – no photocopies.

- A full validity U.S. passport (currently valid or expired)
- U.S. birth certificate (should have parents' names, a seal, registrar's signature, and the date the certificate was filed with the registrar's office – hospital birth certificates are not acceptable)
- Consular Report of Birth Abroad (Form FS-240/FS-1350)
- Certificate of Naturalization
- Certificate of Citizenship

Please click here to obtain vital records.

---

**U.S. EMBASSY & CONSULATES IN JAPAN**

White House ⧉    Department of State ⧉    Privacy Policy    Social Media Terms of Use ⧉    Contact us    FOIA ⧉    No Fear Act ⧉
Accessibility Statement ⧉



𝕏    f    ▶ YouTube    flickr    📷 instagram

# Exhibit 15

Civil Action No. 25-cv-0952 (CKK)
(Lead Case: No. 25-cv-00946 (CKK))

(v) DAV (rated 100 percent disabled by the Department of Veterans Affairs).

(vi) DoD beneficiaries (eligible former spouses, widows, widowers, and abused dependents)

(vii) Civilian personnel in the categories listed in paragraphs (l)(2)(vii)(A) through (D) of this appendix:

(A) Other U.S. Government agency civilian employees when stationed or employed and residing in foreign countries for a period of at least 365 days.

(B) Full-time paid personnel of the United Service Organization, when serving in foreign countries.

(C) United Seaman's Service (USS) personnel in foreign countries.

(D) Military Sealift Command (MSC) civil service marine personnel deployed to foreign countries on MSC-owned and -operated vessels.

(m) *DoD Civilian Retiree Card*—(1) *Description.* This ID shall only be used to establish DoD civilian retiree identity and previous affiliation with the DoD.

(2) *Eligibility.* Appropriated and NAF civilians that have retired from any DoD Service component or agency are eligible for the DoD Civilian Retiree Card. These civilians must have their retired status verified in DEERS before an ID card can be issued.

(n) *NOAA Retired Wage Mariner and Family Member Card*—(1) *Description.* The NOAA Retired Wage Mariner and Family Member Card is a sub-category of the DoD Civilian Retiree Card and shall be used to establish identity and affiliation with the DoD and to identify the individual's eligibility for benefits and privileges administered by the uniformed services as described in subpart C of this part.

(2) *Eligibility.* Retired Wage Mariners of NOAA and their dependents as described in subpart C of this part are eligible for the NOAA Retired Wage Mariners and Family Members Card.

APPENDIX 2 TO § 161.7—TOPOLOGY SPECIFICATIONS

(a) *Topology.* Graphical representations of all CACs are maintained at *www.cac.mil*.

(b) *CAC stripe color coding.* The CAC shall be color-coded as indicated in the Table to reflect the status of the holder of the card. If a person meets more than one condition as shown in the Table, priority will be given to the blue stripe to denote a non-U.S. citizen unless the card serves as a Geneva Conventions card.

(1) If a person meets more than one condition as shown in the Table, priority will be given to the blue stripe to denote a non-U.S. citizen unless the card serves as a Geneva Conventions card.

(2) FIPS Publication 201–3 reserves the color red to distinguish emergency first responder officials. Until the DoD implementation of Homeland Security Presidential Directive 12 is complete, the color red will also be used to denote non-U.S. personnel in the same manner as the blue stripe in the Table (i.e., some cards with red stripes may continue to exist in circulation until the 3-year life cycle is complete).

TABLE—CAC STRIPE COLOR CODING

| No stripe | U.S. military and DoD civilian personnel or any personnel eligible for a Geneva Conventions card |
|---|---|
| Blue ........................................... | Non-U.S. personnel, including DoD contract employees (other than those persons requiring a Geneva Conventions card). |
| Green ........................................ | All U.S. citizen personnel under contract to the DoD (other than those persons requiring a Geneva Conventions card). |

(c) *CAC printed statements*—(1) Eligible individuals who are permanently assigned to foreign countries for at least 365 days (it should be noted that local nationals are in their home country, not a foreign country) will have the word ''OVERSEAS'' printed within the authorized patronage area of the CAC.

(2) The authorized patronage area for eligible individuals permanently assigned within the United States and U.S. territories and possessions will be blank. Travel orders authorize access for these individuals while en route to the deployment site.

(3) During a conflict, combat, or contingency operation, civilian employees with a U.S. DoD or Uniformed Services Geneva Conventions ID Card for Civilians Accompanying the Uniformed Services will be granted all commissary; exchange; MWR; and medical privileges available at the site of the deployment, regardless of the statements on the ID card. Contractor employees possessing this ID card shall receive the benefit of those commissary, exchange, MWR, and medical privileges that are accorded to such persons by international agreements in force between the United States and the host country concerned and their letter of authorization.

(4) The medical area on the card for individuals on permanent assignment in a foreign country will contain the statement: ''When TAD/TDY or stationed overseas on a space available fully reimbursable basis.''

**Office of the Secretary of Defense**                              **§ 161.8**

However, civilian employees and contractor employees providing support when forward deployed during a conflict, combat, or contingency operation are treated in accordance with 10 U.S.C. 10147 and chapters 1209 and 1223 and DoD Instruction 3020.41, ''Operational Contract Support'' (available at *http://www.dtic.mil/whs/directives/corres/pdf/ 302041p.pdf)*, and the Deputy Secretary of Defense Memorandum, ''Policy Guidance for Provision of Medical Care to Department of Defense Civilian Employees Injured or Wounded While Forward Deployed in Support of Hostilities'' (available at *http:// cpol.army.mil/library/nonarmy/dod_092407.pdf)*.

(d) *Blood type indicators.* A blood type indicator is an optional data element on the ID card and will only appear on the card if the blood type is provided by an authoritative data source prescribed by TRICARE Management Activity.

(e) *Organ donor indicators.* An organ donor indicator is an optional data element on the ID card and will only appear if the card applicant opts for this feature at the time of card issuance.

[79 FR 709, Jan. 6, 2014, as amended at 81 FR 74878, Oct. 27, 2016; 89 FR 11179-11180, Feb. 14, 2024]

### § 161.8  ID card life-cycle roles and responsibilities.

(a) *General.* This section provides the roles and responsibilities associated with a series of processes and systems that support the ID card life-cycle. The requirements provided in this section may be supplemented by military Service guidance, DoD Component-level procedures and DMDC procedural and system documentation on DEERS, RAPIDS, TASS, and CPR.

(b) *Separation of duties.* The ID card life-cycle includes a requirement for a separation of duties to support the issuance process. This rule requires more than one person to serve in an official role during the sponsorship and enrollment and issuance processes. Authorizing a RAPIDS SSM or VO to exercise the duties of a TASS TASM, TA, or sponsor would allow a single individual to control the ID card issuance process, from record creation to card issuance. Individuals serving in the role of a RAPIDS SSM or VO shall not exercise the role of the TASS TASM or TA or the role of the signatory sponsor on the DD Form 1172–2. (In the case of their own dependents, a RAPIDS SSM or VO can serve as the sponsor on the

DD Form 1172–2 but cannot serve as the VO for card issuance.)

(c) *DD Form 1172–2.* The DD Form 1172–2 shall be used to collect the information necessary to register ID card and CAC applicants in DEERS via RAPIDS who are not enrolled through an authorized personnel data feed or are not registered through TASS. The DD Form 577, ''Appointment/Termination Record—Authorized Signature,'' shall be used to verify the sponsoring individual's signature, when verification through RAPIDS is unavailable. This form is to be used primarily for DEERS enrollment and verification of initial and continued association for dependents and DoD affiliates (e.g., foreign national military). The DD Form 1172–2 shall also be used to add benefits conditions for eligible personnel in accordance with DMDC, ''Real-time Automated Personnel Identification System (RAPIDS) User Guide'' and subpart C of this part. Retention and disposition of the DD Form 1172–2 shall be in accordance with the uniformed services' regulatory instructions. In the absence of electronic verification of sponsorship for the enrollment or reenrollment of dependents, the sponsor signing block 65 in Section 5 of the DD Form 1172–2 for the ID card applicant:

(1) Shall be a uniformed services member, retiree, civilian employee working for the sponsoring organization, or an individual entitled to DoD benefits in their own right, without requiring relationship to another sponsor, as described in subpart C of this part.

(2) Must be a DoD ID card or CAC holder.

(3) Shall establish the applicant's initial and continued relationship to the sponsor, affiliation with DoD, and need for a CAC card in accordance with this subpart and DoD Component-level procedures.

(d) *TASS.* TASS shall serve as the sponsorship and DEERS data registration tool for CAC-eligible DoD contractors and other populations as determined by the Director, DHRA. TASS employs an automated version of the DD Form 1172–2 to collect information necessary for DEERS enrollment. Organizations that use TASS shall adhere

737

# Exhibit 16

Civil Action No. 25-cv-0952 (CKK)
(Lead Case: No. 25-cv-00946 (CKK))

# Register To Vote In Your State
# By Using This
# Postcard Form and Guide



# For U.S. Citizens

OMB Control No. 3265-0015

# General Instructions

**Who Can Use this Application**

If you are a U.S. citizen who lives or has an address within the United States, you can use the application in this booklet to:

• Register to vote in your State,

• Report a change of name to your voter registration office,

• Report a change of address to your voter registration office, or

• Register with a political party.

**Exceptions**

Please do not use this application if you live outside the United States and its territories and have no home (legal) address in this country, *or* if you are in the military stationed away from home. Use the Federal Postcard Application available to you from military bases, American embassies, or consular offices.

**New Hampshire** town and city clerks will accept this application only as a request for their own absentee voter mail-in registration form.

**North Dakota** does not have voter registration.

**Wisconsin** municipal clerks will accept this application only as a request for their own absentee voter mail-in registration form or for the purposes of the clerk directing that voter to the state's online voter registration system at https://myvote.wi.gov/en-us/.

**Wyoming** law does not permit mail registration.

**How to Find Out If You Are Eligible to Register to Vote in Your State**

Each State has its own laws about who may register and vote. Check the information under your State in the State Instructions. All States require that you be a United States citizen by birth or naturalization to register to vote in federal and State elections. Federal law makes it illegal to falsely claim U.S. citizenship to register to vote in any federal, State, or local election. You cannot be registered to vote in more than one place at a time.

**How to Fill Out this Application**

Use both the Application Instructions and State Instructions to guide you in filling out the application.

• First, read the Application Instructions. These instructions will give you important information that applies to everyone using this application.

• Next, find your State under the State Instructions. Use these instructions to fill out Boxes 6, 7, and refer to these instructions for information about voter eligibility and any oath required for Box 9.

**When to Register to Vote**

Each State has its own deadline for registering to vote. Check the deadline for your State on the last page of this booklet.

**How to Submit Your Application**

Mail your application to the address listed under your State in the State Instructions. Or, deliver the application in person to your local voter registration office. The States that are required to accept the national form will accept copies of the application printed from the computer image on regular paper stock, signed by the applicant, and mailed in an envelope with the correct postage.

**First Time Voters Who Register by Mail**

If you are registering to vote for the first time in your jurisdiction and are mailing this registration application, Federal law requires you to show proof of identification the first time you vote. Proof of identification includes:

• A current and valid photo identification or

• A current utility bill, bank statement, government check, paycheck or government document that shows your name and address.

Voters may be exempt from this requirement if they submit a **COPY** of this identification with their mail in voter registration form. If you wish to show proof of identification, please keep the following in mind:

• Your state may have additional identification requirements which may mandate you show identification at the polling place even if you meet the Federal proof of identification.

• Do not submit original documents with this application, only **COPIES**.

**If You Were Given this Application in a State Agency or Public Office**

If you have been given this application in a State agency or public office, it is your choice to use the application. If you decide to use this application to register to vote, you can fill it out and leave it with the State agency or public office. The application will be submitted for you. Or, you can take it with you to mail to the address listed under your State in the State Instructions. You also may take it with you to deliver in person to your local voter registration office.

Note: The name and location of the State agency or public office where you received the application will remain confidential. It will not appear on your application. Also, if you decide not to use this application to register to vote, that decision will remain confidential. It will not affect the service you receive from the agency or office.

# Application Instructions

Before filling out the body of the form, please answer the questions on the top of the form as to whether you are a United States citizen and whether you will be 18 years old on or before Election Day. If you answer no to either of these questions, you may not use this form to register to vote. However, state specific instructions may provide additional information on eligibility to register to vote prior to age 18.

**Box 1 — Name**
Put in this box your full name in this order — Last, First, Middle. Do not use nicknames or initials. *Note:* If this application is for a change of name, please tell us in **Box A** *(on the bottom half of the form)* your full name before you changed it.

**Box 2 — Home Address**
Put in this box your home address (legal address). Do **not** put your mailing address here if it is different from your home address. Do **not** use a post office box or rural route without a box number. Refer to state-specific instructions for rules regarding use of route numbers.

*Note:* If you were registered before but this is the first time you are registering from the address in Box 2, please tell us in **Box B** *(on the bottom half of the form)* the address where you were registered before. Please give us as much of the address as you can remember.

*Also Note:* If you live in a rural area but do not have a street address, or if you have no address, please show where you live using the map in Box C *(at the bottom of the form).*

**Box 3 — Mailing Address**
If you get your mail at an address that is different from the address in Box 2, put your mailing address in this box. If you have no address in Box 2, you **must** write in Box 3 an address where you can be reached by mail.

**Box 4 — Date of Birth**
Put in this box your date of birth in this order — Month, Day, Year. *Be careful not to use today's date!*

**Box 5 — Telephone Number**
Most States ask for your telephone number in case there are questions about your application. However, you do not have to fill in this box.

**Box 6 — ID Number**
Federal law requires that states collect from each registrant an identification number. You must refer to your state's specific instructions for item 6 regarding information on what number is acceptable for your state. If you have neither a drivers license nor a social security number, please indicate this on the form and a number will be assigned to you by your state.

**Box 7 — Choice of Party**
In some States, you must register with a party if you want to take part in that party's primary election, caucus, or convention. To find out if your State requires this, see item 7 in the instructions under your State.

If you want to register with a party, print in the box the full name of the party of your choice.

If you do not want to register with a party, write "no party" or leave the box blank. Do not write in the word "independent" if you mean "no party," because this might be confused with the name of a political party in your State.
*Note:* If you do not register with a party, you can still vote in general elections and nonpartisan (nonparty) primary elections.

**Box 8 — Race or Ethnic Group**
A few States ask for your race or ethnic group, in order to administer the Federal Voting Rights Act. To find out if your State asks for this information, see item 8 in the instructions under your State. If so, put in Box 8 the choice that best describes you from the list below:

- American Indian *or* Alaskan Native
- Asian or Pacific Islander
- Black, *not* of Hispanic Origin
- Hispanic
- Multi-racial
- White, *not* of Hispanic Origin
- Other

**Box 9 — Signature**
Review the information in item 9 in the instructions under your State. Before you sign or make your mark, make sure that:

(1) You meet your State's requirements, and
(2) You understand **all** of Box 9.

Finally, sign your **full** name or make your mark, and print today's date in this order — Month, Day, Year. If the applicant is unable to sign, put in **Box D** the name, address, and telephone number (optional) of the person who helped the applicant.

# Voter Registration Application

**Before completing this form, review the General, Application, and State specific instructions.**

| Are you a citizen of the United States of America? | ☐ Yes | ☐ No | This space for office use only. |
|---|---|---|---|
| Will you be 18 years old on or before election day? | ☐ Yes | ☐ No | |

**If you checked "No" in response to either of these questions, do not complete form.**
(Please see state-specific instructions for rules regarding eligibility to register prior to age 18.)

| 1 | ☐ Mr. ☐ Miss ☐ Mrs. ☐ Ms. | Last Name | First Name | Middle Name(s) | ☐ Jr ☐ Sr ☐ II ☐ III ☐ IV |
|---|---|---|---|---|---|

| 2 | Home Address | Apt. or Lot # | City/Town | State | Zip Code |
|---|---|---|---|---|---|

| 3 | Address Where You Get Your Mail If Different From Above | City/Town | State | Zip Code |
|---|---|---|---|---|

| 4 | Date of Birth ___ ___ ___ Month   Day   Year | 5 | Telephone Number (optional) | 6 | ID Number - (See item 6 in the instructions for your state) |
|---|---|---|---|---|---|
| 7 | Choice of Party (see item 7 in the instructions for your State) | 8 | Race or Ethnic Group (see item 8 in the instructions for your State) | | |

| 9 | I have reviewed my state's instructions and I swear/affirm that:<br>■ I am a United States citizen<br>■ I meet the eligibility requirements of my state and subscribe to any oath required.<br>■ The information I have provided is true to the best of my knowledge under penalty of perjury. If I have provided false information, I may be fined , imprisoned, or (if not a U.S. citizen) deported from or refused entry to the United States. | Please sign full name (or put mark) ▲<br><br>Date: ___ / ___ / ___   Month   Day   Year |
|---|---|---|

**If you are registering to vote for the first time:** please refer to the application instructions for information on submitting copies of valid identification documents with this form.

## Please fill out the sections below if they apply to you.

If this application is for a **change of name**, what was your name before you changed it?

| A | ☐ Mr. ☐ Miss ☐ Mrs. ☐ Ms. | Last Name | First Name | Middle Name(s) | ☐ Jr ☐ Sr ☐ II ☐ III ☐ IV |
|---|---|---|---|---|---|

If you were **registered before** but this is the first time you are registering from the address in Box 2, what was your address where you were registered before?

| B | Street (or route and box number) | Apt. or Lot # | City/Town/County | State | Zip Code |
|---|---|---|---|---|---|

If you live in a rural area but do not have a street number, or if you have no address, please show on the map where you live.

| C | ■ Write in the names of the crossroads (or streets) nearest to where you live.<br>■ Draw an X to show where you live.<br>■ Use a dot to show any schools, churches, stores, or other landmarks near where you live, and write the name of the landmark.<br><br>Example<br>Route #2   ● Grocery Store<br>Woodchuck Road<br>Public School ●   X | NORTH ↑ |
|---|---|---|

If the applicant is unable to sign, who helped the applicant fill out this application? Give name, address and phone number (phone number optional).

| D | |
|---|---|

## Mail this application to the address provided for your State.

OMB Control No. 3265-0015

# FOR OFFICIAL USE ONLY

_____    _____

_____    _____

_____    _____

_____    _____

_____    _____

_____    _____

_____    _____

_____    _____

_____    _____

_____    _____

FIRST CLASS
STAMP
NECESSARY
FOR
MAILING



_____

_____

_____

_____

OMB Control No. 3265-0015

# Voter Registration Application

**Before completing this form, review the General, Application, and State specific instructions.**

| | | |
|---|---|---|
| Are you a citizen of the United States of America? ☐ Yes ☐ No<br>Will you be 18 years old on or before election day? ☐ Yes ☐ No<br>**If you checked "No" in response to either of these questions, do not complete form.**<br>(Please see state-specific instructions for rules regarding eligibility to register prior to age 18.) | | This space for office use only. |

**1** ☐ Mr. ☐ Miss ☐ Mrs. ☐ Ms.  Last Name _____ First Name _____ Middle Name(s) _____ ☐ Jr ☐ Sr ☐ II ☐ III ☐ IV

**2** Home Address _____ Apt. or Lot # _____ City/Town _____ State _____ Zip Code _____

**3** Address Where You Get Your Mail If Different From Above _____ City/Town _____ State _____ Zip Code _____

**4** Date of Birth _____ Month Day Year

**5** Telephone Number (optional) _____

**6** ID Number - (See item 6 in the instructions for your state) _____

**7** Choice of Party (see item 7 in the instructions for your State) _____

**8** Race or Ethnic Group (see item 8 in the instructions for your State) _____

**9** I have reviewed my state's instructions and I swear/affirm that:
- I am a United States citizen
- I meet the eligibility requirements of my state and subscribe to any oath required.
- The information I have provided is true to the best of my knowledge under penalty of perjury. If I have provided false information, I may be fined , imprisoned, or (if not a U.S. citizen) deported from or refused entry to the United States.

Please sign full name (or put mark) ▲

Date: _____ Month Day Year

**If you are registering to vote for the first time:** please refer to the application instructions for information on submitting copies of valid identification documents with this form.

## Please fill out the sections below if they apply to you.

If this application is for a **change of name**, what was your name before you changed it?

**A** ☐ Mr. ☐ Miss ☐ Mrs. ☐ Ms.  Last Name _____ First Name _____ Middle Name(s) _____ ☐ Jr ☐ Sr ☐ II ☐ III ☐ IV

If you were **registered before but this is the first time you are registering from the address in Box 2**, what was your address where you were registered before?

**B** Street (or route and box number) _____ Apt. or Lot # _____ City/Town/County _____ State _____ Zip Code _____

If you live in a rural area but do not have a street number, or if you have no address, please show on the map where you live.

**C**
- Write in the names of the crossroads (or streets) nearest to where you live.
- Draw an X to show where you live.
- Use a dot to show any schools, churches, stores, or other landmarks near where you live, and write the name of the landmark.

NORTH ↑

Example

Route #2

● Grocery Store

Woodchuck Road

Public School ●

X

If the applicant is unable to sign, who helped the applicant fill out this application? Give name, address and phone number (phone number optional).

**D**

## Mail this application to the address provided for your State.

OMB Control No. 3265-0015

## FOR OFFICIAL USE ONLY

_____    _____

_____    _____

_____    _____

_____    _____

_____    _____

_____    _____

_____    _____

_____    _____

_____    _____

_____    _____

FIRST CLASS
STAMP
NECESSARY
FOR
MAILING



OFFICIAL
ELECTION MAIL
*Authorized by the U.S. Postal Service*
®

_____

_____

_____

_____

# State Instructions

## Alabama

Updated: 08-08-2024

Registration Deadline — Voter registration is closed during the fourteen days preceding an election. Applications must be post-marked or delivered by the fifteenth day prior to the election.

6. ID Number. Alabama driver's license number or Alabama nondriver identification card number. If you do not have an Alabama driver's license or nondriver identification card, you must provide the last 4 digits of your Social Security number.

7.Choice of Party. Do not complete this field. Alabama voters do not register by political party affiliation.

8.Race or Ethnic Group. You are required to fill in this box; however, your application will not be rejected if you fail to do so. See the list of choices under the Application Instructions for Box 8 (on page 2).

9.Signature. To register in Alabama you must:

• be a citizen of the United States
• be a resident of Alabama and your county at the time of registration
• be 18 years old before any election
• not have been convicted of a felony involving moral turpitude (or have had your civil and political rights restored). The list of moral turpitude felonies is available on the Secretary of State web site at:
www.sos.alabama.gov/mtfelonies

• not currently be declared mentally incompetent through a competency hearing
• swear or affirm to "support and defend the Constitution of the U.S. and the State of Alabama and further disavow any belief or affiliation with any group which advocates the overthrow of the governments of the U.S. or the State of Alabama by unlawful means and that the information contained herein is true, so help me God"

Mailing address:
Office of the Secretary of State
P.O. Box 5616
Montgomery, AL 36103-5616

## Alaska

Updated: 03-01-2006

Registration Deadline — 30 days before the election.

6. ID Number. You must provide one of the following identification numbers; Alaska Driver's License or Alaska State Identification Card Number. If you do not have an Alaska Driver's License or Alaska State Identification Card, you must provide the last four digits of your Social Security Number. If you do not have any of these identification numbers, please write "NONE" on the form. A unique identifying number will be assigned to you for voter registration purposes. This information is kept confidential. Having this information assists in maintaining your voter record and may assist in verifying your identity (Title 15 of the Alaska Statutes).

7. Choice of Party. You do not have to declare a party affiliation when registering to vote. If you do not choose a party, you will  be

registered as Undeclared.  Alaska has a closed primary  election system. Each recognized  political party has a separate ballot  listing only candidates from that  political party. Voters registered  as a member of a political party  may only vote that party's ballot.  Voters registered as undeclared  or non-partisan may choose one  ballot from the ballots available.

8.Race or Ethnic Group. Leave blank.

9.Signature. To register in Alaska you must:
• be a citizen of the United States
• be at least 18 years old within 90 days of completing this registration
• be a resident of Alaska
• not be a convicted felon (unless unconditionally discharged)
• not be registered to vote in another State

Mailing address:
Division of Elections  State of Alaska  PO Box 110017
Juneau, AK 99811-0017

## Arizona

Updated: 03-01-2006

Registration Deadline — 29 days before the election.

6. ID Number. Your completed voter registration form must contain the number of your Arizona driver license, or non-operating identification license issued pursuant to A.R.S. § 28-3165, if the license is current and valid. If you *do not have* a current and valid Arizona driver license or non-operating identification license, you must

# State Instructions

include the last four digits of your social security number if one has been issued to you. If you do not have a current and valid driver license or non-operating identification license or a social security number, please write "NONE" on the form. A unique identifying number will be assigned by the Secretary of State.

7. Choice of Party. If you are registered in a political party which has qualified for ballot recognition, you will be permitted to vote the primary election ballot for that party. If you are registered as an independent, no party preference or as a member of a party which is not qualified for ballot recognition, you may select and vote one primary election ballot for one of the recognized political parties.

8. Race or Ethnic Group. Leave blank.

9. Signature. To register in Arizona you must:
• be a citizen of the United States
• be a resident of Arizona and your county at least 29 days preceding the next election
• be 18 years old on or before the next general election
• not have been convicted of treason or a felony (or have had your civil rights restored)
• not currently be declared an incapacitated person by a court of law

Mailing address:
   Secretary of State/Elections
   1700 W. Washington, 7th Floor
   Phoenix, AZ 85007-2888

## Arkansas

Updated: 03-01-2006

Registration Deadline — 30 days before the election.

6. ID Number. Your completed voter registration form must contain your state issued driver's license number or nonoperating identification number. If you do not have a driver's license or nonoperating identification, you must include the last four digits of your social security number. If you do not have a driver's license or a nonoperating identification or a social security number, please write "NONE" on the form. A unique identifying number will be assigned by the State.

7. Choice of Party. Optional. You do not have to register with a party if you want to take part in that party's primary election, caucus, or convention.

8. Race or Ethnic Group. Leave blank.

9. Signature. To register in Arkansas you must:
• be a citizen of the United States
• live in Arkansas at the address in Box 2 on the application
• be at least 18 years old before the next election
• not be a convicted felon (or have completely discharged your sentence or been pardoned)
• not claim the right to vote in any other jurisdiction
• not previously be adjudged mentally incompetent by a court of competent jurisdiction

Mailing address:
   Secretary of State
   Voter Services
   P.O. Box 8111
   Little Rock, AR 72203-8111

## California

Updated: 10-10-2021

Registration Deadline — 15 days before the election; conditional

voter registration up to and including Election Day.

6. ID Number. When you register to vote, you must provide your California driver's license or California identification card number, if you have one. If you do not have a driver's license or ID card, you must provide the last four digits of your Social Security Number (SSN). If you do not include this information, you will be required to provide identification when you vote if it is your first time voting in a federal election.

7. Choice of Party. If you wish to choose a party preference, please enter the name of the political party. If you do not want to choose a political party, enter "No Party Preference" in the space provided. California law allows voters who choose "No Party Preference" or have chosen a preference for a nonqualified political party to vote in the presidential primary election of any qualified political party that files a notice with the Secretary of State allowing them to do so. You can call 1-800-345-VOTE or visit www.sos.ca.gov to learn which political parties allow "No Party Preference" voters and voters who have disclosed a preference for a nonqualified political party to participate in their presidential primary election.

8. Race or Ethnic Group. Leave blank.

9. Signature. To register in California you must:
• be a citizen of the United States
• be a resident of California
• be at least 16 years old, but you must be 18 years of age or older on the date of the election at which you intend to vote

# State Instructions

not currently serving a state or federal prison term for the conviction of a felony
• not currently found to be mentally incompetent to vote by a court

Your signature is required. If you meet the requirements listed above, please sign and date the registration card in the space provided.

Mailing address:
   Secretary of State
   Elections Division
   1500 11th Street, 5th Floor
   Sacramento, CA 95814

## Colorado

Updated: 1-8-2024

Registration Deadline — You may register up to, and on, Election Day. You must register 8 days or more before election day to have a ballot mailed to you. If you register less than 8 days before election day, then you must appear in person in your county to vote.

6.ID Number. Your completed voter registration form must contain your state issued driver's license number or identification number. If you do not have a driver's license or state issued identification, you must include the last four digits of your social security number. If you do not have a driver's license or a state issued identification or a social security number, please write "NONE" on the form. A unique identifying number will be assigned by the State.
7.Choice of Party. You may register with a party. If you leave this section blank you will not be registered with any party.

8.Race or Ethnic Group. Leave blank.
9.Signature. To register in Colorado you must:
• be a citizen of the United States
• be a resident of Colorado for at least 22 days immediately before the Election in which you intend to vote
• be at least 16 years old, but you must be 18 years of age or older on the date of the election at which you intend to vote
• not be serving a sentence for a felony conviction

Mailing address:
   Colorado Secretary of State
   1700 Broadway, Suite 550
   Denver, Colorado 80290

## Connecticut

Updated: 09-03-2019

Registration Deadline — postmarked seven (7) days before the election; postmarked five (5) days before the primary.

6.ID Number. Connecticut Driver's License Number, or if none, the last four digits of your Social Security Number.
7.Choice of Party. This is optional, but you must register with a party if you want to take part in that party's primary election, caucus, or convention.
8.Race or Ethnic Group. Leave blank.
9.Signature. To register in Connecticut you must:
• be a citizen of the United States
• be a resident of Connecticut and of the town in which you wish to vote
• be 17 years old. 17 year olds who will turn 18 on or before

Election Day, may participate in the general primary.
• have completed confinement and parole if previously convicted of a felony, and have had your voting rights restored by Registrars of Voters
• not currently be declared mentally incompetent to vote by a court of law

Mailing address:
   Secretary of the State of
   Connecticut
   Elections Division
   P.O. Box 150470
   Hartford, CT 06115-0470

## Delaware

Updated: 04-18-2018

Registration Deadline — The 4th Saturday before a primary or general election, and 10 days before a special election.

6.ID Number. Your completed voter registration form must contain your state issued driver's license number or nonoperating identification number. If you do not have a driver's license or nonoperating identification, you must include the last four digits of your social security number. If you do not have a driver's license or a nonoperating identification or a social security number, please write "NONE" on the form. A unique identifying number will be assigned by the State.
7.Choice of Party. You must register with a party if you want to take part in that party's primary election, caucus, or convention.
8.Race or Ethnic Group. Leave blank.
9.Signature. You may register to vote in Delaware if you:

# State Instructions

• are a citizen of the United States, AND

• are a resident of Delaware; (Delaware is your home), AND

• will be 18 years old on or before the date of the next General Election.

You may not register to vote in Delaware if you:

• have been adjudged mentally incompetent. Adjudged mentally incompetent refers to a specific finding in a judicial guardianship or equivalent proceeding, based on clear and convincing evidence that the individual has a severe cognitive impairment which precludes exercise of basic voting judgment; OR

• were convicted of a felony and have not completed your sentence, OR

• were convicted of a disqualifying* felony and have not been pardoned.

 *List of Disqualifying Felonies:
 • murder or manslaughter, (except vehicular homicide);
 • any felony constituting an offense against public administration involving bribery or improper influence or abuse of Office, or any like offense under the laws of any state or local jurisdiction, or of the United States, or of the District of Columbia; or
 • any felony constituting a sexual offense, or any like offense under the laws of any state or local jurisdiction or of the United States or of the District of Columbia.

Mailing address:
 State of Delaware
 Office of the State Election Commissioner
 905 S. Governors Ave., Suite 170
 Dover, DE 19904

## District of Columbia

Updated: 10-10-2021

Registration Deadline — 21 days before the election if registering by mail, online, or via mobile app, but a voter may register in-person during early voting and on Election Day.

6.  ID Number. Federal law now requires that all voter registration applications must include either the applicant's driver's license number or the last four digits of the applicant's social security number in order to be processed.
7.  Choice of Party. You must register with a party if you want to take part in that party's primary election, caucus, or convention.
8.  Race or Ethnic Group. Leave blank.
9.  Signature. To vote in the District of Columbia you must:
• Be a United States citizen
• Be a resident of the District of Columbia
• Maintain residency in the District of Columbia for at least 30 days prior to the election in which you intend to vote
• Not claim voting residence or the right to vote in another U.S. state or territory
• Be at least 17 years old (You may register to vote if you are at least 16 years old. You may vote in a primary election if you are at least 17 years old and you will be at least 18 years old by the next general election. You may vote in a general or special election if you are at least 18 years old).
• Not have been found by a court to be legally incompetent to vote
Mailing address:

District of Columbia Board of Elections
1015 Half Street, SE, Suite 750
Washington, DC 20003

## Florida

Updated: 11-30-2011

Registration Deadline — 29 days before the election.

6.  ID Number. If you have one, you must provide your Florida driver's license number or Florida identification card number. If you do not have a Florida driver's license or identification card, you must provide the last four digits of your social security number. If you have not been issued any of these numbers, you must write the word "NONE."
7.  Choice of Party. You must register with a party if you want to take part in that party's primary election, caucus, or convention.
8.  Race or Ethnic Group. You are requested, but not required, to fill in this box. See the list of choices under the Application Instructions for Box 8 (on page 2).
9.  Signature. To register in Florida you must:
• be a citizen of the United States
• be a legal resident of both the State of Florida and of the county in which you seek to be registered
• be 18 years old (you may pre-register if you are at least 16)
• not be adjudicated mentally incapacitated with respect to voting in Florida or any other State, or if you have, you must first have your voting rights restored.
• not be a convicted felon, or if you are, you must first have your civil rights restored if they were taken away.

# State Instructions

"I will protect and defend the Constitution of the United States and the Constitution of the State of Florida, that I am qualified to register as an elector under the Constitution and laws of the State of Florida, and that all information in this application is true."

Mailing address:
State of Florida
Department of State
Division of Elections
The R.A. Gray Building
500 South Bronough St, Rm 316
Tallahassee, Florida 32399-0250

## Georgia

Updated: 08-15-2013

Registration Deadline — The fifth Monday before any general primary, general election, or presidential preference primary, or regularly scheduled special election pursuant to the Georgia Election Code. In the event that a special election is scheduled on a date other than those dates prescribed by the Georgia Election Code, registration would close on the 5th day after the call.

6. ID Number. Federal law requires you to provide your full GA Drivers License number or GA State issued ID number. If you do not have a GA Drivers License or GA ID you must provide the last 4 digits of your Social Security number. Providing your full Social Security number is optional. Your Social Security number will be kept confidential and may be used for comparison with other state agency databases for voter registration identification purposes. If you do not possess a GA Drivers License or Social Security number, a unique identifier will be provided for you.

7. Choice of Party. You do not have to register with a party to take part in that party's primary, caucus or convention.

8. Race or Ethnic Group. You are requested to fill in this box. See the list of choices under the Application Instructions for Box 8 (on page 2).

9. Signature. To register in Georgia you must:
• be a citizen of the United States
• be a legal resident of Georgia and of the county in which you want to vote
• be 18 years old within six months after the day of registration, and be 18 years old to vote
• not be serving a sentence for having been convicted of a felony
• not have been judicially determined to be mentally incompetent, unless the disability has been removed

Mailing address:
Elections Division
Office of the Secretary of State
2 Martin Luther King Jr. Drive
Suite 802 Floyd West Tower
Atlanta, Georgia 30334

## Hawaii

Updated: 10-10-2021

Registration Deadline — 10 days before the election.

6. ID Number. When you register to vote, you must provide your Hawaii driver's license or State identification number, if you have one. If you do not have a driver's license or ID number, you must provide the last four digits of your Social Security Number (SSN). If you do not have any of this information, the Clerk's Office will issue you a unique identification number, which will serve to identify you for voter registration purposes.

7. Choice of Party. A "choice of party" is not required for voter registration.

8. Race or Ethnic Group. Race or ethnic group information is not required for voter registration.

9. Signature. To register in Hawaii you must:
• be a citizen of the United States
• be a resident of the State of Hawaii
• be at least 16 years old (you must be 18 years old by election day in order to vote)
• not be incarcerated for a felony conviction
• not be adjudicated by a court as "non compos mentis"

Mailing address:
Office of Elections State
of Hawaii
802 Lehua Avenue
Pearl City, HI 96782

## Idaho

Updated: 06-27-2022

Registration Deadline — 25 days before the election.

6. ID Number. Enter the number from your Idaho driver's license card or state identification card issued by the Idaho Transportation Department. If you have no such card, enter the last 4 digits of your social security number.

7. Choice of Party. Unless the political party chooses to have an open primary, affiliating with a political party is required if you wish to participate in a party's primary election.

8. Race or Ethnic Group. Leave blank.

9. Signature. To register in Idaho you must:

# State Instructions

• be a citizen of the United States
• have resided in Idaho and in the county for 30 days prior to the day of election
• be at least 18 years old
• not have been convicted of a felony, and without having been restored to the rights of citizenship, or confined in prison on conviction of a criminal offense

Mailing address:
    Secretary of State
    P.O. Box 83720 State
    Capitol Bldg.
    Boise, ID 83720-0080

## Illinois

Updated: 09-03-2019

Registration Deadline — Online Registration is available until 16 days before the election and in-person registration is available through Election Day.

6. ID Number. Illinois requires either the Driver's License (or Secretary of State ID Card) or the last 4 digits of Social Security Number. For people who do not have either of those items, and have not registered in Illinois before, a mail in registration form should be accompanied by a copy of other identifying information: you must send, with this application, either (i) a copy of a current and valid photo identification, or (ii) a copy of a current utility bill, bank statement, government check, paycheck, or other government document that shows the name and address of the voter. If you do not provide the information required above, then you will be required to provide election officials with either (i) or

(ii) described above the first time you vote at a voting place.
7. Choice of Party. Leave Blank. Exception: for primary elections, unless a voter only wishes to vote on public questions, a party preference should be indicated.
8. Race or Ethnic Group. Leave blank.
9. Signature. A signature is required. If signature is missing from registration form, you will be notified your registration is incomplete.
To register in Illinois you must:
• be a citizen of the United States
• be a resident of Illinois and of your election precinct at least 30 days before the next election
• be at least 18 years old on or before the next General Election or Consolidated Election
• cannot be serving a sentence of confinement in any penal institution as a result of conviction of any crime
• not claim the right to vote anywhere else

Preregistration for 17 Year Olds. Illinois permits registration by a 17 year old person who will be 18 on or before the General Election (or the Consolidated Election, the odd year election for city, township, school board and other local Offices) to register and vote in the General Primary (or Consolidated Primary) which will nominate candidates for that next following General Election (or Consolidated Election).

Mailing address:
    State Board of Elections
    2329 S. MacArthur Boulevard
    Springfield, IL 62704

## Indiana

Updated: 03-01-2006

Registration Deadline — 29 days before the election.

6. ID Number. Your state voter ID number is your ten digit Indiana issued driver's license number. If you do not possess an Indiana driver's license then provide the last four digits of your social security number. Please indicate which number was provided. (Indiana Code 3-7-13-13)
7. Choice of Party. Leave blank.
8. Race or Ethnic Group. Leave blank.
9. Signature. To register in Indiana you must:
• be a citizen of the United States
• have resided in the precinct at least 30 days before the next election
• be at least 18 years of age on the day of the next general election
• not currently be in jail for a criminal conviction

Mailing address:
    Election Division
    Office of the Secretary of State
    302 West Washington Street, Room E204
    Indianapolis, IN 46204

## Iowa

Updated: 11-24-2023

Registration Deadline — Must be delivered by 5 p.m. 15 days before the election.* Registration forms which are postmarked 15 or more days before an election are considered on time even if received after the deadline.

*If you fail to meet the voter registration deadlines above you can register and vote by following the guidelines for election day

# State Instructions

registration. You can find these on the Iowa Secretary of State's website: https://sos.iowa.gov/elections/voterinformation/edr.html.

6. ID Number. Your ID number is your Iowa driver's license number or Iowa non-operator identification number if you have one; if not then the last four digits of your social security number. The ID number you provide will be verified with the Iowa Department of Transportation or the Social Security Administration.

7. Choice of Party. You may, but do not have to, register with a party in advance if you want to participate in that party's primary election. You may change or declare a party affiliation at the polls on primary election day.

8. Race or Ethnic Group. Leave blank.

9. Signature. To register in Iowa you must:
• be a citizen of the United States
• be a resident of Iowa
• be at least 17 years old; a person may vote if they will be 18 years old on or before election day. In the case of primary elections, a person may vote if they will be 18 years old on or before the corresponding regular election.
• not have been convicted of a felony or have had your rights restored by the Governor, including through Executive Order, after a felony conviction.
• not currently be judged by a court to be "incompetent to vote"
• not claim the right to vote in more than one place
• give up your right to vote in any other place

Mailing address:
Elections Division
Office of the Iowa Secretary of State
Lucas Building- First Floor
321 E. 12th Street
Des Moines, IA 50319

## Kansas

Updated: 10-25-2013

Registration Deadline — Postmarked or delivered 21 days before the election

6. ID Number. Your completed voter registration form must contain your state issued driver's license number or nondriver's identification card number. If you do not have a driver's license or nondriver's identification card, you must include the last four digits of your social security number. If you do not have a driver's license or a nondriver's identification card or social security number, please write "NONE" on the form. A unique identifying number will be assigned by the State. The number you provide will be used for administrative purposes only and will not be disclosed to the public. (KSA 25-2309).

7. Choice of Party. You must register with a party if you want to take part in that party's primary election, caucus, or convention.

8. Race or Ethnic Group. Leave blank.

9. Signature. To register in Kansas you must:
• be a citizen of the United States
• be a resident of Kansas
• be 18 by the next election

• have completed the terms of your sentence if convicted of a felony; a person serving a sentence for a felony conviction is ineligible to vote
• not claim the right to vote in any other location or under any other name
• not be excluded from voting by a court of competent jurisdiction

Mailing address:
Secretary of State
1st Floor, Memorial Hall
120 SW 10th Ave.
Topeka, KS 66612-1594

## Kentucky

Updated: 03-01-2006

Registration Deadline — 29 days before the election.

6. ID Number. Your full social security number is required. It is used for administrative purposes only and is not released to the public (KRS 116.155). No person shall be denied the right to register because of failure to include social security number.

7. Choice of Party. You must register with a party if you want to take part in that party's primary election, caucus, or convention.

8. Race or Ethnic Group. Leave blank.

9. Signature. To register in Kentucky you must:
• be a citizen of the United States
• be a resident of Kentucky
• be a resident of the county for at least 28 days prior to the election date

# State Instructions

• be 18 years of age on or before the next general election
• not be a convicted felon or if you have been convicted of a felony, your civil rights must have been restored by executive pardon
• not have been judged "mentally incompetent" in a court of law
• not claim the right to vote anywhere outside Kentucky

Mailing address:
State Board of Elections 140 Walnut Street Frankfort, KY 40601-3240

## Louisiana

Updated: 02-28-2019

Registration Deadline — 30 days before the election.

6. ID Number. You must provide your Louisiana driver's license number or Louisiana special identification card number, if issued. If not issued, you must provide at least the last four digits of your social security number, if issued. The full social security number may be provided on a voluntary basis. If the applicant has neither a Louisiana driver's license, a Louisiana special identification card, or a social security number, the applicant shall attach one of the following items to his application: (a) a copy of a current and valid photo identification; or (b) a copy of a current utility bill, bank statement, government check, paycheck, or other government document that shows the name and address of applicant. Neither the registrar nor the Department of State shall disclose the social security number of a registered voter or circulate the social security numbers of registered voters on commercial lists (R.S. 18:104 and 154; 42 U.S.C. § 405).

7. Choice of Party. If you do not list a party affiliation, you may not be able to vote in the Presidential Preference Primary and party committee elections. Political party affiliation is not required for any other election.
8. Race or Ethnic Group. Completing this box is optional. See the list of choices under the Application Instructions for Box 8 (on page 2).
9. Signature. To register in Louisiana you must:
• be a citizen of the United States
• be a resident of Louisiana (Residence address must be address where you claim homestead exemption, if any, except for a resident in a nursing home or veteran's home who may elect to use the address of the nursing home or veterans' home or the home where he has a homestead exemption. A college student may elect to use his home address or his address while away at school.)
• be at least 17 years old (16 years old if registering to vote with application for Louisiana driver's license or in person at registrar of voters Office), and be 18 years old prior to the next election to vote
• not currently be under an order of imprisonment for conviction of a felony; or if under such an order (1) not have been incarcerated pursuant to the order within the last five years and (2) not be under an order of imprisonment related to a felony conviction for election fraud or any other election offense pursuant to R.S. 18:1461.2
• not be under a judgment of full interdiction for mental incompetence or limited interdiction where your right to vote has been suspended

Mailing address:
Secretary of State
Attention: Elections Division
P.O. Box 94125
Baton Rouge, LA 70804-9125

## Maine

Updated: 08-05-2024

Registration Deadline — Delivered to your municipality 21 days before the election (or a voter may register *in-person* up to and including election day).

6. ID Number. You must list your valid Maine driver's license number. If you don't have a valid Maine driver's license, then you must provide the last four digits of your Social Security Num-ber. Voters who don't have either of these forms of ID must write "NONE" in this space.
7. Choice of Party. Unenrolled voters may choose to take part in one party's primary election, caucus, or convention without enrolling in that party.
8. Race or Ethnic Group. Leave blank.
9. Signature. To register in Maine you must:
• be a citizen of the United States
• be a resident of Maine and the municipality in which you want to vote
• be at least 16 years old (you must be 18 years old to vote, or 17 years old for a Primary Election in which you will be 18 years old by that General Election)

B. Prior address. Prior address is a required section for Maine voter registration. If you were previously registered to vote, whether in Maine or not, the address of prior registration is required to register to vote. If you have not been previously registered, write N/A.

# State Instructions

Mailing address:
Elections Division Bureau of Corporations,
Elections and Commissions,
184 State House Station,
Augusta, ME 04333-0184

Municipal addresses: To meet registration deadlines, especially in the two weeks before the closed period (three weeks before an election) you should return the completed voter registration application directly to your municipal clerk. A complete list of municipal clerks is available at https://www.maine.gov/sos/cec/elec/.

## Maryland

Updated: 10-10-2021

Registration Deadline — In-person registration by 5:00 p.m., online registration by 11:59 p.m., or postmarked 21 days before the election.

6. ID Number. If you do not have a current, valid Maryland driver's license or MVA ID card, you must enter the last 4 digits of your social security number. The statutory authority allowing officials to request the last 4 digits of your social security number is Election Law Article, § 3-202.

The number will only be used for registration and other administrative purposes. It will be kept confidential.

7. Choice of Party. You must register with a party if you want to take part in that party's primary election.

8. Race or Ethnic Group. Leave blank.

9. Signature. To register in Maryland you must:

- be a U.S. citizen
- be a Maryland resident
- be at least 16 years old*
- not be under guardianship for mental disability or if you are, you have not been found by a court to be unable to communicate a desire to vote
- not have been convicted of buying or selling votes
- not have been convicted of a felony, or if you have, you have completed serving a court ordered sentence of imprisonment.

*You may register to vote if you are at least 16 years old but cannot vote unless you will be at least 18 years old by the next general election.

Mailing address:
State Board of Elections
P.O. Box 6486
Annapolis, MD 21401-0486

## Massachusetts

Updated: 09-03-2019

Registration Deadline — 20 days before the election.

6. ID Number. Federal law requires that you provide your driver's license number to register to vote. If you do not have a current and valid Massachusetts' driver's license then you must provide the last four (4) digits of your social security number. If you have neither, you must write "NONE" in the box and a unique identifying number will be assigned to you.

7. Choice of Party. If you do not designate a party or political designation in this box, you will be registered as unenrolled, which is commonly referred to as independent. Unenrolled voters and voters registered in political designations may vote in party primaries.

8. Race or Ethnic Group. Leave blank.

9. Signature. To register in Massachusetts you must:

- be a citizen of the United States
- be a resident of Massachusetts
- be at least 16 years old (must be 18 years old to vote on Election Day)
- not have been convicted of corrupt practices in respect to elections
- not be under guardianship with respect to voting
- not be currently incarcerated for a felony conviction

Mailing address:
Secretary of the Commonwealth
Elections Division, Room 1705
One Ashburton Place
Boston, MA 02108

## Michigan

Updated: 09-17-2024

Registration Deadline — Postmarked at least 15 days before the election; or delivered in person to your city or township clerk by 8 p.m. on Election Day. If you are registering within 14 days of an election, you must provide residency verification to be eligible for that election.

6. ID Number. Your completed voter registration form must contain your state issued driver's license number or state issued personal identification card number. If you do not have a driver's license or state issued personal identification card, you must include the last four digits of your social security number. If you do not have a driver's license or a state issued personal identification card or a social security number,

# State Instructions

please write "NONE" on the form. A unique identifying number will be assigned by the State.

7. Choice of Party. A "choice of party" is not required for voter registration.

8.Race or Ethnic Group. Leave blank.

9.Signature. To register in Michigan you must:

• be a citizen of the United States
• be 18 years old by the next election
• be a resident of Michigan and at least a 30 day resident of your city or township by election day
• not be confined in a jail after being convicted and sentenced

Preregistration for 16 year olds— To preregister in Michigan you must:

• be a citizen of the United States
• be at least 16 years of age but less than 17.5 years of age
• be a resident of Michigan and a resident of the city or township in which you are applying for preregistration.

A person who is preregistered to vote automatically becomes a registered voter on their 18th birthday. If you are using this form to preregister to vote, mark "yes" to the question "Will you be 18 years old on or before election day?" if you will be 18 years old at the first election in which you will vote.

*Notice:* If a voter possesses a Michigan driver license (DL) or personal ID (PID), Michigan law requires the same address be used for voter registration and DL/PID purposes. Use of this form will also change your DL/PID address. The Secretary of State will mail you a new address sticker for your DL/PID.

Mailing address:

Mail or deliver this completed application directly to your city or township clerk. Find your city or township clerk's address at Michigan.gov/Vote. If you are unable to find your city or township clerk's address, mail to:

   Michigan Department of State
   Bureau of Elections
   P.O. Box 20126
   Lansing, MI 48901-0726

## Minnesota

Updated 11/24/2023

Registration Deadline — Delivered by 5:00 p.m. 21 days before the election (there is also election day registration at polling places).

6.ID Number. You are required to provide your Minnesota driver's license or state ID number to register to Vote. If you do not have a Minnesota driver's license or state ID then you will have to provide the last four digits of your social security number. If you have neither, please write "none" on the form.

7.Choice of Party. Leave blank.

8.Race or Ethnic Group. Leave blank.

9.Signature. To register in Minnesota you must:

• be a citizen of the United States
• maintain residence in Minnesota for 20 days before the next election
• maintain residence at the address given on the registration form
• be at least 16 years old and understand that you must be at least 18 years old to be eligible to vote.
• not be currently incarcerated for a conviction of a felony offense
• not be under a court-ordered guardianship in which the right to

vote has been revoked
• not be found by a court to be legally incompetent to vote.

Mailing address:
   Secretary of State
   First National Bank Building
   332 Minnesota Street. Suite N201
   Saint Paul. MN 55101

You may also register online or find more information at mnvotes.gov/register.

## Mississippi

Updated: 05-07-2010

Registration Deadline — 30 days before the election.

6.ID Number. You are required to provide your current and valid driver's license number or, if you don't have one, the last four digits of your social security number.

7.Choice of Party. Mississippi does not have party registration. Therefore you do not have to register with a party if you want to take part in that party's primary election, caucus, or convention.

8.Race or Ethnic Group. Leave blank.

9.Signature. To register in Mississippi you must:

• be a citizen of the United States
• have lived in Mississippi and in your county (and city, if applicable) 30 days before the election in which you want to vote
• be 18 years old by the time of the general election in which you want to vote
• have not been convicted of murder, rape, bribery, theft, arson, obtaining money or goods under false pretense, perjury, forgery, embezzlement, armed robbery, extortion, felony bad check, felony shoplifting, larceny, receiving stolen property, robbery, timber larceny, unlawful taking of a motor

# State Instructions

vehicle, statutory rape, carjacking, or bigamy, or have had your rights restored as required by law
• not have been declared mentally incompetent by a court

*Note:* State law changed by federal court order in 1998 and by state legislation in 2000. We now accept the form as registration for voting for <u>all</u> state and federal Offices.

Mailing address:
    Secretary of State
    P.O. Box 136
    Jackson, MS 39205-0136

Local county addresses:
You also may return completed applications to the county circuit clerk/registrar where you reside. A complete list of county circuit clerk/registrars is available on Mississippi's website at www.sos. ms.gov.

## Missouri

Updated: 09-12-2006

Registration Deadline — 28 days before the election.

6.ID Number. Your completed voter registration form must contain your state issued driver's license number. Your completed voter registration form must also include the last four digits of your social security number. (Section 115.155, RSMo). If you do not have a driver's license or a social security number, please write "NONE" on the form. A unique identifying number will be assigned by the State. Any electronic media, printouts or mailing labels provided under this section shall not include telephone numbers and social security

numbers of voters. (Section 115.157, RSMo).
7. Choice of Party. You do not have to register with a party if you want to take part in that party's primary election, caucus, or convention.
8.Race or Ethnic Group. Leave blank.
9.Signature. To vote in Missouri you must:
•  be a citizen of the United States
•  be a resident of Missouri
•  be at least 17-1/2 years of age (you must be 18 to vote)
•  not be on probation or parole after conviction of a felony, until finally discharged from such probation or parole
•  not be convicted of a felony or misdemeanor connected with the right of suffrage
•  not be adjudged incapacitated by any court of law
•  not be confined under a sentence of imprisonment

Mailing address:
    Secretary of State
    P.O. Box 1767
    Jeferson City, MO 65102-1767

## Montana

Updated: 03-15-2022

Registration Deadline — Regular registration closes 30 days before the election. A prospective elector may register or change the existing elector's voter information after the close of regular registration and be eligible to vote in the election if the election administrator in the county where the elector resides receives and verifies the elector's voter registration information prior to noon the day before the election.

6.ID Number. You must provide your Montana (MT) Driver's License number, MT Identification (ID) card number, or the last 4 digits of your Social Security number (SSN). If you are unable to provide the preceding forms of identification, you can provide a United States passport, Montana tribal ID card, military ID card, or Montana concealed carry per-mit when you register; or submit a photo identification, including, but not limited to, a school district or postsecondary education photo identification with your name on it, and a current utility bill, bank statement, paycheck, government check, or other government document that shows your name and current address. *For information on voter registration ID please visit https:// sosmt.gov/voter-id/voter-registration-id-op-tions/
7.Choice of Party. Montana does not require party registration to participate in any election.  8.Race or Ethnic Group. Leave blank.

9.Signature. To register in Montana you must:
•  be a citizen of the United States
•  be at least 18 years old on or before the election
•  be a resident of Montana and of the county in which you want to vote for at least 30 days before the next election
•  not be in a penal institution for a felony conviction
•  not currently be determined by a court to be of unsound mind
•  meet these qualifications by the next election day if you do not cur-rently meet them

Mailing address:
Mail your completed registration form to your local county election

# State Instructions

office. The county contact information can be found on the Montana Secretary of State's website: Election-Officials-Master-Email-List (sosmt.gov). If you have difficulty finding your county election office, contact the Montana Secretary of State Elections and Voter Services Division for assistance at (888) 884-8683 or (406) 444-9608, or email soselections@mt.gov. (Note: Registrations may be sent to the Montana Secretary of State's Office, however, to avoid potential delays, we recommend you return your completed voter registration application directly to your county elections office.)

    Secretary of State's Office
    P.O. Box 202801
    Helena, MT 59620-2801

## Nebraska

Updated: 10-17-2024

Registration Deadline — The third Friday before the election (or delivered by 6 p.m. on the second Friday before the election).

6. ID Number. You must provide your Nebraska driver's license number. If you do not have a Nebraska driver's license number then you must list the last four digits of your social security number.
7. Choice of Party. You must register with a party if you want to take part in that party's primary election, caucus, or convention.
8. Race or Ethnic Group. Leave blank.
9. Signature. To register in Nebraska you must:
• be a citizen of the United States
• be a resident of Nebraska

• be at least 18 years of age or will be 18 years of age on or before the first Tuesday after the first Monday of November
• not have been convicted of a felony, or if convicted, you have completed your sentence for the felony, including any parole term
• not have been officially found to be mentally incompetent

Mailing address:
    Nebraska Secretary of State
    Suite 2300, State Capitol Bldg.
    Lincoln, NE 68509-4608

## Nevada

Updated: 05-01-2020

Registration Deadline — The deadline for mail-in or in-person voter registration is the fourth Tuesday before any primary or general election. This is the date by which: (1) a mail-in voter registration application must be postmarked; or (2) a person must appear in person at the Office of the County Clerk/ Registrar of Voters. The deadline for online voter registration at www.RegisterToVoteNV.gov is the Tuesday preceding the primary or general election. Eligible voters who miss the voter registration deadlines can register to vote in person at the polling place either during early voting or on election day.

6. ID Number. You must supply a Nevada driver's license number or Nevada ID card number if you have been issued one by the DMV. If you do not have a valid Nevada driver's license or Nevada ID card, you must supply the last four digits of your Social Security Number. If you do not have a valid Neva-

da driver's license or Nevada ID card or a Social Security Number, please contact your County Clerk/ Registrar of Voters to be assigned a unique identifier.
7. Choice of Party. You must register with a major political party if you want to take part in that party's primary election, caucus, or convention. If you register with a minor political party or as a nonpartisan, you will receive a nonpartisan ballot for the primary election.
8. Race or Ethnic Group. Leave blank.
9. Signature. To register in Nevada you must:
• Be a citizen of the United States;
• Have attained the age of 18 years on the date of the next election;
• Have continuously resided in the State of Nevada, in your county, at least 30 days and in your precinct at least 10 days before the next election;
• Not be currently serving a term of imprisonment for a felony conviction;
• Not be determined by a court of law to be mentally incompetent; and
• Claim no other place as your legal residence.

Preregistration for 17 Year Olds — A person who is 17 years of age or older but less than 18 years of age and meets all other qualifications to vote in Nevada can preregister to vote using any of the means available for a person to register to vote. A person who is preregistered to vote automatically becomes a registered voter on his or her 18th birthday.

Felony Convictions — Any Nevada resident who is convicted

# State Instructions

of a felony is immediately restored the right to vote upon the individual's release from prison. There is no waiting period or action required by the individual. The restoration of voting rights is automatic and immediate upon the individual's release from prison, regardless of the category of felony committed or whether the individual is still on either parole or probation. More information regarding the restoration of voting rights can be found on the Nevada Secretary of State's website at:
www.nvsos.gov.

Mailing address:
    Secretary of State Elections Division
    101 North Carson Street, Suite 3
    Carson City, NV 89701-4786

Voter registration applications may be returned to the Secretary of State's office at the address above, but to avoid possible delays, you are advised to return your completed voter registration application directly to your local county election official.

Local county addresses: To meet registration deadlines, especially during the two weeks before the mail-in voter registration deadline, you should return completed voter registration applications to your respective County Clerk/ Registrar of Voters. A complete list of County Clerks and Registrars of Voters is available on the Nevada Secretary of State's website: www.nvsos.gov.

## New Hampshire

Updated: 03-01-2006

Registration Deadline — New Hampshire town and city clerks will accept this application only as a request for their own absentee voter mail-in registration form, which must be received by your city or town clerk by 10 days before the election. You need to fill in only Box 1 and Box 2 or 3.

The application should be mailed to your town or city clerk at your zip code. These addresses are listed on the Secretary of State web site at www.state.nh.us/sos/clerks.htm

It should be mailed in plenty of time for your town or city clerk to mail you their own form and for you to return that form to them by 10 days before the election.

## New Jersey

Updated: 03-28-2008

Registration Deadline — 21 days before the election.

6. ID Number. The last four digits of your Social Security number OR your New Jersey Driver's License number is required for voter registration. If you do not possess either of these identifications, please write "NONE" on the form. The State will assign a number that will serve to identify you for voter registration purposes.

7. Choice of Party. New Jersey's voter registration form does not provide a check-of for political party affiliation. A newly registered voter or voter who has never voted in a political party primary election can declare party affiliation at the polling place on the day of a primary election. In New Jersey, a primary election is only held for the Democratic and Republican parties. A voter may also file a political party declaration form to become a member of a political party. If a declared voter wished to change party affiliation he or she must file a declaration form 50 days before the primary election, in order to vote.

8. Race or Ethnic Group. Leave blank.

9. Signature. To register in New Jersey you must:
• be a citizen of the United States
• be at least 18 years of age by the time of the next election
• be a resident of this State and county at your address at least 30 days before the next election
• not be serving a sentence or on parole or probation as the result of a conviction of any indictable offense under the laws of this or another state or of the United States

Mailing address:
    New Jersey Department of Law and Public Safety Division of Elections
    PO BOX 304
    Trenton, NJ 08625-0304

## New Mexico

Updated: 10-02-2024

Registration Deadline — 28 days before the election.

# State Instructions

6.ID Number. You must provide a driver's license or state identification number issued by the motor vehicle division of the taxation and revenue department or the last four digits of your social security number. Computerized listings of limited voter registration information (without social security numbers, codes used to identify agencies where voters have registered, a voter's day and month of birth or, if prohibited by voters, voters' telephone numbers) are available to the general public, and are furnished upon request to incumbent election officeholders, candidates, political parties, courts and non-profit organizations promoting voter participation and registration, for political purposes only.

7.Choice of Party. You must register with a party if you want to take part in that party's primary election, caucus, or convention.

8.Race or Ethnic Group. Leave blank.

9.Signature. To register in New Mexico you must:
• be a citizen of the United States
• be a resident of the State of New Mexico
• be 18 years of age at the time of the next election
• not currently be incarcerated as a result of a felony conviction.

Mailing address:
    Bureau of Elections
    325 Don Gaspar, Suite 300
    Santa Fe, NM 87503

## New York

Updated: 01-12-2023

Registration Deadline — 10 days before the election.

6.ID Number. Federal law requires that you provide your driver's license number to register to vote. If you do not have a driver's license then you will have to provide at least the last four digits of your social security number. If you have neither, please write "NONE" on the form. A unique identifying number will be assigned to you by your State.

7.Choice of Party. You must enroll with a party if you want to vote in that party's primary election or caucus.

8.Race or Ethnic Group. Leave blank.

9.Signature. To register in New York you must:
• be a citizen of the United States
• be a resident of the county, or of the City of New York, at least 30 days before an election
• be 18 years old (you may pre-register at 16 or 17 but cannot vote until you are 18)
• not be in prison for a felony conviction
• not currently be judged incompetent by order of a court of competent judicial authority
• not claim the right to vote elsewhere

Mailing address:
    NYS Board of Elections
    40 North Pearl Street, Suite 5
    Albany, NY 12207-2729

## North Carolina

Updated: 08-22-2024

Registration Deadline — Postmarked 25 days before the election or received in the elections office or designated voter registration agency site by 5:00 p.m. 25 days before the election.

6. ID Number. Provide your North Carolina driver's license number, or North Carolina Department of Motor Vehicles ID number. If you do not have a driver's license, then list the last four digits of your social security number. If you do not have any of these identification numbers, please write "NONE" on the form. A unique identifying number will be assigned to you for voter registration purposes.

7. Choice of Party. You may choose to affiliate with any political party recognized in North Carolina. If you indicate a political party that is not a qualified party, or indicate no party, you will be listed as "Unaffiliated." If you are unaffiliated, you may choose to vote in any party's primary.

8. Race or Ethnic Group. You are required to fill in this box. However, your application will not be rejected if you fail to do so. See the list of choices under the Application Instructions for Box 8 (on page 2).

9. Signature. To register in North Carolina you must:
• be a citizen of the United States
• be a resident of North Carolina and the county in which you live for at least 30 days prior to the election
• be at least 16 years of age and will be 18 years of age by the day of the next general election
• not be currently serving a felony sentence (including any probation, post-release supervision, or parole)

# State Instructions

Mailing address:
   State Board of Elections
   P.O. Box 27255
   Raleigh, NC 27611-7255

## North Dakota

Updated: 03-01-2006

North Dakota does not have voter registration.

## Ohio

Updated: 09-16-2024

Registration Deadline — 30 days before the election.

6. ID Number. Your social security number is requested. Providing this number is voluntary. This information allows the Board of Elections to verify your registration if necessary (O.R.C. 3503.14). [Federal law requires that you provide your driver's license number to register to vote. If you do not have a driver's license then you will have to provide at least the last four digits of your social security number. If you don't have either number you will have to write "NONE" on the form and the State will assign you a number.]

7. Choice of Party. You do not register with a party if you want to take part in that party's primary election. Party affiliation is established by voting at a primary election.

8. Race or Ethnic Group. Leave blank.

9. Signature. To register in Ohio you must:
• be a citizen of the United States
• be a resident of Ohio
• be 18 years old on or before election day. If you will be 18 on or before the day of the general election, you may vote in the primary election for candidates only.

• not be convicted of a felony and currently incarcerated
• not be found incompetent by a court for purposes of voting

Mailing address:
   Office of the Ohio Secretary of State
   180 S Civic Center Dr.
   Columbus, Ohio 43215

## Oklahoma

Updated: 03-15-2022

Registration Deadline — 25 days before the election.

6. ID Number. You must provide either your valid Oklahoma driver's license number, state identification card number, or the last four digits of your Social Security number.

7. Choice of Party. You must register with a party if you want to take part in that party's primary election. A current list of recognized political parties in Oklahoma is available on the Oklahoma State Election Board website. Registered voters with no party affiliation may be allowed by recognized parties to participate in primary elections at the party's discretion. You will find a list of recognized political parties and a list of parties that allow voters with no party affiliation to vote in primaries at: https://oklahoma.gov/elections/voter-registration/political-party-info.html.

8. Race or Ethnic Group. Leave blank.

9. Signature. To register to vote in Oklahoma you must:
• You must be a citizen of the United States and a resident of the State of Oklahoma.
• You must be 18 years old on or before the date of the next election. You may pre-register if you are at least 17½ years old,

but your voter registration will not be activated until you are 18 years old.
• If convicted of a felony, you must have fully served your sentence of court-mandated calendar days, including any term of incarceration, parole, or supervision, or completed a period of probation ordered by any court.
• You must not now be under judgment as an incapacitated person, or a partially incapacitated person prohibited from registering to vote.
• Applications must be signed and dated by the applicant. The signature must be the original, handwritten autograph or mark of the applicant. No facsimile, reproduction, typewritten or other substitute signature, autograph or mark will be valid. It is against the law to sign an Oklahoma Voter Registration Application on behalf of another person.

Mailing address:
   Oklahoma State Election Board
   Box 528800
   Oklahoma City, OK 73152-8800

You can also complete a voter registration application online, using the OK Voter Portal "wizard": https://okvoterportal.okelections.us/Home/RegWizard (Applications must be printed, signed, and mailed or hand-delivered to your county or State Election Board to complete the process.)

## Oregon

Updated: 08-05-2024

Registration Deadline — 21 days before the election.

6. ID Number. To be eligible to vote in Oregon elections, you must provide a valid Oregon

# State Instructions

License, Permit or ID number. If you do not have an Oregon-issued ID, then you will have to provide at least the last four digits of your social security number. If you have neither, you will need to write "NONE" on the form.

7.Choice of Party. In many cases, you must register with a party if you want to take part in that party's primary election. If you are not a member of a party or this space is left blank, you will be registered as a nonaffiliated voter.

8.Race or Ethnic Group. Leave blank.

9.Signature. To register in Oregon you must be:
• a citizen of the United States
• a resident of Oregon
• and at least 16 years of age when registering. If you are not yet 18, you will not receive a ballot until an election occurs on or after your 18th birthday.

Mailing address:
    Oregon Elections Division
    Public Service Building
    Suite 126
    255 Capitol St. NE
    Salem, OR 97310

Register or make changes to your registration online —
www.oregonvotes.gov.

## Pennsylvania

Updated: 05-01-2020

Registration Deadline — 15 days before an election or primary.

6.ID Number. You must supply a Driver's License Number, if you have one. If you do not have a Driver's License Number, you must supply the last four digits of your Social Security Number. If you do not have either form of ID, please write "NONE" in the box.

7. Choice of Party. You must register with a major party if you want to take part in that party's primary election.

8.Race or Ethnic Group. You are requested to fill in this box. See the list of choices under the Application Instructions for Box 8 (on page 2).

9.Signature. To register in Pennsylvania you must:

• be a citizen of the United States at least one month before the next election
• be a resident of Pennsylvania and your election district at least 30 days before the election
• be at least 18 years of age on the day of the next election

Mailing address:
    Office of the Secretary of the Commonwealth 210 North Office Bldg. Harrisburg, PA 17120-0029

You may also register online at register.votespa.com.

## Rhode Island

Updated: 09-03-2019

Registration Deadline — 30 days before the election.

6.ID Number. The applicant shall be required to provide their Rhode Island driver's license or State ID number if the applicant has been issued a current and valid Rhode Island driver's license or State ID. In the case of an applicant who has not been issued a current and valid driver's license or State ID, they must provide the last four (4) digits of their social security number. An applicant, who has neither, will be assigned a unique identifying number by the State of Rhode Island.

7.Choice of Party. In Rhode Island, a person must register with a party if they wish to take part in that party's primary election. A person who fails to register with a party at the time of registration may, if they choose, register with a party on the day of that party's primary and take part in that party's primary election. If a person does not register with a party, they can still vote in general elections and nonpartisan primary elections.

8.Race or Ethnic Group. Leave blank.

9.Signature. To register in Rhode Island you must:
• be a citizen of the United States
• be a resident of Rhode Island
• be at least 16 years of age (you must be 18 years old to vote)
• not be currently incarcerated in a correctional facility due to a felony conviction
• not have been lawfully judged to be mentally incompetent by a court of law

Mailing address:
    Rhode Island State Board of Elections
    50 Branch Ave.
    Providence, RI 02904-2790

## South Carolina

Updated: 01-05-2021

Registration Deadline — 30 days before the election.

6.ID Number. You must provide at least the last four digits of your social security number. You may provide your full social security number on a voluntary basis. Social security number does not

# State Instructions

appear on any report produced by the State Election Commission nor is it released to any unauthorized individual. (South Carolina Title 7-5-170)

7. Choice of Party. You do not have to register with a party if you want to take part in that party's primary election, caucus, or convention.

8.Race or Ethnic Group. You are required to fill in this box. Your application may be rejected if you fail to do so. See the list of choices under the Application Instructions for Box 8 (on page 2).

9.Signature. To register in South Carolina you must:
• be a citizen of the United States
• be at least 18 years old on or before the next election
• be a resident of South Carolina, your county and precinct
• not be confined in any public prison resulting from a conviction of a crime
• never have been convicted of a felony or offense against the election laws, or if previously convicted, have served your entire sentence, including probation or parole, or have received a pardon for the conviction
• not be under a court order declaring you mentally incompetent
• claim the address on the application as your only legal place of residence and claim no other place as your legal residence

Mailing address:
   State Election Commission
   P.O. Box 5987
   Columbia, SC 29250-5987

## South Dakota

Updated: 10-10-2021

Registration Deadline — Received 15 days before the election.

6.ID Number. Any person registering to vote shall provide the person's valid South Dakota driver license number or a South Dakota nondriver identification number on the voter registration form. If a person does not have a valid South Dakota driver license or a South Dakota nondriver identification number, the person shall provide the last four digits of the person's social security number on the voter registration form. If a person does not have a valid South Dakota driver license, a South Dakota nondriver identification number, or a social security number, the person may only register at the county auditor's Office and shall sign a statement verifying the fact that the person does not have a valid South Dakota driver license, a South Dakota nondriver identification number, or a social security number. South Dakota Codified Law 12-4-5.4

7.Choice of Party. If you are currently registered to vote and you leave the choice of party field blank, you will remain registered with your current party affiliation. If you are not currently registered to vote and you leave the choice of party field blank, you will be entered as an independent/no party affiliation voter, which is not a political party in South Dakota. South Dakota Codified Law 12-4-15,12-6-26

8.Race or Ethnic Group. Leave blank.

9.Signature. To register in South Dakota you must:
• Be a United States citizen
• Reside in South Dakota
• Be at least 18 years old on or before the next election
• Not currently serving a sentence for a felony conviction which included imprisonment, served or suspended, in an adult penitentiary system
• Not be judged mentally incompetent by a court of law

South Dakota Codified Law 12-4-6,12-4-8,l2-l-9,l2-l-4,12-4-18, South Dakota Constitution, Article VII, Section 2

Mailing address:
   Elections, Secretary of State
   500 E. Capitol
   Pierre, SD 57501-5070

## Tennessee

Updated: 05-01-2020

Registration Deadline — 30 days before the election.

6.ID Number. Your full social security number is required. Social security number, if any, is required for purposes of identification and to avoid duplicate registration (TCA 2.2.116).

7.Choice of Party. You do not have to register with a party if you want to take part in that party's primary election, caucus, or convention.

8. Race or Ethnic Group. Optional.

9.Signature. To register in Tennessee you must:
• be a citizen of the United States
• be a resident of Tennessee
• be at least 18 years old on or before the next election

# State Instructions

• not have been convicted of a felony, but if convicted, your eligibility to register and vote depends upon the crime you were convicted of and the date of your conviction. For more information about this process, call 877-850-4959 or visit https://sos.tn.gov/restoration. If your conviction has been expunged, you are not considered to have a felony con-viction.
• not be adjudicated incompetent by a court of competent jurisdiction (or have been restored to legal capacity)

Mailing address:
    Coordinator of Elections
    Tennessee Tower, Seventh Floor
    312 Rosa L. Parks Ave.
    Nashville, TN 37243-1102

## Texas

Updated: 11-15-2018

Registration Deadline — 30 days before the election.

6.ID Number. You must provide your driver's license number to register to vote. If you do not have a driver's license then you will have to provide at least the last four digits of your social security number. If you have neither, please write "NONE" on the form. A unique identifying number will instead be assigned to you by your State.
7. Choice of Party. You do not have to register with a party if you want to take part in that party's primary election, caucus, or convention.
8.Race or Ethnic Group. Leave blank.
9.Signature. To register in Texas you must:

• be a resident of the county in which the application for registration is made
• be at least 17 years and 10 months old (you must be 18 to vote)
• not be finally convicted of a felony, or if a convicted felon, you must have fully discharged your punishment, including any incarceration, parole, supervision, period of probation or be pardoned.
• have not been declared mentally incompetent by fnal judgment of a court of law

Mailing address:
    Office of the Secretary of State
    Elections Division
    P.O. Box 12060
    Austin, TX 78711-2060

## Utah

Updated: 09-19-2019

Registration Deadline — Registration deadlines vary:
• Mail: registration forms must be postmarked or otherwise marked as received by the Post Office 30 days before the election.
• In-person: registration forms may be dropped of at the county clerk's Office 7 days before the election.
• Online: registrations must be submitted 7 days before the election. Requires a valid Utah driver license or valid Utah ID.
• Same-Day: voters may register at the polls during the early voting period or on Election Day by filling out a provisional ballot.

6.ID Number. Your completed voter registration form must contain one of the following: a Utah Driver License number, a Utah State Identification number, or the last four digits of your

Social Security number. If you do not have a Utah Driver License or a Utah State Identification card, please write "None" in the designated space and fill in the last four digits of your Social Security number.
7.Choice of Party. Declaring a party is not required in order to register to vote. However, Utah's election law allows each political party to choose whom it will allow to vote in its primary election. If you do not affiliate with a party, you may be restricted from voting in the primary.
8.Race or Ethnic Group. Leave blank.
9.Signature. To register in Utah you must:
• be a citizen of the United States
• have resided in Utah for 30 days immediately before the next election
• be at least 18 years old on or before the next election (individuals who are 16 and 17 years of age may pre-register to vote; if a 17 year old will be 18 years of age on or before the upcoming general election, they may pre-register and vote in the primary election)
• not be a convicted felon currently incarcerated for commission of a felony
• not be convicted of treason or crime against the elective franchise, unless restored to civil rights
• not be found to be mentally incompetent by a court of law
• currently resides within the voting district or precinct in which you register to vote

Mailing address:
    Office of the Lieutenant
    Governor
    P.O. Box 142325
    Salt Lake City, UT 84114

# State Instructions

## Vermont

Updated: 09-19-2019

Registration Deadline — Your mailed registration must be received in the clerk's Office on the last day the clerk has hours before the election. Vermont has Election day voter registration at the polls as well as online voter registration. To register online visit – https://olvr.sec.state.vt.us.

6. ID Number. You must provide your Vermont Driver's license number, or if none, the last 4 digits of your Social Security number. If you do not have a Vermont Driver's license or a Social Security number, please write "NONE" on the form. The Secretary of State's Office will assign you a unique identifying number.

7. Choice of Party. Vermont does not require party registration to participate in any election.

8. Race or Ethnic Group. Not required.

9. Signature. To register in Vermont you must:

• be a citizen of the United States
• be a resident of Vermont
• be 18 years of age on or before election day
• have taken the following Oath: You solemnly swear (or affirm) that whenever you give your vote or suffrage, touching any matter that concerns the state of Vermont, you will do it so as in your conscience you shall judge will most conduce to the best good of the same, as established by the Constitution, without fear or favor of any person [Voter's Oath, Vermont Constitution, Chapter II, Section 42]

By signing in Box 9, you are attesting that you have sworn or affirmed the Vermont voter's oath as printed above.

Mailing address:
Office of the Secretary of State
Elections Division
128 State Street
Montpelier, VT 05633-1101

## Virginia

Updated: 09-19-2019

Registration Deadline — The application must be delivered or postmarked 22 days before the election.

6. ID Number. Your full social security number is required. Your social security number will appear on reports produced only for official use by voter registration and election officials and, for jury selection purposes, by courts. Article II, §2, Constitution of Virginia (1971).

7. Choice of Party. Leave blank.

8. Race or Ethnic Group. Leave blank.

9. Signature. To register in Virginia you must:

• be a citizen of the United States
• be a resident of Virginia and of the precinct in which you want to vote
• be 18 years old by the next May or November general election
• not have been convicted of a felony, or have had your civil rights restored
• not currently be declared mentally incompetent by a court of law

Mailing address:
Virginia State Board of Elections
1100 Bank Street, 1st floor
Richmond, VA 23219

## Washington

Updated: 01-17-2025

Registration Deadline — Online and mail registration forms must be received by an elections official no later than 8 days before the election. Register in person any time during business hours and before 8:00 p.m. on Election Day.

6. ID Number. You must provide your Washington driver's license or ID card number. If you do not have a Washington driver's license or ID card, you must provide the last four digits of your Social Security Number. Failure to provide this information may prevent your registration from being processed.

7. Choice of Party. You are not required to designate your party affiliation to register in Washington.

8. Race or Ethnic Group. Leave blank.

9. Signature. To register in Washington you must:

• be a citizen of the United States
• be a legal resident of Washington State
• be at least 18 years old by Election Day
• If you were convicted of a felony in Washington State, another state, or in federal court, your right to vote will be restored automatically as long as you are not currently serving a sentence of total confinement in prison. You may re-register.
• 16- and 17-year-olds can sign up as Future Voters and be automatically registered to vote when they qualify

# State Instructions

Mailing address:
   Secretary of State  Elections Division  P.O. Box 40229  Olympia, WA 98504-0229

## West Virginia

Updated: 05-24-2024

Registration Deadline — 21 days before the election.

6.ID Number. Enter your driver's license number. If you do not have a driver's license number, enter the last four numbers of your social security number. If you do not have a driver's license number or a social security number, an identification number will be assigned to you.

7.Choice of Party. You must register with a party if you want to take part in that party's primary election, caucus, or convention

(unless you request the ballot of a party which allows independents to vote)

8.Race or Ethnic Group. Leave blank.

9.Signature. To register in West Virginia you must:

• be a citizen of the United States;

• live in West Virginia at the above address;

• be 18 years old (or be 17 years old and turning 18 before the general election);

• not be under conviction, probation, or parole for a felony, treason or election bribery;

• not have been judged "mentally incompetent" in a court of competent jurisdiction; and

• attest that the applicant meets each eligibility requirement.

Mailing address:
   Secretary of State
   Building 1, Suite 157-K
   1900 Kanawha Blvd. East
   Charleston, WV 25305-0770

## Wisconsin

Updated: 11-24-2023

Registration Deadline —  Wisconsin municipal clerks will accept this application only as a request for their own absentee voter mail-in registration form or for the purposes of the clerk directing that voter to the state's online voter registration system at https://my-vote.wi.gov/en-us/. You need to fill in only Box 1 and Box 2 or 3 or go directly to the MyVote website.

## Wyoming

Updated: 03-01-2006

Wyoming by law, cannot accept this form unless State law is changed.

The public reporting burden for this collection of information, OMB Control No. 3265-0015, is estimated to average 7 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing the burden, to

U.S. Election Assistance Commission, 633 3rd Street NW, Suite 200, Washington, DC 20001, Attn: National Mail Voter Registration Form.

Respondents should be aware that not-withstanding any other provision of law, no person shall be subject to any penalty for failing to comply with a collection of information if it does not display a currently valid OMB control number.

# Exhibit 17

Civil Action No. 25-cv-0952 (CKK)
(Lead Case: No. 25-cv-00946 (CKK))

ADVERTISEMENT

   

**Politics**    Trump    Facts First    More ⌄          ▷ Watch    🎧 Listen    ● Live TV    🔍    **Subscribe**

# Speaker Johnson has a bit more room in his historically narrow House majority



By Clare Foran, Annette Choi and Haley Talbot, CNN

🕐 4 minute read · Updated 11:54 AM EDT, Tue April 8, 2025



**Washington (CNN)** — Speaker Mike Johnson has a little more room in his historically narrow majority.

The speaker swore Republicans Randy Fine and Jimmy Patronis into Congress a day after their party held onto two seats in Florida special elections to replace national security adviser Mike Waltz and former Rep. Matt Gaetz, respectively.

At the start of the 119th Congress, Johnson was already facing the narrowest House majority in nearly 100 years. The tight margin has created a major challenge for congressional Republicans as they seek to enact President Donald Trump's agenda.

That brings the partisan breakdown to 220 Republicans and 213 Democrats, one of the thinnest House majorities in history.

### Republicans pad their House majority, still the most narrow in history

Republicans are looking at a 220 to 213 majority with two GOP representatives taking over Matt Gaetz and Michael Waltz's vacated seats. Two seats are currently vacant, following the deaths of Democratic Reps. Sylvester Turner and Raul Grijalva in March.

 Democrat     Republican     Vacancy

Republicans Jimmy Patronis and          218 needed to control a House
Randy Fine won special elections          majority when all vacancies are filled
for Florida's 1st and 6th districts.

Note: Data is as of April 3, 2025.

Source: US House of Representatives
Graphic: Annette Choi, CNN

Republicans won 220 House seats in the November elections, while Democrats won 215, the most narrowly divided House majority since the outset of the Great Depression, almost a century ago.

At the start of the new session of Congress, however, the partisan breakdown stood at 219 to 215, because former GOP Rep. Matt Gaetz of Florida opted not to return to Congress.



**BEYOND RAW®**

*Obsessed With Results*

BEYOND RAW Chemistry Labs Kre-Alkalyn: pH Correct Creatine Powder, Buffered Creatine, Increa Muscle Performance During Exercise, 30 Servings

 166

Prime Day Deal

Shop now

Advertisement          Ad Feedback

Passing a bill in the House requires a majority of all members present and voting. The magic number is 218 if every member shows up to vote and all 435 seats are filled, but that can change if there are vacancies or absences. A tie vote in the House is a fail.

✕



**Do you want the latest in US politics summarized each day?**

Sign up for CNN's What Matters newsletter.

| Email address | Sign me up |

By subscribing you agree to our Privacy Policy.

Two seats in the chamber are vacant, however, meaning 217 votes are currently needed to approve legislation. A special election is scheduled for only one of the vacant seats.

If Republicans aren't in lockstep, then House GOP leaders will need Democrats to pass legislation.

**Florida special elections and Democratic vacancies bolster the GOP House margin**

The election of two GOP representatives in Florida widens House Speaker Mike Johnson's narrow majority. We break down the

Speaker can afford to lose.    Speaker can afford to lose.    Speaker can afford to lose.

2 votes    1 vote    3 votes

*Rounded up because votes cannot be halved
**Reflects two Democratic vacancies

Graphic: Annette Choi and Clare Foran, CNN

# How the House majority ranks in history

The last time a minority in the House held 215 or more seats was after the 1930 elections, when Republicans won 218 seats, Democrats won 216 and the Farmer-Labor Party won one.

The 72nd Congress — which took place in the early years of the Great Depression era — officially started in March 1931, but did not actually convene to conduct legislative business until months later, in December 1931.

At the official start of that term, in March, the House margin had narrowed even further — to 217 seats for Republicans to 216 for Democrats with one seat for the Farmer-Labor party and one vacancy as a result of the death of one Republican.

In an unusual turn of events, however, the partisan breakdown changed significantly by the time Congress convened when a series of additional deaths and ensuing special elections flipped control of the chamber to Democrats, though the margin remained narrow.

According to House historical records, the 65th Congress had the closest party split in American history, but in that case, the partisan division was so narrow that neither party secured an outright majority in the House based on election results, which left Republicans with 215 seats and Democrats with 214. As a result, a handful of third-party lawmakers played a decisive role when the House convened to elect a speaker.

With Republicans in control of Washington, there will be intense pressure on GOP leaders to swiftly enact Trump's agenda. But the extraordinarily tight margin gives any rank-and-file lawmaker the ability to exert outsized influence by making demands on the speaker.

Johnson has already had to contend with that – frequently in the form of pressure from his right flank, a dynamic that now set to intensify.

## Republicans still hold the narrowest House margin in recent history

The GOP majority for the 119th Congress is the smallest since the Great Depression era. Here's what the House majority has looked like for the last 50 years.

Number of seats the majority Democratic or Republican party has over the minority

119th (2025–27)



Note: Data is as of April 3, 2025. Congressional majorities are as of the initial election results of each Congress — except for the 119th Congress. This does not include Independents.

Source: US House of Representatives
Graphic: Annette Choi, CNN

# Challenges ahead after speaker election

Johnson won the speakership in a nail-biter of a vote at the start of the 119th Congress, a sign of the difficulty of overseeing such a narrow majority with little room for error.

To be elected speaker, a candidate needs to win a majority of members who vote for a specific person on the House floor.

The election took place with the majority at 219 to 215, which meant that Johnson could only lose a single Republican votes if every lawmaker voted and all Democrats voted against him.

After the initial roll call vote, Johnson had come up short, with three GOP defections. Rep. Thomas Massie of Kentucky had voted for Rep. Tom Emmer of Minnesota; Rep. Ralph Norman of South Carolina had voted for Rep. Jim Jordan of Ohio; and Rep. Keith Self of Texas had voted for Rep. Byron Donalds of Florida.

But after everyone had voted, the vote was held open for an extended period of time — meaning that it was not gaveled to an official close — as Johnson worked to lock down the votes. Then, in an abrupt turn of events, Self and Norman flipped their votes in support of Johnson, effectively handing him the gavel.

*This story and headline have been updated with additional developments.*

# Exhibit 18

Civil Action No. 25-cv-0952 (CKK)
(Lead Case: No. 25-cv-00946 (CKK))

Home / Member Data



## Party Breakdown

⭐ Party Breakdown                                    *119th Congress*

| 220 | REPUBLICANS | 0 | OTHER |
|-----|-------------|----|-------|
| 212 | DEMOCRATS | 3* | VACANCIES |

*Rep. Sylvester Turner (D-TX) died 03/05/2025.

*Rep. Raul Grijalva (D-AZ) died  03/13/2025.

*Rep. Gerry Connolly (D-VA) died 05/21/2025.

## Latest Floor Action

| Time (ET) | Session |
|-----------|---------|
| 11:06 AM | The Speaker announced that the House do now adjourn pursuant to clause 13 of Rule I. The next meeting is scheduled for 12:00 p.m. on July 14, 2025. |
| 11:06 AM | Canada-United States Interparliamentary Group - Pursuant to 22 U.S.C. 276d and the order of the House of January 3, 2025, the Speaker appointed the following members of the House to the Canada-United States Interparlia... |

Executive Commission on the People's Republic of China - Pursuant to 22 U.S.C. 6913, and the order of the House of January 3, 2025, the Speaker appointed the following members of the House to the Congressional-Executive Commission on the People's Republic of China: Mrs. Kiggans of Virginia and Mr. Strong.

Floor Proceedings

**View the full Floor Proceedings from the Clerk of the House**

## Committee Hearings Schedule

| Today | Tomorrow |

No committee events were scheduled for today.

See all **upcoming committee schedules**

# Exhibit 19

Civil Action No. 25-cv-0952 (CKK)
(Lead Case: No. 25-cv-00946 (CKK))

**United States Government Accountability Office**



Report to Congressional Requesters

June 2007

# MEDICAID

# States Reported That Citizenship Documentation Requirement Resulted in Enrollment Declines for Eligible Citizens and Posed Administrative Burdens





Highlights of GAO-07-889, a report to congressional requesters

June 2007

## MEDICAID

# States Reported That Citizenship Documentation Requirement Resulted in Enrollment Declines for Eligible Citizens and Posed Administrative Burdens

## Why GAO Did This Study

The Deficit Reduction Act of 2005 (DRA) included a provision that requires states to obtain documentary evidence of U.S. citizenship or nationality when determining eligibility of Medicaid applicants and current beneficiaries; self-attestation of citizenship and nationality is no longer acceptable. The Centers for Medicare & Medicaid Services (CMS) issued regulations states must follow in obtaining this documentation. Interested parties have raised concerns that efforts to comply with the requirement will cause eligible citizens to lose access to Medicaid coverage and will be costly for states to implement.

GAO was asked to examine how the requirement has affected individuals' access to Medicaid benefits and assess the administrative and fiscal effects of implementing the requirement.

To do this work, GAO surveyed state Medicaid offices in the 50 states and the District of Columbia about their perspectives on access issues and the administrative and fiscal effects of the requirement. GAO obtained complete responses from 44 states representing 71 percent of national Medicaid enrollment in fiscal year 2004. GAO also reviewed federal laws, regulations, and CMS guidance.

www.gao.gov/cgi-bin/getrpt?GAO-07-889.

To view the full product, including the scope and methodology, click on the link above. For more information, contact James Cosgrove at (202) 512-7114 or cosgrovej@gao.gov.

## What GAO Found

States reported that the citizenship documentation requirement resulted in barriers to access to Medicaid for some eligible citizens. Twenty-two of the 44 states reported declines in Medicaid enrollment due to the requirement, and a majority of these states attributed the declines to delays in or losses of Medicaid coverage for individuals who appeared to be eligible citizens. Of the remaining states, 12 reported that the requirement had no effect and 10 reported they did not know the requirement's effect on enrollment. Not all of the 22 states reporting declines could quantify enrollment declines due specifically to the requirement, but a state that had begun tracking the effect identified 18,000 individuals in the 7 months after implementation whose applications were denied or coverage was terminated for inability to provide the necessary documentation, though the state believed most of them to be eligible citizens. Further, states reporting a decline in enrollment varied in their impressions about the requirement's effect on enrollment after the first year of implementation. States' enrollment policies and whether an individual was an applicant or a beneficiary may have influenced the requirement's effect on access to Medicaid. For example, states that relied primarily on mail-in applications before the requirement were more likely to report declines in enrollment than states where individuals usually applied in person. In addition, the requirement may have more adversely affected applicants than beneficiaries because applicants were given less time to comply in some states and were not eligible for Medicaid benefits until they documented their citizenship.

Although states reported investing resources to implement the requirement, potential fiscal benefits for the federal government and states are uncertain. All 44 states reported taking administrative measures to implement the requirement and assist individuals with compliance. In addition, 10 states reported that a total of $28 million was appropriated in state fiscal year 2007, and 15 states budgeted funds for implementation costs in state fiscal year 2008. Despite these measures, states reported that the requirement has increased the level of assistance needed by individuals and amount of time spent by states during the enrollment process. States specified two aspects of the requirement as increasing the burden for them and for individuals: that documents had to be originals and the list of acceptable documents was complex and did not allow for exceptions. Further, although CMS estimated the requirement would result in savings for the federal government and states of $90 million for fiscal year 2008, states' responses indicated that this estimate may be overstated for two reasons. Specifically, CMS did not account for the increased administrative expenditures reported by states, and the agency's estimated savings from ineligible, noncitizens no longer receiving benefits may be less than anticipated.

In commenting on a draft of the report, CMS raised concerns about the conclusions drawn from the survey responses as to the requirement's effect on access, mainly that states did not submit data to support their responses.

# Contents

| | | |
|---|---|---|
| **Letter** | | 1 |
| | Results in Brief | 4 |
| | Background | 6 |
| | Many States Reported That the Requirement Resulted in Delayed or Lost Medicaid Coverage for Some Individuals Who Appeared to Be Eligible | 13 |
| | States Reported Investing Resources to Implement Requirement, with Fiscal Benefits Uncertain | 19 |
| | Agency Comments and Our Evaluation | 26 |
| **Appendix I** | **List of Acceptable Documents for Proving Citizenship and Identity, as Defined under Federal Regulations** | 31 |
| **Appendix II** | **Comments from the Centers for Medicare & Medicaid Services** | 34 |
| **Appendix III** | **GAO Contact and Staff Acknowledgments** | 38 |
| **Tables** | | |
| | Table 1: Examples from the List of Acceptable Documents for Proving Citizenship Defined under Federal Regulations, by Level of Reliability | 11 |
| | Table 2: Administrative Measures Frequently Taken by States to Implement the Requirement and Assist Individuals with Compliance | 20 |
| | Table 3: Challenges Posed by Certain Aspects of the Requirement, as Reported by States | 24 |
| | Table 4: List of Acceptable Documents for Proving Citizenship, as Defined under Federal Regulations | 31 |
| | Table 5: Acceptable Documents for Proving Identity, as Defined under Federal Regulations | 33 |

# Figures

Figure 1: Key Events in the Implementation of the Requirement     9

Figure 2: Effect of the Requirement on Medicaid Enrollment, as Reported by States     14

Figure 3: Primary Reason Why Requirement Resulted in Medicaid Enrollment Declines, as Reported by States     15

Figure 4: Comparison of the Effect of the Requirement on a Pregnant Woman Applying for Medicaid and a Pregnant Woman at Redetermination     18

Figure 5: Effect of the Requirement on States' Level of Assistance and Amount of Time Needed during Application and Redetermination     22

**Abbreviations**

| | |
|---|---|
| CMS | Centers for Medicare & Medicaid Services |
| DRA | Deficit Reduction Act of 2005 |
| FMAP | Federal Medical Assistance Percentage |
| HHS | Department of Health and Human Services |
| OIG | Office of Inspector General |
| SSA | Social Security Administration |
| TRHCA | Tax Relief and Health Care Act of 2006 |

This is a work of the U.S. government and is not subject to copyright protection in the United States. It may be reproduced and distributed in its entirety without further permission from GAO. However, because this work may contain copyrighted images or other material, permission from the copyright holder may be necessary if you wish to reproduce this material separately.



**United States Government Accountability Office**
**Washington, DC 20548**

June 28, 2007

The Honorable John D. Dingell
Chairman
Committee on Energy and Commerce
House of Representatives

The Honorable Henry A. Waxman
Chairman
Committee on Oversight and Government Reform
House of Representatives

In recent years, states have focused on efforts to streamline and simplify the application and eligibility determination processes for Medicaid, the joint federal-state health care financing program that in fiscal year 2004 covered nearly 60 million low-income individuals, including children, families, and individuals who are elderly or disabled. For example, many states have made application and enrollment processes more accessible through mail-in applications. Some states have also simplified application processes by minimizing documentation requirements, permitting self-declaration of income, and automating systems. These streamlined processes were part of an effort to increase enrollment of eligible individuals in the program.

The Deficit Reduction Act of 2005 (DRA), which was enacted on February 8, 2006, contains many changes to Medicaid requirements, at least one of which affects states' abilities to streamline certain program operations.[1] Specifically, in addition to changes related to benefits, cost-sharing, provider payment, and program integrity, the DRA includes a provision that requires states to obtain satisfactory documentary evidence of U.S. citizenship or nationality[2] for nearly 40 million nonexempt Medicaid beneficiaries within 1 year of the provision's July 1, 2006,

---

[1]DRA, Pub. L. No. 109-171, 120 Stat. 4 (2006).

[2]For the purposes of qualifying for Medicaid as a U.S. citizen, the United States is defined as the 50 states, the District of Columbia, Puerto Rico, Guam, U.S. Virgin Islands, and the Northern Mariana Islands. Nationals from American Samoa or Swain's Island are also regarded as U.S. citizens for purposes of Medicaid. In this report, we combine references to the requirements to document U.S. citizenship or nationality under the broader rubric of documenting citizenship.

effective date, as well as for new applicants to the program, who constitute an estimated 10 million individuals annually.[3] While U.S. citizenship or satisfactory immigration status has long been a requirement for Medicaid eligibility, individuals in most states could previously attest, under penalty of perjury, to their citizenship status in writing. Self-attestation of citizenship is no longer acceptable.[4] Instead, the DRA requires that states implement an effective process for documenting citizenship in order to obtain federal Medicaid matching funds. Although the DRA did not provide any additional federal funds for costs associated with complying with this requirement, states may seek federal matching funds for such administrative expenditures. In implementing the DRA provision, the Centers for Medicare & Medicaid Services (CMS)[5] issued an interim final rule that outlines a prescriptive process states must follow to obtain satisfactory documentation of citizenship for Medicaid applicants and existing beneficiaries and identifies a list of acceptable documentation.[6] Five months after the DRA provision took effect, the Tax Relief and Health Care Act of 2006 was enacted, which exempted additional populations from documenting citizenship, such as children in foster care.[7]

---

[3]DRA, Pub. L. No. 109-171, § 6036, 120 Stat. 80-81 (to be codified at 42 U.S.C. §1396b). The DRA exempted certain groups of individuals, including individuals entitled to or enrolled in Medicare and certain Supplemental Security Income beneficiaries, from documenting citizenship.

[4]In a July 2005 report regarding states' oversight of the self-declaration of U.S. citizenship, the Office of Inspector General (OIG) of the Department of Health and Human Services (HHS) identified 47 states that allowed self-attestation of citizenship for U.S. citizens and nationals. However, the HHS OIG reported that nearly all of these states had a written or informal "prudent person policy," which required individuals to submit documentary evidence when eligibility staff questioned the validity of their attestations. The remaining 4 states independently required U.S. citizens and nationals to provide documentary evidence of their citizenship status in order to qualify for their state Medicaid programs. HHS, OIG, *Self-Declaration of U.S. Citizenship for Medicaid* (July 2005).

[5]CMS is the agency within HHS responsible for administering the Medicaid program, including oversight of the citizenship documentation requirement.

[6]*Medicaid Program; Citizenship Documentation Requirements*, 71 Fed. Reg. 39,214 (July 12, 2006). For the purposes of this report, we refer to the requirement to document citizenship in the DRA and the related requirements identified in the implementing federal regulations as "the requirement."

[7]Tax Relief and Health Care Act of 2006, Pub. L. No. 109-432, title IV, §405(c), 120 stat. 2922, 2998-2999 (2006) (to be codified at 42 U.S.C. §1396b(x)(2)).

Interested parties, including states and advocacy organizations, have raised concerns about the requirement, such as stating that the need for the requirement had not been established,[8] that efforts to comply with the requirement will result in eligible citizens losing access to Medicaid coverage, and that it will be costly for states and individuals. You asked us to evaluate the effect of the requirement on eligible individuals' access to the Medicaid program and the administrative and fiscal burden the requirement imposed on individuals, states, and the federal government. For this report, we (1) examined how the requirement has affected individuals' access to Medicaid benefits and (2) assessed the administrative and fiscal effects of implementing the requirement.

To conduct our work, we surveyed state Medicaid offices in the 50 states and the District of Columbia about the effects of the requirement and obtained responses from 96 percent of them (49 of 51).[9] Of the 49 responses, 1 state's response was largely incomplete and 4 states reported they had not implemented the requirement as of January 2007,[10] so we excluded those 5 states from our analysis, leaving 44 usable responses.[11] States submitted responses in March and April 2007. With regard to the effects on individuals' access to Medicaid benefits, we asked states for their perspectives about (1) changes in enrollment as a result of the requirement, (2) the reasons for any enrollment declines,[12] (3) the groups

---

[8]Specifically, in response to the July 2005 report by the OIG of HHS regarding states' oversight of the self-declaration of U.S. citizenship, CMS acknowledged that the OIG did not find problems regarding false allegations of citizenship and further noted that CMS was not aware of any such problems.

[9]Throughout this report, the term "state" refers to the 50 states and the District of Columbia.

[10]Three of the 4 states reported taking steps to implement the requirement, such as conducting data matches for existing beneficiaries, but, for example, were awaiting issuance of state regulations before fully implementing. The remaining state reported that it implemented the requirement in April 2007. As of May 2007, CMS was aware that not all states had fully implemented the requirement.

[11]These 44 states accounted for 71 percent of national Medicaid enrollment in fiscal year 2004, the most recent year that CMS data are available. The 2 states not responding to the survey represented 5 percent of Medicaid enrollment in fiscal year 2004, and the 5 states excluded from our analysis constituted the remaining 23 percent.

[12]In the survey, we asked states whether they thought enrollment declines were due, in part, to individuals who appeared to be eligible citizens experiencing delays or losses in Medicaid coverage. We believed that states' assessments of individuals' citizenship were appropriate given their reliance on prudent person policies to make such determinations under their prior self-attestation policies.

most affected, and (4) expectations of how long reported changes would continue. We also asked about state policies regarding the amount of time states allow individuals to comply with the requirement before denying coverage or terminating enrollment. With regard to the administrative and fiscal effects of the requirement, we asked states about (1) measures taken to implement the requirement and assist individuals with compliance, (2) changes in the number of individuals needing assistance during the eligibility determination process and the amount of time necessary for states to make eligibility determinations after implementing the requirement, (3) the average number of pending and completed eligibility determinations before and after implementing the requirement, (4) the challenges they and individuals faced in meeting the requirement, and (5) the budget implications of the requirement in state fiscal years 2007 through 2010.[13] We did not independently validate the trends or the data states provided. The results of our survey represent only the views of the 44 state Medicaid offices that completed it.

In assessing the administrative and fiscal effects of the requirement, we also reviewed federal laws, regulations, and CMS guidance to states related to the requirement, and compared the requirement with citizenship documentation requirements applied by other federal agencies, including the Social Security Administration (SSA). In addition, we interviewed CMS officials regarding certain aspects of the requirement. We also obtained CMS's estimates of the administrative and fiscal effects of the requirement on states and the federal government. We performed our work from November 2006 through June 2007 in accordance with generally accepted government auditing standards.

## Results in Brief

States reported that the requirement resulted in barriers to access to Medicaid, such as delayed or lost coverage for some eligible individuals. Twenty-two of the 44 states reported declines in Medicaid enrollment due to the requirement, and a majority of these states attributed the enrollment declines to delays in or losses of Medicaid coverage for individuals who appeared to be eligible citizens. Of the remaining states, 12 reported that the requirement had no effect on enrollment, and 10 reported that they did not know the effect of the requirement on enrollment. Not all of the

---

[13]States define their fiscal years differently. For example, some states' fiscal years are the same as the federal fiscal year (October 1 through September 30), while in other states, the fiscal year runs from July 1 to June 30.

22 states reporting enrollment declines as a result of the requirement could quantify the decline. One that had begun tracking the effect, however, identified 18,000 individuals in the first 7 months of implementing the requirement whose applications were denied or who had coverage terminated due to the inability to provide the necessary documentation, though the state generally believed them to be eligible citizens. States that reported a decline in enrollment varied in their impressions of the effects of the requirement on enrollment beyond the first year of implementation. The effect of the requirement on individuals' access to Medicaid could have been influenced by state enrollment policies and whether an individual was an applicant or an existing beneficiary. For example, states that relied primarily on mail-in applications prior to implementing the requirement were more likely to report declines in enrollment than were states where individuals most frequently applied in person. In addition, the requirement may affect Medicaid applicants more adversely than beneficiaries because applicants in some states were given less time to comply and were not eligible for Medicaid benefits until they documented their citizenship.

Although states have invested resources to implement the requirement, potential fiscal benefits for the federal government and states are uncertain. All of the 44 states reported taking a number of administrative measures, such as training eligibility workers and hiring additional staff, to implement the requirement and assist individuals with compliance. In addition, 10 states reported that a total of $28 million was appropriated for the requirement in state fiscal year 2007, and 15 states budgeted funds for state fiscal year 2008. Despite these measures, states reported that the requirement resulted in the state spending more time completing applications and redeterminations and individuals needing more assistance in person during the process. States reported that two aspects of the requirement increased the burden of the requirement on individuals and states, namely (1) that documents must be originals and (2) the list of acceptable documents was complex and did not allow for exceptions. For example, states reported that individuals who previously would have applied for Medicaid through the mail will not part with original documents, such as driver's licenses, and are instead presenting them in person, which has increased the workload of states' eligibility workers. CMS officials noted, however, that the agency took a number of steps to minimize the administrative burden of the requirement, including substantially expanding the list of acceptable documentation beyond what was included in the DRA provision. In addition to the ongoing challenges to states and individuals, federal estimates of the financial benefits of the requirement for the federal government and states may be overstated.

CMS estimated the requirement would result in savings of $50 million for the federal government and $40 million for states in fiscal year 2008 as a result of terminations of eligibility for noncitizens inappropriately receiving Medicaid benefits. State responses indicated, however, that CMS's estimate of savings may be overstated because the estimate did not account for the increases in administrative expenditures reported by states and the intended effect of the requirement—to prevent ineligible noncitizens from receiving Medicaid benefits—may be less prevalent than CMS expected. For example, among the states that reported expecting the requirement to result in a decrease in Medicaid expenditures, only one state reported potential savings as a result of individuals being denied or terminated from coverage who were determined ineligible because of their citizenship status.

In commenting on a draft of this report, CMS raised concerns about the sufficiency of the underlying data and made several comments about our findings on the administrative and fiscal effects of the requirement. In particular, CMS expressed concern that the report overstated the significance of states' reports of declines in enrollment due to the requirement and the challenges that states and individuals faced in complying with it. CMS nevertheless agreed the requirement posed challenges for individuals and states, though the agency stated that it believed these challenges had decreased and would continue to do so. Our findings represent the views of state Medicaid offices, which stated that the requirement has resulted in enrollment declines and has posed administrative burdens to states and individuals. Further, our survey results indicate that the effects states experienced in the first year may continue at least to some extent in the future.

## Background

Medicaid programs generally represent an open-ended entitlement under which the federal government is obligated to pay its share of expenditures for covered services provided to eligible individuals under each state's federally approved Medicaid plan.[14] Under federal Medicaid law, to qualify for Medicaid coverage, individuals generally must fall within certain eligibility categories—such as children, pregnant women, adults in

---

[14]Under a statutory formula, the federal government may pay from 50 to 83 percent of a state's Medicaid expenditures, known as the Federal Medical Assistance Percentage (FMAP). States with lower per capita incomes receive higher FMAP matching rates. The FMAP for administrative costs is the same for all states and is generally 50 percent for administrative costs. 42 U.S.C. §§ 1396b(a), 1396d(b).

families with dependent children, and those who are aged or disabled—and meet financial eligibility criteria.[15] In addition, since 1986, federal law has required that, as a condition of Medicaid eligibility, individuals declare under penalty of perjury that they are citizens or nationals of the United States or in satisfactory immigration status.[16] Eligibility is determined at the time of application, and for individuals enrolled in the program, at a regular basis referred to as redetermination.[17]

States differ in how they determine eligibility for Medicaid, and many took steps before 2006 to streamline their enrollment processes. While some states conduct all eligibility screening and determinations within the state's Medicaid agency, other states contract with different state agencies, counties, or other local governmental entities to conduct or assist with eligibility determinations. In some cases, states also utilize community-based organizations to assist with outreach and education in their Medicaid programs. Over the past decade, states have also made efforts to simplify the application process to make Medicaid programs more accessible to eligible families. As part of these efforts, many states implemented mail-in applications and ended requirements for face-to-face interviews. States also began coordinating Medicaid eligibility determinations with other public programs, such as school lunch programs and Temporary Assistance for Needy Families.

Enacted in February 2006, the DRA includes a number of new requirements for state Medicaid programs.[18] Most relevant to this report, as of July 1, 2006, the DRA required states to document citizenship of applicants and beneficiaries as a condition of receiving federal matching

---

[15] See 42 U.S.C. § 1396a(a)(10).

[16] Immigration Reform and Control Act of 1986, Pub. L. No. 99-603, § 121, 100 Stat. 3359, 3384-3391 (1986) (codified, as amended, at 42 U.S.C. § 1320b-7). Under this law, individuals who declared themselves aliens in satisfactory immigration status were required to present specific documentary evidence of their status, while those who declared themselves citizens were not. Individuals in satisfactory immigration status include aliens who are lawful permanent residents, refugees, and other aliens under special circumstances.

[17] Federal Medicaid regulations require states to redetermine the eligibility of a Medicaid beneficiary at least once every 12 months or more frequently if the state receives information that may affect the eligibility of the Medicaid beneficiary. 42 C.F.R. 435.916.

[18] For example, the DRA provided states with the ability, under a State Plan Amendment, to restructure Medicaid benefit packages based on newly defined criteria and to impose varying levels of cost-sharing for certain Medicaid populations. See DRA, Pub. L. No. 109-171, §§ 6041-6044, 120 Stat. 81-92 (2006) (to be codified at 42 U.S.C. §§ 1396o-1, 1396u-7).

funds for their Medicaid expenditures.[19] Under this provision, Medicaid applicants and beneficiaries who are undergoing redeterminations of eligibility must provide "satisfactory documentary evidence" of citizenship.[20] Documenting citizenship is a onetime event completed by individuals either at application or, for those already enrolled, at their first redetermination of eligibility. (Fig. 1 illustrates the sequence of key events regarding the requirement from enactment of the DRA through February 2007.)

---

[19]DRA, Pub. L. No. 109-171, § 6036, 120 Stat. 80-81 (2006) (to be codified at 42 U.S.C. § 1396b). The DRA, however, did not impose any additional requirements for Medicaid applicants and beneficiaries who declare themselves aliens in satisfactory immigration status.

[20]"Satisfactory documentary evidence" is defined as a list of specific documents, such as a U.S. passport, and includes those documents that the Secretary of HHS determines, under federal regulations, to provide proof of citizenship and a reliable means of identification.

**Figure 1: Key Events in the Implementation of the Requirement**



Source: GAO.

The DRA explicitly exempts certain individuals from having to document citizenship, specifically those entitled to or enrolled in Medicare, certain individuals receiving Supplemental Security Income, and any additional populations as designated by the Secretary of HHS.[21] In December 2006, Congress expanded the list of populations that are exempt, adding individuals receiving Social Security disability insurance benefits and children in foster care or children who are receiving adoption or foster care assistance.[22]

In implementing the DRA provision, CMS first provided guidance to states in a June 2006 letter to state Medicaid directors and subsequently published an interim final rule on July 12, 2006, almost 2 weeks after the

---

[21]The DRA permits such a designation only when the Secretary of HHS finds that satisfactory documentary evidence of citizenship had been previously presented.

[22]See Tax Relief and Health Care Act of 2006, Pub. L. No. 109-432, title IV, § 405(c), 120 Stat. 2922, 2998-2999 (2006) (to be codified at 42 U.S.C. § 1396b(x)(2)).

DRA provision went into effect.[23] In the interim final rule, CMS expanded upon the list of acceptable documents identified in the DRA and published regulations that grouped the documents by level of reliability, creating a hierarchy in the list and restricting the use of less reliable documents.

As required under the DRA, certain documents, such as U.S. passports, are considered sufficient evidence of citizenship. The DRA requires that if an individual does not have one of these primary documents, the individual must produce specific types of documentation establishing citizenship, such as a U.S. birth certificate, as well as documentation establishing personal identity. The regulations published by CMS similarly identify primary, or tier 1, documents to establish citizenship. Under the regulations, if individuals do not have primary evidence, they are expected to produce secondary, or tier 2, evidence of citizenship, such as a military record showing a U.S. place of birth, as well as evidence of identity, such as a state-issued driver's license. If neither primary nor secondary evidence of citizenship is available, individuals may provide third tier evidence of citizenship to accompany evidence of identity. If primary evidence of citizenship is unavailable, secondary and third tier evidence do not exist or cannot be obtained in a reasonable time period, and the individual was born in the United States, then the individual may provide fourth tier evidence of citizenship, along with evidence of identity. (See table 1 and app. I.)

---

[23]As of June 2007, CMS indicated that a final rule is forthcoming.

**Table 1: Examples from the List of Acceptable Documents for Proving Citizenship Defined under Federal Regulations, by Level of Reliability**

| Level of documentation | Examples of acceptable documents | Other documents required |
|---|---|---|
| Tier 1 (most reliable) | • U.S. passport[a]<br>• Certificate of naturalization[a]<br>• Certificate of citizenship[a] | None |
| Tier 2 | • U.S. birth certificate[b]<br>• Report of birth abroad of a U.S. citizen[b]<br>• U.S. citizen I.D. card issued by the Immigration and Naturalization Service[b]<br>• Final adoption decree showing the child's name and U.S. birthplace<br>• U.S. military record showing U.S. place of birth | Verification of identity[c] |
| Tier 3 | • Hospital record showing a U.S. place of birth<br>• Health insurance record showing a U.S. place of birth | Verification of identity[c] |
| Tier 4 (least reliable) | • Federal or state census record showing U.S. citizenship or place of birth<br>• Nursing home admission papers showing a U.S. place of birth<br>• U.S. vital statistics official notice of birth registration | Verification of identity[c] |

Source: GAO analysis of the DRA and regulations published by CMS.

Notes: This table is not a comprehensive list of documents CMS considers reliable evidence of citizenship. Further, the table does not detail CMS's restrictions for using particular documents. For example, in tier 2, a U.S. birth certificate must be issued before the individual turned 5 years of age. In tier 3, hospital records must be on hospital letterhead and created at least 5 years before the date of the individual's application for Medicaid. Appendix I provides a more complete list of documents and accompanying restrictions as well as a list of acceptable documents for verifying identity.

[a]Under the DRA, this document was determined to be satisfactory evidence of citizenship.

[b]Under the DRA, this document was determined to be satisfactory evidence of citizenship when accompanied by documentation of identity.

[c]Acceptable evidence of identity includes such documents as driver's licenses, school identification cards, and, for children under 16, school records.

In addition to prescribing a list of acceptable documents for verifying citizenship, the regulations issued by CMS specify, with one exception, that documents must be originals or copies certified by the issuing agency. The exception is that for a U.S. birth certificate, which is a tier 2 document, states may use a cross match with a state vital statistics agency to document a birth record. The regulations allow states to accept original documentation from individuals in person or through the mail.

Under the regulations issued by CMS, states must provide applicants and Medicaid beneficiaries a "reasonable opportunity" to document their citizenship before denying or terminating Medicaid eligibility. States have flexibility in defining the length of the reasonable opportunity period. The

regulations further explain that current Medicaid beneficiaries must remain eligible for benefits during this period but that states may terminate eligibility afterward if they determine that the beneficiary has not made a good faith effort to present documentation. In contrast, applicants are not eligible for Medicaid coverage until they submit the required documentation. The regulations also require states to assist individuals who are physically or mentally incapable of obtaining documentation and do not have a representative to assist them. However, the regulations do not specify criteria for determining who is capable or the level of assistance states should provide. CMS intends to monitor state implementation of the requirement, including the extent to which states use the most reliable evidence available to establish citizenship based on its hierarchy. States that do not comply with the regulations may face either denied or deferred payment of federal matching funds.

In the interim final rule, CMS assessed potential administrative and fiscal effects of the requirement. For example, CMS estimated that individuals would need, on average, 10 minutes to acquire and provide the state with acceptable documentary evidence and that states would need 5 minutes per individual to verify citizenship and maintain current records.[24] In addition, CMS determined that implementing the rule would have no consequential effect on costs for state, local, or tribal governments or the private sector.[25] Under the rule, states may seek federal Medicaid matching funds for administrative expenditures associated with implementing the requirement at a 50 percent federal matching rate.

---

[24]In order to meet its obligations under the Paperwork Reduction Act of 1995, CMS solicited comments on these estimates.

[25]CMS did not perform a detailed analysis of the costs and benefits prior to issuing this rule, as would otherwise be required under the Unfunded Mandates Reform Act of 1995, because it determined that the cost would be less than $100 million (or approximately $120 million in 2006 dollars) for any 1 year.

## Many States Reported That the Requirement Resulted in Delayed or Lost Medicaid Coverage for Some Individuals Who Appeared to Be Eligible

States reported that the requirement resulted in barriers to access, such as delayed or lost Medicaid coverage for some eligible individuals. Of the 44 states, 22 reported a decline in Medicaid enrollment due to the requirement. Most that reported a decline in enrollment attributed it to delays in or losses of coverage for individuals who appeared to be eligible citizens, and all states reporting a decline reported that children were affected by the requirement. States that reported a decline in enrollment varied in their views of the effects on access to Medicaid coverage after the first year of implementation. State enrollment policies and whether an individual is an applicant or a beneficiary at redetermination are two factors that may have influenced the effect of the requirement on individuals' access.

### States Reported Enrollment Declines Largely Driven by Delays in or Losses of Medicaid Coverage for Eligible Citizens

Half the states that reported implementing the requirement noted that the requirement resulted in declines in Medicaid enrollment.[26] Of the 44 states, 22 states reported a decline in enrollment due to implementing the requirement, 12 reported no change in enrollment as a result of the requirement, and 10 reported that they did not know the effect of the requirement on enrollment (see fig. 1). Of the 22 states that reported a decline in enrollment due to the requirement, all responded that children were affected by the requirement, and 21 reported that adults were affected, with 2 specifying pregnant women. A few also responded that the aged and blind and disabled were also affected.

[26]Of the 44 states, all reported implementing the requirement as of January 2007: 33 implemented the requirement in July 2006, the month that the requirement became effective, 8 did so within the 2 months following, and 3 did so within 6 months of the July 1, 2006, effective date.

**Figure 2: Effect of the Requirement on Medicaid Enrollment, as Reported by States**



Source: GAO survey of state Medicaid offices.

Note: Numbers reflect responses from 44 states.

Though states often cited a combination of reasons for the decline in Medicaid enrollment, when asked the primary reason, the majority of states (12 of 22) reported that enrollment declined because applicants who appeared to be eligible citizens experienced delays in receiving coverage. In addition, 5 of the 22 states identified the primary reason for the enrollment decline as current beneficiaries losing coverage, with 4 of the 5 states reporting that those individuals appeared eligible. Two states reported that declines were largely driven by denials in coverage for individuals who did not prove their citizenship. It was unclear from survey results, however, whether these individuals were determined ineligible because they were not citizens or simply because they did not provide the required documents within the time frames allowed by the state. (See fig. 3.) Two of the remaining 3 states reported that the primary reason for the decline was that individuals were discouraged from applying because

of the requirement or were not responding to states' requests for documentation of citizenship.[27]

**Figure 3: Primary Reason Why Requirement Resulted in Medicaid Enrollment Declines, as Reported by States**



Source: GAO survey of state Medicaid offices.

Notes: Numbers do not sum to 22, the number of states reporting a decline in Medicaid enrollment as a result of implementing the requirement, because 2 states reported other reasons, namely that individuals were discouraged from applying or were not responding to states' requests for the documentation, and 1 state did not answer the relevant survey question.

[a]It is unclear from the survey results whether these individuals lost or were denied coverage because they were not citizens or because they did not provide the required documentation.

The extent of the decline in Medicaid enrollment due to the requirement in some individual states or nationally was unknown because not all states track the effect of the requirement on enrollment. However, 1 state that had begun tracking the effect reported (1) denying an average of 15.6 percent of its monthly applications because of insufficient citizenship documentation in the first 7 months following implementation and (2) terminating eligibility for an average of 3.2 percent of beneficiaries at redetermination per month over the same period and for the same reason. Overall, these denials and terminations represented over 18,000 individuals, who the state generally believed were eligible citizens.[28] While not tracking the effect of the requirement on enrollment explicitly, 10 other states that attributed enrollment declines at least in part to applicants who were delayed or denied coverage also reported increases

---

[27]The last state did not answer the survey question about the reasons that the requirement led to a decline in enrollment.

[28]This state's total Medicaid enrollment was about 970,000 in fiscal year 2004, the most recent year of enrollment data available.

in monthly denials ranging from 1 to 14 percent after implementing the requirement.

States reporting a decline in Medicaid enrollment differed in their views of the effects of the requirement on enrollment after the first year of implementation. Of the 22 states that reported a decline in enrollment, 17 states responded that they expected the downward enrollment trend to continue. Five of these states indicated that the declines would level off within approximately 1 year of implementation, citing, for example, a drop-off in terminations once their current beneficiaries have successfully documented their citizenship. Ten of the 17 states reported that they were unsure how long enrollment declines would continue or generally expected the trend to continue indefinitely.[29] A few of these states noted concern about the ongoing effect on new applicants who will be unfamiliar with the requirement and may be denied enrollment or discouraged from applying. The remaining 5 of 22 states reported that they did not expect the decline to continue.[30]

## State Enrollment Policies and Individuals' Enrollment Status May Have Influenced Effect of Requirement on Access to Medicaid

Variation in the effects of the requirement on individuals' access may have resulted from different state enrollment policies. For example, states that reported a previous reliance on mail-in applications and redeterminations were more likely to report a decline in Medicaid enrollment. About two-thirds of the 22 states that reported a decline in enrollment indicated that individuals most commonly applied by mail before the requirement was implemented. In contrast, the majority of the 12 states that reported no change in enrollment reported that individuals most frequently applied in person before the requirement was implemented. In addition, prior to implementation, 6 states had documentation policies in place that were similar to the requirement. Three of these 6 states reported no change in enrollment, with 1 explaining that it was because the state already required (1) proof of birth to verify age and family relationship and

---

[29]The remaining 2 states did not indicate how long the trend would continue.

[30]Of these 5 states, 2 noted that they had already documented citizenship for current Medicaid beneficiaries; 1 reported that it accepts photocopies of acceptable documentation; and the remaining 2 expected people eventually to provide the necessary documents and qualify for Medicaid.

(2) proof of identity for adults. Two of the 6 states reported a decline in enrollment caused by the requirement.[31]

Another enrollment policy that may have influenced the requirement's effect on access to Medicaid coverage was the amount of time states allowed individuals to comply with the requirement—otherwise known as reasonable opportunity periods. In total, 33 states reported the number of days they allowed applicants and beneficiaries to meet the requirement before denying applications or terminating eligibility, with limits generally ranging from 10 days to 1 year. Nine of the 33 states reported allowing applicants 30 days or less, and 4 of these states also reported a decline in enrollment due to the requirement.[32] A few states reported allowing applicants and beneficiaries an indefinite amount of time to obtain and submit the necessary documentation, provided they were deemed as making a good faith effort. Some states' written policies indicated that the reasonable opportunity period could be extended, provided the individual notified the state that he or she was making a good faith effort to obtain the documentation but needed more time.[33]

The effect of the requirement on access may have also depended on whether the individual was a new applicant or a beneficiary at redetermination. Applicants who declare themselves citizens are not eligible for Medicaid coverage until they submit the required documentation, while beneficiaries at redetermination maintain their eligibility while collecting documents as long as they are within the reasonable opportunity period allowed by the state or deemed as making a good faith effort to comply with the requirement. For example, a pregnant woman at redetermination is eligible to have her 20-week ultrasound covered by Medicaid, even though she has not yet submitted her documentation to the state. In contrast, a pregnant woman who is a new Medicaid applicant would not be determined eligible for coverage until she

---

[31]The sixth state responded that it did not know the effects of the requirement on enrollment.

[32]Of the 5 remaining states, 3 reported they did not know the effect of the requirement on enrollment, and 2 reported the requirement had no effect on enrollment.

[33]However, states did not define what is considered a good faith effort.

submits her documentation (see fig. 4).[34] In addition, applicants who were born out of state may have faced additional delays while attempting to obtain documentation from their birth state. For example, one state noted that it could take 6 months or more to obtain a birth certificate from another state.

**Figure 4: Comparison of the Effect of the Requirement on a Pregnant Woman Applying for Medicaid and a Pregnant Woman at Redetermination**



Source: GAO.

In addition, applicants in some states were given less time than beneficiaries to meet the requirement. Of the 33 states that provided information on their reasonable opportunity periods, 13 states reported that the time allowed for providing documentation was longer for beneficiaries at redetermination than for applicants, with this difference ranging from 24 to 320 days. Five of the 13 states reported allowing

---

[34]If the applicant is determined eligible, she generally would qualify for Medicaid 3 months prior to the date of her application if she met eligibility requirements during that period. Accordingly, she can be reimbursed for the cost of an ultrasound provided during the retroactive coverage period, but she may first be required to pay the full out-of-pocket cost at the time of service, which many Medicaid-eligible individuals may find difficult to afford.

45 days for applicants and 300 days or more for beneficiaries. States may offer more flexibility to Medicaid beneficiaries as CMS officials told us that for these individuals the state cannot terminate benefits without documenting that the beneficiary has not made a good faith effort to provide the necessary documentation.

# States Reported Investing Resources to Implement Requirement, with Fiscal Benefits Uncertain

Although states reported investing resources to implement the requirement, potential fiscal benefits for the federal government and states are uncertain. To implement the requirement and assist individuals with compliance, all of the 44 states took a number of administrative measures, such as providing additional training for eligibility workers and hiring additional staff, and some also reported committing financial resources. Despite these measures, however, states reported that as a result of the requirement, individuals needed more assistance in person and it was taking the state longer on average to complete applications and redeterminations. According to states, two particular aspects of the requirement increased the burden of implementing it: (1) that documents must be originals and (2) the list of acceptable documents was complex and did not allow for exceptions. While CMS estimated federal and state savings from the requirement, the estimates may be overstated.

## State Resources Invested to Implement the Requirement and Assist Individuals with Compliance

All 44 states reported taking a number of administrative measures to implement the requirement and assist individuals with compliance. Measures most frequently taken by states included training eligibility workers, revising application and redetermination forms, conducting vital statistics data matches, and modifying information technology systems. For example, 1 state reported that in addition to training 18,000 staff on the requirement, it also provided training and information to community agencies, consumer advocates, and providers on how to assist individuals with compliance. Another state established data matches with Indian Health Services to obtain hospital records that met the requirement and built a Web site on which eligibility workers could search the state's vital records to document citizenship. To supplement the efforts of eligibility workers, 3 states reported having formed special units of staff focused entirely on assisting individuals to meet the requirement, particularly in difficult cases where eligibility workers had been unsuccessful in their attempts to help individuals comply. One of those states reported that it was in the process of expanding the size of its team from 22 workers to 40 workers. Table 2 lists the administrative measures frequently reported by states.

**Table 2: Administrative Measures Frequently Taken by States to Implement the Requirement and Assist Individuals with Compliance**

| Measures taken by states | Number of states (of 44) |
|---|---|
| Conducted additional training for eligibility workers | 39 |
| Revised application and redetermination forms | 33 |
| Conducted data matches with the state's vital statistics agency | 33 |
| Modified information technology systems | 32 |
| Conducted educational outreach to individuals | 32 |
| Assisted individuals in paying for documents | 18 |
| Hired or allocated additional staff | 15 |
| Authorized overtime pay | 11 |
| Added new application and redetermination methods | 9 |
| Increased third-party administrative contracts | 7 |

Source: GAO survey of state Medicaid offices.

Beyond these administrative measures, 40 percent of the 44 states reported having appropriated funds for implementation or planned to do so in future years. Specifically, 12 states reported that funds were appropriated in their state fiscal year 2007 to implement the requirement, which for the 10 states that specified the amount totaled over $28 million, with appropriations ranging from $350,000 to $10 million in individual states.[35] Further, 15 states budgeted funds for implementation costs in state fiscal year 2008.[36] While many states did not specifically appropriate funds toward implementing the requirement in state fiscal year 2007, this may have been due, in part, to the timing of the requirement within the budget year. States may not be budgeting funds for future years for various reasons, including that the burden of the requirement may decrease after the first year of implementation or that the state may face other budget constraints. For example, one state Medicaid office that reported a significant backlog in applications and redeterminations as a result of the requirement requested funds for implementation in state fiscal year 2008

---

[35]In 2005, the most recent year of Medicaid expenditure data available from CMS, the 10 states' Medicaid administrative expenditures ranged from approximately $22 million to over $320 million. The amount of funds that states reported were appropriated to implement the requirement represented from 1 percent to 12 percent of each state's respective 2005 Medicaid administrative expenditures.

[36]To the extent that states increase Medicaid administrative spending to implement the requirement, the federal government will share in the costs.

and planned to renew those requests in state fiscal years 2009 and 2010, but was not sure whether the state legislature would appropriate the funds.

## Two Aspects of the Requirement Increased the Burden of Implementation

Despite investments of resources, most states reported that the requirement resulted in the state spending more time completing applications and redeterminations and individuals needing more assistance in person during the process. Of the 44 states, 28 states reported increases in the level of assistance provided to clients in person, and 35 states reported an increase in the amount of time it took the state to complete applications and redeterminations. (See fig. 5.) States reporting no change in the level of in-person assistance or time spent completing applications and redeterminations since implementation were frequently states where individuals primarily applied for and renewed Medicaid enrollment in person prior to the requirement.

Figure 5: Effect of the Requirement on States' Level of Assistance and Amount of Time Needed during Application and Redetermination



Source: GAO survey of state Medicaid offices.

Notes: Numbers do not sum to 44 for level of assistance, because 1 state reported that the amount of in-person assistance increased for applications but did not change for redeterminations and therefore was not counted, and another state did not answer the question related to assistance provided in person. For changes in time spent by the state per application and redetermination, numbers do not sum to 44 because 1 state did not answer the related question.

Of the 35 states that reported increases in enrollment processing time, most reported that the requirement added 5 or more minutes per case to the processing time for applications and redeterminations. While only 1 of the 35 states expected an increase of less than 5 minutes per case, 9 states estimated an additional 5 to 15 minutes per case, and 16 states expected the requirement to add over 15 minutes of processing time per application or redetermination, well above the 5 minutes estimated by CMS in the interim final rule.[37] One of these 16 states reported processing an average

---

[37]The remaining states (9 of 35) did not specify the amount of additional state processing time resulting from the requirement.

of over 150,000 applications per month in the 8 months following implementation. In that state, assuming an increase in processing time of a minimum of 16 minutes per application since implementing the requirement, this would have added at least 40,000 hours of staff time per month. Other states emphasized that the effect of the requirement on workload goes beyond the amount of time necessary to complete applications and redeterminations. For example, one state reported a 60 percent increase in phone calls (from 24,000 to 39,000 per month), a tenfold increase in voice messages (from 1,200 to 11,000 per month), and an 11 percent increase in the amount of time spent on each call.[38]

Though the requirement represented a change in enrollment procedures for most states, states reported that certain aspects of the requirement specified under federal regulations by CMS increased their implementation burden. More than 80 percent of states (36 of 44) reported facing administrative challenges in implementing the requirement, and many attributed the challenges to two specific aspects of the requirement outlined in the regulations, namely (1) that documents must be originals and (2) that the list of acceptable documentation was complex and did not allow for exceptions. In fact, nearly all states (42 of the 44) reported that having to provide original documentation posed a barrier to eligible citizens' meeting the requirement. Further, many states also reported that mandating originals affected state workload primarily because individuals did not feel comfortable mailing the documents to the state and instead began presenting them in person. With regard to the list of acceptable documents, states reported that the list was complex, often confusing both individuals and eligibility workers, and left states with no discretion to allow exceptions. For example, 1 state that documented citizenship for Medicaid prior to enactment of the DRA noted that when acceptable documentation was not available, the state made an assessment based on a preponderance of evidence, which included certain tribal documents excluded from CMS's list. Thirty-four states reported that an individual's inability to provide documents other than those defined under federal regulations by CMS created a barrier to individuals' compliance with the

---

[38]After implementing the requirement, some states also observed increases in the number of pending applications per month and a decrease in the number of redeterminations completed per month, indicating larger caseloads for some eligibility workers. For example, 20 of the 26 states with data available on applications reported an increase in the number of pending applications per month after implementing the requirement, with just over half of states observing increases of at least 30 percent. In 3 states, this increase represented an additional 10,000 pending applications per month as compared to the average number of pending applications per month prior to implementing the requirement.

requirement. Table 3 presents some of the challenges reported by states to implement the requirement.

**Table 3: Challenges Posed by Certain Aspects of the Requirement, as Reported by States**

| Aspect of requirement | Challenge posed | Description |
|---|---|---|
| Documents must be originals | Cost of obtaining original documents | Low-income families enrolled in Medicaid often cannot afford to pay for original documents such as birth certificates, which can cost up to $30 each. When individuals are physically or mentally incapable of obtaining documents for themselves, doing so becomes the state's responsibility, the cost of which has raised concerns among several states. |
| | Original documents needed for daily living | Individuals cannot part with such documents as driver's licenses for the number of days it would take to mail them and have them returned by the state and do not want to risk identity theft. As a result, more individuals are submitting the documents in person, which has increased the volume of walk-in clients at eligibility offices. In some rural areas, individuals may have to travel significant distances to reach the nearest eligibility office to present the documents in person. |
| | Management and remittance of original documents | Some individuals are choosing to submit driver's licenses and U.S. passports through the mail, causing stress among eligibility workers who want to return the documents as quickly as possible. In addition, returning the documents can increase state mail costs. |
| Prescribed list of acceptable documents | Complexity of list | The complexity of the tiered list of acceptable documents has confused individuals and local eligibility workers. As a result, states have invested more time answering calls from customers and providing technical assistance to local offices. |
| | Lack of state discretion to allow exceptions | The list lacks flexibility for states to allow exceptions when an individual, or the state on the individual's behalf, cannot obtain any of the documents. |

Source: GAO survey of state Medicaid offices.

When developing its interim final rule, CMS officials said that CMS considered the specifications of the DRA and other existing federal policies on documenting citizenship, including policies of SSA. CMS officials told us that after meeting the specifications of the DRA, the agency modeled its regulations after the policy established by SSA for documenting citizenship when individuals apply for a Social Security number. Specifically, SSA's policy mandates that documents be originals and includes a hierarchy of documents with restrictions on the use of less reliable documents. Also, the list of acceptable documents identified by CMS mirrors SSA's list with only a few exceptions. In contrast, however, SSA's policy allows more flexibility in special cases. For example, when a U.S.-born applicant for a Social Security number does not have any of the documents from the list, SSA's policy allows staff to work with their supervisors to determine what would be acceptable in those cases. CMS officials told us that CMS's list of acceptable documents represents a significant expansion of what was included in the DRA provision and is

exhaustive and that they were not aware of any case where an individual was unable to provide any document from the list.

To assist states and individuals in complying with documenting citizenship, CMS included some important tools in the regulations. For example, the regulations allow states to use data matches with state vital statistics agencies to verify citizenship and with other government agencies to verify identity, which could alleviate the need for individuals to submit original documents. While many states reported conducting data matches on behalf of individuals, several also expressed concerns that such matches required additional resources and could not be done for individuals born out of state. One state reported conducting 60,000 on-line inquiries per month into the state's vital records system after implementing the requirement. In one area of the state, however, nearly all children were born across state lines and therefore the state could not electronically verify their citizenship. The state reported that verifying citizenship for children in that portion of the state was especially difficult. While CMS officials confirmed that there is no nationwide database for verifying citizenship, they also told us that there are currently initiatives under way in more than one state to share vital statistics with other states through data matches.[39]

## Estimates of Federal and State Fiscal Benefits May Be Overstated

Though CMS expected some savings to result from the requirement in fiscal year 2008, the estimate did not account for the cost to states and the federal government to implement the requirement. CMS's Office of the Actuary estimated that the requirement would result in $50 million in savings for the federal government and $40 million in savings for states in fiscal year 2008, with all savings resulting from terminations of eligibility for individuals who were not citizens. Specifically, CMS assumed that 50,000 noncitizen beneficiaries (which represent less than 1 percent of Medicaid enrollment nationwide) would prove ineligible for Medicaid benefits and be terminated from the program. Though CMS authorized states to claim federal Medicaid matching funds for administrative expenditures related to implementing the requirement, and 15 states reported budgeting funds for 2008 in addition to the numerous other measures being taken by states, CMS's estimate of savings did not account

[39]For example, according to CMS, the National Association for Public Health Statistics and Information Systems, an association of vital statistics agencies, is engaged in creating and making available a database and linking system to permit interstate electronic verification of vital statistics information.

for any increase in administrative expenditures by states or the federal government. CMS expected, however, that states would experience higher administrative costs during the first year of implementation with these costs decreasing in later years.

In addition to not accounting for the cost of the requirement, survey results indicated that CMS may have overestimated the potential savings from the requirement because the intended effect of the requirement, that is, to prevent ineligible noncitizens from receiving Medicaid benefits, may be less prevalent than expected. When asked about potential savings from the requirement, only 5 of the 44 states reported expecting the requirement to result in a decrease in their expenditures for Medicaid benefits in state fiscal year 2008, due in large part to individuals who appeared to be eligible citizens who experienced delays in or lost coverage. Only 1 of the 5 states expecting savings reported that enrollment declines resulted in part from denials or terminations of Medicaid coverage for individuals who were determined ineligible because of their citizenship status. The remaining 39 states expected no savings (20 states) or reported that it was too early to know (19 states). Several of the 20 states that expected no savings in 2008 reported that though some individuals have experienced delays in coverage, those individuals were eligible citizens and would eventually provide the required documentation and receive coverage. In addition, 2 of these 20 states noted that they were not inappropriately financing Medicaid benefits for noncitizens in the past and so expected no savings. Of the 19 states that were unsure how the requirement would affect expenditures, 2 were still tracking the effects of the requirement. Another of these 19 states—a state that reported a decline in enrollment as a result of implementing the requirement—noted that it was difficult to determine whether it would result in lower costs or whether costs would increase, as the state expected individuals would wait to enroll until they were ill or injured, rather than receive preventive care that is less costly to provide.

## Agency Comments and Our Evaluation

We provided a draft of this report to CMS for comment and received a written response, which is included in this report as appendix II. CMS also provided technical corrections, which we incorporated as appropriate. CMS commented that it generally did not disagree with the approach of our study, but raised several concerns regarding the sufficiency of the underlying data for, and certain aspects of, our findings. In particular, CMS characterized the report's conclusions as overstating the effect of the requirement on enrollment, and stated it had concerns about the fact that the states did not submit data to substantiate their responses to the survey

questions on which we based our findings. CMS also commented on our findings related to the challenges posed by the requirement for states and individuals and the cost to states of implementing the requirement. Specific concerns raised and comments made by CMS, and our evaluation, follow.

Regarding the sufficiency of underlying data for certain findings, CMS commented that our survey asked states about the effects of the requirement on enrollment, although states did not provide data to validate their responses. In addition, CMS expressed concerns that the draft report appeared to draw broad conclusions about the effect of the requirement from data provided by one state. The purpose of our work was to report on the initial effects of the requirement. Absent national CMS data on the effects and because state Medicaid offices were largely responsible for implementing the requirement, we determined they were the best source for this information. Though not all states could quantify the effect of the requirement on enrollment, 22 states reported that the requirement resulted in decreases in enrollment, 12 reported that the requirement had no effect on enrollment, and 10 reported not knowing the effect of the requirement on enrollment. We disagree with CMS's assertion that the draft report drew broad conclusions about the effect of the requirement on enrollment from one state's data. The report clearly indicates that these data are from a single state and further notes that the extent of the decline in Medicaid enrollment due to the requirement in some individual states and nationally is unknown.

CMS raised concerns about one survey question that asked states that reported enrollment declines due to the requirement the reasons for those declines and also about the level of information provided regarding the degree to which the requirement deterred nonqualified aliens from applying for Medicaid. With regard to the first concern, in responding to our survey, states could check an option that said enrollment declines were caused by the delays in or losses of coverage for individuals who appeared eligible. CMS objected to the use of "appeared eligible," noting that the term is vague and subjective and that it tends to lead the respondent to certain conclusions. However, as we explain in the report, asking states to assess the citizenship status of individuals is consistent with most states' experience in making such determinations under the self-attestation policies that were in effect prior to the DRA provision. With regard to the second concern, we agree with CMS that our report provides limited information about the extent to which the requirement is deterring nonqualified aliens from applying for Medicaid. However, the report does discuss whether CMS had evidence that such individuals were falsely

declaring citizenship when applying for Medicaid. Specifically, our report notes that CMS in its comments to the 2005 OIG report on state self-attestation policies acknowledged that the OIG did not find problems regarding false allegations of citizenship, and CMS was not aware of any such problems.

CMS commented that the draft report overstated the effect of the requirement on enrollment because the majority of states reporting enrollment declines attributed the declines primarily to delays in receiving coverage rather than denials of coverage. Our report notes the implications for individuals of such delays in coverage. The report points out, for example, that a pregnant woman who is a citizen may be forced to forgo needed prenatal care while her coverage is delayed by efforts to meet the requirement. CMS also noted that its goal in implementing the requirement was to minimize the incidence of delays in or denials of eligibility due to the requirement.

In response to our findings that two aspects of the requirement specified under regulations issued by CMS—namely that documents be originals and that the list of acceptable documents is complex and does not allow for exceptions—presented challenges to states and individuals, CMS commented that the agency has attempted to provide as much flexibility as possible and that other federal agencies require original documentation. Nonetheless, our survey results clearly indicated that these two aspects of the requirement are viewed by most states as posing barriers to access. In particular, 42 of 44 states reported that having to provide original documentation posed a barrier to eligible citizens' meeting the requirement, and 34 states reported that an individual's inability to provide documents other than those defined under federal regulations by CMS created a barrier to compliance. Further, while the report explains that CMS modeled its regulations after SSA's policy for documenting citizenship when individuals apply for a Social Security number, the report also notes that, unlike CMS, SSA provides for flexibility in special cases.

CMS also commented on our finding that CMS's estimates of potential savings from the requirement in fiscal year 2008 did not account for administrative costs. Specifically, CMS agreed that its estimate did not account for administrative costs incurred by states to implement the requirement, but stated that any such costs would decrease after the first year of implementation. Our report describes that some states reported not having budgeted funds for the requirement in future years and explains that one reason for this may be that the burden of the requirement may decrease after the first year of implementation. However, the ongoing

costs of assisting applicants in complying with the requirement may continue to be significant for some states, especially those states that had to substantially modify their enrollment procedures. For example, as noted in the report, due to the requirement, one state faced an additional 40,000 hours of staff time needed per month to process applications.

CMS commented that it was not surprised that states reported facing challenges, given that the report's findings were based on states' experiences after less than 1 year of implementing the requirement. While agreeing that the requirement posed challenges for individuals and states, CMS asserted that these initial challenges have diminished and will continue to do so. Based on our survey responses, states largely do not share CMS's optimism in this regard. In addition to describing the initial effects of the requirement, which in states' perspectives have included enrollment declines and increased administrative burdens, our report includes additional indicators that the effects states experienced in the first year will continue at least to some extent in the future. For example, 17 of the 22 states that reported a decline in enrollment due to the requirement reported that they expected the downward trend in enrollment to continue, with some expecting the decline to continue indefinitely. In addition, 15 states reported already having budgeted funds for the requirement in state fiscal year 2008.

CMS also emphasized actions it has taken to implement the requirement, such as issuing a letter to state Medicaid directors, publishing an interim final rule, and working on a final rule to be issued shortly. Our report describes the steps taken by CMS to implement the requirement. With regard to CMS's work on a final rule, we modified our report to indicate CMS's plans to issue such a rule shortly.

As arranged with your offices, unless you publicly announce the contents of this report earlier, we plan no further distribution of this report until 30 days after its issue date. At that time, we will send copies of this report to the Secretary of HHS, the Administrator of the Centers for Medicare & Medicaid Services, and other interested parties. We will also make copies available to others on request. In addition, the report will be available at no charge on the GAO Web site at http://www.gao.gov.

If you or your staffs have any questions about this report, please contact me at (202) 512-7114 or cosgrovej@gao.gov. Contact points for our Offices of Congressional Relations and Public Affairs may be found on the last page of this report. GAO staff who made major contributions to this report are listed in appendix III.

James C. Cosgrove
Director, Health Care

# Appendix I: List of Acceptable Documents for Proving Citizenship and Identity, as Defined under Federal Regulations

Federal regulations published by the Centers for Medicare & Medicaid Services (CMS) identify primary, or tier 1, documents that are considered sufficient to establish citizenship.  Under the regulations, if individuals do not have primary evidence, they are expected to produce secondary, or tier 2, evidence of citizenship as well as evidence of identity. If neither primary nor secondary evidence of citizenship is available, individuals may provide third tier evidence of citizenship with accompanying evidence of identity. If primary evidence of citizenship is unavailable, secondary and third tier evidence do not exist or cannot be obtained in a reasonable time period, and the individual was born in the United States, then the individual may provide fourth tier evidence of citizenship, along with evidence of identity. See table 4 for a list of acceptable documents to prove citizenship and table 5 for acceptable identity documents.

**Table 4: List of Acceptable Documents for Proving Citizenship, as Defined under Federal Regulations**

| Level of documentation | Acceptable documents | Restrictions |
|---|---|---|
| Tier 1 (primary) | U.S. passport[a] | |
| | Certificate of naturalization[a] | |
| | Certificate of U.S. citizenship[a] | |
| | State-issued driver's license[a] | Limited to states that require proof of citizenship or that verified the individual's Social Security number as a condition of issuance |
| Tier 2 (secondary) | U.S. public birth certificate[b] | Certificate must have been issued before the individual was 5 years of age |
| | Certification of report of birth[b] | |
| | Report of birth abroad of a U.S. citizen[b] | |
| | Certification of birth issued by the Department of State[b] | |
| | U.S. citizen identification card issued by the Immigration and Naturalization Service[b] | |
| | Northern Mariana identification card | |
| | American Indian card | Limited to cards issued by the Department of Homeland Security to Texas Band of Kickapoos |
| | Final adoption decree showing child's name and U.S. place of birth | |
| | Evidence of U.S. civil service employment | Limited to individuals employed before June 1, 1976 |
| | U.S. military record showing a U.S. place of birth | |

| Level of documentation | Acceptable documents | Restrictions |
|---|---|---|
| Tier 3 (third level) | Hospital record indicating a U.S. place of birth | Record must be on hospital letterhead and created at least 5 years before initial application for Medicaid, or, for children under 16, near the time of birth or 5 years before application for Medicaid |
| | Life, health, or other insurance record indicating U.S. place of birth | Record must be created at least 5 years before initial application for Medicaid |
| Tier 4 (fourth level) | Federal or state census record showing U.S. citizenship or a U.S. place of birth | Record must also show applicant's age |
| | Seneca Indian tribal census record | Record must show a U.S. place of birth and have been created at least 5 years before application for Medicaid |
| | Bureau of Indian Affairs tribal census records of the Navajo Indians | Record must show a U.S. place of birth and have been created at least 5 years before application for Medicaid |
| | U.S. state vital statistics official notice of birth registration | Notice must show a U.S. place of birth and have been created at least 5 years before application for Medicaid |
| | U.S. birth record amended more than 5 years after individual's birth | Record must show a U.S. place of birth and have been created at least 5 years before application for Medicaid |
| | Signed statement from physician or midwife present at birth | Statement must show a U.S. place of birth and have been created at least 5 years before application for Medicaid |
| | Medical record | Record must show a U.S. place of birth and have been created at least 5 years before initial application for Medicaid or, for children under 16, near the time of birth or 5 years before application for Medicaid |
| | Institutional admission papers from nursing home or other institution | Papers must show a U.S. place of birth |
| | Written affidavit | Affidavits may be used only in rare circumstances and must comply with several additional requirements |

Source: GAO analysis of the Deficit Reduction Act of 2005 (DRA) and regulations published by CMS.

[a]Document identified in the DRA as an acceptable document for proving citizenship.

[b]Document identified in the DRA as an acceptable document for proving citizenship when accompanied by documentation of identity.

**Appendix I: List of Acceptable Documents for Proving Citizenship and Identity, as Defined under Federal Regulations**

**Table 5: Acceptable Documents for Proving Identity, as Defined under Federal Regulations**

| Level of documentation | Acceptable identity documents |
|---|---|
| Tier 1 | Not applicable |
| Tiers 2, 3, and 4 | • Driver's license with photograph or other identifying information[a] |
| | • School identification card with photograph[a] |
| | • U.S. military card or draft record[a] |
| | • Identification card issued by federal, state, or local government with photograph or other identifying information[a] |
| | • Military dependent's identification card[a] |
| | • Native American Tribal document[a] |
| | • U.S. Coast Guard Merchant Mariner card[a] |
| | • Certificate of Degree of Indian Blood or other tribal document with photograph or other personal identifying information |
| | • Cross match with other government agency if the agency establishes and certifies true identity of individuals |
| | In addition, for children under 16: |
| | • School records |
| | • Written affidavit if no other identity documents on the list are available |

Source: GAO analysis of the DRA and regulations published by CMS.

[a]Document identified in the DRA as an acceptable document for proving identity.

# Appendix II: Comments from the Centers for Medicare & Medicaid Services



DEPARTMENT OF HEALTH & HUMAN SERVICES

Centers for Medicare & Medicaid Services

_Administrator_
Washington, DC  20201

JUN 1 4 2007

Mr. James Cosgrove
Director, Health Care
United States Government Accountability Office
Washington, DC  20548

Dear Mr. Cosgrove:

Thank you for submitting the Draft Report: States Report Citizenship Documentation Resulted in Enrollment Declines for Eligible Citizens and Posed Administrative Burdens. We appreciate the opportunity to comment, and have several concerns we would like to address. The Centers for Medicare & Medicaid Services (CMS) is concerned that the title of this report is misleading, given the results of the survey and the lack of supporting data. Although CMS does not disagree generally with the approach of the report, we believe that GAO reached conclusions largely based on State responses that are not substantiated by State enrollment data.

We understand GAO undertook this survey to analyze the impact of the new Deficit Reduction Act of 2005 (DRA) provision requiring States to secure from applicants and recipients for Medicaid satisfactory documentary evidence of citizenship. The provision requires that as of July 1, 2006 citizens applying for Medicaid, or renewing their eligibility, document their citizenship. United States citizenship or legal immigration status has always been a requirement for Medicaid eligibility, but prior to the DRA, States could accept a citizen applicant's statement of citizenship as sufficient. The new law is designed to ensure that Medicaid beneficiaries who are citizens have documented such status without imposing undue burdens on them or the States. This provision does not apply to applicants and recipients who are in a legal immigration status. Such individuals continue to provide documentation of their immigration status as previously required.

The GAO sought to determine whether States were experiencing declines in Medicaid enrollment because of the citizenship documentation requirements. Based on a survey devised by the GAO, the GAO found that of the 44 States that provided complete responses to the GAO survey, 22 reported some declines in Medicaid enrollment, which may be attributable at least in part to the citizenship documentation requirement. Twelve States reported no decline in enrollment and 10 States did not know the effect of the requirement on enrollment. The GAO refused to provide CMS the names of the 7 States that did not complete the survey or fully implement the program. The GAO also did not provide us the individual responses from the State survey. This information would be helpful in identifying problems related to implementation and to showing best practices among the States.

GAO asks the States to establish causality between the implementation of the documentation requirement and enrollment declines, yet States do not identify data sources that validate the relationship between the implementation of the documentation requirement and enrollment

Page 2 – Mr. James Cosgrove

levels. In addition, we believe the report vastly overstates the conclusions that may be drawn
from the information presented within. These conclusions are largely based on anecdotal
statements or vague feelings by some States that all declines in enrollment must be based on the
new requirements. In fact, enrollment generally ebbs and flows across States such that at any
given time one would expect declines in some States, increases in other States, and unchanging
enrollment levels in others.

The validity of the report's conclusions is problematic. Broad conclusions on impact appear to
be drawn from data provided by one State and generalizing this to other States seems
questionable. We also find that the numbers presented are not put into context so that the reader
may understand the relative number of impacted applicants and recipients compared to those
who do not experience difficulty in meeting the requirement. In addition, we do not believe the
report gives sufficient attention to the effort by CMS to minimize the impact of this requirement
on States.

We agree that some States did report challenges. However, this result was not universal. Half of
the States responding did not report declines specific to this requirement. And, even though 22
States reported declines in Medicaid enrollment, the majority of those States reported that this
decline was primarily caused by applicants experiencing some *delay* in receiving coverage,
rather than a denial in coverage. Moreover, even when reporting this delay, States did not have
the factual information to substantiate that the citizenship requirement was in fact the basis for
the delay in enrollment.

We appreciate the effort GAO undertook in doing this report and understand the difficulty of
drawing clear conclusions due to the fact that States have relatively little specific data on the
reasons for the decline in enrollment. While it is still useful to have the benefit of the
information States provided about their implementation experiences, the limitations of such
information should be recognized. Furthermore, the survey instrument itself has several
weaknesses. Question 7 uses the term "appeared eligible." This is a vague and subjective
concept which tends to lead the respondent to certain conclusions rather than being precise,
because there are many reasons that someone who may "appear" at first meeting to be eligible is
ultimately found ineligible. Questions 16 and 17 ask what application method was/is most
commonly used, such as mail-in, in person, etc. It is the experience of CMS that States use
multiple methods of taking applications that in many cases are unique to specific eligibility
groups. Without this information, it is difficult to make worthwhile conclusions. Question 34,
did not ask for the number or percentage of applicants experiencing the barriers listed.

The report describes State implementation experiences after less than one year implementing a
new documentation requirement. States for 10-15 years prior to implementation had been
generally relying on self declaration without verification except in unusual circumstances. The
generalized practice of minimizing documentation over these years followed by an abrupt shift to
more documentation unsurprisingly has caused some challenges for States in operationalizing the
new requirements in a very short timeframe. With little time to prepare for a major shift in
outlook by States, eligibility workers, and the client population, the rather small declines
generally being reported are a testament to the success of States' implementation. The report
also sheds very little light, beyond the presupposition that citizens are the ones unable to

Appendix II: Comments from the Centers for
Medicare & Medicaid Services

Page 3 – Mr. James Cosgrove

document their citizenship, about whether the provision is deterring nonqualified aliens from
applying for regular Medicaid.

Among the major complaints of States, as reported by the GAO, is the requirement that originals
of documents be submitted, especially when the application process is a mail-in process.
Consequently, the requirement for originals of documents presents some administrative
challenges. In this context, we note that the Social Security Administration (SSA) requires
originals prior to establishing eligibility. Likewise, the Department of State requires original
documents or certified copies prior to issuing a passport. We also, considered the option of
permitting copies, but concluded that program integrity would best be served by requiring
originals or certified copies.

The GAO indicates in the report that CMS may have overestimated potential savings in the
interim final rule with comment period. CMS notes that the regulatory impact statement was
calculated to estimate changes in Medicaid expenditures for claims. It did not account for the
administrative impact on States. With respect to administrative costs, CMS provides federal
match for administrative expenditures. We would expect States to experience higher
administrative costs during the first year of implementation as they adjust to the new
requirements. We also expect these costs to decrease in later years as current recipients meet the
requirements and only new applicants are required to submit documentation. Furthermore, the
exemption of several groups of individuals authorized under both the DRA and the Tax Relief
and Health Care Act of 2006 (TRHCA) will significantly reduce the number of individuals from
whom States must collect documentation. Administrative costs may be further reduced by the
States' ability to cross–verify with the Systematic Alien Verification for Entitlements (SAVE)
database, to which they already have access. Data matches with the State's vital statistics agency
could further reduce administrative costs.

The CMS has undertaken a number of positive steps to implement the citizenship documentation
requirements. Among these are: (a) issuing a State Medicaid Directors' letter and interim final
rule soon after publication of the DRA which expanded upon the documents that could be used
in proving identity and citizenship; (b) providing extensive leadership and training to the States
so that they could implement the requirement; (c) working closely with the SSA and other
agencies to ensure that the requirements reflected standards already used by other Federal
agencies that verify citizenship; (d) working on the issuance of a final rule that should be issued
shortly and that will respond to comments; and (e) encouraging States to use electronic matching
whenever possible. We believe that these activities play a vital role in assisting the States in
understanding the new documentation requirements under the law. Conveying all of this
information to States and beneficiaries is a massive undertaking and we anticipate that with time
the documentation requirements will be recognized and understood as another aspect of the
Medicaid eligibility process.

CMS has attempted to provide as much flexibility as possible and consistent with the provisions
of the DRA in the documents applicants and recipients could use to document citizenship.
Further, any requirement to provide documentation by its nature adds to the responsibility of the
individual and the workload of the State. We also believe any initial impact has diminished as
States and applicants become familiar with the documentation requirement. We expect to see a

Page 4 – Mr. James Cosgrove

reduction in delays or denials for lack of documentation once the startup issues are resolved.
Moreover, we are pleased with the more expansive list of documents that has been published to
assist States in fulfilling the statutory documentation requirement. We believe that through these
documents and/or data matches, States have sufficient tools to assure that any citizen can provide
the necessary documents to meet the documentation requirement, and the State will not be found
at risk for providing Medicaid to undocumented citizens.

Our goal from the beginning has been to minimize the incidence of delays in or denials of
eligibility because of this provision. Thus, we have encouraged States to conduct data matches
with vital statistics agencies and other governmental agencies for identity. The information we
have received from States indicate that producing identity documents for young children has
been the largest problem States have encountered, and we will clarify this issue in the final
regulation.

We conclude also by noting that GAO made no recommendations to CMS in the report.
Enclosed are additional technical comments. Again, thank you for the opportunity to comment.
If you have any questions please feel free to contact me.

Sincerely,

Leslie V. Norwalk, Esq.
Acting Administrator

Enclosure

# Appendix III: GAO Contact and Staff Acknowledgments

| | |
|---|---|
| **GAO Contact** | James C. Cosgrove, (202) 512-7114 or cosgrovej@gao.gov |
| **Acknowledgments** | Kathryn Allen, Director, led the engagement through its initial phases. In addition, Susan Anthony, Assistant Director; Susan Barnidge; Laura Brogan; Elizabeth T. Morrison; and Hemi Tewarson made key contributions to this report. |

| | |
|---|---|
| **GAO's Mission** | The Government Accountability Office, the audit, evaluation and investigative arm of Congress, exists to support Congress in meeting its constitutional responsibilities and to help improve the performance and accountability of the federal government for the American people. GAO examines the use of public funds; evaluates federal programs and policies; and provides analyses, recommendations, and other assistance to help Congress make informed oversight, policy, and funding decisions. GAO's commitment to good government is reflected in its core values of accountability, integrity, and reliability. |
| **Obtaining Copies of GAO Reports and Testimony** | The fastest and easiest way to obtain copies of GAO documents at no cost is through GAO's Web site (www.gao.gov). Each weekday, GAO posts newly released reports, testimony, and correspondence on its Web site. To have GAO e-mail you a list of newly posted products every afternoon, go to www.gao.gov and select "Subscribe to Updates." |
| **Order by Mail or Phone** | The first copy of each printed report is free. Additional copies are $2 each. A check or money order should be made out to the Superintendent of Documents. GAO also accepts VISA and Mastercard. Orders for 100 or more copies mailed to a single address are discounted 25 percent. Orders should be sent to:<br><br>U.S. Government Accountability Office<br>441 G Street NW, Room LM<br>Washington, D.C. 20548<br><br>To order by Phone:  Voice:  (202) 512-6000<br>TDD:  (202) 512-2537<br>Fax:  (202) 512-6061 |
| **To Report Fraud, Waste, and Abuse in Federal Programs** | Contact:<br><br>Web site: www.gao.gov/fraudnet/fraudnet.htm<br>E-mail: fraudnet@gao.gov<br>Automated answering system: (800) 424-5454 or (202) 512-7470 |
| **Congressional Relations** | Gloria Jarmon, Managing Director, JarmonG@gao.gov (202) 512-4400<br>U.S. Government Accountability Office, 441 G Street NW, Room 7125<br>Washington, D.C. 20548 |
| **Public Affairs** | Paul Anderson, Managing Director, AndersonP1@gao.gov (202) 512-4800<br>U.S. Government Accountability Office, 441 G Street NW, Room 7149<br>Washington, D.C. 20548 |



**PRINTED ON** RECYCLED PAPER

# Exhibit 20

Civil Action No. 25-cv-0952 (CKK)
(Lead Case: No. 25-cv-00946 (CKK))

# How many women take their husband's last name when they marry?

**pewresearch.org**/short-reads/2023/09/07/about-eight-in-ten-women-in-opposite-sex-marriages-say-they-took-their-husbands-last-name

Beshay                                                                                          September 7, 2023



(Nerida McMurray Photography)

Marriage in the United States has been changing in many ways over the past several decades – but the tradition of women taking their husband's last name is still going strong. In a new Pew Research Center survey, we asked married people whether they changed their last name after marriage.

How we did this

Most women in opposite-sex marriages (79%) say they took their spouse's last name when they got married. Another 14% kept their last name, and 5% hyphenated both their name and their spouse's name.

Among men in opposite-sex marriages, the vast majority (92%) say they kept their last name. Just 5% took their spouse's last name, and less than 1% hyphenated both names.

The numbers of women and men in same-sex marriages in the sample are too small to analyze separately.

We also asked people of all sexual orientations who have never been married whether they *would* change their last name if they got married.

Women who have never been married have mixed views on this: 33% say they would take their spouse's last name, 23% would keep their last name, 17% would hyphenate both names and 24% aren't sure.

Among men, 73% say they would keep their last name, and 20% aren't sure. Just 4% say they would hyphenate both names and 2% say they would take their spouse's last name.

### Most women in opposite-sex marriages took their spouse's last name

*Among **women who are married to men**,\* % saying they ____ when they got married*



*Among **women who have never been married**, % saying they would ____ if they were to get married*



\* The number of women in same-sex marriages in the sample is too small to analyze separately.

Note: Response categories may not add up to 100% due to rounding. Shares of respondents who said they created or would create a new last name, those who provided some other response, and those who didn't offer an answer shown but not labeled.

Source: Survey of U.S. adults conducted April 10-16, 2023.

**PEW RESEARCH CENTER**

## Which women are more likely to have kept their last name after marriage?

Some women in opposite-sex marriages are more likely than others to say they kept their last name after getting married. They include:

**Younger women:** 20% of married women ages 18 to 49 say they kept their last name, compared with 9% of those ages 50 and older.

**Women with a postgraduate degree:** 26% of married women with a postgraduate degree kept their last name, compared with 13% of those with a bachelor's degree and 11% of those with some college or less education.

# Younger women, women with a postgraduate degree and Democratic women are more likely to keep their last name after marriage

*Among **women who are married to men**, % saying that they _____ when they got married*



| | Took spouse's last name | Kept last name | Hyphenated both names |
|---|---|---|---|
| All women currently married to men | 79 | 14 | 5 |
| Ages 18-49 | 73 | 20 | 5 |
| 50+ | 85 | 9 | 5 |
| Some college or less | 83 | 11 | 5 |
| Bachelor's degree | 79 | 13 | 6 |
| Postgraduate degree | 68 | 26 | 5 |
| Rep/Lean Rep | 86 | 10 | 3 |
| Dem/Lean Dem | 70 | 20 | 9 |
| Conserv Rep | 90 | 7 | 3 |
| Mod/Lib Rep | 79 | 15 | 3 |
| Conserv/Mod Dem | 74 | 16 | 9 |
| Lib Dem | 66 | 25 | 7 |

Note: "Some college" includes those with an associate degree and those who attended college but did not obtain a degree. Shares of respondents who said they created a new last name, those who provided some other response, and those who didn't offer an answer are not shown.
Source: Survey of U.S. adults conducted April 10-16, 2023.

**PEW RESEARCH CENTER**

**Democratic women:** Democratic and Democratic-leaning women are twice as likely as Republican and Republican-leaning women to say they kept their last name (20% vs. 10%). While moderates in each party are about equally likely to say they kept their last name, liberal Democratic women are the most likely to say this (25%), and conservative Republican women are the least likely (7%).

**Hispanic women:** 30% of Hispanic women say they kept their last name, compared with 10% of White women and 9% of Black women. Black women are more likely than White women to say they hyphenated their and their spouse's last names, and White women are the most likely to say they took their husband's last name. (There aren't enough married Asian women in the sample to analyze separately.)

---

**White women are more likely than Black and Hispanic women to say they took their spouse's last name after marriage**

*Among **women who are married to men**, % saying that they _____ when they got married*



Note: Data for Asian adults cannot be shown separately due to small sample size. White and Black adults include those who report being only one race and are not Hispanic. Hispanics are of any race. Shares of respondents who said they have created a new last name, those who provided some other response, and those who didn't offer an answer are not shown. Lines surrounding data points represent the margin of error for each estimate.

Source: Survey of U.S. adults conducted April 10-16, 2023.

**PEW RESEARCH CENTER**

---

For women who have never been married, the sample size is not large enough to look at demographic differences in what they say they would do.

*Note: Here are the [questions used for this analysis](), along with responses, and its [methodology]().*

# Exhibit 21

Civil Action No. 25-cv-0952 (CKK)
(Lead Case: No. 25-cv-00946 (CKK))

Home › Research Topics › Politics & Policy › U.S. Elections & Voters › Voters & Voting › Voter Demographics

REPORT  |  APRIL 9, 2024                                                         SHARE ⬆

CHANGING PARTISAN COALITIONS IN A POLITICALLY DIVIDED NATION

# 6. Partisanship by family income, home ownership, union membership and veteran status

Economic indicators such as family income, home ownership and union membership are all associated with partisanship.

## Partisanship by income groups

Democrats have a substantial advantage over Republicans among voters in the *lowest* income tier, and a modest advantage among those at the *highest* income tier:

- About six-in-ten voters with lower family incomes (58%) associate with the Democratic Party, compared with 36% who affiliate with the Republican Party.
- Among upper-income voters – those on the other end of the income spectrum – 53% are Democrats or Democratic leaners, while 46% are Republicans or GOP leaners.

But Republicans have a modest edge among upper-middle-income voters. Voters in the lower-middle tier and those squarely in the middle of the income distribution are roughly evenly split in their partisan orientation.

Read the methodology for more about income tiers, which are adjusted for household size and cost of living.

**Voters at the lowest and highest income levels tilt more Democratic than middle- and upper-middle-income voters**

*Among registered voters in each income tier, % who are ...*

|  | Dem/ Lean Dem | Rep/ Lean Rep |
|---|---|---|
| Lower income | 58 | 36 |
| Lower-middle income | 50 | 46 |
| Middle income | 48 | 48 |
| Upper-middle income | 46 | 52 |
| Upper income | 53 | 46 |

Note: Based on registered voters. Family income tiers are based on adjusted 2022 earnings. No answer responses not shown.
Source: 2023 American Trends Panel annual profile survey conducted Aug. 7-27, 2023.

PEW RESEARCH CENTER

## The relationship between income and partisanship differs by education

Among voters without a bachelor's degree, higher income is associated with being more Republican. But there are no income differences in partisanship among college graduates.

While voters who do not have a bachelor's degree tilt Republican overall, this differs across income groups.

Among voters without a college degree, those who are in the lower or lower-

**Wide income gap in partisanship among voters without bachelor's degrees**

*Among registered voters in each income tier, % who are ...*

| Among some college or less ... | Dem/ Lean Dem | Rep/ Lean Rep |
|---|---|---|
| Lower/Lower-middle | 54 | 40 |
| Middle | 42 | 57 |
| Upper/Upper-middle | 36 | 63 |

| Among college grad+ ... | | |
|---|---|---|
| Lower/Lower-middle | 58 | 39 |
| Middle | 56 | 42 |
| Upper/Upper-middle | 55 | 43 |

Note: Based on registered voters. Family income tiers are based on adjusted 2022 earnings. No answer responses not shown.

**REPORT MATERIALS**

📄 Party Identification Detailed Tables, 1994-2023

📄 Report PDF

**TABLE OF CONTENTS**

Changing Partisan Coalitions in a Politically Divided Nation

1. The partisanship and ideology of American voters

2. Partisanship by race, ethnicity and education

3. Partisanship by gender, sexual orientation, marital and parental status

4. Age, generational cohorts and party identification

5. Party identification among religious groups and religiously unaffiliated voters

**6. Partisanship by family income, home ownership, union membership and veteran status**

**Partisanship by income groups**

The relationship between income and partisanship differs by education

Union members remain more Democratic than Republican

Homeowners are more Republican than renters

Partisanship of military veterans

7. Partisanship in rural, suburban and urban communities

8. The changing demographic composition of voters and party coalitions

Acknowledgments

Methodology

Appendix A: Adjusting for mode effects when combining telephone surveys and the American Trends Panel

Appendix B: Religious category definitions

Appendix C: Age cohort definitions

**Union members remain more Democratic than Republican**

Union members have long been a Democratically oriented group – and that remains the case today.

Today, nearly six-in-ten voters who belong to a union (59%) associate with the Democratic Party, while around four-in-ten (39%) identify with or lean toward the GOP.

Voters who do not belong to a union are about equally likely to associate with each of the two parties: 49% are Republicans or Republican leaners, while 48% are Democrats or Democratic leaners.



**A majority of union members affiliate with the Democratic Party**

*% of registered voters who are ...*

|  | Dem/ Lean Dem | Rep/ Lean Rep |
|---|---|---|
| Union members | 59 | 39 |
| Not union members | 48 | 49 |

Note: Based on registered voters. No answer responses not shown
Source: 2023 American Trends Panel annual profile survey conducted Aug. 7-27, 2023.

PEW RESEARCH CENTER

## Homeowners are more Republican than renters

About half of voters who own a home (51%) align with the GOP, while slightly fewer (45%) are Democrats or Democratic leaners.

Voters who rent, however, favor Democrats by two-to-one: 64% of voters who rent their home associate with the Democratic Party, while 32% identify with or lean toward the Republican Party.



**Homeowners are slightly more Republican-oriented, while Democrats have a clear advantage among renters**

*% of registered voters who are ...*

|  | Dem/ Lean Dem | Rep/ Lean Rep |
|---|---|---|
| Homeowners | 45 | 51 |
| Renters | 64 | 32 |

Note: Based on registered voters. No answer responses not shown. Source: 2023 American Trends Panel annual profile survey conducted Aug. 7-27, 2023.

PEW RESEARCH CENTER

## Partisanship of military veterans

Voters who are military veterans favor the Republican Party: 63% identify with or lean toward the GOP, while far fewer (35%) are Democrats or Democratic leaners.

Non-veteran voters tilt more Democratic: About half (51%) associate with the Democratic Party, while 46% affiliate with the Republican Party.

The Republican Party's relative advantage among veterans is seen among both older and younger voters. In both groups, veterans are about 15 percentage points more Republican-oriented than non-veterans.

Similarly, among White voters, veterans are substantially more Republican-aligned than non-veterans. Around seven-in-ten White veterans (72%) identify with or lean toward the Republicans. By contrast, 54% of White non-veterans are Republicans or GOP leaners.

In contrast, among Black voters there is no difference in the partisanship of veterans and non-veterans (about eight-



**By a wide margin, military veterans are more likely to associate with the GOP**

*% of registered voters who are ...*

|  | Dem/ Lean Dem | Rep/ Lean Rep |
|---|---|---|
| Veterans | 35 | 63 |
| Non-veterans | 51 | 46 |

*Among voters ages 18-49 ...*

|  | Dem/ Lean Dem | Rep/ Lean Rep |
|---|---|---|
| Veterans | 41 | 57 |
| Non-veterans | 57 | 40 |

*Among voters ages 50+ ...*

|  | Dem/ Lean Dem | Rep/ Lean Rep |
|---|---|---|
| Veterans | 33 | 65 |
| Non-veterans | 46 | 50 |

*Among White voters ...*

|  | Dem/ Lean Dem | Rep/ Lean Rep |
|---|---|---|
| Veterans | 27 | 72 |
| Non-veterans | 43 | 54 |

*Among Black voters ...*

|  | Dem/ Lean Dem | Rep/ Lean Rep |
|---|---|---|
| Veterans* | 82 | 11 |
| Non-veterans | 83 | 12 |

* Black veterans had a relatively small sample size of 153, for an effective sample size of 87 (margin of error of +/- 10.5 percentage points at 95% confidence).
Note: Based on registered voters. White and Black voters include those who report being one race and are not Hispanic. No answer responses not shown.
Source: 2023 American Trends Panel annual profile survey conducted Aug. 7-27, 2023.

PEW RESEARCH CENTER

# Exhibit 22

Civil Action No. 25-cv-0952 (CKK)
(Lead Case: No. 25-cv-00946 (CKK))

RESEARCH TOPICS ▾   PUBLICATIONS   OUR METHODS   SHORT READS   TOOLS & DATASETS   EXPERTS   ABOUT US

Home  ›  Research Topics  ›  Politics & Policy  ›  U.S. Elections & Voters  ›  Voters & Voting  ›  Voter Demographics

REPORT  |  APRIL 9, 2024

SHARE ⬆

CHANGING PARTISAN COALITIONS IN A POLITICALLY DIVIDED NATION

# 3. Partisanship by gender, sexual orientation, marital and parental status

Men continue to be more likely than women to associate with the Republican Party.

Partisan affiliation also varies by marital status, with gender differences in party identification apparent among married and unmarried voters.

Sexual orientation is also strongly associated with partisanship among both men and women.

- Among all registered voters, **men tilt to the GOP** (52% of men identify with or lean toward the Republican Party, 46% to the Democratic Party).
- By a similar margin, **women tilt Democratic** (51% Democratic, 44% Republican, including leaners).

**Marital status**

Married men and women are more likely to identify with or lean toward the Republican Party than their unmarried counterparts, with 59% of married men and half of married women oriented toward the GOP.

And while majorities of both men and women who have never been married and do not live with a partner align with the Democratic Party, never-married women are particularly likely to do so:

- Women who have never been married are three times as likely to associate with the Democratic Party as with the Republican Party (72% vs. 24%).
- By a narrower – though still sizable – margin (61% to 37%), never-married men also favor the Democrats.
- Democrats have a substantial advantage among both women and men who live with a partner but are not married, and a narrower edge among those who are divorced or separated.
- Widowed men tilt Republican (55% GOP vs. 44% Democratic, including party leaders), while widowed women are about equally likely to associate with the GOP or Democrats (46% and 47%).

**Sexual orientation**



**Partisanship varies by gender, marital status and sexual orientation**

*% of registered voters who are ...*

|  | Dem/Lean Dem | Rep/Lean Rep |
|---|---|---|
| All RVs | 49 | 48 |
| Men | 46 | 52 |
| Women | 51 | 44 |
| Married men | 39 | 59 |
| Married women | 45 | 50 |
| Men who live w/partner | 60 | 39 |
| Women who live w/partner | 64 | 33 |
| Divorced/Separated men | 53 | 44 |
| Divorced/Separated women | 51 | 44 |
| Widowed men | 44 | 55 |
| Widowed women | 47 | 46 |
| Never-married men | 61 | 37 |
| Never-married women | 72 | 24 |
| Straight men | 43 | 55 |
| Straight women | 49 | 47 |
| Gay/Bisexual men | 83 | 17 |
| Lesbian/Gay/Bisexual women | 83 | 12 |

Note: Based on registered voters. No answer responses not shown.
Source: 2023 American Trends Panel annual profile survey conducted Aug. 7-27, 2023.

PEW RESEARCH CENTER

REPORT MATERIALS

📄 Party Identification Detailed Tables, 1994-2023

📄 Report PDF

TABLE OF CONTENTS

Changing Partisan Coalitions in a Politically Divided Nation

1. The partisanship and ideology of American voters

2. Partisanship by race, ethnicity and education

3. Partisanship by gender, sexual orientation, marital and parental status

   Gender and partisanship

   Parents are more Republican than voters without children

4. Age, generational cohorts and party identification

5. Party identification among religious groups and religiously unaffiliated voters

6. Partisanship by family income, home ownership, union membership and veteran status

7. Partisanship in rural, suburban and urban communities

8. The changing demographic composition of voters and party coalitions

Acknowledgments

Methodology

Appendix A: Adjusting for mode effects when combining telephone surveys and the American Trends Panel

Appendix B: Religious category definitions

Appendix C: Age cohort definitions



Note: Based on registered voters. Telephone data adjusted for survey mode; details in Appendix A.
Source: Annual totals of Pew Research Center telephone surveys (1994-2018) and American Trends Panel annual profile online surveys (2019-2023).

**PEW RESEARCH CENTER**

While women have consistently been more likely to associate with the Democratic Party over the past several decades, the Democratic edge among women is narrower than it was a few years ago.

## Parents are more Republican than voters without children

A slim majority (54%) of fathers of children under age 18 identify with or lean toward the Republican Party, compared with 44% of men who do not have children. There is a nearly identical gap in partisan association between mothers of minor children and women without children.



Note: Based on registered voters.
Source: 2023 American Trends Panel annual profile survey conducted Aug. 7-27, 2023.

**PEW RESEARCH CENTER**

**At all age levels, parents are more Republican-oriented than non-parents.** For example, 55% of men ages 35 to 44 who have children under 18 identify with or lean toward the GOP. This compares with about a third (36%) of men of the same age who are not parents.



Next: Age, generational cohorts and party identification

← PREV PAGE    1 2 3 4 5 6 ... 14    NEXT PAGE →

### Sign up for our weekly newsletter
Fresh data delivered Saturday mornings

Email Address *  [Email Address]  **Submit**

Topics

Education & Politics,  Election 2024,  Gender & Politics,  Gender & Politics,  Party Identification,  Political Parties,  Race, Ethnicity & Politics,  Race, Ethnicity & Politics,  Religion & Politics,  Rural, Urban and Suburban Communities,  Voter Demographics

SHARE THIS LINK:  https://www.pewresearch.org/?p=45285    SHARE

## Related

SHORT READS | SEP 19, 2024

# Exhibit 23

Civil Action No. 25-cv-0952 (CKK)
(Lead Case: No. 25-cv-00946 (CKK))

**U.S. ELECTION ASSISTANCE COMMISSION**
633 3rd St. NW, Suite 200
Washington, DC 20001

VIA EMAIL

April 11, 2025

Dear Chief Election Officials,

Consistent with 52 U.S.C. § 20508(a)(2), the U.S. Election Assistance Commission ("EAC") is seeking consultation on development of the national mail voter registration form.

Executive Order 14248 of March 25, 2025, "Preserving and Protecting the Integrity of American Elections" ("EO 14248") provides instruction to the EAC. Section 2 of EO 14248 instructs the following be required in the national mail voter registration form:

> (A) documentary proof of United States citizenship, consistent with 52 U.S.C. 20508(b)(3); and
> (B) a State or local official to record on the form the type of document that the applicant presented as documentary proof of United States citizenship, including the date of the document's issuance, the date of the document's expiration (if any), the office that issued the document, and any unique identification number associated with the document as required by the criteria in 52 U.S.C. 21083(a)(5)(A), while taking appropriate measures to ensure information security.

Section 2 of EO 14248 also instructs that "documentary proof of United States citizenship" shall include a copy of:

> (A) a United States passport;
> (B) an identification document compliant with the requirements of the REAL ID Act of 2005 (Public Law 109-13, Div. B) that indicates the applicant is a citizen of the United States;
> (C) an official military identification card that indicates the applicant is a citizen of the United States; or
> (D) a valid Federal or State government-issued photo identification if such identification indicates that the applicant is a United States citizen or if such identification is otherwise accompanied by proof of United States citizenship.

A current copy of the national mail voter registration form is available here: https://www.eac.gov/sites/default/files/eac_assets/1/6/Federal_Voter_Registration_ENG.pdf. The EAC is seeking consultation on how states would propose to implement Section 2 of EO 14248, if required. The EAC is also seeking feedback on the impact of implementation on voter registration in your state. As required by 52 U.S.C. § 20508, the EAC will consider responses in any amendments to the national mail voter registration form or EAC implementing regulations.

The EAC looks forward to your input. Comments may be sent to [NVRAUpdates@eac.gov](mailto:NVRAUpdates@eac.gov) or by mail at 633 3rd Street NW, Suite 200 Washington, DC 20001.


Thank you,

*Brianna Schletz*

Briannna Schletz
EAC Executive Director

# Exhibit 24

Civil Action No. 25-cv-0952 (CKK)
(Lead Case: No. 25-cv-00946 (CKK))

```
                      UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF COLUMBIA


     LEAGUE OF UNITED LATIN         .
     AMERICAN CITIZENS, et al.,     .
                                    .  CA No. 25-0946 (CKK)
              Plaintiffs,           .
                                    .
         v.                         .
                                    .
     EXECUTIVE OFFICE OF THE        .  Washington, D.C.
     PRESIDENT, et al.,             .  Thursday, April 17, 2025
                                    .  1:37 p.m.
              Defendants.           .
     . . . . . . . . . . . . . . . .
```

                       PRELIMINARY INJUNCTION HEARING
                 BEFORE THE HONORABLE COLLEEN KOLLAR-KOTELLY
                       UNITED STATES DISTRICT JUDGE

        <u>APPEARANCES</u>:

     For LULAC Plaintiffs:          DANIELLE M. LANG, ESQ.
                                    Campaign Legal Center
                                    1101 14th Street NW
                                    Washington, DC 20005

     For Nonpartisan               SOPHIA L. LANKIN, ESQ.
     Plaintiffs:                    American Civil Liberties
                                    Union Foundation
                                    125 Broad Street
                                    New York, NY 10004

     For Democratic Party          ARIA C. BRANCH, ESQ.
     Plaintiffs:                    Elias Law Group LLP
                                    250 Massachusetts Avenue NW
                                    Washington, DC 20001

     For Defendants:               MICHAEL GATES, ESQ.
                                    U.S. Department of Justice
                                    950 Pennsylvania Avenue NW
                                    Washington, DC 20530

     Court Reporter:               BRYAN A. WAYNE, RPR, CRR
                                    U.S. Courthouse, Room 4704-A
                                    333 Constitution Avenue NW
                                    Washington, DC 20001

```
 1                    P R O C E E D I N G S
 2           THE DEPUTY CLERK:  Civil case 25-946, League of
 3   United Latin American Citizens, et al., League of Women Voters
 4   Education Fund, et al., and Democratic National Committee, et
 5   al., versus the Executive Office of the President, et al.
 6           THE COURT:  Let me start with the defendant, if we
 7   could have counsel for the defendant.  If you could introduce
 8   yourself.
 9           MR. GATES:  Thank you, Your Honor.  Michael Gates with
10   the Department of Justice on behalf of defendants President
11   Donald J. Trump, Attorney General Pam Bondi, the Election
12   Assistance Commission, and the other three named defendants
13   in the federal lawsuits.
14           THE COURT:  Good afternoon.  And for plaintiffs, I'll
15   call them LULAC, if I may, Secure Families Initiatives, and
16   Arizona Students' Association.
17           MS. LANG:  Danielle Lange for the LULAC plaintiffs, and
18   I'm joined by my colleagues, Heather Szilagyi, Jonathan Diaz
19   and Pooja Chaudhuri, and I believe Norman Eisen is in the
20   courtroom as well.
21           THE COURT:  Good afternoon.  And then for plaintiffs
22   League of Women Voters and the group with that, if you would
23   identify yourself.
24           MS. LAKIN:  Good morning, Your Honor.  Sophia Lakin for
25   League of Women Voters plaintiffs.  I'm joined by a number of
```

1    attorneys: Megan Keenan, Jonathan Topaz, Ethan Herenstein,

2    Clayton Pierce, Michael Perloff, Jasleen Singh, Leah Aden,

3    Niyati Shah, Alizeh Ahmed, Cesar Ruiz, and Sarah Brannon.

4         THE COURT:  Okay.  Good afternoon to all of you.

5         MS. BRANCH:  Good afternoon, Your Honor.  My name is

6    Aria Branch for the Democratic Party plaintiffs DNC, DFCC,

7    DCCC, DGA, Leaders Schumer and Jeffries, and I'm joined by

8    my colleagues, Lalitha Madduri, Julie Zuckerbrod, Christopher

9    Dodge, James Pinchak, and Jacob Shelly.

10         THE COURT:  All right.  Good afternoon.

11         MS. BRANCH:  Thank you.

12         THE COURT:  All right.  Because we are going to be

13    using a public line for today's hearing, I want to make sure

14    that you speak clearly and into the microphone, and you'll

15    need to come up to the podium.  We have microphones at the

16    table, but they don't really work well enough in terms of

17    everybody being able to hear you.  Counsel can also remove

18    your masks, as you have, in terms of speaking.

19      So we're here on a joint hearing on two motions for

20    preliminary injunctions filed by the plaintiffs in these

21    consolidated cases.  So the first motion was filed by a group

22    of plaintiffs that I'm going to be calling the nonpartisan

23    plaintiffs.  I'm grouping you together in terms of the

24    questions and whoever's going to be responding to them.

25      So the nonpartisan plaintiffs are the League of United

1    Latin American Citizens, the Secure Families Initiative, the

2    Arizona Students' Association, the League of Women Voters

3    Education Fund, the League of Women Voters of the United

4    States, the League of Women Voters of Arizona, the Hispanic

5    Federation, the National Association for the Advancement of

6    Colored People, OCA Asian Pacific American Advocates, and

7    Asian and Pacific Islander American Vote.

8        The second motion was filed by a group of plaintiffs

9    that I'm going to be calling the Democratic Party plaintiffs,

10   and the Democratic Party plaintiffs are Democratic National

11   Committee, Democratic Governors Association, Democratic

12   Senatorial Campaign Committee, and Democratic Congressional

13   Campaign Committee, as well as the individual leaders of the

14   Democratic caucuses in the U.S. Senate ad the U.S. House of

15   Representatives, Charles E. Schumer and Hakeem S. Jeffries.

16       Now, before we begin, I'm going to set out a very brief

17   history of the case.  Counsel will know this, but just to put

18   everything into context and to some degree for the benefit of

19   the public attending either in the courtroom or on the public

20   line.

21       So on April 1st of this year, the Clerk of the Court

22   randomly assigned the Democratic Party plaintiffs case to

23   me pursuant to Local Rule of Civil Procedure 40.3(a).

24       Two cases filed by the nonpartisan plaintiffs were later

25   assigned to me as related cases pursuant to Local Rule of

1    Civil Procedure 40.5(c).

2        These three cases are related to one another under the

3    local rules because they grow out of the same event or

4    transaction, the issuance of Executive Order No. 14248, and

5    they involve common issues of fact related to the effect of

6    that executive order.  So I will be calling President Trump's

7    Executive Order 14248 just "the executive order."

8        Given the commonalities among the factual and legal

9    analysis of the three cases, and with consent of the parties,

10    I consolidated the three cases.

11        The nonpartisan plaintiffs then requested that I set an

12    expedited schedule for briefings on motions for preliminary

13    injunctions, and the nonpartisan plaintiffs also requested

14    leave to file briefs separately from the Democratic Party

15    plaintiffs given their nonpartisan status and differing

16    interests in these cases.

17        I granted both requests and set a briefing schedule, and

18    the nonpartisan plaintiffs and the Democratic Party plaintiffs

19    each filed motions for preliminary injunctions, and the

20    defendants oppose both of those motions.  So as of yesterday,

21    April 16, all briefing on these motions has been completed.

22        Before turning to the pending motions, I want to make clear

23    what issues are and are not, following more specifically,

24    before the court today.  Later on I'll confirm with counsel as

25    to whether you would agree with this.

1      So the motions that we will be discussing are based on
2   separation of powers arguments.  The plaintiffs argue that
3   the president lacks the power to order some of the changes to
4   federal election rules described in a recent executive order
5   which I've identified.  The plaintiffs argue that the power to
6   make those rules rests with Congress and the states and not
7   with the president.
8      What I am not discussing is neither of the pending motions
9   ask me to decide whether a documentary proof of citizenship
10  requirement for voter registration would be constitutional if
11  enacted by Congress or any state.
12     No one has asked me to decide whether a documentary proof
13  of citizenship requirement for voter registration would be a
14  good or effective policy, and no one is asking me to decide
15  whether foreign interference in federal elections or voter
16  fraud are serious issues, although these issues are raised in
17  the executive order that's at issue.  The focus today will be
18  on the separation of powers issues.  With that background,
19  we're going to be going forward.
20     Let me just set out a couple of rules of the road.
21  For some of you, I know that this is the first time you've
22  appeared before me, certainly with a hearing.  So this hearing's
23  not an opportunity for an appellate-style oral argument
24  summarizing your briefs.  I read the briefs and all of the
25  materials, so I'm familiar with all of that.

1          There are specific issues that I want to have more clarity

2     on or want to confirm my understanding of what your arguments

3     are, and I have specific questions that I'd like you to answer

4     related to those issues.  So this proceeding's going to be

5     basically questions and answers.

6          I know this case presents complex and novel legal issues.

7     There are five sections of the executive order that are at

8     issue.  So as I indicated in my order consolidating these cases,

9     if you feel someone else would be better poised to answer one

10    of my questions, feel free to switch off counsel at the podium.

11    So I would expect to have the one counsel for the government,

12    the nonpartisan will have one lawyer, unless you switch off

13    because somebody is more attuned to the answer that I need,

14    and one from the partisans.

15         I just ask for my benefit, when you come up to the podium,

16    please speak into the microphone, identify yourself -- and the

17    government doesn't need to identify himself as to who the

18    clients are, but I'd ask that the others just so that -- you

19    don't need to go through each one of these, but as to your name

20    and whether you're the nonpartisan or the Democratic or whatever

21    so that we have a record going forward.

22         Now, some of the answers are going to be just a yes or no

23    that's expected or a short explanation.  I don't expect lengthy

24    presentations of arguments.  I've read your materials, and all

25    of these arguments presumably are included in some way in your

1    pleadings.  There will be some questions that go outside the

2    pleadings of events that have happened more recently, but in

3    order to move this along and to be effective, figure out how

4    much information I actually need, understanding I've read your

5    pleadings.

6        So, in terms of the order in which we're going to be

7    proceeding, I do have some preliminary questions for the

8    defendants, then I'll have some questions for the nonpartisan

9    plaintiffs, followed by the Democratic Party plaintiffs, and

10   I'll go back to the defendants more on the full argument.  The

11   first part for them is some preliminary issues that have arisen.

12       Finally, I will allow both the nonpartisan plaintiffs and the

13   Democratic Party plaintiffs to come back and provide a brief

14   response, if you wish to, to new arguments.  I don't want you to

15   repeat what you've already argued that has already been raised.

16   I'm having you come back since the burden is on the plaintiff at

17   this stage.  At the end of the hearing, we can then discuss next

18   steps and schedule any further proceedings that are necessary.

19       So anything anybody at this point needs to ask me a question

20   or bring to my attention?  If not, we'll proceed with the

21   questions.  I don't see anybody getting up, so let me start with

22   some opening questions.  Mr. Gates, if you could come on up.

23       Mr. Gates, before we begin, I just want to make sure you have

24   no disagreements with my scope of the issues not presented in

25   the motions that we're going to be discussing today.

1          MR. GATES:  No disagreement, Your Honor.

2          THE COURT:  All right.  Do you agree that neither

3   of the pending motions ask me to decide these various things,

4   the documentary proof of citizenship and all of those?  I

5   assume that you're not going to be addressing any of those

6   issues.  Am I correct?

7          MR. GATES:  Not unless Your Honor has questions.

8          THE COURT:  Nope.  All right.

9      Now, turning to the merits, it would be helpful to

10  understand at the outset the scope of any ongoing or imminent

11  action to implement the provisions of the executive order that

12  are challenged in the pending motions, and I have a few

13  questions at the outset about how, if at all, the executive

14  order is being implemented.

15     Now, you represented in your briefs that the executive

16  order -- and I'm going to quote what was in the brief -- "has

17  not even begun to be implemented."  That's at page 25 of your

18  opposition to the nonpartisan plaintiffs' motion, page 35 to

19  the Democrat Party motion.

20     You also said in both briefs that "no action has been made

21  and nothing has been implemented," but the plaintiffs have

22  produced a letter dated April 11 from the executive director

23  of the Election Assistance Commission, which I'm going to call

24  "EAC" going forward, to the states "seeking consultation on

25  how states would propose to implement Section 2 of the

1    Executive Order 14248 if required."  That letter also

2    describes the executive order as a -- and this is a quote

3    again -- "instruction" to the EAC.

4        Now, you filed your briefs and the declaration from the

5    director, and it's S-C-H-L-E-T-Z.  I don't want to butcher how

6    she pronounces it.  It was dated three days after she sent the

7    letter to the states, but your briefs and her declaration

8    don't mention the letter at all.  So were you or any defense

9    counsel aware of the letter at the time you filed your

10    opposition briefs on April 14?

11        MR. GATES:  So, Your Honor, I think we're probably both

12    under the same understanding that the letter is dated three

13    days after we submitted our opposition.  Is that correct?

14        THE COURT:  No.  The letter was dated April 11 and you

15    submitted it after.

16        MR. GATES:  Okay.

17        THE COURT:  So your brief came after.  That's why I'm

18    raising the question.

19        MR. GATES:  Fair enough.  And so on the one hand, we

20    didn't know about the letter, but on the other, I since now

21    have an explanation in the context of this rulemaking process

22    under the APA, if Your Honor would indulge me.

23        THE COURT:  Well, I think -- I'll get into that.  At

24    the time that the letter was sent from the executive director,

25    she didn't consult with you or anybody else before it was

1    sent?

2         MR. GATES:  Well, I guess what I would say, Your Honor,

3    is I had no knowledge of the letter.  But if those are also

4    communication -- those would be communications if they

5    occurred between, obviously, my client and myself, but I will

6    represent to you that there was no communication about the

7    letter.

8       Having said that, the letter itself, after getting further

9    clarification from the EAC, is not any step at all that's

10   contemplated by the APA in the rulemaking process.  It's not a

11   step.  The letter asked for consultation from other elections

12   officials with regard to the --

13        THE COURT:  A particular section of the executive

14   order, which --

15        MR. GATES:  Correct.

16        THE COURT:  And you're saying to me that isn't part of

17   the process?

18        MR. GATES:  The first significant process under the APA

19   is to actually propose rule language and have that circulated.

20   So this consultation was an early consultation.  It had

21   nothing to do and it did not commence the rulemaking process

22   under the APA.

23        THE COURT:  So let me see if I understand your

24   argument.  Even though the letter refers to a particular

25   section of the executive order and indicates -- let's see

1    where we are -- "seeking consultations of how states would

2    propose to implement" -- implement means started or follow it

3     -- Section 2 of the particular executive order and describes

4    the executive order as an instruction to EAC.  And you don't

5    see that as starting the process to reach out to the states to

6    start to talk to them about Section 2(a), which is users of

7    the federal form in terms of relating to the federal form

8    itself?

9         MR. GATES:  No.  The usual fashion or the usual

10    approach under the APA for a situation where the EAC, the

11    Elections Assistance Commission, is going to start to endeavor

12    new rules is to actually propose the language of the new rule

13    and then circulate that, get consultation, put it out for

14    notice, put it out for comment, put it out for feedback.

15     This, in the unusual circumstance, is just a consultation

16    request.  But other than citing the section of the EO, there's

17    no specifics.  There's no proposed language.  There's nothing

18    specific.  It was represented that it was more or less a

19    brainstorming and an initial first blush to get feedback from

20    elections officials about their initial thoughts.

21     And it was also represented that as the feedback came in,

22    that would start to, or may start to, inform or dictate the

23    language of the rule.  The process under the APA that the EAC

24    normally embarks on is listed in the declaration presented by

25    defendants, as you indicated, by Brianna Schletz of the EAC.

1      That is the normal process.

2              THE COURT:  So she just reached out and did this, and

3      this is not part of the --

4              MR. GATES:  It's of no moment.  It didn't have to

5      happen to start the process.

6              THE COURT:  Whether it didn't have to happen or not,

7      the point is that she did.  The chief election officials, a

8      carbon copy of the national mail voter registration form is

9      available, talks about, is seeking consultation on how states

10     would propose to implement it, seeking feedback on the impact

11     of implementation on voter registration in your state, etc.,

12     will consider responses, etc.  You don't see this as starting

13     the process on voter registration?

14             MR. GATES:  No, Your Honor.  It is an extra step, and

15     that's how it was explained to me.  The rules and the process

16     you just laid out there normally occurs after a proposed

17     language has already been circulated.  There is no proposed

18     language at this point.  The proposed language is the first

19     step that starts the APA process.

20         That's not what happened here.  This is just an early

21     letter asking for thoughts and initial feedback, and it says

22     on the last page of the letter that "the EAC looks forward to

23     your input."  But it's just general input.  There's nothing

24     specific.  There's no particular rule.  Again, under the

25     normal process under other circumstances, the EAC actually

1    starts with proposed language, circulates that, gets feedback.

2    Once they update the language, modify it, and sort of the

3    stakeholders are generally approved, then they put it out for

4    notice for 60 days; then it's out for public comment for

5    another 30 days --

6         THE COURT:  I understand all of the rest of it.  So you

7    view this as something she decided to do on her own without

8    consultation and it's not the beginning of the process,

9    putting it in very summary form.

10        MR. GATES:  I think that's accurate.  And it is not

11   even the first step in the APA process.

12        THE COURT:  Okay.  So what I would like -- if you could

13   sit down for a quick second, I'll give you an opportunity to

14   -- I'll start with the nonpartisan and then move to the

15   partisan, or either way, if you want to respond to whether you

16   view it as he has described it.

17        MS. LAKIN:  Good afternoon, Your Honor.  Sophia Lakin

18   for the nonpartisan plaintiffs.

19     I think that the defendants' counsel is trying to parse

20   this very finely.  At the end of the day, the April 11th

21   letter cites as its motivating, or impetus, the executive

22   order.  It is a step to implement the executive order.

23     I'd also point out that under the National Voter

24   Registration Act, the EAC is required to consult with the

25   chief elections officials of the states in developing changes

1    to the federal form.  And whether it happens -- whenever it

2    happens, even if it happens usually in the ordinary course

3    at a different time or it could happen multiple times, this

4    consultation with the chief election officials of the states,

5    a term of art in the NVRA itself, is part of the statutory

6    process required to change the federal form.

7          THE COURT:  All right.

8       Counsel, anything you want to respond to?

9          MS. BRANCH:  Thank you, Your Honor.  Aria Branch for

10   the Democratic Party plaintiffs.  I think the key thing to

11   keep in mind here is that the government has made arguments

12   that our claims are not ripe and that preliminary relief is

13   not warranted because nothing has happened.  And that's just

14   fundamentally not true because of this letter, and I think

15   the nonpartisan plaintiffs also submitted an email with their

16   brief yesterday that indicates that the process is moving

17   forward.

18     So the EAC is taking steps pursuant to the executive

19   order to implement DPOC, documentary proof of citizenship.

20   So that is what the letter shows.  I think it underscores the

21   fact that relief is needed now because the process has begun.

22     And the fact that the letter may have been sent outside of

23   the normal process for APA notice and comment I think further

24   underscores the need for relief because that means that the

25   government isn't actually even following the process set forth

1   in the APA.  So I think the sending of the letter indicates that

2   the process is moving and relief is needed now, our claims are

3   ripe.

4           THE COURT:  All right.

5           MS. BRANCH:  Thank you.

6           THE COURT:  So I have everybody's argument on this

7   issue.  I will just add in terms of the email indicating that

8   "Please note this is an initial consultation.  Chief election

9   officials will also be consulted on any proposed changes to

10   the EAC implementing regulations with a form prior to

11   implementation.  The purpose of this initial consultation is

12   to guide the EAC and any proposed changes which require

13   further comment."

14      So I'll leave this issue at this point and move on.  I do

15   have quick other questions in terms of these initial things,

16   Mr. Gates.

17      So have any of the defendants, just to clarify, other than

18   President Trump and the Executive Office of the President,

19   taken any action or any other actions, whether you view them

20   as implementing it or not, but taking actions relating to this

21   executive order in terms of implementing or taking forward the

22   direction from the executive order to sections 2(a), 2(b),

23   2(d), 7(a), or 7(b) of the executive order, which are the

24   provisions that are at issue in this pending motion?  So

25   anything else out there besides this letter and email?

1           MR. GATES:  No, Your Honor.  And may I briefly offer

2    a reply to what I just heard from opposing counsel?

3           THE COURT:  Go ahead.

4           MR. GATES:  Thank you, Your Honor.  Again, the letter,

5    if anything, suggests that this is a process.

6           THE COURT:  Right.

7           MR. GATES:  Nothing has occurred yet.  And the process,

8    there are mandatory time requirements built into the APA,

9    mandatory 60 days plus 30 days.  That's at least 90 days.

10   At lightning speed, nothing could be effectuated under the

11   rulemaking process for at least 120 days.  I just want to make

12   that clear.

13          THE COURT:  Oh, I understand that.  This is really more

14   a matter of whether -- the briefs seem to indicate nothing had

15   happened, the executive order was issued, and that was it.

16   Nobody had done anything.  And I'm pointing out that there was

17   something that was done.  It does take time.  And I'll get to

18   some of those other questions.

19       I do understand that there's a process and there's a time

20   frame for this process and that, as she has indicated, it's an

21   initial one.  But it isn't, as the brief suggested, that

22   nothing has happened with the executive order or moving

23   forward with considering EAC at least starting to consider --

24   they haven't taken steps.  I fully agree if that's your point.

25   They've taken no steps other than reaching out relating to the

1    executive order.  Would you agree with that much at least?

2         MR. GATES:  I'm actually going to disagree, Your Honor,

3    on this one point.

4         THE COURT:  Okay.

5         MR. GATES:  The brief, ad nauseam, and at least

6    defendants' opposing brief in the DNC case, the partisan case,

7    ad nauseam talks about the partisan process.  So when we talk

8    about what is done, what is actionable, we're talking about at

9    the end of that line of when the rule is actually presented.

10    We're speculating right now, Your Honor.  We're all

11    speculating.  I'm speculating.  Plaintiff counsel is

12    speculating.  We're all speculating what's going to be at the

13    end of this line.  So when they're asking for preliminary

14    injunction and they're asking for relief because of action,

15    just because this may have started a conversation with

16    elections officials doesn't mean anything's happened.  We're

17    still speculating as to what it might be.

18         THE COURT:  Well, you can't say nothing's happened.

19    It says -- you put in there, and I'm not going to belabor this

20    more; we've got a lot to talk about -- has not even begun to

21    be implemented.  I agree that there hasn't been the final

22    process.  There is a whole process you have to go through.

23    But I think you would have to agree that at least the

24    executive order has been brought to the attention of the

25    states who are -- and there are going to be consultations

1    between EAC and the states.  And she has brought up the

2    executive order and indicates in it seeking consultations

3    to implement.  Okay?  So it hasn't been implemented, but

4    consulting about the implementation.  So the subject of

5    implementing this executive order has been raised specifically

6    with the states.  You would agree with that, right?

7         MR. GATES:  I would, and I would also add that this

8    early consultation is not even the first step under the APA.

9         THE COURT:  It doesn't matter, as a practical matter,

10   formalized ways maybe of doing it.  But the point is the

11   states are now on notice that the EAC is planning on proposing

12   what's in, or at least discussing, consulting.  They haven't

13   made any decisions, I fully agree, but they raised the

14   topic -- I'll put it that way -- raised the topic of the

15   executive order and specifically Section 2.  I think you could

16   agree to that.

17        MR. GATES:  And I will also agree, Your Honor, and

18   submit to the court that all state election officials were on

19   notice on March 25 when the presidential executive order was

20   issued in the first place.

21        THE COURT:  Okay, I'm sure, but this is a more formal

22   one coming from the EAC, the executive director.

23      Okay.  One more little set of things, and this relates to

24   -- and I just want to clarify whether this is still on the

25   table or not, and this relates to the stipulation.

1          On page 19 of the motion, the nonpartisan plaintiffs

2     offered to withdraw their motion if the defendants would

3     stipulate that they, quote, do not intend to make any change

4     to the federal form relating to documentary proof of

5     citizenship within 30 days, and that they will comply with

6     notice and comment and other procedural requirements before

7     making any such changes in the future.  And the relevant

8     requirements would include those under the Administrative

9     Procedure Act, the Help America Vote Act, the National Voter

10    Registration Act, and the Paperwork Reduction Act.

11         Now, your opposition to the nonpartisan plaintiffs' motion

12    references the offer to withdraw, but you don't take any clear

13    position on whether you would agree -- the relevant defendants

14    would agree to the stipulation.  So we only have this letter

15    that's been sent out on April 11.

16         So are the EAC defendants, which would mean the EAC

17    commissioners, executive director, now prepared to stipulate

18    that they will not make any changes within 30 days to the

19    federal form to require documentary proof of citizenship?

20              MR. GATES:  Yes, Your Honor.

21              THE COURT:  I'm sorry?

22              MR. GATES:  Yes, Your Honor.

23              THE COURT:  Okay.  And would they stipulate that

24    they'll comply with all applicable procedure requirements

25    before making such changes to the federal form in the future?

1      MR. GATES:  Yes, and as mandated by the executive order

2  itself.

3      THE COURT:  And as mandated.  All right.

4    So let me just see at this point the nonpartisan, whether

5  you at this point, since the landscape has changed somewhat,

6  whether you're still of that position or not.

7      MR. GATES:  Your Honor, before I leave the podium,

8  would you like me to address question No. 2?  It's very

9  similar.

10     THE COURT:  Yes, sure.

11     MR. GATES:  Okay.  Likewise -- so I'm taking 1 and 2

12  together, but likewise with our response to No. 1, No. 2, the

13  response is because the EAC will comply with a notice and

14  comment and other procedural requirements under the

15  Administrative Procedure Act and other applicable statutes

16  making any such changes to the required documentary proof of

17  citizenship is not possible within 30 days or even 90 days

18  under any circumstances.  So just for clarification.

19     THE COURT:  Well, I'm glad you've agreed with that.

20     MR. GATES:  Thank you, Your Honor.

21     THE COURT:  But let me just ask -- I don't know whether

22  in terms of the nonpartisan, whether you want to think about

23  it or not.  I'm not asking you to withdraw right now, but I am

24  asking what your position is.

25     MS. LAKIN:  Sophia Lakin for the nonpartisan

1    plaintiffs.

2         THE COURT:  I wanted, since it was sitting out there,

3    to bring it up and make sure.  They've agreed.  You'd

4    obviously have to work out language, etc., but I'm going to

5    proceed with the hearing as if we're going forward anyway with

6    questions.  But I want to know whether at this point you're in

7    a position to still agree with that or you want some

8    modifications or some others.

9         MS. LAKIN:  Unfortunately, given the circumstances,

10   now that we know there has been some action taken pursuant to

11   the executive order, which I would point out our challenge is

12   to the executive order itself, and any steps taken to implement

13   it are tainted by the initial unlawful conduct in the first

14   instance.  And so because we know at this point in time, which

15   is not what we were aware of when we put forward this proposal

16   in our opening brief, that's not a viable situation for our

17   clients at this point.

18      At this point we know that it's being implemented in some

19   fashion.  Steps are being taken.  Further action to implement

20   the executive order's directive, which is a mandate here to

21   add a requirement to the federal form, not just to engage in

22   conduct, steps to do that ultimate, preordained outcome will

23   only continue and become increasingly difficult to unravel if

24   not --

25         THE COURT:  Okay.  A stipulation is an agreement

1    between two parties.  I have nothing to do with it.  You all

2    have to decide whether you want to agree.  So I wanted to

3    raise the issue since it was in the pleadings.  I will leave

4    it at this point if you want to have a further discussion

5    about this.  Obviously, it won't be happening right today and

6    as part of this hearing, but everybody's taken their

7    positions.

8        So let me move on to -- at this point, it doesn't sound

9    like you're ready to go forward with it, but I'll leave it to

10   you and the government to have further discussions if the two

11   sides wish to do so.

12             MS. LAKIN:  I appreciate that.

13             THE COURT:  As I said, I bring it up because it was in

14   the pleadings.  I don't get involved with what is stipulated

15   to other than making sure that everybody understands what

16   they've agreed to.

17             MS. LAKIN:  I appreciate that, Your Honor.  If I may

18   respond just to one item that you brought up with defendants'

19   counsel which was related to any additional steps or actions

20   that had been taken pursuant to the executive order, in

21   addition to the email, which I will point out also has a

22   May 2nd response date to that initial response for the --

23             THE COURT:  Right.

24             MS. LAKIN:  -- suggesting they're moving somewhat

25   quickly here, there is also -- and we have this as Exhibit 33

1    to our reply brief -- the agenda for the EAC standards board

2    that is having a meeting on April 24 in which they are going

3    to be discussing implementation of the executive order.  So

4    there are further actions being taken, further conversations.

5    Things are occurring under this executive order.

6        THE COURT:  All right.  That's noted for the record.

7      Let me move to my questions, and frankly I'm going to start

8    with you.

9        MS. LAKIN:  Okay.

10       THE COURT:  So with each of these questions, I'm going

11   to give a little background information so you understand why

12   I'm asking.

13     So, as I understand it, the nonpartisan plaintiffs have

14   moved for a preliminary injunction against implementation

15   specifically of Section 2(a) of the executive order which

16   directs the EAC to, quote, "take appropriate action," unquote,

17   within 30 days to "require" users of the federal forum to

18   provide "documentary proof of citizenship" which state and

19   local officials must then record on the form.

20     So as counsel well knows, in terms of the preliminary

21   injunction, the burden is going to be you have to show likely

22   to succeed on the merits, likely to show irreparable harm in

23   absence of preliminary relief, balance of equities tips in

24   your favor, and an injunction is in the public interest.

25     Now, when the government is an opposed party, which it

1    is in this case, the balance of equities and public interest

2    charges usually merge.  So I would be addressing that

3    together.

4        So let me start with standing.  And to show that you're

5    likely to succeed on the merits, the nonpartisan plaintiffs

6    must show a substantial likelihood of standing supported by

7    affidavits or other credible evidence.  As I understand it,

8    there are two theories of standing that you're raising:

9    organizational standing and associational standing.  So my

10    first focus is going to be on the organizational standing.

11        So to have organizational standing, an organization must

12    make "the same showing as an individual an actual or

13    threatened injury in fact that is fairly traceable to the

14    defendants' allegedly unlawful conduct and unlikely to be

15    redressed by a favorable court decision."  So that's sort

16    of the definition.

17        So the parties understandably focus on the injury in fact,

18    but I also need to make findings regarding causation and

19    redressability.  So, briefly, how is Section 2(a) causally

20    linked to the harm you allege to your clients' interest, and

21    how would a favorable decision on your motion redress that

22    harm?

23        MS. LAKIN:  So I'm going to take a moment to pass the

24    podium to my colleague, Ms. Lang.

25        THE COURT:  Not a problem.  I told you that's not an

1    issue.

2        MS. LANG:  Thank you, Your Honor.  Danielle Lange for

3    the nonpartisan plaintiffs.  The question of causation I think

4    is a rather clear one, which is that the injury that our

5    clients are facing is an injury that would arise from the

6    addition of a documentary proof of citizenship requirement.

7        And as my colleague just pointed out, the executive order,

8    in very plain terms, mandates the addition of a documentary

9    proof of citizenship requirement.  When it says "take

10   appropriate action" to require the documentary proof of

11   citizenship requirement, this court needs to give meaning

12   to all of those words.

13       So appropriate action might take several different forms.

14   I think the defendants have now admitted that action would be

15   required to go through various procedural mechanisms.  But

16   appropriate action does not mean no action.  It is a demand to

17   take action and for that action to end in a result, which is

18   to require documentary proof of citizenship.  And once there

19   is such a requirement, all of the harms that our clients are

20   facing will become realized, and that is impending.

21       There is an argument about causation in the defendants'

22   brief that focuses on a claim that third-party choices are

23   somehow going to impact the injury to our clients because

24   folks might refuse to provide documentary proof of citizenship

25   or not bother to go get it, and I think that that's mistaken

for a couple of reasons.

One, Supreme Court precedent just rejects that argument altogether.  So if you look at *Department of Commerce v. New York*, for example, which was about the addition of a citizenship question to the census, the government made a very similar argument that, well, all of your harms are going to arise from folks who will shy away from the census because of this question; those are individual choices.

But the Supreme Court rejected that argument because it was the action of adding the question that was going to have a predictable effect.  And same thing here.  We know that the addition of a documentary proof of citizenship requirement is going to have predictable effects on many voters.

But quite frankly, the point here is even more straight-forward because even if every voter had the opportunity or ability to provide documentary proof of citizenship, the addition of a documentation requirement to registration makes voter registration activities themselves far more cumbersome, far more difficult, and far less effective.

So, for example, if you are a League of Women Voters or LULAC volunteer at the grocery store conducting a voter registration drive, in order to do so with the federal form if it has a documentary proof of citizenship requirement, every person you encounter you would need to ask do they have these types of documentation.  Not just do they have it in general,

but do they have it on their person right now.  And even if
they did, which is very unlikely, they would have to have a
manner of capturing that — taking a copy, printing it — in
order to perform their basic functions.  So the causation here
is much more straightforward, Your Honor.

THE COURT:  Okay.  And how would a favorable decision,
should I rule in your favor, redress the harm that you've
talked about?

MS. LANG:  Yes.  So if we have an injunction that
stops the Election Assistance Commission from acting on this
mandate, that will redress our harm.  Right now the plaintiffs'
concern is that there is going to be an imminent addition of a
documentary proof of citizenship requirement for an
unconstitutional reason, which is that the president has taken
over authority to dictate election rules.

And here I would point you to *Seila Law* as I think an
important point about redressability, which is there the court
said that a litigant challenging governmental action as void
on the basis of separation of powers is not required to prove
that the government's course of conduct would be different in
a counterfactual world in which the government had acted with
constitutional authority.

So right now there is a mandate for the EAC to add
documentary proof of citizenship.  Whether they do it in
10 days or 120 days, this is an imminent action coming from

1    the president that is unconstitutional, and that action is

2    going to harm our clients.  And if you enjoin that action and

3    you let the EAC know that they do not have to bend to the will

4    of the president's mandate which is in violation of separation

5    of powers, that will remedy our harm.

6         THE COURT:  Okay.  Anything of particular -- wait.

7    Without getting into what you've already put in your motion,

8    reply, etc., anything else of particular note that you want

9    me to consider in making this decision as to whether you've

10    shown a substantial likelihood of organizational standing to

11    challenge this section?

12         MS. LANG:  Just a couple more comments, Your Honor.

13    On the redressability point, I do want to make another comment

14    on *Seila Law*, which I think the case for *Seila Law* for

15    standing is much harder.  There the government had a

16    reasonable argument that regardless of -- so there the issue

17    was whether or not the CFPB director should have been subject

18    to removal at will or for cause, and a regulated party who,

19    you know, has an enforcement action against them by the CFPB

20    said that was injuring them.  And there the government had a

21    very good argument that the outcome for that individual

22    probably would have been the same as far as the enforcement

23    action regardless of whether the CFPB director was removable

24    for cause or not.

25         Here the evidence is quite to the contrary, right?  The

1    Election Assistance Commission has been asked before if it

2    thinks it's a good idea to -- or if it's consistent with the

3    NVRA to add a documentary proof of citizenship requirement,

4    and it has always declined to do so.  So we have no reason to

5    believe that the Election Assistance Commission would ever

6    take this step absent this executive order.  And the letter,

7    for example, only highlights that they're only taking this

8    action in response to the executive order.

9        The one area that I did want to address about organizational

10   -- well, I was going to move on to talk about associational

11   standing, but perhaps you wanted to focus --

12           THE COURT:  No, that's fine.  I've picked the different

13   topics that I need additional information on.

14           MS. LANG:  You got it.

15           THE COURT:  So we're not finished yet, but I'm not sure

16   which one of you wants to address the next thing, which is

17   likelihood of success on the merits.  And that's -- it directs

18   the EAC to take appropriate action within 30 days to "require

19   users of the federal form to provide documentary proof of

20   citizenship," which then they're recording.

21       So your principal argument, as I understand it, the

22   president simply lacks the authority to direct the EAC to

23   take any action to alter the regulation of federal elections,

24   if I understand your argument.  If I were to agree with that

25   argument, is there anything else I need to consider to decide

1    whether you're likely to succeed on the merits?

2        (Pause.)

3        If there's anything else you want to highlight.  If not,

4    there are other arguments you have, but just to point that

5    out.  There may not be.  I'm not expecting something; I just

6    want to make sure I've covered everything.

7        MS. LANG:  Fair enough.  I pause in part because I want

8    to make sure I'm not missing anything.  But I do think the

9    constitutional merits argument is just that straightforward.

10    The president has no authority to make these commands.  The

11    defendants point to no such authority anywhere in their papers

12    in response.

13        THE COURT:  Okay.  As I said, just wanted to make

14    sure.  So let me move on to then the defendants emphasize

15    in their pleadings the executive order's use of phrases like

16    "appropriate action" and "consistent with law."  Their

17    argument, as I understand it, is that you can't show that

18    Section 2(a) is unlawful because of these -- they're usually

19    considered "saving phrases," because the phrases mean that the

20    executive order can have only lawful effects.

21        You do discuss this in your reply, but very briefly.  So

22    if you could, why are you likely to succeed in showing Section

23    2(a) is unlawful despite these, quote, saving phrases?  So put

24    it in the context of saving phrases.

25        MS. LANG:  My colleague, Ms. Lakin, is going to take

1    that one.  Thank you, Your Honor.

2              THE COURT:  Okay.

3              MS. LAKIN:  So to your question --

4              THE COURT:  The argument -- their argument, the

5    government's argument, is that you can't show that 2(a)

6    is unlawful based on these saving phrases, which say "take

7    appropriate action," has to be "consistent with law."

8        So you discuss it in passing, but I wanted to see if there

9    was anything else you wanted to add to it.  So why are you

10   likely to succeed in showing that Section 2(a) is unlawful

11   even though we have these what I'll call "saving phrases" in

12   the executive order?

13             MS. LAKIN:  Yes, Your Honor.  We lay this out in our

14   reply brief, so please stop me if I'm repeating.  But the

15   savings clause has no impact on our preliminary relief because

16   courts have repeatedly rejected the argument that a facially

17   illegal executive order, which we have here, can be salvaged

18   with boilerplate language about following the law.

19       The rule is that, if it's impossible for the EO to be

20   implemented consistent with the law, then the savings clause

21   must be disregarded.  And here you have it's impossible for

22   Section 2(a) of this executive order, for the reasons that

23   Ms. Lang has pointed out with respect to the separation of

24   powers concerns, for that to be implemented consistent with

25   applicable law.

1          It's the order itself that's unconstitutional, and any

2     command from the president to the independent, bipartisan

3     Election Assistance Commission is unlawful.  So the savings

4     clause here would nullify the executive order as a result,

5     and so it can't save it.

6          THE COURT:  Okay.  What about in terms of we have

7     the letter from the executive director and the email which

8     obviously makes it clear EAC is not going to be finishing this

9     within the 30 days that's discussed in the executive order.

10    How does this all factor in, from your perspective, in terms

11    of your argument, if at all?

12         MS. LAKIN:  It factors only to the extent there is

13    some attempt to have some process and some steps that involve

14    before the president's mandate is carried out, but it does

15    nothing.  The amount of process, the facts of any sort of

16    process, cannot launder the unconstitutionality of the mandate

17    in the first instance to require, ultimately, this preordained

18    conclusion that documentary proof of citizenship be required

19    as part of registering to vote on the federal form.

20         THE COURT:  Okay.  So as I asked your colleague,

21    anything else -- again, I've looked at your motion and the

22    reply.  Anything else of particular note that you think I need

23    to consider in this?  Doesn't have to be.  I just want to make

24    sure.

25         MS. LAKIN:  One quick note, and it's related to a prior

1    issue that you asked Ms. Lang about the merits.  The separation

2    of powers argument is simply, as we note in our reply brief,

3    defendants haven't said anything to the contrary in their

4    briefs and, we would submit, have forfeited any arguments to

5    the contrary as a result.

6         THE COURT:  Okay.  Let me move then to irreparable

7    harm, whoever's going to argue that.

8         MS. LAKIN:  I think that might be me.

9         THE COURT:  Okay.  So irreparable harm -- we're still

10    talking about Section 2(a).  So the D.C. Circuit, unlike some

11    other circuits, sets a very high standard for showing of

12    irreparable harm that's necessary to support a preliminary

13    injunction.

14      The threatened injury has to be beyond remediation, and

15    injunctive relief will not be granted against something merely

16    feared as liable to occur at some indefinite time, nor will

17    such relief be granted against an injury that's just

18    theoretical.  So very briefly, why is the burden at Section

19    2(a) we place on the nonpartisan plaintiffs beyond remediation

20    and not merely theoretical?

21         MS. LAKIN:  For several reasons, Your Honor.

22    Defendants have already been, as we discussed, implementing,

23    at least taking steps to implement the president's mandate,

24    and without a preliminary injunction or any efforts to pause

25    moving forward to that preordained result, we know that

1    unfortunately there will be a documentary proof of citizenship

2    requirement on the federal form.  That is what the mandate

3    requires.

4        *Newby* is very instructive here, and it makes very clear

5    that even where the documentary proof of citizenship

6    requirement isn't yet in place, the harm to the ability to

7    help voters get registered that a documentary proof of

8    citizenship requirement imposes, which Ms. Lang has discussed

9    in depth, that form imposes -- that harm is irreparable

10   because this is part -- that action harms the League's program

11   or our clients' programmatic activities and that that harm

12   directly impairs our clients' core missions.

13            THE COURT:  Is it remedial?

14            MS. LAKIN:  It is not remedial if you have lost the

15   ability to register a voter, especially where we have -- in

16   our country there's always another election.  They're not able

17   to gain that opportunity back following a loss of registration

18   and an election that takes place with an individual unable to

19   participate in that election.

20            THE COURT:  Okay.  Moving to another section, would

21   implementation of Section 2(a) of the executive order cause

22   irreparable harm to the nonpartisan plaintiffs in states other

23   than Arizona?

24            MS. LAKIN:  Yes.  Absolutely.  As I mentioned, we point

25   to Arizona because that is an election that is coming upon us

1    very quickly.  But there are a number of elections that are

2    occurring shortly after that, and year after year, month after

3    month, there's going to be another election.

4        Our clients are going to be continuing to try to register

5    as many voters as they possibly can, assist as many voters as

6    they possibly can through the voting process, and the

7    documentary proof of citizenship requirement will require them

8    to take a number of different kinds of actions to counteract

9    the difficulties in registering people to vote where you have

10   a requirement to show documentation.

11       And that's going to occur in Arizona, will occur later

12   this year in Texas.  We could continue documenting all the

13   additional elections that are going to occur for the

14   foreseeable future.

15       THE COURT:  All right.  The defendants argue that given

16   the compelling public interest in fair, trustworthy, federal

17   elections, the balance of equities and public interest are in

18   their favor.  So you're asking me to reach the opposite

19   conclusion.  In summary form, why?

20       MS. LAKIN:  Your Honor, there's simply -- that's an

21   assertion of what this executive order is going to accomplish.

22   There's no evidence.  In fact, if we were to look at anything

23   that has come before that Congress has considered in the past,

24   what the Election Assistance Commission has considered in the

25   past, all evidence is to the contrary.  Requiring a documentary

1    proof of citizenship requirement will just make it more

2    difficult for individuals to get registered to vote, with no

3    evidence whatsoever put forward except an assertion that this

4    will somehow create more secure elections.

5            THE COURT:  All right.  Okay.  Then let me move on to

6    the Democratic Party plaintiffs.

7            MS. LANG:  Your Honor, if you would indulge me on the

8    Arizona question on scope of relief?

9            THE COURT:  Sure.

10           MS. LANG:  I just want to add some comments on the

11   comparison to nationwide injunctions made by defendants here.

12           THE COURT:  Okay.

13           MS. LANG:  So as my colleague, Ms. Lakin, already

14   pointed out -- well, let me back up.  When this court

15   considers what relief to grant, the question is what would

16   provide complete relief to the plaintiffs, and if that

17   complete relief to the plaintiffs has some incidental impact

18   on others, that has never been a bar to the complete relief to

19   the plaintiffs.

20      And the plaintiffs here, both the Democratic Party

21   plaintiffs and the nonpartisan plaintiffs, are national

22   actors.  And I can tell you, LULAC and the League of Women

23   Voters and others are engaging in voter registration all the

24   time, not just in the run-up to a specific election.  And once

25   you've lost the opportunity at the grocery store to register

1    someone to vote, there is no way to remedy that harm.

2        But this is just not a nationwide injunction case, right?

3    So a good example again is the census citizenship question

4    case.  At the district court level, when considering the scope

5    of relief, the court pointed out that that case didn't involve

6    a case-by-case enforcement of a policy or a statute against

7    various people.  Instead, it was about a single decision about

8    a single questionnaire.  And we have the same question here.

9    We have a question about a single decision made by the EAC

10   about a single form.

11       And quite frankly, the NVRA's point in creating a federal

12   form was to have one form for national use; and it would be

13   contrary to the NVRA to be springing up different federal

14   forms for different states, and it would not provide complete

15   relief to the plaintiffs.

16       And cases like *Labrador v. Poe*, where there was a

17   concurrence from Justice Gorsuch, are just entirely

18   inapposite, right?  That was a case where the district court

19   had enjoined an entire law and its application to everyone,

20   even provisions that were completely unrelated to the

21   plaintiff's needs.  Here the question is simple.  It's about

22   one action by one set of actors about one form, and enjoining

23   that action is necessary to provide complete relief.

24       And the last comment on balance on equities that I would

25   make is, as Ms. Lakin pointed out, that is the -- those are

1   the policy beliefs of the president.  But it is not in the

2   interest of the public to allow the president to usurp the

3   policy decisions of Congress and the states, policy decisions

4   that the Constitution provided to Congress and the states.

5       So the president might have a set of policy views, but

6   what's in the public interest is enforcing that separation of

7   powers and allowing the congress and the states to exercise

8   their own power over election rules.

9           THE COURT:  All right.

10          MS. LANG:  Thank you, Your Honor.

11          THE COURT:  Let me do just one quick thing.  Okay.

12  All right.  Could you give us your name again, please?

13          MS. BRANCH:  Yes.  Good afternoon.  Aria Branch for the

14  Democratic Party plaintiffs.

15          THE COURT:  All right.  The Democratic Party plaintiffs

16  have moved for preliminary injunction, and it's against five

17  different provisions of the executive order including the one

18  we've just been talking about, the 2(a).  There's some

19  overlap, so some of my questions may overlap a little bit with

20  what's been asked for by the nonpartisan plaintiffs.

21      So let me just set out, as I understand it, the challenges

22  that you're raising.  2(a) directs the EAC to take appropriate

23  action within 30 days, to require users of the federal form to

24  provide documentary proof of citizenship, and then the state

25  and local officials have to record it on the form.

1    2(b) directs several federal agencies and officers to

2    take action to "identify unqualified voters registered in

3    the states," primarily by granting access to information in

4    federal databases.

5    Third, 2(d) directs federal agencies to "assess

6    citizenship" before providing the federal form to enrollees

7    of public assistance programs.

8    Fourth, 7(a) directs the attorney general to take all

9    necessary action to enforce 2 U.S.C. § 7 and 3 U.S.C.

10    § 1 against states that count ballots received after the

11    election day in federal elections.

12    And the last provision was 7(b), directs the EAC to

13    condition any available funding to states, specifically

14    on those states acting to set a ballot receipt deadline of

15    election day for all methods of voting except for ballots

16    by service members or other voters.

17    Obviously, I'm not going to go through all of the

18    requirements under *Winter* about preliminary injunction, so

19    let me move to each of the aspects that we need to get to.

20    So let me start with standing.  Plaintiffs have the burden

21    of showing again a substantial likelihood of standing.  There

22    are three theories, as I understand it, of standing that you

23    have raised: organizational standing, associational standing

24    like the nonpartisan plaintiffs, as well as political

25    competitor standing.  Am I correct about that?

1        MS. BRANCH:  That is correct, Your Honor.

2        THE COURT:  Okay.  Then let me move to organizational

3   standing.  To have organizational standing in its own right,

4   an organization has to make "the same showing required of

5   individuals an actual or threatened injury in fact that is

6   fairly traceable to the defendant's allegedly unlawful conduct

7   and likely to be redressed by a favorable court decision."

8      So I take it from your declarations that each of your

9   organizational clients considers it part of its mission to

10  register eligible voters for federal elections and to help

11  eligible voters have their ballots counted at least to the

12  extent that doing so helps elect Democratic candidates.  So

13  I'm assuming that's your position.  Is that correct?

14       MS. BRANCH:  That is correct, Your Honor.

15       THE COURT:  Okay.  So your standing arguments for most

16  of the challenged provisions are quite clear in your motion

17  and reply, but briefly, how is Section 2(d) of the executive

18  order, which requires federal agencies to assess citizenship

19  before providing it to a public assistance program, the

20  enrollment, causally linked to the harm you allege to your

21  organizational clients' interest, and how would a favorable

22  decision on your motion by me redress that harm?  So if you'd

23  focus on that one.

24       MS. BRANCH:  Sure, Your Honor.  So as you mentioned,

25  Section 2(d) requires federal agencies that are designated as

1    voter registration agencies under the National Voter

2    Registration Act to, quote-unquote, assess citizenship before

3    they can even provide the federal registration form to

4    enrollees of public assistance programs, and only enrollees

5    of public assistance programs, no one else.

6        And so we have submitted declarations from all of the

7    Democratic Party organizations as well as the leaders of the

8    Democratic caucuses and the Congress that talk about the ways

9    in which low-income voters who may submit themselves to these

10   voter registration agencies and desire to register to vote

11   would be subject to these citizenship assessments before they

12   can be even be given the federal form.

13       And so in our declarations, we have the declarants talking

14   about how low-income voters who qualify for assistance

15   programs support Democratic candidates to the tune of 20-plus

16   percent more than their Republican counterparts.

17       I would point Your Honor to Exhibit 10, which is the Pew

18   Research on Party Affiliation, talks about how low-income

19   voters are more likely to support Democratic candidates.  And

20   so this provision has real potential to cause competitive harm

21   to Democratic candidates because it will decrease the ability

22   of Democratic-affiliated voters to be able to use the federal

23   form to register to vote.

24       That, in and of itself, will cause organizational harm

25   because my clients are in the business of running elections

1   and winning elections.  And so everything that they do, day

2   in and day out, 365 days of the year, is focused on that.

3   It's focused on registering Democratic voters.  It's focused

4   on turning voters out to vote.  It's focused on ensuring that

5   voters know how to cast a ballot and that that ballot will be

6   counted once it's submitted.

7        And if Democratic-affiliated voters can't register to vote

8   at these voter registration agencies, that means that my

9   clients will have to step in and fill the void.  That will

10  cause organizational harm to them because they will have to

11  divert resources from persuasion efforts, all of the different

12  things — programs, turnout programs, even advertising that are

13  listed in the declarations — in order to make sure that

14  enrollees of public assistance programs can register to vote.

15       I would point Your Honor also to the 2007 GAO report that's

16  referenced in our brief, which the court can take judicial

17  notice of.  It's a government report, and it talks about how

18  citizenship checks have discouraged participation in public

19  assistance programs by eligible individuals.

20       So there's a real concern that this provision, this command

21  of the president, which is unlawful for all of the reasons in

22  our briefs, will discourage Democratic-affiliated voters from

23  registering to vote, and that will hurt my clients both at the

24  ballot box, and it will cause them competitive harm --

25            THE COURT:  Leaving that aside, just the organizational

1    one.

2         MS. BRANCH:  Yes, Your Honor.  Because they will have

3    to divert resources from other programs, other core activities,

4    to fill the void and counteract the harms of the president's

5    unlawful command.

6         THE COURT:  All right.  Anything else that you think

7    of note that you want to add, again talking strictly about the

8    substantial likelihood of organizational standing, that

9    argument.

10        MS. BRANCH:  The only thing I would say is, on the

11   ripeness point, these are injuries that are happening now

12   because, as I mentioned, my clients are in the business of

13   registering voters 365 days of the year.  And so to the extent

14   that Democratic-affiliated voters can't register to vote, that

15   is causing them harm now.  It will be irreparable because the

16   resources that they spend to counteract this harm can't be

17   recouped.

18      And there are lots of court decisions that talk about how

19   campaign- and election-related injuries like the ones we have

20   articulated are irreparable, because once the election is

21   over, there can't be a do-over and there can't be any redress

22   to recoup resources that have been diverted to counteract this

23   harm.

24        THE COURT:  All right.  Let's move to associational

25   standing.  That requires that the membership organization has

1    to show its members would otherwise have standing to sue in

2    their own right and the interests the organization seeks to

3    protect are germane to the organization's purpose, and neither

4    the claim asserted nor the relief requested requires the

5    participation of individual members in the lawsuit.  So who

6    exactly are your organizational clients' members for purposes

7    of associational standing?

8         MS. BRANCH:  Sure.  And this is detailed in the

9    declarations, but I represent the Democratic National

10   Committee, which has a formal membership of state party

11   leaders and Democratic leaders.  It also considers every

12   registered Democratic voter to be a member.

13       So to the government's argument that we have not identified

14   individual members who will be affected is just incorrect

15   because we have identified and we have declarations that we've

16   submitted from both Leader Schumer and Leader Jeffries, both

17   of whom are members of the DNC.

18       The Democratic Governors Association also has a formal

19   membership of all the Democratic governors in the country.

20   We have listed the names of all of those governors in our

21   declaration.  The DCCC and the DSCC similarly consider

22   Democratic voters to be among their membership and their

23   constituency, and each of the commands that the president

24   has set forward in this executive order will impact those

25   constituencies and those members in harmful ways which we've

1    detailed in the declarations.

2         THE COURT:  You mentioned the Democratic Governors

3    Association members.  Are they in their individual capacities

4    or members in their official capacities as governors?  What

5    capacity?

6         MS. BRANCH:  In terms of their membership --

7         THE COURT:  Yes.

8         MS. BRANCH:  -- in the organization?  I believe it's

9    in their official capacities as governors.  And also, I mean,

10   as voters, right?  They are individuals who cast ballots in,

11   I think it's 26 states in the country.  So I think they have

12   standing both as individuals, and then they're also members of

13   the DGA in their official capacities.

14        THE COURT:  Okay.  The political competitor standing.

15   Our D.C. Circuit has recognized that political competitors can

16   have standing to challenge illegal structuring of a competitive

17   environment in which rival parties identify their concrete

18   interests.  It's available primarily to candidates with

19   concrete plans to run for office in the future.

20      And obviously, two of your clients — Representative

21   Jeffries and Senator Schumer — are individual, active

22   candidates for federal office, and it appears likely that they

23   have political competitor standing to challenge actions that

24   directly affect their elections.  So I think I would agree

25   with that.

1       Do organizational clients have political competitor

2    standing as well?

3       MS. BRANCH:  They absolutely do, Your Honor, and I

4    would point Your Honor to a case -- I think it's from the D.C.

5    Circuit.  I think it's the *Natural Law Party* case.  And I'll

6    check the case name of that, but that specifically recognizes

7    that political parties can also have competitor standing

8    because they suffer electoral harm if they are not able to

9    elect their candidates at the ballot box.

10      And so the DCCC, the DGA, and the DSCC as well as the

11   DNC are all in the business of electing Democrats to elected

12   office.  And because the executive order's election-day

13   receipt provision and command and its requirement that the EAC

14   impose documentary proof of citizenship would both decrease

15   the number of Democratic voters who can become registered and

16   would make it more difficult for Democratic voters to have

17   their ballots counted, including in states like California

18   where the DCCC has a number of -- and every cycle has a number

19   of competitive congressional races and 80 percent of the

20   voters in California vote by mail, I think that under current

21   law, ballots can be received I think up to seven to 10 days

22   after the election.

23      If that changes, that is a sea change in election law in

24   California and across the country.  It would have an enormous

25   impact on the party committees' and particularly the DCCC's

1    ability to win elections.  And so the party committees

2    actually have competitor standing, and the executive order

3    imposes unlawful command on various agencies that would hurt

4    their ability to elect Democratic candidates.

5              THE COURT:  What's the best precedent?  Is it the case

6    you're hoping to check?

7              MS. BRANCH:  That the parties --

8              THE COURT:  Yes.  In other words, what's the best

9    precedent from this circuit, not from some other circuit --

10             MS. BRANCH:  Yes, it is from this circuit, and I think

11   the *Shays* case may speak to this as well, *Shays v. FEC*.  But I

12   think it's the *Natural Law Party* --

13             THE COURT:  I see your colleague nodding.

14             MS. BRANCH:  Apologies.

15             THE COURT:  So do any of your organizational clients

16   have as members active candidates for federal elective office

17   in the state of Arizona?  And if so --

18             MS. BRANCH:  Absolutely.  Absolutely, Your Honor.  So

19   the DGA, Governor Hobbs, who is the governor of Arizona, is a

20   member of the DGA, and then the DCCC has a number of candidates

21   who hold office in Arizona and who will be running for

22   re-election.

23             THE COURT:  If I directed you to get affidavits, would

24   you be able to do so, and how quickly, from these individuals?

25             MS. BRANCH:  I can certainly do my best.  Can we follow

1      up on that?

2              THE COURT:  Yes.

3              MS. BRANCH:  I mean, I do think that the affidavits we

4      submitted -- and we've referenced Governor Hobbs, I believe,

5      in the DGA affidavit as the governor of Arizona, a member of

6      the DGA.  But certainly, if Your Honor would request further

7      affidavits, we can work on that.

8              THE COURT:  All right.  Then moving to 2(d), which

9      directs federal agencies to assess citizenship before

10     providing the federal form to enrollees of public assistance

11     programs, how would that affect the competitive environment

12     for candidates for federal elective office?

13             MS. BRANCH:  So as I mentioned earlier, Your Honor, and

14     we've submitted declarations and both the Pew Research Center

15     study on this, the studies show that lower-income voters are

16     more likely to vote for and support Democratic candidates.

17         And so to the extent that they are not able to register

18     to vote or they're discouraged from being able to register to

19     vote at federal agencies using the federal form that Congress

20     has, you know, set forth under the National Voter Registration

21     Act, that will -- that will ensure that there are fewer

22     Democratic voters who can cast ballots for Democratic

23     candidates.  And so that will cause competitive and electoral

24     harm for all of my clients.

25             THE COURT:  All right.  Let me move to the likelihood

1    of success on the merits.  One of the arguments that you make

2    about Section 2(b), instructions on data sharing, that it's

3    *ultra vires* because implementing those instructions would

4    violate the Privacy Act.  The defendants in turn argue that

5    there's at least one routine use allowed under the Privacy

6    Act that would cover the kind of data sharing described in

7    Section 2(b).

8        Specifically, they cite a routine use listed in the USCIS

9    alien file System of Records Notice, or SORN, which covers

10   disclosures "to a federal, state, local, tribal, or territorial

11   government agency seeking to verify or ascertain the citizenship

12   or immigration status of any individual within the jurisdiction

13   of the agency for any purpose authorized by law."

14       Do you disagree with their interpretation of the routine use?

15            MS. BRANCH:  I do, Your Honor.

16            THE COURT:  Okay.

17            MS. BRANCH:  And the first thing I would point out is

18   that the executive order commands that this personal, private

19   data be shared with DOGE, and there's no exception that the

20   government has pointed to that would allow for such data

21   sharing.

22       With respect to the routine use, there are two requirements

23   that have to be invoked in order to advance that exception.

24   The first is that the agency has to publish the routine use in

25   the Federal Register.  The second is that disclosure of the

relevant record has to be compatible for the purpose for which
the record was collected.

   And the government points to a single published routine
use for this data, and even then only to a single database.
That routine use, which we pointed out in our reply brief,
is limited to when state and local officials affirmatively
request information about said citizenship from the federal
government.

   So it does not allow for a broad disclosure of citizenship
data with state and local officials across this country.
There are 300 local election officials across this country,
many of whom are election deniers, and the Privacy Act is put
in place to prohibit just this kind of broad disclosure.

   We're not just talking about disclosure to a couple of
employees at DOGE, although that is unauthorized.  We're
talking about disclosure to all state and local officials,
and the routine use that the government points to allows for
disclosure when state and local officials request it, not
pursuant to an unlawful command by the president.

        THE COURT:  Okay.  Moving to 7(a), why are your
clients the proper plaintiffs to challenge 7(a) which directs
enforcement actions against states?  Aren't the states the
proper plaintiffs to raise those claims in an *Ex parte Young*
style equitable action for an anti-enforcement injunction?

        MS. BRANCH:  I think states could bring such a claim,

1    but our plaintiffs also have standing to do so as well because

2    they will be injured by the ballot receipt, the election-day

3    ballot receipt provisions.  And so they are seeking an

4    injunction against the attorney general from prohibiting

5    states from engaging in changing their laws to comply with the

6    president's unlawful demand.  Because that will inflict harm on

7    our plaintiffs, they have standing to challenge the provision.

8         THE COURT:  So would I have equitable power to enjoin

9    the attorney general from filing a suit against a nonpartisan,

10   and can you point me to some case that says so if you think

11   that I would have that power?

12        MS. BRANCH:  Well, I think the important thing to note

13   here is that the executive order is quite broad.  It commands

14   the attorney general to enforce the law in any way she sees

15   possible.  It's not clear that that's limited to filing

16   lawsuits, but certainly that might be one way that she may

17   see fit to enforce the law.  And I think -- yes, I think Your

18   Honor does.  Because that provision is *ultra vires*, it

19   violates the separation of powers, I think Your Honor does

20   have the power to enjoin that provision.

21       The president simply doesn't have authorization from the

22   Constitution or any federal law to force the attorney general

23   to enforce a flawed and incorrect view of federal law.  The

24   states are under the Election Clause.  Both the states and

25   Congress have control over elections, and the states have

1    taken their -- they have followed their policy choice in

2    enacting state ballot receipt deadlines that may be after

3    election day, and that is completely consistent with their

4    power under the Elections Clause.

5        The election-day statutes do not have any bearing on that.

6    They speak to when elections are to be held, when voters must

7    make their final choice in an election.  They don't speak to

8    when ballots must be received.  And so the claim here is that

9    the president simply doesn't have the power to force the

10   attorney general to enforce a flawed view of the law that

11   violates the separation of powers.  And so that is what we

12   are asking Your Honor to consider and to enjoin.

13       THE COURT:  Do you have any kind of case that you can

14   cite to relating to this?

15       MS. BRANCH:  I will check on that.

16       THE COURT:  Okay.

17       MS. BRANCH:  I don't recall one off top of my head in

18   our reply brief, but if Your Honor will permit me to follow up

19   on reply, I can do that, or rebuttal.

20       THE COURT:  Okay.  Now we'll move to 7(b).  Why are

21   your clients the proper plaintiffs to challenge 7(b), which

22   directs the EAC to withhold funding from states under certain

23   conditions?  Again, shouldn't the states be the ones to bring

24   those claims?

25       MS. BRANCH:  Again, I think the states could be the

1    ones to bring those claims, but my clients also are harmed by

2    the provision — in particular, the governors who are members

3    of the DGA, the Democratic Governors Association — because the

4    president's acting unlawfully by commanding the EAC to

5    withhold funding from state officials to run their elections.

6         That will have -- if they decide not to comply with his

7    unlawful command to reject ballots received after election

8    day and the EAC withholds funds as a result, that will have

9    enormous impact on election administration in states, which

10   will impact voters and the way that elections are run.

11        It will also impact the governors, and it will certainly

12   impact the party organizations who will have to step in and

13   fill the void.  They will have to engage in and try to help

14   with election administration tasks that states are no longer

15   able to handle because the EAC has unlawfully withheld funds.

16   And so my clients absolutely are being injured by 7(b), and

17   they have standing to sue as a result.

18        THE COURT:  So talking about both sections 7(a) and

19   7(b), what would be the thinking about private parties who

20   basically are asserting claims to protect states or sovereign

21   entities from federal infringement on their sovereign

22   prerogatives in terms of your almost acting on behalf of the

23   states?

24        MS. BRANCH:  I don't think that's what's happening here.

25        THE COURT:  Okay.

1          MS. BRANCH:  Because I think that, as I've articulated,

2     the plaintiffs that we represent, in particular the governors,

3     are going to be injured because of the president's unlawful

4     command for these states to reject ballots received after

5     election day.

6          So I don't think it's necessary to even reach that

7     question, because I don't think this is a situation where the

8     plaintiffs are acting on behalf of states.  They're acting on

9     behalf of their own interest, which will be injured because of

10    the president's unlawful command.

11         THE COURT:  All right.  The last one is obviously

12    irreparable harm, and as I indicated before with the

13    nonpartisan plaintiffs, it's a very high standard.  It's

14    not one that all the circuits have in terms of showing

15    irreparable harm.  It has to be beyond remediation, it can't

16    be theoretical, and won't be granted against something merely

17    feared is liable to occur at some indefinite time in the

18    future.

19         So very briefly, why is the burden that each provision

20    of the executive order would place on the Democratic parties

21    beyond remediation and not merely theoretical?  And I'll leave

22    you to figure out how you want to discuss it in the context of

23    the provisions.

24         MS. BRANCH:  Sure.  So the election-day receipt

25    deadline provisions are undermining the party organization's

1    ability to plan for and compete in the upcoming '25 and '26

2    elections.  Instead of mapping out persuasion strategies and

3    ad strategies and working on turning out voters, they're

4    spending their limited time and resources planning on how to

5    revise their mail voting programs to ensure that their members

6    and constituents can submit their ballots on time.  That's

7    time, money, and organizational resources and strategy that

8    can't be recouped.

9        And with elections, as I'm sure Your Honor knows, every

10   single day is important.  Like we're on a ticking clock to

11   election day every cycle, and every moment that my clients are

12   spending planning for counteracting the harm of the receipt

13   deadline provision or counteracting the harm of the president

14   commanding documentary proof of citizenship is time that

15   they're not spending persuading voters to support Democratic

16   candidates.

17       And courts have said that these types of election- and

18   political-related injuries are irreparable and they can't be

19   redressed later because you can't get that time and you can't

20   get that money back.  And so these are precious resources that

21   my clients are having to spend now in order to counteract the

22   unlawful provisions in this executive order, and that will

23   impact them both at the ballot box and in terms of elections

24   and their ability to turn out voters going forward.

25            THE COURT:  In terms of -- is there irreparable damages

1    as this case has set out that's specific to any of these --

2    that's a more general one that you discussed as I assume you

3    would say affects all of the sections.  Are there particular

4    ones that are related to a specific section that's at issue?

5         MS. BRANCH:  I think with respect to the data-sharing

6    provisions and the Privacy Act violations, those provisions

7    further threaten irreparable harm because they require the

8    disclosure of personal information of Democratic Party members

9    and constituents to state and local officials and including

10   DOGE.

11        And I think that provision will impact the -- and we talked

12   about in our declarations the fact that Democratic voters are

13   particularly concerned about their data being shared with DOGE

14   and other federal agencies given the president's discussions

15   and accusations of cheating by Democratic voters.

16        The data-sharing provisions in particular will make it more

17   difficult for the party committees to register voters because

18   voters are going to be more hesitant to share their personal

19   information to register to vote if they know that that

20   information will be shared with state and local officials,

21   it'll be shared with DOGE, it could potentially result in them

22   being disqualified to vote or removed from the voter rolls

23   mistakenly.

24        But in general, I think the organizational harm and the

25   associational harm is irreparable here.  In Leader Jeffries'

1    and Leader Schumer's declarations, they talk about the impact

2    these provisions have on the ability to recruit candidates

3    because candidates want to know that the rules of the road are

4    clear and that the rules that apply to Democratic voters won't

5    hurt their ability to get elected.

6        And so these provisions are causing all sorts of harm right

7    now because candidate recruitment is something that's going on

8    right now, and if a candidate decides they're not going to run

9    for office because it's too difficult because there's too much

10   uncertainty, because in California, for instance, ballots

11   won't be able -- or across the country, frankly, ballots won't

12   be able to be returned after election day, and that will cause

13   mass confusion and chaos amongst voters.

14       That's a harm that's occurring right now, and that can't be

15   recouped because you can't -- once a candidate decides they're

16   not going to run for office because of this and the candidate

17   deadlines for declaring for office have passed, you can't go

18   back and recruit that candidate.

19       So that's just a small -- that's one example that's

20   discussed in the declarations as the way that these provisions

21   are harming both the organizations and the party leaders right

22   now, and that harm is irreparable.

23           THE COURT:  In terms of the last one, which is the

24   balance of equities in public interest, why do they tip in

25   your favor?  And again, we're looking at all of the sections.

1     So you give one overall or pick particular sections that you

2     think you want to address it with.

3          MS. BRANCH:   Sure.   I mean, I would join the arguments

4     that the nonpartisan plaintiffs made as well, which is, one,

5     the government doesn't have an interest in enforcing laws that

6     are unconstitutional.   And so I think when you look at the

7     balance of the equities, it's very clear that these provisions

8     were -- they're *ultra vires*, they violate separation of powers,

9     and the government doesn't have an interest in enforcing them.

10         On the other side of the balance, you have the threat of

11    disenfranchisement of Democratic voters, and courts have held

12    that it is in the public interest for lawful citizens, which

13    is all we're talking about here, to be able to cast ballots

14    and have that ballot counted.

15         And so I think the balance of the equities weighs very

16    heavily on our side, especially with respect to the ballot

17    receipt deadline which would result in disenfranchisement of

18    voters whose ballots are received by states after election

19    day, even if it's through no fault of their own due to post

20    office delays or other issues the government just says, oh,

21    well, that doesn't matter.

22         And that certainly is not -- that is not within the spirit

23    of the NVRA, which the entire purpose of the NVRA is to

24    encourage voter participation.   That is why Congress enacted

25    it.   That's why the federal registration form exists.   So I

1    think the balance of the equities is very clearly on our side.

2        I think an injunction here is certainly within the public

3    interest because it would make it easier for people to vote.

4    And because what the president has done here is so unlawful,

5    it is a clear violation of the separation of powers both with

6    respect to the states and Congress who have the power over

7    elections.  The president plays no role, and his commandeering

8    of the EAC and trying to override state laws on elections is

9    absolutely *ultra vires* and should be enjoined.  And that would

10    be consistent with the public interest.

11        THE COURT:  All right.  What I'm going to do at this

12    point is, before we start with the defendants, I'm going to

13    take a break so the court reporter has a break here instead of

14    going through the rest of the afternoon.  So it's 3:15.  We'll

15    come back at 3:30, and we'll pick up at that point.

16        MS. BRANCH:  Thank you, Your Honor.

17    (Recess from 3:15 p.m. to 3:39 p.m.)

18        THE COURT:  All right.  Mr. Gates, I have some

19    questions for you.

20        MR. GATES:  Thank you very much, Your Honor.

21        THE COURT:  All right.  The 2(a) directs that the EAC

22    take appropriate action within 30 days to require users of the

23    federal form to provide documentary proof of citizenship,

24    which state and local officials must then put on the form.

25    I take it from our colloquy at the beginning of the arguments

1    today that you would agree that making a change to the federal

2    form is going to take more than 30 days, so that provision

3    isn't going to be specifically implemented.  Would you agree

4    with that?

5         MR. GATES:  That's correct, Your Honor.  Not within 30

6    days.

7         THE COURT:  So let's put aside for the moment arguments

8    about standing.  I understand your principal defense of

9    Section 2(a) to center on the "appropriate action" language

10   and then Section 11(b)'s "consistent with applicable law"

11   language, and I'll call those the "savings clauses" for short.

12        MR. GATES:  Yes, Your Honor.

13        THE COURT:  And your argument, as I understand it,

14   basically comes down to saying you must read the savings

15   clauses to remove anything illegal from the order.  Under that

16   reading, Section 2(a) only orders actions that are legal, so

17   plaintiffs have no claim and face no irreparable harm.

18      Would that be a good summary of what you said?  I think

19   that's how you worded it.

20        MR. GATES:  Yes.  And if you're referring to our

21   briefing, I think we --

22        THE COURT:  Yes.

23        MR. GATES:  -- briefed this pretty extensively.  And

24   I would underscore, too, that the EAC, pursuant to 52 U.S.C.

25   20921, is a bipartisan organization.

1          THE COURT:  Right.

2          MR. GATES:  It's an independent entity, and it is part

3     of the Executive Branch under the purview of the President of

4     the United States.  So the executive order is properly placed

5     giving direction to the agencies that are contemplated in the

6     executive order, whether it's DHS, attorney general, and the

7     EAC.

8          THE COURT:  So you're indicating it's not really an

9     independent agency; it's basically the president can tell them

10    what to do?

11         MR. GATES:  Well, the president's executive order

12    applies to the EAC.

13         THE COURT:  I understand.  But if I understand your

14    argument, I understand that the executive order relates to or

15    purports to tell the EAC what he wants done, if I understand

16    your argument, and you're indicating that because it's

17    considered part of the Executive Branch, he legally can do it.

18    Is that what you're arguing?

19         MR. GATES:  Well, if I could make my argument --

20         THE COURT:  Well, it's not a question I asked, but you

21    brought it up.

22         MR. GATES:  That's fair.

23         THE COURT:  I'm trying to figure out whether you're

24    making some argument in terms of it's not really an

25    independent agency or some other thing, which I didn't see in

 1    your brief, but I'm happy to hear what it is.

 2            MR. GATES:  It is -- I believe it is noted in our

 3    brief, Your Honor.  I don't have the page cite, but what's

 4    important and responsive to your question is that the --

 5            THE COURT:  Responsive to which question?

 6            MR. GATES:  To the question about the lawfulness, the

 7    EAC shall implement according to the applicable laws.  There's

 8    a whole host of statutes that the EAC must comply with, and

 9    they are expected to comply with them.

10            THE COURT:  Oh, I -- there's no dispute about that.

11    I mean, EAC has different obligations and different procedures

12    that it needs to go through.  I'm not disagreeing with that.

13    What I was trying to get to in your argument is if for some

14    reason that the savings clause in essence saves any potential

15    issues, that whatever is being ordered would be considered

16    legal and that the savings clause makes it clear that whatever

17    is being ordered has to be legal.

18            MR. GATES:  Yeah, and --

19            THE COURT:  Would you agree that's your argument,

20    that the savings clause sort of saves what it is that's being

21    ordered because it's expected to comply with the law?

22            MR. GATES:  And -- yes, and the executive order is

23    directing the agencies that the president has purview over to

24    enforce the laws that are already on the books that Congress

25    passed.  Specifically, if I may, according to existing federal

1    law, it's a federal crime to vote if you're a noncitizen.

2    That's 18 U.S.C. --

3           THE COURT:  Right.  I'm not disputing that, but I'm

4    just -- let me do it this way, okay?  And then I'll let you

5    get back to it.

6           MR. GATES:  Okay.

7           THE COURT:  Let me do my hypothetical for a second

8    in terms of sort of seeing how the savings clause and the

9    "consistent with applicable law" language is used, as I

10   understand your argument, that it sort of saves any -- and

11   makes it clear that any actions that are going to be ordered

12   are going to be legal because it has to comply with applicable

13   law and basically has to be done legally.

14       And let me make it clear that I'm doing a hypothetical

15   that has nothing to do with elections, and it should not

16   be concluded that this is actually going to happen or is

17   happening just because, evidently, other people, when they've

18   done hypotheticals, they've somehow taken it for granted that

19   this is correct.  This isn't.

20       This is strictly to not draw a comparison between the

21   hypothetical facts and the facts in this case.  It's basically

22   to see how the legal arguments would apply to different facts

23   but to make a point.  Okay?  I'm doing it as sort of a caveat

24   out here since, evidently, some other hypotheticals people

25   have taken to be correct.  This isn't, hopefully, correct.

1          So imagine an executive order that said, "The General

2     Services Administration shall, in five days, bar all women

3     from entering federal buildings."  The order would plainly

4     violate the Fifth Amendment.  And assuming standing and venue

5     and everything else, a woman could come into court and enjoin

6     the GSA from enforcing that order.  Okay?

7          Now imagine the order says, "Consistent with applicable

8     law, the General Services Administration shall, in five days,

9     bar all women from entering federal buildings."  The ordered

10    action is exactly the same and completely unconstitutional.

11    The only difference is that it's consistent with applicable

12    law.

13         So, in other words, the first hypothetical just simply

14    says, "The General Services Administration shall, in five

15    days, bar all women from entering federal buildings."  The

16    next order says, "Consistent with applicable law," part of the

17    savings clause, "the General Services Administration shall, in

18    five days, bar all women from entering federal buildings."

19         So it has the savings-clause language which you've

20    indicated.  And if the savings clause meant the order didn't

21    direct anything illegal to happen, then the order wouldn't

22    direct anything at all.  Right?  Because the only thing the

23    order directs in this particular hypothetical is something

24    illegal.  So, in other words, it's legally impossible to

25    enforce the order consistent with the order in this

1    hypothetical consistent with applicable law.  Would you agree

2    with that?

3           MR. GATES:  Yes.

4           THE COURT:  So as I see the law in the cases, and

5    exercising some common sense, would it be irrational to say

6    that a woman still couldn't come into court and seek an

7    injunction against the GSA, barring enforcement of the order?

8    Of course they could.  Right?

9           MR. GATES:  In your hypothetical, the order is patently

10   unconstitutional.  In this case --

11          THE COURT:  Wait a minute, wait a minute.  Let me

12   finish my hypothetical, and then you can move on.  So the

13   applicable language "consistent with applicable law" doesn't

14   save it because it's illegal.  So even though they have

15   language in there, "consistent with applicable law," etc., it

16   doesn't save an illegal action.  Am I correct?  Would you

17   agree with that?

18          MR. GATES:  I would, Your Honor.

19          THE COURT:  Okay.

20          MR. GATES:  But that's not what we have here.

21          THE COURT:  Well, that is something in terms of an

22   argument in terms of whether or not what he has ordered is

23   legal or not and whether it's saved by the language of

24   "applicable" or "conforming with the law."

25        The reason I raise this is you argued, as part of your

1    argument, that the savings clause is important to be

2    considered along with the action; and I'm pointing out that it

3    certainly should be considered, but it does not do anything if

4    the law that's at issue is illegal.  So I'm just trying to get

5    an argument to make sure that we're all on the same page that

6    the savings clause doesn't help and doesn't save an illegal

7    order.

8         We disagree as to whether what the president has done

9    is illegal.  And I understand that, and I understand your

10    argument.  All the point I was trying to make is to make sure

11    that we agreed that if the order is illegal to start with,

12    the savings clause doesn't save it, and you've agreed to that.

13    So let me move on.

14              MR. GATES:  Your Honor, may I please make a distinction?

15              THE COURT:  If you're going to argue whether the order

16    is legal or not, I know what your arguments are, and I have

17    other questions that I'd like to ask.  And I know what your

18    arguments are, and I haven't made a decision about it.  But

19    let me ask my questions, and at the end, if it doesn't cover

20    it, we can get to it.  Okay?

21              MR. GATES:  Would you allow me, so the record's clear,

22    just to make a quick distinction?  The savings clause for our

23    part isn't there to suggest -- we're not arguing that it makes

24    what appears to be to others as an illegal order legal.

25    That's not what we're saying.

1    We only argued the savings clause because plaintiffs have

2    said that the president is usurping congressional power to

3    regulate time, place, and manner in conducting federal

4    elections; the president has claimed the exercise of unlawful

5    control over the EAC; and the president has claimed *ultra*

6    *vires* separation of powers including claims the EO is directed

7    by the president without any constitutional or statutory

8    authority.

9        THE COURT:  Okay.  Mr. Gates, I don't like interrupting

10   counsel, but let me say, you're getting to an argument that I

11   understand their argument and I understand yours, okay?  And I

12   don't have a question about what the arguments are.  I haven't

13   made a decision about them.  What I wanted to find out is

14   generally how savings clause are used.  I understand your

15   arguments, and you set them all out, and I will review those

16   carefully, that what the president has done is legal, and I

17   understand their argument that it isn't.  That's not what I

18   was getting at.

19       So I understand the argument.  I'm in no way indicating

20   that you have somehow agreed in any way that the executive

21   order is somehow illegal.  I understand that.  So that's not

22   a problem.  I was just trying to make sure that we had an

23   agreement to how savings clauses only work so far and they

24   don't really save something, that if the court determines,

25   should I determine that the actions are illegal, the savings

1    clause doesn't help.  That was the only point I was trying to

2    make.  So let me move on to my questions.

3        Now, would it be appropriate and consistent with law for

4    the EAC to start a notice and comment process to revise the

5    federal form if the EAC had decided in advance that the

6    outcome of that process would be to add a documentary proof

7    of citizenship requirement regardless of the content of the

8    comments received?

9        In other words, would it be appropriate for the EAC to call

10   for notice and comment if it had already decided the outcome

11   in advance, in other words, deciding that the efforts that you

12   need to go through, that EAC is expected to go through, would

13   be to come to a conclusion about what the form, etc., and how

14   they should be doing things, it would not be expected that it

15   would make an advance decision, a determination based already

16   on what the president had in his order.

17       In other words, this would be an independent review and not

18   informed or set up as their being required in their notice and

19   comments and all the other things to adopt what the president

20   wants.  That is what I was trying to get at.  So would you

21   agree that it would not be appropriate to have them determine

22   before they start the whole process what the end result is?

23   Would you agree with that?

24            MR. GATES:  Well, can I explain, Your Honor --

25            THE COURT:  Okay.  Can you answer my question, and

1   then I'll let you explain.  Yes or no?

2          MR. GATES:  Okay.  It is appropriate in this

3   circumstance --

4          THE COURT:  Okay.

5          MR. GATES:  -- because the documentary proof is binary.

6   You're either going to be required to provide it or not, and

7   it has been decided by the executive order to provide the

8   documentary --

9          THE COURT:  I understand.

10         MR. GATES:  -- proof of citizenship, which is binary.

11         THE COURT:  So let me understand it.  As you are

12  describing it, it would appear that the president has set out

13  an executive order, what it is that he has ordered, and he

14  expects that the EAC is going to adopt it.  They're going to

15  go through the notice and comment.  Doesn't matter what's

16  going to come back because the end result is going to be what

17  the president wants.  Is that what you're saying?

18         MR. GATES:  No.  If I can explain, Your Honor.

19         THE COURT:  Okay.

20         MR. GATES:  The issue of whether there's documentary

21  proof is binary.  The way in which the language on the form,

22  which I have a copy before me, is manifest.  The language, the

23  words chosen, the way the form is designed, all of that is a

24  compilation of input from all the stakeholders.

25         THE COURT:  I understand.

1              MR. GATES:  So to answer your question, Your Honor,

2       that's why they go through the process, to get all of this

3       input.

4              THE COURT:  And that's my question.  You're not

5       answering my question.  My question is, they go through all of

6       this, the stakeholders and everybody else, and then they come

7       back and they -- let's say they decide they disagree with the

8       president on 2(a).  So would the expectation be that EAC would

9       say, no, we're not going to do that, or would the expectation

10      be, because of the executive order, that no matter what

11      process they went through and whoever said what, the end

12      result would be what the president wants?

13             MR. GATES:  Well, it's going to be that there's going

14      to be documentary proof because it's contemplated by the

15      executive order, and proof of citizenship is also contemplated

16      by Congress in about a dozen different statutes.  The

17      citizenship requirement is absolutely required by Congress by

18      legislation in order to vote.  You have to --

19             THE COURT:  Right.  But the question is, does it have

20      to be on the form, and do they have to provide proof of it?

21             MR. GATES:  The question for voter eligibility is

22      whether you're a citizen.

23             THE COURT:  Of course.  I'm not disputing that,

24      Mr. Gates.

25             MR. GATES:  And the only thing the president has

1    ordered is a mechanism to prove what the statutes passed

2    by Congress require.

3            THE COURT:  The point is, Mr. Gates, at this point the

4    expectation is that, yes, you have to be a citizen in order to

5    vote.  We all agree on that.

6            MR. GATES:  That's the law.

7            THE COURT:  So the question is whether the additional

8    provision in 2(a) should be added or not.  So you're ducking

9    my question.

10           MR. GATES:  I don't mean to.

11           THE COURT:  No, you are, sir.

12           MR. GATES:  I didn't intend to.

13           THE COURT:  You may not intend it, but you are.  So let

14   me just put it this way again, and then we'll move on:  Your

15   view is that what the president is requiring in 2(a) is legal.

16           MR. GATES:  Yes.

17           THE COURT:  Okay.  That's fine.  And you also agree

18   that they're going to go through the process of notice and

19   comment, they're going to be adding all these extra

20   consultations, etc.

21           MR. GATES:  Yes.

22           THE COURT:  And let's assume, at the end of what

23   they're required to do, they disagree with what the president

24   wants added to the form.  Okay?  Let's assume that that

25   happens.  The question for you is whether, if the expectation

1    is that despite their conclusion -- you seem to have decided

2    they can't conclude anything else.  But let us assume that

3    actually they could conclude at the end that there isn't a

4    need for it, or for whatever reason.  Would the expectation

5    be from your argument that it wouldn't matter if they decided

6    that it didn't need to be there as the president wanted in

7    terms of the proof, EAC would still be required to do this

8    because the president has ordered it?  Is that your view?

9             MR. GATES:  Yes, and I'm not ducking --

10            THE COURT:  Okay.  You answered my question.

11            MR. GATES:  Can I please explain?  The executive order

12   is binding --

13            THE COURT:  No, no.  You've answered my question.  It

14   goes to -- if I could follow up with this.  So as a practical

15   matter, the president has decided that this 2(a), with the

16   requirements that are in 2(a), should be something that EAC

17   should adopt and that --

18            MR. GATES:  Proof of citizenship.

19            THE COURT:  Okay.  And EAC is expected to go through

20   the process that's set out by statute and otherwise, okay?

21   And the expectation on the president's part, because he's

22   ordered it, is that the end result will be that 2(a) will be

23   adopted by EAC even if EAC decides, after they go through all

24   of their process, that they do not think it's needed, required,

25   or whatever their reason is, they wouldn't put it in except

1     for the president's order.  So would you agree that that's

2     your position?

3          MR. GATES:  Yes, but we don't know what the form is

4     ultimately going to look like.

5          THE COURT:  I agree.  I'm putting it totally in a

6     hypothetical form.  I'm trying to figure out whether from

7     your perspective that the EAC is expected to adopt 2(c) no

8     matter what process they go through.

9          MR. GATES:  That's the directive --

10          THE COURT:  And I don't know what the answer is.

11          MR. GATES:  Well, that --

12          THE COURT:  Yes or no?  This is a yes or no.  You can

13     explain, but it's a yes-or-no question.

14          MR. GATES:  I think it's a yes because the documentary

15     proof is required, but what the form is going to look like or

16     what information's going to be presented on the form won't be

17     in final form until the APA process has been completed.

18          THE COURT:  Right.  But I'm just saying to you, you go

19     through the APA process, and at the bottom, at the end, the

20     EAC decides that they do not want to adopt 2(a).  But your

21     view, as I understand it, and the president's view is that he

22     has mandated that it be included, that 2(a) be adopted; and

23     therefore, they can go through the whole process, but the

24     bottom line is 2(a) is going to be adopted by EAC.  Am I

25     correct?  Yes or no.

1    MR. GATES:  Yes.  And the EAC could actually require

2    documentary proof if the executive order didn't ever exist.

3    The EAC could, on its own, knowing that citizenship is

4    required by law, could require it on their own.

5    THE COURT:  They could require it.  I'm not saying

6    that they couldn't.  If they decided on their own and it was

7    consistent with the president, that's fine.  My question is,

8    if they concluded differently than the president, would the

9    president's direction and order -- basically, it's sort of the

10   prior determination as to the outcome.

11   MR. GATES:  I think you're assuming what questions

12   are going to be presented to the stakeholders and what their

13   feedback is going to be.

14   THE COURT:  I'm telling you the bottom line.  I'm

15   telling you the end.  I think I've gotten enough of a sense

16   of what you're arguing, so let me move on to some other

17   things.

18   MR. GATES:  Okay.

19   THE COURT:  So 2(b), let's move to that, directs

20   several federal agencies and officers to take action to

21   identify unqualified voters registered in the states by

22   granting access to information in federal databases, and

23   Section 2(b)(iii) in particular directs the Department of

24   Homeland Security to coordinate with a DOGE administrator

25   to review each state's publicly available voter registration

1    list alongside federal immigration databases, among other

2    records.  So what's the source of the president's authority

3    to issue the instruction, Section 2(b)?

4        MR. GATES:  Law.  It's already part of the law.  I'm

5    looking for the citation.  It's already required under 52

6    U.S.C. 20507, which I believe is the NVRA, the National Voter

7    Registration Act, which was signed into law in 1993.  These

8    requirements are already in the NVRA.  And, Your Honor, they

9    apply to 44 states.

10        THE COURT:  That includes DOGE?

11        MR. GATES:  Well, that part was added, but the

12    requirements for the enforcement and information sharing,

13    that's already in the NVRA, and we put that in our papers

14    as well.  That has been the law of the land for decades.

15        THE COURT:  Let me ask it in a slightly different way.

16    You've argued that there's a routine listed in USCIS, the

17    alien file system of records notice, the SORN, that allows

18    the kind of data sharing directed in Section 2(b)(i).

19        And this routine use covers -- this is an argument you

20    made -- discloses "to a federal, state, local, tribal, or

21    territorial government agency seeking to verify or ascertain

22    the citizenship or immigration status of any individual within

23    the jurisdiction of the agency for any purpose authorized by

24    law."  So that certainly allows it.

25        Is DOGE Service a federal government agency within the

1    scope of this routine use?  Otherwise, it wouldn't seem to

2    allow DOGE to get access to it.

3        MR. GATES:  It is, and that's why it's contemplated

4    by the order.  What is --

5        THE COURT:  Answer my question.

6        MR. GATES:  Yes.

7        THE COURT:  Since the routine use, which you argue

8    that this routine use applied, this routine use, DOGE is not

9    a federal, state, local, tribal, territorial, a government

10   agency.  So are you saying that they're a government agency

11   within the scope?

12       MR. GATES:  They are designated -- they are proper

13   parties to the implementation of the executive order because

14   they've been designated by the president.

15       THE COURT:  Are they listed in the routine use?

16   Somewhere.

17       MR. GATES:  I would have to go verify that.

18       THE COURT:  Well, just look at what it says in terms of

19   the routine use sets out the disclosure and who can have this

20   information disclosed to.

21       MR. GATES:  I understand that.  I guess I misunderstood

22   your --

23       THE COURT:  It's an argument you made.

24       MR. GATES:  I guess I misunderstood your previous

25   question.  It is.

1        THE COURT:  So I'm just trying to find out in terms

2    of DOGE, at least in terms of this SORN, where DOGE fits in.

3    It doesn't seem to fit within a government agency, unless

4    you're making the argument it is a government agency.

5        MR. GATES:  Well, it is to the extent that the

6    president has designated DOGE to work with multiple federal

7    agencies --

8        THE COURT:  All I'm asking is, in your view, are you

9    telling me that they're a government agency, in which case,

10   therefore, they fall under this routine use.

11       MR. GATES:  They're not a government agency like DHS

12   or DOJ, but they are designated as a government agent.  And

13   presidents in the past have designated those outside of formal

14   government agencies --

15       THE COURT:  I'm not saying they can't delegate it.

16   My question is, in this particular routine use which you

17   pointed to, it doesn't seem to include DOGE if you're

18   indicating they're not a government agency the way this is set

19   out.  You're the one who brought up this issue about it falls

20   under this routine use.  So I'm just asking -- I'm not arguing

21   about the rest; I'm just asking whether DOGE is or is not a

22   government agency for purposes of this routine use.

23       MR. GATES:  For purposes of the routine use, I maintain

24   that it is.

25       THE COURT:  Okay.  Moving along.

1          The executive order also refers separately to the

2     Department of State databases.

3          MR. GATES:  Yes.

4          THE COURT:  In your brief, you don't identify any

5     established routine use that would allow the Department of

6     State to share information from any of its databases outside

7     the federal government such as with the states.  So is there

8     some routine use that would apply to the Department of State's

9     systems use for that purpose?

10          MR. GATES:  We explain it, Your Honor, on page 27

11     and 28.

12          THE COURT:  Okay.  And what's the routine use?

13          MR. GATES:  That the federal government, through

14     the SAVE program, the Systematic Alien Verification for

15     Entitlements program, shares information with states all the

16     time, and they have under the NVRA for decades.  And they have

17     under HAVA since 2002.

18          THE COURT:  Okay.  Let's move on --

19          MR. GATES:  What I want to underscore is the

20     president's executive order is literally just telling its

21     executive agencies, his executive agencies, to follow the law.

22     So everything we're talking about has been the law for decades.

23          THE COURT:  Okay.  And that's your view, and I

24     understand it.  I'm just poking at it a little bit to make

25     sure I'm confirming what your view is.

1          MR. GATES:  That's fair.  And what I would underscore,

2     Your Honor, that if the plaintiffs wanted to challenge these

3     processes, they would sue the NVRA.  They would sue HAVA.  To

4     sue over the executive order, to sue the president, to sue the

5     federal government over the executive order claiming that

6     something's amiss here, that something's *ultra vires* or beyond,

7     it's -- they -- he's asking to enforce federal statutes that

8     have been on the books for decades.

9          THE COURT:  I can't believe you're inviting another

10     lawsuit, but anyway.

11          MR. GATES:  No, but I mean these are long-standing

12     statutes.  They're older than some of the folks in the room.

13          THE COURT:  I understand.  I understand your argument,

14     so let's move on to Section 2(d).  Again, I'm just trying to

15     clarify things.  I understand the rest of your arguments.  If

16     I haven't asked about them, I understand what they are.

17        Section 2(d) directs federal agencies to assess citizenship

18     before providing the form to enrollees of federal assistance

19     programs.  So they don't get to fill it out until there's been

20     an assessment as to their citizenship.  Again, what's the

21     source of the president's authority to issue this particular

22     one?

23          MR. GATES:  It's consistent with federal law.  If

24     you're going to get -- if anyone is going to get public

25     assistance, they have to prove -- they have to show a series

1    of IDs and prove who they are, where they live.  It's

2    absolutely consistent --

3        THE COURT:  What I'm asking for is -- nobody's

4    suggesting that anybody but a citizen should vote.  So the

5    question really gets to what's his authority to require that

6    that be shown before they get the form.

7        MR. GATES:  It's consistent with other federal law

8    including --

9        THE COURT:  What law?  Tell me.

10       MR. GATES:  The public assistance programs require

11   identification.

12       THE COURT:  Right.  Okay.

13       MR. GATES:  And many of them --

14       THE COURT:  But if they're already on the public

15   assistance rolls, presumably there's been some checking to

16   find out why they're there.  So if they're already on the

17   roll, why are you doing an additional assessment, presumably,

18   before they get the form?

19       MR. GATES:  The federal voter registration application,

20   that's the very first question, is whether you're a citizen or

21   not.

22       THE COURT:  I understand that.  I understand.

23       MR. GATES:  You're going to be asked all the time

24   whether you're a citizen.

25       THE COURT:  Right.  But it's not just filling it out.

1    If that was all that was needed, the president wouldn't need

2    to do 2(d).  So what he's asking for is not just you're on

3    public assistance where you have to be a citizen, presumably,

4    or that you've marked off that you're a citizen, there has to

5    be a special assessment; in other words, a review, a

6    consideration, some additional steps taken to assess whether

7    they're actually citizens before you give them the form.  At

8    least that's the way I would interpret it.

9         MR. GATES:  And that's literally what the NVRA and HAVA

10   both require under 52 U.S.C. 205 --

11        THE COURT:  But do they require it now before you get

12   the form, or is it already assumed that if you're on the

13   public assistance programs, if you're filling in the form,

14   that you are a citizen?

15        MR. GATES:  An assessment is contemplated under the

16   NVRA and HAVA.

17        THE COURT:  All right.  I'm curious to have the

18   plaintiffs respond to that.  Let me move to my next question.

19        The NVRA provides that voter registration agencies shall

20   make the federal form available and provide the federal form

21   "with each application for services or assistance unless the

22   applicant, in writing, declines to register to vote."  So the

23   federal form is provided under NVRA with each application for

24   services or assistance.  So it's provided at the present time

25   with it so that they would be in expectation that you would

1    know that they were citizens.  And that language is mandatory.

2        So how can an agency comply with the direction to assess

3    citizenship before providing the form and follow the NVRA?

4    The NVRA requires the form be given at the time that they're

5    asking for the services, and presumably a determination as to

6    their citizenship, and you're asking that they can't give it

7    until they find it out beforehand.  Doesn't there seem to be

8    an inconsistency here?

9        MR. GATES:  Not exactly.  The form itself asks the very

10   first question, whether you're a citizen or not, and the next

11   instruction is if the answer is no, do not complete the form.

12        THE COURT:  Okay.  But I'm talking about the NVRA.

13        MR. GATES:  I understand.

14        THE COURT:  Not that form.  The NVRA says they make

15   the form with each application for service.  In other words,

16   if you're asking for public assistance, you get the form to

17   fill out at the same time.  Presumably, they would be making

18   some determination relating to the citizenship at that point,

19   and that's mandatory.  So tell me how the agency complies with

20   2(d) to assess citizenship before providing the federal form

21   and still follow the NVRA.  So they don't have the federal

22   form at that point.

23        MR. GATES:  Well, I would have to --

24        THE COURT:  Although the NVRA says that they should.

25        MR. GATES:  I would have to consult the exact language

1    and get back, but the requirement under the NVRA and the

2    requirement under HAVA that a citizenship status assessment

3    occur is absolutely required.  And on the form, you can't

4    even complete the form until you say yes to the very first

5    question, which is a self-reporting assessment.

6        When you go to register in many states for a driver's

7    license, for instance, a lot of it is electronic, and folks

8    just click a number of buttons and there's no third-party

9    assessment or verification --

10            THE COURT:  We're not talking about driver's licenses.

11            MR. GATES:  I understand.

12            THE COURT:  We're talking about --

13            MR. GATES:  Well, except the NVRA is --

14            THE COURT:  -- and NVRA.  Okay?  Let's move on to the

15    next question.  In your brief, you describe the instruction in

16    Section 2(d) as undefined and too uncertain to determine

17    foreseeable harm.  That's the argument you made.  But suppose

18    that a federal voter registration agency declined to provide

19    the federal form to an eligible person because the agency was

20    unable to assess citizenship.

21        Wouldn't that be a cognizable harm?  I mean, who's going

22    to be doing this assessment if there -- there certainly are

23    federal voter registration agencies, and they're not going to

24    do it because they can't figure it out.  But the person

25    actually is a citizen.  Isn't that a harm?

1          MR. GATES:  Well, on the one hand, we've talked a

2     lot about different harms today.  We've got 16 plaintiff

3     organizations --

4          THE COURT:  Just answer the question, the harm I've

5     talked about.

6          MR. GATES:  I don't -- so let me understand the

7     hypothetical.  You're saying that somebody goes to register --

8          THE COURT:  Okay.  Let me read it again to make sure

9     that we're on the same page.

10          MR. GATES:  Okay.

11          THE COURT:  In your argument -- I'm getting at your

12     argument that 2(d) somehow is too uncertain to decide about

13     foreseeable harm.  A federal voter registration agency, which

14     they are, declines to provide the federal form to an eligible

15     person because the agency has no way of being able to assess

16     the citizenship.  Wouldn't that be a cognizable harm?  Because

17     you're making it a precondition to their actually getting the

18     form.

19          MR. GATES:  No.

20          THE COURT:  Okay.  Tell me how.

21          MR. GATES:  What's going to constitute a harm -- first

22     of all, the cases, all of them, talk about a substantial

23     injury in order to impose a preliminary injunction --

24          THE COURT:  You don't think that somebody who is

25     eligible to vote but that they won't --

1              MR. GATES:  They can go down the street --

2              THE COURT:  -- do the precondition and therefore you

3       don't get the voter form?

4              MR. GATES:  It's inconvenient.  They can go down the

5       street to the DMV.  They can go --

6              THE COURT:  In other words, they can go to a different

7       agency that somehow would be able to assess it.

8              MR. GATES:  I'm assuming --

9              THE COURT:  Is that your point?

10             MR. GATES:  Well, let's assume that your hypothetical

11      even exists.  If your hypothetical even exists, yes, there are

12      alternatives, and inconvenience is not a harm.

13             THE COURT:  I agree that inconvenience isn't, but

14      that's not what I actually asked.  But anyway.  Okay.  I

15      know what your answer is.

16          So let me move to 7(a).  This again directs the attorney

17      general to "take all necessary action to enforce 2 U.S.C. § 7

18      and 3 U.S.C. § 1 against states that count ballots received

19      after election day in federal elections."

20          So what's the source of the president's authority to issue

21      the instruction in 7(a) to enforce the election-day statutes?

22      What's the authority?

23             MR. GATES:  2 U.S.C. § 7.

24             THE COURT:  Okay.

25             MR. GATES:  And, Your Honor, plaintiffs talk about harm

1    in this regard.  Only the states have standing in a claim like

2    this on the one hand.  On the other hand, 33 states, including

3    Arizona, have already adopted election-day ballot receipt

4    deadline requirements.

5         THE COURT:  I understand that.  You're bringing extra

6    arguments out, but they're not really what I was trying to

7    get at.  So let me get on to the rest of it.  I don't disagree

8    with what you said, and that is in the pleadings.

9       What actions could the attorney general take consistent

10   with applicable law to enforce the election-day statutes?

11   Does that mean lawsuits?

12        MR. GATES:  Any number of actions, including criminal

13   actions.

14        THE COURT:  Okay.  So it's bringing lawsuits or taking

15   court actions.  Right?

16        MR. GATES:  Any number of actions.  You could send

17   letters to correct -- to encourage compliance --

18        THE COURT:  I'm asking if one of the things would be

19   lawsuits, in other words.

20        MR. GATES:  Well, you and I have to look into our

21   crystal ball and make a prediction.

22        THE COURT:  Okay.  Let me move on a little bit as to

23   why I was getting to this.  So let me talk about lawsuits.

24   The Voting Rights Section of the DOJ Civil Rights Division has

25   always been historically responsible for bringing lawsuits on

1    behalf of the United States relating to election law rights.

2    I believe that's correct, and you're not going to disagree

3    with that.

4        So I had one of my law clerks look into the many lawsuits

5    your office has brought over the years, and what we found was

6    that DOJ has sued states and local governments under the

7    Voting Rights Act, which has explicit civil enforcement

8    provisions; the NVRA, which has explicit civil enforcement

9    provisions; The Uniformed and Overseas Citizens Absentee

10   Voting Act, which has an explicit civil enforcement provision;

11   HAVA, which has an explicit civil enforcement provision; and

12   the Civil Rights Act of 1964, which has an explicit civil

13   enforcement provision.

14       What I did not see is a single case in which the U.S.

15   brought a suit to enforce the election-day statutes, neither

16   of which has a civil enforcement provision, explicit or

17   otherwise.  So with that in mind, what would be the United

18   States' cause of action to enforce the election-day statutes

19   against the state?

20           MR. GATES:  Again, we'd have to look into our crystal

21   ball to try to anticipate --

22           THE COURT:  I'm asking you --

23           MR. GATES:  She's got a whole host -- a whole host of

24   recourse.  Like I said --

25           THE COURT:  What I asked about is statutes.  We're

1    talking about lawsuits.  All of the lawsuits they brought

2    to enforce have all been under statutes that have a civil

3    enforcement provision.  The ones you're talking about, as far

4    as I can tell, don't have any civil enforcement.

5        MR. GATES:  And I'm not denying that she could continue

6    to bring civil action.  I'm not --

7        THE COURT:  I'm asking you -- what I was asking you

8    is under what statute you'd be bringing the suit to enforce

9    the election-day statutes.  The election-day statutes don't

10   have enforcement provisions, explicit or otherwise, while all

11   of these other statutes that have been brought to enforce the

12   various rights, etc., or to enforce making sure that the

13   voting is done correctly and according to the law have a

14   specific enforcement.  So is it just that the president has

15   decided to grant this authority, or is there something else

16   they would be relying on?

17       MR. GATES:  Well, the attorney general would only

18   operate under lawful authority and this EO.  This executive

19   order has not been implemented yet.  I don't know that the

20   attorney general at this point has given any thought to what

21   her recourse or what her options would be to enforce.

22       THE COURT:  Okay.  So at this point, although it's in

23   the executive order, we don't know how that would actually be

24   enforced.  Would that be fair?

25       MR. GATES:  Not with certainty, no, Your Honor.  We

1    could sit here and hypothesize, and it would depend on a

2    case-by-case basis, but this has not been implemented yet.

3    This is all to the point.  All of these hypotheticals, we're

4    relying on hypotheticals because none of this has been --

5        THE COURT:  It's not a hypothetical.  The president has

6    indicated and said that the attorney general is going to do

7    this.  I would have thought that they would have considered

8    how the attorney general's going to do it.  You've indicated

9    that there may be options, but at least at this point you

10   don't know how it's going to get implemented.  Would that be

11   fair?

12       MR. GATES:  I don't know the full portfolio of options

13   that the attorney general could take to enforce this provision

14   at this point.

15       THE COURT:  Okay.  And my last question -- no, not

16   quite my last question.  Sorry.  Is there any party, other

17   than the states, who would be a proper defendant in a case

18   brought to enforce the election-day statutes?

19     I'll repeat that:  Is there any party, other than the

20   states, who would be a proper defendant in a case brought to

21   enforce the election-day statutes, which has to do with the

22   states actually deciding on this?

23       MR. GATES:  It's really another hypothetical.  Anybody

24   who can come into court and demonstrate that they have

25   standing under Article III would be a proper party to bring.

1          THE COURT:  Okay.  So you couldn't identify anybody,

2     a particular type of defendant, other than the states.

3          MR. GATES:  Any type of plaintiff?

4          THE COURT:  No.  I asked about defendants.

5          MR. GATES:  Okay.  Repeat the question again,

6     Your Honor?

7          THE COURT:  Okay.  Is there any party, other than the

8     state, who would be a proper defendant in a case brought to

9     enforce the election-day statutes?  Obviously, the states who

10    would be dealing with when you could count the ballots in

11    terms of the election day and the election-day statute.  But

12    besides the state, is there any other defendant that you can

13    identify that would be able to do this?

14         MR. GATES:  Well, to the extent -- I mean, I'd have to

15    give this some thought.  To the extent it's required by law

16    pursuant to an act of Congress, I would have to give that some

17    thought.  The states are the first ones to come to mind, but

18    there may be others.

19         THE COURT:  Okay.  7(b) --

20         MR. GATES:  It's in federal law.

21         THE COURT:  7(b) directs EAC to "condition any

22    available funding" to states on those states acting to set a

23    "ballot receipt deadline of election day for all methods of

24    voting," except for certain ballots by service members and

25    other voters living abroad.

1          So HAVA provides that the EAC "shall make a requirements
2     payment each year" to each state which meets the conditions
3     described in the statute in an amount determined by the
4     statute, and that's 52 U.S.C. § 21001(a).  Is compliance with
5     the election-day statutes, 2 U.S.C. § 7 or 3 U.S.C. § 1, one
6     of the conditions specified in HAVA?
7          MR. GATES:  I would have to go back and look at the
8     language of HAVA, but the concept of holding back funding to
9     states who are not following federal law is at issue there,
10    and I'm not sure what the --
11         THE COURT:  So you don't know one way or the other
12    whether it's a condition specified in HAVA.
13         MR. GATES:  I would have to look that up.  I didn't
14    see that as one of the questions on your list, so I wasn't
15    prepared --
16         THE COURT:  Well, I was just trying to give areas so
17    people wouldn't come wondering what they should be prepared
18    to talk about.  Okay.
19         MR. GATES:  I understand, Your Honor.  Thank you.
20         THE COURT:  Would it be consistent with the law for
21    the EAC to impose additional conditions on the distribution
22    of those funds beyond the conditions that Congress created in
23    HAVA?
24         MR. GATES:  Well, it depends on what you mean by
25    "conditions."

1    THE COURT:  Well, the conditions we're talking about is

2    the requirement payments in terms of the preconditions before

3    payments are made.  The answer, by the way, is compliance with

4    election-day statutes, one of the conditions specified in

5    HAVA, the answer's no.  But I'll give you an opportunity to

6    look.  But I'm asking you whether it would be consistent for

7    the EAC to add conditions about distribution of funds if it's

8    not beyond the conditions that Congress put in HAVA.

9    MR. GATES:  Your Honor, just because it doesn't appear

10   in HAVA, it appears in 2 U.S.C. 7.  It appears in other

11   federal statutes.

12   THE COURT:  Okay.  I'm just speaking -- I'm just

13   talking about HAVA.

14   MR. GATES:  Those receiving federal funds under the

15   executive order pursuant to elections have to be following all

16   federal laws.  If they're going to be violating this law or

17   that law, they may be at risk of losing funding.  The fact

18   that all of that isn't restated in HAVA doesn't undermine the

19   authority to impose that requirement.  Election day is

20   2 U.S.C. 7.

21   THE COURT:  Right.  I understand.  Okay.

22   MR. GATES:  All right.

23   THE COURT:  I'm finished with my questions.  Let me

24   give, very quickly, the plaintiffs an opportunity to not

25   repeat arguments already made, but if there's something in

1    particular you want to bring to my attention that's come up

2    that's new that we didn't talk about that you want to respond

3    to the government since you have the burden.  You, plaintiffs.

4         MS. LANG:  Thank you, Your Honor.

5    I think that defendants' presentation was very helpful for

6    this court to be able to resolve some of the questions that

7    were raised in the briefing, specifically around speculation.

8         It is not speculative whether or not a documentary proof of

9    citizenship requirement will be added to the federal form as

10   defendants' briefing suggested, but Mr. Gates said that while

11   the exact language on the form might change depending on

12   notice or comment, that the outcome is predetermined.

13        It is a requirement of the executive order, which is of

14   course exactly how the language of the executive order reads.

15   And therefore, any question about speculation I think has

16   entirely dissipated.  That was precisely why we brought this

17   case, and it is immediately apparent now that there is no

18   speculation.

19        I think that we are now also on all fours with the *League*

20   *of Women Voters v. Newby* case, and because there is no

21   speculation, the D.C. Circuit held that a documentary proof of

22   citizenship requirement on the federal form --

23        THE COURT:  You need to slow down.

24        MS. LANG:  Thank you, Your Honor.

25        Quote, "unquestionably makes it more difficult for the

1    leagues to accomplish their primary mission of registering

2    voters.  They provide injury for both purposes of standing and

3    irreparable harm."

4       And so that is binding D.C. Circuit case law about both

5    irreparable harm and injury for purposes of standing that is

6    on all fours with this case and I think makes your decision,

7    Your Honor, on questions of standing much easier.

8       One of your questions in your order was related to

9    associational standing.  I did want to let the court know that

10   we have identified a member of Arizona Students' Association

11   who would be willing to put forth a declaration under a

12   pseudonym, explaining their difficulties providing documentary

13   proof of citizenship if they were required to do so anytime

14   they need to update their voter registration.

15      That is just one of many Arizona students that Arizona

16   Students' Association has worked with.  The declaration that's

17   already in evidence demonstrates that about 50 percent of all

18   registrants that Arizona Students' Association works with

19   cannot provide documentary proof of citizenship and so rely

20   on the federal form.

21      So I don't know if Your Honor needs that, but I did want

22   you to know that we have that available; but we would need to

23   move to file that under a pseudonym.

24         THE COURT:  All right.  Let me think about it.

25         MS. LANG:  Thank you, Your Honor.

1          THE COURT:  All right.  Anything else?

2      Anything you want to add?

3          MS. BRANCH:  Yes.  I agree that I think the ripeness

4      and speculation questions have been dissipated and answered.

5      I think defense counsel has made clear that the EAC does not

6      have discretion not to adopt a documentary proof of

7      citizenship requirement.

8      It seems to me like the only things that are outstanding

9      are really like administrative issues — for instance, maybe

10     whether documentary proof of citizenship needs to be stapled

11     to the registration form or paper-clipped.  The EAC does not

12     have discretion to decide whether or not documentary proof of

13     citizenship is actually required and should be required under

14     NVRA.  And as we've briefed it, it is not permissible.

15     I wanted to follow up on some of Your Honor's questions

16     from earlier, particularly with respect to case law regarding

17     whether political parties have competitive standing, and the

18     case I was referring to earlier, I have the name correct.

19     It's *Natural Law Party v. FEC*.  It is a district court case

20     from the District of Columbia from 2000.  And the citation --

21     we actually cite it on page 12 of our opening preliminary

22     injunction brief.  The citation is 111 F.Supp 2.

23         THE COURT:  That's the case that you were not sure was

24     the correct one.  Okay.

25         MS. BRANCH:  That's correct.  I had the name correct,

1    but that is the correct case.

2        THE COURT:  Okay.  That's fine.

3        MS. BRANCH:  With respect to the privacy issues,

4    defense counsel asked -- you asked defense counsel whether

5    or not DOGE is a federal agency, and I would submit it is not.

6    I don't know that we got a fully clear answer, but it seemed

7    like defense counsel provided that it may be.

8        But I want to point Your Honor to another point of the

9    privacy part, particularly the exception that counsel is

10    relying on for routine use, and that is, even if the entity

11    that is going to receive the personal data or privacy

12    information falls into the routine-use exception, that routine

13    use has to be authorized by law.  And that is in the statute.

14        So even if you're a federal agency, you have to be

15    requesting the information for a reason authorized by law.

16    The government has not said where DOGE is authorized by law to

17    inquire about citizenship, and I would submit that it is not.

18    There's no provision of federal law that allows for that.

19        With respect to the argument that data sharing is already

20    provided for under the NVRA, there was mention of 52 U.S.C.

21    20507.  That is the correct citation for the NVRA, but that

22    provision in the NVRA specifically talks about sharing public

23    data.  And we're not saying that DOGE can't look at public

24    data.  What we're saying is that it cannot run -- it cannot

25    run public data that is provided for under the NVRA against

1    private data which is the immigration databases that the

2    executive order commands DOGE to have access to.  Those

3    are two different things.  The NVRA does not so much as

4    contemplate the sharing of private data or running it against

5    public data.

6         The final -- I think it's the final point I want to make

7    regarding one of Your Honor's questions earlier related to the

8    ballot receipt deadline issue, and the question seemed to be

9    can I grant an injunction against the attorney general when

10   she can only enforce the law against the state, and my clients

11   are not states.

12        And I would point Your Honor to the Virginia booksellers

13   case on this issue where the booksellers were the ones who

14   sued.  They sued -- it was a First Amendment claim based on

15   selling obscene materials, and they were the ones who sued.

16        But the court found that relief would run to book buyers,

17   too, even though they were not parties to the suit and they

18   weren't at risk of the anti-obscenity law.  They were still

19   injured because they lost the opportunity to buy the obscene

20   books despite no enforcement risk.  So the booksellers were

21   the foreseeable and predictable beneficiary of the injunction

22   that prevented suits against the booksellers.

23        The same is true here.  That's correct, we can't have

24   7(a) enforced against us because we're not the states, but

25   my clients are the predictable beneficiaries of such an

1    injunction because our voters rely on mail ballots both to

2    cast them, and the party organizations rely on mail ballots

3    to fulfill their organizational missions.

4        Your Honor asked earlier about whether or not you can

5    enjoin the attorney general from bringing lawsuits with

6    respect to 7(a), and I want to just highlight what the

7    government said earlier, which is that -- and it's clear it's

8    reinforced by the text of the executive order which says that

9    the attorney general can take all necessary action to enforce

10    the election-day statutes against the states.

11        So that is not limited to bringing lawsuits, as defense

12    counsel conceded.  The attorney general has all types of

13    power, can issue subpoenas, begin investigations.  And so

14    at least this court should be able to exercise its equitable

15    power to enjoin the attorney general from taking those types

16    of actions because they are not consistent with federal law

17    and the president doesn't have the power to do what he's done.

18        And the final thing I would just underscore is the

19    *Youngstown* case and the *Axon Enterprise* cases, which really

20    I think just reinforce what is happening here, which is the

21    executive order violates separation of powers.  And merely

22    being subject to a proceeding that violates separation of

23    powers is here-and-now injury.  The *Youngstown* case says that

24    once there's a violation of separation of powers, the action

25    is void from the beginning.

1          And so I think with respect to 7(a) and all of the sections

2     that we've challenged and move for preliminary injunction on,

3     those principles apply.  There is no factual development that

4     is needed for this court to enjoin those provisions because

5     they violate the constitution on their face, and that is

6     sufficient under the *Youngstown* case and other Supreme Court

7     cases on separation of powers.

8               THE COURT:  All right.

9               MS. BRANCH:  Thank you, Your Honor.

10              THE COURT:  Thanks, everybody.  What I'd like to do

11    before I go to further proceedings, I have a lot of notes, as

12    you can see through the papers.  I want to run back for about

13    10 minutes and make sure that I've asked all of the questions,

14    and then I'll come out and we'll talk about -- because I'm

15    obviously going to take this under advisement and talk about

16    next steps.

17        But I want to make sure -- I've tried to divide the topics

18    up, but things have come up in the answers that have made me

19    sort of shift around, and I want to make sure I've covered

20    everything.  And it's getting late.  It's twenty of.  So at

21    ten of 5:00 I'll be right back out, and we'll pick up from

22    there unless I have something I need to ask.

23        (Recess from 4:39 p.m. to 4:53 p.m.)

24              THE COURT:  Well, it's a good thing I went over my

25    notes.  When we were talking, Mr. Gates, about 2(a), I said

1    we'll put a pin in an argument you wanted to make about the

2    authority of the president, and I have it in my notes and I

3    didn't give you that chance.  So you have the floor.

4          MR. GATES:  I appreciate Your Honor.  Can you represent

5    the question?

6          THE COURT:  I'm sorry.  No, no, no.  You started to

7    make an argument when we were discussing 2(a) relating to the

8    authority of the president, and I said we'd put a pin in it.

9          MR. GATES:  Okay.

10          THE COURT:  And we moved off it.  So I'm just letting

11    you go ahead.  I told you I'd let you make the argument, so

12    I want to make sure you get your chance.

13          MR. GATES:  Well, I very, very much appreciate it.

14    I have to catch a flight, so I'm going to make it very quick.

15          THE COURT:  Okay.

16          MR. GATES:  The president, under Article II of the U.S.

17    Constitution, has plenary authority over the Executive Branch,

18    and it's his duty or her duty to take care to enforce all the

19    laws of the land.  The executive order, if you read through it

20    and look up the statutes it cites and he relies upon, we will

21    all see that he is simply directing his federal agencies, his

22    executive agencies, to enforce the law, to enforce the laws

23    that Congress passed.  He's really doing nothing more.

24      When we see new things like documentary proof of

25    citizenship, that's simply a mechanism to enforce the laws

1    that are already on the books, the ones that Congress has long

2    passed, whether it's the NVRA of 1993, HAVA of 2002, or the

3    election-day statutes and so on and so forth.

4        So there isn't much new.  If you peel back the layers and

5    look at those statutes in the executive order, he's literally

6    directing his agencies to enforce law, and he has to because

7    for really the past couple decades, those agencies really have

8    not been enforcing those laws, including the fact that how

9    many criminal prosecutions do we know of that have occurred

10   against illegal aliens who have voted or who attempted to vote

11   through fraudulent means, I don't know of any.  That's just

12   one easy example of where the federal agencies have not been

13   enforcing the law.

14       The executive order basically says, hey, federal agencies,

15   you're under my purview, this is the executive branch, go

16   enforce the law.  Go enforce the NVRA, go enforce HAVA, go

17   enforce election day, go enforce the criminal statutes on

18   elections and false statements in order to attempt to become

19   eligible to vote and so on and so forth.

20       It's the constitutional authority of Article II that I'm

21   relying on.  The executive order, as I said, doesn't create

22   really anything new.  It says, go out and enforce the laws.

23       And with that, Your Honor, I would respectfully request

24   this court deny the preliminary injunction.  It's early.

25   Even if, as you said, the president's directive to EAC is to

1    require documentary proof, that's not going to show up on

2    the form for at least 120 days anyway.  So even if it is a

3    foregone conclusion, Your Honor, it's not going to show up

4    on the form and nobody's going to be harmed.

5         Counsel for DNC came up and implored this court, people

6    are being harmed today, they're being harmed every day.

7    Those were her words.  Yet the executive order hasn't been

8    implemented, and the federal form won't be updated for many,

9    many, many months.  That alone undermines the need for a

10   preliminary injunction.

11        It's extraordinary means, on top of the fact that none of

12   these plaintiffs, none of the 16 plaintiffs have standing,

13   Article III standing.  Article III standing is extremely rigid

14   and narrow, and it doesn't allow for these plaintiffs to be

15   here in this action and request this relief.  And with that,

16   Your Honor, I will submit.

17        THE COURT:  All right.  Then I've given you your

18   opportunity.

19        The plaintiffs have requested that I rule before April 24,

20   which is the executive order's deadline for the EAC to take

21   certain steps.  Are you asking for any different timelines

22   here, or are we still with that timeline?  I'm going to take

23   it under advisement, and I'm going to get it out before that

24   if that's it.  I just want to make sure, in terms of the date,

25   the date.

1    And I'd ask that you not file anything else, please, no

2    one, and just go with what we've got so that I can actually

3    get it out.  I think between what you have filed and very

4    extensive motions on all parts of the parties, as well as the

5    discussions today, have been very helpful.  So I don't need

6    anything else.  If I need anything, I will certainly ask for it.

7        So the other question that I have -- so is the April 24th

8    date the deadline you still want?

9        MS. LAKIN:  I think what we would say, now that we know

10   that the executive order is being implemented, that April 24th

11   is a good target, but as soon as possible.

12       THE COURT:  Okay.  I'll make the effort.  I just wanted

13   to make sure there wasn't some other deadline or some other

14   way that you wanted to handle this.

15       Looking ahead for a few questions about planning, do the

16   defendants at some point, if you know, intend to file a motion

17   to dismiss in these cases?  I'm not going to set deadlines

18   now, just to get a sense of how it's going to proceed.

19       MR. GATES:  What I would say is this, Your Honor,

20   without obviously revealing all of our deliberative

21   considerations, is in part it depends on what the court's

22   decision looks like, how it reads.  I'll just leave it at that.

23       THE COURT:  All right.  And as I said, I don't know how

24   I'm going to rule.  I'm going to go back and look and review

25   everything.  I believe the nonpartisan plaintiffs indicated

1      that at some point you were going to move for summary

2      judgment, and I think I would suggest that you all wait till

3      I issue whatever I'm going to issue before doing that.

4        Anybody asking for discovery, at least at this point?

5      I'm just trying to plan stuff.

6          MS. LANG:  Speaking for the nonpartisan plaintiffs, I

7      don't think there's any plan to move for kind of expedited --

8          THE COURT:  Okay.  This isn't set in stone.  I'm just

9      trying to get a sense today.

10         MS. LANG:  I do imagine that there may be some

11     discovery here, but that's something we need to discuss, and

12     I don't think there's any imminent plan to move for any

13     expedited discovery.

14         THE COURT:  Okay.

15         MS. BRANCH:  And Aria Branch for the Democratic Party

16     plaintiffs, and we're of the same mind.  No imminent need for

17     discovery, but we may seek discovery down the road.

18         THE COURT:  All right.  So I will take it under

19     advisement.  I will consider the deadline which has been set,

20     which is the April 24th, and after I make whatever decision I

21     make, then I will contact you-all about what next steps you

22     want to take in terms of timing and everything else.

23       All right.  Thank you all.  The papers that have been filed

24     on everybody's part have been very helpful, very well done.

25     I thank you for that.  It always makes the job easier for the

1    judge.  And I appreciate your taking the time and not finding

2    it difficult to follow the format of answering questions,

3    which when I was a lawyer I was not enthused about.

4        All right.  Take care.  Parties are excused.

5        (Proceedings adjourned at 5:00 p.m.)

\* \* \* \* \* \*

CERTIFICATE

    I, BRYAN A. WAYNE, Official Court Reporter, certify that the foregoing pages are a correct transcript from the record of proceedings in the above-entitled matter.

*/s/ Bryan A. Wayne*
Bryan A. Wayne

# Exhibit 25

Civil Action No. 25-cv-0952 (CKK)
(Lead Case: No. 25-cv-00946 (CKK))

# Driver licensing fees

dol.wa.gov/driver-licenses-and-permits/driver-licensing-fees

This list shows you a general idea of what you'd pay. It may not cover all situations. For renewal fees, log in or join, or check your renewal notice. For an exact amount call our customer contact center at 360-902-3900.

See which payment options we accept.

## Getting your first WA permit

| First instruction (learner's) permit | More information | Total* |
|---|---|---|
| Learner's permit | See Instruction (learner's) permits<br>Also called Instruction permit | $25 for 1 yr |
| Renew learner's permit | Visit driver licensing office | $25 for 1 yr |
| Replace your learner's permit | See Replace your lost or stolen permit | $20 |
| Motorcycle learner's permit | See How to get your endorsement or permit | $35 for 180 days |
| Renew motorcycle learner's permit | Renew your permit at a driver licensing office | $15 for 180 days |
| Commercial learners permit (CLP) | See Steps to getting your CDL<br>Also called commercial driver license learners permit | $40 |

## Getting your first WA driver license

| First driver license | More information | Total* |
|---|---|---|
| Driver license | $35 application fee + $9 per year issuance fee + $1 technology fee =<br>See Steps to getting your first license<br>Also called First Washington driver license | $72 for 4 years issued in 2025 |

| First driver license | More information | Total* |
|---|---|---|
| Enhanced driver license (EDL) | $35 application fee + $16 per year issuance fee + $1 technology fee = See Steps to getting your EDL/EID Also called enhanced driver license (EDL) | $100 for 4 years issued in 2025 |
| Upgrade your WA driver license to an EDL | $7 per year for the time remaining on your license. See Steps to getting your EDL/EID (Not available for licenses with "military" expiration.) | $7-$56 |

*Note: If you're taking driver training, you'll also pay additional school fees to get your first license.

## Testing

| Take a test | More information | Total |
|---|---|---|
| Knowledge test | Cost varies by location. Check with your testing location for the exact amount. | Varies |
| Driving test | Cost varies by location. Check with your testing location for the exact amount. | Varies |
| CDL knowledge test | See Knowledge test: CDL | $35 |
| CDL skills test | See Skills test: CDL | $175 |
| CDL skills test (Head Start only) | See Skills test: CDL | $175 |
| CDL skills test for school bus endorsement | See CDL testing. Your primary usage of a CDL must be to drive a school bus.<br><br>Your test fee gets you 2 attempts. If you change examiners after your first attempt, you may have to pay the fee again. | $100 |
| 2-wheel motorcycle knowledge tests (permit and endorsement tests) | Costs vary by location. Check with your motorcycle safety training school for the exact amount. | Varies |
| 2-wheel motorcycle riding skills tests (permit and endorsement tests) | Costs vary by location. Check with your motorcycle safety training school for the exact amount. | Varies |

| Take a test | More information | Total |
|---|---|---|
| 3-wheel motorcycle knowledge test | Cost varies by location. Check with your motorcycle safety training school for the exact amount. | Varies |
| 3-wheel motorcycle riding skills test | Cost varies by location. Check with your motorcycle safety training school for the exact amount. | Varies |

## Getting your first WA ID card

| First ID card | More information | Total |
|---|---|---|
| ID card | See Get your WA ID card | $55 for 6 years or $73 for 8 years† |
| Enhanced ID card (EID) | See Get your EDL/EID | $97 for 6 years or $129 for 8 years |
| Upgrade your WA ID card to an EID | $7 per year for the time remaining on your license. | $7-$56 |

## Updating your card

| Get an updated card | More information | Total |
|---|---|---|
| Get a license/ID card before the next renewal | When you change your name, address, or endorsement, you may get an updated card. See Update your driver license or ID card. | |
| | If you get it in-person. | $20† |
| | If you get it online (View replacement options). | $20 |

## Replace a card

| Replace lost or stolen card | More information | Total |
|---|---|---|
| ID card | View ID replacement options | $20† |
| Enhanced ID card (EID) | View EID replacement options | $20 |
| Driver license | View driver license replacement options | $20 |
| Enhanced license (EDL) | View  EDL replacement options | $20 |

## Renewing your ID/EID card

| Renew ID card/EID | More information | Total |
|---|---|---|
| ID renew fee | [View ID renewal options](#) | $55 for 6 years or $73 for 8 years† |
| EID renew fee | [View EID renewal options](#) | $97 for 6 years or $129 for 8 years |

†You may qualify for a reduced fee ID card. If you are eligible, your cost for a standard ID card is $5. To qualify for the reduced fee, you'll need to visit a driver licensing office and show:

- A 'Request for "Identicard" form issued to you by Department of Social and Health Services (DSHS), or
- A copy of your DSHS benefits approval letter showing your current certification period, or
- A printout of your Washington Connection client benefit account history page, or
- A letter from your WIC provider confirming your participation in the Women, Infants, and Children (WIC) program.

If you are under 25 years old and don't have a permanent home address, you don't need to provide any documentation.

If you choose to enhance your reduced fee ID card, the enhanced fees still apply. There is an extra $7 per year until it expires.

## Renewing your standard driver license

| Renew driver license | More information | Total |
|---|---|---|
| Renew fee | [View renew options](#) | $55 for 6 years or $73 for 8 years |
| If more than 60 days late | $55 renew + $10 late fee = Or $73 renew + $10 late fee = | $65 for 6 years or $83 for 8 years |
| While out of state | [View out of state instructions](#) | $55 for 6 years or $73 for 8 years |
| To extend expire date for 12 months while out of state | [View out of state instructions](#) | $5 |
| Renew with motorcycle endorsement | $55 renew + $30 motorcycle = $73 renew + $40 motorcycle= Also called driver license renewal with motorcycle endorsement | $85 for 6 years or $113 for 8 years |

| Renew driver license | More information | Total |
|---|---|---|
| Renew with CDL endorsement | $55 renew + $102 CDL = <br> $73 renew + $136 CDL = <br> Also called commercial driver license renewal | $157 for 6 years <br> or <br> $209 for 8 years |
| Renew with CDL and motorcycle endorsements | $55 renew + $102 CDL + $30 motorcycle = <br> $73 renew + $136 CDL + $40 motorcycle <br> Also called CDL renewal with motorcycle endorsements | $187 for 6 years <br> $249 for 8 years |
| Get a revised license before the next renewal | Update your name, address, photo or endorsement. <br> See Update your driver license or ID card <br> (Additional fees may apply) | $20 |

## Renewing your enhanced driver license (EDL)

| Renew enhanced driver license (EDL) | More information | Total |
|---|---|---|
| Renew fee | View EDL renewal options <br> Also called enhanced driver license renewal | $97 for 6 years or $129 for 8 years |
| If more than 60 days late | $97 renew + $10 late fee = <br> $129 renew + $10 late fee | $107 for 6 years <br> $139 for 8 years |
| Renew with motorcycle endorsement | $97 renew + $30 motorcycle = <br> $129 renew + $40 motorcycle = <br> Also called EDL renewal with motorcycle endorsement | $127 for 6 years <br> $169 for 8 years |
| Renew with commercial driver license endorsement (CDL) | $97 renew + $102 CDL = <br> $129 renew + $136 CDL = <br> Also called enhanced commercial driver license (ECDL) renewal | $199 for 6 years <br> $265 for 8 years |

| Renew enhanced driver license (EDL) | More information | Total |
|---|---|---|
| Renew with CDL and motorcycle endorsement | $97 renew + $102 CDL + $30 motorcycle =<br>$129 renew + $136 CDL + $40 motorcycle =<br>Also called ECDL renewal with motorcycle endorsement | $229 for 6 years<br>$305 for 8 years |
| Get a revised EDL before the next renewal | Update your name, address, photo or endorsement.<br>See Update your EDL/EID<br>(Additional fees may apply) | $20 |

## Motorcycle endorsements

| Motorcycle | More information | Total |
|---|---|---|
| Add 2-wheel or 3-wheel motorcycle endorsement | $25 license/application fee + $2 per yr for the time remaining on your license =<br>See Motorcycles<br>Also called Add an original 2 or 3 wheel motorcycle endorsement | $27 - $41 |
| Renew motorcycle endorsement | $55 license + $30 motorcycle =<br>$73 license + $40 motorcycle =<br>View renewal options | $85 for 6 years<br>$113 for 8 years |
| 2-wheel motorcycle knowledge tests (permit and endorsement tests) | Costs vary by location. Check with your motorcycle safety training school for the exact amount. | Varies |
| 2-wheel motorcycle riding skills tests (permit and endorsement tests) | Costs vary by location. Check with your motorcycle safety training school for the exact amount. | Varies |
| 3-wheel motorcycle knowledge test | Cost varies by location. Check with your motorcycle safety training school for the exact amount. | Varies |
| 3-wheel motorcycle riding skills test | Cost varies by location. Check with your motorcycle safety training school for the exact amount. | Varies |

## Commercial driver license (CDL)

| CDL | More information | Total |
|---|---|---|
| CDL knowledge test | See [Knowledge test: CDL](#) | $35 |
| Commercial learner's permit (CLP) | When you apply for a permit. See [Commercial learner's permit (CLP)](#) Also called commercial driver license learner's permit (CLP) | $40 |
| CDL skills test | See [Skills test: CDL](#). | $175 |
| CDL skills test (Head Start only) | See [Skills test: CDL](#) | $175 |
| CDL skills test for school bus endorsement | See [CDL testing](#). Your primary usage of a CDL must be to drive a school bus. Your test fee gets you 2 attempts. If you change examiners after your first attempt, you may have to pay the fee again. | $100 |
| Add CDL endorsement to a WA driver license | $20 license fee + $17 per yr for the time remaining on your license = | $37 – $156 |
| Add CDL special endorsement to a WA driver license | See: • [Types of CDLs](#) • [CDLs and endorsements](#) | $20 |
| Transfer out-of-state CDL to a WA CDL | $102 CDL fee + $55 license fee + $35 application = See [Transfer your CDL](#) (Fees may vary depending on your license expire day) | $192 |
| CDL re-qualification | See [Commercial Driver License (CDL) disqualifications](#) | $35 |

## Military personnel and dependents

| Driver license | More information | Total |
|---|---|---|
| Update the expiration date | See [Military personnel](#) | $20 |
| Replace "military" license while out of state | See [Military personnel](#) | $20 |

## Agriculture permits (under 18)

| Type | More information | Total |
|---|---|---|

| Type | More information | Total |
|------|------------------|-------|
| Get first agriculture permit | See Agricultural permits<br>Also called Get original agriculture permit | $55 |
| Renew agriculture permit | Renew each year at a driver licensing office.<br>Also called Agriculture permit renewal | $15 |
| Replace lost or stolen agriculture permit | Replace your permit at a driver licensing office.<br>Also called Agriculture permit replacement | $20 |
| Update agricultural permit | Update your permit: name, address, or photo at a driver licensing office | $20 |

## Restricted driver licenses and reinstatements

| Type | More information | Total |
|------|------------------|-------|
| Apply for Occupational/Restricted driver license (ORL) | See Occupational/Restricted driver license<br>Also called Restricted driver license application (Occupational Restricted license - ORL, or Ignition Interlock license - IIL) | $100 |
| Apply for Ignition Interlock driver license (IIL) | See Ignition Interlock driver license<br>Also called Restricted driver license application (Occupational Restricted license - ORL, or Ignition Interlock license - IIL) | $100 |
| Request a DUI hearing | See How to request a hearing | $375 |
| Get license reissued after suspension or revocation: Non-alcohol | See Types of suspensions<br>(Additional fees may apply) | $75 |
| Get license reissued after suspension or revocation: Alcohol | See Types of suspensions<br>(Additional fees may apply) | $170 |
| Get probationary driver license after a DUI conviction or deferred prosecution | (Additional fees may apply) | $50 |
| CDL re-qualification | See Commercial driver license (CDL) disqualifications | $35 |
| Check your license status and/or find out how to get your license back if you've lost your driving rights | Check your license status | Free |

## Miscellaneous fees

| Type | More information | Total |
|------|------------------|-------|
| Buy a copy of your driving record | See [Buy a copy of your driving record](#) | $15 |
| Technology fee | This fee is added to all original and renewal transactions for standard and enhanced ID cards and driver licenses. The fee supports technology upgrades and maintenance for our driver license and ID card systems. This fee has already been included in the pricing listed above. | $1 |

## Fee payment options

| Pay with your: | For online services | For licensing office |
|----------------|---------------------|----------------------|
| Cash | No | Yes |
| Check<br>Make checks payable "Department of Licensing" | Yes | Yes |
| Visa – credit/debit | Yes* | Yes – at most offices** |
| MasterCard – credit/debit | Yes* | Yes – at most offices** |
| American Express – credit/debit | Yes* | Yes – at most offices** |
| Discover – credit/debit | No | Yes – at most offices** |

*Starting January 1, 2020 we will charge a 3% card payment fee for online transactions. You can also pay with your checking account information online for no added fee.

**We accept credit and debit cards at some of our offices. Our card payments vendor charges a fee.

- If using a debit card, the convenience fee adds $2.25.
- If using a credit card, the convenience fee adds:
  - $2.25 if your transaction total is $75 or less.
  - 3% of your transaction total if over $75.

These offices only accept cash/check:

- Coulee Dam
- Goldendale
- Newport
- South Bend