## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.*, | |
| *Plaintiffs*, | |
| v. | Case No. 1:25-cv-00946-CKK |
| EXECUTIVE OFFICE OF THE PRESIDENT, *et al.*, | |
| *Defendants*. | |
| DEMOCRATIC NATIONAL COMMITTEE, *et al,*, | |
| *Plaintiffs*, | |
| v. | Case No. 1:25-cv-00952-CKK |
| DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*, | |
| *Defendants*. | |
| LEAGUE OF WOMEN VOTERS EDUCATION FUND, *et al.*, | |
| *Plaintiffs*, | |
| v. | Case No. 1:25-cv-00955-CKK |
| DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*, | |
| *Defendants*. | |

## BRIEF OF BIPARTISAN FORMER STATE SECRETARIES OF STATE AS AMICI CURIAE IN SUPPORT OF LEAGUE AND LULAC PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGEMENT (ECF NO. 145)

## TABLE OF CONTENTS

INTEREST OF AMICI ............................................................................................. i

INTRODUCTION................................................................................................... 1

ARGUMENT ......................................................................................................... 2

    I.    The Constitution ensures that states play an irreplaceable and primary role in election regulation and administration. .................................................. 4

        A.    The states' role in regulating and administering elections is constitutionally mandated. .......................................................................... 4

        B.    The Constitution reflects an intentional choice to prioritize the states' accountability to voters. ............................................................ 5

        C.    Because state officials are responsible for enacting and executing election laws, their election expertise surpasses that of the President. ..................... 6

    II.    The President has no standalone power to regulate or administer elections.............. 7

    III.    The President cannot direct the Elections Assistance Commission ("EAC"), which is an "independent entity," to take specific actions. ................................................. 8

    IV.    The Executive Order violates federalism and the separation of powers by infringing on the Elections and Electors Clauses. .................................................. 10

    V.    The Executive Order violates federal law in many other ways. ............................ 12

    VI.    State election administrators face actual, imminent, and irreparable harm from the Executive Order.................................................................................................. 16

CONCLUSION ...................................................................................................... 19

# TABLE OF AUTHORITIES

**Cases**

*Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*,
576 U.S. 787 (2015) ................................................................................................................. 1

*Arizona v. Inter Tribal Council of Arizona, Inc.*,
570 U.S. 1 (2013) ................................................................................................ 4, 5, 6, 13, 14

*Ass'n of Cmty. Orgs. for Reform Now (ACORN) v. Edgar*,
56 F.3d 791 (7th Cir. 1995) ...................................................................................................... 5

*Bush v. Gore*,
531 U.S. 98 (2000) ................................................................................................................... 7

*California v. Trump*,
--- F. Supp. 3d ----, No. 25-cv-10810, 2025 WL 1667949 (D. Mass. June 13, 2025) ........ 2, 4, 5

*Campanale & Sons, Inc. v. Evans*,
311 F.3d 109 (1st Cir. 2002) .................................................................................................. 15

*Clinton v. City of New York*,
524 U.S. 417 (1998) ............................................................................................................... 11

*Colorado v. DeJoy*,
No. 20-cv-2768, 2020 WL 5513567 (D. Colo. Sept. 14, 2020) ............................................... 8

*Georgia v. Clark*,
119 F.4th 1304 (11th Cir. 2024) .............................................................................................. 8

*Georgia v. Meadows*,
692 F. Supp. 3d 1310 (N.D. Ga. 2023) .................................................................................... 7

*Gonzalez v. Arizona*,
677 F.3d 383 (9th Cir. 2012) .................................................................................................... 5

*Gregory v. Ashcroft*,
501 U.S. 452 (1991) ............................................................................................................... 11

*Harkless v. Brunner*,
545 F.3d 445 (6th Cir. 2008) .................................................................................................... 5

*Humphrey's Ex'r v. United States*,
295 U.S. 602 (1935) ................................................................................................................. 9

*In re Aiken Cnty.*,
645 F.3d 428 (D.C. Cir. 2011) ................................................................................................. 9

*League of United Latin Am. Citizens v. Exec. Off. of the President*,
    --- F. Supp. 3d ----, No. 25-cv-0946, 2025 WL 1187730 (D.D.C. Apr. 24, 2025) .. 2, 4, 6, 7, 12, 13, 15, 16

*League of Women Voters of U.S. v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016) ................................................................................. 14

*Libertarian Party of Virginia v. Alcorn*,
    826 F.3d 708 (4th Cir. 2016) ................................................................................. 6

*Louisiana v. Biden*,
    55 F.4th 1017 (5th Cir. 2022) ............................................................................... 17

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) .............................................................................................. 15

*Moore v. Harper*,
    600 U.S. 1 (2023) .................................................................................................. 5

*Patchak v. Zinke*,
    583 U.S. 244 (2018) .............................................................................................. 20

*Sandusky Cnty. Democratic Party v. Blackwell*,
    387 F.3d 565 (6th Cir. 2004) ............................................................................... 14

*Seila Law LLC v. Consumer Financial Protection Bureau*,
    591 U.S. 197 (2020) .............................................................................................. 10

*State v. Meadows*,
    88 F.4th 1331 (11th Cir. 2023) ......................................................................... 7, 11

*Storer v. Brown*,
    415 U.S. 724 (1974) ........................................................................................... 6, 7

*Trump v. Wilcox*,
    145 S. Ct. 1415 (2025) ......................................................................................... 9

*U.S. Term Limits, Inc. v. Thornton*,
    514 U.S. 779 (1995) .............................................................................................. 4

*U.S. v. Gradwell*,
    243 U.S. 476 (1917) ........................................................................................... 5, 6

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952) ....................................................................................... 12, 19

**Statutes**

42 U.S.C § 20923 ..................................................................................................... 9

42 U.S.C. § 901 ....................................................................................................... 9

52 U.S.C. § 20508 ................................................................................................... 13

52 U.S.C. § 20921 ................................................................................................... 9

**Other Authorities**

3 Records of the Federal Convention of 1787 (M. Farrand ed. 1911) ........................................... 6

Agenda, EAC Technical Guidelines Development Committee (July 2, 2025) ........................... 16

*Black's Law Dictionary* (12th ed. 2024) ................................................................... 15

Lisa Marshall Manheim, *Presidential Control of Elections*, 74 Vand. L. Rev. 385 (2021) ........ 12

Mitch McConnell, *Trump Gives Democrats a Voting Gift*, Wall St. J. (Apr. 7, 2025) ................. 8

National Conference of State Legislatures, *Helping America Vote, Election Administration in the United States 2024* at 92 (2025) .............................................................. 17

Patrick Marley and Yvonne Wingett Sanchez, *DOJ hits states with broad requests for voter rolls, election data*, Wash. Post (July 16, 2025) ................................................ 16

The Federalist No. 47 (James Madison) (Clinton Rossiter ed., 1961) ........................................ 20

The Federalist No. 59 (C. Rossiter ed. 1961) (A. Hamilton) .................................................. 6

U.S. Dep't of Just., Just. Manual § 9-85.300 (2022) ...................................................... 8

William J. Clinton, Remarks on Signing the National Voter Registration Act of 1993 (May 20, 1993), https://www.presidency.ucsb.edu/node/219638 ........................................... 14

**Executive Orders & Regulations**

Exec. Order No. 14248, 90 Fed. Reg. 14005 (Mar. 25, 2025) ........................................ 1, 17, 18

**Constitutional Provisions**

U.S. Const. art. I, § 4, cl. 1 ..................................................................................... 4

U.S. Const. art. II, § 1, cl. 2 .................................................................................... 4

## INTEREST OF AMICI

Amici are a bipartisan group of former state secretaries of state.[1] As this court concluded in granting Amici leave to file a similar amicus brief in support of the League and LULAC Plaintiffs' motion for preliminary injunction, "[a]s former state election officials, [A]mici offer a unique perspective not presented by the parties. And their proposed brief is relevant and helpful." Minute Order, *League of United Latin Am. Citizens v. Exec. Off. of the President*, No. 25-cv-946, (Apr. 24, 2025).

Although Amici may not always have agreed about what constitutes the best election policies, Amici nonetheless share a common commitment to ensuring that elections are free and fair, and Amici are unified in their understanding of states' pivotal role in enacting and executing election laws, as set forth in the U.S. Constitution. Amici are:

- **<u>Former Secretary of State for the State of Colorado</u>** – The Colorado Secretary of State is an elected member of the Executive Branch of Colorado's state government. The Secretary of State serves as the chief executive of an office that oversees and administers many laws, including the Colorado Election Code, Voter Registration Laws, and Campaign Finance Laws. As a result, the Secretary of State supervises elections, maintains the statewide voter registration file, and verifies initiative petition signatures.

  o **<u>Mary Estill Buchanan</u>** was a public servant in Colorado for many years and a tireless advocate for democracy and women in public service. Most relevant here, Buchanan served two terms as Colorado's Secretary of State—from 1974 to 1983—as a Republican. When she took office, she was the first woman to hold

---

[1] Amici state that no counsel for a party has authored this brief in whole or in part and that no person or entity, other than Amici or their counsel, has made a monetary contribution to the preparation or submission of this brief.

that office in the State's then-98-year existence. During her tenure as Colorado's Secretary of State, Buchanan was the only Republican in statewide office, working across the aisle to ensure efficient, effective administration of Colorado's elections. As Secretary, Buchanan advocated for and implemented reforms to improve transparency for elections and public office. Before being elected Secretary of State, Buchanan served on the Colorado Board of Agriculture and the Colorado Commission on the Status of Women, for which she created and served as chair for the Women in Government Committee to recruit and elect women to serve in public office.

● **Former Secretary of State for the State of Connecticut** – The Secretary of State of Connecticut is the Commissioner of Elections for the State. The Secretary is charged with administering, interpreting, and implementing election laws and ensuring fair and impartial elections. The Elections and Voting Division of the office administers, interprets, and implements all state and federal laws pertaining to elections, primaries, nominating procedures, and the acquisition and exercise of voting rights. Additionally, in conjunction with local officials in the state, the office encourages and monitors the implementation of the National Voter Registration Act and other voter registration efforts in Connecticut.

  o **Miles Rapoport** was elected Connecticut's Secretary of the State as a Democrat in 1995 and served until 1998, leading multiple initiatives to expand voting and election participation. Before that, Rapoport served five terms in the Connecticut House of Representatives, from 1984 to 1994, chairing the Committee on Elections. Rapoport was President of Dēmos from 2001 to 2014 and President of

Common Cause from 2014 to 2016. He then served as a Senior Practice Fellow in American Democracy at the Ash Center of the Harvard Kennedy School from 2017 to 2022. Since 2021 he has served as the Executive Director of 100% Democracy, an initiative committed to promoting a more representative democracy. He is the co-author, with *Washington Post* columnist E.J. Dionne, of *100% Democracy: The Case for Universal Voting,* published in March 2022 by the New Press.

- **Former Secretary of State for the State of Minnesota** – The Secretary of State of Minnesota is an elected constitutional officer serving in the state's executive branch. One of the office's primary responsibilities is overseeing statewide elections and operating the statewide voter registration system.

  o **Joan Anderson Growe** served first in the Minnesota House of Representatives before being elected to be Minnesota Secretary of State as a Democrat. When she was elected Minnesota Secretary of State, Growe became the first woman to be elected to a Minnesota statewide office without having been appointed first. During her six-term tenure, Growe was tireless in her advocacy of voter participation, and, for most of her tenure, Minnesota led the nation in voter turnout. In addition to her work as Secretary of State, Growe also has served as an international election observer in Romania, South Africa, and Azerbaijan and as a member of the advisory committee for the Hubert H. Humphrey Institute of Public Affairs at the University of Minnesota.

- **Former Secretaries of the Commonwealth of Pennsylvania** – the Secretary of the Commonwealth is the chief state election official in Pennsylvania and leads the

Pennsylvania Department of State. The Department of State is responsible for ensuring the security, integrity, and accessibility of the electoral process in Pennsylvania, by overseeing free, fair, and accurate elections.

- o **<u>Kathy Boockvar</u>** served as the Secretary of the Commonwealth from 2019 until 2021, and before that as Senior Advisor on election security, under Governor Tom Wolf (D). Boockvar was also co-chair of the National Association of Secretaries of State (NASS)'s Elections Committee from 2019 to 2020, and a NASS Representative on the Election Infrastructure Subsector Government Coordinating Council (EIS-GCC), a collaboration among federal, state, and local officials. During her tenure, Boockvar co-chaired Pennsylvania's Inter-Agency Election Security and Preparedness Workgroup, strengthened election security and voting rights measures across the state, and oversaw secure and accessible elections amid a global pandemic, marked by unparalleled transparency and voter participation. In prior years, Boockvar served as a poll worker and as a voting-rights attorney for a national civil rights organization and has been dedicated to public service throughout her career. After serving as Secretary, Boockvar became Vice President of Election Operations for the Center for Internet Security, and she is currently President of Athena Strategies, continuing work to strengthen election security and amplify understanding and civil discourse about elections.

- o **<u>Leigh M. Chapman</u>** served as the acting Secretary of the Commonwealth from January 2022 until January 2023 under Governor Wolf. Chapman also previously held the position of Policy Director for the Pennsylvania Department of State, from July 2015 until May 2017. In that role, Chapman managed the Department's

iv

policy and regulatory development process in coordination with the Governor's
Office of Policy, including in the elections program area. Chapman also has
served as the Executive Director for Deliver My Vote, the Voting Rights Program
Director at The Leadership Conference on Civil and Human Rights, as a Senior
Policy Advisor at Let America Vote, and as a Staff Attorney at the Advancement
Project in the Voter Protection Program.

● **Former Secretary of State for the State of Washington** – The Secretary of State of
Washington is the state's chief elections officer. The Secretary of State serves as an
elected constitutional officer, and the duties of the office include supervising state and
local elections, certifying the results of state primaries and general elections, filing and
verifying initiatives and referendums, and producing and distributing the state voters'
pamphlet and election-notice legal advertising.

   ○ **Kim Wyman** was elected as a Republican to serve as Secretary of State for
   Washington State from 2013 to 2021. Wyman's career reflects thirty years of
   federal, state, and county-level elections experience. Previously, Wyman served
   as the Senior Election Security Advisor for the Cybersecurity and Infrastructure
   Security Agency. Before that, she was elected as Washington Secretary of State
   and Thurston County Auditor. Wyman began her career in election administration
   as the Thurston County Elections Director. She has earned state and national
   election administration certifications and served in leadership roles in many civic
   and professional associations. She has received numerous awards and distinctions,
   including her selection as a Rodel Fellow by the Aspen Institute in 2013, and her

v

induction into The Election Center Hall of Fame in 2022 for her contributions to the election community. She is currently the president of ESI Consulting.

- **Former Secretary of State for the State of West Virginia** –The Secretary of State of West Virginia is the state's chief elections officer and is a member of the State Election Commission. The Secretary of State oversees the election process throughout the state along with the recording of official campaign financial records and candidate filings.

  - **Natalie E. Tennant** was elected as a Democrat to serve as West Virginia's Secretary of State. She was in that role eight years, earning the reputation as an innovative and visionary leader who was recognized nationally as a pioneer in elections administration, business development and financial accountability. Tennant has worked with the Brennan Center for Justice at New York University School of Law as a Manager of State Advocacy for Voting Rights and Elections. A respected voting rights leader, she has also testified in front of the U.S. Senate and Congressional committees as well as state legislative committees about the importance of improving the election process and access to voting. Tennant served as a resident fellow at the Harvard Kennedy School's Institute of Politics in 2022 and was the first West Virginian chosen to participate in the highly respected Aspen Institute's Rodel Fellowship for Public Leadership that brings together a select group of America's most promising political leaders for bipartisan discussion and problem solving.

vi

## INTRODUCTION

Amici—a bipartisan group of former secretaries of state—faithfully oversaw elections across the "laboratories" of electoral democracy: the states. *Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*, 576 U.S. 787, 817 (2015). In their roles, Amici witnessed firsthand the Framers' wisdom in giving states authority to enact election laws and administer elections, as set forth in the Elections Clause and Electors Clause of the U.S. Constitution. That is because, as the Supreme Court recognized in reaffirming the states' role under the Elections Clause, "[d]eference to state lawmaking allows local policies more sensitive to the diverse needs of a heterogeneous society, permits innovation and experimentation, enables greater citizen involvement in democratic processes, and makes government more responsive by putting the States in competition for a mobile citizenry." *Id.* (cleaned up).

President Trump's March 25, 2025, Executive Order—"Preserving and Protecting the Integrity of American Elections" (the "Executive Order")—seeks to upend this constitutional framework by using *mandatory* language to (purportedly) *require*: unilaterally adding new requirements to the federal voter registration form (the "Federal Form"); federalizing some voter roll list maintenance; requiring the review and potential decertification of certain voting systems; and prohibiting states from processing absentee and mail-in ballots received after Election Day. Exec. Order No. 14248, 90 Fed. Reg. 14005 (Mar. 25, 2025). Contrary to the federalism and separation of powers principles codified in the Constitution's Elections and Electors Clauses, the Executive Order would unilaterally coronate *the President* as the country's chief election policymaker and administrator. To voters, Amici's successors, and every state legislator in the country, the Executive Order therefore represents an existential threat.

Indeed, when this Court previously granted Plaintiffs' motion for preliminary injunction, it recognized exactly this by enjoining enforcement of part of the Executive Order because our

1

"Constitution entrusts Congress and the States—not the President—with the authority to regulate federal elections . . . [a]nd no statutory delegation of authority to the Executive Branch permits the President to short-circuit Congress's deliberative process by executive order." *League of United Latin Am. Citizens v. Exec. Off. of the President*, --- F. Supp. 3d ----, No. 25-cv-0946, 2025 WL 1187730, at *1 (D.D.C. Apr. 24, 2025) ("*LULAC*"). The District of Massachusetts followed suit. *See California v. Trump*, --- F. Supp. 3d ----, No. 25-cv-10810, 2025 WL 1667949, at *1-2 (D. Mass. June 13, 2025) (recognizing that "the authority for election requirements is in the hands of Congress" and that the EAC must "consult with the States before implementing any changes to the federal forms for voter registration"). Indeed, the court in *California* agreed with these very same Amici about this crucial point: "As amici, bipartisan former secretaries of state, explain, 'allowing the President to change election rules and procedures on his whim whenever he sees fit, without any input from election administrators charged with executing those rules and without the checks and balances provided by Congress, would be equivalent to dropping an anvil onto the carefully balanced scales of justice.'" 2025 WL 1667949, at *17 (cleaned up).

Those conclusions still apply just as forcefully here. Unless the Court enters partial summary judgment in favor of the League and LULAC Plaintiffs, the Court would not just endorse the President and Executive Branch immediately usurping the authority of lawmakers and officials constitutionally responsible for making and enforcing election policy, it also would write any President a blank check to arrogate to themself powers that the Constitution explicitly reserves for the states and Congress.

## ARGUMENT

When Amici served in their roles, they were links in a chain of election administrators reaching back centuries to the enactment of the Constitution itself. In all aspects of their work,

Amici respected and incorporated a deep historical understanding of the states' crucial role in enacting and enforcing election laws. Drawing from this experience, Amici have no doubt that the Executive Order is unconstitutional.

*First*, under the Elections and Electors Clauses, states play an irreplaceable role in election regulation and administration. Recognizing this, the Supreme Court has held the U.S. Constitution permits only the states and Congress to regulate the time, places, and manner of federal elections, the qualifications for voter registration, and the manner of appointing presidential electors.

*Second*, caselaw reaffirms that the President plays no standalone role in regulating elections.

*Third*, Congress created the Election Assistance Commission as an independent entity. The President cannot exercise unilateral supervisory authority to direct the Commission to act in a specific way.

*Fourth*, to the extent that the Executive Order attempts to draw power from federal laws enacted by Congress, none of the laws at issue have displaced states' traditional role in elections—indeed those laws explicitly reserve powers for states that the Executive Order disregards.

*Fifth*, the Executive Order violates federal law in many other ways.

*Sixth*, executive overreach and the imposition of new requirements onto state election officials is already irreparably harming state election administrators' ability to carry out their constitutionally mandated role.

At bottom, the Executive Order intrudes on the states' and Congress's powers and attempts to seize for the Executive Branch power that it does not and cannot exercise.

I.    **The Constitution ensures that states play an irreplaceable and primary role in election regulation and administration.**

A.    **The states' role in regulating and administering elections is constitutionally mandated.**

The Constitution explicitly gives states the responsibility to enact election laws and administer elections. The Elections Clause provides: "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed *in each State by the Legislature thereof*; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators." U.S. Const. art. I, § 4, cl. 1 (emphasis added). Similarly, the Electors Clause states: "Each state shall appoint, in such Manner as the *Legislature thereof may direct*, a Number of Electors, equal to the whole Number of Senators and Representatives to which the State may be entitled in the Congress." U.S. Const. art. II, § 1, cl. 2 (emphasis added).[2]

In granting a preliminary injunction, this Court recognized that these provisions endow the states with "sweeping" authority to enact election laws, subject only to the rest of the Constitution and preemption by Congress. *LULAC*, 2025 WL 1187730, at *4. The Elections Clause's "substantive scope is broad. 'Times, Places, and Manner,' . . . are '*comprehensive* words,' which 'embrace authority to provide a *complete* code for congressional elections. . . .'" *Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1, 8-9 (2013) ("ITCA") (quoting *Smiley v. Holm*, 285 U.S. 355, 366 (1932)) (emphasis added); *California*, 2025 WL 1667949, at *2 (stating same). The Elections Clause therefore "has two functions. [1] Upon the States it imposes the duty ('shall be prescribed') to prescribe the time, place, and manner of electing Representatives and Senators; [2] upon Congress it confers the power to alter those regulations or supplant them altogether." *Id.* at 8 (citing *U.S. Term Limits*, 514 U.S. at 804-05); *see also*

---

[2] A state's "duty" under the Elections Clause "parallels the duty" described in the Electors Clause. *U.S. Term Limits, Inc. v. Thornton,* 514 U.S. 779, 804-05 (1995).

*Moore v. Harper*, 600 U.S. 1, 29 (2023) (States hold a "constitutional duty to craft the rules governing federal elections."). "In other words, only Congress has the power to adjust state election rules." *California*, 2025 WL 1667949, at *7.

In addition to giving the states and Congress the power to regulate elections, under the current regime enacted pursuant to the Elections and Electors Clauses, states are responsible for administering federal elections. The Elections Clause "places the burden of administering federal elections on the states." *Ass'n of Cmty. Orgs. for Reform Now (ACORN) v. Edgar*, 56 F.3d 791, 796 (7th Cir. 1995); *Harkless v. Brunner*, 545 F.3d 445, 454 (6th Cir. 2008); *accord Gonzalez v. Arizona*, 677 F.3d 383, 391 (9th Cir. 2012) ("[A] state's role in the creation and implementation of federal election procedures . . . is to administer the elections through its own procedures.") *aff'd sub nom. ITCA*, 570 U.S. 1; *ITCA*, 570 U.S. at 41 (Alito, J., dissenting) (The Elections Clause "reserve[es] to the States default responsibility for administering federal elections . . . .").

In sum, it is "clearly established" that the Constitution "leave[s] the conduct of [federal elections] to state laws, administered by state officers," and separately Congress may also "assume[] to regulate such elections . . . by positive and clear statutes." *U.S. v. Gradwell*, 243 U.S. 476, 485 (1917).

### B.  The Constitution reflects an intentional choice to prioritize the states' accountability to voters.

The Elections Clause reflects the Framers' view that states are well situated to regulate and administer federal elections, subject to Congressional preemption. That is because of state officials' accountability and proximity to local needs. "All other things being equal, it is generally better for states to administer elections. . . . [L]ocal administration . . . allows for greater individual input and accountability; a distant bureaucracy is in danger of appearing out of reach and out of touch." *Libertarian Party of Virginia v. Alcorn*, 826 F.3d 708, 715-16 (4th Cir.

2016) (Wilkinson, J.). As James Madison explained, "[i]t was found necessary to leave the regulation of [federal elections], in the first place, to the state governments, as being best acquainted with the situation of the people." 3 Records of the Federal Convention of 1787, p. 312 (M. Farrand ed. 1911); *Gradwell*, 243 U.S. at 484; *ITCA*, 570 U.S. at 41 (Alito, J., dissenting). Indeed, even ardent federalist Alexander Hamilton conceded that, because the states are closer to the people, state regulation of federal elections is "in ordinary cases . . . both more convenient and more satisfactory." The Federalist No. 59, p. 360 (A. Hamilton) (C. Rossiter ed. 1961) ; *accord Gradwell*, 243 U.S. at 484-85; *ITCA*, 570 U.S. at 41 (Alito, J., dissenting); *LULAC*, 2025 WL 1187730, at \*5. Of course, Madison and Hamilton also agreed that under the Elections Clause, Congress—*but not the President*—was a necessary check on potential abuses by state legislatures. *See Gradwell*, 243 U.S. at 484-85.

## C. Because state officials are responsible for enacting and executing election laws, their election expertise surpasses that of the President.

In practice, the Elections Clause creates a regime in which state officials, like Amici, possess unique expertise in local election procedures that the Federal Government, and in particular the President, simply does not have. "[T]here must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Storer v. Brown*, 415 U.S. 724, 730 (1974). As a result, states have "comprehensive, and in many respects complex, election codes regulating in most substantial ways, with respect to both federal and state elections, the time, place, and manner of holding primary and general elections, the registration and qualifications of voters, and the selection and qualification of candidates." *Id.* In turn, it is state and local officials like Amici— *i.e.*, those charged with developing and operationalizing those comprehensive election codes—

6

who possess the "expertise" necessary to implement such a complex system. *Bush v. Gore*, 531 U.S. 98, 109 (2000).

II.      **The President has no standalone power to regulate or administer elections.**

"The Constitution empowers *only* the states and Congress to 'regulate the conduct of [federal] elections.'" *State v. Meadows*, 88 F.4th 1331, 1346 (11th Cir. 2023) (emphasis added), *cert. denied*, 145 S. Ct. 545 (2024) (quoting *Roudebush v. Hartke*, 405 U.S. 15, 24 (1972)). That is because, as this Court has recognized, with respect to the Elections and Electors Clauses, "[t]he President does not feature at all. In fact, Executive regulatory authority over federal elections does not appear to have crossed the Framers' minds." *LULAC*, 2025 WL 1187730, at *5. As a result, given that the "Constitution clearly grants the States the power to manage elections under the Elections Clause[,]" the Executive Branch cannot declare, on its own initiative, "power to involve itself in States' election procedures[.]" *Georgia v. Meadows*, 692 F. Supp. 3d 1310, 1327-28 (N.D. Ga. 2023) (quoting *Bond v. United States*, 564 U.S. 211, 221 (2011)); *see also LULAC*, 2025 WL 1187730, at *36 (The Elections Clause and federal law "vest control over federal election regulation in other actors, leaving no role for the President.").

The Executive Branch does not, because it cannot, have constitutional authority to exercise—let alone usurp—the states' and Congress's Constitutionally delegated power to regulate and administer elections. Rather, federal courts have consistently found that "neither the Constitution, nor statutory law, nor precedent" support a broad authority to "superintend the states' administration of elections." *Meadows*, 88 F.4th at 1346. Indeed, Executive Branch officials have themselves "long recognized that the States – *not the federal government* – are responsible for administering elections, determining the validity of votes, and tabulating the results, with challenges handled by the appropriate election administrators, officials, legislatures,

7

and courts." U.S. Dep't of Just., Just. Manual § 9-85.300 (2022) (emphasis added); *accord*

*Georgia v. Clark*, 119 F.4th 1304, 1315 (11th Cir. 2024) (Rosenbaum, J., concurring). Or as

Senator Mitch McConnell bluntly stated in a recent article: "[D]elegation of authority over

election administration is crystal clear. Elections may have national consequences but the power

to conduct them rests in state capitols."[3]

To the extent Executive Branch *agencies or commissions* play any role in the states'

administration of elections, their authority to do so is strictly limited to the parameters set by

Congress under the Elections Clause. *See Colorado v. DeJoy*, No. 20-cv-2768, 2020 WL

5513567, at *2 (D. Colo. Sept. 14, 2020) ("Although the Constitution allows Congress to

override a State's authority regarding its elections, it does not extend the same authority to the

Postal Service – an agency of the federal executive branch."). When a similar conflict of

authority arose in *Colorado v. DeJoy*, concerning whether a federal executive official of the

Postal Service could implement policy that would intrude on the state's power to administer its

election, the court enjoined the policy because if found no caselaw that "would permit this

constitutional authority, specifically delegated to Congress, to be massively enlarged so as to

cloak [a federal agency] and its agents with the power over-ride the election functions of a state

sovereign." *Id.* The Executive Order at issue here attempts to do exactly this, epitomizing

unconstitutional executive overreach of the highest and most alarming degree.

### III.    The President cannot direct the Elections Assistance Commission ("EAC"), which is an "independent entity," to take specific actions.

The President does not have the authority to order or direct an *independent*

Congressionally created entity to act. "[T]here are two kinds of agencies in the Executive

---

[3] Mitch McConnell, *Trump Gives Democrats a Voting Gift*, Wall St. J. (Apr. 7, 2025), https://archive.ph/30TWq.

Branch: executive agencies and independent agencies…. [A]n independent agency … operates free of presidential direction and supervision." *In re Aiken Cnty.*, 645 F.3d 428, 439 (D.C. Cir. 2011) (Kavanaugh, J., concurring). By statute, Congress established the EAC as such an "independent entity." 52 U.S.C. § 20921. It is not unique in this respect: many other agencies, like the Social Security Administration, are similarly "independent." 42 U.S.C. § 901(a). Moreover, Congress also ensured that the EAC is bipartisan by stating that no more than half of the EAC's members may be affiliated with the same political party. *See* 52 U.S.C. § 20923(b). The Government cannot cite to any authority establishing that the President may compel an independent, bipartisan, Congressionally-created entity like the EAC to act in a particular way.

In at least some circumstances, bipartisan administrative bodies carrying out expertise-based functions with a measure of independence are protected from presidential control. *See Humphrey's Ex'r v. United States*, 295 U.S. 602 (1935); *Trump v. Wilcox*, 145 S. Ct. 1415 (2025) (discussing Federal Reserve's Board of Governors or other members of the Federal Open Market Committee). In other circumstances, the Supreme Court has held that under Article II of the Constitution's Vesting Clause, the President may at most control certain independent entities by *appointing and removing* their officers. *See Wilcox*, 145 S. Ct. at 1415 ("Because the Constitution vests the executive power in the President . . . he may remove without cause executive officers who exercise that power on his behalf, subject to narrow exceptions recognized by our precedents[.]" (citing *Seila Law LLC v. Consumer Financial Protection Bureau*, 591 U.S. 197, 215-18 (2020))); *Seila Law*, 591 U.S. at 227 ("[T]he President's removal power stems from Article II's vesting of the 'executive Power' in the President.").

*Seila Law* confirms that here there is no understanding of executive power that grants the President the authority to control the day-to-day actions of the EAC. In *Seila Law*, although the

9

Court concluded that the CFPB's leadership by a single independent director violated the separation of powers because the director necessarily had to be subject in some way to presidential control, 591 U.S. at 231-232, the *remedy* the Court chose was neither to transfer to the President the CFPB director's ability to "issue final regulations, oversee adjudications, set enforcement priorities, initiate prosecutions, and determine what penalties to impose on private parties," *id.* at 225, nor to strike down the entire CFPB because of its independence from the President. *See id.* at 232-35. Instead, the Court struck only the statutory provision that protected the CFPB director from removal. *See id.* In other words, even in the circumstances where the President may exercise control over an independent, congressionally created entity, he does so only by *removal*. Here, the Court need not determine whether the President can remove the independent EAC commissioners under *Seila Law* or whether *Humphrey's Executor* instead applies. Rather, it is enough that the President does not, in any circumstance, have supervisory authority to direct the EAC to act in a specific way.

IV.    **The Executive Order violates federalism and the separation of powers by infringing on the Elections and Electors Clauses.**

Irrespective of Amici's views about the policy decisions reflected in the Executive Order, Amici all agree that the Executive Order violates the Constitution, and its implementation would represent a cataclysmic sea of change in election administration. "Perhaps the principal benefit of the federalist system is a check on abuses of government power. The constitutionally mandated balance of power between the States and the Federal Government was adopted by the Framers to ensure the protection of our fundamental liberties." *Gregory v. Ashcroft*, 501 U.S. 452, 458 (1991) (cleaned up). "Just as the separation and independence of the coordinate branches of the Federal Government serve to prevent the accumulation of excessive power in any one branch, a

10

healthy balance of power between the States and the Federal Government will reduce the risk of tyranny and abuse from either front." *Id.*

The Executive Order represents the Executive Branch mounting a direct assault on these principles by claiming for the President powers reserved for the states and Congress under the Elections and Electors Clauses. Put differently, "[b]y increasing the power of the President beyond what the Framers envisioned," the Executive Order "compromises the political liberty of our citizens, liberty which the separation of powers seeks to secure." *Clinton v. City of New York*, 524 U.S. 417, 452 (1998) (Kennedy J., concurring). Amici are particularly sensitive to the risks inherent in the Executive Order's reallocation of power over elections. Election administration is already intricate and demanding; it requires an enormous amount of manpower and careful coordination, with preparation beginning months, if not years, in advance.

Fortunately, the law reflects that the president has no such authority. To start, the Executive Order purports to require—in mandatory terms—that various executive agencies and the Elections Assistance Commission unilaterally execute policy changes that neither the states nor Congress has enacted in accordance with the Elections Clause. *See, e.g.*, Executive Order, §§ 2(a) (using the verb "shall" to direct action by EAC).[4] But of course, as established above, "the President has no 'direct control' over the individuals—members of Congress and state officials—who conduct federal elections." *Meadows*, 88 F.4th at 1347. In other words, this Court was right to recognize that "the President has done much more than state his views: He has issued an 'Order' directing that an independent commission 'shall' act to 'require' changes to an

---

[4] The word "shall" is also used in sections 2(d), 3(d), and 7, but the at-issue motion only seeks summary judgment as to Executive Order § 2(a).

important document, the contents of which Congress has tightly regulated. That command

exceeds the President's authority." *LULAC*, 2025 WL 1187730, at *40 (cleaned up).

Though the Executive Order attempts to obscure the President's attempt to exercise

unilateral control over the election administration by directing the EAC to do the President's

bidding, that nonetheless stretches the separation of powers past its breaking point. "In the

framework of our Constitution, the President's power to see that the laws are faithfully executed

refutes the idea that he is to be a lawmaker." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S.

579, 587 (1952). That is especially true "in the field of election administration," where

"Congress appears to have granted the president vanishingly little power to exercise unilateral

control." Lisa Marshall Manheim, *Presidential Control of Elections*, 74 Vand. L. Rev. 385, 435

(2021). Thus, as this Court said in granting a preliminary injunction, "the President's power is 'at

its lowest ebb' because his unilateral instruction" to change election procedures "is contrary to

the manifest will of Congress, as expressed in the text, structure, and context of" federal election

law. *LULAC*, 2025 WL 1187730, at *37 (quoting *Youngstown*, 343 U.S. at 639 (Jackson, J.,

concurring)). And because, beyond federal election statutes, "the President has no constitutional

power over election regulation that would support this unilateral exercise of authority," the

Executive Order is unlawful. *Id.* at *38.

**V.      The Executive Order violates federal law in many other ways.**

In addition to violating the Constitution by illegally arrogating power to the President, the

Executive Order directly conflicts with statutes that Congress enacted using its authority under

the Elections Clause—statutes that maintain the states' central role in election administration.

The Executive Order ignores that states must play a role in developing the Federal Form.

The National Voter Registration Act ("NVRA"), which Congress enacted under the Elections

Clause, requires that the EAC "*shall* develop a mail voter registration application form" "*in consultation with the chief election officers of the States*." 52 U.S.C. § 20508(a)(2) (emphasis added); *see also ITCA*, 570 U.S. at 5 ("The EAC is explicitly instructed, however, to develop the Federal Form 'in consultation with the chief election officers of the States.'"). Further, the Federal Form:

> may require *only* such identifying information (including the signature of the applicant) and other information (including data relating to previous registration by the applicant), *as is necessary to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process*.

52 U.S.C. § 20508(b)(1) (emphasis added). The Government has previously argued to the Supreme Court that this "means that the EAC *'shall require* information that's necessary [to states], but may only require that information." *ITCA*, 570 U.S. at 18. As a result, to determine whether information is necessary to state officials, the EAC necessarily *must* as an antecedent step seek input from state officials, as reaffirmed by the requirement that the Federal Form be developed "in consultation with" states. 52 U.S.C. § 20508(a)(2). Which is why this Court pointed out that, "[c]ritically, Congress has never assigned any responsibility for the content of the Federal Form to the President or to any other individual in the Executive Branch with the power to act unilaterally." *LULAC*, 2025 WL 1187730, at *37. The President cannot carve the states out of a process in which federal law requires their involvement.

The statutory division of responsibility between the EAC and states regarding the Federal Form makes sense, because Congress created the Federal Form in the NVRA and established the EAC in the Help America Vote Act ("HAVA"), which both ensure states' continued role in election administration. "Nowhere in the language or structure of HAVA as a whole is there any indication that the Congress intended to strip from the States their traditional responsibility to

administer elections . . . ." *Sandusky Cnty. Democratic Party v. Blackwell*, 387 F.3d 565, 576 (6th Cir. 2004); *see also* McConnell *supra* n. 3 ("When we wrote the Help America Vote Act, we took care to reinforce—not undermine—the limits of federal involvement in America's elections."). And under the NVRA, the very "purpose of the federal form is *not* to supplant the States' authority in this area but to facilitate interstate voter registration drives." *ITCA*, 570 U.S. at 46 (Alito, J., dissenting) (emphasis added); *see also League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016) ("[T]he Federal Form requires registrants to supply information as part of their application only insofar as it is '*necessary* to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process.'" (quoting 52 U.S.C. § 20508(b)(1))); William J. Clinton, Remarks on Signing the National Voter Registration Act of 1993 (May 20, 1993), https://www.presidency.ucsb.edu/node/219638 (describing NVRA's "implementation by States"). Executive Order Section 2(a) therefore contravenes both the text and intent of HAVA and the NVRA, by stripping from federal law the mandatory role that secretaries of state like Amici must play in developing the federal voter registration form.

Nor is there any question that Executive Order Section 2(a) purports to be mandatory. "At the hearing on Plaintiffs' [preliminary injunction motion before this court], [the Government] affirmed that the Executive Order means what it says: The EAC *must* add a documentary-proof-of-citizenship requirement to the Federal Form, regardless of the feedback it receives from the States or other participants in the notice-and-comment process or of its own conclusions about whether such proof is 'necessary' to allow States to assess voter qualifications." *LULAC*, 2025 WL 1187730, at *40 (emphasis in original).

14

The EAC's initial steps to execute the Executive Order confirm this point. In April, the EAC's Executive Director sent a letter and email to state officials ostensibly gesturing towards states providing consultation in amending the Federal Form. *See* Exhibits to Declaration, (ECF No. 95-1) (the "April EAC Communications"). However, purporting to seek the states' "input" on "on how states would propose to *implement"* the President's policy is not the participatory process envisioned by Congress. *Id.* (emphasis added). "Consultation" requires seeking the "advice or opinion of someone[,]" here, the election officers of the States. Consultation, *Black's Law Dictionary* (12th ed. 2024). "[I]f Congress has required consultation. . . we must presume that such consultation will have a serious purpose that is likely to produce tangible results." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 585 (1992) (Stevens, J., concurring) (describing congressionally required consultation between agencies). Thus, as the First Circuit has emphasized, "[c]onsultation . . . must mean something more than general participation . . ., otherwise the consultation requirement would be rendered nugatory." *Campanale & Sons, Inc. v. Evans*, 311 F.3d 109, 118 (1st Cir. 2002) (interpreting "consultation" in context of the Atlantic Coastal Act). Moreover, the April EAC Communications demonstrates to the states that the Executive Order "instructs" new provisions are "required" to be included in the Federal Form, (ECF No. 95-1), making clear that the EAC understands Executive Order Section 2 to require the EAC to unilaterally make certain specific and substantive changes to the federal national mail voter registration form, regardless of any input the EAC allows states to nominally provide.

It is undeniable that the Government views Executive Order Section 2(a) as a means to circumvent the states' statutory role in offering their advice or opinion regarding the substance of

the Federal Form.[5] The Government's gambit is unconstitutional and the Court should not sanction it.

### VI.    State election administrators face actual, imminent, and irreparable harm from the Executive Order.

In addition to constituting an unlawful intrusion into the states' sovereign prerogative, the Executive Order is immediately and irreparably harming states' abilities to administer their elections. The EAC has already taken steps to implement the Executive Order, including sending letters to states regarding revising the Federal Form,[6] taking steps to change voting systems guidelines,[7] and demanding that states turn over copies of their voter rolls and share information about voters.[8] Many of those steps have explicitly required action by the states.

Moreover, in Amici's experience, *any* change or update to election law forces states to divert resources away from their existing processes for election administration—processes that are complicated, require careful planning far in advance of elections, and already rely on tenuous funding. Election administrators working across the country have confirmed that the Executive Order is already disrupting their work. (*See Washington v.* Trump, No. 2:25-cv-00602 (W.D.

---

[5] Any argument by the Government that the EAC may change the Federal Form if it complies with all procedural requirements, is therefore a red herring. Even if the Government is correct, here the EAC did not follow the procedures set forth in federal law.

[6] *LULAC*, 2025 WL 1187730, at *29 ("[O]n April 11, the EAC began taking action in response to Section 2(a). That day, the EAC's Executive Director Brianna Schletz sent a letter on EAC letterhead to the chief election officials of each State 'seeking consultation on development of' the Federal Form.")

[7] Agenda, EAC Technical Guidelines Development Committee (July 2, 2025) ("Discussion of the Implementation of the Executive Order to Protect the Integrity of American Elections"), https://www.eac.gov/sites/default/files/2025-06/TGDC_2025_Annual_Meeting_Agenda.pdf.

[8] Patrick Marley and Yvonne Wingett Sanchez, *DOJ hits states with broad requests for voter rolls, election data*, Wash. Post (July 16, 2025), https://www.washingtonpost.com/politics/2025/07/16/trump-voter-fraud-elections/.

Wash.) (ECF No. 39) (May 29, 2025)). That alone constitutes irreparable harm. *See Louisiana v. Biden*, 55 F.4th 1017, 1033-34 (5th Cir. 2022) (affirming preliminary injunction based on "diversion of resources" resulting in "nonrecoverable compliance costs"). And because the Executive Order requires immediate implementation of certain provisions and provides little notice for others, *see*, *e.g.*, Executive Order, § 7(a), 2(d), states' election administrators must already be preparing and even implementing processes to ensure that county officials and state agencies are following, and voters are aware of, the anticipated changes throughout registration and voting.

Administering elections is complicated. As the National Conference of State Legislatures ("NCSL") has described, election administration "requires proficiency in many areas, including event planning, logistics, procurement, warehouse management, human resources, physical security and cybersecurity skills…. These additional responsibilities come with unique funding and staffing challenges."[9] Though the Executive Order seemingly presupposes that changes to election administration can be made immediately and with the ease of flipping a switch or swiping a credit card, election administrators like Amici know that the work required for successful election administration spans across multiple state and local agencies, relies on many different stakeholders, and requires year-round dedication. The National Conference of State Legislatures for example recognizes that "new voting policies" and "systems that require implementation and procedural changes" are among the factors that most significantly influence election workforces.[10] Amici's experience confirms this. Changes to election laws necessarily

---

[9] National Conference of State Legislatures, *Helping America Vote, Election Administration in the United States 2024* at 92 (2025), https://tinyurl.com/mr3hka63.

[10] *Id.* at 95.

have a ripple effect, and implementing those changes and addressing their consequences takes away from the steady flow of tasks that are already on state election administrators' plates, including: managing outward facing websites, communicating with county and city elections officials, voter list maintenance, complying with state laws, informing the public about elections processes and procedures, reviewing and implementing cyber- and physical- security measures, reviewing and refining training plans and elections regulations, reviewing vendor contracts, initiating and submitting procurement process pursuant to the State law concerning purchasing equipment, ensuring ADA compliance and generally increasing accessibility for voters, supporting state legislative efforts related to elections, and countless other technical, operational, time-intensive aspects of election administration. And that is to say nothing of the fact that most state election administrators oversee the entire state's Department of State, which has many functions unrelated to election administration.

That burdensomeness of immediately implementing the Executive Order—so significant that it nears impossibility—is compounded by the Executive Order's threatened stripping of necessary, already-appropriated state election funding. *See* Executive Order, § 4(a), 4(d), 5(b)(ii), 7(b). Election funding is already tenuous. The funds that the Executive Order claims to newly restrict, those mandated by HAVA, were directed to the states precisely because of the need to ensure safe and secure elections. By holding crucial state election funding hostage, the Executive Order actually jeopardizes rather than secures election administration, creating uncertainty where there previously was none.

Further, the Executive Order has caused the proliferation of controversy and misinformation about the safety and security of American elections. Every step to implement the Executive Order will increase such misinformation. On its face, the Executive Order falsely

claims that "the United States has not adequately enforced Federal election requirements that, for example, prohibit States from counting ballots received after Election Day or prohibit non-citizens from registering to vote." Election administrators and states bear the brunt of these false assertions and the Executive Order's other misleading innuendos. They have been and will continue to be responsible for maintaining voters' confidence in elections and their understanding of how elections *actually* are administered.

Amici know well that, in anticipation of the many and complex additional steps required to effectuate new election requirements, state election officials must immediately and continually grapple with how to address the Executive Order. Each hour allocated to implementing, assessing, or responding to the President's top-down mandate has irreversibly cost election administrator's time that should have been put toward existing policy priorities. Implementing the Order is increasingly unworkable as officials prepare for upcoming election deadlines.

*       *       *

The Elections Clause and numerous federal statutes designate states a crucial part of enacting and administering federal elections. The President cannot use the Executive Order to crop states out of this picture, just as he cannot superimpose himself in.

## CONCLUSION

"The Executive, except for recommendation and veto, has no legislative power. The executive action we have here originates in the individual will of the President and represents an exercise of authority without law." *Youngstown*, 343 U.S. at 655 (Jackson, J., concurring). As shown above, the Executive Order seeks to fundamentally reorder the Constitution's clear allocation of control over elections. The President plays no role in election regulation and administration—the Constitution explicitly leaves those tasks to the states and Congress. But if

the Court does not grant the League and LULAC Plaintiffs' targeted request to permanently enjoin one of the most onerous portions of the Executive Order now, the snowball of executive overreach will grow swiftly and exponentially. And then it is only a matter of time until the regime created by the Elections and Electors Clauses is buried under an avalanche of Presidential power—"an accumulation that would pose an inherent 'threat to liberty.'" *Patchak v. Zinke*, 583 U.S. 244, 250 (2018) (Plurality Op.) (Thomas, J.) (citation omitted); *see also* The Federalist No. 47, at 301 (James Madison) (Clinton Rossiter ed., 1961) ("The accumulation of all powers, legislative, executive, and judiciary, in the same hands, whether of one, a few, or many, and whether hereditary, self-appointed, or elective, may justly be pronounced the very definition of tyranny."). The Court should not countenance the Executive Order's attempted unconstitutional power grab by the President. For the foregoing reasons, Amici respectfully request that the Court grant the League and LULAC Plaintiffs' motion for partial summary judgment.

Dated: August 1, 2025                    Respectfully submitted,

/s/ Kalyn Mizelle McDaniel
Kalyn Mizelle McDaniel (D.C. Bar No. 90027120)
John B. Hill (PA Bar No. 328340)*
Alex M. Goldstein (D.C. Bar No. 90005086)
Donald K. Sherman (D.C. Bar No. 90031810)**
CITIZENS FOR RESPONSIBILITY AND
ETHICS IN WASHINGTON
P.O. Box 14596
Washington, D.C. 20044
Telephone: (202) 408-5565
dsherman@citizensforethics.org
jhill@citizensforethics.org
kmcdaniel@citizensforethics.org
*admitted *pro hac vice*
** *pro hac vice* motion forthcoming
*Counsel for Amici*