# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.*, | |
| Plaintiffs, | |
| v. | Civil Action No. 25-0946 (CKK) |
| EXECUTIVE OFFICE OF THE PRESI-DENT, *et al.*, | |
| Defendants. | |
| DEMOCRATIC NATIONAL COMMITTEE, *et al.*, | |
| Plaintiffs, | |
| v. | Civil Action No. 25-0952 (CKK) |
| DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*, | |
| Defendants, | |
| *and* | |
| REPUBLICAN NATIONAL COMMITTEE, | |
| Intervenor-Defendant. | |
| LEAGUE OF WOMEN VOTERS EDUCA-TION FUND, *et al.*, | |
| Plaintiffs, | |
| v. | Civil Action No. 25-0955 (CKK) |
| DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*, | |
| Defendants. | |

## THE REPUBLICAN NATIONAL COMMITTEE'S
## CROSS-SUMMARY JUDGMENT BRIEF ON SECTION 2(a) CLAIMS

# TABLE OF CONTENTS

Table of Authorities ........................................................................................................... iii

Introduction ........................................................................................................................1

Factual Background ............................................................................................................3

Legal Standard ...................................................................................................................7

Argument ...........................................................................................................................7

I.   Plaintiffs' *ultra vires* claims fail on the merits..........................................................7

  A.  Section 2(a) does not contravene the NVRA. ..........................................................8

    1.  The NVRA does not restrict citizenship information to the voter's signature..........9

    2.  Proof of citizenship is "necessary" identifying information. ...................................12

    3.  Section 2(a) does not conflict with the NVRA's consultation provision...............16

  B.  Section 2(a) does not infringe on Congress's Elections Clause authority..................17

II.  Plaintiffs' statutory claims fail because Plaintiffs have not identified violations of federal law. ...................................................................................................................................22

  A.  Requiring proof-of-citizenship for the federal registration form doesn't violate the NVRA....................................................................................................................................22

  B.  Requiring proof of citizenship doesn't unduly burden U.S. citizens' right to vote.....22

    1.  The DNC fails to prove that requiring proof of citizenship poses anything more than a *de minimis* burden on eligible U.S. citizen voter registration applicants. ....23

    2.  Any burden is outweighed by compelling governmental interests. ........................27

Conclusion .........................................................................................................................32

## TABLE OF AUTHORITIES

**Cases**

*Ardelyx, Inc. v. Becerra*,
    2024 WL 5186613 (D.D.C.) ................................................................................23

*Arizona v. Inter Tribal Council of Ariz., Inc.*,
    570 U.S. 1 (2013) .......................................................................3, 14, 17, 21

*Baker v. Carr*,
    369 U.S. 186 (1962) ........................................................................................21

*Barnhart v. Peabody Coal Co.*,
    537 U.S. 149 (2003) ........................................................................................10

*Bell v. Leavitt*,
    2006 WL 8460338 (N.D. Ill.) ........................................................................25

*Bldg. & Constr. Trades Dep't, AFL-CIO v. Allbaugh*,
    295 F.3d 28 (D.C. Cir. 2002) ...................................................2, 15, 18, 22

*Bowsher v. Synar*,
    478 U.S. 714 (1986) ........................................................................................19

*Brnovich v. DNC*,
    594 U.S. 647 (2021). ...........................................................................24, 30, 31

*Buckley v. Valeo*,
    424 U.S. 1 (1976) ....................................................................................18, 19

*Burdick v. Takushi*,
    504 U.S. 428 (1992) ........................................................................................21

*Burlington Truck Lines v. United States*,
    371 U.S. 156 (1962) ........................................................................................17

*Cabell v. Chavez-Salido*,
    454 U.S. 432 (1982) ..........................................................................................1

*California v. Trump*,
    2025 WL 1667949 (D. Mass.) ..........................................................................4

*Cellular Telecomm. & Internet Ass'n v. FCC*,
    330 F.3d 502 (D.C. Cir. 2003) ................................................................13, 15

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ..........................................................................................7

*Changji Esquel Textile Co. v. Raimondo*,
    40 F.4th 716 (D.C. Cir. 2022) ..........................................................................9

*Collins v. Yellen*,
    594 U.S. 220 (2021) .................................................................................2, 14, 19

*Crawford v. Marion Cnty. Election Bd.*,
    553 U.S. 181 (2008) .................................................................................passim

*Cyrus v. Univ. of Toledo*,
  2022 WL 985819 (6th Cir.) ...................................................................................23

*English v. Trump*,
  279 F. Supp. 3d 307 (D.D.C. 2018) ...............................................................20, 21

*Eu v. S.F. Cnty. Democratic Central Comm.*,
  489 U.S. 214 (1989) ..............................................................................................28

*Fam. Tr. of Mass., Inc. v. United States*,
  892 F. Supp. 2d 149 (D.D.C. 2012) .......................................................................7

*Fed. Express Corp. v. U.S. Dep't of Com.*,
  39 F.4th 756 (D.C. Cir. 2022) ..........................................................1, 8, 11, 22

*Fish v. Kobach*,
  840 F.3d 710 (10th Cir. 2016) ............................................................................13

*Foley v. Connelie*,
  435 U.S. 291 (1978) ................................................................................................1

*Frank v. Walker*,
  768 F.3d 744 (7th Cir. 2014) ..............................................................................27

*Free Enter. Fund v. PCAOB*,
  561 U.S. 477 (2010) ..............................................................................................20

*Gonzalez v. Arizona*,
  485 F.3d 1041 (9th Cir. 2007) ..........................................................2, 8, 9, 12

*Gray v. Sanders*,
  372 U.S. 368 (1963) ..............................................................................................21

*Griffith v. FLRA*,
  842 F.2d 487 (D.C. Cir. 1988) ..............................................................................8

*Hall v. D.C. Bd. of Elections*,
  141 F.4th 200 (D.C. Cir. 2025) .............................................................................1

*Jama v. ICE*,
  543 U.S. 335 (2005) ................................................................................................9

*Jinks v. Richland Cnty.*,
  538 U.S. 456 (2003) ..............................................................................................13

*Kennedy v. Comm'r*,
  __ F.4th __, 2025 WL 1872819 (D.C. Cir.) ......................................................11

*Kobach v. EAC*,
  772 F.3d 1183 (10th Cir. 2014) ..............................................................14, 15, 16

*League of Women Voters of U.S. v. Newby*,
  838 F.3d 1 (D.C. Cir. 2016) ...........................................................................15, 16

*LULAC v. Exec. Off. of the President*,
  2025 WL 1187730 (D.D.C.) ....................................................................................4

*Maydak v. United States*,
630 F.3d 166 (D.C. Cir. 2010)........................................................................................7

*McCulloch v. Maryland*,
4 Wheat. 316 (1819)........................................................................................13

*McMahon v. New York*,
No. 24A1203, 2025 WL 1922626 (S. Ct. July 14, 2025)........................................20

*Mi Familia Vota v. Fontes*,
719 F. Supp. 3d 929 (D. Ariz. 2024)........................................................passim

*Munro v. Socialist Workers Party*,
479 U.S. 189 (1986)........................................................................................30

*Myers v. United States*,
272 U.S. 52 (1926)........................................................................................2, 21

*Nat'l Air Traffic Controllers Ass'n v. Fed. Serv. Impasses Panel*,
437 F.3d 1256 (D.C. Cir. 2006)........................................................................8, 10

*NRDC v. Thomas*,
838 F.2d 1224 (D.C. Cir. 1988)........................................................................14

*Nyunt v. Chairman, Broad. Bd. of Governors*,
589 F.3d 445 (D.C. Cir. 2009)........................................................................2

*Pierce v. Jacobsen*,
44 F.4th 853 (9th Cir. 2022)........................................................................28

*Purcell v. Gonzalez*,
549 U.S. 1 (2006)........................................................................................31, 32

*Rossignol v. Voorhaar*,
316 F.3d 516 (4th Cir. 2003)........................................................................7

*Seila L. LLC v. CFPB*,
591 U.S. 197 (2020)........................................................................................19

*Trump v. Am. Fed'n of Gov't Emps.*,
No. 24A1174, 2025 WL 1873449 (S. Ct. July 8, 2025)........................................20

*Trump v. Boyle*,
2025 WL 2056889 (2025)........................................................................19, 20

*Trump v. United States*,
603 U.S. 593 (2024)........................................................................................2, 18

*Trump v. Wilcox*,
145 S. Ct. 1415 (2025)........................................................................................19, 20

*U.S. Inst. of Peace v. Jackson*,
No. 25-5185, 2025 WL 1840572 (D.C. Cir. June 27, 2025)........................................20

*United Dominion Indus. v. United States*,
532 U.S. 822 (2001)........................................................................................10

*United States v. Florida,*
  870 F. Supp. 2d 1346 (N.D. Fla. 2012) ................................................12

*United States v. Hendrickson,*
  949 F.3d 95 (3d Cir. 2020) ................................................................10

*Williams v. Taylor,*
  529 U.S. 362 (2000) .........................................................................13

*Youngstown Sheet & Tube Co. v. Sawyer,*
  343 U.S. 579 (1952) .........................................................................22

**Statutes**

18 U.S.C. §1015 ................................................................................1, 18

18 U.S.C. §611 ..................................................................................1, 18

52 U.S.C. §20501 ............................................................................12, 15

52 U.S.C. §20504 ............................................................................12, 13

52 U.S.C. §20508 ............................................................................passim

Fed. R. Civ. Pro. 56(a) ........................................................................2, 7

**Other Authorities**

Antonin Scalia & Bryan A. Garner, *Reading Law* (2012) ........................11

Arthur S. Miller, *The President and Faithful Execution of the Laws,*
  40 Vand. L. Rev. 389 (1987) ..............................................................21

Comm'n on Federal Election Reform, Building Confidence in U.S. Elections
  (Sept. 2005) ........................................................................16, 29, 31

Elena Kagan, *Presidential Administration,*
  114 Harv. L. Rev. 2245 (2001) .....................................................19, 22

Exec. Order 35, *Comprehensive Election Security Protecting Legal Voters and Accurate
  Counting,* Off. of the Va. Gov. (Aug. 7, 2024), perma.cc/6KSZ-EHS4 ....29

Exec. Order No. 14248,
  2025 WL 929182 (Mar. 25, 2025).................................................passim

*Governor Abbott Announces Over 1 Million Ineligible Voters Removed from Voter Rolls,*
  Off. of the Tex. Gov. (Aug. 26, 2024), perma.cc/HZ5S-5EGB ................29

H.R. Rep. No. 103-9 ...........................................................................11

*Harris, Trump Voters Differ Over Election Security, Vote Counts and Hacking Concerns,*
  Pew Rsch. Ctr. (Oct. 24, 2024), perma.cc/4J2D-7HPV .........................32

Lisa M. Manheim, *Presidential Control of Elections,*
  74 Vanderbilt L. Rev. 385 (2021) .......................................................21

Megan Brenan, *Americans Endorse Both Early Voting and Voter Verification,*
  Gallup (Oct. 24, 2024), perma.cc/6HRG-7LB6 ....................................32

*Michigan Department of State Review Confirms Instances of Noncitizen Voting are Extremely Rare*, Mich. Dep't of State (Apr. 3, 2025), perma.cc/W3DF-5VHY ........................................29

*National Mail Voter Registration Form*, U.S. Election Assistance Comm'n (Sept. 18, 2024), perma.cc/29VK-RNKP ..............................................................................3, 9

*REAL ID*, Transp. Security Admin., perma.cc/5RN8-HBMS ........................................31

S. Rep. No. 103-6 ..........................................................................................................11

*Scripps News/Ipsos Poll*, Ipsos (Sept. 18, 2024), perma.cc/V689-LXAN ...................31

*Secretary of State Wes Allen Implements Process to Remove Noncitizens Registered to Vote in Alabama*, Off. of Ala. Sec'y of State, perma.cc/8KUS-PSVE (2023) ....................................29

*Secretary Whitley Issues Advisory on Voter Registration List Maintenance Activity*, Tex. Sec'y of State (Jan. 25, 2019), perma.cc/26Z4-B3EM ....................................................29

## INTRODUCTION

Only U.S. citizens can participate in national elections. *See* 18 U.S.C. §§611, 1015. The federal government "may deny" non-citizens "the right to vote" because "a democratic society is ruled by its people" and it is the "right" of "the people to be governed by their citizen peers." *Foley v. Connelie*, 435 U.S. 291, 296 (1978). The "exclusion" of non-citizens "from basic governmental processes is not a deficiency in the democratic system but a necessary consequence of the community's process of political self-definition. Self-government, whether direct or through representatives, begins by defining the scope of the community of the governed and thus of the governors as well." *Cabell v. Chavez-Salido*, 454 U.S. 432, 439 (1982). When noncitizens register and vote, it "reduce[s] the voting power of each U.S. citizen voter." *Hall v. D.C. Bd. of Elections*, 141 F.4th 200, 206 (D.C. Cir. 2025).

To ensure that "the Federal prohibition on foreign nationals voting in Federal elections" is faithfully executed, President Trump issued an Executive Order directing the Election Assistance Commission to require "proof of United States citizenship" for the federal mail voter registration form. Exec. Order No. 14248, 2025 WL 929182, at *14005. Less than a week after President Trump signed this Order, the Democratic National Committee and other Democratic Party members sued, alleging that requiring proof of citizenship would harm Democrats' chances to win federal elections. DNC Compl. (Doc. 1, No. 1:25-cv-952). Soon after, other allied organizations filed similar suits. LWV Compl. (Doc. 1, No. 1:25-cv-955); LULAC Compl. (Doc. 1).[1]

Plaintiffs' "*ultra vires* challenge" is "essentially a Hail Mary pass." *Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 765 (D.C. Cir. 2022) (cleaned up). In "court as in football, the attempt rarely succeeds." *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C.

---

[1] Unless otherwise noted, docket entries refer to the lead case: *LULAC v. EOP*, No. 1:25-cv-946.

Cir. 2009). It fails here because, "[o]f course, the President's duty to 'take Care that the Laws be faithfully executed' plainly encompasses enforcement of federal election laws passed by Congress." *Trump v. United States*, 603 U.S. 593, 626-27 (2024) (quoting U.S. Const. Art. II, §3). The President is well within his Article II authority to direct the Commission to revise the federal form for voter registration to require proof of citizenship. "[T]he President's power necessarily encompasses 'general administrative control of those executing the laws,' throughout the Executive Branch of government, of which he is the head." *Bldg. & Constr. Trades Dep't v. Allbaugh*, 295 F.3d 28, 32 (D.C. Cir. 2002) (quoting *Myers v. United States*, 272 U.S. 52, 164 (1926)). Since the Commission is an agency that "exercises executive power," it is subject to the President's control. *Collins v. Yellen*, 594 U.S. 220, 254 (2021).

Directing the Commission to develop a proof-of-citizenship requirement for the federal voter-registration form doesn't contradict any federal law. Rather, the directive takes care that the law is executed by "ensur[ing] that any non-citizens that register to vote, intentionally or mistakenly, do not make it onto or remain on the voter rolls." *Mi Familia Vota v. Fontes*, 719 F. Supp. 3d 929, 1011 (D. Ariz. 2024), *aff'd in part, vacated in part, and remanded*, 129 F.4th 691 (9th Cir. 2025). Federal law "clearly conditions eligibility to vote on United States citizenship." *Gonzalez v. Arizona*, 485 F.3d 1041, 1050-51 (9th Cir. 2007). And Congress, through the National Voter Registration Act, has granted to the Executive Branch the authority to require such "identifying information" as is "necessary to enable State election official[s] to assess the eligibility" of voter registration applicants. 52 U.S.C. §20508(b)(1). Federal law "plainly allow[s]" for requiring voter registration applicants "to present evidence of citizenship." *Gonzalez*, 485 F.3d at 1051. Summary judgment is therefore proper in favor of Defendants on all of Plaintiffs' claims concerning the proof-of-citizenship provision of President Trump's Executive Order. Fed. R. Civ. Pro. 56(a).

## FACTUAL BACKGROUND

On March 25, 2025, President Trump issued Executive Order No. 14248, titled "Preserving and Protecting the Integrity of American Elections." 2025 WL 929182, at *14005. The order directs various federal agencies to implement specific measures to bolster the integrity of federal elections. Among those directives, President Trump ordered the Election Assistance Commission to "take appropriate action to require, in its national mail voter registration form" issued under the National Voter Registration Act, "proof of United States citizenship." *Id.*

The Election Assistance Commission bears significant responsibility to ensure election integrity. In the National Voter Registration Act, Congress tasked the Commission with developing a national mail voter-registration form that requires "such identifying information" and "other information" as is "necessary to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process." 52 U.S.C. §20508(b)(1). For decades, the only citizenship information sought in the federal voter-registration form was an "attestation, subscribed to under penalty of perjury, that an … applicant meets the State's voting requirements (including the citizenship requirement)." *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 6-7 (2013). But the form "does not require concrete evidence of citizenship." *Id.* at 7; *see National Mail Voter Registration Form*, U.S. Election Assistance Comm'n (Sept. 18, 2024), perma.cc/29VK-RNKP. And because the NVRA "precludes [States] from requiring a Federal Form applicant to submit information beyond that required by the form itself," *Inter Tribal Council*, 570 U.S. at 20, as a practical matter, applicants can register to vote in federal elections without documentary proof of their U.S. citizenship.

The Executive Order closes this loophole. President Trump ordered that when the Commission takes "appropriate action" to revise the federal voter-registration form, it "shall include" certain documents as acceptable "documentary proof of United States citizenship." Exec. Order

No. 14248, 2025 WL 929182, at *14006. Those documents "include" a U.S. passport, a REAL ID–compliant identification that "indicates the applicant is a citizen of the United States," an official military ID card "that indicates the applicant is a citizen of the United States," and a valid government-issued photo ID that "indicates that the applicant is a United States citizen," or "is otherwise accompanied by proof of United States citizenship." *Id.* President Trump issued the citizenship directive "[t]o enforce the Federal prohibition on foreign nationals voting in Federal elections." *Id*.

Within a week, Plaintiffs sued, demanding that the court enjoin enforcement of the Executive Order. DNC Compl. (Doc. 1, No. 1:25-cv-952); LWV Compl. (Doc. 1, No. 1:25-cv-955); LULAC Compl. (Doc. 1). When Plaintiffs filed their complaints, the time period that the Commission had to take "appropriate action" to revise the national mail voter registration form to require proof of citizenship had not run. Exec. Order No. 14248, 2025 WL 929182, at *14006. President Trump specifically gave the Commission "30 days" to take such "appropriate action." *Id.* Nevertheless, in April, Plaintiffs moved for a preliminary injunction prohibiting the Commission from acting on the citizenship directive and other provisions in the Executive Order. *See* LWV & LULAC PI Mot. (Doc. 34); DNC PI Mot. (Doc. 53). The Court preliminarily enjoined Section 2(a)'s citizenship provision, reasoning that the President lacks authority under federal statutes or the Constitution to direct the Commission "to require documentary proof of citizenship on the Federal Form." *LULAC v. Exec. Off. of the President*, 2025 WL 1187730, at *41 (D.D.C.). A few months later, another district court issued a similar injunction, concluding that Section 2(a) exceeds the President's authority. *See California v. Trump*, 2025 WL 1667949, at *7 (D. Mass.).

In June, the RNC moved to intervene in these cases. The RNC claimed "an interest in defending key provisions of the EO because they affect the RNC's political programs." RNC

Interv. Mot. (Doc. 125) at 1. The League and LULAC Plaintiffs opposed the RNC's participation, (Doc. 130), but the Court granted the motion in part, "allowing the RNC to intervene as a Defendant against all Plaintiffs' claims regarding Sections 2(a), 2(b), 2(d), 3(a), and 7(a)" of the Executive Order. Order Granting Interv. (Doc. 135) at 2. The Court held that "[t]he RNC has standing both in its own right ('organizational' standing) and standing to represent the interests of its members ('associational' standing) to defend those provisions of the Executive Order that directly benefit the electoral prospects of Republican candidates for federal office." *Id.* at 6. The Court held that the RNC didn't have standing to defend Section 7(b) of the Executive Order, "which directs the U.S. Election Assistance Commission to 'condition any available funding to a State' on the adoption of a rule requiring that all mail-in ballots be received by Election Day." *Id.* at 7-8. Because the RNC satisfied the remaining intervention elements, the Court granted the motion concerning Plaintiffs' "claims for relief from the implementation of Sections 2(a), 2(b), 2(d), 3(a), and 7(a)." *Id.* at 5-6.

The RNC has continuing interests in this case. The RNC represents over 30 million registered Republicans, including candidates and voters, hailing from all 50 states, the District of Columbia, and U.S. territories. Ex. A, Suppl. Decl. of Michael Ambrosini, ¶2. In November 2026, the RNC's candidates will appear on the ballot in every State for election to the U.S. House of Representatives, and in each State holding an election for the U.S. Senate. *Id.* ¶5. Republican candidates will compete for votes against Democratic candidates and others in the upcoming election, especially in competitive election contests. *Id.* ¶20. The RNC devotes substantial time and resources to election-day and post-election activities such as poll watching, observing absentee ballots, and canvassing processes. *Id.* ¶15. Participating in these activities is essential to Republicans' electoral success and the RNC's mission.

When non-citizens are registered to vote and listed on State voter rolls, it harms the RNC's ability to provide services to candidates and voters, and to accomplish its core activities of electing Republican candidates and turning out Republican voters in local, state, and federal elections. *Id.* at ¶¶24-26. For example, when non-citizens are illegally registered to vote, it artificially inflates the number of registrants on the voter rolls, which hinders the RNC's efforts to provide effective registration services for candidates, voters, and state parties. *Id.* at ¶25. And because Democrats benefit from lax citizenship rules, *see* DNC Statement of Facts (Doc. 146-2) at ¶31, failing to confirm voters' citizenship harms Republicans' electoral chances, Ex. A, Suppl. Decl. of Michael Ambrosini, ¶¶26-28. Preventing the Commission from implementing proof-of-citizenship on the federal voter-registration form would thus harm the RNC's mission to turn out Republican voters and elect Republican candidates.

Plaintiffs move for partial summary judgment on some of their claims against Section 2(a) of the Executive Order. Plaintiffs "agree" that their "challenges to Section 2(a)" of President Trump's Executive Order "can be resolved without discovery on cross-motions for summary judgment." Scheduling Order (Doc. 141) at 2. The DNC Plaintiffs move for partial summary judgment only on Counts I and II of their complaint, which allege "that E.O. § 2(a) is legally void as *ultra vires* and an unconstitutional violation of the separation of powers." DNC Mot. (Doc. 146) at 2. They did not include their other claims against Section 2(a) arising under the Administrative Procedure Act. *See* DNC Compl. 55-72 (Doc. 1, No. 1:25-cv-952) (Counts 6, 10, and 11). The League and LULAC Plaintiffs likewise move for partial summary judgment on their claims against Section 2(a)'s citizenship provision. LWV & LULAC Mot. (Doc. 145) at 1. For the League Plaintiffs, that includes both counts in their Complaint. *See* LWV Compl. 31-33 (Doc. 1, No. 1:25-cv-955). For the LULAC Plaintiffs, that includes Counts 1 and 5 of their Complaint. *See* LULAC Compl. 41-

42, 46-47. The LULAC Plaintiffs have not moved for summary judgment on their claim against Section 2(a) arising under the Administrative Procedure Act. *Id*. at 46-47 (Count 5).

In accordance with the Court's Scheduling Order, the RNC cross-moves for summary judgment on Plaintiffs' Section 2(a) claims.

## LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Pro. 56(a). "When faced with cross-motions for summary judgment," the Court "must review each motion separately on its own merits 'to determine whether either of the parties deserves judgment as a matter of law.'" *Fam. Tr. of Mass., Inc. v. United States*, 892 F. Supp. 2d 149, 154 (D.D.C. 2012) (quoting *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003)). Because the genuine dispute here is legal, not factual, the Court can resolve this case on summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Defendants are "entitled to a judgment as a matter of law" if the Court finds that Plaintiffs have "failed to make a sufficient showing on an essential element" of their case "with respect to which [they have] the burden of proof." *Maydak v. United States*, 630 F.3d 166, 181 (D.C. Cir. 2010) (cleaned up). For example, because Plaintiffs bring multiple claims under the Administrative Procedure Act, "the burden" is on them "to establish" that they "meet[]" the "statutory requirements" of that Act. *Fam. Tr. of Mass.*, 892 F. Supp. 2d at 154 (cleaned up).

## ARGUMENT

### I.    Plaintiffs' *ultra vires* claims fail on the merits.

Plaintiffs' *ultra vires* claims fail on the merits because Section 2(a) does not direct the Election Assistance Commission to disregard any specific and unambiguous statutory directive

established by Congress. Rather, Section 2(a) is a valid exercise of the President's executive pow-ers that does not intrude upon congressional authority.

## A.    Section 2(a) does not contravene the NVRA.

To establish their *ultra vires* claims, Plaintiffs must meet an "exacting standard," because "[o]nly error that is patently a misconstruction of the Act, that disregards a specific and unambig-uous statutory directive, or that violates some specific command of a statute will support relief." *Fed. Express Corp.*, 39 F.4th at 764 (cleaned up). "Garden-variety errors of law" are "not enough." *Griffith v. FLRA*, 842 F.2d 487, 493 (D.C. Cir. 1988). Plaintiffs "must demonstrate" that the Pres-ident has ordered the Commission to "plainly and openly cross[] a congressionally drawn line in the sand." *Fed. Express Corp.*, 39 F.4th at 765. The D.C. Circuit rejects "a diluted *ultra vires* standard." *Id.* at 766.

Plaintiffs cite no federal law that prohibits the Commission from establishing a proof-of-citizenship requirement for the federal mail-in voter-registration form. Nothing in the NVRA or anywhere else in the U.S. Code prohibits the Commission from finding it necessary that registrants provide proof of citizenship. "The language of the [NVRA] does not prohibit documentation re-quirements." *Gonzalez*, 485 F.3d at 1050-51. *Ultra vires* review applies only when a "specific statutory mandate" has been violated. *Nat'l Air Traffic Controllers Ass'n v. Fed. Serv. Impasses Panel*, 437 F.3d 1256, 1264 (D.C. Cir. 2006). If Congress had wanted to prohibit proof of citizen-ship, it could have said so. But it didn't. Courts "do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply." *Jama v. ICE*, 543 U.S. 335, 341 (2005). Because Section 2(a) does not direct the Commission to act "contrary" to a spe-cific statutory prohibition that is "clear and mandatory," Plaintiffs' *ultra vires* claims fail. *See Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 722 (D.C. Cir. 2022) (cleaned up).

### 1. The NVRA does not restrict citizenship information to the voter's signature.

The NVRA establishes citizenship as a voter eligibility requirement, 52 U.S.C. §20508(b)(2), and permits the federal form to require a "signature" and other "identifying information … to assess the eligibility of the applicant." *Id.* §20508(b)(1). For decades, the federal voter-registration form required nothing more than an applicant's self-attestation that they're a citizen. *National Mail Voter Registration Form*, U.S. Election Assistance Comm'n (Sept. 18, 2024), perma.cc/29VK-RNKP. Following the President's Executive Order, citizenship will also be assessed by reference to documentation of citizenship.

Plaintiffs resist the addition of citizenship documentation by misreading the NVRA's notarization prohibition as a broad prohibition against any documentation. *See* DNC Br. (Doc. 146-1) at 15-16. Courts have rejected that faulty reading. That the NVRA "prohibits states from requiring that the form be notarized or otherwise formally authenticated" can't be read as "a proscription against states requiring documentary proof of citizenship." *Gonzalez*, 485 F.3d at 1050. That's because the prohibition against "notarization or other formal authentication" refers to attempts to verify "the signature of the applicant." 52 U.S.C. §20508(b)(1), (3). The role of a "notary public" is to "attest to the authenticity of signatures." *Notary Public*, Black's Law Dictionary (12th ed. 2024). In this context, "authentication" means "the assent to or adoption of a writing as one's own." *Authentication*, *id.* So the notarization clause isn't a broad prohibition against other forms of "[i]dentifying information." 52 U.S.C. §20508(b)(1). Moreover, "[t]he word 'other' usually indicates that the term that follows it is 'of the same kind as the item or person already mentioned.'" *United States v. Hendrickson*, 949 F.3d 95, 99 n.5 (3d Cir. 2020) (quoting *Cambridge English Dictionary* (2019)). Congress's use of the word "other" removes any doubt that the forms of "formal authentication" it referenced are those *similar to* "notarization." 52 U.S.C. §20508(b)(3). The

provision thus does not implicitly bar documentary proof of citizenship, let alone confer a "specific statutory mandate" against it. *Nat'l Air Traffic Controllers Ass'n*, 437 F.3d at 1263.

Indeed, the notary clause implies that the Commission may require proof of citizenship from applicants who use the federal registration form. The NVRA prohibits the Commission only from requiring "notarization or other formal authentication." 52 U.S.C. §20508(b)(3). "[T]he mention of some implies the exclusion of others not mentioned." *United Dominion Indus. v. United States*, 532 U.S. 822, 836 (2001). Here, Congress prohibited notarization or other signature-authentication requirements, but it didn't prohibit actual documentation of an applicant's qualifications, such as proof of citizenship. To the contrary, Congress expressly permits the Commission to require such "identifying information" or "other information" that "is necessary to enable the appropriate State election official to assess the eligibility of the applicant." 52 U.S.C. §20508(b)(1). So it's "fair to suppose" that "Congress considered" prohibiting evidence of eligibility but "meant to say no" to taking that action. *Cf. Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003).

Plaintiffs also argue that the NVRA limits the list of acceptable "information" that is "necessary to establish 'citizenship'" to "the signature of the applicant, under penalty of perjury," attesting "that the applicant meets each such requirement." DNC Compl. 60 (Doc. 1, No. 1:25-cv-952) (quoting 52 U.S.C. 20508(b)(2)). But the NVRA section Plaintiffs rely on refers to "identifying information (including the signature of the applicant) and other information." 52 U.S.C. 20508(b)(1). By its own terms, the "identifying information" Congress allowed "includ[es] the signature of the application"—it's not *limited to* the applicants' signature. *Cf. id.* Even if it were, the Commission is free to require "other information" that doesn't fit in the category of "identifying information." *Id.* Congress's use of "the signature of the applicant" as an example (set off in

10

parentheses, no less) can't be construed as an "exhaustive list" of the information the Commission can require. *See* Antonin Scalia & Bryan A. Garner, *Reading Law* 132 (2012) (Presumption of Nonexclusive "Include"). The Commission remains free to require applicants to submit "identifying information" and "other information" to register to vote, like proof of citizenship. 52 U.S.C. 20508(b)(1).

In place of the text, Plaintiffs rely on a House conference report rejecting an amendment to the NVRA to suggest that Congress intended to prohibit requiring proof-of-citizenship. DNC PI Mem. 47 (Doc. 53-1) (citing H.R. Conf. Rep. 103-66). But "legislative history is not the law and, insofar as it is ever a proper source for divining congressional intent, it is only to resolve an ambiguity, not to create one by muddying clear statutory language.'" *Kennedy v. Comm'r*, __ F.4th __, 2025 WL 1872819, at *9 (D.C. Cir.) (cleaned up). No Plaintiff argues that the NVRA is ambiguous, so the Court can ignore their resort to legislative history. Even if they did argue ambiguity, the argument would undercut their *ultra vires* claims, which depends on an "unambiguous statutory directive." *Fed. Express Corp.*, 39 F.4th at 764 (cleaned up). Regardless, the conference report shows at most that Congress was "particularly interested in ensuring that election officials continue to make determinations as to applicant's eligibility, such as citizenship, as are made under current law and practice." H.R. Rep. No. 103-9, at 8; *accord* S. Rep. No. 103-6, at 25. That is, Congress did not intend to displace pre-existing citizenship checks.

For these reasons, the NVRA "plainly allow[s]" the government "at least to some extent, to require their citizens to present evidence of citizenship when registering to vote." *Gonzalez*, 485 F.3d at 1050-51. After all, the NVRA begins with the legislative finding that "the right of *citizens of the United States* to vote is a fundamental right." 52 U.S.C. §20501(a)(1) (emphasis added). The NVRA's express purposes include "protect[ing] the integrity of the electoral process" and

"ensur[ing] that accurate and current voter registration rolls are maintained." *Id.* §20501(b)(3)-(4). Requiring proof of citizenship advances both goals. The NVRA imposes a "duty" on States "to maintain an accurate voting list," and that means the government "can and should do that on the front end" by "blocking a noncitizen from registering in the first place." *United States v. Florida*, 870 F. Supp. 2d 1346, 1350 (N.D. Fla. 2012). Requiring proof of citizenship helps block noncitizens from registering to vote in the first place. Nothing in the NVRA prohibits that common-sense practice.

### 2.  Proof of citizenship is "necessary" identifying information.

The federal voter-registration form can require information that "is necessary to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process." 52 U.S.C. §20508(b)(1). Plaintiffs argue that the form can require only the "minimum" amount of information "necessary to establish 'citizenship.'" DNC Compl. 60. But that section of the NVRA doesn't contain the word "minimum." The Plaintiffs pull that word from Section 5 and graft it into Section 9, where Congress never intended the "minimum" restriction to apply. *Compare* 52 U.S.C. §20504(c)(2)(B), *with* 52 U.S.C. §20508(b)(1).

That is, Plaintiffs err by reading the word "necessary" to mean "minimum." They believe the Executive Order "goes beyond the limits" of "necessary" identifying information. DNC Compl. 56. But in context, the word "necessary" doesn't mean "minimum." *Contra id.* The NVRA's other provisions prove as much. In Section 5, for example, Congress required States to "include a voter registration application form for elections for Federal office as part of an application for a State motor vehicle driver's license." 52 U.S.C. §20504(c)(1). Those specific state applications "may require only the *minimum amount* of information necessary" to "enable State election officials to assess the eligibility of the applicant." *Id.* §20504(c)(2)(B) (emphasis added). But

12

Section 9, which governs the contents of the federal form, contains no "minimum" limitation. 52 U.S.C. §20508(b)(1). Courts "must 'give effect, if possible, to every clause and word of a statute.'" *Williams v. Taylor*, 529 U.S. 362, 404 (2000) (cleaned up). The Tenth Circuit has thus held that "section 5's 'only the minimum amount of information necessary' is a stricter principle than section 9's 'such identifying information ... as is necessary.'" *Fish v. Kobach*, 840 F.3d 710, 734 (10th Cir. 2016) (alteration in original). "By adding 'minimum'" in Section 5 and omitting that word from Section 9, "Congress intended to restrain the discretion of states more strictly than it restrains the EAC's discretion in composing the Federal Form." *Id.*

Even if the NVRA didn't distinguish between "minimum" and "necessary" information, Plaintiffs' wooden definition of "necessary" isn't a reasonable interpretation. In the "legal" context, "necessary" means "'appropriate and well adapted to fulfilling an objective.'" *Cellular Telecomm. & Internet Ass'n v. FCC*, 330 F.3d 502, 509-10 (D.C. Cir. 2003) (quoting Black's Law Dictionary 1052 (7th ed. 1999)). "[T]he Supreme Court 'long ago rejected the view'" that "necessary" means "'absolutely necessary.'" *Id.* (quoting *McCulloch v. Maryland*, 4 Wheat. 316, 414-15 (1819)). Rather, it means "'conducive to'" or "'plainly adapted' to [its] end." *Id.* (quoting *Jinks v. Richland Cnty.*, 538 U.S. 456, 462 (2003)). Particularly when the case concerns a government regulation, the "*absolutely required* or *indispensable*" definition of "necessary" should be rejected because "it is difficult to imagine a regulation whose enforcement is *absolutely required* or *indispensable.*" *Id.* at 511. Rather, "the word 'necessary'" means "something that is done, regardless of whether it is indispensable, to achieve a particular end." *Id.* at 510. Courts have thus "frequently interpreted the word 'necessary' to mean less than absolutely essential, and have explicitly found that a measure may be 'necessary' even though acceptable alternatives have not been exhausted." *NRDC v. Thomas*, 838 F.2d 1224, 1236 (D.C. Cir. 1988).

Plaintiffs prefer dictionary definitions for "the strictest sense of the term." *Ayestas v. Davis*, 584 U.S. 28, 44 (2018). But "in the law," just as "in ordinary speech, the term [necessary] is often used more loosely to refer to something that is merely important or strongly desired." *Id.* Plaintiffs provide no reason why their preferred definition of "essential" is correct. DNC Br. 32-33. They just assert that it is. *Id.*

Plaintiffs' arguments on the caselaw fare no better. They cite a Tenth Circuit decision to argue that proof of citizenship "has never been 'necessary' to assess eligibility." DNC Br. 16 (citing *Kobach v. EAC*, 772 F.3d 1183, 1189 (10th Cir. 2014)). But *Kobach* didn't address whether proof of citizenship was unnecessary. Rather, it addressed whether the Commission's *refusal* to adopt documentary proof of citizenship was "arbitrary and capricious." *Kobach*, 772 F.3d at 1196-98. Arizona demanded that the Commission implement proof-of-citizenship requirements in the federal form, and sued when the Commission refused. *Id.* The court held that "the EAC is not compulsorily mandated to approve state-requested changes to the Federal Form." *Id.* at 1194. But the request here comes from the President, who—unlike Arizona—does exercise authority over the Commission. *Collins*, 594 U.S. at 254.

Plaintiffs also wrongly assert that proof of citizenship has "never" been deemed "necessary" by a federal court to verify voter eligibility. DNC Br. 33 (Doc. 146-1). The Supreme Court has noted that requiring proof of citizenship provides "information necessary to enforce" the "voter qualification[]" of U.S. citizenship. *Inter Tribal Council*, 570 U.S. at 18-19. The Court even used an Arizona proof-of-citizenship requirement as an example of the type of information that registration "forms may require" under the NVRA. *Id.* at 12. It referred to documentation of citizenship as "information" and advised that "Arizona may … request anew that the EAC include such a requirement among the Federal Form's state-specific instructions." *Id.* at 20. Ultimately, the

Supreme Court, the Tenth Circuit, and the D.C. Circuit have all confirmed that in the NVRA, Congress delegated the discretion to determine what is and is not "necessary" information for the federal voter-registration form to the Commission. *Id.* at 18-19 (noting that the Commission has "validly conferred discretionary executive authority" to determine what is "necessary"); *Kobach*, 772 F.3d at 1196 ("[t]he EAC does have discretion" to determine what "necessary" means); *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 10 (D.C. Cir. 2016) ("the Commission, not the states, determines necessity"). Plaintiffs don't even argue that requiring proof of citizenship is an arbitrary and capricious abuse of that discretion. *See infra* Section II. Since the President can direct the Commission to determine that proof of citizenship is "necessary" identifying infor- mation, and there are ample indications that the current self-attestation measure is inadequate to the task of confirming citizenship, *see infra* Section II.B, there's no NVRA violation, *see Allbaugh*, 295 F.3d at 32.

In sum, because "necessary" in Section 9 means "appropriate and well adapted to fulfilling an objective," *Cellular Telecomm. & Internet Ass'n*, 330 F.3d at 509-10, Section 2(a)'s proof-of- citizenship requirement complies with the NVRA. Among the NVRA's primary goals are "pro- tect[ing] the integrity of the electoral process" and "ensur[ing] that accurate and current voter reg- istration rolls are maintained." 52 U.S.C. §20501(b)(3)-(4). Proof of citizenship advances both those objectives. The specific proof-of-citizenship documents Section 2(a) mandates will enable state election officials to "carefully identify[] all voters participating in the election process." *Cf. Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 196 (2008) (photo-ID is appropriate to prevent "maladministration" of voter rolls). The REAL ID document that Section 2(a) lists as ac- ceptable proof was recommended as a "logical vehicle" for requiring "proof of citizenship" in the bipartisan Carter-Baker Report. *See* Ex. B, Comm'n on Federal Election Reform, Building

Confidence in U.S. Elections 19 (Sept. 2005) (Carter-Baker Report); *see also Crawford*, 553 U.S. at 194 & n.10. Plaintiffs don't even contest that the citizenship documents are well adapted to verifying an applicant's citizenship status.

### 3.  Section 2(a) does not conflict with the NVRA's consultation provision.

Plaintiffs argue that the President got the order of operations wrong under the NVRA. They claim that "the President" cannot add a "proof-of-citizenship requirement to the Federal Form without *first* finding that it was necessary to assess voter eligibility." LWV Compl. 32 (emphasis added). But this sequence of steps is nowhere mandated in the statute. The NVRA contemplates that the Commission will "prescribe" regulations and "develop" the federal voter-registration form "in consultation with the chief election officers of the States." 52 U.S.C. §20508(a)(1), (2). Nothing in the NVRA requires anyone to make a separate "necessary" determination before the Commission develops the federal form.

Plaintiffs suggest that the NVRA requires consultation about what is "necessary." *See* LU-LAC Br. 23-24. But the NVRA doesn't specify when the "consultation" takes place or what must be discussed. At most, "[o]nly after the Commission" has "determine[d]" what identifying information is of "necessity" is the Commission "under a nondiscretionary duty" to consult with States. *Newby*, 838 F.3d at 10 (cleaned up). Plaintiffs cite no precedent supporting their conclusion that the Commission must consult with States to determine what identifying information is necessary. "[T]he EAC is not compulsorily mandated to approve state-requested changes to the Federal Form." *Kobach*, 772 F.3d at 1194. And the D.C. Circuit has instructed that "the Commission, not the states, determines necessity." *Newby*, 838 F.3d at 10. The Supreme Court has thus "explained at some length that the NVRA could not be read to contemplate a scheme whereby a state could mandate" the contents of the "Federal Form." *Id.* at 11 (citing *Inter Tribal Council*, 570 U.S. 1, 12-13 & n.4). Plaintiffs acknowledge that the Commission is consulting with States. *See* DNC

16

Statement of Facts ¶45 (citing April 11, 2025 Commission Letter). So the Commission can determine what is "necessary" when it takes "appropriate action" to require proof of citizenship in the voter-registration form. Exec. Order No. 14248, 2025 WL 929182, at *14005-06.

These sequencing issues aside, the President *did* find that proof of citizenship is "necessary" to assess voter eligibility. The Executive Order begins by finding that "the United States now fails to enforce basic and *necessary* election protections employed by modern, developed nations" because it "largely relies on self-attestation for citizenship" while other countries are "tying voter identification to a biometric database." *Id*. at *14005 (emphasis added). The Order also finds that "States fail adequately to vet voters' citizenship, and, in recent years, the Department of Justice has failed to prioritize and devote sufficient resources for enforcement of these provisions. Even worse, the prior administration actively prevented States from removing aliens from their voter lists." *Id*.; *see also infra* Section II.B (confirming the President's findings). Based on these findings, the Executive Order concludes that the Commission must take "appropriate action" to require proof of citizenship. *Id*. at *14006. Since the President gave a "satisfactory explanation" for the action containing a "rational connection between the facts found and the choice made," the President properly made the "necessary" determination required by the NVRA. *Cf. Burlington Truck Lines v. United States,* 371 U.S. 156, 168 (1962).

### B.    Section 2(a) does not infringe on Congress's Elections Clause authority.

Plaintiffs argue that Section 2(a) runs afoul of the Elections Clause because they believe the President has "no role" in regulating federal elections. LULAC Br. 21 (Doc. 145-1) (cleaned up). But the President's "duty to 'take Care that the Laws be faithfully executed' plainly encompasses enforcement of federal election laws passed by Congress." *Trump*, 603 U.S. at 626-27. The President's "faithful execution of the laws" enacted by Congress "ordinarily allows and frequently requires the President to provide guidance and supervision to his subordinates." *Allbaugh*, 295

F.3d at 32. Federal law criminalizes non-citizens registering to vote and casting ballots in federal elections. 18 U.S.C. §§611, 1015. And the NVRA requires the Commission to develop a mail voter-registration form that obtains sufficient "identifying information" from applicants to "enable" State election officials to assess "the eligibility" of those applicants. 52 U.S.C. §20508(b). Section 2(a)'s proof-of-citizenship requirement helps "enforce the Federal prohibition on foreign nationals voting in Federal elections." Exec. Order No. 14248, 2025 WL 929182, at *14006. It helps prevent non-citizens from registering to vote and ensures state election officials have sufficient identifying information to enable an accurate assessment of whether an applicant is eligible to vote as a qualified citizen.

Supreme Court precedent forecloses Plaintiffs' inference that the President has no executive authority when it comes to implementing election laws. In *Buckley v. Valeo*, the Court rejected the argument that "because Congress has been given explicit and plenary authority" to regulate elections, it can override the President's executive authority under the Constitution. 424 U.S. 1, 132 (1976). While Congress does have "extraordinary authority" to "regulate elections," there's "no reason to believe that the authority of Congress over federal election practices is of such a wholly different nature from the other grants of authority to Congress that it may be employed in such a manner as to offend well-established constitutional restrictions stemming from the separation of powers." *Id*. Congress cannot reserve to itself the power to appoint members of the Federal Election Commission, for example, because that body exercises "executive" power. *Id*. at 136-37. "Congress has plenary authority in all areas in which it has substantive legislative jurisdiction," *id*. at 132, which defeats the Plaintiffs' unfounded inference that the Elections Clause strips the President of his Take Care duties when it comes to Executive Branch enforcement of election laws. *See Bowsher v. Synar*, 478 U.S. 714, 733-34 (1986) ("[O]nce Congress makes its choice in

enacting legislation, its participation ends. Congress can thereafter control the execution of its enactment only indirectly—by passing new legislation.").

Plaintiffs argue that Congress—in the NVRA and the Help America Vote Act (HAVA)—intended to preclude the President from exercising his executive authority in relation to the federal form. LULAC Br. 28. But they cite no statutory text prohibiting the President from directing the Commission when it formulates the federal form. "That Congress could bar the President from directing discretionary action does not mean that Congress has done so." Elena Kagan, *Presidential Administration*, 114 Harv. L. Rev. 2245, 2326-27 (2001). Plaintiffs argue that Congress implicitly did this when it styled the Commission as an "independent" agency. LULAC Br. 32. But "[t]hat interpretation reads far too much into the term 'independent.'" *Collins*, 594 U.S. at 248. And it should be rejected because it raises serious constitutional doubt. *Cf. Inter Tribal Council*, 570 U.S. at 18-19 (NVRA should be interpreted to "avoid serious constitutional doubt"). Congress cannot constitutionally restrict presidential control over an agency wielding executive authority merely by styling it as "independent." *Cf. Collins*, 594 U.S. at 249 (independent FHFA is still subject to "control" of the President); *Seila L. LLC v. CFPB*, 591 U.S. 197, 213-14 (2020) (independent CFPB "remain[s] accountable to the President"); *Trump v. Wilcox*, 145 S. Ct. 1415, 1415 (2025) (independent "NLRB and MSPB exercise considerable executive power"); *Trump v. Boyle*, 2025 WL 2056889, at *0 (2025) (independent "Consumer Product Safety Commission exercises executive power").

Under Article II, "the President must 'take care that the laws be faithfully executed,' across the entire Executive Branch—including 'independent' agencies." *English v. Trump*, 279 F. Supp. 3d 307, 327 (D.D.C. 2018) (citing *Free Enter. Fund v. PCAOB*, 561 U.S. 477, 496-97 (2010)). Both the Supreme Court and the D.C. Circuit have thus stayed numerous lower-court injunctions

that limited the President's ability to control independent and executive agencies. *See, e.g.*, *Wilcox*, 145 S. Ct. at 1415 ("Because the Constitution vests the executive power in the President, he may remove without cause executive officers who exercise that power on his behalf, subject to narrow exceptions recognized by our precedents…." (citation omitted)); *Trump v. Am. Fed'n of Gov't Emps.*, No. 24A1174, 2025 WL 1873449 (S. Ct. July 8, 2025) (mem.); *McMahon v. New York*, No. 24A1203, 2025 WL 1922626 (S. Ct. July 14, 2025); *U.S. Inst. of Peace v. Jackson*, No. 25-5185, 2025 WL 1840572 (D.C. Cir. June 27, 2025) (unpublished op.). "Although [the Court's] interim orders are not conclusive as to the merits, they inform how a court should exercise its equitable discretion in like cases." *Boyle*, 2025 WL 2056889 (citing *Wilcox*).

Reading the NVRA and HAVA to give the Commission "the privilege of insulation from direct presidential control" would impair "the President's ability to fulfill his obligations under the Take Care Clause." *Id*. at 327-28. This "imposition on the President's Take Care Clause responsibilities matters. The Constitution's separation of powers is not a mere abstract principle, but a practical measure that is critical to preserving liberty." *Id*. at 328. "We the people" do "not vote for the 'Officers of the United States.'" *Id*. We vote for the President, and the public "must be able to hold the President accountable for his Take Care Clause responsibilities across the entire Executive Branch." *Id*.

This is especially true regarding an agency like the Commission, which has been given duties by Congress "with direct implications for individual liberty," including the right to vote. *Id*. at 329. The President's Take Care Clause responsibilities oblige him to use the executive power to enforce the Constitution, not "only statutes." Arthur S. Miller, *The President and Faithful Execution of the Laws*, 40 Vand. L. Rev. 389, 402 (1987). And the Constitution's protection extends not only to the act of voting itself, but also to ensuring that votes "are protected from the diluting

effect of illegal ballots." *Gray v. Sanders*, 372 U.S. 368, 380 (1963); *accord Baker v. Carr*, 369 U.S. 186, 208 (1962). "[T]he right to vote is the right to participate in an electoral process that is necessarily structured to maintain the integrity of the democratic system." *Burdick v. Takushi*, 504 U.S. 428, 441 (1992). So the President has a constitutional duty to ensure that the integrity of the right to vote is protected, and the NVRA and HAVA should not be interpreted so as to conflict with that duty. *See Inter Tribal Council*, 570 U.S. at 18-19. Because Plaintiffs' interpretation of the NVRA and HAVA deprives the President of "general administrative control of those executing the laws" and thereby "make[s] it impossible for the President" to "take care that the laws be faithfully executed," *Myers*, 272 U.S. at 163-64, the Court should reject their interpretation.

Plaintiffs' own sources confirm that the President has "some degree" of "control over elections" because the "federal government executes its laws through the executive." Lisa M. Manheim, *Presidential Control of Elections*, 74 Vanderbilt L. Rev. 385, 435 (2021); *see* DNC Compl. 43 (quoting Manheim approvingly). When "Congress enacts statutes implicating election administration," the "executive branch then works to implement these mandates," and "[t]his arrangement ensures presidential control." Manheim, *supra*, at 387. Through the "lawful exercise of power over the interpretation and implementation of election rules," the President has a role to play in regulating federal elections. *Id*.

As a last-ditch effort to avoid the President's authority, Plaintiffs compare the Executive Order here to the one the Supreme Court declared unlawful in *Youngstown*. But here, the President "issued the directives" not against "a backdrop not of congressional silence, much less of congressional reservation, but of explicit congressional delegations to make regulations and otherwise exercise discretion. Congress ha[s] decided that there would be a decisionmaker other than itself." Kagan, *supra*, at 2321. In *Youngstown*, Congress had not delegated to the Secretary of Commerce

the authority to seize the property at issue. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952). But here, Congress *has delegated* authority to the Commission to prescribe the contents of the federal form. 52 U.S.C. §20508(b). The *Youngstown* comparison is further "misplaced because the present Executive Order is not selfexecuting." *Allbaugh*, 295 F.3d at 33. The question in *Youngstown* was "whether the President had constitutional authority to seize the mills and not, as here, whether he could direct Executive Branch officials in their implementation of statutory authority." *Id.* Such a "mundane dispute" about an agency's congressionally delegated discretion doesn't implicate *ultra vires* review, *id.*, which is reserved for "extreme" cases of "defiance" of the "specific command[s] of a statute," *Fed. Express Corp.*, 39 F.4th at 764 (cleaned up).

## II. Plaintiffs' statutory claims fail because Plaintiffs have not identified violations of federal law.

### A. Requiring proof-of-citizenship for the federal registration form doesn't violate the NVRA.

Plaintiffs argue that requiring proof of citizenship "goes beyond" what the NVRA allows, is "not 'necessary to assess the eligibility' of applicants," and that the federal form for voter registration can be changed "only 'in consultation' with the States." LWV Compl. 33; DNC Br. 30. As Section I explains, Plaintiffs misread the NVRA. Their APA and NVRA claims premised on alleged NVRA violations fail for those same reasons. *See* DNC Compl. 59-72 (Counts 6, 10, and 11); LWV Compl. 32-33 (Count 2); LULAC Compl. 46-47 (Count 5).

### B. Requiring proof of citizenship doesn't unduly burden U.S. citizens' right to vote.

Basic documentation requirements are a fact of life, and a necessary part of orderly governance—they're not an "undue" burden on the right of citizens to vote. The DNC argues that Section 2(a) "unlawfully burdens the right to vote by purporting to condition registration using the Federal Form on the provision of limited forms" of proof of citizenship. DNC Compl. 69. The

DNC claims that "[a]t least 21.3 million" people "lack access to documentation necessary to prove citizenship." *Id*. Those allegations are premature, since Plaintiffs have not proven that there is any finalized list of documents to prove citizenship yet. *See* Trans. of Meeting, Doc. 145-32 at 53-54 (statement of EAC General Counsel Camden Kelliher) ("[t]he preliminary injunction remains in effect"). Section 2(a) lists documents that the Commission "shall include" in the revised national voter registration form. The DNC infers that these are the only documents allowed. *See* DNC Statement of Facts (Doc. 146-2) at ¶6. But the phrase "'shall include'" is "'not exhaustive.'" *Ardelyx, Inc. v. Becerra*, 2024 WL 5186613, 5 n.1 (D.D.C.) (quoting *Cyrus v. Univ. of Toledo*, 2022 WL 985819, at *8 (6th Cir.)). Section 2(a) leaves it to the Commission's discretion to add additional documents to the list of acceptable forms of proof of citizenship. Without the final list of documents to prove citizenship, Plaintiffs can't plausibly allege that certain U.S. citizens lack access to such documentation. In any event, Plaintiffs fail to allege that U.S. citizens will be *unduly* burdened by Section 2(a)'s proof-of-citizenship requirement, or that Section 2(a) does not advance legitimate government interests.

### 1. The DNC fails to prove that requiring proof of citizenship poses anything more than a *de minimis* burden on eligible U.S. citizen voter registration applicants.

"Casting a vote, whether by following the directions for using a voting machine or completing a paper ballot, requires compliance with certain rules." *Brnovich v. DNC*, 594 U.S. 647, 669 (2021). Complying with those rules "necessarily requires some effort." *Id.* But "effort" is not the same as a "burden." The Constitution does not implement a minimal-effort requirement for American elections. Voting rules are constitutionally suspect only when they impose "excessively burdensome requirements" unjustified by the government's various interests in free and fair elections. *Crawford*, 553 U.S. at 202. Documentation requirements such as Section 2(a)'s proof-of-citizenship rule are evergreen facts of American life. At most, the DNC's evidence shows that

proof of citizenship "necessarily requires some effort." *Brnovich*, 594 U.S. at 669. They are a far cry from showing that the rule is "excessively burdensome" on the typical American voter. *Crawford*, 553 U.S. at 202.

In their constitutional right to vote claim (Count X), the DNC cites just one case that concerns a proof-of-citizenship law: *Mi Familia Vota v. Fontes*, 719 F. Supp. 3d 929 (D. Ariz. 2024), *affirmed in part, vacated in part, and remanded*, 129 F.4th 691 (9th Cir. 2025). *See* DNC Compl. 66 (Doc. 1, No. 1:25-cv-952). The case illustrates the DNC's deficient evidence here. In *Mi Familia Vota*, the court held that Arizona's proof of citizenship requirement *did not* pose an undue burden on the right to vote. 719 F. Supp. 3d at 1005-11. Just like the *Mi Familia Vota* plaintiffs, the DNC has "offered no witness testimony or other 'concrete evidence' to corroborate" their claim that Section 2(a)'s proof of citizenship requirement "will in fact impede any qualified voter from registering to vote or staying on the voter rolls." *Id*. at 1008. While the DNC alleges that millions of persons in the U.S. lack proof of citizenship, they have not proven that those persons are in fact U.S. citizens who are otherwise eligible to vote. "For those voters who possess [proof of citizenship] but want to avoid the 'inconvenience' of providing it," this "'does not qualify as a substantial burden on the right to vote.'" *Id*. (quoting *Crawford*, 553 U.S. at 198).

Moreover, "even assuming some" U.S. citizens who are eligible voters "do not possess [proof of citizenship], the evidence does not reliably illustrate the likelihood that voters will encounter obstacles to obtaining this information." *Id*. "Because plaintiffs have not yet been asked to provide proof of citizenship, let alone tried and failed to do so," their alleged burdens are "nothing more than conjecture." *Bell v. Leavitt*, 2006 WL 8460338, at *5 (N.D. Ill.). Without any "quantifiable evidence regarding how many qualified [voter] registrations without [proof of citizenship] might be rejected or cancelled" under Section 2(a)'s new proof-of-citizenship requirements, "it

would be mere conjecture" to conclude that the Section 2(a)'s requirements "would impose a burden" on the right to vote. *Mi Familia Vota*, 719 F. Supp. 3d at 1008. Section 2(a) does "not impose an excessive burden on any specific subgroup of voters raising equal protection concerns. Instead, based on the evidence presented, [Section 2(a)] impose[s] only a limited burden on all individuals qualified to vote." *Id*. at 1010.

Even if the DNC's own cases didn't defeat its claims, Supreme Court precedent forecloses finding that requiring proof of citizenship poses an undue burden on the right to vote. In *Crawford*, the Supreme Court held that Indiana's law requiring photo identification at the polling place didn't unduly burden the right to vote. 553 U.S. at 197-200. That was so even though obtaining a photo ID required the voter to present "a birth certificate, certificate of naturalization, U.S. veterans photo identification, U.S. military photo identification, or a U.S. passport." *Id.* at 198 n.17. The Court rejected the notion that a fee "between $3 and $12" for primary documents in 2008 was an unreasonable burden. *Id.* And while Indiana's law required voters to present photo ID for each subsequent election, Section 2(a) requires proof of citizenship just once, at the registration stage. Exec. Order No. 14248, 2025 WL 929182, at *14006. If requiring voters to obtain a birth certificate or passport did not unconstitutionally burden Indiana voters' right to vote in *Crawford*, it doesn't unduly burden the right here, either.

The DNC fails to produce evidence of a concrete burden on a significant number of eligible U.S. citizen voters. In *Crawford*, the Supreme Court found no evidence of a concrete burden even though "[t]ens of thousands of voting-age residents" in Indiana "lack[ed] the necessary photo identification." *Id.* at 220 (Souter, J., dissenting). The DNC presents even less evidence. It has not, for example, presented evidence of a U.S. citizen who has "expressed a personal inability to vote" because of the Executive Order. *Id.* at 201 (plurality op.). The sole individual Plaintiffs present is

a DSCC officer who changed her last name after being married and has not yet updated her passport. *See* Boss Decl. (Doc. 145-3) at ¶19. The declarant does not say when she changed her name, whether she would be unable to obtain "any of the other documents listed in President Trump's Order," *id.*, or even that it would be "difficult" for her to do so, *Crawford*, 553 U.S. at 201. She even admits that she "plan[s] to update [her] passport as soon as possible." Boss Decl. (Doc. 145-3) at ¶19. In any event, this "single affidavit gives no indication of how common the problem is." *Crawford*, 553 U.S. at 202. The DNC also just assumes that a "mismatch" between a maiden and married name is an insurmountable problem for election officials. DNC Br. 7. Many of those difficulties the Commission can resolve through rulemaking—a rule permitting marriage certificates to be presented alongside citizenship documents, for example. Any remaining difficulties from things like name changes are just "[b]urdens of that sort arising from life's vagaries," which "are neither so serious nor so frequent as to raise any question about the constitutionality" of the documentation requirement. *Crawford*, 553 U.S. at 197.

When it comes to statistics, the DNC presents only half the picture. They allege that "nearly 9 percent of American citizens of voting age" lack access to citizenship documents. DNC Compl. 65. Even if that's true, the DNC doesn't present evidence that the 9% who lack access to documents are registered voters who would otherwise not be registered if they were required to obtain those documents. That is, the Court can't just assume those 9% are qualified voters ready to engage in the democratic process. *See Frank v. Walker*, 768 F.3d 744, 749 (7th Cir. 2014) ("If people who already have copies of their birth certificates do not choose to get [identification], it is not possible to describe the need for a birth certificate as a legal obstacle that disfranchises them."). The same is true for the DNC's broad statistics about name changes or indigent citizens. *See* DNC Br. 6-8. The DNC doesn't present evidence of "the number of registered voters" affected, or how many of

those couldn't obtain documents if they tried. *Crawford*, 553 U.S. at 200. Without that evidence, "it is not possible to quantify either the magnitude of the burden on this narrow class of voters or the portion of the burden imposed on them that is fully justified." *Id.* at 200. Those deficiencies aside, according to the DNC's own evidence 91% of voting-age citizens have "access to documentation necessary to prove citizenship." *See* DNC Compl. 65. That the vast majority of the voting base has no trouble presenting citizenship documentation demonstrates that Section 2(a) does not impose a severe burden on the right of "most voters" to vote. *Crawford*, 553 U.S. at 198.

Finally, the DNC improperly focuses on idiosyncratic burdens of some voters. As in *Crawford*, there might be a "small number of voters who may experience a special burden" because they "cannot afford or obtain a birth certificate." *Id.* at 200. But the Court found that "a somewhat heavier burden may be placed on a limited number of persons" without presenting constitutional problems. *Id.* at 199. That's because those burdens "aris[e] from life's vagaries," not from the documentation requirement. *Id.* at 197. It's not the role of courts to solve all of life's problems, particularly when Congress has already weighed those policy considerations. And even if "the burden may not be justified as to a few voters," the documentation requirement still doesn't "pose a constitutional problem unless it is *wholly* unjustified." *Id.* at 199 (emphasis added). As the next section explains, Section 2(a) passes that low bar, and thus does not impose "excessively burdensome requirements on any class of voters." *Id.* at 202 (cleaned up).

## 2. Any burden is outweighed by compelling governmental interests.

Section 2(a) is justified by many compelling governmental interests. Start with *Mi Familia Vota*, which the DNC relies on. *See* DNC Compl. 66. In that case, the court reasoned that because requiring proof of citizenship "imposes a limited burden on the right to vote," a "'less exacting review'" of the government's "interests" should be employed. 719 F. Supp. 3d at 1010 (quoting *Pierce v. Jacobsen*, 44 F.4th 853, 859-60 (9th Cir. 2022)). Under that lenient standard, Arizona's

proof-of-citizenship requirement was justified by the government's weighty interests in "preventing non-citizens from voting and promoting voter confidence" in elections. *Id*. Those same interests justify Section 2(a) here. The Executive Order's proof-of-citizenship provisions "enforce Federal law," "protect the integrity of our election process," and ensure elections are "honest and worthy of the public trust." Exec. Order No. 14248, 2025 WL 929182, at *14005-06. The government "indisputably" has a "legitimate interest 'in counting only the votes of eligible voters,'" and is "entitled" to act "to prevent the occurrence of non-citizen voting." *Mi Familia Vota*, 719 F. Supp. 3d at 1010 (quoting *Crawford*, 553 U.S. at 196); *see also Eu v. S.F. Cnty. Democratic Central Comm.,* 489 U.S. 214, 231 (1989) (noting that "preserving the integrity" of the "election process" is a "compelling interest").

The DNC argues that "non-citizen voting is exceedingly rare." DNC Compl. 66. But the DNC supports that assertion with statistics from only one court case in one state. *See id.* (citing *Mi Familia Vota*, discussing "13 prosecutions specifically for non-citizen voting" and "two sealed indictments related to non-citizen voting" in Arizona). The DNC hasn't proven that claim on a national scale. The bipartisan Carter-Baker Commission observed that "[w]hile election fraud is difficult to measure, it occurs" and "convictions" for "election fraud offenses" include "submitting false voter registration information and voting-related offenses by non-citizens." Ex. B, Carter-Baker Report, *supra*, at 45. "Non-citizens have registered to vote in several recent elections." *Id.* at 46 (collecting cases).

More recent evidence bolsters the Carter-Baker Commission's well-respected findings. Last year in Texas, "over 6,500 potential noncitizens" were "removed from the voter rolls," and "1,930" of those individuals had "a voter history." Ex. C, *Governor Abbott Announces Over 1 Million Ineligible Voters Removed from Voter Rolls*, Off. of the Tex. Gov. (Aug. 26, 2024),

perma.cc/HZ5S-5EGB. In 2019, Texas identified "95,000 individuals" as "non-U.S. citizens" with "a matching voter registration record in Texas, approximately 58,000 of whom have voted in one or more Texas elections." Ex. D, *Secretary Whitley Issues Advisory on Voter Registration List Maintenance Activity*, Tex. Sec'y of State (Jan. 25, 2019), perma.cc/26Z4-B3EM. Since 2022, Virginia has found and removed "6,303 noncitizens" from its voter rolls. Ex. E, Exec. Order 35, *Comprehensive Election Security Protecting Legal Voters and Accurate Counting*, Off. of the Va. Gov. (Aug. 7, 2024), perma.cc/6KSZ-EHS4. Alabama recently identified "3,251 individuals who are registered to vote in Alabama who have been issued noncitizen identification numbers by the Department of Homeland Security." Ex. F, *Secretary of State Wes Allen Implements Process to Remove Noncitizens Registered to Vote in Alabama*, Off. of Ala. Sec'y of State, perma.cc/8KUS-PSVE (2023). Michigan recently "identified 15 people who appear to be non-U.S. citizens and cast a ballot in the 2024 General Election." Ex. G, *Michigan Department of State Review Confirms Instances of Noncitizen Voting are Extremely Rare*, Mich. Dep't of State (Apr. 3, 2025), perma.cc/W3DF-5VHY.

Regardless, this Court need not wade into the thicket of determining exactly how many non-citizens illegally vote or are registered to vote in federal elections. *Crawford* instructs that the government's interests in preventing voter fraud and preserving election integrity outweigh modest burdens even when there is "no evidence" of "any" fraud "actually occurring in Indiana at any time in its history." 553 U.S. at 194. Because "the risk of voter fraud" is "real" and "could affect the outcome of a close election," the "propriety" of verifying the identity of voters is "perfectly clear." *Id*. at 195-96. The government can act prophylactically to stop illegal voting by non-citizens before it starts, and it "should be permitted to respond to potential deficiencies in the electoral process with foresight rather than reactively." *Munro v. Socialist Workers Party*, 479 U.S. 189,

195 (1986). "[I]t should go without saying" that the government "may take action to prevent election fraud without waiting for it to occur and be detected within its own borders." *Brnovich*, 594 U.S. at 686. And the government can rely on fraud in other jurisdictions, general history, or common sense because "[t]here is no question about the legitimacy" of the government's interest in "carefully identifying all voters participating in the election process." *Crawford*, 553 U.S. at 194-96.

Nor is fraud prevention the only legitimate governmental interest that Section 2(a) advances. Requiring proof of citizenship advances the legitimate interest of "improv[ing] and moderniz[ing] election procedures" that the government has determined are "antiquated" or "inefficient." *Id.* at 191. Modernizing the nation's election integrity protections is a core concern of President Trump's Executive Order, which begins by observing that while other "modern, developed nations" such as "India and Brazil" are employing more sophisticated "voter identification" methods, the United States "largely relies" on an outdated "self-attestation" system. Exec. Order No. 14248, 2025 WL 929182, at *14005. Just as HAVA and the NVRA "made it necessary" for Indiana to "reexamine" its "election procedures," *Crawford*, 553 U.S. at 192, the REAL ID Act has made it necessary for the federal government to reexamine national election protections. "Starting May 2025, U.S. travelers must be REAL ID compliant to board domestic flights and access certain federal facilities." Ex. H, *REAL ID*, Transp. Security Admin., perma.cc/5RN8-HBMS. Section 2(a) encourages U.S. voters to become REAL ID–compliant. Exec. Order No. 14248, 2025 WL 929182, at *14006. Submitting "an identification document compliant with the requirements of the REAL ID Act of 2005" that "indicates the applicant is a citizen of the United States" is one way an applicant can prove citizenship under Section 2(a). *Id*. Though the REAL ID Act does not "require[]" President Trump to promulgate Section 2(a), it does "indicate that Congress believes

that [a REAL ID] is one effective method" of verifying an individual's "qualification[s]." *See Crawford*, 553 U.S. at 193. "That conclusion is also supported" by the Carter-Baker Commission, *id.*, which recommended that "REAL ID cards" be used "for voting purposes" because the "card adds two critical elements for voting—proof of citizenship and verification by using the full Social Security number," Ex. B, Carter-Baker Report, *supra*, at 19. A REAL ID is now "'needed to board a plane, enter federal buildings, and cash a check. Voting is equally important.'" *Crawford*, 553 U.S. at 193 (quoting Carter-Baker Report).

Section 2(a) is also justified by the "independent" governmental interest of promoting "voter confidence," which "encourages citizen participation in the democratic process." *Id.* at 197; *accord Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006); *Brnovich*, 594 U.S. at 672 (observing the importance of election laws that preserve "public confidence in the fairness of elections and the perceived legitimacy of the announced outcome"). Before the 2024 election, most American adults expressed concern about non-citizens voting. Ex. I, *Scripps News/Ipsos Poll* 9, Ipsos (Sept. 18, 2024), perma.cc/V689-LXAN. Sixty-three percent of Harris supporters and ninety percent of Trump supporters believed it was "very or somewhat important to stop noncitizens from voting." Ex. J, *Harris, Trump Voters Differ Over Election Security, Vote Counts and Hacking Concerns*, Pew Rsch. Ctr. (Oct. 24, 2024), perma.cc/4J2D-7HPV. Eighty-three percent of U.S. adults support requiring proof of citizenship when registering to vote. Ex. K, Megan Brenan, *Americans Endorse Both Early Voting and Voter Verification*, Gallup (Oct. 24, 2024), perma.cc/6HRG-7LB6. This crisis of voter confidence "has independent significance" because "citizen participation in the democratic process" is essential to the "legitimacy of representative government." *Crawford*, 553 U.S. at 197 (cleaned up). Section 2(a) is therefore justified to ensure that "[v]oters who fear" that "their legitimate votes will be outweighed by fraudulent ones" cast by non-citizens do not "feel

disenfranchised." *Purcell*, 549 U.S. at 4. "Considering the evidence as a whole," the government's "interests in preventing non-citizens from voting and promoting public confidence" in national elections outweigh "the limited burden voters might encounter when required" to prove citizenship. *Mi Familia Vota*, 719 F. Supp. 3d at 1011.

## CONCLUSION

For these reasons, the Court should deny Plaintiffs' motions for summary judgment and grant the RNC's cross-motion.

Dated: August 8, 2025

Respectfully submitted,

*/s/ Thomas R. McCarthy*

Lee E. Goodman (D.C. Bar 435493)
Michael Columbo (D.C. Bar 476738)
DHILLON LAW GROUP
2121 Eisenhower Ave., Ste. 608
Alexandria, VA 22314
(415) 433-1700
lgoodman@dhillonlaw.com
mcolumbo@dhillonlaw.com

Thomas R. McCarthy (D.C. Bar 489651)
Gilbert C. Dickey (D.C. Bar 1645164)
Conor D. Woodfin (D.C. Bar 1780807)
William Bock IV* (Ohio Bar 0105262)
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, Virginia 22209
(703) 243-9423
tom@consovoymccarthy.com
gilbert@consovoymccarthy.com
conor@consovoymccarthy.com

*Admitted *pro hac vice*

wbock@consovoymccarthy.com

*Counsel for Intervenor-Defendant*
*The Republican National Committee*