**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> EXECUTIVE OFFICE OF THE PRESIDENT, *et al.*, <br><br> Defendants. | Civil Action No. 25-0946 (CKK) |
| DEMOCRATIC NATIONAL COMMITTEE, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, *et al.*, <br><br> Defendants. | Civil Action No. 25-0952 (CKK) |
| LEAGUE OF WOMEN VOTERS EDUCATION FUND, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, *et al.*, <br><br> Defendants. | Civil Action No. 25-0955 (CKK) |

*AMICUS CURIAE* **BRIEF OF RESTORING INTEGRITY AND TRUST IN ELECTIONS**
**AND THE REPUBLICAN PARTY OF ARIZONA**
**IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. Civ. P. 26.1, the Republican Party of Arizona, LLC discloses that it is an Arizona limited liability company.  The Republican Party of Arizona, an unincorporated political committee, is its sole member.  It has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

Pursuant to Fed. R. Civ. P. 26.1, Restoring Integrity and Trust in Elections discloses that it is a Virginia nonstock corporation.  It has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

INTEREST OF THE *AMICI CURIAE* ........................................................................... 3

ARGUMENT ...................................................................................................................... 4

   I.   The NVRA Permits a Documentary Proof Of Citizenship Requirement ........................... 4

      A.   Overview of the NVRA's Mail Registration Form Provisions........................................ 5

      B.   Courts Have Affirmed That NVRA Section 9(b) Permits the EAC and States to Incorporate Proof-of-Citizenship Mandates into Voter Registration Forms................. 6

         1.   The Supreme Court Expressly Recognized Arizona's (and the EAC's) Authority to Adopt Proof of Citizenship Requirements ................................................................ 6

         2.   The D.C. and Tenth Circuits Have Reaffirmed EAC's Statutory Authority to Require Documentary Proof of Citizenship........................................................................ 8

         3.   The Supreme Court Has Again Signaled Its Agreement That NVRA Section 9(b) Authorizes Proof of Citizenship Requirements.......................................................... 9

      C.   The Court Need Not and Should Not Preemptively Ban the EAC From  Considering and Adopting a Documentary Proof of Citizenship Requirement ............................... 10

   II.   The Executive Order's Documentary Proof of Citizenship Requirement Would Not Impermissibly Burden Voting Rights .............................................................................. 13

      A.   Documentary Proof of Citizenship Mandates Do Not "Severely" Burden Voting Rights .................................................................................................................... 13

      B.   The Executive Order Advances Vital Governmental Interests in Preventing Unlawful Voting and Fortifying Public Confidence in Elections ............................................... 16

CONCLUSION.................................................................................................................. 19

# TABLE OF AUTHORITIES

**Cases**

*Am. Ass'n. of People with Disabilities v. Herrera,*
  580 F. Supp. 2d 1195 (D.N.M. 2008) ..................................................................... 11

*Am. Civil Liberties Union of N.M. v. Santillanes,*
  546 F.3d 1313 (10th Cir. 2008) ....................................................................... 14, 17

*Anderson v. Celebrezze,*
  460 U.S. 780 (1983) ............................................................................................. 13

*Brakebill v. Jaeger,*
  932 F.3d 671 (8th Cir. 2019) ............................................................................... 14

*Brnovich v. Democratic Nat'l. Comm.,*
  594 U.S. 647 (2021) ....................................................................................... 13, 17

*Burdick v. Takushi,*
  504 U.S. 428 (1992) ............................................................................................. 13

*Cabell v. Chavez-Salido,*
  454 U.S. 432 (1982) ............................................................................................. 19

*California v. Trump,*
  -- F. Supp. 3d --, 2025 WL 1667949 (D. Mass. Jun. 13, 2025) ............................... 12

*CASA de Maryland, Inc. v. Trump,*
  971 F.3d 220 (4th Cir. 2020) ............................................................................... 12

*Common Cause/Ga. v. Billups,*
  554 F.3d 1340 (7th Cir. 2009) ............................................................................. 14

*Crawford v. Marion Cnty. Election Bd.,*
  553 U.S. 181 (2008) ................................................................................ 13, 14, 18

*Foley v. Connelie,*
  435 U.S. 291 (1978) ............................................................................................. 19

*Frank v. Walker,*
  768 F.3d 744 (7th Cir. 2014) ............................................................................... 14

*Gonzalez v. Arizona,*
  2006 WL 8431038 (D. Ariz. Oct. 12, 2006) ............................................................ 2

*Gonzalez v. Arizona,*
   2008 WL 11395512 (D. Ariz. Aug. 20, 2008) ........................................................... 15

*Gonzalez v. Arizona,*
   485 F.3d 1041 (9th Cir. 2007) .................................................................................... 15

*Ind. Democratic Party v. Rokita,*
   458 F. Supp. 2d 775 (S.D. Ind. 2006) ........................................................................ 14

*League of United Latin Am. Citizens v. Exec. Office of the President,*
   -- F. Supp. 3d --, 2025 WL 1187730 (D.D.C. Apr. 24, 2025) .................................... 12

*League of Women Voters of Fla. v. Browning,*
   863 F. Supp. 2d 1155 (N.D. Fla. 2012) ...................................................................... 12

*Lee v. Va. State Bd. of Elections,*
   843 F.3d 592 (4th Cir. 2016) ...................................................................................... 14

*Mecinas v. Hobbs,*
   30 F.4th 890 (9th Cir. 2022) ......................................................................................... 3

*Mi Familia Vota v. Fontes,*
   111 F.4th 976 (9th Cir. Aug. 1, 2024) ....................................................................... 10

*Mi Familia Vota v. Fontes,*
   129 F.4th 691 (9th Cir. 2025) ........................................................................... 2, 10, 12

*Mi Familia Vota v. Fontes,*
   2024 WL 3629418 (9th Cir. Jul. 18, 2024) ............................................................... 10

*Mi Familia Vota v. Fontes,*
   691 F. Supp. 3d 1077 (D. Ariz. 2023) ....................................................................... 10

*Mi Familia Vota v. Fontes,*
   719 F. Supp. 3d 929 (D. Ariz. 2024) ........................................................... 2, 15, 16, 17

*Mi Familia Vota v. Fontes,*
   No. 24-3188 (9th Cir. Apr. 11, 2025) ........................................................................ 10

*N.C. Green Party v. N.C. State Bd. of Elections,*
   619 F. Supp. 3d 547 (E.D.N.C. 2022) ......................................................................... 3

*Nken v. Holder,*
   556 U.S. 418 (2009) ................................................................................................... 10

*Republican Nat'l Comm. v. Mi Familia Vota*,
   145 S. Ct. 108 (Mem.) (2024) ........................................................................ 10, 12

*Shays v. Fed. Election Comm'n.*,
   414 F.3d 76 (D.C. Cir. 2005) ................................................................................. 3

## Statutes

18 U.S.C. § 611 .................................................................................................... 19

2022 Ariz. Laws ch. 99, § 4 .................................................................................... 9

Ariz. Rev. Stat. § 16-166(F) ............................................................................... 6, 14

National Voter Registration Act of 1993, 52 U.S.C. § 20501 ............................. passim

Pub. L. 103-31, 107 Stat. 77 ................................................................................... 5

## Other Authorities

Ariz. Atty. Gen. Op. I13-011,
   2013 WL 5676943 (Oct. 7, 2013) ......................................................................... 9

Exec. Order No. 14248, § 2(a), *Preserving and Protecting the Integrity of American Elections*,
   90 Fed. Reg. 14005 (Mar. 25, 2025) ..................................................................... 1

Miles Parks, *Democrats Are Now Open To New Voter ID Rules. It Probably Won't Win Over The GOP*, NPR (Aug. 28, 2021) ............................................................... 18

Nicole Willcoxon and Lydia Saad, *Eight in 10 Americans Favor Early Voting, Photo ID Laws*,
   Gallup.com (Oct. 14, 2022) ................................................................................. 18

Pew Research Center, *Confidence in voting access and integrity; expectations for whether and when the election results will be clear* (Oct. 24, 2024) ........................................... 18

Pew Research Center, *Republicans and Democrats Move Further Apart in Views of Voting Access* (Apr. 22, 2021) ......................................................................................... 18

Ray Christensen & Thomas J. Schultz, *Identifying Election Fraud Using Orphan and Low Propensity Voters*, 42 AM. POLITICS RESEARCH 311 (2014) ...................................... 17

Wendy Underhill, *States Consider Options to Ensure That Noncitizens Aren't Voting* (Jan. 30, 2025) ...................................................................................................... 18

**Rules**

F.R.A.P. 29(a)(4)(E) ................................................................................................ 4

Local Civ. R. 7(o)(5) .............................................................................................. 4

The Republican Party of Arizona ("RPAZ") and Restoring Integrity and Trust in Elections ("RITE") submit this brief as *amici curiae* to underscore two points. First, irrespective of whether or to what extent the President can prompt the Election Assistance Commission ("EAC") to act, the National Voter Registration Act of 1993, 52 U.S.C. § 20501, *et seq.* ("NVRA"), certainly ***permits*** the EAC (and the respective States) to require documentary proof of citizenship as a prerequisite to registering to vote in federal elections. Second, the introduction of a documentary proof of citizenship element to the federal voter registration form would not unduly burden any citizen's constitutional right to vote.

## INTRODUCTION

On March 25, 2025, the President issued an executive order providing that, *inter alia*, the EAC must within 30 days "take appropriate action to require, in its national mail voter registration form issued under 52 U.S.C. 20508 . . . documentary proof of United States citizenship, consistent with 52 U.S.C. 20508(b)(3)." Exec. Order No. 14248, § 2(a), *Preserving and Protecting the Integrity of American Elections*, 90 Fed. Reg. 14005 (Mar. 25, 2025) (hereafter, the "Executive Order"). The Executive Order accordingly engendered the question—presented by the Plaintiffs here—of whether and in what manner the President may initiate or mandate EAC action.[1] The Democratic Party Plaintiffs, however, then take it a step further, and seek to bootstrap a ruling concerning the scope of the President's power into a preemptive judicial abrogation of the EAC's own preexisting statutory authority. *See* Doc. 1 (Count VI); Doc. 146-1 at 15-16. The Court should resist that invitation. Even assuming *arguendo* that the President cannot order the EAC to promulgate a documentary proof of citizenship requirement, the NVRA empowers the EAC—and,

---

[1] While the *amici* believe there are sound arguments in support of the Defendants' conception of the President's powers relative to the EAC, this brief does not address that issue.

in the case of state-specific voter registration forms used to register voters in federal elections, the individual States—to do so upon determining that it is "necessary to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process." 52 U.S.C. § 20508(b)(1). Far from foreclosing that prerogative, the cases cited by the Plaintiffs—most notably, the U.S. Supreme Court's opinion in *Arizona v. Inter Tribal Council of Arizona, Inc.* ("*ICTA*"), 570 U.S. 1 (2013)—recognize and preserve it.

Further, Section 2(a) does not impermissibly burden any voting rights protected by the First and Fifth Amendments. Arizona's experience with implementing a proof of citizenship mandate is instructive. Two different judges—in two different proceedings spanning nearly two decades— found ***zero*** confirmed instances of known citizens being excluded from the voter rolls. *See Mi Familia Vota v. Fontes*, 719 F. Supp. 3d 929, 1008 (D. Ariz. 2024) (finding, after a nine-day trial, that "Plaintiffs offered no witness testimony or other 'concrete evidence' to corroborate that the Voting Laws' [documentary proof of citizenship] Requirements will in fact impede any qualified voter from registering to vote or staying on the voter rolls."), *aff'd in part, vacated in part on other grounds*, 129 F.4th 691 (9th Cir. 2025); *Gonzalez v. Arizona*, 2006 WL 8431038, at *7 (D. Ariz. Oct. 12, 2006) (although plaintiffs had presented high-level evidence that some eligible individuals may be affected by Arizona's new proof of citizenship and voter ID laws, "it is not clear what percentage of these individuals wish to vote but are *actually* unable to obtain identification"). And the government's indisputably important interests in protecting the integrity of the franchise and preserving public confidence in the election system easily eclipse any incidental inconveniences that Section 2(a)'s implementation may present.

## INTEREST OF THE *AMICI CURIAE*

The RPAZ is a statewide political party committee under Arizona law, and the organizing body of Arizona electors who are registered members of the Republican Party, the largest political party in Arizona. The RPAZ sponsors and engages in large-scale voter registration efforts, and promotes the election of Republican candidates in Arizona. The Plaintiffs' claims in this litigation intersect with at least two foundational interests of the RPAZ. First, like all political party organizations, the RPAZ is intrinsically affected by the structuring of "competitive environment"—*i.e.*, the legal and regulatory framework within which the electoral system operates. *See Shays v. Fed. Election Comm'n.*, 414 F.3d 76, 85 (D.C. Cir. 2005); *Mecinas v. Hobbs*, 30 F.4th 890, 898 (9th Cir. 2022); *N.C. Green Party v. N.C. State Bd. of Elections*, 619 F. Supp. 3d 547, 562 (E.D.N.C. 2022) (recognizing political parties' "interests in a competitive playing field for their candidates and conserving party resources").

Second, the RPAZ is unique among virtually all state political party organizations because Arizona has for more than twenty years maintained a documentary proof of citizenship requirement for applicants using its state voter registration form. As discussed in detail below, the Democratic Party Plaintiffs' misconstruction of NVRA provisions addressing the promulgation and amending of registration forms used to register voters in federal elections would, if adopted, conflict with U.S. Supreme Court precedents and orders that undergird Arizona's voter registration regime.

Amicus RITE is a tax-exempt social welfare corporation organized and operated pursuant to section 501(c)(4) of the Internal Revenue Code of 1986, whose mission is to protect the rule of law in elections throughout the United States. RITE supports laws and policies that promote secure elections and enhance voter confidence in the electoral process. Pursuant to this mission, RITE

routinely files briefs in state and federal courts across the country on important issues regarding the qualifications for voting, including citizenship. RITE has a direct interest in the outcome of the litigation pending before the Court as it relates to noncitizen voting, an unlawful practice striking at RITE's core organizational mission.

Pursuant to Local Civ. R. 7(o)(5) and F.R.A.P. 29(a)(4)(E), RPAZ and RITE disclose that no party or party's counsel authored this brief in whole or in part or contributed money that was intended to fund preparing or submitting the brief. RITE and RITE PAC, an affiliate of RITE that is organized and operated pursuant to section 527 of the Internal Revenue Code of 1986, provided all funding for the preparation and submission of this brief.

## ARGUMENT

### I.    The NVRA Permits a Documentary Proof Of Citizenship Requirement

The NVRA "erected a complex superstructure of federal regulation atop state voter-registration systems." *ICTA*, 570 U.S. at 5. The Democratic Party Plaintiffs obscure key distinctions embedded in the NVRA that secure the EAC's flexibility to adapt and evolve voter registration procedures. To discern the infirmity in their contention that the NVRA somehow affirmatively prohibits documentary proof of citizenship as a condition of registering to vote in federal elections, it is useful to unpack the interplay between the various provisions governing how individuals may register to vote and who determines the prerequisites for doing so. The litigation that ensued from Arizona's enactment of its own proof-of-citizenship mandate illuminated in more concrete terms the EAC's ability to supplement the Federal Form's existing affirmation of citizenship with additional safeguards.

### A.    Overview of the NVRA's Mail Registration Form Provisions

To facilitate Congress' stated objective of "enhanc[ing] the participation of eligible citizens as voters in elections for Federal office," 52 U.S.C. § 20501(b)(3), the NVRA provided for the creation of a mail registration form.  There are two general species of this registration form.  The first is the so-called "Federal Form" promulgated by the EAC, which the States must "accept and use" to register voters in federal elections.  *See* 52 U.S.C. §§ 20505(a)(1), 20508(a)(2).  Section 9 of the NVRA[2] (which corresponds to what is now 52 U.S.C. § 20508) enumerates certain basic informational fields or averments that the Federal Form "shall include"—among them, a sworn affirmation of citizenship.  Above and beyond this baseline, the EAC may incorporate into the Federal Form any additional informational elements that are "necessary to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process."  52 U.S.C. § 20508(b)(1).

The NVRA also countenances a second variant of a mail registration form—to wit, that "develop[ed] and use[d]" by a State.  52 U.S.C. § 20505(a)(2).  A so-called State Form is NVRA-compliant if it "meets all of the criteria stated in [Section 9(b)]."  *Id.*  In other words, the same general rubric in Section 9(b) governs the permissible parameters of both the Federal Form and the State Forms, but their specific content is determined by different actors—*i.e.*, the EAC and state legislatures, respectively.  The NVRA thus tempers a nationwide voter registration regime with deference to federalism and regulatory latitude to adapt both the Federal Form and State Forms to future policy needs.  Put another way, "States retain the flexibility to design and use their own registration forms, but the Federal Form provides a backstop."  *ICTA*, 570 U.S. at 12.

---

[2] *See* Pub. L. 103-31, 107 Stat. 77.

**B.    Courts Have Affirmed That NVRA Section 9(b) Permits the EAC and States to Incorporate Proof-of-Citizenship Mandates into Voter Registration Forms**

Nearly two decades of litigation precipitated by Arizona's first-in-the-nation documentary proof of citizenship law crystallized the States' and the EAC's ability to amend and enhance their voter registration forms.  And the resulting precedents discredit the Democratic Party Plaintiffs' current effort to interpolate into the NVRA a preemptive ban on documentary proof of citizenship mandates.

*1.    The Supreme Court Expressly Recognized Arizona's (and the EAC's) Authority to Adopt Proof of Citizenship Requirements*

In 2004, the Arizona electorate approved a statutory measure that required county recorders—the local officials who are responsible under Arizona law for registering voters and maintaining the rolls—to "reject any application for registration that is not accompanied by satisfactory evidence of United States citizenship."  Ariz. Rev. Stat. § 16-166(F).  The statute did not differentiate between Federal Form and State Form submissions—an attribute that proved central to the U.S. Supreme Court's consideration of the law nine years later.  After dissecting the controlling provisions, the Supreme Court concluded that the NVRA "precludes Arizona from requiring a Federal Form applicant to submit information beyond that required by the form itself." *ICTA*, 570 U.S. at 20.

The Democratic Party Plaintiffs' inferential leap that the NVRA affirmatively prohibits ***anyone*** (including the EAC) from imposing a proof of citizenship requirement through ***any*** mechanism, however, trips on two critical qualifiers cabining *ICTA*'s holding.  First, the Court emphasized that the NVRA allows Arizona to request that "the EAC alter the Federal Form to include information the State deems necessary to determine eligibility," *id.* at 19, and held open the possibility that the EAC may even have "a nondiscretionary duty to include Arizona's concrete

6

evidence [of citizenship] requirement on the Federal Form." *Id.* at 20. Second, the Court explained that Arizona could incorporate a documentary proof of citizenship field into its own State Form, noting that "state-developed forms may require information the Federal Form does not." *Id.* at 12; *accord Gonzales v. Arizona*, 485 F.3d 1041, 1050–51 (9th Cir. 2007) (finding that Section 9(b) of the NVRA "plainly allow[s] states, at least to some extent, to require their citizens to present evidence of citizenship when registering to vote").

The Democratic Party Plaintiffs' position is irreconcilable with *ICTA*. Their declaration that "the NVRA's plain terms prohibit" a documentary proof of citizenship requirement [Doc. 146-1 at 15] collides with the Supreme Court's admonition that the NVRA actually permits—and may indeed require—the EAC to accede to States' demands for a proof of citizenship component on the Federal Form. *See ICTA*, 570 U.S. at 19–20. Further, as noted above, Section 9(b)'s 'necessity' criterion governs both the Federal Form ***and*** any State Form that is used to register voters in federal elections. Far from ratifying Plaintiffs' theory that Section 9(b) precludes a documentary proof of citizenship element, the Supreme Court expressly cited Arizona's mandate as an "example" of how, pursuant to Section 9(b), "state-developed forms may require information the Federal Form does not." *Id.* at 12. In other words, *ICTA* held only that States cannot unilaterally append their own bespoke mandates to the Federal Form. But it recognized the EAC's and the States' respective powers under Section 9(b) to incorporate documentary proof of citizenship requirements into the Federal Form and individual State Forms.

The Supreme Court in *ICTA* pointedly left open the door to documentary proof of citizenship requirements in the Federal Form and individual State Forms; the Democratic Party Plaintiffs cannot here peremptorily close it.

2.    *The D.C. and Tenth Circuits Have Reaffirmed EAC's Statutory Authority to Require Documentary Proof of Citizenship*

Subsequent lower court cases, of course, could not and did not derogate *ICTA*'s recognition that proof of citizenship mandates can be consistent with the NVRA. Plaintiffs cite *Kobach v. United States Election Assistance Commission*, 772 F.3d 1183 (10th Cir. 2014), and *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1 (D.C. Cir. 2016), to prop-up their theory that Section 9(b) forbids proof of citizenship requirements. Neither court, though, said any such thing.

Heeding the Supreme Court's invitation in *ICTA*, Arizona and Kansas petitioned the EAC to incorporate proof of citizenship requirements into their state-specific instructions on the Federal Form. The EAC denied the request. *See Kobach*, 772 F.3d at 1187–88. Declining to disturb the EAC's decision, the court emphasized that the "standard of review is 'very deferential' to the agency's determination, and a presumption of validity attaches to the agency action such that the burden of proof rests with the party challenging it." *Id.* at 1197 (internal citation omitted). In other words, *Kobach* concluded only that "the NVRA does not impose a ministerial duty on the EAC to approve state requests to change the Federal Form." *Id.* at 1199. It never—and, in light of *ICTA* could not have—held that the NVRA precludes the EAC from approving a proof of citizenship requirement.

*Newby* presented a different variant of the same narrow procedural point. There, the EAC's staff had approved several States' request for state-specific instructions on the Federal Form concerning documentary proof of citizenship requirements. *See* 838 F.3d at 4. The court held that the EAC had acted improperly because it "never made the necessity finding required by [Section 9(b)]." *Id.* at 12. Crucially, however, the court emphasized that its ruling did ***not*** "forbid the Commission from including a proof-of-citizenship requirement if it determined that such a requirement was necessary" pursuant to Section 9(b). *Id.* at 11 (citation omitted).

In short, *Newby* and *Kobach* collectively hold that the EAC (1) is not required to reflexively acquiesce to States' demands for proof of citizenship provisions, but (2) is statutorily authorized to adopt proof of citizenship requirements upon finding that such a policy comports with Section 9(b).

3.     *The Supreme Court Has Again Signaled Its Agreement That NVRA Section 9(b) Authorizes Proof of Citizenship Requirements*

The U.S. Supreme Court indicated last year that it is poised to again affirm that documentary proof of citizenship is (or at least can be) "necessary to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process," 52 U.S.C. § 20508(b)(1), and hence eligible for inclusion on State Forms (and, by extension, the Federal Form).  In 2022, the Arizona Legislature strengthened Arizona's proof of citizenship requirement by (among other things) mandating that county recorders must "reject" any State Form application "that is not accompanied by satisfactory evidence of citizenship."  Ariz. Rev. Stat. § 16-121.01(C), as amended by 2022 Ariz. Laws ch. 99, § 4.  Various plaintiff groups challenged this provision, arguing that the NVRA (as well as a 2018 consent decree approved by the Arizona Secretary of State) required the county recorders to accept State Form submissions lacking proof of citizenship and to register these applicants as "federal only" voters.[3]  The district court sided with the plaintiffs and enjoined Ariz. Rev. Stat. § 16-121.01(C)'s implementation.  *See Mi Familia Vota v. Fontes*, 691 F. Supp. 3d 1077, 1096 & n.13 (D. Ariz. 2023).  After a motions panel of the Ninth Circuit unanimously stayed this facet of the

---

[3] Following *ICTA*, Arizona has maintained bifurcated voter registration rolls.  Registrants whose citizenship status has not been verified (other than individuals who registered to vote prior to the 2004 law's effective date) have a "federal only" designation and are issued ballots that contain only races for federal offices.  *See* Ariz. Atty. Gen. Op. I13-011, 2013 WL 5676943 (Oct. 7, 2013).

district court's injunction, *see* 2024 WL 3629418 (9th Cir. Jul. 18, 2024), another panel intervened and, on a 2-1 vote, vacated the stay, *see* 111 F.4th 976 (9th Cir. Aug. 1, 2024).  The appellants then sought and received from the U.S. Supreme Court a stay of the district court's injunction against enforcement of Ariz. Rev. Stat. § 16-121.01(C).  *See Republican Nat'l Comm. v. Mi Familia Vota*, 145 S. Ct. 108 (Mem.) (2024).[4]

The *Mi Familia Vota* saga may be procedurally convoluted, but the Supreme Court's intimations are clear.  In staying the district court's injunction of Ariz. Rev. Stat. § 16-121.01(C), the Court implicitly but necessarily conveyed that there likely is "no basis to overrule Arizona's determination that documentary proof of citizenship is 'necessary to enable [its] election official[s] to assess the eligibility of the applicant.'"  *Mi Familia Vota II*, 129 F.4th at 749 (Bumatay, J., dissenting) (quoting NVRA Section 9(b), 52 U.S.C. § 20508(b)(1)); *see also Nken v. Holder*, 556 U.S. 418, 434 (2009) (Supreme Court will grant a stay only if, *inter alia*, the "applicant has made a strong showing that he is likely to succeed on the merits").  An inevitable corollary is that Section 9(b)—which also regulates the content of the Federal Form—likewise empowers the EAC to assimilate a documentary proof of citizenship element into the Federal Form.

## C.    The Court Need Not and Should Not Preemptively Ban the EAC From Considering and Adopting a Documentary Proof of Citizenship Requirement

To sum up, two decades of litigation emanating out of Arizona's seminal documentary proof of citizenship law imparts five key points that should inform this Court's evaluation of the

---

[4] Refusing to "take[] the hint" and "ignoring the Supreme Court's direction," *Mi Familia Vota v. Fontes*, 129 F.4th 691, 733, 745 (9th Cir. 2025) ("*Mi Familia Vota II*") (Bumatay, J., dissenting), the same panel later affirmed the district court's injunction, *see id.* at 718-20.  A petition for en banc review is pending.  *See* Intervenors' Petition for Rehearing En Banc, *Mi Familia Vota v. Fontes*, No. 24-3188 (9th Cir. Apr. 11, 2025).

Democratic Plaintiffs' theory that the NVRA precludes a documentary proof of citizenship requirement.

*First*, Section 9(b) authorizes the EAC and state legislatures to integrate into the Federal Form or particular State Forms, respectively, the disclosure of information "necessary to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process."  52 U.S.C. § 20508(b)(1).

*Second*, the Supreme Court has cited Arizona's documentary proof of citizenship law as an "example" of how Section 9(b) can be applied to permissibly augment and update voter registration forms.  *See ICTA*, 570 U.S. at 12.

*Third*, while the EAC may not reflexively kowtow to States' demands for modifications to the Federal Form, it retains statutory authority to add elements to the Federal Form, including corroboration of citizenship, upon determining that they comport with Section 9(b).  *See ICTA*, 570 U.S. at 19–20; *Newby*, 838 F.3d at 11–12; *Kobach*, 772 F.3d at 1197.

*Fourth*, courts historically have construed Section 9(b)'s "necessity" criterion liberally.  If elections officials actually use the mandated item of information to verify applicants' eligibility and administer the voter registration process, the NVRA countenances its inclusion on the registration form.  *See, e.g.*, *Gonzalez*, 485 F.3d at 1050–51; *Am. Ass'n. of People with Disabilities v. Herrera*, 580 F. Supp. 2d 1195, 1243 (D.N.M. 2008) (holding that inclusion on state registration form of mandatory field for the ID number of third-party voter registration agents satisfied Section 9 because "the state uses the numbers to prevent voter registration fraud"); *League of Women Voters of Fla. v. Browning*, 863 F. Supp. 2d 1155, 1166 (N.D. Fla. 2012) (observing that "identifying the organization that submits an application is sufficiently 'necessary' to the sound administration of the voter-registration process to pass muster" under Section 9).

*Fifth*, the U.S. Supreme Court's recent stay order in the *Mi Familia Vota* litigation evinces its likely agreement that Section 9(b) authorizes the inclusion of documentary proof of citizenship requirements in forms that are used to register voters in federal elections. *See Republican Nat'l. Comm.*, 145 S. Ct. 108; *Mi Familia Vota II*, 129 F.4th at 745 (Bumatay J., dissenting) (noting the significance of the stay order); *see also generally CASA de Maryland, Inc. v. Trump*, 971 F.3d 220, 230 (4th Cir. 2020) ("[E]very maxim of prudence suggests that we should decline to take the aggressive step of" issuing a ruling contrary to a Supreme Court stay order), *reh'g en banc granted* 981 F.3d 311 (4th Cir. 2020).

Accordingly, the Democratic Party Plaintiffs' position that the NVRA preemptively immunizes the Federal Form from the inclusion of a documentary proof of citizenship facet—regardless of who makes the policy determination or the reasons for doing so—dissipates under the collective weight of the NVRA's plain text, the Supreme Court's explication of it in *ICTA*, and circuit court precedents. At the very least, the Court should defer any adjudication of whether a new proof of citizenship element in the Federal Form complies with Section 9(b) until such time as the EAC (acting pursuant to the Executive Order or otherwise) actually adopts the concept in a final agency action. Notably, this Court previously declined to endorse the Democratic Party Plaintiffs' misguided construction of the NVRA. *See League of United Latin Am. Citizens v. Exec. Office of the President*, -- F. Supp. 3d --, 2025 WL 1187730, at *38 (D.D.C. Apr. 24, 2025); *see also California v. Trump*, -- F. Supp. 3d --, 2025 WL 1667949, at *8 n.6 (D. Mass. Jun. 13, 2025) (similarly declining to hold that the NVRA proscribes documentary proof of citizenship requirements). It should not do so now, either.

II.     **The Executive Order's Documentary Proof of Citizenship Requirement Would Not Impermissibly Burden Voting Rights**

The Democratic Party Plaintiffs also challenge Section 2(a) of the Executive Order as allegedly violative of the right to vote under the First and Fifth Amendments to the U.S. Constitution.  *See* Doc. 1 at ¶¶ 207–212 (Count X).  The Complaint frames this theory within the so-called *Anderson-Burdick* standard, which "weigh[s] the asserted injury to the right to vote against the 'precise interests put forward by the State as justifications for the burden imposed by its rule." *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 190 (2008) (plurality op.) (citing *Anderson v. Celebrezze*, 460 U.S. 780 (1983) and *Burdick v. Takushi*, 504 U.S. 428 (1992)).  As the Defendants correctly note, the claim is facially unviable because it is not ripe.  *See* Doc. 162-1 at 21.  But its flaws transcend its non-justiciability.

A.     **Documentary Proof of Citizenship Mandates Do Not "Severely" Burden Voting Rights**

The *Anderson-Burdick* framework takes as its premise the reality that compliance with virtually any regulatory safeguard will demand *some* quantum time or effort by voters.  But such strictures become constitutionally suspect only if they "represent a significant increase over the usual burdens of voting."  *Crawford*, 553 U.S. at 198 (2006); *see also Brnovich v. Democratic Nat'l. Comm.*, 594 U.S. 647, 669 (2021) (recognizing in Voting Rights Act context that "voting necessarily requires some effort and compliance with some rules" and that "[m]ere inconvenience cannot be enough" to impugn a facially neutral statute's validity).  In offering eligible registrants a broad menu of commonly held documents for corroborating their citizenship, Section 2(a) of the Executive Order is, both conceptually and in its practical operation, substantively identical to voter ID laws that *Crawford* and its progeny have almost uniformly sustained.  *See, e.g.*, *Am. Civil Liberties Union of N.M. v. Santillanes*, 546 F.3d 1313 (10th Cir. 2008); *Lee v. Va. State Bd. of*

*Elections*, 843 F.3d 592, 606-07 (4th Cir. 2016); *Frank v. Walker*, 768 F.3d 744, 748 (7th Cir. 2014); *Brakebill v. Jaeger*, 932 F.3d 671, 679-80 (8th Cir. 2019).

Notably, despite their equally febrile and conclusory assertion that "million[s]" of Americans face disenfranchisement under the Executive Order, *see* Doc. 1 ¶¶ 208–209, the Democratic Party Plaintiffs are unable to muster even a single example of an actual, real-life individual who is eligible and wishes to register to vote but cannot feasibly prove his or her citizenship.  This conspicuous omission itself should extinguish the claim.  *See Santillanes*, 546 F.3d 1319 (noting that "Plaintiffs cannot identify a single individual who would not vote . . . because of the [photo ID] measure."); *Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1354 (7th Cir. 2009) ("[T]he inability to locate a single voter who would bear a significant burden 'provides significant support for a conclusion that the Photo ID requirement does not unduly burden the right to vote.'" (citation omitted)); *Ind. Democratic Party v. Rokita*, 458 F. Supp. 2d 775, 822-23 (S.D. Ind. 2006) ("Despite apocalyptic assertions of wholesale voter disenfranchisement, Plaintiffs have produced not a single piece of evidence of any identifiable registered voter who would be prevented from voting pursuant to [the challenged law] because of his or her inability to obtain the necessary photo identification."), *aff'd sub nom. Crawford*, 553 U.S. 181.

The long-running litigation engulfing Arizona's proof of citizenship requirement illuminates the flaws in the Democratic Party Plaintiffs' overwrought prognostications.    As recounted above, the Arizona electorate in 2004 approved a statute requiring all new registrants to provide documentary proof of citizenship as a condition of registering to vote.  *See* Ariz. Rev. Stat. § 16-166(F).  No court has ever found that the statute unconstitutionally burdens voting rights, and it remains an enforceable (and enforced) prerequisite to voting in Arizona state and local elections. That is not, however, for lack of trying by a litany of political and nonprofit groups, including

Democrat Party organizations.  Shortly after the law's adoption, a federal district court refused a request to enjoin it, finding scant evidence that it was obstructing any otherwise eligible registrants. *See Gonzalez*, 2006 WL 8431038, at *7, *aff'd*, 485 F.3d 1041, 1050 (9th Cir. 2007) (declarations averring that obtaining required documentation would be a "burden" were insufficient).[5]  Other plaintiffs (which included the Democratic National Committee) fared no better during a second round of litigation in 2023.  Despite nearly 18 years' worth of data at their disposal and a nine-day trial in which to prove their claims, the plaintiffs were unable to identify even a single individual who was disenfranchised by the proof of citizenship law.  Although it invalidated portions of the Arizona law on preemption grounds, the district court wholly rejected the plaintiffs' *Anderson-Burdick* claim.  Notably, it found that they had been "unable to provide evidence quantifying the number of Arizonans qualified to vote that may be unable to provide *any* form of [proof of citizenship] or that have been or will be deterred from registering to vote because of" that requirement.  *Mi Familia Vota*, 719 F. Supp. 3d at 1003.

It is true that (at the time of the decision in *Mi Familia Vota*) approximately 19,000 Arizona registrants have not supplied proof of citizenship and thus are ineligible to vote in state or local elections.  While the *Mi Familia Vota* court noted that Arizona's so-called "federal only" voters were not affirmatively proved to be non-citizens, *see* 719 F. Supp. 3d at 1011, it also never purported to find that any or all of them are, in fact, U.S. citizens, and certainly never found that these individuals were *unable* to comply with the law.  To the contrary, it pointed out that the plaintiffs in that case had "not estimated the number of these voters that wholly *lack*" proof of citizenship, adding that "even assuming some Federal-Only Voters do not possess [proof of

---

[5] After "significant discovery and motions practice extending over a year and a half," the *Gonzalez* plaintiffs were eventually able to locate exactly one individual who may have met the criteria. *Gonzalez v. Arizona*, 2008 WL 11395512, at *1, *17 (D. Ariz. Aug. 20, 2008).

citizenship], the evidence does not reliably illustrate the likelihood that voters will encounter obstacles to obtaining this information." *Id.* at 1008.

The Arizona proceedings aptly underscore the factual deficiencies that debilitate the Democratic Party Plaintiffs' *Anderson-Burdick* claim here. At bottom, they rely on speculative suppositions conjoined with generic characterizations of various demographic groups to serve as a springboard for the haphazard inferential leap that the Executive Order will cause the disenfranchisement of a significant (yet notably unspecified) number of otherwise eligible Americans who wish to vote. That kind of evidentiary alchemy, however, does not enable a court to find a constitutionally significant "burden" under *Anderson-Burdick*. The Court should enter summary judgment for the Defendants on Count X, as applied to § 2(a) of the Executive Order.

### B. The Executive Order Advances Vital Governmental Interests in Preventing Unlawful Voting and Fortifying Public Confidence in Elections

Section 2(a) of the Executive Order is appropriately tailored to advancing crucial regulatory interests in preempting fraud, preventing other forms of unlawful voting, and preserving voter confidence in the integrity of elections. The Democratic Party Plaintiffs tellingly do not deny that non-citizen voting occurs, but declare incidence of it to be "exceeding rare," Doc. 1 ¶ 209. That argument neglects at least three distinctions.

First, both courts and experts have acknowledged that election crimes evade easy detection, and reported rates hence do not necessarily reflect actual incidence. Stated another way, the absence of evidence is not always evidence of absence. *See Mi Familia Vota*, 719 F. Supp. 3d at 966 (noting that even plaintiffs' expert witness had agreed "that voter fraud can be difficult to detect"); Ray Christensen & Thomas J. Schultz, *Identifying Election Fraud Using Orphan and Low Propensity Voters*, 42 AM. POLITICS RESEARCH 311, 313 (2014) ("The difficulties in discovery or measuring electoral fraud are well known.").

Second, the lexicon of voter "fraud" obscures that unintentional violations—for example, a registration form signed by a longtime permanent resident who subjectively but mistakenly believes she is a naturalized citizen—also corrode election security, even though they may not be investigated, charged or prosecuted as voter "fraud" or a similar criminal offense. *See Mi Familia Vota*, 719 F. Supp. 3d at 1011 ("The State's interests in preventing voter fraud and unintentional non-citizen voting are both legitimate, as both forms of non-citizen voting can undermine the integrity of Arizona's elections."). Requiring that paper representations of one's qualifications be corroborated with common forms of documentary proof necessarily curtails the risk of good faith, but still illicit, registration and voting by ineligible individuals.

Third, the Supreme Court has explicitly cautioned that the magnitude of the government's interest in policing election-related wrongdoing is not denoted by the prevalence of extant fraud. To the contrary, "it should go without saying that a State may take action to prevent election fraud without waiting for it to occur and be detected within its own borders." *Brnovich*, 594 U.S. at 686; *see also Santillanes*, 546 F.3d at 1323 (holding in voter ID context that "[i]n requiring the City to present evidence of past instances of voting fraud, the district court imposed too high a burden on the City"); *Greater Birmingham Ministries v. Sec'y of State for the State of Ala.*, 992 F.3d 1299, 1334 (11th Cir. 2021) (noting that "deterring voter fraud is a legitimate policy on which to enact an election law, even in the absence of any record evidence of voter fraud").

More fundamentally, the value of guardrails around election processes transcends such laws' deterrent capabilities. The Supreme Court has expressly recognized public confidence in elections as a freestanding governmental interest that is independent of (albeit related to) the regulatory objective of deterring and detecting actual fraud. *See Crawford*, 553 U.S. at 197.

The Executive Order's objectives enjoy broad popular support. National polling consistently shows widespread support for measures aimed at restricting voting to United States citizens. A 2024 Pew Research study found that strong majorities of all voters "say it is very or somewhat important to stop noncitizens from voting (90%) and to prevent people who are not qualified to vote from doing so (89%)." Pew Research Center, *Confidence in voting access and integrity; expectations for whether and when the election results will be clear* (Oct. 24, 2024), https://tinyurl.com/zepnbzd2. A 2021 Pew Research poll showed that 93 percent of Republicans and 61 percent of Democrats favor requirements that voters show government-issued photo ID to vote. Pew Research Center, *Republicans and Democrats Move Further Apart in Views of Voting Access* (Apr. 22, 2021). A 2021 Monmouth poll found that 56% of self-identified liberals and 84% of nonwhite voters favored photo ID requirements. Miles Parks, *Democrats Are Now Open To New Voter ID Rules. It Probably Won't Win Over The GOP*, NPR (Aug. 28, 2021). A 2022 Gallup poll found that 97% of Republicans, 84% of independents and 53% of Democrats favored photo ID requirements. Nicole Willcoxon and Lydia Saad, *Eight in 10 Americans Favor Early Voting, Photo ID Laws*, Gallup.com (Oct. 14, 2022). That poll found that 77 percent of people of color support voter-identification laws. *Id.* And in 2024, eight states amended their constitutions away from "every citizen" can vote to "only citizens" can vote, bringing the total number of states with explicit prohibitions to fifteen. Wendy Underhill, *States Consider Options to Ensure That Noncitizens Aren't Voting* (Jan. 30, 2025), https://www.ncsl.org/state-legislatures-news/details/states-consider-options-to-ensure-that-noncitizens-arent-voting.

This widespread support is unsurprising—limiting federal elections to citizens, and establishing guardrails to ensure that limit is protected, are common-sense electoral measures that fortify and implement longstanding federal laws against non-citizen voting. *E.g.*, 18 U.S.C. § 611.

Citizenship is "a relevant ground for determining membership in the political community." *Cabell v. Chavez-Salido*, 454 U.S. 432, 438 (1982). And "[t]he exclusion of aliens from basic governmental processes is not a deficiency in the democratic system but a necessary consequence of the community's process of political self-definition." *Id.* at 439. "A new citizen has become a member of a Nation, part of a people distinct from others." *Foley v. Connelie*, 435 U.S. 291, 295 (1978). "The individual, at that point, belongs to the polity and is entitled to participate in the processes of democratic decisionmaking." *Id.* The sovereign's "obligation to preserve the basic conception of a political community" means "exclud[ing] aliens from participation in its democratic political institutions" and protecting citizens' right to direct their affairs. *Id.* at 295–96. Section 2(a) of the Executive Order aims directly at that objective and should be sustained.

## CONCLUSION

The Court should deny the Democratic Party Plaintiffs' Cross-Motion for Partial Summary Judgment and grant the Defendants' Motion for Partial Summary Judgment.

Dated: August 15, 2025                   Respectfully submitted,

                                        STATECRAFT PLLC

                                        By: */s/Kory Langhofer*
                                        Kory Langhofer (DC Bar No. 1031714)
                                        649 North Fourth Avenue, First Floor
                                        Phoenix, Arizona 85003
                                        (602) 382-4078
                                        kory@statecraftlaw.com

                                        *Counsel for Amici Curiae Republican Party*
                                        *of Arizona, LLC and Restoring Integrity and*
                                        *Trust in Elections*