# UNITED STATES DISTRICT COURT
# DISTRICT OF COLUMBIA

| | |
|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> EXECUTIVE OFFICE OF THE PRESIDENT, *et al.*, <br><br> Defendants. | Civil No. 25-cv-0946 (CKK) |
| DEMOCRATIC NATIONAL COMMITTEE, *et al*, <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*, <br><br> Defendants. | Civil No. 25-cv-0952 (CKK) |
| LEAGUE OF WOMEN VOTERS EDUCATION FUND, *et al.*, <br><br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*, <br> Defendants. | Civil No. 25-cv-0955 (CKK) |

## DEFENDANTS' MEMORANDUM IN SUPPORT OF
## MOTION FOR PARTIAL SUMMARY JUDGMENT

BRETT A. SHUMATE
Assistant Attorney General

ERIC J. HAMILTON
Deputy Assistant Attorney General
Civil Division, Federal Programs Branch

JOSEPH E. BORSON
Assistant Director
Civil Division, Federal Programs Branch

BRIDGET K. O'HICKEY
Counsel to the Assistant Attorney General
U.S. Department of Justice, Civil Division
950 Pennsylvania Avenue, NW
Washington, DC 20530
(202) 353-8679
Bridget.K.O'Hickey@usdoj.gov

MARIANNE F. KIES
CHRISTIAN DIBBLEE
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20005

*Attorneys for Defendants*

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................. 1

ARGUMENT ..................................................................................................................... 3

I.  This Court cannot reach the merits of Plaintiffs' claims because it lacks subject-
    matter jurisdiction. ................................................................................................... 3

    A.  Plaintiffs lack standing to challenge EO §§ 2 and 3. ................................. 5

    B.  Plaintiffs lack standing to challenge EO § 4 and those claims are unripe. ............. 9

    C.  Plaintiffs lack standing to challenge EO § 7. ............................................ 12

    D.  Plaintiffs are not entitled to a declaratory judgment against the President. .......... 15

II. Plaintiffs' claims suffer from threshold defects on the merits. .......................... 16

    A.  Plaintiffs lack a cause of action to bring their nonstatutory claims. ............ 16

    B.  Plaintiffs' APA claims fail because there is no final agency action and the
        Privacy Act sets forth a reticulated scheme for judicial review. .......................... 17

    C.  Plaintiffs' claims are also prudentially unripe. .......................................... 20

III. Plaintiffs' claims substantively fail. .................................................................... 21

    A.  Sections 2(b) and 3(a) (Democratic Party Claims 1 and 9) ................................. 21

    B.  Section 2(d) (Democratic Party Claims 1, 6, and 8) ............................................ 27

    C.  The President lawfully instructed the Secretary of Defense to carry out §
        3(d)'s directive (LULAC Claims 4 and 6, Democratic Party Claims 7 and
        10). ............................................................................................................... 30

    D.  The President lawfully instructed the EAC to carry out EO § 4(a)'s
        directive (LULAC Claim 2, Democratic Party Claims 1, 2, 4, and 11). .............. 33

    E.  The President lawfully instructed the EAC to carry out § 4(b)'s directive
        (Democratic Party Claims 1–2 and 11). ..................................................... 35

    F.  Plaintiffs' challenges to EO § 4(c) fail (DPPs Claims 1, 2, 11) ............................ 36

    G.  Plaintiffs' challenges to EO § 4(d) fail (Democratic Party Plaintiffs Claim
        4). ............................................................................................................... 37

H.    Plaintiffs' challenges to EO §§ 7(a) and 7(b) lack merit (LULAC Claims 2–3, Democratic Party Claims 1–5, and 11). ....................................................... 39

CONCLUSION ............................................................................................................. 45

# TABLE OF AUTHORITIES

## CASES

*Abbott Lab'ys v. Gardner,*
  387 U.S. 136 (1967)...................................................................................................... 20

*\*Am. Fed'n of Tchrs. v. Bessent,*
  2025 WL 2313244 (4th Cir. Aug. 12, 2025)............................................... 6, 19, 25

*Am. Foreign Serv. Ass'n v. Trump,*
  2025 WL 1742853 (D.C. Cir. June 20, 2025)......................................................... 17

*Am. Petrol. Inst. v. EPA,*
  683 F.3d 382 (D.C. Cir. 2012)................................................................................. 20

*Ameron, Inc. v. U.S. Army Corps of Eng'rs,*
  809 F.2d 979 (3d Cir. 1986)..................................................................................... 40

*Ames v. United States Dep't of Homeland Sec.,*
  861 F.3d 238 (D.C. Cir. 2017)................................................................................. 23

*Anderson v. Celebrezze,*
  460 U.S. 780 (1983)................................................................................................... 31

*Atl. States Legal Found. v. EPA,*
  325 F.3d 281 (D.C. Cir. 2003)................................................................................. 20

*Bennett v. Spear,*
  520 U.S. 154 (1997)................................................................................................... 18

*Bowen v. Massachusetts,*
  487 U.S. 879 (1988)................................................................................................... 19

*Bowsher v. Synar,*
  478 U.S. 714 (1986)................................................................................................... 40

*Brnovich v. DNC,*
  594 U.S. 647 (2021).................................................................................... 32, 33, 42

*\*Building & Const. Trades Dept., AFL-CIO v. Allbaugh,*
  295 F.3d 28 (D.C. Cir. 2002).......................................................................... passim

*Burdick v. Takushi,*
  504 U.S. 428 (1992).............................................................................................. 31, 32

*Bush v. Gore,*
  531 U.S. 98 (2000)..................................................................................................... 43

iii

*California v. Trump*,
    2025 WL 1667949 (D. Mass. June 13, 2025) ............................................................... 18, 19

*Carney v. Adams*,
    592 U.S. 53 (2020) ....................................................................................................... 3

*Cell Assocs., Inc. v. Nat'l Inst. of Health*,
    579 F.2d 1155 (9th Cir. 1978) ...................................................................................... 19

*Citizens United v. FEC*,
    558 U.S. 310 (2010) ...................................................................................................... 10

*City & Cnty. of S.F. v. Trump*,
    897 F.3d 1225 (9th Cir. 2018) ...................................................................................... 39

*City of Arlington v. FCC*,
    569 U.S. 290 (2013) ...................................................................................................... 37

*\*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013) .............................................................................................. passim

*Comcast Corp. v. FCC*,
    526 F.3d 763 (D.C. Cir. 2008) ...................................................................................... 13

*Common Cause v. Trump*,
    506 F. Supp. 3d 39 (D.D.C. 2020) ........................................................................... 20, 38

*Crawford v. Marion Cnty. Election Bd.*,
    553 U.S. 181 (2008) .................................................................................................. 32, 33

*DaimlerChrysler Corp. v. Cuno*,
    547 U.S. 332 (2006) ...................................................................................................... 5

*Dalton v. Specter*,
    511 U.S. 462 (1994) ...................................................................................................... 17

*Dep't of Com. v. New York*,
    588 U.S. 752 (2021) ...................................................................................................... 14

*Dixon v. D.C.*,
    666 F.3d 1337 (D.C. Cir. 2011) .................................................................................... 29

*FDA v. All. for Hippocratic Med.*,
    602 U.S. 367 (2024) ......................................................................................... 4, 8, 11, 14

*Food & Water Watch, Inc. v. Vilsack*,
    808 F.3d 905 (D.C. Cir. 2015) ................................................................................... 4, 14

*Foster v. Love*,
    522 U.S. 67 (1997) ............................................................................. 40, 42, 44

*Franklin v. Massachusetts*,
    505 U.S. 788 (1992) ............................................................................. 16, 17

*Huggins v. Isenbarger*,
    798 F.2d 203 (7th Cir. 1986) ................................................................. 40

*Indus. Energy Consumers of Am. v. FERC*,
    125 F.4th 1156 (D.C. Cir. 2025) ........................................................... 3, 11

*Info. Ctr. v. IRS*,
    910 F.3d 1232 (D.C. Cir. 2018) ............................................................. 19, 22

*ITServe All., Inc. v. U.S. Dep't of Homeland Sec.*,
    71 F.4th 1028 (D.C. Cir. 2023) ............................................................. 4

*League of Women Voters of Fla. Inc. v. Fla. Sec'y of State*,
    66 F.4th 905 (11th Cir. 2023) ............................................................... 32

*League of Women Voters of U.S. v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016) ................................................................... 34

*Libertarian Party v. D.C. Bd. of Elections & Ethics*,
    682 F.3d 72 (D.C. Cir. 2012) ................................................................. 32

*McConnell v. FEC*,
    540 U.S. 93 (2003) ............................................................................... 10, 13

*McCray v. Biden*,
    574 F. Supp. 3d 1 (D.D.C. 2021) .......................................................... 16, 17

*Mi Familia Vota v. Fontes*,
    719 F. Supp. 3d 929 (D. Ariz. 2024) ..................................................... 32, 33

*Munro v. Socialist Workers Party*,
    479 U.S. 189 (1986) ............................................................................. 33

*Myers v. United States*,
    272 U.S. 52 (1926) ............................................................................... 21

*Nat'l Ass'n of Home Builders v. EPA*,
    667 F.3d 6 (D.C. Cir. 2011) ................................................................... 4

*Nat'l Fair Hous. All. v. Carson*,
    330 F. Supp. 3d 14 (D.D.C. 2018) ........................................................ 8, 24

*Nat'l Taxpayers Union, Inc. v. United States*,
  68 F.3d 1428 (D.C. Cir. 1995) .......................................................................... 4, 15

*Norman v. Reed*,
  502 U.S. 279 (1992) .......................................................................................... 31

*Nuclear Regul. Comm'n v. Texas*,
  606 U.S. 665 (2025) .......................................................................................... 17

*Ohio Democratic Party v. Husted*,
  834 F.3d 620 (6th Cir. 2016) ............................................................................ 33

*PETA v. USDA*,
  797 F.3d 1087 (D.C. Cir. 2015) .......................................................................... 8

*POET Biorefining, LLC v. EPA*,
  970 F.3d 392 (D.C. Cir. 2020) ............................................................................ 5

*Pub. Citizen Health Rsch Grp. v. Comm'r, FDA*,
  740 F.2d 21 (D.C. Cir. 1984) ........................................................................ 20, 21

*Rapanos v. United States*,
  547 U.S. 715 (2006) .......................................................................................... 43

*Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*,
  324 F.3d 726 (D.C. Cir. 2003) .......................................................................... 18

*\*Republican Nat'l Comm. v. Wetzel*,
  120 F.4th 200 (5th Cir. 2024) ..................................................................... passim

*Romer v. Evans*,
  517 U.S. 620 (1996) .......................................................................................... 29

*Rubin v. City of Santa Monica*,
  308 F.3d 1008 (9th Cir. 2002) .......................................................................... 32

*Sedima, S.P.R.L. v. Imrex Co.*,
  473 U.S. 479 (1985) .......................................................................................... 43

*Segovia v. United States*,
  880 F.3d 384 (7th Cir. 2018) ............................................................................ 30

*\*Seila L. LLC v. Consumer Fin. Prot. Bureau*,
  591 U.S. 197 (2020) ............................................................................... 22, 28, 37

*Sherley v. Sebelius*,
  689 F.3d 776 (D.C. Cir. 2012) .......................................................................... 38

*Soc. Sec. Admin. v. Am. Fed'n of State, Cnty., & Mun. Emps.*,
    145 S. Ct. 1626 (2025) ................................................................................ 26

*Steffan v. Perry*,
    41 F.3d 677 (D.C. Cir. 1994) ..................................................................... 29

*\*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021) .......................................................................... 4, 6, 7, 12

*Trump v. AFGE*,
    145 S. Ct. 2635 (2025) ..................................................................... 13, 26, 38

*Trump v. New York*,
    592 U.S. 125 (2020) ................................................................................. 5, 13

*Trump v. United States*,
    603 U.S. 593 (2024) ..................................................................................... 12

*United States v. Texas*,
    599 U.S. 670 (2023) ..................................................................................... 12

*Voting Integrity Project, Inc. v. Keisling*,
    259 F.3d 1169 (9th Cir. 2001) ..................................................................... 43

*Washington All. of Tech. Workers v. United States Dep't of Homeland Sec.*,
    50 F.4th 164 (D.C. Cir. 2022) ..................................................................... 25

*Wilson v. Libby*,
    535 F.3d 697 (D.C. Cir. 2008) ..................................................................... 20

*Wyo. Outdoor Council v. U.S. Forest Serv.*,
    165 F.3d 43 (D.C. Cir. 1999) ................................................................. 4, 20

**STATUTES**

2 U.S.C. § 7 ........................................................................................... passim

3 U.S.C. § 1 ........................................................................................... passim

5 U.S.C. § 552a(a)(4) ........................................................................... 22, 23

5 U.S.C. § 552a(b)(1) ................................................................................. 25

5 U.S.C. § 702 ........................................................................................... 39

5 U.S.C. § 704 ........................................................................................... 18

6 U.S.C. § 603 ........................................................................................... 38

8 U.S.C. § 1373(a) ........................................................................................ 25

18 U.S.C. §§ 611 .......................................................................................... 24

18 U.S.C. §§ 1015(f) .................................................................................... 30

52 U.S.C. 20507 ........................................................................................... 25

52 U.S.C. 21081(a)(6) ....................................................................... 14, 41, 44

52 U.S.C. 21142 ........................................................................................... 36

52 U.S.C. § 20301(b)(2) ............................................................................... 30

52 U.S.C. § 20302(a)(1) ................................................................................. 7

52 U.S.C. § 20506(a)(1) .......................................................................... 27, 28

52 U.S.C. § 20508(a)(1) ............................................................................ 9, 34

52 U.S.C. § 20962(a) .................................................................................... 35

52 U.S.C. § 21001(b) ............................................................................... 44, 45

52 U.S.C. § 21003(a) ..................................................................... 33, 34, 45

52 U.S.C. § 21142(b)(1) ............................................................................... 37

52 U.S.C. § 21145 ..................................................................................... 9, 34

52 U.S.C. §§ 20505(a)(1) ............................................................................. 34

§ 7(a) ...................................................................................................... 41, 42

§§ 7(a) and 7(b) ........................................................................................... 41

## OTHER AUTHORITIES

80 Fed. Reg. ................................................................................................. 24

85 Fed. Reg. ................................................................................................. 23

Executive Order 14,248 ............................................................................. 1, 2

*The Dead Voter Rule*,
  73 Ala. L. Rev. 341 (2021) ....................................................................... 41

## INTRODUCTION

Fair elections—free of fraud—form the foundation of our republic. In Executive Order 14,248, the President sought to safeguard American elections by directing Executive agencies to take actions designed to encourage compliance with federal law prohibiting foreign nationals from voting in federal elections and setting a uniform Election Day. Plaintiffs challenge various sections of the Executive Order on the grounds that the President exceeded his authority to issue its directives and that those directives are themselves unlawful. Plaintiffs' claims fail, however, because they lack standing to bring them; their claims suffer from threshold defects, including the inability to bring a nonstatutory cause of action; and their claims fail substantively because the Executive Order is lawful on its face.

## BACKGROUND

On March 25, 2025, President Trump issued Executive Order 14,248, entitled "Preserving and Protecting the Integrity of American Elections," 90 Fed. Reg. 14,005 (Mar. 25, 2025) ("Executive Order"; sections cited as "EO § n"). The Executive Order explained that "[f]ree, fair, and honest elections unmarred by fraud, errors, or suspicion are fundamental to maintaining our constitutional Republic. The right of American citizens to have their votes properly counted and tabulated, without illegal dilution, is vital to determining the rightful winner of an election." *Id.* § 1. "Under the Constitution, State governments must safeguard American elections in compliance with Federal laws that protect Americans' voting rights and guard against dilution by illegal voting, discrimination, fraud, and other forms of malfeasance." *Id.*

Therefore, President Trump declared, "[i]t is the policy of [his] Administration to enforce Federal law and to protect the integrity of our election process." *Id.* For example, although "[s]everal Federal laws, including 18 U.S.C. [§§] 1015 and 611, prohibit foreign nationals from

registering to vote or voting in Federal elections," "States fail adequately to vet voters' citizenship, and, in recent years, the Department of Justice has failed to prioritize and devote sufficient resources for enforcement of these provisions." *Id.* Further, "Federal law establishes a uniform Election Day across the Nation for Federal elections, 2 U.S.C. § 7 and 3 U.S.C. § 1," setting "the day by which ballots must be both cast by voters and received by state officials." *Id.* Accordingly, "[i]t is the policy of [President Trump's] Administration to enforce those statutes and require that votes be cast and received by the election date established in law." *Id.*

The Executive Order, which issued directives to agencies to further those policies, also directed that "[n]othing in [this Executive Order]" is to "be construed to impair or otherwise affect . . . the authority granted by law to an executive department or agency, or the head thereof." *Id.* § 11(a)(i). And the EO must "be implemented consistent with applicable law." *Id.* § 11(b).

Six days after the EO issued, Plaintiffs League of United Latin American Citizens, Secure Families Initiative, and Arizona Students' Association ("LULAC Plaintiffs") filed a complaint in this Court. *League of United Latin American Citizens v. Exec. Off. of the President*, No. 1:25-cv-00946, ECF No. 1 (LULAC Compl.). On the same day, Plaintiffs Democratic National Committee, Democratic Governors Association, DSCC, DCCC, U.S. Senate Minority Leader Charles E. Schumer, and U.S. House of Representatives Minority Leader Hakeem S. Jeffries ("Democratic Party Plaintiffs" or "DPPs") followed suit. *Democratic Nat'l Comm. v. Trump*, No. 1:25-cv-00952, ECF No. 1 (DPP Compl.) (D.D.C. Mar. 31, 2025). The next day, Plaintiffs League of Women Voters Education Fund, League of Women Voters of the United States, League of Women Voters of Arizona, Hispanic Federation, National Association for the Advancement of Colored People, OCA – Asian Pacific American Advocates, and Asian and Pacific Islander American Vote ("League Plaintiffs") filed their Complaint. *League Of Women Voters Education Fund v. Trump*,

No. 1:25-cv-00955, ECF No. 1 (League Compl.) (D.D.C. Apr. 1, 2025). The Court consolidated the three Complaints brought by the LULAC, Democratic Party, and League Plaintiffs on April 3, 2025. *See* ECF No. 12 at 4.[1]

After its preliminary-injunction decision, the Court set a phased briefing schedule for summary judgment. ECF No. 141. In Phase One, as to which the parties agreed no discovery would be necessary, Plaintiffs and Defendants would file cross-motions for partial summary judgment as to EO § 2(a). *Id.* at 2. In Phase Two, Defendants would seek summary judgment on the remainder of Plaintiffs' challenges to the Executive Order's directives. *Id.* at 3.[2]

## ARGUMENT

**I.    This Court cannot reach the merits of Plaintiffs' claims because it lacks subject-matter jurisdiction.**

Article III standing requires an "'injury in fact' that must be 'concrete and particularized,'" as well as 'actual and imminent,'" not "'conjectural or hypothetical.'" *Carney v. Adams*, 592 U.S. 53, 58 (2020).[3] To be imminent, injury must be certainly impending; mere "allegations of possible future injury are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)). In other words, injury cannot be established through a "highly attenuated chain of possibilities predicated on guesswork as to how independent decisionmakers will exercise their judgment." *Indus. Energy Consumers of Am. v. FERC*, 125 F.4th 1156, 1163 (D.C. Cir. 2025).

Associational standing allows an organization to sue on behalf of its members if it shows that (1) at least one of its members would have standing to sue in his own right; (2) the interests

---

[1] All ECF citations are to the docket in No. 25-cv-946, unless otherwise noted.
[2] This motion moves for summary judgment only on claims asserted by the LULAC Plaintiffs and the Democratic Party Plaintiffs. The League Plaintiffs' claims are not addressed in this motion because they "relate to Section 2(a) only," which the parties have briefed separately. ECF No. 141 at 3 n.4; *see* ECF Nos. 145, 146, 162, 163.
[3] Internal citations are generally omitted throughout this brief.

the members seek to protect are germane to their organization's purposes; and (3) "neither the claim nor the requested relief requires individual members to join." *ITServe All., Inc. v. U.S. Dep't of Homeland Sec.*, 71 F.4th 1028, 1032 (D.C. Cir. 2023). The first prong requires an association to show that at least one of its members has sustained or will sustain an injury in fact, meaning— as discussed above—an injury that is "concrete, particularized, and actual or imminent." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021).

Like an individual, an organization asserting standing on its own behalf must demonstrate that it has suffered a "concrete and demonstrable injury to [its] activities—with [a] consequent drain on [its] resources—constitut[ing] . . . more than simply a setback to the organization's abstract social interests." *Nat'l Ass'n of Home Builders v. EPA*, 667 F.3d 6, 11 (D.C. Cir. 2011). The organization must establish that "discrete programmatic concerns are being directly and adversely affected by the challenged action." *Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1433 (D.C. Cir. 1995). "[F]rustration of an organization's objectives is 'the type of abstract concern that does not impart standing.'" *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015). Further, "an organization does not suffer an injury in fact where it expends resources to educate its members and others" unless doing so causes "operational costs beyond those normally expended." *Id.* at 920. Finally, plaintiff organizations cannot "manufacture standing by choosing to make expenditures based on hypothetical future harm that is not certainly impending." *Clapper*, 568 U.S. at 402; *see also FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 394 (2024).

Article III also requires a plaintiff's claim to be ripe for adjudication. *Wyo. Outdoor Council v. U.S. Forest Serv.*, 165 F.3d 43, 48 (D.C. Cir. 1999). But because Plaintiffs raise pre-enforcement challenges, "[c]onstitutional ripeness is subsumed into the Article III requirement of

4

standing." *POET Biorefining, LLC v. EPA*, 970 F.3d 392, 403 (D.C. Cir. 2020); *accord Trump v. New York*, 592 U.S. 125, 131 (2020) (per curiam). Plaintiffs challenge EO provisions that they claim would burden the right to vote of certain voters, including members in certain associations. *E.g.*, LULAC Compl. ¶¶ 3, 138–43, 151–68, 175–78; DPP Compl. ¶¶ 103–19. Plaintiffs must demonstrate standing for each claim they seek to press. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006). Because Plaintiffs either lack standing or their claims are not ripe, both Complaints should be dismissed in their entirety.

### A.    Plaintiffs lack standing to challenge EO §§ 2 and 3.

#### 1.    *Sections 2(b) and 3(a) (Democratic Party Claims 1 and 9)*

The DPPs lack standing to challenge EO § 2(b)(iii) as an *ultra vires* exercise of Presidential constitutional or statutory authority. DPP Compl. ¶ 131 (Claim 1). Section 2(b)(iii) instructs DHS, "in coordination with the DOGE Administrator," to "review each State's publicly available voter registration list and available records concerning voter list maintenance activities" alongside "Federal immigration databases and State records requested, including through subpoena where necessary and authorized by law," for "consistency with Federal requirements." In other words, this section only requires DHS, in coordination with the DOGE Administrator, to lawfully request where necessary, review, and compare records; it does not require DHS to do anything with that information once it has completed its review. The DPPs do not allege how this process could injure them. Instead, they argue that the President lacks authority to "[r]equire DHS or authorize DOGE to *supervise* how States maintain their voter registration lists under the NVRA, including by instructing those agencies to subpoena State records." DPP Compl. ¶ 131 (emphasis added). But that argument reads "supervision" requirements into section 2(b)(iii)'s text that do not actually

exist. On its face, EO § 2(b)(iii) does not injure the DPPs and they lack standing to challenge it as *ultra vires*.

The DPPs also lack standing to bring Claim 9, their APA claim challenging EO §§ 2(b)(i), 2(b)(ii), 2(b)(iii), and 3(a) as unlawful agency action in violation of the Privacy Act. Plaintiffs argue that each of these provisions violates the Privacy Act and that these violations inflict "direct and irreparable harm on" them "by disclosing personal information, on a mass basis, to unauthorized entities and individuals." *Id*. ¶¶ 202–04. In other words, the DPPs assert that they are injured because the agency disclosures contemplated by EO §§ 2(b)(i), 2(b)(ii), 2(b)(iii), and 3(a) violate the Privacy Act. "But under Article III, an injury in law is not an injury in fact." *TransUnion*, 594 U.S. at 427. The DPPs "must allege a concrete injury, defined as an injury with a 'close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts.'" *Am. Fed'n of Tchrs. v. Bessent*, 2025 WL 2313244, at *5 (4th Cir. Aug. 12, 2025) (quoting *TransUnion*, 594 U.S. at 425). "This requires a comparison between the *factual* harm alleged by Plaintiffs and another harm redressable at common law." *Id*. Plaintiffs do not assert how review of publicly available information or information lawfully acquired through judicial process constitutes an injury-in-fact closely analogous to a common-law tort. The closest DPPs come to alleging any factual harm is their assertion that the "unlawful" disclosure of information risks "erroneous identification, investigation, and improper removal from voter rolls." DPPs Compl. ¶ 204. But no section challenged in this claim instructs an agency to remove anyone from voter rolls, much less by Defendants with no role in removing anyone from voter rolls; any such harm is entirely speculative. Plaintiffs similarly provide no basis for their apparent fear of "erroneous identification [and] investigation." Because their claimed injury is nonexistent, Plaintiffs lack Article III injury.

2.      *Section 3(d) (LULAC Claims 4 and 6, Democratic Party Claims 7 and 10)*

Section 3(d) directs the Secretary of Defense to update the Federal Post Card Application

("FPCA") pursuant to the Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA")

to require documentary proof of United States citizenship, "as defined by [EO] section 2(a)(ii),"

and "proof of eligibility to vote in elections in the State in which the voter is attempting to vote."

UOCAVA requires states to permit absent uniformed service voters and overseas voters to use

absentee registration procedures for federal elections. 52 U.S.C. § 20302(a)(1); *see id*. § 20310(1),

(5). UOCAVA directs the Secretary of Defense to "prescribe an official post card form" to fulfill

this requirement. *Id.* § 20301(b)(2).

Plaintiffs lack standing to challenge EO § 3(d). As Plaintiffs recognize, there are no facts

to suggest what proof of eligibility might suffice, or how a UOCAVA voter might obtain such

proof. *See* LULAC Compl. ¶ 162. The Secretary of Defense, via the Federal Voting Assistance

Program ("FVAP"), has not yet updated the FPCA, and the EO does not establish a deadline to do

so. The particulars of how or when § 3(d) will be implemented are thus unsettled.[4] Ex. 1 at 16–17

(Defendants' interrogatory responses). Without knowing what is required to establish proof of

eligibility to vote in elections in the state in which the voter is attempting to vote—which could

vary among states—Plaintiffs (and the Court) can only speculate about whether the requirement

would violate UOCAVA. And an individual or entity cannot have an imminent injury if that

individual or entity's theory depends on contingent future events that might not occur. *TransUnion*,

594 U.S. at 523.

---

[4] The FPCA available on the FVAP website is still the 01-2023 revision. FVAP, "Federal Post Card Application (FPCA)," https://www.fvap.gov/uploads/fvap/forms/fpca.pdf (last visited Aug. 20, 2025).

Regardless, Plaintiffs have not shown associational standing. Plaintiffs allege that the Secure Families Initiative ("SFI") members will be harmed by § 3(d) because they "may not" have qualifying documents, LULAC Compl. ¶ 156, might not be able to access them due to poor packing, and often do not have reliable Internet access, *id.* ¶ 158–59. Plaintiffs do not identify any one member with those issues. SFI says that its members have standing due to concerns about sending sensitive documents via mail, but that theory is based on a "chain of possibilities" involving bad actors intercepting mail and using it to malicious ends. *Clapper*, 568 U.S. at 410. Although SFI identifies a purportedly "unique[]" burden requiring their members to submit documentary proof of citizenship more than once, LULAC Compl. ¶ 163, this "burden" is based on speculation about how the EO will be enforced.

Plaintiffs also fail to show that they have organizational standing. Plaintiffs allege only that they are "mak[ing] expenditures based on hypothetical future harm." *Clapper*, 568 U.S. at 402. The LULAC Plaintiffs allege that SFI must divert resources to provide new and additional services to eligible registered voters, including new training materials and earlier outreach to members. LULAC Compl. ¶¶ 170–71. The DPPs similarly say that they will need to "divert resources away from other critical priorities" to combat the EO's impact. DPP Compl. ¶ 111. But the Supreme Court requires more: "standing" does not routinely "exist[ ] when an organization diverts its resources in response to a defendant's actions." *All. for Hippocratic Med.*, 602 U.S. at 370. Because the details concerning § 3(d)'s implementation are still speculative, no one knows whether § 3(d) "will actually impair [any] organization's activities." *Nat'l Fair Hous. All. v. Carson*, 330 F. Supp. 3d 14, 42 (D.D.C. 2018) (quoting *PETA v. USDA*, 797 F.3d 1087, 1095 (D.C. Cir. 2015)). Plaintiffs thus lack standing to challenge § 3(d).

**B.    Plaintiffs lack standing to challenge EO § 4 and those claims are unripe.**

*1.    Section 4(a) (LULAC Claim 2, Democratic Party Claims 1, 2, 4, and 11)*

Section 4(a) directs the EAC to take "all appropriate action" to "cease providing Federal funds to States that do not comply with 52 U.S.C. § 21145," including the requirement to use the national mail voter registration form issued pursuant to 52 U.S.C. § 20508(a)(1) (the "federal form") and any concomitant requirement for documentary proof of citizenship adopted pursuant to § 2(a). Plaintiffs challenge EO § 4(a) as an unlawful funding condition that States comply with any DPOC requirement pursuant to § 2(a). LULAC Compl. ¶ 197; *see also* DPP Compl ¶¶ 137, 151. Because Plaintiffs lack standing to challenge § 2(a), the same outcome is warranted with respect to their § 4(a) challenge. ECF No. 163 at 13–17.

As explained previously, § 2(a) inflicts no imminent injury on Plaintiffs because the EAC has not completed the process for considering whether to add a documentary-proof-of-citizenship requirement to the federal form. ECF No. 163 at 14–18. Accordingly, Plaintiffs cannot establish that § 4(a) will imminently injure them either. And even if § 2(a) did create cognizable injury, it is entirely speculative about what "appropriate action" the EAC will take in the future pursuant to § 4(a); such conjectural injury is not ripe for review. *Clapper*, 568 U.S. at 409; Ex. 1 at 18–19.

*1.    Section 4(b) (Democratic Party Claims 1–2 and 11)*

The DPPs also lack standing to challenge § 4(b), which directs the EAC to "initiate appropriate action" to amend the Voluntary Voting System Guidelines 2.0 and issue "other appropriate guidance" for voting systems to "protect election integrity." EO § 4(b)(i). Section 4(b)(ii) then instructs that, within 180 days of the EO, the EAC shall take "appropriate action" to review and, if appropriate, re-certify voting systems under its new standards and rescind previous certifications of voting equipment. "Voluntary Voting System Guidelines (VVSG) are a set of

specifications and requirements against which voting systems can be tested to determine if they meet required standards." *VVSG*, https://www.eac.gov/voting-equipment/voluntary-voting-system-guidelines (last visited Aug. 20, 2025).

The DPPs' claims challenging § 4(b) depend on States' adoption of the VVSG. "[S]tates' adoption of the standards is completely voluntary, as the name suggests, and limited to equipment acquired by states and EAC-certified." *See* Saige Draiger, *Election Assistance Commission Updates Voluntary Voting System Guidelines* (June 30, 2022), https://www.ncsl.org/state-legislatures-news/details/election-assistance-commission-updates-voluntary-voting-system-guidelines. Any alleged injury resulting from the VVSG therefore is not traceable to the Executive Order but to the States' decision to participate in the VVSG. *See, e.g.*, *McConnell v. FEC*, 540 U.S. 93, 228 (2003) (party's alleged injury not fairly traceable to the challenged provision because it "stem[med] not from the operation of [the law], but from their own personal . . . choice"), *overruled on other grounds by Citizens United v. FEC*, 558 U.S. 310 (2010). This theory "rests on speculation about the decisions of independent actors," the States, and cannot support standing. *Clapper*, 568 U.S. at 414; *see also* ECF No. 104 at 103 (this Court noting that "States may choose to leave their own laws in place and either accept the loss of funds" or "challenge" the validity of the funding provisions in court).

Additionally, the DPPs cannot show injury to their members to support associational standing. They have not shown that the EAC has imminently decertified or will imminently decertify any systems on which Democratic voters rely. In fact, the EAC has only certified one voting system under the *current* standard—VVSG 2.0—that predated the EO.[5] Assertions of future

---

[5] EAC, *The EAC Announces First Certified Voting System to VVSG 2.0* (July 10, 2025), https://www.eac.gov/news/2025/07/10/eac-announces-first-certified-voting-system-voluntary-voting-system-guidelines-vvsg.

harm to Democratic voters are thus speculative. *See* DPP Compl. ¶ 117 (alleging that "threats to state funding will come down hardest on Democrats"). Concerning organizational harm, the Democratic Party Plaintiffs claim only that they will be "forced to spend resources to perform election-related functions that States typically perform." *Id.* Bare allegations that the EO will require the DPPs to divert resources are insufficient to support standing. *See All. for Hippocratic Med.*, 602 U.S. at 370.

### 2.    Section 4(c) (Democratic Party Claims 2 and 11)

EO § 4(c) provides that, "[f]ollowing an audit of Help America Vote Act fund expenditures conducted pursuant to 52 U.S.C. [§] 21142," the EAC "shall report any discrepancies or issues with an audited State's certifications of compliance with Federal law to the Department of Justice for appropriate enforcement action." The EAC has not audited any Help America Vote Act fund expenditures, however, and Plaintiffs do not claim otherwise. Ex. 1 at 22. Nor has the EAC "report[ed] any discrepancies or issues" to the Department of Justice for appropriate enforcement action. *Id*. Even if the EAC had done an audit and reported discrepancies, the EO does not identify—and neither can Plaintiffs—what "appropriate" enforcement action would follow. Because Article III injury cannot be established through a "highly attenuated chain of possibilities predicated on guesswork as to how independent decisionmakers will exercise their judgment," Plaintiffs lack standing to challenge § 4(c). *Indus. Energy Consumers of Am.*, 125 F.4th at 1163.

### 3.    Section 4(d) (Democratic Party Claim 4)

Section 4(d) provides that the DHS Secretary and the Administrator of the Federal Emergency Management Agency shall, in considering funding for State or local election offices or administrators through the Homeland Security Grant Programs, "heavily prioritize compliance" with the VVSG and completion of testing through the accreditation process. Section 4(d) does not

contain a date certain or otherwise define the Agencies' review and prioritization, so the DPPs do not identify any relevant non-speculative Article III injury.

### C.    Plaintiffs lack standing to challenge EO § 7.

#### 1.    Section 7(a) (LULAC Claims 2–3, Democratic Party Claims 1, 3, and 5)

Section 7(a) interprets 2 U.S.C. § 7 and 3 U.S.C. § 1 to require a national ballot receipt deadline and instructs the Attorney General to "take all necessary action to enforce [the statutes] against States that violate" them. What that action will be, how it will be enforced, and against whom it will be enforced is entirely speculative, and is not a basis for Article III standing.

This instruction to the Attorney General is a matter of enforcement discretion that belongs to the Executive Branch. *See United States v. Texas*, 599 U.S. 670, 678 (2023) ("The President 'shall take Care that the laws be faithfully executed.'" (quoting U.S. Const., art. II, § 1, cl. 1, § 3)); *see also TransUnion LLC*, 594 U.S. at 429 (under Article II, the Executive Branch has authority to decide "how to prioritize and how aggressively to pursue legal actions against defendants who violate the law"). The Attorney General acts as the President's "chief law enforcement officer" who "provides vital assistance to [him] in the performance of [his] constitutional duty to preserve, protect, and defend the Constitution." *Trump v. United States*, 603 U.S. 593, 620 (2024). Moreover, the Executive Branch's enforcement decisions are not subject to judicial review because "courts generally lack meaningful standards for assessing the propriety of enforcement choices." *Texas*, 599 U.S. at 679.

At the outset, the Attorney General has not implemented EO § 7(a). Ex. 1 at 26. Any dispute about what she may do in the future, and whether any such action would violate Plaintiffs' legal rights, is necessarily speculative. As this Court has recognized, the Attorney General can lawfully enforce these statutes. *See* ECF No. 104 at 98–99. This Court has also acknowledged that,

because EO § 11(b) requires the Attorney General to enforce the statutes "consistent with applicable law," there is no risk of imminent injury. *Id.* at 99; *see New York*, 592 U.S. at 131; *see also Trump v. AFGE*, 145 S. Ct. 2635, 2635 (2025) (Sotomayor, J., concurring) (concurring in grant of stay because "the relevant Executive Order directs agencies to" act "consistent with applicable law"); *Allbaugh*, 295 F.3d at 33.

In *Trump v. New York*, for example, plaintiffs challenged a memorandum issued by President Trump instructing the Secretary of Commerce to implement a policy, "to the maximum extent feasible and consistent with the discretion delegated to the executive branch," that would have excluded "from the apportionment base aliens who are not in a lawful immigrant status." 592 U.S. at 129–30. The Supreme Court found that the plaintiffs failed to establish both standing and ripeness because the "case [was] riddled with contingencies and speculation that impede[d] judicial review" and "[a]ny prediction how the Executive Branch might eventually implement [its] general statement of policy is 'no more than conjecture' at this time." *Id.* at 131, 134.

So too here. *See* ECF No. 104 at 99 ("[I]t is unclear on the present record whether Section 7(a) will lead imminently to any unlawful action" because the "Attorney General . . . must implement Section 7(a), as the Executive Order says, 'consistent with applicable law.'"). Nothing has changed on that point since this Court's preliminary-injunction order. Because the Court "cannot simply assume" that the Attorney General will enforce Section 7(a) unlawfully or act in bad faith, *Comcast Corp. v. FCC*, 526 F.3d 763, 769 n.2 (D.C. Cir. 2008), Plaintiffs' alleged injury is entirely speculative, ECF No. 104 at 99.

Nor can Plaintiffs meet the standards for associational and organizational standing. LULAC alleges that its members in States that count absentee ballots after Election Day "will be harmed and potentially disenfranchised." LULAC Compl. ¶ 142. No further detail is given beyond

this conclusory assertion of harm. They allege specifically that SFI's members frequently "rely on ballot acceptance deadlines after Election Day." *Id.* ¶ 165. But the LULAC Plaintiffs do not explain how that common practice translates to an injury in fact, particularly in view of the fact that the Attorney General has yet to act. *Dep't of Com. v. New York*, 588 U.S. 752, 768 (2021).

With respect to organizational harm, the LULAC Plaintiffs argue only that they "will be forced to divert resources" in the form of money and staff to engage in advocacy and education efforts related to the absentee ballot deadline. LULAC Compl. ¶ 147, *see id.* ¶¶ 148–49, 173, 182. Diversion of resources in response to agency action without more cannot support organizational standing. *See All. for Hippocratic Med.*, 602 U.S. at 370.

2.    *Section 7(b) (LULAC Claim 2, Democratic Party Claims 2, 4–5, and 11)*

Section 7(b) directs the EAC to "condition any available funding to a State" on "compliance with the requirement in 52 U.S.C. 21081(a)(6) that each State adopt uniform and nondiscriminatory standards within that State that define what constitutes a vote and what will be counted as a vote, including that . . . there be a uniform and nondiscriminatory ballot receipt deadline of Election Day for all methods of voting." This Court has already held that the DPPs were unable to establish a substantial likelihood of standing for a preliminary injunction against § 7(b). ECF No. 104 at 102–08. The Court should reach the same conclusion here because the "heightened standard" used to evaluate standing for a preliminary injunction is identical to the standard used "for evaluating a motion for summary judgment." *Food & Water Watch, Inc.*, 808 F.3d at 912 (cited by ECF No. 104 at 101).

Plaintiffs cannot demonstrate standing, either on behalf of members or themselves. Plaintiffs assert that their members are harmed regardless of whether States "adopt the President's preferred electoral policies" or "lose federal funding." LULAC Compl. ¶ 143, *see also id.* ¶¶ 164,

178; DPP Compl. ¶ 170. Any potential injury resulting from how States will implement § 7(b) remains too speculative to support Article III standing. ECF No. 104 at 103. And even if § 7(b) were enjoined here, it is still the position of the Executive that "the Election Day Statutes, 2 U.S.C. § 7 and 3 U.S.C. § 1, 'set the day by which ballots must be both cast by voters and received by state officials." Plaintiffs cannot enjoin a view of the law in the abstract—indeed, a view adopted by the U.S. Court of Appeals for the Fifth Circuit, *Republican Nat'l Comm. v. Wetzel*, 120 F.4th 200, 204 (5th Cir. 2024), and thus any injunction against EO § 7(b) would fail to redress any "voter confusion." *See* ECF No. 104 at 103; *see, e.g.*, LULAC Compl. ¶ 183 ("ASA is harmed by the confusion the EO has created[.]").

Concerning organizational harm, diversion of resources is insufficient to confer standing. *See supra* I.A.2. The LULAC Plaintiffs claim that they "will be required to do more education work than in the past to address the confusion that the Order creates about what voter registration and ballot receipt deadline are [sic] valid." LULAC Compl. ¶ 148; *see id.* ¶¶ 172, 183. But as stated, any injury based on confusion is not redressable by an injunction against 7(b) and cannot confer standing. ECF No. 104 at 103. Moreover, Plaintiffs do not establish that the resources expended on this education work—which is part of LULAC's mission to "encourage its members to vote," LULAC Compl. ¶ 13—would be "beyond those normally expended" for LULAC to fulfill its mission to educate members about ballot receipt deadlines, *Nat'l Taxpayers Union*, 68 F.3d at 1434. So too for the "outreach events," which will occur as in previous years, only earlier than planned. LULAC Compl. ¶ 171.

### D.    Plaintiffs are not entitled to a declaratory judgment against the President.

Plaintiffs' claims are not redressable by an injunction or a declaratory judgment against the President and his Executive Office. Plaintiffs do not seek an injunction against the President, which

they are not entitled to in any event. *See* ECF No. 145-1 at 36; ECF No. 146-1 at 27 n.7; *Franklin v. Massachusetts*, 505 U.S. 788, 802 (1992) (plurality). And they also lack standing to seek a declaratory judgment against the President. *McCray v. Biden*, 574 F. Supp. 3d 1, 10–11 (D.D.C. 2021). This Court should therefore dismiss Plaintiffs' claims seeking a declaratory judgment against the President.

## II.    Plaintiffs' claims suffer from threshold defects on the merits.

Plaintiffs bring nonstatutory claims challenging EO §§ 2(b)(iii), 2(d), 3(d), 4(a), 4(b), 4(c), 4(d), 7(a), and 7(b) on the grounds that they are *ultra vires* and violate the separation of powers. LULAC Compl. ¶¶ 194–200, 201–07, 208–12; DPP Compl. ¶¶ 126–33, 134–41, 142–45, 146–163. Plaintiffs also challenge EO §§ 2(b), 2(d), 3(a), 3(d), 4(a), 4(b), 4(c), 7(a), and 7(b) under the APA, on the basis that those sections direct unlawful agency action in violation of the Election Day statutes, the NVRA, UOCAVA, HAVA, the First and Fifth Amendments, and the Privacy Act. LULAC Compl. ¶¶ 222–26; DPP Compl. ¶¶ 164–70, 171–78, 179–185, 186–94, 195–204, 205–12, 213–19. Plaintiffs' nonstatutory claims fail because Plaintiffs lack a cause of action to bring them. Plaintiffs' APA claims challenging §§ 2(b)(ii), 2(d), 3(d), 4(a), 4(b), 4(c), 7(a), and 7(b) fail because there is no final agency action. And Plaintiffs' claims—statutory and nonstatutory—challenging §§ 2(b)(ii), 2(d), 3(d), 4(a), 4(b), 4(c), 7(a), and 7(b) should also be dismissed because they are not prudentially ripe.

### A.    Plaintiffs lack a cause of action to bring their nonstatutory claims.

Plaintiffs lack a cause of action to bring their nonstatutory claims challenging EO §§ 2(b)(iii), 2(d), 3(d), 4(a), 4(b), 4(c), 4(d), 7(a), and 7(b), because the APA is available. *Ultra vires* review is improper "if, as is usually the case, a statutory review scheme provides aggrieved persons with a meaningful and adequate opportunity for judicial review, or if a statutory review

scheme forecloses all other forms of judicial review." *Nuclear Regul. Comm'n v. Texas*, 606 U.S. 665, 681 (2025) (quotations omitted); *see also Am. Foreign Serv. Ass'n v. Trump*, 2025 WL 1742853, at *2 (D.C. Cir. June 20, 2025) ("[*U*]*ltra vires* review—which is a suit in equity, not a statutory cause of action—is 'strictly limited' when 'other judicial-review statutes' are present."). Here, the APA provides Plaintiffs with "a meaningful and adequate opportunity" to challenge §§ 2(b), 2(d), 3(d), 4(a), 4(b), 4(c), 4(d), 7(a), and 7(b), which task various agencies with specific responsibilities. *Nuclear Regul. Comm'n*, 605 U.S. at 681. Recognizing that fact, Plaintiffs have also brought claims under the APA.

Notably, Plaintiffs' inability to bring APA claims against the President directly, *see Dalton v. Specter*, 511 U.S. 462, 469 (1994), does not deprive them of meaningful judicial review of their claims in these cases, because Plaintiffs are not entitled to an injunction or declaratory judgment against the President anyway, *Franklin*, 505 U.S. at 802 (plurality) ("in general," courts have "no jurisdiction of a bill to enjoin the President in the performance of his official duties" (citation omitted)); *McCray v. Biden*, 574 F. Supp. 3d 1, 10–11 (D.D.C. 2021) ("[I]t is clear that a declaratory judgment is not available to Plaintiff, . . . because relief is available against other executive officials and so the President has not been sued as a last resort.").

This Court should not allow Plaintiffs' request for "ultra vires review" to make "an easy end-run around the limitations of . . . judicial-review statutes," like the APA, simply because Plaintiffs filed their complaint too early to use the "statutory avenue" that Congress provided. *Nuclear Regul. Comm'n*, 606 U.S. at 681–82 (an ultra vires challenge is "essentially a Hail Mary pass" that "rarely succeeds").

**B.    Plaintiffs' APA claims fail because there is no final agency action and the Privacy Act sets forth a reticulated scheme for judicial review.**

Plaintiffs' APA claims challenging EO §§ 2(b)(ii), 2(d), 3(d), 4(a), 4(b), 4(c), 7(a), and

7(b) as unlawful agency action in violation of the Election Day statutes, the NVRA, UOCAVA, HAVA, the First and Fifth Amendments, and the Privacy Act fail because there has not been any final agency action. LULAC Compl. ¶¶ 222–26; DPP Compl. ¶¶ 164–70, 171–78, 179–85, 186–94, 195–204, 205–12, 213–19. Under the APA, "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review." 5 U.S.C. § 704; *see also Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*, 324 F.3d 726, 731 (D.C. Cir. 2003) (affirming dismissal because "[i]f there was no final agency action," there is "no doubt" that appellant "would lack a cause of action under the APA"). "An agency action is deemed final if it is 'definitive' and has a 'direct and immediate . . . effect on the day-to-day business' of the party challenging the agency action." *Reliable Automatic Sprinkler*, 324 F.3d at 731. "Final agency action 'mark[s] the consummation of the agency's decisionmaking process' and is 'one by which rights or obligations have been determined, or from which legal consequences will flow.'" *Id.* (quoting *Bennett v. Spear*, 520 U.S. 154, 178 (1997)). "Agency action is considered final to the extent that it imposes an obligation, denies a right, or fixes some legal relationship." *Id*.

Here, no final agency action exists with respect to §§ 2(b)(ii), 2(d), 3(d), 4(a), 4(b), 4(c), 7(a), and 7(b). The Department of State has not yet "taken all lawful and appropriate action to make available information" required under § 2(b)(ii). Ex. 1 at 7, 10. No agency has yet implemented § 2(d) because this Court has enjoined it. ECF No. 104 at 119. The Department of Defense has not completed the process for updating the federal post card form—section 3(d) is also enjoined. Ex. 1 at 16–17; *California v. Trump*, 2025 WL 1667949, at *22 (D. Mass. June 13, 2025). The EAC has not yet taken any steps to implement § 4(a); it has taken certain steps to update the VVSG pursuant to § 4(b), but that process is not complete and the EAC has not issued other

18

appropriate guidance establishing standards for voting systems; nor has it implemented §4(c). Ex. 1 at 18–22. The EAC also has not taken any steps to implement § 7(b), which is enjoined as to 13 States. *Id*. at 28; *California*, 2025 WL 1667949, at *22. Last, the Department of Justice has not yet taken any action pursuant to § 7(a), which is also enjoined as to 13 States. Ex. 1 at 26–27; *California*, 2025 WL 1667949, at *22. As a result, there are no direct and immediate effects on Plaintiffs flowing from §§ 2(b)(ii), 2(d), 3(d), 4(a), 4(b), 4(c), 7(a), and 7(b). Plaintiffs can only speculate what final agency action will eventually emerge. The Court should dismiss Plaintiffs' APA claims challenging §§ 2(b)(ii), 2(d), 3(d), 4(a), 4(b), 4(c), 7(a), and 7(b) on that basis.

Additionally, the DPPs bring a claim under the APA challenging §§ 2(b)(i), 2(b)(ii), 2(b)(iii), and 3(a) as unlawful agency action in violation of the Privacy Act. DPP Compl. ¶¶ 195–204. But "[t]he APA provides a cause of action only if 'there is no other adequate remedy in a court.'" *Elec. Priv. Info. Ctr. v. IRS*, 910 F.3d 1232, 1244 (D.C. Cir. 2018); *see also Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988). Thus "another statute will preclude suit under the general provisions of APA when it contains its own specific procedural scheme of judicial review." *Am. Fed'n of Tchrs.*, 2025 WL 2313244, at *8 (citing *Bowen*, 487 U.S. at 904). The Privacy Act itself provides a reticulated scheme, "enumerat[ing] violations and details on jurisdiction, venue, and timing," and "at least plausibly reflect[ing] Congress's intent to preclude suit under the APA in circumstances like those presented here." *Id*. (citing *Cell Assocs., Inc. v. Nat'l Inst. of Health*, 579 F.2d 1155, 1159–60 (9th Cir. 1978) ("We think it unlikely that Congress would have gone to the trouble [in the Privacy Act] of authorizing equitable relief for two forms of agency misconduct and monetary relief for all other forms if it had intended to make injunctions available across the board.")); *Wilson v. Libby*, 535 F.3d 697, 703 (D.C. Cir. 2008) ("[T]his Court has held that the Privacy Act is a comprehensive remedial scheme[.]")). Accordingly, the APA does not provide the

DPPs with a cause of action to bring their Privacy Act claim, and this Court should dismiss that claim on that basis.

### C.    Plaintiffs' claims are also prudentially unripe.

Plaintiffs' APA and nonstatutory claims challenging §§ 2(b)(ii), 2(d), 3(d), 4(a), 4(b), 4(c), 7(a), and 7(b) are prudentially unripe. *See Common Cause v. Trump*, 506 F. Supp. 3d 39, 45–53 (D.D.C. 2020) (applying prudential ripeness to non-APA challenge to executive action). To assess prudential ripeness, courts consider "the 'fitness of the issues for judicial decision' and the extent to which withholding a decision will cause 'hardship to the parties.'" *Am. Petrol. Inst. v. EPA*, 683 F.3d 382, 387 (D.C. Cir. 2012) (quoting *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 149 (1967)). The fitness requirement protects "the agency's interest in crystallizing its policy before that policy is subjected to judicial review and the court's interests in avoiding unnecessary adjudication and in deciding issues in a concrete setting." *Id.* (quoting *Wyo. Outdoor Council*, 165 F.3d at 49). Fitness "depends on whether it is purely legal, whether consideration of the issue would benefit from a more concrete setting, and whether the agency's action is sufficiently final." *Id.* (quoting *Atl. States Legal Found. v. EPA*, 325 F.3d 281, 284 (D.C. Cir. 2003)). Hardship caused by deferring review must be "immediate and significant," *id.* at 389, but "will rarely overcome the finality and fitness problems inherent in attempts to review tentative positions," *id.* (quoting *Pub. Citizen Health Rsch Grp. v. Comm'r, FDA*, 740 F.2d 21, 31 (D.C. Cir. 1984)).

Because the responsible agencies have not either begun or completed implementation of EO §§ 2(b)(ii), 2(d), 3(d), 4(a), 4(b), 4(c), 7(a), and 7(b), in addition to there not being any final agency action, Plaintiffs' claims are not fit for adjudication. Any harm Plaintiffs allege that they will suffer cannot "overcome the finality and fitness problem" that plagues their claims. Right

20

now, Defendants' potential future action is not concrete, is not final, and—to the extent it depends on factual predicates—is not purely legal.

### III.    Plaintiffs' claims substantively fail.

#### A.    Sections 2(b) and 3(a) (Democratic Party Claims 1 and 9)

***Claim 1***. Plaintiffs argue that the EO "dramatically exceeds" the President's "constitutional and statutory authority when it comes to regulating elections." DPP Compl. ¶ 131. Specifically, they contend that the President has no legal authority to "[r]equire DHS or authorize DOGE to supervise how States maintain their voter registration lists under the NVRA, including by instructing those agencies to subpoena State records," per § 2(b)(iii). *Id.* But Plaintiffs' argument depends upon their mischaracterization of the provision.

The President's Article II power "necessarily encompasses 'general administrative control of those executing the laws,' . . . throughout the Executive Branch of government, of which he is the head." *Bldg. & Constr. Trades Dep't, AFL-CIO v. Allbaugh*, 295 F.3d 28, 32 (D.C. Cir. 2002) (internal citation omitted); *see Myers v. United States*, 272 U.S. 52, 135 (1926) (explaining that the President "may properly supervise and guide [agency officials'] construction of the statutes under which they act in order to secure that unitary and uniform execution of the laws which [Article II] of the Constitution evidently contemplated in vesting general executive power in the President alone"). Section 2(b)(iii) simply directs DHS, with the DOGE Administrator's cooperation, to "review . . . publicly available voter registration . . . records" and compare them with federal immigration databases and lawfully requested state records to identify unqualified voters. It does not require any action other than reviewing, comparing, and identifying. It does not direct any federal agency, for example, to remove any unqualified voters. The President, as head of the Executive branch, was well within his authority to direct Executive officials to conduct those

actions. *See Seila L. LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 200 (2020) ("[I]ndividual executive officials . . . wield significant authority, but that authority remains subject to the ongoing supervision and control of the elected President.").

In any event, the DPPs challenge only § 2(b)(iii) and no other subsection of 2(b) in their *ultra vires* claim, unlike their APA claim. DPP Compl. ¶¶ 126–33. Additionally, though the DPPs state that the President lacks the "constitutional or statutory authority to issue" § 2(b)(iii), they do not allege that § 2(b)(iii) violates any particular statute in their *ultra vires* claim. *Id*. Any challenge based on another provision of §2(b) or a conflict with a specific statute is thus forfeited.

**_Claim 9._** Plaintiffs also bring an APA claim arguing that §§ 2(b)(i), 2(b)(ii), 2(b)(iii), and 3(a) instruct Defendants to "grant unauthorized third parties access to systems and databases containing personal information of voters . . . without consent," in violation of the Privacy Act. *Id*. ¶¶ 202–03. Though Plaintiffs' Privacy Act APA claim fails as a threshold matter, *see supra* II.B, it also fails because the contemplated disclosures do not violate the Privacy Act. Instead, these sections direct DHS and the Department of State to make certain records available to state and local election officials and DHS, in coordination with DOGE, to review publicly available voter registration lists.

The Privacy Act defines a "record" as "any item, collection, or grouping of information about an individual that is maintained by an agency . . . that contains his name, or the identifying number, symbol, or other identifying particular assigned to the individual, such as a finger or voice print or a photograph." 5 U.S.C. § 552a(a)(4). Agencies may not "disclose any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains," unless the disclosure falls under certain exceptions. *Id*. § 552a(b).

The record may be disclosed, however, "for a routine use." *Id*. § 552a(b)(3). A "routine use" is one that uses the record "for a purpose which is compatible with the purpose for which it was collected." *Id*. § 552a(a)(7). "To fit within the confines of the routine use exception to the Privacy Act, an agency's disclosure of a record must be both (i) 'for a purpose which is compatible with the purpose for which it was collected' and (ii) within the scope of a routine use notice published by the agency." *Ames v. United States Dep't of Homeland Sec*., 861 F.3d 238, 240 (D.C. Cir. 2017) (citing 5 U.S.C. § 552a(a)(7), (e)(4)(D)).

No subsection under 2(b) violates the Privacy Act. Section 2(b)(i) instructs the Secretary of Homeland Security to, "consistent with applicable law, ensure that State and local officials have, without the requirement of the payment of a fee, access to appropriate systems for verifying the citizenship or immigration status of individuals registering to vote or who are already registered." Any disclosure by DHS to state and local officials constitutes a permissible "routine use" of the record. The EO directs DHS to disclose information relating to citizenship and immigration status. The information collected and maintained in DHS's "Systematic Alien Verification for Entitlements Program System of Records," or "SAVE," includes citizenship records and is used to "assist[] Federal, state, tribal, and local government agencies" in "confirm[ing an individual's] immigration" or "citizen status . . . to enable these agencies and entities to make decisions related to . . . determining eligibility for a Federal, state, tribal, or local public benefit." Privacy Act of 1974; System of Records, 85 Fed. Reg. 31,798, 31,800 (May 27, 2020). Making this information available to state and local officials to help them verify the citizenship of individuals registering to vote is consistent with that purpose. Further, DHS has published in the Federal Register a SORN stating that SAVE records "may be disclosed outside DHS" to federal, state, and local authorities "charged with investigating or prosecuting a violation or enforcing or implementing a law, rule,

regulation, or order, when a record, either on its face or in conjunction with other information, indicates a violation or potential violation of law." *Id*. at 31,802. Only citizens may vote, so a record from DHS indicating an individual's citizenship or immigration status, coupled with the fact that that person is trying to register to vote or has registered to vote, would "indicate[] a violation or potential violation of law." *Id*.; *see also* 18 U.S.C. §§ 611, 1015.

Section 2(b)(ii) similarly directs the Secretary of State to "take all lawful and appropriate action to make available information from relevant databases to State and local election officials engaged in verifying the citizenship of individuals registering to vote or who are already registered." Any future disclosure by the Department of State to state and local officials also qualifies as a "routine use" of the records. The Department of State maintains "Passport Records," which it collects and maintains "to establish the U.S. nationality and identity of persons for a variety of legal purposes including, but not limited to, the adjudication of passport applications and requests for related services, social security benefits, employment applications, estate settlements, and Federal and state law enforcement and counterterrorism purposes." Privacy Act; System of Records: Passport Records, State-26, 80 Fed. Reg. 15,653, 15,654 (Mar. 24, 2015). Disclosing this information so that state and local officials may verify the citizenship of individuals registering to vote is consistent with the purpose of collecting information for state law-enforcement purposes. Moreover, the Department of State has published a SORN in the Federal Register stating that routine uses of its Passport Records include use by "state, local or other agencies having information on an individual's history, nationality, or identity, . . . where there is reason to believe that an individual . . . has violated the law." *Id*. at 15,655. Because only citizens may vote, Passport Records indicating an individual's citizenship status may help enforce 18

U.S.C. §§ 611, 1015, which make it unlawful for aliens to vote or knowingly make any claim of United States citizenship to vote.

Section 2(b)(iii) charges DHS, "in coordination with the DOGE Administrator," with "review[ing] each State's publicly available voter registration list and available records concerning voter list maintenance activities as required by 52 U.S.C. 20507, alongside Federal immigration databases and State records requested, including through subpoena where necessary and authorized by law, for consistency with Federal requirements." As explained above, the DPPs are not injured by mere "review." *See supra* I.A.1. To the extent that "coordination with the DOGE Administrator" requires DHS to disclose records to the Administrator herself, such disclosure constitutes a "routine use" of SAVE records for verifying information related to an individual's eligibility to vote, as explained in relation to section 2(b)(i). Additionally, 8 U.S.C. § 1373(a) provides that "[n]otwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, [DHS] information regarding the citizenship or immigration status, lawful or unlawful, of any individual."[6]

But, to the extent that "coordination with the DOGE Administrator" requires DHS to disclose records to DHS "DOGE Team" employees, such intra-agency disclosure is permissible under the Privacy Act. Ex. 1 at 11. "The Privacy Act allows records to be shared intra-agency with 'those officers and employees of the agency . . . who have a need for the record in the performance of their duties.'" *Am. Fed'n of Tchrs.*, 2025 WL 2313244, at *9 (quoting 5 U.S.C. § 552a(b)(1)). Here, the intra-agency disclosure to DHS DOGE Team employees is necessary for them to review

---

[6] *Washington All. of Tech. Workers v. United States Dep't of Homeland Sec.*, 50 F.4th 164, 170 n.1 (D.C. Cir. 2022) (noting that statutory authority was transferred from "the Immigration and Naturalization Service" to DHS in 2002).

state voter registration lists for consistency with federal requirements, particularly the requirement of United States citizenship. *See Soc. Sec. Admin. v. Am. Fed'n of State, Cnty., & Mun. Emps.*, 145 S. Ct. 1626 (2025) (mem.) (granting stay application and concluding that "SSA may proceed to afford members of the SSA DOGE Team access to the agency records in question in order for those members to do their work").

Finally, § 3(a) directs the "Commissioner of Social Security" to "take all appropriate action to make available the Social Security Number Verification Service, the Death Master File, and any other Federal databases containing relevant information to all State and local election officials engaged in verifying the eligibility of individuals registering to vote or who are already registered," to "assist States in determining whether individuals are eligible to register and vote." Section 3(a) specifies, however, that "[i]n determining and taking such action, the Commissioner of Social Security shall ensure compliance with applicable privacy and data security laws and regulations." For the reasons explained above, *see supra* I.A.1, Plaintiffs lack standing to bring their claim challenging § 3(a). However, if this Court reaches the merits of this claim, § 3(a)'s directive is lawful. It instructs the SSA not to simply make these records available to state and local officials but to "take all appropriate action" to do so consistent with "applicable privacy and data security laws and regulations." That instruction recognizes that there may be preliminary actions that SSA must take prior to making the Social Security Number Verification Service, the Death Master File, and any other federal database, to state and local election officials, in order to comply with "applicable privacy and data security laws and regulations." Sharing these types of records may be done lawfully pursuant to an agency's routine use as described with respect to the Departments of Homeland Security and State. Accordingly, § 3(a) is lawful on its face. *AFGE*, 145 S. Ct. at 2635 (Sotomayor, J., concurring); *Allbaugh*, 295 F.3d at 33.

**B.      Section 2(d) (Democratic Party Claims 1, 6, and 8)**

The DPPs challenge § 2(d) as *ultra vires*, alleging that the President lacks the constitutional or statutory authority to "[c]ompel the heads of Federal voter registration agencies to 'assess citizenship prior to providing a Federal voter registration form to enrollees of public assistance programs.'" DPP Compl. ¶ 131. The DPPs bring an APA claim, challenging § 2(d) as unlawful agency action contrary to the NVRA and the Fifth Amendment's guarantee of equal protection. *Id*. ¶¶ 176–77, 191–93. Section 2(d)'s directive, however, does not exceed the President's constitutional authority; nor does it violate the NVRA or equal protection.

On its face, section 2(d) is directed to federal, Executive agencies, which the President has the constitutional authority to direct. Section 2(d) directs "[t]he head of each Federal voter registration executive department or agency . . . under the National Voter Registration Act, 52 U.S.C. [§] 20506(a)" to "assess citizenship prior to providing a Federal voter registration form to enrollees of public assistance programs." EO § 2(d). The NVRA permits States to designate federal agencies as voter registration agencies with their agreement and requires certain federal offices to be so designated. 52 U.S.C. § 20506(a)(1) requires States to "designate agencies for the registration of voters in elections for Federal office." States must designate "as voter registration agencies," "all offices in the State that provide public assistance," "all offices in the State that provide State-funded programs primarily engaged in providing services to persons with disabilities," and "other offices within the State," which "may include . . . *Federal* and nongovernmental offices, with the agreement of such offices." *Id*. § 20506(a)(2), (3) (emphasis added); *see id*. § 20506(b) ("All departments, agencies, and other entities of the executive branch of the Federal Government shall, to the greatest extent practicable, cooperate with the States in carrying out subsection (a)."). And "[a] recruitment office of the Armed Forces of the United States

27

shall be considered a voter registration agency." *id*. § 20506(c)(2), as are any "Federal . . . offices" that agree to become a voter registration agency, *id*. § 20506(a)(3)(B)(ii).

Section 2(d) therefore is directed to those federal agencies that are designated as voter registration agencies. The President, as the head of the Executive branch, has the constitutional authority to direct the actions of those agencies—Executive branch officials—consistent with their statutory mandates. *See Seila L.*, 591 U.S. at 200 ("[I]ndividual executive officials . . . wield significant authority, but that authority remains subject to the ongoing supervision and control of the elected President."); *see supra* III.A.

The DPPs assert that § 2(d)'s instruction to federal voter registration agencies to "assess []" citizenship" prior to providing the federal form violates the NVRA. DPP Compl. ¶ 177. But § 2(d) is consistent with the NVRA's command. The NVRA provides that "each voter registration agency" "shall" "[d]istribut[e] . . . mail voter registration application forms," 52 U.S.C. 20506(a)(4)(A)(i), and where that "voter registration agency is an office that provides service or assistance in addition to conducting voter registration" it "shall . . . distribute with each application for such service or assistance . . . the mail voter registration application form," *id*. § 20506(a)(6)(A)(i). Section 2(d) requires Executive officials to "assess citizenship" prior to providing that form—it does not instruct those officials to withhold the form under any circumstances. It simply functions as a reminder to the person receiving the form of the requirement that he or she be a United States citizen to complete the form. The EO's command to "implement[]" its provisions "consistent with applicable law" further supports this understanding. EO § 11. Section 2(d) does not violate the NVRA.

The DPPs further challenge section 2(d) because it applies only to "enrollees of public assistance programs," and, in their view, there is no "rational[] basis for imposing citizenship

28

assessment only on individuals enrolled in public assistance programs before they can even receive a voter registration form." DPP Compl. ¶¶ 191, 193. Recognizing that § 2(d) neither burdens a fundamental right nor targets a suspect class, the DPPs concede that rational-basis review applies. *Id*. ¶ 193. The DPPs' claim fails thereunder.

"[R]ational-basis review in equal protection analysis is not a license for courts to judge the wisdom, fairness, or logic of legislative choices." *Steffan v. Perry*, 41 F.3d 677, 684 (D.C. Cir. 1994). "[I]f a law neither burdens a fundamental right nor targets a suspect class, [courts] will uphold the . . . classification so long as it bears a rational relation to some legitimate end." *Dixon v. D.C.*, 666 F.3d 1337, 1342 (D.C. Cir. 2011) (quoting *Romer v. Evans*, 517 U.S. 620, 631 (1996)). It is the DPPs' burden to "negative every conceivable basis which might support [section 2(d)], whether or not the basis has a foundation in the record." *Steffan*, 41 F.3d at 684. The DPPs cannot do that because § 2(d) bears a rational relation to a legitimate end. Here, § 2(d)'s instruction to federal voter registration agencies to "assess citizenship prior to providing" the federal form "to enrollees of public assistance programs," furthers the EO's express purpose of "safeguard[ing] American elections in compliance with Federal laws . . . that . . . guard against dilution by illegal voting" by reminding members of the public who interact with Executive officials that they must be a U.S. citizen prior to registering to vote. EO § 1. Any unique application of section 2(d)'s requirement to "public assistance enrollees" comes from the NVRA itself, which specifically requires voter registration agencies that "provide[] service or assistance in addition to conducting voter registration" to "distribute" the federal form "with each application for such service or assistance." 52 U.S.C. § 20506(a)(6)(A)(1). Plaintiffs' complaint, therefore, lies with the NVRA and not the Executive Order. Section 2(d)'s directive is rational because it recognizes that the NVRA, by requiring Executive officials to provide the federal form to public assistance enrollees

when they apply for services, "and with each certification, renewal, or change of address," creates these points of contact between form recipients and Executive officials. Section 2(d), therefore, rationally requires those officials to remind individuals receiving the form in that instance of the obligation to be a U.S. citizen to register to vote.

### C.    The President lawfully instructed the Secretary of Defense to carry out § 3(d)'s directive (LULAC Claims 4 and 6, Democratic Party Claims 7 and 10).

Plaintiffs allege that § 3(d) is *ultra vires*, LULAC Compl. ¶ 209, violates UOCAVA, *id.* ¶ 225; DPP Compl. ¶ 182, and unlawfully "burdens the right to vote" enjoyed by military and overseas voters, *id.* ¶ 208. As for Plaintiffs' *ultra vires* objection, the President has the authority to direct the Secretary of Defense to "update the Federal Post Card Application" for the reasons explained in the Government's motion for summary judgment as to section 2(a). *See* ECF No. 163 at 5–8; *see also supra* III.A.

Plaintiffs' UOCAVA arguments fail because § 3(d) is consistent with UOCAVA's text and design. UOCAVA "protect[s] the voting rights of United States citizens who move overseas but retain their American citizenship." *Segovia v. United States*, 880 F.3d 384, 387 (7th Cir. 2018). To that end, the Secretary of Defense must, in consultation with State and local election officials, "prescribe an official post card form, containing both an absentee voter registration application and an absentee ballot application." 52 U.S.C. § 20301(b)(2).

Nothing in UOCAVA *limits* what kind of document requirements the Secretary of Defense may "prescribe" on the "official post card form." *Id*. And Congress has made clear that UOCAVA voters must be "qualified to vote" in their "place[s] of residence" or "the last place in which [they] were] domiciled before leaving the United States." *See, e.g.*, *id*. § 20310(1), (5). Being "qualified to vote" necessarily requires U.S. citizenship under federal law. *Id*.; 18 U.S.C. §§ 1015(f), 611 (unlawful for any alien to vote in Federal elections). Section 3(d)'s directive that the Secretary of

Defense update the FPCA to require "documentary proof of [] citizenship" and "proof of eligibility to vote in elections in the State in which the voter is attempting to vote" aligns with UOCAVA's requirements.

The DPPs also challenge § 3(d) on the grounds that it constitutes agency action in violation of the First and Fifth Amendments by excessively burdening the right of "military and overseas voters" to vote. LULAC Compl. ¶ 209. Defendants have already responded to analogous arguments regarding § 2(a). *See* ECF No. 163 at 20–23. As noted there, "[e]lection laws will invariably impose some burden upon individual voters," *Burdick v. Takushi*, 504 U.S. 428, 433 (1992), and affect "the individual's right to vote and his right to associate with others for political ends," *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983). "A court considering a challenge to a [government] election law must weigh 'the character and magnitude of the asserted injury to the rights protected by the First and [Fifth] Amendments that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 789). When an individual's First and Fifth Amendment rights are severely burdened, the law must be "narrowly drawn to advance a state interest of compelling importance." *Id*. (quoting *Norman v. Reed*, 502 U.S. 279, 289 (1992)). But when an election law "imposes only 'reasonable, nondiscriminatory restrictions' upon the First and [Fifth] Amendment rights of voters," the government's "important regulatory interests are generally sufficient to justify the restrictions." *Id*. (quoting *Anderson*, 460 U.S. at 788).

As a preliminary matter, § 3(d) does not burden Plaintiffs' First or Fifth Amendment rights because it is not prudentially ripe and any injury flowing from it is speculative. *See supra* I.A.2.,

II.C. But even if the Secretary of Defense updated the Federal Post Card Application in the manner contemplated by the EO, a requirement for documentary proof of citizenship would not severely burden individual voters' First and Fifth Amendment rights because it is "generally applicable, even-handed, politically neutral, and . . . protect[s] the reliability and integrity of the election process." *Rubin v. City of Santa Monica*, 308 F.3d 1008, 1014 (9th Cir. 2002). Because § 3(d) does not severely burden Plaintiffs' First and Fifth Amendment rights, Defendants' "important regulatory interests" sufficiently justify any burden. *Libertarian Party v. D.C. Bd. of Elections & Ethics*, 682 F.3d 72, 76 (D.C. Cir. 2012) (quoting *Burdick*, 504 U.S. at 434).

The Executive Order identifies several important interests that § 3(d) furthers, including ensuring that American elections comply with federal laws that protect Americans' voting rights, guarding against dilution by illegal voting, and promoting public trust in elections. EO § 1. Section 3(d) plainly promotes compliance with "the Federal prohibition on foreign nationals voting in Federal elections." *Id*. § 2. And "[t]here is no question about the legitimacy or importance of the [Government's] interest in counting only the votes of eligible voters." *Crawford v. Marion Cnty. Election Bd*., 553 U.S. 181, 196 (2008) ("*Crawford II*"). "[T]he [Government] is entitled to enact prophylactic legislation to prevent the occurrence of non-citizen voting." *Mi Familia Vota v. Fontes*, 719 F. Supp. 3d 929, 1010 (D. Ariz. 2024) (quoting *Crawford II*, 553 U.S. at 196); *Brnovich v. DNC*, 594 U.S. 647, 685–86 (2021); *League of Women Voters of Fla. Inc. v. Fla. Sec'y of State*, 66 F.4th 905, 925 (11th Cir. 2023) (rejecting plaintiffs' argument that a voting law designed to prevent voter fraud was a "proverbial solution in search of a problem" and a pretext for discrimination because "[t]he Supreme Court has already held that deterring voter fraud is a legitimate policy on which to enact an election law, even in the absence of any record evidence of voter fraud.")), *aff'd in part, vacated in part, remanded*, 129 F.4th 691 (9th Cir. 2025). Voter fraud

"does exist," and Defendants' "interests in preventing voter fraud and unintentional non-citizen voting are both legitimate, as both forms of non-citizen voting can undermine the integrity of [federal] elections." *Id.* at 1010–11.

Additionally, Defendants have an important interest in "safeguarding public confidence by eliminating [fraud and] even appearances of fraud." *Ohio Democratic Party v. Husted*, 834 F.3d 620, 633 (6th Cir. 2016) (internal quotation marks omitted). "[P]ublic confidence in the integrity of the electoral process has independent significance, because it encourages citizen participation in the democratic process." *Crawford II*, 553 U.S. at 197. And the "electoral system cannot inspire public confidence if no safeguards exist to deter or detect fraud or to confirm the identity of voters." *Id.* Defendants are "permitted to respond to potential deficiencies in the electoral process with foresight rather than reactively." *Munro v. Socialist Workers Party*, 479 U.S. 189, 195–96 (1986); *DNC*, 594 U.S. at 685–86. Defendants' important interests therefore sufficiently justify any minimal restriction on Plaintiffs' First and Fifth Amendment rights.

**D.    The President lawfully instructed the EAC to carry out EO § 4(a)'s directive (LULAC Claim 2, Democratic Party Claims 1, 2, 4, and 11).**

Plaintiffs allege that § 4(a) is *ultra vires*, DPP Compl. ¶ 131, and violates the separation of powers, by "condition[ing] the disbursement of federal funds on President Trump's preferred criteria, rather than anything set by Congress," *id.* ¶ 151, *see* LULAC Compl. ¶ 197, and "overrid[ing] the EAC's" procedures, DPP Compl. ¶ 137. The DPPs also argue that § 4(a)'s directive to "[c]ease providing federal funds to States" violates the HAVA. *Id.* ¶ 218.

At the outset, nothing has happened to implement § 4(a). But even if the EAC did take action, the problem with Plaintiffs' arguments is that the statutory sections cited in the EO and enacted by Congress provide for the condition that the EO directs the EAC to apply. For a state to be "eligible to receive a requirements payment" under HAVA, 52 U.S.C. § 21003(a) requires the

state's "chief executive officer . . . or designee . . . [to] certify[] that the State is in compliance with the requirements referred to in subsection (b)," which include "compliance with each of the laws described in section 21145," *id*. § 21003(b)(3). The laws named in 52 U.S.C. § 21145 include the NVRA, among others. *Id*. § 21145(a). And the NVRA requires that states use the federal form developed by the EAC. *See id*. § 20505(a)(1); *see also id*. § 20508(a)(1). Thus, to be eligible to receive HAVA requirements payments, states must use the EAC's federal form.

Section 4(a) simply parrots the NVRA's requirement. The EO directs the EAC to "cease providing Federal funds to States that do not comply with the Federal laws set forth in 52 U.S.C. [§] 21145, including the requirement in 52 U.S.C. [§] 20505(a)(1) that States accept and use the national mail voter registration form . . . , including any requirement for documentary proof of United States citizenship adopted pursuant to section 2(a)(ii)." EO § 4(a). The NVRA's command that States use the federal form is not limited to the version first created in response to the NVRA's directive—it applies to all future iterations of that form developed by the EAC, including any version that requires documentary proof of citizenship. *See, e.g.*, *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 4 (D.C. Cir. 2016); 52 U.S.C. §§ 20505(a)(1), 20508(a)(2)). By requiring States to certify compliance with the laws set forth in 52 U.S.C. § 21145, including the NVRA's requirement to use the federal form, Congress necessarily contemplated the possibility that States may not agree to the certification and that funding may be withheld on that basis. 52 U.S.C. § 21003(a) ("A State is eligible to receive a requirements payment for a fiscal year if . . . ."). Section 4(a) thus lawfully directs the EAC to apply existing statutory funding conditions set forth by Congress.

E.      **The President lawfully instructed the EAC to carry out § 4(b)'s directive (Democratic Party Claims 1–2 and 11).**

The DPPs allege that § 4(b) is *ultra vires*, DPP Compl. ¶ 131, and violates the separation of powers, by "[a]mending guidance regarding standards for voting systems," *id.* ¶ 137. They also allege that § 4(b) violates HAVA. *Id.* ¶ 218. Section 4(b)(i) directs the EAC to "initiate appropriate action to amend" the VVSG 2.0 "and issue other appropriate guidance establishing standards for voting systems to protect election integrity." "[E]xcept where necessary to accommodate individuals with disabilities," the amended guidelines and guidance "shall provide that voting systems should not use a ballot in which a vote is contained within a barcode or quick-response code in the vote counting process." *Id.* And "[w]ithin 180 days of the date of [the EO]," the EAC "shall take appropriate action to review and, if appropriate, recertify voting systems under the new standards . . . , and to rescind all previous certifications of voting equipment based on prior standards." *Id.* § 4(b)(ii).

Despite the DPPs' assertion that the President has "no source of legal authority" to direct the EAC to amend its guidelines, DPPs Compl. ¶ 131, the EAC is an Executive agency. And the President has the authority to direct Executive agencies to carry out their statutory duties in a particular way, consistent with that statute. *See supra* III.A. Congress charged the EAC with "adopt[ing] . . . the voluntary voting system guidelines," 52 U.S.C. § 20962(a), and with "testing, certif[ying], decertif[ying], and recertif[ying] . . . voting system hardware and software by accredited laboratories," *id.* § 20971(a)(1). Section 20962(a) sets forth the process for adopting the VVSG, which includes publishing notice of the proposed guidelines in the federal register and an opportunity for public comment. The President's directive in EO § 4(b)(i) accounts for this statutory process, as it directs the EAC to "initiate appropriate action to amend" the VVSG 2.0. And, as explained, the head of the Executive Branch possesses the authority to direct the EAC to

35

carry out that the amendment process in a particular way, consistent with the statute. *See supra* III.A.

Similarly, § 4(b)(ii) directs the EAC to "take appropriate action" to recertify voting systems under the new standards "if appropriate," and "rescind all previous certifications . . . based on prior standards." This is not inconsistent with section 20971's requirements. Accordingly, § 4(b) is not *ultra vires* and does not violate the separation of powers. Nor does it violate HAVA because Congress delegated particular duties to the EAC. Congress, of course, may modify the manner of federal elections in states. U.S. Const. art. I, § 4 cl. 1; *id*. art. II, § 1, cl. 2. And the President may direct the manner in which the EAC executes its mandate.

Even if none of the above were true, however, the VVSG is, as the name indicates, voluntary. Because states do not have to adopt the VVSG, § 4(b) of the EO cannot violate the vertical separation of powers.

### F.    Plaintiffs' challenges to EO § 4(c) fail (DPPs Claims 1, 2, 11).

The DPPs allege that § 4(c) is *ultra vires*; violates the separation of powers; and violates the APA. DPPs Compl. ¶¶ 131, 137, 218. Section 4(c) provides that, "[f]ollowing an audit of Help America Vote Act fund expenditures conducted pursuant to 52 U.S.C. 21142," the EAC "shall report any discrepancies or issues with an audited State's certifications of compliance with Federal law to the Department of Justice for appropriate enforcement action." Plaintiffs contend that (i) the President "lacks any constitutional or statutory authority" to direct the EAC to report audit discrepancies to the DOJ, *id*. ¶¶ 131–32; (ii) the reporting requirement "overrides the EAC's independent, bipartisan, and majority-based decision-making procedures," violating the separation of powers, *id*. ¶¶ 137–40; and (iii) § 4(c) violates HAVA and thereby the APA, *id*. ¶¶ 218–19. But as explained above, the EAC is an Executive agency and, as the head of the Executive branch, the

President has the constitutional authority to direct Executive agencies and officials consistent with their statutory mandates. *See supra* III.A. Regardless of whether an agency is "independent," if it "exercise[s] any executive power," as the EAC does, it is subject to the President's supervisory authority because "[t]he entire 'executive Power' belongs to the President alone." *Seila L.*, 591 U.S. at 213 (emphasis added); *see also id.* at 216 & n.2 ("[i]t is hard to dispute that the powers of the FTC at the time of *Humphrey's Executor* would at the present time be considered 'executive,' at least to some degree"); *City of Arlington v. FCC*, 569 U.S. 290, 304 n.4 (2013) (even though the activities of administrative agencies "take 'legislative' and 'judicial' forms," "they are exercises of—indeed, under our constitutional structure they must be exercises of—the 'executive Power'" (quoting U.S. Const. art. II, § 1, cl. 1)). Directing the EAC to report information to the Department of Justice falls well within the President's authority. It does not violate any majority-based decision-making procedure—§ 4(c) does not even require any decision to be made. It requires only that information be reported to the DOJ. Because it does not require any decision-making and because HAVA already permits the EAC to audit expenditures, § 4(c) also does not violate HAVA. 52 U.S.C. § 21142(b)(1).

## G.    Plaintiffs' challenges to EO § 4(d) fail (Democratic Party Plaintiffs Claim 4).

The DPPs allege that § 4(d) violates the separation of powers because it unlawfully "condition[s] the disbursement of federal funds" based on the President's "preferred criteria, rather than anything set by Congress." LULAC Compl. ¶ 151.

Section 4(d) directs the Secretary of Homeland Security and the Administrator of FEMA to, "consistent with applicable law," prioritize compliance with the VVSG 2.0 and completion of testing through the Voting System Test Labs accreditation process when "considering the provision of funding for State or local election offices or administrators through the Homeland

Security Grant Programs." EO § 4(d). Section 4(d) cannot be unlawful when it merely directs agencies to act in accordance with applicable law. *AFGE*, 145 S. Ct. at 2635 (2025) (Sotomayor, J., concurring).

Definitionally, directing Executive agencies to take action *to the extent consistent with applicable law* cannot be interpreted as an order to violate the law. It is plainly lawful for the President to instruct agencies to act within their own statutory authorities to implement the President's priorities consistent with applicable law. *See, e.g.*, *Sherley v. Sebelius*, 689 F.3d 776, 784 (D.C. Cir. 2012) ("[A]s an agency under the direction of the executive branch, it must implement the President's policy directives to the extent permitted by law."). Here, DHS is statutorily empowered to administer homeland security grant programs. 6 U.S.C. § 603. As part of that statutory authority, DHS has discretion to designate priorities when allocating grant funds. *Id*. § 608(a)(1)(K). It may exercise this discretion consistent with the President's priorities.

In *Building & Construction Trades Department, AFL-CIO v. Allbaugh*, 295 F.3d 28 (D.C. Cir. 2002), the plaintiffs challenged an executive order that provided that "to the extent permitted by law," no federal agency and no entity that receives federal assistance for a construction project could require or prohibit bidders or contractors from entering into a project labor agreement. *Id.* at 29. The plaintiffs sued, claiming that the executive order exceeded the President's constitutional authority. *See id.* at 31–32. The D.C. Circuit rejected this argument, pointing out that the executive order "directs [agencies] how to proceed in administering federally funded projects, but only '[t]o the extent permitted by law.'" *Id.* at 33. The court concluded that "[t]he mere possibility that some agency might make a legally suspect decision" in the future is not a ground for an injunction. *Id.*; *see also Common Cause*, 506 F. Supp. 3d at 47 (three judge panel) (Katsas, J.) ("We cannot ignore these repeated and unambiguous qualifiers imposing lawfulness and feasibility constraints on

38

implementing the memorandum.").

Nor does § 4(d) "preclude[] a court from examining whether [it] is consistent with law," rendering "judicial review . . . a meaningless exercise." *City & Cnty. of S.F. v. Trump*, 897 F.3d 1225, 1240 (9th Cir. 2018). As the D.C. Circuit noted, "[i]n the event that an agency does contravene the law in a particular instance, an aggrieved party may seek redress through any of the procedures ordinarily available to it," including "an action in the district court challenging that specific decision." *Allbaugh*, 295 F.3d at 33; *see* 5 U.S.C. § 702.

## H. Plaintiffs' challenges to EO §§ 7(a) and 7(b) lack merit (LULAC Claims 2–3, Democratic Party Claims 1–5, and 11).

Plaintiffs allege that EO § 7 is *ultra vires* DPPs Compl. ¶ 131, violates the separation of powers between Congress and the President, *id.* ¶¶ 137, 151; LULAC Compl. ¶ 199, violates the vertical separation of powers between the Government and the States, DPP Compl. ¶ 143, and violates the Election Day statutes, LULAC Compl. ¶ 205; DPP Compl. ¶¶ 168–69, and HAVA, DPP Compl. ¶ 217.

Plaintiffs assert that the President cannot impose "an election day ballot receipt deadline." DPP Compl. ¶ 77. But the President did not create a ballot-receipt deadline for federal elections—Congress did. The EO does not alter the Election Day statutes—2 U.S.C. § 7 and 3 U.S.C. § 1. As the person responsible for taking care that the laws are properly executed, the President put forward his interpretation of those statutes. The Executive has interpreted the law since the Constitution was ratified—this is nothing new, and certainly nothing constitutionally objectionable. In any event, the President's interpretation of the Election Day statutes accords with their text, purpose, and history, and he has the authority to interpret for the Executive Branch what they require.

Article II, section 3 of the Constitution charges the President with the duty to "take Care that the Laws be faithfully executed." "[A]n essential part of execution of the law is the

interpretation of that law." *Ameron, Inc. v. U.S. Army Corps of Eng'rs*, 809 F.2d 979, 990 (3d Cir. 1986). Functionally, "the executive cannot execute [a] law's command until he decides what that command is, and absent a determination by the courts the executive must find the law's command himself." *Id*. Thus, the President's duty under the take-care clause "often puts upon him the duty to interpret [the law] for the Executive Department." *Id*.; *see also Bowsher v. Synar*, 478 U.S. 714, 750 n.16 (1986) (Stevens, J., concurring) ("interpret[ing]" a "law enacted by Congress" is "a power normally committed initially to the Executive under the Constitution's prescription that he 'take Care that the Laws be faithfully executed'"); *Huggins v. Isenbarger*, 798 F.2d 203, 208 (7th Cir. 1986) (Easterbrook, J., concurring). Plaintiffs' attempt to elevate this commonplace reality to a violation of the separation of powers is unavailing. The claims challenging EO § 7 can be dismissed simply by respecting the unremarkable conclusion that the President can interpret the law—leaving the propriety of that interpretation for a day when that interpretation is properly ripe.

But if the Court addresses the substance of this dispute, Plaintiffs fail to state a claim. The Election Day statutes establish a uniform, national Election Day for federal elections. 2 U.S.C. § 7; 3 U.S.C. § 1; *Foster v. Love*, 522 U.S. 67, 69 (1997). Section 7 provides that "[t]he Tuesday next after the 1st Monday in November, in every even numbered year, is established as *the day for the election*, in each of the States and Territories of the United States, of Representatives and Delegates to the Congress commencing on the 3d day of January next thereafter." 2 U.S.C. § 7 (emphasis added). And section 1 further specifies that "[t]he electors of President and Vice President shall be appointed, in each State, *on election day*." 3 U.S.C. § 1 (emphasis added). But Congress enacted 3 U.S.C. § 1 and 2 U.S.C. § 7, in 1845 and 1872, when absentee voting was in its infancy. *Republican Nat'l Comm. v. Wetzel*, 120 F.4th 200, 204, 209 (5th Cir. 2024); *Foster*, 522 U.S. at 69. The advent of commonplace no-excuse-absentee voting presents the question of what having

40

a "day for the election" means for purposes of those statutes, including whether ballots must be received by that day. *See* David Horton, *The Dead Voter Rule*, 73 Ala. L. Rev. 341, 350 (2021).

The President answered that question by interpreting the Election Day statutes for Executive Branch officials, pursuant to his constitutional authority, in EO §§ 7(a) and 7(b). In § 7(a), he instructed the Attorney General to "take all necessary action to enforce 2 U.S.C. [§] 7 and 3 U.S.C. [§] 1 against States that violate these provisions by including absentee or mail-in ballots received after Election Day in the final tabulation of votes for the appointment of Presidential electors and the election of members of the United States Senate and House of Representatives." And in § 7(b), he directed the EAC to "condition any available funding to a State on that State's compliance with" 52 U.S.C. § 21081(a)(6)'s requirement "that each state adopt uniform and nondiscriminatory standards . . . including that, as prescribed in 2 U.S.C. [§] 7 and 3 U.S.C. [§] 1, there be a uniform and nondiscriminatory ballot receipt deadline of Election Day for all methods of voting," except for UOCAVA votes. It was soundly within the President's authority to interpret the Election Day statutes in a manner consistent with the statutes' text so that Executive Branch officials could carry out their commands.

The only on-point federal appellate opinion holds that the Election Day statutes require ballots to "be both cast by voters and received by state officials" on Election Day. *Wetzel*, 120 F.4th at 204. The term "election" in 2 U.S.C. § 7 has three "definitional elements": (1) official action, or one "involv[ing] an element of government action"; (2) finality, or "the polity's final choice of an office-holder"; and (3) consummation, or "when the last ballot is received and the ballot box is closed." 120 F.4th at 207–08 (emphasis omitted). Continuing to receive ballots after Election Day means that the election is not final or consummated until after Election Day and

therefore violates the Election Day statutes. *Id.* at 208–09, 215. Section 7(a) therefore merely seeks to enforce 2 U.S.C. § 7 as written.

History reveals that the term "'election' include[d] both ballot casting and ballot receipt." *Id.* at 209. These two concepts were not bifurcated until the Civil War to "secure the franchise of soldiers in the field." *Id.* Even then, soldiers voted by casting their ballots in ballot boxes that election officials brought to the battlefield or else sending a proxy to deposit their votes in the ballot box at the soldier's home precinct. *Id.* With ballot-box voting, the voter's connection with his vote ended when he put it into the box; and with proxy voting, the voter's connection with his ballot did not end until it as cast. *Id.* at 209–10. In other words, the act of voting concluded when the vote was received. After that, states allowing civilian absentee voting still required votes to be received by Election Day. *Id.* at 210. By 1977, only two of the 48 states to allow absentee voting would count ballots received after Election Day. *Id.*; *see also DNC*, 594 U.S. at 670. And in January 2020, 14 states and the District of Columbia counted ballots postmarked by Election Day, whereas the other 36 states required receipt on or before that date. *Wetzel*, 120 F.4th at 211. This history of absentee voting "says nothing about whether States can extend the election past the uniform, singular Election Day required by federal law"; rather, "the practice of absentee voting that arose during the Civil War demonstrates that the election concludes when all ballots are received." *Wetzel*, 120 F.4th at 211. "'[L]ate-in-time outliers" have no bearing on "the original public meaning of the Election-Day statutes." *Id.*

As to purpose, Congress enacted the Election Day statutes to prohibit early federal elections in some states, which were influencing election results in states voting later. *Foster*, 522 U.S. at 73. But permitting absentee ballots to be received after Election Day is equally discriminatory. After all, "[h]aving once granted the right to vote on equal terms, [a] State may

not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Bush v. Gore*, 531 U.S. 98, 104–05 (2000). Yet States arbitrarily treat some people's votes differently when they permit absentee votes to be received after Election Day. If postmarks are unenforced, for example, absentee voters have several extra days after Election Day to cast their votes.

Moreover, "[t]he postal service permits senders to recall mail," *Wetzel*, 120 F.4th at 208, which could permit "voters [to] . . . change their votes after Election Day," *id.* Some States such as Illinois even provide for counting mail-in ballots lacking a postmark so long as they are "received by the election authority after the polls close on election day and before the close of the period for counting provisional ballots" and "the date inserted on the certification," after opening the ballot, "is election day or earlier." 10 Ill. Comp. Stat. Ann. 5/19-8(c).

Under that regime, it is possible to imagine that an un-postmarked ballot, delivered after Election Day but before counting concluded, could be counted based on a person's fraudulent certification date. Congress intended the Election Day statutes to curb that type of behavior, which results in treating some votes differently. *Voting Integrity Project, Inc. v. Keisling*, 259 F.3d 1169, 1173–74 (9th Cir. 2001) ("Whenever you provide that elections shall take place upon the same day, you do interpose a not inconsiderable check to frauds in elections . . . ." (quoting Cong. Globe, 42d Cong., 2d Sess. 618 (1872)). Permitting it to continue by allowing ballots to be received after Election Day contradicts Congress's purpose.

Furthermore, congressional inaction says very little, if anything, about congressional intent. *See Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 495 n.13 (1985) ("[C]ongressional silence, no matter how 'clanging,' cannot override the words of the statute."); *Rapanos v. United States*, 547 U.S. 715, 749 (2006) (plurality). Nor does it invalidate the President's interpretation of the Election Day statutes. Congress legislated against the backdrop of the historical understanding of

43

what an "election" meant in 1845 and 1872. The President's interpretation does not contradict the statutes. *Contra* DPP Compl. ¶¶ 164–70 (Count 5); LULAC Compl. ¶¶ 201–07 (Count 3).

The President's interpretation that the Election Day statutes require ballots to be received by Election Day also does not violate the vertical separation of powers or state sovereignty. *See* DPP Compl. ¶ 142. According to its Article I, section 4 authority to "alter" the "Time, Places, and Manner of holding" federal elections, Congress preempted state law when it enacted the Election Day statutes. U.S. Const. art. I, § 4, cl. 1. The President merely interpreted the text of Congress's command. *See Foster*, 522 U.S. at 71 ("For all of petitioners' invocations of state sovereignty, there is no colorable argument that § 7 goes beyond the ample limits of the Elections Clause's grant of authority to Congress.").

      1.     *Section 7(b) permissibly conditions funding on the adoption of nondiscriminatory standards (LULAC Claim 2, Democratic Party Claims 2, 4, and 11).*

With respect to § 7(b) specifically, Plaintiffs allege that the EAC's funding to States is governed by HAVA and that the President has no authority to condition those funds on "compliance with … the unlawfully imposed Election Day ballot receipt deadline." LULAC Compl. ¶ 199, and no authority to create additional conditions on that funding, DPP Compl. ¶¶ 150–53, 169. But §7(b) simply directs the EAC to condition state funds "consistent with 52 U.S.C. § 21001(b) and other applicable law," on a state's compliance with an existing statutory requirement: to "adopt uniform and nondiscriminatory standards that define what constitutes a vote and what will be counted as a vote for each category of voting system used in the State." 52 U.S.C. § 21081(a)(6). In other words, the President is directing the EAC to condition funding on compliance with applicable statutory requirements, subject to his interpretation of those

requirements as discussed above.

Section 21001(a) provides that the EAC "shall make a requirements payment each year . . . to each State which meets the conditions described in section 21003." *Id.* § 21001(a). And section 21003 requires states to certify their compliance with the requirements in § 21003(b) to be "eligible to receive a requirements payment." *Id*. § 21003(a). One of those requirements includes filing a state plan with the EAC that describes "[h]ow the State will use the requirements payment to meet the requirements of subchapter III," which includes § 21081(a)(6)'s directive to "adopt uniform and nondiscriminatory standards that define what constitutes a vote." *Id*. §§ 21003(b)(1)(A), 21004(a)(1), 21081(a)(6). A state's failure to meet that requirement would make it "[in]eligible to receive a requirements payment." *See id*. § 21003(a).

To that end, § 7(b) specifies that "what constitutes a vote and what will be counted as a vote" must "includ[e] that, as prescribed in 2 U.S.C. [§] 7 and 3 U.S.C. [§] 1, there be a uniform and nondiscriminatory ballot receipt deadline of Election Day for all methods of voting . . . after which no additional votes may be cast," except for UOCAVA votes. Requiring a uniform ballot receipt deadline of Election Day for all methods of voting ensures that a state's definition of what constitutes a vote is nondiscriminatory by not privileging absentee voters' ballots. *See supra* III.H. Thus, to comply with § 21081(a)(6)'s mandate, states must adopt a uniform ballot receipt deadline of Election Day. This condition does not usurp Congress's constitutional powers, because Congress itself set the condition in § 21081(a)(6) (as well as in the Election Day statutes).

## CONCLUSION

For the foregoing reasons, the Court should grant summary judgment to Defendants for challenges to all EO sections, excluding challenges to section 2(a), which have been separately briefed.

Dated: August 20, 2025

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

ERIC J. HAMILTON
Deputy Assistant Attorney General
Civil Division, Federal Programs Branch

JOSEPH BORSON
Assistant Director
Civil Division, Federal Programs Branch

/s/ Bridget K. O'Hickey
BRIDGET K. O'HICKEY
Counsel to the Assistant Attorney General
U.S. Department of Justice, Civil Division
950 Pennsylvania Avenue,
NW Washington, DC 20530
(202) 353-8679
Bridget.K.O'Hickey@usdoj.gov

MARIANNE F. KIES
CHRISTIAN DIBBLEE
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20005
(202) 353-1819
Marianne.F.Kies@usdoj.gov

*Attorneys for Defendants*