## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, et al., <br><br>                Plaintiffs, <br><br> v. <br><br> EXECUTIVE OFFICE OF THE PRESIDENT, et al., <br><br>                Defendants. | Civil Action No. 25-cv-0946 (CKK) |
| DEMOCRATIC NATIONAL COMMITTEE, et al., <br><br>                Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States, et al., <br><br>                Defendants. | Civil Action No. 25-cv-0952 (CKK) |
| LEAGUE OF WOMEN VOTERS EDUCATION FUND, et al., <br><br>                Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States, et al., <br><br>                Defendants. | Civil Action No. 25-cv-0955 (CKK) |

## DEMOCRATIC PARTY PLAINTIFFS' COMBINED REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO SECTION 2(A) OF EXECUTIVE ORDER 14248 AND OPPOSITION TO DEFENDANTS' CROSS MOTIONS

**ELIAS LAW GROUP LLP**
Marc E. Elias (DC 442007)
Aria C. Branch (DC 1014541)
Lalitha D. Madduri (DC 1659412)
Christopher D. Dodge (DC 90011587)
Jacob D. Shelly (DC 90010127)
Harleen K. Gambhir (DC 1781869)
James J. Pinchak (DC 90034756)*
250 Massachusetts Ave. NW, Suite 400
Washington, DC 20001
T: (202) 968-4652

Tyler L. Bishop (DC 90014111)
1700 Seventh Ave. Suite 2100
Seattle, WA 98101
T: (206) 656-0177

*Counsel for the Democratic Party Plaintiffs*

*Admitted pro hac vice*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................... iii

INTRODUCTION ................................................................................................... 1

ARGUMENT ......................................................................................................... 2

I.   Section 2(a) is a unilateral command to the EAC to add a documentary proof of citizenship requirement to the Federal Form. ............................................................... 2

II.  The Democratic Party Plaintiffs are entitled to summary judgment on their separation of powers and *ultra vires* claims against Section 2(a) of the EO. ................................ 6

    A. Section 2(a) violates the separation of powers by intruding upon Congress's and States' constitutional authority over elections. ........................................... 6

        1. The RNC fails to identify any constitutional or statutory authority for the President's unlawful mandate. ................................................................. 7

        2. Precluding the President's unilateral mandate for the Federal Form does not intrude on his executive powers ............................................................ 13

    B. The President's mandate in Section 2(a) is *ultra vires* because the President has no power to dictate the contents of the Federal Form ..................................... 16

    C. Section 2(a) directly violates the NVRA's substantive provisions ........................... 17

        1. Section 2(a) violates the plain text of the NVRA ..................................... 17

        2. The relevant legislative history, purpose, and judicial precedent confirm that Section 2(a) conflicts with the NVRA ................................................. 20

III. The Federal Defendants' justiciability and remedial arguments each fail. .......................... 24

    A. Democratic Party Plaintiffs established Article III standing to challenge Section 2(a), and their claims are constitutionally ripe ........................................... 24

    B. Democratic Party Plaintiffs' claims are prudentially ripe because Section 2(a) mandates a specific change to the Federal Form. ......................................... 27

    C. The APA does not preclude the Democratic Party Plaintiffs' *ultra vires* or constitutional claims. ............................................................................... 28

    D. The Democratic Party Plaintiffs are entitled to a permanent injunction .................... 31

IV. Defendants are not entitled to summary judgment on the Democratic Party Plaintiffs' APA claims against Section 2(a). ............................................................................... 33

i

A.  The Court should defer resolving summary judgment on Counts VI and X until Phase III of the case. .................................................... 34

B.  Defendants are not entitled to summary judgment on Plaintiffs' NVRA-based APA claim. ................................................................ 36

C.  Defendants are not entitled to summary judgment on Plaintiffs' APA claim based on *Anderson-Burdick* and the constitutional right to vote. ......................................... 37

  1.  The parties' factual dispute about the burden imposed by Section 2(a) cannot be resolved yet. ...................................................... 38

  2.  The lack of any evidence supporting a governmental interest in Section 2(a) further precludes summary judgment. .................................. 39

  3.  The Supreme Court's decision in *Crawford* does not require prematurely granting summary judgment. ......................................... 42

CONCLUSION ....................................................................... 45

# TABLE OF AUTHORITIES

## CASES

*ACORN v. Miller*,
129 F.3d 833 (6th Cir. 1997) ........................................................................... 22

*AFGE v. Trump*,
139 F.4th 1020 (9th Cir. 2025) ........................................................................ 15

*AFGE v. Trump*,
318 F. Supp. 3d 370 (D.D.C. 2018) ............................................................ 16, 25

*All. for Retired Americans v. Bessent*,
No. CV 25-0313, 2025 WL 1114350 (D.D.C. Mar. 20, 2025) ............................ 34

*Allina Health Servs. v. Azar*,
No. CV 16-150 (RC), 2020 WL 7042869 (D.D.C. Jan. 2, 2020) ........................ 34

*Am. Ctr. for Int'l Lab. Solidarity v. Chavez-DeRemer*,
No. CV 25-1128, 2025 WL 1795090 (D.D.C. June 30, 2025) ............................ 30

*Am. Foreign Serv. Ass'n v. Trump*,
No. 25-5184, 2025 WL 1742853 (D.C. Cir. June 20, 2025) ............................... 30

*Amador Cnty. v. Jewell*,
170 F. Supp. 3d 135 (D.D.C. 2016) .................................................................. 33

*Amador Cnty. v. U.S. Dep't of the Interior*,
707 F. App'x 720 (D.C. Cir. 2017) .................................................................. 33

*Anatol Zukerman & Charles Krause Reporting v. U.S. Postal Serv.*,
64 F.4th 1354 (D.C. Cir. 2023) ........................................................................ 31

*Anderson v. Celebrezze*,
460 U.S. 780 (1983) ........................................................................................ 37

*Aracely v. Nielsen*,
319 F. Supp. 3d 110 (D.D.C. 2018) .................................................................. 37

*Arizona v. Inter Tribal Council of Ariz., Inc.*,
570 U.S. 1 (2013) .......................................................................... 7, 17, 18, 22, 23

*Ayestas v. Davis*,
584 U.S. 28 (2018) .......................................................................................... 18

*Bednasek v. Kobach*,
    259 F. Supp. 3d 1193 (D. Kan. 2017) ................................................................. 38, 39, 42, 43

*Bennett v. Spear*,
    520 U.S. 154 (1997) ................................................................................................... 37

*Blassingame v. Trump*,
    87 F.4th 1 (D.C. Cir. 2023) ..................................................................................... 8, 14

*Booth v. Bowser*,
    597 F. Supp. 3d 1 (D.D.C. 2022) ................................................................................ 11

*Browder v. Wormuth*,
    No. CV 18-2411, 2024 WL 5168281 (D.D.C. Dec. 19, 2024) ............................................ 34

*Building & Construction Trades Dep't v. Allbaugh*,
    295 F.3d 28 (D.C. Cir. 2002) ................................................................................... 13, 14

*Burdick v. Takushi*,
    504 U.S. 428 (1992) ................................................................................................... 37

*Bynum v. District of Columbia*,
    215 F.R.D. 1 (D.D.C. 2003) ......................................................................................... 39

*California v. Trump*,
    No. 25-CV-10810-DJC, 2025 WL 1667949 (D. Mass. June 13, 2025) .................... 4, 11, 14

*Cavazos v. Zinke*,
    No. CV 19-891 (CKK), 2019 WL 121210 (D.D.C. Jan. 7, 2019) ...................................... 35

*Cellular Telecomm. & Internet Ass'n v. FCC*,
    330 F.3d 502 (D.C. Cir. 2003) ................................................................................ 18, 19

*Chamber of Com. of U.S. v. Reich*,
    74 F.3d 1322 (D.C. Cir. 1996) ................................................................................ 14, 28

*Clinton v. City of New York*,
    524 U.S. 417 (1998) ................................................................................................... 32

*Collins v. Yellen*,
    594 U.S. 220 (2021) ................................................................................................ 13, 28

*Colón-Marrero v. Vélez*,
    813 F.3d 1 (1st Cir. 2016) ............................................................................................ 22

iv

*Common Cause v. Trump*,
  506 F. Supp. 3d 39 (D.D.C. 2020) ........................................................... 27

*Common Cause/Ga. v. Billups*,
  554 F.3d 1340 (11th Cir. 2009) ............................................................... 45

*Cook Cnty., Illinois v. Wolf*,
  962 F.3d 208 (7th Cir. 2020) ................................................................... 23

*Crawford v. Marion Cnty. Election Bd.*,
  553 U.S. 181 (2008) ............................................................ 40, 42, 43, 44, 45

*Dalton v. Specter*,
  511 U.S. 462 (1994) ................................................................................ 28

*Devlin v. Berry*,
  26 F. Supp. 3d 74 (D.D.C. 2014) ....................................................... 34, 35

*Doe 2 v. Mattis*,
  322 F. Supp. 3d 92 (D.D.C. 2018) .......................................................... 39

*Eakin v. Adams Cnty. Bd. of Elections*,
  775 F. Supp. 3d 903 (W.D. Pa. 2025) ..................................................... 40

*\*Eakin v. Adams Cnty. Bd. of Elections*,
  No. 25-1644, 2025 WL 2449056 (3d Cir. Aug. 26, 2025) ........... 37, 39, 40, 41, 43

*eBay Inc. v. MercExchange*,
  547 U.S. 388 (2006) ................................................................................ 31

*FDA v. All. for Hippocratic Med.*,
  602 U.S. 367 (2024) ................................................................................ 26

*Fish v. Kobach*,
  840 F.3d 710 (10th Cir. 2016) ........................................................... 24, 32

*Fish v. Schwab*,
  957 F.3d 1105 (10th Cir. 2020) ................................................. 24, 40, 43, 44

*Fourth Est. Pub. Benefit Corp. v. WallStreet.com, LLC*,
  586 U.S. 296 (2019) ................................................................................ 21

*Frank v. Autovest*,
  961 F.3d 1185 (D.C. Cir. 2020) .............................................................. 26

*Franklin v. Massachusetts*,
  505 U.S. 788 (1992) ........................................................................................ 28

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
  561 U.S. 477 (2010) ............................................................................ 13, 28, 29

*Gill v. Scholz*,
  962 F.3d 360 (7th Cir. 2020) ..................................................................... 37, 45

*Gonzalez Am. Ass'n. of People with Disabilities v. Herrera*,
  580 F. Supp. 2d 1195 (D.N.M. 2008) ............................................................ 19

*Gonzalez v. Arizona*,
  485 F.3d 1041 (9th Cir. 2007) ....................................................................... 23

*Graveline v. Benson*,
  992 F.3d 524 (6th Cir. 2021) ......................................................................... 40

*Grundmann v. Trump*,
  770 F. Supp. 3d 166 (D.D.C. 2025) ........................................................... 31, 32

*Harris v. Bessent*,
  775 F. Supp. 3d 164 (D.D.C. 2025) ................................................................ 32

*Ind. Democratic Party v. Rokita*,
  458 F. Supp. 2d 775 (S.D. Ind. 2006) ............................................................ 43

*J.G.G. v. Trump*,
  No. 25-5067, 2025 WL 914682 (D.C. Cir. Mar. 26, 2025) ................................. 21

*Jacobs v. Bondi*,
  No. 22-CV-654-MJS, 2025 WL 1824821 (D.D.C. 2025) .................................... 39

*Jama v. Immigr. & Customs Enf't*,
  543 U.S. 335 (2005) ....................................................................................... 20

*Jibril v. Mayorkas*,
  20 F.4th 804 (D.C. Cir. 2021) ......................................................................... 25

*Kennedy v. Comm'r*,
  __ F.4th __, 2025 WL 1872819 (D.C. Cir. 2025) ............................................. 21

*Kobach v. U.S. Election Assistance Comm'n*,
  772 F.3d 1183 (10th Cir. 2014) ...................................................................... 23

*Larson v. Domestic & Foreign Com. Corp.*,
    337 U.S. 682 (1949) ................................................................................. 28

*\*League of United Latin Am. Citizens v. Exec. Off. of the President*,
    780 F. Supp. 3d 135 (D.D.C. 2025) ........................................................... *passim*

*League of Women Voters v. Browning*,
    863 F. Supp. 2d 1155 (N.D. Fla. 2012) ....................................................... 19

*\*League of Women Voters v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016) ...................................................................... *passim*

*League of Women Voters v. North Carolina*,
    769 F.3d 224 (4th Cir. 2014) ....................................................................... 45

*Louisiana v. Biden*,
    622 F. Supp. 3d 267 (W.D. La. 2022) ......................................................... 16

*Marin Audubon Soc'y v. FAA*,
    121 F.4th 902 (D.C. Cir. 2024) ................................................................ 8, 14

*Mazo v. N.J. Sec'y of State*,
    54 F.4th 124 (3d Cir. 2022) ......................................................................... 38

*McMahon v. New York*,
    145 S. Ct. 2643 (July 14, 2025) ................................................................... 15

*Merck Sharp & Dohme Corp. v. Lee*,
    75 F. Supp. 3d 16 (D.D.C. 2014) ................................................................... 4

*\*Mi Familia Vota v. Fontes*,
    129 F.4th 691 (9th Cir. 2025) ................................................... 18, 20, 23, 42

*Mi Familia Vota v. Fontes*,
    719 F. Supp. 3d 929 (D. Ariz. 2024) ...................................................... 41, 44

*Mi Familia Vota v. Fontes*,
    No. CV-22-0050, 2023 WL 8183070 (D. Ariz. Feb. 16, 2023) ......................... 44

*Mich. State A. Philip Randolph Inst. v. Johnson*,
    No. 16-CV-11844, 2018 WL 493184 (E.D. Mich. Jan. 19, 2018) ..................... 41

*N.C. State Conf. of NAACP v. McCrory*,
    997 F. Supp. 2d 322 (M.D.N.C. 2014) ......................................................... 45

*Nat'l Coal. for Students with Disabilities Educ. & Legal Def. Fund v. Allen*,
    152 F.3d 283 (4th Cir. 1998) ............................................................ 22

*Nat'l Treasury Emps. Union v. Nixon*,
    492 F.2d 587 (D.C. Cir. 1974) ........................................................... 32

*\*Nat'l Treasury Emps. Union v. Vought*,
    No. 25-5091, 2025 WL 2371608 (D.C. Cir. Aug. 15, 2025) .................... 2, 29, 30

*New Hampshire v. Maine*,
    532 U.S. 742 (2001) ...................................................................... 4, 5, 6

*NRDC v. Thomas*,
    838 F.2d 1256 (D.C. Cir. 2006) ...................................................... 18, 19

*NRDC v. Train*,
    519 F.2d 287 (D.C. Cir. 1975) ........................................................... 34

*Nuclear Regul. Comm'n v. Texas*,
    605 U.S. 665 (2025) ......................................................................... 29

*Open Cmtys. All. v. Carson*,
    286 F. Supp. 3d 148 (D.D.C. 2017) .................................................... 32

*Pacito v. Trump*,
    768 F. Supp. 3d 1199 (W.D. Wash. 2025) ............................................ 17

*POET Biorefining v. EPA*,
    970 F.3d 392 (D.C. Cir. 2020) ........................................................... 25

*President v. Vance*,
    627 F.2d 353 (D.C. Cir. 1980) ........................................................... 32

*Project Vote/Voting for Am., Inc. v. Long*,
    682 F.3d 331 (4th Cir. 2012) ............................................................. 22

*Purcell v. Gonzalez*,
    549 U.S. 1 (2006) ............................................................................ 32

*Refugee Ctr. for Educ. & Legal Servs. v. Noem*,
    No. CV 25-306, 2025 WL 1825431 (D.D.C. July 2, 2025) ........................ 30

*RNC v. Mi Familia Vota*,
    145 S. Ct. 108 (2024) ............................................................. 15, 16, 23

*Rodriguez v. Robbins*,
    715 F.3d 1127 (9th Cir. 2013) .................................................................... 32

*Seila L. LLC v. CFB*,
    591 U.S. 197 (2020)................................................................................... 29

*Shipp v. Hurwitz,  (RC)*,
    2019 WL 2996541 (D.D.C. July 9, 2019)................................................... 27

*Soltysik v. Padilla*,
    910 F.3d 438 (9th Cir. 2018) ......................................................... 40, 41, 43

*State v. Meadows*,
    88 F.4th 1331 (11th Cir. 2023) .................................................................... 7

*Susman Godfrey LLP v. Exec. Off. of President*,
    No. CV 25-1107, 2025 WL 1779830 (D.D.C. June 27, 2025) .................. 30, 31

*Temple Univ. Hosp. Inc. v. NLRB*,
    929 F.3d 729 (D.C. Cir. 2019)............................................................ 4, 5, 16

*Teva Pharms. USA, Inc. v. Sebelius*,
    595 F.3d 1303 (D.C. Cir. 2010) ................................................................. 25

*Thompson v. Trump*,
    590 F. Supp. 3d 46 (D.D.C. 2022) ............................................................. 14

*Torres v. Lynch*,
    578 U.S. 452 (2016)................................................................................... 11

*Trudeau v. Fed. Trade Comm'n*,
    456 F.3d 178 (D.C. Cir. 2006) ................................................................... 35

*Trump v. AFGE*,
    145 S. Ct. 2635 (July 8, 2025) ................................................................... 15

*Trump v. United States*,
    603 U.S. 593 (2024)................................................................................. 6, 7

*U.S. Inst. of Peace v. Jackson*,
    No. 255185, 2025 WL 1840572 (D.C. Cir. June 27, 2025)......................... 15

*United States v. Burwell*,
    122 F.4th 984 (D.C. Cir. 2024) .................................................................. 21

*United States v. Picciotto,*
    875 F.2d 345 (D.C. Cir. 1989) ............................................................ 14

*Van Buren v. United States,*
    593 U.S. 374 (2021) ........................................................................ 21

*Venetian Casino Resort v. EEOC,*
    409 F.3d 359 (D.C. Cir. 2005) ............................................................ 5

*Vera Inst. of Just. v. U.S. Dep't of Just.,*
    No. 25-CV-1643 (APM), 2025 WL 1865160 (D.D.C. July 7, 2025) ............... 30

*Waetzig v. Halliburton Energy Servs., Inc.,*
    604 U.S. 305 (2025) ........................................................................ 20

*Walker v. District of Columbia,*
    969 F. Supp. 794 (D.D.C. 1997) ......................................................... 36

*West Virginia ex rel. Morrisey v. U.S. Dep't of Health & Hum. Servs.,*
    No. CV 14-1287, 2014 WL 12803229 (D.D.C. Nov. 3, 2014) ...................... 34

*Wilkins v. Jackson,*
    750 F. Supp. 2d 160 (D.D.C. 2010) ..................................................... 27

*Wood v. Meadows,*
    117 F.3d 770 (4th Cir. 1997) ............................................................. 38

*Youngstown Sheet & Tube Co. v. Sawyer,*
    343 U.S. 579 (1952) ................................................................... *passim*

*Zivotofsky v. Kerry,*
    576 U.S. 1 (2015) ..................................................................... 9, 16, 17

## CONSTITUTIONAL PROVISIONS

U.S. Const. art. I, § 4 ......................................................................... 1, 7

U.S. Const. art. II, § 1, cl. 1 ................................................................ 3, 8

U.S. Const. art. II, § 3 .......................................................................... 7

## STATUTES

5 U.S.C. § 706 ................................................................................... 34

16 U.S.C. § 1536 ................................................................................ 12

x

18 U.S.C. § 611 .................................................................................................. 14

18 U.S.C. § 1015 ................................................................................................ 14

19 U.S.C. § 1336 ................................................................................................ 12

22 U.S.C. § 4103 ................................................................................................ 30

52 U.S.C. § 20501 ......................................................................................... 22, 32

52 U.S.C. § 20505 ............................................................................................... 9

52 U.S.C. § 20508(a) ................................................................................... *passim*

52 U.S.C. § 20508(b) ................................................................................... *passim*

52 U.S.C. § 20929 ............................................................................................... 9

## OTHER AUTHORITIES

139 Cong. Rec. S5746-03 (Daily Ed. May 11, 1993) ........................................ 9

*Authentication*, Black's Law Dictionary (12th ed. 2024) ............................... 19

Conf. Rep. on the NVRA, H.R. Rep. No. 103–66 (Apr. 28, 1993) (Conf. Rep.) ................... 9, 21

Elena Kagan, Presidential Administration, 114 Harv. L. Rev. 2245 (2001) ............... 12

Exec. Order No. 14248, Preserving and Protecting the Integrity of American Elections
(Mar. 25, 2025) ..................................................................................... 1, 3, 4

*Notarize*, Black's Law Dictionary (12th ed. 2024) ........................................ 20

Wright & Miller 18B Fed. Prac. & Proc. Juris. § 4477.2 (3d ed. updated May 21, 2025) ........... 5

Wright & Miller, 18B Fed. Prac. & Proc. Juris. § 4477.5 (3d ed. updated May 21, 2025) ........... 6

# INTRODUCTION

As this Court has rightly concluded, no law "expressly or impliedly grants the President authority to require documentary proof of citizenship on the Federal Form" created pursuant to the National Voter Registration Act ("NVRA"). *League of United Latin Am. Citizens v. Exec. Off. of the President*, 780 F. Supp. 3d 135, 200 (D.D.C. 2025) ("*LULAC*"). By commanding the Election Assistance Commission ("EAC") to impose such a requirement on the Federal Form in Section 2(a) of Executive Order 14248 (the "EO"), President Trump unlawfully asserted power the Constitution reserves for Congress and the States. U.S. Const. art. I, § 4, cl. 1. His command therefore violates the separation of powers and is *ultra vires*.

Defendants' attempts to salvage Section 2(a) only reinforce its unlawfulness. The Federal Defendants now argue that Section 2(a) does not require anything at all, recasting it as a mere 'Executive Suggestion.' The RNC, by contrast, insists the EO is mandatory—and defends it as a valid exercise of presidential authority. These contradictory defenses both ultimately collapse on their own terms: the Federal Defendants' reading cannot be squared with the EO's plain text or their prior concessions about what it requires, while the RNC's theory depends upon a contorted reading of the NVRA and a maximalist view of executive authority that conflicts with precedent. At bottom, Congress—not the President—exercised its constitutional authority to create the Federal Form and to set forth the procedural requirements for amending it, including by requiring a majority of the bipartisan and independent EAC Commissioners to determine whether a change is "necessary," and to do so in consultation with the States. 52 U.S.C. § 20508(b). The President cannot trample those requirements and dictate the contents of the Federal Form.

The justiciability and remedial arguments presented by the Federal Defendants are no obstacle to granting summary judgment to the Democratic Party Plaintiffs, just as the Court found at the preliminary injunction stage. Undisputed record evidence confirms that the Democratic Party

Plaintiffs face an array of concrete, imminent injuries from Section 2(a), which the EAC itself understands as a mandatory instruction and began to implement before this Court preliminarily enjoined that effort. The Federal Defendants do not dispute these injuries; instead, they suggest that Plaintiffs are not entitled to establish them with evidence, a theory which badly misunderstands the Federal and Local Rules and which this Court has since rejected. Given the mandatory nature of Section 2(a) and the concreteness of their injuries, the Democratic Party Plaintiffs have standing and their claims are ripe and ready for this Court's review. And while the Federal Defendants now contend that Plaintiffs lack a proper cause of action, their argument cannot be squared with precedent confirming that courts have "long recognized implied equitable claims arising under the Constitution." *Nat'l Treasury Emps. Union v. Vought*, No. 25-5091, 2025 WL 2371608, at *18 (D.C. Cir. Aug. 15, 2025).

Finally, the Court should defer consideration of the Democratic Party Plaintiffs' *additional* claims targeting Section 2(a) of the EO—claims they did not move on and which require factual development before the Court can properly consider them. Deferring resolution of these claims is particularly warranted because the Court may not ever need to resolve them, as Plaintiffs seek complete relief against Section 2(a) through their separation of powers and *ultra vires* claims. For the reasons set forth herein, the Court should grant entry of judgment on those two claims now.

## ARGUMENT

### I.    Section 2(a) is a unilateral command to the EAC to add a documentary proof of citizenship requirement to the Federal Form.

The Federal Defendants advance a single merits theory in defense of Section 2(a)—that the provision merely directs the EAC to "begin the process" of adding a documentary proof of citizenship ("DPOC") requirement to the Federal Form, but does not "*require*" the EAC to finalize the requirement unless the EAC determines it is "necessary." Mem. in Supp. of Defs.' Cross-Mot.

for Partial Summ. J. ("Fed. Defs.' Br.") at 5–6 (Aug. 8, 2025), ECF No. 163 (emphasis added). The Federal Defendants now insist that the President is doing no more than exercising traditional "executive power" that is "vested" in the President—ensuring subordinates carry out the law. *Id.* at 5 (quoting U.S. Const. art. II, § 1, cl. 1 (Vesting Clause)). Their resort to this defense makes sense, as even they appear to acknowledge that Section 2(a) cannot be "lawfully enforce[d]" if the DPOC requirement is "preordained" by an order of the President. *Id.* at 9.

But the text of Section 2(a) does not support the Federal Defendants' transparent attempt to revise the President's clear commands. Section 2(a) plainly states that the EAC "shall" act to "require" DPOC with the Federal Form, and it requires election officials to record the type of DPOC that the applicant presents. E.O. § 2(a).[1] The text of Section 2(a) even dictates what the acceptable proof of citizenship "shall include" and what information States are "require[d]" to collect about the proof provided. *Id.* Thus, the plain and mandatory language of the EO is sufficient to resolve the issue against the Federal Defendants. *See LULAC*, 780 F. Supp. 3d at 185–87.

Moreover, as the Democratic Party Plaintiffs explained in their opening brief, counsel for the EAC has already *conceded* this meaning of Section 2(a). *See* Dem. Party Pls.' Br. at 19 (July 11, 2025), ECF No. 146-1 (citing SOF ¶ 48). While the Federal Defendants attempt to backtrack on the point now, *see* Fed. Defs.' Br. at 8, they are barred from doing so. To start, the Federal Defendants conceded as a *factual matter* that the purpose and effect of the EO was to require the EAC to implement a proof of citizenship requirement on the Federal Form. SOF ¶¶ 46–48. The

---

[1] *Compare* Fed. Defs.' Br. at 7 ("Section 2(a) therefore simply directs the EAC to begin the process for adding a documentary-proof-of-citizenship requirement to the federal form and instructs that if it determines such a requirement is necessary, then it is statutorily required to add it to the form."), *with* EO § 2(a) ("Within 30 days of the date of this order, the [EAC] *shall* take appropriate action *to require*, in its national mail voter registration form issued under 52 U.S.C. 20508 . . . documentary proof of United States citizenship.") (emphases added).

Federal Defendants' decision to take that position at the preliminary injunction stage was "knowing and intentional," *Merck Sharp & Dohme Corp. v. Lee*, 75 F. Supp. 3d 16, 28 (D.D.C. 2014), reflecting the President's own belief that his commands are binding and self-effecting, Exec. Order No. 14215 ("EO"), *Ensuring Accountability for All Agencies* (Feb. 18, 2025). Their past concession that Section 2(a) commands a specific outcome "forecloses th[eir] [new] argument" saying the exact opposite. *Merck*, 75 F. Supp. 3d at 28.

To avoid this conclusion, the Federal Defendants claim that their change of heart reflects a change in *legal* position. *See* Fed. Defs.' Br. at 8. That is dubious; the text of Section 2(a) is straightforward and the Federal Defendants offer no explanation why *as a legal matter* they now read it differently than they did in April. But even assuming the Federal Defendants' conspicuous choice to read the President's words differently now is a legal question, judicial estoppel applies. *Temple Univ. Hosp. Inc. v. NLRB*, 929 F.3d 729, 737 (D.C. Cir. 2019). The Supreme Court has identified three equitable "factors" that "inform the decision" to apply judicial estoppel, though each need not be satisfied to hold a party to its past position. *Id.* at 733 (citing *New Hampshire v. Maine*, 532 U.S. 742, 755 (2001)). The first factor is whether the party's new position is "clearly inconsistent" with their past representations to the Court. *Id.* The Federal Defendants do not even dispute this point. *See* Fed. Defs.' Br. at 8 (failing to dispute this factor). Nor could they; their counsel was adamant at the preliminary injunction hearing that President Trump had "decided" through his EO to impose a DPOC requirement on the Federal Form, PI Hearing Tr. 70:5–8, and that accordingly—no matter what process the EAC undertook—"there's going to be a [DPOC requirement] because it's contemplated by the executive order," *id.* at 71:13–19; *see also* SOF ¶ 48; *LULAC*, 780 F. Supp. 3d at 199; *accord California v. Trump*, No. 25-CV-10810-DJC, 2025 WL 1667949, at *7 (D. Mass. June 13, 2025).

Unable to dispute the inconsistency of their positions, the Federal Defendants turn to the second factor—"whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that" the court was "misled." *Temple*, 929 F.3d at 733 (quoting *New Hampshire*, 532 U.S. at 750–51). The Federal Defendants argue this factor is not met because they lost the preliminary injunction motion. *See* Fed. Defs.' Br. at 8–9. But that misunderstands the factor— judicial estoppel applies where "a court accepted the party's position, even though the party lost the [motion]." Wright & Miller 18B Fed. Prac. & Proc. Juris. § 4477.2 & n.6 (3d ed. updated May 21, 2025). The Court clearly accepted the Federal Defendants' repeated position, under Section 2(a), that the "EAC *must* add a [DPOC] requirement to the Federal Form." *LULAC*, 780 F. Supp. 3d at 199. Permitting the Federal Defendants to pull a 180-degree shift now would result in the impression that the Court was "misled" as to how the *President's own lawyers* understand his commands. That is particularly so since the Federal Defendants have been tight-lipped from the start of this litigation about Section 2(a)'s implementation status. *Id.* at 188 n.29. This second factor therefore cuts *strongly* in favor of holding the Federal Defendants to their own past concession about what Section 2(a) says and does. So, too, does the third factor: whether the Federal Defendants would "derive an unfair advantage" from changing their view. The Federal Defendants are in the best position to know whether the agencies subject to the President's order intend to carry out its mandatory terms. They cannot simply flip-flop their view as suits them when they seek to defeat any given motion. *Temple*, 929 F.3d at 733 (quoting *New Hampshire*, 532 U.S. at 750–51); *cf. Venetian Casino Resort v. EEOC*, 409 F.3d 359, 367 (D.C. Cir. 2005).

Finally, the fact the Federal Defendants are government agencies does not give them free license to mislead the Court as to their understanding of the EO. The "government may be

precluded from blatant inconsistency, particularly when the matter does not involve broad formulation and reformulation of public policy." Wright & Miller, 18B Fed. Prac. & Proc. Juris. § 4477.5 (3d ed. updated May 21, 2025). The text of Section 2(a) is straightforward, and the Federal Defendants have not pointed to any "change in public policy" that might warrant a "shift in the government's position." *New Hampshire*, 532 U.S. at 755 (rejecting government's claim that it was immune from estoppel).

In sum, nothing in the text of the EO or in the record supports the Federal Defendants' effort to re-characterize Section 2(a) as a mere 'Executive Suggestion.' Accordingly, their sole defense to the merits of the Democratic Party Plaintiffs' separation of powers claim fails.

## II. The Democratic Party Plaintiffs are entitled to summary judgment on their separation of powers and *ultra vires* claims against Section 2(a) of the EO.

The RNC, for its part, attempts to defend Section 2(a) as written. It accepts that the President mandated the EAC to require DPOC on the Federal Form, but argues that such a dictate is both authorized by the NVRA and constitutionally permissible under the Take Care Clause of the U.S. Constitution. *See* RNC's Cross-Summ. J. Br. ("RNC Br.") at 17–22 (Aug. 8, 2025), ECF No 161-1. There is a good reason the Federal Defendants did not take this route: the RNC's statutory argument ignores the NVRA's text and reads the EAC's express obligations entirely out of law, and its constitutional argument relies on a maximalist view of executive power that finds no support in precedent. Both contentions fail.

### A. Section 2(a) violates the separation of powers by intruding upon Congress's and States' constitutional authority over elections.

"No matter the context, the President's authority to act" must "stem either from an act of Congress or from the Constitution itself." *Trump v. United States*, 603 U.S. 593, 607 (2024) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 634 (1952)). "If the President claims authority to act but in fact exercises mere 'individual will' and 'authority without law,' the

courts may say so" and issue appropriate relief. *Id.* (quoting *Youngstown,* 343 U.S. at 655 (Jackson, J., concurring)). This Court correctly determined Section 2(a) violates the separation of powers because neither a "provision of the Constitution" nor any "statute expressly or impliedly grants the President authority to require [DPOC] on the Federal Form." *LULAC*, 780 F. Supp. 3d at 200. Neither the law nor the facts have since changed, and the Court should therefore grant summary judgment on Plaintiffs' separation of powers claim as to Section 2(a). Democratic Party Pls.' Compl. ¶¶ 134–41, No. 1:25-cv-00952-CKK (D.D.C. Mar. 31, 2025), ECF No. 1 (Count II).

### 1. The RNC fails to identify any constitutional or statutory authority for the President's unlawful mandate.

Neither the Constitution nor the NVRA authorize, much less permit, the President to unilaterally require that DPOC be added to the Federal Form. To start, the RNC appears to acknowledge that the Elections Clause grants authority to prescribe election regulations (including the manner of voter registration) to the States, subject only to preemption by Congress—reserving no power over elections for the President. *See* RNC Br. at 18–19; *see* U.S. Const. art. I, § 4, cl. 1. Under this "default provision," any and all powers to regulate elections are retained by the States, except for the specific acts of *Congress*. *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 8 (2013) ("*ITCA*"); *see also, e.g.*, *State v. Meadows*, 88 F.4th 1331, 1346 (11th Cir. 2023) ("The Constitution empowers *only* the states and Congress to regulate the conduct of federal elections." (cleaned up)), *cert. denied*, 145 S. Ct. 545 (2024). The RNC thus does not contend that the President derives authority from the Elections Clause, nor is the RNC able to identify any other specific grant of constitutional authority over elections. *See* RNC Br. at 17–22.

The RNC instead points to the President's general executive power, specifically his authority to "take Care that the Laws be faithfully executed." *Id*. at 17 (quoting U.S. Const. art. II, § 3 (Take Care Clause)). The RNC's logic appears to be as follows: Congress exercised its

Elections Clause authority to require the EAC to promulgate the contents of a Federal Form through regulations. Because the EAC is an "executive" agency, the President must have "control" over the form's contents—and, according to the RNC, any contrary interpretation would impair the President's ability to ensure the laws are faithfully executed. *Id.* at 18–19. But the RNC's "maximalist" view of executive power has been repeatedly rejected, *LULAC*, 780 F. Supp. 3d at 198 (discussing cases), and it finds no support in the cases it relies on.

Beginning with *Youngstown*, the Supreme Court made clear that a President's order "must stem either from an act of Congress or from the Constitution itself." 343 U.S. at 585. Both the Opinion of the Court and Justice Jackson's oft-cited concurrence squarely reject the contention that the Take Care Clause and other general "constitutional provisions that grant executive power to the President" provide freestanding authority to issue orders if the authority to act cannot be found elsewhere in a specific provision of the Constitution or statute. *Id.* at 587–88; *id.* at 646 (Jackson, J., concurring). The reason is simple: The power to "faithfully execute" the law can extend only as far as the law itself. *Id.* at 646 (Jackson, J., concurring). "Article II and the Take Care Clause do not grant the President boundless authority to supervise, control, or otherwise interfere with procedures entrusted by law to other branches of government." *Blassingame v. Trump*, 87 F.4th 1, 36 (D.C. Cir. 2023) (Rogers, J., concurring in part); *see also, e.g.*, *Marin Audubon Soc'y v. FAA*, 121 F.4th 902, 911–12 (D.C. Cir. 2024).

Given that no party, including the RNC, can identify a specific constitutional provision authorizing the President to dictate a proof of citizenship requirement for the Federal Form, Section 2(a) could only be constitutional if an act of Congress expressly or implicitly granted such power. *Youngstown*, 343 U.S. at 643. But as this Court concluded, Congress has not granted the President

such authorization. *LULAC*, 780 F. Supp. 3d at 195–96. Indeed, a review of the text, purpose, and history of the NVRA and HAVA confirms that Congress *precluded* such unilateral action. *See id.*

Pursuant to its Elections Clause authority, Congress enacted the NVRA, which requires that States "accept and use" the Federal form. 52 U.S.C. § 20505(a)(1). In doing so, Congress strictly limited the Federal Form's contents to "require only" information that "is necessary to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process." *Id.* § 20508(b)(1).[2] The statute further prescribes a procedure for determining what "information" is "necessary": The EAC "in consultation with the chief election officers of the States" determines the Federal Form's requirements by promulgating regulations through notice-and-comment rulemaking. *Id.* §§ 20508(a)(1)–(2), 20929. And the EAC may approve or revise the Federal Form only "with the approval of at least three" of its four members. *Id.* § 20928.

Viewed within this statutory context, it is clear that Congress did not give *the President* any authority to dictate the Federal Form's requirements—much less authority to do so *unilaterally*. Congress instead set forth "a careful allocation of regulatory power to a bipartisan panel of experts, accompanied by a requirement for consultation with the States." *LULAC*, 780 F. Supp. 3d at 196 (citations omitted). In other words, unilateral presidential action requiring the addition of a DPOC requirement to the Federal Form is "incompatible with the expressed [and] implied will of Congress," meaning the President lacked authority to act. *Zivotofsky v. Kerry*, 576 U.S. 1, 10 (2015) (quoting *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring)).

---

[2] As Plaintiffs have noted and as this Court has recognized, Congress considered and rejected a proposal that would have allowed States to impose a DPOC requirement but concluded that such a requirement was "not necessary or consistent with the purposes of [the] Act." Conf. Rep. on the NVRA, H.R. Rep. No. 103–66 (Apr. 28, 1993) (Conf. Rep.); 139 Cong. Rec. S5746-03 (Daily Ed. May 11, 1993) (Senate agreeing to Conference Report); *see also LULAC*, 780 F. Supp. 3d at 196.

The RNC nonetheless argues that *Youngstown* does not apply. *See* RNC Br. at 21–22. In its view, the fact that Congress passed a statute creating the Federal Form makes this case different because, in *Youngstown*, Congress had not enacted legislation regarding the seizure of steel plants. *See id*. But, under *Youngstown*, when the President both lacks constitutional authority and claims power *contrary* to a statutory scheme, his power is at its lowest ebb. 343 U.S. at 637 (Jackson, J., concurring). Given the incompatibility of Section 2(a) with Congress's statutory design, the distinction highlighted by the RNC shows that this case presents an even more straightforward question than the one in *Youngstown*, where the President acted in the face of congressional "silence." *Id.* President Trump has not merely acted against "silence" here; he has acted in open defiance of Congress's clear command. Thus, "[t]he President's order does not direct that a congressional policy be executed in a manner prescribed by Congress—it directs that a presidential policy be executed in a manner prescribed by the President." *Id.* at 588. He lacks such authority.

Finally, the RNC makes a series of arguments to claim that the President's mandate in Section 2(a) is in fact compatible with the process set out by Congress for amending the Federal Form. *See* RNC Br. at 16–17. But each is contradicted by the plain text of the NVRA. The RNC first asserts that the NVRA does not prescribe a specific "sequence of steps" before "the Commission" issues the Federal Form, *id.*, but the law's text clearly requires the agency to consult with States *before* issuing (or reissuing) the Federal Form, 52 U.S.C. § 20508(a)(2) ("The [EAC] . . . *in consultation with* the chief election officers of the States, shall develop a mail voter registration application form for elections for Federal office.") (emphasis added). The RNC does not explain how the EAC could issue a Federal Form "in consultation with" the States if it promulgated the contents of the form *before* consulting the States. *See* RNC Br. at 16. Indeed, the EAC itself understands the consultation requirement as mandatory: The agency sent a letter to the

States' chief election officials correctly stating that "consultation" with them is "required by 52 U.S.C. § 20508," but—consistent with the EO's dictate—sought input only on the EAC's "implementation" of the preordained policy the President had "instructed." *California*, 2025 WL 1667949, at *7; SOF ¶¶ 46–48. Thus, the RNC wrongly asks this Court to read the consultation requirement out of the NVRA. *See Booth v. Bowser*, 597 F. Supp. 3d 1, 18 (D.D.C. 2022) ("courts shun statutory interpretations that result in surplusage") (citing *Torres v. Lynch*, 578 U.S. 452, 463 n.8 (2016)); *California*, 2025 WL 1667949, at *7.

The RNC further claims that the NVRA does not actually "require[] *anyone*" to make a "determination" about what "information" demanded by the Federal Form is "necessary," and similarly asserts that the Act does not require *any* consultation between the EAC and the States. RNC Br. at 16–17. But its argument again runs headlong into the plain language of the NVRA, which requires that "[t]he [EAC]. . . *in consultation with* the chief election officers of the States, shall develop a mail voter registration application form for elections for Federal office," 52 U.S.C. § 20508(a)(2), and further states that, "[t]he mail voter registration form . . . may require only such identifying information . . . *as is necessary to enable the appropriate State election official to assess the eligibility of the applicant* and to administer voter registration." 52 U.S.C. § 20508(b) (emphasis added). The D.C. Circuit's decision in *League of Women Voters v. Newby* reiterates that the EAC, as the "developer" of the Federal Form, with the States as "consultant[s]," must make a determination as to "necessity." 838 F.3d 1, 10 (D.C. Cir. 2016).

Finally, the RNC claims that, in any event, the President made the "necessary" determination himself by issuing the EO. *Id.* at 16–17. Needless to say, "the Commission" is not "the President," *id.*, and the latter has no role under the NVRA in making the necessity determination, *see* 52 U.S.C. § 20508(a). Congress knows how to delegate specific responsibility

11

to the President to supervise multimember commissioners when it wishes, but it did not do so here.[3] Instead, Congress used its Elections Clause authority to assign exclusive responsibility for the Federal Form's requirements to an independent agency in consultation with the States—not the President. *LULAC*, 780 F. Supp. 3d at 195 ("Congress has never assigned any responsibility for the content of the Federal Form to the President or to any other individual in the Executive Branch with the power to act unilaterally."); *Newby*, 838 F.3d at 10–12 (repeatedly recognizing the EAC is the actor Congress assigned the duty of determining necessity).

In short, the RNC mangles the NVRA and fails to identify a legitimate source of authority for the President's order in Section 2(a). The NVRA embodies Congress's clear intent to keep determinations about the Federal Form free from unilateral decision-making by the President. *LULAC*, 780 F. Supp. 3d at 200 ("If the President, acting alone, could dictate the content of the Federal Form, Congress's careful structural choices would be for naught.").[4] The President's attempt to gainsay that Congressional scheme violates the separation of powers.

---

[3] *Compare* 52 U.S.C. § 20508(a), *with, e.g.*, 19 U.S.C. § 1336 (granting President authority to "approve the rates of duty and changes in classification" if based his "judgment" they are "necessary"), *and* 16 U.S.C. § 1536(p) ("Notwithstanding any other provision of this section, the Committee shall accept the determinations of the President under this subsection.").

[4] The RNC's citation to a law review article by then-Professor, now-Justice Kagan supports Plaintiffs' view, not the RNC's. Professor Kagan noted that the existence of Congress's authority to "bar the President from directing discretionary action does not [always] mean that Congress has done so." RNC Br. at 19 (quoting Elena Kagan, Presidential Administration, 114 Harv. L. Rev. 2245, 2327 (2001)). But in the very same passage, she explained that whether Congress intended to "bar" the President from exercising his own discretion is a "matter of statutory construction" in any given case—and that when Congress's "delegation [of a particular task] runs to the members of an *independent agency*," it should be "*obvious*" that Congress intended to bar the President from exercising such authority, absent clear indication otherwise. Kagan, 114 Harv. L. Rev. at 2327 (emphases added). This is because the very "premise" of assigning duties to such an agency is that Congress exercised its own authority to "insulate [the relevant] decisionmaking from the President's influence." *Id.* The RNC ignores that discussion, which cripples its argument.

### 2. Precluding the President's unilateral mandate for the Federal Form does not intrude on his executive powers.

Unable to root its argument in the text of the NVRA, the RNC argues that construing the NVRA and HAVA to preclude the President from dictating the EAC's determinations about the Federal Form would amount to an unconstitutional "restrict[ion on] presidential control" over the agency's commissioners. *See* RNC Br. at 19. In advancing this view, the RNC relies almost exclusively on inapposite cases addressing restrictions on the President's removal or appointment powers. *See id.* at 19, 21. But restrictions on the President's appointment and removal powers are not at issue here, and construing the NVRA and HAVA to preclude the kind of unilateral dictate in Section 2(a) in no way restricts that "traditional executive power." *LULAC*, 780 F. Supp. 3d at 199 (quoting *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 492 (2010)).

*Collins v. Yellen* does not alter that conclusion. *See* RNC Br. at 19 (citing 594 U.S. 220, 248 (2021)). There, the Supreme Court rejected the argument that simply because an agency is "independent" the president could not remove its acting director as that would "read[] far too much into the term 'independent.'" *Collins*, 594 U.S. at 247–48. *Collins* in no way supports RNC's view that the NVRA and HAVA cannot or should not be read to preclude unilateral dictates from the President regarding the Federal Form's requirement. To the contrary, that case makes clear that courts must carefully review the particular statutes at issue, *see id.*—and here, it is clear that Congress did intend that very limitation, *supra* Argument § II.A.1.

The D.C. Circuit's decision in *Building & Construction Trades Department v. Allbaugh*, 295 F.3d 28, 34 (D.C. Cir. 2002), is likewise inapposite. *See* RNC Br. at 17–18, 22. That case did not address the President's authority to direct decisions of independent agencies, nor did the executive order at issue there contravene any statutory requirements, *see Allbaugh*, 295 F.3d at 34 Indeed, as this Court already noted, *Allbaugh* affirms that while executive officials generally must

"follow the President's directives," that is true "only to the extent allowed by the law." *LULAC*, 780 F. Supp. 3d at 198 (quoting *Allbaugh*, 295 F.3d at 32–33). The RNC's suggestion that the EO is not "self-executing," RNC Br. at 22 (quoting *Allbaugh*, 295 F.3d at 33), again contradicts the plain text of the EO, which makes a categorical command that runs roughshod over the NVRA's carefully crafted requirements, *supra* Argument § II.A.1. Moreover, the EAC's letter to the States confirms that the Order's mandate is in fact a preordained policy that *must* be "implemented." *California*, 2025 WL 1667949, at *7 (explaining the letter confirms that the "new provisions" are "required" and sought input from states "only [on] implementation"); *see also* SOF ¶¶ 46–48.

Similarly flawed is the RNC's suggestion that precluding the President's ability to dictate the contents of the Federal Form undermines his ability to "take care" that entirely separate restrictions on non-citizen voting are enforced. RNC Br. at 18, 22 (citing 18 U.S.C. §§ 611, 1015 and referencing constitutional protections against vote dilution). The President's "take care" authority is not so capacious as to permit him to trample express Congressional commands merely by pointing to unrelated statutes that do not provide him with authority to override Congress. *See Youngstown*, 343 U.S. at 587–88; *Thompson v. Trump*, 590 F. Supp. 3d 46, 77 (D.D.C. 2022), *aff'd sub nom. Blassingame*, 87 F.4th at 1 (under the Take Care Clause, "Presidential authority remains constrained by the Constitution and the laws that Congress enacts."). Indeed, even when Congress expressly provides the President "broad" authority to set policy, his authority yields to specific statutory limitations. *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1332–33 (D.C. Cir. 1996). And, "[t]o repeat, the Constitution does not permit the President to seize for himself the law-making power of Congress by issuing an order that, like a statute," directs subordinate officials to adopt specific rules where Congress already prescribed a procedure. *Marin Audubon Soc'y*, 121 F.4th at 911–12 (quoting *Youngstown,* 343 U.S. at 588); *cf. United States v. Picciotto*, 875 F.2d

345, 347 (D.C. Cir. 1989) (agency is not free to "veto [procedural] Congressional directions"). That conclusion flows directly from the bedrock principle that, "[i]n the framework of our Constitution," the President's role in the lawmaking process is limited to "the recommending of laws he thinks wise and the vetoing of laws he thinks bad." *Youngstown*, 343 U.S. at 587.

Finally, the recent orders staying lower courts from enjoining the enforcement of other, distinct executive orders do not alter the analysis. *See* RNC Br. at 20 (citing *Trump v. AFGE*, 145 S. Ct. 2635 (July 8, 2025); *McMahon v. New York*, 145 S. Ct. 2643 (July 14, 2025); *and U.S. Inst. of Peace v. Jackson*, No. 255185, 2025 WL 1840572 (D.C. Cir. June 27, 2025) (unpublished)). Aside from the fact that these interlocutory orders are not controlling, as the RNC concedes, they each were issued in fundamentally different circumstances. *Jackson*, an unpublished D.C. Circuit order, stayed a district court order preliminarily enjoining the President's removal of certain executive officers. *See U.S. Inst. of Peace*, 2025 WL 1840572, at *1. Like the cases addressed above, it has nothing to say about the President's unilateral order directing an independent agency to take action that runs headlong into procedural requirements mandated by Congress. *See id.* In *AFGE*, the Supreme Court stayed a preliminary injunction enjoining enforcement of an order that directed agencies to begin planning "reorganizations and reductions in force consistent with applicable law." 145 S. Ct. at 2635 (Sotomayor, J., concurring in the grant of stay) (quotation omitted). Unlike here, that case did not concern an order directing immediate implementation of a specific policy that trampled Congress's requirements for setting such policy. *See id.* at 2635; *see also AFGE v. Trump*, 139 F.4th 1020, 1044 (9th Cir. 2025) (Callahan, J., dissenting from the denial of stay in court of appeals) (noting that no specific aspect of the order "prevent[ed] the [relevant] agencies from fulfilling their statutory mandates" (quotation omitted)). And, finally, in *McMahon*, the Supreme Court stayed a preliminary injunction based solely on "*jurisdictional and remedial*

arguments," not based on merits arguments that the President's contested order was in fact lawful. 145 S. Ct. at 2650–51 (Sotomayor, J., dissenting from grant of stay) (emphasis added).

For all these reasons, the RNC fails to show that the President's unilateral order requiring the EAC to add a DPOC requirement to the Federal Form did not violate the separation of powers. Summary judgment should be granted to Plaintiffs on this claim.

**B.      The President's mandate in Section 2(a) is *ultra vires* because the President has no power to dictate the contents of the Federal Form.**

This Court should also grant summary judgment on Plaintiffs' *ultra vires* claim, Democratic Party Pls.' Compl. ¶¶ 126–33, because Section 2(a) plainly falls outside the President's statutory authorization and conflicts with the substantive provisions of the NVRA.

Like a separation of powers claim, an *ultra vires* claim "requires the court to analyze what statutory authority, if any, the President possesses in relation to a challenged action" in combination with the "the President's inherent authority to act" under the Constitution. *AFGE v. Trump*, 318 F. Supp. 3d 370, 393 (D.D.C. 2018), *rev'd and vacated on other grounds*, 929 F.3d 748 (D.C. Cir. 2019). As discussed *supra* Argument II.A, the President has no constitutional or statutory authority to require the EAC to add a DPOC requirement to the Federal Form, making Section 2(a) "incompatible with the expressed [and] implied will of Congress" as reflected in the NVRA, *Zivotofsky*, 576 U.S. at 10 (quoting *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring)); *see also Louisiana v. Biden*, 622 F. Supp. 3d 267, 288 (W.D. La. 2022) (holding executive order was *ultra vires* where Congress had "sole authority" in area of regulation and did not "grant authority to the President to make revisions" to applicable statute).

The RNC misunderstands the relevant question for Plaintiffs' *ultra vires* claim, which does not hinge on whether "federal law [] prohibits the *Commission* from establishing a proof-of-citizenship requirement" for the Federal Form. RNC Br. at 8 (emphasis added). This Court

correctly rejected that theory as "unresponsive to Plaintiffs'" claims. *LULAC*, 780 F. Supp. 3d at 197. Rather, the question remains whether federal law grants the *President* power to unilaterally require the EAC to change the federal form. *See Zivotofsky*, 576 U.S. at 10. It does not. The NVRA makes clear that only the EAC can change the form, and even then only "in consultation" with the States and upon a finding of "necessity." 52 U.S.C. § 20508(a), (b). While it authorizes "*a State* [to] *request* that the EAC alter the Federal Form to include information the State deems necessary to determine eligibility," *ITCA*, 570 U.S. at 19 (emphases added), nowhere does it allow the President to alter the form by decree, *see* 52 U.S.C. § 20508. By ordering the EAC to do so anyway, Section 2(a) "eviscerates an entire statutory scheme," unlawfully "replacing it with the President's unfettered discretion." *Pacito v. Trump*, 768 F. Supp. 3d 1199, 1221 (W.D. Wash. 2025).

### C.    Section 2(a) directly violates the NVRA's substantive provisions.

Because the President lacks authority to unilaterally impose his preferred requirements on the Federal Form, and acted against Congress's clear command by doing so, the Court can grant summary judgment for Plaintiffs on their *ultra vires* claims on that basis alone. It need not also decide whether Section 2(a) violates the NVRA's substantive provisions. If it does reach that question, it should hold that the text, purpose, and history of the NVRA also renders Section 2(a)'s DPOC requirement *ultra vires*.

#### 1.    Section 2(a) violates the plain text of the NVRA.

The NVRA limits the Federal Form's contents to "require *only*" information that "is necessary to enable the appropriate State election official to assess the eligibility of the applicant," including as to citizenship. 52 U.S.C. § 20508(b)(1) (emphasis added). In the very next subsection, the NVRA makes clear what information is "necessary" to establish "citizenship": "the signature of the applicant, under penalty of perjury," attesting "that the applicant meets each such requirement." *Id.* § 20508(b)(2). And importantly, the NVRA prohibits any "formal

authentication" on the Federal Form. *Id.* § 20508(b)(3). These requirements ensure "the Federal Form provides a backstop: No matter what procedural hurdles a State's own form imposes, the Federal Form guarantees that a simple means of registering to vote in federal elections will be available." *ITCA*, 570 U.S. at 12. Section 2(a)'s DPOC requirement violates the NVRA twice over: first, because it is not "necessary" to assess voter eligibility and, second, because it calls for a prohibited form of "formal authentication."

To start, "the text of the NVRA is unambiguous" that DPOC is not "necessary" to enable State officials to assess eligibility, because the applicant's attestation under penalty of perjury "already gives proof of citizenship." *Mi Familia Vota v. Fontes*, 129 F.4th 691, 719 (9th Cir. 2025). DPOC is therefore not "necessary" or "essential" to establish citizenship. *See id.* The RNC claims that the Democratic Party Plaintiffs "just assert" that "necessary" in 52 U.S.C. § 20508(b) means "essential," *see* RNC Br. at 21, when in fact the federal appellate decision that has most recently examined the text found exactly that, *see Mi Familia Vota*, 129 F.4th at 719 (citing the Supreme Court, Black's Law Dictionary, and the Oxford English Dictionary for the proposition that "necessary" in 52 U.S.C. § 20508(b) means "essential"). The RNC, in contrast, relies on cases interpreting the meaning of "necessary" in several unrelated statutes, including the Telecommunications Act of 1996, *see* RNC Br. at 13, 15 (citing *Cellular Telecomm. & Internet Ass'n v. FCC*, 330 F.3d 502 (D.C. Cir. 2003)), the Clean Air Act, *see* RNC Br. at 14 (citing *NRDC v. Thomas*, 838 F.2d 1256 (D.C. Cir. 2006)), and a statute regarding counsel for indigent criminal defendants, *see* RNC Br. at 14 (citing *Ayestas v. Davis*, 584 U.S. 28, 44 (2018) (discussing statute's use of "necessary" in light of similar legislation and congressional intent)).

But in citing cases interpreting these distinct statutory regimes, the RNC ignores that its own authorities caution against applying them elsewhere because "[c]ontext is relevant to the

interpretation of the term 'necessary'" as "'the meaning varies with context,' and a dictionary definition by no means tells us what necessary means in every statutory context." *Cellular Telecomm. & Internet Ass'n*, 330 F.3d at 510 (quoting *Thomas*, 838 F.2d at 1237). The meaning of "necessary" in 52 U.S.C. § 20508(b)(1) must be understood in the context of the NVRA's prohibition on formal authentication, *see infra*, and of the legislative history, purpose, and judicial precedent indicating that Congress did not intend the Federal Form to include DPOC, *infra* Argument § II.A.1. This context reinforces that Congress limited the Federal Form to requiring only information that is "essential" for state officials tasked with determining citizenship, namely the voter's sworn affirmation of their citizenship status. The remaining cases cited by the RNC and amici on this point merely demonstrate that state officials may collect other types of information for purposes other than assessing citizenship. *Gonzalez Am. Ass'n. of People with Disabilities v. Herrera*, 580 F. Supp. 2d 1195, 1243 (D.N.M. 2008) (allowing state to require third-party registering agents to place their identification number on registration forms); *League of Women Voters v. Browning*, 863 F. Supp. 2d 1155, 1166 (N.D. Fla. 2012) (holding state could require name of organization collecting form). Section 2(a)'s requirements are not "necessary" or "essential" to determining an applicants' citizenship.

Section 2(a) further violates the NVRA because the DPOC it demands is a prohibited form of "formal authentication." 52 U.S.C. § 20508(b)(3). The NVRA forbids the Federal Form from having any such "requirement for notarization or other formal authentication." *Id*. To "authenticate" something—such as citizenship status—refers to "the act of proving that something (as a document) is true or genuine." *Authentication*, Black's Law Dictionary (12th ed. 2024). Accordingly, under the NVRA, an applicant does not need to formally engage in the "act of

proving" their citizenship status, so long as they comply with the NVRA's requirement to swear the fact under penalty of perjury, subject to "assess[ment]" by the State, 52 U.S.C. § 20508(b)(1).

Defendants urge the Court to disregard the plain meaning of "authentication" and instead read the statute to bar only "attempts to verify 'the signature of the applicant,'" *see* RNC Br. at 9 (quoting 52 U.S.C. § 20508(b)(1)), or to "verify the applicant's identity," *see* Fed. Defs.' Br. at 28. But those readings contort the NVRA's text and create unnecessary redundancy. The NVRA does not say prohibit "notarization or *other signature verification*," or "notarization or *other verification of identity*," or even "notarization or *other similar formal authentication*." Instead, Congress adopted a broader prohibition on any "other formal authentication," requirements, notwithstanding Defendants' effort to winnow this text to signature or identity verification. 52 U.S.C. § 20508(b)(3). Moreover, the preceding term—"notarization"—already refers to confirming "the authenticity of a []signature [or] mark." *Notarize*, Black's Law Dictionary (12th ed. 2024). Accordingly, to restrict the broad phrase "or other formal authentication" to mean only notarization or signature verification would unduly narrow Congress's broad formulation. *See Waetzig v. Halliburton Energy Servs., Inc.*, 604 U.S. 305, 145 S. Ct. 690, 699 (2025) (declining to hold that one term in a list should be interpreted to have the same characteristics as others in the list, because to do so "would strip it of any independent meaning"). Congress could have adopted the limitations the RNC suggests, but it did not. *Cf. Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 341 (2005) ("We do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply.").

### 2. The relevant legislative history, purpose, and judicial precedent confirm that Section 2(a) conflicts with the NVRA.

While the Court may reject the RNC's contentions based on the NVRA's "unambiguous" text alone, *see Mi Familia Vota*, 129 F.4th at 713, the NVRA's history and purpose confirm that

Section 2(a) conflicts with the NVRA. *See United States v. Burwell*, 122 F.4th 984, 991 (D.C. Cir. 2024) (concluding that statutory text was clear and further noting that "legislative history support[ed] [the court's] reading of the statute"). Though unnecessary to "resolve an ambiguity" in the NVRA's text, *see* RNC Br. at 18 (citing *Kennedy v. Comm'r*, __ F.4th __, 2025 WL 1872819, at *9 (D.C. Cir.)), the statute's legislative history provides "probative evidence of the original public meaning of the text" and acts as "extra icing on a cake already frosted." *J.G.G. v. Trump*, No. 25-5067, 2025 WL 914682, at *9 n.7 (D.C. Cir. Mar. 26, 2025) (quoting *Van Buren v. United States*, 593 U.S. 374, 394 (2021)).

The NVRA's legislative history underscores that a DPOC requirement cannot be lawfully included on the Federal Form. As this Court has noted, "[t]he Conference Committee on the NVRA expressly concluded that a proposed amendment allowing States to adopt [DPOC] requirements for the Federal Form was 'not necessary or consistent with the purposes of [the] Act." *LULAC*, 780 F. Supp. 3d at 203 (citing H.R. Rep. No. 103–66, at 23 (1993) (Conf. Rep.)). The Committee explained that the proposed amendment "could effectively eliminate, or seriously interfere with, the mail registration program of the Act." Conf. Rep. at 23. Congress's express determination that a DPOC requirement was "not necessary" to further the purposes of the NVRA further confirms that such a requirement is incompatible with the EAC's duty to impose only "necessary" requirements on the Federal Form. *E.g.*, *Fourth Est. Pub. Benefit Corp. v. WallStreet.com, LLC*, 586 U.S. 296, 307 (2019) (relying on the fact that Congress considered and "rejected proposals that would have eliminated [copyright] registration" in interpreting a statute). Even the RNC concedes that the Conference Report shows Congress was interested in maintaining "current law and practice" as to citizenship checks, *see* RNC Br. at 18, undercutting the notion that the NVRA could countenance the disruptive, nationwide DPOC requirement imposed by Section 2(a).

Defendants' arguments as to the NVRA's purpose similarly fall short. The RNC selectively cites the NVRA's purposes of protecting electoral integrity and maintaining voter rolls, *see* RNC Br. at 11–12, but omits its paramount purposes of "establish[ing] procedures that will increase the number of eligible citizens who register to vote" and "enhanc[ing] the participation of eligible citizens as voters." 52 U.S.C. § 20501(b)(1)-(2). The RNC also fails to address how Section 2(a) squares with Congress's finding that "discriminatory and unfair registration laws and procedures can have a direct and damaging effect on voter participation." *Id.* § 20501(a)(3). As the Supreme Court has explained, Congress intended the Federal Form to serve as a "backstop" protecting the right to vote, "guarantee[ing] that a simple means of registering to vote in federal elections will be available." *ITCA*, 570 U.S. at 13. Section 2(a)'s DPOC requirement contravenes this "primary emphasis" on "simplifying the methods for registering to vote in federal elections." *See Colón-Marrero v. Vélez*, 813 F.3d 1, 10 n.13 (1st Cir. 2016); *see also Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 335 (4th Cir. 2012) (explaining that the NVRA reflects "a conviction that Americans … eligible … to vote have every right to exercise their franchise," and that this right "must not be sacrificed to … chicanery, oversights, or inefficiencies"); *Nat'l Coal. for Students with Disabilities Educ. & Legal Def. Fund v. Allen*, 152 F.3d 283, 285 (4th Cir. 1998) ("Congress passed the NVRA ... to make it easier to register to vote...."); *ACORN v. Miller*, 129 F.3d 833, 835 (6th Cir. 1997) ("In an attempt to reinforce the right of qualified citizens to vote by reducing the restrictive nature of voter registration requirements, Congress passed the [NVRA].").

Despite their protestations, *see* RNC Br. at 14, Amicus Br. of Restoring Integrity & Trust in Elections & the Republican Party of Ariz. ("RITE Br.") at 6–10 (Aug. 18, 2025), ECF No. 174, neither Defendants nor amici identify any case holding that the NVRA permits the EAC—never mind the President—to modify the Federal Form to require DPOC. The Supreme Court has not

held, nor even suggested in *dicta*, that the NVRA allows the EAC to impose such a requirement. In *ITCA*, for instance, the Supreme Court rejected Arizona's effort to require voters to submit DPOC alongside the Federal Form. 570 U.S. at 15. The Court noted that Arizona could request that the EAC amend the Federal Form and challenge a potential denial through the APA, but said nothing about whether the EAC adding a DPOC requirement to the Federal Form would comport with the NVRA. *See id.* at 19–20. The remaining non-authority cited by the RNC and its amici— an unreasoned stay order—is no more persuasive on the point. *See RNC v. Mi Familia Vota*, 145 S. Ct. 108 (Mem.) (2024) (giving no reasoning for stay); *see also Cook Cnty., Illinois v. Wolf*, 962 F.3d 208, 234 (7th Cir. 2020) ("There would be no point in the merits stage if an issuance of a stay must be understood as a *sub silentio* disposition of the underlying dispute."). The Court should decline the invitation to read between the lines of cases that never addressed the relevant issue.

In contrast, courts that have squarely confronted proof of citizenship requirements have repeatedly found them incompatible with the NVRA and unnecessary for the Federal Form. *See, e.g.*, *Mi Familia Vota*, 129 F.4th at 719; *Kobach v. U.S. Election Assistance Comm'n*, 772 F.3d 1183, 1197–98 (10th Cir. 2014) ("The states have failed to meet their evidentiary burden[.]"); *Newby*, 838 F.3d at 11. And while the RNC and amici repeatedly cite *Gonzalez v. Arizona*, *see* RNC Br. at 2, 8, 9, 12; RITE Br. at 15, they rely on only a two-paragraph preliminary injunction ruling that was later rejected by the same court. *See Gonzalez v. Arizona*, 485 F.3d 1041, 1050–51 (9th Cir. 2007); *see also Mi Familia Vota*, 129 F.4th at 719 (explaining "the language from

*Gonzalez I* is not persuasive").[5] In sum, all on-point precedent supports a finding that Section 2(a)'s requirements violate the substantive provisions of the NVRA.

**III.    The Federal Defendants' justiciability and remedial arguments each fail.**

The Federal Defendants, but not the RNC, raise a bevy of threshold justiciability arguments, *see* Fed. Defs.' Br. at 10–18, along with a half-hearted argument on the scope of any remedy, *id.* at 23-24. These arguments, which the Court largely rejected at the preliminary injunction stage, are without merit.

> **A.    The Democratic Party Plaintiffs established Article III standing to challenge Section 2(a), and their claims are constitutionally ripe.**

The Federal Defendants contend that the Democratic Party Plaintiffs have only alleged a speculative future injury because Section 2(a) merely initiates a rulemaking process and does not dictate or compel a specific outcome. *See* Fed. Defs.' Br. at 15–16. The Court has already considered this argument and properly rejected it. As the Court explained, "the plain text of the Executive Order . . . mandates that the EAC take action to require documentary proof of citizenship on the Federal Form." *LULAC*, 780 F. Supp. 3d at 184. The President issued that command "in no uncertain terms" and even imposed a 30-day "deadline for such action," *id.*, a timeline upon which full rulemaking would be near-impossible. Contrary to the Federal Defendants' claim that Section 2(a) merely commences a process with no predetermined outcome, "there is no mystery about what Section 2(a) purports to require." *Id.*

---

[5] In *Fish v. Kobach*, 840 F.3d 710 (10th Cir. 2016), and *Fish v. Schwab*, 957 F.3d 1105 (10th Cir. 2020), the Tenth Circuit considered whether Kansas could require DPOC on its so-called "motor voter" form, which is governed by a different section of the NVRA than the Federal Form. That court concluded that the NVRA preempted the Kansas law's document proof of citizenship requirement. *See* 957 F.3d at 1145.

Further undercutting the Federal Defendants' argument is the uncontroverted fact that the EAC—prior to this Court's preliminary injunction—had "already begun to implement Section 2(a)," confirming that the agency itself understands the President's command as an unqualified "instruction" to carry out the terms of the EO. *Id.* at 187; *see also* Argument § I. The Federal Defendants attempt to downplay the EAC's statement as reflecting only "the first step in the consultation process" without any predetermined outcome. Fed. Defs.' Br. at 16. But the record refutes that theory: the EAC admitted it views Section 2(a) as "provid[ing] *instruction* to the EAC" to "require[]" certain changes to the Federal Form. SOF ¶ 46 (emphasis added). The EAC's counsel subsequently confirmed the same at the preliminary injunction hearing. *See id.* ¶ 48.

To the extent the Federal Defendants contend that the Democratic Party Plaintiffs must sit idly by until the EAC finishes implementing Section 2(a)'s preordained command, that argument also fails. "Damocles's sword does not have to actually fall . . . before the court will issue an injunction." *LULAC*, 780 F. Supp. 3d at 193 (quoting *Newby*, 838 F.3d at 9). Where, as here, the President's order unambiguously "announces the endpoint that the agency must strive to achieve," *AFGE*, 318 F. Supp. 3d at 431 (Jackson, J.), Plaintiffs have a sufficiently certain and imminent injury to satisfy standing and are not "required to wait for an injury to occur in order to satisfy Article III." *Jibril v. Mayorkas*, 20 F.4th 804, 817 (D.C. Cir. 2021) (concluding plaintiffs had standing to pursue prospective relief where risk of harm was imminent and substantial); *see also Teva Pharms. USA, Inc. v. Sebelius*, 595 F.3d 1303, 1314 (D.C. Cir. 2010) (similar).

In view of the foregoing, there is no question that the Democratic Party Plaintiffs have established several injuries-in-fact "that [are] imminent or certainly impending." *POET Biorefining v. EPA*, 970 F.3d 392, 403 (D.C. Cir. 2020) (cleaned up). The EAC's implementation of Section 2(a) would impose a host of injuries on the Democratic Party Plaintiffs, including direct

harm to Plaintiffs' core activities, competitive harm to their electoral prospects, and associational harm to their members and supporters. *See* Mem. in Supp. of Democratic Party Pls.' Mot. for Partial Summ. J. at 20–26 (July 11, 2025), ECF No. 146-1; *see also LULAC*, 780 F. Supp. 3d at 191–94 (finding Democratic Party Plaintiffs likely to establish these injuries).

The Federal Defendants resist this evidence only with gamesmanship. They insist that Plaintiffs must "affirmatively demonstrate their standing." Fed. Defs.' Br. at 16. But in the next breath, they contend that Democratic Party Plaintiffs are not permitted to "rely" upon "extrinsic evidence" to make this showing, *id.* at 17. The Court has squarely rejected that 'heads-I-win, tails-you-lose' argument, recognizing that it "would [be] inconsistent with the basic demands of summary judgment procedure," given that "at the summary-judgment stage, [a] plaintiff must demonstrate standing by 'affidavit or other evidence.'" ECF No. 180 at 11 (quoting *Frank v. Autovest*, 961 F.3d 1185, 1187 (D.C. Cir. 2020)).

Little remains of the Federal Defendants' standing arguments once their baseless complaint about the record is set aside. *See* Fed. Defs.' Br. at 16–17. As to organizational injury, the Federal Defendants offer a strawman argument, contending the Democratic Party Plaintiffs have merely alleged a voluntary diversion of resources. *See id.* at 16. But the Democratic Party Plaintiffs have shown that Section 2(a) "would make it more difficult for them to register voters who are likely to support Democratic candidates." *LULAC*, 780 F. Supp. 3d at 191. Registering voters who are likely to support Democrats is, unsurprisingly, a mission-critical activity for Plaintiffs. *See* SOF ¶¶ 16–19, 29–36, 41–42, 44. By burdening that effort, Section 2(a) would "directly affect[] and interfere[] with" their "core business activities." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024); *see also* Dem. Party Pls.' Br. at 24–26. The Federal Defendants nowhere dispute that direct and perceptible impairment of Plaintiffs' ability to pursue their voter registration activities.

Finally, as to both associational and competitive standing, the Federal Defendants make no argument whatsoever, save to reiterate their complaint about Democratic Party Plaintiffs' declarations. *See* Fed. Defs.' Br. at 17. By failing to make any other argument, the Federal Defendants concede that the Democratic Party Plaintiffs have established that no genuine dispute of material fact exists as to these additional standing grounds. *See Wilkins v. Jackson*, 750 F. Supp. 2d 160, 162 (D.D.C. 2010) ("It is well established that if a [party] fails to respond to an argument raised in a motion for summary judgment, it is proper to treat that argument as conceded." (citations omitted)).

### B.  Democratic Party Plaintiffs' claims are prudentially ripe because Section 2(a) mandates a specific change to the Federal Form.

The Federal Defendants also invoke their failed prudential ripeness arguments, relying chiefly on the three-judge district court's decision in *Common Cause v. Trump*. *See* Fed. Defs.' Br. at 13–14. The gist of their ripeness argument is that judicial review is premature because "the EAC has not completed the process" for adding a DPOC requirement to the Federal Form. *Id.* at 14. But the Court already rejected that claim, finding that Section 2(a) "dictates the precise contours of the mandated requirement." *LULAC*, 780 F. Supp. 3d at 184. Thus, this is not a case where "the merits [of] each claim may depend on" "how the [EAC] will implement" the EO. *Common Cause v. Trump*, 506 F. Supp. 3d 39, 50 (D.D.C. 2020). Section 2(a) leaves no such "basic uncertainty," nor does it leave "genuinely open questions about how" the EAC should "implement it." *Id.* at 48, 50. Accordingly, "no further factual development is needed" to aid the Court in evaluating the lawfulness of Section 2(a)'s command. *Shipp v. Hurwitz*, No. CV 19-1733 (RC), 2019 WL 2996541, at *3 (D.D.C. July 9, 2019) (rejecting prudential ripeness argument); *see also LULAC*, 780 F. Supp. 3d at 173–75, 185–88; Dem. Party Pls.' Br. at 17–20.

**C.    The APA does not preclude the Democratic Party Plaintiffs' *ultra vires* or constitutional claims.**

As this Court has already concluded, it is well established "that plaintiffs are 'entitled to bring a non-statutory cause of action questioning the legality of [an] Executive Order." *LULAC*, 780 F. Supp. 3d at 171 (quoting *Reich*, 74 F.3d at 1327). The Federal Defendants now contend that the Democratic Party Plaintiffs are barred from asserting such a non-statutory cause of action because of the prospect of APA relief. *See* Fed. Defs.' Br. at 10. Their argument, however, confuses the critical "distinction between claims that an official exceeded his statutory authority, on the one hand, and claims that he acted in violation of the Constitution, on the other." *Dalton v. Specter*, 511 U.S. 462, 474 (1994).

The Supreme Court has long "distinguished between claims of constitutional violations and claims that an official has acted in excess of his statutory authority." *Id.* at 472. Although the latter may sometimes be foreclosed where alternative statutory review schemes are available to plaintiffs, the former type of claim is not so restricted. *See Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992) (explaining that "the President's actions may still be reviewed for constitutionality" (citing authority)); *see also Dalton*, 511 U.S. at 472 (recognizing "unconstitutional and ultra vires conduct as separate categories"); *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 691, n.11 (1949) (distinguishing between executive acting "unconstitutionally *or* beyond his statutory powers"). Because the Democratic Party Plaintiffs have moved for summary judgment on claims the President has acted unconstitutionally and in violation of the separation of powers, *see* Compl. ¶¶ 126–145 (Counts I–III), the theoretical availability of other statutory relief is no impediment to their claims, *see, e.g.*, *Collins*, 594 U.S. at 245; *Free Enter. Fund*, 561 U.S. at 491 n.2; *Reich*, 74 F.3d at 1328.

The D.C. Circuit confirmed this just two weeks ago, holding that the availability of non-statutory "equitable relief substantially depends on whether the plaintiff claims a statutory or constitutional violation." *Vought*, 2025 WL 2371608, at *18. The Court explained that while the availability of *ultra vires* review is limited where "a federal agency has [allegedly] violated a federal statute," courts have "long recognized implied equitable claims arising under the Constitution." *Id.* And for such "implied equitable claims under the Constitution, [courts have] imposed neither the requirements for *ultra vires* review nor those for APA review." *Id.* That is particularly true where plaintiffs allege the sort of separation of powers violation at issue here—such claims arise "directly under the Constitution." *Free Enter. Fund*, 561 U.S. at 491 n.2; *cf. Seila L. LLC v. CFB*, 591 U.S. 197, 212 (2020) (explaining violations of the separation of powers create a "here-and-now injury" that "can be remedied by a court" (quotation omitted)). Accordingly, the "stringent prerequisites for *ultra vires* review" the Federal Defendants point to do not apply where a challenge "raise[s] constitutional questions." *Vought*, 2025 WL 2371608, at *7.

The Federal Defendants ignore this distinction, citing only cases where courts have limited *ultra vires* review based solely on allegations of *statutory* violations. Thus, for example, in *Nuclear Regulation Commission v. Texas*, the Supreme Court held that Texas and a private company could not pursue an *ultra vires* claim against the Nuclear Regulatory Commission's grant of a license to store spent nuclear fuel where the Court found that the plaintiffs had failed to properly preserve a cause of action under the Hobbs Act. *See* 605 U.S. 665, 675–80 (2025) ("*NRC*"). Their alternative "ultra vires agency action" claim did not work either because it was an improper effort to "dress up a typical statutory-authority argument as an ultra vires claim." 605 U.S. at 665, 675–80, 682–83. Unlike this case, *NRC* did not concern any alleged constitutional violation—merely a question

of whether the agency had acted properly under its own governing statute. *See Vought*, 2025 WL 2371608, at *18 (recognizing that *NRC* concerned statutory, rather than constitutional, claims).[6]

Consistent with *Vought*, courts within this Circuit continue to regularly hear non-statutory challenges alleging that an executive officer has acted *ultra vires* in violation of the Constitution. *See, e.g.*, *Vera Inst. of Just. v. U.S. Dep't of Just.*, No. 25-CV-1643 (APM), 2025 WL 1865160, at *7 (D.D.C. July 7, 2025) (concluding that where the "source of . . . claimed rights is . . . the Constitution," the court could "hear [such] claims); *Am. Ctr. for Int'l Lab. Solidarity v. Chavez-DeRemer*, No. CV 25-1128 (BAH), 2025 WL 1795090, at *29 (D.D.C. June 30, 2025) (similar); *Susman Godfrey LLP v. Exec. Off. of President*, No. CV 25-1107 (LLA), 2025 WL 1779830, at *23 (D.D.C. June 27, 2025) (similar); *cf. Refugee Ctr. for Educ. & Legal Servs. v. Noem*, No. CV 25-306 (RDM), 2025 WL 1825431, at *30 (D.D.C. July 2, 2025) (granting summary judgment in suit raising both constitutional and statutory *ultra vires* arguments).

The Federal Defendants' argument is an "attempt to dodge" valid constitutional claims, as was the case in *Susman Godfrey*. 2025 WL 1779830, at *23. In contrast to cases "challeng[ing] an agency interpretation of a statute," *Susman Godfrey* presented a "classic separation-of-powers claim in the vein of *Youngstown*," asking "whether the President was acting within his constitutional power when he issued an [executive] order." *Id.* (quoting *Youngstown*, 343 U.S. at 582). The Democratic Party Plaintiffs similarly seek judgment on a claim that Section 2(a) "does

---

[6] Similarly, *American Foreign Service Association v. Trump*—a non-dispositive order issued on a motion to stay—concerned allegations that President Trump had violated the Foreign Service Act of 1980, but not that he exceeded his constitutional authority. *See* No. 25-5184, 2025 WL 1742853, at *1 (D.C. Cir. June 20, 2025) (per curiam). The underlying statute also "delegates broad authority to the President" to regulate the Foreign Service, consistent with his broader Article II authority over foreign relations. *See id.* at *3 (citing 22 U.S.C. § 4103(b)). In contrast, the Federal Defendants cannot cite any statute delegating authority to the President over the content of the Federal Form.

not draw on an executive power that has been designated to the President by the Constitution or statute," and thus violates the separation of powers. *Id.*; *see also LULAC*, 780 F. Supp. 3d at 194–200. As there, the Democratic Party Plaintiffs possess the necessary cause of action to obtain relief.

### D.    The Democratic Party Plaintiffs are entitled to a permanent injunction.

Finally, as to remedy, the Federal Defendants contend that this Court should refuse any prospective injunctive relief to the Democratic Party Plaintiffs, even if they prevail on the merits. *See* Fed. Defs.' Br. at 23–24. That argument fails for the same reasons that the Court found in granting preliminary injunctive relief. *See LULAC*, 780 F. Supp. 3d at 203.

A permanent injunction is appropriate if Plaintiffs show (1) they would suffer "irreparable injury" absent an injunction, (2) remedies available at law such as monetary damages are inadequate, (3) the balance of hardships favor relief, and (4) the public interest would not be disserved. *eBay Inc. v. MercExchange*, 547 U.S. 388, 391 (2006). Courts in this district consider the first two factors together, *Grundmann v. Trump*, 770 F. Supp. 3d 166, 183–84 (D.D.C. 2025), and the last two factors "merge" because "the defendant is the government," *Anatol Zukerman & Charles Krause Reporting v. U.S. Postal Serv.*, 64 F.4th 1354, 1364 (D.C. Cir. 2023).

Rather than dispute the Democratic Party Plaintiffs' showing of irreparable harm, or explain how they could possibly gain relief through monetary damages, the Federal Defendants once more repeat their baseless complaint that Plaintiffs cannot rely on "extrinsic record evidence" to establish irreparable injury. *See* Fed. Defs.' Br. at 23. As explained, that argument is deeply flawed and at odds with both the Federal and Local Rules. *See infra* Argument § III.A; *see also* ECF No. 172 at 1–2. Furthermore, Defendants make only a meager attempt to distinguish *Newby*—which granted a preliminary injunction in similar circumstances, *see* 838 F.3d at 12—claiming that here the EAC has only "begun the process" of imposing a DPOC requirement, whereas in *Newby* it had already consummated that effort as to several states. Fed Defs.' Br. at 32.  But absent

31

this Court's preliminary injunction, the EAC would have continued the process of implementing Section 2(a). *Supra* Argument § I. The Federal Defendants simply ignore that elephant in the room explaining why that implementation process is no longer ongoing.

The Federal Defendants likewise fail to offer any sound reason why the balance of equities and public interest do not favor an injunction. *See* Fed. Defs.' Br. at 24. They make no attempt to rebut the well-established principles that a government defendant "cannot suffer harm from an injunction that merely ends an unlawful practice," *Open Cmtys. All. v. Carson*, 286 F. Supp. 3d 148, 179 (D.D.C. 2017) (quoting *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013)), and that ensuring "governmental agencies abide by the federal laws that govern their existence and operations" serves a "substantial public interest," *Newby*, 838 F.3d at 12 (quotation omitted). Instead, they baldly assert—without any factual or legal support—that refusing to enjoin Section 2(a) would serve public interests in the "integrity of our electoral processes." Fed. Defs.' Br. at 24 (quoting *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006)). But Congress, in enacting the NVRA, already exercised its own policy judgment in this arena as to the best way to serve that interest. 52 U.S.C. §§ 20501(b) (reciting public interests served by the NVRA, including protecting the "integrity of the electoral process"), 20508 (prescribing procedures for Federal Form); *see also Fish*, 840 F.3d at 756 (explaining that "Congress has spoken clearly" as to the "public interest" by enacting the "registration procedures" at issue). Defendants cannot avoid an injunction preventing enforcement of an order that runs headlong into Congress's judgment by declaring that the President's policy preferences would be better than those enacted by Congress.[7]

_____

[7] Declaratory relief should also issue because such relief will "afford relief from [] uncertainty, insecurity, and controversy giving rise to [this] proceeding." *Grundmann*, 770 F. Supp. 3d at 181 (quoting *President v. Vance*, 627 F.2d 353, 364 n.76 (D.C. Cir. 1980)). The Federal Defendants

IV.    **Defendants are not entitled to summary judgment on the Democratic Party Plaintiffs' APA claims against Section 2(a).**

In addition to their separation of powers and *ultra vires* claims, the Democratic Party Plaintiffs brought two APA claims challenging Section 2(a)—one alleging Section 2(a) violates the NVRA and another alleging it violates the constitutional right to vote. *See* Democratic Party Pls.' Compl. ¶¶ 171–75 (Count VI); *id.* ¶¶ 205–12 (Count X). Review under the APA must be conducted based on an administrative record produced by the agency, though additional "factfinding" is often necessary. *Amador Cnty. v. Jewell*, 170 F. Supp. 3d 135, 141 (D.D.C. 2016), *aff'd sub nom. Amador Cnty. v. U.S. Dep't of the Interior*, 707 F. App'x 720 (D.C. Cir. 2017) (describing APA standard and resolving summary judgment motion following discovery ordered by Court of Appeals). The Democratic Party Plaintiffs properly did not seek summary judgment on these claims at Phase I because no administrative record has yet been produced and necessary factual development has not yet occurred. Moreover, these claims need only be resolved if enforcement of Section 2(a) is not enjoined on some other basis—including the Democratic Party Plaintiffs' separation of powers and *ultra vires* claims. *See supra* Argument § II.

Defendants nonetheless seek summary judgment on these claims immediately. Fed. Defs.' Br. at 18–23; RNC Br. at 22–32. But their motions are premature and resolution of the Democratic Party Plaintiffs' APA claims—if ever even necessary—should be deferred until a proper record is

---

offer no reason that a declaratory judgment should not issue if Plaintiffs succeed on the merits of their separation of powers and *ultra vires* claims. Instead, they merely suggest that declaratory relief against *the President* is inappropriate. Fed. Defs.' Br. at 18. While that assertion is dubious, given that the D.C. Circuit and Supreme Court "have previously affirmed the issuance of declaratory relief involving the President," *Harris v. Bessent*, 775 F. Supp. 3d 164, 180 (D.D.C. 2025) (citing *Nat'l Treasury Emps. Union v. Nixon*, 492 F.2d 587, 616 (D.C. Cir. 1974), and *Clinton v. City of New York*, 524 U.S. 417, 421 (1998)), it is also a red herring because Plaintiffs seek declaratory relief against the officials charged with enforcing Section 2(a). No defendant disputes such relief would be appropriate if Plaintiffs prevail on the merits.

developed. Even if the Court proceeds to the merits of Defendants' cross-motions on these counts, it must ultimately deny them because there are outstanding disputes of material fact as to each.

> ### A.   The Court should defer resolving summary judgment on Counts VI and X until Phase III of the case.

The Democratic Party Plaintiffs did not move for summary judgment on their APA claims targeting Section 2(a) for a simple reason—resolving summary judgment on those claims is premature at this early stage of the Court's multi-phase scheduling order. Most notably, Defendants have not yet been required to produce an administrative record—a prerequisite for resolving APA claims. *See* 5 U.S.C. § 706 (noting the reviewing court "shall review the whole record or those parts of it cited by a party"); *see also NRDC v. Train*, 519 F.2d 287, 291 (D.C. Cir. 1975) ("The Administrative Procedure Act and the cases require that the complete administrative record be placed before a reviewing court."); *All. for Retired Americans v. Bessent*, No. CV 25-0313 (CKK), 2025 WL 1114350, at *2 (D.D.C. Mar. 20, 2025) (similar). Courts within this circuit regularly decline to grant summary judgment before an administrative record has been produced. *See, e.g.*, *Devlin v. Berry*, 26 F. Supp. 3d 74, 80 (D.D.C. 2014) ("The Court is loath to grant a motion for summary judgment in an APA proceeding where the entire record has not yet been filed."); *West Virginia ex rel. Morrisey v. U.S. Dep't of Health & Hum. Servs.*, No. CV 14-1287 (RBW), 2014 WL 12803229, at *2 (D.D.C. Nov. 3, 2014) (granting stay and explaining that "absent the production of the administrative record, further summary judgment briefing . . . would be premature"); *Browder v. Wormuth*, No. CV 18-2411 (TJK), 2024 WL 5168281, at *6 (D.D.C. Dec. 19, 2024) (denying summary judgment motion without prejudice because the administrative record was not produced); *cf. Allina Health Servs. v. Azar*, No. CV 16-150 (RC), 2020 WL 7042869, at *1 (D.D.C. Jan. 2, 2020) (declining to enter judgment prior to production of the record).

Further still, the Democratic Party Plaintiffs made clear when negotiating a schedule with the Federal Defendants that adjudication of their APA claims would follow their separation of powers and *ultra vires* claims. In the parties' June 16 joint submission, the Democratic Party Plaintiffs explained they "intend[e]d to seek discovery on . . . their claims under the Administrative Procedure Act," and requested that the Government "file an administrative record" to facilitate consideration of those claims, as is required by the APA and this Court's local rules. ECF No. 137 at 4–5. The Court subsequently adopted a case schedule limiting Phase I motions to those capable of resolution "without discovery." ECF No. 141 at 2. Consistent with that order, and the nature of their claims challenging Section 2(a), the Democratic Party Plaintiffs' opening Phase I summary judgment motion includes their *ultra vires* and constitutional claims upon which the current preliminary injunction is based, while reserving Plaintiffs' right to move for summary judgment on their APA claims at an appropriate time, if necessary. *See* Democratic Party Pls.' Br. at 9 n.3.

Defendants nevertheless argue they are entitled to immediate summary judgment on Counts VI and X because there is no "final agency action." Fed. Defs.' Br. at 12–13. But the Democratic Party Plaintiffs dispute that claim, which is not yet ripe for judicial resolution pending the Federal Defendants' production of an administrative record. *See Devlin*, 26 F. Supp. 3d at 80 (deferring summary judgment until after production of administrative record because the record could reveal additional facts concerning circumstances surrounding final agency action). And there is no need for the Court to resolve the question of final agency action now because the issue does not go to this Court's subject-matter jurisdiction over Plaintiffs' claims. *See Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 183 (D.C. Cir. 2006) (holding that final agency action is not a jurisdictional requirement); *Cavazos v. Zinke*, No. CV 18-891 (CKK), 2019 WL 121210, at *2 (D.D.C. Jan. 7, 2019) ("Because the APA's requirement of a final agency action is not jurisdictional, even if

Plaintiffs failed to exhaust their administrative remedies, this Court would still have subject matter jurisdiction over Plaintiffs' claim."). Indeed, there may be no need for the Court to resolve these claims *at all*, which weighs strongly in favor holding them until a later phase of this litigation.

In sum, the prudent course is for this Court to defer consideration of the Democratic Party Plaintiffs' APA claims, particularly if it grants them judgment on a separate claim seeking the same relief from Section 2(a). *See supra* Argument § II. The Court's scheduling order expressly contemplates further rounds of summary judgment briefing as needed, based on the claims outstanding after the first two briefing phases. *See* ECF No. 141 at 3. The Court should not strain to reach potentially duplicative claims based on an incomplete record, particularly given the outstanding factual dispute as to the presence of final agency action.

### B. Defendants are not entitled to summary judgment on Plaintiffs' NVRA-based APA claim.

The Federal Defendants and RNC each assert that they are entitled to partial summary judgment on Plaintiffs' claim that "[a]ny action taken by the EAC to carry out" Section 2(a) is contrary to the NVRA in violation of the APA (Count VI). *See* Fed. Defs.' Br. 12, 18–20; RNC Br. at 22. But Defendants have not met their burden of showing that they are entitled to judgment as a matter of law on this claim because "there are outstanding issues of material fact that preclude the entry of judgment." *Walker v. District of Columbia*, 969 F. Supp. 794, 798 (D.D.C. 1997).

Specifically, there is at least a genuine dispute of material fact as to final agency action. The EAC's Executive Director sent a letter to state officials explaining that the EO "instructs" DPOC "be required" on the Federal Form. SOF ¶ 46. Defendants' counsel represented to the Court that the "EAC *must* add a documentary-proof-of-citizenship requirement to the Federal Form, regardless of the feedback it receives from the States or other participants in the notice-and-comment process or of its own conclusions about whether such proof is 'necessary' to allow States

to assess voter qualifications." *LULAC*, 780 F. Supp. 3d at 199 (citing preliminary injunction hearing transcript and NVRA). This admission at minimum raises an open question as to whether there has been a "consummation of the agency's decisionmaking process . . . by which rights or obligations have been determined." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (quotation omitted); *see also, e.g.*, *Aracely v. Nielsen*, 319 F. Supp. 3d 110, 138 (D.D.C. 2018) (explaining that an ascertainable policy, even not "in writing," constitutes final action) (collecting cases). As a result, and consistent with this Court's briefing schedule, the claim should be deferred and only resolved—if necessary—when the relevant facts are before the Court. *See id.*

Defendants otherwise claim that judgment should be granted on this claim because Section 2(a) is, as a matter of law, consistent with the NVRA. Fed. Defs.' Br. at 18–20; RNC Br. at 22. But Section 2(a)'s unilateral demand for a DPOC requirement on the Federal Form plainly violates not only the NVRA's procedural requirements for promulgating the form, but also the Act's substantive provisions. *Supra* Argument § II. Accordingly, Defendants' motions for partial summary judgment as to Count VI should be denied.

### C.    Defendants are not entitled to summary judgment on Plaintiffs' APA claim based on *Anderson-Burdick* and the constitutional right to vote.

Summary judgment is also inappropriate on the Democratic Party Plaintiffs' APA claim premised on the constitutional *Anderson-Burdick* framework (Count X), which requires the Court to weigh the burden imposed by a challenged election law against the government's interest in imposing such a burden. *See Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983); *Burdick v. Takushi*, 504 U.S. 428, 434 (1992); *see also* Democratic Party Pls.' Compl. ¶ 207.

By its nature, the "*Anderson-Burdick* balancing test" requires a "fact-intensive analysis." *Gill v. Scholz*, 962 F.3d 360, 365 (7th Cir. 2020); *Eakin v. Adams Cnty. Bd. of Elections*, No. 25-1644, 2025 WL 2449056, at *10, n.27 (3d Cir. Aug. 26, 2025) ("Evidence is key to the balancing

of interests at the heart of the *Anderson-Burdick* framework.") (quoting *Mazo v. N.J. Sec'y of State*,

54 F.4th 124, 152 (3d Cir. 2022)). At this stage, the parties have not had an opportunity to develop

evidence as to either half of the *Anderson-Burdick* framework, so many disputes of fact remain as

to both the burden Section 2(a) imposes and the governmental interests it purportedly serves.

Courts routinely decline to resolve summary judgment in *Anderson-Burdick* cases where the

record is so undeveloped. *See, e.g.*, *Wood v. Meadows*, 117 F.3d 770, 776 (4th Cir.

1997) (reversing summary judgment and remanding "for further factual development both as to

the burdens . . . and as to the interests of the [government] in imposing that [burden]"); *Bednasek*

*v. Kobach*, 259 F. Supp. 3d 1193, 1209 (D. Kan. 2017) (denying motion for summary judgment in

case concerning impact of a DPOC law). The Court's scheduling order already accounts for the

need to develop this record, but only after earlier phases of briefing are complete. ECF No. 141 at

2–3. Accordingly, the Court should not apply the *Anderson-Burdick* framework to the limited

record before it; instead, it should defer the motions as to Count X or deny them without prejudice.

Even if the Court proceeds to apply the *Anderson-Burdick* framework to the record before

it, it must ultimately still deny Defendants' motions because outstanding disputes of material fact

exist as to both prongs of the framework.

### 1. The parties' factual dispute about the burden imposed by Section 2(a) cannot be resolved yet.

The RNC has raised arguments about whether Section 2(a)'s DPOC requirement imposes

a significant burden. *See* RNC Br. at 22–26. But those arguments merely raise factual questions

the record does not yet firmly answer. For example, the RNC disputes just how many Americans

lack the DPOC required by the EO, RNC Br. at 22–23; and whether people lacking such proof are

in fact "U.S. citizens who are otherwise eligible to vote," *id.* at 24. But the parties have not fully

developed the record as to either of these questions. Nowhere does the RNC explain why it believes summary judgment is appropriate while such factual questions are purportedly outstanding.

Thus, while the RNC is free to dispute whether "the evidence . . . reliably illustrate[s] the likelihood that voters will encounter obstacles to obtaining" DPOC, *id.*, that factual disagreement simply illustrates why summary judgment must be denied at this time, *see Jacobs v. Bondi*, No. 22-CV-654-MJS, 2025 WL 1824821, at *8 (D.D.C. July 2, 2025) (denying summary judgment where plaintiff's "statistics at least raise[d] a triable issue of fact" despite government's competing interpretation of data); *Bednasek*, 259 F. Supp. 3d at 1209 (similar). Likewise, while the RNC charges that the Democratic Party Plaintiffs' statistical data about who has access to DPOC paints "only half the picture," *id.* at 26, the dispute over that data—before any fact or expert discovery has occurred on the topics—confirms that summary judgment is not appropriate. *See Bynum v. District of Columbia*, 215 F.R.D. 1, 2 (D.D.C. 2003) (concluding it "premature to consider a motion for summary judgment when the discovery process," which has "not even commenced" "might yield additional facts that would guide the Court's decision as to the merits"). Finally, summary judgment is particularly inappropriate because evidence about the severity of the burden imposed by Section 2(a) informs the Court's standard of review. *See Eakin*, 2025 WL 2449056, at *14 (holding that even minimal burdens require a standard higher than rational basis review); *Doe 2 v. Mattis*, 322 F. Supp. 3d 92, 98 (D.D.C. 2018) (denying defendants' motion for summary judgment where "factual disputes" "affect[ed] the threshold question" about "what level of scrutiny the Court should apply" in assessing constitutional questions).

### 2. The lack of any evidence supporting a governmental interest in Section 2(a) further precludes summary judgment.

Apart from the parties' dispute over burden, Defendants are also not entitled to summary judgment at this juncture because they have "fail[ed] to provide any evidence to demonstrate that

the [DPOC] requirement" is appropriately drawn "to protect [the government's] interests." *Graveline v. Benson*, 992 F.3d 524, 545 (6th Cir. 2021) (affirming grant of summary judgment to plaintiff, and denial of the state's cross-motion, in action brought under *Anderson-Burdick* for lack of governmental interest); *Eakin*, 2025 WL 2449056 (same).

To start, the Federal Defendants did not comply with their obligation under the Local Rules to submit a statement of undisputed material facts with its motion for summary judgment, never mind any supporting evidence. They therefore cannot plausibly establish that no genuine dispute of material fact exists as to the government's interest—which begins and ends with only their say-so—in revising the Federal Form to require DPOC. *See, e.g.*, *Fish*, 957 F.3d at 1136 (discounting the state's purported interests because it presented "no evidence" to support those claimed interests); *Soltysik v. Padilla*, 910 F.3d 438, 448 (9th Cir. 2018) (rejecting the argument that states are "not required to make an evidentiary showing of [their interests]" in *Anderson-Burdick* challenges and explaining the government "must sometimes be required to offer evidence that its regulation of the political process is a reasonable means of achieving the state's desired ends").

Instead of introducing evidence to support its request for judgment, the Federal Defendants rely on a smattering of cases to support the straightforward proposition that the government has an "interest in counting only the votes of eligible voters." Fed. Defs.' Br. at 22 (quoting *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 196 (2008)). Even so, the Federal Defendants presented no evidence as to how Section 2(a) furthers that interest relative to the burden it imposes. *See Fish*, 957 F.3d at 1133 (discounting such a claimed government interest at summary judgment where defendant presented "no evidence that the DPOC requirement furthers" such an interest); *see also Eakin v. Adams Cnty. Bd. of Elections*, 775 F. Supp. 3d 903, 920 (W.D. Pa. 2025) (granting summary judgment against state where purported interests of "fraud detection" and "voter

confidence" were "nebulous" and "unsupported by evidence of record"), *aff'd*, No. 25-1644, 2025 WL 2449056; *Mich. State A. Philip Randolph Inst. v. Johnson*, No. 16-CV-11844, 2018 WL 493184, at *9 (E.D. Mich. Jan. 19, 2018) (denying state's motion for summary judgment where there was "little evidence in the record" supporting state's proffered interest in imposing voting restriction). Given the paucity of any evidence supporting the government's interest in Section 2(a), granting it summary judgment at this stage would improperly "convert *Anderson*/*Burdick*'s means-end fit framework into ordinary rational-basis review." *Soltysik*, 910 F.3d at 448–49.

For its part, the RNC offers a meager record of governmental interest by submitting a handful of press releases purporting to establish that non-U.S. citizens vote in American elections. RNC SOF ¶¶ 9–12, 14 (Aug. 20, 2025), ECF No. 176-2. But this scattershot evidence fails to show the absence of any disputes of material fact. Indeed, they are comprised largely of partisan claims that fail to substantiate the very assertions made by the RNC, referring only to "potential noncitizens" removed from voter rolls in Texas, *see* RNC Ex. C (Aug. 8, 2025), ECF No. 161-2, or voters who "appear[ed]" to be noncitizens in Alabama, RNC Ex. G.[8] Other RNC exhibits merely note that some registered individuals "were not able to be verified" as U.S. citizens by government databases like the SAVE program (RNC Ex. N)—an unremarkable fact given that "SAVE cannot conclusively 'confirm' non-citizenship." *Mi Familia Vota v. Fontes*, 719 F. Supp. 3d 929, 955,

---

[8] These partisan claims appear to be based on identifying registered voters who *at some point in time* were assigned an immigration number. *See, e.g.*, RNC Ex. G. But that fact alone hardly establishes the existence non-citizen voting, as each year hundreds of thousands of people issued immigration numbers become naturalized American citizens. Indeed, in 2024, Idaho reviewed its voter register rolls and identified 678 "potential noncitizens" on its voter rolls using this method. *See* Democratic Party Pls.' Resp. to RNC SOF ¶ 12. Based on minimal investigation, however, Idaho was able to quickly determine that nearly all these individuals were in fact citizens. *See id.* Idaho ultimately was not able to determine that even a *single* individual on its rolls was a noncitizen. *See id.*

959 (D. Ariz. 2024) (reaching this conclusion based on trial evidence and explaining SAVE's limited response options), *aff'd in part, vacated in part, remanded*, 129 F.4th 691 (9th Cir. 2025).

The RNC's paltry evidence, if anything, reflects the conspicuous lack of evidence that noncitizens vote to any meaningful degree in American elections; it certainly does not establish the absence of any dispute of fact as to whether Section 2(a) advances a legitimate government interest. *Bednasek*, 259 F. Supp. 3d at 1209 (denying state's summary judgment motion in DPOC case where the "scant evidence of noncitizen voter fraud" could not, as a matter of law, justify burden imposed by DPOC requirement); *see also* ECF No. 146-3 at 31 (Schneider Decl.) ("[T]here is no evidence of widespread voting by non-citizens in U.S. elections."); *id.* at 43 (Edelman Decl.) (explaining that "[i]nvestigations of the President's claims to the contrary have been consistently debunked," so "DGA's members know that [existing] laws are successful"); *id.* at 14 (Jeffries Decl.) ("existing law prevents non-citizens from voting"); *id.* at 20 (Schumer Decl.) (similar).

### 3. The Supreme Court's decision in *Crawford* does not require prematurely granting summary judgment.

Perhaps recognizing that their request for judgment is premature, Defendants also try to advance a purely legal argument that "Supreme Court precedent forecloses finding that requiring proof of citizenship poses an undue burden on the right to vote." RNC Br. at 25 (citing *Crawford*, 553 U.S. at 197–200); *see also* Fed. Defs.' Br. at 32 (arguing DPOC is per se lawful because it is "generally applicable, even-handed, [and] politically neutral"). But that is a fundamental misreading of *Crawford*, which concerned a state law requiring proof of *identity* when casting a ballot—not proof of *citizenship* when registering. The two are plainly not the same, as evidenced by the fact that a driver's license typically satisfies the former requirement but virtually never satisfies the latter. *See* SOF ¶ 7; RNC Answer ¶ 7 (June 12, 2025), ECF No. 139.

Far from adopting a *per se* legal rule, *Crawford* expressly disclaimed any "litmus test for measuring" the burden of a challenged voting rule. 553 U.S. at 191. Like all *Anderson-Burdick* cases, it was resolved based on "the record that [was] made in [that] litigation," *id.* at 202, in which both parties cross-moved and "agree[d] that there [were] no material facts in dispute that preclude[d] summary judgment," *Ind. Democratic Party v. Rokita*, 458 F. Supp. 2d 775, 784 (S.D. Ind. 2006). That record included expert reports, formal surveys, published books, university studies, and accompanying testimony submitted by both the plaintiffs and the state throughout the discovery period. *Id.* at 793–96, 803; *see also Eakin*, 2025 WL 2449056, at *5 (noting that discovery produced "voluminous pages of interrogatories, depositions, and other documents" before parties cross-moved for summary judgment on *Anderson-Burdick* claim). No opportunity to develop a similar record has occurred here.

Similarly, the Defendants wrongly claim that *Crawford* holds that the government can justify *any* voting regulation by pointing to an interest in preventing "foreign nationals [from] voting in Federal elections." Fed. Defs.' Br. at 22 (quoting EO § 2). While preventing foreign nationals from voting is a valid interest in the abstract, the government cannot simply invoke it without any substantiating evidence as a specter to justify *any* voting restriction, no matter how severe the associated burdens are. *See Soltysik*, 910 F.3d at 448. Contrary to their argument, "*Crawford* does not stand for the proposition that these interests presumptively outweigh a more-than-minimal burden imposed on voters by a State law." *Bednasek*, 259 F. Supp. 3d at 1209.

Indeed, in one of the few post-*Crawford* decisions analyzing a proof of citizenship requirement, the Tenth Circuit affirmed a district court's finding—made after trial—that such a law violated *Anderson-Burdick*. *See Fish*, 957 F.3d at 1105. It did so in part because the severe burden imposed by the law could not be justified by the "incredibly slight" and "weak" evidence

of noncitizen voting introduced by the state at trial. *Id.* at 1134. In other words, *Crawford* did not operate as a get-out-of-jail free card for Kansas—the state was held to its burden of showing a legitimate governmental need for such a burdensome measure. *Id.* Ultimately, its evidence was found wanting and the proof of citizenship requirement was enjoined. *Id.*

For similar reasons, Defendants' heavy reliance on *Mi Familia Vota v. Fontes* is misplaced. RNC Br. at 24–25, 27–28, 32; Fed. Defs.' Br. at 2. That court concluded, again after trial, that the plaintiffs' evidence of burden failed to outweigh the government's interest—not for a DPOC requirement generally—but over a narrow claim challenging Arizona's cancellation of registrants who affirmatively indicated that they were not citizens, and who also did not have DPOC on file. *See* 719 F. Supp. 3d at 1010 (noting that under the challenged law, "Arizona *may not* deny . . . voter registrations when a voter fails to provide DPOC") (emphasis in original). But the court was only able to make that conclusion "based on the evidence presented" after extensive discovery and trial—not an incomplete summary judgment record. *Id.* In fact, earlier in the same case, the court *rejected* the precise argument Defendants make here—that *Crawford* stands for the rule "that requiring voter identification to vote is not an undue burden as a matter of law." *Mi Familia Vota v. Fontes*, No. CV-22-00509-PHX-SRB, 2023 WL 8183070, at *14 (D. Ariz. Feb. 16, 2023) (declining to dismiss *Anderson-Burdick* claim absent factual development).

At bottom, the Supreme Court in *Crawford* refused to "neatly separate valid from invalid restrictions," and requires trial courts to make a "hard judgment" based on record evidence. *Crawford*, 553 U.S. at 190. That is why Defendants cannot cite any similar case where a court entered summary judgment on an *Anderson-Burdick* claim—before the development of a factual record—simply by pointing to *Crawford*. Courts have instead cited *Crawford* for the exact opposite proposition—that "district courts . . . applying the *Anderson-Burdick* balancing test" must

be carefully attuned to "factual differences" between cases. *Gill*, 962 F.3d at 366 (citing *Crawford*, 553 U.S. at 190); *see also Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1352 (11th Cir. 2009) (similar) (citing *Crawford*, 553 U.S. at 189–90); *N.C. State Conf. of NAACP v. McCrory*, 997 F. Supp. 2d 322, 381 (M.D.N.C.) (noting "*Crawford* turned on the specific facts relevant in the context of Indiana's voter ID law" and further explaining "that the determination of whether such a law satisfies the Constitution is factually intensive"), *rev'd in part on other grounds sub nom. League of Women Voters v. North Carolina*, 769 F.3d 224 (4th Cir. 2014).

Accordingly, the Court should deny Defendants' motions for judgment on Count X and defer the "hard judgment" required by the Democratic Party Plaintiffs' *Anderson-Burdick* until a more appropriate time, if necessary.

## CONCLUSION

This Court should grant the Democratic Party Plaintiffs' motion for partial summary judgment as to their constitutional separation of powers and *ultra vires* claims concerning Section 2(a) of the EO, declare the provision unlawful, and permanently enjoin its enforcement. The Court should also deny the Defendants' cross-motions in full, including as to claims that are not yet appropriate for resolution at summary judgment.

Dated: August 29, 2025

Respectfully submitted,

*/s/ Marc E. Elias*
**ELIAS LAW GROUP LLP**
Marc E. Elias (DC 442007)
Aria C. Branch (DC 1014541)
Lalitha D. Madduri (DC 1659412)
Christopher D. Dodge (DC 90011587)
Jacob D. Shelly (DC 90010127)
Harleen K. Gambhir (DC 1781869)
James J. Pinchak (DC 90034756)*
250 Massachusetts Ave. NW, Suite 400
Washington, DC 20001
T: (202) 968-4652

Tyler L. Bishop (DC 90014111)
1700 Seventh Ave. Suite 2100
Seattle, WA 98101
T: (206) 656-0177

*Counsel for the Democratic Party Plaintiffs*

*Admitted pro hac vice

46