## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.*,<br><br>    Plaintiffs,<br><br>    v.<br><br>EXECUTIVE OFFICE OF THE PRESIDENT, *et al.*,<br><br>    Defendants. | Civil Action No. 25-0946 (CKK) |
| DEMOCRATIC NATIONAL COMMITTEE, *et al.*,<br><br>    Plaintiffs,<br><br>    v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>    Defendants,<br><br>*and*<br><br>REPUBLICAN NATIONAL COMMITTEE,<br>    Intervenor-Defendant. | Civil Action No. 25-0952 (CKK) |
| LEAGUE OF WOMEN VOTERS EDUCATION FUND, *et al.*,<br><br>    Plaintiffs,<br><br>    v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>    Defendants. | Civil Action No. 25-0955 (CKK) |

## THE REPUBLICAN NATIONAL COMMITTEE'S REPLY BRIEF IN SUPPORT OF SUMMARY JUDGMENT ON PLAINTIFFS' SECTION 2(a) CLAIMS

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

INTRODUCTION ............................................................................................................... 1

ARGUMENT ....................................................................................................................... 2

I.    Requiring proof of citizenship doesn't violate the NVRA. ...................................... 2

II.   The President's directive to the Election Assistance Commission isn't at odds with
      Congress's Elections Clause power. ......................................................................... 6

III.  Plaintiffs have not shown that Section 2(a) unconstitutionally burdens the right to vote. .... 14

CONCLUSION .................................................................................................................. 19

## TABLE OF AUTHORITIES

**Cases**

*ACLU of N.M. v. Santillanes*,
   546 F.3d 1313 (10th Cir. 2008) ............................................................................ 17

*Am. Fed'n of Gov't Emp. v. Carmen*,
   669 F.2d 815 (D.C. Cir. 1981) ............................................................................. 10

*Arizona v. Inter Tribal Council of Ariz., Inc.*,
   570 U.S. 1 (2013) ........................................................................................... 1, 5, 6

*Ass'n for Educ. Fin. & Pol'y v. McMahon*,
   2025 WL 1568301 (D.D.C.) .................................................................................. 7

*Ayestas v. Davis*,
   584 U.S. 28 (2018) ................................................................................................. 5

*Azar v. Allina Health Servs.*,
   587 U.S. 566 (2019) .............................................................................................. 5

*Berkeley v. Home Ins.*,
   68 F.3d 1409 (D.C. Cir. 1995) .............................................................................. 1

*Bldg. & Const. Trades Dep't v. Allbaugh*,
   295 F.3d 28 (D.C. Cir. 2002) ........................................................................... 7, 13

*Brnovich v. Democratic Nat'l Comm.*,
   594 U.S. 647 (2021) ............................................................................................ 17

*Buckley v. Valeo*,
   424 U.S. 1 (1976) .............................................................................................. 1, 8

*Cellular Telecomm. & Internet Ass'n v. FCC*,
   330 F.3d 502 (D.C. Cir. 2003) .............................................................................. 4

*Collins v. Yellen*,
   594 U.S. 220 (2021) ............................................................................... 8, 9, 11, 12

*Common Cause/Ga. v. Billups*,
   554 F.3d 1340 (11th Cir. 2009) .......................................................................... 17

*Crawford v. Marion Cnty. Election Bd.*,
   553 U.S. 181 (2008) .................................................................................... passim

*Daunt v. Benson*,
   999 F.3d 299 (6th Cir. 2021) .............................................................................. 15

*Exxon Mobil Corp. v. Allapattah Servs., Inc.*,
   545 U.S. 546 (2005) .............................................................................................. 5

*Fish v. Kobach*,
   189 F. Supp. 3d 1107 (D. Kan. 2016) ............................................................... 4, 5

*Fish v. Kobach*,
   840 F.3d 710 (10th Cir. 2016) ............................................................................ 10

*Frank v. Walker,*
    768 F.3d 744 (7th Cir. 2014) ........................................................................ 15, 16

*Free Enter. Fund v. PCAOB,*
    561 U.S. 477 (2010) ........................................................................... 7, 8, 9, 13

*Fusaro v. Cogan,*
    930 F.3d 241 (4th Cir. 2019) ........................................................................ 15, 16

*Glob. Health Council v. Trump,*
    2025 WL 2480618 (D.C. Cir. Aug. 28) ............................................................. 7, 10

*Gonzalez v. Arizona,*
    485 F.3d 1041 (9th Cir. 2007) ........................................................................... 4

*Gonzalez v. Arizona,*
    649 F.3d 953 (9th Cir. 2011) ............................................................................. 4

*In re Hennen,*
    38 U.S. 230 (1839) ........................................................................................ 12

*J.G.G. v. Trump,*
    2025 WL 914682 (D.C. Cir. Mar. 26) ................................................................. 5

*Kendall v. United States ex rel. Stokes,*
    37 U.S. (12 Pet.) 524 (1838) .......................................................................... 10

*Kobach v. EAC,*
    772 F.3d 1183 (10th Cir. 2014) .................................................................. 10, 14

*League of Women Voters of U.S. v. Newby,*
    838 F.3d 1 (D.C. Cir. 2016) ........................................................................ 10, 14

*Main St. Legal Services v. NSC,*
    811 F.3d 542 (2d Cir. 2016) .......................................................................... 9, 10

*Mi Familia Vota v. Fontes,*
    129 F.4th 691 (9th Cir. 2025) ........................................................................... 3

*Mi Familia Vota v. Fontes,*
    719 F. Supp. 3d 929 (D. Ariz. 2024) ........................................................... 18, 19

*Myers v. United States,*
    272 U.S. 52 (1926) ................................................................................. passim

*Nat'l Treasury Emps. Union v. Vought,*
    2025 WL 2371608 (D.C. Cir. Aug. 15) ................................................................ 7

*Ohio Democratic Party v. Husted,*
    834 F.3d 620 (6th Cir. 2016) ......................................................................... 16

*Page v. Comey,*
    137 F.4th 806 (D.C. Cir. 2025) ......................................................................... 5

*Seila L. LLC v. CFPB,*
    591 U.S. 197 (2020) ................................................................................ 8, 13

*Sherley v. Sebelius*,
    689 F.3d 776 (D.C. Cir. 2012) ............................................................ 13

*Shurtleff v. United States*,
    189 U.S. 311 (1903) ............................................................................ 12

*Timmons v. Twin Cities Area New Party*,
    520 U.S. 351 (1997) ............................................................................ 16

*Trump v. Wilcox*,
    145 S. Ct. 1415 (2025) .................................................................... 9, 11

*United States v. Bouchard*,
    No. 7:25-cr-83 (E.D.N.C. Aug. 26, 2025) ......................................... 18

*United States v. Hendrickson*,
    949 F.3d 95 (3d Cir. 2020) ................................................................... 2

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952) .............................................................................. 7

**Statutes**

52 U.S.C. §20504 .......................................................................................... 4

52 U.S.C. §20508 ................................................................................. passim

52 U.S.C. §20923 ........................................................................................ 12

Fed. R. Evid. 901 ......................................................................................... 3

**Other Authorities**

1 Annals of Cong. 463 (1789) ..................................................................... 8

139 Cong. Rec. S2897, S2902, 1993 WL 73164 ....................................... 5

Black's Law Dictionary (12th ed. 2024) ..................................................... 3

Cambridge English Dictionary (2019) ......................................................... 2

Elena Kagan, *Presidential Administration*, 114 Harv. L. Rev. 2245 (2001) ......................... 11, 12

Exec. Order No. 14,248, 90 Fed. Reg. 14005 (Mar. 25, 2025) ............. 13, 19

**Constitutional Provisions**

U.S. Const. art. I, §2 .................................................................................... 6

## INTRODUCTION

In the National Voter Registration Act, Congress gave the Election Assistance Commission power to set rules regarding voter registration for federal elections. 52 U.S.C. §20508. The NVRA never mentions documentary proof of citizenship, let alone prohibits the Commission from requiring it. And because the Commission is an executive agency, it falls under the President's control. *Cf. Buckley v. Valeo*, 424 U.S. 1, 132, 136 (1976). Neither the Elections Clause nor the Electors Clause strips the President of his Article II power to "control" the Commission. *Myers v. United States*, 272 U.S. 52, 163-64 (1926). The President thus has lawfully instructed the Commission to begin the process of requiring proof of citizenship on the federal voter-registration form.

Plaintiffs argue not just that the President lacks power to direct the Commission, but that the Commission could *never* require documentary proof of citizenship consistent with the NVRA. Their lead textual argument is that "formal authentication" means "evidence of qualifications." *See* DNC Resp. Br. (Doc. 185) 33-34. But definitions and context make clear that "formal authentication" refers to authenticating signatures; it's not a blanket prohibition against gathering "other information," which the same subsection permits. 52 U.S.C. §20508(b). Moreover, the Supreme Court has already rejected Plaintiffs' interpretation, noting that it raises "serious constitutional doubt" because it would interfere with a State's ability to enforce citizenship requirements. *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 19 (2013).

As for their other Section 2(a) claims, Plaintiffs have provided no evidence that requiring proof of citizenship unconstitutionally burdens voters. The DNC agreed they needed no discovery on their Section 2(a) claims. Joint Civil Rule 16.3 Report (Doc. 137) 5. They can't change their mind now. *Cf. Berkeley v. Home Ins.*, 68 F.3d 1409, 1414 (D.C. Cir. 1995). In any event, precedent indicates that any *de minimis* burden on the right to vote is outweighed by the government's compelling interest in "carefully identifying all voters participating in the election process." *Crawford*

*v. Marion Cnty. Election Bd.*, 553 U.S. 181, 196 (2008) (plurality op.). And Plaintiffs have shown

no more than a *de minimis* burden.

## ARGUMENT

### I.    Requiring proof of citizenship doesn't violate the NVRA.

Plaintiffs suggest that the NVRA outlaws *all* proof-of-citizenship requirements for federal

voter registration. *See* DNC Resp. Br. 33-34. They argue that the NVRA prevents not only the

President directing the Commission to add a proof-of-citizenship requirement to the federal form,

but also the Commission itself from finding it "necessary," even at the request of the States. *Id*. at

31. They arrive at their expansive reading by misinterpreting the phrases "other formal authenti-

cation," "necessary," and resorting to legislative history. DNC Resp. Br. 30-37.

The NVRA doesn't prohibit all types of "formal authentication." 52 U.S.C. §20508(b)(3).

It prohibits requiring "*notarization or other* formal authentication." *Id.* (emphasis added). "The

word 'other' usually indicates that the term that follows it is 'of the same kind as the item or person

already mentioned.'" *United States v. Hendrickson*, 949 F.3d 95, 99 n.5 (3d Cir. 2020) (quoting

Cambridge English Dictionary (2019)). So the "formal authentication" the NVRA is referring to

must be "'of the same kind'" as the item "'already mentioned.'" *Id*. That item is "notarization." 52

U.S.C. §20508(b)(3). Plaintiffs' interpretation doesn't account for the word "other" in the sen-

tence. That the RNC's interpretation gives the word "other" meaning doesn't "strip" the words

"formal authentication" of "any independent meaning." *Contra* DNC Resp. Br. 33 (cleaned up).

Plaintiffs admit as much when they recognize that the "formal authentication" includes signature

verification. *Id*. The RNC's interpretation gives those words their ordinary meaning as modified

by the word "other." Plaintiffs offer no definition of the word "other."

With "other formal authentication" correctly defined as "'of the same kind'" as "notariza-

tion," *Hendrickson*, 949 F.3d at 99 n.5, the NVRA's notary clause indicates that the Commission

can require proof of citizenship from applicants who use the federal registration form. The DNC assumes that "formal authentication" refers to the authentication of "citizenship status." DNC Resp. Br. 32. It provides no explanation for that assumption, and its preferred definitions rebut it: in the legal context, "authentication" "refers to 'the act of proving that something (*as a document*) is true or genuine.'" *Id*. (quoting *Authentication*, Black's Law Dictionary (12th ed. 2024)) (emphasis added). But the DNC uses the word to refer to proving that a *fact* is true, "such as citizenship status." *Id*. That's not authentication; that's evidence. *See* Fed. R. Evid. 901 (rules for "authenticating or identifying an item of evidence"). If Congress wanted to prohibit "evidence" or "proof" of qualifications like citizenship, it would have said so. Instead, Congress prohibited only "notarization or other formal authentication," 52 U.S.C. §20508(b)(3), which in context refers to proofs that the applicant's *signature* is "true or genuine," *Authentication*, Black's Law Dictionary (12th ed. 2024).

Having failed to jam a proof-of-citizenship prohibition into "other formal authentication," Plaintiffs next try to force it into the term "necessary." They argue that proof of citizenship is not "necessary" identifying information "to enable the appropriate State election official to assess the eligibility of the applicant" because they believe it isn't "essential." DNC Resp. Br. 24, 31 (cleaned up). Their only support for defining the term "necessary" as "essential" is an out-of-circuit case—written over a scathing dissent—concluding that "necessary" means "essential" only by quoting the dictionary. *Compare Mi Familia Vota v. Fontes*, 129 F.4th 691, 719 (9th Cir. 2025), *with id*. at 749-50 (Bumatay J., dissenting). The RNC's en banc petition in that case has been pending for several months. Intervenors' Pet. for Reh'g En Banc, *Mi Familia Vota v. Fontes*, Doc. 211, No. 24-3559 (April 11, 2025). The opinion split with another Ninth Circuit panel that concluded the term "necessary" in the NVRA "plainly allow[s]" at least "to some extent" applicants to be

required to "present evidence of citizenship when registering to vote." *Gonzalez v. Arizona*, 485 F.3d 1041, 1051 (9th Cir. 2007). Plaintiffs argue *Gonzalez* has been "repudiated." LULAC Resp. Br. (Doc. 182) at 11-12 n.2. But for support they rely on a nullified panel opinion that "shall not be cited as precedent." *Gonzalez v. Arizona*, 649 F.3d 953, 955 (9th Cir. 2011).

In any event, the D.C. Circuit has recognized that the "dictionary definition" of the term "necessary" doesn't "tell[] us what 'necessary' means in every statutory context." *Cellular Tele-comm. & Internet Ass'n v. FCC*, 330 F.3d 502, 510 (D.C. Cir. 2003). The *Mi Familia Vota* panel didn't analyze the statutory context. But this Court should. In context, the term "necessary" can't mean the minimum "essential" amount of information from applicants. RNC Br. (Doc. 161-1) 19-20. Compare Section 9's mail voter-registration provision with Section 5's motor voter provision. Section 9 establishes that "[t]he mail voter registration form" may "require only such identifying information" as is "necessary to enable the appropriate State election official to assess the eligibil-ity of the applicant" for registration. 52 U.S.C. §20508(b). By contrast, Section 5 provides that a State "may require only the *minimum amount* of information necessary" to "enable State election officials to assess the eligibility of the applicant." *Id*. §20504(c)(2)(B) (emphasis added). "While the 'necessary' phrase is identical in §§ 5 and 9 of the NVRA, in both sections it is preceded by words that must be given some meaning; the word 'minimum' appears in § 5, but not in § 9, which suggests that Congress intended for a stricter standard to apply in § 5." *Fish v. Kobach*, 189 F. Supp. 3d 1107, 1131-32 (D. Kan.), *aff'd*, 691 F. App'x 900 (10th Cir. 2016). So the term "neces-sary" in Section 9 can't mean "minimum" or essential. *Id*. It refers to *more information* than "the least possible amount" to "enable State election officials to assess whether the applicant is a United States Citizen." *Cf. id*. at 1132. The best definition of "necessary" in this context is "appropriate and well adapted to fulfilling an objective." *Cellular Telecomm.*, 330 F.3d at 509-10 (cleaned up);

*see also Ayestas v. Davis*, 584 U.S. 28, 44 (2018) ("necessary" is commonly "in the law" used "more loosely"). Plaintiffs have no response to this context.

Plaintiffs cite nothing else in the NVRA that prohibits requiring proof of citizenship for the federal voter-registration form. The only other support they offer is a conference committee report, which they believe is "'probative evidence of the original public meaning of the text.'" DNC Resp. Br. 34 (quoting *J.G.G. v. Trump*, 2025 WL 914682, at *9 n.7 (D.C. Cir. Mar. 26) (Henderson, J., concurring)). Plaintiffs pull that quote from a concurrence, ignoring that under binding precedent, "insofar as" legislative history is "ever a proper source for revealing congressional intent, it is only to resolve an ambiguity, not to create one." *Page v. Comey*, 137 F.4th 806, 830 (D.C. Cir. 2025); *accord Azar v. Allina Health Servs.*, 587 U.S. 566, 579-80 (2019). In any event, the legislative history of the NVRA is murky. For instance, the sponsor of the Senate version of the NVRA noted that the Act "did not preclude States from requiring documentary proof of citizenship." *Fish*, 189 F. Supp. 3d at 1114. "[T]here is nothing" in the Act that would "preclude the State's requiring presentation of documentary evidence of citizenship." 139 Cong. Rec. S2897, S2902, 1993 WL 73164 (statement of Sen. Ford). Since the conference report and sponsor of the Senate version of the bill offer two contradictory accounts of the meaning of the text, this Court should abide by what the Supreme Court has "repeatedly held" that "the authoritative statement is the statutory text, not the legislative history or any other extrinsic material." *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568 (2005).

Precedent confirms that "necessary" in this context means "appropriate or well adapted," not "essential." In *Inter Tribal Council*, the Supreme Court rejected the government's definition of "necessary" as establishing "a ceiling and a floor with respect to the contents of the Federal Form" in part because it would create "serious constitutional doubt." 570 U.S. at 18-19. The Court

concluded that "a State may request that the EAC alter the Federal Form to include information the State deems necessary to determine eligibility" including proof of citizenship. *Id*. at 19. So "necessary" means more than just "essential." It can include information a "State deems necessary to determine eligibility," such as "evidence-of-citizenship." *Id*.

Plaintiffs' contrary interpretation raises serious constitutional doubts. The Elections Clause allows States to determine how to verify their own voter qualifications, one of which is citizenship. *Id*. at 16 (citing U.S. Const. art. I, §2). The Supreme Court refused to read the NVRA as "preclud[ing] a State from obtaining the information necessary to enforce its voter qualifications." *Id*. at 17. The Supreme Court upheld the NVRA only because Arizona was able to petition the Commission "anew" to modify the federal voter-registration form to add proof of citizenship. *Id*. at 20. Plaintiffs' interpretation prohibits the Commission from doing exactly what the Supreme Court said it could do.

## II.    The President's directive to the Election Assistance Commission isn't at odds with Congress's Elections Clause power.

The President has "general administrative control" over an executive agency's "ordinary duties prescribed by statute" and "he may properly supervise and guide their construction of the statutes under which they act." *Myers*, 272 U.S. at 135. Congress exercised its election clause authority by giving an executive agency—the Election Assistance Commission—the duty of developing the contents of the federal form. 52 U.S.C. §20508(a). The form must require applicants to provide "such identifying information" as is "necessary to enable the appropriate State election official to assess the eligibility of the applicant" to vote. *Id*. §20508(b)(1).[1]

---

[1] The LWV and LULAC Plaintiffs argue that they "bring a constitutional claim, not a statutory one," so *ultra vires* review does not apply. LULAC Resp. Br. 9. But LULAC brought multiple claims where they admit *ultra vires* review applies. LULAC Compl. (Doc. 1) 43, 46 ¶¶186, 200 ("Executive Orders" can be "challenged as *ultra vires* when they are in excess of the President's constitutional and statutory authority."). Regardless, Plaintiffs' constitutional claims "are

Plaintiffs quote *Youngstown* to argue that the President is acting as a lawmaker. DNC Resp. Br. 19-20. But they ignore that "the question in [*Youngstown*] was whether the President had constitutional authority to seize the mills and not, as here, whether he could direct Executive Branch officials in their implementation of statutory authority." *Bldg. & Const. Trades Dep't v. Allbaugh*, 295 F.3d 28, 33 (D.C. Cir. 2002). Justice Jackson recognized a "wide definition of presidential powers under statutory authorization." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 n.2 (1952) (Jackson, J., concurring). Congress gave the Commission the authority to develop a federal voter-registration form. 52 U.S.C. §20508(b). So the President "may properly supervise and guide [the Commission's] construction of the statutes under which they act in order to secure that unitary and uniform execution of the laws." *Cf. Myers*, 272 U.S. at 135. The President's "faithful execution of the laws … ordinarily allows and frequently requires the President to provide guidance and supervision to his subordinates." *Allbaugh*, 295 F.3d at 32.

Plaintiffs attempt to "reduce" the President's station from "Chief Magistrate" to something less than even "a cajoler-in-chief." *Cf. Free Enter. Fund v. PCAOB*, 561 U.S. 477, 502 (2010). They don't believe the President has *any* directive authority whatsoever when it comes to the regulation of federal elections. LULAC Resp. Br. 10. And they accuse the RNC of being presidential "maximalist[s]" for suggesting otherwise. DNC Resp. Br. 19. But the view that the President has directive authority over executive branch agencies isn't maximalist—it's precedent: "if any power

_____

constitutional in name only." *Ass'n for Educ. Fin. & Pol'y v. McMahon*, 2025 WL 1568301, at *4 (D.D.C. June 3). "The assertedly constitutional claim here begins with the premise that [Section 2(a)] would violate the statutes that create the [EAC] and require it to perform various mandatory tasks." *Cf. Nat'l Treasury Emps. Union v. Vought*, 2025 WL 2371608, at *20 (D.C. Cir. Aug. 15). So binding Supreme Court precedent "requires" the court to "analyze" these claims as "*ultra vires* one[s]." *Id*.; *Glob. Health Council v. Trump*, 2025 WL 2480618, *6  (D.C. Cir. Aug. 28) ("[A] non-statutory right to vindicate separation-of-powers principles" is "foreclosed" by "*Dalton v. Specter*.").

whatsoever is in its nature Executive, it is the power" of "overseeing" and "controlling those who execute the laws." *Free Enter. Fund*, 561 U.S. at 492 (quoting 1 Annals of Cong. 463 (1789) (statement of J. Madison)). "The ability and judgment manifested" by executive agents when adopting "regulations" to "make the law workable and effective" are "subjects which the President must consider and supervise in his administrative control." *Myers*, 272 U.S. at 135. The President's directive authority applies to the "field of activity" of elections. *See Buckley*, 424 U.S. at 132-36.

Plaintiffs, by contrast, are "'fourth branch'" maximalists. *Cf. Collins v. Yellen*, 594 U.S. 220, 278-79 (2021) (Gorsuch, J., concurring). Their briefs paper over the reality that "[o]ur Constitution was adopted to enable the people to govern themselves, through their *elected* leaders." *Free Enter. Fund*, 561 U.S. at 499 (emphasis added). Under Plaintiffs' interpretation, the "power" to develop the federal voter-registration form has "slip[ped]" entirely from the President's "control, and thus from that of the people" into the hands of an unelected officials. *Id*. It's no defense to claim that the Commission is "bipartisan," DNC Resp. Br. 14, or that it's staffed by a "panel of experts," LULAC Resp. Br. 15 (cleaned up). Those arguments concede that "the chain of dependence" between the government and the governed is broken. *Seila L. LLC v. CFPB*, 591 U.S. 197, 224 (2020) (quoting Madison).

This Court, however, need not confront the serious constitutional problems that Plaintiffs' interpretation of federal law would raise. *Cf. id*. This Court need only acknowledge that the Commission is an executive agency subject to the President's directive authority because it wields executive power in his name and its members are subject to removal by the President. *Contra* DNC Resp. Br. 21. While the Commission is styled as "independent," it is not "'independent' of the President." *Cf. Collins*, 594 U.S. at 248.

The LWV and LULAC Plaintiffs give away the case by admitting that "the EAC" may "exercise[] 'considerable executive power'" and "the President may have the authority to remove commissioners and, with the advice and consent of the Senate, appoint new ones." LULAC Resp. Br. 13 (quoting *Trump v. Wilcox*, 145 S. Ct. 1415 (2025)). The RNC's core argument concerning why the President has directive authority over the Commission is that it is an executive agency— not independent of the President—because it wields executive power and the President can remove its members at will. RNC Br. (Doc. 161-1) 9; *see also* DNC Resp. Br. 21 (acknowledging that the RNC's core argument is that "the EAC is an 'executive' agency"). By admitting that the President may have removal authority over members of the Commission, LWV and LULAC Plaintiffs also admit that the President has directive authority over the Commission. *Cf. Myers*, 272 U.S. at 117. Removal authority presupposes directive authority. *Id*. It ensures that an executive agent is "accountable to the President" and that the "buck stops" with the President. *Free Enter. Fund*, 561 U.S. at 493. It ensures accountability for "officers who disobey [the President's] commands," who "exercise their discretion in a way that is not intelligent or wise" according to the President, who "have different views of policy," and who "come from a competing political party who is dead set against the President's agenda." *Collins*, 594 U.S. at 256 (cleaned up). The "reasonable implication" of the President's removal authority is that the members of the Commission are "under [the President's] direction in the execution of the laws." *Myers*, 272 U.S. at 117.

LWV and LULAC Plaintiffs' own caselaw contradicts their argument that the President cannot direct an executive agency. *See* LULAC Br. 13. In *Main St. Legal Services v. NSC*, the Second Circuit reasoned that when Congress grants "statutory" authority to "executive departments," the "President may still give directions to executive agencies, and he can usually fire a recalcitrant agency head." 811 F.3d 542, 558 (2d Cir. 2016). That is precisely what the President

has done. The Executive Order gives "directions" to the Commission concerning how it is to exercise its "statutory" authority. *Id*. And in *Carmen*, the D.C. Circuit noted that "even in the absence of a clear statutory provision establishing a governing role for the President, we would not conclude that Congress, simply by assigning a function to an executive agency, thereby intended to exclude initiating action by the President." *Am. Fed'n of Gov't Emp. v. Carmen*, 669 F.2d 815, 823 (D.C. Cir. 1981). But that is precisely what Plaintiffs (and their amici) ask this Court to do regarding the development of the federal form for voter registration. *E.g.*, LULAC Resp. Br. 10; Amicus Br. of Former State Secretaries of State (Doc. 155-1) 19-20.

Plaintiffs also rely on *Kendall v. United States*. But as the D.C. Circuit explained, *Kendall* is a "writ of mandamus" case, which limits the applicability of its holding. *Glob. Health Council v. Trump*, 2025 WL 2480618, *8 n.13 (D.C. Cir. Aug. 28). Even if *Kendall*'s *dicta* were to apply such that Congress could create executive duties that are "not" subject to "the direction of the President," those duties would have to be of a "mere ministerial character," not discretionary. 37 U.S. (12 Pet.) 524, 610 (1838). By its own terms, *Kendall* doesn't apply "where the officer has a discretion," because there "no mandamus lies." *Id.* at 568. Plaintiffs don't argue that the Commission's duty of developing the federal form is ministerial. Nor could they. Binding precedent confirms that development of the federal voter-registration form is a discretionary duty. *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 10 (D.C. Cir. 2016); *Fish v. Kobach*, 840 F.3d 710, 734 (10th Cir. 2016); *Kobach v. EAC*, 772 F.3d 1183, 1196 (10th Cir. 2014). This duty comes "under the general administrative control of the President by virtue of the general grant to him of the executive power, and he may properly supervise and guide [the Commission's] construction of the statutes under which they act in order to secure that unitary and uniform execution of the laws." *Myers*, 272 U.S. at 135.

As a last-ditch effort to resist the President's directive authority, Plaintiffs quote now-Justice Kagan's observation that "[t]he conventional view" is that "the President lacks the power to direct an agency official to take designated actions within the sphere of that official's delegated discretion." LULAC Resp. Br. 13 (quoting Kagan, *Presidential Administration*, 114 Harv. L. Rev. 2245, 2323 (2001)). But Plaintiffs leave out that this was the conventional view among academics, not Courts, and that "no court has ever decided" that the conventional view held by certain academics is correct. Kagan, *supra*, at 2250. And Justice Kagan explicitly rejected that view, writing that just because Congress "assigned discretionary authority to an agency official" does not mean that "the President lacks all power to direct administrative officials as to the exercise of their delegated discretion." *Id.* at 2326-27.

The DNC also selectively reads Justice Kagan's article. They argue that "when Congress's 'delegation [of a particular task] runs to the members of an independent agency,' it should be '*obvious*' that Congress intended to bar the President from exercising such authority, absent clear indication otherwise." DNC Resp. Br. 25 n.4 (quoting Kagan, *supra*, at 2327). Even if the President's authority over "independent" agencies could be limited by Congress, *contra Wilcox*, 145 S. Ct. at 1415, that still wouldn't answer the question of what an "independent" agency is, and whether the Election Assistance Commission qualifies as one.

The DNC offers no definition of "independent agency." Their view appears to be that whenever Congress uses the term "independent" to refer to an agency, that agency is an independent agency. *See* DNC Response to RNC Statement of Facts (Doc. 185-3) 3. But the Supreme Court has rejected that simplistic definition. *Collins*, 594 U.S. at 248-49. Rather, "independent agencies" are agencies "whose heads the President may not remove at will." Kagan, *supra*, at 2273 & n.102 (collecting cases). Under that definition, the Commission isn't an independent agency because

there is no statutory limit on the President's removal of any Commission member. 52 U.S.C. §20923(a)(1). When Congress created the Election Assistance Commission, it provided that all members are to be appointed by the President. *See id.* Congress did not state that they can be fired only for cause, which means they serve at "the President's pleasure." *Collins*, 594 U.S. at 248. Since the Commission is an executive agency, the "interpretive principle" to be applied to the NVRA which details the Commission's statutory duties is a "presum[ption]" of "undifferentiated presidential control." Kagan, *supra*, at 2328. This presumption "more accurately than any other" best "reflects" the "general intent and understanding of Congress." *Id.*

The DNC retorts that the "appointment" of Commission members "requires 'advice and consent of the Senate.'" DNC Response to RNC Statement of Facts (Doc. 185-3) 3-4. But that fact doesn't make the Commission any less an executive agency. "It cannot now be doubted that, in the absence of constitutional or statutory provision, the President can, by virtue of his general power of appointment, remove an officer, *even though appointed by and with the advice and consent of the Senate.*" *Shurtleff v. United States*, 189 U.S. 311, 315 (1903) (emphasis added). When there is no for-cause removal statute for an agency, the power of removal is "vested in the President alone." *In re Hennen*, 38 U.S. 230, 259 (1839).

The DNC's misunderstanding about which agencies are "independent" versus "executive" explains why they don't think any of the Supreme Court's removal precedents matter. *See* DNC Resp. Br. 26. They overlook that the President's removal authority is what determines whether an agency is independent. *Collins*, 594 U.S. at 248; Kagan, *supra*, at 2322, 2273 ("[A]nalysis" of the President's directive authority "must begin with the body of cases relating to the President's removal power."). They also miss that the President's removal authority derives from his broader "administrative control" over the Executive Branch. *Myers*, 272 U.S. at 135. "The imperative

reasons requiring an unrestricted power to remove" are the same reasons why the President "may properly supervise and guide [an agency's] construction of the statutes under which they act in order to secure that unitary and uniform execution of the laws." *Id*. at 134-35. The "power to remove" is the power to "supervise." *Seila L.*, 591 U.S. at 204. Removal restrictions thus determine "whom is subject to the President's direct control." *Free Enter. Fund*, 561 U.S. at 495.

Plaintiffs don't confront the precedents that confirm the President's directive authority over executive agencies. *See, e.g.*, *Myers*, 272 U.S. at 135; *Sierra Club v. Costle*, 657 F.2d 298, 406 n.524 (D.C. Cir. 1981); *Allbaugh*, 295 F.3d at 32; *Sherley v. Sebelius*, 689 F.3d 776, 186 (D.C. Cir. 2012). No Plaintiff cites *Myers*, much less distinguishes it. The DNC attempts to distinguish *Allbaugh* by noting that the Court wasn't faced with the question of whether the President could "direct decisions of independent agencies." DNC Resp. Br. 26. But this Court isn't faced with that question either, since the Election Assistance Commission isn't an independent agency but an "executive" one. *Allbaugh*, 295 F.3d at 33. The President thus can give directives to the Commission. *Id*. at 32.

The DNC further argues that Section 2(a) requires the Commission to adopt a "preordained policy" rather than allowing the Commission to exercise discretion when implementing the President's directive. DNC Resp. Br. 27. But the Commission still retains discretion in developing the contents of the federal form. While it cannot disregard the order to take "appropriate action" to add a proof of citizenship requirement, Exec. Order No. 14,248, §2(a), 90 Fed. Reg. 14005, 14006 (Mar. 25, 2025), *see Sherley*, 689 F.3d at 784-85, the Commission can, for example, determine which documents are acceptable proofs of citizenship in addition to those specified by Section 2(a), *see* Exec. Order No. 14,248, §2(a).

Finally, the RNC never argued that the NVRA "does not require *any* consultation between the EAC and the States." *Contra* DNC Resp. Br. 24. According to Plaintiffs' evidence, the Commission is beginning its consultation obligations with the States. Schletz Letter (Doc. 95-1) 5. Throughout this process, the Commission is the "developer," and the States are the "consultants." *Newby*, 838 F.3d at 10. Plaintiffs assume that consultation requires the Commission to change its final rule. But the Commission can both consult with the States and comply with the Executive Order. It is "not compulsorily mandated to approve state-requested changes to the Federal Form." *Kobach*, 772 F.3d at 1194. Nothing in the Elections Clause prohibits the President from enforcing the laws Congress has enacted.

### III. Plaintiffs have not shown that Section 2(a) unconstitutionally burdens the right to vote.

United States citizenship is a basic requirement to vote in federal elections. 18 U.S.C. §§611, 1015. And requiring those basic documents that show citizenship as part of the voting process does not unduly burden the right to vote. The Supreme Court said as much in *Crawford*, 553 U.S. at 198 & n.17. Plaintiffs have provided no evidence to the contrary.

The DNC argues that the record has not been "fully developed" regarding whether Section 2(a) burdens the right to vote. DNC Resp. Br. 51-52. But Plaintiffs are the ones who waived discovery for their Section 2(a) claims. Joint Civil Rule 16.3 Report (Doc. 137) 5. They stated that "[n]o discovery [is] needed" concerning their APA claim premised on an alleged constitutional right-to-vote violation. *Id.* Since they waived discovery, they cannot now argue that they need the "opportunity to develop" the record. DNC Resp. Br. 51. And as the United States explained, any questions about how the Commission will implement the Executive Order (and how it will affect voters) are reasons why the DNC's lawsuit is premature. *See* United States Br. (Doc. 162-1) 20-22. Those questions don't excuse the DNC from proving its case.

Regardless, *Crawford* shows why their *Anderson-Burdick* claims are legally deficient. While Section 2(a) "differs from Indiana's [law]," it does not do so "in ways that matter under the analysis in *Crawford.*" *Frank v. Walker*, 768 F.3d 744, 746 (7th Cir. 2014). The DNC argues that the parties in *Crawford* "agreed that there were no material facts in dispute that precluded summary judgment." DNC Resp. Br. 56 (cleaned up). But that's also true here, which is why the DNC agreed that "[n]o discovery [is] needed" on this claim. Joint Civil Rule 16.3 Report (Doc. 137) 5. Regardless, "[w]here, as here, the alleged severity of the burdens imposed can be gleaned from the face of the challenged law and they can be weighed against the asserted state interests, dismissal on the pleadings is warranted." *Daunt v. Benson*, 999 F.3d 299, 313 (6th Cir. 2021). While "the severity of the burden imposed by an electoral regulation is a context-dependent inquiry," that inquiry "may nevertheless be resolved on a motion to dismiss because its resolution generally depends on legal—rather than factual—sources and considerations." *Fusaro v. Cogan*, 930 F.3d 241, 259 (4th Cir. 2019). Because the "burden" is "plain according to [Section 2(a)'s] fixed terms," summary judgment is warranted. *Cf. Daunt*, 999 F.3d at 313.

The DNC has presented no evidence establishing that Section 2(a) unduly burdens the right to vote. Their most significant claim of a burden is an unsupported assertion that "nearly 9 percent" of the voting age population in the U.S. lacks the proof of citizenship that Section 2(a) requires. DNC Compl. (Doc. 1, No. 1:25-cv-952) 69. They have produced no evidence supporting that assertion. Even if it's true, the mere fact that "9%" of the voting age population currently "lack[s] a photo ID" doesn't establish an undue burden on the right to vote. *Frank*, 768 F.3d at 746. "[I]t is difficult to infer from the fact that 9% have not acquired photo ID that [obtaining a photo ID] is particularly difficult." *Id.* at 749. Rather, a "more plausible inference would be that people who do not plan to vote also do not go out of their way to get a photo ID that would have no other use to

them," which "does not imply that a need for photo ID is an obstacle to a significant number of persons who otherwise would cast ballots." *Id.* Put another way, if 9% of eligible voters lack proof of citizenship, it means that 91% possess the proof of citizenship necessary to comply with Section 2(a). So "it is not possible to describe the need for [proof of citizenship] as a legal obstacle that disfranchises them." *Frank*, 768 F.3d at 749. Because the burden of getting proof of citizenship is "no greater than the burden in Indiana," *Crawford* "requires" the court "to reject" the DNC's "constitutional challenge." *Id*. at 749-51. The DNC doesn't show that "substantial numbers of persons eligible to vote have tried to get [proof of citizenship] but been unable to do so." *Id.* at 746.

On the other side of the *Anderson-Burdick* balance, the DNC agrees that "preventing foreign nationals from voting is a valid interest." DNC Resp. Br. 56. They claim that the government needs "evidence" to support this interest. *Id*. *Crawford* repudiates that notion. 553 U.S. at 194. The Supreme Court does not "require elaborate, empirical verification of the weightiness of the State's asserted justifications." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 364 (1997). The record supporting the government's interest in preventing voter fraud can be "inconclusive" because the government has a compelling interest in "safeguarding public confidence by eliminating even appearances of fraud." *Ohio Democratic Party v. Husted*, 834 F.3d 620, 633 (6th Cir. 2016) (cleaned up). Indeed, Section 2(a) is justified not only by the government's compelling interest in preventing voter fraud, but also by the "independent" governmental interest of promoting "voter confidence," which "encourages citizen participation in the democratic process." *Crawford*, 553 U.S. at 197. In addition, Section 2(a) "improve[s] and modernize[s] election procedures" that the government has determined are "antiquated" or "inefficient" because it incentivizes applicants to procure a REAL ID by making that form of identification "one effective method" of verifying an

individual's "qualification[s]." *Id.* at 191. The DNC doesn't even mention these latter two interests, let alone refute that Section 2(a) advances them.

Instead, the DNC focuses its fire only on the government's interest in preventing voter fraud. DNC Resp. Br. 56. But in arguing that the "lack of any evidence" supporting the government's interest in preventing voter fraud precludes "summary judgment," the DNC misunderstands *Crawford*. DNC Resp. Br. 52. Under *Crawford*, "requiring the [government] to present evidence of past instances of voting fraud" is "too high a burden." *ACLU of N.M. v. Santillanes*, 546 F.3d 1313, 1323 (10th Cir. 2008). A state may "take action to prevent election fraud" before it has occurred. *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 685-86 (2021). "The Supreme Court did not require Indiana to prove specific instances of voter fraud" and this Court should "decline to impose that burden" on the President. *Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1353-54 (11th Cir. 2009) (citing *Crawford*). Even "scattershot evidence," DNC Resp. Br. 54, is much more than is necessary, *see Crawford*, 553 U.S. at 194. So the DNC's quibbles with the RNC's examples of non-citizens being registered voters don't create issues of material fact. *See* DNC Resp. Br. 54 & n.8. The critical question is whether the government "has identified" state "interests that arguably justify the burdens" of requiring proof of citizenship. *Crawford*, 553 U.S. at 191. And as a matter of law, "[t]here is no question about the legitimacy or importance of the State's interest in counting only the votes of eligible voters. Moreover, the interest in orderly administration and accurate recordkeeping provides a sufficient justification for carefully identifying all voters participating in the election process." *Id.* at 196. "[N]o evidence" is needed to justify these interests. *Id.* at 194.

In any event, the record shows at least five States over the past six years finding over 110,000 instances of persons whom they believe to be non-citizens on their voter rolls. Exs. C-G

17

(Doc. 161-2) 127-148. Since the Carter-Baker Commission's report over two decades ago, it has been apparent that "[w]hile election fraud is difficult to measure, it occurs" and "convictions" for "election fraud offenses" include "submitting false voter registration information and voting-related offenses by non-citizens." Ex. B (Doc. 161-2) 66. Just weeks ago, a federal grand jury in North Carolina indicted a Canadian citizen for illegally registering and voting in the 2022 and 2024 federal elections. *See United States v. Bouchard*, Doc. 1, No. 7:25-cr-83 (E.D.N.C. Aug. 26, 2025). That the DNC calls this a "meager record" demonstrates another misunderstanding of *Crawford*. *Contra* DNC Resp. Br. 54. Evidence of "occasional examples" that "have surfaced in recent years" is precisely the record the Court had when it concluded in *Crawford* that "the risk of voter fraud" is "real" and that it can "affect the outcome of a close election." 553 U.S. at 195-96.

The DNC argues that *Crawford* is distinguishable because it concerned a "state law requiring proof of identity when casting a ballot—not proof of citizenship when registering" to vote. DNC Resp. Br. 55 (cleaned up). But to obtain free photo identification in Indiana, voters had to present proof of citizenship such as a birth certificate, passport, or some other document. *Crawford*, 553 U.S. at 198 n.17. That was so even though obtaining proof of citizenship documents required paying a fee. *See id*. Many of those same documents satisfy Section 2(a). If obtaining those documents didn't unconstitutionally burden Indiana voters' right to vote in *Crawford*, it doesn't burden voters' rights here. If anything, the burden imposed by Section 2(a) is less than that imposed by Indiana's law. Section 2(a) requires an individual to present proof of citizenship only once, while Indiana's photo ID law was an ongoing requirement for each election. *See id.* at 197.

In addition to misinterpreting *Crawford*, the DNC claims that the RNC places "heavy reliance" on the district court's decision in the *Mi Familia Vota* case. DNC Resp. Br. 57 (citing *Mi Familia Vota v. Fontes*, 719 F. Supp. 3d 929, 1010 (D. Ariz. 2024)). But that case was the one the

DNC relied on in their Complaint to allege that proof of citizenship "imposes a severe burden on the right to vote," DNC Compl. 70, even though that court held the opposite, *Mi Familia Vota*, 719 F. Supp. 3d at 1011.

The DNC's cited cases don't support their position. The DNC argues that *Mi Familia Vota* concerned "a narrow claim challenging Arizona's cancellation of registrants." DNC Resp. Br. 57. But it didn't. The Court analyzed the "relevant burden" of "the cost of timely complying" with Arizona's proof-of-citizenship requirements "when *registering to vote or after* receiving a notice of non-citizenship from the county recorder." *Mi Familia Vota*, 719 F. Supp. 3d at 1007 (emphasis added). It concluded that neither amounted to an undue burden under *Crawford*. *Id.* at 1011. The documentation under Arizona's law is virtually identical to the documentation under Section 2(a). *Compare* Exec. Order 14,248 §2(a), *with Mi Familia Vota*, 719 F. Supp. 3d at 949. So the court's *Anderson-Burdick* analysis is on point. "*Crawford's* reasoning applies here," and proof of citizenship doesn't burden the right to vote. *Mi Familia Vota*, 719 F. Supp. 3d at 1008 & n.60.

## CONCLUSION

For these reasons, the Court should deny Plaintiffs' motions for summary judgment and grant the RNC's cross-motion.

Dated: September 12, 2025

Respectfully submitted,

*/s/ Thomas R. McCarthy*

Lee E. Goodman (D.C. Bar 435493)
Michael Columbo (D.C. Bar 476738)
DHILLON LAW GROUP
2121 Eisenhower Ave., Ste. 608
Alexandria, VA 22314
(415) 433-1700
lgoodman@dhillonlaw.com
mcolumbo@dhillonlaw.com

Thomas R. McCarthy (D.C. Bar 489651)
Gilbert C. Dickey (D.C. Bar 1645164)
Conor D. Woodfin (D.C. Bar 1780807)
William Bock IV* (Ohio Bar 0105262)
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, Virginia 22209
(703) 243-9423
tom@consovoymccarthy.com
gilbert@consovoymccarthy.com
conor@consovoymccarthy.com
wbock@consovoymccarthy.com

*Admitted *pro hac vice*

*Counsel for Intervenor-Defendant
The Republican National Committee*