# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.*, | |
| *Plaintiffs*, | |
| v. | Civil Action No. 25-0946 (CKK) |
| EXECUTIVE OFFICE OF THE PRESIDENT, *et al.*, | |
| *Defendants*. | |

| | |
|---|---|
| DEMOCRATIC NATIONAL COMMITTEE, *et al.*, | |
| *Plaintiffs*, | |
| v. | |
| DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*, | Civil Action No. 25-0952 (CKK) |
| *Defendants*, | |
| and | |
| REPUBLICAN NATIONAL COMMITTEE, | |
| *Intervenor-Defendant*. | |

| | |
|---|---|
| LEAGUE OF WOMEN VOTERS EDUCATION FUND, *et al.*, | |
| *Plaintiffs*, | |
| v. | Civil Action No. 25-0955 (CKK) |
| DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*, | |
| *Defendants*. | |

## LULAC PLAINTIFFS' STATEMENT OF UNDISPUTED MATERIAL FACTS

Pursuant to LCvR 7(h)(1), Plaintiffs League of United Latin American Citizens, Secure Families Initiative, and Arizona Students' Association ("LULAC Plaintiffs") submit the following statement of undisputed material facts to accompany their motion for partial summary judgment on their challenge to Sections 3(d) and 7(a) of the Executive Order.

1.      On March 25, 2025, President Trump issued Executive Order 14,248 ("Executive Order"). 90 Fed. Reg. 14,005 (Mar. 25, 2025), https://perma.cc/F55X-RYFN.

2.      The Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA") mandates that the President's designee "prescribe" a Federal Post Card Application ("Post Card Form" or "FPCA"), which must be used by the States, for absent UOCAVA voters to use as a simultaneous voter registration application and absentee ballot request form. 52 U.S.C. §§ 20301(b)(2), 20302(a)(4).

3.      Among other things, the Executive Order mandates: "The Secretary of Defense shall update the Federal Post Card Application, pursuant to the Uniformed and Overseas Citizens Absentee Voting Act, 52 U.S.C. § 20301, to require: (i) documentary proof of United States citizenship, as defined by section 2(a)(ii) of this order; and (ii)  proof of eligibility to vote in elections in the State in which the voter is attempting to vote." Executive Order § 3(d).

4.      Section 2(a) of the Executive Order defines "documentary proof of citizenship" to include a copy of one the following documents: "(A) a United States passport; (B) an identification document compliant with the requirements of the REAL ID Act of 2005 (Public Law 109-13, Div. B) that indicates the applicant is a citizen of the United States; (C) an official military identification card that indicates the applicant is a citizen of the United States; or (D) a valid Federal or State government-issued photo identification if such identification indicates that the applicant is a

United States citizen or if such identification is otherwise accompanied by proof of United States citizenship." Executive Order § 2(a)(ii).

5.      The Executive Order states: "The Attorney General shall take all necessary action to enforce 2 U.S.C. § 7 and 3 U.S.C. § 1 against States that violate these provisions by including absentee or mail-in ballots received after Election Day in the final tabulation of votes for the appointment of Presidential electors and the election of members of the United States Senate and House of Representatives." Executive Order § 7(a).

6.      At least fourteen states and the District of Columbia have state laws permitting timely voted absentee or mail-in ballots to be received after Election Day, i.e. "ballot receipt window." *See, e.g.*, Alaska Stat. § 15.20.081(e) (by the tenth day after Election Day); Cal. Elec. Code § 3020 (seven days after Election Day); 10 Ill. Comp. Stat. 5/19-8, 5/18A-15 (received within fourteen days after Election Day); Md. Elec. Law § 11-302(c); Md. Code Regs. § 33.11.03.08(B)(4) (by 10 a.m. on the second Friday after Election Day); Mass. Gen. Laws ch. 54, § 93 (until 5 p.m. on the third day after  Election Day); Nev. Rev. Stat. § 293.269921(1)(b), (2) (by 5 p.m. on the fourth day following  Election Day); N.J. Stat. Ann. § 19:63-22(a) (six days); N.Y. Elec. Law §§ 8-412(1), 8-710(1) (within seven days of Election Day); Ohio Rev. Code § 3509.05 (within four days of Election Day); Or. Rev. Stat. § 254.470(6)(e)(B) (within seven days of Election Day); Tex. Elec. Code § 86.007(a), (d)-(f) (by the day following  Election Day or, if mailed from abroad, within five days of Election Day); Va. Code § 24.2-709 (by noon the third day after Election Day); Wash. Rev. Code §§ 29A.40.110(4), 29A.60.190 (received no later than the day before certification); W. Va. Code § 3-3-5 (received by the start of the vote canvass, i.e. five days after the election, not counting Sundays); D.C. Code § 1-1001.05(10A) (received by the seventh day after Election Day).

7.     At least twenty-four states and the District of Columbia have state laws permitting mail ballots to be cured after Election Day, not including the cure periods additionally provided by States for military and overseas voters. *See, e.g.*, Ariz. Rev. Stat. § 16-550 (cure within five days after primary, general, or special election that includes a federal office); Cal. Elec. Code § 3019(d) (cure for signature discrepancies no later than 5 p.m. two days prior to certification); Colo. Rev. Stat. § 1-7.5-107.3 (cure within eight days after Election Day to correct signature verification issues and other identity-related issues); Fla. Stat. § 101.68 (cure for signature discrepancies by 5 p.m. on the second day after Election Day); Ga. Code § 21-2-386(a)(1)(C) (cure within three days for  missing signature as to oath, nonmatching identifying information, or missing other information); Haw. Rev. Stat. § 11-106 (five business days after Election Day to cure deficiencies in absentee ballot return identification envelopes); 10 Ill. Comp. Stat. 5/19-8(g)-(5) (14th day after Election Day to cure mail ballots rejected for any reason); Ind. Code § 3-11.5-4-13.5 (by noon eight  days after Election Day to cure  for rejections based on signature mismatch); Kan. Stat. § 25-1124(b) (cure for no signature or mismatching signature on "advance voting ballot" or absentee ballot before commencement of final county canvass); Md. Elec. Law, § 11-302(c) (by 10 a.m. 10 days after Election Day for absentee ballots missing signed oath);  1-2 Miss. Code R. § 17-4.2(d) (cure for signature deficiency by noon on the 10th calendar day after Election Day); Nev. Rev. Stat. § 293.269927(6) (by 5 p.m. of the sixth day after Election Day to cure signature-related discrepancies); N.J. Stat. Ann. § 19:63-17.1(2) (no later than 48 hours prior to the final certification to cure alleged or actual deficiency involving voter's signature); N.M.  Admin. Code § 1.10.12.16(C)-(D) (before the conclusion of the county canvass to cure missing signature, missing last four digits of SSN, or mismatched last four digits of SSN); N.Y. Elec. Law § 9-209(e) (seven business days after the notice of the defect is mailed, or until 5 p.m. on the seventh day after

Election Day, whichever is later to cure "curable defect[s]" as enumerated in § 9-209(3)(b));  N.C. Gen. Stat. § 163-230.1(e) (cure documentation for "curable deficiency" as defined in § 163-230.1(e1) received by noon on the third business day after Election Day); N.D. Cent. Code § 16.1-07-13.1 (cure for signature mismatch before close of canvassing board meeting occurring 13 days after Election Day); Ohio Rev. Code § 3509.06(D)(3)(b) (no later than fourth day after Election Day to cure incomplete or mismatched identification envelope statement accompanying absentee ballot); Or. Rev. Stat. § 254.431 (no later than 21 calendar days after Election Day to cure for unsigned or mismatched signature on mail ballot return identification envelope); 17 R.I. Gen. Laws § 17-20-16 and 410-R.I.C.R.-20-00-23.12 (no later than 4 p.m. on third day following primary election or seven days following date of election to cure for missing or deficient information on mail-ballot envelope); Tex. Elec. Code § 87.0411(a), (c) (no later than the sixth day after Election Day to cure defects on mail ballot); Utah Code § 20A-3a-401(5) (no later than noon on the last business day before the canvass to cure mailed ballot rejected by poll worker); Va. Code § 24.2-709.1(C) (no later than noon third day after Election Day to cure incorrect or incomplete voter affirmation accompanying absentee ballot); Wash. Admin. Code §§ 434-261-052, 434-261-053 Wash. Rev. Code § 29A.60.190 (by close of business the day before election is certified to cure signature discrepancies); D.C. Code Ann. § 1-1001.05(10D) (no later than 7 days after Election Day to cure signature discrepancies).

8.      In *California v. Trump*, several states submitted declarations expressing uncertainty about whether Section 7(a) applies to their cure periods and whether they would be required to eliminate those ballot cure provisions as a result. No. 25-CV-10810-DJC, 2025 WL 1667949 (D. Mass. June 13, 2025) (ECF No. 76-3, Decl. of Jana Lean, Chief of Elections Div. California ¶ 34; ECF No. 76-9, Decl. of Melissia Dorsey, Assistant Deputy Administrator for Election Policy in

Maryland, ¶ 65; ECF No. 76-14, Decl. of Dean C. Logan, the Registrar-Recorder/County Clerk for the County of Los Angeles, ¶ 30).

9.     North Dakota changed its law after the Executive Order was issued to prohibit post-Election Day ballot receipt. N.D. Legis. H.B. 1165 (2025) (eff. Aug. 1, 2025).

10.     Plaintiff Secure Families Initiative ("SFI") is a non-partisan 501(c)(4) non-profit and is affiliated with the 501(c)(3) organization Secure Families Foundation. Ex. 1, Decl. of Brandi Jones ("Jones Decl.") ¶ 4.

11.     "SFI's mission is to mobilize diverse military partners, parents, children, and veterans to vote and advocate for their communities," particularly in the areas of foreign policy and national security that especially impact SFI's members. Jones Decl. ¶ 6.

12.     "SFI believes that mobilizing its community to vote and advocate is the most effective way to reshape the country's conversations around military intervention and ensure its members have a seat at the table over decisions that affect their own lives." Jones Decl. ¶ 6.

13.     SFI has over 44,000 members, as well as five full-time staff members and two part-time staff members. Jones Decl. ¶ 5.

14.     SFI's members include military-connected families serving abroad in at least eight different countries, families living abroad who have transitioned out of military service, and members posted to military bases within the United States. Jones Decl. ¶ 9.

15.     "SFI has members residing or registered to vote in every state other than Vermont, as well as the District of Columbia," including members "who are registered to vote in the District of Columbia and every state that currently has a post-Election Day ballot return deadline, as well as in North Dakota, which changed its law to impose an Election Day ballot return deadline after the Executive Order was issued." Jones Decl. ¶ 9.

16.     SFI's members face unique challenges in exercising their right to vote, "including the need to re-register regularly when they move to accommodate the military assignments of their family members and the need to vote absentee, including from overseas." Jones Decl. ¶ 17.

17.     Many members of SFI register to vote and request an absentee ballot using the Post Card Form and plan to do so in the future. Jones Decl. ¶¶ 18, 21.

18.     SFI has members who do not possess or will have difficulty obtaining documentary proof of citizenship that would allow them to use the Post Card Form under the Executive Order, including U.S. passports, for a variety of reasons, including that passports are expensive and unnecessary for domestic travel. Jones Decl. ¶¶ 22–25.

19.     Military identification cards issued to both military servicemembers and dependents do not indicate citizenship status and are not a viable form of proof of citizenship for SFI members. Jones Decl. ¶ 27.

20.     Many SFI members who do have qualifying DPOC will still have difficulty providing a copy of that document to use the Post Card Form, including because they don't have access to that document when using the Post Card Form or because they don't have access to the equipment needed to copy the document. Jones Decl. ¶¶ 22, 28, 31.

21.     SFI members are military dependents and therefore move frequently, and during this process it is common for even correctly packed personal items and sensitive documents, including U.S. passports, to be delayed for months at a time and/or lost in transit. Jones Decl. ¶¶ 29–30.

22.     Military servicemembers stationed overseas are able to travel between the United States and their duty station without a passport and may not have their passport when using the Post Card Form. Jones Decl. ¶ 26.

23.    Many SFI members are trained on security risks and threats from foreign adversaries and are concerned about transmitting copies of sensitive documents with personal information through the mail or electronically. Jones Decl. ¶¶ 32–33.

24.    Because the Post Card Form generally requires resubmission every time a voter moves or at least once every calendar year, SFI members who use the Post Card Form will generally be forced to submit documentation and information required by the Executive Order at least annually. Jones Decl. ¶ 34.

25.    SFI members are likely to be burdened by the Executive Order's "proof of eligibility" requirement because it is not clear how they can comply, they are unlikely to have access to any form of "proof of eligibility" while they are stationed away from their place of residence, and they may face challenges accessing equipment required to submit such proof. Jones Decl. ¶ 36–39.

26.    The Post Card Form is already difficult for SFI members to navigate, and Section 3(d) of the Executive Order layers additional burdens onto the process that make it even more complicated for military-connected voters. Jones Decl. ¶¶ 35, 40.

27.    SFI members absent from their place of residence generally must rely on mail voting because "[w]hile some states allow email or online portal return of absentee ballots for UOCAVA voters, these states do not include many of the top states for military recruitment with large numbers of SFI members, including California, Texas, Florida, Georgia, and New York." Jones Decl. ¶ 41.

28.    "SFI has members registered to vote in all states with post-Election Day ballot return deadlines, and these members will have less time to return their ballots if the Executive Order is enforced. SFI also has members registered to vote in North Dakota who now already have

7

less time to return their ballots after the state changed its ballot return deadline after the EO was issued." Jones Decl. ¶ 54.

29.    SFI members stationed abroad experience routine mail delays and challenges receiving and sending mail. It takes a significant amount of time for SFI members to receive mail and for mail sent by an SFI member in a foreign country to be received in the United States, all of which complicates the timely receipt and return of ballots. Jones Decl. ¶¶ 42–44, 46.

30.    "SFI members located outside of the United States must mail their ballots far in advance of when voters located in the United States would typically need to do so in order to meet the state ballot return deadline," Jones Decl. ¶ 43, and SFI members who vote in states that accept ballots after Election Day routinely rely on this ballot return window, Jones Decl. ¶ 45.

31.    The Federal Write-in Absentee Ballot ("FWAB") allows UOCAVA voters absent from the United States to vote in federal races if they did not receive their ballot. Jones Decl. ¶ 47; *see also* 52 U.S.C. § 20303.

32.    The FWAB is an option of last resort, and SFI members who use it "necessarily do so because they did not receive their ballot and they are submitting their ballot closer to Election Day than they had intended." Jones Decl. ¶ 47.

33.    As UOCAVA voters need as much time as possible to receive and return absentee ballots, post-Election Day ballot return deadlines can be critical in ensuring that SFI members, including those who vote using the FWAB, have their vote counted. Jones Decl. ¶¶ 47–48.

34.    SFI members who live in the United States "are frequently stationed with their families in a different state than the one in which they reside and vote, sometimes in remote places," and they also experience challenges voting by mail and rely on post-Election Day ballot return deadlines in states where it is permitted. Jones Decl. ¶¶ 49, 51.

35.     Eliminating extended ballot return deadlines will force more SFI members who can afford to do so to pay for costly express mailing to return their ballots, or even to fly back to their State of residence to vote in person. Jones Decl. ¶¶ 50, 53.

36.     According to the Federal Voting Assistance Program, the two most common reasons that a military voter's ballot is rejected are that it arrived after the deadline and that it was missing information and the voter was not given an opportunity to "cure" the ballot by the deadline; SFI members have reported experiencing both of these issues. Jones Decl. ¶¶ 52–53.

37.     "SFI members are already confused about the requirements of the Executive Order and are unsure how they will be affected," and SFI staff have been forced to divert time from other projects to address member concerns, "including questions about what documentation will be required to vote, what documents prove eligibility, whether they will be required to fly back to the United States to get updated documentation, and how they can make sure their ballot is delivered on time." Jones Decl. ¶ 70.

38.     A core component of SFI's mission and its voter engagement program is to close the 27% voter participation gap between military-connected voters and their civilian counterparts. Jones Decl. ¶¶ 10, 55.

39.     SFI provides comprehensive resources on its website to prepare military families to vote, including resources explaining how to register to vote and encouraging qualifying active-duty servicemembers and active-duty family members to use the Post Card Form. Jones Decl. ¶ 15.

40.     "SFI convenes a monthly Voting Leadership Team that works to expand voting rights, reduce barriers to military voting, and improve America's democratic elections process. The team consists of 37 members living all over the world." Jones Decl. ¶ 12.

41.    SFI creates and runs military voter education programs, including programs that have been nationally recognized and highlighted by the Department of Defense. Jones Decl. ¶ 10.

42.    These programs include SFI's "Voting Ambassador Program," which trains military family members to "to register voters within their personal networks and educate others on how to navigate the specific voting challenges military families face, such as voting absentee and overseas due to frequent relocations." Jones Decl. ¶ 11.

43.    SFI engages in non-partisan get-out-the-vote activities every year, and its Voting Ambassadors conduct workshops, develop social media content, and undertake other activities to educate their military networks on the voting process. Jones Decl. ¶ 67.

44.    SFI provides its Voting Ambassadors with "training and resources to register voters in their military networks and help those voters successfully navigate the voting process," including during a "one-on-one with SFI staff where they receive information on the program, identify how they will conduct education in their communities, and learn the voting process and review common questions military connected voters typically have." Jones Decl. ¶ 61.

45.    SFI's training for Voting Ambassadors includes training on how to register to vote using the Post Card Form. Jones Decl. ¶ 20.

46.    Including through the Voting Ambassador Program, "SFI specifically encourages its members who are absent from their jurisdiction to register to vote and request an absentee ballot using the FPCA because—though not without complications—it is the most accessible method for absent military-connected voters to register and request a ballot." Jones Decl. ¶¶ 19–20.

47.    SFI's Voting Ambassadors host voter registration events, including at college campuses, community centers, and local events, using the Post Card Form targeting military-connected voters in both the continental United States and abroad. Jones Decl. ¶¶ 11, 63.

48. Voter registration events run by Voting Ambassadors within the continental United States typically feature printed copies of state or federal voter registration forms and the Post Card Form, and events outside of the continental United States include printed copies of the Post Card Form and/or, if a printer is not available, business cards with a QR code to direct the prospective voter to the Post Card Form. Jones Decl. ¶ 63.

49. At these events, "Voting Ambassadors explain the voter registration process to voters for whichever method of registration they need to use." Jones Decl. ¶ 63.

50. In response to the Executive Order, SFI was already forced to update its Voting Ambassador program, including its program toolkit and Voting Ambassador orientation video, to explain the potential impact of the Executive Order's documentary proof of citizenship, proof of eligibility, and ballot return deadline provisions, as well as the current status of the Order's implementation. Jones Decl. ¶¶ 61–62.

51. If the Executive Order is implemented to require documentary proof of citizenship and state-specific proof of voter eligibility for voters who use the Post Card Form, SFI would have to further overhaul its educational materials, online resources, and its training program for Voting Ambassadors to ensure that its volunteers are equipped to address increasingly complex scenarios, and its voter registration efforts would be impaired. Jones Decl. ¶¶ 64, 66, 68.

52. "SFI would need to train volunteers to explain how to walk prospective voters through new and restrictive requirements, including the type of documentation that would be required and how it could be provided to successfully use the FPCA," which would include "create[ing] complex new instructions and advis[ing] prospective voters on how to find, secure, and potentially pay for specific documents before attempting to register to vote using the FPCA, including during voter registration drives." Jones Decl. ¶ 64.

53.     If Sections 3(d) and 7(a) of the Executive Order were implemented, SFI would be forced to increase staffing and volunteer capacity to hold "hotlines" to provide guidance and information to voters. Jones Decl. ¶ 64.

54.     The Executive Order's proof of eligibility requirement inherently requires information that varies by state, requiring SFI to not only overhaul its guidance and training program, but possibly force the organization to reconsider promoting the FPCA among its membership, as the Post Card Form would be far less useful if it were not a uniform document that could be used by voters in any State by following the same general rules. Jones Decl. ¶ 65.

55.     If post-Election Day ballot return deadlines were eliminated in the many States where SFI members now rely on them, "SFI would update its programs and resources, including its training for Voting Ambassadors, to explain the discrepancy between the Executive Order and existing state laws that SFI members have relied on for years." Jones Decl. ¶ 69.

56.     SFI staff and volunteers have limited time and resources, and SFI's work to respond to the Executive Order will cause work in other areas—including work to increase the safety and wellbeing of military families through one-on-one meetings and in-person events—to suffer. Jones Decl. ¶¶ 12, 56–58.

57.     SFI has already devoted resources to educating its membership on the Executive Order and diverted other planned educational activities, including postponing the launch of the Voting Ambassador program by several months due to confusion over the Executive Order's requirements. Jones Decl. ¶¶ 59–60.

58.     "In the second quarter of the year, between 10% to 20% of [SFI] staff time was dedicated to work connected to this Order." Jones Decl. ¶ 60.

59.    Unless and until Sections 3(d) and 7(a) of the Executive Order are declared void, SFI will be forced to continue diverting resources from its existing projects, and its mission will be frustrated if the Order is implemented "because fewer SFI members and fewer military family members overall will be able to register, to vote, and to have their vote counted." Jones Decl. ¶¶ 71–72.

60.    Plaintiff League of United Latin American Citizens ("LULAC") is a nationwide, non-profit, non-partisan organization, established in 1929 and headquartered in Washington, D.C. Ex. 2, Decl. of Juan Proaño ("Proaño Decl.") ¶ 2.

61.    LULAC is the largest and oldest Latino civil rights organization in the United States with a mission to advance the civil rights, voting rights, educational attainment, and political influence of Hispanic Americans through community-based programs. Proaño Decl. ¶¶ 2–4.

62.    LULAC is a membership-based nationwide organization with more than 400 councils and over 500,000 members, which include both U.S.-born citizens and naturalized citizens. Proaño Decl. ¶¶ 2, 7.

63.    LULAC's members are civically engaged—at least 80% are registered to vote. Proaño Decl. ¶ 8.

64.    LULAC provides citizenship application assistance to its members, and its councils hold get-out-the-vote programs before elections to encourage its members and other community members to vote, including by mail. Proaño Decl. ¶¶ 7, 9.

65.    Part of LULAC's core mission is to help not only all citizens across the country register to vote and vote, but to promote registration and participation among its members who are part of the military community. Proaño Decl. ¶ 11.

66.     In service of its core mission to help military families and veterans, LULAC has a number of veterans' councils that specifically focus on advancing the voting rights of active-duty LULAC members. Proaño Decl. ¶¶ 11–12.

67.     LULAC has over 500 overseas members, including over 200 who use military postal codes. Proaño Decl. ¶ 13.

68.     LULAC military members are stationed both domestically and abroad, and many of these members rely on the FPCA to register to vote and to request mail-in and absentee ballots. Proaño Decl. ¶ 13.

69.     Many of these members do not have documentary proof of citizenship papers, are uncertain how to comply because the types of documents that would be acceptable remain unclear, or face difficulties obtaining such documentation on short notice if it were required alongside the FPCA. Proaño Decl. ¶ 14.

70.     LULAC has members who would not readily have access to documentary proof of citizenship. For example, some members are called upon to travel on short notice, including during election season. This includes LULAC members who are in the National Guard and have been dispatched to handle domestic emergencies, as well as other members who serve abroad and are deployed to locations where access to their documentation such as their passports, even if those are available, is impossible. Proaño Decl. ¶ 15; Ex. 3, Decl. of Luis Reyna ("Reyna Decl.") ¶¶ 4, 13–15.

71.     Many of these members need to vote by mail due to their circumstances and usually use the FPCA to request their mail-in ballots, but they will be unable to do so if they are required to submit proof of citizenship documents alongside their FPCA. Proaño Decl. ¶¶ 13, 15, 20; Reyna Decl. ¶ 18.

14

72.     LULAC's national team invests resources in its councils by offering training and educational programs on the use of the FPCA—they educate military members about the FPCA and encourage these members to engage other community members to use the FPCA. Proaño Decl. ¶ 21.

73.     Local LULAC councils also promote the use of the FPCA for voter registration and absentee voting among their military members. Proaño Decl. ¶ 22.

74.     LULAC has received numerous inquiries from councils and members on what qualifies as documentary proof of citizenship, how they should start educating military members, or whether service-members should begin carrying proof of citizenship documents; addressing these questions has consumed staff and volunteer time that would otherwise be devoted to advancing other community-based initiatives. Proaño Decl. ¶ 23.

75.     LULAC has more than 180,000 members residing in Alaska, California, Illinois, Massachusetts, Maryland, Nevada, New Jersey, New York, Ohio, Oregon, Texas, Virginia, Washington, West Virginia, and Washington D.C., which all provide a ballot receipt window after Election Day for receipt of timely voted absentee or mail-in ballots. Proaño Decl. ¶¶ 27–28.

76.     Many of these members have voted by mail in the past and plan to vote by mail in the future. Proaño Decl. ¶ 28.

77.     If these States are forced to prohibit the receipt of ballots after Election Day, then many LULAC members living in these States who vote by mail and rely on these ballot receipt windows will be at risk of their ballots being thrown out. Proaño Decl. ¶¶ 33, 42.

78.     More than 70,000 LULAC members live in Alaska, Ohio, Virginia, and West Virginia—which have ballot receipt windows and are not represented in the *California v. Trump*

lawsuit—and many of these members have voted by mail in the past and plan to vote by mail in the future. Proaño Decl. ¶ 29.

79.    These ballot receipt windows are essential for many LULAC members who vote by mail. Proaño Decl. ¶¶ 34–38.

80.    At least 150 LULAC members live in North Dakota, and many of them reside in rural areas and some regularly vote by mail. Proaño Decl. ¶¶ 30–32.

81.    These members previously relied on North Dakota's ballot receipt window to ensure that their mail-in ballots had sufficient time to reach election officials. Proaño Decl. ¶ 32.

82.    Some LULAC members are elderly and/or have disabilities requiring them to vote by mail and to rely on their States' ballot receipt window to ensure that their ballots are counted. Proaño Decl. ¶ 35.

83.    More specifically, some members have mobility issues that preclude them from standing for any significant period of time, including one LULAC member who is thirty-seven years old, but with medical issues that render her unable to drive. Ex. 4, Decl. of Irma Gonzalez ("Gonzalez Decl.") ¶¶ 8–10.

84.    Still others are elderly individuals with a range of ailments, who need physical assistance getting out of the house and to the post office. Ex. 5, Decl. of James Fukuda ("Fukuda Decl.") ¶¶ 15–17.

85.    Other LULAC members are veterans recovering from extensive surgeries. Reyna Decl. ¶ 20.

86.    For members with disabilities, their ability to return their ballots by mail depends on others who can take those ballots to the post office, which frequently means that their ballots are mailed very close to Election Day. Gonzalez Decl. ¶ 13.

16

87.     Other LULAC members live in rural areas where mail drop-off and pick-up are unreliable and find themselves having to rely on their States' ballot receipt window. Proaño Decl. ¶ 34.

88.     Several members have noted that their Councils, based in more rural parts of the country, have members who are physically incapacitated at home, vote by mail, have faced delays in USPS collecting their mail in the past—including their ballots—and have had to rely on their states' ballot receipt windows to ensure that their mail ballots count. Ex. 6, Decl. of Ana Orellana ("Orellana Decl.") ¶¶ 16–18; Gonzalez Decl. ¶¶ 8–10, 17.

89.     Other LULAC members are in the military and deployed at a minute's notice such that they are forced to send their mail-ballots last minute and must rely on their States' ballot return window. Proaño Decl. ¶ 37; Reyna Decl. ¶¶ 11–16.

90.     Other LULAC members are active duty in the U.S. Navy, serve overseas, were stationed abroad in the 2024 election, and voted by mail in the 2024 election. Fukuda Decl. ¶ 26.

91.     LULAC service members do not always know where they will be mailing their ballots from, how long their ballots will take to arrive, or how reliable the mail service is at any given location. Reyna Decl. ¶ 17.

92.     When deployed abroad, these LULAC members often receive ballots close to Election Day, need the extra time after Election Day for their ballots to arrive, and must move regularly and adjust their schedules on potentially unpredictable and tight timelines, as directed. Therefore, these members rely on their states' ballot return windows to ensure that their mail-in ballots are counted. Reyna Decl. ¶ 17; Fukuda Decl. ¶ 27.

93.     LULAC also has many student members who vote by mail and live in the states that provide ballot return windows for absentee ballot return. Proaño Decl. ¶ 36.

94.    LULAC members who are away from home for the first time studying at college may receive their ballots at their parents' home address and then need to figure out both how to obtain their ballots and then return them on time. Orellana Decl. ¶ 8.

95.    Other student LULAC members are registered where they grew up and receive their mail ballot through student mail, which is not always reliable. Gonzalez Decl. ¶ 11.

96.    Other LULAC members rely on their states' ballot return window because of travel and commuting schedules. Orellana Decl. ¶¶ 12–13.

97.    Many LULAC members who vote by mail wait until the last minute to do so, since critical late-breaking news such as political scandals, major policy shifts, endorsements, or revelations about a candidate's record often emerge in the final days of a campaign, which have shifted a member's perspective on a given candidate or race. Ex. 7, Decl. of Felix Rivera ("Rivera Decl.") ¶¶ 9–10; Gonzalez Decl. ¶¶ 16; Orellana Decl. ¶ 15.

98.    Many LULAC members who reside in the States that allow for post-Election Day cure of ballots will likely face disenfranchisement if Section 7(a) also requires States to eliminate their cure periods. This would be especially detrimental to elderly and disabled members who vote by mail and often struggle to complete their ballots correctly, i.e., omitting the date or a hyphen in their middle name—meaning these otherwise valid and eligible ballots containing minor errors would no longer be counted after Election Day if the states were prohibited from providing post-election cure. Proaño Decl. ¶ 39.

99.    One LULAC member, who worked at the County of Riverside Registrar of Voters in Riverside, California, encountered many ballots that arrived after Election Day and thousands that had defects, such as a signature mismatch, that needed to be cured. Reyna Decl. ¶ 22.

100.    Another LULAC council president was notified after Election Day—in both the 2016 and 2020 elections—that her signature had a mismatch, and she was able to cure her ballot after Election Day in accordance with State law. Gonzalez Decl. ¶ 20.

101.    If Sections 3(d) and 7(a) go into effect, LULAC national and local LULAC councils will need to cut back on their projects that help veterans navigate benefits, encourage U.S. military recruitment, support community members facing immigration concerns, provide youth scholarships, and advocate for the elderly. Proaño Decl. ¶¶ 45, 54–58; Reyna Decl. ¶¶ 23–25; Orellana Decl. ¶ 21; Fukuda Decl. ¶¶ 22–23.

102.    If Sections 3(d) and 7(a) go into effect, LULAC will have to change its website, and update its educational materials and trainings. Proaño Decl. ¶¶ 46–49.

103.    For Section 3(d), it would take a lot of work for LULAC to educate its members about potential new documentary proof of citizenship requirements for the FPCA, including legal research, updating its website, and getting the information out to local councils. Proaño Decl. ¶¶ 24, 47–51.

104.    As for Section 7(a), LULAC would have to expend considerable resources tracking potential changes to States' mail-in ballot return windows and cure periods and change its educational materials accordingly. Proaño Decl. ¶¶ 43, 46, 48.

105.    LULAC's research and policy teams are actively planning and spending their capacity now on new voting materials related Sections 3(d) and 7(a). This is diverting their time, energy, and resources away from working on the newest iteration of their Know Your Rights publication, "El Escudo." Proaño Decl. ¶ 50.

106.    If Sections 3(d) and 7(a) are implemented, LULAC's members who use the Post Card Form will be unable to vote, members who rely on their State's ballot return window will

likely be disenfranchised, and members who rely on their States' post-Election Day cure periods will likely be at risk of their ballots being thrown out for minor discrepancies. Proaño Decl. ¶¶ 15, 39, 42.

107.    LULAC's core mission of providing holistic community-based services will also suffer because it will have to reallocate staff, change its management, and shift its programmatic work to responding to the impacts of Sections 3(d) and 7(a). Proaño Decl. ¶¶ 45, 52, 53–57.

108.    LULAC actively educates its members and constituents about voting by mail by developing programs to instruct members on requesting mail ballots, informing them about key rules, and encouraging them to vote by mail with assurances that their ballots will be counted. Proaño Decl. ¶ 11.

Dated: September 17, 2025                    Respectfully submitted,

*/s/ Pooja Chaudhuri*
Pooja Chaudhuri (D.C. Bar No. 888314523)
Sofia Fernandez Gold (D.C. Bar No. 90010196)
Jacob Kovacs-Goodman (D.C. Bar No. 90032363)
Norman L. Eisen (D.C. Bar No. 435051)
Tianna J. Mays (D.C. Bar No. 90005882)
DEMOCRACY DEFENDERS FUND
600 Pennsylvania Avenue SE #15180
Washington, D.C. 20003
(202) 601-8678
pooja@democracydefenders.org
sofia@democracydefenders.org
jacob@democracydefenders.org
norman@democracydefenders.org
tianna@democracydefenders.org

*/s/ Jon Greenbaum*
Jon Greenbaum (D.C. Bar No. 489887)
JUSTICE LEGAL STRATEGIES PLLC
P.O. Box 27015
Washington, D.C. 20038

*/s/ Anna M. Baldwin*
Anna M. Baldwin (D.C. Bar No. 998713)
Danielle Lang (D.C. Bar No. 1500218)
Jonathan Diaz (D.C. Bar No. 1613558)
Robert Brent Ferguson (D.C. Bar No. 1782289)
Heather Szilagyi (D.C. Bar No. 90006787)
Benjamin Phillips (D.C. Bar No. 90005450)
CAMPAIGN LEGAL CENTER
1101 14th St. NW, Suite 400
Washington, D.C. 20005
(202) 736-2200
abaldwin@campaignlegalcenter.org
dlang@campaignlegalcenter.org
jdiaz@campaignlegalcenter.org
bferguson@campaignlegalcenter.org
hszilagyi@campaignlegalcenter.org
bphillips@campaignlegalcenter.org

(202) 601-8678
jgreenbaum@justicels.com

*Counsel for Plaintiffs League of United Latin
American Citizens, Secure Families Initiative,
and Arizona Students' Association*