# EXHIBIT 2

**Civil Action No. 25-0946 (CKK)**

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.*,<br><br>       *Plaintiffs*,<br>v.<br><br>EXECUTIVE OFFICE OF THE PRESIDENT, *et al.*,<br><br>       *Defendants*. | Civil Action No. 25-0946 (CKK) |
| DEMOCRATIC NATIONAL COMMITTEE, *et al.*,<br><br>       *Plaintiffs*,<br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>       *Defendants*. | Civil Action No. 25-0952 (CKK) |
| LEAGUE OF WOMEN VOTERS EDUCATION FUND, *et al.*,<br><br>       *Plaintiffs*,<br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>       *Defendants*. | Civil Action No. 25-0955 (CKK) |

## DECLARATION OF JUAN PROAÑO
## CHIEF EXECUTIVE OFFICER, LEAGUE OF UNITED LATIN AMERICAN CITIZENS

I, Juan Proaño, pursuant to 28 U.S.C. § 1746, declare that the following statements are true and correct to the best of my knowledge and belief:

1. I am the Chief Executive Officer of League of United Latin American Citizens (LULAC), a position I have held since November 2023. In my role as Chief Executive Officer, I oversee the day-to-day operations at LULAC and work to amplify the organization's advocacy initiatives and action-oriented programs.

2. LULAC is a nationwide, non-profit, non-partisan, membership-based nationwide organization with more than 400 councils and over 500,000 members. LULAC was established in 1929 and is headquartered in Washington, D.C.

A. **LULAC's General Mission and Activities**

3. LULAC is the largest and oldest Latino civil rights organization in the United States. LULAC's mission is to improve the lives of Latino families throughout the United States and to protect their civil rights, including their voting rights.

4. LULAC advances the economic conditions, educational attainment, political influence, housing, health, and civil and voting rights of Hispanic Americans through community-based programs.

5. LULAC has a national board, president, and professional staff, as well as several issue-specific committees. LULAC programs include citizenship and voter registration drives, as well as education and health promotion events and programs that empower the Hispanic community at the local, state and national level. LULAC has more than 400 state-based councils nationwide, each composed of members, with total membership across the councils numbering in the thousands.

6. LULAC offers educational programming to disadvantaged youth, which impacts more than 18,000 Hispanic students per year at fourteen regional centers. LULAC councils, including LULAC's employment arm, provide job skills and literacy training to the Hispanic

community through more than forty-eight employment training centers located throughout the United States. The LULAC Corporate Alliance, an advisory board of Fortune 500 companies, fosters stronger partnerships between Corporate America and the Hispanic community.

7.   LULAC's members include both U.S.-born citizens and naturalized citizens. LULAC provides citizenship application assistance and civics and citizenship education to its members, many of whom are newly naturalized.

8.   LULAC's members are civically engaged. At least 80% are registered to vote. At least 80% of LULAC's members who are registered to vote voted in 2020 and at least 75% voted in 2022.

9.   LULAC councils also hold get-out-the-vote programs before elections to encourage LULAC members to vote.

### B. Section 3(d)'s Impact on LULAC's mission and members

10.   My understanding of Section 3(d) of the President's Executive Order, "Preserving and Protecting the Integrity of American Elections," is that it directs officials in the Executive Branch to change the Federal Post Card Application ("FPCA") for military/uniformed and overseas voters to require documentary proof of citizenship.

11.   LULAC actively educates its members and constituents about voting by mail by developing programs to instruct members on requesting mail ballots, informing them about key rules, and encouraging them to vote by mail with assurances that their ballots will be counted. Part of LULAC's core activities is to help not only all citizens across the country register to vote and participate in the voting process—but to promote more voter registration and participation among its members who are part of the military community.

12. LULAC has a number of veterans' councils in the states that specifically focus on advancing the rights of active-duty LULAC members and veterans, including assisting them with voting and protecting their voting rights. In addition, LULAC's other councils include members who are currently serving in the military.

13. LULAC has over 500 overseas members, including over 200 who use military postal codes. LULAC military members are stationed both domestically and abroad, many of whom rely on the Federal Post Card Application (or, "Post Card Form") to register to vote and request absentee ballots.

14. Many of these members either lack documentary proof of citizenship, do not know how they would comply with such a requirement because what types of documents would be acceptable remain unclear, or face significant difficulties in obtaining such documentation on short notice if it were required alongside the Post Card Form.

15. Many military members lack access to documentary proof of citizenship—especially those called upon to travel on short notice, including during election season. LULAC has members who are in the National Guard and have been dispatched to handle domestic emergencies in other states. LULAC also has members serving abroad who are deployed to locations where access to their documentation, even if it is available, is impossible. These members will be unable to vote if they must submit proof of citizenship documents along with their Post Card Form. In fact, I know of members who are called upon to handle domestic emergencies away from their homes. These members often do not carry proof of citizenship documentation with them, or it would be difficult for them to obtain their such documentation at last minute's notice.

16. Voting is already difficult for service members because of the emergency nature of their duties, but imposing a proof-of-citizenship requirement adds a substantial burden by forcing

them to maintain and carry such documentation—if it is even accessible—regardless of where they are stationed, including in remote locations or locations far away from home.

17. Another concern that some LULAC's military members have is that some of them are part of "mixed-citizenship status" families and *do not want to* provide documentary proof of citizenship even if they have it for fear that it would attract attention to their family members who are undocumented.

18. Many members who are U.S. citizens and are eligible to vote are concerned that they and their families will become targets of the Administration, which has vowed to share sensitive voter data with DOGE and the IRS and subject immigrants to a myriad of unwarranted investigations and prosecutions.

19. For these members, the calculation is simple—participating in elections is not worth the risk, however great or small, of exposing their undocumented family members to potential immigration investigations and other consequences.

20. Requiring proof of citizenship documentation, therefore, will make the Post Card Form unusable for many of LULAC's military members and they will be unable to register to vote and to vote by absentee ballot.

21. LULAC's national team invests resources in its councils, including its veterans' councils, and supports its military members by offering training and educational programs on voting. It does so by specifically by promoting use of the Post Card Form, educating members about it, encouraging them to engage their communities about the Post Card Form, and assisting other service members to use the Post Card Form. LULAC has already spent time and resources talking to its members about Section 3(d), and if the Executive Order is implemented, LULAC

will continue to expend resources to educate its members, particularly its veterans councils, about changes to the Post Card Form that are coming down the pike.

23. LULAC's state-based councils as well as its veterans' councils also promote voter registration and absentee voting among LULAC's military members. They advocate the use of the Post Card Form at events, such as "Menudo breakfasts," where they educate attendees on how to register and request mail-in ballots through the Post Card Form.

23. LULAC has received numerous inquiries from councils regarding what qualifies as documentary proof of citizenship, how to educate military members on these requirements, whether service members should begin carrying proof-of-citizenship documents during deployments, and related concerns. Addressing these questions has consumed significant staff and volunteer time that would otherwise be devoted to advancing other initiatives I discuss below.

24. If Section 3(d) takes effect, LULAC and its councils will be forced to revise their training materials, educational programs, and related resources to guide military members through the new Post Card Form requirements. Doing so will demand significant staff time, resources, and coordination, especially given the challenge of communicating these changes across LULAC's more than 400 councils and hundreds of members.

**C. Section 7(a)'s impact on LULAC's mission and its members.**

25. My understanding is that Section 7(a) of the Executive Order, if implemented, would require certain states to stop receiving mail-ballots after Election Day and would prohibit these states from including those mail-in ballots—even if they were timely voted and timely mailed out by the voter—in the final vote count.

26. My understanding is that it is unclear whether Section 7(a) applies to states that allow voters to cure mail-in ballots after Election Day when officials reject them for discrepancies.

If it does apply, then it would eliminate post-election cure periods altogether. Such changes would be especially harmful to LULAC members residing in states that currently permit mail-in ballots to be received or cured after Election Day.

27. My understanding is that Alaska, California, Illinois, Massachusetts, Maryland, Nevada, New Jersey, New York, Ohio, Oregon, Texas, Virginia, Washington, West Virginia, and Washington, D.C., all provide a ballot-receipt window after Election Day for election boards to receive voted mail-in ballots.

28. LULAC has more than 180,000 members residing in these aforementioned states, many of whom have previously voted by mail and intend to continue doing so. I have personally spoken with numerous members who live in these states—most recently at our annual Convention—who expressed their plans to vote by mail in the future.

29. Over 70,000 members live in Alaska, Ohio, Texas, Virginia, and West Virginia. My understanding is that LULAC members in those five states have no protection from the other federal court case in Massachusetts where the states got relief on Section 7(a). Members in these five states have voted by mail in the past and plan to vote by mail in the future.

30. There are at least 150 LULAC members in North Dakota many of whom have voted by mail and used to rely on their North Dakota's post-Election Day ballot-receipt window for mailing and receiving absentee ballots. However, in 2025, North Dakota changed its laws.

31. As I understand, North Dakota eliminated its ballot-receipt window for receiving mail-in ballots after Election Day *because of* the Executive Order, to avoid federal reprisal.

32. Many of LULAC's North Dakota members reside in rural areas, with at least some who regularly vote by mail. Several of these members have relied on the ballot receipt-window to ensure their ballots had sufficient time to reach election officials.

33. Even LULAC members in the states that are challenging Section 7(a) in a different court are at risk of harm if those states are forced to change their laws while litigation is ongoing. This would subject LULAC members to the same irreparable consequences they face elsewhere.

34. The ballot-receipt window is essential for many LULAC members who vote by mail, both because of their personal circumstances and their sincerely held beliefs. Many LULAC members live in rural areas where mail drop-off and pick-up are unreliable—these members receive their mail-in ballots closer to Election Day and must mail their ballots a day or two before Election Day.

35. Other LULAC members are elderly or have disabilities and must rely on other people to mail their absentee ballots, meaning these ballots are often mailed very close to Election Day and may arrive after Election Day as a result.

36. Many LULAC members are students and are registered to vote in their home counties far away from their universities. These individuals often receive their mail ballots close to Election Day due to unreliable dorm mail service and must quickly mail those ballots back home. Therefore, they rely on ballot-receipt windows to ensure their votes are counted.

37. Many of LULAC's military members are also deployed at a minute's notice such that many are forced to send their mail-in ballots at the last minute and must rely on their states' ballot-receipt windows to ensure their ballots will count.

38. Many LULAC members wait until Election Day to complete their ballots so they can respond to late-breaking campaign news and new information, allowing them to cast fully informed votes. These members sometimes change their choices or select different candidates as a result. Many of these same members vote by mail and depend on their states' ballot-receipt windows for returning ballots to ensure that their votes are counted.

39. LULAC members who vote by mail also have had their ballots rejected in the past because of minor discrepancies or errors. Those residing in states that permit post–Election Day cure opportunities can have their votes counted. However, the harsh and ambiguous language of the Executive Order may also impact the states that provide cure periods after Election Day for mail-in ballots. If these states had to get rid of their post-Election Day cure periods, this would be especially detrimental to elderly and disabled members who vote by mail and often struggle to complete their ballots correctly, i.e., omitting the date or a hyphen in their middle name—meaning these otherwise valid and eligible ballots containing minor errors would no longer be counted after Election Day if the states were prohibited from providing post-election cure.

40. Section 7(a)'s directive that the Attorney General take all necessary action to enforce one, uniform "Election Day" and eliminate states' post-Election Day receipt of absentee ballots impacts all LULAC members in these states. Were the Attorney General to target a state's failure to implement the ballot receipt deadline, that state could also cut funding and resources to its most underserved locations, which disproportionately impacts LULAC members.

41. Apart from the difficulty of complying with the new ballot receipt deadline, the imposition of trying to decipher a shifting landscape of deadlines will make it so that many LULAC members are unable to ensure timely receipt of their mail-in ballots.

42. There is rarely an interaction I have with a LULAC member older than 50 who does not ask about how the laws are changing and how these changes impact them. If Section 7(a) takes effect, members who vote by mail and rely on their states' ballot-receipt windows to ensure that their mail-in ballots are counted will be at risk of having their ballots thrown out.

43. LULAC has already spent time and resources talking to its members about Section 7(a), and if the Executive Order is implemented, LULAC will continue to expend resources to

educate its members about potential changes to states' absentee ballot receipt ballot-receipt windows and post-Election Day cure periods that are likely on the horizon. LULAC has received numerous inquiries from councils regarding these issues. And addressing these questions has consumed significant staff and volunteer time that would otherwise be devoted to advancing other initiatives discussed below.

44.     If Section 7(a) takes effect, LULAC and its councils will be forced to revise their training materials, educational programs, and related resources to guide its members on how to vote by mail in the states that used to provide ballot-receipt windows and cure periods for mail ballots after Election Day. Doing so will demand significant staff time, resources, and coordination, especially given the challenge of communicating these changes across LULAC's more than 400 councils and hundreds of members.

   D. **LULAC's Core Mission Will Be Undermined and Its Work in Other Areas Will Be Adversely Affected**

45.     Tackling the implications of the Executive Order is draining LULAC's scarce resources. Our national membership has grown significantly this year. There is already an increased level of interest among these new members in upcoming elections. Despite managing our vast array of programming across diverse domains, I personally have been fielding many questions and concerns about the timing of the new ballot deadline, the logistics of educating members about the new ballot receipt deadline, and how we will determine how much time our members will have to vote in their respective impacted states. Members have asked me these questions in both phone calls and emails. We recently held our national annual LULAC Convention, where I personally received questions on both Sections 3(d) and 7(a) of the Executive Order.

46. LULAC, along with its state boards and local councils, is planning how to revise its resources, training, and guidance regarding voter registration for those states that allow for mail-in ballot receipt after Election Day. For example, LULAC's website contains guidance on absentee and vote-by-mail in these states and/or links to other webpages that include this information. LULAC would now need to develop new webpages with different methods of providing potential voters with information about the specific states that permit receipt of mail ballots after Election Day, which would require significant time and resources.

47. LULAC would also have to change its website to reflect documentary proof of citizenship requirements as to the Post Card Form. LULAC's website is not customized to these new requirements. And it would take a lot of work to change its current website and educational materials, including legal research, updating the website, and getting the information out to local councils.

48. LULAC would have to create state-specific pages that link out to state forms and guidance. Such state-specific information will evolve dramatically and remain in flux, as different states respond haphazardly both to the Order and the legal challenges to it. LULAC would have to track changes in each state—for example, the way it has had to track changes in North Dakota, which changed its ballot receipt deadline this year.

49. This would be extremely burdensome to LULAC, its staff, and its limited resources. LULAC and its councils have struggled to assess the shifting landscape and craft new, reliable guidance for members on what will be sufficient for voters to comply with the Executive Order's ballot receipt deadline.

50. Our research and policy team are actively planning and spending their capacity now on new voting materials related Sections 3(d) and 7(a). This is diverting their time, energy, and

resources away from working on the newest iteration of our Know Your Rights publication, "El Escudo." Our policy and membership teams at this juncture should be dedicating all their efforts to this publication, but instead they are now analyzing and processing any potential effects of Sections 3(d) and 7(a).

51.    I expect that the potential changes to the Post Card Form will also impact the effectiveness of our voter drives targeting our military members, a core activity of LULAC councils, including its veterans' councils. I anticipate having to spend my own limited time assessing the legal landscape and documentary proof of citizenship changes to the Post Card Form, updating the LULAC website correspondingly, and propagating this new information out to volunteers. This will drastically cut LULAC's resources both at the national and local levels.

52.    All of these changes and nuances will complicate the current, straightforward guidance LULAC has for its members and volunteers, which will make it harder to recruit volunteers to help with voter registration work. Because civic engagement is a key pillar of LULAC's core mission, negative impacts on the recruitment and retention of volunteers harm state boards and local councils.

53.    These added burdens, including new retention problems and the need to address concerns and questions of members and volunteers, will require LULAC to expend significant time and resources. These resources could be better spent supporting local councils on other activities, including their rapid response immigration work and economic and health initiatives.

54.    It is some of our most important work in other areas that stands to suffer. For example, LULAC has been at the forefront of combatting the new immigration policies of the current presidential administration ("Administration"). It has had to devote a significant amount of its time toward helping those who have been deported or are under threat of being deported.

This includes multiple new initiatives aimed at helping impacted families and communities with immigration resources, referrals, and other types of assistance. LULAC as an organization, both at the national level, at the state-wide level, and at the local level, is fielding lots of calls and emails related to immigration. We have diverted a significant proportion of our resources this year to building out our immigration-related resources. For instance, LULAC obtained over 165,000 signatures on its petition, "President Trump: Protect Essential Workers." Our communications team needs to work tirelessly on efforts like this with the current Administration. All of this work has taken a tremendous amount of time and resources.

55.     LULAC has also been working with its councils to combat the impacts of the Administration's dismantling of Diversity, Equity, and Inclusion initiatives. The loss of these programs at universities, local governments, and in the private sector has made it more difficult for the communities LULAC serves to access higher education through scholarships and become part of the workforce. Every year, LULAC funds entrepreneur programs to help the Latino community, provides scholarships to youth pursuing higher educational or vocational programs, and holds year-round educational workshops to connect youth members to leaders in the community. This work takes up a lot of our staff and volunteer time.

56.     LULAC further allocates resources to its Latina economic, empowerment, health and wellness programs, the LULAC Academy, and Latino leadership programs. These initiatives are vital for the advancement of LULAC's members and constituents, and LULAC spends significant resources to ensure the longevity of these programs.

57.     To respond to the effects of Sections 3(d) and 7(a), LULAC must reallocate staff, management, and programmatic work. We will need to scale back our LULAC Academy, in-person events, entrepreneurship program, and skilled trades programming.

58.  All of these programs require staff to draft curricula, engage the community in live trainings, and get out into the field to meet members where they are. More than half of our staff is dedicated to these educational endeavors.

59.  All of these programs stand to suffer if LULAC must use its limited resources to combat the effects flowing from the portions of the Executive Order.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Executed this 15th day of September, 2025, in Washington, D.C.

_____
Juan Proaño