# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> EXECUTIVE OFFICE OF THE PRESIDENT, *et al.*, <br><br> *Defendants*. | Civil Action No. 25-0946 (CKK) |
| DEMOCRATIC NATIONAL COMMITTEE, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*, <br><br> *Defendants,* <br><br> and <br><br> REPUBLICAN NATIONAL COMMITTEE, <br><br> *Intervenor-Defendant.* | Civil Action No. 25-0952 (CKK) |
| LEAGUE OF WOMEN VOTERS EDUCATION FUND, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*, <br><br> *Defendants*. | Civil Action No. 25-0955 (CKK) |

## MEMORANDUM IN SUPPORT OF LULAC PLAINTIFFS' CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT AND RESPONSE IN OPPOSITION TO DEFENDANTS' AND RNC'S MOTIONS FOR SUMMARY JUDGMENT

**TABLE OF CONTENTS**

INTRODUCTION .................................................................................................................1

BACKGROUND .................................................................................................................2

I.    Legal Background ...............................................................................................2

    A.  Constitutional Framework ...........................................................................2

    B.  The Uniform Overseas Citizens Absentee Voting Act ("UOCAVA")....................3

    C.  Federal Election Day Statutes ......................................................................3

II.    Factual Background and Procedural History .........................................................4

    A.  LULAC Plaintiffs........................................................................................4

    B.  Procedural History .....................................................................................5

ARGUMENT ......................................................................................................................6

I.    LULAC Plaintiffs Have Standing to Challenge Sections 3(d) and 7(a) of the Executive Order and Their Claims Are Ripe ................................................................6

    A.  Legal Standard ...........................................................................................6

        1.  Organizational Standing.........................................................................7

        2.  Associational Standing...........................................................................7

    B.  Plaintiffs Have Standing and a Ripe Claim Challenging Section 3(d) ...................9

        1.  Plaintiffs Have Organizational Standing ...................................................9

        2.  Plaintiffs Have Associational Standing ...................................................12

        3.  Plaintiffs' Claim is Ripe and Not Speculative .................................................14

    C.  Plaintiffs Have Standing and a Ripe Claim Challenging Section 7(a) .................16

        1.  Plaintiffs Have Organizational Standing .................................................16

        2.  Plaintiffs Have Associational Standing ...................................................18

        3.  Plaintiffs Have a Ripe Claim and Defendants' Other Attempts to Undermine Plaintiffs Standing Fail .....................................................................21

II.    Plaintiffs Are Entitled to Summary Judgment on Their Claim That Section 3(d) Violates UOCAVA (Count Four) ...........................................................................24

    A.  Section 3(d)'s Documentary Proof of Citizenship Requirement Violates UOCAVA .................................................................................................25

    B.  Plaintiffs Have an Equitable Cause of Action to Challenge and Enjoin Implementation of Section 3(d) ...................................................................27

III.    Plaintiffs Are Entitled to Summary Judgment on Their Claim That Section 7(a) Is *Ultra Vires* of the Elections Clause and the President's Constitutional Authority (Count 3) .................................................................................................33

i

A.  Section 7(a) Violates the Constitution Because the President Has No Power to Override State Laws Governing Ballot Receipt Deadlines.................................33

B.  Plaintiffs Have an Equitable Cause of Action to Challenge and Enjoin Implementation of Section 7(a) ...........................................................................41

IV.  Plaintiffs Are Entitled to Declaratory and Permanent Injunctive Relief ....................42

CONCLUSION.................................................................................................................45

# TABLE OF AUTHORITIES

*\* Authorities upon which this brief chiefly relies are marked with an asterisk.*

## Cases

*Anatol Zukerman & Charles Krause Reporting, LLC. v. United States Postal Service*,
  64 F.4th 1354 (D.C. Cir. 2023) ...............................................................................43

*Arizona v. Inter Tribal Council of Arizona, Inc.* ("*ITCA*"), 570 U.S. 1 (2013)...................2, 32, 34

*Bognet v. Secretary Commonwealth of Pennsylvania*, 980 F.3d 336 (3d Cir. 2020) ....................35

*Bognet v. Degraffenreid*, 141 S. Ct. 2508 (2021)........................................................................35

*Bost v. Illinois State Board of Elections*, 684 F. Supp. 3d 720 (N.D. Ill. 2023)...........................35

*Bush v. Gore*, 531 U.S. 98 (2000) ...............................................................................................41

*\*California v. Trump*, No. 25-CV-10810-DJC,
  2025 WL 1667949 (D. Mass. June 13, 2025) ...........................................15, 32, 35, 36, 37, 44

*Center for Sustainable Economy v. Jewell*, 779 F.3d 588 (D.C. Cir. 2015).............................8, 14

*\*Chamber of Commerce of U.S. v. Reich*, 74 F.3d 1322 (D.C. Cir. 1996)..............................27, 30

*Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716 (D.C. Cir. 2022) ....................................31

*Charles H. Wesley Education Foundation, Inc. v. Cox*, 408 F.3d 1349 (11th Cir. 2005) .............13

*Chicago & Southern Air Lines v. Waterman S. S. Corp.*, 333 U.S. 103 (1948)............................29

*Clinton v. City of New York*, 524 U.S. 417 (1998) ................................................................26, 43

*Common Cause/Georgia v. Billups*, 554 F.3d 1340 (11th Cir. 2009)...........................................13

*Consolidated Coal Co. v. Federal Mine Safety & Health Review Commission*, 824 F. 2d 1071
  (D.C. Cir. 1987) .....................................................................................................................24

*Dalton v. Specter*, 511 U.S. 462 (1994) ......................................................................................29

*Democratic National Committee v. Wisconsin State Legislature*, 141 S. Ct. 28 (2020)..........37, 38

*Department of Commerce v. New York*, 588 U.S. 752 (2019)........................................................23

*Donald J. Trump for President, Inc. v. Way*, 492 F. Supp. 3d 354 (D.N.J. 2020) ........................35

*Equal Rights Center v. Post Properties, Inc.*, 633 F.3d 1136 (D.C. Cir. 2011)........................7, 11

*Fish v. Schwab*, 957 F.3d 1105 (10th Cir. 2020) .........................................................................44

*Food and Drug Administration v. Alliance for Hippocratic Medicine* ("*AHM*"),
  602 U.S. 367 (2024).......................................................................................................7, 9, 18

*Foster v. Love*, 522 U.S. 67 (1997) ........................................................................39, 40

*Frank v. Walker*, 17 F. Supp. 3d 837 (E.D. Wis. 2014) ...................................................13

*Global Health Council v. Trump*, No. 25-5097,
   2025 WL 2480618 (D.C. Cir. Aug. 28, 2025).........................................28, 29, 30, 42

*Harris v. Florida Elections Canvassing Commission*, 122 F. Supp. 2d 1317 (N.D. Fla. 2000) ....35

*Harris v. Florida Elections Commission*, 235 F.3d 578 (11th Cir. 2000) .....................................35

*Humane Society of the United States v. Hodel*, 840 F.2d 45 (D.C. Cir. 1988).........................8, 14

*Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333 (1977) ...........................8

*International Union, United Automobile, Aerospace and Agricultural Implement Workers of
   America v. Brock*, 477 U.S. 274 (1986) ...............................................................8, 21

*Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682 (1949).......................................28

*League of United Latin American Citizens v. Executive Office of the President* ("*LULAC*"),
   780 F. Supp. 3d 135 (D.D.C. 2025) ...1, 2, 5, 7, 8, 11, 12, 15, 16, 24, 27, 29, 30, 33, 34, 44, 45

**League of Women Voters of the United States. v. Newby*,
   838 F.3d 1 (D.C. Cir. 2016) ...........................................................7, 9, 10, 15, 17, 44

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ........................................................6

*Maddox v. Board of State Canvassers*, 149 P.2d 112 (1944) ..............................................38

*Marbury v. Madison*, 5 U.S. 137 (1803) ........................................................................43

*Mi Familia Vota v. Fontes*, 129 F.4th 691 (9th Cir. 2025) ...............................................12

*National Treasury Employees Union v. Vought*, No. 25-5091,
   2025 WL 2371608 (D.C. Cir. Aug. 15, 2025).....................................................28, 42

*New York v. Biden*, 636 F. Supp. 3d 1 (D.D.C. 2022) ....................................................42

*Nken v. Holder*, 556 U.S. 418 (2009).............................................................................44

*Nuclear Regulatory Commission v. Texas*, 605 U.S. 665 (2025)....................................30

*Pennsylvania Democratic Party v. Boockvar*, 238 A.3d 345 (Pa. 2020) .......................35

*President v. Vance*, 627 F.2d 353 (D.C. Cir. 1980) ........................................................42

*Republican National Committee v. North Carolina State Board of Elections*,
   120 F.4th 390 (4th Cir. 2024)...........................................................................11

*Republican National Committee v. Wetzel*, 120 F.4th 200 (5th Cir. 2024)..................38, 39, 40, 41

*Republican National Committee v. Wetzel*, 132 F.4th 775 (5th Cir. 2025)....................41

*Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47 (2006) ....................6

*Samuels v. Mackell*, 401 U.S. 66 (1971) ...................................................................43

*Smiley v. Holm*, 285 U.S. 355 (1932) ........................................................................2

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014) ..............................................24

*Susman Godfrey LLP v. Executive Office of the President*, No. 25-cv-1107, 2025 WL 1779830 (D.D.C. June 27, 2025) ...........................................................................42

*Travelers United, Inc. v. Hyatt Hotels Corporation*, 761 F. Supp. 3d 97 (D.D.C. 2025) ...............7

*Trump v. CASA, Inc.*, 606 U.S. 831 (2025) .................................................................44

*Trump v. New York*, 592 U.S. 125 (2020) ...........................................................22, 23

*United States v. Alabama*, 78 F.3d 926 (11th Cir. 2015) .................................................24

*United States v. Alabama*, 998 F. Supp. 2d 1283 (M.D. Ala. 2014) ....................................24

*Wilmer Cutler Pickering Hale & Dorr LLP v. Executive Office of the President*, No. 25-cv-917, 2025 WL 1502329 (D.D.C. May 27, 2025) ...........................................................42

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) .................................3, 26, 27

**Constitutional Provisions**

U.S. Const. art. I, § 4, cl. 1 .............................................................................2, 34

U.S. Const. art. II, § 1, cl. 2, 4 ..............................................................................34

U.S. Const. art. II, § 1 .........................................................................................2

U.S. Const. art. II, § 3 ......................................................................................2, 34

**Codes, Regulations, and Statutes**

2 U.S.C. § 7 .........................................................................................3, 34, 35, 40

3 U.S.C. § 1 ...................................................................................3, 34, 35, 37, 40

32 C.F.R. § 233.6(a)(1) ........................................................................................25

52 U.S.C. §§ 20301–20311 .....................................................................................3

52 U.S.C. § 20301(b)(1)-(7) ..................................................................................27

52 U.S.C. § 20301(b)(2) ..........................................................................3, 25, 26, 31

52 U.S.C. § 20301(b)(7) ...............................................................................3, 25, 32

52 U.S.C. § 20302(a)(1) .................................................................................3, 32

52 U.S.C. § 20302(a)(4) ........................................................................3, 25, 26, 31, 32

52 U.S.C. § 20302(a)(5) ......................................................................................33

52 U.S.C. § 20302(i)(1) ...........................................................................................25, 33

52 U.S.C. § 20303 ..............................................................................................................20

52 U.S.C. § 20303(b)(3) ....................................................................................................36

52 U.S.C. § 20306 ..............................................................................................................13

La. Rev. Stat. Ann. § 42:1360 .........................................................................................40

**Other Authorities**

Designation of the Secretary of Defense as the Presidential Designee Under Title I of the
    Uniformed and Overseas Citizens Absentee Voting Act,
    53 Fed. Reg. 21975 (June 8, 1988) .........................................................................25

Election Assistance Commission, "Fact Sheet: Serving UOCAVA Voters,"
    https://www.eac.gov/sites/default/files/electionofficials/UOCAVA/UOCAVA_Fact_Sheet_Fin
    al_508.pdf (April 2023) ...............................................................................................13

Exec. Order No. 14,248 (Mar. 25, 2025) ...................................................................2, 33

Federal Post Card Application, https://www.fvap.gov/uploads/fvap/forms/fpca.pdf ..................32

Federal Voting Assistance Act of 1955, Pub. L. No. 84-296, 69 Stat. 584 ....................26

H.R. Rep. No. 99-765 (1986), *as reprinted in* 1986 U.S.C.C.A.N. 2009 ..................3, 24

N.D. Legis. H.B. 1165 (2025) (eff. Aug. 1, 2025) .........................................................18

Pub. L. No. 99-410, 100 Stat. 924 ....................................................................................3

Soldier Voting Act of 1942 Pub. L. No. 77-712, 56 Stat. 753 .......................................26

*Uniformed and Overseas Citizens Absentee Voting: Hearing on H.R. 4393*, 99th Cong. 21 (Feb.
    6, 1986) (Statement of Henry Valentino, Director, Federal Voting Assistance Program)........36

## INTRODUCTION

This Court has correctly recognized that "[o]ur Constitution entrusts Congress and the States—not the President—with the authority to regulate federal elections." *League of United Latin Am. Citizens v. Exec. Off. of the President* ("*LULAC*"), 780 F. Supp. 3d 135, 155 (D.D.C. 2025). This case is about the President's attempt, in defiance of the Constitution and laws passed by Congress, to unlawfully overhaul Federal elections through an Executive Order issued on March 25, 2025.[1] *See* LULAC Plaintiffs' Statement of Undisputed Material Facts ("SUMF") ¶ 1. Together with the League Plaintiffs, LULAC Plaintiffs[2] have already briefed why Section 2(a) of the challenged Executive Order ("EO")—instructing the EAC to require documentary proof of citizenship on the Federal Form—violates the separation of powers and must be permanently enjoined. ECF 145, 182. LULAC Plaintiffs are further entitled to summary judgment as to their equitable claims regarding Sections 3(d) and 7(a).

Section 3(d) commands the Secretary of Defense to update the Federal Post Card Application ("Post Card Form") for military and overseas voters to require specified forms of documentary proof of citizenship to register or request an absentee ballot. EO § 3(d); *see also* SUMF ¶¶ 3–4. But this command is contrary to the Uniform Overseas Citizens Absentee Voting Act, and harms Plaintiff Secure Families Initiative ("SFI") and League of League of United Latin

---

[1] The complete text of the challenged Executive Order has previously been filed on the docket in this case, including at ECF 145-4.

[2] "LULAC Plaintiffs" are the League of United Latin American Citizens, Secure Families Initiative (SFI), and Arizona Students' Association. "League Plaintiffs" are the League of Women Voters Education Fund, League of Women Voters of the United States, League of Women Voters of Arizona, Hispanic Federation, National Association for the Advancement of Colored People, OCA-Asian Pacific American Advocates, and Asian and Pacific Islander American Vote. Because the present cross-motion and opposition are filed only on behalf of LULAC Plaintiffs, in this memorandum the term "Plaintiffs" refers to LULAC Plaintiffs.

American Citizens ("LULAC") and its members who are military and overseas voters, and who often rely on the Post Card Form to register and vote.

Section 7(a) seeks to prohibit States from counting "absentee or mail-in ballots received after Election Day" that were validly and timely cast in accordance with State law. EO § 7(a); *see also* SUMF ¶¶ 5. This command is *ultra vires* of the President's authority under the Constitution, harms Plaintiffs SFI and LULAC, and would disfranchise many voters, including Plaintiffs' members. This Court should grant Plaintiffs the declaratory and injunctive relief requested below with respect to these unlawful commands.

## BACKGROUND

### I.    Legal Background

#### A.  Constitutional Framework

The U.S. Constitution's Elections Clause empowers States to prescribe the "Times, Places, and Manner of holding" congressional elections. U.S. Const. art. I, § 4, cl. 1. This grant of power authorizes States to "provide a complete code for congressional elections, not only as to times and places, but in relation to notices, registration, [and] protection of voters," among other issues. *Smiley v. Holm*, 285 U.S. 355, 366 (1932). The Elections Clause simultaneously grants Congress the power to "make or alter" such election laws. U.S. Const. art. I, § 4, cl. 1. Thus, States have primary responsibility for regulation of Federal elections, "but only so far as Congress declines to pre-empt state legislative choices.'" *Arizona v. Inter Tribal Council of Arizona, Inc.* ("*ITCA*"), 570 U.S. 1, 9 (2013) (citation omitted). "The President does not feature at all" in the constitutional division of powers regarding elections. *LULAC*, 780 F. Supp. 3d at 159.

Instead, the Constitution vests the President with "executive Power" and commands him to "take Care that the Laws be faithfully executed." U.S. Const. art. II, §§ 1, 3. As the Supreme

Court has long made clear, "the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587 (1952).

### B.  The Uniform Overseas Citizens Absentee Voting Act ("UOCAVA")

In 1986, Congress passed and President Reagan signed UOCAVA. Pub. L. No. 99-410, 100 Stat. 924 (as amended, 52 U.S.C. §§ 20301–20311). UOCAVA guarantees the right "to vote by absentee ballot in general, special, primary, and runoff elections for Federal office" to three categories of voters: members of the uniformed services absent from their place of residence due to service on active duty, their spouses and dependents who are also absent due to the servicemembers' active service, and United States citizens residing overseas. 52 U.S.C. § 20302(a)(1). UOCAVA reflects Congress's longstanding determination that "protect[ing] the voting rights of all eligible citizens living, working or serving their country in uniform and overseas" is an important national interest, and that "the job of the Federal Government is to provide a mechanism so that a person can participate in elections." H.R. Rep. No. 99-765, at 5 (1986), *as reprinted in* 1986 U.S.C.C.A.N. 2009, 2012. Consistent with that purpose, UOCAVA provides for the creation of "an official post card form, containing both an absentee voter registration application and an absentee ballot application" and requires States to accept the prescribed "post card" form. 52 U.S.C. §§ 20301(b)(2), 20302(a)(4); *see also* SUMF ¶ 2. UOCAVA requires that voters using the Post Card Form verify their citizenship through attestation under penalty of perjury. 52 U.S.C. § 20301(b)(7).

### C.  Federal Election Day Statutes

Congress provided in 2 U.S.C. § 7 that "[t]he Tuesday next after the 1st Monday in November, in every even numbered year" is Election Day for Members of Congress. And 3 U.S.C.

§ 1 provides that "[t]he electors of President and Vice President" are to be "appointed" on Election Day. These statutes make no mention of enforcement by the Attorney General or anyone else, and are silent as to the mechanisms that States may adopt for the receipt of mail and absentee ballots.

## II.    Factual Background and Procedural History

### A.  LULAC Plaintiffs

**Plaintiff LULAC** is the largest and oldest Latino civil rights organization in the United States with a mission to improve the lives of Latino families and to protect their civil rights, including voting rights. SUMF ¶¶ 60–61. LULAC advances the economic conditions, educational attainment, political influence, housing, health, and civil rights of Hispanic Americans through community-based programs operating at more than 400 LULAC councils nationwide. SUMF ¶¶ 61–63.

LULAC has members who are currently serving in the military, as well as a number of veterans' councils across the country focused on protecting the rights—including voting rights—of active-duty LULAC members and veterans. SUMF ¶¶ 65–66. Many of LULAC's active-duty members rely on the Post Card Form. SUMF ¶¶ 67–68. Additionally, many LULAC members in councils across the country rely on absentee and mail voting for a variety of reasons, including that they are elderly, have a disability, or are located in rural areas. SUMF ¶¶ 75–76, 78–98. LULAC and its members are directly harmed by both Sections 3(d) and 7(a) of the EO.

**Plaintiff SFI** is a non-partisan 501(c)(4) non-profit organization that consists of military spouses and family members. SUMF ¶¶ 10, 13–14. It has five full-time staff members, two part-time staff members, and over 44,000 members. SUMF ¶ 14. The mission of SFI "is to mobilize diverse military partners, parents, children, and veterans to vote and advocate for their communities." SUMF ¶ 11. Further, "SFI believes that mobilizing its community to vote and

4

advocate is the most effective way to reshape the country's conversations around military intervention and ensure its members have a seat at the table as to decisions that affect their own lives." SUMF ¶ 12.

As such, a core part of SFI's mission is increasing turnout of the military community to close the 27% voting gap between military-connected and civilian voters. SUMF ¶ 38. SFI's members host voter registration drives using the Post Card Form, and SFI conducts educational programming for its members on all components of voting by mail, including using the Post Card Form and meeting ballot return deadlines. SUMF ¶¶ 40–50, 55. Because military service often causes SFI's members to be absent from their home jurisdiction, they are heavily reliant on mail voting, including through use of the Post Card Form. SUMF ¶¶ 16–17, 27. Military deployments also subject SFI members to mail delays and other voting challenges, making it crucial that SFI members have as much time as possible to receive and return their ballots. SUMF ¶¶ 27–30, 33–34. SFI and its members are directly harmed by both Sections 3(d) and 7(a) of the Executive Order.

### B. Procedural History

In their complaints, the LULAC Plaintiffs challenged Sections 2(a), 3(d), 4(a), and 7 of the Executive Order, the Democratic Party Plaintiffs challenged Sections 2(a), 2(b)(iii), 2(d), 4(a), 4(b), 4(c), 7(a), and 7(b), and the League Plaintiffs challenged Section 2(a).[3] This Court previously granted a preliminary injunction as to Sections 2(a) and 2(d). *See LULAC*, 780 F. Supp. 3d at 226.

The Court then entered a scheduling order providing for multi-phase summary judgment briefing. ECF 141. At phase one, all plaintiffs moved for summary judgment as to Section 2(a). ECF 145; ECF 146. Those motions will resolve Count One of the LULAC Plaintiffs' Complaint.

---

[3] *See* Compl., *LULAC*, No. 1:25-cv-00946 (D.D.C. Mar. 31, 2025), ECF 1; Compl., *League of Women Voters Educ. Fund v. Trump*, No. 1:25-cv-00955 (D.D.C. Apr. 1, 2025); Compl., *Democratic Nat'l Comm. v. Trump*, No. 1:25-cv-00952 (D.D.C. Mar. 31, 2025).

This filing concerns phase two. Defendants and the Republican National Committee ("RNC") as Defendant-Intervenor have filed motions for summary judgment as to other provisions of the EO at issue. ECF 176; ECF 177. The RNC has moved for summary judgment solely as to claims challenging Sections 2(d) and 7(a). ECF 176. Defendants have moved for summary judgment as to all challenged EO sections. ECF 177-1. For the reasons below, the LULAC Plaintiffs are entitled to summary judgment on Counts Three and Four of their complaint, which challenge Sections 3(d) and 7(a) of the Executive Order.[4]

## ARGUMENT

## I.    LULAC Plaintiffs Have Standing to Challenge Sections 3(d) and 7(a) of the Executive Order and Their Claims are Ripe

### A.  Legal Standard

To establish standing, Plaintiffs must demonstrate that they have suffered an "injury in fact" that is "fairly . . . trace[able] to the challenged action of the defendant" and is "likely" to be "redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–561 (1992) (internal citations omitted). Organizations may establish standing to sue in their own right as well as associational standing on behalf of their members. "[T]he presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." *Rumsfeld v. F. for Acad. and Institutional Rts., Inc.*, 547 U.S. 47, 52 n.2 (2006).

---

[4] Count Two of LULAC Plaintiffs' complaint challenges the *ultra vires* directives in Sections 4(a) and 7(b) to the EAC to withhold funds from the States. Because successful resolution of Plaintiffs' challenges to Sections 2(a) and 7(a) will remedy the harms to LULAC Plaintiffs that Count Two addresses, Plaintiffs do not move on or separately press this claim. Counts Five and Six of LULAC Plaintiffs' complaint raise APA claims. Plaintiffs agree that there has been no final agency action as to these claims, but ask that they be held in abeyance until final judgment has been entered as to Plaintiffs' equitable claims.

### 1. Organizational Standing

"To have standing 'in its own right,' an organization must make 'the same showing required of individuals: an actual or threatened injury in fact that is fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by a favorable court decision.'" *LULAC*, 780 F. Supp. 3d at 179 (quoting *Am. Anti-Vivisection Soc'y v. U.S. Dep't of Agric.*, 946 F.3d 615, 618 (D.C. Cir. 2020)). To establish organizational standing, an organization must do more than demonstrate "simply a setback to [its] abstract social interests." *Food and Drug Admin. v. All. for Hippocratic Med.* ("*AHM*"), 602 U.S. 367, 394 (2024) (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)). But the Supreme Court has reaffirmed that interference with an organization's "core business activities" is a constitutionally cognizable injury. *Id.* at 395; *see also League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016) ("new obstacles" that "unquestionably make it more difficult for [plaintiffs] to accomplish their primary mission of registering voters" constitute Article III injury); *Equal Rts. Ctr. v. Post Props., Inc*., 633 F.3d 1136, 1140–41 & n.4 (D.C. Cir. 2011) (standing established where "diversion of resources to programs designed to counteract the injury," including "increased educational and counseling efforts"); *Travelers United, Inc. v. Hyatt Hotels Corp.*, 761 F. Supp. 3d 97, 117 (D.D.C. 2025) (standing established where defendants' "conduct prompted the plaintiff organizations to divert resources toward providing additional direct services designed to offset the harmful effects of the challenged conduct") (emphasis omitted).

### 2. Associational Standing

A membership organization may establish associational standing by demonstrating that "(a) its members would otherwise have standing to sue in their own right; (b) the interests [the organization] seeks to protect are germane to the organization's purpose; and (c) neither the claim

asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). Of course, "the primary reason people join an organization is often to create an effective vehicle for vindicating interests that they share with others." *Int'l Union, United Auto., Aerospace and Agric. Implement Workers of Am. v. Brock*, 477 U.S. 274, 290 (1986).

Members may establish standing to sue in their own right where they meet the *Lujan* test. *See Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588, 596 (D.C. Cir. 2015). To do so, organizations may "produc[e] declarations from individual members setting forth the facts that establish their standing," or organizational leaders may "describ[e] their organizations' membership in sufficient detail to support a finding of standing." *LULAC*, 780 F. Supp. 3d at 181 (citations omitted). Membership organizations need not name individual members where "the opposing parties did not 'need to know the identity of a particular member to respond to [the organization]'s claim of injury.'" *Id.* (quoting *Mi Familia Vota v. Fontes*, 129 F.4th 691, 709 (9th Cir. 2025)).

The second prong, germaneness, is an "undemanding" inquiry that mandates only "mere pertinence between litigation subject and organizational purpose." *Humane Soc'y of the U.S. v. Hodel*, 840 F.2d 45, 58 (D.C. Cir. 1988). The third prong is satisfied and "[m]ember participation is not required where a 'suit raises a pure question of law' and neither the claims pursued nor the relief sought require the consideration of the individual circumstances of any aggrieved member of the organization." *Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588, 597 (D.C. Cir. 2015) (citation omitted).

**B.  Plaintiffs Have Standing and a Ripe Claim Challenging Section 3(d)**

Plaintiffs have associational and organizational standing to challenge Section 3(d), and this claim presents no justiciability issues.

### 1.  Plaintiffs Have Organizational Standing

LULAC and SFI have standing to challenge Section 3(d) of the Executive Order because the Order's documentary proof of citizenship and proof of eligibility mandate interfere with the organizations' "core business [activity]," *AHM*, 602 U.S. at 395, of assisting voters using the Post Card Form. SUMF ¶¶ 39, 42, 44–49, 72–73; *see also Newby*, 838 F.3d at 9 (interference with organizational mission of "registering voters" is constitutional injury). Both LULAC and SFI have already diverted, and will continue to divert resources from other areas of work to respond to Section 3(d), including by revamping training and educational resources and addressing member concerns and questions about Section 3(d) of the Executive Order. SUMF ¶¶ 50–54, 56–59, 74, 102–03, 105, 107.

Section 3(d) directly interferes with LULAC's mission of ensuring its members are able to vote because it will lead to fewer of LULAC's members being able to register and request a ballot using the Post Card Form. SUMF ¶¶ 68–71. LULAC also offers training and educational programs to its military members that promote the use of the Post Card Form. SUMF ¶¶ 66, 72–73. LULAC state-based councils and veterans' councils promote the Post Card Form among their membership and attendees at LULAC events. SUMF ¶¶ 66, 73. LULAC has already spent time and resources educating its members about the Executive Order's documentary proof of citizenship requirement for the Post Card Form and will continue to expend more resources revising training materials, programs, and resources and educating its members and veterans councils about these requirements if the Executive Order is implemented. SUMF ¶¶ 102–03, 105, 107. LULAC has

also expended significant staff and volunteer time addressing questions from LULAC councils about the Post Card Form's documentary proof of citizenship requirement. SUMF ¶ 74. The resources LULAC has spent and will continue to spend responding to Section 3(d) of the Executive Order detract from LULAC's other work, including in the areas of immigration. SUMF ¶¶ 64, 101.

SFI has organizational standing to challenge Section 3(d) because its core mission is to promote voter registration and participation among the military community, including through voter education and registration events hosted by its trained Voting Ambassadors, in order to close the voter participation gap between military and civilian communities. SUMF ¶¶ 11–12, 38–44. SFI regularly promotes and facilitates the use of the Post Card Form during these events. SUMF ¶¶ 45–49. Like the documentary proof of citizenship requirement in *Newby*, 838 F.3d at 9, Section 3(d) threatens SFI's core voter registration and voter engagement mission. SFI would be unable to assist prospective voters without qualifying documentary proof of citizenship in using the Post Card Form to register to vote or request an absentee ballot or would need to provide additional guidance to help prospective voters obtain the required documentation, likely resulting in fewer of its members registering to vote. SUMF ¶¶ 52, 59.

SFI will also have to divert substantial resources to updating its training program, educational materials, and other resources to assist voters—both during voter registration events and in other contexts—in navigating new, complex requirements to use the Post Card Form. SUMF ¶¶ 51–54, 56–59. SFI has already expended, and if the Executive Order is implemented, will continue to expend, resources to educate its members and constituents about new voting requirements to further its mission of closing the military and civilian voting gap. SUMF ¶¶ 37, 50–54, 56–59. This includes direct assistance that SFI Voting Ambassadors provide to prospective voters in their military networks. SUMF ¶¶ 37, 52, 57–58.

As such, Section 3(d) of the Executive Order will directly impair Plaintiffs' core mission of registering voters in the military community and will force them to divert resources from other programming to educate their members and constituents about burdensome changes to the voting process. SUMF ¶¶ 37, 50–54, 56–59, 74, 102–03, 105, 107. Plaintiffs are thus not merely "expending money to gather information and advocate against the defendant's action," *AHM*, 602 U.S. at 394, but are instead "challeng[ing] practices that directly interfere with their core activities, such as direct services program," *League of United Latin Am. Citizens*, 780 F. Supp. 3d at 180 (citing *AHM*, 602 U.S. at 394–96); *see also Republican Nat'l Comm. v. N. Carolina State Bd. of Elections*, 120 F.4th 390, 397 (4th Cir. 2024) (standing sufficiently alleged for political parties whose "core mission" was "to counsel voters"); *Equal Rts. Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1141–42 & n.4 (D.C. Cir. 2011)).

Contrary to Defendants' arguments, this harm is not "hypothetical" or "speculative," ECF 177-1 at 18. Plaintiffs have already diverted substantial resources from other planned activities to educate their membership and constituents about how the Executive Order's mandated changes to the Post Card Form will impact UOCAVA voters. SUMF ¶¶ 50, 57–59, 74, 105. Moreover, there is also "no mystery" as to what forms of DPOC Section 3(d) requires and the accompanying burdens that this requirement will impose. *See LULAC*, 780 F. Supp. 3d at 184; *see also* ECF 145-2 (Nonpartisan Plaintiffs' SUMF ¶¶ 32, 37–41, 61, 66, 71, 78-86). In addition, these injuries are clearly traceable to the Executive Order and would be remedied by an injunction against the officials responsible for its implementation. Plaintiffs have organizational standing.

## 2. Plaintiffs Have Associational Standing

Both LULAC and SFI have associational standing to sue on behalf of their members because each organization has members who rely on the Post Card Form and would be burdened and potentially disenfranchised by Section 3(d)'s requirements. SUMF ¶¶ 17–26, 62, 67–71.

LULAC has active-duty members, including those who may be deployed on short notice during election season and who rely on the Post Card Form to register to vote and request absentee ballots. SUMF ¶¶ 68, 70–71. LULAC also has more than 500 members residing overseas, including more than 200 members who use military postal codes. SUMF ¶ 67. Even if they do possess required documentation, these members would likely lack access to documentary proof of citizenship when deployed and would face significant difficulty submitting documentation alongside the Post Card Form, if they are able to do so at all. SUMF ¶ 70–71, 106.

Similarly, SFI has members who have regularly used the Post Card Form and plan to do so in the future. SUMF ¶ 17. This includes members who do not possess documentary proof of citizenship or would have difficulty accessing and providing such documentation alongside the Post Card Form. SUMF ¶¶ 18–23, 26.[5] Moreover, SFI members will need to comply with this requirement *each* time they use the Post Card Form, which they must do each time they move or, in many states, at least once a year to stay current on their registration. SUMF ¶ 24. Contrary to Defendants' characterization, this is not "speculation about how the EO will be enforced." ECF 177-1 at 18. This is a feature of federal and state law that the Executive Branch does not have the

---

[5] Because the declaration from SFI's Co-Acting Executive Director describes SFI's "membership in sufficient detail to support a finding of standing," *LULAC*, 780 F. Supp. 3d at 181, including with descriptions of the experiences of individual members, SFI need not identify such members by name. *See Mi Familia Vota v. Fontes*, 129 F.4th 691, 709 (9th Cir. 2025) (organization not required to identify individual members where "the opposing parties did not 'need to know the identity of a particular member to respond to [the organization]'s claim of injury'").

power to change.[6] *See* SUMF ¶ 24. And UOCAVA voters, including SFI members, frequently move between elections and therefore need to resubmit the Post Card Form each time they do so. SUMF ¶¶ 16, 21, 24. SFI's many members who use the Post Card Form will unquestionably be substantially burdened by Section 3(d)'s requirements, if not disenfranchised entirely.

And whether or not Plaintiffs' members are ultimately able to comply with the Executive Order's mandate, the burdens inherent in the need to produce one of the specified forms of documentation to register to vote and request an absentee ballot is sufficient to confer a constitutional injury. *See, e.g.*, *Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1351–52 (11th Cir. 2009); *Frank v. Walker*, 17 F. Supp. 3d 837, 866 (E.D. Wis. 2014), *rev'd on other grounds*, 768 F.3d 744 (7th Cir. 2014), *cert. denied*, 135 S. Ct. 1551 (2015) ("[T]he part of [the law] that the plaintiffs challenge is the provision requiring a voter to *present* a photo ID at the polls. It is the need to present such an ID that injures a voter and confers standing to sue."). This is because "[a] plaintiff need not have the franchise wholly denied to suffer injury. Any concrete, particularized, non-hypothetical injury to a legally protected interest is sufficient." *Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F.3d 1349, 1352 (11th Cir. 2005). When implemented, Section 3(d) will require Plaintiffs' members to obtain, locate, and find a way to submit additional documentation with their voter registration applications and absentee ballot requests. Defendants do not dispute that Plaintiffs' members' injuries are also clearly traceable to Defendants and likely

---

[6] *See* 52 U.S.C. § 20306 (prohibiting states from rejecting post card applications received "during a year" prior to the earliest date non-UOCAVA voters may submit an application); Election Assistance Commission, "Fact Sheet: Serving UOCAVA Voters," https://www.eac.gov/sites/default/files/electionofficials/UOCAVA/UOCAVA_Fact_Sheet_Final_508.pdf (April 2023) ("The [Post Card Form] serves as a ballot request during the calendar year in which it was received at a minimum but may be valid longer depending on state law.").

to be remedied by an injunction against Executive officials responsible for implementing the Executive Order. This is a clear injury-in-fact.

Plaintiffs easily satisfy the final two elements of the associational standing inquiry, and Defendants do not argue otherwise. LULAC's mission includes protecting and advancing the voting rights of its members, including those who are serving in the military. SUMF ¶¶ 61, 65–66. Similarly, SFI's mission is to promote political engagement among the military community and mobilize military families to vote. SUMF ¶¶ 11–12. In challenging Section 3(d) of the Executive Order, LULAC and SFI seek to protect the ability of its members to register to vote and cast a ballot. This is more than sufficient to satisfy the "undemanding" germaneness inquiry. *Humane Soc. of the U.S.*, 840 F.2d at 58. Finally, the lawsuit does not require the participation of individual members because only pure questions of law are at issue and "neither the claims pursued nor the relief sought require the consideration of the individual circumstances of any aggrieved member of the organization." *Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588, 597 (D.C. Cir. 2015). SFI has associational standing to challenge Section 3(d).

### 3. Plaintiffs' Claim is Ripe and Not Speculative

Defendants also make a generalized argument that Plaintiffs' injuries from Section 3(d) are not sufficiently "imminent" to confer standing. ECF 177-1 at 17. Defendants rest this argument on two points: (1) the Post Card Form has yet to be updated, and (2) "there are no facts to suggest what proof of eligibility might suffice, or how a UOCAVA voter might obtain such proof." ECF 177-1 at 17. Neither argument holds water.

First, it does not matter that changes to the Post Card Form in accordance with the Executive Order are not complete. Section 3(d) directs unambiguous action. It states that the "Secretary of Defense shall update the Federal Post Card Application" to require specified documentary proof of citizenship. Because it "dictates a particular outcome and leaves no

14

uncertainty," Plaintiffs' claim presents no imminence problems. *LULAC*, 780 F. Supp. 3d at 185; s*ee also Newby*, 838 F.3d at 9 ("Damocles's sword does not have to actually fall . . . before the court will issue an injunction.").[7]

Second, Defendants miss the point in asserting that "Plaintiffs (and the Court) can only speculate about whether the [proof of eligibility] requirement would violate UOCAVA." ECF 177-1 at 17. But Plaintiffs' claim centers not on the proof of eligibility requirement, but on the documentary proof of citizenship requirement in Section 3(d). To be sure, if the eligibility requirement were implemented in such a way as to require extrinsic documentation, it too would violate UOCAVA as a result of nullifying the singular post card requirement for use in all U.S. states and territories.[8] But the crux of Plaintiffs' claim is that requiring documentary proof of citizenship is, by itself, contrary to UOCAVA and unlawful.

Furthermore, Defendants do not suggest that there is any uncertainty surrounding Plaintiffs' challenge to Section 3(d)'s documentary proof of citizenship mandate. They implicitly concede that Section 3(d) means what it says—that UOCAVA voters who wish to use the Post Card Form will be required to provide documentary proof of citizenship. Plaintiffs' claim is ripe.

---

[7] Moreover, Defendants' Statement of Undisputed Material Facts states: "The Department of Defense *has not completed* the process for updating the Federal Post Card Form pursuant to section 3(d) of the Executive Order." ECF 177-2 ¶ 5 (emphasis added). Despite their obfuscation in response to Plaintiffs' interrogatories, *see* ECF 177-3 at 17-18, Defendants therefore make clear that they have indeed started, if not yet completed, updating the Post Card Form. Defendants are unable to complete such updates only because, as a result of a suit brought by a number of States, they have been preliminarily enjoined from doing so. *See California v. Trump*, No. 25-CV-10810-DJC, 2025 WL 1667949 (D. Mass. June 13, 2025). But issuance of that preliminary injunction does not defeat ripeness here.

[8] State-specific requirements for the submission of additional information or documentation in conjunction with the Post Card Form only affect a voter's ability to obtain that state's ballot for state elections, and do not impact the voter's ability to obtain a federal election ballot using the standard Post Card Form. *California v. Trump*, 1:25-cv-10810-DJC, 2025 WL 1667949, at *10 n.7.

### C. Plaintiffs Have Standing and a Ripe Claim Challenging Section 7(a)

Section 7(a) directs the Attorney General to "enforce" an Election Day ballot return deadline, which may also include overriding State ballot "cure" periods. *See* SUMF ¶ 8. At least 14 States and the District of Columbia accept ballots received after Election Day. SUMF ¶ 6. At least 24 States and the District of Columbia also currently allow some form of post-Election Day cure. SUMF ¶ 7. But the impact of Section 7(a) is hardly limited to the States alone. LULAC and SFI have standing to challenge Section 7(a) based on injuries that it inflicts on both their members and their organizations.

#### 1. Plaintiffs Have Organizational Standing

LULAC and SFI have organizational standing to challenge Section 7(a) because it imposes "[n]ew obstacles" that "make it more difficult for [plaintiffs] to accomplish their primary mission." *Newby*, 838 F.3d at 9. Section 7(a) has already forced, and will continue to force, the organizations to divert resources toward providing additional direct services designed to offset the harmful effects of the challenged conduct. *LULAC*, 780 F. Supp. 3d at 180 (citing *Fair Emp. Council of Greater Wash., Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268, 1277 (D.C. Cir. 1994)).

Many LULAC and SFI members depend on post-Election Day ballot return deadlines. *See* SUMF ¶¶ 27–36, 75–81. A core part of LULAC's mission and its activities is geared toward ensuring its members—including domestic military personnel, the elderly, persons with disabilities, and students living in states that accept mail ballots after Election Day and permit post-Election Day cures—can successfully vote by mail in their home states. *See* SUMF ¶¶ 64–66. Similarly, SFI's core mission and activities include ensuring that its members and military-connected voters are able to successfully vote by mail and have that vote counted in order to bridge the turnout gap between military and civilian communities. SUMF ¶¶ 11, 38–43. Plaintiffs are

16

injured by Section 7(a) of the Executive Order because it will interfere with each organization's work to ensure that its members' votes are counted. *See Newby*, 838 F.3d at 9.

LULAC and SFI have already diverted resources to ameliorate this injury and will continue to do so if the Executive Order is implemented. LULAC actively educates its members and constituents about voting by mail and LULAC would have to expend considerable resources tracking potential changes to states' mail-in ballot windows and change its educational materials if Section 7(a) was enforced. SUMF ¶ 108. The same is true of SFI. SFI's get-out-the-vote programming, published materials, and other voter education activities, including its training for Voting Ambassadors and the guidance that these Ambassadors provide to voters, all emphasize options for SFI members and their military networks to vote by mail in accordance with State law and provide guidance on how to do so. SUMF ¶ 38–46.

After the issuance of the Executive Order, LULAC and SFI began educating their respective members about its provisions, including Section 7(a), which would prevent mail ballots received after Election Day from being counted and possibly cured. SUMF ¶¶ 50, 105. As ballot return deadlines change because of Section 7(a), LULAC will be forced to update its programs and resources to explain the difference between state law and the Executive Order's mandate. SUMF ¶¶ 101–02, 104. Similarly, SFI educates its members and its military constituency through non-partisan get-out-the-vote efforts in all elections, not just in years with significant federal elections. SUMF ¶ 39–43. SFI has already been educating its membership about the potential impacts of the Executive Order's purported change in the ballot return deadline, and if Section 7(a) were in force, SFI would need to further update its programs and resources, including its training for Voting Ambassadors, to explain the discrepancy between the Executive Order and existing state ballot return laws. SUMF ¶¶ 50, 53, 55. This would force SFI to divert its resources from the other

ways it supports the safety and wellbeing of military families and advocates for them to have a voice in our democracy. SUMF ¶¶ 56–59.

The burden that 7(a) imposes on Plaintiffs is therefore "far more than simply a setback to [their] abstract social interests." *See AHM*, 602 U.S. at 394 (quoting *Havens*, 455 U.S. at 379). Instead, it is a direct impediment to one of the organizations' "core business activities"—helping their members and constituents to vote by mail and helping cure ballot errors in accordance with state law.

Additionally, as a result of the President directing the Attorney General to "enforce" an Election Day ballot receipt deadline, LULAC and SFI have been fielding urgent questions from members about how changes to mail ballot return deadlines will impact their ability to vote, underscoring widespread uncertainty and concern among those who rely most on these protections. SUMF ¶¶ 37, 74. To address these questions, the organizations have had to divert precious staff time and resources away from other core projects. SUMF ¶¶ 37, 74.

### 2. Plaintiffs Have Associational Standing

LULAC and SFI have standing on behalf of their members because many of their members vote by mail in the 14 states and the District of Columbia that accept absentee ballots after Election Day. SUMF ¶¶ 15, 27–28, 75–76, 78.

Section 7(a) of the Executive Order is already causing real harm and threatens further harm to Plaintiffs. Following the March 25, 2025, issuance of the Executive Order, North Dakota changed its mail-in ballot deadline to eliminate the receipt window for ballots postmarked before Election Day but received afterward. N.D. Legis. H.B. 1165 (2025) (eff. Aug. 1, 2025); *see also* SUMF ¶ 9. This directly harms LULAC and SFI members in North Dakota who vote by mail. SUMF ¶¶ 15, 28, 80–81.

Many LULAC and SFI members depend on the ballot receipt window due to their circumstances that make efficient ballot receipt and return challenging. *See* SUMF ¶¶ 27, 30, 34, 77, 79. If other states change their laws in response to the EO as North Dakota did, SFI and LULAC members risk disenfranchisement or hardship. *See* SUMF ¶ 59, 106. Many LULAC members live in rural areas where mail drop-off and pick-up are unreliable—thus these members receive their mail-in ballots closer to Election Day and are left with no choice but to mail their ballots a day or two before Election Day. SUMF ¶¶ 87–88. And some LULAC members who are elderly or have disabilities must rely on others to mail their absentee ballots, meaning these ballots are often mailed very close to Election Day and may arrive after Election Day as a result. SUMF ¶¶ 82–86. LULAC has student members who are registered to vote in their home counties far from their universities, who often receive their mail ballots close to Election Day due to unreliable dorm mail service, and must quickly mail those ballots back home—relying on post-Election Day ballot return deadlines to ensure their votes are counted. SUMF ¶¶ 93–95. These LULAC members would all have standing to sue in their own right.

Furthermore, the nature of military service means that SFI members are heavily reliant on absentee voting and often experience routine mail delivery delays and challenges both receiving absentee ballots and returning them on time to vote in federal elections. SUMF ¶¶ 27, 29–30, 34. According to the Federal Voting Assistance Program, the most common reason UOCAVA ballots are rejected is that they are received after the deadline. SUMF ¶ 36. SFI members frequently experience challenges returning their ballots on time. SUMF ¶¶ 36, 29–30, 33–35. SFI members are military dependents, and they are often absent from their place of residency to accommodate the deployments of their family members. These SFI members do not have in-person ballot return options and generally must mail their ballots to their state of residence. SUMF ¶ 27. ("While some

states allow email or online portal return of absentee ballots, these states do not include many states that are the top states for military recruitment with large numbers of SFI members, including California, Texas, Florida, Georgia, and New York.") SFI members—particularly those located outside of the United States—must mail their ballots far in advance of when voters located in the United States would typically need to do so in order to meet the state ballot return deadline. SUMF ¶ 30. This poses challenges to SFI members, who are already frequently burdened or disenfranchised by mail delivery issues. *See* SUMF ¶¶ 29, 34.

SFI members stationed abroad often face difficulty returning their ballots on time, and this challenge is even more acute for SFI members who are forced to use the Federal Write-in Absentee Ballot (FWAB). The FWAB allows UOCAVA voters located outside of the United States to vote in federal races if they do not receive their absentee ballots. 52 U.S.C. § 20303; *see also* SUMF ¶ 31. The FWAB is an option of last resort, and SFI members who make use of it are inherently submitting their ballot closer to Election Day than intended because they did not receive their full absentee ballot. SUMF ¶ 32. Given that it can take weeks for mail from abroad to reach the United States, these members benefit from having as much time as possible to have their ballot received by their election official. SUMF ¶ 33. Using the FWAB already presents logistical challenges to SFI members, and eliminating extended ballot return deadlines in states in which large numbers of SFI members vote would cause further hardship and potential disenfranchisement to those members. *See* SUMF ¶ 33.

SFI members who reside in a different state than which they are registered to vote within the United States also face challenges unique to UOCAVA voters, including frequent moves and remote deployments. SUMF ¶ 34 (describing experience of SFI member stationed at a military installation in Hawaii whose absentee ballot was never delivered). SFI members already incur

significant personal expense to attempt to return their ballots on time, and they will be forced to incur even more as a result of the Executive Order's ballot return deadline provisions. SUMF ¶ 35. Similarly, LULAC's domestic military members are deployed at a moment's notice such that many are forced to send their mail-in ballots at the last minute and must rely on their state's extended ballot receipt period. SUMF ¶¶ 89–92. Moreover, to the extent that Section 7(a) is applied to prohibit ballot cure periods, LULAC and SFI members whose ballots are rejected due to minor errors are at risk of disenfranchisement. SUMF ¶¶ 36, 98–100.

Lastly, LULAC and SFI Plaintiffs meet the second and third requirements of associational standing. LULAC's mission is to advance the civil rights, voting rights, educational attainment, and political influence of Hispanic Americans through community-based programs. SUMF ¶ 61. The declarations of LULAC members demonstrate that the subject of the litigation furthers the organizational mission of vindicating the right to vote for the organizations' members and constituencies. *See* SUMF ¶¶ 83–97. SFI's mission is to close the turnout gap between military and civilian populations. SUMF ¶¶ 38. The subject of this litigation—protecting the ability of its members to cast ballots that will be counted—is clearly germane to both organizations' purposes. And Plaintiffs satisfy the third and final prong of associational standing because they "can litigate this case without the participation of those individual claimants and still ensure that 'the remedy, if granted, will inure to the benefit of those members of the association actually injured[.]'" *Brock*, 477 U.S. at 288 (citation omitted).

### 3. Plaintiffs Have a Ripe Claim and Defendants' Other Attempts to Undermine Plaintiffs Standing Fail

Defendants' arguments that Plaintiffs do not have standing as to Section 7(a) can be easily dispatched. They contend that how the Attorney General will act to enforce Section 7(a) and against whom it will be enforced is "entirely speculative," that such enforcement may not harm

Plaintiffs, that enforcement decisions are not properly the subject of judicial review, and that the Attorney General has lawful options (such as merely sending letters to States urging the President's interpretation of the law) for "enforcement" of Section 7(a).

To start, there is nothing "speculative" about Section 7(a)'s mandate—it sets forth a rule (ballots received after Election Day are invalid) and instructs the Attorney General to enforce it. Nor must Plaintiffs wait for actual enforcement proceedings for them to suffer Article III injury. The announcement of the rule itself in Section 7(a)—with the threat of enforcement action—is causing cognizable harm. This is all the more so when the government has not in fact limited itself to arguably lawful means of "enforcement" but has stated that criminal enforcement of Section 7(a)'s dictate is a possible option. Counsel for Defendants represented to this Court that "[a]ny number of actions, including criminal actions" are a plausible step for the Attorney General to take. Tr. of Apr. 17, 2025 Mot. Hr'g, ECF 100 at 87.

Fundamentally, Defendants' "enforcement discretion" arguments, ECF 177-1 at 22–23, confuse the issue. Plaintiffs are not challenging any enforcement decision which the Attorney General has yet to make. Plaintiffs are challenging the President's assertion that he has the power to override state ballot receipt deadlines, and his assertion that the Attorney General can enforce federal statutes which neither set a nationwide ballot receipt deadline nor contain any enforcement mechanism.

Separate from their "enforcement discretion" arguments, Defendants point to *Trump v. New York*, 592 U.S. 125 (2020), arguing that LULAC Plaintiffs lack standing because any harm is speculative until the Attorney General actually implements the Order. ECF 177-1 at 22–23. But *Trump v. New York* is distinguishable because there the presidential memorandum only directed the Commerce Secretary to "gather information" that would later allow the President to set a policy

that excluded undocumented individuals from the total census apportionment. 592 U.S. at 131. Pursuant to the memorandum, the Census Bureau was to prepare its standard tabulation of total population for each state, as required for apportionment, but also provide the additional information that excluded undocumented individuals. *Id.* at 130. Based on this, the Supreme Court concluded that the plaintiffs lacked standing and the case was not ripe*. Id.* at 134.

Unlike *Trump v. New York*, where the President's potential use of data from the Commerce Secretary was uncertain, Section 7(a) sets forth a much clearer situation. Here, the President has attempted to dictate that federal law prohibits accepting mail-in ballots after Election Day, and the EO—across multiple sections—specifically grants the Executive the authority to target states that do not follow this directive. The EO thus places States on clear notice that refusing to comply with the President's interpretation will likely result in adverse consequences, a fact that was not present in *Trump v. New York*. Indeed, counsel for Defendants has stated that criminal enforcement is possible.

The foreseeable impacts on Plaintiffs here are not speculative. Courts have recognized that foreseeable downstream harms to parties that are not directly targeted in an enforcement action, but nevertheless are harmed, can be redressed. In *Department of Commerce v. New York*, 588 U.S. 752 (2019), the Supreme Court held that the plaintiffs—cities, states, and organizations—had standing to challenge the decision to add a citizenship question to the census, even though any injury depended on third parties independently deciding not to respond out of fear their answers could be used against them by the government. *Id*. at 764–65. The Court reasoned that the plaintiffs, who were not themselves subjected to the citizenship question, had standing because the government's actions had predictable, as opposed to speculative, effects. Just as in *Department of Commerce*, States here are the intermediate actors which, due to federal government action, will

adversely impact Plaintiffs. North Dakota has already acted in direct response to the Executive Order by changing its laws in response to the Executive Order. In sum, "the Article III standing and ripeness issues in this case boil down to the same question"—whether Plaintiffs must wait for actual enforcement before challenging an action that is certain to occur. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 n.5 (2014) (internal citation omitted); *see also LULAC*, 780 F. Supp. 3d at 173. Precedent makes clear that the answer is "no." *See Consol. Coal Co. v. Fed. Mine Safety & Health Rev. Comm'n*, 824 F. 2d 1071, 1081 (D.C. Cir. 1987) (for ripeness inquiry, "[i]t is enough that the petitioner show that it has suffered sufficient hardship to pass the Article III threshold"). For all the reasons above, Plaintiffs have standing to challenge Section 7(a).

## II.    Plaintiffs Are Entitled to Summary Judgment on Their Claim that Section 3(d) Violates UOCAVA (Count Four).

Congress enacted UOCAVA "to protect the voting rights of military members, their families, and other United States citizens living overseas." *United States v. Alabama*, 998 F. Supp. 2d 1283, 1286 (M.D. Ala. 2014), *aff'd*, 778 F.3d 926 (11th Cir. 2015). The purpose of UOCAVA is "to facilitate absentee voting by United States citizens, both military and civilian, who are overseas." H.R. Rep. No. 99-765, at 5 (1986). In passing UOCAVA, "Congress unequivocally committed to eliminating procedural roadblocks, which historically prevented thousands of service members from sharing in the most basic of democratic rights." *Alabama*, 778 F.3d at 928.

The Post Card Form is an essential component of the scheme Congress created to eliminate the legal and administrative barriers that "discourage[d] or confuse[d] overseas citizens" from voting in federal elections. H.R. Rep. No. 99-765, at 9 (1986). UOCAVA requires the President's

designee—currently the Secretary of Defense[9]—to "prescribe an official post card form," that "contain[s] both an absentee voter registration application and an absentee ballot application." 52 U.S.C. § 20301(b)(2). States are required to use the Post Card Form as a simultaneous application to register to vote and receive an absentee ballot. 52 U.S.C. § 20302(a)(4).

## A.  Section 3(d)'s Documentary Proof of Citizenship Requirement Violates UOCAVA

Section 3(d) is contrary to UOCAVA for at least three related reasons.

*First*, in passing UOCAVA, Congress expressly addressed how the Post Card Form must verify applicant eligibility, including citizenship, for federal elections. Like the Federal Form created by the NVRA, the Post Card Form requires applicants to attest to their citizenship on the form with a "standard oath," signed under penalty of perjury, that information entered on the Form is accurate. 52 U.S.C. § 20301(b)(7). As with the Federal Form, Congress also prohibited States from rejecting a duly submitted Post Card Form based on a lack of notarization. *Id.* § 20302(i)(1). Congress made deliberate choices regarding the verification of citizenship and eligibility in crafting UOCAVA. Neither the President nor his designee is free to disregard the choices enacted by Congress and instead mandate different and more onerous requirements.

*Second*, Section 3(d) is contrary to UOCAVA because inclusion of documentary proof of citizenship and eligibility requirements would render the Post Card Form unusable. Congress's efforts to make voter registration and ballot requests simple and straightforward for military voters have consistently focused on eliminating onerous paperwork and notarization requirements since

---

[9] *See* Designation of the Secretary of Defense as the Presidential Designee Under Title I of the Uniformed and Overseas Citizens Absentee Voting Act, 53 Fed. Reg. 21975 (June 8, 1988). The Secretary of Defense has delegated the power to create the post card to the Federal Voting Assistance Program, a component of the Department of Defense under the purview of the Under Secretary of Defense, Personnel, and Readiness. 32 C.F.R. § 233.6(a)(1).

the 1940s.[10] The text of UOCAVA mandates that the Post Card Form actually must be a post card. 52 U.S.C. § 20302(a)(4). This format of the Post Card Form is both a substantive requirement mandated by the plain language of the statute and is essential to fulfilling Congress's purposes in enacting UOCAVA. By specifically requiring a post card, Congress necessarily precluded a requirement to append additional documentation beyond the four corners of the Post Card Form. The President's directive renders the Post Card Form prescribed by Congress inoperable, because it no longer allows a post card, standing alone, to be used by military and overseas voters.

Section 3(d) is thus an unlawful attempt by the President to rewrite and defy UOCAVA's requirements. The President has no power to override or amend Congress's exercise of its constitutional authority to regulate federal elections. *Clinton v. City of New York*, 524 U.S. 417, 438 (1998) ("There is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes."); *see also Youngstown*, 343 U.S. at 587. But that is exactly what Section 3(d) does by directing the President's designee to eliminate the standalone Post Card Form and replace it with a new set of documentary requirements for military and overseas voters.

*Third*, the instructions that the President has given to his designee in Section 3(d)—*i.e.*, the instructions to the Secretary of Defense—are contrary to the narrow and specifically-defined role that Congress enacted for the UOCAVA designee. Again, the text of UOCAVA requires the Secretary of Defense, as the President's designee, to "prescribe an official post card form," that contains "both an absentee voter registration application and an absentee ballot application." 52 U.S.C. § 20301(b)(2). The text of UOCAVA does not give the designee authority to determine whether or not to provide a post card at all—that the Post Card Form must literally be a post card

---

[10] *See, e.g.*, Soldier Voting Act of 1942 Pub. L. No. 77-712, 56 Stat. 753; Federal Voting Assistance Act of 1955, Pub. L. No. 84-296, 69 Stat. 584.

has already been decided and prescribed by Congress. Indeed, Congress limited the scope of the designee's authority to specific duties that include consulting with State and local election officials, designing the absentee ballot mailing envelopes, providing descriptive material on the States' absentee voting procedures, including the dates of elections, and prescribing a standard oath. 52 U.S.C. § 20301(b)(1)-(7). The fact that Congress granted the President the authority to select a designee to carry out a narrowly defined set of responsibilities does not give either the President or his designee any authority to void other requirements enacted by Congress. And Congress plainly did not give the President or his designee the authority to decide whether or not to issue a post card application. To the contrary, Congress already made that choice and the President may not unilaterally invalidate it through issuance of an Executive Order.

### B.    Plaintiffs Have an Equitable Cause of Action to Challenge and Enjoin Implementation of Section 3(d)

The President's power "to issue the [Executive O]rder must stem either from an act of Congress or from the Constitution itself." *Youngstown*, 343 U.S. at 585. As this Court has already recognized, "[r]eview of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive . . . just as unlawful legislative action can be reviewed . . . by enjoining those congressional (or executive) agents who carry out Congress's directive." *See LULAC*, 780 F. Supp. 3d at 172–73 (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 828–29 (1992) (Scalia, J., concurring in part) (citations omitted)). Thus, when the President issues *ultra vires* commands in an Executive Order that are not grounded in either the Constitution or a law passed by Congress, plaintiffs are "entitled to bring a non-statutory cause of action questioning the legality of [such an] Executive Order." *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1327 (D.C. Cir. 1996).

Section 3(d) of the Executive Order is *ultra vires* because it unlawfully directs the President's designee to violate UOCAVA by jettisoning the Post Card Form that Congress mandated and to substitute in its place a set of documentary requirements that are fundamentally incompatible with UOCAVA's text and purpose. In arguing that the LULAC Plaintiffs lack a cause of action, Defendants assert that Plaintiffs cannot directly challenge the Executive Order and are instead limited to an Administrative Procedure Act ("APA") challenge. Not so. The D.C. Circuit has held that the possibility of APA review of final agency actions by other Executive branch actors does not preclude equitable actions for statutory *ultra vires* review, which "remains available to test presidential action alleged to violate any spending or other statute, provided that plaintiffs can plausibly allege action contrary to a clear and mandatory statutory prohibition." *Global Health Council v. Trump*, No. 25-5097, 2025 WL 2480618, at * 8 n.14 (D.C. Cir. Aug. 28, 2025); *see also Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 690–91 (1949) (explaining that "a restraint may be obtained against the conduct of . . . a Federal officer acting in excess of his authority or under an authority not validly conferred").

Statutory *ultra vires* claims require plaintiffs to establish that "(1) review is not expressly precluded by statute, (2) 'there is no alternative procedure for review of the statutory claim' and (3) the challenged action is 'plainly' in 'excess of [the agency's] delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory.'" *Global Health Council*, 2025 WL 2480618, at *12 (quoting *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 722 (D.C. Cir. 2022)).[11] In this cross-motion, Plaintiffs do not challenge any final agency action by the Secretary

---

[11] Plaintiffs acknowledge this Circuit's distinction between constitutional separation of powers claims and statutory *ultra vires* claims. *See, e.g.*, *Nat'l Treasury Emps. Union v. Vought*, No. 25-5091, 2025 WL 2371608, at *18 (D.C. Cir. Aug. 15, 2025) (noting distinction between constitutional and statutory equitable claims and explaining "[f]or implied equitable claims under

of Defense, but instead challenge the President's directive to his designee to take action expressly contrary to UOCAVA. Plaintiffs' challenge to Section 3(d) thus satisfies this Circuit's statutory *ultra vires* test as set out below.

First, judicial review is plainly not precluded by UOCAVA or any other statute. In *Dalton v. Specter*, the Supreme Court determined that judicial review was inappropriate where the statutory provision at issue did not "prevent[] the President" from taking the particular action "for whatever reason he s[aw] fit." *See* 511 U.S. 462, 476 (1994) ("The 1990 Act does not at all limit the President's discretion . . . ."); *see also Chicago & S. Air Lines v. Waterman S. S. Corp.*, 333 U.S. 103, 106 (1948) (addressing a statutory provision granting the President "unconditional[]" authority). UOCAVA contains no similar grant of unbounded discretion. The authority that UOCAVA grants to the Presidential designee is specifically circumscribed. Beyond the selection of the designee, the statute grants no discretion to the President at all. As such, UOCAVA neither expressly nor implicitly precludes judicial review. Defendants do not argue otherwise. Plaintiffs thus satisfy the first prong of the test.

Second, there is no alternative procedure for review because neither the APA nor any other statutory review provision is available. Plaintiffs challenge an Executive Order, not any action taken by an Executive official that might implicate agency action. To put it more directly, as this Court did in its Section 2(a) preliminary injunction opinion, "the APA does not supply a cause of action to challenge an executive order." *LULAC*, 780 F. Supp. 3d at 171. But this does not deprive

---

the Constitution, we have imposed neither the requirements for *ultra vires* review nor those for APA review"). Unlike their challenge to Section 2(a) of the Executive Order—which raises a constitutional separation-of-powers claim because the statutes the President invokes do not "contemplate" any presidential action whatsoever, s*ee Global Health Council*, 2025 WL 2480618, at *8—UOCAVA does not, by itself, prohibit presidential involvement. Rather, it prohibits the changes that the President attempts to make to the Post Card Form. As such, Plaintiffs challenge Section 3(d) under the statutory *ultra vires* framework.

Plaintiffs of an equitable cause of action, and in fact underscores the propriety of *ultra vires* review. Again, as this Circuit has recently recognized, in these situations, "ultra vires review remains available to test presidential action alleged to violate any . . . statute, provided that plaintiffs can plausibly allege action contrary to a clear and mandatory statutory prohibition." *Global Health Council*, 2025 WL 2480618, at *8 n.14. Because the APA "does not repeal the review of *ultra vires* actions," plaintiffs "are entitled to bring a non-statutory cause of action questioning the legality of [an] Executive Order." *Reich*, 74 F.3d at 1327–28.[12]

Defendants also appear to argue that "Plaintiffs are not entitled to an injunction or declaratory judgment against the President," ECF 177-1 at 27, and therefore have no cause of action. LULAC Plaintiffs did not name or serve the President as a defendant. All declaratory and injunctive relief that LULAC Plaintiffs seek is against other officials and agencies ordered to carry out the President's *ultra vires* commands. In addition, this Court has already explained that "any 'conflict between the desire to avoid confronting the elected head of a coequal branch of government and to ensure the rule of law can be successfully bypassed, because the injury at issue can be rectified by injunctive relief against subordinate officials.'" *LULAC*, 780 F. Supp. 3d at 172 (quoting *Swan v. Clinton*, 100 F.3d 973, 978 (D.C. Cir. 1996)). It is thus clear that Plaintiffs have an equitable cause of action to challenge the legality of an Executive Order and may seek

---

[12] Defendants' invocation of *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681 (2025) is inapposite. There, a statutory judicial review provision barred the parties to the suit from seeking judicial review of a Nuclear Regulatory Commission licensing order because neither was a "party aggrieved" as required by the statute. *Id.* at 675, 680. Defendants ignore that in the instant case, unlike in *Nuclear Regulatory Commission*, neither the APA nor any other statute provides a cause of action to challenge the Executive Order, and therefore no "statutory review scheme" provides "a meaningful and adequate opportunity for judicial review" or "forecloses all other forms of judicial review." *Id.* at 681. As such, Plaintiffs are "entitled to bring a non-statutory cause of action." *Reich*, 74 F.3d at 1327.

declaratory and injunctive relief against subordinate officials tasked with carrying out that Order. *Id.* at 173. Plaintiffs satisfy the second prong of the *ultra vires* framework.

Third, Plaintiffs are entitled to relief because the President's directive is "contrary to a specific prohibition in the statute that is clear and mandatory." *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 722 (D.C. Cir. 2022) (quoting *DCH Reg'l Med. Ctr. v. Azar*, 925 F.3d 503, 509 (D.C. Cir. 2019)). UOCAVA plainly commands that the President's designee "shall" "prescribe an official post card form, containing both an absentee voter registration application and an absentee ballot application, for use by the States." 52 U.S.C. § 20301(b)(2). Section 3(d) of the Executive Order nullifies the requirement to have a single post card that serves as a voter registration and absentee ballot application. It instead commands that the "Secretary of Defense shall update the Federal Post Card Application . . . to require: (i) documentary proof of United States citizenship . . . [and] (ii) proof of eligibility to vote in elections in the State in which the voter is attempting to vote."[13] Section 3(d) replaces the single Post Card Form required by Congress with additional documentation requirements created by the President. As such, the Executive Order directly conflicts with Congress's mandate that a singular Post Card Form be made available to military and overseas voters "for simultaneous voter registration application and absentee ballot application." 52 U.S.C. § 20302(a)(4).

As the district court in the *California* litigation already held, neither the President nor his designee may add requirements to UOCAVA, particularly requirements that conflict with and

---

[13] Documentary proof of citizenship is defined in reference to Section 2(a)(ii) of the Executive Order to include a U.S. passport, a REAL ID Act-compliant identification that "indicates the applicant is a citizen of the United States," a military identification card that "indicates the applicant is a citizen of the United States," or "a valid Federal or State government-issued photo identification if such identification indicates that the applicant is a United States citizen or if such identification is otherwise accompanied by proof of United States citizenship."

nullify the Post Card Form as enacted by Congress. *California v. Trump*, No. 25-CV-10810-DJC, 2025 WL 1667949, at *10 (D. Mass. June 13, 2025). UOCAVA's mandate that the Presidential designee design a "post card" means just that: military and overseas applicants must be permitted to use a "post card" to register to vote and request an absentee ballot for federal elections. "[T]his Court [should not] presume that Congress ignored the meaning of 'postcard' when it employed it in the statute." *Id.*

In their motion for summary judgment, Defendants assert that "[n]othing in UOCAVA *limits* what kind of document requirements the Secretary of Defense may 'prescribe' on the 'official post card form.'" ECF 177-1 at 40. But that is not so. Once again, UOCAVA requires that the "official post card form" alone—not the post card *plus* any additional documentation—be "use[d]" by the states "for simultaneous voter registration application and absentee ballot application." 52 U.S.C. § 20302(a)(4). UOCAVA's express requirement that the post card serve as a voter registration and absentee ballot application *does* "*limit*[] what kind of document requirements the Secretary of Defense may 'prescribe,'" ECF 177-1 at 40. It says that no additional documents may be required. *Cf. ITCA*, 570 U.S. at 9 (holding that the NVRA's mandate that States must "accept and use" the Federal Form, 52 U.S.C. § 20505(a)(1), means that States may not condition acceptance of the form by adding a requirement to submit further documentation).

Moreover, Congress already answered the question of how military and overseas voters must verify their citizenship. Like the National Mail Voter Registration Form mandated by the NVRA, the Post Card Form requires applicants to attest to their eligibility, including United States citizenship, under penalty of perjury using a "standard oath." 52 U.S.C. § 20301(b)(7); *see* Federal Post Card Application at 1, https://www.fvap.gov/uploads/fvap/forms/fpca.pdf. UOCAVA prohibits and preempts state laws that "require[] an oath or affirmation" beyond this standard oath.

52 U.S.C. § 20302(a)(5). UOCAVA also prohibits formal notarization. 52 U.S.C. § 20302(i)(1). In short, UOCAVA's text plainly spells out how the Presidential designee may design the Post Card Form to ensure applicant eligibility, and it does not permit the designee to impose documentary methods of verification. Neither the President nor his designee may act in violation of UOCAVA's terms.[14]

The Court should deny Defendants' motion for summary judgment and grant Plaintiffs' cross-motion for summary judgment as to Count Four challenging Section 3(d).

### III.    Plaintiffs Are Entitled to Summary Judgment on Their Claim That Section 7(a) Is *Ultra Vires* of the Elections Clause and the President's Constitutional Authority (Count 3)

#### A.    Section 7(a) Violates the Constitution Because the President Has No Power to Override State Laws Governing Ballot Receipt Deadlines

In Section 7(a) of the Executive Order, the President commands the Attorney General to "take all necessary action "to enforce 2 U.S.C. 7 and 3 U.S.C. 1 against States that violate these provisions by including absentee or mail-in ballots received after Election Day in the final tabulation of votes." At least fourteen states and the District of Columbia provide for the counting of mail and absentee ballots received during some period after Election Day. *See* SUMF ¶ 6. These provisions carry immense consequences for these States and their voters, including Plaintiffs' members.

---

[14] Nor does the Executive Order's boilerplate savings clause, EO § 11(b), salvage Section 3(d)'s legality. As this Court has already recognized, "if an executive order unambiguously 'command[s] . . . action that a saving[] clause purports to negate,' a reviewing court must ignore the saving clause and read the order's operative provision to mean what it says." *LULAC*, 780 F. Supp. 3d at 176 (quoting *Common Cause v. Trump*, 506 F. Supp. 3d 39, 53 n.8 (D.D.C. 2020)). Section 3(d) leaves no ambiguity or room for interpretation in what it demands. As "the executive order cannot possibly be implemented consistent with applicable law, [the] command to do so in [the] saving clause is meaningless." *Id.*

Defendants claim that the President has the authority to propound Section 7(a) under the "take Care" Clause of the Constitution, art. II, § 3. ECF 177-1 at 49–50. But that is not so. The Take Care Clause does not authorize the President to override State elections laws based on an entirely erroneous reading of federal statutes, which themselves contain no mechanism for civil or criminal enforcement. The President's enforcement command in Section 7(a) is not grounded in any constitutional or statutory grant of power to him and should accordingly be declared to be without effect.

Start with the Elections Clause. The Elections Clause provides that the "Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof." U.S. Const. art. I, § 4, cl. 1. As this Court acknowledged previously, the Elections Clause has a "broad" substantive scope that gives States the authority to provide a complete code for federal elections. *LULAC*, 780 F. Supp. 3d at 194. The constitutional "default" is thus that States make the rules for federal elections, up to the point that Congress enacts any superseding laws because "the Congress may at any time by Law make or alter such Regulations." U.S. Const. art. I, § 4, cl. 1. Thus, States have primary responsibility for congressional elections, "but only so far as Congress declines to pre-empt state legislative choices.'" *ITCA*, 570 U.S. at 9 (internal citation omitted). For presidential elections, the Electors Clause grants States primary authority to decide how electors are chosen. U.S. Const. art. II, § 1, cl. 2, 4. Thus, unless a federal statute *requires* states to reject ballots cast on or before Election Day but received afterwards, there is no role for federal action. But the point here is that no such federal statute exists.

Consider the text of Election Day Statutes—2 U.S.C. § 7 and 3 U.S.C. § 1—relied upon in Section 7(a). Neither supports the President's command. Again, 2 U.S.C. § 7 merely sets forth the election date for congressional elections: "[t]he Tuesday next after the 1st Monday in November,

in every even numbered year . . . as the day for the election," for Congressional offices. And 3 U.S.C. § 1 provides that "[t]he electors of President and Vice President shall be appointed, in each State, on election day, in accordance with the laws of the State enacted prior to election day." While these statutes define the date of Election Day, they do not prohibit counting mail-in ballots that are mailed on or before Election Day yet received afterward. And they of course contain absolutely no civil or criminal enforcement mechanism.

It is especially significant that of all the courts to have addressed the issue, all except one have rejected the President's interpretation of 2 U.S.C. § 7 and 3 U.S.C. § 1.[15] Common sense dictates that if the text and the structure of these statutes even hinted at the notion that States could not lawfully receive mail ballots after Election Day, that would be the prevailing view among courts. Yet only one court has reached that conclusion (discussed further below), and only very recently.

The most recent of the decisions to reject the President's interpretation is particularly instructive. In *California v. Trump*, Judge Casper granted several States' motion for preliminary injunction against Section 7(a), holding that the President's interpretation of the Election Day statutes was contrary to law, 2025 WL 1667949 at *13–14, and it further barred the Attorney General from bringing civil or criminal cases against the plaintiff states and their officials based on Section 7(a). Relying on the plain meaning of the two statutes, 2 U.S.C. § 7, 3 U.S.C. §§ 1,

---

[15] *See California v. Trump*, 2025 WL 1667949 at *13 (D. Mass. June 13, 2025); *Bost v. Ill. State Bd. of Elections*, 684 F. Supp. 3d 720, 736 (N.D. Ill. 2023), *aff'd on other grounds*, 114 F.4th 634 (7th Cir. 2024); *Donald J. Trump for President, Inc. v. Way*, 492 F. Supp. 3d 354, 372 (D.N.J. 2020); *Pa. Democratic Party v. Boockvar*, 238 A.3d 345, 368 & n.23 (Pa. 2020); *see also Bognet v. Sec'y Commonwealth of Pa.*, 980 F.3d 336, 353–54 (3d Cir. 2020), *cert. granted, judgment vacated sub nom. Bognet v. Degraffenreid*, 141 S. Ct. 2508 (2021); *see also Harris v. Fla. Elections Canvassing Comm'n*, 122 F. Supp. 2d 1317, 1325 (N.D. Fla. 2000), *aff'd sub nom. Harris v. Fla. Elections Comm'n*, 235 F.3d 578 (11th Cir. 2000).

21(1), as well as on the rulings in *Bost* and *Way*, Judge Casper embraced not only the prevailing consensus, but also the most sensible interpretation—that the text of the Election Day statutes requires only that all votes are cast by Election Day, "not that they are received by that date." 2025 WL 1667949 at *13. Judge Casper further reasoned that the "[t]he logic behind such a ruling is simple: states that allow ballots received after Election Day to be counted still require that all votes are cast by Election Day, meaning a candidate's 'electoral fate is sealed at midnight on Election Day.'" *Id.* (quoting *Bost*, 684 F. Supp. 3d at 733–34).

Judge Casper emphasized that Congress itself has never "endorsed" the President's definition of "Election Day" under Section 7(a), despite having had many opportunities to do so. *Id.* In enacting the Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA), 52 U.S.C. § 20301 et seq., Congress could have required that military and overseas ballots be received by election officials no later than Election Day. But it chose not to. Instead, Congress expressly acknowledged that "State law" sets the "deadline for receipt of the State absentee ballot," as well as the Federal Write-in Ballot if the State ballot is not received by the State first. 52 U.S.C. § 20303(b)(3). At the time of UOCAVA's passage, twelve states already permitted ballots to be received after Election Day—a fact noted in the legislative hearings—undercutting any suggestion that Congress intended the Election Day statutes to impose the restrictive interpretation advanced by the Executive Order. *See Uniformed and Overseas Citizens Absentee Voting: Hearing on H.R. 4393*, 99th Cong. 21 (Feb. 6, 1986) (Statement of Henry Valentino, Director, Federal Voting Assistance Program). Nor was UOCAVA the only chance for Congress to act. Just three years ago, Congress defined "election day" for presidential elections. Yet it declined to adopt the restrictive interpretation urged by Section 7(a)—even though nearly twenty states then accepted mail-in ballots received after Election Day, and even though the issue had already been litigated during

the 2020 cycle. Rather than impose the hard deadline the President now advances, Congress once again left the matter to the states. 3 U.S.C. §§ 1, 21, Pub. L.117-328, 136 Stat. 4459 (2022).

Defendants retort that none of this matters, because, according to them, Congressional "inaction" provides cover for the Executive Branch to "interpret" the law in a way that "does not contradict" it. ECF 177-1 at 54. But that could not be further from the truth. Congress was fully aware that States accepted voted mail ballots after Election Day, and it nonetheless *chose* to defer to State law. That awareness, as the *California* court found, is sufficient to defeat Defendants' half-hearted argument related to congressional "inaction." 2025 WL 1667949, at *13 (quoting *CTS Corp. v. Waldburger*, 573 U.S. 1, 18 (2014)) (cleaned up) ("The case for federal pre-emption is particularly weak where Congress has indicated its awareness of the operation of state law in a field of federal interest, and has nonetheless decided to stand by both concepts and to tolerate whatever tension there is between them.").

The Supreme Court has weighed in on this issue, though indirectly. In the concurring opinions of Justices Gorsuch and Kavanaugh in *Democratic National Committee v. Wisconsin State Legislature*, 141 S. Ct. 28 (2020), both Justices recognized that states had the discretion to determine the receipt dates of mail-in ballots. In that case, voters argued that Wisconsin's requirement that mail ballots be received by Election Day should be enjoined to ensure that voters could exercise their right to vote amid the challenges posed by the COVID-19 pandemic. The district court ordered that mail-in ballots cast by Election Day and received within six days of Election Day could be counted. *Id.* at 30 (Kavanaugh, J., concurring). The Supreme Court reversed the district court by a 6–3 vote in a summary order. Justice Gorsuch wrote:

> The Constitution *provides that state legislatures* . . . bear primary responsibility for setting election rules. Art. I, §4, cl. 1. And the Constitution provides a second layer of protection too. If state rules need revision, Congress is free to alter them. *Ibid.* ("The Times,

> Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations . . . "). Nothing in our founding document contemplates the kind of judicial intervention that took place here, nor is there precedent for it in 230 years of this Court's decisions.

*Id.* at 29. (Gorsuch, J., concurring) (emphasis added). Notably, Justice Gorsuch did not say Wisconsin was forbidden from counting mail ballots received within six days of Election Day, Rather, Justice Gorsuch reasoned that this determination should be left to state discretion. Justice Kavanaugh, in his concurring opinion, adopted similar reasoning:

> Of particular relevance here, a few States such as Mississippi no longer require that absentee ballots be received before election day. *See, e.g.*, Miss. Code Ann. §23-15-637 (2020). Other States such as Vermont, by contrast, have decided not to make changes to their ordinary election-deadline rules, including to the election-day deadline for receipt of absentee ballots. *See, e.g.*, Vt. Stat. Ann., Tit. 17, § 2543 (2020). The variation in state responses reflects our constitutional system of federalism. Different state legislatures may make different choices.

*Id.* at 32–33 (Kavanaugh, J., concurring).

2. Against the weight of all this overwhelming authority, the only support Defendants and the RNC can muster is a single Fifth Circuit decision that itself rests on a flawed reading of the statute's text, structure, and historical context. This case, *Republican National Committee v. Wetzel*, 120 F.4th 200 (5th Cir. 2024), stands alone[16] in holding that absentee ballots must be received by Election Day to count, and on top of that, it rests on shaky ground. The case was brought by the RNC and others, who challenged Mississippi's law allowing absentee ballots "postmarked on or

---

[16] The RNC claims that a 1944 Montana Supreme Court decision, *Maddox v. Bd. of State Canvassers*, 149 P.2d 112 (1944), "is directly on point," ECF 176-1 at 25. But the *Maddox* court's determination that absentee ballots from military voters must be received on Election Day was based on its referencing a state law that provided as follows: "the absent voters' ballots must be deposited in the ballot box between the opening and closing of the polls," *Maddox*, 149 P.2d at 115. The federal election laws were relevant only in that they set the day that polls closed.

before the date of the election and received by the registrar no more than five (5) business days after the election" *Id.* at 204–05 (quoting Miss. Code § 23-15-637(1) as a violation of 2 U.S.C. § 7 and 3 U.S.C. § 1). On summary judgment, the district court rejected this claim.

But the Fifth Circuit reversed. It relied on three "definitional elements" from *Foster v. Love*, 522 U.S. 67 (1997): "(1) official action, (2) finality, and (3) consummation." *Wetzel*, 120 F.4th at 207. The panel's reasoning went something like this: since each of these elements must be completed by Election Day, absentee ballots must also be received by Election Day to comply with federal law. *Id.* at 207–08. Defendants and the RNC now lean on *Wetzel*, invoking these same so-called "definitional elements," to argue that Section 7(a) of the EO "merely seeks to enforce 2 U.S.C. § 7 as written." ECF 177-1 at 42; ECF 176-1 at 18–19.

This conclusion rests in part on a misreading of *Foster v. Love*—which addressed a challenge to Louisiana's congressional election system—and a fundamental misunderstanding of the historical practices surrounding mail-in voting in the nineteenth century. Take *Foster v. Love* first. The facts of *Foster* illustrate why the holding in that case is limited to its facts: Louisiana held a primary for all candidates in October and, if one candidate received a majority of votes in that primary, that candidate was elected. 522 U.S. at 70. If no candidate received a majority, the top two finishers would have a runoff on the November election day. *Id.* The Supreme Court held "that a contested selection of candidates for a congressional office that is concluded as a matter of law before the federal election day, with no act in law or in fact to take place on the date chosen by Congress, clearly violates § 7 [because the election concluded before Election Day]." *Id.* at 72.

Examples abound of how the Fifth Circuit misread *Foster*, but one in particular is salient—the Fifth Circuit's emphasis on "consummation." The *Wetzel* panel asserts that "[r]eceipt of the last ballot . . . constitutes consummation of the election, and it must occur on Election Day." 120 F.4th

39

at 209. But *Foster* references "consummation" only once, and in a footnote with a completely different meaning: "We hold today only that if an election does take place, it may not be consummated prior to federal election day." 522 U.S. at 72 n.4 (emphasis added). *Foster*'s narrow holding, thus, prohibits only the complete determination of an election's outcome prior to Election Day, and says nothing further. In fact, *Foster* highlights Louisiana's practice that a congressional primary may be held on Election Day, La. Rev. Stat. Ann. § 42:1360, with a runoff taking place *after* Election Day, *Foster*, 522 U.S. at 71 & n.3. And apart from *Foster*, none of the other authorities the Fifth Circuit panel relies upon in its "consummation" discussion support the claim that federal law prohibits counting mail ballots sent by Election Day but received afterward. *Wetzel*, 120 F.4th at 208.

Another example of the weaknesses in the Fifth Circuit's reasoning in *Wetzel* is its flawed historical analysis. The panel relies on what "election day" meant in 1845 and 1871, when 2 U.S.C. § 7 and 3 U.S.C. § 1 were enacted—yet it conveniently overlooks that Congress first formally defined "election day" as a statutory term in 2022, by which time nearly half the states accepted mail-in or absentee ballots cast by Election Day but received after. It also heavily leans on an early twentieth-century text, Josiah Henry Benton's *Voting in the Field: A Forgotten Chapter of the Civil War* (1915), to assert that absentee voters "voted when the vote was received by election officials," and that this had to occur by Election Day. 120 F.4th at 210. Defendants adopt *Wetzel's* characterization of Benton's book to make the same argument. ECF 177-1 at 42 (citing 120 F.4th at 210).

Defendants and the RNC adopt the *Wetzel* panel's mischaracterization of Civil War-era voting practices, relying on its historical account without recognizing that the cited source fails to support their claim. But Defendants can offer no citation from Benton in support of their central

40

claim—that "***all ballots were received by election officials no later than election day.***" ECF 176-1 at 26 (emphasis added).[17] While this Court need not resolve the issue of Civil War historical practices, the essential point is that the Fifth Circuit had to canvass far and wide in its attempt to escape the plain text of the Election Day statutes.[18]

Finally, Defendants contend that a State's decision to count absentee ballots mailed on or before Election Day, but received afterward, is arbitrary and disparate, in violation of the Equal Protection Clause under *Bush v. Gore*, 531 U.S. 98 (2000). ECF 176-1 at 43. That case, however, is inapposite: absentee and mail-in voters are not treated differently from in-person voters—both must relinquish control of their ballot by Election Day for it to be counted.

### B.    Plaintiffs Have an Equitable Cause of Action to Challenge and Enjoin Implementation of Section 7(a)

The RNC makes one last effort to undermine Plaintiffs, asserting that "Plaintiffs' *ultra vires* claims [including as to Section 7(a)] fail because the Executive Order doesn't disregard any specific and unambiguous statutory directive." ECF 176-1 at 29. That contention misses the mark. Statutory *ultra vires* claims require contravening a specific statutory directive. See infra p. 21. But Plaintiffs' challenge to Section 7(a) is not a statutory *ultra vires* claim at all—it is a constitutional one. Section 7(a) contravenes the Elections Clause. This Court has already recognized that an *ultra vires* claim may proceed under the Elections Clause with respect to Section 2(a).

---

[17] Benton shows that not all methods used in the States resulted in mail ballots being in the hands of election officials by Election Day. *See, e.g.,* Benton at 186 (describing how troops from Rhode Island delivered their ballots to commanding officers on election day); *Id.* at 318 (describing long delays between soldiers voting in the field and votes reaching officials who could count them).

[18] The Fifth Circuit's inconsistent treatment of UOCAVA in *Wetzel* further undermines its persuasiveness. Led by Judge Oldham, the panel initially found UOCAVA *silent* on receipt deadlines and asserted that federal law did not permit such counting. *See Wetzel*, 120 F.4th at 211-12. Later, Judge Oldham acknowledged that UOCAVA does allow states to accept and count such ballots, if state law provides for it. 132 F.4th 775, 778-79 (5th Cir. 2025) (Oldham, J., concurring).

As the D.C. Circuit recently confirmed, "[f]or implied equitable claims under the Constitution, [the court] ha[s] imposed neither the requirements for *ultra vires* review nor those for APA review." *Vought*, 2025 WL 2371608, at *18; s*ee also Susman Godfrey LLP v. Exec. Off. of the President*, No. 25-cv-1107, 2025 WL 1779830, at *23 (D.D.C. June 27, 2025) (explaining that the statutory ultra vires framework from "Federal Express Corp. is inapposite" because "[t]he challenge mounted here . . . is a classic separation-of-powers claim in the vein of *Youngstown*, where the court was 'asked to decide whether the President was acting within his constitutional power when he issued an [executive] order'") (quoting *Youngstown*, 343 U.S. at 582)); *Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of the President*, No. 25-cv-917, 2025 WL 1502329, at *21 n.24 (D.D.C. May 27, 2025) (similar).[19]

## IV.    Plaintiffs Are Entitled to Declaratory and Permanent Injunctive Relief

Under the Declaratory Judgment Act, a court "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a).  The decision to issue declaratory relief "always rests within the sound discretion of the court." *President v. Vance*, 627 F.2d 353, 364 n.76 (D.C. Cir. 1980). Granting such relief is appropriate if (1) "the judgment will serve a useful purpose in clarifying the legal relations at issue," or (2) "the judgment will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding," *New York v. Biden*, 636 F. Supp. 3d 1, 31 (D.D.C. 2022) (quoting *Glenn v. Thomas Fortune Fay*, 222 F. Supp. 3d 31, 36

---

[19] Moreover, even if this claim were analyzed as a statutory *ultra vires* claim, Plaintiffs would prevail under the relevant factors as (1) review is not expressly precluded by statute, (2) there is no alternative procedure for review and (3) the challenged action is plainly in excess of any statutorily delegated powers. *Global Health Council*, 2025 WL 2480618, at *12. The Federal Election Day statues do not preclude review, nor is there an alternate avenue for challenging the Executive Order's pronouncement in Section 7(a). And the Federal Election Day statutes grant no authority—much less delegate power or discretion—to any Executive Branch actor.

(D.D.C. 2016)). Granting declaratory relief is entirely appropriate here. Indeed, the Court has a "duty . . . to say what the law is," *Marbury v. Madison*, 5 U.S. 137, 177 (1803), and this duty applies even when the central actor proceeding contrary to the law is the President. *See, e.g.*, *Clinton v. New York*, 524 U.S. 417, 421 (1998). This Court should enter declaratory judgment that Section 3(d) of the Executive Order is contrary to UOCAVA and that Section 7(a) is *ultra vires* of the President's authority under the Elections Clause given that the Election Day statutes neither set a ballot receipt deadline nor provide to the Attorney General any enforcement authority.[20]

A movant entitled to summary judgment may obtain a permanent injunction by showing: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Anatol Zukerman & Charles Krause Reporting, LLC v. USPS*, 64 F.4th 1354, 1364 (D.C. Cir. 2023) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)). Each of these factors is met here. This Court should therefore: (1) declare that Section 3(d) violates UOCAVA and that Section 7(a) violates the Elections Clause and the constitutional separation of powers and (2) permanently enjoin implementation of Section 3(d)'s documentary proof of citizenship requirement.[21]

First, Plaintiffs have demonstrated irreparable harm and the inadequacy of any remedy available at law. Plaintiffs have more than adequately demonstrated the concrete, irreparable harm

---

[20] While Plaintiffs contend that both injunctive and declaratory relief are appropriate, declaratory relief remains available even in cases where injunctive relief would not be appropriate. *See Samuels v. Mackell*, 401 U.S. 66, 73 (1971) (explaining that there may be circumstances warranting declaratory relief in the absence of injunctive relief).

[21] With respect to Section 3(d), to afford plaintiffs "complete relief, the court has only one feasible option" and that is to enjoin Defendants from changing the single Post Card Form in response to

they have incurred and will continue to incur should Sections 3(d) and 7(a) be implemented. Again, both provisions unlawfully impose "[n]ew obstacles" that "make it more difficult for [Plaintiffs] to accomplish their primary mission[s]" of supporting voter registration and participation. *Newby*, 838 F.3d at 9. Sections 3(d) has already forced, and will continue to force, the organizations to divert resources toward providing additional direct services designed to offset the harmful effects of the challenged requirement.

Because Defendants here are federal officials and agencies, the balance-of-equities and public-interest factors "merge." *Nken*, 556 U.S. at 435. Plaintiffs, their members, and the public will face substantial, concrete burdens if Section 3(d) is implemented. The balance of the equities and public interest factors also favor Plaintiffs.

There are no valid governmental interests outweighing the clear need for relief here. While there is a public interest in "preserving the integrity of [the] election process," there is no record evidence that injunctive relief would harm that interest. *LULAC*, 780 F. Supp. 3d at 203 (quoting *Newby*, 838 F.3d at 13); *see also California*, 2025 WL 1667949, at *20; *Fish v. Schwab*, 957 F.3d 1105, 1142 (10th Cir. 2020) (defendants failed to show "that substantial numbers of noncitizens successfully registered to vote" under the NVRA's attestation procedures).

Moreover, there is no public interest in the perpetuation violations of the separation of powers that make it more difficult for voters to cast their ballots in accordance with the laws passed by the States and Congress. Because the public interest "favors permitting as many qualified voters

---

the EO's instruction in Section (d) to require documentary proof of citizenship. *Trump v. CASA, Inc.*, 606 U.S. 831, 851 (2025). Such an injunction would not be a universal injunction but would instead "concern a single decision about a single [requirement], to be used on a single [form] throughout the nation." *LULAC*, 780 F. Supp. 3d at 222 (citation omitted).

to vote as possible," that interest here weighs in favor of injunctive relief. *Id.* (quoting *Newby*, 838 F.3d at 12).

## CONCLUSION

Plaintiffs respectfully request that the Court enter judgment and declaratory relief in favor of Plaintiffs on their Section 3(d) and 7(a) claims and permanently enjoin the implementation of Section 3(d)'s documentary proof of citizenship requirement.

Dated: September 17, 2025                                    Respectfully submitted,

*/s/ Pooja Chaudhuri*
Pooja Chaudhuri (D.C. Bar No. 888314523)
Sofia Fernandez Gold (D.C. Bar No. 90010196)
Jacob Kovacs-Goodman (D.C. Bar No. 90032363)
Norman L. Eisen (D.C. Bar No. 435051)
Tianna J. Mays (D.C. Bar No. 90005882)
DEMOCRACY DEFENDERS FUND
600 Pennsylvania Avenue SE #15180
Washington, D.C. 20003
(202) 601-8678
pooja@democracydefenders.org
sofia@democracydefenders.org
jacob@democracydefenders.org
norman@democracydefenders.org
tianna@democracydefenders.org

*/s/ Jon Greenbaum*
Jon Greenbaum (D.C. Bar No. 489887)
JUSTICE LEGAL STRATEGIES PLLC
P.O. Box 27015
Washington, D.C. 20038
(202) 601-8678
jgreenbaum@justicels.com

*Counsel for Plaintiffs League of United Latin American Citizens, Secure Families Initiative, and Arizona Students' Association*

*/s/ Anna M. Baldwin*
Anna M. Baldwin (D.C. Bar No. 998713)
Danielle Lang (D.C. Bar No. 1500218)
Jonathan Diaz (D.C. Bar No. 1613558)
Robert Brent Ferguson (D.C. Bar No. 1782289)
Heather Szilagyi (D.C. Bar No. 90006787)
Benjamin Phillips (D.C. Bar No. 90005450)
CAMPAIGN LEGAL CENTER
1101 14th St. NW, Suite 400
Washington, D.C. 20005
(202) 736-2200
abaldwin@campaignlegalcenter.org
dlang@campaignlegalcenter.org
jdiaz@campaignlegalcenter.org
bferguson@campaignlegalcenter.org
hszilagyi@campaignlegalcenter.org
bphillips@campaignlegalcenter.org