**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, et al., <br><br> Plaintiffs, <br><br> v. <br><br> EXECUTIVE OFFICE OF THE PRESIDENT, et al., <br><br> Defendants. | Civil Action No. 25-cv-0946 (CKK) |
| DEMOCRATIC NATIONAL COMMITTEE, et al., <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States, et al., <br><br> Defendants. | Civil Action No. 25-cv-0952 (CKK) |
| LEAGUE OF WOMEN VOTERS EDUCATION FUND, et al., <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States, et al., <br><br> Defendants. | Civil Action No. 25-cv-0955 (CKK) |

**DEMOCRATIC PARTY PLAINTIFFS' COMBINED OPPOSITION TO DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT ON ALL REMAINING CLAIMS AND CROSS
MOTION FOR PARTIAL SUMMARY JUDGMENT (PHASE II)**

**ELIAS LAW GROUP LLP**
Marc E. Elias (DC 442007)
Aria C. Branch (DC 1014541)
Lalitha D. Madduri (DC 1659412)
Christopher D. Dodge (DC 90011587)
Jacob D. Shelly (DC 90010127)
Harleen K. Gambhir (DC 1781869)
James J. Pinchak (DC 90034756)*
250 Massachusetts Ave. NW, Suite 400
Washington, DC 20001
T: (202) 968-4652

Tyler L. Bishop (DC 90014111)
1700 Seventh Ave. Suite 2100
Seattle, WA 98101
T: (206) 656-0177

*Counsel for the Democratic Party Plaintiffs*

*Admitted pro hac vice*

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................ 2

STANDARD OF REVIEW ............................................................................................. 3

ARGUMENT ................................................................................................................. 4

I.    Section 2(d)'s requirement that federal voter registration agencies "assess citizenship" before distributing the Federal Form is unlawful. ................................................. 4

    A.    The Federal Defendants' threshold arguments as to § 2(d) fail. ................................. 5

        1.    The Democratic Party Plaintiffs can seek judgment on their non-statutory causes of action against § 2(d). .......................................................... 5

        2.    Plaintiffs' claims against § 2(d) are ripe for review. ......................................... 6

    B.    Section 2(d) is *ultra vires* and violates the separation of powers. ............................... 7

II.   Section 3(d)'s DPOC requirement for the Federal Post Card Application is unlawful. ....... 13

    A.    Federal Defendants' threshold arguments as to § 3(d) fail. ......................................... 13

    B.    Section 3(d) is *ultra vires* and violates the separation of powers. ............................. 16

        1.    Neither the Constitution nor statute authorizes the President or Defense Secretary to add a DPOC requirement to the Federal Postcard. .................... 16

        2.    Democratic Party Plaintiffs have a cause of action to challenge § 3(d). ........ 20

III.  Section 7's preemption of state ballot receipt deadlines is unlawful. .................................. 22

    A.    Federal Defendants' threshold arguments as to § 7 fail. ............................................. 23

        1.    The Democratic Party Plaintiffs have standing to challenge § 7. ................... 23

        2.    Democratic Plaintiffs' claims against § 7 are ripe for review. ....................... 29

        3.    Democratic Plaintiffs can seek judgment on their non-statutory causes of action against § 7. .......................................................... 30

    B.    Section 7 is *ultra vires* and violates the separation of powers. ................................... 31

        1.    The Election Day Statutes do not set a uniform ballot receipt deadline. ........ 32

2.   The President lacks authority to enforce a uniform national ballot receipt deadline. ................................................................................ 37

IV.   The EAC should be permanently enjoined from enforcing § 4(a). ..................................... 38

A.   Federal Defendants' threshold arguments as to § 4(a) fail. ........................................ 38

B.   Section 4(a) is unlawful to the extent it requires the EAC to withhold funds based on the President's unlawful orders. ............................................................. 40

V.   Changes to DHS's SAVE program violate the Privacy Act. ................................................. 41

A.   Since April, DHS has together with DOGE and SSA implemented dramatic expansions of SAVE. .................................................................................... 42

B.   Democratic Party Plaintiffs are harmed by disclosures of sensitive information resulting from SAVE updates. .................................................................. 45

1.   The unlawful disclosures violate the privacy of Plaintiffs' members. ............ 45

2.   The unlawful disclosures harm the voting rights of Plaintiffs' members. ....... 48

3.   The unlawful disclosures harm the Democratic Party Plaintiffs' core organizational activities and competitive interests. ........................................ 50

4.   The remaining standing elements are satisfied. ............................................ 50

C.   DOGE, DHS, and SSA's SAVE updates violate the Privacy Act. ............................ 50

1.   The SAVE updates are reviewable final agency action. .................................. 51

2.   The Privacy Act does not foreclose APA review of the SAVE updates. ....... 51

3.   DHS, DOGE, and SSA violated the Privacy Act by incorporating NUMIDENT into SAVE. ..................................................................................... 53

D.   Defendants are not entitled to judgment on Plaintiffs' remaining claims against §§ 2(b) and 3(a). ......................................................................................... 57

VI.   The Court should defer consideration of the Democratic Party Plaintiffs' remaining APA claims. ........................................................................................................................ 59

CONCLUSION ..................................................................................................................... 60

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Fed'n of Tchrs. v. Bessent*,
   No. 25-1282, 2025 WL 2313244, at *5 (4th Cir. Aug. 12, 2025) ...................................... 53

*Abbott Lab'ys v. Gardner*,
   387 U.S. 136 (1967) .................................................................................................... 29

*Action NC v. Strach*,
   216 F. Supp. 3d 597 (M.D.N.C. 2016) ............................................................................ 9

*AFGE v. Trump*,
   318 F. Supp. 3d 370 (D.D.C. 2018) .......................................................................... 16, 39

*AFL-CIO v. DOL,*
   No. CV 25-339, 2025 WL 1783899 (D.D.C. June 27, 2025) ............................................ 50

*\*AFL-CIO v. DOL*,
   778 F. Supp. 3d 56 (D.D.C. 2025) ........................................................................... *passim*

*AFL-CIO v. OPM,*
   No. 25-cv-1237, 2025 WL 1621714 (D.D.C. June 9, 2025) ......................................... 54, 58

*AFL-CIO v. OPM*,
   777 F. Supp. 3d 253 (S.D.N.Y. 2025) ........................................................................... 52

*AFL-CIO v. SSA*,
   778 F. Supp. 3d 685 (D. Md. 2025) .......................................................................... 46, 48

*In re Al-Nashiri*,
   47 F.4th 820 (D.C. Cir. 2022) ...................................................................................... 51

*\*All. for Retired Americans v. Bessent*,
   770 F. Supp. 3d 79 (D.D.C. 2025) ................................................................. 45, 46, 47, 48, 50

*All. for Retired Ams. v. Bessent*,
   No. CV 25-0313 (CKK), 2025 WL 1114350 (D.D.C. Mar. 20, 2025)......................... 57, 58

*Arizona v. Inter Tribal Council of Ariz., Inc.*,
   570 U.S. 1 (2013) ...................................................................................................... 4, 8

*Babbitt v. United Farm Workers Nat'l Union*,
  442 U.S. 289 (1979) .................................................................................. 28

*Bennett v. Spear*,
  520 U.S. 154 (1997) ...................................................................... 26, 39, 51

*Biden v. Nebraska*,
  600 U.S. 477 (2023) .................................................................................. 37

*Blassingame v. Trump*,
  87 F.4th 1 (D.C. Cir. 2023) ...................................................................... 12

*Bldg. & Const. Trades Dep't, AFL-CIO v. Allbaugh*,
  172 F. Supp. 2d 67 (D.D.C. 2001) ............................................................ 26

*Bldg. Indus. Ass'n of Superior California v. Babbitt*,
  979 F. Supp. 893 (D.D.C. 1997) ............................................................... 26

*Bognet v. Sec'y Commw. of Pa.*,
  980 F.3d 336 (3d Cir. 2020) ..................................................................... 33

*Bost v. Ill. State Bd. of Elections*,
  684 F. Supp. 3d 720 (N.D. Ill. 2023) ....................................................... 35

*California v. Trump*,
  No. 25-cv-10810-DJC, 2025 WL 1667949 (2025) ................................ *passim*

*Cell Assocs., Inc. v. NIH*,
  579 F.2d 1155 (9th Cir. 1978) .................................................................. 52

*Chamber of Com. of U.S. v. Reich*,
  74 F.3d 1322 (D.C. Cir. 1996) ....................................................... 6, 21, 31

*City & Cnty. of San Francisco v. Trump*,
  897 F.3d 1225 (9th Cir. 2018) ........................................................... 28, 40

*Cnty. of Santa Clara v. Trump*,
  250 F. Supp. 3d 497 (N.D. Cal. 2017) ..................................................... 40

*Common Cause/Ga. v. Billups*,
  554 F.3d 1340 (11th Cir. 2009) ................................................................ 14

*Crawford v. Marion Cnty. Election Bd.*,
  472 F.3d 949 (7th Cir. 2007) .................................................................... 13

*CREW v. OMB*,
   No. CV 25-1051, 2025 WL 2025114 (D.D.C. July 21, 2025)........................................ 41

*Dalton v. Specter*,
   511 U.S. 462 (1994) ..................................................................................................... 6

*Dep't Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*,
   601 U.S. 42 (2024) ..................................................................................................... 52

*Dep't of Com. v. New York*,
   588 U.S. 752 (2019) ................................................................................................... 26

*Deutsch v. N.Y. State Bd. of Elections*,
   No. 20 CIV. 8929, 2020 WL 6384064 (2020) ...................................................... 16, 17

*Devlin v. Berry*,
   26 F. Supp. 3d 74 (D.D.C. 2014) ............................................................................. 59

*\*Diamond Alternative Energy, LLC v. EPA*,
   145 S. Ct. 2121 (2025) ................................................................................... 25, 35, 39

*DNC v. Wisconsin State Legis.*,
   141 S. Ct. 28 (2020) ................................................................................................... 35

*Doe v. Chao*,
   540 U.S. 614 (2004) ................................................................................................... 52

*Doe v. Stephens*,
   851 F.2d 1457 (D.C. Cir. 1988) ............................................................................... 53

*Donald J. Trump for President, Inc. v. Way*,
   492 F. Supp. 3d 354 (D.N.J. 2020) .......................................................................... 33

*Elliott v. Hogan*,
   315 S.W.2d 840 (Mo. App. 1958) ............................................................................ 34

*Energy Future Coal. v. EPA*,
   793 F.3d 141 (D.C. Cir. 2015) ................................................................................. 29

*Ex parte Siebold*,
   100 U.S. 371 (1879) ................................................................................................... 32

*FDA v. All. for Hippocratic Med.*,
   602 U.S. 367 (2024) ............................................................................................. 16, 50

*Fed. Express Corp. v. U.S. Dep't of Com.*,
    39 F.4th 756 (D.C. Cir. 2022) ................................................................ 22, 31

*Fish v. Schwab*,
    957 F.3d 1105 (10th Cir. 2020) ................................................................ 60

*\*Foster v. Love*,
    522 U.S. 67 (1997) ................................................................ 1, 32, 33

*\*Free Enterprise Fund v. Public Company Accounting Oversight Board*,
    561 U.S. 477 (2010) ................................................................ 27, 30

*Georgia v. Meadows*,
    88 F.4th 1331 (11th Cir. 2023) ................................................................ 12

*Gill v. Scholz*,
    962 F.3d 360 (7th Cir. 2020) ................................................................ 59

*\*Glob. Health Council v. Trump*,
    5097, No. 25-, 2025 WL 2480618 (D.C. Cir. Aug. 28, 2025) ............................ 6, 21, 30, 31

*Grundmann v. Trump*,
    770 F. Supp. 3d 166 (D.D.C. 2025) ................................................................ 41

*Hammond v. Hickel*,
    588 P.2d 256 (Alaska 1978) ................................................................ 34

*Harris v. Fla. Elections Canvassing Comm'n*,
    122 F. Supp. 2d 1317 (N.D. Fla. 2000) ................................................................ 35

*Harris v. Fla. Elections Comm'n*,
    235 F.3d 578 (11th Cir. 2000) ................................................................ 35

*Hawkins v. Tom's Tree Serv.*,
    No. 4:23-cv-00224-SMR-WPK, 2024 WL 3551148 (2024) ................................ 46, 47

*Hillman v. Maretta*,
    569 U.S. 483 (2013) ................................................................ 10

*Holcomb v. Powell*,
    433 F.3d 889 (D.C. Cir. 2006) ................................................................ 4

*Hunt v. Wash. State Apple Advert. Comm'n*,
    432 U.S. 333 (1977) ................................................................ 49

*Int'l Dark-Sky Ass'n v. FCC,*
    106 F.4th 1206 (D.C. Cir. 2024) ......................................................................... 49

*Jama v. Immigr. & Customs Enf't,*
    543 U.S. 335 (2005) ........................................................................................... 19

*Jeffries v. Volume Servs. Am., Inc.,*
    928 F.3d 1059 (D.C. Cir. 2019) ................................................................... 45, 46

*Kendall v. U.S. ex rel. Stokes,*
    37 U.S. 524 (1838) ............................................................................................. 12

*Lee v. Nat'l Elec. Contractor Ass'n,*
    322 F. Supp. 3d 43 (D.D.C. 2018) ...................................................................... 20

*Londrigan v. FBI,*
    670 F.2d 1164 (D.C. Cir. 1981) .......................................................................... 53

*LULAC v. Exec. Off. of the President,*
    780 F. Supp. 3d 135, 226 (D.D.C. 2025) ................................................... *passim*

*McKoy v. Spencer,*
    271 F. Supp. 3d 25 (D.D.C. 2017) ................................................................ 41, 58

*Medellin v. Texas,*
    552 U.S. 491 (2008) ........................................................................................... 12

*MedImmune, Inc. v. Genentech, Inc.,*
    549 U.S. 118 (2007) ........................................................................................... 29

*Mi Familia Vota v. Fontes,*
    719 F. Supp. 3d 929 (D. Ariz. 2024) ............................................................ 43, 49

*Mi Familia Vota,*
    129 F.4th 691 (9th Cir. 2025) ....................................................................... 43, 48

*Minnesota v. Mille Lacs Band of Chippewa Indians,*
    526 U.S. 172 (1999) ........................................................................................ 7, 37

*Muransky v. Godiva Chocolatier,*
    979 F.3d 917 (11th Cir. 2020) ............................................................................ 45

*N.H. Right to Life Pol. Action Comm. v. Gardner,*
    99 F.3d 8 (1st Cir. 1996) .................................................................................... 29

*N.Y. State Rifle Ass'n v. Bruen,*
　　597 U.S. 1 (2022) ........................................................................... 33

*Nat'l Fed'n of Indep. Bus. v. Sebelius,*
　　567 U.S. 519 (2012) ....................................................................... 19

*National Wildlife Fed'n v. Hodel,*
　　839 F.2d 694 (D.C. Cir. 1988) ....................................................... 26

*New York v. Trump,*
　　767 F. Supp. 3d 44 (S.D.N.Y. 2025) .............................................. 51

*Newberry v. United States,*
　　256 U.S. 232 (1921) ................................................................. 32, 33

*NTEU v. Nixon,*
　　492 F.2d 587 (D.C. Cir. 1974) ....................................................... 12

*NTEU v. Vought,*
　　No. 25-5091, 2025 WL 2371608 (D.C. Cir. Aug. 15, 2025) .......... 6, 21, 40

*Pelton v. DeJoy,*
　　No. CV 19-1766, 2024 WL 1961297 (D.D.C. May 3, 2024) ........... 20

*PFLAG, Inc. v. Trump,*
　　769 F. Supp. 3d 405 (D. Md. 2025) ............................................... 38

*Poss v. Kern, Civ. A.,*
　　No. 23-2199, 2024 WL 4286088 (D.D.C. Sept. 25, 2024) .............. 52

*Radack v. DOJ,*
　　402 F. Supp. 2d 99 (D.D.C. 2005) ................................................. 52

*Randolph v. ING Life Ins. & Annuity Co.,*
　　973 A.2d 702 (D.C. 2009) .............................................................. 47

*RNC v. DNC,*
　　589 U.S. 423 (2020) ................................................................. 30, 35

*RNC v. N.C. State Bd. of Elections (RNC),*
　　120 F.4th 390 (4th Cir. 2024) ........................................................ 50

*RNC v. Wetzel,*
　　120 F.4th 200 (5th Cir. 2024) .................................................. 36, 50

*RNC v. Wetzel*,
    132 F.4th 775 (5th Cir. 2025) ................................................................... 36

*In re Sci. Applications Int'l Corp. (SAIC) Backup Tape Data Theft Litig.*,
    45 F. Supp. 3d 14 (D.D.C. 2014) .............................................................. 54

*Seila Law v. CFPB*,
    591 U.S. 197 (2020) ............................................................................ 27, 30

*Shays v. FEC*,
    414 F.3d 76 (D.C. Cir. 2005) .................................................................... 24

*Smith v. Meese*,
    821 F.2d 1484 (11th Cir. 1987) ................................................................ 49

*Soltysik v. Padilla*,
    910 F.3d 438 (9th Cir. 2018) .................................................................... 60

*Sprint Corp. v. FCC*,
    331 F.3d 952 (D.C. Cir. 2003) .................................................................... 7

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009) ................................................................................ 47

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014) ................................................................................ 27

*Susman Godfrey LLP v. Exec. Off. of President*,
    No. CV 25-1107, 2025 WL 1779830 (D.D.C. June 27, 2025) ............................. 5

*Texas v. EPA*,
    726 F.3d 180 (D.C. Cir. 2013) .................................................................. 56

*Tolbert-Smith v. Chu*,
    714 F. Supp. 2d 37 (D.D.C. 2010) ............................................................ 54

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021) .................................................................. 28, 45, 46, 47

*Trudeau v. FTC*,
    456 F.3d 178 (D.C. Cir. 2006) .................................................................. 59

*Trump v. New York*,
    592 U.S. 125 (2020) ................................................................................ 28

*Trump v. United States,*
603 U.S. 593 (2024) ................................................................................ 28

*Turner v. Shinseki,*
824 F. Supp. 2d 99 (D.D.C. 2011) .......................................................... 20

*United States v. Alabama,*
778 F.3d 926 (11th Cir. 2015) ........................................................... 17, 22

*United States v. Classic,*
313 U.S. 299 (1941) ........................................................................... 32, 33

*United States v. Texas,*
599 U.S. 670 (2023) ................................................................................ 28

*Univ. of Colo. Health v. Azar,*
486 F. Supp. 3d 185 (D.D.C. 2020) ........................................................ 41

*Valdez v. Squier,*
676 F.3d 935 (10th Cir. 2012) ............................................................. 9, 10

*Venetian Casino Resort, LLC v. EEOC,*
409 F.3d 359 (D.C. Cir. 2005) ................................................................ 57

*Vote Forward v. DeJoy,*
490 F. Supp. 3d 110 (D.D.C. 2020) ........................................................ 59

*Warth v. Seldin,*
422 U.S. 490 (1975) ................................................................................ 26

*Wolf v. Regardie,*
553 A.2d 1213 (D.C. 1989) ..................................................................... 48

*Youngstown Sheet & Tube Co. v. Sawyer,*
343 U.S. 579 (1952) ..................................................................... 12, 19, 37

*\*Zivotofsky v. Kerry,*
576 U.S. 1 (2015) ......................................................................... 6, 11, 21

### Constitutional Provisions, Statutes, and Regulations

U.S. Const. art. I, § 4 ......................................................................... 30, 36

U.S. Const. art. I, § 8 ................................................................................ 38

U.S. Const. art. I, § 9 ................................................................................................ 37

U.S. Const. art. II, § 1 .......................................................................................... 30, 36

U.S. Const. art. II, § 3 .............................................................................................. 12

2 U.S.C. § 7 .................................................................................................. 32, 34, 38

3 U.S.C. § 1 ........................................................................................ 32, 34, 35, 38

5 U.S.C. § 552a ............................................................................................ 52, 54, 56

5 U.S.C. § 704 .......................................................................................................... 50

5 U.S.C. § 706 ................................................................................................... 41, 50

8 U.S.C. § 1642 ........................................................................................................ 11

52 U.S.C. § 20301 .................................................................................................... 17

52 U.S.C. § 20301(b) ........................................................................................ *passim*

52 U.S.C. § 20302 .................................................................................................... 17

52 U.S.C. § 20303(b) ............................................................................................... 34

52 U.S.C. § 20304(b) ............................................................................................... 34

52 U.S.C. § 20506(a) ........................................................................................ *passim*

52 U.S.C. § 20507(c) ............................................................................................... 10

52 U.S.C. § 20508(b)(1) ......................................................................................... 8, 9

52 U.S.C. § 20921 .................................................................................................... 37

52 U.S.C. § 21001 .................................................................................................... 38

52 U.S.C. § 21003(b)(3) .......................................................................................... 40

52 U.S.C. § 21145(a) ............................................................................................... 40

Illegal Immigration Reform and Immigrant Responsibility Act, Pub. L. No. 104-208, § 642,
110 Stat. 3009, 3009-707 (1996) ..................................................................... 42

Pub. L. No. 78-277, § 311(b)(3), 58 Stat. 136 ...................................................... 34

Pub. L. No. 84-296, 69 Stat. 587 ........................................................................ 17

Pub. L. No. 99-603, § 121(a)(1)(C), 100 Stat. 3359, 3384–86 (1986) ........................ 42

20 C.F.R. § 401.120 ........................................................................................... 56

42 C.F.R. § 435.956(a) ....................................................................................... 11

### Federal Rules

Fed. R. Civ. P. 15(a)(2) ...................................................................................... 20

Fed. R. Civ. P. 56(a) ........................................................................................... 3

### Other Authorities

40 Fed. Reg. 28948, 28953 (July 9, 1975) ............................................................ 54

*Assess*, Black's Law Dictionary (3d ed. 1933) ...................................................... 8

Exec. Order 14,248, *Preserving and Protecting the Integrity of American Elections* (Mar. 25, 2025) ......................................................................................*passim*

H.R. Rep. No. 99–765, at 7 (1986) ............................................................... 17, 34

H.R. Rep. No. 103-9 (1993) ............................................................................... 4, 9

Jack Goldsmith & John F. Manning, *The Protean Take Care Clause*, 164 U. Pa. L. Rev. 1835 (2016) ........................................................................................................ 12

Josiah Henry Benton, *Voting in the Field: A Forgotten Chapter of the Civil War* (1915).......... 34

Restatement (Second) of Torts § 652B (A.L.I. 1965) ............................................ 47

S. Rep. No. 103-6 (1993) ................................................................................. 4, 9

Systems of Record Notice, 90 Fed. Reg. 10025-02 (corrected Feb. 20, 2025) ...... 44, 55

Systems of Records Notice, 85 Fed. Reg. 31798-01 (May 27, 2020) ................... 43, 55

The Federalist No. 52 .......................................................................................... 1

The Federalist No. 60 (Alexander Hamilton) ......................................................... 4

## INTRODUCTION

This case is about who has the power to set the rules for federal elections, which the Founders regarded as "a fundamental article of republican government." The Federalist No. 52. To that end, the Constitution "invests *the States* with responsibility for the mechanics of congressional elections, but only so far as *Congress* declines to pre-empt state legislative choices." *Foster v. Love*, 522 U.S. 67, 69 (1997) (emphases added) (citation omitted). The President has no role in this scheme, other than to dutifully carry out the commands of Congress.

President Trump's Executive Order 14,248 ("EO") unlawfully attempts to upend this constitutional design. It seeks to nationalize the deadline for receiving timely cast mail ballots, even though Congress has prescribed no such thing, long deferring to individual state practice on the matter. It demands that federal departments designated as voter registration agencies "assess" the citizenship of people seeking public assistance before giving them the Federal Form, even though Congress has ordered these agencies to simply provide the Form to applicants, while relying on state officials to then assess their qualifications. It orders the imposition of documentation requirements on top of the Federal Post Card, even though Congress has mandated it remain a simple and convenient post card for Americans living and serving overseas. Each of these commands grossly exceeds the President's constitutional and statutory authority and, in doing so, harms the Democratic Party Plaintiffs ("DPPs"). Defendants should be permanently enjoined from carrying out these *ultra vires* and unconstitutional provisions.

Similarly, the Court should enjoin recent changes made to the Systematic Alien Verification for Eligibility system ("SAVE") by Defendants DHS, DOGE, and SSA because they are contrary to the Privacy Act. As public reporting has indicated, and as the Federal Defendants have now confirmed, recent updates to SAVE have trampled the Privacy Act's protections. These agencies have integrated sensitive Social Security information about nearly every American into

1

SAVE and made this data available to DOGE and thousands of state and local officials. These changes permit investigation of the eligibility of native-born U.S. citizen voters—a use for which SAVE has *never* been authorized. Rather than taking steps necessary to obtain authorization—including subjecting these changes to required public notice and comment—Defendants have simply barreled past the safeguards Congress enacted to protect sensitive personal information. And, while all of this has been done purportedly to identify non-citizen voters on the rolls, the Social Security information at issue is not fit to determine citizenship, creating a severe risk that many citizens, including Plaintiffs' members and supporters, will be wrongly removed from the voter rolls as a result of Defendants' unlawful and unauthorized activity.

The DPPs have standing to pursue their claims against these dictates, which harm their core activities, their members and supporters, and their competitive position. The claims are also ripe: the EO's commands are unambiguous, leaving little discretion to the relevant agencies and making clear they must obey the President's commands. And the DPPs have asserted valid causes of action—constitutionally-rooted *ultra vires* and separation of powers claims against the President's unlawful orders and an APA claim against the implemented changes to SAVE. Finally, while the Federal Defendants seek judgment as to certain other APA-based causes of action raised by the DPPs, the Court should defer ruling on those claims at this juncture. Those claims remain premature pending production of the administrative record ("AR") and discovery. Further, the Court may never need to rule on them—the DPPs' cross-motion already seeks relief as to nearly every provision at issue. For the reasons set forth herein, the Court should grant the DPPs' motion, which will substantially moot the remaining APA claims.

## BACKGROUND

On March 25, 2025, President Trump issued Executive Order 14,248, which purports to make sweeping changes to American elections. On March 31, the DPPs filed suit, challenging

several provisions of the EO. Shortly thereafter, the DPPs and other groups moved to preliminarily enjoin parts of the EO. The Court enjoined two provisions preliminarily: § 2(a) and § 2(d). *LULAC v. Exec. Off. of the President*, 780 F. Supp. 3d 135, 226 (D.D.C. 2025). Section 2(a) requires the EAC to adopt a documentary proof of citizenship (DPOC) requirement on the Federal Form, while § 2(d) requires certain federal agencies to "assess citizenship" before distributing that Form.

The Court subsequently adopted a three-phase summary judgment briefing schedule. The first phase, which concerned Plaintiffs' challenges to § 2(a), is fully briefed. The parties are now in Phase II, which is the phase in which the Court set the deadlines for Federal Defendants' motions for summary judgment as to all "remaining claims [based] on purely legal grounds." ECF No. 141 at 3. Plaintiffs reserved the right to cross-move during this Phase. *See id.* at 3 n.5.

In their Phase II motion, Defendants move for summary judgment on all of the DPPs' outstanding claims, including as to §§ 2(b), 2(d), 3(a), 3(d), 4(a)–(d), 7(a), and 7(b). They do so on the merits, as well as procedural grounds concerning standing, ripeness, and the availability of causes of action. The RNC adds its own merits arguments as to § 2(d) and § 7(a).

The DPPs now cross-move on their *ultra vires* and separation of powers claims as to §§ 2(d), 3(d), 4(a), and 7 of the EO. They further cross-move for partial summary judgment on their APA claim as to §§ 2(b)(i), 2(b)(iii), and 3(a), as Federal Defendants have conceded the agencies charged with carrying out those provisions—DHS, DOGE, and SSA—have taken final agency action. *See* SOF ¶ 90. It is otherwise premature to resolve DPPs' remaining APA claims.

## STANDARD OF REVIEW

A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "'genuine' if 'the evidence is such that a reasonable [factfinder] could

return a verdict for the nonmoving party.'" *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

## ARGUMENT

**I.      Section 2(d)'s requirement that federal voter registration agencies "assess citizenship" before distributing the Federal Form is unlawful.**

Under the NVRA, States may designate certain federal offices as "voter registration agencies," so long as they have "the agreement of such" agencies. 52 U.S.C. § 20506(a)(3)(B)(ii). Designated voter registration agencies that provide public assistance must "distribute with each application for . . . assistance" the "mail voter registration application form" created by the NVRA (*i.e.*, the Federal Form). *Id.* § 20506(a)(6)(A)(i). The NVRA leaves these agencies no discretion in this task; the law imposes a "mandatory duty to provide the Federal Form 'with each *application*'" for public assistance. *LULAC*, 780 F. Supp. 3d at 210 (quoting 52 U.S.C. § 20506(a)(6)). The NVRA's legislative history confirms the point: agencies must perform their duty to "distribut[e] registration forms *simultaneously* with applications for services or benefits." S. Rep. 103-6, at 22 (1993); *see also* H.R. Rep. No. 103-9, at 6, 11 (1993) (same). The NVRA further requires that the Federal Form list "each eligibility requirement (including citizenship)" and that each applicant attest to their qualifications under penalty of perjury. 52 U.S.C. § 20506(a)(6).

Despite this straightforward scheme enacted by Congress, § 2(d) requires federal voter registration agencies to "assess [the] citizenship" of individuals seeking public assistance "prior to providing [them] a Federal voter registration form." EO § 2(d). But this "command is contrary to" the "mandatory duty" that the NVRA imposes on federal voter registration agencies to distribute the Federal Form. *LULAC*, 780 F. Supp. 3d at 210. The Constitution grants the Executive *no* role in determining a voter's qualifications—that is a task squarely assigned to state officials. *See Arizona v. Inter Tribal Council of Ariz., Inc.* (*ITCA*), 570 U.S. 1, 16–17 (2013); The Federalist No.

4

60 (Alexander Hamilton) (explaining the power to determine voter qualifications "forms no part of the power to be conferred upon the national government"). The President's EO both usurps the constitutional role of the States while at the same time asserting authority that Congress never granted the President.

### A. The Federal Defendants' threshold arguments as to § 2(d) fail.

#### 1. The Democratic Party Plaintiffs can seek judgment on their non-statutory causes of action against § 2(d).

Defendants raise several threshold arguments as to the DPPs' claims against § 2(d), though notably not as to standing. *See* FD Mot. 17–21; *see also LULAC*, 780 F. Supp. 3d at 207–09 (concluding the DPPs likely have standing). None have merit.

Defendants' contention that the DPPs lack a non-statutory cause of action because of the availability of APA relief, *see* FD Mot. 16–17, ignores the basis of Plaintiffs' claims against § 2(d). The DPPs argue that the President has "no source of legal authority" under either the Constitution or federal law to require federal agencies to "assess citizenship" before distributing the Federal Form to public assistance applicants. *See* DPP Compl. ¶ 131 (citation omitted). Such a lawless assertion of authority intrudes upon powers the Constitution assigns to Congress and the States— powers that do not belong to the President. *See id.* As the DPPs explained in Phase I, such a claim arises directly under the Constitution and presents "a classic separation-of-powers claim in the vein of *Youngstown*" regarding the source of the President's authority. *Susman Godfrey LLP v. Exec. Off. of President*, No. CV 25-1107 (LLA), 2025 WL 1779830, at *23 (D.D.C. June 27, 2025); *see also* ECF No. 185 at 28–31. That relief under the APA may also be available does not change the analysis.

Federal Defendants confirm as much, defending § 2(d) solely on the basis that it reflects the President's "constitutional authority to direct" "federal, Executive agencies." FD Mot. 27; *id.*

at 28 (pointing to the President's "*constitutional authority* to direct the actions of [federal] agencies" (emphasis added)). They tellingly stop short of arguing that the NVRA grants the President such authority—as explained below, it clearly does not. Thus, as in *Youngstown*, the "only basis of authority asserted" is "the President's inherent constitutional power as the Executive," not any statutory authority. *Glob. Health Council v. Trump*, No. 25-5097, 2025 WL 2480618, at *7 (D.C. Cir. Aug. 28, 2025) (citation omitted); *see also Zivotofsky v. Kerry*, 576 U.S. 1, 10 (2015) (explaining that, in the absence of statutory authority the President must rely solely "upon his own constitutional powers minus any constitutional powers of Congress over the matter" (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring)). This dispute over the President's asserted authority in § 2(d) thus "necessarily turn[s] on whether the Constitution authorize[s] the President's actions," *Dalton v. Specter*, 511 U.S. 462, 473 (1994), given that there can be no doubt that the "assessment" requirement in § 2(d) was never "even contemplated by Congress," *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1332 (D.C. Cir. 1996). As recent D.C. Circuit authority confirms, the DPPs therefore have a non-statutory cause of action against § 2(d). *See Glob. Health Council*, 2025 WL 2480618, at *6–9; *cf. NTEU v. Vought*, No. 25-5091, 2025 WL 2371608, at *19–20 (D.C. Cir. Aug. 15, 2025).

### 2.    Plaintiffs' claims against § 2(d) are ripe for review.

Federal Defendants passingly assert a prudential ripeness argument, though they fail to tailor the argument to § 2(d). *See* FD Mot. 20–21. According to them, Plaintiffs' claims are not prudentially ripe because "agencies have not either begun or completed implementation" of *any* provision in the EO. *Id.* at 20. But they ignore this Court's earlier analysis, which explained that judicial review of an executive order is prudentially ripe where the order "dictate[s] particular outcomes" or "purport[s] to create binding, enforceable obligations on their own." 780 F. Supp. 3d at 175 (quoting *AFGE v. Trump*, 318 F. Supp. 3d 370, 437–38 (D.D.C. 2018)). That is precisely

what § 2(d) does: it obligates federal public assistance offices designated as voter registration agencies to "assess citizenship" prior to distributing the Federal Form. *See* EO § 2(d); *see also LULAC*, 780 F. Supp. 3d at 210 (explaining § 2(d) "unambiguously commands action" contrary to the NVRA). Nowhere do Federal Defendants say how further delay would facilitate adjudication.

Federal Defendants' underdeveloped ripeness argument also ignores that implementation of § 2(d) is presently enjoined by two courts, *see LULAC*, 780 F. Supp. 3d at 225; *California v. Trump*, No. 25-cv-10810-DJC, 2025 WL 1667949, at *22 (D. Mass. June 13, 2025), illustrating that there is no need for "further factual development" of this claim. *Sprint Corp. v. FCC*, 331 F.3d 952, 956 (D.C. Cir. 2003) (citation omitted); *see also* 780 F. Supp. 3d at 209–11. This Court's finding that the DPPs showed irreparable harm from § 2(d) confirms that any delay of judicial review would "cause hardship to the plaintiffs." *Sprint Corp.*, 331 F.3d at 956; *see also* 780 F. Supp. 3d at 211 (concluding the DPPs had "carried their burden of showing a likelihood of irreparable harm from Section 2(d)"). Accordingly, the DPPs' claims against § 2(d) are ripe.

**B.    Section 2(d) is *ultra vires* and violates the separation of powers.**

The President's commands "must stem either from an act of Congress or from the Constitution itself." *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 188–89 (1999) (citation omitted). Section 2(d) stems from neither and thus is *ultra vires* and violates the separation of powers, for similar reasons as § 2(a). *See LULAC*, 780 F. Supp. 3d at 194–200.

To start, neither Federal Defendants nor the RNC identify "any statute [that] explicitly grants the President the power" to require federal voter registration agencies to assess a person's citizenship status before providing them with the Federal Form. *Id.* at 194. None exists.

The NVRA sets out a mandatory sequence of events for designated voter registration agencies that provide public assistance, and it does not allow for the additional interim step the President seeks to impose. *See* 52 U.S.C. § 20506(a)(4), (6). To the contrary, it requires that any

such agency "*shall* . . . distribute [the Federal Form] *with each application* for such service or assistance . . . unless the applicant, in writing, declines to register to vote." *Id.* § 20506(a)(6)(A) (emphases added); *see also id.* § 20506(a)(6)(B). This provision creates "a mandatory duty" to provide the form to "[*a*]*pplicants*." *LULAC*, 780 F. Supp. 3d at 210.[1] Once an applicant completes the Form, the NVRA requires each agency to "[a]ccept[] [the] completed voter registration application forms for transmittal to the appropriate State election official." 52 U.S.C. § 20506(a)(4)(A)(iii). It then becomes the duty of *state* officials to review the completed form to determine whether the applicant is qualified to vote in that State—the entire purpose of the Federal Form is "to enable the appropriate *State election official to assess the eligibility of the applicant* and to administer voter registration." 52 U.S.C. § 20508(b)(1) (emphasis added); *see also ITCA*, 570 U.S. at 17. This congressionally delineated process "leaves no role for agencies to 'assess citizenship.'" *LULAC*, 780 F. Supp. 3d at 210. Their "*only* role in enforcing States' citizenship requirement for voting is to provide the Federal Form to the applicant." *Id.*

Neither Federal Defendants nor the RNC suggest the NVRA grants the President any power to disrupt this process by injecting a citizenship-assessment requirement before the Federal Form is even distributed—and rightly so. Federal Defendants instead assert that § 2(d) is "consistent" with the NVRA. FD Mot. 28. But they fail to elaborate on that opaque claim. At most, they suggest the provision's assessment "functions as a reminder to the person receiving the form" that they must be a citizen to register to vote. *Id.* But that claim—based on pure attorney conjecture—is nonsensical. For one, it strains the term "assess" past its breaking point. To "assess" something is to "determine" or "evaluate" it, *see Assess*, Black's Law Dictionary (3d ed. 1933), not to merely

---

[1] This same duty applies whenever a person submits a recertification, renewal, or change of address concerning public assistance. *See* 52 U.S.C. § 20506(a)(6)(A).

remind someone about it. In any event, Congress already provided just such "reminders" directly through the attestation requirement on the form itself. *See* 52 U.S.C. §§ 20506(a)(6), 20508(b)(2); *cf. id.* § 20504(c)(2)(C). Finally, both the Constitution and NVRA assign *States* the responsibility for assessing a person's qualification to vote; the NVRA reflects that by directing federal employees to simply "[a]ccept[] [the] completed voter registration application forms for transmittal to the appropriate State election official." *Id.* § 20506(a)(4)(A)(iii); *see also id.* § 20508(b)(1). Congress did *not* intend to "transfer[] voting registration authority from State voting registrars to agencies," but rather drafted the law such that the "only . . . role of the agency-based registration program is to provide forms to applicants and receive completed voter applications for transmittal to the appropriate State voting registration official." S. Rep. No. 103-6, at 17 (1993).

The RNC offers a similarly flawed theory, making three erroneous arguments related to the NVRA. *See* RNC Mot. 8–11. First, it contends that the DPPs cannot point to a provision in the statute expressly prohibiting the assessment in § 2(d). *See id.* at 9. That is wrong: Section 20506(a) establishes a "mandatory duty" to provide the Federal Form "with each *application*," absent an express written declination on a prescribed form, *LULAC*, 780 F. Supp. 3d at 210 (citation omitted); *see also see also Valdez v. Squier*, 676 F.3d 935, 945–47 (10th Cir. 2012) (applying provision); *Action NC v. Strach*, 216 F. Supp. 3d 597, 633–34 (M.D.N.C. 2016) (explaining registration form must be distributed with "each" and "every" application for benefit or assistance (citing 52 U.S.C. § 20506(a)(6)(A)). This mandatory language grants no discretion to the President or any agency to condition distribution on additional requirements. *See* 52 U.S.C. § 20506(a)(6)(A); *see also* S. Rep. No. 103-6, at 22, 27 (1993); H.R. Rep. No. 103-9, at 6, 11 (1993). The RNC simply ignores this text and this Court's past interpretation of it.

Second, the RNC points to § 50206(a)(6)(B), which requires each agency to "provide a form" to applicants asking them whether they would like to register to vote, telling them they can receive assistance in completing the form, and advising them that choosing not to register does not impact their receipt of public assistance. The RNC reasons that this provision shows the NVRA "contemplates obtaining information from public assistance applicants before providing them with the federal voter-registration form." RNC Mot. 9 (emphasis omitted) (citing 52 U.S.C. § 20506(a)(6)(B)(i)). But the NVRA permits the agency to place only a single question on this informational sheet: "If you are not registered to vote where you live now, would you like to apply to register to vote here today?" 52 U.S.C. § 20506(a)(6)(B)(i). Voter registration agencies that offer public assistance must distribute the Federal Form unless the applicant expressly declines in writing; it *must* provide the Form, even if the applicant leaves this question blank. *See Valdez*, 676 F.3d at 947. The provision thus further confirms that Congress did not authorize the President to condition distributing the Federal Form based on the citizenship assessments ordered in § 2(d)— the NVRA "explicitly enumerates" what can be asked of such applicants when providing them with the Federal Form and "additional exceptions are not to be implied." *Hillman v. Maretta*, 569 U.S. 483, 496 (2013).

Third, the RNC alludes vaguely to the NVRA's list maintenance requirements, one of which permits "investigating potential non-citizens and removing them" from the rolls based on individualized information within 90 days of a federal election. RNC Mot. 10 (quoting *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1348 (11th Cir. 2014)). But the RNC ignores that this provision of the NVRA merely requires "[a] State" to complete systematic list maintenance by a deadline. 52 U.S.C. § 20507(c)(2)(A). Thus, once more, the RNC's argument highlights the *lack* of any role for the President in determining whether a public assistance applicant can receive the Form.

Unable to point to anything in the NVRA granting the Executive authority to perform citizenship assessments typically performed by state officials, the RNC grasps at an unrelated statute—8 U.S.C. § 1642. But that statute has nothing to do with distributing the Federal Form. It requires federal agencies to develop rules for determining whether federal benefit recipients are either "a qualified alien . . . eligible to receive" certain benefits or whether they have "proof of citizenship." *Id.* § 1642(a)(1), (2). The RNC does not say this provision authorizes the citizenship assessment required by § 2(d)—because it plainly does not.[2] Instead, the RNC claims it shows that federal agencies are already "assess[ing] the citizenship status of persons seeking public assistance." RNC Mot. 8. But that argument is beside the point—nothing in § 1642 disrupts the mandatory sequencing for distributing the Federal Form set forth in the NVRA. And whereas § 1642 requires an agency to "verif[y]" a person's immigration status when determining their eligibility for a public benefit, the NVRA makes clear the Federal Form must be distributed *before* that point—"with [the] application" for the benefit itself. 52 U.S.C. § 20506(a)(6)(A); *cf., e.g.*, 42 C.F.R. § 435.956(a) (describing Medicaid post-application citizenship verification). It is then the responsibility of *state* officials to review the form and assess the applicant's qualifications.

In the end, Federal Defendants' and the RNC's arguments only further underscore the "absence of any clear grant of authority to the President" to impose the citizenship checks in § 2(d). *LULAC*, 780 F. Supp. 3d at 195. Neither tries to identify congressional authorization for § 2(d). Because § 2(d) is clearly not authorized by statute and runs contrary to the NVRA's "mandatory duty," *id.* at 210, the only powers that the President can rely on in defending it are those that "the Constitution grants to him." *Zivotofsky*, 576 U.S. at 10. The RNC points to no constitutional authority, *see* RNC Mot. 8–11, while Federal Defendants point generally to the President's

---

[2] Tellingly, Federal Defendants and the EO make no mention of § 1642 as a source of authority.

authority to "direct the actions of [federal] agencies . . . consistent with their statutory mandates." FD Mot. 28. But therein lies the problem.

As the DPPs explained in Phase I, *see* ECF No. 185 at 8–9, the President's authority to "take care that the Laws be faithfully executed," U.S. Const. art. II, § 3, "reaches so far as there is law," but no further. *Youngstown*, 343 U.S. at 646 (Jackson, J., concurring). "This authority allows the President to execute the laws, not make them." *Medellin v. Texas*, 552 U.S. 491, 532 (2008); *cf. Blassingame v. Trump*, 87 F.4th 1, 36 (D.C. Cir. 2023) (Rogers, J., concurring in part) ("Article II and the Take Care Clause do not grant the President boundless authority to supervise, control, or otherwise interfere with procedures entrusted by law to other branches of government."). Defendants' bare assertion that § 2(d) simply orders agencies to act in a manner "consistent with their statutory mandates," FD Mot. 28, is flatly wrong. As in *Youngstown*, § 2(d) "does not direct that a congressional policy be executed in a manner prescribed by Congress—it directs that a presidential policy be executed in a manner prescribed by the President." 343 U.S. at 588.

To endorse the President's reading of the Take Care Clause—as permitting him to direct federal agencies at his whim, notwithstanding the laws enacted by Congress—"would be clothing the President with a power entirely to control the legislation of congress." *Kendall v. U.S. ex rel. Stokes*, 37 U.S. 524, 613 (1838). Such a reading "would give the President authority effectively to nullify Acts of Congress." *NTEU v. Nixon*, 492 F.2d 587, 604 (D.C. Cir. 1974); *accord* Jack Goldsmith & John F. Manning, *The Protean Take Care Clause*, 164 U. Pa. L. Rev. 1835, 1851 (2016) (explaining "the Court has read the . . . Clause to limit the President's authority to act *contra legem*"). That would be particularly egregious in the election context, where the President's constitutional authority is at a nadir. *Cf. Georgia v. Meadows*, 88 F.4th 1331, 1347 (11th Cir. 2023)

(explaining "no authority" supports the President's dictation of election rules "based solely on [his] own initiative, and not in relation to another branch's constitutionally authorized act").

In sum, neither the Federal Defendants nor the RNC can cite to valid constitutional or statutory authority for the President's § 2(d) edict. Accordingly, the Court should declare it *ultra vires* and enjoin the relevant federal agencies from enforcing it.

## II.    Section 3(d)'s DPOC requirement for the Federal Post Card Application is unlawful.

The DPPs also cross-move for summary judgment as to § 3(d), which orders the Defense Secretary to "update the Federal Post Card Application" to require "documentary proof of United States citizenship" as well as "proof of eligibility to vote in elections in the State in which the voter is attempting to vote." EO § 3(d). But neither the Constitution nor UOCAVA authorize the President to add a DPOC requirement—or a "proof of eligibility" requirement—to the Federal Post Card. Quite the opposite: Congress has expressly ordered that States accept a simple "post card form" exclusively available to uniformed members of the military and overseas voters. 52 U.S.C. § 20301(b)(2). While UOCAVA permits the executive branch to design the form, nothing in that statute or the Constitution empowers the Executive to require voters to attach extraneous documentation or proof requirements; the Defense Secretary's authority is limited to prescribing fields within the four corners of the form itself. *Id.* Accordingly, as another court has found, § 3(d) is "in conflict with the will of Congress," which has granted the President no power to pile requirements atop the Federal Post Card. *California*, 2025 WL 1667949, at *10.

### A.    Federal Defendants' threshold arguments as to § 3(d) fail.

Federal Defendants contest the DPPs' standing to challenge § 3(d), *see* FD Mot. 7–8, but the Court has already rejected analogous arguments as to § 2(a) and should do so here too. *See* 780 F. Supp. 3d at 191. As with § 2(a)'s DPOC requirement, the Party Organizations have associational standing based on harms § 3(d) would impose on their members and constituents. *See Crawford*

*v. Marion Cnty. Election Bd.*, 472 F.3d 949, 951 (7th Cir. 2007) (holding Democratic Party had associational standing through its members to challenge voter ID requirement). Many of their members living abroad lack ready access to DPOC or the technology needed to send DPOC and proof of eligibility to state officials; § 3(d) thus "hinder[ers] these members' ability to register to vote, inflicting a cognizable harm that is directly traceable to the Executive Order." *LULAC*, 780 F. Supp. 3d at 192 (citing *Mi Familia Vota v. Fontes*, 129 F.4th 691, 709 (9th Cir. 2025)); SOF ¶ 20. Further still, military and overseas voters often use the Federal Post Card to request an absentee ballot, meaning they would need to satisfy § 3(d)'s burdensome documentation requirements each year they vote. SOF ¶ 22; *cf. Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1351–52 (11th Cir. 2009) ("Requiring a registered voter either to produce photo identification to vote in person or to cast an absentee or provisional ballot is an injury sufficient for standing.").

The Party Organizations also have competitive standing because "[i]mplementing [§ 3(d)] would alter the 'competitive environment' in which Plaintiffs Jeffries and Schumer compete for elective office." *LULAC*, 780 F. Supp. 3d at 192 (quoting *Shays v. FCC*, 414 F.3d 76, 87 (D.C. Cir. 2005)). As the Court concluded with respect to § 2(a), Leader Jeffries and Leader Schumer both have "active candidacies for reelection to federal office" and "some of their constituents and likely supporters may be unable to register to vote or may be dissuaded from registering" if § 3(d) is implemented due to their limited ability to provide or transmit DPOC. *Id.*; SOF ¶¶ 23–27. The same goes for their supporters' ability to request an absentee ballot from abroad using the Federal Post Card, a task that will be made more burdensome if § 3(d) is implemented. SOF ¶¶ 23–27. Moreover, the Party Organizations work on behalf of *hundreds* of similarly situated candidates across the country. *See id*. Many of these candidates will compete in close elections; the hundreds of thousands of voters who depend on the Federal Post Card each year can tip the scales in these

races. *See id.* As the "party affiliate[s]" of such active candidates, the Party Organizations can "exercise political-competitor standing" on their behalf. *LULAC*, 780 F. Supp. 3d at 192 (quoting *Nat. L. Party v. FCC*, 111 F. Supp. 2d 33, 47 (D.D.C. 2000)).

Finally, the DPPs have standing to challenge § 3(d) because "the implementation of" its DPOC and proof-of-eligibility requirements "would make it more difficult for them to register voters who are likely to support Democratic candidates," and some of the Party Organizations would be forced "to divert additional resources toward further voter registration efforts." *Id.* at 191 (finding standing as to § 2(a) challenge); SOF ¶¶ 31–34. The same is true for ensuring military and overseas voters abroad who depend on the Federal Post Card to request absentee ballots are able to vote. SOF ¶¶ 20–22. By burdening the ability of some of the DPPs to register overseas supporters to vote (and apply for absentee ballots), § 3(d) inflicts direct harm on their core programs that aim to maximize registration and turnout among their members and supporters— including the 1.3 million voters living abroad who are registered to vote domestically. SOF ¶¶ 20–34. That alone suffices to show an organizational injury, but the DPPs are yet further harmed by the additional resources they will have to deploy to ensure that their members and supporters abroad are able to request ballots annually. SOF ¶ 32; *see also LULAC*, 780 F. Supp. 3d at 191.

Defendants continue to cite *FDA v. Alliance for Hippocratic Medicine* for the proposition that "'standing' does not routinely 'exist[] when an organization diverts its resources in response to a defendant's actions.'" FD Mot. 8 (alteration in original) (quoting 602 U.S. 367, 370 (2024)). But that case confirms that organizations "have standing to challenge practices that directly interfere with their core activities, such as direct services programs." *LULAC*, 780 F. Supp. 3d at 180 (citing *Hippocratic Med.*, 602 U.S. at 394–96). Federal Defendants nowhere dispute that implementing § 3(d) would "directly affect[] and interfere[] with" Plaintiffs' investments in core

voter registration programs and their ability to ensure members and constituents can register and remain registered. *Hippocratic Med.*, 602 U.S. at 395.

Defendants never squarely address these grounds for standing. They instead suggest that "[t]he particulars of how or when § 3(d) will be implemented are . . . unsettled" because the "Secretary of Defense, via the Federal Voting Assistance Program . . . , has not yet updated the FPCA," and as such, "Plaintiffs (and the Court) can only speculate about whether the requirement would violate UOCAVA." FD Mot. 7–8. But § 3(d) "leaves no uncertainty about what it requires." *LULAC*, 780 F. Supp. 3d at 185. It leaves the Department of Defense "with discretion over little more than 'whether documentary proof of citizenship needs to be stapled to the [Federal Post Card] or paper-clipped.'" *Id.* at 199 (citation omitted). And though § 3(d)(ii) does not define "proof of eligibility to vote in elections in the State in which the voter is attempting to vote," it will almost certainly require some additional documentation extraneous to the post card itself, otherwise it would add nothing on top of the Federal Post Card's already-existing "standard oath." *See* SOF ¶ 17; *see also California*, 2025 WL 1667949, at *9 (reaching similar conclusion as to § 3(d)). Section 3(d)'s mandatory language "dictate[s] [the] particular outcome[]" that the Secretary must reach, and the legal question presented is thus concrete and ready for review. *AFGE v. Trump*, 318 F. Supp. 3d 370, 437–38 (D.D.C. 2018).

## B. Section 3(d) is *ultra vires* and violates the separation of powers.

### 1. Neither the Constitution nor statute authorizes the President or Defense Secretary to add a DPOC requirement to the Federal Postcard.

Neither the Constitution nor other federal law authorizes the President to add a DPOC or proof of eligibility requirement to the Federal Post Card. UOCAVA, often "referred to as the 'Post Card' law," was enacted to address "severe difficulties" faced by active military personnel and their families in exercising their fundamental right to vote. *Deutsch v. N.Y. State Bd. of Elections*,

No. 20 CIV. 8929 (LGS), 2020 WL 6384064, at *1 (S.D.N.Y. Oct. 30, 2020). To that end, the Federal Post Card reflects an "unequivocal[] commit[ment] to eliminating procedural roadblocks, which historically prevented thousands of service members from sharing in the most basic of democratic rights." *United States v. Alabama*, 778 F.3d 926, 928 (11th Cir. 2015).

UOCAVA carefully delineates responsibilities for both federal and state officials. *See* 52 U.S.C. §§ 20301, 20302. The Executive is given the narrow charge to "prescribe an official post card form, containing both an absentee voter registration application and an absentee ballot application." *Id.* § 20301(b)(2). A post card, of course, is "a card . . . for mailing without an envelope and to which the sender must affix a stamp." *California*, 2025 WL 1667949, at *10 (alteration in original) (citing dictionary). And UOCAVA's sponsor confirmed at congressional hearings that the Federal Post Card was created to be a "postage free post card." SOF ¶ 18.

Congress's choice to mandate a simple postcard was purposeful; it intended the Federal Post Card to be "widely available throughout the world—at military installations, embassies, consulates, corporations and organizations of overseas citizens." H.R. Rep. No. 99-765, at 7 (1986) (explaining the Federal Post Card was "the primary source used by overseas voters to register and request a ballot"); *see also* SOF ¶ 19 (congressional testimony by military officer that "anyone could handle" the Federal Post Card and "the only way a guy could really not correctly fill [it] out" "would be to put John Doe on the name line instead of his own").[3] The present iteration of the form fulfills this function, and requires information like name, birth date, driver's license number,

_____

[3] A predecessor to the current Federal Post Card was created by Congress in the Federal Voting Assistance Act of 1955. That law also required that the application should take "the form of a post card," going so far as to prescribe its size and contents. *See* Pub. L. No. 84-296, §§ 101, 204, 69 Stat. 587. While UOCAVA grants the executive branch greater leeway in designing the contents of the Federal Post Card, it retains the essential requirement at issue here—the application must in fact remain in "post card form." 52 U.S.C. § 20301(b)(2).

Social Security number, and contact information. SOF ¶ 16. As with the Federal Form, Congress prescribed how a Federal Post Card registrant confirms their citizenship and eligibility to vote: by swearing a "standard oath" under penalty of perjury that attests to their citizenship and eligibility. 52 U.S.C. § 20301(b)(7).

Section 3(d) runs roughshod over Congress's delineated scheme by ordering the Defense Secretary to "update the Federal Post Card Application" to "require" overseas voters to include with their Federal Post Card "documentary proof of United States citizenship" and also "proof of eligibility to vote" in a State. EO § 3(d). It further "define[s]" acceptable documentation by cross referencing § 2(a)(ii) of the EO. But UOCAVA makes clear that the Federal Post Card is restricted to what its name suggests—a post card. UOCAVA forbids the President from adding extraneous requirements to the form, including § 3(d)'s mandate to attach additional documentation to the Federal Post Card itself. *See California*, 2025 WL 1667949, at *10 (concluding "neither the Constitution nor any statute grants the President the authority to enact § 3(d)").

Federal Defendants do not—and cannot—identify any constitutional or statutory provision authorizing the President to add these new documentary requirements to the Federal Post Card, because no such authorization exists. While UOCAVA permits the Defense Secretary to design the "post card form," 52 U.S.C. § 20301(b)(2), nothing in the Constitution or in UOCAVA empowers him to add extraneous registration requirements to the Federal Post Card, let alone mandate proof of citizenship.[4] To the contrary, any delegation of authority from Congress was

---

[4] Though Arizona, Puerto Rico, and Vermont have additional jurisdiction-specific requirements on the Federal Post Card, applicants from Vermont and Puerto Rico need only provide additional information on the form itself, and all three jurisdiction-specific requirements "affect only whether a voter can obtain a ballot for state elections and they have no impact on a voter's ability to obtain a ballot for federal []elections." *California*, 2025 WL 1667949, at *10 n.7.

purposefully circumscribed to the contents of the "post card form"; the Executive Branch has no power to graft additional requirements on top of that form. After all, any power to prescribe "reaches [only] so far as there is law," *Youngstown*, 343 U.S. at 646 (Jackson, J., concurring), which Congress has made clear extends only to the contents of the "postcard form." President Trump's effort to require more is *ultra vires* and intrudes upon authority assigned to Congress.

Federal Defendants respond that "[n]othing in UOCAVA *limits* what kind of documentation requirements the Secretary of Defense may 'prescribe' on the 'official post card form.'" FD Mot. 30. But that limitation is clear from Congress' purposeful choice of the term "post card." *See Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 544 (2012) ("Where Congress uses certain language in one part of a statute and different language in another, it is generally presumed that Congress acts intentionally."). It is further confirmed by UOCAVA's direction that the Secretary ensure citizenship status through "a standard oath," 52 U.S.C. § 20301(b)(7), and the statute's silence as to any documentary proof that must accompany that oath. *See California*, 2025 WL 1667949, at *10. Congress's careful enumeration of specific and narrow duties for the Secretary, along with its choice to employ an attestation requirement, circumscribes any grant of authority to the executive branch. *See id.* at *10 ("None of the enumerated duties [in UOCAVA] contemplates a documentary proof of citizenship requirement."). This Court should "not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply," particularly where it has "shown elsewhere in the same statute that it knows how to make such a requirement manifest." *Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 341 (2005). The Court "cannot presume that Congress ignored the meaning of 'postcard' when it employed it in the statute." *California*, 2025 WL 1667949, at *10.

### 2.    Democratic Party Plaintiffs have a cause of action to challenge § 3(d).

The DPPs agree with and join the LULAC Plaintiffs' arguments that § 3(d) is *ultra vires* and violates the separation of powers. While the DPPs pled their challenge as an APA claim, their complaint gives fair notice as to this alternative *ultra vires* theory: that no source of law, including "UOCAVA . . . permit[s] or contemplate[s] the addition of any requirements beyond what voters place on the 'post card.'" DPP Compl. ¶ 182; *see also Lee v. Nat'l Elec. Contractor Ass'n*, 322 F. Supp. 3d 43, 44 (D.D.C. 2018) (explaining Rule 8 requires "that defendants receive fair notice of the claim being asserted"). Given that the DPPs pled *ultra vires* claims as to other provisions, DPP Compl. ¶¶ 126–63, and that the availability of a non-statutory *ultra vires* cause of action has already been extensively litigated—indeed, that claim has been pressed by the LULAC Plaintiffs specifically as to § 3(d), *see* LULAC Compl. ¶ 209—Federal Defendants will suffer no prejudice if Count I is read as directed towards § 3(d). *See* FD Mot. 16–17, 30–31 (already addressing this issue); ECF No. 163 at 10–12. That is particularly so since Federal Defendants already moved for summary judgment on this exact issue—an *ultra vires* claim as to § 3(d). Because the issue has been briefed, and the relevant theories have been set forth in their complaint, the DPPs' Count I should be either read or constructively amended to include a challenge to § 3(d). *See Turner v. Shinseki*, 824 F. Supp. 2d 99, 122 & n.23 (D.D.C. 2011) (treating claim as constructively amended at summary judgment stage where "both parties discuss the claim in their briefs"); *Pelton v. DeJoy*, No. CV 19-1766 (LLA), 2024 WL 1961297, at *7 (D.D.C. May 3, 2024) (similar).[5]

---

[5] Alternatively, if the Court declines to construe Count I as pleading an *ultra vires* theory directed towards § 3(d), it should permit the DPPs to amend their pleading pursuant to Rule 15(a)(2). Such leave "should [be] freely give[n] when justice so requires." Fed. R. Civ. P. 15(a)(2). That standard is readily met here, where the parties' summary judgment brief already addresses the precise issues raised by any such amendment and no party will suffer prejudice. *See* FD Mot. 16–17, 30–31.

As to the availability of such a claim, Federal Defendants continue to wrongly assert that the APA bars a non-statutory, equitable cause of action. *See* FD Mot. 16. That argument is misguided for the reasons outlined in Phase I and above. *See* ECF No. 184 at 28–31. "[E]quitable relief substantially depends on whether the plaintiff claims a statutory or constitutional violation," and courts have "long recognized implied equitable claims arising under the Constitution." *Vought*, 2025 WL 2371608, at *18. The challenge to § 3(d) falls squarely within that category because neither the Constitution nor UOCAVA "provide[] a mechanism for the President" or any other executive officer to add extraneous requirements to the Federal Post Card. *Glob. Health Council*, 2025 WL 2480618, at *8. As explained above, Congress's deliberate choice to allow overseas voters to register using only a "post card' necessarily precludes the authority to prescribe *any* other burdensome documentation requirements when using the Federal Post Card. Any action to require DPOC was not even "contemplated" by Congress, *Reich*, 74 F.3d at 1332, and—in the absence of any possible statutory authorization—the President can rely only on powers "the Constitution grants to him." *Zivotofsky*, 576 U.S. at 10.

Even assuming Plaintiffs' *ultra vires* challenge to § 3(d) does not arise under the Constitution, they still have a statutory *ultra vires* claim. *See Glob. Health Council*, 2025 WL 2480618, at *12 (listing three requirements to prevail under statutory *ultra vires* cause of action). First, no provision of UOCAVA "preclude[s]" judicial review, *id.*, and no party contends otherwise. Second, there is no "alternative procedure for review" available under the APA because—as Federal Defendants highlight—implementation of § 3(d) is presently enjoined, precluding the Defense Secretary from taking final agency action. *See* FD Mot. 18 (noting the Defense Department "has not completed the process for updating the federal post card form— *section 3(d) is also enjoined*" (emphasis added)). Finally, there is a "clear and mandatory statutory

prohibition" against the President adding extraneous documentation requirements atop the Federal Post Card, as Congress demarcated the scope of the relevant form—a "post card form." 52 U.S.C. § 20301(b)(2); *Alabama*, 778 F.3d at 928. By adding additional documentation requirements outside the four corners of the Federal Post Card itself, § 3(d) "disregard[s] [this] specific and unambiguous statutory directive." *Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 762 (D.C. Cir. 2022) (citation omitted).

## III. Section 7's preemption of state ballot receipt deadlines is unlawful.

Thirty States allow for the counting of ballots that are cast by—but received after—election day. SOF ¶¶ 48–50. These laws protect voters, including the elderly, disabled, servicemembers, and overseas citizens, who may otherwise be disenfranchised because of mail delays beyond their control. SOF ¶ 51. They therefore protect millions of members and supporters of the DPPs, particularly since those plaintiffs have made mail voting a cornerstone of their electoral strategy. SOF ¶ 52. The EO purports to override these state laws by incorrectly claiming they violate the Election Day Statutes—that is, "the Federal laws that set the uniform day for appointing Presidential electors and electing members of Congress." EO § 7(a) (citing 2 U.S.C. § 7 and 3 U.S.C. § 1). Section 7(a) directs the AG to "take all necessary action to enforce" this nonexistent federal ballot-receipt deadline, and § 7(b) directs the EAC to "condition any available funding to a State on that State's compliance" with the same. EO § 7(a)–(b).

Federal law does not mandate that all ballots be received on election day. Rather, the Election Day Statutes are silent on when timely cast ballots must be received, meaning the Constitution reserves the issue for the States. The President has no power to invent new election regulations that trample States' authority. The Court should therefore grant summary judgment on Plaintiffs' claims that § 7(a) and § 7(b) are *ultra vires* and violate the separation of powers.

A.    **Federal Defendants' threshold arguments as to § 7 fail.**

1.    **The Democratic Party Plaintiffs have standing to challenge § 7.**

The DPPs presented extensive, unrefuted evidence on § 7's impact at earlier stages of this litigation. *See* ECF No. 53-2–53-7. Democratic voters and candidates disproportionately benefit from post-election ballot-receipt deadlines. *See* SOF ¶ 53; *see also* ECF No. 125-1 ¶ 20 (RNC declarant arguing "voting by mail is starkly polarized by party" and thus these state laws "heavily favor Democratic candidates"); ECF No. 135 at 6 (concluding that § 7(a) "directly benefit[s] the electoral prospects of Republican candidates for federal office"). A national election day ballot receipt deadline will disenfranchise Democrats and make it harder for Democrats to win elections. SOF ¶ 56. The DPPs have invested heavily in encouraging voters to vote by mail, in furtherance of their mission of electing Democratic candidates. SOF ¶ 57. Indeed, President Trump is attacking mail voting for just these reasons; he has open contempt for mail voting and believes it favors his political opponents. *See* SOF ¶¶ 37–47. His outright assault on state laws that facilitate mail voting is part and parcel with his effort to shape the competitive environment in a way that favors him and his party. *See* SOF ¶¶ 51–56. The legal cloud of doubt created by § 7 prevents the Party Organizations from formulating their outreach, assistance, and ballot-cure programs in advance of the 2026 elections. SOF ¶ 61.

These harms have intensified as the 2026 elections draw closer. Though § 7 is preliminarily enjoined as to a subset of States with post-election ballot receipt deadlines, *see California*, 2025 WL 1667949, at *22, the DPPs have already been forced to expend resources to grapple with how the threatened enforcement of § 7 will impact their outreach, assistance, and ballot-cure programs, given the lack of permanent nationwide relief and § 7's impact in States not subject to that order. SOF ¶¶ 57–58. The President's order that the AG "take all necessary action" to erase state ballot receipt laws hangs as a sword over the Party Organizations, their members, and supporters. The

President's command requires the AG to take "[a]ny number of actions, including criminal actions," ECF No. 146-3, Ex. 24, at 87:9-21, that will directly harm Plaintiffs; she is under a mandatory order to undertake "all necessary" steps until these state laws are gone.

The DPPs therefore have standing thrice over. *First*, the Party Organizations have organizational standing because § 7 interferes with their core activities, which naturally includes ensuring their voters cast valid ballots. SOF ¶ 59. The threat of imminent enforcement action also frustrates their ability to make critical strategic decisions about how to plan for the 2026 elections. SOF ¶¶ 58–61. So long as the threat of enforcement looms, the DPPs cannot make decisions needed to prosecute the 2026 campaign. SOF ¶ 61.

*Second*, the DPPs have standing to challenge § 7 because it "illegally structure[s]" the campaign environment to the detriment of the Party Organizations, candidates, and voters. *Shays v. FEC*, 414 F.3d 76, 90–91 (D.C. Cir. 2005)); *see also* 780 F. Supp. 3d at 181–82. The President's choice to cloud the rules governing mail voting "predictably inflict[s] concrete harms on the head-to-head competitors of their beneficiaries." *Id.* at 181. Here, the beneficiary is President Trump's own party, which has placed significantly less emphasis on mail voting in recent elections, particularly as Trump has serially impugned mail voting with unproven claims and conspiracy theories. SOF ¶¶ 37–47, 54. Indeed, the RNC stressed that point in seeking intervention as to § 7(a) specifically. *See* ECF No. 125-1 ¶ 20. The President and his AG have "set the rules of the game in violation of statutory directives" by threatening to use the Election Day Statutes as a cudgel against States lawfully enforcing their mail ballot receipt rules. *Shays*, 414 F.3d at 85. Accordingly, "injured competitor[s]" like the DPPs have "suffer[ed] legal injury." *Id.*

*Third*, the Party Organizations enjoy associational standing on behalf of their millions of members who intend to cast mail ballots in 2026. *See LULAC*, 780 F. Supp. 3d at 191–92; SOF

¶¶ 53, 62–64. In recent elections, many of these voters have cast mail ballots that were counted solely by operation of the state laws that § 7 targets. SOF ¶ 63. These voters are now actively discouraged from voting by ma il due to concern and confusion about the operative receipt deadlines, and they stand to have their otherwise lawful ballots discarded if § 7 is enforceable. SOF ¶ 64.

Recent Supreme Court precedent and additional record evidence should eliminate concerns this Court had at the preliminary injunction stage about the DPPs' standing to challenge § 7. To start, the Supreme Court's decision in *Diamond Alternative Energy, LLC v. EPA*, 145 S. Ct. 2121 (2025)—rendered after this Court's preliminary injunction order—reinforces the DPPs' standing. This Court denied preliminary relief as to § 7(a) in part because it perceived that "the most natural parties to seek an injunction against enforcement under Section 7(a) are the States" that would "be the defendant in the enforcement action," rather than "third party that may suffer collateral harm." 780 F. Supp. 3d at 214. *Diamond Energy* alters this analysis. There, the Supreme Court held gasoline producers had standing to challenge the EPA's approval of California regulations directed at automakers because, "with respect to causation (and redressability), a court must conclude that third parties"—there, the gasoline producers and here, the DPPs—"will likely react to the government regulation (or judicial relief) in predictable ways that will likely cause (or redress) the plaintiffs' injury." 145 S. Ct. at 2134 (quoting *Hippocratic Med.*, 602 U.S. at 383). *Diamond Energy* indicates that the DPPs have standing to challenge § 7 given the predictable consequences it will impose on them; to hold otherwise would allow the government to "target" the DPPs "and then evade the resulting lawsuits by claiming that the targets of its regulation should be locked out of court as unaffected bystanders." *Id.* at 2142.

While *Diamond Energy* confirms the point, preexisting authority already established the DPPs' standing. The Supreme Court has long recognized that an injured party has standing to challenge government conduct directed towards an intermediary, particularly where it will have "predictable" consequences for plaintiffs. *Dep't of Com. v. New York*, 588 U.S. 752, 767–68 (2019) (holding plaintiffs could challenge government action regulating third parties "likely [to] react in predictable ways"); *see also Warth v. Seldin*, 422 U.S. 490, 504–05 (1975) (similar); *National Wildlife Fed'n v. Hodel*, 839 F.2d 694, 705 (D.C. Cir. 1988) (holding "an injury worked on one party by another through a third party intermediary may suffice" for standing). That is precisely the case here, where the injuries to Plaintiffs are a "predictable"—indeed, intended—consequence of § 7's command to stamp out state ballot receipt laws, a fact reinforced by President Trump's desire to restrict mail voting as a means of competitive advantage to his party. SOF ¶¶ 37–47.

Put slightly differently, the DPPs *are* among directly regulated entities here. Plaintiffs "can be 'an object' of Government regulation even when the regulation requires nominally 'independent' third parties to implement the regulation's prohibitions, when the injury is produced by determinative or coercive effect upon the action of the third party." *Bldg. & Const. Trades Dep't, AFL-CIO v. Allbaugh*, 172 F. Supp. 2d 67, 75 (D.D.C. 2001). There is effectively no "*independent* action of some third party" at issue here because any action by States to cease counting ballots received after election day will be entirely dependent on and traceable to the "determinative or coercive effect" of § 7. *Bennett v. Spear*, 520 U.S. 154, 169 (1997) (concluding ranchers had standing to challenge Fish & Wildlife Service opinion that governed Bureau of Reclamation's management of a water project). Article III "does not exclude injury" produced by such a compulsive effect on an intermediary. *Id.* Simply put, if the AG and EAC are permitted to carry out § 7, the DPPs will be among the directly injured parties. *See Bldg. Indus. Ass'n of*

26

*Superior California v. Babbitt*, 979 F. Supp. 893, 899 (D.D.C. 1997) (landowners had standing to challenge endangered species designation that required "various regulatory entities that govern land use in California" to take actions harming plaintiffs).

Even so, the Supreme Court has been particularly clear in separation of powers cases like this one that a party need not be directly regulated to have standing. *Free Enterprise Fund v. Public Company Accounting Oversight Board*, 561 U.S. 477 (2010), illustrates the point. The challenged law there—removal protections for members of the PCAOB—regulated the PCAOB members and their SEC superiors, not the plaintiff accounting firm regulated by the PCAOB. *See* 561 U.S. at 487. Nevertheless, the plaintiff firm had standing to challenge laws regulating the PCAOB, an intermediary that set rules for the accounting firm, just as the States do here for the DPPs. *See id.* at 513 (holding plaintiffs were "entitled to declaratory relief sufficient to ensure . . . they are subject [to] a constitutional agency accountable to the Executive"). The same logic followed in *Seila Law v. CFPB*, 591 U.S. 197 (2020)—the challenged statute there regulated the President and the CFPB Director, but not the plaintiff law firm. *Id.* at 207–08. Once more, the Court affirmed that when a challenged "provision violates the separation of powers it inflicts a 'here-and-now' injury on affected third parties that can be remedied by a court." *Id.* at 212. The DPPs are just such an "affected third party" because the President's unconstitutional attack on state authority directly harms their core activities, members, and competitive position.

Federal Defendants' claim that the DPPs lack standing as to § 7(a) because the AG's actions are a matter of enforcement discretion. FD Mot. 12–13. But that ignores extensive precedent supporting pre-enforcement review of a threatened government action, *see, e.g.*, *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014), as well as the "here-and-now" nature of separation of powers violations, *Free Enterprise*, 561 U.S. at 513. Such review is particularly

27

appropriate here given Federal Defendants' statement to this Court that the AG can take "[a]ny number of actions, including criminal actions," against States for purported violations of the Election Day Statutes. ECF No. 146-3, Ex. 24, at 87:9–21; *see also Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 302 (1979) (finding standing where "the State ha[d] not disavowed any intention of invoking" the challenged provision, such that plaintiffs were "not without some reason in fearing prosecution"); *California*, 2025 WL 1667949, at *12 (same). Section 7(a) itself mandates that the AG take "all necessary action," requiring her to pursue all available enforcement mechanisms until compliance is achieved nationwide. This unambiguous command cannot be overridden by the EO's savings clause. *See City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1240 (9th Cir. 2018).

None of the cases cited by Federal Defendants suggest pre-enforcement review is unavailable. Defendants rely on *Trump v. New York*, 592 U.S. 125 (2020), in which plaintiffs sought to enjoin the Commerce Secretary from reporting the number and distribution of U.S. residents without lawful immigration status to the President, which, in turn, could affect the President's transmittal to Congress of population numbers used for congressional reapportionment. *Id.* at 131. The injury and corresponding remedy sought here are more direct: the President has already ordered the AG to enforce § 7(a) in a manner that will harm the DPPs; no further decision by the President remains unknown. Each of the other cases Federal Defendants cite considered issues not before the Court here. *See United States v. Texas*, 599 U.S. 670, 685 (2023) (considering whether federal courts may "order the Executive Branch to *take* enforcement actions," rather than refrain from them (emphasis added)); *TransUnion LLC v. Ramirez*, 594 U.S. 413, 429 (2021) (explaining how statutory standing for private plaintiffs might impact enforcement discretion); *Trump v. United States*, 603 U.S. 593, 620 (2024) (discussing presidential immunity).

As to § 7(b), Federal Defendants dispute only whether Democratic voters will experience confusion, one of several harms that support the DPPs' standing to challenge this provision. *See* FD Mot. 14–15. Beyond additional evidence regarding voter confusion, the DPPs have established additional competitive, organizational, and associational harm. SOF ¶¶ 56–64. This new record evidence and intervening precedent make clear that the DPPs have standing to challenge § 7.

## 2. Democratic Plaintiffs' claims against § 7 are ripe for review.

The DPPs' claims against § 7 are fit for judicial decision because the core question they present—whether the Election Day Statutes are inconsistent with state ballot receipt deadline laws—is "purely legal." *Energy Future Coal. v. EPA*, 793 F.3d 141, 146 (D.C. Cir. 2015). That dispute is not academic: it is presently harming the DPPs by making it impossible for them to finalize strategic plans, while also creating a cloud of legal doubt that discourages their supporters from mail voting. SOF ¶ 64. Accordingly, there is a "substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007). Further still, § 7 creates "a credible threat of present or future prosecution," *N.H. Right to Life Pol. Action Comm. v. Gardner*, 99 F.3d 8, 13 (1st Cir. 1996), that is presently pressuring States to alter or refuse to enforce their laws in a manner that will harm the DPPs, *see supra* Part III.A.I. States impacted by § 7 have already demonstrated in other cases that § 7 would impact their day-to-day work administering elections. SOF ¶ 65; *see also Abbott Lab'ys v. Gardner*, 387 U.S. 136, 152 (1967). The Party Organizations' ordinary planning and operations have been similarly disrupted by the threat of § 7. SOF ¶¶ 59–61. Absent this Court's review, the DPPs will suffer hardship from being forced to compete under the cloud that § 7 has placed over state laws upon which they formulate their strategies and upon which their supporters rely to ensure their votes are counted.

Their claims against § 7 are also ripe because the provision "violates the separation of powers [and so] inflicts a 'here-and-now' injury on affected third parties," such as the Party Organizations, their candidates, and their members. *Seila L.*, 591 U.S. at 212; *see also Free Enter. Fund.*, 561 U.S. at 487–91. In similar cases the Supreme Court has "expressly rejected the argument that consideration of the effect" of a violation of the separation of powers "is not 'ripe' until [it] is actually used." *Seila L.*, 591 U.S. at 212 (citation modified).

The Court should therefore not delay resolution of § 7. It is well established that "federal courts should ordinarily not alter the election rules on the eve of an election." *RNC v. DNC*, 589 U.S. 423, 424 (2020) (per curiam) (citation omitted). It is better to decide the issue well ahead of the 2026 general election; otherwise the AG could time her enforcement efforts to prompt changes in state law too close to the election for litigants to seek judicial review.

### 3.     Democratic Plaintiffs can seek judgment on their non-statutory causes of action against § 7.

The DPPs have non-statutory causes of action against § 7 for substantially the same reasons discussed in the sections addressing their challenges to §§ 2(d) and 3(d). *See supra* Parts I.A.1, II.A. The Constitution grants the States the principal authority to determine the manner of holding federal elections. *See* U.S. Const. art. I, § 4; *id.* art. II, § 1. Congress may preempt those rules, but it has not done so when it comes to deadlines for ballot *receipt*. Accordingly, the President has "no source of legal authority" under the Constitution or federal law to mandate States' ballot receipt deadlines. DPP Compl. ¶ 131. Moreover, the Election Day Statutes do not "provide[] a mechanism for the President" or any other member of the Executive Branch to preempt state laws that allow for the counting of ballots cast by but received after election day. *Glob. Health Council*, 2025 WL 2480618, at *8. Accordingly, the only way § 7 can be defended against this claim is if the President has *constitutional* authority to make that unilateral revision to election laws. The RNC admits as

much, conceding that "there exists no statute authorizing" enforcement of the Election Day Statutes, RNC Mot. 21 (citation omitted), and pointing only to the Take Care Clause as a source of the President's enforcement authority, *see id.* at 21–23. Federal Defendants likewise stress the President's responsibility "for taking care that the laws are properly executed." FD Mot. 39. Plaintiffs' claim on this score should thus be analyzed under the framework for constitutional *ultra vires* and separation of powers claims. *Reich*, 74 F.3d at 1332.[6]

      **B.**    **Section 7 is *ultra vires* and violates the separation of powers.**

Section 7 directs the Justice Department and EAC to enforce a nonexistent election day ballot receipt deadline, even though Congress has never adopted such a measure or granted those agencies such authority. Defendants claim the President has authority under the Election Day Statutes, the Take Care Clause, or a vague, sweeping power to "provide protection for federal elections" by creating extra-statutory restrictions on state election laws. That is wrong—the Election Day Statutes are silent as to ballot receipt deadlines and the President lacks any constitutional authority to enforce such a uniform national receipt deadline against the DPPs via the States. The Court should reject Defendants' expansive and dangerous view of presidential authority, hold that § 7(a) and § 7(b) are ultra vires and violate the separation of powers, and grant summary judgment on Plaintiffs' corresponding claims.

---

[6] For similar reasons as § 3(d), the DPPs would still have a cause of action under the statutory *ultra vires* framework. *See supra* Part II.B.1; *see also Glob. Health Council*, 2025 WL 2480618, at *12. The first two factors are satisfied because "review is not expressly precluded by statute," *id.*, and there is no "alternative procedure for review" that could ameliorate the DPPs' present harms, *id*. Finally, § 7 is "in clear excess" of the AG and EAC's delegated powers and contrary to the Election Day Statutes. *See Fed. Express Corp.*, 39 F.4th at 762.

1.      **The Election Day Statutes do not set a uniform ballot receipt deadline.**

Defendants claim the Election Day Statutes preempt dozens of state laws that permit the counting of mail ballots that are cast by election day but received by officials shortly thereafter. In doing so, they ignore the statutory text, history, and weighty judicial precedent to the contrary.

As for text, the Election Day Statutes specify "the day for the election," 2 U.S.C. § 7, and provide that electors must "be appointed . . . on election day," 3 U.S.C. § 1. But they do not speak to when timely cast ballots—that is, ballots cast by election day—must be received or tabulated by officials. That alone resolves this issue. While "the action of Congress" may "supersede[]" contrary state election laws, *Ex parte Siebold*, 100 U.S. 371, 384 (1879), its power to do so extends only "so far as it is exercised, and *no farther*." *ITCA*, 570 U.S. at 9 (quoting *Siebold*, 100 U.S. at 392) (emphasis added). Congress did not "exercise" any authority in the Election Day Statutes to displace state ballot receipt deadline laws because the statutes say nothing about such receipt.

Defendants claim otherwise by arguing the term "election" or "election day" in these laws necessarily incorporates the act of receiving ballots cast by mail. But as the Supreme Court has explained, by setting a day for the "election" of federal officers, these laws merely set a deadline for the "act of choosing a person to fill an office." *Foster*, 522 U.S. at 71 (quoting N. Webster, An American Dictionary of the English Language 433 (Charles Goodrich & N. Porter eds. 1869)); *see also Newberry v. United States*, 256 U.S. 232, 250 (1921) (defining "election" as the "final choice of an officer by the duly qualified electors"); *United States v. Classic*, 313 U.S. 299, 318 (1941) (explaining "election" means "the expression by qualified electors of their choice of candidates"). The targeted state laws are consistent with this text; they require voters to make their selections and relinquish control over their ballots by election day, completing the "act of choosing a person to fill an office." *Foster*, 522 U.S. at 71. The laws thus operate in harmony with the Election Day

Statutes, ensuring voters make their "final choice," *Newberry*, 256 U.S. at 250, and "express[] . . . their choice of candidates," *Classic*, 313 U.S at 318, by election day.

Brushing aside the Election Day Statutes' failure to mention ballot "receipt," the RNC emphasizes the statutes also do not contain the word "cast." RNC Mot. 15. But that is precisely the point. The Election Day Statutes "are silent on methods of determining the timeliness of ballots," *Way*, 492 F. Supp. 3d at 372, and "Federal law does not provide for *when* or *how* ballot counting occurs," *Bognet v. Sec'y Commw. of Pa.*, 980 F.3d 336, 353 (3d Cir. 2020). Accordingly, they do not preempt state laws in these areas because Congress did not "exercise[]" its authority to do so. *ITCA*, 570 U.S. at 9.

The RNC next criticizes the DPPs for highlighting the original public meaning of "election" found in a leading dictionary that is contemporaneous to the Election Day Statutes' enactment. *See* RNC Mot. 15. But they ignore that the Supreme Court relied upon the exact same dictionary definition in construing the exact same statutory text in *Foster*. *See* 522 U.S. at 71. The RNC points instead to alternate definitions of "election," such as the "public choice of officers" and the "day of a public choice of officers," *see id.* (quoting N. Webster, An American Dictionary of the English Language 433 (Charles Goodrich & N. Porter eds. 1869), but to no avail—each of these definitions are consistent with the notion that the Election Day Statutes simply set a day by which voters must make their final "choice,"—not when that choice must be received.[7]

The history "from around the adoption" of the Election Day Statutes further indicates that they do not preempt state ballot receipt deadlines. *N.Y. State Rifle Ass'n v. Bruen*, 597 U.S. 1, 60

---

[7] The RNC also claims that construing "election" to mean when all votes are cast is "contentless" and lacks preemptive force. RNC Mot. 16. But that again ignores *Foster*, in which the Supreme Court held the Election Day Statutes preempted a state scheme where voting typically concluded *prior* to election day. 522 U.S. at 71–72. No one disputes that preemption holding here.

(2022). During the Civil War, after adoption of 3 U.S.C. § 1 and before the adoption of 2 U.S.C. § 7, many States permitted soldiers in the field to cast their ballots on election day, such that they were later transmitted to election officials for tabulation after election day. Josiah Henry Benton, *Voting in the Field: A Forgotten Chapter of the Civil War* 171–73, 186–87, 190 (1915). Over the following 150 years, States continued to exercise their authority to accept ballots received after election day; the RNC highlights *nothing* from that period indicating any belief or concern from state legislatures or Congress that such laws might clash with the Election Day Statutes.[8]

That is not for lack of awareness: Congress has long known of this state practice—and embraced it. *E.g.*, Pub. L. No. 78-277, 58 Stat. 136, § 311(b)(3) (amendment to the Soldier Voting Act in World War II requiring ballots cast by soldiers to be received by election day "except that any extension of time for the receipt of absentee ballots permitted by State laws shall apply"); 16 Cong. Rec. 6996 (1970) (Statement of Sen. Goldwater describing States that permit "absentee ballots of certain categories of their voters to be returned as late as the day of the election or *even later*." (emphasis added)). By the time it enacted UOCAVA in 1986, Congress observed that many "States accept[ed] absentee ballots, particularly those from overseas, for a specified manner of days after election day." H.R. Rep. No. 99–765, at 8 (1986). Far from preempting such laws, Congress *praised* these "State level" initiatives that "aid[] in protecting the right rights of . . . citizens." *Id.* Congress then specifically provided that military and overseas ballots would be subject to the "deadline for receipt of the State absentee ballot under State law." 52 U.S.C. § 20303(b); *see also* 52 U.S.C. § 20304(b)(1) (noting that officials must count UOCAVA ballots if received by "the date by which an absentee ballot must be received in order to be counted in the

---

[8] *See* DPP Compl. ¶¶ 45–46 (collecting numerous examples); *see also Elliott v. Hogan*, 315 S.W.2d 840, 848 (Mo. App. 1958) (citing Mo. Stat. § 112.050); *Hammond v. Hickel*, 588 P.2d 256, 268 (Alaska 1978) (citing Alaska Stat. § 15.20.150).

election"). Congress' choice to incorporate these state laws into UOCAVA reflects that it plainly did not believe not believe the Election Day Statutes imposed a uniform national deadline.

This lengthy history of state practice—repeatedly embraced by Congress over the past century—dispels the notion that federal law has long included some newly discovered national uniform ballot receipt deadline. And "[t]he case for federal pre-emption is particularly weak where Congress has indicated its awareness of the operation of state law in a field of federal interest and has nonetheless decided to stand by both concepts and to tolerate whatever tension there [is] between them." *California*, 2025 WL 1667949, at *13 (alternation in original) (citation omitted); *see also Bost v. Ill. State Bd. of Elections*, 684 F. Supp. 3d 720, 736 (N.D. Ill. 2023), *aff'd*, 114 F.4th 634 (7th Cir. 2024), *cert. granted*, 145 S. Ct. 2751 (June 2, 2025) (similar).

Nevertheless, in recent years activists have brought a series of legal challenges seeking to displace state ballot receipt deadlines. Yet courts have overwhelmingly concluded that "the text of the Election Day Statutes require[s] only that all votes are cast by Election Day, not that they are received by that date." *California*, 2025 WL 1667949, at *13 (collecting cases). Indeed, the Supreme Court has already distinguished "the date by which ballots may be cast by voters" from "the date by which ballots may be . . . received by the municipal clerks." *RNC v. DNC*, 589 U.S. 423, 424 (2020) (per curiam). As Justice Kavanaugh explained, allowing absentee ballots to "be *mailed* by election day" and received by some specified date thereafter is a "policy choice" left to the States. *DNC v. Wisconsin State Legis.*, 141 S. Ct. 28, 34 (2020) (Kavanaugh, J., concurring); *see also Harris v. Fla. Elections Canvassing Comm'n*, 122 F. Supp. 2d 1317, 1325 (N.D. Fla. 2000) (recognizing some States "allow post-election-day acceptance of absentee ballots" and concluding "Congress did not intend 3 U.S.C. § 1" to preclude such laws), *aff'd sub nom. Harris*

*v. Fla. Elections Comm'n*, 235 F.3d 578 (11th Cir. 2000).[9]

Defendants rely on one outlier case presently subject to a petition for certiorari. *See RNC v. Wetzel*, 120 F.4th 200 (5th Cir. 2024), *cert. pending* No. 24-1260. But *Wetzel* is a deeply flawed decision that does not bind this Court. *See RNC v. Wetzel*, 132 F.4th 775, 779 (5th Cir. 2025) (Graves, J., dissenting from denial of rehearing *en banc*); *id.* at 789 (Higginson, J., similarly dissenting). It invents an election day ballot-receipt requirement that it admits is not grounded in any historical definitions of "election" or the text of the Election Day Statutes. *Id.* at 781. It mischaracterizes the history of state practice, *see id.* at 785–86, and it relies almost exclusively on a Montana state court case interpreting Montana law, *see id.* at 783–84 (citing *Maddox v. Bd. of State Canvassers*, 116 Mont. 217, 149 P.2d 112 (1944)). *Wetzel* is not a sufficient or persuasive ground for holding the Election Day Statutes preempt States' ballot receipt deadlines.

Defendants' remaining arguments are unavailing. Federal Defendants claim that "permitting absentee ballots to be received after Election Day" is "arbitrary" and "discriminatory." *See* FD Mot. 42–43. That blinkered argument ignores the purposefully federalized election system adopted by the Founders. *See* U.S. Const. art. I, § 4; *id.* art. II, § 1. Moreover, it is Defendants who urge an arbitrary rule; under their preferred approach, identically situated voters casting ballots at the same time in the same State might not each have their ballot counted if postal operations delay delivery of one ballot but not the other. Post-election receipt deadlines *reduce* arbitrary distinctions, helping to ensure all timely cast ballots are processed. Federal Defendants also claim post-election receipt deadlines would allow individuals to vote after election day "[i]f postmarks are unenforced" or if a person somehow obtains a "fraudulent certification date." FD Mot. 43.

---

[9] Until recently, the DOJ routinely secured extensions of ballot receipt deadlines after election day as a remedy in UOCAVA cases. DOJ did so 29 times between 2000 and 2022. *See* SOF ¶ 73.

Such idle speculation amounts only to policy preference; it surely does not reflect any "exercise[]" of Congress's authority to preempt state election regulations. *ITCA*, 570 U.S. at 9.

### 2. The President lacks authority to enforce a uniform national ballot receipt deadline.

Because the President has no independent authority under the Elections Clause, and because federal law plainly does not preempt state laws permitting post-election receipt of timely cast ballots, the President, AG, and EAC lack authority to impose their own preferred deadline on the States by fiat. *See Mille Lacs Band*, 526 U.S. at 188–89. The RNC argues the President has a freewheeling "constitutional duty to ensure that the integrity of the right to vote is protected against unlawful votes," *see* RNC Mot. 22–23, that apparently empowers him to unilaterally preempt duly enacted state laws and to impose requirements not authorized by Congress. That dangerous and dictatorial conception finds no support in the Constitution, which purposefully assigns the power to set election rules elsewhere. The President's Take Care Clause power also does not secretly grant him power that the Constitution purposefully denies him in the Elections Clause; that authority "reaches [only] so far as there is law." *Youngstown*, 343 U.S. at 646 (Jackson, J., concurring). The President may not "seiz[e] the power of the Legislature" by enacting policy "that Congress has chosen not to enact itself." *Biden v. Nebraska*, 600 U.S. 477, 503 (2023).

Nor can the President impose a national receipt deadline circuitously via the EAC. *See* EO § 7(b). For one, he cannot trample the EAC's procedural decision-making requirements. *See* ECF No. 146-1 at 12–15. Congress designed the EAC as an "independent entity," 52 U.S.C. § 20921, and the President may not ruin that design by dictating the results of its decision-making processes.

Second, neither the President nor the EAC can revise Congress's instructions when it comes to distributing federal funds. The Constitution vests Congress—and Congress alone—with the power to attach conditions on the receipt of federal funds through legislation. *See* U.S. Const.

art. I, § 9, cl. 7; U.S. Const. art. I, § 8, cl. 1. Congress has exercised that authority to specify conditions for States to receive funds from the EAC. *See* 52 U.S.C. §§ 21001–03. These conditions do *not* include abiding by a "uniform . . . ballot receipt deadline of Election day" ostensibly found in "2 U.S.C. 7 and 3 U.S.C. 1." EO § 7(b). Executive orders cannot place "new conditions on federal funds" not provided for by Congress. *PFLAG, Inc. v. Trump*, 769 F. Supp. 3d 405, 433 (D. Md. 2025). Such an *ultra vires* attempt to "wield Congress's exclusive spending power" violates "the Constitution's separation of powers principles." *Id.* (quoting *Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 531 (N.D. Cal. 2017)).[10]

## IV.    The EAC should be permanently enjoined from enforcing § 4(a).

Defendants also seek judgment as to § 4(a), which requires the EAC to "cease providing Federal funds to States that do not" accept and use the Federal Form, including as to "any requirement for documentary proof of United States citizenship adopted pursuant to section 2(a)(ii) of this order." EO § 4(a). Section 4(a) is intended to be a cudgel against the States: accept the President's unlawful DPOC requirement on the Federal Form or lose funding. Like § 2(a), it overrides the EAC's procedural requirements and rests upon the President's naked assertion of authority that he does not have. The Court should therefore permanently enjoin the EAC from carrying it out.

### A.    Federal Defendants' threshold arguments as to § 4(a) fail.

Federal Defendants' various gatekeeping arguments as to § 4(a)—concerning standing, ripeness, and a cause of action—fail for the same reasons that this Court rejected their threshold

---

[10] Congress's funding criteria make no mention of the Election Day Statutes, so Defendants point to a law requiring States to adopt "uniform and nondiscriminatory standards that define what constitutes a vote" to receive funds. EO § 7(b) (citing 52 U.S.C. § 21081(a)(6)). But that provision "refer[s] to uniformity *within* each State, not among the several States." *LULAC*, 780 F. Supp. 3d at 215.

arguments as to § 2(a). *See* 780 F. Supp. 3d at 183–94. The DPPs have standing to challenge § 4(a) because it is part and parcel of President Trump's effort to impose a DPOC requirement on the Federal Form, as reflected in "section 2(a)(ii) of []his order." EO § 4(a). Like § 2(a), it is framed as an unconditional order to the EAC, which "shall" withhold funding from States that refuse obedience to the President. The prospect that the EAC will carry out this command imposes a concrete and imminent injury on the DPPs, who are foreseeably injured by President Trump's pressure-campaign to accept a DPOC requirement on the Federal Form. SOF ¶¶ 5–9; ECF No. 184 at 24–32. The fact that the threat is directed towards the States does not change matters—their acceptance of a Federal Form renders them an intermediary coerced into harming the DPPs. *Supra* Part III.A.1. Article III "does not exclude injury produced by determinative or coercive effect upon the action of someone else," namely the States here. *Bennett*, 520 U.S. at 169. Simply put, the President is "targeting the use of" the Federal Form by the DPPs in part by "regulating" the States and requiring them to accept his version of it. *Diamond Alternative Energy*, 145 S. Ct. at 2136.

The DPPs' challenge to § 4(a) is ripe for similar reasons. Federal Defendants claim it is not certain what "appropriate action" the EAC will take to implement the provision. FD Mot. 9. But the provision leaves no doubt as to what the EAC must do—it "shall" "cease providing Federal funds" to States that refuse to accept "any requirement for documentary proof of United States citizenship." EO § 4(a). The order thus "dictate[s] [the] particular outcome[]" that the EAC must pursue and leaves no room for discretion. *AFGE*, 318 F. Supp. 3d at 437–38. Because no further factual development is necessary to understand the contours of the order, it is ripe for review.

Finally, the DPPs have a cause of action to seek relief from President Trump's unconstitutional assertion of control over the EAC. *See LULAC*, 780 F. Supp. 3d at 194–200. As explained, *see* ECF No. 184 at 28–31, Defendants' argument ignores that courts have "long

recognized implied equitable claims arising under the Constitution." *Vought*, 2025 WL 2371608, at *18. That is what DPPs assert here. *See* DPP Compl. ¶¶ 131, 137, 151.

**B.    Section 4(a) is unlawful to the extent it requires the EAC to withhold funds based on the President's unlawful orders.**

Federal Defendants' sole merits defense of § 4(a) is to contend that it does nothing more than require States to comply with HAVA and the NVRA. *See* FD Mot. 33–34. But that cramped reading of § 4(a) neglects the full scope of President Trump's order. Specifically, the final clause of § 4(a) commands the EAC to withhold funds if a State refuses to "accept and use" any version of the Federal Form that includes a "requirement for documentary proof of United States citizenship adopted pursuant to section 2(a)(ii) of this order." EO § 4(a). But nothing in any federal law authorizes the EAC to condition receipt of HAVA funds on compliance with § 2(a) or any other presidential dictate. To the contrary, Congress has expressly specified what federal laws States must comply with to obtain HAVA funds. *See* 52 U.S.C. § 21003(b)(3). The President may not add to these, not least of all through his unlawful effort to add a DPOC requirement to the Federal Form. *See Cnty. of Santa Clara*, 250 F. Supp. 3d at 531. Like § 2(a) itself, § 4(a) is unlawful because no statute or constitutional provision "expressly or impliedly grants the President authority" to punish States—and the DPPs' members and supporters within those States—for their refusal to obey his unlawful commands. *LULAC*, 780 F. Supp. 3d at 200. Further, by grafting additional requirements for HAVA funds onto the statute, the President's order invades Congress's exclusive spending power. *See City & Cnty. of S.F.*, 897 F.3d at 1234.

Federal Defendants do not even engage with this point. They instead pretend that § 4(a) merely "parrots" the NVRA's requirements that States comply with various civil rights laws and accept and use the Federal Form. FD Mot. 34. But nothing in the NVRA or the various statutes contained within 52 U.S.C. § 21145(a) say anything about a DPOC requirement on the Federal

Form. Section 4(a) of the EO itself admits that this command comes from "section 2(a)(ii) of this order" and not any law passed by Congress. EO § 4(a). The President cites no constitutional or statutory authority empowering him to invent grounds for withholding HAVA funds. Accordingly, the Court should grant the DPPs summary judgment on their *ultra vires* claim and enjoin the EAC from enforcing § 4(a) to the extent it reflects the President's unlawful claim of authority to impose a DPOC requirement on the Federal Form.

## V.    Changes to DHS's SAVE program violate the Privacy Act.

The DPPs are also entitled to partial summary judgment on their claim that actions taken by DHS, DOGE, and SSA pursuant to §§ 2(b)(i), 2(b)(iii), and 3(a) to expand uses of SAVE ignore critical mandates of the Privacy Act and thus violate the APA. *See* DPP Compl. ¶¶ 195–204 (Count IX) (citing 5 U.S.C. § 706(2)). The changes—which harm the privacy and voting rights of Plaintiffs' members—are contrary to law and should be set aside and enjoined.

When Plaintiffs sought a preliminary injunction barring disclosures by DHS to DOGE, this Court concluded additional facts regarding Defendants' implementation of § 2(b) were necessary to assess the Privacy Act violations but noted that, "once Defendants' plans to implement [the EO become] clear, the DPPs [could] seek appropriate relief" against disclosures made pursuant to the EO under the APA. 780 F. Supp. 3d at 206. That time has come with respect to SAVE, as the Federal Defendants' interrogatory responses confirm they have taken final action to implement "enhance[ments]" to SAVE described below. SOF ¶¶ 90–95.[11] The Court should grant summary

---

[11] That an AR has not been produced is not a bar to partial judgment for the DPPs on this claim. The DPPs rely only on agency documents that are undeniably part of the AR (and admissions by Defendants) to establish the merits of their claim. *See Univ. of Colo. Health v. Azar*, 486 F. Supp. 3d 185, 199 (D.D.C. 2020) (AR consists of documents showing the "information that the agency considered" either "directly or indirectly"); 5 U.S.C. § 706 (allowing judgment based on the

judgment that those so-called enhancements violate the Privacy Act and set aside their operation. Plaintiffs' remaining Privacy Act claims, which require further factual development, should be deferred until Phase III. *See* Rule 56(d) Decl. ¶ 23; *see also* DPP Compl. ¶¶ 202–04.

### A. Since April, DHS has together with DOGE and SSA implemented dramatic expansions of SAVE.

SAVE is an "online service" administered by USCIS that aims to help federal, and local government agencies assess the "immigration status and U.S. citizenship of applicants seeking benefits, licenses, and other purposes" authorized by law. SOF ¶ 79.[12] It works by pooling data from several databases to provide a response and corresponding "personal information" when an agency submits an "inquiry" requesting verification of an individual's immigration or citizenship status. SOF ¶ 80.

Under longstanding agency rules, DHS is authorized to use SAVE to conduct inquiries only related to non-citizens, naturalized citizens, and some citizens born internationally to citizens.

---

"whole record or those parts of it cited by a party"). As a result, unless Defendants identify genuine disputes that would require a "complete" AR to assess, final judgment is warranted. *E.g.*, *McKoy v. Spencer*, 271 F. Supp. 3d 25, 39 (D.D.C. 2017) (Kollar-Kotelly, J.) ("[E]ven assuming . . . the Court's review is limited to the" AR under the APA, the "entire" record is necessary only if the "completeness" of the parts necessary to resolve a claim is "contest[ed.]"). If the Court concludes that partial judgment is premature for any reason, the DPPs request a preliminary injunction barring use of the updates to SAVE. *See LULAC*, 780 F. Supp. 3d at 206 (stating Plaintiffs may seek an "emergency remedy" on this claim "once Defendants' plans to implement Section 2(b) are clear"). Courts in similar postures frequently consider alternative requests for final or preliminary relief. *E.g.*, *Grundmann v. Trump*, 770 F. Supp. 3d 166, 187 n.4 (D.D.C. 2025); *CREW v. OMB*, No. CV 25-1051 (EGS), 2025 WL 2025114, at *2 (D.D.C. July 21, 2025).

[12] SAVE was initially created by the Immigration Reform and Control Act of 1986 to help agencies determine whether immigrants were eligible for federal benefits. *See* Pub. L. No. 99-603, § 121(a)(1)(C), 100 Stat. 3359, 3384–86 (1986). Congress later enacted a separate law requiring DHS to respond to inquiries from government offices seeking confirmation of an individual's immigration or citizenship status for law-enforcement purposes. *See* Illegal Immigration Reform and Immigrant Responsibility Act, Pub. L. No. 104-208, § 642, 110 Stat. 3009, 3009-707 (1996). According to DHS, these laws authorize election officials to submit SAVE inquiries for voter registration applicants and registered voters. *See* FD Mot. 23, 25.

Systems of Records Notice, 85 Fed. Reg. 31798-01, 31800–01 (May 27, 2020); SOF ¶¶ 87, 89. The DHS policies governing SAVE have never contemplated or authorized inquiries concerning possible U.S.-born citizens for voter registration purposes; DHS rarely has jurisdiction over such citizens and does not maintain records on them, and it has no authorization to access or query databases for that purpose. SOF ¶¶ 79, 87–89; *see also Mi Familia Vota*, 129 F.4th at 714.

Consistent with that understanding, before the EO and the actions Federal Defendants have taken to implement its directive, SAVE inquiries could only be submitted for individuals with an identifying number assigned by DHS. *See* 85 Fed. Reg. at 31800; SOF ¶ 87. Because most state and local governments do not have a way to access DHS identifying numbers, only a handful of state and local governments had used SAVE to inquire about the immigration or citizenship status of individuals for voter registration or list maintenance purposes. SOF ¶ 89; *see also Mi Familia Vota v. Fontes*, 719 F. Supp. 3d 929, 955 (D. Ariz. 2024).

Since April 2025, however, DHS has implemented a series of significant changes to SAVE pursuant to § 2(b) and § 3(a) of the EO. Most relevant, SAVE users may now submit inquiries for nearly *all* Americans by providing a partial Social Security number and other limited information, such as a name and date of birth. SOF ¶¶ 90, 93. Additionally, while SAVE was previously limited to individual inquiries, users may now submit "bulk" inquiries on thousands of individuals at once, SOF ¶ 90. Corresponding "update[s]" further "increase the user agency's ability to audit, view, and download case information" regarding those individuals. SOF ¶ 90.[13]

DHS implemented these changes by incorporating information from an SSA database, NUMIDENT, into SAVE with the assistance of DOGE. SOF ¶¶ 93 ("SSA has allowed DHS to

---

[13] DHS also eliminated fees for agencies using SAVE for voter registration or list maintenance purposes, consistent with the President's directive in Section 2(b). SOF ¶ 90.

[sic] access to query NUMIDENT data for the purpose of verifying individuals' citizenship and immigration status for voter verification and other authorized inquiries."); SOF ¶ 95 (interrogatory response acknowledging disclosures to DOGE to facilitate updates). NUMIDENT is SSA's master file of individuals who have applied for or obtained a Social Security number, including both citizens and non-citizens. *See* Systems of Record Notice, 90 Fed. Reg. 10025-02, 10026 (corrected Feb. 20, 2025); *see* SOF ¶ 81. It contains sensitive information—such as Social Security numbers, other identifying numbers, names, dates and places of birth, citizenship indicators, and other "information obtained during the processing of . . . SSN request[s]"—of nearly all U.S. residents, to the extent it is available. *See* 90 Fed. Reg. at 10026; SOF ¶ 82. It is the only non-DHS database being used with SAVE to verify individuals' citizenship. SOF ¶ 96.

NUMIDENT, however, is not intended to confirm voters' citizenship status. *See generally* 90 Fed. Reg. at 10026–29. SSA has emphasized that its citizenship records are frequently inaccurate because it did not begin to consistently maintain such information until 1981. SOF ¶ 85. The onus is on individuals to update inaccurate information with SSA directly; SSA does not independently update citizenship records. SOF ¶¶ 83, 85; *see also* 90 Fed. Reg. at 10029 (citing 20 C.F.R. § 401.65).

The recent changes to SAVE using NUMIDENT have nonetheless been fully implemented, as confirmed by Defendants' interrogatory responses, agency press releases, and a newly released internet guide. *See* SOF ¶¶ 90–92. DHS has further confirmed that state and local governments have begun using this so-called "enhance[d]" version of SAVE to retrieve protected information: "Since April 2025 . . . USCIS and state and local agency users and administrators from nine states . . . have created approximately 8 million [new] voter verification cases using SAVE." SOF ¶ 101.

**B.    Democratic Party Plaintiffs are harmed by disclosures of sensitive information resulting from SAVE updates.**

Plaintiffs have associational and organizational standing to challenge the recent updates to SAVE, which (1) harm Plaintiffs' members' privacy rights, (2) discourage and prevent members from voting, and (3) undermine Plaintiffs' efforts to register voters.

**1.    The unlawful disclosures violate the privacy of Plaintiffs' members.**

Where, as here, a plaintiff alleges harm stemming from a violation of a federal statute like the Privacy Act, the plaintiff may satisfy Article III's injury requirement by showing "a close historical or common-law analogue for their asserted injur[ies]." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424 (2021); *LULAC*, 780 F. Supp. 3d at 208 (Plaintiffs have standing based on "denial of . . . procedural right[s] guaranteed by statute" where the statute protects against harm "traditionally recognized . . . in American courts"). The harms alleged need not be "an exact duplicate" of the common law elements; instead, courts look to similarities between the statutory violation and the common law cause of action. *TransUnion*, 594 U.S. at 424; *Muransky v. Godiva Chocolatier*, 979 F.3d 917, 932 (11th Cir. 2020). In conducting this analysis, "the Court must 'assume Plaintiffs will prevail on the merits of their'" Privacy Act claims. *All. for Retired Americans v. Bessent*, 770 F. Supp. 3d 79, 100 (D.D.C. 2025) (Kollar-Kotelly, J.) (*Bessent*) (quoting *LaRoque v. Holder*, 650 F.3d 777, 785 (D.C. Cir. 2011) (alteration omitted)).

In this case, and contrary to Federal Defendants' unsupported assertion (FD Mot. 8), harms to Plaintiffs' members stemming from the violation—unauthorized disclosure of records protected by the Privacy Act—are akin to at least two torts long-recognized in common law: (1) breach of confidence, and (2) invasion of privacy (*i.e.*, "intrusion upon seclusion").

***Breach of Confidence.*** The harms here are akin to a common law breach of confidence claim. *See Jeffries v. Volume Servs. Am., Inc.*, 928 F.3d 1059, 1064 (D.C. Cir. 2019) (holding harm

associated with common law "breach of confidence" is sufficiently "concrete" to satisfy Article III). The key elements of the tort involve "a person offer[ing] private information to a third party in confidence and the third party reveal[ing] that information to another." *Id.* (cleaned up). Nothing beyond the "plaintiff's trust in the breaching party" being "violated" must occur for the harm to be actionable at common law; disclosure to a third party is sufficient. *Id.* at 1064–65.

The DPPs have established precisely this harm. Members and constituents have given DHS and SSA personal information in confidence "backed by the Privacy Act's guarantee that the agencies would not disclose the information to any other person or agency." *AFL-CIO v. DOL*, 778 F. Supp. 3d 56, 73 (D.D.C. 2025); *see* SOF ¶ 104–05. Yet, because of the EO's mandate and the Federal Defendants' implementing actions, that information is now available to state and local election officials via SAVE "at any time," including at a minimum: a citizenship status indicator provided by SSA, a numerical identifier created for the individual's SAVE case file, a description of the agency's finding regarding the individual's status, and if available, "employment authorization" history. SOF ¶ 97; *see AFL-CIO v. DOL*, 778 F. Supp. 3d at 73 (holding harms stemming from giving DOGE access to a database were sufficiently analogous to breach of confidence (citing *Jeffries*, 928 F.3d at 1064)); *see also infra* n.18.

***Invasion of Privacy.*** The harm to the Party Organizations' members is also analogous to an invasion of privacy claim. *TransUnion* recognizes that harms associated with "intrusion upon seclusion" are sufficiently "concrete" and "particularized" to satisfy Article III. 594 U.S. at 424–25. "Courts in this District and across the country have followed suit when assessing standing." *Bessent*, 770 F. Supp. 3d at 102 & n.5 (collecting cases); *AFL-CIO v. SSA*, 778 F. Supp. 3d 685, 724 (D. Md. 2025) (collecting cases); *Hawkins v. Tom's Tree Serv.*, No. 4:23-cv-00224-SMR-

WPK, 2024 WL 3551148, at *4 (S.D. Iowa June 20, 2024) ("Invasion of privacy is a nearly universally-recognized common law tort.").

The violations here bear a "close relationship" to the common law tort of intrusion upon seclusion. *TransUnion*, 594 U.S. at 425. The essential elements of that tort include intentionally intruding on "the solitude or seclusion of another or his private affairs or concerns" in a manner that would "would be highly offensive to a reasonable person." Restatement (Second) of Torts § 652B (A.L.I. 1965). "Intrusion upon seclusion," unlike some other torts in the invasion-of-privacy family of claims, "does not depend upon any publicity given to the person whose interest is invaded." *Bessent*, 770 F. Supp. 3d at 102 (quoting Restatement (Second) of Torts § 652B cmt. b)). Rather, "[t]he intrusion itself makes the defendant subject to liability." *Id.*

Here, the facts establish intentional intrusions on the private affairs or concerns of Plaintiffs' members. It is undisputed that DHS, DOGE, and SSA have given state and local officials (among others) access to records contained in agency systems that are required to remain confidential under the Privacy Act. SOF ¶¶ 90, 93. It is also undisputed that "various USCIS and state and local agency users and administrators" from at least nine States have actually retrieved these records for more than eight million voters, and that officials from at least 21 States have ready access to do so. SOF ¶ 101. The Party Organizations' members are among those whose information has been disclosed, including in States with ready access to SAVE. *See* SOF ¶ 103.[14] These disclosures are plainly akin to intrusions on their "private affairs or concerns." *Bessent*, 770 F. Supp. 3d at 102 (quoting Restatement (Second) of Torts § 652B cmt. b)); *see also Randolph v.*

---

[14] This is the rare claim in which "*all* [of Plaintiffs'] members . . . are affected by the challenged activity," given that Defendants made protected records of anyone who holds a Social Security number available through SAVE, *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009) (citing *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 459 (1958)) (emphasis in original), although the harm is *most* pressing for members in States with immediate access, *see* SOF ¶¶ 100–103.

*ING Life Ins. & Annuity Co.*, 973 A.2d 702, 710 (D.C. 2009); *Wolf v. Regardie*, 553 A.2d 1213, 1217–18 (D.C. 1989) ("examining" a plaintiffs' private bank account information is one of the "types of invasion intrinsic in the tort of intrusion upon seclusion").

It is also beyond dispute that the disclosure of these records is "highly offensive" to a reasonable person. *Bessent*, 770 F. Supp. 3d at 102. Plaintiffs and their members have expressed deep concerns about their protected information being disclosed by DHS, DOGE, and SSA. SOF ¶ 105–06. The immediate availability of such information to state and local election officials alone is disturbing to Plaintiffs' members. SOF ¶ 106. The concerns are well-founded: A whistleblower who was SSA's chief data officer at the time of the SAVE changes recently explained to Congress why disclosures of the "citizenship" records and related "personal information" at issue here risk invasions of privacy and improper use, including that such disclosures can result in problems like identity theft and loss of benefits. SOF ¶ 86. And, finally, to the extent Defendants assert Plaintiffs and their members have no expectation of privacy in the records, the argument fails. It is "entirely reasonable" for individuals to rely on the explicit statutory protections of the Privacy Act. *Bessent*, 770 F. Supp. 3d at 102; *see also* SOF ¶ 104 (explaining that members have formed an expectation that the information contained in SSA and DHS records will remain confidential).

Accordingly, the actual and ongoing disclosure of information protected by the Privacy Act to state and local officials who lack authorization to use it injures Plaintiffs and their members within the ambit of Article III. *See Bessent*, 770 F. Supp. 3d at 103; *AFL-CIO*, 778 F. Supp. 3d at 70; *AFL-CIO v. SSA*, 778 F. Supp. 3d at 724.

### 2.    The unlawful disclosures harm the voting rights of Plaintiffs' members.

Members and constituents of the Party Organizations are distinctly harmed by the unlawful disclosure of information through the recent SAVE updates because those disclosures discourage voter registration and risk imminent, unlawful removal from the voter rolls. *See Mi Familia Vota*,

129 F.4th at 709 (threat of injury to voting rights of members sufficient to establish associational standing); *Smith v. Meese*, 821 F.2d 1484, 1494 (11th Cir. 1987).

The Party Organizations' members and constituents are disturbed by disclosures of their private information by DHS, DOGE, and SSA for the purpose of assessing voting eligibility—so much so that, in some cases, they are hesitant to even register or reregister to vote. SOF ¶¶ 105–106. Their members are also discouraged by the prospect of officials using their information for improper purposes, such as targeting them with disfavored treatment. *Id.* These fears, too, are well-founded, given that President Trump, administration officials, and state and local officials aligned with the President, have targeted political opponents with this kind of retribution. SOF ¶ 107.

Further, the unauthorized disclosures will subject members and constituents to false suspicions of being non-citizens and wrongful removal from the voter rolls. SOF ¶ 108–09. The SSA data incorporated into SAVE is often unreliable; it is incomplete and outdated for several reasons. SOF ¶ 85. Wrongly flagging voters for removal frustrates their ability to vote and discourages them from participating. SOF ¶ 110. And there is a significant risk that at least some will be unable to vote altogether: When a voter is wrongfully identified as a non-citizen, their registration status is typically altered and in many cases they have only a short amount of time to confirm their citizenship with their local election official before being removed from the rolls. *See* SOF ¶ 108–09; *see also Mi Familia Vota*, 719 F. Supp. 3d at 955.

For all these reasons, the Party Organizations' members and constituents would have standing to sue in their own right. *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977); *see also Int'l Dark-Sky Ass'n v. FCC*, 106 F.4th 1206, 1217 (D.C. Cir. 2024).[15]

---

[15] While undisputed, the other associational standing factors are also satisfied. *See* SOF ¶¶ 110 (ensuring members are registered is germane to DPPs' missions); *AFL-CIO*, 778 F. Supp. 3d at 74 (individual participation not required).

**3.    The unlawful disclosures harm the Democratic Party Plaintiffs' core organizational activities and competitive interests.**

The Party Organizations independently have direct standing to challenge the updates to SAVE based on harms to their mission-critical efforts to register and persuade voters to elect their candidates. *See All. for Hippocratic Med.*, 602 U.S. at 395 (organizations may establish injury by showing that a challenged act "perceptibly impair[s]" their "core . . . activities" (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)); *RNC v. N.C. State Bd. of Elections* (*RNC*), 120 F.4th 390, 397 (4th Cir. 2024) (holding party committee had standing based on impairment to mission of "organizing lawful voters and encouraging them to support Republican[s]").

As just explained, the updates to SAVE harm the Party Organizations' members and constituents by discouraging them from registering to vote and risking wrongful removal from voter rolls. This directly injures their core activities of registering voters and ensuring they can vote. SOF ¶ 110; *see also RNC*, 120 F.4th at 397; *LULAC*, 780 F. Supp. 3d at 191.

**4.    The remaining standing elements are satisfied.**

The last two standing prongs—causation and redressability—are easily satisfied here. *Bessent*, 770 F. Supp. 3d at 104; *AFL-CIO v. DOL*, No. CV 25-339 (JDB), 2025 WL 1783899, at *8 (D.D.C. June 27, 2025). The injuries are fairly traceable to Defendants' conduct updating SAVE to grant access to members' protected records without obtaining consent or complying with statutory mandates. And the requested relief—setting aside and enjoining the updates—would in turn redress those injuries. *Bessent*, 770 F. Supp. 3d at 104.

**C.    DOGE, DHS, and SSA's SAVE updates violate the Privacy Act.**

The APA requires this Court to set aside "final agency action" that is "not in accordance with law" where "there is no other adequate remedy" for the violations. 5 U.S.C. §§ 704, 706. Here, DHS, DOGE, and SSA disregarded Privacy Act mandates when incorporating SSA's

NUMIDENT into DHS's SAVE for the purpose of letting state and local officials make inquiries regarding the citizenship of possible U.S.-born citizens. These final agency actions were contrary to law. They should therefore be set aside.

### 1.     The SAVE updates are reviewable final agency action.

The Federal Defendants do not dispute that the recent updates to SAVE constitute final agency action and are ripe for review. *See* FD Mot. 17–20 (arguing "no final agency action exists" as to § 2(b)(ii), concerning DOS, but not §§ 2(b)(i), 2(b)(iii), or 3(a), which concern DHS, DOGE, and SSA). That concession makes sense, as the updates are plainly final. *See Bennett*, 520 U.S. at 177–78. The agencies "consummated" their decision-making when they "implemented" the "enhance[d]" version of SAVE, which is already being used by state and local officials. SOF ¶¶ 90, 98–102. "[L]egal consequences" flow from the action because privacy and other rights of individuals whose information is being disclosed are affected—including Plaintiffs' members. *Supra* Part V.B. The D.C. Circuit has also held that final action occurs when, as here, agencies decide to disclose information protected by federal law. *See AFL-CIO*, 778 F. Supp. 3d at 78 (citing *Venetian Casino Resort, LLC v. EEOC*, 530 F.3d 925, 931 (D.C. Cir. 2008)); *New York v. Trump*, 767 F. Supp. 3d 44, 77 (S.D.N.Y. 2025) (same). And because no further action must occur to "crystalize[]" the dispute as to these actions, the claim is likewise ripe. *E.g.*, *In re Al-Nashiri*, 47 F.4th 820, 826 (D.C. Cir. 2022).

### 2.     The Privacy Act does not foreclose APA review of the SAVE updates.

Federal Defendants passingly attempt to show that APA review is foreclosed because the Privacy Act provides an "adequate" judicial review scheme. FD Mot. 19 (quoting *Elec. Priv. Info. Ctr. v. IRS*, 910 F.3d 1232, 1244 (D.C. Cir. 2018)). This argument has been repeatedly rejected by courts assessing similar claims challenging agency actions resulting in unlawful sharing of

information protected by the Privacy Act. *E.g.*, *AFL-CIO*, 778 F. Supp. 3d at 82; *AFL-CIO v. OPM*, 777 F. Supp. 3d 253, 281 (S.D.N.Y. 2025). This Court should follow suit.

Federal Defendants point out that the Privacy Act includes some specific judicial review provisions, FD Mot. 19, but they overlook that the Act does not provide any forms of declaratory or injunctive relief that could remedy "agency-wide" procedures or policies which, like the recent updates to SAVE, fail to adhere to the Act's protections. *AFL-CIO*, 778 F. Supp. 3d at 82. The Act's remedial scheme prescribes only *damages* for *individual* disclosures. 5 U.S.C. § 552a(g).[16] Such a scheme cannot provide an adequate remedy for Plaintiffs because "[d]amages and injunctions belong to different genres: one compensates for harm while the other prevents it." *AFL-CIO*, 778 F. Supp. 3d at 80; *see also Radack v. DOJ*, 402 F. Supp. 2d 99, 104 (D.D.C. 2005) (holding the Act does not provide an "adequate remedy" to a plaintiff seeking "declaratory and injunctive relief" because it "provides only for monetary relief when an agency makes illegal disclosures"); *Poss v. Kern*, Civ. A. No. 23-2199 (DLF), 2024 WL 4286088, at *6 (D.D.C. Sept. 25, 2024) (similar); *AFL-CIO v. OPM*, 777 F. Supp. 3d at 281 (similar). These decisions are consistent with Supreme Court and D.C. Circuit authority, which explain that the Act's remedial provisions are intended to complement—not preclude—review under the APA. *See Doe v. Chao*, 540 U.S. 614, 619 n.1 (2004) (the Act's "inattention" to "equitable relief" is "explained by the general provisions for equitable relief within the . . . APA"); *Dep't Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*, 601 U.S. 42, 63 (2024) (the Act is intended to be "complementary" rather than

---

[16] If the failure "was intentional or willful," the plaintiff may obtain attorney's fees and the greater of the plaintiff's actual damages or $1,000. 5 U.S.C. § 552a(g)(4). The Act's allowances for injunctive relief— authorizing courts to compel disclosure or correct records when the agency fails to respond to an individual's request—are inapplicable here. *See Cell Assocs., Inc. v. NIH*, 579 F.2d 1155, 1159 (9th Cir. 1978) (describing 5 U.S.C. § 552a(g)(2), (3)); *see also AFL-CIO*, 778 F. Supp. 3d at 82.

preclusive of other remedial schemes); *Doe v. Stephens*, 851 F.2d 1457, 1463 (D.C. Cir. 1988) (the Act "does not by itself authorize" declaratory or injunctive relief and holding plaintiffs were instead "entitled under the [APA] to a declaration").

In the face of this precedent, Defendants rely only on an out-of-circuit interlocutory order reversing a preliminary injunction blocking recent agency disclosures to DOGE. *See* FD Mot. 19 (citing *Am. Fed'n of Tchrs. v. Bessent*, No. 25-1282, 2025 WL 2313244, at *5 (4th Cir. Aug. 12, 2025)). In that case, a panel of the Fourth Circuit determined there were too many uncertainties over factual and legal questions to satisfy that Circuit's preliminary injunction standard and reached no definitive conclusion on the adequate alternative remedy question. *Am. Fed'n of Tchrs.*, 2025 WL 2313244, at *7. After concluding the plaintiffs failed to establish standing and had likely not identified final action, the court stated in dicta—without analysis—that the Privacy Act's remedial scheme "plausibly reflects [an] intent to preclude suit under the APA." *Id.* at *5. But the court did not engage with the extensive authority reaching the opposite conclusion. *See id.*[17] This Court should thus proceed to the merits of the Privacy Act claim.

### 3. DHS, DOGE, and SSA violated the Privacy Act by incorporating NUMIDENT into SAVE.

Congress enacted the Privacy Act after the Watergate scandal as a response to "a growing awareness that governmental agencies were accumulating an ever-expanding stockpile of information about private individuals that was readily susceptible to both misuse and the perpetuation of inaccuracies." *Londrigan v. FBI*, 670 F.2d 1164, 1169 (D.C. Cir. 1981). The Act prohibits federal agencies from disclosing "any record which is contained in a system of records

---

[17] The Fourth Circuit cited only to *Cell Associates*, but as another Court in this district recently explained, that case dealt only with claims in which plaintiffs "sought to compel disclosure unlawfully withheld, not to prevent disclosure imminently (and unlawfully) threatened." *AFL-CIO*, 778 F. Supp. 3d at 81 (citing 579 F.2d at 1159).

by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains," except in specific limited circumstances. 5 U.S.C. § 552a(b). An agency may disclose information to other government entities only "for a civil or criminal law enforcement activity," and only upon a "written request to the agency which maintains the record specifying the particular portion desired and the law enforcement activity for which the record is sought." *Id.* § 552a(b)(7). An agency may also disclose records "for a routine use," *id.* § 552a(b)(3), which is defined as the use of a record "for a purpose which is compatible with the purpose for which it was collected." *Id.* § 552a(a)(7).

As this Court has recognized, however, "agencies cannot invent routine uses on the fly." 780 F. Supp. 3d at 165–66. "Instead, any time they establish or revise a system of records, they must 'publish in the Federal Register' a notice containing a list of 'each routine use of the records contained in the system, including the categories of users and the purpose of such use.'" *Id.* (quoting 5 U.S.C. § 552a(e)(4)(D)). When an agency intends "any new use," it must publish a systems of record notice ("SORN") providing at least 30 days "for interested persons to submit written data, views, or arguments" about the new routine uses. 5 U.S.C. § 552a(e)(11). A SORN must also describe, among other things, the "categories of individuals on whom records are maintained," as well as the "sources of records in the system." *Id.* § 552a(e)(4). As part of this mandatory process, the agency must "make reasonable efforts to assure that such records are accurate, complete, timely, and relevant for agency purposes." *Id.* § 552a(e)(6).[18]

---

[18] The strict prohibition of disclosures that fail to adhere to these requirements includes both direct disclosures of information and granting access to covered systems. *See* 5 U.S.C. § 552a(b) ("No agency shall disclose any record which is contained in a system of records *by any means of communication* to any person . . . ." (emphasis added)); *AFL-CIO v. OPM*, No. 25-cv-1237, 2025 WL 1621714, at *25 (D.D.C. June 9, 2025) ("[P]roviding access to another person for their review

The Privacy Act violations here are clear: DHS is operating a new version of SAVE—incorporating finalized action from DHS, DOGE, and SSA—which pools protected information about new categories of people, utilizing new sources (including NUMIDENT), for an entirely new purpose—assessing the citizenship of U.S.-born as well as foreign-born individuals. SOF ¶¶ 93, 97. The agencies admit that both SAVE and NUMIDENT are systems of records "subject to the requirements of the Privacy Act." SOF ¶ 78. Yet the changes they have implemented, which vastly expand the disclosures being made by the agencies, did not adhere to any of the mandates in the Privacy Act just described. *See* SOF ¶ 90.

Federal Defendants misquote the SORN to erroneously suggest that the existing SORN for SAVE justifies the new uses for the system, claiming it permits federal, state, local, and tribal agencies to confirm immigration and "citizen status." FD Mot. 23 (quoting 85 Fed. Reg. 31798, 31,800 (May 27, 2020)). Far from authorizing disclosures to these agencies to verify "citizen status" generally, *id.*, the SORN restricts SAVE's purpose to "confirm[ing] *immigration and naturalized and certain derived citizen status* information," 85 Fed. Reg. 31800 (emphasis added); *see also* 85 Fed. Reg. 31798 ("SAVE allows users agencies to confirm immigration and naturalized and certain derived citizen status information."). *Nothing* in the SORN suggests SAVE can be used to investigate possible U.S.-born native citizens for voter eligibility purposes. Further still, the SORN does not list NUMIDENT as a "source" of information disclosed via SAVE. 85 Fed. Reg. 31800, 31802. Nor does the existing SORN for NUMIDENT contemplate disclosures for its new uses in SAVE. *See* 90 Fed. Reg. 10028 (describing routine uses, including disclosures to DHS "to

---

of a record is a disclosure, even if that access is not used." (internal quotation marks omitted)); *Tolbert-Smith v. Chu*, 714 F. Supp. 2d 37, 43 (D.D.C. 2010) (similar); *In re Sci. Applications Int'l Corp. (SAIC) Backup Tape Data Theft Litig.*, 45 F. Supp. 3d 14, 29 (D.D.C. 2014) (similar); *see also* OMB Guidelines, 40 Fed. Reg. 28948, 28953 (July 9, 1975) ("A disclosure may be either the transfer of a record or the granting of access to a record.").

identify and locate *aliens* located in the United States" and to "administ[er] the E-Verify Program," which concerns work authorization for non-citizens (emphasis added)).[19]

These failures are not just mundane or academic concerns. By ignoring the Privacy Act's mandates and imposing these dramatic changes to SAVE, including the issuance of a new or updated SORN, Defendants have made SAVE a veritable fountain of improper disclosures—precisely what the Act is intended to prevent. Nor is there any assurance that the disclosures are, as the Privacy Act requires, "accurate, complete, timely, and relevant" for proper purposes. 5 U.S.C. § 552a(e)(6). To the contrary, NUMIDENT is ill-suited for citizenship verification purposes—as explained, that database only contains a few decades of consistent data and the agency does not regularly update it. SOF ¶¶ 83–85. In fact, SSA will update or correct information in NUMIDENT only at the request of an individual; it performs no such updates on its own initiative. SOF ¶¶ 83–84. These shortcomings—as well as the risk of disclosing the sensitive information of hundreds of millions of Americans in NUMIDENT—could have been aired through the Privacy Act's procedures, had Defendants not shirked those obligations.

At bottom, if the Federal Defendants wish to disclose sensitive data that federal law has allowed the agencies to collect, they must follow Congress's mandates when doing so. They have not. The Court should enter partial summary judgment for plaintiffs on this claim, hold DHS's recent updates to SAVE unlawful, and set those changes aside.

---

[19] SSA has also pointed to a regulation purporting to authorize "access" to NUMIDENT for SAVE, SOF ¶ 78 (Federal Defendant's responses to Plaintiff's interrogatories), but the regulation specifically states disclosures may be made to USCIS "to carry out its duties *regarding aliens*," 20 C.F.R. § 401.120 (emphasis added). In any event, a regulation cannot displace independent statutory requirements. *Texas v. EPA*, 726 F.3d 180, 195 (D.C. Cir. 2013).

### D.    Defendants are not entitled to judgment on Plaintiffs' remaining claims against §§ 2(b) and 3(a).

None of Federal Defendants' efforts to obtain summary judgment at this juncture on the DPPs' remaining claims against §§ 2(b) and 3(a) have merit; the Court should deny their motion and resolve the claims in later phases of the case when an appropriate record has been produced.

Federal Defendants argue that the DPPs lack standing to challenge actions taken to implement these provisions because they lack a "concrete" harm resulting from disclosures and that asserted harms to voting rights are too speculative. FD Mot. 5–6. The effort falls flat, particularly given that Defendants have promised to continue using federal data pursuant to the EO to identify purportedly ineligible voters, *see* SOF ¶ 94, even as they have thus far refused to disclose relevant facts—aside from actions *they* think have already been fully "implement[ed]," SOF ¶¶ 78, 90. As a result, the DPPs and this Court remain unable to assess disputes regarding the contours of all the actions taken pursuant to §§ 2(b) and 3(a); additional facts—via the required AR and possibly discovery—are necessary, *see* Rule 56(d) Decl. ¶¶ 27, 34, 41, 45.[20] And while the DPPs have demonstrated standing to challenge the SAVE updates, *supra* Part V.B, disputes regarding the full scope of harm to members whose records have been used—information only Defendants possess—cannot yet be resolved, *see* Rule 56(d) Decl. ¶¶ 30–35. D.C. Circuit precedent does not permit judgment in the face of this kind of information asymmetry. *Venetian Casino Resort, LLC v. EEOC*, 409 F.3d 359, 366–67 (D.C. Cir. 2005); *All. for Retired Ams. v. Bessent*, No. CV 25-0313 (CKK), 2025 WL 1114350, at *3 (D.D.C. Mar. 20, 2025) (ordering

---

[20] Defendants' argument that Plaintiffs lack any common law analogue for the harms stemming from Privacy Act violations, FD Mot. 5-6, fails for the reasons already explained, *supra* Part V.B.1. Defendants' injury argument further fails to account for the distinct organizational harms resulting from implementation of Sections 2(b) and 3(a). SOF ¶ 110; *supra* Part V.B.3.

discovery on APA Privacy Act claim on this ground after insufficient AR was produced). The argument that Plaintiffs' claim as to Section 2(b)(ii) is unripe, FD Mot. 20, is unpersuasive for the same reason, *see* Rule 56(d) Decl. ¶¶ 43–47.

Defendants' arguments on the merits likewise fail. Starting with the DPPs' *ultra vires* claim against § 2(b)(iii), Defendants claim the EO does no more than direct DOGE to compare state and federal lists, which they insist is "well within [the President's] authority" to demand. FD Mot. 21. Notably, Defendants cite no such "authority," and they ignore that the EO's mandate to inject federal officials into state processes, EO § 2(b)(iii) (citing 52 U.S.C. § 20507), conflicts with the constitutional and statutory scheme that reserves assessment of voter eligibility to the States, *see* DPP Compl. ¶¶ 129–31. In any event, relevant discovery regarding the agencies' understanding of the EO and its implementation has not yet taken place. *See* Rule 56(d) Decl. ¶¶ 23–47; *Bessent*, 2025 WL 1114350, at *3; *McKoy v. Spencer*, 271 F. Supp. 3d 25, 39 (D.D.C. 2017).

Defendants' motion fails as to the DPPs' remaining Privacy Act-based APA claims for similar reasons: An AR and, likely, discovery are necessary for the Court to resolve disputes as to whether the agencies' actions are lawful. Rule 56(d) Decl. ¶¶ 23–47; *Bessent*, 2025 WL 1114350, at *3. As for Plaintiffs' challenge to § 2(b)(iii), Defendants rely heavily on the assertion that DOGE officials are "employees" of DHS for purposes of using databases, FD Mot. 25, but they make that claim without having disclosed material facts about "what work they do, where they work, and who supervises them"—all necessary to resolve the issue, *AFL-CIO v. OPM*, 2025 WL 1621714, at *27 (explaining a "detaile[e] . . . cannot be deemed an employee of multiple agencies at the same time" and holding DOGE personnel were likely "not OPM employees"); *see* Rule 56(d) Decl. ¶¶ 24–29. Factual development is needed for the Court to resolve these claims, too.

## VI.   The Court should defer consideration of the Democratic Party Plaintiffs' remaining APA claims.

In addition to their *ultra vires* and separation of powers claims, the DPPs also raise various APA challenges to several of the provisions above. *See* DPP Compl. ¶¶ 171–78, 186–94 (§ 2(d)), ¶¶ 179–85, 205–12 (§ 3(d)), ¶¶ 164–70, 213–19 (§ 7). The Court has subject matter jurisdiction over these claims because the DPPs have standing to challenge each of them, as explained above. But it should not yet resolve these APA claims for several reasons. *First*, Federal Defendants have not yet produced an AR, which makes review of these APA claims premature. *See Devlin v. Berry*, 26 F. Supp. 3d 74, 80 (D.D.C. 2014); *see also* DPPs' Phase I Resp. Br., ECF No. 184, at 34–36. *Second*, the preliminary injunctions issued by this Court and the District of Massachusetts have precluded the agency from taking final agency action, a non-jurisdictional prerequisite for Plaintiffs' APA claims. *See Trudeau v. FTC*, 456 F.3d 178, 183 (D.C. Cir. 2006); FD Mot. 18 (explaining DOD "has not [yet] completed the process for updating the federal post card form" because "section 3(d) is also enjoined"); *id.* at 19 (noting § 7 is "enjoined as to 13 States").

*Third*, if the Court grants judgment on the DPPs' *ultra vires* and separation of powers claims, the Court may never need to reach these remaining APA claims—it should not strain to reach potentially unnecessary and premature issues when the ripe claims above may substantially dispose of this action.

*Finally*, several of the DPPs' claims are assessed under the *Anderson-Burdick* framework which, as explained in Phase I, requires "fact-intensive analysis," *Gill v. Scholz*, 962 F.3d 360, 365 (7th Cir. 2020); ECF No. 184 at 37.[21] Granting summary judgment on these claims in the case's

---

[21] It is an open question in this Circuit whether an equal protection claim regarding an election rule is addressed under the traditional equal protection framework or the *Anderson-Burdick* framework.

current posture would therefore be improper. *See* ECF No. 184 at 37–39; *see* SOF ¶¶ 20–25, 64 (identifying facts relevant to burden analysis). For instance, though Section 3(d)(ii)'s eligibility provision will almost certainly require some additional documentation extraneous to the Federal Post Card itself, it does not define "proof of eligibility to vote in elections in the State in which the voter is attempting to vote," which necessarily impacts the burden-analysis for DPPs' claims premised on *Anderson-Burdick*. Nor has the government produced discovery demonstrating its interest in imposing a DPOC requirement for uniformed military and overseas voters. *See Fish v. Schwab*, 957 F.3d 1105, 1126 (10th Cir. 2020) (discounting the State's purported interests because it presented "no evidence" to support those claimed interests); *see also Soltysik v. Padilla*, 910 F.3d 438, 448 (9th Cir. 2018) (rejecting the argument that States are "not required to make an evidentiary showing of [their] interests" in *Anderson-Burdick* challenges).

## CONCLUSION

This Court should grant the Democratic Party Plaintiffs' motion for partial summary judgment as to their *ultra vires* and constitutional separation of powers claims concerning Sections 2(d), 3(d), 4(a), 7(a), and 7(b) of the EO, declare the provisions unlawful, and permanently enjoin their enforcement. The Court should further grant partial judgment on Democratic Party Plaintiffs' APA-based Privacy Act claim against the recent expansion of SAVE taken pursuant to Sections 2(b) and 3(a). The Court should otherwise deny the Defendants' cross-motions in full and reserve any outstanding claims for Phase III, if necessary.

---

*See Vote Forward v. DeJoy*, 490 F. Supp. 3d 110, 125 (D.D.C. 2020). Accordingly, the DPPs' equal protection claim, *see* DPP Compl. ¶¶ 186–194, may also require factual development, further warranting deferment of these potentially unnecessary claims to a later phase.

Dated: September 17, 2025

Respectfully submitted,

*/s/ Aria C. Branch*
**ELIAS LAW GROUP LLP**
Marc E. Elias (DC 442007)
Aria C. Branch (DC 1014541)
Lalitha D. Madduri (DC 1659412)
Christopher D. Dodge (DC 90011587)
Jacob D. Shelly (DC 90010127)
Harleen K. Gambhir (DC 1781869)
James J. Pinchak (DC 90034756)*
250 Massachusetts Ave. NW, Suite 400
Washington, DC 20001
T: (202) 968-4652

Tyler L. Bishop (DC 90014111)
1700 Seventh Ave. Suite 2100
Seattle, WA 98101
T: (206) 656-0177

*Counsel for the Democratic Party Plaintiffs*

*\*Admitted pro hac vice*