# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

LEAGUE OF UNITED LATIN
AMERICAN CITIZENS, *et al.*,

          Plaintiffs,

    v.

EXECUTIVE OFFICE OF THE
PRESIDENT, *et al.*,

          Defendants.

Civil Action No. 25-cv-0946 (CKK)

DEMOCRATIC NATIONAL
COMMITTEE, *et al.*,

          Plaintiffs,

    v.

DONALD J. TRUMP, in his official capacity
as President of the United States, *et al.*,

          Defendants.

Civil Action No. 25-cv-0952 (CKK)

LEAGUE OF WOMEN VOTERS
EDUCATION FUND, *et al.*,

          Plaintiffs,

    v.

DONALD J. TRUMP, in his official capacity
as President of the United States, *et al.*,

          Defendants.

Civil Action No. 25-cv-0955 (CKK)

## DEMOCRATIC PARTY PLAINTIFFS' PHASE II STATEMENT OF MATERIAL FACTS

Pursuant to Local Civil Rule 7(h), Plaintiffs the Democratic National Committee ("DNC"), the Democratic Governors Association ("DGA"), the Democratic Senatorial Campaign Committee ("DSCC"), the Democratic Congressional Campaign Committee ("DCCC") (collectively, "Party Organizations"), and the Democratic leaders of the U.S. Senate and U.S. House of Representatives, Charles E. "Chuck" Schumer and Hakeem S. Jeffries, respectively (together with the Party Organizations, "Democratic Party Plaintiffs"), respectfully submit the following Statement of Material Facts as to which there is no genuine dispute in support of their Motion for Partial Summary Judgment as to Sections 2(b), 2(d), 3(a), 3(d), 4(a), 7(a), and 7(b) of Executive Order 14,248. Democratic Party Plaintiffs incorporate their previous statement of undisputed material facts on the Phase I briefing (ECF No. 184-3) and add these additional facts relevant to the remaining claims. Exhibits cited herein are attached to the Declaration of Aria C. Branch (Sep. 17, 2025), filed concurrently with this Statement of Material Facts.

Dated: September 17, 2025                    Respectfully submitted,

                                             */s/ Aria C. Branch*
                                             **ELIAS LAW GROUP LLP**
                                             Marc E. Elias (DC 442007)
                                             Aria C. Branch (DC 1014541)
                                             Lalitha D. Madduri (DC 1659412)
                                             Christopher D. Dodge (DC 90011587)
                                             Jacob D. Shelly (DC 90010127)
                                             Harleen K. Gambhir (DC 1781869)
                                             James J. Pinchak (NY 5965397)*
                                             250 Massachusetts Ave. NW, Suite 400
                                             Washington, DC 20001
                                             T: (202) 968-4652

                                             Tyler L. Bishop (DC 90014111)
                                             1700 Seventh Ave. Suite 2100
                                             Seattle, WA 98101
                                             T: (206) 656-0177

                                             *Admitted pro hac vice*

**TABLE OF EXHIBITS TO DECLARATION OF ARIA C. BRANCH (SEPTEMBER 17, 2025)**

| Ex. | Description |
|---|---|
| **1** | Second Declaration of U.S. House Minority Leader Hakeem S. Jeffries (September 16, 2025) |
| **2** | Second Declaration of U.S. Senate Minority Leader Charles E. Schumer (September 16, 2025) |
| **3** | Second Declaration of DNC Deputy Executive Director Liberty Schneider (September 16, 2025) |
| **4** | Second Declaration of DGA Chief Operating Officer Jillian Edelman (September 16, 2025) |
| **5** | Second Declaration of DSCC Chief Operating Officer Lillie Snyder Boss (September 16, 2025) |
| **6** | Second Declaration of DCCC Chief Operating Officer Erik Ruselowski (September 16, 2025) |
| **7** | Declaration of Bahareh Azizi (September 16, 2025) |
| **8** | Declaration of Rachel E. Nelson, M.D. (September 16, 2025) |
| **9** | Declaration of Judy Bryant (September 16, 2025) |
| **10** | Declaration of Ada Shen (September 16, 2025) |
| **11** | Declaration of Kaitlin Cagle (September 16, 2025) |
| **12** | Declaration of Gene Scott Phillips (September 16, 2025) |
| **13** | Seth Chizeck et al., *Political Underrepresentation Among Public Benefits Recipients: Evidence from Linked Administrative Data*, 60 URB. AFFS. REV. 420 (Aug. 16, 2023), |

| | |
|---|---|
| | https://doi.org/10.1177/10780874231191703 |
| 14 | Rich Morin et al., *A Bipartisan Nation of Beneficiaries*, PEW RSCH. CTR. (Dec. 18, 2012), perma.cc/BYH9-JBZK |
| 15 | H.R. Rep. No. 99-765 (Aug. 7, 1986), reprinted in 1986 U.S.C.C.A.N. 2009 |
| 16 | Fed. Voting Assistance Program, Federal Post Card Application (rev. Jan. 2023), perma.cc/ENE7-JTJ9 |
| 17 | *Uniformed and Overseas Citizens Absentee Voting: Hearing Held Before the Subcommittee on Elections of the Committee on House Administration*, 99th Cong., 2nd Sess. (Feb. 6, 1986), at 12–13, 64–65 (statements of Al Swift and C.R. Jackson) |
| 18 | U.S. Election Assistance Comm'n, *Election Administration and Voting Survey: 2024 Comprehensive Report* (June 2025), perma.cc/SN5Q-E7AD |
| 19 | Orion Rummler, *Trump rails against mail-in voting, as more states expand options amid outbreak*, Axios (Apr. 7, 2020), https://www.axios.com/2020/04/08/trump-coronavirus-voting-primary-mail-in |
| 20 | Stephanie Saul & Reid J. Epstein, *Trump Is Pushing a False Argument on Vote-by-Mail Fraud. Here Are the Facts.* N.Y. Times (Sep. 28, 2020), perma.cc/ZLN8-HRR2 |
| 21 | Eugene Kiely et al., *The President's Trumped-Up Claims of Voter Fraud*, FactCheck.org (July 30, 2020), perma.cc/4JWE-HDUH |
| 22 | The Comm'n on Presidential Debates, *September 29, 2020 Debate Transcript* (Sep. 29, 2020), perma.cc/D5YG-FQEV |
| 23 | Roll Call, *Speech: Donald Trump Makes an Unscheduled Pre-Recorded Speech on the Election* (Dec. 2, 2020), perma.cc/YS72-V6UY |
| 24 | Brennan Ctr. for Just., *Voting Rights Litigation Tracker 2020* (last updated July 8, 2021), perma.cc/793L-EBMJ |
| 25 | Brian Naylor, *Read Trump's Jan. 6 Speech, A Key Part Of Impeachment Trial*, Nat'l Pub. Radio (Feb. 10, 2021), perma.cc/QJ3K-7EKS |

| 26 | H.R. Rep. No. 117-663, Select Comm. to Investigate the Jan. 6 Attack on the U.S. Capitol, 117th Cong., 2d Sess., at 201-02 (Dec. 22, 2022), https://www.govinfo.gov/content/pkg/GPO-J6-REPORT/pdf/GPO-J6-REPORT.pdf |
| --- | --- |
| 27 | Ashley Lopez, *The RNC wants Republicans to embrace early voting. Trump's rhetoric makes it tough*, Nat'l Pub. Radio (Jan. 18, 2024), perma.cc/VT6E-95A6 |
| 28 | Chris Cameron & Maggie Haberman, *After Summit, Trump Heaps Praise on Putin in Fox News Interview*, N.Y. Times (Aug. 16, 2025), perma.cc/TEA7-KKRB |
| 29 | Donald J. Trump (@realDonaldTrump), Truth Social (Aug. 18, 2025, at 7:17 AM), https://truthsocial.com/@realDonaldTrump/posts/115049485680941254 |
| 30 | Nat'l Conf. on State Legs., *Table 11: Receipt and Postmark Deadlines for Absentee/Mail Ballots* (updated Aug. 1, 2025), https://www.ncsl.org/elections-and-campaigns/table-11-receipt-and-postmark-deadlines-for-absentee-mail-ballots |
| 31 | Va. Dep't of Elections, *2024 November General* (last updated Mar. 5, 2025), perma.cc/6M28-4YHM |
| 32 | N.M. Sec'y of State, *2024 Nov 5 General: President of the United States*, perma.cc/4G6J-HCMY |
| 33 | N.C. State Bd. of Elections, *11/05/2024 Official General Election Results – Statewide*, https://perma.cc/4HQ2-D6V3 (last accessed Sep. 16, 2025) |
| 34 | Pa. Dep't of Elections, *2024 Presidential Election (Official Returns)*, perma.cc/SFB9-V3A9 (last accessed Sep. 16, 2025) |
| 35 | Wash. Sec'y of State, *November 5, 2024 General Election Results* (last updated Nov. 26, 2024), perma.cc/65ZZ-93S8 |
| 36 | Ashley Lopez, *Republicans say mail ballots arriving after Election Day in Nevada should be illegal*, Nat'l Pub. Radio (June 6, 2024), perma.cc/9QZN-9Z23 |
| 37 | Declaration of Natalie Adona, Elected Nevada County Clerk-Recorder/Registrar of Voters in California, *California v. Trump*, No. 1:25-cv-10810 (D. Mass. May 5, 2025), ECF No. 76-6 |

| | |
|---|---|
| **38** | Declaration of Donna Barber, Executive Director of the New Jersey Department of State, Division of Elections, *California v. Trump*, No. 1:25-cv-10810 (D. Mass. May 5, 2025), ECF No. 76-7 |
| **39** | Declaration of Edmund Michawloski, Deputy Clerk for Elections for the Office of the Cook County Clerk, *California v. Trump*, No. 1:25-cv-10810 (D. Mass. May 5, 2025), ECF No. 76-15 |
| **40** | Declaration of Jana M. Lean, Chief of the Elections Division in the Office of the California Secretary of State, *California v. Trump*, No. 1:25-cv-10810 (D. Mass. May 5, 2025), ECF No. 76-3 |
| **41** | Declaration of Julie Wise, Director of Elections for King County, Washington, *Washington v. Trump*, No. 2:25-CV-00602 (W.D. Wash. May 29, 2025), ECF No. 48 |
| **42** | Declaration of Dena Dawson, Elections Director for the Oregon Secretary of State, *Washington v. Trump*, No. 2:25-CV-00602 (W.D. Wash. May 29, 2025), ECF No. 40 |
| **43** | Declaration of Mary Hall, Thurston County Auditor, *Washington v. Trump*, No. 2:25-CV-00602 (W.D. Wash. May 29, 2025), ECF No. 43 |
| **44** | Declaration of Linda Farmer, Pierce County Auditor, *Washington v. Trump*, No. 2:25-CV-00602 (W.D. Wash. May 29, 2025), ECF No. 42 |
| **45** | Josiah Henry Benton, *Voting in the Field: A Forgotten Chapter of the Civil War*, at 316-18 (1915) |
| **46** | *Bill to Amend the Act of September 16, 1942: Hearing on H.R. 3436 Before the H. Comm. on Election of President, Vice President, and Representatives in Congress*, 78th Cong. 100, 102 (Oct. 26, 1943) |
| **47** | *Uniformed and Overseas Citizens Absentee Voting: Hearing on H.R. 4393*, 99th Cong., 2nd Sess., at 21 (Feb. 6, 1986) (statement of Henry Valentino) |
| **48** | Declaration of Greg Kimsey, Clark County Auditor, *Washington v. Trump*, No. 2:25-CV-00602 (W.D. Wash. May 29, 2025), ECF No. 44 |
| **49** | U.S. Dep't of Just., *Cases Raising Claims Under the Uniformed and Overseas Citizen Absentee Voting Act* (updated Mar. 24, 2022), perma.cc/Q5KP-S8AM |

| 50 | Press Release, *USCIS Deploys Common Sense Tools to Verify Voters*, U.S. Dep't of Homeland Sec. Citizenship & Immigr. Servs. (May 22, 2025), perma.cc/JT4Y-SVX3 |
|----|----|
| 51 | Press Release, *DHS, USCIS, DOGE Overhaul Systematic Alien Verification for Entitlements Database*, U.S. Dep't of Homeland Sec., (April 22, 2025), perma.cc/9X3Z-DUEE |
| 52 | U.S. Dep't of Homeland Sec. Citizenship & Immigr. Servs., *SAVE User Reference Guide* at 1-10, 59-61 (June 2025), perma.cc/6Y3V-U6RS |
| 53 | U.S. Dep't of Homeland Sec. Citizenship & Immigr. Servs., *Voter Registration and Voter Maintenance Fact Sheet* (last updated Aug. 27, 2025), perma.cc/UL8Q-AEZS |
| 54 | Letter from Dana L. Gold & Andrea Meza, Government Accountability Project, on behalf of Mr. Chuck Borges, to House and Senate Officials (Aug. 26, 2025), perma.cc/X27F-232L |
| 55 | Letter from Social Security Admin. Off. of Gen. Counsel to Jon Sherman, Litigation Director and Senior Counsel, Fair Elections Center (July 13, 2023), perma.cc/AK7V-GEYZ |
| 56 | U.S. Dep't of Homeland Sec., *Privacy Impact Assessment for the Systematic Alien Verification for Entitlements Program* (June 30, 2020), perma.cc/G9WG-8UFG |
| 57 | U.S. Gov't Accountability Off., Rep. to Cong. Comms. No. GAO-17-204, *Immigration Status Verification for Benefits: Actions Needed to Improve Effectiveness and Oversight*, (Mar. 23, 2017), perma.cc/Q569-KT5W |
| 58 | Mem. of Agreement Between U.S. Dep't of Homeland Sec., U.S. Citizenship & Immigr. Servs., & the Va. State Bd. of Elections, *Va. Coal. For Immigrant Rts. v. Beals*, No. 1:24-cv-01778 (E.D. Va. Oct. 15, 2024), ECF No. 26-3 |
| 59 | Iowa Sec'y of State, Mem. of Agreement Between U.S. Dep't of Homeland Sec., U.S. Citizenship & Immigr. Servs., & the Iowa Sec'y of State (rev. June 20, 2013), https://sos.iowa.gov/elections/pdf/SAVEMOA.pdf |
| 60 | Jude Joffe-Block & Miles Parks, *Trump Administration Is Building a National Citizenship Data System*, Nat'l Pub. Radio (June 29, 2025), perma.cc/DBQ5-Y2JE |
| 61 | Ga. Sec'y of State, *November General Election* (last updated Jan. 30, 2025), |

| | perma.cc/WJ37-V9HA |
|---|---|
| **62** | Natalia Contreras, *Texas dives into federal SAVE immigration database to check voter citizenship*, Votebeat.org (July 22, 2025), perma.cc/A26Y-GYX9 |
| **63** | Aaron Pellish, *Nearly half of election officials concerned about politically motivated investigations*, Politico (July 10, 2025), politico.com/news/2025/07/10/election-officials-threat-survey-00445734 |
| **64** | E-mail from Timothy Benz, Dep't of Homeland Sec., U.S. Citizenship & Immigr. Servs., Verification Div., to Adam Steele, N.C. State Bd. of Elections (Aug. 21, 2025) |

## STATEMENT OF MATERIAL FACTS

**I.    President Donald J. Trump Issues Executive Order No. 14,248**

1.    On March 25, 2025, President Trump issued Executive Order No. 14,248, *Preserving and Protecting the Integrity of American* Elections ("EO" or "Executive Order").

2.    The full text of the Executive Order is published in the Federal Register, 90 Fed. Reg. 14005, and is also available on the public website of the White House, https://www.whitehouse.gov/presidential-actions/2025/03/preserving-and-protecting-the-integrity-of-american-elections.

3.    The Executive Order directs various federal agencies and agency officials to take actions related to elections in the United States. *See generally* EO.

**II.    The Executive Order's Requirement that Federal Voter Registration Agencies "Assess" Citizenship**

4.    Section 2(d) of the Executive Order requires that "each Federal voter registration executive department or agency (agency) under the National Voter Registration Act, 52 U.S.C. § 20506(a), shall assess citizenship prior to providing a Federal voter registration form to enrollees of public assistance programs." EO § 2(d).

5.    The Federal Form is the best option for many of the Party Organizations' members and constituents to register to vote. *See* ECF No. 146-2 ¶ 29.

6.    Millions of Americans, including many members and supporters of the Democratic Party Plaintiffs, lack documentation that satisfies the Executive Order's definition of proof of citizenship. *See* ECF No. 146-2 ¶ 30. Lower-income voters and women are particularly likely to lack such documentation or have difficulty obtaining it. *See id.* ¶¶ 31–32.

7.    Women, lower-income voters, and voters on public assistance are more likely to support Democratic candidates than Republican candidates. *See* ECF No. 146-2 ¶¶ 33–34; *see also*

Ex. 13 (noting that SNAP beneficiaries in major Pennsylvania county "are younger, less white, more female, poorer, and more Democratic than the county's voters as a whole"); Ex. 14 (observing voters on multiple public assistance programs are more likely to "identify with the Democratic Party" and that Democrats are "more likely . . . to have received entitlements from two or more government programs").

8.    Section 2(d), if implemented, would create barriers to accessing and completing the Federal Form. *See* ECF No. 146-2 ¶¶ 35–38.

9.    Section 2(d), if implemented, would frustrate the Democratic Party Plaintiffs' efforts to register voters, engage them in the political process, and encourage them to ultimately cast ballots for Democratic Party candidates. *See* ECF No. 146-2 ¶¶ 39–44.

10.    Existing laws already make it illegal for foreign nationals to register in federal elections. *See* 18 U.S.C. § 611.

## III.    The Executive Order's Documentary Proof Requirements for the Federal Post Card Application

11.    Section 3(d) of the Executive Order orders the Secretary of Defense to "update the Federal Post Card" to require "documentary proof of United States citizenship" and "proof of eligibility to vote in elections in the State in which the voter is attempting to vote." EO § 3(d).

12.    Section 3(d) states:

(d) The Secretary of Defense shall update the Federal Post Card Application, pursuant to the Uniformed and Overseas Citizens Absentee Voting Act, 52 U.S.C. 20301, to require:

(i) documentary proof of United States citizenship, as defined by section 2(a)(ii) of this order; and

(ii) proof of eligibility to vote in elections in the State in which the voter is attempting to vote.

13.  In turn, the documentary proof of citizenship "as defined by section 2(a)(ii)" includes:

> (A) a United States passport;
>
> (B) an identification document compliant with the requirements of the REAL ID Act of 2005 (Pub. L. [No.] 109-13, Div. B) that indicates the applicant is a citizen of the United States;
>
> (C) an official military identification card that indicates the applicant is a citizen of the United States; or
>
> (D) a valid Federal or State government-issued photo identification if such identification indicates that the applicant is a United States citizen or if such identification is otherwise accompanied by proof of United States citizenship.

14.  The Executive Order does not allow any of the following documents to be used to prove U.S. citizenship: birth certificates, adoption certificates, Consular Reports of Birth Abroad issued by the Secretary of State, naturalization documents issued by the U.S. Department of Homeland Security ("DHS"), or American Indian Cards issued by DHS. *See* EO § 2(a).

15.  The Federal Post Card is a widely available and simple way for many of the Democratic Party Plaintiffs' members and constituents living overseas to register to vote and request absentee ballots. Ex 1 ("Jeffries Decl.") ¶¶ 10–11; Ex. 2 ("Schumer Decl.") ¶ 11; Ex. 4 ("Edelman Decl.") ¶ 16; Ex. 3 ("Schneider Decl.") ¶¶ 17, 21; Ex. 5 ("Boss Decl.") ¶¶ 18, 22; Ex. 6 ("Ruselowski Decl.") ¶¶ 17, 21; Ex. 7 ("Azizi Decl.") ¶¶ 4–5; Ex. 10 ("Shen Decl.") ¶¶ 8, 13, 17.

16.  The present iteration of the Federal Post Card fulfills the intended functions of (1) being widely available throughout the world and (2) still requiring information like name, birth date, driver's license number, Social Security number, and contact information. Ex. 15 (H.R. REP. 99-765, 7); Jeffries Decl. ¶ 10; Schumer Decl. ¶ 11; Edelman Decl. ¶ 16; Schneider Decl. ¶ 17;

Boss Decl. ¶ 18; Ruselowski Decl. ¶ 17; Azizi Decl. ¶ 5; Shen Decl. ¶ 8; *see also* Ex. 16 (Federal Post Card Application).

17. As required by the NVRA, the Federal Post Card includes a "standard oath" requiring an applicant to "swear or affirm, under penalty of perjury," that the applicant is "a U.S. citizen." Ex. 16.

18. At the congressional hearings discussing the enactment of the Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA), the Chair of the Subcommittee on Elections, Representative Al Swift, explained that the Federal Post Card was created to be a "postage-free post card." Ex 17 at 12.

19. At UOCAVA's congressional hearings, military officer C.R. Jackson testified that "anyone could handle" the Federal Post Card and "the only way a guy could really not correctly fill [it] out" "would be to put John Doe on the name line instead of his own." Ex. 17 at 64.

20. Overseas and military voters are often located in remote areas without access to a copy machine, scanner, or printer. Section 3(d) will therefore make it difficult for many eligible voters, including those serving our country, to send proof of their citizenship or other eligibility requirements to their county election board, which will render them unable to exercise their fundamental right to vote. Jeffries Decl. ¶ 11; Schumer Decl. ¶ 11; Edelman Decl. ¶ 20; Schneider Decl. ¶ 21; Boss Decl. ¶ 22; Ruselowski Decl. ¶ 21; Azizi Decl. ¶ 5; Shen Decl. ¶¶ 13, 15, 17.

21. There are an estimated 1.3 million voters living abroad who are registered to vote domestically. Ex. 18 at iv.

22. Overseas voters also use the Federal Post Card to request absentee ballots for federal elections, meaning they would need to satisfy the EO's documentation requirements each

year they request absentee ballots for federal elections—not only when they register to vote. Edelman Decl. ¶ 20; Schneider Decl. ¶ 21; Ruselowski Decl. ¶ 21.

23.     If § 3(d) is implemented, overseas voters will be unable to register to vote or request absentee ballots using the Federal Post Card without presenting documentary proof of citizenship or eligibility. Jeffries Decl. ¶ 10; Schumer Decl. ¶ 10; Edelman Decl. ¶ 19; Schneider Decl. ¶ 20, 24; Boss Decl. ¶¶ 21, 23; Ruselowski Decl. ¶¶ 20, 22; Azizi Decl. ¶ 5; Shen Decl. ¶ 17.

24.     Even voters who are able to complete the registration or application process required by the updated Federal Post Card will be significantly inconvenienced by the burdens imposed by § 3(d), which adds extraneous requirements to what Congress has prescribed as a "post card form." *See* 52 U.S.C. § 2031(b)(2); *see also* Jeffries Decl. ¶ 11–12; Schumer Decl. ¶ 11–12; Edelman Decl. ¶¶ 19–20; Schneider Decl. ¶ 20–2, 24; Boss Decl. ¶¶ 21–23; Ruselowski Decl. ¶¶ 20–23; Azizi Decl. ¶ 5; Shen Decl. ¶ 17.

25.     Some eligible voters located overseas, including constituents and supporters of (1) Leader Jeffries, (2) Leader Schumer, and (3) hundreds of other similarly situated Democratic Party candidates, will be dissuaded from or unable to complete the registration process if documentary proof of citizenship or eligibility is required as a condition of completing the Federal Post Card Application. Jeffries Decl. ¶ 11; Schumer Decl. ¶ 11; Edelman Decl. ¶¶ 18–21; Schneider Decl. ¶¶ 20, 24; Boss Decl. ¶¶ 21, 23; Ruselowski Decl. ¶¶ 20, 22; Azizi Decl. ¶ 5; Shen Decl. ¶ 17.

26.     Many of these candidates will compete in close elections decided by a small number of votes; the hundreds of thousands of voters who depend on Federal Post Cards each year can tip the scales in these races. Jeffries Decl. ¶ 11; Schumer Decl. ¶ 11; Edelman Decl. ¶ 21; Schneider Decl. ¶ 24; Boss Decl. ¶ 23; Ruselowski Decl. ¶ 19.

27.    The new requirement is likely to cause voter confusion, which further disincentivizes participation in the electoral process. Shen Decl. ¶¶ 14, 17.

28.    The discouragement of voter participation caused by § 3(d) harms the DNC and DCCC because if implemented they must dedicate additional resources to registration efforts to ensure that their voters can cast ballots that are counted. Schneider Decl. ¶ 15, 22–23; Ruselowski Decl. ¶¶ 16, 23.

29.    Implementation of § 3(d) would require the DNC and DCCC to divert their limited resources toward new efforts to counteract the burdensome changes to the Federal Post Card. Schneider Decl. ¶ 15, 22–23; Ruselowski Decl. ¶¶ 16, 23.

30.    The Party Organizations are actively in the process of making mission-critical strategic decisions for the upcoming election cycles, which will impact their ability to inform voters about candidates and persuade them to vote for Democrats. Schneider Decl. ¶¶ 22–23, 32; Edelman Decl. ¶¶ 9, 13, 30; Boss Decl. ¶¶ 11, 13 – 15; Ruselowski Decl. ¶¶ 12 – 15, 23.

31.    Implementation of § 3(d) threatens to frustrate and interfere with voter registration programs like those that the DNC and DCCC have invested in, and further burdens all of the Party Organizations' abilities to compete effectively in federal and state elections. Edelman Decl. ¶¶ 30–31; Schneider Decl. ¶ 15, 22–23; Ruselowski Decl. ¶¶ 16, 23; Boss Decl. ¶¶ 33–34.

32.    The DNC and DCCC's expenditure of resources to counteract the effects of § 3(d)'s new requirements on Federal Post Card users would necessarily come at the cost of other of the DNC's and DCCC's mission-critical planned activities and expenditures. Schneider Decl. ¶¶ 22–23; Ruselowski Decl. ¶ 23.

33.    In the context of elections, any opportunity to recruit candidates, persuade voters, and galvanize supporters cannot be restored once lost. *See* ECF No. 146-2 ¶ 43.

34.     The lost registration and persuasion opportunities across the country that would result from implementation of § 3(d) cannot be replaced or compensated with monetary damages once lost. Schneider Decl. ¶¶ 22–24, 33–34; Edelman Decl. ¶¶ 20–21, 30–31; Boss Decl. ¶¶ 23–24; 33–34; Ruselowski Decl. ¶¶ 32–33; *see also* Jeffries Decl. ¶¶ 11, 18–21; Schumer Decl. ¶¶ 11, 18–21.

## IV.    The Executive Order's Unlawful Effort to Impose a Nationwide Election Day Ballot Receipt Deadline

35.     Section 7(a) of the Executive Order states:

> **Sec. 7.** Compliance with Federal Law Setting the National Election Day. To achieve full compliance with the Federal laws that set the uniform day for appointing Presidential electors and electing members of Congress:
>
>> (a) The Attorney General shall take all necessary action to enforce 2 U.S.C. 7 and 3 U.S.C. 1 against States that violate these provisions by including absentee or mail-in ballots received after Election Day in the final tabulation of votes for the appointment of Presidential electors and the election of members of the United States Senate and House of Representatives
>>
>> (b) Consistent with 52 U.S.C. 21001(b) and other applicable law, the Election Assistance Commission shall condition any available funding to a State on that State's compliance with the requirement in 52 U.S.C. 21081(a)(6) that each State adopt uniform and nondiscriminatory standards within that State that define what constitutes a vote and what will be counted as a vote, including that, as prescribed in 2 U.S.C. 7 and 3 U.S.C. 1, there be a uniform and nondiscriminatory ballot receipt deadline of Election Day for all methods of voting, excluding ballots cast in accordance with 52 U.S.C. 20301 et seq., after which no additional votes may be cast.

36.     Section 1 of the Executive Order criticizes "mass voting by mail." EO § 1.

37.     President Trump has frequently made comments disparaging mail voting, while also voicing his belief that the practice favors Democratic Party candidates and harms Republicans. President Trump has often advanced unproven claims about whether mail voting is reliable and safe. *See* Exs. 19–29; *see also* Jeffries Decl. ¶ 8 ("[I]t is clear from President Trump's years-long

14

attack on mail voting that a significant motivation of the EO is to restrict voting by mail and to punish his political opponents."); Schumer Decl. ¶ 8 (similar).

38.     In April 2020, President Trump claimed that "[m]ail ballots are a very dangerous thing for this country, cause they're cheaters" and are "fraudulent in many cases." Ex. 19.

39.     In July 2020, President Trump stated that due to mail voting, the election would be "INACCURATE AND FRAUDULENT" and "a great embarrassment to the USA." He suggested "[d]elaying" the election due to mail voting. Ex. 21.

40.     At the September 29, 2020 debate between President Trump and then-Vice President Biden, President Trump was asked about mail-in ballots and whether he would accept the results of the presidential election. He stated that mail ballots were "a disaster," and claimed without evidence that there was "going to be a fraud like you've never seen." Ex. 22. He claimed there would be a "rigged election" due to mail voting in states "run by Democrats." *Id.*

41.     After President Trump lost the 2020 election, he amplified his attacks on mail voting. On December 2, 2020, President Trump spoke of a "corrupt mail-in balloting scheme that Democrats systematically put into place that allowed voting to be altered, especially in swing states." Ex. 23.

42.     President Trump filed dozens of meritless lawsuits attacking mail voting and seeking to toss out thousands of lawfully cast mail ballots by eligible American voters. Ex. 24.

43.     On January 6, 2021, while speaking to thousands of supporters at the White House, President Trump repeatedly made false allegations about the use of mail ballots in the 2020 election, alleging that "Democrats attempted the most brazen and outrageous election theft" in American history through the "scam of mail-in ballots." Ex. 25.

44.     The Final Report of the U.S. House Select Committee to Investigate the January 6th Attack on the United States Capital subsequently detailed the "blizzard of lies" President Trump made to "delegitimiz[e] mail-in voting in the middle of a deadline pandemic." Ex. 26.

45.     President Trump's efforts to delegitimize the use of mail ballots continued throughout 2024. During the Iowa caucuses in January 2024, for example, President Trump insisted that "[w]e have to get rid of mail-in ballots because once you have mail-in ballots, you have crooked elections." Ex. 27.

46.     President Trump has made his continued opposition to mail voting clear even after issuing the EO challenged in this case. On August 16, 2025, following a meeting with Russian President Vladmir Putin, President Trump stated in a Fox News interview that Putin told him, "Your election was rigged because you have mail-in voting.'" Ex. 28.

47.     Two days later, on August 18, 2025, President Trump announced on Truth Social that he would "lead a movement to get rid of MAIL-IN BALLOTS." He stated that "ELECTIONS CAN NEVER BE HONEST WITH MAIL IN BALLOTS/VOTING." In addition, he claimed that "the States are merely an 'agent' for the Federal Government in counting and tabulating the votes," and that "[t]hey must do what the Federal Government, as represented by the President of the United States, tells them." Ex. 29.

48.     Fifteen states, plus three territories and the District of Columbia allow for the counting of mail ballots that are mailed on or before Election Day but received after Election Day. Alaska Stat. § 15.20.081(e); Cal. Elec. Code § 3020(b); D.C. Code § 1-1001.05(a)(10B); Guam Code Ann. tit. 3, § 10114; 10 Ill. Comp. Stat. 5/19-8; Code of Md. Regs. 33.11.03.08(B)(4); Mass. Gen. Laws ch. 54 § 93; Miss. Code § 23-15-637(1)(a); Nev. Rev. Stat. § 293.269921(1)(b), (2); N.J. Stat. § 19:63-22(a); N.Y. Elec. Law § 8-412(1); Ohio Rev. Code § 3509.05(D)(2)(a); Or. Rev.

Stat. § 253.070(3)(b); P.R. Code Ann. 16 § 4736; Tex. Elec. Code § 86.007(a)(2); V.I. Code Ann. § 665; Va. Code § 24.2-709(B); Wash. Rev. Code § 29A.40.091; W. Va. Code § 3-3-5(g)(2); *see also* Ex. 30.

49.    An additional fifteen states apply a similar rule for overseas and military servicemembers specifically. Ala. Code § 17-11-18(b); Ark. Code § 7-5-411(a)(1)(A)(ii); Colo. Rev. Stat. § 1-8.3-113(2); Fla. Stat. § 101.6952(5); Ga. Code § 21-2-386(a)(1)(G); Ind. Code § 3-12-1-17(b); Iowa Code § 53.44; Mich. Comp. Laws § 168.759a(18); Mo. Rev. Stat. § 115.920(1); N.C. Gen. Stat. § 163-258.12(a); N.D. Cent. Code § 16.1-07-24; 25 Pa. Cons. Stat. § 3511(a); R.I. Gen. Laws § 17-20-16; S.C. Code § 7-15-700(A). Montana has similar laws for federal write-in absentee ballots and military-overseas ballots transmitted electronically. Mont. Code Ann. §§ 13-21-206(1)(c), 13-21-226(1).

50.    In total, at least 30 states, the District of Columbia, and several U.S. territories permit the counting of mail ballots that are sent by election day and received afterwards for at least some categories of voters. *See supra* ¶¶ 48–49.

51.    Post-election ballot receipt deadlines laws protect voters, including the elderly, disabled, servicemembers, and overseas citizens, who may otherwise be disenfranchised because of mail delays beyond their control. Ex. 9 ("Bryant Decl.") ¶¶ 2–3 (Texas Democrat explaining that, as a senior citizen, she "prefer[s] to vote by mail due to concerns about long lines and needing to stand for extended periods of time"); Azizi Decl. ¶¶ 2–3, 6–9 (Georgia Democrat living abroad explaining the potential for delay associated with mailing a completed ballot back to the United States); Ex. 8 ("Nelson Decl.") ¶¶ 2–7, 9–10 (Washington State Democrat describing how the demanding nature of her out-of-state surgical residency meant that she mailed her ballot on election day); Ex. 12 ("Phillips Decl.") ¶¶ 2–4, 6 (Oregon Democrat explaining that he has benefited from

post–election day receipt deadlines and appreciates not "leaving it to chance based on Postal Service delivery times" whether his ballot will count); Shen Decl. ¶ 13 (describing how a uniform election day ballot receipt deadline would harm overseas voters, including because "delays are common when mailing materials back to the United States" and so without a post–election day receipt deadline "it is possible that postal delays would cause [a voter's] ballot not to be counted at all"); Ex. 41 ¶ 34 (explaining that an election day ballot receipt deadline "would result in the disenfranchisement of a significant number of eligible voters in King County and would disproportionately impact voters who are most reliant on our vote-by-mail system, including elderly, disabled, low-income, and rural voters—for whom traveling to a ballot drop box or vote center may be difficult"); Ex. 43 ¶ 34 ("[A]n election receipt deadline only serves to disenfranchise voters based on USPS delays beyond the voter's control and, as a result, to make the election results less reliable, as they less accurately reflect the preferences of the electorate."); Jeffries Decl. ¶ 6; Schumer Decl. ¶ 6; Schneider Decl. ¶ 9; Ruselowski Decl. ¶ 9; Edelman Decl. ¶ 7; Boss Decl. ¶ 8; *see also* Ex. 43 (election administrator noting that her "office has observed that USPS is slower and less reliable than in the past. A few years ago, we would receive mailings within approximately one to two days. Now, the timeframe is longer and unpredictable"); Ex. 41 ("[T]he executive order's requirement that all ballots be returned by election day comes at a time when the federal government is contemplating significant cuts to USPS that will impact USPS's ability to deliver ballots to [election administrators] by election day.").

52.    The Democratic Party Plaintiffs have made mail voting a key component of their electoral strategy. *See* Ruselowski Decl. ¶¶ 4, 7 ("Particularly since the pandemic, DCCC has expended significant resources to encourage voters to vote by mail, because that method is often

the most convenient or accessible way for voters to participate"); Schneider Decl. ¶¶ 4, 7; Boss Decl. ¶ 5; Edelman Decl. ¶ 5; Jeffries Decl. ¶ 7; Schumer Decl. ¶ 7.

53.    In most States, including many key battleground States and States with competitive federal elections, Democratic voters disproportionately rely on mail voting and post-election ballot-receipt deadlines, which in turn benefit Democratic candidates. ECF No. 161-2 ¶ 20 (RNC Chief of Staff stating that "Democratic voters tend to mail their ballots later on average than Republican voters, which results in late-arriving ballots favoring Democratic candidates" and that "late deadlines heavily favor Democratic candidates"); Ruselowski Decl. ¶ 10 ("In the last several election cycles, Democrats have been more likely to vote by mail than Republican voters, and we expect that trend to continue."); Jeffries Decl. ¶¶ 7 – 9; Schumer Decl. ¶¶ 7 – 9; Schneider Decl. ¶ 10; Boss Decl. ¶¶ 9; *see also* ECF No. 53-8 (Pew Research Center reporting that in the 2024 general election, "44% of Democratic voters say they voted by mail or absentee, compared with 26% of Republican voters"); ECF No. 176-2 ¶ 14–15; Ex. 31 (showing that Kamala Harris won over 72% of the mail vote in Virginia, with mail votes accounting for 10% of all votes, and won the state with nearly 52% of the vote); Ex. 61 (showing that Kamala Harris won 64.63% of the mail vote in Georgia in 2024); Ex.32  (showing that Kamala Harris won 74.18% of the mail vote in New Mexico in 2024); Ex. 33 (showing that Kamala Harris won 62.62% of the mail vote in North Carolina in 2024); Ex. 34 (showing that Kamala Harris won 64.93% of the mail vote in Pennsylvania in 2024); Ex. 35 (showing that Kamala Harris won Washington State with 57.23% of the vote, with 98% of the vote in the state cast by mail ballot).

54.    The Republican Party has placed less emphasis on mail voting in recent elections as compared to the Democratic Party. *See* ECF No. 161-2 ¶ 20 (stating that "[p]ost-election ballot-receipt deadlines harm Republican candidates and voters"); *see also id.* ¶ 15 (acknowledging that

"voting by mail is starkly polarized by party"); ECF No. 53-8 (Pew Research Center reporting that in the 2024 general election, "44% of Democratic voters say they voted by mail or absentee, compared with 26% of Republican voters").

55.    Mail ballots arriving after election day sometimes exceed the typical margin of victory in close races. For example, in the 2022 general election, more than 40,000 ballots came in after election day in Clark County, Nevada; Joe Biden beat Donald Trump by about 33,500 votes in Nevada in the 2020 general election. Ex. 36; *see also* Ex. 48 ("If properly voted ballots cast by registered voters that were postmarked by election day or earlier had not been included in the results for the 2020 and 2024 general election the results of [Clark County, Washington's] 10 candidate races and three issues may been different.").

56.    A national election day ballot receipt deadline will disenfranchise Democratic Party Plaintiffs' members and make it harder for Democrats to win elections. Nelson Decl. ¶¶ 9–11 (explaining that if § 7 went into effect "ballots like [hers] would not count and many voters in Washington and other states would be disenfranchised" as her "current circumstances mean [she is] particularly likely to cast [her] ballot on or close to election day"); Phillips Decl. ¶ 6 (explaining that he is "especially at risk" of disenfranchisement because he "tend[s] to mail [his] ballot closer to election day"); Azizi Decl. ¶¶ 7–9 (explaining that she "rel[ies]" on post-election day receipt deadlines "given that mail delays are common" for overseas voters); Shen Decl. ¶ 16 (Deputy Global "Get Out The Vote" Officer of Democrats Abroad, official Democratic Party arm for Americans overseas, describing hardship imposed by an election day receipt deadline); Ruselowski Decl. ¶ 15 ("A national election day ballot receipt deadline would also inflict severe harm on our supporters and members, many of whom rely upon mail voting and oftentimes only have their votes count due to the effect of state ballot receipt deadline laws like those targeted by

the EO."); *see also id.* ¶¶ 9–10 (explaining that a national election day ballot receipt deadline "puts DCCC at a competitive disadvantage"); Schneider Decl. ¶¶ 9 – 10, 14; Boss Decl. ¶¶ 8 – 9; Edelman Decl. ¶¶ 9 – 13; Jeffries Decl. ¶¶ 7 – 9 (describing "impact on Democratic voters" and also explaining that "[t]he unfairness, uncertainty, and confusion around the election day receipt deadline imposed by the EO will also make it harder for [Leader Jeffries] to effectively recruit strong candidates to run for office" because "[c]andidates want to know that the rules of the road are clear" and "will be discouraged from running for office with the President has unfairly changed the election rules in a way that tilts the playing field heavily in favor of Republicans"); Schumer Decl. ¶¶ 7 – 9 (similar); *see also* ECF No. 161-2 ¶ 20 (RNC Chief of Staff acknowledging that "late-arriving ballots favor[] Democratic candidates" and "late deadlines heavily favor Democratic candidates").

57.    The Party Organizations have invested heavily in encouraging voters to vote by mail in accordance with relevant state laws, in furtherance of their mission of electing Democratic candidates. This includes educating supporters of Democratic candidates about the applicable rules in their States for voting by mail. Ruselowski Decl. ¶ 8 ("DCCC has dedicated significant staff time and resources to developing a comprehensive education, assistance, and ballot-cure program to ensure Democratic voters are able to cast mail ballots and have them counted. In many districts, these programs were built with the understanding that voters' ballots will be counted if they are postmarked by election day and returned by the Postal Service to the proper state election official or office by their state's deadline, which, in many states, extends past election day."); Schneider Decl. ¶ 8 (similar for DNC); Boss Decl. ¶ 6 (similar for DSCC); Edelman Decl. ¶ 6 (similar for DGA).

58.     The Party Organizations have already been forced to expend resources to grapple with the how the threatened enforcement of § 7 will impact their outreach, assistance, and ballot-cure programs, given the lack of permanent nationwide relief and § 7's impact in states not subject to the preliminary injunction entered in *California v. Trump*, No. 25-cv-10810-DJC, 2025 WL 1667949 (D. Mass. June 13, 2025). Ruselowski Decl. ¶ 11 ("DCCC's leadership team has had to expend resources to grapple with how the threatened enforcement of a uniform national ballot receipt deadline will impact the party's outreach, assistance, and ballot-cure programs for the 2026 general election."); *see also id.* ¶¶ 12–14; Schneider Decl. ¶¶ 11-13 (similar for DNC); Boss Decl. ¶¶ 10 – 12 (similar for DSCC).

59.     Section 7 interferes with the Party Organizations' core activities, which naturally include helping their supporters to cast valid ballots. Ruselowski Decl. ¶¶ 4, 8–14; Schneider Decl. ¶¶ 4, 7 – 13; Boss Decl. ¶¶ 3, 6 – 15; Edelman ¶¶ 5 – 7.

60.     The threat of imminent enforcement frustrates the Party Organizations' ability to make critical strategic decisions about how to plan for the 2026 elections—plans that are being made now and need to be finalized sufficiently in advance of the elections in order to minimize disruption on the eve of the election. Ruselowski Decl. ¶ 12 ("At this point in the election cycle, DCCC would normally be making strategic decisions about how to allocate its resources for these mail-ballot-related programs. The DCCC has not been able to solidify decisions about resource allocation because, among other things, the EO's ballot receipt provisions have disrupted the electoral playing field."); *see also id.* ¶¶ 13–14 (describing the competitive disadvantages and resource impacts of enforcement of an election day ballot receipt deadline later in the electoral cycle); Schneider Decl. ¶¶ 12 – 13 (explaining that a national election day ballot receipt deadline would force the DNC to make "adjustments far later in the electoral cycle than usual, prejudicing

22

our ability to make concrete strategic plans even as the midterms elections approach" and "poses a severe risk to the DNC's ability to accomplish its mission in the 2026 election cycle"); Boss Decl. ¶ 11 ("At this point in the election cycle, DSCC would normally be making strategic decisions about its mail-ballot-related programs. It is difficult for DSCC to do so right now because, among other things, the EO's ballot receipt provisions have disrupted the electoral playing field."); Edelman ¶ 9 (similar for DGA).

61.     So long as the threat of enforcement looms, Democratic Party Plaintiffs cannot make decisions needed to most effectively prosecute the 2026 campaign. Ruselowski Decl. ¶ 12 ("President Trump's threat of enforcement against state mail ballot receipt laws that our voters rely upon has cast a cloud of uncertainty over the rules governing mail ballots in the 2026 election, frustrating our ability to make important strategic decisions as the 2026 midterms approach."); *see also id.* ¶¶ 13–14; Schneider Decl. ¶¶ 12 – 13; Boss Decl. ¶¶ 12-15 (describing specific programs that would need to be implemented to respond to a national election day ballot receipt deadline and explaining that having to "make these adjustments far later in the electoral cycle than usual" would "prejudice[e] its ability to make concrete strategic plans even as the midterm elections approach"); Jeffries Decl. ¶ 8 (explaining that "[t]he unfairness, uncertainty, and confusion around the election day receipt deadline imposed by the EO" make it more difficult for the House Democratic Caucus "to recruit new candidates for office"); Schumer Decl. ¶ 8 (similar for Senate Democratic Caucus); Edelman Decl. ¶¶ 9 – 11.

62.     As was the case in recent elections, millions of Democrats are likely to vote by mail in 2026. *See* Ex. 35 (indicating Kamala Harris received over 2 million votes in Washington State, in which 98% of the vote was cast by mail, during the 2024 general election); Ex. 34 (indicating Kamala Harris received over one million votes by mail in Pennsylvania during the 2024 general

election); *see also* Ex. 37 ¶ 23 (explaining that "anywhere between 90-94 percent of returned ballots were cast using vote-by-mail in Nevada County, California").

63.    Many of these Democratic voters have cast mail ballots in recent elections and had their ballots count solely by operation of the state laws that § 7 targets. Nelson Decl. ¶¶ 3–7 (explaining that her ballot in the 2024 general election would not have been counted but for Washington State's post-election day receipt deadline); Azizi Decl. ¶¶ 7–19; Shen Decl. ¶ 16; Ruselowski Decl. ¶ 15 (explaining that the DCCC's supporters and members "oftentimes only have their votes count due to the effect of state ballot receipt deadline laws like those targeted by the EO"); Schneider Decl. ¶ 14; Boss Decl. ¶ 16; Ruselowski Decl. ¶ 9; *see also* Jeffries Decl. ¶ 7; Schumer Decl. ¶ 7; Ex. 37 ¶ 23 (county election official explaining that their office "would have to reject hundreds or thousands of ballots cast" in the county if § 7 were enforced); Ex. 38 ¶ 24 ("In the last Presidential Election in New Jersey in November 2024 . . . more than 20,000 mail-in ballots were received and accepted after Election Day in the general election."); Ex. 39 ¶ 11 ("For the November 5, 2024 Presidential Election . . . 66,132 mail-in ballots, postmarked on or before Election Day, were received by the Cook County Clerk through delivery by the United States Post Office after Election Day.");.

64.    These Democratic voters are now actively discouraged from voting by mail due to concern and confusion about the operative deadlines for receipt of ballots. Bryant Decl. ¶ 7 ("[I]f Texas's [mail ballot receipt deadline] is changed by the federal government, it would make me significantly more hesitant to vote by mail and would force me to consider alternative, more burdensome voting methods."); Ruselowski Decl. ¶ 15 ("Changing states' mail ballot receipt deadlines will confuse voters and make it more likely that they will be disenfranchised); Schneider Decl. ¶ 14; Boss Decl. ¶ 16; Jeffries Decl. ¶ 9; Schumer Decl. ¶ 9; Ex. 39 ¶ 32 ("In California,

voters have become accustomed to an extended deadline for the receipt of their vote-by-mail ballots by their county elections office.").

65.     States in related litigation have demonstrated how the threat of enforcement posed by § 7 meaningfully impacts their day-to-day work administering elections. Ex. 41 ¶ 36 ("Accommodating a significant change in how and when voters return their ballots in a manner that maximizes voters' ability to cast their votes would require significant operational changes for King County Elections"); Ex. 42 ¶ 15 ("If Oregon was required to reject votes for federal office, it would require changing numerous communications with voters."); *id.* ("If county elections officials in Oregon cannot count votes for federal office that are received after election day but are timely under state law, the SOS and county elections officials will need to change current ballot processes to differentiate between votes for state office and votes for federal office."); Ex. 43 ¶ 33 ("An election day ballot would also result in extraordinary logistical challenges to the extent that such ballots could not be counted for federal elections but could be counted for state and local elections."); *id.* ¶ 35 ("The potential for criminal prosecution will make it more difficult to hire election workers."); Ex. 44 ¶ 34 (similar).

66.     During the Civil War, many states adopted laws to permit service members to vote in the field. Oftentimes these soldiers cast their ballots in the field on election day, typically before their own officers. But their votes were not added to the full count until conveyed back to their home states for a canvass. Ex. 45 at 317–18. Many states, in both the North and South, extended their canvassing deadlines to accommodate this. *Id.* This was necessary because of "the difficulty of getting the votes home to the various States in season to be counted with the other votes." *Id.* at 316. Under these systems, election officials would not receive the results of these in-the-field elections until well after election day. *Id.* at 318.

67.     Several states enacted post-election-day ballot receipt deadlines in the wake of World War I. *See, e.g.*, Neb. Comp. Stat. §§ 2007, 2009, 2011, 2035 (1921) (counting ballots received before county canvassing board convenes, up to six days after election day); Cal. Pol. Code § 1360 (1923) (permitting receipt up to 14 days after election day); Kan. Stat. § 25-1106 (1929) (mailed by election day and received by ten days after); Mo. Rev. Stat. § 11474 (1939) (permitting receipt by day after election day); 1933 Wash. Sess. Laws Extraordinary Sess. at 102–03, ch. 41, § 5 (postmarked by election day and received by canvassing six days after).

68.     By 1942, with the United States' entry into World War II, post-election day receipt deadlines were common. *See* Ex. 46.

69.     At least nine States—California, Kansas, Maryland, Missouri, New York, Nebraska, Pennsylvania, Rhode Island, and Washington—had post-election ballot receipt deadlines, either for civilians, servicemembers, or both by 1943. Ex. 46 at 101; *see also* Neb. Rev. Stat. § 32-838 (1943) (permitting mail-in ballots to be received by up to two days after election day).

70.     By the mid-1980s, "[t]welve [States] ha[d] extended the deadline for the receipt of voted ballots to a specified number of days after the election." Ex. 47 (Statement of Henry Valentino, Director, Federal Voting Assistance Program).

71.     Congress has amended the Election Day Statutes several times without addressing State post-election ballot receipt deadlines—including most recently in December 2022. *See* Electoral Count Reform and Presidential Transition Improvement Act of 2022, Pub. L. No. 117-328, div. P, tit. I, 136 Stat. 4459, 5233 (2022).

72.     Congress has affirmatively acknowledged in other federal statutes that ballot receipt deadlines are left up to the States. In 1986, Congress passed UOCAVA, which requires

States to allow uniformed military and overseas citizens to register and cast absentee ballots in federal elections. *See* 52 U.S.C. § 20301 *et seq*. UOCAVA provides that an alternative federal write-in ballot for uniformed military and overseas voters shall not count "if a State absentee ballot of the absent uniformed services voter or overseas voter is received by the appropriate State election official not later than the deadline for receipt of the State absentee ballot under State law." *Id.* § 20303(b)(3) (emphasis added).

73.    Indeed, until recently, DOJ routinely secured extensions of ballot receipt deadlines after election day as a remedy in UOCAVA cases. DOJ did so 29 times between 2000 and 2022. *See* Ex. 49.

74.    In 2009, Congress passed the MOVE Act, which explicitly incorporates state-law ballot receipt deadlines into the federal statutory scheme by requiring officials to ensure that overseas servicemembers' ballots "for regularly scheduled general elections for Federal office" are delivered "to the appropriate election officials" "*not later than the date by which an absentee ballot must be received in order to be counted in the election*." *Id.* § 20304(b)(1) (emphasis added); Pub. L. No. 111-84, div. A, tit. V., subtit. H, § 580(a), 123 Stat. 2190.

75.    Republicans in recent years filed lawsuits challenging post-election ballot receipt deadlines in Illinois, Mississippi, Nevada, New Jersey, and Pennsylvania. These efforts have overwhelmingly failed, with nearly every court rejecting such challenges for lack of standing, on the merits, or both. *See Pa. Democratic Party v. Boockvar*, 238 A.3d 345, 368 n.23 (Pa. 2020) (concluding Election Day Statutes are consistent with extended ballot receipt deadlines); *Bognet v. Sec'y Commonwealth of Pa.*, 980 F.3d 336, 353–54 (3d Cir. 2020), *cert. granted, judgment vacated sub nom. Bognet v. Degraffenreid*, 141 S. Ct. 2508 (2021) ("Federal law does not provide for when or how ballot counting occurs," and extended receipt deadlines and the Election Day

Statutes "can, and indeed do, operate harmoniously."); *Donald J. Trump for President, Inc. v. Way*, 492 F. Supp. 3d 354, 369 (D.N.J. 2020) (rejecting the RNC's and others' challenges to New Jersey post-election mail ballot receipt deadline); *Bost v. Ill. State Bd. of Elections*, 684 F. Supp. 3d 720, 736 (N.D. Ill. 2023), *aff'd*, 114 F.4th 634 (7th Cir. 2024), *cert. granted*, 145 S. Ct. 2751 (June 2, 2025) (rejecting challenge to Illinois's 14-day ballot receipt deadline); *Republican Nat'l Comm. v. Wetzel*, 742 F. Supp. 3d 587, 601 (S.D. Miss.), *rev'd in part, vacated in part*, 120 F.4th 200 (5th Cir. 2024) (concluding Election Day Statutes are not violated "by allowing a reasonable interval for ballots cast and postmarked by election day to arrive by mail"); *Republican Nat'l Comm. v. Burgess*, No. 3:24-CV-00198-MMD-CLB, 2024 WL 3445254, at *2 (D. Nev. July 17, 2024) (concluding Republican organizations and voters lacked standing to challenge Nevada's ballot receipt deadline); *see also Harris v. Fla. Elections Canvassing Comm'n*, 122 F. Supp. 2d 1317, 1325 (N.D. Fla.), *aff'd sub nom. Harris v. Fla. Elections Comm'n*, 235 F.3d 578 (11th Cir. 2000) ("Congress did not intend 3 U.S.C. § 1 to impose irrational scheduling rules on state and local canvassing officials, and certainly did not intend to disenfranchise voters whose only reason for not being able to have their ballots arrive by the close of election day is that they were serving their country overseas.").

## V.    The Executive Order's Data-Sharing Provisions

76.    Section 2(b) of the EO states:

(b)  To identify unqualified voters registered in the States:

(i) the Secretary of Homeland Security shall, consistent with applicable law, ensure that State and local officials have, without the requirement of the payment of a fee, access to appropriate systems for verifying the citizenship or immigration status of individuals registering to vote or who are already registered;

(ii) the Secretary of State shall take all lawful and appropriate action to make available information from relevant databases to State and local election

officials engaged in verifying the citizenship of individuals registering to vote or who are already registered; and

(iii) the Department of Homeland Security, in coordination with the DOGE Administrator, shall review each State's publicly available voter registration list and available records concerning voter list maintenance activities as required by 52 U.S.C. 20507, alongside Federal immigration databases and State records requested, including through subpoena where necessary and authorized by law, for consistency with Federal requirements.

77.    Section 3(a) of the EO states:

(a) The Commissioner of Social Security shall take all appropriate action to make available the Social Security Number Verification Service, the Death Master File, and any other Federal databases containing relevant information to all State and local election officials engaged in verifying the eligibility of individuals registering to vote or who are already registered. In determining and taking such action, the Commissioner of Social Security shall ensure compliance with applicable privacy and data security laws and regulations.

78.    The Systematic Alien Verification for Entitlements program ("SAVE"), a system of records maintained by DHS, and NUMIDENT, a system of records maintained by SSA, "have been used" by DHS, DOGE, and SSA to "implement" Section 2(b)(i) of the EO. Fed. Defs.' Resp. to Pls.' Interrog., ECF No. 177-3 ("FD ROG Resp.") at 7, 8, 11, 12; *see* Ex. 50; Ex. 51.

79.    SAVE is an online service administered by DHS that provides federal, state, and local government agencies information about the immigration or citizenship status and other information regarding applicants seeking certain benefits and licenses. FD Rog Resp. at 9; Systems of Records Notice, 85 Fed. Reg. 31798, 31800–01 (May 27, 2020); Ex. 52 at 3–4; Ex. 53.

80.    Through SAVE, DHS shares information derived from federal records by cross-referencing other federal databases and creating a case page that displays information from the databases when a user submits an inquiry. *See* 85 Fed. Reg. 31800–01; Ex. 52 at 59–61; Ex. 53.

81.    NUMIDENT is SSA's master database of individuals who have applied for or obtained a Social Security number. *See* Systems of Record Notice, 90 Fed. Reg. 10025, 10026

(corrected Feb. 20, 2025) ("This system contains a record of each person who has applied for and to whom we have assigned an SSN."); *see* FD ROG Resp. at 1 (citing 90 Fed. Reg. 10025).

82.     NUMIDENT contains Social Security numbers, other identifying numbers, names, dates and places of birth, citizenship indicators, and other information obtained during the processing of requests for Social Security numbers. 90 Fed. Reg. 10026; Ex. 54 at 3.

83.     SSA does not independently update its records absent a request from the individual to do so. Ex. 55 at 2; *see* 90 Fed. Reg. 10029 (citing 20 C.F.R. § 401.65).

84.     Individuals have no obligations to correct or report updates regarding their citizenship or immigration status to SSA unless the individual is receiving Social Security payments. Ex. 55 at 2; *see* 20 C.F.R. § 401.65.

85.     Records contained in NUMIDENT, including an individual's citizenship indicator, are sometimes inaccurate. Ex. 53 (acknowledging that information from Social Security data may be inaccurate); Ex. 55 at 2 (stating the "citizenship SSA maintains merely represents a snapshot of the individual's citizenship status at the time of their interaction with SSA").

86.     The SSA's chief data officer at the time these recent changes to SAVE were implemented has filed a whistleblower disclosure with Congress stating that the sharing of SSA's NUMIDENT data by current agency officials and DOGE employees violated agency protocols, and that disclosures of citizenship information and other personal information risk invasions of privacy and misuse of personal data. Ex. 54 at 1–18; *see also id.* at 2 n.3 (noting that the specified DOGE employees have conducted work for both DHS and SSA).

87.     Prior to the EO, inquiries could be submitted through SAVE only for individuals with an identifying number assigned by DHS. 85 Fed. Reg. 31800; Ex. 56 at 3; Ex. 57 at 8; Ex. 50; *see also infra* ¶ 89.

88.     Most state and local agencies do not collect DHS identifying numbers. Ex. 50; *see also* Ex. 57 at 8.

89.     Prior to the EO, a small number of state and local governments had used SAVE to inquire about the citizenship status of naturalized citizens for whom they had obtained a DHS identifying number for voter registration or list maintenance purposes. *E.g.*, Exs. 58, 59; *see* FD ROG Resp. at 4. These state and local governments did so pursuant to memoranda of understanding that strictly limited how SAVE could be used, in part to protect sensitive information disclosed under the agreement, and that—consistent with the SAVE SORN—allowed only for inquiries of "non-citizen[s] and naturalized or derived" citizens. Ex. 58 at 3; Ex. 59 at 2.

90.     USCIS, a component of DHS, recently implemented updates, which Federal Defendants refer to as "enhance[ments]," to SAVE. These changes include:

(1)     On April 15, 2025, USCIS eliminated fees for state and local government users (effective April 1, 2025).

(2)     On May 1, 2025, USCIS implemented a feature that allows user agencies to submit bulk inquiries by uploaded CSV-delimited files.

(3)     On May 1, 2025, USCIS implemented a feature increasing the user agency's ability to audit, view, and download case information.

(4)     On May 16, 2025, USCIS implemented searches based on a first and last name, date of birth, and nine-digit social security number.

(5)     On July 11, 2025, USCIS implemented an "error file" download feature, which enables user agencies to identify errors and resubmit queries.

(6)     On July 11, 2025, USCIS implemented a "file history retrieval dashboard," which helps improve file retrieval for bulk uploads.

(7)     On July 11, 2025, USCIS implemented bulk escalation capability, allowing States to escalate numerous cases to secondary review at the same time.

(8)     On August 15, 2025, USCIS implemented searches based on first and last name, date of birth, and partial (last four digits) social security number.

FD ROG Resp. at 13–14.

91. DHS issued a new reference guide for SAVE users on June 4, 2025. *See* Ex. 52.

92. The SAVE user guide incorporates many of the implemented changes described above. *See* Ex. 52 at 3–10, 59–61.

93. SSA provided NUMIDENT access to DHS to carry out the Executive Order's commands and facilitate the changes above, allowing for searches of any U.S. citizen with a Social Security number, including U.S.-born citizens. FD ROG Resp. at 7, 12, 14.

94. DHS incorporated records from NUMIDENT in the SAVE system to complete the updates to SAVE described above, including "implement[ing] searches" based on a full or partial Social Security number. FD ROG Resp. at 6, 11, 14; *see* Ex. 50 ; Ex. 64 (DHS official describing to a North Carolina election official the "new integration with SSA that enables case submission using the Social Security Number (SSN) as a non-DHS enumerator," and emphasizing that the agency is "committed to optimizing its SAVE system to meet citizenship and immigration status verification needs").

95. DHS allowed DOGE detailees to access SAVE and NUMIDENT to complete the updates to SAVE described above. FD ROG Resp. at 11; *see* Ex. 50 at 1; Ex. 51 at 1.

96. NUMIDENT is the only non-DHS database being used in SAVE for the purpose of assessing voter eligibility. *See* FD ROG Resp. at 6.

97. In response to an inquiry, SAVE will provide users the individual's citizenship status indicator provided by SSA, a numerical identifier created for the individual's SAVE case file, a description of the agency's finding regarding the individual's status, and "employment history," if applicable. Ex. 52 at 7 & 59–61; Ex. 53.

98. DHS officials have encouraged state and local agencies to use the updated version of SAVE, including by providing select states with "invitation only" access to the new four-digit

Social Security number search feature before it was announced by the agency. Ex. 64.; Ex. 50 at 1; *see also* Ex. 62.

99.     State and local agencies that have registered with DHS to use SAVE for voter verification "may, at any time, create cases for verification of U.S. citizenship or immigration status." FD ROG Resp. at 9.

100.     State and local officials in the following States have registered with DHS for voter verification and "can submit or create SAVE cases for this purpose at any time": Alabama, Arizona, Arkansas, Colorado, Florida, Georgia, Idaho, Indiana, Iowa, Louisiana, Michigan, Mississippi, Missouri, North Carolina, North Dakota, Ohio, South Carolina, Tennessee, Texas, Virginia, and Wyoming. FD ROG Resp. at 9.

101.     "Since March 2025, various USCIS and state and local agency users and administrators from nine states (Alabama, Florida, Louisiana, Missouri, Arizona, Ohio, South Carolina, Tennessee and Texas) have created approximately 8 million voter verification cases using SAVE." FD ROG Resp. at 9; Ex. 60 at 6 (reporting that, by the end of June 2025, DHS had confirmed "run[ning] more than 9 million voter records through the upgraded SAVE system").

102.     As of August 20, 2025, state and local officials from three additional states, Nevada, Oklahoma, and Utah, had a "pending SAVE registration request to verify U.S. citizenship or immigration status for voter registration or list maintenance under review." FD ROG Resp. 9.

103.     The Democratic Party Plaintiffs' members have Social Security numbers and reside in each of the states in which state and local officials have ready access to SAVE. Schneider Decl. ¶¶ 5, 25, 27–29; Ruselowski Decl. ¶¶ 5, 27; Ex. 11 ("Cagle Decl.") ¶ 6–8; Bryant Decl. ¶ 9; *see also* Jeffries Decl. ¶¶ 13, 16; Schumer Decl. ¶ 13, 16.

104.    The Democratic Party Plaintiffs' members expect that their personal records stored with the federal government remain confidential and that any disclosures of information comply with the strict protections of federal law. Cagle Decl. ¶ 9; *see also* Bryant Decl. ¶ 9; Jeffries Decl. ¶ 14; Schumer Decl. ¶ 14.

105.    The availability of their personal information in federal records, including records stored in NUMIDENT, to state and local election officials is disturbing to some of the Democratic Party Plaintiffs' members who are concerned about invasions of privacy and improper use of their information. Cagle Decl. ¶ 9; *see also* Bryant Decl. ¶ 9.

106.    Some of the Democratic Party Plaintiffs' members and constituents are so concerned about the disclosures of their private information by DHS, DOGE, and SSA to state and local officials that they are hesitant to register or reregister to vote in upcoming elections. Cagle Decl. ¶ 9; Schneider Decl. ¶ 31; Edelman Decl. ¶ 28; Boss Decl. ¶ 30; Ruselowski Decl. ¶ 30.

107.    President Trump, other Trump administration officials, and state and local officials have been accused of giving disfavored treatment to political opponents. *See* Ex. 63; *see also* Jeffries Decl. ¶ 8; Schumer Decl. ¶ 8.

108.    In some states, state and local election officials may alter a voter's registration status when they suspect that the voter is ineligible to vote, and may ultimately remove them from voter rolls if the voter does not provide confirmation of their status. *See* Schneider Decl. ¶¶ 29–30; Edelman Decl. ¶¶ 26–27; Boss Decl. ¶¶ 29–30; Ruselowski Decl. ¶¶ 28-29; Ex. 62.

109.    In some states, state and local election officials have removed voters from voter rolls based on information that the voter was a non-citizen. Ex. 62; Schneider Decl. ¶ 29; Edelman Decl. ¶ 29; Boss Decl. ¶ 29; Ruselowski Decl. ¶ 29.

110.    To counteract harms to their mission resulting from the SAVE updates, the Democratic Party Plaintiffs will need to retool their mission-critical voter registration efforts to account for the privacy concerns of prospective voters and risks to the registrations of the members. *See* Schneider Decl. ¶¶ 31–32; Edelman Decl. ¶¶ 28–29; Boss Decl. ¶¶ 31–32; Ruselowski Decl. ¶¶ 30–31.

Dated: September 17, 2025                              Respectfully submitted,

                                                       */s/ Aria C. Branch*
                                                       **ELIAS LAW GROUP LLP**
                                                       Marc E. Elias (DC 442007)
                                                       Aria C. Branch (DC 1014541)
                                                       Lalitha D. Madduri (DC 1659412)
                                                       Christopher D. Dodge (DC 90011587)
                                                       Jacob D. Shelly (DC 90010127)
                                                       Harleen K. Gambhir (DC 1781869)
                                                       James J. Pinchak (DC 90034756)*
                                                       250 Massachusetts Ave. NW, Suite 400
                                                       Washington, DC 20001
                                                       T: (202) 968-4652

                                                       Tyler L. Bishop (DC 90014111)
                                                       1700 Seventh Ave. Suite 2100
                                                       Seattle, WA 98101
                                                       T: (206) 656-0177

                                                       *Admitted pro hac vice*