UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


League of United Latin American Citizens, et al

v.

Office of the President, et al

Civil Action 1:25-cv-946 (CKK)


*AMICUS CURIAE* BRIEF ON THE CONSTITUTIONAL AUTHORITY AND DUTY OF THE UNITED STATES, INCLUDING THE PRESIDENT, TO ENSURE ELECTION INTEGRITY, IN SUPPORT OF THE DEFENDANTS

# Table of Contents

THE AUTHOR'S INTEREST ................................................................................................ 3

TABLE OF LEGAL AND OTHER AUTHORITIES .............................................................. 3

INTRODUCTION .................................................................................................................. 4

THE AUTHORITY OF THE PRESIDENT ............................................................................ 4

    THE ELECTORS AND ELECTIONS CLAUSES ............................................................. 4

    THE GUARANTEE CLAUSE ............................................................................................ 5

        The Guarantee Clause Prohibits the Corruption of Elections ..................................... 6

        Measures Taken to Protect the Manner of Elections Do Not Alter Such Manner .......... 7

        If there is a Conflict, the Guarantee Clause Supersedes the Elections Clause ............. 7

        The Existential Importance of Election Integrity to Democracy Justifies Oversight Not Just by One Branch of the Federal Government, But Two .......................................... 8

IS THE DPOC REQUIREMENT A REASONABLE ONE? .................................................. 9

COMPARITIVE CONSEQUENCES .................................................................................... 10

CONCLUSIONS .................................................................................................................. 12

## THE AUTHOR'S INTEREST

My interest regarding this case follows the publication of 5 articles on election integrity appearing in *American Thinker*, including two that address the primary subject of this amicus – the Guarantee Clause. The first of those two is "We Need a Revote," published on Dec. 25, 2020 (which was republished at *RealClearPolitics* on the same day); the second (and closest to the present amicus brief) is "What We Must Do to Restore Confidence in Our Elections," on August 4, 2022.

I hold a J.D. from Washington University School of Law in St. Louis, and was briefly a member of the Illinois Bar.

## TABLE OF LEGAL AND OTHER AUTHORITIES

U.S. Constitution:   Electors Clause, Art. 2 § 1 cl. 3
                     Elections Clause, Art.1 § 4 cl. 1
                     Guarantee Clause, Art. 4 § 4 cl. 1.

Commission on Federal Election Reform, aka Carter-Baker Commission, "Building Confidence in U. S. Elections," Sept. 2005.

Cybersecurity and Infrastructure Security Agency (CISA), "MAIL–IN VOTING IN 2020 INFRASTRUCTURE RISK ASSESSMENT," 7/28/202

Executive Order 14248, "Preserving and Protecting the Integrity of American Elections," Office of the President, March 25, 2025.

*Federalist 39*, ¶ 3.

Gabriel J. Chin, Edward L. Barrett Jr. Chair of Law, Martin Luther King, Jr. Professor of Law, and Director of Clinical Legal Education at the University of California - Davis School of Law, writing for the National Constitutional Center (NCC).

Mike Pence, "Election Integrity Is a National Imperative" *The Daily Signal*, March 3, 2021.

## INTRODUCTION

On March 25th 2025, Pres. Trump issued EO 14248, an order that, at § 2(a) and "consistent with applicable law," directed the Election Assistance Commission to require that persons registering by mail to vote in federal elections provide documentary proof of citizenship (DPOC).

On March 31st the *League of United Latin American Citizens* (LULAC) and 16 other Plaintiffs filed a complaint challenging such provision on the grounds that, under the Electors and the Elections Clauses of the US Constitution, the President had no jurisdiction over the "manner" of elections, that such authority lay with Congress only.

Another clause, the Guarantee Clause provides the President with such authority. It does not conflict with the aforementioned clauses, but, if it is found that it does, it supersedes them.

The Carter-Baker Commission for Federal Election Reform recommended to all states a proof of citizenship requirement for voter registration 20 years ago.

The potential negative consequences of a ruling against the Defendants far outweigh the consequences of a negative ruling against the Plaintiffs.

## THE AUTHORITY OF THE PRESIDENT

### THE ELECTORS AND ELECTIONS CLAUSES

Electors Clause, Article II § 1 cl. 3:

> Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors, equal to the whole Number of Senators and Representatives to which the

State may be entitled in the Congress: but no Senator or Representative, or Person holding an Office of Trust or Profit under the United States, shall be appointed an Elector.

Elections Clause, Article I § 4 cl.1:

<u>The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations</u>, except as to the Places of chusing Senators.

As can be seen, the first, the Electors Clause is not directly about elections, but about appointments of electors. In practice, legislatures have not appointed electors themselves but have authorized the contesting political parties to do so, dependent on which one's nominee wins the election. But the Clause says nothing about who determines how that election is to be conducted.

In the second, the Elections Clause, such authority (and oversight of it) is delegated. And, since (in practice) congressional and presidential elections take place concurrently, the states' authority over congressional elections effectively extends to concurrent presidential elections. It is not, however, constitutionally required that congressional and presidential elections take place concurrently. Which means that, if we are to rely only on these two Clauses, the framers were perfectly content to have *no national oversight at all over presidential elections* – unless, that is, there were another clause somewhere in the Constitution that would provide for such oversight.

## THE GUARANTEE CLAUSE

Article IV § 4 cl. 1:

"The United States shall guarantee to every State in this Union a Republican Form of Government…"

Exactly what is a "Republican form of Government? In *Federalist 39*, at ¶ 3, James Madison wrote:

"… we may define a republic to be … a government that derives all its powers directly or indirectly from the great body of the people."

Most of us today would understand Madison as more precisely describing democracy rather than a republic, but in fact it describes them both – a republic is a democracy that, through a ratified constitution, sets restraints on itself, but with both, all power traces back to elections.

In the Elections Clause, elections are assumed, but they are not required. Under it alone, a state might vote to become a monarchy, oligarchy, dictatorship etc., and thus dispense with elections – *and yet continue to send electors to the Electoral College and senators and representatives to Congress*. Even if electorate of a state freely chooses an undemocratic system, the Guarantee Clause prohibits such a possibility.[1]

### The Guarantee Clause Prohibits the Corruption of Elections

Included as dictatorships, of course, would be covert dictatorships – that is, dictatorships that appear to be elective, but, through covert vote fraud, are not. But while this is obviously a "non-republican" form of government, it is one that the federal government cannot so easily identify. If such corruption were suspected, it cannot investigate without invoking charges (and perhaps legitimate ones) of being politically motivated. And even it nonetheless did, actually

---

[1] "Guarantee Clause," NCC website.

proving such corruption sufficient as to remove a state government and/or exclude it from participating in presidential/congressional elections would be a very tall if not dangerous order.

In short, as a practical matter, if a state or states appear to have become covertly corrupted, there is no remedial action that the federal government can take against them.

What it can do however, without making or proving any accusations of corruption, is to prohibit all 50 states from employing electoral processes that lend themselves to vote fraud, and/or require processes that do not. This is what the Guarantee Clause not only authorizes, but requires, and it requires it not only of Congress, but of the United States – which includes the Presidency.

### Measures Taken to Protect the Manner of Elections Do Not Alter Such Manner

Does such presidential authority conflict with the Elections Clause, which reserves oversight over the "manner" of elections to Congress alone? At first blush, it appears to do so.

If, however, an election process has been corrupted, does that mean that the "manner" of elections has been altered? That such corruption has become part of the "manner?" No. It means that the manner of elections has been covertly *repudiated*. Measures taken to prevent such repudiation do not alter the manner of election, they *protect* such manner.

In the present case, for example, Congress has required that all persons voting in federal elections be citizens. That is the fundamental "manner" at the heart of such elections. The President's Order at 2(a) does not alter that manner; it *protects* it.

### If there is a Conflict, the Guarantee Clause Supersedes the Elections Clause

For the sake of argument, let us say that such distinction is invalid, and that any alteration to the voting process, even for safeguarding that process impermissibly affects the "manner" of

the process. That notwithstanding, the Guarantee Clause still requires that the US ensure that all states have a "Republican form of government."

Without that Guarantee, some states may become corrupt, and yet still "vote" in presidential elections and send representatives to Congress. We may be there already; it doesn't matter. The Guarantee Clause, if not our common sense, requires that our elections be as secure as is reasonably possible in any case. *If* this conflicts with the Elections Clause, then the Guarantee Clause, *around which everything else in the Constitution depends*, must prevail.

### The Existential Importance of Election Integrity to Democracy Justifies Oversight Not Just by One Branch of the Federal Government, But Two

As a rule, the framers separated power whenever feasible. But, with respect to enforcing the Guarantee that states would be governed democratically, there is no separation of powers, not between the state and federal governments, nor between the branches of the federal government. The states are free to ensure their own democratic rule, but, if they are in fact threatened by corruption, they are in the weakest position to do so. Congress, if it includes states that are not threatened by corruption, is in a stronger position to protect a threatened state. But if other states in Congress are threatened as well, then, of course, that advantage is compromised; its oversight is obstructed.[2]

---

[2] In 2005, following the disputed presidential election of 2000, the bipartisan 21-member Carter-Baker Commission made several recommendations going to election integrity, which included the recommendation that all states eliminate ballot harvesting. The Commission provided opportunity for its bipartisan members to express dissent, on this recommendation, there were none. While the recommendation was directed to the states, Congress, through its oversight, could have acted as well. 20 years later, however, it hasn't done so. Indeed, in 2021, Democrats put forth a bill titled "For the People Act," one in which, according to former VP Mike Pence, it required that "States must… allow ballot harvesting—where paid political operatives collect absentee ballots from places such as nursing homes—exposing our most vulnerable voters [and voters generally] to coercion and increasing the risk that their ballots will be tampered with."

A president may be obstructed as well, but, as a national leader embodied in a single person, not as easily. And, even if Congress is not obstructed, a president may act more quickly. The measures he or she may take are potentially temporary, but, if, consistent with the Guarantee, the courts find that they may[3] ensure the integrity of elections, such measures may serve until Congress can find a way to bring them into law.

## IS THE DPOC REQUIREMENT A REASONABLE ONE?

Is it? Well, the bipartisan Commission on Federal Election Reform, a 21-member commission headed by former President Jimmy Carter and former Secretary of State James Baker III, and which included former Democratic Majority and Minority leader Tom Daschle, former Democratic Representative Lee Hamiliton, for US Rep. Lee Hamilton, former Republican Minority Leader Bob Michel, and other prominent government and private industry luminaries – on Sept. 20, 2025, this Commission issued "Building Confidence in U.S. Elections," in which, among other recommendations, it asserted:

> "2.5.2  The right to vote is a vital component of U. S. citizenship, and all states should use their best efforts to obtain proof of citizenship before registering voters."

At the end of the report, there was a section reserved for dissent or comments. None of the members filed a dissent against this recommendation.[4]

---

[3] I use the word "may" here because, if the DPOC requirement is adopted, there is never going to be any proof that they prevented vote fraud. There would, however, never be any proof that they didn't, either. If, in this present litigation, such requirement is accepted, it can only be on the basis that it is found to be a reasonable response to the reasonable possibility of non-citizens voting in elections.

[4] Tom Daschle, joined by two others, did challenge another recommendation, relating to voter identification, raising the same objection presently being raised by the Plaintiffs. They wrote: "The goals of ballot access and integrity are not mutually exclusive… For voters who have traditionally faced barriers to voting … [some of] these recommendations appear to be more about ballot security than access to the ballot." (Both with Daschle's complaint and the present one, however, the issue is not between integrity and access, but between it and easy access;

Some may say that this report was issued twenty years ago, and that technological advances -- the cross-referencing of data bases to confirm citizenship -- make such recommendation no longer necessary. But technology is only as good as the input it receives – "garbage in; garbage out." It can also be vulnerable to other technology. In assessing the risk of mail-in voting, the Cybersecurity and Infrastructure Security Agency states,

> "Increasing the amount of infrastructure and technology expands the vectors of attack for cyber actors [possibly including China, et al] and opportunity to affect the process at scale." [5]

In relying not on cross-referenced data bases, but on DPOC, the electoral system would be less vulnerable to data manipulation and cyberattacks. In relying on proof rather than invisible computer cross-referencing, voters can be something more than passive instruments of bureaucracies and technologies, and so may more easily have confidence in elections.

These two electoral systems are quite different, but not incompatible. Consistent with the Guarantee, both could be relied on, and serve as a check on, or confirmation of the other.

## COMPARITIVE CONSEQUENCES

From Plaintiffs' Complaint:

---

convenience. (And also, between convenience to the person registering to vote and that of the governmental administrative efficiency – that of preventing a crime as opposed to not preventing it, bringing the offender to court, proving guilt, and punishment with fines and/or imprisonment, and/or deportation.)
[5] CISA report, p. 3, under "Compensating Control."

"139. LULAC members who are eligible to vote often do not have the requisite citizenship documents, i.e., United States passports or state, federal, or military identification documents that indicate that the applicant is a citizen of the United States."

If they do not have requisite documents, then how does LULAC know that they are citizens? It doesn't know. We are apparently supposed to take their word for it. But if we take their word for it, then why don't we take all the tens of millions "undocumented" migrants word for it as well?

LULAC goes on at length to discuss the problems that members will have in complying with providing the requisite documents. But, barring subsequent loss or theft, overcoming such problems would be a once-in-a-lifetime event. The alternative for them would be voting in elections for the rest of their lives without proof that they are entitled to do so.

LULAC writes of the potential one-time hardships to its members; it says nothing about the potential consequences of potentially corrupted elections *to the nation* beyond its members.

What is the consequence to the nation if the DPOC requirement is adopted, but in fact, there is little or no non-citizen voting in any case. It would be that the efforts of attaining the documents were, at least for this purpose, unnecessary.

How does that compare to the scenario of the DPOC requirement being rejected, and the repeated higher possibility of elections being stolen because of it?[6] This would be a stiff price to

---

[6] In raising this question, I am aware that many studies show non-citizen voting to exist, but at very low rates. But there must be caveats to such findings. 1) Such studies measure only the non-citizen voting that has been discovered; it does not measure what has not been discovered. 2) As Democrats have been less than conscientious in controlling the border, non-citizens who illegally vote can generally be expected to vote Democratic, which means that Democratic states would have little motivation in discovering them. 3) "Past performance is no guarantee of future returns." In prior years, a Republican administration was not deporting illegal migrants; such an administration is doing so now. This could, of course, motivate many such migrants to vote to defeat this administration, regardless of the law.

pay for not requiring some of our citizens to acquire, at some one-time point in their lives, documents proving citizenship.

## CONCLUSIONS

Under Article 4 § 4, the Constitution guarantees to the 50 states of the Union that all of them will be governed democratically. The enforcement of this guarantee falls not on any particular branch of the federal government, but on all of it, including the Presidency.

The bipartisan Carter-Baker Commission recommended (to Congress) that those registering to vote provide proof of citizenship. Of the 21 members, there were no direct dissents to this recommendation; perhaps 3 indirect dissents – leaving a majority of 11 to 18 members supporting the measure.

In their Complaint, the Plaintiffs do not challenge the merit of the DPOC requirement, but only the President's authority to impose it. And they charge that it would create a harm/burden on some of its members. But, (barring subsequent loss of documents), only once. In contrast, if DPOC were not required, and, cross-referenced, potentially hackable or tampered data bases notwithstanding, they were not citizens, they would continue to be eligible to illegally vote for the rest of their lives.

Respectfully submitted,

/s/ Robert T. Peterson
Robert T. Peterson
1825 Tamiami Trail
Unit J #1014
Port Charlotte FL 33948
vpnpete@protonmail.com