**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.*, | |
| Plaintiffs, | |
| v. | Civil Action No. 25-0946 (CKK) |
| EXECUTIVE OFFICE OF THE PRESI-DENT, *et al.*, | |
| Defendants. | |
| DEMOCRATIC NATIONAL COMMITTEE, *et al.*, | |
| Plaintiffs, | |
| v. | Civil Action No. 25-0952 (CKK) |
| DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*, | |
| Defendants, | |
| *and* | |
| REPUBLICAN NATIONAL COMMITTEE, Intervenor-Defendant. | |
| LEAGUE OF WOMEN VOTERS EDUCA-TION FUND, *et al.*, | |
| Plaintiffs, | |
| v. | Civil Action No. 25-0955 (CKK) |
| DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*, | |
| Defendants. | |

**THE REPUBLICAN NATIONAL COMMITTEE'S OPPOSITION TO PLAINTIFFS'
PHASE II CROSS MOTIONS AND REPLY BRIEF IN SUPPORT OF SUMMARY
JUDGMENT ON PLAINTIFFS' REMAINING CLAIMS**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... iii

INTRODUCTION ................................................................................................................... 1

ARGUMENT ........................................................................................................................... 2

I.    The DNC's APA claims fail because Sections 2(d) and 7(a) are consistent with law. ........... 2

   A.    Section 2(d) is consistent with federal law because it directs when to collect proof of citizenship that federal law already requires. ....................................................................... 2

   B.    Section 2(d) complies with the Fifth Amendment because it treats similarly situated voters the same, imposes no additional burdens on voting, and serves legitimate government interests. ................................................................................................................................... 6

   C.    Section 7(a) is consistent with the federal election-day statutes. ....................................... 8

      1.    The executive order's implementation of the federal election-day statutes is consistent with precedent. ................................................................................................................ 9

      2.    The executive order's application of the election-day statutes is consistent with their original public meaning. ................................................................................................. 13

II.   Plaintiffs' *ultra vires* claims fail because the executive order doesn't contravene any clear statutory command ........................................................................................................................ 18

CONCLUSION ...................................................................................................................... 20

# TABLE OF AUTHORITIES

**Cases**

*Arizona v. Inter Tribal Council of Ariz., Inc.*,
   570 U.S. 1 (2013) .................................................................................... 8

*Ass'n for Educ. Fin. & Pol'y v. McMahon*,
   786 F. Supp. 3d 13 (D.D.C. 2025) ......................................................... 19

*Bognet v. Degraffenreid*,
   141 S. Ct. 2508 (2021) .......................................................................... 11

*Bognet v. Sec'y Commonwealth of Pa.*,
   980 F.3d 336 (3d Cir. 2020) .................................................................. 11

*Bost v. Ill. State Bd. of Elections*,
   684 F. Supp. 3d 720 (N.D. Ill. 2023) .................................................... 11

*California v. Trump*,
   2025 WL 1667949 (D. Mass. June 13) .................................................. 11

*City of Cleburne v. Cleburne Living Ctr.*,
   473 U.S. 432 (1985) ................................................................................ 8

*\*Dalton v. Specter*,
   511 U.S. 462 (1994) ........................................................................ 19, 20

*Daunt v. Benson*,
   999 F.3d 299 (6th Cir. 2021) .................................................................. 7

*DNC v. Wis. State Legis.*,
   141 S. Ct. 28 (2020) .............................................................................. 12

*Donald J. Trump for President v. Way*,
   492 F. Supp. 3d 354 (D.N.J. 2020) ....................................................... 11

*Epic Sys. Corp. v. Lewis*,
   584 U.S. 497 (2018) .............................................................................. 18

*Fed. Express Corp. v. U.S. Dep't of Com.*,
   39 F.4th 756 (D.C. Cir. 2022) ........................................................... 1, 18

*Fusaro v. Cogan*,
   930 F.3d 241 (4th Cir. 2019) .................................................................. 7

*Gerace v. Liberty Mut. Ins.*,
   264 F. Supp. 95 (D.D.C 1966) ........................................................... 9, 12

*\*Glob. Health Council v. Trump*,
   2025 WL 2480618 (D.C. Cir. Aug. 28) ................................................ 19

*Gregory v. Ashcroft*,
   501 U.S. 452 (1991) ................................................................................ 6

*Harris v. Fla. Elections Canvassing Comm'n*,
   122 F. Supp. 2d 1317 (N.D. Fla. 2000) ................................................ 11

*Lichtenstein v. Hargett*,
  83 F.4th 575 (6th Cir. 2023) ........................................................................ 6, 7

*LULAC v. EOP*,
  780 F. Supp. 3d 135 (D.D.C. 2025) ................................................................. 2

*\*Maddox v. Bd. of State Canvassers*,
  149 P.2d 112 (1944) ....................................................................................... 9

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986) ........................................................................................ 7

*Millsaps v. Thompson*,
  259 F.3d 535 (6th Cir. 2001) ......................................................................... 10

*Moore v. Harper*,
  600 U.S. 1 (2023) ........................................................................................... 13

*Myers v. United States*,
  272 U.S. 52 (1926) ...................................................................................... 2, 4

*N.Y. State Rifle & Pistol Ass'n, v. Bruen*,
  597 U.S. 1 (2022) ..................................................................................... 16, 17

*\*NTEU v. Vought*,
  149 F.4th 762 (D.C. Cir. 2025) .................................................................. 19, 20

*O'Connor v. Donaldson*,
  422 U.S. 563 (1975) ...................................................................................... 11

*Oestereich v. Selective Serv. Sys. Loc. Bd. No. 11*,
  393 U.S. 233 (1968) ...................................................................................... 19

*Pa. Democratic Party v. Boockvar*,
  238 A.3d 345 (Pa. 2020) ................................................................................ 11

*RNC v. Burgess*,
  2024 WL 3445254 (D. Nev., Jul. 17) ............................................................. 11

*RNC v. DNC*,
  589 U.S. 423 (2020) ...................................................................................... 12

*\*RNC v. Wetzel*,
  120 F.4th 200 (5th Cir. 2024) ................................................................. *passim*

*Sanchez v. Off. of State Superintendent of Educ.*,
  45 F.4th 388 (D.C. Cir. 2022) .......................................................................... 6

*Scott v. Schedler*,
  771 F.3d 831 (5th Cir. 2014) ........................................................................... 5

*Trudeau v. FTC*,
  456 F.3d 178 (D.C. Cir. 2006) ......................................................................... 1

*Trump v. United States*,
  603 U.S. 593 (2024) ........................................................................................ 1

*United States v. Rahimi*,
  602 U.S. 680 (2024) ............................................................................................ 16

*Valdez v. Squier*,
  676 F.3d 935 (10th Cir. 2012) ............................................................................... 5

*Voting Integrity Project, Inc. v. Keisling*,
  259 F.3d 1169 (9th Cir. 2001) ............................................................... 10, 13, 15

*Wis. Cent. Ltd. v. United States*,
  585 U.S. 274 (2018) ............................................................................................. 13

**Statutes**

2 U.S.C. §§1 .................................................................................................................. 1

2 U.S.C. §7 .................................................................................................................... 1

3 U.S.C. §1 .................................................................................................................... 1

52 U.S.C. §20506 ............................................................................................. 2, 3, 4, 8

52 U.S.C. §20507 .......................................................................................................... 6

52 U.S.C. §20511 .......................................................................................................... 6

8 U.S.C. §1642 ...................................................................................................... *passim*

Act of Jan. 23, 1845, ch. 1, 5 Stat. 721 ..................................................................... 16

Neb. Comp. Stat. §1963 (1922) .................................................................................. 17

Neb. Comp. Stat. §2017 (1922) .................................................................................. 17

Neb. Comp. Stat. §2020 (1922) .................................................................................. 17

**Other Authorities**

Exec. Order 14,248, *Preserving and Protecting the Integrity of American Elections* (Mar. 25,
  2025) ............................................................................................................. 3, 5, 8, 9

N. Webster, An American Dictionary of the English Language (Charles Goodrich & N. Porter
  eds. 1869) ................................................................................................... 14, 15

*Proposed Executive Order Entitled "Federal Regulation,"* 5 Op. O.L.C. 59 (1981) ................... 2

**Constitutional Provisions**

U.S. Const. Art. II, §3 ................................................................................................... 1

## INTRODUCTION

The DNC now recognizes that their "APA claims" are "premature." DNC Phase II Br. 59.[1] There is no "final agency action," for example, which is a "prerequisite" for those claims. *Id*. But the most basic defect with the DNC's APA claims is that they have failed to prove that Sections 2(d) and 7(a) of the challenged executive order are contrary to law. Section 2(d) doesn't "demand[] that federal departments designated as voter registration agencies 'assess' the citizenship of people seeking public assistance." *Contra id*. at 1. Congress demanded that assessment. 8 U.S.C. §1642. Section 7(a) doesn't "nationalize the deadline for receiving timely cast mail ballots." *Contra* DNC Phase II Br. 1. Congress nationalized that deadline. 3 U.S.C. §1; 2 U.S.C. §§1, 7. Sections 2(d) and 7(a) direct executive agents to enforce laws that are already on the books. In doing so, the executive order fulfills the President's constitutional duty to "'take Care that the Laws be faithfully executed,'" which "plainly encompasses enforcement of federal election laws passed by Congress." *Trump v. United States*, 603 U.S. 593, 626-27 (2024) (quoting U.S. Const. Art. II, §3).

Because the DNC's APA claims concerning Sections 2(d) and 7(a) fail as a matter of law, Plaintiffs' *ultra vires* claims fail as a matter of law, too. *Ultra vires* review inherently "represents a more difficult course" than "would review under the APA." *Trudeau v. FTC*, 456 F.3d 178, 190 (D.C. Cir. 2006). And those APA claims can't be resurrected and then "succeed under *ultra vires* review." *Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 765 (D.C. Cir. 2022) (cleaned up). Even if Plaintiffs could bring separate *ultra vires* claims, those would still fail because Plaintiffs have failed to identify any "congressionally drawn line in the sand" that the President has

---

[1] Unless otherwise noted, all docket entries cited in this brief refer to the docket entries in the lead case: *LULAC v. EOP*, No. 1:25-cv-946 (D.D.C. 2025). "DNC Phase II Br." refers to Doc. 197-1 and "LULAC Phase II Br." refers to Doc. 195.

crossed. *Id.* Sections 2(d) and 7(a) are valid exercises of the President's authority. The Court should thus grant summary judgment in favor of the defendants.

## ARGUMENT

I.    **The DNC's APA claims fail because Sections 2(d) and 7(a) are consistent with law.**

The DNC alleged that Sections 2(d) and 7(a) violate the APA because those provisions are contrary to the NVRA, the equal protection component of the Fifth Amendment, and the federal Election Day statutes. DNC Compl. (Doc. 1, No. 1:25-cv-952) at 53-55, 60-62, 64-67. Each claim fails because the DNC hasn't proven any conflict between Sections 2(d) and 7(a) and federal law.

A.    **Section 2(d) is consistent with federal law because it directs when to collect proof of citizenship that federal law already requires.**

The President's Take Care Clause authority gives him power to "supervise and guide" executive agents in "their construction of the statutes under which they act in order to secure that unitary and uniform execution of the laws which Article II of the Constitution evidently contemplated in vesting general executive power in the President alone." *Myers v. United States*, 272 U.S. 52, 135 (1926); *see also Proposed Executive Order Entitled "Federal Regulation,"* 5 Op. O.L.C. 59, 60 & n.1 (1981) (noting that it is "well established" that the Take Care Clause gives the President directive authority over executive officers); *LULAC v. EOP*, 780 F. Supp. 3d 135, 199-200 (D.D.C. 2025) (citing OLC Memo approvingly). The NVRA requires federal agencies designated as voter registration offices to provide public assistance applicants with the federal voter-registration form after verifying that the applicant wants the form. 52 U.S.C. §20506(a). Other federal public-assistance laws require those same agencies to "verif[y]" the citizenship status of public assistance applicants to determine whether they qualify for public benefits. 8 U.S.C. §1642(a)-(b). Section 2(d) faithfully implements both these statutes by specifying that federal agencies should

assess citizenship "prior to" providing public assistance applicants with the federal voter-registration form. Exec. Order 14,248, §2(d).

The DNC inserts a prohibition on citizenship assessments where none exists. The DNC insists that the NVRA requires providing the federal voter-registration form "with each application." DNC Phase II Br. 4 (cleaned up). But Section 2(d) places no restriction on handing out the federal voter-registration form "with each application." It merely requires federal agencies to "assess citizenship" before doing so. *Cf.* Exec. Order 14,248, §2(d). And because assessing citizenship is something they already must do, 8 U.S.C. §1642(a)-(b), there's no conflict between the executive order and federal law. Moreover, Section 2(d) does not "condition distribution" of the federal voter-registration form based on U.S. citizenship. *Contra* DNC Phase II Br. 9. It just requires federal agencies to assess citizenship under §1642 *before* moving on to fulfill the NVRA's requirements. Congress didn't specify which statute federal agencies should comply with first. Section 2(d) ensures the faithful execution of both §1642 and the NVRA by providing that order of operations.

The DNC argues that §1642 is "an unrelated statute" to the NVRA that "has nothing to do with distributing the Federal Form." DNC Phase II Br. 11. But both statutes impose requirements on federal agencies when an individual walks through their doors and applies for public assistance. Section 1642 requires federal agencies to verify the citizenship status of public assistance applicants to ensure they are "qualified" to receive public assistance. And the NVRA requires federal agencies to provide the federal voter-registration form to public assistance applicants "with each application." 52 U.S.C. §20506(a)(6)(A). Neither statute specifies which step should come first. The DNC argues that "nothing in [§1642] disrupts the mandatory sequencing for distributing the Federal Form set forth in the NVRA." DNC Phase II Br. 11. But it can't point to any mandatory

sequencing in the NVRA. Moreover, 8 U.S.C. §1642 creates a separate, coequal, and explicit congressional command that agencies must execute in tandem with their NVRA obligations. *See Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 666 (2007) (approving agency action that would "harmonize[] … statutes"); *cf. FCC v. NextWave Personal Commc'ns, Inc.*, 537 U.S. 293, 304 (2003) (when two statutes can coexist, each must be given effect.). Section 2(d) faithfully executes both statutes by providing federal agencies with an order of operations under which they can fulfill both statutory mandates. In this way, Section 2(d) "guide[s]" executive agents in their faithful implementation of §1642 and the NVRA to ensure the "unitary and uniform execution of the laws." *Myers*, 272 U.S. at 135.

The DNC's pleading confirms that it overlooked 8 U.S.C. §1642. The executive order doesn't place a "new obligation[]" on agencies to confirm citizenship. *Contra* DNC Compl. 60. Section 1642 has long imposed that obligation. Nor does the executive order "target[] only 'enrollees of public assistance programs' for extra citizenship review." *Contra id.* at 61. That review already exists under §1642. And because the DNC overlooked §1642, it now backfills its briefs with arguments that the NVRA requires agencies to "'distribut[e] registration forms *simultaneously* with applications for services or benefits.'" DNC Phase II Br. 4 (quoting S. Rep. 103-6, at 22 (1993)).

The DNC's purported prohibition of citizenship assessments is further undercut by the NVRA's declination requirement. The NVRA requires agencies to provide each applicant with a declination form that contains "boxes for the applicant to check to indicate whether the applicant would like to register or declines to register to vote." 52 U.S.C. §20506(a)(6)(B)(iii). Only if the applicant checks "yes" must a voter registration agency provide the applicant with the federal voter-registration form. *Id*. The NVRA "clearly absolves the states of providing a voter registration

form when the applicant checks 'no.'" *Scott v. Schedler*, 771 F.3d 831, 841 (5th Cir. 2014). The DNC's interpretation reads that sequence out of the NVRA, "introducing an inconsistency into the statute." *Cf. id.* at 840. There's no point in providing an applicant with an opportunity to decline the federal voter-registration form if the agency must give the applicant the form before confirming that she wants it.

Just as the NVRA doesn't prohibit asking about an applicant's citizenship, the executive order doesn't condition the delivery of the voter-registration form on that step. Section 2(d) fully complies with the NVRA's requirement to distribute the federal voter-registration form because it mandates federal agencies "provid[e] a Federal voter registration form to enrollees of public assistance programs." Exec. Order 14,248, §2(d). The DNC relies on *Valdez v. Squier* to argue that a voter registration agency must provide the federal voter-registration form "with each application." DNC Phase II Br. 9-10 (cleaned up). But Section 2(d) still requires federal voter registration agencies to provide the federal voter-registration form with each application. It just requires assessing citizenship first. Exec. Order 14,248, §2(d). *Valdez* didn't discuss *when* a voter registration agency must hand out the federal voter-registration form to a public assistance applicant, or what steps they could take before distributing the form. The court in *Valdez* just noted that if the applicant does not check either box on the declination form, then the federal voter registration agency should still provide the federal voter-registration form to the applicant. 676 F.3d 935, 942 (10th Cir. 2012); *cf. Scott*, 771 F.3d at 841 (disagreeing with *Valdez*, and holding that a failure to check any box on the declination form meant an applicant rejected the federal voter-registration form). Section 2(d) requires as much.

Any doubt about the ability to conduct citizenship assessments is put to rest by other provisions. The NVRA requires "inform[ing] applicants" of "voter eligibility requirements; and

penalties provided by law for submission of a false voter registration application." 52 U.S.C. §20507(a)(5). And it criminalizes any "person, including an election official" from "procur[ing] or submi[tting] voter registration applications that are known by the person to be materially false, fictitious, or fraudulent." *Id.* §20511(2)(A). The DNC's interpretation would prohibit federal agencies from even asking about an applicant's citizenship status throughout the course of the application process. Even if—as the DNC believes—the NVRA requires agencies to hand out federal voter-registration forms to known noncitizens, there's good reason for federal officers to know in advance that they are handing the form to someone who can't legally fill it out. Nothing in the NVRA or any other law prohibits federal agencies from conducting the citizenship assessment required by §1642 first.

> **B.    Section 2(d) complies with the Fifth Amendment because it treats similarly situated voters the same, imposes no additional burdens on voting, and serves legitimate government interests.**

Instead of defending the substance of their Fifth Amendment equal protection claim, the DNC urges the Court to kick the issue down the road. In a footnote, they argue that their equal protection claim "may" need "factual development," which "warrant[s] deferment" of the claim "to a later phase." DNC Phase II Br. 59-60 n.21. But the DNC doesn't identify what further "factual development" is necessary. Even if it had identified some potential discovery, those facts wouldn't move the needle in the rational basis analysis. "When rational-basis review applies, it is downright routine for courts to dismiss constitutional challenges at the pleading stage." *Lichtenstein v. Hargett*, 83 F.4th 575, 601 (6th Cir. 2023) (citing *Gregory v. Ashcroft*, 501 U.S. 452, 456, 470-73 (1991)). That's true of equal protection claims. *Sanchez v. Off. of State Superintendent of Educ.*, 45 F.4th 388, 395-400 (D.C. Cir. 2022). And it's true of *Anderson-Burdick* claims. *Daunt v. Benson*, 999 F.3d 299, 313 (6th Cir. 2021); *Fusaro v. Cogan*, 930 F.3d 241, 259 (4th Cir. 2019); *see also* RNC Br. (Doc. 191) 20.

The DNC points out that it's "an open question in this Circuit whether an equal protection claim regarding an election rule is addressed under the traditional equal protection framework or the *Anderson-Burdick* framework." DNC Phase II Br. 59 n.21. But deciding that question doesn't get the DNC out of rational basis review. Under *Anderson-Burdick*, "[l]aws that impose minimal burdens need only satisfy something approaching rational-basis review." *Lichtenstein*, 83 F.4th at 589. In their complaint, the DNC suggested that rational-basis review applies to their equal protection claim. *See* DNC Compl. 60-61. And in their brief, the DNC didn't advance any argument that the burdens are so severe that anything other than rational basis applies. So although the DNC is unsure which test applies, their equal protection claim fails under either test.

The DNC's demand for more discovery is belied by the fact that the DNC has already sought and been granted numerous discovery requests by this Court. *See* Discovery Order (Doc. 154) 4-5. The DNC doesn't point to anything in the record raising a genuine dispute of material fact concerning their equal protection claim. They don't identify what additional facts they need to support their claim. The burden is now on them to "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (cleaned up). Yet they have failed to "do more than simply" raise the possibility of "some metaphysical doubt as to the material facts." *Id*. at 586.

There isn't any further factual development that could change the conclusion that Section 2(d) serves a rational basis or that it treats similarly situated voters similarly. Public assistance enrollees can still access the federal voter-registration form without any citizenship assessment through the same avenues available to any other applicant. That is, they could register to vote outside the context of their "application" for public assistance. *Cf*. 52 U.S.C. §20506(a)(6). And when they apply for federal public assistance, they already must provide proof of citizenship. 8

U.S.C. §1642(a)(2)-(b). Section 2(d) does not address proof of citizenship outside of where it's already required by law. So it doesn't treat "similarly situated" voters differently, and it doesn't impose any burdens not already required under federal law. *Cf. City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). No amount of factual development can change those realities. Defendants are thus entitled to summary judgment on the DNC's equal protection claim concerning Section 2(d).

### C.    Section 7(a) is consistent with the federal election-day statutes.

Section 7(a) does not "unilaterally preempt duly enacted state laws" or "impose requirements not authorized by Congress." *Contra* DNC Phase II Br. 37. It merely authorizes the Attorney General to "take all necessary action to enforce 2 U.S.C. 7 and 3 U.S.C. 1 against States that violate these provisions." Exec. Order 14,248, §7(a). It is those federal *statutes* that preempt State laws—not the President's executive order. When Congress acts under its Elections Clause authority, it "*necessarily* displaces some element of a pre-existing legal regime erected by the States." *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 14 (2013).

Here, Congress displaced State post-Election Day mail ballot receipt deadlines by establishing a "'day for the election.'" *RNC v. Wetzel*, 120 F.4th 200, 203-04 (5th Cir. 2024). "[T]his 'day for the election' is the day by which ballots must be both *cast* by voters and *received* by state officials." *Id*. at 204. Section 7(a) faithfully executes the federal election-day statutes by establishing a method of enforcement for those provisions—through "necessary action" by the Attorney General. Exec. Order 14,248, §7(a). Plaintiffs argue that the President has incorrectly interpreted the preemptive scope of the federal election-day statutes. DNC Phase II Br. 32-37; LULAC Phase II Br. 38-41. But the President's interpretation is consistent with those statutes and the only precedential circuit opinion interpreting them. *Wetzel*, 120 F.4th at 203-04.

1. **The executive order's implementation of the federal election-day statutes is consistent with precedent.**

The executive order cited the Fifth Circuit's opinion in *Wetzel* to support its conclusion that the federal election-day statutes preempt post-election receipt of mail ballots. Exec. Order 14,248, §1. The "[d]ecisions of United States Courts of Appeals for other circuits" are to "receive great weight and may be persuasive." *Gerace v. Liberty Mut. Ins.*, 264 F. Supp. 95, 97 (D.D.C 1966). Plaintiffs argue that *Wetzel* is an "outlier." DNC Phase II Br. 36. But their briefs merely repeat arguments that the RNC already extensively refuted in its summary judgment brief. *See* RNC Br. (Doc. 176-1) 23-26. And Plaintiffs don't dispute that *Wetzel* is the only non-vacated federal circuit court decision to consider and decide whether the federal election-day statutes preempt post-election receipt of mail ballots.

The DNC argues that *Wetzel* "relies almost exclusively on a Montana state court case interpreting Montana law." DNC Phase II Br. 36 (citing *Maddox v. Bd. of State Canvassers*, 149 P.2d 112 (1944)). But that argument ignores the heart of the Fifth Circuit's opinion, which relies on the Supreme Court's "teach[ing]" in *Foster* and the "original public meaning of the Election-Day statutes." *Wetzel*, 120 F.4th at 207, 211. In any event, Plaintiffs fail to refute the substantive reasoning in *Maddox*. There, the Montana Supreme Court struck down a state law that permitted a "seven weeks delay after the statutory election day" to receive mail ballots. *Maddox*, 149 P.2d at 114. Because the law "extend[ed] beyond the election day the time within which voters' ballots may be received by the election officials for the election of presidential electors," the Court concluded that "it is in conflict with the constitutional congressional Act which requires the electing to be done on election day." *Id*. at 115; *contra* LULAC Phase II Br. 38 n.16. *Maddox* also refutes the notion that the Fifth Circuit stands alone, *contra* DNC Phase II Br. 36, because after "[a] diligent search" the Montana Supreme Court found "no authorities nor precedents" rebutting the

9

conclusion that election day was the day by which ballots must be received by election officials, *Maddox*, 149 P.2d at 115.

Wetzel* also correctly interpreted *Foster*. LULAC argues that *Foster* had a "narrow holding." LULAC Phase II Br. 40. But even a narrow holding doesn't justify disregarding the Court's reasoning. And "*Foster* teaches" the basic "definitional elements" that comprise the "election." *Wetzel*, 120 F.4th at 207. The Fifth Circuit isn't alone in concluding that "consummation" is an element of the term "election." *Id.* The Ninth Circuit also concluded that "the word 'election' means a 'consummation' of the process of selecting an official" because it "must follow" *Foster*. *Voting Integrity Project, Inc. v. Keisling*, 259 F.3d 1169, 1175 (9th Cir. 2001). *Foster* "represents the most serious effort to date to infuse meaning into the term 'election' and leaves us with 'the combined actions of voters and officials meant to make a final selection of an officeholder' as a definition," and the notation that an election "may not be consummated prior to federal election day." *Millsaps v. Thompson*, 259 F.3d 535, 544 & n.4 (6th Cir. 2001).

The DNC argues that under *Foster*, the federal election-day statutes "merely set a deadline for the 'act of choosing a person to fill an office.'" DNC Phase II Br. 32 (quoting *Foster v. Love*, 522 U.S. 67 (1997)). But the DNC backfills their preferred theory concerning the meaning of "election" into the word "choosing." They ignore that *Foster* explained the word "election" in the federal election-day statutes "plainly refer[s] to the combined actions of voters and officials meant to make a final selection of an officeholder." 522 U.S. at 71. This definition highlights the need for a public act to make the decision final—and the public act that makes the choice of a candidate final is the closing of the ballot box. The DNC mistakenly believes "election" refers to the unilateral act by the voter, not a "combined action[] of voters and officials." *Id.* The voters' choice is

just one half of the "combined actions of voters and officials." *Id*. Election officials' receipt is the other half.

Plaintiffs resist the conclusion that *Wetzel* is good law by arguing that it diverges from a number of non-precedential or vacated cases. The only federal circuit court decision that Plaintiffs cite to support their interpretation of the federal election-day statutes is the Third Circuit's decision in *Bognet v. Secretary of Pennsylvania*. *E.g.*, DNC Phase II Br. 33. But the DNC fails to note that *Bognet* was vacated by the Supreme Court, *Bognet v. Degraffenreid*, 141 S. Ct. 2508 (2021), which "deprives that court's opinion of precedential effect," *O'Connor v. Donaldson*, 422 U.S. 563, 577 n.12 (1975). Plaintiffs cite a string of district court and state court cases that they believe contradict *Wetzel*. DNC Phase II Br. 35-36; LULAC Phase II Br. 35 n.15. But these cases were either principally decided on standing, decided in an emergency posture, or are otherwise distinguishable. *See, e.g.*, *Bost v. Ill. State Bd. of Elections*, 684 F. Supp. 3d 720, 736 (N.D. Ill. 2023) (decided on standing), *affirmed*, 114 F.4th 634 (7th Cir. 2024), *cert. granted*, No. 24-568 (S. Ct.); *RNC v. Burgess*, 2024 WL 3445254, at *2 (D. Nev., Jul. 17) (decided on standing), *on appeal*, No. 24-5071 (9th Cir.); *Donald J. Trump for President v. Way*, 492 F. Supp. 3d 354, 372 (D.N.J. 2020) (preliminary injunction on eve of election); *California v. Trump*, 2025 WL 1667949 (D. Mass. June 13) (preliminary injunction); *Harris v. Fla. Elections Canvassing Comm'n*, 122 F. Supp. 2d 1317, 1325 (N.D. Fla. 2000) (concerned counting of votes, not the ballot-receipt deadline); *Pa. Democratic Party v. Boockvar*, 238 A.3d 345, 368 n.23 (Pa. 2020) (single *dicta* footnote from a case applying the Pennsylvania Constitution, not the federal election-day statutes). None of those decisions discussed the original public meaning of the term "election" in the federal election-day statutes. Even if they had, it is the "[d]ecisions of United States Courts of Appeals for other

circuits" (*i.e.*, *Wetzel*) that "must receive great weight." *Gerace*, 264 F. Supp. at 97. The vacated and nonprecedential decisions of district courts are unhelpful.

The DNC argues that *Wetzel* conflicts with *RNC v. DNC*, 589 U.S. 423 (2020). DNC Phase II Br. 35. But that case concerned Wisconsin's presidential primary, so the election-day statutes (which apply to the general election) weren't even at issue. *See RNC v. DNC*, 589 U.S. at 423. Even if the election-day statutes applied to primary elections, the receipt deadline was "not challenged" in that case. *Id.* Rather, the RNC challenged the "extraordinary relief" of allowing voters "to mail their ballots after election day." *Id.* at 426. The "critical point in the case" was that not even the plaintiffs had requested that relief. *Id.* at 424. The case didn't apply the election-day statutes, didn't discuss *Foster*, and didn't confront the history and arguments made in *Wetzel*. The DNC ignores that the Fifth Circuit already refuted the argument that *RNC v. DNC* "proves the act of mailing ballots equates to voting." *Wetzel*, 120 F.4th 214. That reading of *RNC v. DNC* is neither "logical nor necessary." *Id*. "If voters can mail their ballots after Election Day, those ballots are necessarily received after Election Day, too." *Id*.

The DNC also argues that *Wetzel* conflicts with Justice Kavanaugh and Gorsuch's concurrences in *DNC v. Wisconsin State Legis.*, 141 S. Ct. 28 (2020). DNC Phase II Br. 35. But in that case, Justice Kavanaugh corrected a district court for unilaterally *extending* mail ballot receipt past Election Day because the court "did not sufficiently appreciate the significance of election deadlines." *Wis. State Legis.*, 141 S. Ct. at 33 (Kavanaugh, J., concurral). Justice Kavanaugh clarified that the Supreme Court has not approved changing the "deadline for receipt of absentee ballots" to allow for absentee ballots to be counted "so long as the ballots were postmarked by election day." *Id*. at 34. Justice Gorsuch also repudiated the district court for causing "confusion and chaos and eroding public confidence" by eliminating the election-day deadline and instead establishing

its own "improvise[d]" deadline. *Id.* at 30 (Gorsuch, J., concurral). Neither concurrence interpreted the original public meaning of "election" in the federal election-day statutes or approved of post-election day ballot receipt. Rather, as the Fifth Circuit noted, Justice Kavanaugh's opinion supports its conclusion that "'a State cannot conduct an election without deadlines.'" *Wetzel*, 120 F.4th at 214. Justice Gorsuch agrees: "Elections must end sometime, a single deadline supplies clear notice, and requiring ballots be in by election day puts all voters on the same footing." *Wis. State Legis.*, 141 S. Ct. at 28 (Gorsuch, J., concurral). The "'day for the election'" in the federal election-day statutes is the day "by which ballots must be both *cast* by voters and *received* by state officials." *Wetzel*, 120 F.4th at 203-04.

### 2. The executive order's application of the election-day statutes is consistent with their original public meaning.

The Court must interpret the word "election" in a way that is "consistent with" its "ordinary meaning at the time Congress enacted the statute." *Wis. Cent. Ltd. v. United States*, 585 U.S. 274, 277 (2018) (cleaned up). Historical practice "[a]t the time of the Act's adoption" is evidence of the original public meaning of a statute. *Id.* at 276-77. And "historical practice" is "particularly pertinent when it comes to the Elections and Electors Clauses." *Moore v. Harper*, 600 U.S. 1, 32 (2023). Here, the historical practice of States conducting elections before 1845 and well after indicates that election day was understood to be ballot-receipt day.

Start with the 1845 Congress, which shortened a month-long window for appointing presidential electors to just one day. *Wetzel*, 120 F.4th at 204. In enacting the first election-day statute, "Congress considered and rejected the practice of multi-day voting allowed by some states." *Keisling*, 259 F.3d at 1172-73. So Congress established Election Day as the "Tuesday after the first Monday in November." *Id.* at 1172. In 1845, "[b]y necessity, early American voting occurred contemporaneously with receipt of votes. Voting typically occurred *viva voce*, by showing hands,

or by using handwritten ballots that voters physically brought to the polls for submission and counting." *Wetzel*, 120 F.4th at 209. Plaintiffs don't dispute this history. None of their historical analysis even concerns the period in which the first federal election-day statute was passed.

Plaintiffs start their revisionist history of election day by discussing field voting during the Civil War. The DNC notes that "many States permitted soldiers in the field to cast their ballots on election day." DNC Phase II Br. 34. LULAC gives one example: Rhode Island. LULAC Phase II Br. 41 n.17. But they ignore that to facilitate field voting, "[e]lection officials brought ballot boxes to the battle-field, where soldiers cast their ballots. In such cases, the voter's connection with his vote ended when he put it in the box, precisely as it would have ended if he had put it into the box ... at home." *Wetzel*, 120 F.4th at 209 (cleaned up). "[F]ield voting involved soldiers directly placing their ballots into official custody with no carrier or intermediary. The act of voting simultaneously involved receipt by election officials." *Id*. at 210. So field voting just provides more historical evidence that election day is ballot-receipt day.

The only other shred of history that Plaintiffs cite from the Civil War and Reconstruction era is a single dictionary definition of "election" published in 1869. DNC Phase II Br. 33. The DNC points out this dictionary defines "election" as an "act of choosing a person to fill an office." *Id*. (citing N. Webster, An American Dictionary of the English Language 433 (Charles Goodrich & N. Porter eds. 1869)). But the same dictionary also defines "election" as "the public choice of officers" or "[t]he day of a public choice of officers." Webster, *supra*, at 433. The DNC ignores that the word "election" can be used in different ways. A "voter's election" is different from a "candidate's election," which is different from a "State's election." The word "election" in each of those uses carries a different meaning: the "voter's choice," the "candidate's victory," and the

"State's process," respectively. The DNC doesn't even try to explain why it thinks Congress was regulating the "voter's choice" as opposed to the "State's process" in the election-day statutes.

When Congress used the word "election" in the federal election-day statutes, it was using the term to refer to a State's administrative process of facilitating voting—not "[a] voter's *selection* of a candidate." *Wetzel*, 120 F.4th at 207. When Congress established the "day for the election," it regulated when States could *conduct* elections. Congress wasn't regulating each individual voter's choice. It was establishing the day when the State's administrative process of facilitating voting must be "consummated." *Foster*, 522 U.S. at 72 n.4. "So the election concludes when the final ballots are received and the *electorate*, not the individual *selector*, has chosen." *Wetzel*, 120 F.4th at 207. The best reading of contemporaneous dictionary definitions is that ballots must be received by election officials for "the act of choosing" or the "public choice" to be consummated. *Cf.* Webster, *supra*, at 433. Only then has an "election" taken place. *Cf. Foster*, 522 U.S. at 72 n.4. Plaintiffs don't provide any contemporaneous historical evidence that cuts against the interpretation that the "act of choosing" refers to the public choice of a candidate.

In 1872, Congress passed the second of the federal election-day statutes. "At the time, different states elected members of the House of Representatives during different months." *Keisling*, 259 F.3d at 1173. When it established election day for congressional elections, "Congress expressly considered an amendment to continue to allow states 'in which by law the polls are held open more than one day' to continue the practice." *Id.* But "[u]ltimately, Congress rejected the provision" and "it allowed multi-day voting to continue through the election of 1872, but not thereafter." *Id.* at 1174. "[A]t the time Congress established a uniform election day" in "1872," voting and ballot receipt "necessarily occurred at the same time." *Wetzel*, 120 F.4th at 209. "Early postwar iterations of absentee voting universally required receipt by Election Day." *Id.* at 210. "By the time

of World War I," many States "had adopted a variety of absentee voting laws." *Id*. But "*even during the height of wartime exigency, a ballot could be counted only if received by Election Day." Id*.

Through at least the early 1920s, "States that permitted civilian absentee voting imposed the same Election Day deadline for receiving ballots." *Id*. "[E]arly absentee voting laws universally foreclosed the possibility of accepting and counting ballots received *after* Election Day because they specified that ballots would be counted on Election Day." *Id*. Indeed, the first post-election ballot-receipt deadline that Plaintiffs point to is over 75 years removed from when Congress first established the uniform election day. *Compare* DNC Statement of Facts (Doc. 197-2) 26, *with* Act of Jan. 23, 1845, ch. 1, 5 Stat. 721. When "earlier generations addressed the societal problem, but did so through materially different means," it is "evidence that a modern regulation" likely doesn't comport with the original meaning of the text. *N.Y. State Rifle & Pistol Ass'n, v. Bruen*, 597 U.S. 1, 26-27 (2022). Plaintiffs show nothing that casts doubt on the historical reality that "at the time Congress established a uniform election day in 1845 and 1872, voting and ballot receipt necessarily occurred at the same time." *Wetzel*, 120 F.4th at 209. That is the relevant time period to determine the original public meaning of the federal election-day statutes—not 75 years later. *See Bruen*, 597 U.S. at 26-27.

Plaintiffs focus the rest of their historical analysis on post-adoption history. DNC Phase II Br. 34-35. But for post-adoption history to even be relevant it must be at least "reasonably consistent and longstanding." *United States v. Rahimi*, 602 U.S. 680, 724 (2024) (Kavanaugh, J., concurring). The history of mail-ballot receipt deadlines from the 1920s on is neither. The DNC collects only four examples of states that they allege adopted post-election ballot-receipt deadlines

before World War II. DNC Statement of Facts (Doc. 197-2) 26.[2] LULAC believes by 1986 "twelve states" permitted ballots to be received after Election Day. LULAC Phase II Br. 36. But both Plaintiffs ignore that a little over a decade earlier, in 1977, "only two of the 48 States permitting absentee voting counted ballots received after Election Day." *Wetzel*, 120 F.4th at 210. "Even today, a substantial majority of States prohibit officials from counting ballots received after Election Day." *Id*. at 210-11. It is impossible to draw any conclusion about what the term "election" meant in 1845 and 1872 from this inconsistent pattern of post-adoption history over a century removed from the passage of the federal election-day statutes. Instead, the conduct of elections that occurred before and in the years immediately following the Civil War "demonstrates that the election concludes when all ballots are received." *Id*. at 211. A few "late-in-time outliers" say nothing about the original public meaning of the Election-Day statutes. *Bruen*, 597 U.S. at 70.

Plaintiffs' final attempt to contest the original public meaning of the election-day statutes is to point to other federal statutes such as the Uniformed and Overseas Citizens Absentee Voting Act "purporting to show" that "the federal election-day statutes do not require ballot receipt by election day." *Cf. Wetzel*, 120 F.4th at 211 (cleaned up). But those "statutes do no such thing." *Id*. None of them repeal by implication the deadline for ballot receipt established by the federal election-day statutes. "Where Congress wants to make exceptions to the federal Election Day statutes, it has done so. All of this further proves Congress did not abrogate the uniform Election Day in other, non-excepted circumstances." *Id.* at 213.

---

[2] The 1921 Nebraska example doesn't support the DNC's position because Nebraska law provided that the "the county clerk" shall "receive" absentee ballots before the "board of county canvassers canvass the vote according to law." Neb. Comp. Stat. §2017 (1922). Nebraska law provided that "[w]hen the poll is closed" the county canvassers "shall immediately proceed to canvas and ascertain the result of the election." *Id*. at §2020. In Nebraska, polls closed at "8 o'clock in the afternoon" on Election Day. *Id*. at §1963.

In a footnote LULAC argues that the Fifth Circuit "initially found UOCAVA *silent* on receipt deadlines and asserted that federal law did not permit such counting" but then later "Judge Oldham acknowledged that UOCAVA does allow states to accept and count such ballots, if state law provides for it." LULAC Phase II Br. 41 n.18. But the Fifth Circuit explicitly recognized that UOCAVA "permits post-Election Day balloting" albeit only in the limited circumstances provided in UOCAVA's "statutory text." *Wetzel*, 120 F.4th at 213. The Fifth Circuit concluded that "the fact that UOCAVA authorizes such actions" is not "enough to abrogate the uniform federal Election Day." *Id*. "A party seeking to suggest that two statutes cannot be harmonized, and that one displaces the other, bears the heavy burden of showing a clearly expressed congressional intention that such a result should follow." *Id*. at 212 (quoting *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018)). LULAC has failed to shoulder that burden here. "Nothing" in UOCAVA or any of the other federal statutes LULAC cites repeals the federal election-day statutes. *Id*. at 211-12. And the federal election-day statutes "in their text, tradition, and interpretation" by the Supreme Court "*do* require States to receive all ballots by Election Day." *Id*. at 212. The executive order is consistent with federal law. *Cf. id.* at 203-04. "[T]he 'day for the election' is the day by which ballots must be both *cast* by voters and *received* by state officials." *Id*. at 204.

## II.    Plaintiffs' *ultra vires* claims fail because the executive order doesn't contravene any clear statutory command.

Plaintiffs' *ultra vires* claims fail because the executive order doesn't violate "a specific command of a statute." *Fed. Express Corp*., 39 F.4th at 764 (cleaned up). Plaintiffs have not pointed to any statute passed by Congress that prohibits the President from directing federal agencies to assess citizenship before they provide public assistance applicants with the federal voter-registration form. They have not pointed to any statute passed by Congress that explicitly prohibits the President from directing the Attorney General to enforce the election-day statutes. There is

nothing "plain" on "the face of the statute" that prohibits Sections 2(d) or 7(a). *Id*. at 765 (quoting *Oestereich v. Selective Serv. Sys. Loc. Bd. No. 11*, 393 U.S. 233, 238 n.7 (1968)). Plaintiffs' *ultra vires* claims thus fail because they can't point to any "congressionally drawn line in the sand" that the President has crossed. *Id*.

Plaintiffs attempt to sidestep the strictures of *ultra vires* review by arguing that they are bringing constitutional claims. DNC Phase II Br. 31; LULAC Phase II Br. 42. They "assert a non-statutory right to vindicate separation-of-powers principles." *Glob. Health Council v. Trump*, 2025 WL 2480618, at *6 (D.C. Cir. Aug. 28). "[B]ut they are foreclosed from doing so" by Supreme Court precedent. *Id*. (citing *Dalton v. Specter*, 511 U.S. 462 (1994)). Their purported constitutional claims "are constitutional in name only." *Ass'n for Educ. Fin. & Pol'y v. McMahon*, 786 F. Supp. 3d 13, 22 (D.D.C. 2025). They "simply repackage" the DNC's APA claims and "try to sneak them in through a constitutional back door. But that door is locked by precedent." *Id*. LULAC and the DNC both allege that Section 7(a) is *ultra vires* and unconstitutional because it supposedly violates the separation of powers between the President and Congress and the federal government and the states. *See* LULAC Compl, 44-45; DNC Compl., 44-45. But these allegations merely repackage the DNC's APA claim that Section 7(a) is "contrary to constitutional rights and powers reserved to the States under the Election Clause." DNC Compl., 54-55 (cleaned up). "[I]mplied equitable review for constitutional claims is unavailable where the plaintiff argues that statutory violations by executive officials implicate the separation of powers." *NTEU v. Vought*, 149 F.4th 762, 793 (D.C. Cir. 2025). That's what Plaintiffs argue here. DNC Phase II Br. 31; LULAC Phase II Br. 42. "[T]he separation of powers issues" Plaintiffs allege "are just doppelgängers" of the DNC's "APA claim." *Ass'n for Educ. Fin. & Pol'y*, 786 F. Supp. 3d at 31.

The President's invocation of his Take Care Clause authority doesn't turn this into a constitutional case. As Plaintiffs admit, "the only constitutional source of executive authority" that has been invoked in this case is "the President's obligation to take care that the *statutes*" passed by Congress establishing a federal election day and mandating verifying the citizenship status of public assistance enrollees "are faithfully executed." *NTEU*, 149 F.4th at 794; *see also* DNC Phase II Br. 31 (noting Defendants "point[] only to the Take Care Clause as a source of the President's enforcement authority"). And as Supreme Court precedent makes "clear," a claim "that executive officials have not discharged such a responsibility under the Take Care Clause gives rise at most to an *ultra vires* claim." *NTEU*, 149 F.4th at 794 (citing *Dalton*). So Plaintiffs are stuck with at best only APA claims and *ultra vires* claims—not constitutional ones.

## CONCLUSION

For these reasons, the Court should deny Plaintiffs' cross motions for summary judgment and grant the RNC's motion.

Dated: October 17, 2025

Respectfully submitted,

*/s/ Thomas R. McCarthy*

| | |
|---|---|
| Lee E. Goodman (D.C. Bar 435493) | Thomas R. McCarthy (D.C. Bar 489651) |
| Michael Columbo (D.C. Bar 476738) | Gilbert C. Dickey (D.C. Bar 1645164) |
| DHILLON LAW GROUP | Conor D. Woodfin (D.C. Bar 1780807) |
| 2121 Eisenhower Ave., Ste. 608 | William Bock IV* (Ohio Bar 0105262) |
| Alexandria, VA 22314 | CONSOVOY MCCARTHY PLLC |
| (415) 433-1700 | 1600 Wilson Blvd., Ste. 700 |
| lgoodman@dhillonlaw.com | Arlington, Virginia 22209 |
| mcolumbo@dhillonlaw.com | (703) 243-9423 |
| | tom@consovoymccarthy.com |
| | gilbert@consovoymccarthy.com |
| | conor@consovoymccarthy.com |
| *Admitted *pro hac vice* | wbock@consovoymccarthy.com |

*Counsel for Intervenor-Defendant
The Republican National Committee*