# UNITED STATES DISTRICT COURT
# DISTRICT OF COLUMBIA

LEAGUE OF UNITED LATIN
AMERICAN CITIZENS, *et al.*,

                Plaintiffs,

      v.

EXECUTIVE OFFICE OF THE
PRESIDENT, *et al.*,

                Defendants.

Civil No. 25-cv-0946 (CKK)

---

DEMOCRATIC NATIONAL
COMMITTEE, *et al*,

                Plaintiffs,

      v.

DONALD J. TRUMP, in his official capacity
as President of the United States, *et al.*,

                Defendants.

Civil No. 25-cv-0952 (CKK)

---

LEAGUE OF WOMEN VOTERS
EDUCATION FUND, *et al.*,

                Plaintiffs,

      v.

DONALD J. TRUMP, in his official capacity
as President of the United States, *et al.*,
                Defendants.

Civil No. 25-cv-0955 (CKK)

**DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' CROSS-MOTIONS FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

BRETT A. SHUMATE
Assistant Attorney General

ERIC J. HAMILTON
Deputy Assistant Attorney General
Civil Division, Federal Programs Branch

JOSEPH E. BORSON
Assistant Director
Civil Division, Federal Programs Branch

BRIDGET K. O'HICKEY
Counsel to the Assistant Attorney General
U.S. Department of Justice, Civil Division
950 Pennsylvania Avenue, NW
Washington, DC 20530
(202) 353-8679
Bridget.K.O'Hickey@usdoj.gov

MARIANNE F. KIES
WINSTON SHI
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20005

*Attorneys for Defendants*

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................................... 1

ARGUMENT ........................................................................................................................... 1

I.      Plaintiffs lack a cause of action for their ultra vires claims, and their APA claims
        fail because there is no final agency action. ................................................................ 1

II.     The Democratic Party Plaintiffs' claims challenging section 2(d) are not
        justiciable and fail substantively. ............................................................................... 6

        A.      There is no standing. ......................................................................................... 6

        B.      Plaintiffs' challenges to section 2(d) lack merit. ............................................. 8

III.    The Democratic Party Plaintiffs' Count IX, challenging sections 2(b)(i), 2(b)(iii)
        and 3(a), is not justiciable and fails substantively. ................................................... 11

        A.      There is no standing. ....................................................................................... 12

        B.      DPPs' Count IX lacks merit. .......................................................................... 17

IV.     Plaintiffs' claims challenging section 3(d) are not justiciable and fail
        substantively. ............................................................................................................. 20

        A.      Plaintiffs' claims challenging section 3(d) are not justiciable.. ..................... 20

        B.      Plaintiffs' claims challenging section 3(d) lack merit. ................................... 26

V.      The Plaintiffs' claims challenging section 4(a) are not justiciable and fail
        substantively. ............................................................................................................. 28

VI.     Plaintiffs' claims challenging section 7 are not justiciable and fail substantively. ......... 31

        A.      Plaintiffs' claims challenging section 7(a) and (b) are not justiciable. ................. 31

        B.      Plaintiffs' claims challenging section 7(a) and (b) lack merit. ............................ 36

VII.    Plaintiffs are not entitled to the remedies they seek. ...................................................... 41

CONCLUSION ............................................................................................................................ 42

# TABLE OF AUTHORITIES

**Cases**

*AFL-CIO v. Dep't of Lab.*,
    778 F. Supp. 3d 56 (D.D.C. 2025) ........................................................................... 16

*AFL-CIO v. SSA*,
    2025 WL 1249608 (en banc) ................................................................................... 16

*Am. Anti-Vivisection Soc'y v. U.S. Dep't of Agric.*,
    946 F.3d 615 (D.C. Cir. 2020) ........................................................................ 32, 33

*Am. Fed'n of Tchrs. v. Bessent*,
    152 F.4th 162 (4th Cir. 2025) ........................................................................ 13, 16

*Am. Fed'n of Tchrs. v. Bessent*,
    2025 WL 1023638 (4th Cir. Apr. 7, 2025) ............................................................ 16

*Am. Foreign Serv. Ass'n v. Trump*,
    2025 WL 1742853 (D.C. Cir. June 20, 2025) ......................................................... 2

*Anatol Zukerman & Charles Krause Reporting, LLC v. USPS*,
    64 F.4th 1354 (D.C. Cir. 2023) ............................................................................. 41

*\*Arizona v. Inter Tribal Council of Ariz., Inc.*,
    570 U.S. 1 (2013) ................................................................................................... 27

*Bennett v. Spear*,
    520 U.S. 154 (1997) ............................................................................................... 18

*Bldg. & Const. Trades Dep't, AFL-CIO v. Allbaugh*,
    295 F.3d 28 (D.C. Cir. 2002) ............................................................................ 9, 10

*Bognet v. Sec'y Commw. of Pa.*,
    980 F.3d 336 (3d Cir. 2020) ................................................................................. 40

*Bost v. Illinois State Bd. of Elections*,
    145 S. Ct. 2751 (2025) .......................................................................................... 40

*Bost v. Illinois State Board of Elections*,
    114 F.4th 634 (7th Cir. 2024) ............................................................................... 40

*Bost v. Illinois State Board of Elections*,
    2025 WL 2597334 (U.S. Sept. 2, 2025) ................................................................ 25

ii

*Carney v. Adams,*
    592 U.S. 53 (2020) ........................................................................................ 6

*Cell Assocs., Inc. v. NIH,*
    579 F.2d 1155 (9th Cir. 1978) ..................................................................... 19

*Chamber of Commerce of U.S. v. Reich,*
    74 F.3d 1322 (D.C. Cir. 1996) ....................................................................... 2

*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398 (2013) ............................................................................. *passim*

*Common Cause/Ga. v. Billups,*
    554 F.3d 1340 (11th Cir. 2009) ................................................................... 24

*Crawford v. Marion County Elec. Bd.,*
    553 U.S. 181 (2008) ..................................................................................... 28

*Crawford v. Marion County Elections Board,*
    472 F.3d 949 (7th Cir. 2007) ...................................................................... 24

*Democratic National Committee v. Wisconsin State Legislature,*
    141 S. Ct. 28 (2020) .................................................................................... 39

*Diamond Alternative Energy, LLC v. EPA,*
    145 S. Ct. 2121 (2025) ..................................................................... 25, 31, 32

*Dickson v. Direct Energy, LP,*
    69 F.4th 338 (6th Cir. 2023) ....................................................................... 15

*Doe v. Stephens,*
    851 F.2d 1457 (D.C. Cir. 1988) ................................................................... 19

*Donald J. Trump for President, Inc. v. Way,*
    492 F. Supp. 3d 354 (D.N.J. 2020) ............................................................. 40

*Elec. Privacy Info. Ctr. v. U.S. Dep't of Com.,*
    928 F.3d 95 (D.C. Cir. 2019) ................................................................. 34, 35

*FDA v. All. for Hippocratic Med.,*
    602 U.S. 367 (2024) ......................................................................... 21, 24, 33

*\*Foster v. Love,*
    522 U.S. 67 (1997) ................................................................................. 37, 39

*Franklin v. Massachusetts,*
  505 U.S. 788 (1992) ................................................................................................ 41

*Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.,*
  460 F.3d 13 (D.C. Cir. 2006) .................................................................................. 18

*Gadelhak v. AT&T Servs., Inc.,*
  950 F.3d 458 (7th Cir. 2020) .................................................................................. 15

*Garey v. James S. Farrin, P.C.,*
  35 F.4th 917 (4th Cir. 2022) ................................................................................... 15

*Global Health Council v. Trump,*
  No. 25-5097, 2025 WL 2480618 (D.C. Cir. Aug. 28, 2025) ............................. 2, 3, 4

*Havens Realty Corp. v. Coleman,*
  455 U.S. 363 (1982) ................................................................................................ 33

*Hearst Radio, Inc. v. FCC,*
  167 F.2d 225 (D.C. Cir. 1948) ................................................................................ 18

*Hunt v. Wash. State Apple Advert. Comm'n,*
  432 U.S. 333 (1977) ................................................................................................ 34

*In re Grand Jury Investigation,*
  916 F.3d 1047 (D.C. Cir. 2019) .............................................................................. 40

*Indep. Equip. Dealers Ass'n v. EPA,*
  372 F.3d 420 (D.C. Cir. 2004) ........................................................................... 18, 19

*Indus. Energy Consumers of Am. v. FERC,*
  125 F.4th 1156 (D.C. Cir. 2025) ............................................................................... 6

*Jacobson v. Florida Sec'y of State,*
  974 F.3d 1236 (11th Cir. 2020) .............................................................................. 24

*Jeffries v. Volume Services America, Inc.,*
  928 F.3d 1059 (D.C. Cir. 2019) ......................................................................... 13, 14

*Jones v. U.S. Secret Serv.,*
  701 F. Supp. 3d 4 (D.D.C. 2023) ............................................................................ 18

*Kowalski v. Tesmer,*
  543 U.S. 125 (2004) .................................................................................................. 7

*Krakauer v. Dish Network, LLC*,
  925 F.3d 643 (4th Cir. 2019) ............................................................................ 15

*Lee v. Nat'l Elec. Contractor Ass'n*,
  322 F. Supp. 3d 43 (D.D.C. 2018) ................................................................. 4, 16

*Lujan v. Nat'l Wildlife Fed'n*,
  497 U.S. 871 (1990) ...................................................................................... 17, 18

*LULAC v. Exec. Off. of the President*,
  780 F. Supp. 3d 135 (D.D.C. 2025) .............................................................. 24, 31

*Lupia v. Medicredit, Inc.*,
  8 F.4th 1184 (10th Cir. 2021) .......................................................................... 15

*McCray v. Biden*,
  574 F. Supp. 3d 1 (D.D.C. 2021) ..................................................................... 41

*Mertens v. Hewitt Assocs.*,
  508 U.S. 248 (1993) ......................................................................................... 28

*Monsanto Co. v. Geertson Seed Farms*,
  561 U.S. 139 (2010) ......................................................................................... 25

*Muransky v. Godiva Chocolatier, Inc.*,
  922 F.3d 1175 (11th Cir. 2019) ....................................................................... 13

*Muransky v. Godiva Chocolatier, Inc.*,
  979 F.3d 917 (11th Cir. 2020) ......................................................................... 13

*Murthy v. Missouri*,
  603 U.S. 43 (2024) ........................................................................................... 35

*\*Myers v. United States*,
  272 U.S. 52 (1926) ........................................................................................... 10

*Nat'l Fair Hous. All. v. Carson*,
  330 F. Supp. 3d 14 (D.D.C. 2018) ............................................................... 21, 22

*Nat'l Treasury Emps. Union v. Vought*,
  149 F.4th 762 (D.C. Cir. 2025) .......................................................................... 3

*Nken v. Holder*,
  556 U.S. 418 (2009) ......................................................................................... 41

*Norton v. S. Utah Wilderness All.*,
   542 U.S. 55 (2004) ............................................................................................. 17

*Nuclear Regul. Comm'n v. Texas*,
   605 U.S. 665 (2025) ......................................................................................... 2, 3

*Pennsylvania Democratic Party v. Boockvar*,
   238 A.3d 345 (Pa. 2020) ................................................................................... 40

*PETA v. USDA*,
   797 F.3d 1087 (D.C. Cir. 2015) ........................................................................ 21

*Republican National Committee v. Democratic National Committee*,
   589 U.S. 423 (2020) .......................................................................................... 39

*Republican Nat'l Comm. v. Wetzel*,
   120 F.4th 200 (5th Cir. 2024) ............................................................... 37, 38, 39

*Seminole Tribe of Fla. v. Florida*,
   517 U.S. 44 (1996) ............................................................................................ 40

*Shays v. FEC*,
   414 F.3d 76 (D.C. Cir. 2005) ..................................................................... 25, 35

*Six v. IQ Data Int'l, Inc.*,
   129 F.4th 630 (9th Cir. 2025), *cert. denied*, ---S. Ct.---,
   2025 WL 2823837 (U.S. Oct. 6, 2025) ............................................................. 15

*Soundboard Ass'n v. Fed. Trade Comm'n*,
   888 F.3d 1261 (D.C. Cir. 2018) .......................................................................... 5

*Spokeo, Inc. v. Robins*,
   578 U.S. 330 (2016) .................................................................................... 13, 23

*SSA v. Am. Fed'n of State, Cnty., & Mun. Emps.*,
   145 S. Ct. 1626 (2025) ...................................................................................... 16

*Summers v. Earth Island Institute*,
   555 U.S. 488 (2009) .......................................................................................... 24

*Sussman v. U.S. Marshal Serv.*,
   494 F.3d 1106 (D.C. Cir. 2007) ........................................................................ 19

*TransUnion LLC v. Ramirez*,
   594 U.S. 413 (2021) ................................................................................. *passim*

*Wash. All. of Tech. Workers v. U.S. Dep't of Homeland Sec.*,
    50 F.4th 164 (D.C. Cir. 2022) ................................................................. 20

*Wolf v. Regardie*,
    553 A.2d 1213 (D.C. 1989) ................................................................. 15

*Wood v. Raffensperger*,
    981 F.3d 1307 (11th Cir. 2020) ......................................................... 24

*Young v. DOJ*,
    882 F.2d 633 (2d Cir. 1989)............................................................... 14

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952)..................................................................... 9, 10

**Constitutional Provisions**

U.S. Const. art. II, § 3 ................................................................. 38

**Statutes**

2 U.S.C. § 7 ................................................................. *passim*

3 U.S.C. § 1 ................................................................. 4, 31, 36, 37

5 U.S.C. § 551 ................................................................. 17, 18

5 U.S.C. § 552a ................................................................. 19

5 U.S.C. § 704 ................................................................. 18

8 U.S.C. § 1373 ................................................................. 16, 20

18 U.S.C. § 611 ................................................................. 17

52 U.S.C. § 20301 ................................................................. 26, 27

52 U.S.C. § 20302 ................................................................. 28

52 U.S.C. § 20307 ................................................................. 39

52 U.S.C. § 20505 ................................................................. 30

52 U.S.C. § 20506 ................................................................. 8, 10

52 U.S.C. § 20507 ................................................................. 11

52 U.S.C. § 20508 ................................................................................................ 8, 9, 10, 30

52 U.S.C. § 21003 ........................................................................................................ 30

52 U.S.C. § 21081 ........................................................................................................ 41

52 U.S.C. § 21082 ........................................................................................................ 39

52 U.S.C. § 21145 ................................................................................................... 29, 30

**Rules**

Fed. R. Civ. P. 8 ............................................................................................................. 4

**Regulations**

85 Fed. Reg. 31798-01 (May 27, 2020) ....................................................................... 20

Executive Order No. 14,248, 90 Fed. Reg. 14005 (Mar. 25, 2025) ..................................... *passim*

**Other Authorities**

Joseph Copeland, *Military veterans remain a Republican group, backing Trump over Democratic Party Committee Abroad*, https://www.votefromabroad.org/faqs/FP1 ................ 27

Joseph Copeland, *Military veterans remain a Republican group, backing Trump over Harris by wide margin*, Pew Res. Ctr. (Sept. 30, 2024), https://www.pewresearch.org/short-reads/2024/09/30/military-veterans-remain-a-republican-group-backing-trump-over-harris-by-wide-margin/ ................................................................................................................... 26

Post Card Form, https://www.fvap.gov/uploads/fvap/forms/fpca.pdf ........................................ 27

Receipt and Postmark Deadlines for Absentee/Mail Ballots, NCSL (Aug. 1, 2025), https://www.ncsl.org/elections-and-campaigns/table-11-receipt-and-postmark-deadlines-for-absentee-mail-ballots ....................................................................................................... 33

Restatement (Second) of Torts § 652B (A.L.I. 1977) ................................................................ 15

## INTRODUCTION

Plaintiffs seek to undercut the President's efforts to safeguard elections, which they contend are ultra vires and contrary to law. Plaintiffs, however, continue to misconstrue the terms of the Executive Order[1] and the agency actions that it contemplates. Premised on this misconstruction, Plaintiffs' asserted bases for subject-matter jurisdiction—and success on the merits—fail. More fundamentally, Plaintiffs ignore that their numerous ultra vires and Administrative Procedure Act ("APA") challenges suffer from threshold defects that preclude this Court from reaching their substance. Namely, Plaintiffs ignore recent, binding precedent that foreclose their ultra vires challenges, and Plaintiffs ask this Court to ignore the well-established legal principle that, to be reviewable under the APA, the challenged "agency" actions must be "final." For any or all these reasons, Plaintiffs' Cross Motions for Summary Judgment should be denied, and Defendants' Motion for Summary Judgment should be granted. At a minimum, in the event the Court finds facts in dispute, Defendants are entitled to discovery to refute Plaintiffs' many one-sided declarations, which they propound in support of both jurisdiction and the merits.

## ARGUMENT

### I.    Plaintiffs lack a cause of action for their ultra vires claims, and their APA claims fail because there is no final agency action.

The LULAC Plaintiffs challenge sections 3(d), 4(a), 7(a), and 7(b) of the Executive Order as "ultra vires" pursuant to an "equitable cause of action." ECF No. 194-1 at 27–31, 33; *League of United Latin Am. Citizens v. Exec. Off. of the President*, No. 1:25-cv-00946, ECF No. 1 (LULAC Compl.) at 43–46. The Democratic Party Plaintiffs ("DPPs") similarly bring an ultra vires challenge to sections 2(b)(iii), 2(d), 4(a), 7(a), and 7(b). ECF No. 196-1 at 7, 31, 38; *Democratic*

---

[1] Executive Order No. 14,248, Preserving and Protecting the Integrity of American Elections, 90 Fed. Reg. 14005 (Mar. 25, 2025) ("EO").

*Nat'l Comm. v. Trump*, No. 1:25-cv-00952, ECF No. 1 (DPP Compl.) at 42–53. Neither the LULAC Plaintiffs nor the DPPs can bring a nonstatutory cause of action, however, because "a statutory review scheme" (here, the APA) "provides [the] aggrieved persons with a meaningful and adequate opportunity for judicial review," which thus precludes any ultra vires claim. ECF No. 177-1 at 16–17 (quoting *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681 (2025); citing *Am. Foreign Serv. Ass'n v. Trump*, 2025 WL 1742853, at *2 (D.C. Cir. June 20, 2025) ("[*U*]*ltra vires* review—which is a suit in equity, not a statutory cause of action—is 'strictly limited' when 'other judicial-review statutes' are present.")).

Plaintiffs contend that this Court has already decided that they can bring their claims pursuant to a nonstatutory cause of action, ECF No. 194-1 at 27, 41, because *Chamber of Commerce of U.S. v. Reich*, 74 F.3d 1322, 1327 (D.C. Cir. 1996), permits them to do so, and because their claims satisfy the "statutory ultra vires [test]," set forth in *Global Health Council v. Trump*, No. 25-5097, 2025 WL 2480618, at *12 (D.C. Cir. Aug. 28, 2025). These contentions fail. As a threshold matter, Plaintiffs disregard that this Court's ruling, and *Reich*, both preceded the D.C. Circuit's ruling in *Global Health Council*, 2025 WL 2480618, at *1, as well as the Supreme Court's ruling in *Nuclear Regulatory Commission*, 605 U.S. at 681. *Global Health Council* and *Nuclear Regulatory Commission* unambiguously hold that plaintiffs lack a nonstatutory cause of action where, as here, a statutory review scheme provides a meaningful and adequate opportunity for judicial review and any "constitutional claims" are "predicated on underlying statutory violations," *Glob. Health Council*, 2025 WL 2480618, at *7–8; *see also* ECF No. 177-1 at 16–17.

Governing law therefore demonstrates that Plaintiffs lack a nonstatutory cause of action. "To succeed on an ultra vires claim, the plaintiff must show that (1) judicial review is not expressly foreclosed; (2) the agency made an extreme legal error; and (3) there is no alternative means for

the plaintiff to seek judicial review." *Nat'l Treasury Emps. Union v. Vought*, 149 F.4th 762, 791 (D.C. Cir. 2025). Despite protestations to the contrary, a plain reading of Plaintiffs' Complaints shows that Plaintiffs fundamentally challenge the resulting agency action that the Executive Order directs. *See* ECF 194-1 at 30 (Plaintiffs admitting that "[a]ll declaratory and injunctive relief . . . [they] seek is against [] officials and agencies ordered to carry out the President's . . . commands"). Therefore, the APA provides Plaintiffs with a cause of action once there is final agency action. Plaintiffs' attempt to bring ultra vires claims as a way of bypassing the APA just reflects that there is no final agency action—except, they claim, as to certain agency action related to the DPPs' Count IX—that would enable their APA claims to proceed now. ECF No. 177-1 at 17–19; *see also* ECF No. 194-1 at 6 n.4 ("[LULAC] Plaintiffs agree that there has been no final agency action as to [their APA] claims[.]"). Assuming arguendo that there *has* been final agency action with respect to the DPPs' APA claim challenging sections 2(b) and 3(a), that does not revive the DPPs' ultra vires challenge to that section, because the APA still provides an avenue to challenge it, generally (although not via the Privacy Act). *See infra* III.[2]

Moreover, despite their framing, Plaintiffs' ultra vires claims are not "implied equitable claims under the Constitution." *Nat'l Treasury Emps. Union*, 149 F.4th at 791. This Circuit rejects "reframing any alleged statutory violation by the President" as a "constitutional [separation-of-powers] one" and has dismissed similarly reframed claims. *Glob. Health Council*, 2025 WL 2480618, at *5–6.

---

[2] Quoting a footnote in *Global Health Council*, the LULAC Plaintiffs argue that ultra vires review "remains available to test presidential action alleged to violate any spending or other statute, provided that plaintiffs can plausibly allege action contrary to a clear and mandatory statutory prohibition." ECF No. 194-1 at 28. However, the D.C. Circuit clarified in the same footnote that "such claims must [still] meet the standards governing review of ultra vires claims," *Glob. Health Council*, 2025 WL 2480618, at *8 n.14, which require that there not be another avenue of relief available, *Nuclear Regul. Comm'n*, 605 U.S. at 681. Here, there is. *See* ECF No. 177-1 at 16–17.

With respect to section 2(b)(iii), the DPPs allege that the President exceeded his authority because the section "[r]equire[s] DHS or authorize[s] DOGE to supervise how States maintain their voter registration lists under the NVRA." DPP Compl. ¶ 131. Similarly, they allege that the President exceeded his authority in section 2(d) by "[c]ompel[ling] the heads of Federal voter registration agencies to 'assess citizenship prior to providing a Federal voter registration form to enrollees of public assistance programs,'" *id.* (quoting EO § 2(d)), because the NVRA "leaves no role for agencies to 'assess citizenship,'" ECF No. 196-1 at 8. In other words, Plaintiffs contend that EO sections 2(b)(iii) and 2(d) direct actions that violate a statute—the NVRA. The LULAC Plaintiffs confirm that they challenge section 3(d) "under the statutory ultra vires framework." ECF No. 194-1 at 29 n.11. And all Plaintiffs challenge section 4(a) as ultra vires because its directive purportedly "unlawfully intrudes upon Congress's design" set forth in the "Help America Vote Act . . . , which created the EAC to improve the administration of elections through funding, guidance, and policy development." DPP Compl. ¶¶ 131, 137, 139, 148; LULAC Compl. ¶ 197. Finally, despite Plaintiffs' insistence that their section 7 challenges are "constitutional" in nature, ECF No. 194-1 at 41, they are really claims that the President has exceeded his authority under the Election Day statutes, 2 U.S.C. § 7 and 3 U.S.C. § 1, which allegedly do not require a uniform ballot-receipt deadline for all methods of voting, LULAC Compl. ¶¶ 198, 204; DPP Compl. ¶¶ 131, 137, 152; ECF No. 194-1 at 33–41; ECF No. 196-1 at 31.[3]

---

[3] The DPPs purport to "join" the LULAC Plaintiffs' arguments that "§ 3(d) is ultra vires and violates the separation of powers." ECF No. 196-1 at 20. But the Democratic Party Plaintiffs have not brought a nonstatutory claim challenging section 3(d) as ultra vires, and this Court should not construe the DPPs' complaint to assert a claim that they have not brought. Rule 8 requires, as the DPPs note, *id.*, "that defendants receive fair notice of the claim being asserted," *Lee v. Nat'l Elec. Contractor Ass'n*, 322 F. Supp. 3d 43, 44 (D.D.C. 2018) (citing Fed. R. Civ. P. 8). The DPPs request that if the Court declines to construe their complaint as bringing a nonstatutory claim challenging section 3(d), it permit the DPPs to amend their complaint. Amendment would be fundamentally improper and unfair where, as here, preliminary discovery has already concluded

In sum, regardless of how they are superficially described, each of Plaintiffs' ultra vires claims is statutory—not constitutional.

Finally, Plaintiffs request that the Court "defer consideration" of their APA claims because the "Federal Defendants have not yet produced an AR, which makes review of th[ose] . . . claims premature," and "the preliminary injunctions issued by this Court and the District of Massachusetts have precluded the agency from taking final agency action, a non-jurisdictional prerequisite for Plaintiffs' APA claims."[4] ECF No. 196-1 at 59; *see also* ECF No. 194-1 at 6 n.4 ("Plaintiffs agree that there has been no final agency action as to [their APA] claims, but ask that they be held in abeyance until final judgment has been entered as to Plaintiffs' equitable claims.").[5] This Court should not "defer" ruling on Plaintiffs' APA claims: the Court's scheduling order did not provide a separate briefing schedule for Plaintiffs' APA claims, ECF No. 141, and if an APA claim is premature because there is no final agency action, the proper remedy is dismissal, *Soundboard Ass'n v. Fed. Trade Comm'n*, 888 F.3d 1261, 1274 (D.C. Cir. 2018) (dismissing for failure to state a claim because "[w]ithout final agency action, SBA lacks a cause of action under the APA").

---

and the parties are in the process of concluding Phase II summary-judgment briefing. ECF No. 196-1 at 20 & n.5. Defendants reserve the right to fully oppose any future motion to amend.

[4] The DPPs contend that this Court should decide their APA Privacy Act claim with respect to the "SAVE updates," but not as to any particular claim challenging a specific section of the Executive Order. *See* ECF No. 196-1 at 50–56; *id*. at 57 ("[T]he Court should deny [Defendants'] motion and resolve the [remaining claims against sections 2(b) and 3(a)] in later phases of the case").

[5] Plaintiffs acknowledge elsewhere that unless genuine disputes of fact exist, an AR is unnecessary to decide APA claims. ECF No. 196-1 at 41 n.11. All of Plaintiffs' APA claims can be decided on purely legal grounds, eliminating the need for an AR.

## II.    The Democratic Party Plaintiffs' claims challenging section 2(d) are not justiciable and fail substantively.[6]

EO Section 2(d) directs "[t]he head of each Federal voter registration executive department or agency . . . under the National Voter Registration Act, 52 U.S.C. [§] 20506(a)" to "assess citizenship prior to providing a Federal voter registration form to enrollees of public assistance programs." The DPPs argue that section 2(d) "usurps the constitutional role of the states while at the same time asserting authority that Congress never granted the President." ECF No. 196-1 at 5. Neither is true.

### A.    There is no standing.

As a threshold matter, the DPPs lack Article III standing to challenge section 2(d) because it does not imminently injure them. Article III standing requires an "'injury in fact' that must be 'concrete and particularized,' as well as 'actual and imminent,'" not "'conjectural or hypothetical.'" *Carney v. Adams*, 592 U.S. 53, 58 (2020). To be imminent, injury must be certainly impending; mere "allegations of possible future injury are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (citation modified). In other words, injury cannot be established through a "highly attenuated chain of possibilities predicated on guesswork as to how independent decisionmakers will exercise their judgment." *Indus. Energy Consumers of Am. v. FERC*, 125 F.4th 1156, 1163 (D.C. Cir. 2025). The DPPs assert that section 2(d) will harm them because it will "create barriers to accessing and completing the Federal Form." DPP SoF (ECF No. 196-2) ¶¶ 4–9. But Plaintiffs' claimed theory of injury rests on a fundamental misunderstanding of what EO section 2(d) does: *i.e.*, it directs "[t]he head of each Federal voter registration executive

---

[6] For the reasons discussed *supra* Part I, Plaintiffs lack a cause of action for their ultra vires claims, and their APA claims fail for lack of final agency action. In Part II and the other Parts *infra*, Defendants explain why—even if Plaintiffs had viable claims (and they do not)—the claims fail on the merits.

department or agency" to "*assess citizenship* prior to providing a Federal voter registration form to enrollees of public assistance programs" (emphasis added). The EO does not direct any federal voter registration executive department or agency to *withhold* the registration form in any circumstance. And if reminding an individual that he or she must be a citizen prior to registering him or her to vote discourages that person from registering, then that person was likely not eligible to vote and an ineligible individual's failure to register to vote results in no injury caused by the inquiry directed by the Executive Order (as opposed to that individual's citizenship status itself).[7]

To the extent DPPs argue that they are injured as a result of section 2(d) because "both the Constitution and NVRA assign States the responsibility for assessing a person's qualifications to vote," ECF No. 196-1 at 9 (emphasis omitted), the DPPs lack third-party standing to assert this alleged injury. To have third-party standing, the DPPs must have a "a 'close' relationship with" the states that "possess[] the right," and there must be something that "hind[ers]" the states from vindicating their own interests. *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004). The DPPs have not demonstrated such a relationship, and there is no hindrance because several states are challenging section 2(d) in separate lawsuits. *See California v. Trump*, 1:25-cv-10810 (D. Mass.); *Washington v. Trump*, 2:25-cv-602 (W.D. Wash.).

---

[7] For section 2(d) to injure the DPPs, the following would have to occur in the future: (i) a citizen and public-assistance program enrollee would have to visit a Federal voter registration executive agency for receipt of a service or assistance; (ii) an official at that federal agency would have to inquire about the individual's citizenship and advise him that he must be a citizen to vote prior to providing the federal form; and (iii) the citizen enrollee would have to be dissuaded from registering on that basis, *i.e.*, being asked about their citizenship status as opposed to their citizenship status itself. This is a highly attenuated and speculative chain of contingencies that is not likely to occur. Plaintiffs' remaining claimed injuries resulting from section 2(d) are based on evidence that Defendants have had no opportunity to test. *See, e.g.*, DPP SoF ¶¶ 5–9. At a minimum, Defendants are entitled to discovery before the Court grants summary judgment based on Plaintiffs' one-sided declarations relevant to section 2(d) and any of their challenges to the EO in their pending Cross-Motions. *See* Rule 56(d) declaration, filed contemporaneously herewith.

B.    <u>Plaintiffs' challenges to section 2(d) lack merit</u>.

If the Court reaches the merits of the DPPs' section 2(d) claim, it should grant summary judgment in favor of Defendants because section 2(d) is not ultra vires: the President has the constitutional authority to direct Executive agencies to carry out their statutory duties in a particular way so long as that direction is consistent with the law and the manner he has chosen to do so in section 2(d) does not conflict with the NVRA. As Defendants previously explained, section 2(d) is directed *only* to federal executive agencies that are designated as voter registration agencies in a state. ECF No. 177-1 at 27–30. The DPPs recognize this. DPP Compl. ¶ 176 ("As relevant, the NVRA defines certain federal agencies as 'voter registration agencies' that 'shall' provide the NVRA's Federal Form to all voters who receive services form those agencies."). Section 2(d)'s command that those agencies "assess citizenship prior to providing" the federal form to public assistance enrollees does not direct any official to withhold the federal form in any circumstance. Section 2(d) simply serves to remind the individual receiving the form that he or she must be a United States citizen to register to vote, which is itself a statutory requirement. ECF No. 177-1 at 27–30; *see* 52 U.S.C. § 20508(b)(2). As such, it does not violate the NVRA's command that voter registration agencies "[d]istribut[e] . . . mail voter registration application forms." 52 U.S.C. § 20506(a)(4)(A)(i), § 20506(a)(6)(A)(i); *see also* ECF No. 177-1 at 28.

The DPPs object to this interpretation of section 2(d) because, they claim, it is "based on pure attorney conjecture"; it "strains" the meaning of "assess"; Congress "already provided . . . reminders . . . through the attestation requirement"; and "Congress did not intend to 'transfer[] voting registration authority from State voting registrars to agencies.'" ECF No. 196-1 at 8–9 (emphasis omitted). None of these objections hold water.

First, section 2(d)'s text—not attorney conjecture—shows that it does not require withholding the federal form. As the DPPs acknowledge, and the Oxford English Dictionary confirms, to "assess" something means "to evaluate" it. *Assess*, Oxford English Dictionary, https://www.oed.com/dictionary/assess_v?tab=meaning_and_use#36886717 (last visited Oct. 17. 2025). Evaluating whether an individual is a citizen requires no further action beyond the evaluation, and it certainly need not require withholding the form, particularly in view of section 11's command to "implement[]" the EO's provisions "consistent with applicable law." EO § 11(b).

Second, the fact that Congress already built in a "reminder" through the attestation requirement does not prevent the Executive from reiterating it via the EO (and action taken pursuant to that EO). The NVRA does not prohibit officials from inquiring about a registrant's citizenship and informing a registrant that citizenship is necessary to be eligible to vote. 52 U.S.C. § 20508(b)(2). Because section 2(d)'s directive is not inconsistent with the NVRA, the President has the constitutional authority to direct executive agencies to carry out their statutory duties— here, providing the federal form to public assistance enrollees—in a particular manner. *See Bldg. & Const. Trades Dep't, AFL-CIO v. Allbaugh*, 295 F.3d 28, 32 (D.C. Cir. 2002) ("[T]he President's power necessarily encompasses general administrative control of those executing the laws, the Executive Branch of government, of which he is the head."); *see also* U.S. Const. art. II § 1 (vesting Executive power in the President).

The DPPs dispute that the President has that authority under Article II, however, and insist that Defendants must be able to "point to" something "in the NVRA granting the Executive the authority to perform citizenship assessments." ECF No. 196-1 at 11. In the absence of a specific statutory grant, in the DPPs' view, the Take Care Clause does not permit the President "to direct federal agencies at his whim" and *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952),

prohibits the President's directive in 2(d). ECF No. 196-1 at 12. But the relevant clause in Article II is not § 3 but § 1, which vests the totality of the Executive power in the President. *Allbaugh*, 295 F.3d at 32; *accord Myers v. United States*, 272 U.S. 52, 135 (1926) ("The ordinary duties of officers prescribed by statute come under the general administrative control of the President by virtue of the general grant to him of the executive power, and he may properly supervise and guide their construction of the statutes under which they act in order to secure that unitary and uniform execution of the laws which article 2 of the Constitution evidently contemplated in vesting general executive power in the President alone."). It is under that authority that courts have found he has supervisory authority over Executive agencies. *See Allbaugh*, 295 F.3d at 32.; *see also Myers*, 272 U.S. at 164.

Contrary to Plaintiffs' view, this case is not similar to *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952). ECF No. 196-1 at 12. In *Youngstown*, the President directed the Secretary of Commerce to seize and operate the nation's steel mills. 343 U.S. at 582. No statutory authority provided for government seizure of the steel mills. *See id*. at 585–86. And the Constitution did not empower the President to issue his order there because "[t]he President's order [did] not direct that a congressional policy be executed in a manner prescribed by Congress" but "a presidential policy [to] be executed in a manner prescribed by the President." *Id*. at 588. Here, by contrast, Congress has already required that those registering to vote attest that they are citizens. 52 U.S.C. § 20508(b)(2). It has also required voter registration agencies that provide services or assistance to "distribute" the federal form "with each application for such service or assistance." *Id.* § 20506(a)(6)(A). Thus, in section 2(d), the President is directing federal Executive agencies that function as voter registration agencies within states to execute Congress's policy by inquiring whether individuals seeking public services are citizens prior to providing them with the federal

form. The inquiry serves only to remind individuals of the requirement that only citizens are eligible to vote. Section 2(d)'s directive is consistent with Congress's policy goals set forth in the NVRA. In other words, contrary to Plaintiff's contention that this is a "*Youngstown* Three" category where Executive action is contrary to Congressional command, it is, being the most generous to Plaintiffs, a "*Youngstown* Two" category, where Congress does not speak directly to the issue.

Last, an assessment of an individual's citizenship prior to providing the federal form does not transfer voter registration authority from State voting registrars to agencies. Any assumption that it does is rooted in an erroneous interpretation of section 2(d): that it requires withholding the federal form from anyone. As explained, section 2(d) does not instruct officials to withhold the form in any instance; it simply requires officials to inquire whether individuals seeking public assistance are citizens before providing them with the federal form. Because section 2(d) does not actually prohibit anyone from receiving the federal form, it does not require federal officials to make any decisions about voter eligibility and therefore transfers no authority to federal officials.

### III.    The Democratic Party Plaintiffs' Count IX, challenging sections 2(b)(i), 2(b)(iii) and 3(a), is not justiciable and fails substantively.

The DPPs claim that they are entitled to partial summary judgment on part of Count IX, which challenges EO sections 2(b)(i), 2(b)(iii), and 3(a). ECF No. 196-1 at 41. EO section 2(b)(i) instructs the Secretary of Homeland Security to, "consistent with applicable law, ensure that State and local officials have, without the requirement of the payment of a fee, access to appropriate systems for verifying the citizenship or immigration status of individuals registering to vote or who are already registered." Section 2(b)(iii) charges DHS, "in coordination with the DOGE Administrator," with "review[ing] each State's publicly available voter registration list and available records concerning voter list maintenance activities as required by 52 U.S.C. 20507,

alongside Federal immigration databases and State records requested, including through subpoena where necessary and authorized by law, for consistency with Federal requirements." Finally, EO section 3(a) directs the "Commissioner of Social Security" to "take all appropriate action to make available the Social Security Number Verification Service, the Death Master File, and any other Federal databases containing relevant information to all State and local election officials engaged in verifying the eligibility of individuals registering to vote or who are already registered," to "assist States in determining whether individuals are eligible to register and vote." Section 3(a) specifies, however, that "[i]n determining and taking such action, the Commissioner of Social Security shall ensure compliance with applicable privacy and data security laws and regulations."

The DPPs argue that "recent changes to SAVE using NUMIDENT" violate the Privacy Act because state and local governments may now use "SAVE to retrieve protected information," including information regarding U.S.-born citizens. ECF No. 196-1 at 42–44. Although there is no final agency action on this claim as explained above, for the additional reasons that follow, the Court should decline the DPPs' request for piecemeal summary judgment and dismiss Count IX entirely. *See* ECF No. 177-1 at 22–26.

A.    <u>There is no standing.</u>

As a threshold matter, the DPPs lack standing to bring their APA claim challenging sections 2(b) and 3(a) as unlawful agency action in violation of the Privacy Act because they have not demonstrated a concrete injury, ECF No. 177-1 at 6, and their members are not harmed by the updates to SAVE. As previously stated, "under Article III, an injury in law is not an injury in fact." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 427 (2021). Therefore, a violation of the Privacy Act is not, standing alone, Article III injury-in-fact. Rather, the DPPs "must allege a concrete injury, defined as an injury with a 'close relationship to harms traditionally recognized as providing a

basis for lawsuits in American courts.'" *Am. Fed'n of Tchrs. v. Bessent*, 152 F.4th 162, 171 (4th Cir. 2025) (quoting *TransUnion*, 594 U.S. at 425). "This requires a comparison between the factual harm alleged by Plaintiffs and another harm redressable at common law." *Id.* (emphasis omitted).

The DPPs argue that the "harms to Plaintiffs' members stemming from the [alleged Privacy Act] violation . . . are akin to . . . breach of confidence, and . . . invasion of privacy." ECF No. 196-1 at 45. Plaintiffs' theory is fundamentally flawed.

**Breach-of-Confidence.** To start, it is doubtful whether the breach-of-confidence tort qualifies as a traditional cause of action that satisfies *TransUnion*. *See* 594 U.S. at 427 (stating that "lawsuit may not proceed because that plaintiff has not suffered any . . . harm traditionally recognized as providing a basis for a lawsuit in American courts"). While the D.C. Circuit in *Jeffries v. Volume Services America, Inc.*, 928 F.3d 1059, 1064 (D.C. Cir. 2019), invoked the tort to find standing, *Jeffries* predated *TransUnion*; did not address whether the tort has a sufficient historical origin; and relied, in part, on an Eleventh Circuit panel decision that was later overturned by the Eleventh Circuit sitting en banc. *See Jeffries*, 928 F.3d at 1064 (citing *Muransky v. Godiva Chocolatier, Inc.*, 922 F.3d 1175 (11th Cir. 2019), *reh'g en banc granted, opinion vacated*, 939 F.3d 1278 (11th Cir. 2019), and *on reh'g en banc*, 979 F.3d 917 (11th Cir. 2020)).

Critically, in its en banc decision, decided after *Jeffries*, the Eleventh Circuit questioned whether breach of confidence "can fairly be said to have 'traditionally been regarded as providing a basis for a lawsuit in English or American courts'" for standing purposes. *Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 931 (11th Cir. 2020) (en banc) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016)). Indeed, the Eleventh Circuit noted that the tort has been "emerging" only since the 1980s in a "rudimentary form after initially dying out in its infancy." *Id.* (citation modified). The Second Circuit, moreover, has described breach-of-confidence as "a relative

13

newcomer to the tort family" and found that the tort is usually limited to the physician-patient or bank-customer relationships. *Young v. DOJ*, 882 F.2d 633, 640 (2d Cir. 1989). The tort's nascent and underdeveloped pedigree raises serious doubts about whether it could ever serve as a valid analogue under *TransUnion*'s requirement of a historically grounded cause of action. 594 U.S. at 414.

Even assuming that the breach-of-confidence tort could sometimes be a permissible analogue for standing purposes under *TransUnion*, the facts here bear no resemblance to the circumstances where it could apply—*e.g.*, the physician-patient or bank-customer relationships. *Young*, 882 F.2d at 640. "'A common law breach of confidence lies where a person offers private information to a third party in confidence and the third party reveals that information' to another." *Jeffries*, 928 F.3d at 1064. The relevant "private information" in this case includes: "a citizenship status indicator provided by SSA, a numerical identifier created for the individual's SAVE case file, a description of the agency's finding regarding the individual's status, and . . . 'employment authorization' history." ECF No. 196-1 at 46. This is not information that the DPPs' members have demonstrated that they have "offered" to the government in confidence. They have made no showing that when they offered citizenship information to the government, they did so in confidence. All the evidence shows is that they fear the government is not complying with privacy laws. ECF No. 196-2 ¶¶ 104–05. Reliance on an analogy to the tort of breach of confidence therefore fails.

**Intrusion Upon Seclusion.** The DPPs' intrusion-upon-seclusion theory of Article III standing fares no better.

The tort of intrusion upon seclusion makes liable any person "who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or

concerns . . . if the intrusion would be highly offensive to a reasonable person." Restatement (Second) of Torts § 652B (A.L.I. 1977); *see also Wolf v. Regardie*, 553 A.2d 1213, 1217 (D.C. 1989). The tort has three elements: "(1) an invasion or interference by physical intrusion, by use of a defendant's sense of sight or hearing, or by use of some other form of investigation or examination; (2) into a place where the plaintiff has secluded himself, or into his private or secret concerns; (3) that would be highly offensive to an ordinary, reasonable person." Restatement (Second) of Torts § 652BId. (citation modified).

The D.C. Court of Appeals has explained that "the kind of invasion that this cause of action seeks to redress" are various forms of offensive "invasions" including harassment, peeping, eavesdropping, and so on. *See id.* at 1217–18; *see also Krakauer v. Dish Network, LLC*, 925 F.3d 643, 653 (4th Cir. 2019) (addressing "intrusions made via phone calls"). Or, as then-Judge Barrett termed it in a case later cited in *TransUnion*, "irritating intrusions." *Gadelhak v. AT&T Servs., Inc.*, 950 F.3d 458, 462 (7th Cir. 2020); *see also TransUnion*, 594 U.S. at 425.[8] Intrusion upon seclusion, thus, "has long been understood to guard not against the disclosure of sensitive information . . . but against the feeling of unease when and where one should ideally be at peace."

---

[8] For additional examples of injury contemplated by the tort of intrusion upon seclusion, all of which stand in stark contrast with Plaintiffs' alleged injury here, *see Garey v. James S. Farrin, P.C.*, 35 F.4th 917, 919, 922 (4th Cir. 2022) (finding standing where defendants had obtained plaintiffs' information to mail unsolicited advertising materials to the plaintiffs' homes); *Krakauer*, 925 F.3d at 653 (addressing "intrusions made via phone calls"); *Gadelhak*, 950 F.3d at 462 (finding standing based on "irritating intrusions" caused by unwanted text messages, which is "analogous to [the] type of intrusive invasion of privacy" covered by the tort of intrusion upon seclusion); *Dickson v. Direct Energy, LP*, 69 F.4th 338, 345–46 (6th Cir. 2023) (concluding that "invasion-of-privacy-like harms flow[] from unwanted telephonic communications" in part because such communications "interject[] [the caller] into [the recipient's] private sphere"); *Lupia v. Medicredit, Inc.*, 8 F.4th 1184, 1192 (10th Cir. 2021) (standing based on unwanted telephone communications because they were an "unwanted intrusion into [the plaintiff's] peace and quiet"); *Six v. IQ Data Int'l, Inc.*, 129 F.4th 630, 634 (9th Cir. 2025) (explaining that other courts have "found that the harm caused by unwanted communications bears a close relationship to intrusion upon seclusion"), *cert. denied*, ---S. Ct.---, 2025 WL 2823837 (U.S. Oct. 6, 2025) (mem.).

*Am. Fed'n of Tchrs. v. Bessent*, 2025 WL 1023638, at *4 (4th Cir. Apr. 7, 2025) (Richardson, J., concurring).

The sharing of citizenship data within the federal government, and between the federal and state and local governments, bears no resemblance to the "irritating" intrusions characteristic of the tort of intrusion upon seclusion. Nor is sharing citizenship information with state and local governments "highly offensive to a reasonable person" for the purposes of the tort, regardless of the DPPs' members' subjective distrust of the relevant officials. Here, the federal government is simply using citizenship information within its possession to carry out its legal responsibilities under federal law. *See* 8 U.S.C. § 1373. The DPPs have failed to demonstrate that their members have a concrete injury.[9]

The DPPs argue that their members are harmed by these disclosures on the basis that they "discourage voter registration and risk imminent, unlawful removal from the voter rolls." ECF No. 196-1 at 48. *First*, the DPPs assert that their members are discouraged from registering to vote "by the prospect of officials using their information for improper purposes, such as . . . disfavored treatment." *Id*. at 49. But they have not established that a reasonable *citizen* would be discouraged from registering to vote for fear that his standing as a *citizen* would be used against him. And any *non*-citizen who is discouraged from registering to vote for fear that his citizenship status will be

---

[9] *AFL-CIO v. Dep't of Lab.*, 778 F. Supp. 3d 56, 73 (D.D.C. 2025), which held that the harm associated with disclosure of personal information to unauthorized individuals was analogous to the harm inflicted by the tort of intrusion upon seclusion, agreed with, and relied heavily upon, two decisions of the District of Maryland that were subsequently rejected on appeal (once by the Fourth Circuit and once by the Supreme Court). Defendants respectfully disagree with those district-court decisions for the reasons stated in this brief, in the relevant opinions from the Fourth Circuit, *see Am. Fed'n of Tchrs. v. Bessent*, 152 F.4th 162 (4th Cir. 2025); *AFL-CIO v. SSA*, 2025 WL 1249608, at *7 (en banc) (Richardson, J., dissenting), and consistent with the Supreme Court's subsequent decision to grant a stay, *SSA v. Am. Fed'n of State, Cnty., & Mun. Emps.*, 145 S. Ct. 1626 (2025).

used against him cannot be injured because it is not lawful for him to vote. *See, e.g.*, 18 U.S.C. § 611. Second, the DPPs assert that the disclosures will subject their members to "false suspicions of being non-citizens and wrongful removal from the voter rolls" because "the SSA data incorporated into SAVE is often unreliable." ECF No. 196-1 at 49. But DHS reviews the data in SAVE manually for accuracy. Broderick Decl. ¶ 16. Therefore, any injury resulting from false suspicions of being a non-citizen is unlikely to occur.

Finally, because Plaintiffs have not established that individuals registering to vote are harmed and citizens are discouraged from registering to vote as a result of these disclosures, the "Party Organizations" also do not suffer harm to their "mission-critical efforts to register and persuade voters to elect their candidates." ECF No. 196-1 at 50.

B.    DPPs' Count IX lacks merit.

If this Court determines it has jurisdiction, however, the DPPs' Count IX still fails because there is no final agency action here, the Privacy Act forecloses APA review, ECF No 177-1 at 19–20, and the updates to SAVE do not violate the Privacy Act.

**No final agency action.** Despite the DPPs' insistence, any updates to SAVE are not final agency action. To be final agency action, first, the challenged action must be an "agency action" recognized by the APA, which defines the term to include a specific "rule, order, license, sanction, relief, or the equivalent." 5 U.S.C. § 551(13). Such an action must be a "discrete" act, as plaintiffs are prohibited from leveling a "broad programmatic attack," *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004) ("SUWA"), against programs for which they are seeking "wholesale improvement . . . by court decree, rather than in the offices of the Department or the halls of Congress," *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 891 (1990). As the Court explained in

*Lujan*, moreover, the APA is not intended to permit "general judicial review of the [an agency's] day-to-day operations." *Id*. at 899.

And, second, agency action must be "final," meaning that (1) the action must "mark the consummation of the agency's decisionmaking process," rather than being "of a merely tentative or interlocutory nature"; and (2) the action must be one by which "rights or obligations have been determined," or from which "legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997). The APA expressly excludes "preliminary, procedural, or intermediate agency action[s] or ruling[s]." 5 U.S.C. § 704.

**Privacy Act forecloses APA review.** The DPPs contend that the "agencies 'consummated' their decision-making when they 'implemented' the 'enhance[d]' version of SAVE, which is already being used by state and local officials." ECF No. 196-1 at 51. "'[L]egal consequences' flow from the action," they argue, "because the privacy and other rights of individuals whose information is being disclosed are affected." *Id*. But these SAVE updates fail to constitute actionable final agency action under the APA. The APA provides a list of five actions which it considers to be "agency action": rules, orders, licenses, sanctions, and relief. 5 U.S.C. § 551(13). The Act further defines each of these terms. *Id*. §§ 551(4) ("rule"), (6) ("order"), (8) ("license"), (10) ("sanction"), (11) ("relief"). While broadly construed, these terms do not permit judicial review of the day-to-day operations of agencies. Courts recognize that agency action "is not so all-encompassing as to authorize courts to exercise 'judicial review [over] everything done by an administrative agency.'" *Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 427 (D.C. Cir. 2004) (quoting *Hearst Radio, Inc. v. FCC*, 167 F.2d 225, 227 (D.C. Cir. 1948)). For example, courts do not oversee agency training programs, *see Jones v. U.S. Secret Serv.*, 701 F. Supp. 3d 4, 17 (D.D.C. 2023), or "the common business of managing government programs," *Fund for Animals, Inc. v.*

*U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 20 (D.C. Cir. 2006). Put another way, judicial review does not reach the agency's "workaday" dealings. *Indep. Equip. Dealers Ass'n*, 372 F.3d at 427. Agency updates to an informational database are not, generally speaking, rules, orders, licenses, sanctions, or relief, and the DPPs have not demonstrated otherwise.

**No Privacy Act violation.** The DPPs argue that the Privacy Act does not foreclose APA review of the SAVE updates because the Act's remedial scheme provides only damages for individual disclosures and, therefore, does not provide them with an adequate remedy. ECF No 196-1 at 52. Plaintiffs, however, face a different problem that dooms their claim—the Privacy Act implicitly excludes the injunctive relief they seek. The Privacy Act allows for injunctive relief in only two narrow circumstances: (1) to order an agency to amend inaccurate, incomplete, irrelevant, or untimely records of an individual, 5 U.S.C. § 552a(g)(1)(A), (g)(2)(A); and (2) to order an agency to allow an individual access to his records, *id.* § 552a(g)(1)(B), (g)(3)(A). The DPPs have not sought any such relief. Injunctive relief, as the D.C. Circuit has recognized, is otherwise unavailable for any other situation arising out of the Privacy Act. *See Sussman v. U.S. Marshal Serv.*, 494 F.3d 1106, 1122 (D.C. Cir. 2007) ("We have held that only monetary damages, not declaratory or injunctive relief, are available to § 552a(g)(1)(D) plaintiffs" (citing *Doe v. Stephens*, 851 F.2d 1457, 1463 (D.C. Cir. 1988))); *see also Cell Assocs., Inc. v. NIH*, 579 F.2d 1155, 1161–62 (9th Cir. 1978). Accordingly, the injunctive relief Plaintiffs seek is unavailable and they have therefore not stated a claim for redressable relief.

Nor do the SAVE updates violate the Privacy Act. The DPPs argue that "Defendants have made SAVE a veritable fountain of improper disclosures" because "[n]*othing* in the SORN suggests SAVE can be used to investigate possible U.S.-born native citizens for voter eligibility purposes," and "the SORN does not list NUMIDENT as a 'source' of information disclosed via

SAVE." ECF No. 196-1 at 55–56. But the SORN states that a purpose of SAVE is to "assist[] Federal, state, tribal, and local government agencies" in "confirm[ing] immigration and naturalized and certain derived citizen status information." Privacy Act of 1974; System of Records, 85 Fed. Reg. 31798-01, 31,800 (May 27, 2020). To the extent that SAVE contains data related to U.S.-born citizens, it would still serve that purpose to learn that an individual was not a naturalized citizen but a U.S.-born citizen. Moreover, 8 U.S.C. § 1373(a) provides that "[n]otwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, the Immigration and Naturalization Service information regarding the citizenship or immigration status, lawful or unlawful, of any individual."[10] Thus, federal law makes it entirely lawful for DHS to share via SAVE (and state and local officials to receive) citizenship or immigration-status information about any individual. Because sharing citizenship data is lawful, the DPPs are not entitled to summary judgment barring use of the updates to SAVE. *See* ECF No. 196-1 at 42 n.11.

## IV.    Plaintiffs' claims challenging section 3(d) are not justiciable and fail substantively.

### A.    Plaintiffs' claims challenging section 3(d) are not justiciable.

Section 3(d) directs the Secretary of Defense to update the Federal Post Card Application ("FPCA") pursuant to UOCAVA to require documentary proof of United States citizenship, "as defined by [EO] section 2(a)(ii)," and "proof of eligibility to vote in elections in the State in which the voter is attempting to vote." It is undisputed that the Secretary of Defense has not yet updated

---

[10] *Wash. All. of Tech. Workers v. U.S. Dep't of Homeland Sec.*, 50 F.4th 164, 170 n.1 (D.C. Cir. 2022) (noting that statutory authority was transferred from "the Immigration and Naturalization Service" to DHS in 2002).

the FPCA; the EO does not establish a deadline to do so. ECF No. 177-1 at 7. Similarly, there are

no facts in the record to suggest what "proof of eligibility" might suffice—to the extent Plaintiffs

even challenge this aspect of section 3(d). *See* ECF No. 194-1 at 15. The absence of *any* evidence

as to how or when section 3(d) will be implemented negates Plaintiffs' claim of Article III

standing. *TransUnion*, 594 U.S. at 423.

Plaintiffs raise a handful of arguments to salvage jurisdiction over their 3(d) claims, but

none succeed.

**Organizational Standing.** Plaintiffs claim to have organizational standing because

"Section 3(d) directly interferes with [their] mission of ensuring its members are able to vote

because it will lead to fewer of [their] members being able to register and request a ballot using

the Post Card Form." *E.g.*, ECF No. 194-1 at 9–11. But Plaintiffs' speculation about what the

FPCA may ultimately look like if and when 3(d) is implemented is not a basis for standing. *Nat'l*

*Fair Hous. All. v. Carson*, 330 F. Supp. 3d 14, 42 (D.D.C. 2018) (quoting *PETA v. USDA*, 797

F.3d 1087, 1095 (D.C. Cir. 2015)) ("[I]f the challenged conduct affects an organization's activities,

but is neutral with respect to its substantive mission, then it is entirely speculative whether the

challenged practice will actually impair the organization's activities." (cleaned up)). Next,

Plaintiffs point to their diversion of "resources" to address this EO provision. *E.g.*, ECF No. 194-

1 at 9–11. But "standing" does not routinely "exist[] when an organization diverts its resources in

response to a defendant's actions." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 370 (2024).[11]

Moreover, the fact that a potential DPOC requirement might render appropriate some "revamping"

---

[11] DPPs criticize the Government for "continu[ing] to cite *FDA v. Alliance for Hippocratic*
*Medicine*" for the proposition that a plaintiff cannot spend its way into standing. ECF No. 196-1
at 15. But DPPs' only response to *Alliance* is Plaintiffs' mistaken belief that "§ 3(d) 'leaves no
uncertainty about what it requires.'" *Id.* at 16.

of existing training, educational, or other materials, ECF No. 194-1 at 9, is immaterial: as Plaintiffs acknowledge, they have reached out to overseas voters in prior elections. ECF No. 198-10 ¶ 4. It is reasonable to infer that, as get-out-the-vote entities, Plaintiffs are consistently adapting in response to any number of strategic shifts and factual developments in election law. *See, e.g.*, *id.* ¶ 2 (DPP declarant asserting that she re-trains "each election year to ensure that our practices remain current and consistent with UOCAVA).

**Associational Standing.** Plaintiffs claim to have associational standing because "each organization has members who rely on the Post Card Form and would be burdened and potentially disenfranchised by Section 3(d)'s requirements." *E.g.*, ECF No. 194-1 at 12–14. However, Plaintiffs' claim to associational standing—similar to their claim for organizational standing— depends on Plaintiffs' speculation about how section 3(d) will ultimately be implemented. Again, speculation does not give rise to concrete Article III injury or a ripe claim. *Carson*, 330 F. Supp. 3d at 42. And Plaintiffs' examples of the alleged burdens associated with section 3(d) are also facially inadequate to confer standing.

<u>LULAC Plaintiffs</u>. LULAC Plaintiffs argue that, for example, that "[e]ven if they do possess required documentation, [their military] members would likely lack access to documentary proof of citizenship when deployed and would face significant difficulty submitting documentation alongside the Post Card Form, if they are able to do so at all." ECF No. 194-1 at 12. Plaintiffs do not genuinely dispute that members of the military are required to possess documentary proof of citizenship—instead, Plaintiffs' concern seems to be that members may not be able to access such proof "at last minute's notice." ECF No. 194-5 ¶ 15. But Plaintiffs offer no basis for their assumption that members would be registering to vote at the eleventh hour. If Plaintiffs' members intend to register to vote, and documentary proof of citizenship is required, there is no reason to

doubt that Plaintiffs' members could procure the necessary documentation with notice. And how much notice is required depends on the outcome of a final agency action that has yet to be completed. Similarly, the Court should disregard LULAC Plaintiffs' argument that the burden is magnified by the fact that some voters may have to re-submit the post card form every election cycle. ECF No. 194-1 at 12–13. They would have to do that anyway.

DPPs. DPPs proffer the declarations of two overseas Americans, Bahareh Azizi and Ada Shen. ECF Nos. 198-7 & 198-10. Neither claims that she lacks a passport or would have trouble getting one. Although other DPP declarants (the ones living in the United States) try to make that argument for them, opining that "[o]verseas and military voters are often located in remote areas without access to a copy machine, scanner, or printer," ECF No. 196-2 ¶ 20, Azizi and Shen make no such claim for themselves. Instead, Azizi and Shen assert generalized concerns about data security and the cost and inconvenience of international mail, ECF 198-7 ¶¶ 5–7; ECF 198-10 ¶¶ 10–11, 13, 15, 17. None of these concerns are specific to the EO. They would have to pay to mail the post card form even without a proof-of-citizenship requirement, and that requirement would not change even if they had to resubmit the post card form every election cycle, ECF No. 196-2 ¶ 22; ECF 194-1 at 12–13. In fact, Azizi already pays for Federal Express. ECF 198-7 ¶ 6. And while Shen says mailing DPOC risks "unnecessary exposure of [voters'] personal data" to foreign governments, ECF 198-10 ¶ 11, civilians typically convey their passport information to foreign governments every time they go through customs. In any event, generalized data security concerns, by themselves, do not support standing, *Spokeo*, 578 U.S. at 341–42.

Perhaps recognizing that their members would, in fact, be able to comply with any DPOC requirement if section 3(d) is ultimately implemented, Plaintiffs pivot to arguing that "the burdens *inherent* in the need to produce one of the specified forms of documentation to register to vote and

request an absentee ballot is sufficient to confer a constitutional injury." ECF No. 194-1 at 13 (emphasis added) (discussing *Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1351 (11th Cir. 2009)). But even assuming that a photo identification requirement (at issue in *Billups*) is comparable to a proof-of-citizenship requirement, Plaintiffs' theory cannot be reconciled with *Clapper*. Under *Clapper*, an injury must be fairly traceable to the challenged action, so someone who has a "similar incentive" to do something—here, to obtain and keep handy a passport or other identification reflecting citizenship—both before and after the law is enacted lacks standing. 568 U.S. at 417. In any event, not even the Eleventh Circuit reads *Billups* as broadly as Plaintiffs. Rather, as the court later clarified in *Wood v. Raffensperger*, 981 F.3d 1307, 1315 (11th Cir. 2020), "the burden to produce photo identification [in *Billups*] affected each voter in a personal way." *Cf. Jacobson v. Florida Sec'y of State*, 974 F.3d 1236, 1249 (11th Cir. 2020).[12]

**Competitive Standing.** DPPs claim to have competitive standing because "Leader Jeffries and Leader Schumer both have 'active candidacies for reelection to federal office' and 'some of their constituents and likely supporters may be unable to register to vote or may be dissuaded from registering' if § 3(d) is implemented due to their limited ability to provide or transmit DPOC." ECF No. 194-1 at 14–15 (quoting *LULAC v. Exec. Off. of the President*, 780 F. Supp. 3d 135, 192 (D.D.C. 2025) (discussing section 2(a))); *see* ECF No. 196-2 ¶¶ 23–27. Section 3(d), however, governs voter registration. Voters—not candidates—are objects of such rules. Section 3(d) does not "require or forbid" actions by candidates, *All. for Hippocratic Medicine*, 602 U.S. at 382, nor

---

[12] The Seventh Circuit's panel opinion in *Crawford v. Marion County Elections Board*, 472 F.3d 949, 951 (7th Cir. 2007), addressed associational standing in a single conclusory sentence, assuming that some Democrats would be "prevented from voting" by a new voter identifications law. The panel appears to have been thinking in terms of statistical standing, which *Summers v. Earth Island Institute*, 555 U.S. 488, 497–98 (2009), rejected two years later. 472 F.3d at 951 ("No doubt most people who don't have photo ID are low on the economic ladder and thus, if they do vote, are more likely to vote for Democratic than Republican candidates.").

24

does it target candidates' concrete interest in winning election, *see Diamond Alternative Energy, LLC v. EPA*, 145 S. Ct. 2121, 2138 (2025). It does not, for example, authorize electoral rivals to engage in "additional practices," and thus "illegally structure [the] competitive environment" in which candidates must defend their interests in gaining "elected office." *Shays v. FEC*, 414 F.3d 76, 86, 87 (D.C. Cir. 2005). The DPPs therefore cannot simply claim there is a risk that Section 3(d) affects Jeffries's and Schumer's election chances; it must provide "concrete evidence to substantiate [its] fears" that Section 3(d) will cost Jeffries and Schumer their election. *Clapper*, 568 U.S. at 420 (discussing the evidence provided in *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 153–155 & n.3 (2010)).

But all the DPPs provide is "a highly attenuated chain of possibilities." *Clapper*, 568 U.S. at 410. Even if (i) section 3(d) were implemented on some undetermined future date, and (ii) section 3(d) as implemented burdened overseas and military voters, and (iii) any such burdens yielded lower turnout for those demographics—itself a highly attenuated chain of possibilities— Plaintiffs' claim of competitive standing *still* fails because they have not demonstrated that any decreased turnout would harm *their candidates*. In *Bost v. Illinois State Board of Elections*, the Illinois Democrats told the Supreme Court that under *Clapper*, a politician claiming competitive standing to challenge the counting of allegedly invalid votes must show that the votes in question would cut against him. 2025 WL 2597334, at *12–13 (U.S. Sept. 2, 2025) (Amicus Brief for the Democratic Party of Illinois in Support of Respondents) ("Bost is surely right that if he succeeds in his lawsuit, some number of Illinois voters will have their ballots thrown out . . . . But those votes *also* may very well be for *Bost*."). Given that a large number of military voters identify as Republican, Plaintiffs cannot and do not explain why a DPOC requirement that applies to all UOCAVA voters is likelier to harm DPPs than it is to harm Republicans. *E.g.*, Joseph Copeland,

*Military veterans remain a Republican group, backing Trump over Harris by wide margin*, Pew Res. Ctr. (Sept. 30, 2024), *available at* https://www.pewresearch.org/short-reads/2024/09/30/military-veterans-remain-a-republican-group-backing-trump-over-harris-by-wide-margin/.

B.  Plaintiffs' claims challenging section 3(d) lack merit.

LULAC Plaintiffs challenge section 3(d) as ultra vires, and both LULAC and DPP Plaintiffs challenge it under the APA. In all counts, Plaintiffs contend that section 3(d) violates UOCAVA. *See* LULAC Compl. ¶¶ 208–12 (Count IV), 222–26 (Count VI); DPP Compl. ¶¶ 179–85 (Count VII), 205–12 (Count X); *see also, e.g.*, ECF No. 194-1 at 15 ("[T]he crux of Plaintiffs' claim is that requiring documentary proof of citizenship is, by itself, contrary to UOCAVA and unlawful."). Because it does not, even if there were jurisdiction, Defendants are entitled to judgment as a matter of law.

Section 3(d) is consistent with UOCAVA. That statute authorizes the Secretary of Defense to "prescribe an official post card form, containing both an absentee voter registration application and an absentee ballot application." 52 U.S.C. § 20301(b)(2). On its face, UOCAVA does not preclude the Secretary from requiring documentary proof-of-citizenship as part of the voter registration application. Although the Secretary must "consult State and local election officials" before doing so, *id.* § 20301(b)(1), the statute does not compel the Secretary to make a specific finding that the change is "necessary," as the EAC must do before adding additional information to the Federal Form under Section 20508(b).

Contrary to Plaintiffs' view (*e.g.*, ECF No. 194-1 at 25, 32–33; ECF No. 196-1 at 18, 19), the provision directing the Secretary to "prescribe a standard oath for use with any document under this chapter affirming that a material misstatement of fact in the completion of such a document

26

may constitute grounds for a conviction for perjury," 52 U.S.C. § 20301(b)(7), does not establish a UOCAVA violation here. That provision does not expressly relate to citizenship and does not implicitly forbid the Secretary from requiring documentary proof-of-citizenship under his authority in § 20301(b)(2). After all, under § 20508, an applicant using the Federal Form must "attest[]" to citizenship "under penalty of perjury," but that does not preclude the EAC from adding a documentary proof-of-citizenship requirement to the Federal Form under appropriate circumstances. *See Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 19–20 (2013). Similarly, UOCAVA's "standard oath" provision does not preclude the Secretary from adding a similar documentary proof-of-citizenship requirement to the post card form.

Likewise, Plaintiffs read too much into the term "post card" in 52 U.S.C. § 20301(b)(2), construing those words to preclude a documentation requirement because a literal postcard would not allow it. *E.g.*, ECF No. 194-1 at 25–26, 31–32; ECF No. 196-1 at 17 & n.3, 18, 19. Although the requirement that the form must be a "post card" might place some limit on the form of the voter registration application, it does not preclude a proof-of-citizenship requirement unless it is impossible to provide documentary proof of citizenship within the confines of a "post card form." But there is no reason to so conclude. The current "Federal Post Card Application" is not a traditional "postcard" at all, but a two-page 8 ½ x 11 form that explains applicants can either "[r]emove the adhesive liner from the top and sides" of the form and "[f]old and seal tightly," or, in the alternative, they may "print[] out the form," fold it, and "seal it in an envelope." Post Card Form, https://www.fvap.gov/uploads/fvap/forms/fpca.pdf (last visited Oct. 16, 2025).[13] If

---

[13] Moreover, some states allow applicants to electronically submit the Post Card Form. *See* "Why Should I Use VoteFromAbroad.org rather than the paper form?", Democratic Party Committee Abroad, https://www.votefromabroad.org/faqs/FP1 (last visited Oct. 16, 2025).

Plaintiffs' interpretation of § 20301(b)(2) were correct, then the current (and previous) post card form would have been inconsistent with the statute regardless of anything in the Executive Order.

Finally, Congressional purpose (ECF No. 194-1 at 24, ECF No. 196-1 at 17) is not a sound foundation for reading into the words "post card" a hidden and inflexible statutory prohibition on a documentary proof-of-citizenship requirement. *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 261 (1993) ("[V]ague notions of a statute's 'basic purpose' are nonetheless inadequate to overcome the words of its text regarding the *specific* issue under consideration."). More importantly, Plaintiffs' rationale that a documentary proof-of-citizenship requirement would constitute a roadblock because many citizens lack a passport is nonsensical as applied here to American citizens who are currently abroad and thus most likely *do* have a passport or other identifying document that permits them to travel outside the United States to another country. UOCAVA applies to "absent uniformed services voters and overseas voters," 52 U.S.C. § 20302(a)(1), who by definition are already "absent from the United States" or who "reside[] outside the United States," *id*. § 20310(5), and thus may have obtained such documentation prior to departing the United States. It is not burdensome to ask someone to photocopy a document that he or she would be expected to already have. *Cf. Crawford v. Marion County Elec. Bd.*, 553 U.S. 181, 188 n.6 & 202 (2008) (Stevens, J.) (noting for three Justices that a "single affidavit gives no indication of how common the problem is" and that 99% of Indiana's voting age population already had an ID card); id. at 206 (Scalia, J., concurring) (noting for three other Justices that the Court does not "consider the peculiar circumstances of individual voters").

### V.    The Plaintiffs' claims challenging section 4(a) are not justiciable and fail substantively.

EO section 4(a) directs the Election Assistance Commission ("EAC") to "cease providing Federal funds to States that do not comply with the Federal laws set forth in 52 U.S.C. [§] 21145,

including the requirement in 52 U.S.C. [§] 20505(a)(1) that States accept and use the national mail

voter registration form . . . , including any requirement for documentary proof of United States

citizenship adopted pursuant to section 2(a)(ii)." The DPPs argue that the Court should

permanently enjoin section 4(a) because it "graft[s] additional requirements for HAVA funds onto

the statute" and "invades Congress's exclusive spending power." ECF No. 196-1 at 40. But this

Court should grant summary judgment in favor of Defendants on the Plaintiffs' section 4(a) claims

because this Court lacks jurisdiction to consider it, and because section 4(a) simply requires that

states use the federal form, as the NVRA requires, whether the EAC updates it to require

documentary proof of citizenship or not.[14]

Plaintiffs lack standing to challenge section 4(a) for the same reasons that they lack

standing to challenge section 2(a): Plaintiffs' future injury is speculative because the EAC has not

completed its process to amend the federal form to require documentary proof of citizenship. ECF

No. 163 at 14–17. The DPPs argue that they have standing to challenge section 4(a) because "it is

framed as an unconditional order." ECF No. 196-1 at 39. But the harm they complain of is

"pressure" to comply with section 2(a)'s potential documentary proof of citizenship requirement

and not section 4(a)'s command to "comply with the Federal laws set forth in 52 U.S.C. 21145,"

standing alone, EO § 4(a); *see also* ECF No, 196-1 at 39. Because any injury resulting from section

2(a) is speculative, so is any injury resulting from 4(a).

Moreover, despite the DPPs' disclaimer that although section 4(a)'s "threat is directed

towards the States," that "does not change matters." ECF No. 196-1 at 39. Section 4(a) directs the

EAC to cease providing federal funds to *states* if they fail to comply with the laws set forth in 52

---

[14] The LULAC Plaintiffs do not move for summary judgment on claim challenging section 4(a).

U.S.C. § 21145. Plaintiffs lack standing to challenge section 4(a) because if any party is injured as a result of that provision it is the states and not Plaintiffs.

If this Court reaches the merits of Plaintiffs' section 4(a) claims, however, they still fail. DPPs argue that "Congress has expressly specified what federal laws States must comply with to obtain HAVA funds," and the President may not add to these, not least of all through his unlawful effort to add a DPOC requirement to the Federal Form." ECF No. 196-1 at 40. But section 2(a) and 4(a) are separate provisions. Section 4(a) does not direct the addition of a documentary proof of citizenship requirement to the federal form. It directs the EAC to apply existing conditions set forth in HAVA.

For a state to be "eligible to receive a requirements payment" under HAVA, 52 U.S.C. § 21003(a) requires the state's "chief executive officer . . . or designee . . . [to] certify[] that the State is in compliance with the requirements referred to in subsection (b)," which include "compliance with each of the laws described in section 21145," *id*. § 21003(b)(3). The laws named in 52 U.S.C. § 21145 include the NVRA, among others. *Id*. § 21145(a). And the NVRA requires that states use the federal form developed by the EAC. *See id*. § 20505(a)(1); *see also id*. § 20508(a)(1). Thus, to be eligible to receive HAVA requirements payments, states must "accept and use" the EAC's federal form—no matter the current version—"including *any* requirement for documentary proof citizenship adopted" by the EAC. EO § 4(a) (emphasis added). The use of the word "any" is distinct and conveys a degree of uncertainty. Section 4(a) does not say "including *the* requirement for documentary proof of citizenship" that the EAC will adopt. It says any requirement—as in if such a requirement is added in the future, it will be folded into the statutory requirement to use the federal form. Section 4(a) merely requires compliance with the laws set

forth in § 21145, and the President has the authority to direct Executive agencies to apply existing statutory conditions. *See supra* II.

## VI. Plaintiffs' claims challenging section 7 are not justiciable and fail substantively.

### A. Plaintiffs' claims challenging section 7(a) and (b) are not justiciable.

Section 7(a) instructs the Attorney General to "take all necessary action to enforce 2 U.S.C. § 7 and 3 U.S.C. § 1 against States that violate" them "by including absentee or mail-in ballots received after Election Day in the final tabulation of votes" for federal elections. Plaintiffs lack standing to challenge section 7(a) because how it will be enforced is a matter of Executive discretion and may be done lawfully. What the extent of those enforcement efforts will be and how it will be enforced is speculative and not a basis for Article III standing regarding present injury. ECF No. 177-1 at 12. This Court determined that Plaintiffs were unlikely to succeed on the merits of their claim because, in light of section 11, which requires that the EO be "implemented consistent with applicable law," section 7(a) may be implemented lawfully. *League of United Latin Am. Citizens v. Exec. Off. of the President*, 780 F. Supp. 3d 135, 213 (D.D.C. 2025). That is still the case.

Further, Plaintiffs' alleged injuries are not redressable by an order enjoining the Attorney General from taking enforcement action under section 7(a) because it "directs enforcement 'against' States, not private parties" and "anti-enforcement injunctions blocking civil or criminal suits by the government are typically brought by the party that would be the defendant in the enforcement action, rather than by a third party that may suffer collateral harm from enforcement." *Id*. at 214. Because Plaintiffs are not the proper parties to challenge section 7(a), they lack standing to contest this provision.

*Diamond Alternative Energy, LLC v. EPA*, 145 S. Ct. 2121 (2025), does not change that analysis, contrary to the DPPs' argument that it "indicates" they "have standing to challenge § 7 given the predictable consequences it will impose on them." ECF No. 196-1 at 25. In *Diamond Alternative Energy*, fuel producers sought to challenge California regulations that require automakers to manufacture more electric vehicles and fewer gasoline-powered vehicles. 145 S. Ct. at 2129. To determine whether the fuel producers had standing, the Court had to "distinguish the 'predictable' from the 'speculative' effects of government action or judicial relief on third parties." *Id*. at 2134. Specifically, whether "third parties will likely react to [California's] regulation (or judicial relief) in predictable ways that will likely cause (or redress) the [fuel producers'] injury." *Id*. (citation modified). The Court held they had standing because the regulation would likely result in a decrease in fuel purchases that could be redressed in part by invalidating the regulation. *Id*. at 2135.

Here, Plaintiffs are not regulated by section 7, and there are too many unknowns to premise standing on the "predictable" actions of third parties not before the court—because what actions occur are anything but predictable. As explained, the extent of the efforts that the Attorney General will take to enforce section 7(a) is uncertain. And since the predicate action itself is uncertain, it is nearly impossible to predict how the states will react to that action. Any injury resulting from section 7(a) is too speculative to support standing at this juncture.

Even beyond these threshold issues, Plaintiffs also lack organizational, associational, and political-competitor standing. ECF No. 194-1 at 16–21; ECF No. 196-1 at 23–25.

**Organizational standing**. "Organizations can establish their own standing by 'mak[ing] the same showing required of individuals: an actual or threatened injury in fact that is fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by a favorable

court decision.'" *Am. Anti-Vivisection Soc'y v. U.S. Dep't of Agric.*, 946 F.3d 615, 618 (D.C. Cir. 2020) (quoting *Am. Soc'y for Prevention of Cruelty to Animals v. Feld Ent., Inc.*, 659 D.3d 13, 24 (D.C. Cir. 2011)). "To demonstrate injury in fact, an organization must allege a 'concrete and demonstrable injury to the organization's activities' that is 'more than simply a setback to the organization's abstract social interests.'" *Id*. (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)). Plaintiffs assert that they are injured by section 7(a), which makes it more difficult for them "to accomplish their primary mission" to ensure that its members' votes are counted and they will have "to divert resources toward providing additional direct services designed to offset the harmful effects of the challenged conduct." ECF No. 194-1 at 16–17; *see also* ECF No. 196-1 at 24. The DPPs argue that as "long as the threat of enforcement looms" against the states that they "cannot make decisions needed to prosecute the 2026 campaign." ECF No. 196-1 at 24. But, as explained, any injury resulting from section 7(a) is speculative. Taking Plaintiffs' alleged harms head on, however, section 7(a) does not eliminate mail-in ballots—it simply directs enforcement of a uniform ballot receipt deadline. Plaintiffs do not explain or provide evidence substantiating why they cannot instruct individuals to cast their mail-in ballots early or provide evidence demonstrating they are unable to do so. They also do not explain why they cannot make the strategic decision to proceed as if mail-ballots are due by the earlier of the two possibilities—Election Day, something that is already true in many states.[15] Additionally, Plaintiffs contend that they will have to divert resources to educate their members on new mail-in ballot windows. ECF No. 194-1 at 17. And, as explained in relation to section 3(d), "standing" does not routinely "exist[] when an organization diverts its resources in response to a defendant's

---

[15] Table 11: Receipt and Postmark Deadlines for Absentee/Mail Ballots, NCSL (Aug. 1, 2025), https://www.ncsl.org/elections-and-campaigns/table-11-receipt-and-postmark-deadlines-for-absentee-mail-ballots.

actions." *FDA*, 602 U.S. at 370. Further, that Plaintiffs may have to change their educational efforts and materials, ECF No. 194-1 at 17, is immaterial. As get-out-the-vote entities, Plaintiffs must consistently adapt in response to any number of strategic shifts and factual developments in election law. *See, e.g.*, ECF 198-10 ¶ 2 (DPP declarant asserting that she re-trains "each election year to ensure that our practices remain current and consistent with UOCAVA," for example).

**Associational standing.** An organization has associational standing if "(a) its members would otherwise have standing to sue in their own right; (b) the interests [the organization] seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977); *Elec. Priv. Info. Ctr. v. U.S. Dep't of Com.*, 928 F.3d 95, 101 (D.C. Cir. 2019). The LULAC Plaintiffs assert they have associational standing because their members would be injured as a result of section 7(a) because many of them live in rural areas where mail is unreliable and must receive mail-in ballots closer to Election Day or mail their ballots "a day or two before Election Day." ECF No. 194-1 at 19. Similarly, they contend that some of their elderly members must rely on others to mail their ballots and they are often mailed close to Election Day. And student members must utilize "unreliable dorm mail service. *Id*. Similarly, "the nature of military service means that SFI members are heavily reliant on absentee voting and often experience routine mail delivery delays" making voting on time difficult. *Id*. The DPPs also argue that their members are "discouraged from voting by mail due to concern and confusion about the operative receipt deadlines, and their ballots may be discarded if § 7 is enforceable." ECF No. 196-1 at 24–25. Again, any injury flowing from section 7(a) is speculative at this juncture. But even so, the alleged injuries that the LULAC Plaintiffs describe are not traceable to altering the ballot receipt deadline. Moving up the date would simply require

LULAC's members to begin the process for obtaining and returning their ballots earlier or to engage in early voting—the difficulties these individuals face related to the mail are not a result of the EO.

And any voter confusion resulting from section 7(a) is speculative because section 7(a) would have to first be enforced against a state, and a state would have to change its ballot receipt deadline. The DPPs' declarations bear this out because they are framed in terms of whether the individual would be confused *if* a state's deadline were changed. ECF No. 196-2 ¶ 64 ("[I]f Texas's [mail ballot receipt deadline] is changed by the federal government, it would make me significantly more hesitant to vote by mail and would force me to consider alternative, more burdensome voting methods."); *id*. ("Changing states' mail ballot receipt deadlines will confuse voters and make it more likely that they will be disenfranchised). Plaintiffs therefore lack associational standing.

**Competitor standing.** Political competitors may have Article III standing to challenge the "illegal structuring of a competitive environment" in which "rival parties defend their concrete interests." *Shays v. Fed. Election Comm'n*, 414 F.3d 76, 85–87 (D.C. Cir. 2005). The DPPs argue they have political-competitor standing because section 7 "illegally structures the campaign environment" to their detriment because it disadvantages Democratic voters since the Republican Party "has placed significantly less emphasis on mail voting in recent elections." ECF No. 196-1 at 24. Not so. First, all section 7(a) does is direct the Attorney General to "take all necessary action to enforce" the Election Day statutes against the states that accept mail-in ballots after Election Day. On its own, section 7(a) does not direct candidates to do or not do anything or have any effect on what ballots are counted or not counted; rather, section 7(a) directs the Attorney General to take certain actions, currently unknown, that may "incidentally" affect certain candidates. *Clapper*, 568 U.S. at 414. As a result, the injuries to the DPP's candidates are "one-step-removed" from the EO

the DPP challenges. *Murthy v. Missouri*, 603 U.S. 43, 57 (2024). Simply put, candidates are not a direct object of an EO directing the Attorney General to take certain actions against States, and so, consistent with cases like *Clapper*, plaintiffs must show that the Attorney General will take steps pursuant to section 7(a)—as opposed to other provisions—in a way that jeopardizes the DPP's candidates' ability to win their races, *see id.* at 411–414.

Thus, the DPPs' claim of competitive standing fails because they have not shown that the Attorney General will take certain steps pursuant to section 7(a) that will cost their candidates their races. To be sure, the DPPs attach evidence supporting that President Trump has criticized mail-in voting, and more Democrats voted by mail than Republicans in the 2024 general election. ECF No. 196-1 at 24; ECF No. 196-2 ¶¶ 37–47, 54. But those two things do not prove that in a future election, Democratic candidates would be disadvantaged by a generally-applicable, earlier mail-in-ballot receipt deadline.

For similar reasons, Plaintiffs lack standing to challenge section 7(b), which conditions funding for states on their compliance with the Election Day statutes' uniform ballot-receipt deadline for all forms of voting.

B.  Plaintiffs' claims challenging section 7(a) and (b) lack merit.

Section 7(a) directs the Attorney General to "take all necessary action to enforce 2 U.S.C. § 7 and 3 U.S.C. § 1 against States that violate these provisions by including absentee or mail-in ballots received after Election Day in the final tabulation of votes for the appointment of Presidential electors and the election of members of the United States Senate and House of Representatives." Plaintiffs assert that section 7 is ultra vires and violates the separation of powers because, in their view: "the Election Day Statutes do not set a uniform ballot receipt deadline"; the history from the time of the adoption of the Election Day statutes does not "indicate[] that they

preempt ballot receipt deadlines"; Congress knew that states accepted mail-in ballots after Election Day and "embraced it"; and many courts purportedly have concluded that "the text of the Election Day statutes require[s] only that all votes are cast by Election Day, not that they are received by that date." ECF No. 196-1 at 31–37; *see also* ECF No. 194-1 at 33–41. They are wrong.

The Election Day statutes set forth a uniform ballot receipt deadline, and the President has the authority to execute those statutes. Specifically, 2 U.S.C. § 7 and 3 U.S.C. § 1 "mandate[] holding all elections for Congress and the Presidency on a single day throughout the Union." *Foster v. Love*, 522 U.S. 67, 70 (1997); *see also* ECF No. 177-1 at 40. The only federal court of appeals to have considered what it means to set a "day for the election," 2 U.S.C. § 7, held that "[r]eceipt of the last ballot . . . constitutes consummation of the election," which "must occur on Election Day." *Republican Nat'l Comm. v. Wetzel*, 120 F.4th 200, 209 (5th Cir. 2024).

In *Wetzel*, 120 F.4th at 200, the court addressed a Mississippi statute permitting mail-in absentee ballots to be accepted if they are postmarked on or before the day of election and received up to five days after the federal election, *id*. at 204–05. The court held that the Mississippi statute was preempted by 2 U.S.C. § 7 and 3 U.S.C. § 1 and their establishment of "the day for the election" and "election day." *See id*. at 206–09. The *Wetzel* court reasoned that the Supreme Court's decision in *Foster v. Love* understood the text of the Election Day statutes—particularly the words "the day for the election"—to entail three elements: "(1) official action, (2) finality, and (3) consummation." *Wetzel*, 120 F.4th at 207; *see Love*, 522 U.S. at 71 ("When the federal statutes speak of 'the election' of a Senator or Representative, they plainly refer to the combined actions of voters and officials meant to make a final selection of an officeholder" and the statutes

"establish[] a particular day as 'the day' in which these actions must take place."); *id.* at 72 n.4 (federal election "may not be consummated prior to federal election day").

The "official action" required by the Election Day means that "a ballot is 'cast' when the State takes custody of it." *Wetzel*, 120 F.4th at 207. Were it otherwise, a State could "allow voters to mark their ballots and place them in a drawer," or "mark a ballot and then post a picture on social media," which would be "obviously absurd." *Id.*

The "finality" required by the Election Day statutes requires "final ballots" to be "received." *Id.* Under state regulations, however, an absentee ballot "is 'final' when accepted by [State] election officials," *id.* at 208, not merely when the voter submits in the mail. Federal postal service regulations likewise "permit[] senders to recall [domestic] mail," which further reinforces the conclusion "that at least domestic ballots are not cast when mailed." *Id.*

As for "consummation," the Election Day statutes require "the proverbial ballot box [to be] closed" on the day specified in the statute, at which point "officials know there are X ballots to count" because no further ballots can be received. *Id.* at 209. While "counting ballots" may continue after Election Day, because "it can take additional time to tabulate the election results," the "[r]eceipt of the last ballot, by contrast, constitutes consummation of the election, and it must occur on Election Day." *Id.* Thus, the Election Day statutes set forth a uniform ballot receipt deadline for all votes—including mail-in or absentee votes—for federal elections.

Article II, section 3 of the Constitution charges the President with the duty to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3. The President therefore has the duty to ensure that the Election Day statutes are faithfully executed, including their uniform ballot-receipt deadline. Section 7(a) was simply a lawful use of that authority.

Nonetheless, Plaintiffs argue that (1) Congress has been aware of the lengthy history of states accepting mail-in ballots after Election Day and embraced; and (2) "Congress's choice to incorporate" those state laws "into UOCAVA reflects that it plainly did not believe the Election Day Statutes imposed a uniform national deadline." ECF No. 196-1 at 34–35; *see also* ECF No. 194-1 at 36. The Help America Vote Act, 52 U.S.C. § 21082, does "authorize post-Election Day voting," and UOCAVA, 52 U.S.C. § 20307(a), "also permits post-Election Day balloting." Wetzel, 120 F.4th 212-13. But all those statutes show is that "Congress knew how to authorize post-Election Day voting when it wanted to do so," and that such narrow exceptions "do[] not impliedly repeal all of the other federal laws that impose a singular, uniform Election Day for every other voter in America." *Id.* at 212. The same is true for "other Election Day exceptions" in federal law, such as congressional election in the event of a vacancy, authorization for a run-off election, or modifying the period of voting for force majeure events. *Id.* at 213.

Plaintiffs attempt to distinguish *Wetzel* as an "outlier" and that "courts have overwhelmingly concluded that "the text of the Election Day Statutes require[s] only that all votes are cast by Election Day, not that they are received by that date." ECF No. 196-1 at 35. But *Wetzel* is the only federal court of appeals to have considered what it means for ballot-receipt deadlines to set a "day for the election," 2 U.S.C. § 7. None of the authorities that Plaintiffs cite consider when ballots must be received under the Election Day statutes.

*Foster v. Love*, 522 U.S. 67 (1997), did not consider this question. Rather, it acknowledged that "there is room for argument about just what may constitute the final act of selection within the meaning of the law," and declined to resolve that question because the case (which addressed when the proceedings of an "election" should start, and not when they would end) did not squarely present it. *Foster*, 522 U.S. at 72. Neither *Republican National Committee v. Democratic National*

*Committee*, 589 U.S. 423, 424 (2020) nor *Democratic National Committee v. Wisconsin State Legislature*, 141 S. Ct. 28, 34 (2020) (Kavanaugh, J., concurring), directly implicated whether states could lawfully receive mail-in ballots after Election Day, so any statements concerning that question are dicta. *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 67 (1996) (contrasting dictum with holdings, which include the final disposition of a case as well as the preceding determinations "*necessary* to that result" (emphasis added)); *In re Grand Jury Investigation*, 916 F.3d 1047, 1053 (D.C. Cir. 2019) ("[A] statement not necessary to a court's holding is dictum."). *Bost v. Illinois State Board of Elections*, 114 F.4th 634 (7th Cir. 2024), reached only the question of standing, not the merits, and even on that question the Supreme Court granted certiorari, thus making the ultimate outcome of this decision unclear, *Bost v. Illinois State Bd. of Elections*, 145 S. Ct. 2751 (2025). And *Bognet v. Sec'y Commw. of Pa.*, 980 F.3d 336, 364 (3d Cir. 2020), *vacated as moot sub nom. Bognet v. Degraffenreid*, 141 S. Ct. 2508 (2021) (mem.), similarly did not reach the merits. *Donald J. Trump for President, Inc. v. Way*, 492 F. Supp. 3d 354 (D.N.J. 2020), is an un-appealed district court opinion decided in the context of a preliminary injunction motion seeking injunctive relief on the eve of an election, *id*. at 375–76. As such, it has no precedential force here, especially as compared to the unanimous court of appeals decision in *Wetzel*. And finally, in *Pennsylvania Democratic Party v. Boockvar*, 238 A.3d 345 (Pa. 2020), the case turned on state constitutional law, *id.* at 371–72, and the federal statutory argument was not squarely presented, *id.* at 368 & n.23. Because the Election Day statutes set forth a uniform ballot-receipt deadline requiring mail-in ballots to be received by Election Day, and the President must take care that the laws, including the Election Day statutes, are faithfully executed, this Court should dismiss Plaintiffs' claims challenging section 7(a).

For the same reasons, section 7(b) is not ultra vires or a separation-of-powers violation. ECF No. 177-1 at 44–45. The Election Day statutes include a uniform ballot-receipt deadline for mail-in ballots as well as ballots cast in person. Treating mail-in ballots differently is discriminatory. And the President has the authority to enforce an existing funding condition in 52 U.S.C. § 21081(a)(6). And Plaintiffs' claims challenging 7(b) should also be dismissed.

## VII.    Plaintiffs are not entitled to the remedies they seek.

Finally, Plaintiffs argue that they are entitled to a declaratory judgment and a permanent injunction on their claims challenging sections 2(d), 3(d), 4(a), 7(a), and 7(b).[16] ECF No. 196-1 at 60; ECF No. 194-1 at 42–43. They are not entitled to either remedy because all of Plaintiffs' claims fail on the merits.

Additionally, Plaintiffs are not entitled to, and their claims are not redressable by, an injunction or a declaratory judgment against the President and his Executive Office. Plaintiffs do not seek an injunction against the President, which they are not entitled to in any event. *See* ECF No. 145-1 at 36; ECF No. 146-1 at 27 n.7; *Franklin v. Massachusetts*, 505 U.S. 788, 802 (1992) (plurality). And they also lack standing to seek a declaratory judgment against the President. *McCray v. Biden*, 574 F. Supp. 3d 1, 10–11 (D.D.C. 2021). This Court should therefore dismiss Plaintiffs' claims seeking a declaratory judgment against the President.

Plaintiffs also have not made the showing necessary to obtain a permanent injunction. To obtain a permanent injunction, Plaintiffs would have to show "(1) that [they have] suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between . . . [P]laintiff[s]

---

[16] The DPPs do not ask for a permanent injunction or declaratory judgment regarding their request for partial summary judgment on Count IX and the SAVE updates. ECF No. 196-1 at 60.

and [D]efendant[s], a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Anatol Zukerman & Charles Krause Reporting, LLC v. USPS*, 64 F.4th 1354, 1364 (D.C. Cir. 2023) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)). Plaintiffs cannot make that showing because, as explained above, all their claims should be dismissed for lack of jurisdiction or because there is no genuine issue of material fact and that the President's directives in EO 14248 are lawful.

## CONCLUSION

For the foregoing reasons, the Court should grant summary judgment to Defendants on all of Plaintiffs' claims, excluding the separately briefed challenges to section 2(a).

Dated: October 17, 2025

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

ERIC J. HAMILTON
Deputy Assistant Attorney General
Civil Division, Federal Programs Branch

JOSEPH E. BORSON
Assistant Director
Civil Division, Federal Programs Branch

/s/ Bridget K. O'Hickey
BRIDGET K. O'HICKEY
Counsel to the Assistant Attorney General
U.S. Department of Justice, Civil Division
950 Pennsylvania Avenue,
NW Washington, DC 20530
(202) 353-8679
Bridget.K.O'Hickey@usdoj.gov

MARIANNE F. KIES
WINSTON SHI
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20005
(202) 353-1819
Marianne.F.Kies@usdoj.gov

*Attorneys for Defendants*