## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.*, | |
| *Plaintiffs*, | |
| v. | Civil Action No. 25-0946 (CKK) |
| EXECUTIVE OFFICE OF THE PRESIDENT, *et al.*, | |
| *Defendants*. | |

| | |
|---|---|
| DEMOCRATIC NATIONAL COMMITTEE, *et al.*, | |
| *Plaintiffs*, | |
| v. | |
| DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*, | Civil Action No. 25-0952 (CKK) |
| *Defendants,* | |
| and | |
| REPUBLICAN NATIONAL COMMITTEE, | |
| *Intervenor-Defendant.* | |

| | |
|---|---|
| LEAGUE OF WOMEN VOTERS EDUCATION FUND, *et al.*, | |
| *Plaintiffs*, | |
| v. | Civil Action No. 25-0955 (CKK) |
| DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*, | |
| *Defendants*. | |

## REPLY MEMORANDUM IN SUPPORT OF LULAC PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................................1

ARGUMENT .........................................................................................................................2

I.    Plaintiffs Are Entitled To Summary Judgment On Their Claim Challenging Section 3(d) Of The Executive Order .....................................................................................2

    A.  Plaintiffs Have A Ripe and Fully Justiciable Claim, Standing, and A Cause of Action Challenging Section 3(d) .............................................................................2

        1.  Plaintiffs have organizational standing to challenge Section 3(d) of the Executive Order ................................................................................................3

        2.  Plaintiffs have associational standing to challenge Section 3(d) of the Executive Order ................................................................................................5

        3.  Plaintiffs have an equitable cause of action to challenge Section 3(d) of the Executive Order ................................................................................................6

    B.  Section 3(d) Violates UOCAVA .............................................................................8

II.    Plaintiffs Are Entitled To Summary Judgment On Their Claim Challenging Section 7(a) Of The Executive Order ..................................................................................10

    A.  Plaintiffs Have A Ripe and Fully Justiciable Claim, Standing, and A Cause of Action Challenging Section 7(a) ..........................................................................11

        1.  Plaintiffs have established organizational standing .......................................13

        2.  Plaintiffs have established associational standing .........................................15

        3.  Plaintiffs have an equitable cause of action to challenge Section 7(a) ...........16

    B.  Section 7(a) Is *Ultra Vires* Of The President's Constitutional Authority ...............18

III.   Defendants Are Not Entitled To Discovery Or Delay Of Judgment As To Plaintiffs Section 7(a) and 3(d) Claims Under Rule 56(d) .........................................................24

    CONCLUSION.....................................................................................................................25

i

## TABLE OF AUTHORITIES

*Authorities upon which this brief chiefly relies are marked with an asterisk.*

**Cases**                                                                 **Pages**

*Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1 (2013)..................................9

*\*California v. Trump*, 786 F. Supp. 3d 359 (D. Mass. 2025)............................1, 2, 9, 21

*\*Chamber of Commerce of U.S. v. Reich*, 74 F.3d 1322 (D.C. Cir. 1996).........................7, 17, 18

*Charles H. Wesley Education Foundation, Inc. v. Cox*, 408 F.3d 1349 (11th Cir. 2005) ............14

*Clinton v. City of New York*, 524 U.S. 417 (1998) ........................................................10

*Convertino v. U.S. Department of Justice*, 684 F.3d 93 (D.C. Cir. 2012)..............................24, 25

*Democratic National Committee v. Wisconsin State Legislature*, 141 S. Ct. 28 (2020)..........21, 22

*Diamond Alternative Energy, LLC. v. EPA*, 145 S. Ct. 2121 (2025)..............................12

*FBME Bank Ltd. v. Lew*, 142 F. Supp. 3d 70 (D.D.C. 2015) ...........................................22

*\*Food and Drug Administration v. Alliance for Hippocratic Medicine* ("*AHM*"),
    602 U.S. 367 (2024)....................................................................................4, 14, 15

*Foster v. Love*, 522 U.S. 67 (1997) ..............................................................................19

*Frankin v. Massachusetts*, 505 U.S. 788 (1992) ...........................................................7

*Global Health Council v. Trump*, 153 F.4th 1 (D.C. Cir. 2025)..................................7, 17

*Gordon v. Lynch*, 817 F.3d 804 (D.C. Cir. 2016) .........................................................22

*Havens Realty Corporation v. Coleman*, 455 U.S. 363 (1982)..................................4, 15

*\*League of United Latin American Citizens v. Executive Office of the President* ("*LULAC*"),
    780 F. Supp. 3d 135 (D.D.C. 2025) ...............................................3, 5, 6, 17

*Millsaps v. Thompson*, 259 F.3d 535 (6th Cir. 2001) ....................................................19

*National Fair Housing Alliance v. Carson*, 330 F. Supp. 3d 14 (D.D.C. 2018) ..........................4

*National Institutes of Health v. American Public Health Association* ("*APHA*"),
    145 S. Ct. 2658 (2025)...............................................................................22

*National Treasury Employees Union v. Vought*, 149 F.4th 762 (D.C. Cir. 2025) .........................17

*PETA v. USDA*, 797 F.3d 1087 (D.C. Cir. 2015)...........................................................4

*PFLAG, Inc. v. Trump*, 766 F. Supp. 3d 535 (D. Md. 2025)................................................7

*Republican National Committee v. Wetzel*, 120 F.4th 200 (5th Cir. 2024)........................18, 19, 20

*Rowland v. Walker*, 245 F. Supp. 2d 136 (D.D.C. 2003) ...............................................................25

*Service Employees International Union National Industries Pension Fund v. Castle Hill Health
    Care Providers, LLC*, 312 F.R.D. 678 (D.D.C. 2015) ...........................................................25

*Soucie v. David*, 448 F.2d 1067 (D.C. Cir. 1971)............................................................................7

*Steffel v. Thompson*, 415 U.S. 452 (1974).....................................................................................13

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014) .............................................................13

*Susman Godfrey LLP v. Executive Office of the President*, No. 25-cv-1107,
    2025 WL 1779830 (D.D.C. June 27, 2025) ...........................................................................17

*Taniguchi v. Kan Pacific Saipan, Ltd.*, 566 U.S. 560 (2012) ..........................................................9

*United States v. Alabama*, 857 F. Supp. 2d 1236 (M.D. Ala. 2012) .............................................10

*Voting Integrity Project, Inc. v. Keisling*, 259 F.3d 1169 (9th Cir. 2001)........................19, 20, 23

*\*Youngstown Sheet & Tube Company v. Sawyer*, 343 U.S. 579 (1952) ...................................7, 17

**Statutes and Rules**

2 U.S.C. § 7................................................................................................................................18, 23

3 U.S.C. § 1................................................................................................................................18, 23

3 U.S.C. § 21..............................................................................................................................18, 22

52 U.S.C. § 20301 *et seq*.............................................................................................................1, 18

52 U.S.C. § 20301(b)(2) .................................................................................................................... 8

52 U.S.C. § 20301(b)(7) .................................................................................................................... 8

52 U.S.C. § 20302(a)(4)..................................................................................................................8, 9

52 U.S.C. § 20508(b)(1) .................................................................................................................... 9

Fed. R. Civ. P. 56(d)........................................................................................................................24

**Constitutional Provisions**

U.S. Const. art. 1, § 4................................................................................................................18, 22

**Other Authorities**

Consolidated Appropriations Act of 2023, Pub. L. No. 117-328, 136 Stat. 4459 (2022)..............22

Executive Order No. 14,248 (Mar. 25, 2025) ...........................................................................2, 11

Josiah Henry Benton, *Voting in the Field: A Forgotten Chapter of the Civil War* (1915).......20, 21

*League of United Latin American Citizens v. Executive Office of the President*, Civil Action No. 25-0946 (CKK) (D.D.C. Oct. 31, 2025) (ECF 218) ("Mem. Op.") ........................ 3, 5, 6, 16

*Mail Ballot Deadlines, 2012-2022*, U.S. Election Assistance Commission, https://perma.cc/JYG6-U2BQ ........................................................................................22

USA.gov, *Requirements to Join the U.S. Military*, https://perma.cc/ED9B-XWK3 (last updated Aug. 27, 2025) ..........................................................................................................................5

U.S. Election Assistance Commission, Docket No. EAC-2013-0004, Memorandum Concerning State Requests to Include Additional Proof-of-Citizenship Instructions on the National Mail Voter Registration Form (Jan. 17, 2014)...............................................................................9

## INTRODUCTION

Defendants contend that the President can unilaterally: (1) command that the Secretary of Defense change the Post Card Form for military and overseas voters, a form created and governed by federal statute, to require documentary proof of citizenship (Section 3(d)); and (2) demand States change their State law ballot receipt deadlines or else face Attorney General "enforce[ment]" action (Section 7(a)). But Defendants' attempts to conjure authority for the President to take such actions fail. Section 3(d) is contrary to the Uniform Overseas Citizens Absentee Voting Act ("UOCAVA"), 52 U.S.C. § 20301 *et seq*., and Section 7(a) is *ultra vires* of the President's authority under the Constitution.

Defendants further contend that Plaintiffs' lawsuit is premature, arguing that Plaintiffs "misconstrue the terms of the Executive Order[] and the agency actions that it contemplates," that Plaintiffs' 3(d) arguments require "a highly attenuated and speculative chain of contingencies that is not likely to occur," and that Plaintiffs' 7(a) arguments fail because "the extent of the efforts that the Attorney General will take to enforce section 7(a) is uncertain." ECF 213 at 1, 7 n.7, 32. All the while, Defendants fail to mention that Section 3(d) has not been implemented because the provision has been enjoined by another federal court. *California v. Trump*, 786 F. Supp. 3d 359, 395–96 (D. Mass. 2025). And Section 7(a)—contrary to Defendants' explicit assertions—is *already* being enforced by the U.S. Department of Justice, which sent at least one State a letter on September 29, 2025 threatening "costly litigation in federal court" if the State does not "take immediate action" to change its State ballot receipt statutes to conform to the federal government's preferred ballot receipt deadline. *See* Ex. A (written testimony of Ohio Secretary of State Frank LaRose). Plaintiffs Secure Families Initiative ("SFI") and League of United Latin American Citizens ("LULAC") and their members rely on the Post Card Form to register and vote and rely

1

on many States' post-Election Day ballot receipt deadlines to ensure their absentee and vote-by-mail ballots are counted. Plaintiffs have standing, equitable causes of action, and ripe and fully justiciable claims as to both provisions. LULAC Plaintiffs thus ask this Court to grant summary judgment as to their claims regarding Sections 3(d) and 7(a) of the Executive Order.

## ARGUMENT

### I.    Plaintiffs Are Entitled To Summary Judgment On Their Claim Challenging Section 3(d) Of The Executive Order

Section 3(d) purports to direct the Secretary of Defense to "update" the Post Card Form used by military and overseas voters to require documentary proof of citizenship. E.O. § 3(d). Specifically, it requires documentary proof of citizenship "as defined by" Section 2(a)(ii) of the Executive Order. Exec. Order No. 14,248 § 3(d)(i) (Mar. 25, 2025). Section 2(a)(ii), in turn, provides a short, specific list of documents that would satisfy the Executive Order's documentary proof of citizenship requirements. Plaintiffs have a ripe and fully justiciable claim challenging this provision of the Executive Order and are entitled to summary judgment because the provision is contrary to UOCAVA.

### A.    Plaintiffs Have A Ripe and Fully Justiciable Claim, Standing, and A Cause of Action Challenging Section 3(d)

Defendants assert that the Secretary's failure, as of yet, to modify the Post Card Form in response to the Executive Order is a threshold barrier to the justiciability of Plaintiffs' claim. ECF 213 at 20–21. Not so. First, it is no surprise that the Secretary has not yet fully implemented Section 3(d) of the Executive Order as he is enjoined from doing so by another federal court. *California v. Trump*, 786 F. Supp. 3d 359, 395–96 (D. Mass. 2025). Moreover, as Plaintiffs explain in their cross-motion and Defendants do not contest, Defendants' Statement of Undisputed Material Facts states: "The Department of Defense has not *completed* the process for updating the Federal Post

Card Form pursuant to section 3(d) of the Executive Order." ECF 194-1 at 15 n.7 (citing ECF 177-2 ¶ 5) (emphasis added). It is thus clear that Defendants have at least *started* updating the Post Card Form.

Second, there is no ambiguity as to what Section 3(d) mandates the Secretary to do or what the final outcome of that mandate will be. Like Section 2(a)'s clear direction to the Election Assistance Commission to require specific forms of documentary proof of citizenship on the Federal Form, Section 3(d) provides a clear command to the Secretary of Defense to require the same specific forms of documentary proof of citizenship as a precondition to being able to use the Post Card Form. This case is ripe for review. *See League of United Latin Am. Citizens v. Exec. Off. of the President*, Civil Action No. 25-0946 (CKK) (D.D.C. Oct. 31, 2025) at 38–43 ("Mem. Op."); *see also League of United Latin Am. Citizens v. Exec. Off. of the President ("LULAC")*, 780 F. Supp. 3d 135, 184 (D.D.C. 2025); ECF 145-2 (Nonpartisan Plaintiffs' SUMF ¶¶ 32, 37–41, 61, 66, 71, 78–86).[1]

### 1. Plaintiffs have organizational standing to challenge Section 3(d) of the Executive Order.

Defendants' repeated contention that the final contents of the Post Card Form are mere "speculation" fares no better in their challenge to Plaintiffs' organizational standing. ECF 213 at 21. Once again, the Executive Order is crystal clear as to its requirements for documentary proof of citizenship on the Post Card Form, requiring the same forms as would be required under Section 2(a) of the Order. There is nothing speculative about the scope of requirement itself or the injury

---

[1] As Plaintiffs explain in their cross-motion, their "claim centers not on the proof of eligibility requirement, but on the documentary proof of citizenship requirement in Section 3(d)." ECF 194-1 at 15. Thus, it is of no moment that "there are no facts in the record to suggest what 'proof of eligibility' might suffice." ECF 213 at 21.

that it causes to Plaintiffs.[2] Furthermore, Defendants once again misrepresent the core holding of *Food and Drug Admin. v. All. for Hippocratic Med. ("AHM")*, 602 U.S. 367 (2024). ECF 213 at 21.[3] *AHM* reaffirms the central holding of *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982). *See AHM*, 602 U.S. at 395–96. And *Havens* instructs that while the impairment of an "organization's abstract social interests" does not suffice to confer standing, *AHM*, 602 U.S. at 394 (quoting *Havens*, 455 U.S. at 379), interference with the organization's "core business activities" is a constitutionally cognizable injury, *AHM*, 602 U.S. at 395 (citing *Havens*, 455 U.S. at 379).

Here, Plaintiffs' "core business activities" include assisting their members and constituencies in registering to vote and requesting an absentee ballot with the Post Card Form. ECF 194-1 at 9. As Plaintiffs explain, and Defendants do not contest, Section 3(d) will impair LULAC's and SFI's ability to register voters using the Post Card Form. ECF 194-1 at 9–11. It will also force LULAC and SFI to divert resources from other programming to educate their members and constituents, update their training programs and materials, and otherwise assist their members in complying with burdensome new requirements. *Id*. And regardless of whether Plaintiffs

---

[2] The authorities Defendants rely upon (ECF 213 at 21) are inapposite. Both *National Fair Housing Alliance v. Carson*, 330 F. Supp. 3d 14 (D.D.C. 2018) and *PETA v. USDA*, 797 F.3d 1087 (D.C. Cir. 2015) stand for the unremarkable proposition that Defendants' action must be "at loggerheads" with plaintiffs' mission in order to confer standing. In other words, there must be "a direct conflict between the defendant's conduct and the organization's mission," or else it is "speculative" whether the organization will be affected by the challenged practice. *PETA*, 797 F.3d at 1095. That is not at issue here: LULAC and SFI each have an organizational mission of registering voters using the Post Card Form, SUMF ¶¶ 39, 42, 44–49, 72–73, which will indisputably be made more challenging by Section 3(d) of the Executive Order. *National Fair Housing Alliance* and *PETA* do not bear at all on Defendants' argument here, which is the (mistaken) claim that *Defendants' own conduct* is speculative. The mere fact that the *PETA* court used the word "speculative" does not mean it supports Defendants' theory.

[3] In fact, Defendants quote from the *AHM* syllabus to make their argument, rather than the opinion itself. ECF 213 at 21 (quoting *AHM*, 602 U.S. at 370). As the footnote to the syllabus makes clear, "[t]he syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader."

regularly update their training materials and other resources, *see* ECF 213 at 21–22, Plaintiffs are concretely injured by Section 3(d) because they are forced to respond to burdensome new requirements introduced by the Executive Order. *See LULAC*, 780 F. Supp. 3d at 188–90; Mem. Op. at 38. They have diverted resources not to merely oppose the Executive Order on ideological grounds, but to counteract the harm Section 3(d) has inflicted and will continue to inflict on their members and organizations. ECF 194-1 at 9–11. Plaintiffs have organizational standing.

### 2. Plaintiffs have associational standing to challenge Section 3(d) of the Executive Order.

Defendants' primary challenge to Plaintiffs' associational standing is—once again—the demonstrably false claim that Plaintiffs have "speculat[ed] about how section 3(d) will ultimately be implemented." ECF 213 at 22. Defendants then either categorically ignore or misrepresent Plaintiffs' undisputed evidence in an effort to undercut the severity of the harm Section 3(d) inflicts on Plaintiffs' members.

Defendants say that "Plaintiffs do not genuinely dispute that members of the military are required to possess documentary proof of citizenship." ECF 213 at 22. This is wrong in a number of ways. First, Defendants provide no evidence that members of the military are indeed required to possess documentary proof of U.S. citizenship. Nor could they, because non-U.S. citizens are permitted to be members of the military. *See* USA.gov, *Requirements to Join the U.S. Military*, https://perma.cc/ED9B-XWK3 (last updated Aug. 27, 2025). Second, SFI's more than 44,000 members are not themselves members of the military, but are "military-connected families serving abroad in at least eight different countries, families living abroad who have transitioned out of military service, and members posted to military bases within the United States." SUMF ¶¶ 13–14. Finally, Plaintiffs have presented evidence, which Defendants ignore, that each organization has members who do not possess documentary proof of citizenship. SUMF ¶¶ 17–18, 65–69. In

addition, Plaintiffs have provided ample evidence that its members would have difficulty providing documentary proof of citizenship when using the Post Card Form for many reasons, including that they often need to utilize the Post Card Form relatively close in time to Election Day. ECF 194-1 at 12–14; *see also* SUMF ¶ 70. This is sufficient to confer associational standing, and Defendants do not suggest otherwise. *LULAC*, 780 F. Supp. 3d at 190. Mem. Op. at 32–33.

Furthermore, Defendants argue that it is irrelevant that Plaintiffs' members will need to submit documentary proof of citizenship along with their Post Card Form at least annually because "[t]hey would have to do that anyway." ECF 213 at 23 (citation omitted). Defendants miss the point. In general, Plaintiffs' members need to submit the Post Card Form "at least once a year to stay current on their registration." ECF 194-1 at 12. Section 3(d), as Defendants *now* do not dispute, *cf.* ECF 177-1 at 8, adds to this requirement: these voters must *also* submit documentary proof of citizenship each year. As Plaintiffs have explained at length, this compounds the burden on Plaintiffs' members because they will be forced to keep their documents current, locate their documents, and find a means to copy and submit them at the appropriate time annually. ECF 194-1 at 12–13. Defendants' challenge to Plaintiffs' associational standing thus fails.

### 3. Plaintiffs have an equitable cause of action to challenge Section 3(d) of the Executive Order.

Finally, there is no merit to Defendants' argument that Plaintiffs do not have an equitable cause of action to challenge Section 3(d) of the Executive Order.  ECF 213 at 1–3. Defendants argue that because the APA provides "aggrieved persons with a meaningful and adequate opportunity for judicial review," the existence of such a statutory cause of action precludes review here. ECF 213 at 2 (citation omitted). But that is not so. To start, as Defendants concede, the D.C. Circuit has long held that plaintiffs are "entitled to bring a non-statutory cause of action questioning the legality of [an] Executive Order." *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322,

1327 (D.C. Cir. 1996). The D.C. Circuit's recent decision in *Global Health Council v. Trump*, 153 F.4th 1 (D.C. Cir. 2025), reaffirmed this principle and set out the factors that plaintiffs must meet when their claim is that a Presidential command is contrary to a federal statute. *Global Health Council* specifically explained that the possibility of APA review of final agency actions subsequently taken by other Executive branch actors does not preclude equitable actions for statutory *ultra vires* review. Such review "remains available to test presidential action alleged to violate any spending or other statute, provided that plaintiffs can plausibly allege action contrary to a clear and mandatory statutory prohibition." *Glob. Health Council v. Trump*, 153 F.4th 1, 17 n.14 (D.C. Cir. 2025).

In challenging Section 3(d) of the Executive Order, Plaintiffs contest the legality of the commands in Section 3(d) of the Order itself, not a final agency action taken pursuant to the Order. But this poses no impediment to Plaintiffs' equitable claim, because "[p]laintiffs are not required to wait for a final agency action before bringing a suit for equitable relief." *PFLAG, Inc. v. Trump*, 766 F. Supp. 3d 535, 554 n.19 (D. Md. 2025). No case from the D.C. Circuit, or to Plaintiffs' knowledge, any other federal court, holds that when the President issues an Executive Order that unlawfully commands federal officials to take action contrary to a federal statute or the Constitution, plaintiffs must wait for the consummation of that unlawful command by other federal officials and may only then bring an APA claim. Indeed, Defendants' position would render Presidential commands issued in Executive Orders completely unreviewable. That is not the law. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587 (1952). Instead, "courts have power to compel subordinate executive officials to disobey illegal Presidential commands." *Soucie v. David*, 448 F.2d 1067, 1072 n.12 (D.C. Cir. 1971); *see also Franklin v. Massachusetts*, 505 U.S. 788, 828 (1992) (Scalia, J., concurring) ("Review of the legality of Presidential action can

ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive.").

In their opening brief, Plaintiffs explained why they meet each of the four factors from *Global Health Council* to establish a statutory *ultra vires* claim. ECF 194-1 at 27–33. Other than asserting that Plaintiffs may eventually be able to bring an APA claim, Defendants entirely fail to address or refute Plaintiffs' arguments. ECF 213 at 3. Plaintiffs have an equitable cause of action to challenge Section 3(d) now and need not wait to bring an APA claim in the future.

**B.  Section 3(d) Violates UOCAVA**

As Plaintiffs previously explained, Section 3(d) of the Executive Order is *ultra vires* because it unlawfully directs the President's designee to violate UOCAVA by jettisoning the Post Card Form that Congress mandated and to substitute in its place a set of documentary proof of citizenship requirements that are fundamentally incompatible with both UOCAVA's text and the statute's purpose. As enacted by Congress, the Post Card Form already requires applicants to attest to a "standard oath," signed under penalty of perjury, that information entered on the Form, which includes a statement that the voter is a U.S. citizen, is accurate. 52 U.S.C. § 20301(b)(7).  And Congress specifically mandated that the Post Card Form must actually be a "post card," 52 U.S.C. § 20302(a)(4)—meaning that neither the President nor his designee can add additional documentation requirements as a condition of using the Post Card Form.

Defendants resist the plain text of UOCAVA by arguing that the statute does not on its face state that documentary proof of citizenship requirements are forbidden. ECF 213 at 26. But this argument ignores the language that Congress did in fact mandate, namely that the Post Card Form must be a "post card." 52 U.S.C. §§ 20301(b)(2), 20302(a)(4). "When a term goes undefined in a statute," courts are to give "the term its ordinary meaning." *Taniguchi v. Kan Pac. Saipan, Ltd.*,

566 U.S. 560, 566 (2012). The ordinary meaning of a "post card" means that the form must be capable of being sent without further attachment or documentation appended—it is a mailing with no need of having an envelope. *See California v. Trump*, 786 F. Supp. 3d 359, 383 (D. Mass. 2025) (discussing plain meaning of "post card"). As such, Defendants' arguments all fly in the face of the language that Congress actually enacted. The format of the Post Card Form is both a substantive requirement mandated by the plain language of UOCAVA and is essential to fulfilling Congress's purposes in enacting the statute. By specifically requiring a post card, Congress necessarily precluded a requirement to append additional documentation beyond the four corners of the form.[4] Section 3(d) replaces the single Post Card Form required by Congress with additional documentation requirements created by the President. As such, the Executive Order directly conflicts with Congress's mandate that a singular Post Card Form be made available to military and overseas voters "for simultaneous voter registration application and absentee ballot application." 52 U.S.C. § 20302(a)(4). Congress acted to ensure that there would be one streamlined form that UOCAVA voters, if they chose, could use to register and request a ballot. "As cannot be doubted, for our citizens overseas, voting by absentee ballot may be the only

---

[4] Defendants' argument that *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 19–20 (2013) ("ITCA"), somehow supports their claim that the President can require a documentary proof of citizenship requirement for use of UOCAVA's Post Card Form is baseless. ECF 213 at 27. In *ITCA*, the Supreme Court held that States could not mandate the use of DPOC in order to register using the Federal Form. *Ibid.* Under the NVRA, the EAC may only require such information on the Federal Form "as is *necessary* to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process." 52 U.S.C. § 20508(b)(1) (emphasis added). The EAC has never made such a necessity determination and has instead repeatedly rejected requests to add State-specific documentary proof of citizenship requirements to the Federal Form. *See* U.S. Election Assistance Comm'n, Dkt. No. EAC-2013-0004, Mem. Concerning State Requests to Include Additional Proof-of-Citizenship Instructions on the National Mail Voter Registration Form (Jan. 17, 2014) (describing rejection of 2006 request from Arizona and 2013 requests from Arizona, Georgia, and Kansas to modify the Federal Form to include State instructions requiring documentary proof of citizenship).

practical means to exercise the right to vote," and for "the members of our military, the absentee ballot is a cherished mechanism to voice their political opinion." *United States v. Alabama*, 857 F. Supp. 2d 1236, 1242 (M.D. Ala. 2012) (internal quotation marks and citations omitted).

Defendants are wrong in arguing that the current format of the Post Card Form—a two-sided piece of paper with adhesive liner that can be folded, allowing it to be mailed without using an envelope—somehow supports their position. ECF 213 at 27. Defendants argue that because the form is a whole sheet of paper, that may be mailed in an envelope, or printed, and in some States submitted online, undermines Plaintiffs' arguments here. Not so. That voters may *choose* to print out the form and are *permitted* to return it in an envelope or online does not mean that the President's designee is free to *require* such steps, or to *require* voters to submit additional documentation as under Section 3(d). Neither the President nor his designee may unilaterally invalidate Congress's decision that a Post Card Form, by itself, must be sufficient to register and request an absentee ballot. *Clinton v. City of New York*, 524 U.S. 417, 438 (1998) ("There is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes."). Finally, Defendants' wholly unsupported claim that requiring documentary proof of citizenship would not be burdensome for UOCAVA voters is beside the point. Again, Plaintiffs have provided ample evidence that they have members who would have difficulty providing documentary proof of citizenship when using the Post Card Form. ECF 194-1 at 19–21. The degree of burden that such a requirement poses is not material to Plaintiffs' claim, which relies instead on the fact that Section 3(d) is flatly contrary to UOCAVA. Plaintiffs' cross-motion for summary judgment that Section 3(d) is *ultra vires* and unlawful should be granted.

## II.     Plaintiffs Are Entitled To Summary Judgment On Their Claim Challenging Section 7(a) Of The Executive Order

Section 7(a) seeks to prohibit States from counting "absentee or mail-in ballots received after Election Day" that were validly and timely cast in accordance with State law. EO § 7(a). This command is *ultra vires* of the President's authority under the Constitution. Plaintiffs are entitled to summary judgment and declaratory relief on their claim against Section 7(a).

### A. Plaintiffs Have A Ripe and Fully Justiciable Claim, Standing, and A Cause of Action Challenging Section 7(a)

Throughout their brief, Defendants[5] repeat their threshold argument that Plaintiffs do not have standing for their Section 7(a) claims, nor are those claims justiciable, because any injury suffered by Plaintiffs is speculative. *See, e.g.*, ECF 213 at 31–35. According to this argument, a challenge to Section 7(a) cannot proceed until the Attorney General has begun enforcing it. But Defendants' speculation argument misconstrues the nature of Plaintiffs' challenge and ignores facts that Plaintiffs have put into evidence, as well as actions taken by Defendants pursuant to Section 7(a).

Plaintiffs are not challenging the specific enforcement decisions the Attorney General will make in implementing Section 7(a). Instead, the issuance of Section 7(a) itself—setting forth an Election Day receipt deadline that purports to override State deadlines and directing the Attorney General to enforce the President's preferred deadline "against States that violate" it—harms Plaintiffs by coercing States to change their ballot receipt deadlines to comply with the Executive Order. Defendants incorrectly suggest that "there are too many unknowns to premise standing on the 'predictable' actions of third parties." ECF 213 at 32.[6] To the contrary, the harm to Plaintiffs from the issuance of Section 7(a) is not speculative but evident already. As discussed in Plaintiffs'

---

[5] The RNC does not make a standing argument with respect to Section 7(a).

[6] Defendants imply the existence of Section 11, the Executive Order's saving clause, defeats Plaintiffs' claim. ECF 213 at 31. This argument fails because Plaintiffs' injury emanates from the effect the Executive Order has on third party States, not whether there are ways for the Attorney General to enforce the Executive Order legally.

brief, ECF 194-1 at 18, though not addressed by Defendants, North Dakota changed its ballot receipt deadline to an Election Day deadline only after the Executive Order was issued. Since then, the Department of Justice has taken steps to begin implementing Section 7(a). On September 29, 2025, DOJ sent a letter to the Attorney General of Ohio, "implor[ing] [him] to take immediate action (legislative or otherwise) to comply with federal law, and avoid costly litigation in federal court" by changing the State's ballot receipt deadline from four days after Election Day to Election Day. *See* Ex. A at 2. Ohio Secretary of State Frank LaRose subsequently submitted testimony to the Ohio Senate's General Government Committee on the matter, explaining that his staff had "spoke[n] with attorneys for the Department of Justice, who indicated that federal litigation was being considered to address" the purported "conflict between State and federal law as to the deadline by which absentee ballots must be returned by mail." Ex. A at 1. Secretary LaRose implored the State Senate to pass legislation to alter the State's ballot receipt deadline "in hopes of avoiding costly litigation." *Id.* at 2. The DOJ's efforts to strong-arm the State of Ohio into adopting an Election Day ballot receipt deadline pursuant to the dictates of Section 7(a) are clear proof that the threat posed by Section 7(a) is anything but speculative. As in *Diamond Alternative Energy, LLC. v. EPA*, third parties harmed by the foreseeable effects of enforcement action have standing to challenge that action if the court concludes that intermediary actors "will likely react to the government regulation or judicial relief in predictable ways that will likely cause (or redress) the plaintiff's injury." 145 S. Ct. 2121, 2134 (2025) (citation modified). That is precisely the case here.

Plaintiffs (and this Court) must act now to prevent injury—once a State actually changes its laws under threat of litigation to hew to the legally baseless mandate of the Executive Order, it will be too late. *See, e.g.*, Ex. A at 2 (testimony of Sec. LaRose that he "shared with legislative

leaders the [DOJ]'s communication with [his] office, and [he] asked them to consider the stated concern in hopes of avoiding costly litigation. That resulted in the language included in this bill."). And where threatened action by the government is concerned, "it is not necessary" for a plaintiff to "first expose himself to actual" enforcement where the challenged action "deters the exercise of his constitutional rights." *Steffel v. Thompson*, 415 U.S. 452, 459 (1974). Indeed, courts have long found that administrative action "may give rise to harm sufficient to justify pre-enforcement review." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 165 (2014). That is especially true when the enforcement threatens conduct affected with a constitutional interest, such as voting and political speech, as here. *Id.* at 161.[7]

### 1. Plaintiffs Have Established Organizational Standing

Plaintiffs have established organizational standing because the Executive Order has already and will continue to require them to divert resources to counteract the harms that Defendants' unlawful conduct will inflict on their core activities and services. *See* ECF 194-1 at 16–18. Defendants' attempts to minimize the harms to Plaintiffs' organizations are unsuccessful.

First, Defendants suggest Plaintiffs suffer no harm here because "section 7(a) does not eliminate mail-in ballots—it simply directs enforcement of a uniform ballot receipt deadline." ECF 213 at 33. But there is no requirement that an injury be total in order for it to be cognizable. *Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F.3d 1349, 1352 (11th Cir. 2005) ("A plaintiff need not have the franchise wholly denied to suffer injury."). Section 7(a)'s mandate that States adopt an Election Day ballot receipt deadline makes it more difficult for LULAC and SFI to accomplish

---

[7] Defendants also claim that "Plaintiffs' alleged injuries are not redressable by an order enjoining the Attorney General from taking enforcement action under Section 7(a)." ECF 213 at 31. Plaintiffs are not seeking such an order, or injunctive relief at all. With respect to Section 7(a), Plaintiffs are only seeking declaratory relief.

their missions of helping their members successfully vote by mail, even if vote by mail remains available but more restricted. Both organizations have made clear in concrete and particularized ways how Section 7(a) inflicts harm on their work. *See, e.g.*, ECF 194-4 ¶¶ 55–72; ECF 194-5 ¶¶ 43–46, 48–50, 52–59. The fact that the Executive Order does not eliminate mail-in ballots in their entirety is beside the point.

Second, Defendants fault Plaintiffs for not providing evidence "substantiating why they cannot instruct individuals to cast their mail-in ballots early" or explaining "why they cannot make the strategic decision to proceed as if mail-ballots are due by the earlier of the two possibilities." ECF 213 at 33. But LULAC and SFI are not required to follow the very mail ballot receipt deadline they are challenging, especially when doing so will make voting by mail more difficult for their members. *See* ECF 194-2 ¶¶ 11, 38–43, 64–66. That is the very reason LULAC and SFI brought this case—because adopting such a deadline will make it more difficult for their members to successfully cast a vote.

Finally, Plaintiffs' diversion of resources—including their updating of services and materials—in response to the Executive Order is not "immaterial" to the standing calculus, as Defendants contend. ECF 213 at 34. In *Food and Drug Administration v. Alliance for Hippocratic Medicine* ("*AHM*"), which Defendants cite, ECF 213 at 33–34, the Court reaffirmed that an organization suffers a cognizable injury when a defendant's actions have "directly affected and interfered with [the plaintiff organization's] core business activities." 602 U.S. 367, 395 (2024) (discussing *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982)).[8] In the case of *AHM*, the plaintiff organization claimed only that they chose to expend resources "engaging in public

---

8 Defendants continue to misrepresent the core holding of *AHM*, in part because they once again rely on the syllabus rather than the opinion itself. ECF 213 at 33–34 (quoting *AHM*, 602 U.S. at 370).

advocacy and public education" to "oppose [defendant's] actions." *Id.* at 394–95. That is not the case before us now. Section 7(a) interferes with what has always been part of LULAC's and SFI's "core business activities": helping voters, and especially their members, successfully vote by mail. By requiring LULAC and SFI to undertake constant monitoring, updating, advising, and educating on changing ballot receipt deadlines, Section 7(a) directly affects the organizational capacity of both LULAC and SFI and their ability to carry out activities that long pre-dated this litigation.

### 2. Plaintiffs Have Established Associational Standing

Plaintiffs have also demonstrated associational standing because they have established that (1) individual members would have standing to sue in their own right, (2) the interest the members seek to protect are germane to the purpose of Plaintiff organizations, and (3) there is no need for individual members to participate in the lawsuit. *See* ECF 194-1 at 18–21. Defendants' objections—that Plaintiffs' injuries are not traceable to the Executive Order, and that confusion arising out of the Order is speculative—are unpersuasive.

First, the injuries Plaintiffs outline are directly traceable to the alteration of the ballot receipt deadline proposed by Section 7(a). Defendants' contention that "[m]oving up the date would simply require LULAC's members to begin the process for obtaining and returning their ballots earlier or to engage in early voting" is both tautological and missing the point. ECF 213 at 34–35. While it is true that rural voters, elderly voters, disabled voters, student voters, and UOCAVA voters already encounter specific challenges when casting a mail ballot, shortening the time in which that ballot must be received is a new and higher burden on these individuals. Plaintiffs provide exhaustive evidence to demonstrate as much. *See, e.g.*, ECF 194-4 ¶ 45 (describing how the challenges of military affected voters will be "compounded" if extended State ballot return deadlines are eliminated); ECF 194-5 ¶ 39 (describing how elderly and disabled

members who vote by mail struggle to complete their ballots correctly even with current post-Election Day receipt deadlines); ECF 194-7 ¶ 11–15 (describing how student members, disabled members, and elderly members "face a heightened risk of having validly cast ballots discarded"). To suggest that "the difficulties these individuals face related to the mail are not a result of the EO" strains credulity. ECF 213 at 35.

Second, Defendants argue that "any voter confusion resulting from section 7(a) is speculative" because the provision has not yet been enforced. ECF 213 at 35. Again, it is not true that Defendants are not seeking to enforce Section 7(a). They are, and State officials are citing DOJ pressure as a reason to change their State laws. *See supra*, at 11–12. And even before Plaintiffs became aware of such efforts, the evidence already demonstrated that the provision was causing voter confusion. Plaintiffs provide multiple declarations demonstrating that voters are already confused about what deadline applies. *See, e.g.*, ECF 194-5 ¶ 45 ("I personally have been fielding many questions and concerns about the timing of the new ballot deadline"); ECF 194-4 ¶ 70 ("SFI members are already confused about the requirements imposed by the Executive Order and are unsure how they will be affected . . . including questions about . . . how they can make sure their ballot is delivered on time."). In the face of such evidence, Defendants' claims hold no water.

### 3. Plaintiffs have an equitable cause of action to challenge Section 7(a)

As this court has already recognized, it is well-established that the court's inherent equitable power allows for the review of unconstitutional executive orders. *See* Mem. Op. at 48–54. *LULAC*, 780 F. Supp. 3d at 172; *Reich*, 74 F.3d at 1327. Defendants' argument that Plaintiffs are "reframing an[] alleged statutory violation by the President" as a "constitutional [separation-of-powers] one" here is mistaken. ECF 213 at 3 (citation omitted). Plaintiffs' claim as to Section 7(a) is a constitutional, not statutory, *ultra vires* claim. Indeed, Plaintiffs' claim here is predicated

on the fact that there is *no federal statute* that addresses the issue of whether States can count ballots mailed by Election Day and received afterward. The upshot of that lack of federal statutory authority is that Section 7(a) is wholly *ultra vires* of the President's constitutional authority and the separation of powers. *See, e.g.*, *Susman Godfrey LLP v. Exec. Off. of the President*, No. 25-cv-1107, 2025 WL 1779830, at *23 (D.D.C. June 27, 2025) ("The challenge mounted here . . . is a classic separation-of-powers claim in the vein of *Youngstown*, where the court was 'asked to decide whether the President was acting within his constitutional power when he issued an [executive] order.'") (quoting *Youngstown*, 343 U.S. at 582).

The D.C. Circuit's recent decisions in *Global Health Council* and *National Treasury Employees Union v. Vought*, 149 F.4th 762, 770 (D.C. Cir. 2025) confirm that Plaintiffs' claim against Section 7(a) is constitutional in nature. In those cases, the court held that the plaintiffs were bringing statutory *ultra vires* claims, not constitutional claims, because in each case a federal statute conferred authority on the Executive branch to act. *Glob. Health Council*, 153 F.4th at 20 (Impoundment Control Act contemplated presidential action); *Vought*, 149 F.4th at 792 (claim was statutory, not constitutional, because it turned on whether the agency violated its governing statutes). Where some federal statute provides a mechanism for presidential action, the claim ultimately alleges that the President exceeded that statute's limits and is thus statutory in nature. *See Glob. Health Council*, 153 F.4th at 14 (citing *Dalton v. Specter*, 511 U.S. 462 (1994)). But the court also made clear that when the President purports to draw authority from a statute that does not "even contemplate[]" presidential action, the claim is constitutional, not statutory. *Id.* at 16 (quoting *Reich*, 74 F.3d at 1332). That is the case here. The Election Day Statutes do not in any way contemplate or authorize action by the President, or any sort of enforcement by the Attorney General. Plaintiffs have a constitutional *ultra vires* claim.

17

### B.  Section 7(a) Is *Ultra Vires* Of The President's Constitutional Authority

The Elections Clause makes clear that States determine the time, place, and manner of elections unless Congress says otherwise. U.S. Const. art. 1, § 4. The federal Election Day statutes, 2 U.S.C. § 7 and 3 U.S.C. § 1, which set the federal Election Day for Congress and the President respectively, make no mention of the enforcement by the Attorney General or the President and do not prohibit post-Election Day ballot receipt, instead leaving this issue to the States. When Congress has legislated in this area, it has continued to permit States to count ballots received after Election Day and has accommodated varying State deadlines in the federal statutory scheme. *See, e.g.*, UOCAVA, 52 U.S.C. § 20301 *et seq*. Indeed, when Congress recently provided a statutory definition of the term "Election Day" at 3 U.S.C. § 21, it did not prohibit post-Election Day ballot receipt. In other words, Congress has left the issue of ballot receipt deadlines to the States. And all precedent—other than one anomalous Circuit Court decision—flatly contradicts Defendants' and the RNC's position to the contrary. Plaintiffs made all of these points in their brief in support of their cross-motion for summary judgment. ECF 194-1 at 33–42. Defendants and the RNC do not directly dispute these arguments but instead either ignore or seek to minimize them.

In the face of the overwhelming authority against them, Defendants and the RNC principally rely on the single outlier decision in their favor, *Republican National Committee v. Wetzel*, 120 F.4th 200 (5th Cir. 2024). Plaintiffs' opening brief describes in detail the serious problems with the *Wetzel* decision. ECF 194-1 at 38–41. But Defendants' argument that this Court should follow *Wetzel* is further undermined by a significant concession in their latest brief. ECF 194-1 at 39–40. Though acknowledging the *Wetzel* court's reliance on *Foster v. Love*, 522 U.S. 67 (1997) in reaching its determination, ECF 213 at 37, Defendants concede that *Foster* "addressed when the proceedings of an 'election' should start, and not when they would end." ECF 213 at 39

18

(citing *Foster*, 522 U.S. at 72). This concession both accurately characterizes *Foster* and is completely at odds with the *Wetzel* court's contention that the Supreme Court in *Foster* adopted a definition of "consummation" of an election that bars mail-in ballots received after Election Day from being counted. *Wetzel*, 120 F.4th at 209. Without that unsupported definition of "consummation," *Wetzel* crumbles like a house of cards.[9]

Despite that critical flaw in *Wetzel*, Defendants and the RNC rely almost exclusively on the decision to address various other problems with their position. For example, Defendants and the RNC acknowledge that UOCAVA accounts for the counting of ballots mailed by Election Day and received thereafter. ECF 213 at 39 (citing *Wetzel*, 120 F.4th at 213); ECF 210 at 17. Pointing to *Wetzel*, Defendants and the RNC argue that this just shows that Congress knew how to make exceptions to a rule that mail-in ballots must be received by Election Day. ECF 213 at 39 (citing *Wetzel*, 120 F.4th at 213); ECF 210 at 17. But Congress was not making an exception in UOCAVA, and Defendants and the RNC cannot point to where Congress said it was. UOCAVA takes as the baseline that different State laws permit the counting of ballots received after Election Day and that nothing in federal law prevents this. This is because Congress has never enacted—through the Election Day statutes or any other law—a prohibition on counting ballots mailed by Election Day and received thereafter. As such, Plaintiffs do not need to show that UOCAVA "repeals" the Election Day statutes, ECF 210 at 18, because UOCAVA is not inconsistent with the Election Day statutes.

Next, the RNC relies almost exclusively on *Wetzel* in its five-page argument about historical practice in its attempt to come up with support for an Election Day ballot receipt

---

[9] The RNC argues that two cases other than *Wetzel* support the argument in *Wetzel* that "consummation" is an element of the term "election." ECF 210 at 10. But both cases, *Millsaps v. Thompson*, 259 F.3d 535 (6th Cir. 2001), and *Voting Integrity Project, Inc. v. Keisling*, 259 F.3d 1169 (9th Cir. 2001), merely rejected arguments that State statutes, which allowed for voting in federal elections on days other than Election Day, violated federal law. They do not support *Wetzel*'s argument regarding "consummation." As such, neither case furthers Defendants' position.

deadline, ECF 210 at 13-18, but the main historical source used by the Fifth Circuit *Wetzel* in fact strongly casts doubt on the RNC's characterization of history.

At the outset, though the RNC would start with history from "before 1845," *id.* at 13, absentee voting began in the Civil War. *See Wetzel*, 120 F.4th at 209; *Keisling*, 259 F.3d at 1175. More fundamentally, the RNC fails to engage with the actual historical source that *Wetzel* exhaustively relies upon—Josiah Henry Benton's *Voting in the Field: A Forgotten Chapter of the Civil War* (1915)—never actually quoting it. For example, the RNC quotes *Wetzel* to contend that, during the Civil War, "[e]lection officials brought ballot boxes to the battle-field." ECF 210 at 14 (quoting 120 F.4th at 209 (citing Benton at 15)). However, at the page *Wetzel* cites, Benton does not describe election officials at all. *See* Benton at 15. Indeed, it is not at all clear from Benton's portrayal that all States ensured ballots were in the hands of election officials by Election Day. For example, according to Benton, soldiers in Nevada, Rhode Island, and Pennsylvania were permitted to vote at a place designated by, or by delivering their ballots to, their commanding officer, whom Benton does *not* describe as an election official. *Id.* at 171, 186–87, 190.[10]

Furthermore, Benton's descriptions of the railways at the time cast more serious doubt on the RNC's proposition that all soldiers' ballots were in the hands of election officials by Election Day. He comments on the "difficulty of getting the votes home to the various States" due to the underdeveloped rail network at the time. For example:

> It seems to have been understood in all these Northern States except Maryland that a sufficient period would elapse between the day of the election, which was the day on which the soldiers were to vote in the field, and the counting of the votes of the State by the officers who were to count them, to enable the votes to reach them.

---

[10] This is a crucial omission, since Benton did include that fact when it was present. *See, e.g.*, Benton at 37 (describing South Carolina's law as authorizing "the commissioned officer on duty commanding any company of volunteers, after being first duly sworn to manage the election fairly and impartially according to law, 'to open a poll[.]'").

*Id.* at 316, 318. Thus, to the extent historical practice tells us anything here, it only undercuts Defendants' key argument and does nothing to dispel the lopsided weight of other authority rejecting their position.

It would seem that Defendants rely solely on *Wetzel* because the overwhelming weight of the remaining authority is squarely against them. *See* ECF 213 at 39–40; ECF 210 at 11. Defendants fail to mention another federal district court's decision in *California v. Trump*, 786 F. Supp. 3d 359 (D. Mass. 2025), which is the only other case that directly addresses whether Section 7(a) violates the Elections Clause. The RNC mentions it only in a parenthetical, noting that it was decided on preliminary injunction. It is telling that Defendants and the RNC fail to grapple with *California v. Trump* and Plaintiffs' extensive discussion of it, *see* ECF 194-1 at 35–37, since the case involves the exact same issue on the merits and, because of its recency, discusses the other important cases, including *Wetzel*.

Moreover, Defendants are wrong to suggest that other cases that have considered this issue are irrelevant. For example, they dismiss as dicta Justice Kavanaugh's opinion in *DNC v. Wisconsin* on Mississippi's decision to "no longer require that absentee ballots be received before election day." *Democratic National Committee v. Wisconsin State Legislature*, 141 S. Ct. 28, 32 (2020) (Kavanaugh, J., concurring); *see also* ECF 213 at 40. Kavanaugh writes: "[A] variation in state responses reflects our constitutional system of federalism. Different state legislatures may make different choices." *Id.* at 32–33. Dicta this is not. "[J]ust as binding as a holding is the reasoning underlying it." *Nat'l Institutes of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2664 (2025) ("*APHA*") (citation omitted) (Gorsuch, J., concurring in part). Justice Kavanaugh's reasoning here directly underpins one of his core "independent reasons" for the holding—"[t]his Court has consistently stated that the Constitution principally entrusts politically accountable state

21

legislatures," some of which "exercised their Article I, § 4, authority over elections" to address the pandemic. *DNC*, 141 S. Ct. at 30, 32.

Defendants similarly attempt to distinguish cases either on standing grounds or for their preliminary postures. ECF 213 at 40. These arguments also fail. For example, the RNC brushes off the decision in *California v. Trump* on the basis that the decision was made at the preliminary injunction stage. ECF 210 at 11. But this line of attack fails to accord proper weight to the constitutional reasoning underlying all of these courts' decisions. While "decisions regarding interim relief are not necessarily conclusive as to the merits because further litigation may follow . . . regardless of a decision's procedural posture, its reasoning—its *ratio decidendi*—carries precedential weight in future cases." *APHA*, 145 S. Ct. at 2663 (Gorsuch, J., concurring in part) (internal quotations omitted). *See also FBME Bank Ltd. v. Lew*, 142 F. Supp. 3d 70, 74 (D.D.C. 2015) (describing how though "the findings and conclusions in the Court's preliminary-injunction order may not have precedential value as to the ultimate merits . . . the Court made several holdings . . . that may guide future courts in similar cases"); *Gordon v. Lynch*, 817 F.3d 804, 807 (D.C. Cir. 2016) (describing how even an "affirmed but now vacated preliminary injunction, as well as the underlying opinions, would likely have some persuasive effect").

Finally, the *Wetzel* court, Defendants, and the RNC all conveniently ignore that, in 2022, Congress defined "Election Day" for Presidential elections at 3 U.S.C. § 21. This definition does not prohibit States from counting ballots mailed by Election Day and received by election officials thereafter. Consolidated Appropriations Act of 2023, Pub. L. No. 117-328, § 102, 136 Stat. 4459 (2022). When Congress enacted this definition, even more States than now accepted mail-in ballots postmarked by Election Day and received after Election Day. *See Mail Ballot Deadlines, 2012-2022*, U.S. Election Assistance Comm'n, https://perma.cc/JYG6-U2BQ. Courts have previously

found "the long history of . . . express congressional approval of absentee balloting when it has spoken on the issue" persuasive. *Keisling*, 259 F.3d at 1175. If Congress was of the view that ballots mailed by Election Day but received thereafter cannot be counted, it would have said so when it actually defined the term in 2022.

In sum, the President's unconstitutional attempt to dictate State ballot receipt deadlines by threatening federal enforcement action finds no support whatsoever in the Election Day Statutes. This Court should accordingly declare Section 7(a) unconstitutional and grant Plaintiffs' motion for summary judgment as to this provision.

Finally, LULAC Plaintiffs stress that they do not seek injunctive relief as to their equitable claim against Section 7(a), only declaratory relief making clear that "that the federal Election Day statutes, 2 U.S.C. § 7 and 3 U.S.C. § 1, neither provide for civil or criminal enforcement by the U.S. Attorney General, nor prohibit states from counting, in accordance with state law, mail and absentee ballots that are mailed on or before Election Day yet received afterward." *See* ECF 194-11 at 2 (proposed order).

While Defendants argue that Plaintiffs have no standing to seek declaratory relief against the President, ECF 213 at 41, LULAC Plaintiffs did not name the President as a Defendant. *See* ECF 1 at 5–7. Defendants make no argument whatsoever that declaratory relief with respect to the U.S. Department of Justice, and Attorney General Bondi is unavailable, or that the specific declaratory relief that Plaintiffs seek regarding Section 7(a) is improper. Not only have Defendants waived any objection, such relief is entirely warranted and necessary. The requested declaratory judgment will "terminate and afford relief from the uncertainty, insecurity, and controversy" that Section 7(a) of the Executive Order has engendered, and that the Department of Justice is actively

and lawlessly fomenting. *New York v. Biden*, 636 F. Supp. 3d 1, 31 (D.D.C. 2022) (citation omitted).

### III.    Defendants Are Not Entitled To Discovery Or Delay Of Judgment As To Plaintiffs Section 7(a) and 3(d) Claims Under Rule 56(d)

In opposing Plaintiffs cross-motion for partial summary judgment, Defendants baldly assert that they are "entitled to discovery to refute Plaintiffs' many one-sided declarations, which they propound in support of both jurisdiction and the merits." ECF 213 at 1. The Federal Defendants thus filed a Rule 56(d) Declaration as part of their opposition. ECF 213-3 (Decl. of Winton Shi). This is, of course, not the first time that Defendants have attempted to invoke Rule 56(d). This Court previously rejected Defendants' Motion, ECF 160, to Strike, Deny, or Defer Consideration of the Motions for Partial Summary Judgment as to Section 2(a) of the Executive Order. *See* ECF 180. For largely the same reasons as before, Defendants are not entitled to any relief under Rule 56(d) at this time either. *See* ECF 180 at 3–8 (recounting procedural history).

Federal Rule of Civil Procedure 56(d) provides that if the party opposing summary judgment "shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition," a reviewing court "may" defer consideration of the motion, deny the motion, allow additional time for discovery, or "issue any other appropriate order." Fed. R. Civ. P. 56(d). To obtain relief under Rule 56(d), the party opposing summary judgment must produce an affidavit that "satisf[ies] three criteria." *Convertino v. U.S. Dep't of Just.*, 684 F.3d 93, 99 (D.C. Cir. 2012). The requirement most relevant here is that the opposing party must explain "why [it] could not produce [the facts] in opposition to the motion [for summary judgment]." *Id.* at 99–100.

As this Court previously noted, "[u]nlike the typical Rule 56(d) movant requesting additional time for discovery, the Federal Defendants have repeatedly argued that discovery is

neither necessary nor appropriate in these consolidated cases." ECF 180 at 10; *see also* Joint Scheduling Proposal, ECF 119 at 5–6; LCvR 16.3 Report, ECF 137 at 11, 16; June 18 Tr. at 21:4–15. Consistent with all parties' representations that no discovery was needed for Plaintiffs' claims on Section 2(a), no party took discovery prior to the filing of those Phase I summary judgment motions, Plaintiffs took limited discovery before Phase II summary judgment briefing, and the Federal Defendants never sought to take any discovery whatsoever prior to the start of summary judgment briefing.

Given that the Federal Defendants voluntarily elected not to seek discovery from Plaintiffs before proceeding to summary judgment, the statements in their Rule 56(d) affidavit fall well short of adequately explaining why they "could not produce" purportedly essential facts. *See Convertino*, 684 F.3d at 99–100. "It cannot possibly be the law that a party can forego seeking information by discovery and, when confronted by a motion for summary judgment, seek discovery it never sought in the first place to defeat the motion." *Rowland v. Walker*, 245 F. Supp. 2d 136, 139 (D.D.C. 2003), *aff'd*, No. 03-5082, 2003 WL 21803321 (D.C. Cir. July 31, 2003). When, as in this case, a defendant has "made no effort to take discovery" despite an ample opportunity to request it, this "most significant" requirement for relief under Rule 56(d) is not satisfied. *Serv. Emps. Int'l Union Nat'l Indus. Pension Fund v. Castle Hill Health Care Providers, LLC*, 312 F.R.D. 678, 684 (D.D.C. 2015). There is no basis for allowing Defendants to delay judgment in favor of Plaintiffs as to their claims regarding Sections 3(d) and 7(a).

## CONCLUSION

Plaintiffs respectfully request that the Court enter judgment and declaratory relief in favor of Plaintiffs on their Section 3(d) and 7(a) claims and permanently enjoin the implementation of Section 3(d)'s documentary proof of citizenship requirement.

Dated: October 31, 2025                              Respectfully submitted,

*/s/ Sofia Fernandez Gold*                           */s/ Anna M. Baldwin*
Pooja Chaudhuri (D.C. Bar No. 888314523)             Anna M. Baldwin (D.C. Bar No. 998713)
Sofia Fernandez Gold (D.C. Bar No. 90010196)         Danielle Lang (D.C. Bar No. 1500218)
Jacob Kovacs-Goodman (D.C. Bar No.                   Jonathan Diaz (D.C. Bar No. 1613558)
90032363)                                            Robert Brent Ferguson (D.C. Bar No. 1782289)
Norman L. Eisen (D.C. Bar No. 435051)                Heather Szilagyi (D.C. Bar No. 90006787)
Tianna J. Mays (D.C. Bar No. 90005882)               Benjamin Phillips (D.C. Bar No. 90005450)
DEMOCRACY DEFENDERS FUND                             CAMPAIGN LEGAL CENTER
600 Pennsylvania Avenue SE #15180                    1101 14th St. NW, Suite 400
Washington, D.C. 20003                               Washington, D.C. 20005
(202) 601-8678                                       (202) 736-2200
pooja@democracydefenders.org                         abaldwin@campaignlegalcenter.org
sofia@democracydefenders.org                         dlang@campaignlegalcenter.org
jacob@democracydefenders.org                         jdiaz@campaignlegalcenter.org
norman@democracydefenders.org                        bferguson@campaignlegalcenter.org
tianna@democracydefenders.org                        hszilagyi@campaignlegalcenter.org
                                                     bphillips@campaignlegalcenter.org

*/s/ Jon Greenbaum*
Jon Greenbaum (D.C. Bar No. 489887)
JUSTICE LEGAL STRATEGIES PLLC
P.O. Box 27015
Washington, D.C. 20038
(202) 601-8678
jgreenbaum@justicels.com

*Counsel for Plaintiffs League of United Latin*
*American Citizens, Secure Families Initiative,*
*and Arizona Students' Association*