**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, et al., | |
| Plaintiffs, | Civil Action No. 25-cv-0946 (CKK) |
| v. | |
| EXECUTIVE OFFICE OF THE PRESIDENT, et al., | |
| Defendants. | |
| DEMOCRATIC NATIONAL COMMITTEE, et al., | |
| Plaintiffs, | Civil Action No. 25-cv-0952 (CKK) |
| v. | |
| DONALD J. TRUMP, in his official capacity as President of the United States, et al., | |
| Defendants. | |
| LEAGUE OF WOMEN VOTERS EDUCATION FUND, et al., | |
| Plaintiffs, | Civil Action No. 25-cv-0955 (CKK) |
| v. | |
| DONALD J. TRUMP, in his official capacity as President of the United States, et al., | |
| Defendants. | |

**DEMOCRATIC PARTY PLAINTIFFS' REPLY IN SUPPORT OF PHASE II CROSS-
MOTION FOR SUMMARY JUDGMENT (ECF NO. 196)**

**ELIAS LAW GROUP LLP**
Marc E. Elias (DC 442007)
Aria C. Branch (DC 1014541)
Lalitha D. Madduri (DC 1659412)
Christopher D. Dodge (DC 90011587)
Jacob D. Shelly (DC 90010127)
Harleen K. Gambhir (DC 1781869)
James J. Pinchak (DC 90034756)*
250 Massachusetts Ave. NW, Suite 400
Washington, DC 20001
T: (202) 968-4652

Tyler L. Bishop (DC 90014111)
1700 Seventh Ave., Suite 2100
Seattle, WA 98101
T: (206) 656-0177

*Counsel for the Democratic Party Plaintiffs*

*\*Admitted pro hac vice*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ......................................................................................... ii

INTRODUCTION ................................................................................................. 1

ARGUMENT ....................................................................................................... 2

I.     The Democratic Party Plaintiffs have an *ultra vires* cause of action against the EO............ 2

       A.    The Democratic Party Plaintiffs' claims are constitutional in nature.......................... 2

       B.    Plaintiffs satisfy the prerequisites for a statutory *ultra vires* claim in any event. ....... 6

II.    Section 2(d) should be declared unlawful and permanently enjoined. ................................ 7

       A.    Defendants' effort to rewrite § 2(d) does not defeat standing. .................................. 7

       B.    Section 2(d) is *ultra vires* and violates the separation of powers. ............................. 8

III.   Section 3(d)'s DPOC Requirement for the Federal Post Card Application is unlawful. ..... 10

       A.    Federal Defendants' threshold arguments as to § 3(d) fail....................................... 10

       B.    Section 3(d) is *ultra vires*. ..................................................................... 13

IV.    Section 7's threatened preemption of State ballot receipt deadlines is unlawful.............. 14

       A.    The Democratic Party Plaintiffs have standing to challenge § 7............................... 14

       B.    Section 7 is *ultra vires* and violates the separation of powers.................................. 18

V.     The EAC should be permanently enjoined from enforcing § 4(a). ................................... 21

VI.    The Court should set aside the unlawful SAVE expansion. ............................................. 22

       A.    Democratic Party Plaintiffs have standing to challenge the SAVE expansion. ........ 22

       B.    Plaintiffs have a ripe APA claim against the SAVE expansion. .............................. 26

       C.    The SAVE expansion is contrary to the Privacy Act. ............................................. 28

CONCLUSION..................................................................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Advoc. Health Care Network v. Stapleton*,
 581 U.S. 468 (2017)................................................................................................ 13

*AFL-CIO v. Dep't of Lab.*,
 778 F. Supp. 3d 56 (D.D.C. 2025) .................................................................... 2, 28

*AFL-CIO v. Dep't of Lab.*,
 No. CV 25-339 (JDB), 2025 WL 1783899 (D.D.C. June 27, 2025) .................... 24

*Blassingame v. Trump*,
 87 F.4th 1 (D.C. Cir. 2023)................................................................................... 1

*Burke v. State Bd. of Canvassers*,
 107 P.2d 773 (Kan. 1940) .................................................................................... 20

*California v. Trump*,
 786 F. Supp. 3d 359 (D. Mass. 2025) .................................................................. 14

*Chamber of Com. of U.S. v. Reich*,
 74 F.3d 1322 (D.C. Cir. 1996)............................................................................. 6

*Christensen v. Harris County*,
 529 U.S. 576 (2000).............................................................................................. 29

*Clinton v. City of New York*,
 524 U.S. 417 (1998).............................................................................................. 9

*Collins v. Yellen*,
 594 U.S. 220 (2021).......................................................................................... 4, 23

*Common Cause/Ga. v. Billups*,
 554 F.3d 1340 (11th Cir. 2009) ....................................................................... 8, 11

*Dalton v. Specter*,
 511 U.S. 462 (1994).......................................................................................... 2–4

*Daunt v. Benson*,
 999 F.3d 299 (6th Cir. 2021) ............................................................................... 10

*Epic Sys. Corp. v. Lewis*,
 584 U.S. 497 (2018).............................................................................................. 20

*Ex parte Siebold*,
    100 U.S. 371 (1879).................................................................................... 19

*FDA v. All. for Hippocratic Med.*,
    602 U.S. 367 (2024)............................................................................ 13, 16

*Fish v. Schwab*,
    957 F.3d 1105 (10th Cir. 2020) ......................................................... 11, 12

*Foster v. Love*,
    522 U.S. 67 (1997)...................................................................................... 19

*Friends of Animals v. Jewell*,
    824 F.3d 1033 (D.C. Cir. 2016) ................................................................. 26

*Gadelhak v. AT&T*,
    950 F.3d 458 (7th Cir. 2020) ..................................................................... 25

*Georgia v. Clark*,
    119 F.4th 1304 (11th Cir. 2024) .................................................................. 5

*Glob. Health Council v. Trump*,
    No. 25-5097, 2025 WL 2709437 (D.C. Cir. Aug. 28, 2025)............................ 4, 7

*Global Health Council v. Trump*,
    153 F.4th 1 (D.C. Cir. 2025).................................................................. 4–7

*Goodell v. Judith Basin Cnty.*,
    224 P. 1110 (Mont. 1924)............................................................................. 20

*Gorss Motels, Inc. v. Safemark Sys., LP*,
    931 F.3d 1094 (11th Cir. 2019) ..................................................................... 7

*Griffin v. N. Carolina State Bd. of Elections*,
    781 F. Supp. 3d 411 (E.D.N.C. 2025).......................................................... 17

*Harding v. Edwards*,
    484 F. Supp. 3d 299 (M.D. La. 2020)........................................................... 16

*Jeffries v. Volume Servs. Am.*,
    928 F.3d 1059 (D.C. Cir. 2019) ............................................................. 23, 24

*League of United Latin Am. Citizens v. Exec. Off. Of the President*,
    780 F. Supp. 3d 135 (D.D.C. 2025) ...................................................... *passim*

*League of Women Voters of U.S. v. Newby,*
 838 F.3d 1 (D.C. Cir. 2016) .............................................................. 13

*Lopez v. Davis,*
 531 U.S. 230 (2001) ............................................................................ 9

*Maddox v. Bd. of State Canvassers,*
 149 P.2d 112 (Mont. 1944) ............................................................... 20

*Muransky v. Godiva Chocolatier,*
 979 F.3d 917 (11th Cir. 2020) .......................................................... 23

*Murthy v. Missouri,*
 603 U.S. 43 (2024) ............................................................................ 18

*N. Am.'s Bldg. Trades Unions v. Dep't of Def.,*
 783 F. Supp. 3d 290 (D.D.C. 2025) .................................................... 8

*N.H. Right to Life Pol. Action Comm. v. Gardner,*
 99 F.3d 8 (1st Cir. 1996) .................................................................. 15

*N.L.R.B. v. Noel Canning,*
 573 U.S. 513 (2014) .......................................................................... 21

*Nat'l Ass'n for Gun Rts., Inc. v. Garland,*
 697 F. Supp. 3d 601 (N.D. Tex. 2023) .............................................. 15

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife,*
 551 U.S. 644 (2007) ............................................................................ 9

*NCAE v. DOL,*
 143 F.4th 395 (D.C. Cir. 2025) ......................................................... 26

*Norton v. SUWA,*
 542 U.S. 55 (2004) ............................................................................ 28

*NRC v. Texas,*
 605 U.S. 665 (2025) ............................................................................ 7

*NTEU v. Vought,*
 149 F.4th 762 (D.C. Cir. 2025) ........................................... 1, 2, 4–7

*Pharm. Rsch. & Mfrs. of Am. v. Stolfi,*
 724 F. Supp. 3d 1174 (D. Or. 2024) ................................................. 16

*Refugee & Immig. Ctr. for Educ. & Legal Servs. v. Noem*,
    No. 25-cv-306 (RDM), 2025 WL 1825431 (2025) ............................................................. 27

*RNC v. Wetzel*,
    120 F.4th 213 (5th Cir. 2024) .................................................................................... 19, 20

*Said v. Nat'l R.R. Passenger Corp.*,
    317 F. Supp. 3d 304 (D.D.C. 2018) .................................................................................. 26

*\*Shays v. Fed. Election Comm'n*,
    414 F.3d 76 (D.C. Cir. 2005) ....................................................................... 12, 17, 18

*Spirit Airlines v. DOT*,
    997 F.3d 1247 (D.C. Cir. 2021) ....................................................................................... 27

*State v. Meadows*,
    88 F.4th 1331 (11th Cir. 2023) ......................................................................................... 5

*Tanner-Brown v. Haaland*,
    105 F.4th 437 (D.C. Cir. 2024) .......................................................................................... 8

*Texas v. United States*,
    555 F. Supp. 3d 351 (S.D. Tex. 2021) ............................................................................. 9

*United States v. Illinois*,
    25-cv-1285, 2025 WL 2098688 (N.D. Ill. July 25, 2025) ............................................. 30

*United States v. Stevens*,
    559 U.S. 460 (2010) ............................................................................................................ 8

*VanDerStok v. Garland*,
    625 F. Supp. 3d 570 (N.D. Tex. 2022) ........................................................................... 15

*Venetian Casino Resort v. EEOC*,
    530 F.3d 925 (D.C. Cir. 2008) .................................................................................. 27, 28

*Wolf v. Regardie*,
    553 A.2d 1213 (D.C. 1989) .............................................................................................. 24

*\*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952) ..................................................................................................... 1, 3

**Statutes and Regulations**

2 U.S.C. § 683 ................................................................................................................ 4

5 U.S.C. § 552a(e) ........................................................................................................ 29

5 U.S.C. § 552a(e)(4) .................................................................................................... 28

5 U.S.C. § 552a(r) ......................................................................................................... 29

5 U.S.C. § 552a(v)(1) .................................................................................................... 30

5 U.S.C. § 706(1) ............................................................................................................ 7

8 U.S.C. § 1373 ............................................................................................................. 30

8 U.S.C. § 1642 .............................................................................................................. 9

52 U.S.C. § 3(a)(4) ........................................................................................................ 11

52 U.S.C. § 20301(b)(2) ............................................................................................... 13

52 U.S.C. § 20303(b) .................................................................................................... 20

52 U.S.C. § 20505(a)(1) ............................................................................................... 13

52 U.S.C. § 20506(a)(4) ........................................................................................... 8, 10

52 U.S.C. § 20506(a)(6) ........................................................................................... 8, 10

52 U.S.C. § 20507(a)(5) ................................................................................................ 10

52 U.S.C. § 21003(b) .................................................................................................... 21

52 U.S.C. § 21145 ......................................................................................................... 21

Pub. L. 101-510, § 2903, 104 Stat. 1808 ....................................................................... 3

Mont. Code § 13-21-206(1)(c) ...................................................................................... 20

Mont. Code § 13-21-226(1) ........................................................................................... 20

62 Fed. Reg. 61344 (Nov. 17, 1997) ............................................................................... 9

63 Fed. Reg. 41662 (Aug. 4, 1998) ................................................................................. 9

85 Fed. Reg. 31798, 31800 (May 27, 2020) ................................................................. 29

90 Fed. Reg. 48948 (Oct. 31, 2025)................................................................... 22, 30

Exec. Order No. 14,218, 90 Fed. Reg. 10581 (Feb. 19, 2025) ...................................... 9

Exec. Order No. 14,248, 90 Fed. Reg. 14005 (Mar. 28, 2025) ........................... *passim*

**Other Authorities**

Alan B. Vickery, 82 Colum. L. Rev. 1426 (1982)....................................................... 23

Alan Feuer, *Trump Loses String of Election Lawsuits, Leaving Few Vehicles to Fight His
    Defeat*, N.Y. Times (Nov. 13, 2020),
    https://www.nytimes.com/2020/11/13/us/politics/trump-loses-election-lawsuits.html....... 17

Am. Compl., *AIDS Vaccine Advocacy Coalition v. Dep't of State*, No. 1:25-cv-400 (D.D.C.
    May 2, 2025), ECF No. 86................................................................................. 4

*Assess*, Black's Law Dictionary (12th ed. 2024) ........................................................ 7

Defs.' Opp. to Pls.' Mot. for Prelim. Inj. or Stay, *League of Women Voters et al. v. DHS*,
    No. 1:25-cv-03501-SLS (D.D.C. Oct. 22, 2025), ECF No. 37........................... 27

**INTRODUCTION**

The claims at Phase II chiefly concern what authority President Trump holds to issue the commands in E.O. 14,248. Under our separation of powers, his "power, if any, to issue the order must stem either from an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952). Yet Defendants fail to identify any constitutional or statutory authority for the President's orders. Lacking such authority, they retreat to a vague and seemingly limitless "Take Care" power they believe the President possesses. But "Article II and the Take Care clause do not grant the President boundless authority," particularly where the "President lacks an identified duty to faithfully execute the laws." *Blassingame v. Trump*, 87 F.4th 1, 36 (D.C. Cir. 2023) (Rogers, J., concurring in part). Because the President cannot bootstrap his Take Care authority into freewheeling power to make laws—whether by setting State ballot receipt deadlines or amending Congress's method for distributing the Federal Form—the Court should grant judgment to Democratic Party Plaintiffs (DPPs) on their *ultra vires* and separation of powers claims.

Defendants' threshold arguments do not bar relief. DPPs have causes of action to challenge President Trump's *ultra vires* conduct and violation of the separation of powers. These claims— which challenge the *absence* of any grant of authority to the President—"aris[e] under the Constitution," *NTEU v. Vought*, 149 F.4th 762, 791 (D.C. Cir. 2025), and thus need not satisfy the requirements for a statutory *ultra vires* claim. Even so, those requirements are satisfied here. Defendants' standing arguments are equally flawed, ignoring record evidence and the predictable (and intended) consequences of the President's order on his political rivals and Democratic voters.

Finally, while the bulk of DPPs' APA claims are better resolved at Phase III, those related to the recent expansion of SAVE can and should be resolved now. Defendants offer almost no defense of that claim on the merits and, in attacking standing, misconstrue case law and ignore precedent from within this Circuit. The Court should therefore grant judgment on that claim as well.

## ARGUMENT

**I.    The Democratic Party Plaintiffs have an *ultra vires* cause of action against the EO.**

**A.    The Democratic Party Plaintiffs' claims are constitutional in nature.**

Federal Defendants wrongly claim that Plaintiffs lack any non-statutory cause of action. *See* ECF No. 213 at 1–5 ("FD Resp."); ECF No. 210 at 18–20 ("RNC Resp."). They insist DPPs' *ultra vires* claims are "statutory" rather than "Constitutional" in nature, meaning Plaintiffs must satisfy certain prerequisites to have a claim. *See Vought*, 149 F.4th at 791–93. But that argument is wrong as to nearly all DPPs' claims, which were expressly pled as constitutional claims as to at least sections 2(d), 4(a), 7(a), and 7(b). *See* DPP Compl. ¶¶ 126–163.[1] As those claims make clear, DPPs' *ultra vires* claims allege not merely that the Federal Defendants are "*exceeding* the statutory authority [they] ha[ve] been granted." *AFL-CIO v. Dep't of Lab.*, 778 F. Supp. 3d 56, 89 (D.D.C. 2025). Rather, it is that the President's commands are "without any legal authority *whatsoever*, whether statutory or constitutional." *Id.*; DPP Compl. ¶ 132 ("Each of these commands is *ultra vires* because the President lacks any constitutional or statutory authority to issue them."). "Courts have long recognized [such] implied equitable claims arising under the Constitution." *Vought*, 149 F.4th at 791.

In response, Defendants cite only to distinguishable cases that concerned claims that the President or his subordinates exceeded statutory authority that clearly existed—not that they acted in the absence of authority altogether. FD Resp. 1–5. In *Dalton v. Specter*, for example, public officials and unions challenged a recommendation to close the Philadelphia Naval Shipyard under the Defense Base Closure and Realignment Act of 1990. *See* 511 U.S. 462, 464 (1994). That law created a

---

[1] As noted, *see* ECF No. 196-1 at 20–22 ("DPP Mot."), DPPs did not originally challenge § 3(d) in their *ultra vires* count, though their complaint gave fair notice to such a claim, which is already in dispute via the LULAC Plaintiffs' complaint. Defendants offer token opposition to that request, *see* FD Resp. 4 n.3, based on the claim that "preliminary discovery" has occurred. But virtually no discovery has occurred as to § 3(d), which was enjoined prior to discovery here. DPPs therefore renew their request to either construe their complaint as pleading an *ultra vires* claim as to § 3(d) or, alternatively, for leave to amend.

commission for recommending base closures to the President and granted the President discretion to approve such recommendations. *Id.* at 465; *see also* Pub. L. 101-510, § 2903(e), 104 Stat. 1808, 1812 ("Review by the President"). Plaintiffs "sought review exclusively under the APA" and "did not name the President as a defendant," 511 U.S. at 471, alleging only that executive officials had "violated substantive and procedural requirements of the 1990 Act" by recommending closure of the Philadelphia shipyard—a recommendation the President adopted. *Id.* at 466. Despite the plaintiffs' purely statutory claims, a divided court of appeals held that "whenever the President acts in excess of his statutory authority, he also violates the constitutional separation-of-powers doctrine." *Id.*

The Supreme Court, however, rejected the notion that "every action by the President . . . in excess of his statutory authority is *ipso facto* in violation of the Constitution." *Id.* at 472. The Court explained it "often distinguished between claims of constitutional violations and claims that an official has acted in excess of his statutory authority," *id.*, citing *Youngstown* as an instance where the claim was constitutional because of the "*absence* of *any* statutory authority, not a claim that the President acted in excess of such authority," *id.* at 473. But—consistent with the *Dalton* plaintiffs' own pleadings—it held their cause to be a "statutory one," rooted in the allegation that the Executive "violated the terms of the 1990 Act." *Id.* at 474. The Court concluded judicial review was unavailable because "the statute in question commits the decision to the discretion of the President." *Id.*

This case is nothing like *Dalton*. Most obviously, DPPs pled constitutional claims against the President (and others) alleging the absence—rather than misuse—of legal authority to issue portions of the EO. *E.g.*, DPP Compl. ¶ 132. Such claims fit comfortably within the scope of *Youngstown*, where "no statute . . . expressly authorize[d]" the President to Act. *Youngstown*, 343 U.S. at 585. In contrast, the *Dalton* plaintiffs exclusively raised an APA challenge based on the Executive Branch's alleged non-compliance with a complex statutory scheme rife with grants of power to the President. *See* 511 U.S. at 471. Defendants cannot point to *any* relevant statute that bears resemblance to the one

in *Dalton*, where the President had "authority under the Act," including "discretion to approve or disapprove" base closures. *Dalton*, 511 U.S. at 470; *cf. id.* at 474 (explaining *ultra vires* review is unavailable where it "concerns not a want of [Presidential] power, but a mere excess or abuse of discretion in exerting a power given" (citation omitted)). DPPs possess the right to pursue such a constitutionally grounded separation of powers claim. *See Collins v. Yellen*, 594 U.S. 220, 245 (2021).

*Vought* and *Global Health*, upon which Defendants also rely, are like *Dalton*. *Vought* concerned the CFPB Director's managerial choices, which plaintiffs alleged amounted to shutting down the CFPB and overturning the Dodd-Frank Act. *Vought*, 149 F.4th at 771. But those issues were statutory because "Congress gave the CFPB broad discretion regarding how to pursue" its goals, including "unreviewable discretion to determine how much funding" it needs. *Vought*, 149 F.4th at 770–71 (collecting statutory authority). The court rejected plaintiffs' constitutional framing because their claims rested on the premise that "CFPB would violate [various] statutes that create the agency and require it to perform various mandatory tasks." *Id.* at 792–93. Their "supposed separation-of-powers [claim] turn[ed] entirely on whether CFPB officials violated the governing statutes." *Id.* at 793.

Similarly, *Global Health Council v. Trump*, 153 F.4th 1, 7 (D.C. Cir. 2025), concerned the President's impoundment of foreign aid that had previously been allocated by Congress. The plaintiffs pled a separation of powers claim alleging the President's impoundment violated "governing statutes," including the Impoundment Control Act of 1974 (ICA), which prescribes when the President can rescind funds. Am. Compl. ¶ 75, *AIDS Vaccine Advocacy Coalition v. Dep't of State*, No. 1:25-cv-400 (D.D.C. May 2, 2025), ECF No. 86; *see also* 2 U.S.C. § 683. The Court recognized that "the constitutional claim [wa]s predicated on underlying statutory violations," including of the ICA, which "provides a mechanism for the President to act on impoundment." 153 F.4th at 16–17.[2]

_____

[2] The Court rejected concerns that its holding would permit the President to evade constitutional

In stark contrast, this case does not "turn[] entirely" on whether the President or other defendants have violated any statutes, *Vought*, 149 F.4th at 793, nor is it "predicated" on "underlying alleged statutory violations," *Global Health*, 153 F.4th at 15 n.11. Rather, DPPs' claims are premised on the allegation that the "President lacks any constitutional or statutory authority to issue" the EO's various commands, DPP Compl. ¶ 132, and not simply that the President misused a grant of statutory authority. The fundamentally constitutional aspect of *this* case comes as no surprise because the Constitution "empowers only the states and Congress to 'regulate the conduct of [federal] elections," *State v. Meadows*, 88 F.4th 1331, 1346 (11th Cir. 2023) (quoting *Roudebush v. Hartke*, 405 U.S. 15, 24 (1972)), and "the Constitution gives no express role to the President in overseeing election procedures," *Georgia v. Clark*, 119 F.4th 1304, 1314 (11th Cir. 2024) (Rosenbaum, J., concurring). The President's effort to wrest control of federal elections from Congress and the States is a classic violation of the Constitution's separation of powers that does not turn on any statutory violation.

Defendants themselves confirm the constitutional nature of this case by relying entirely on constitutional *defenses*. They fail to cite any statutory source of authority for nearly every provision at issue, relying instead on the President's constitutional authority. As to § 2(d), the Defendants' argument is that "[t]he President, as the head of the Executive branch, has the *constitutional authority* to direct the actions of those agencies." ECF No. 177-1 ("FD Mot.") (emphasis added); *see also* FD Resp. 8 (rooting defense of § 2(d) in President's Article II authority). Likewise, as to § 7(a),

_____

review by "assert[ing] both constitutional and statutory authority to validate his conduct" only to have courts "characterize the whole dispute as statutory." *See* 153 F.4th at 15 n.11. It stressed that "this dispute is fundamentally statutory," because "the alleged constitutional violation is predicated on the underlying alleged statutory violations." *Id*. Judge Katsas's concurrence in the order denying rehearing *en banc* in *Global Health* reinforces the point. *See Glob. Health Council v. Trump*, No. 25-5097, 2025 WL 2709437, at *1 (D.C. Cir. Aug. 28, 2025). As he explained, the spending claims in *Global Health* turn "on whether the relevant appropriations *were* mandatory" under the appropriations statute, "which makes it statutory for reviewability purposes[.]" *Id*. In contrast, he noted the Court "could freely" consider any Article II assertion of authority under *Youngstown*. *See id*.

Defendants insist only that the President has a constitutional "duty to ensure that the Election Day statutes are faithfully executed," FD Resp. 38—but they identify no statutory "mechanism for the President to act" in those laws, nor any other authority for the President to set the manner by which States hold elections. *Global Health*, 153 F.4th at 16. The RNC *concedes* that "there exists no statute authorizing" enforcement of the Election Day Statutes and also relies exclusively upon the President's constitutional authority. ECF No. 176-1 at 21 ("RNC Mot."). These constitutional defenses make clear that DPPs' claims are not disguised statutory claims. And they distinguish this case from those where "the government disclaim[ed] any constitutional defense." *Global Health*, 153 F.4th at 15.

**B.    Plaintiffs satisfy the prerequisites for a statutory *ultra vires* claim in any event.**

Even if some of the DPPs' *ultra vires* challenges "turn[ed] entirely" on whether the EO "violate[s] the governing statutes," *Vought*, 149 F.4th at 793, review would still be available because "(1) judicial review is not expressly foreclosed; (2) the agency made an extreme legal error; and (3) there is no alternative means for the plaintiff to seek judicial review," *id.* at 791.

Defendants claim these prerequisites are not met chiefly because the APA forecloses review. *See* FD Resp. 1–5. But APA review plainly is *not* available as to much of the EO because no final agency action has yet occurred, in part due to a parallel preliminary injunction. Defendants notably fail to cite a single case holding that the uncertain prospect of a future APA challenge bars judicial review of an *ultra vires* claim. The D.C. Circuit has suggested the opposite, explaining the APA "does not repeal the review of *ultra vires* actions," *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996) (citation omitted), and that "[statutory] ultra vires review remains available to test presidential action alleged to violate any … statute," notwithstanding that "[p]residential action may [also] be reviewed through APA challenges to final agency action," *Global Health*, 153 F.4th at 17 n.14. Absent such final action, DPPs lack "alternative means" for challenging the EO.

That distinguishes this case from Defendants' precedent once more. In *Vought*, the plaintiffs "disavow[ed] any [statutory] *ultra vires* claim." 149 F.4th at 791.[3] In *Global Health*, the Court held statutory *ultra vires* review was unavailable based on the second factor, as it was not obvious that the President transgressed his delegated authority under the ICA. *See* 153 F.4th at 20. And in *Nuclear Regulatory Commission*, the plaintiffs had a clear statutory claim, but they failed to preserve it. *NRC v. Texas*, 605 U.S. 665, 675–76 (2025). The plaintiffs could not assert an *ultra vires* claim as a substitute for that forfeited claim because they "had an alternative path" which "guaranteed judicial review," but they failed to pursue it. *Id.* at 682. That is not the case here.

## II.    Section 2(d) should be declared unlawful and permanently enjoined.

### A.    Defendants' effort to rewrite § 2(d) does not defeat standing.

Defendants' passing challenge to DPPs' standing to challenge § 2(d) requires rewriting its plain text, which compels federal officials to "*assess citizenship prior* to providing a Federal voter registration form to enrollees of public assistance programs." E.O. § 2(d) (emphasis added). Defendants say this merely requires federal voter registration agencies to "remind[]" applicants that they must be citizens to register. FD Resp. 7. They argue that because § 2(d) does not facially require federal officials to "withhold" the Federal Form from anyone, the DPPs cannot be injured. *See id.*

While the President is free to amend his own orders, his lawyers are not. To "assess" a qualification to vote means to "determine" or "evaluate" it, *see Assess*, Black's Law Dictionary (12th ed. 2024), not merely to "remind" someone about it. The provision's use of the term "prior" adds a sequencing element—under § 2(d), citizenship must be "assessed" or "determined" *before* the Federal Form is "provided." *Cf. Gorss Motels, Inc. v. Safemark Sys., LP*, 931 F.3d 1094, 1100 (11th Cir.

---

[3] In *dicta*, the Court noted that any fired employees would likely be able to sue under the Civil Service Reform Act, while impacted consumers could seek review through the APA for unreasonable delay. *Id.* That observation does not suggest—never mind hold—that the mere glimmer of APA review bars an *ultra vires* claim. Moreover, the Court's reference to the APA alludes to the unlawful *withholding* of agency action under 5 U.S.C. § 706(1), rather than challenges to final agency action under § 706(2).

2019) (explaining qualifier "prior" means event must precede subsequent event). The EO therefore requires federal officials to determine one aspect of a voter's qualification to register—U.S. citizenship—before providing them the Federal Form in the first place. Reading § 2(d) "as the Government desires requires rewriting, not just reinterpretation." *United States v. Stevens*, 559 U.S. 460, 481 (2010); *see also N. Am.'s Bldg. Trades Unions v. Dep't of Def.*, 783 F. Supp. 3d 290, 311 (D.D.C. 2025) (rejecting "post hoc effort" to "sidestep" the plain text of an EO).[4]

Federal Defendants raise no argument about standing under a proper reading of § 2(d). Nor could they. By adding a burdensome, extra step for obtaining the Federal Form, § 2(d) makes it more difficult to use that form, even where an applicant can comply with the new rule. *See Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1351–52 (11th Cir. 2009). That obstacle to voter registration harms the DPPs' organizational voter registration efforts, as well as their individual members. As this Court's analysis already confirms, that suffices for standing. *See League of United Latin Am. Citizens v. Exec. Off. Of the President*, 780 F. Supp. 3d 135, 207–09 (D.D.C. 2025) (*LULAC*).

**B.    Section 2(d) is *ultra vires* and violates the separation of powers.**

Congress has prescribed a mandatory sequence for distributing the Federal Form at designated voter registration agencies that provide public assistance. *See* 52 U.S.C. § 20506(a)(4), (6). Neither Defendants nor the RNC point to any law that grants the President discretion to disrupt this sequencing by requiring citizenship assessments before distributing the Federal Form. None exists.

Bereft of any statutory authority, Defendants rely on the President's "constitutional authority to direct Executive agencies" in how they "carry out their statutory duties." FD Resp. 8. But the President cannot order officials to exercise discretion where Congress has afforded none. Here, the

---

[4] Defendants' effort to alter § 2(d)'s plain text fails as to standing and the merits. But at the standing phase, the Court must also "assume *arguendo* the merits of [DPP's] claim." *Tanner-Brown v. Haaland*, 105 F.4th 437, 445 (D.C. Cir. 2024). The effort thus fails twice over as to standing.

"statutory language is mandatory," so the President "does not have the discretion" to add steps. *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 661 (2007). His Take Care Clause authority does not permit him to modify a "clear congressional mandate under the guise of exercising 'discretion.'" *Texas v. United States*, 555 F. Supp. 3d 351, 412–13 (S.D. Tex. 2021). Nor is this an instance "where Congress [did] not speak directly to the issue." FD Resp. 11. Instead, it "impose[d] discretionless obligations" on the Executive. *Lopez v. Davis*, 531 U.S. 230, 231 (2001). The statutory scheme is mandatory, and "[t]here is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes." *Clinton v. City of New York*, 524 U.S. 417, 438 (1998).

For its part, the RNC continues to rely on 8 U.S.C. § 1642 as the source of the President's authority—a puzzling claim given that neither the EO nor the Federal Defendants have once invoked that law.[5] Even assuming the RNC can supply the President legal authority he himself does not claim, its argument fails. Section 1642(a)(2) instructs the AG to establish procedures for certain recipients of public benefits to "provide proof of citizenship in a fair and nondiscriminatory manner." The law is not self-actualizing—it simply orders the AG to promulgate a rule under the APA. Section 1642 therefore does nothing on its own to qualify the "mandatory duty" in the NVRA to "provide the Federal Form 'with each *application.*'" *LULAC*, 780 F. Supp. 3d at 210 (quoting 52 U.S.C. §§ 20506(a)(6)). Nor, by ordering the AG to undertake a rulemaking process, does it somehow grant the President power to modify the text of the NVRA or shirk notice-and-comment rulemaking.

Further still, the AG has yet to promulgate a final regulation implementing a verification requirement under § 1642. Instead, DOJ has issued interim guidance, *see* 62 Fed. Reg. 61344 (Nov. 17, 1997), and a proposed rule, *see* 63 Fed. Reg. 41662 (Aug. 4, 1998). Both documents state an agency "should determine whether an applicant otherwise meets specific program requirements for

---

[5] That is not for lack of awareness, as President Trump previously invoked § 1642 in other Executive Orders. *See, e.g.*, Exec. Order No. 14218, 90 Fed. Reg. 10581 (Feb. 19, 2025).

benefit eligibility before initiating the [citizenship] verification process" because of the "potential intrusiveness and possibly time-consuming nature of the citizenship" inquiry. 62 Fed. Reg. at 61346–47; *see also* 63 Fed Reg. at 41667 (similar). Thus, whereas the NVRA prescribes the point at which the Federal Form must be distributed—"with each application," 52 U.S.C. § 20506(a)(6)(A)—§ 1642 imposes no such restriction. *Cf. LULAC*, 780 F. Supp. 3d at 210 (observing "*[a]pplicants* . . . not *recipients*" are "entitled to the Federal Form").

The RNC's remaining arguments fail, too. It notes that the NVRA requires informing applicants about eligibility requirements, *see* RNC Resp. 5–6, but neglects that the provision it quotes is directed at "each State," 52 U.S.C. § 20507(a)(5)(a). That is consistent with the NVRA's design, which treats federal voter registration agencies as conduits for transmitting Federal Form applications to state election officials, the officials responsible for assessing voter qualification. *See* 52 U.S.C. § 20506(a)(4)(A)(iii). Finally, the RNC again points to the applicant's option to decline the Federal Form, *see* RNC Resp. 5, but that express statutory exception supplies the "*only* circumstance in which a voter registration agency may withhold the Federal Form," *LULAC*, 780 F. Supp. 3d at 162, confirming that Congress knew how to sequence distribution of the Federal Form when it wished to.[6]

### III.    Section 3(d)'s DPOC Requirement for the Federal Post Card Application is unlawful.

#### A.    Federal Defendants' threshold arguments as to § 3(d) fail.

*Ripeness.* Defendants' chief argument is that DPPs' challenge to § 3(d) is premature because it is unclear "what the FPCA may ultimately look like if and when 3(d) is implemented." FD Resp. 21.

---

[6] DPPs' Fifth Amendment challenge to § 2(d) is properly addressed at Phase III. DPP Mot. 59 n.21. Defendants argue that *all* APA claims should be resolved now, *see* FD Resp. 5, but ignore the multi-phase summary judgment plan in this case, which contemplates "discovery and/or the production of one or more administration records" at Phase III. ECF No. 141 at 3. They also ignore DPPs' Rule 56(d) declaration describing what facts are required as to this claim, among others. ECF No. 196-5. The RNC's own authority *agrees* that "many if not most cases" involving *Anderson-Burdick* present "a fact-intensive inquiry." *Daunt v. Benson*, 999 F.3d 299, 313 (6th Cir. 2021). Here, the Court need not resolve a "fact-intensive inquiry" with no record because (1) the schedule contemplates further summary judgment briefing, and (2) alternative grounds may moot such claims.

But that is a red herring—§ 3(d) "leaves no uncertainty about what it requires." *LULAC*, 780 F. Supp. 3d at 185. Just like § 2(a), it "prescribe[es] the substance of the documentary-proof-of-citizenship requirement it purports to mandate." *Id*. Section 3(d) even borrows the same definition of DPOC from § 2(a), and thereby "dictates a particular outcome" DOD must reach. *Id*. Tellingly, Defendants fail to explain *how* implementation of § 3(d)'s will alter or inform the Court's evaluation of the merits. They cannot do so because "the precise contours of the mandated requirement" are clear already. *Id.* at 184.

*Associational Standing.* Defendants' attacks on standing fail too. To start, DPPs have established through undisputed evidence that many members would be unable to comply with § 3(d)'s DPOC requirement. *See* SOF ¶ 20. Defendants do not dispute that fact. Even so, the bar for standing is much lower; DPPs can establish associational standing by showing that at least one of their members "would be required to present [DPOC] to vote" via the Federal Post Card, even if they are ultimately able to comply with the requirement. *Billups*, 554 F.3d at 1352 (citing *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 668 (1966)); *see also Fish v. Schwab*, 957 F.3d 1105, 1120 (10th Cir. 2020) (holding that "requirement [to] provide DPOC is sufficient to establish standing"). DPPs have done so with sworn, uncontroverted declarations from members stating their desire to register to vote via the Federal Post Card, and explaining how compliance with § 3(d) would make the Federal Post Card costlier and less appealing to them. *See* SOF ¶¶ 20, 24–25, 27. That is a "sufficient injury" for an individual member's standing, *Billups*, 553 F.3d at 1352.

Federal Defendants quibble about *how* burdensome it would be for DPPs' members to comply with § 3(d). FD Resp. 23. But it is enough that the requirement would regulate members who are able to comply, while also burdening them in concrete ways, such as through added shipping costs or risk to personal data. SOF ¶¶ 20, 24–25, 27. By the same token, "[t]he inability of a voter to pay a poll tax" is "not required to challenge a statute that imposes a tax on voting." *Billups*, 553 F.3d at 1352 (citing *Harper*, 383 U.S. at 668). Defendants' appeal to *Clapper* is irrelevant for similar reasons; the

relevant harms here are the costs, risks, and inconveniences of complying with § 3(d)—not the burdens associated with obtaining a passport. *Contra* FD Resp. 24. *Those* harms are traceable to § 3(d) alone. *See* SOF ¶¶ 20, 24–25, 27. And, unlike in *Clapper*, enforcement of § 3(d) is not hypothetical—absent permanent relief, its "DPOC requirement [will be] enforced against" DPP members. *Fish*, 957 F.3d at 1120 (rejecting *Clapper* argument as to DPOC requirement). Those members will then either be forced to forego use of the Federal Post Card or bear the costs of compliance. SOF ¶¶ 20–25, 27.

**Competitive Standing.** DPPs also have competitive standing because "some of their constituents and likely supporters may be unable to register to vote or may be dissuaded from registering" if § 3(d) is implemented. *LULAC*, 780 F. Supp. 3d at 192; SOF ¶¶ 23–27. Defendants insist that § 3(d) must directly "require or forbid" actions by candidates, and that *voting* regulations are unrelated to candidates' "concrete interest in winning election[s]." FD Resp. 24–25. That is wrong: the touchstone of competitive standing is whether "regulations illegally structure a competitive environment." *Shays v. Fed. Election Comm'n*, 414 F.3d 76, 87 (D.C. Cir. 2005). As this Court held, registering to vote is indisputably a central part of an election's competitive environment. *LULAC*, 780 F. Supp. 3d at 192. And Defendants' recycled argument that DPPs must show "Section 3(d) will cost Jeffries and Schumer their election[s]," FD Resp. 25, was already rejected by the Court: a candidate "has no obligation to demonstrate definitively that he has less chance of victory under" a challenged rule to show competitive standing. *LULAC*, 780 F. Supp. 3d at 193 (citation omitted).

**Organizational Standing.** DCCC and DNC have also "each shown that the implementation of Section [3(d)] would make it more difficult for them to register voters," "forcing them to divert additional resources" to ensure their members and supporters abroad are able to request ballots annually. *LULAC*, 780 F. Supp. 3d at 191; SOF ¶¶ 20–34. Defendants insinuate these harms are not "material" because DPPs have "reached out to overseas voters in prior elections." FD Resp. 22. But that ignores that § 3(d) imposes a *new* "obstacle[]" that will "unquestionably make it more difficult"

for these organizations to help "register[] voters." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016) (finding organizational standing as to DPOC requirement). Accordingly, § 3(d) is an encumbrance that will "directly affect[] and interfere[] with" DPPs' voter efforts moving forwarding. *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024); *see also* SOF ¶¶ 28–33. And it will require new expenditures that "necessarily come at the cost of other . . . planned activities and expenditures." SOF ¶ 32. That supports standing, too. *See LULAC*, 780 F. Supp. 3d at 190.

**B.      Section 3(d) is *ultra vires*.**

Congress tasked the Executive with "prescrib[ing] an official post card form" through which overseas and military voters could both register and request a ballot. 52 U.S.C. § 20301(b)(2). As explained, Congress's longstanding choice to require a "post card" application for overseas voters was deliberate. *See* DPP Mot. 16–18. And, by definition, a self-contained post card form cannot be understood to include extrinsic documentation like copies of "documentary proof of United States citizenship" or other "proof of eligibility." E.O. § 3(d); *see* DPP Mot. 18–19.

Defendants try to deflect from the statute's use of the term 'post card,' FD Resp. 27, ignoring that "each word Congress uses is there for a reason." *Advoc. Health Care Network v. Stapleton*, 581 U.S. 468, 469 (2017). The term "post card" in UOCAVA is no exception—it was created as something "anyone could handle." SOF ¶ 19. The term deserves particular attention because Congress could just as easily have omitted it and told the Executive to prescribe a "form" or "application." *Cf.* 52 U.S.C. § 20505(a)(1). But the fact that it "did not adopt obvious alternative language" carries "the natural implication is that it did not intend [any] alternative." *Stapleton*, 581 U.S. at 469 (cleaned up).

Despite conceding that the term "post card" "might place some limit on the form of the voter registration application," FD Resp. 27, Federal Defendants insist § 3(d) is lawful because it is not "impossible" to impose the EO's DPOC requirement while maintaining a "post card form." *Id.* But no matter how liberally the term "post card" is construed, it plainly cannot be stretched—physically

13

or rhetorically—to include extrinsic documentation. That is not what a "post card" is. *See California v. Trump*, 786 F. Supp. 3d 359, 383 (D. Mass. 2025). Requiring additional documentation atop the singular, standalone "card" would defeat a key purpose of UOCAVA, to obviate the need for an envelope. *California*, 786 F. Supp. 3d at 383; SOF ¶¶ 18.

While the modern Federal Post Card is "8 ½ x 11," Defendants' description of it as a "two page" document is misleading; the current form is printed on a single, *double-sided* piece of paper, which can be folded and sent as a single piece of mail, with no outer envelope. *See* FD Resp. 27. That it can be "print[ed] out" (FD Resp. 27), submitted electronically, or placed in an outer envelope with additional postage reflects only that Congress created a floor, not a ceiling in developing the Federal Post Card. That voters can submit the card by various means says nothing about the President's power to unilaterally add new documentation requirements or to eliminate the form's baseline status as a standalone "card" that can be mailed "without an envelope." *California*, 786 F. Supp. 3d at 383.

**IV.    Section 7's threatened preemption of State ballot receipt deadlines is unlawful.**

**A.    The Democratic Party Plaintiffs have standing to challenge § 7.**

The AG's threat to "enforce" a fictious federal ban on post-Election Day ballot receipt laws continues to severely harm DPPs, stymieing preparations for the 2026 elections, hindering candidate recruitment, and saddling voters with uncertainty about whether their ballots will be counted—an acute concern in States where most voting occurs by mail. Indeed, DOJ has threatened at least one state with "costly litigation in federal court" if it does not abandon its ballot receipt law.[7] DOJ sent this letter *weeks before* telling this Court that "how [§ 7] will be enforced is speculative." FD Resp. 31. Similar efforts may well be underway, but DOJ has not yet properly amended its discovery

---

[7] Ohio's Secretary of State testified to a committee that AAG Dhillon "implored Ohio to take immediate action (legislative or otherwise) to" change its ballot receipt deadline to "avoid costly litigation in federal court" in a September 29 letter to Ohio officials. Ex. 65. Ohio's legislative leaders then proposed an amendment that would change the state's ballot receipt deadline. *Id.*

responses to reflect such developments. Regardless, DPPs are suffering ongoing harms from § 7.

 ***Organizational Standing.*** Defendants claim that DPPs' organizational harms are "speculative" because no enforcement of § 7 has yet occurred. FD Resp. 33. But that ignores the AG's recent enforcement efforts and the nature of DPPs' injuries. As the 2026 midterms rapidly approach, the legal uncertainty over when ballots must be received in dozens of States looms over many of the DPPs' strategic decisions. "At this point in the election cycle," DPPs "would normally be making strategic decisions about [their] mail-ballot related programs," but the EO has "frustrat[ed] [their] ability" to do so. SOF ¶ 60 *see also id.* ¶¶ 59-61. There is nothing "speculative" about these injuries; they are happening now and severely disrupting DPPs' organizational efforts. And the fact that the AG has not yet brought litigation to enforce § 7 changes nothing because the *threat* of imminent enforcement suffices to create a present injury. *See* DPP Mot. 27–28; *see also N.H. Right to Life Pol. Action Comm. v. Gardner*, 99 F.3d 8, 13 (1st Cir. 1996) (explaining that "a credible threat of present or future prosecution itself works an injury that is sufficient to confer standing"). As DPPs learned just two days ago, DOJ is now amplifying these threats. *See* Ex. 65.

 Defendants' response is revealing: they argue that DPPs should just pretend § 7 is already in effect and "proceed as if mail-ballots are due by" Election Day. FD Resp. 33. In other words, they insist DPPs "should trade one form of irreparable harm for another." *VanDerStok v. Garland*, 625 F. Supp. 3d 570, 584 (N.D. Tex. 2022). But "it is no answer to say [DPPs] may avoid [] harm by complying with an unlawful agency" command like § 7. *Id.* Defendants' response *confirms* DPPs have standing here because they "face irreparable injury in whichever course they choose—suffer injury by complying with a regulation they allege Defendants lack the authority to enforce *or* risk … enforcement" that imposes other harms upon DPPs. *Nat'l Ass'n for Gun Rts., Inc. v. Garland*, 697 F. Supp. 3d 601, 629 (N.D. Tex. 2023); DPP Mot. 27–28. DPPs should not be forced to make the impossible choice of either suffering the uncertainty of threatened enforcement—which could occur

at any time between, before or after election day—or simply surrendering to the President's shakedown by accepting his unlawful command. "Forced compliance with an 'unlawful regulation' is itself a legally cognizable harm, which the court can remedy by declaring the regulation invalid." *Pharm. Rsch. & Mfrs. of Am. v. Stolfi*, 724 F. Supp. 3d 1174, 1197 (D. Or. 2024).

Even accepting Defendants' flawed premise, responding to the sudden imposition of a nationwide ballot receipt deadline would also "interfere[]" with DPPs' "core" activities, and would "perceptibly impair[]" their operations. *Hippocratic Med.*, 602 U.S. at 395; *see also* SOF ¶¶ 57-61. The "monumental and unprecedented investments" necessary "to ensure that voters . . . are not disenfranchised" by a sudden nationwide shift in ballot receipt rules is a far cry from ordinary get-out-the-vote operations. ECF No. 198-1 ¶ 18.

***Associational Standing.*** DPPs also have associational standing because § 7 threatens to deprive their members of a lawful period for their timely-cast ballots to count, while creating substantial confusion about how to cast a ballot in timely fashion and imposing the burden of tracking shifting deadlines. *Harding v. Edwards*, 484 F. Supp. 3d 299, 311 (M.D. La. 2020) (explaining confusion from attempting to comply with an "ever-shifting landscape" of "voting procedures" shows injury).

Defendants' sole response is to claim DPPs' associational standing is conditional on state deadlines actually changing. FD Resp. 35. But several of DPPs' declarants testified to concerns that "the rules for mail voting could be in flux or limbo up through the election, and [that they] will need to keep track of which deadline applies." ECF No. 198-9 ¶ 7; *see also* ECF No. 198-7 ¶ 8. These members are presently harmed by the confusion and burdensome monitoring wrought by § 7.

Relatedly, Defendants are wrong to claim that a State would actually "have to change its ballot receipt deadline" for DPPs to be harmed. FD Resp. 35. That ignores the unfortunate reality that *post-election* challenges to ballots—even those cast under existing laws—are increasingly common. To wit, over the past year, a failed candidate for the North Carolina Supreme Court spent months in court

attempting to invalidate over 60,000 ballots to reverse his election loss. *See generally Griffin v. N. Carolina State Bd. of Elections*, 781 F. Supp. 3d 411 (E.D.N.C. 2025). President Trump also famously refused to accept the results of the 2020 presidential election and—among his litany of post-election efforts—challenged the validity of Pennsylvania ballots cast by Election Day but received shortly thereafter—the very issue here.[8] Thus, a Democratic Party member whose ballot appears to count under their State's post-Election Day receipt law cannot rest assured that ballot will not be challenged after the fact; the AG may invoke § 7 at any time in an effort to invalidate such ballots.

**Competitive Standing.** President Trump, through § 7, is weaponizing his authority to undermine the use of mail voting, which he believes favors his Democratic opponents. SOF ¶¶ 37-47. It naturally follows that DPPs have competitive standing because § 7 seeks to "illegally structure a competitive environment" in which DPPs are "defending [the] concrete interest[]" of "retention of elected office." *Shays*, 414 F.3d at 87. It is hard to fathom a more appropriate circumstance for competitive standing than when an incumbent abuses his power to undercut the ability of his opponents to compete.

Defendants argue competitive standing is lacking because § 7 does not directly regulate candidates or parties and directs enforcement against States. *See* FD Resp. 35–36. But they largely ignore DPPs' authority explaining both that non-regulated parties can have standing where they are impacted in predictable ways, *see* DPP Mot. 26, and also that injured parties effectively *are* regulated directly when challenged action "requires nominally 'independent' third parties to implement the regulation's prohibitions," *id.* (quoting *Bldg. & Const. Trades Dep't, AFL-CIO v. Allbaugh*, 172 F. Supp. 2d 67, 75 (D.D.C. 2001)). DPPs—political party committees, their hundreds of federal candidates, and their millions of members—are obviously impacted by an attack on state balloting

---

[8] *See* Alan Feuer, *Trump Loses String of Election Lawsuits, Leaving Few Vehicles to Fight His Defeat*, N.Y. Times (Nov. 13, 2020), https://www.nytimes.com/2020/11/13/us/politics/trump-loses-election-lawsuits.html (describing suits intended to invalidate ballots cast by, but received after, Election Day).

rules, even where (as here) the federal government seeks to coerce intermediary States. *See id.* at 26–27.[9] Federal Defendants' passing rejoinder that § 7 could only "incidentally" affect DPPs does not pass even cursory review, FD Resp. 35, and ignores record evidence, SOF ¶¶ 52-64. Their reference to *Murthy v. Missouri* is also off the mark; that case was a "sprawling suit" where disparate plaintiffs alleged future censorship harms based on solely "on allegations of past Government censorship" over social media. 603 U.S. 43, 61–62 (2024). Here, the President has definitively announced a forward-looking policy and is now actively pursuing it. *See* Ex. 65. DPPs do not ask the Court to draw predictive inferences from past actions, just to take the President's own words in § 7 at face value.

Next, the Federal Defendants claim the DPPs must show § 7 "will cost their candidates their races." FD Resp. 36. But the D.C. Circuit has rejected "requiring candidates to establish that but for certain . . . rules they could have won an election," *Shays*, 414 F.3d at 91, and the DPPs have provided evidence to that effect in any event, *see* ECF No. 198-5 ¶ 9. Relatedly, Defendants assert that the DPPs have not shown Democrats "would be disadvantaged by a generally applicable earlier" deadline for mail ballots. FD Resp. at 36. But *Shays* explains that "across-the-board changes undermine statutorily protected expectations," even where a rule gives plaintiffs "the same legal options as their opponents." 414 F.3d at 84, 87. Moreover, DPPs *have* provided evidence that they would be disproportionately harmed by a nationwide Election Day receipt deadline. *E.g.*, ECF No. 198-5 ¶ 34; ECF No. 198-1 ¶ 19. If any doubt existed, the Court need only credit the President's own past statements to that effect. SOF ¶¶ 37-47. DPPs have therefore established competitive standing.

**B.    Section 7 is *ultra vires* and violates the separation of powers.**

The President's attempt to conjure a national election-day ballot-receipt deadline in States

---

[9] Defendants acknowledge that *Diamond Energy* held standing may exist where a non-regulated party is predictably impacted. *See* FD Resp. 32. Still, they insist there are too many "unknowns" for that to be the case here, *id.*, but gloss over undisputed facts showing the harms DPPs are already suffering, SOF ¶¶ 57-61, as well as the further harms they face from enforcement, *id.* ¶¶ 51-56, 63-64.

across the country violates the separation of powers. Defendants argue the EO enforces the Election Day Statutes, but those laws say *nothing* about ballot receipt deadlines, never mind the President's power to "enforce" them, E.O. § 7(a), or "condition" funding from the EAC upon them, E.O. § 7(b).

While much ink has been spilled on § 7, the key question is straightforward: do the Election Day Statutes set a national ballot receipt deadline or authorize the President to impose one at his pleasure? They do no such thing. Neither Defendants nor the RNC can point to *any* text in those laws that mention ballot receipt or grant the President any authority to set any kind of ballot casting rule. Accordingly, it remains the "responsibility" of "the States" to determine the "mechanics" for ballot receipt in their respective domains. *Foster v. Love*, 522 U.S. 67, 69 (1997). That should end the matter.

Defendants nonetheless try to cram a ballot receipt rule into the term "election," which the RNC admits refers to "the act of choosing" or a "public choice," RNC Resp. 15. But nothing about these words implicates ballot *receipt* by election officials. State laws that require the "public" to make their "choice" by Election Day (and then relinquish their ballot to election officials or the Postal Service) readily satisfy those terms. *See* DPP Mot. 32–33. They are in no way "inconsistent" with the Election Day Statutes, so there is no basis to suggest Congress "exercised" any authority to preempt them. *Ex parte Siebold*, 100 U.S. 371, 392 (1879). The RNC grasps at *Foster*, but the Supreme Court there declined to define the term "election" beyond stating that it supplies the time by which voters must "make [their] final selections." 522 U.S. at 73. State laws define when that selection must be received.

Defendants also try to evade numerous statutes in which Congress has acknowledged and directly incorporated States' post-Election Day receipt deadlines, *see* DPP Mot. 34–35, claiming the statutes in fact created exceptions to the Election Day Statutes, *see* RNC Resp. 17; FD Resp. 39. But they cannot show where Congress did so, relying instead solely on the factually wrong assertion in *RNC v. Wetzel*, 120 F.4th 200 (5th Cir. 2024). Simply put, there is no exemption in UOCAVA or any

other federal law to the President's fictious national ballot receipt deadline.[10] To the contrary, Congress for the better part of a century has enacted laws that, by their text, defer to deadlines set by state ballot receipt laws. *See* DPP Mot. 34. Defendants cannot explain what these *express* statutory phrases—like "deadline for receipt of the State absentee ballot under State law," 52 U.S.C. § 20303(b)—could mean if the Election Day Statutes had already displaced just such state laws. They therefore fail to present a construction of the Election Day Statutes that can be "harmonized" with other existing federal laws. *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018).

At bottom, Federal Defendants and the RNC place nearly all their reliance on *Wetzel*, which is the only case in American history to hold that federal law—unbeknownst to state legislatures, Congress, and numerous courts—imposes a uniform national ballot receipt deadline, based on a strained construction of the term "election."[11] On the other side of ledger are myriad federal and state decisions, *see* DPP Compl. ¶ 51, extensive State practice going back a century and more, *see id.* ¶¶ 45–46, Congressional enactments praising and adopting these State laws, *see id.* ¶ 49; DPP Mot. 34–

---

[10] *Wetzel* contradicted itself by stating UOCAVA authorizes post-Election Day receipt for some voters "through its statutory text," 120 F.4th at 213, when two pages earlier it (correctly) noted that "[n]othing in" UOCAVA "says that States are allowed to accept and count ballots received after Election Day," *id.* at 211. *Wetzel* was also wrong where it said that "today[] a substantial majority of States prohibit officials from counting ballots received after Election Day." *Id.* at 210. In reality, about thirty States permit such ballots to count for at least some voters. SOF ¶¶ 48–50. But overseas and military voters benefitting from such state laws would—under Defendants' reading—be violating the Election Day Statutes, and no carveout for them exists in UOCAVA or elsewhere.

[11] *Maddox v. Bd. of State Canvassers*, 149 P.2d 112 (Mont. 1944), is not another such case. It interpreted a *state* law requiring that ballots "*delivered* to the election officials and *deposited* in the ballot box before the closing of the polls on Election Day." *Id.* at 115 (emphases added). Because "state law provide[d] for voting by ballots deposited" at that time, so too did the Election Day Statutes. *Id. Maddox* thus confirms that *state law* determines ballot casting rules. Further still, precedent close in time with *Maddox* shows that other States deemed a ballot cast when "the ballot [wa]s marked and deposited in the mail addressed to the proper election officer." *Goodell v. Judith Basin Cnty.*, 224 P. 1110, 1113 (Mont. 1924) (citing *In re Opinion of the Justices*, 113 A. 293 (N.H. 1921)); *see also Burke v. State Bd. of Canvassers*, 107 P.2d 773, 778 (Kan. 1940) (same). Montana has since changed its laws to permit post-election ballot receipt for certain military-overseas ballots—laws the Federal Defendants' reasoning would find preempted. *See* Mont. Code §§ 13-21-206(1)(c); 13-21-226(1).

35, and—most importantly—the plain meaning of the term "election" as used in the relevant laws. Further still, there is no evidence of the Executive Branch ever having "enforced" the Election Day Statutes against the many States that have adopted post-Election Day receipt deadlines throughout the past century and beyond. *Cf. N.L.R.B. v. Noel Canning*, 573 U.S. 513, 525 (2014) (explaining how the longstanding practice of the Executive Branch can inform the meaning of the law). President Trump did not simply discover this newfound enforcement authority to alter state law—it does not exist. His effort to will such authority into existence through § 7 is *ultra vires* and invades upon the Elections Clause domain of the States and Congress.[12]

## V.    The EAC should be permanently enjoined from enforcing § 4(a).

HAVA permits States to receive certain funding if, among other things, they certify compliance with a suite of federal laws "described in section 21145." 52 U.S.C. § 21003(b). Section 4(a) of the EO orders the EAC to withhold "Federal funds to States that do not comply with the Federal Laws set forth in 52 U.S.C. 21145." E.O. § 4(a). While that command to the independent EAC likely "exceeds the President's authority," *LULAC*, 780 F. Supp. 3d at 199, it would have evoked little controversy if it went no further than parroting the requirements § 21003(b).

The problem is that § 4(a) goes further. It also requires that States "accept and use" the Federal Form, including as to "any requirement for documentary proof of United States citizenship adopted pursuant to section 2(a)(ii) of this order." E.O. § 4(a). Section 2(a)'s DPOC requirement is *ultra vires*, and the President may not impose it circuitously by amending Congress's statutory funding requirements to include a DPOC requirement. *See* DPP Mot. 40–41.

Defendants, including the EAC and its Commissioners, do not disclaim intent to enforce this

---

[12] The Federal Defendants hastily defend § 7(b) by characterizing it as an enforcement of a law requiring States to adopt "[non]discriminatory standards," *see* FD Resp. at 41. But they do not address any of Plaintiffs' arguments to the contrary. *See* DPP Mot. at 36–38 & n.10.

provision. Instead, they argue this claim is premature because the EAC has not yet adopted a DPOC requirement. FD Resp. 29. As a practical matter that may be true—so long as § 2(a) is enjoined, the EAC likely cannot enforce § 4(a) as written. But in Defendants' view, the President is entitled as a legal matter to require the EAC to adopt a DPOC requirement at his command. *See LULAC*, 780 F. Supp. 3d at 194–200. His effort to impose that belief via § 2(a) is *ultra vires* and properly enjoined by this Court. *See id*. Accordingly, § 4(a)—which seeks to achieve the same end as § 2(a) through the threat to withhold of federal funds—should be enjoined for substantially the same reasons as § 2(a).

## VI.    The Court should set aside the unlawful SAVE expansion.

Federal Defendants' Response confirms that DPPs are entitled to judgment on their claim that the recent "overhaul" of SAVE violated the Privacy Act's data-protection and transparency provisions and thus must be set aside under the APA. *See* FD Resp. 11–20; DPP Mot. 41–56 (citing 5 U.S.C. § 552a(e)). Seeking to evade review, Defendants advance primarily threshold arguments, mustering barely four sentences on the merits. FD Resp. 11–20. None holds up.[13]

### A.    Democratic Party Plaintiffs have standing to challenge the SAVE expansion.

DPPs have standing because the SAVE expansion harms their members' privacy interests and voting rights, and also impairs DPPs' mission-critical programs. DPP Mot. 45–50.

*Privacy harms.* Defendants admit that disclosure of personal information—including citizenship indicators, numerical identifiers, descriptions of agency findings, and work history—are occurring, but argue such harm is not akin to a historically recognized tort and thus does not "qualify"

---

[13] On the day this brief was filed, DHS published a "modified" SORN "to update the purpose of SAVE to include the addition of expanded search functionality for registered SAVE user agencies to verify the U.S. citizenship of U.S. citizens by birth and to clarify use of SAVE for voter verification," effectively conceding the merits. 90 Fed. Reg. 48948 (Oct. 31, 2025). The SORN confirms the addition of new categories of records, categories of individuals, as well as the new uses DPPs identified. 90 Fed. Reg. 48949. While the Privacy Act precludes implementation of most of the changes until December 1, *see id.*, there is no dispute that the challenged SAVE changes have been in effect for months and that SAVE users are presently using these updates to purge voter rolls.

as injury. FD Resp. 12. Not so—several long-recognized torts recognize the analogous injuries inflicted here. *See* DPP Mot. 45–48.

Federal Defendants' view that "breach of confidence" is too "new[] to the tort family" to satisfy the Supreme Court's "historical origin" test, FD Resp. 13–14, is foreclosed by precedent. The D.C. Circuit squarely held in *Jeffries v. Volume Services America* that harm akin to breach of confidence satisfies Article III because the "harm the . . . tort makes actionable—an unauthorized disclosure of privileged information" provides a "basis for a lawsuit in English or American courts." 928 F.3d 1059, 1065 (D.C. Cir. 2019) (citing *Spokeo v. Robins*, 578 U.S. 330, 341 (2016)).

Federal Defendants urge the Court to ignore *Jeffries* because it "predated *TransUnion.*" FD Resp. 13 (citing *TransUnion LLC v. Ramirez*, 594 U.S. 413, 427 (2021)). That is irrelevant. *TransUnion* applied the same "historical analysis" test announced in *Spokeo*, just as the D.C. Circuit did in *Jeffries. Compare* 594 U.S. at 427, *with* 928 F.3d at 1064. Defendants' unexplained assertion that *Jeffries'* analysis of breach of confidence was deficient also fails—*Jeffries* discussed exactly the same "historical" authorities cited in Defendants' own cases. *See* FD Resp. 13–14.[14] Each of those authorities shows that "breach of confidence" is a long-recognized tort, and *none* suggests the "harm addressed" by the tort cannot satisfy Article III. *Muransky v. Godiva Chocolatier*, 979 F.3d 917, 932 (11th Cir. 2020) (en banc); Alan B. Vickery, 82 Colum. L. Rev. 1426, 1450 & n.127 (1982) (citing Warren and Brandeis, Right to Privacy, 4 Harv. L. Rev. 193 (1890)).

Nor is Defendants' argument that the disclosures lack resemblance to breach of confidence persuasive. FD Resp. 14. The tort "lies where a person offers private information to a third party in

---

[14] *Compare Jeffries*, 928 F.3d at 1064–65, *with Muransky*, 979 F.3d at 931. Defendants' suggestion the Eleventh Circuit in *Muransky* "overturned" a panel's holding that harms akin to breach of confidence "qualify," FD Resp. 13, also misses the mark. That Court simply reserved the question because "the facts of *[that] case*" did not support the "analogy." 979 F.3d at 932 (noting "no information was disclosed" and "no confidential relationship existed").

confidence and the third party reveals that information to another." *Jeffries*, 928 F.3d at 1064 (cleaned up). Here, as relevant, all citizens offer private information to SSA when they obtain a social security number, and naturalized citizens also offer private information, such as work history, to DHS and SSA. ECF No. 213-2 at 69–74, ¶¶ 80–82, 87, 97. Some of this information is being disclosed to third parties without consent, despite expectations that it will remain confidential consistent with the Privacy Act. *Id.* ¶¶ 80, 94, 97, 99–102; *see AFL-CIO v. Dep't of Labor*, No. CV 25-339 (JDB), 2025 WL 1783899, at *4 (D.D.C. June 27, 2025) ("[H]arm that results from disclosure . . . in violation of the Privacy Act is sufficiently akin [to] breach of confidence."); *AFL-CIO v. DOL*, 2025 WL 1783899, at *4 n.4 (D.D.C. June 27, 2025) (reaffirming holding). Defendants assert without citation that citizens cannot offer citizenship information "in confidence," but even if that were true, Defendants do not dispute that *other* categories of protected information are exposed through SAVE as well. ECF No. 213-2 at 69 ¶ 80, 74 ¶ 97; Ex. 52 at 11–14.

Finally, ignoring the record, Federal Defendants assert that DPPs' members are at most concerned the "government is not complying with privacy laws." FD Resp. 14. But unrebutted declaration testimony confirms they fear their government's breach of trust as well as the consequences of such breaches. *Compare* FD Resp. at 14, *with* SOF ¶¶ 103–06 (citing declarations). Those are "harms" the breach of confidence tort "addresses." *Jeffries*, 928 F.3d at 1065.

Federal Defendants also fail to rebut the similarities between the harm to DPPs' members and the well-established "intrusion upon seclusion" tort. *See* FD Resp. 15. That tort's elements include: "(1) an invasion . . . [by] use of some . . . form of investigation or examination . . . (2) into . . . private or secret concerns . . . (3) that would be highly offensive to an ordinary, reasonable person." *Id.* (citing Restatement (Second) of Torts § 652B); *see* DPP Mot. 46–48. Attempting to show that the disclosures are not akin to an "invasion," Defendants simply omit the relevant language from the D.C. Court of Appeals opinion supporting this analogue. *Compare Wolf v. Regardie*, 553 A.2d 1213, 1217–18 (D.C.

1989) ("[T]he kind of invasion that this cause of action seeks to address [includes] harassment, peeping . . . opening personal mail . . . eavesdropping . . . examining a plaintiff's private bank account . . . or other invasions of that nature."), *with* FD Resp. 15 ("'[T]he kind of invasion that this cause of action seeks to redress' are various forms of offensive 'invasions' including harassment, peeping, eavesdropping, and so on." (quoting *Wolf*, 553 A.2d at 1217–18)). They also misstate then-Judge Barrett's opinion in *Gadelhak v. AT&T*, which *rejected* a narrow reading of "intrusion." 950 F.3d 458, 462 (7th Cir. 2020). Defendants are ultimately left with no more than "disagree[ment]" with the sound decisions rejecting their view. FD Resp. 16 n.9; *see* DPP Mot. 46–47 (collecting cases).

*Voting rights harms*. DPPs have independently established injuries to members' voting rights: Disclosures of SSA data through SAVE discourages participation in upcoming elections and creates a substantial risk of wrongful removal from voter rolls. *See* DPP Mot. 48–50.

As for discouraging participation, Defendants' sole argument is that DPPs have not shown their members reasonably fear that their "standing as citizens . . . will be used against" them if they participate. FD Resp. 16. As explained, however, SAVE is exposing more than just citizenship status. *See* ECF No. 213-2 at 74–76 ¶¶ 97, 99–102. Even assuming disclosure of status *alone* could not reasonably deter participation, Defendants fail to explain why fears of the corresponding disclosures—including of numerical identifiers, descriptions of agency findings, and employment history—do not. FD Resp. 16–17. DPPs' unrebutted declarations establish the disclosures have this deterrent effect—their members are "hesitant to register" when a consequence is that their federal information will be shared through SAVE. SOF ¶¶ 103–07.

DPPs have also shown a substantial threat that the SAVE expansion will cause false identification of non-citizens and improper removal from the rolls. *See* FD Resp. 17; DPP Mot. 49. Federal Defendants concede that the SSA data now being disclosed through SAVE is inaccurate and that SSA does not maintain it. ECF No. 213-2 at 70–71 ¶¶ 83, 85. And they fail to address evidence

that state and local officials use SAVE's failure to "verify" citizenship as evidence of non-citizenship and that citizens have in fact been removed from rolls based on false suspicions. *See* SOF ¶¶ 108–09; *see also* Ex. 62 (noting Texas's MOA permits removal of voters SAVE is unable to verify if the voter is sent a notice and provided opportunity to prove citizenship).[15] Federal Defendants nonetheless insist such removals are "unlikely" based on their own assurance that a "manual review" of records occurs when SAVE's "automated" process fails to provide verification. FD Resp. 17 (citing Broderick Decl. ¶ 16). Yet, the records available for such review are themselves outdated and inaccurate, as Federal Defendants have conceded—so it is certain that SAVE will return "unable to verify" results for some citizens, triggering removal processes. *See* ECF No. 213-2 at 70–78 ¶¶ 83, 85, 108–09. Thus, removal of eligible voters is a foreseeable consequence of the unlawful expansion of SAVE.

Defendants' argument that DPPs suffer no direct harm to their mission-critical programs fails for the same reasons. *See* FD Resp. 17. *But see* SOF ¶ 110. Defendants also fail to appreciate that their failure to comply with the Privacy Act deprived DPPs of critical information about how federal data affects their efforts to ensure members and supporters are registered, as well as any meaningful opportunity to voice concerns to the agencies. *E.g.*, *NCAE v. DOL*, 143 F.4th 395, 405 (D.C. Cir. 2025); *Friends of Animals v. Jewell*, 824 F.3d 1033, 1041 (D.C. Cir. 2016); *see also* DPP Mot. 56.

### B.    Plaintiffs have a ripe APA claim against the SAVE expansion.

Federal Defendants previously conceded that final action has been taken to carry out §§ 2(b)(i), 2(b)(iii), and 3(a). *See* FD Mot. 19. They now argue the SAVE expansion—which is in use and already resulted in millions of disclosures—does not "qualif[y]" as final action. FD Resp. 17. But the

---

[15] Since DPPs filed their motion, millions of new SAVE inquiries have been completed—including in Texas, which "r[an its] entire . . . voter list with more than 18 million voters through the SAVE database." Ex. 66. Texas now claims "2,724" individuals who could not be "verified" through SAVE are "potential noncitizens." *Id.* These "individuals will receive a notice," and the registrations of any who do not provide "proof of citizenship" within 30 days "will be cancelled." *Id.* The Court may take notice of these facts. *Said v. Nat'l R.R. Passenger Corp.*, 317 F. Supp. 3d 304, 335 (D.D.C. 2018).

undisputed record confirms "consummation" of "decisionmaking" by which "rights or obligations have been determined" or from which "legal consequences will flow." *Id.* at 18 (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)).

- On May 15, 2025, DHS and SSA executed a letter agreement purporting to authorize use of data in SSA records for SAVE inquiries. ECF No. 213-2 at 73 ¶ 93.[16]

- On May 22, DHS announced it had "deploy[ed]" this "new partnership" and updated SAVE with the help of DOGE, allowing the program to disclose information for anyone with a social security number to state and local officials. SOF ¶¶ 76–80; Ex. 50.

- On June 4, DHS replaced its SAVE user guide, instructing users in federal, state, and local offices to use the "updated" program. ECF No. 213-2 at 73 ¶¶ 91–92; Ex. 52.

- On August 15, DHS confirmed in interrogatory responses that the updates were in effect and had already facilitated millions of new cases, disclosing information from SSA records to users in nearly a dozen states. ECF No. 213-2 at 73–77 ¶¶ 91–95, 99–105.

Defendants ignore these facts, each of which shows final action, *see Venetian Casino Resort v. EEOC*, 530 F.3d 925, 931 (D.C. Cir. 2008) (holding adoption of policy to disclose protected information is final agency action); *Refugee & Immig. Ctr. for Educ. & Legal Servs. v. Noem*, No. 25-cv-306 (RDM), 2025 WL 1825431, at *27 (D.D.C. July 2, 2025) (holding publication of guidelines for program created pursuant to proclamation constitutes final agency action).[17]

Defendants instead suggest the expansion is "preliminary" or "intermediate." FD Resp. 18 (quoting 5 U.S.C. § 704). But "there is nothing preliminary . . . about" a program that is already in effect, *Refugee & Immigrant Ctr.*, 2025 WL 1825431, at *27. That remains true even if the action "is subject to change in the future." *Spirit Airlines v. DOT*, 997 F.3d 1247, 1252 (D.C. Cir. 2021) (citation omitted). "It is equally clear" the expansion has "legal consequences," *Refugee & Immigrant Ctr.*, 2025 WL 1825431, at *27 (quoting *Bennett*, 520 U.S. at 177–78), given that it has resulted and will

---

[16] SSA published a redacted version of the agreement days after DPPs filed their motion. Ex. 67.

[17] In a parallel case challenging the same SAVE expansion on similar Privacy Act grounds, DHS has not asserted a final agency action defense. *See* Defs.' Opp. to Pls.' Mot. for Prelim. Inj. or Stay, *League of Women Voters et al. v. DHS*, No. 1:25-cv-03501-SLS (D.D.C. Oct. 22, 2025), ECF No. 37.

result in disclosures of records that would not otherwise be exposed, *see* ECF No. 213-2 at 69 ¶ 80, 74 ¶ 97, 75–76 ¶¶ 99–102; *Venetian Casino*, 530 F.3d at 931. Defendants also assert DPPs' claim is a "broad programmatic attack" on "day to day" operations rather than a challenge to "discrete" action. FD Resp. 17–18 (quoting *Norton v. SUWA*, 542 U.S. 55, 64 (2004) and *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990)). But unlike the claim discussed in *Lujan* and *SUWA*—a challenge to the "entirety" of a mishmash of different "operations"—DPPs challenge implementation of specific updates to SAVE, *compare* DPP Mot. 51–55, *with SUWA*, 542 U.S. at 64.

Finally, Defendants assert the "Privacy Act forecloses APA review" of the SAVE expansion. FD Resp. 18. But they rely solely on cases noting that an individual bringing a claim directly under the Privacy Act is limited to the remedies provided for in that Act, *id.* at 19 (citing 5 U.S.C. § 552a(g)). That misses the point: DPPs bring a claim *under the APA*. The question is whether "clear and convincing evidence" shows Congress—by adding some remedies to the Act—intended to override the "presumption of judicial review," thus precluding *other forms of relief* available under the APA. *AFL-CIO*, 778 F. Supp. 3d at 81 (citation omitted). As DPPs have explained, the evidence does not suggest Congress did so. DPP Mot. 52–53 (discussing cases).

### C.    The SAVE expansion is contrary to the Privacy Act.

Federal Defendants do not dispute the facts chronicling their failure to abide by the Privacy Act's data-protection protocols. *See* FD Resp. 19–20. The merits are thus straightforward.

The Privacy Act requires DHS to issue a new or updated SORN *before* any "revision" to SAVE. 5 U.S.C. § 552a(e)(4). Any "*significant* change" also requires "advance notice of [the] proposal" to Congress, and any change involving a "new use" of information further requires a 30-day advance public notice-and-comment period so "interested persons" can "submit written data, views, or arguments." *Id.* §§ 552a(e)(11), (r). Here, there is no dispute that (1) SAVE is subject to the Act; (2) SAVE previously shared information only for immigrants and naturalized citizens; (3) Defendants

integrated SSA records in SAVE, allowing third-parties new access to confidential information of *anyone with a social security number*, including millions of U.S.-born citizens; (4) the expansion added corresponding "upgrades," including granting users the ability to submit inquiries and download case data in bulk; (5) millions of citizens' information has been disclosed via the expansion; (6) the added SSA data has significant inaccuracies; and (7) Defendants did not comply with the Act's notice and comment provisions. *See* ECF No. 213-2 at 69–76 ¶¶ 78–102; *see also* FD Resp. 19–20.

In the face of this undisputed record, Defendants lodge just two defenses, neither of which has merit. They first assert the existing SORN for SAVE, which specifies its purpose is to help "confirm immigration and naturalized and certain derived citizen status information," 85 Fed. Reg. 31798, 31800 (May 27, 2020), should be construed to cover disclosures for *any person with a social security number*, including "U.S.-born citizens," because "it would still serve that purpose to learn that an individual was not a naturalized citizen but a U.S.-born citizen." FD Resp. 20. That circular interpretation conflicts with the SORN's text, which limits SAVE's reach to confirming status information of immigrants, naturalized citizens, and certain derived citizens. 85 Fed. Reg. at 31800. And the SORN's limited authorization is consistent with the immigration reform statutes that created SAVE. *See* DPP Mot. 42 n.12. Defendants cannot rewrite the SORN "on the fly." *LULAC*, 780 F. Supp. 3d at 165; *cf. Christensen v. Harris County*, 529 U.S. 576, 588 (2000) (courts must not "permit [an] agency, under the guise of interpreting a regulation, to create de facto a new regulation").

Moreover, the argument fails to account for several other aspects of the SAVE expansion that trigger mandatory compliance with the Privacy Act's guardrails. DHS is required to provide Congress and the public advance notice and opportunity to weigh in on any "significant change" to SAVE, and to publish a SORN following that process. *See* 5 U.S.C. §§ 552a(e), (r); OMB Circular No. A-108, *Federal Agency Responsibilities for Review, Reporting, and Publication Under the Privacy Act* 5–14 (2016). Binding OMB guidance implementing § 552a prescribes a non-exhaustive set of "significant

29

changes," including "substantial increase in the number, type, or category of individuals about whom records are maintained," expansion of "the types or categories of records maintained," modification of the system's "scope" or "purpose(s)," and anything that "expand[s] the availability of the information." OMB Circular No. A-108 at 5–6.[18] The SAVE expansion tracks each of these paradigmatic "significant" changes, *see* DPP Mot. 42–44, 53–56, and Defendants offer no reason to hold otherwise, *see* FD Resp. 19–20. Indeed, the expansion is far more "significant" than other "changes" that prompted issuance of revised SORNs in the past.[19]

Federal Defendants also argue that 8 U.S.C. § 1373, a provision of the Immigration and Nationality Act, provides broad license to implement the SAVE expansion, but that is wrong. *See* FD Resp. 20. That provision, which limits restrictions on communications among government agencies about "citizenship or immigration status," applies *only* to "a person's legal classification under federal law" and does not displace restrictions on sharing other information. *United States v. Illinois*, No. 25-cv-1285, 2025 WL 2098688, at *13 (N.D. Ill. July 25, 2025). "[E]very court" to construe the provision has rejected a more "capacious reading," as Defendants seek here. *Id.* at *10 (collecting cases). And Defendants concede SAVE automatically discloses *other* information protected by the Privacy Act. *Supra* at 24. Section 1373 thus provides no refuge for the unlawful overhaul of SAVE.

## CONCLUSION

This Court should grant DPPs' motion for partial summary judgment as to their *ultra vires* and separation of powers, as well as their DPPs' APA-based Privacy Act. The Court should deny the Defendants' motions and reserve any outstanding claims for Phase III, if necessary.

---

[18] *See* 5 U.S.C. § 552a(v)(1) (authorizing OMB to "prescribe guidelines and regulations for the use of agencies in implementing the provisions of" the Privacy Act).

[19] *See* 90 Fed. Reg. at 48955 (collecting past SORNs); *see also* Ex. 56 at 14.

Dated: October 31, 2025

Respectfully submitted,

/s/ *Aria C. Branch*
**ELIAS LAW GROUP LLP**
Marc E. Elias (DC 442007)
Aria C. Branch (DC 1014541)
Lalitha D. Madduri (DC 1659412)
Christopher D. Dodge (DC 90011587)
Jacob D. Shelly (DC 90010127)
Harleen K. Gambhir (DC 1781869)
James J. Pinchak (DC 90034756)*
250 Massachusetts Ave. NW, Suite 400
Washington, DC 20001
T: (202) 968-4652

Tyler L. Bishop (DC 90014111)
1700 Seventh Ave. Suite 2100
Seattle, WA 98101
T: (206) 656-0177

*Counsel for the Democratic Party Plaintiffs*

*\*Admitted pro hac vice*