# Exhibit 65

Civil Action No. 25-cv-0952 (CKK)
(Lead Case: No. 25-cv-00946 (CKK))



# Senate General Government Committee

## October 28, 2025

### Substitute Senate Bill 153 Proponent Testimony

Chair Roegner, Vice Chair Gavarone, Ranking Member Blackshear, and members of the Ohio Senate General Government Committee, thank you for the opportunity to offer testimony on Substitute Senate Bill 153.

I am offering perspective to the committee today as Ohio's chief election officer, and I am here at the invitation of the bill's sponsors, Senators Gavarone and Brenner, to speak to three of its key provisions as work continues on the final version.

Before I do that, I want to acknowledge that the General Assembly, several years ago, adopted clear statutory language reaffirming its exclusive authority to set the "time, place, and manner" of Ohio's elections.

I view my role in this process to be an advisor on what works and what does not work for my office and Ohio's 88 county boards of elections. It is ultimately up to you to decide whether and how to amend the state's election system.

Simply put, I believe the reforms outlined in this bill *can be* implemented according to the terms and timelines as prescribed. I want to thank Senators Gavarone and Brenner for understanding the complexity of Ohio's decentralized election system and the extensive work that is needed to make some of these improvements.

### Ballot Return Deadline

First, I want to address the matter of Ohio's ballot return deadline. Several weeks ago, the Department of Justice contacted me, along with Ohio's attorney general, to identify what they consider to be a conflict between state and federal law as to the deadline by which absentee ballots must be returned by mail.

The Department indicated that Ohio's law should match that of 33 other states requiring ballots to be returned by the close of polls on Election Day, rather than the current requirement that ballots be post-marked the day before Election Day and returned up to four days after the date of the election.

My staff spoke with attorneys for the Department of Justice, who indicated that federal litigation was being considered to address this discrepancy. I asked for the opportunity

to work with you to address it through legislation rather than litigation, and the Department agreed to that approach.

In a September 29, 2025 letter to Attorney General Dave Yost, Assistant Attorney General Harmeet Dillon, head of the Department's Civil Rights Division, "implores Ohio to take immediate action (legislative or otherwise) to comply with federal law, and avoid costly litigation in federal court."

I shared with legislative leaders the Department's communication with my office, and I asked them to consider the stated concern in hopes of avoiding costly litigation. That resulted in the language included in this bill.

Again, I view my role here as helping to facilitate an outcome that prevents an unnecessary legal dispute and confusion for Ohio voters. It is ultimately up to the General Assembly to decide the best course of action.

I remind the committee that this change to Ohio law is not an outlier, as it mirrors the existing state laws of two-thirds of the country. As a member of our nation's military, I have consistently asked that, if this change is made, it must include an exemption for UOCAVA voters. This was included in the bill at my request.

## Mismatched Voter Records

The second reform I would like to address is the reconciliation process for mismatched voter registration records. This legislation would ensure that Ohio continues its well-deserved reputation for having the most extensive and effective voter list maintenance program in the nation.

The voter list is constantly changing, as people die, move, change names, or otherwise become ineligible to vote. My office and the 88 county boards of elections are responsible for maintaining the accuracy of the statewide voter registration database, and one of our biggest obstacles to that requirement is the existence of mismatched voter records.

Substitute Senate Bill 153 makes great strides in securing our elections by verifying the identity of voters with known errors on their registration record. These errors are discovered when registration data is matched against identifying information provided to us by the Bureau of Motor Vehicles or the Social Security Administration.

Through permanent directive, I have required county boards of elections to verify a voter's driver license number, state identification number, last four of the voter's Social

Security number, date of birth, and the first and last name of the voter with information from the BMV and SSA.

Thanks to the General Assembly enacting the DATA Act, my office has been able, through the Office of Data Analytics and Archives, to identify unverified voter records and flag those records for the county boards of elections to investigate.

The vast majority of these mismatches are due to human error. Characters can be transposed incorrectly from paper voter registration forms, or a voter's handwriting can be difficult to read.

When these errors are identified, the county board of elections pulls the voter registration record and compares it with the information provided by the BMV and the SSA. Obvious data entry errors are corrected by election officials, and I can report that the diligent work by our boards has resolved tens of thousands of these errors in the past 24 months.

However, records that cannot be fixed immediately by the boards must be placed in a confirmation status that requires direct outreach to the voter. This is where we run into a loophole that needs to be closed, and Substitute Senate Bill 153 does that.

A voter with a mismatched registration record can request an absentee ballot while in confirmation status. They can receive and return that ballot without correcting the mismatched identification data on their registration. In fact, the loophole actually allows that voter's registration to go back into active status without ever fixing the problem.

Substitute Senate Bill 153 deals with this by requiring these electors to be informed that an error exists on their registration record, and it must be fixed before they can vote a regular ballot in the next election.

The voter will receive a form that identifies the information needing to be fixed, along with a convenient postage-paid return envelope. If they do not return the form with the corrected information, they will be required to cast a provisional ballot in person at the next election. The provisional ballot will correct the voter's mismatched record; the ballot will be counted; and the voter will be restored to active status.

If the voter does not respond to a confirmation notice or provide the necessary correcting information by way of a provisional ballot, the voter's registration is eligible for removal from the voter rolls.

We must do everything we can to ensure the accuracy of our voter file, and allowing registration records to go unresolved erodes public confidence in the integrity of our elections. It also creates administrative challenges for our boards of elections.

The process outlined in Substitute Senate Bill 153 is an effective way to tackle the problem, while still upholding the basic right of every voter to cast a ballot.

### Citizenship Verification

Finally, the third request I made of the General Assembly is to codify our citizenship verification process. Ohio's Constitution clearly states only a citizen of the United States may vote in our elections. This is a policy that an overwhelming majority of Ohioans support.

During my tenure as secretary of state, I have utilized every data set at my disposal to uphold this requirement, including the use of the federal government's SAVE database.

The information maintained by the Department of Homeland Security through SAVE is essential to verifying the accuracy of our voter registrations, particularly when it comes to checking citizenship status. The SAVE database also now includes death records from the Social Security Administration, further enhancing our ability to remove deceased registrants from Ohio's voter rolls.

As you might know, my office filed litigation against the Biden administration to secure this crucial and expanded data access. Federal law clearly gives states the right to use certain federal government records for voter verification purposes, and several other states joined me in filing similar lawsuits seeking such information.

While the prior administration refused to provide reasonable access to SAVE, the current administration has not only granted this access but is also working directly with Ohio to build a data verification process that works specifically for our state's unique needs. As a result, we are now able to conduct ongoing citizenship verifications on all new voter registrations, rather than only conducting an annual review as state law requires.

This bill will allow us to continue this process while the General Assembly pursues a new requirement of front-end citizenship verification. This is an important next step, but it will take time to develop and deploy, as our voter registration systems will need to be reprogrammed to accommodate that requirement.

Given Ohio's decentralized election administration system, all 88 counties will need to upgrade their voter registration systems to meet the requirements of this legislation. The Secretary of State's statewide voter registration database will also need to be

upgraded to accommodate the additional data required in this legislation, as well as incorporate new electronic processes to provide county boards of elections with citizenship information.

These system upgrades will take time to implement, and I appreciate Senators Gavarone and Brenner for working with my office to understand the complicated nature of Ohio's election data systems.

In the meantime, I can assure you that our current process has given Ohio the most accurate and extensive citizenship verification system in the history of our state – one that other states are now working to emulate.

With front-end verification on the horizon, I remain confident that the election integrity model we've established here in Ohio has positioned us as the national gold standard of election integrity and administration.

## Conclusion

Republicans and Democrats should share the goal of ensuring accurate voter rolls and that only US citizens are registered to vote. Substitute Senate Bill 153 would codify the common-sense policies needed to ensure that our elections are secure, accessible, and transparent. I thank Senators Gavarone and Brenner for their leadership on this important legislation.

Yours in service,

Frank LaRose
Ohio Secretary of State