# Exhibit 1

Civil Action No. 25-cv-0952 (CKK)
(Lead Case: No. 25-cv-00946 (CKK))

(Slip Opinion)    OCTOBER TERM, 2025    1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## BOST ET AL. *v.* ILLINOIS STATE BOARD OF ELECTIONS ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

No. 24–568.    Argued October 8, 2025—Decided January 14, 2026

Illinois law requires election officials to count mail-in ballots postmarked or certified no later than election day and received within two weeks of election day. Congressman Michael Bost and two other political candidates filed a lawsuit claiming that counting ballots received after election day violates federal law. They principally contended that doing so conflicts with 2 U. S. C. §7 and 3 U. S. C. §1, which set election day as the Tuesday following the first Monday in November. The district court dismissed the case, and the Seventh Circuit affirmed on the ground that petitioners lacked standing.

*Held*: As a candidate for office, Congressman Bost has standing to challenge the rules that govern the counting of votes in his election. Pp. 3–10.

(a) Under Article III of the Constitution, plaintiffs must have a "personal stake" in a case to have standing to sue. *FDA* v. *Alliance for Hippocratic Medicine*, 602 U. S. 367, 379. An unlawful election rule can injure a candidate in several ways: It might cause him to lose the election, require him to expend additional resources, or decrease his vote share and damage his reputation. But winning, and doing so as inexpensively and decisively as possible, are not a candidate's only interests in an election.

Candidates also have an interest in a fair process. Candidates seek to represent the people, and their interest in that prize cannot be severed from their interest in the electoral process. Win or lose, candidates suffer when the process departs from the law. The harm to candidates from an unfair and inaccurate election is not common to all.

2        BOST *v.* ILLINOIS STATE BD. OF ELECTIONS

Syllabus

While voters also have a general interest in an accurate vote tally, a candidate's interest differs in kind. Those who spend time and resources seeking to claim the right to voice the will of the people have "an undeniably different—and more particularized—interest" in knowing what that will is. *Hotze* v. *Hudspeth*, 16 F. 4th 1121, 1126 (Oldham, J., dissenting).

Rules that undermine the integrity of the electoral process also undermine the winner's political legitimacy. The counting of unlawful votes—or discarding of lawful ones—erodes public confidence in election results and the elected representative. "[R]eputational harms" are classic Article III injuries. *TransUnion LLC* v. *Ramirez*, 594 U. S. 413, 425. And they are particularly concrete for those whose very jobs depend on the support of the people. Pp. 3–6.

(b) Candidates do not need to show a substantial risk that a rule will cause them to lose the election or prevent them from achieving a legally significant vote threshold in order to have standing. Requiring such a showing could channel many election disputes to shortly before election day or after. Only then will many candidates be able to predict with any certainty that a rule will be outcome determinative. Yet the Court has repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election. Such late-breaking, court-ordered rule changes can result in voter confusion and undermine confidence in the integrity of electoral processes. The democratic consequences can be worse if courts intervene only after votes have been counted. Counting first and ruling upon legality afterwards is not a recipe for producing election results that have the public acceptance democratic stability requires.

Premising standing on a candidate's risk of election loss or failure to achieve a certain vote threshold would also convert Article III judges into political prognosticators and "invite[] findings on matters as to which neither judges nor anyone else can have any confidence." *Rucho* v. *Common Cause*, 588 U. S. 684, 711 (internal quotation marks omitted). "[A]ccurately predicting electoral outcomes is not" a "simple" endeavor. *Id.*, at 712. And the limits of federal courts' jurisdiction do not rest upon such "unstable ground outside judicial expertise." *Id.*, at 713.

Nor would requiring candidates to plead a substantial risk of harm to their vote share leave courts on any surer footing. Such an approach would force judges to assess whether an election rule is likely to disadvantage a particular candidate—determinations judges are no better qualified to make than assessing a candidate's likelihood of winning or losing. Candidates would also have to plead and prove that voters who take advantage of the challenged rule will favor their rivals, which may require divulging information about political vulnerabilities.

Syllabus

Faced with that prospect, many candidates are sure to wait until after votes are counted to sue.

Article III does not require this result. Candidates have a concrete and particularized interest in the rules that govern the counting of votes in their elections, regardless whether those rules harm their electoral prospects or increase the cost of their campaigns. Their interest extends to the integrity of the election—and the democratic process by which they earn or lose the support of the people they seek to represent. Pp. 6–10.

114 F. 4th 634, reversed and remanded.

ROBERTS, C. J., delivered the opinion of the Court, in which ALITO, THOMAS, GORSUCH, and KAVANAUGH, JJ., joined. BARRETT, J., filed an opinion concurring in the judgment, in which KAGAN, J., joined. JACKSON, J., filed a dissenting opinion, in which SOTOMAYOR, J., joined.

Cite as: 607 U. S. ____ (2026)          1

Opinion of the Court

NOTICE: This opinion is subject to formal revision before publication in the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, pio@supremecourt.gov, of any typographical or other formal errors.

# SUPREME COURT OF THE UNITED STATES

_____

No. 24–568

_____

## MICHAEL J. BOST, ET AL., PETITIONERS *v.* ILLINOIS STATE BOARD OF ELECTIONS, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

[January 14, 2026]

CHIEF JUSTICE ROBERTS delivered the opinion of the Court.

Three political candidates challenged Illinois's procedure for counting mail-in ballots received after election day. We consider whether the candidates have standing to maintain their suit.

I

Illinois law requires election officials to count mail-in ballots postmarked or certified no later than election day and received within two weeks of election day. Ill. Comp. Stat., ch. 10, §§5/19–8(c), 5/18A–15(a) (West 2022). In May 2022, Congressman Michael Bost and Presidential elector nominees Laura Pollastrini and Susan Sweeney (petitioners) sued the Illinois State Board of Elections and its executive director (respondents), claiming that counting ballots received after election day violates federal law. They principally contended that doing so conflicts with 2 U. S. C. §7 and 3 U. S. C. §1, which set election day as the Tuesday following the first Monday in November.

Opinion of the Court

In their complaint and declarations, petitioners asserted several bases for standing as candidates.[1]  They first argued that they were "entitled to have their election[] results certified with votes received in compliance with the federal Election Day statutes."  App. to Pet. for Cert. 87a.  And they alleged that they "rely on provisions of federal and state law in conducting their campaigns including, in particular, resources allocated to the post-election certification process."  *Id.*, at 87a–88a.  Congressman Bost further explained that the late counting of ballots would require him to "organize, fundraise, and run [his] campaign for fourteen additional days."  *Id.*, at 66a.  This, in turn, would "cost[ his] campaign time, money, volunteers and other resources" by, for example, requiring the campaign to send poll watchers to "monitor late arriving ballots."  *Id.*, at 67a.  He also alleged that he "risk[ed] injury if untimely and illegal ballots cause[d him] to lose [his] election," and "because [his] margin of victory . . . may be reduced."  *Id.*, at 68a.  "A diminished margin of victory [would] lead to the public perception that [his] constituents have concerns about [his] job performance," which would "influence . . . future voters, Congressional leadership, donors, and potential political opponents."  *Id.*, at 68a–69a.[2]

The District Court held that petitioners lacked standing and dismissed the suit.  684 F. Supp. 3d 720 (ND Ill. 2023).  Petitioners appealed, and the Seventh Circuit affirmed.  114 F. 4th 634 (2024).  The court concluded that the costs

———————

[1] At the time, Congressman Bost was a candidate in the 2022 election, and Pollastrini and Sweeney planned to seek reappointment as Presidential electors in the 2024 election.  Congressman Bost has served as the United States Representative for Illinois's 12th Congressional District since he was first elected in 2014.  And he was previously a member of the Illinois House of Representatives, to which he was first elected in 1994.

[2] Petitioners also alleged that Illinois's ballot receipt deadline injured them as voters by "dilut[ing] the weight of [their] votes."  App. to Pet. for Cert. 88a.  They have not advanced that argument before this Court.

to monitor vote counting after election day could not support standing, because those costs would have been voluntarily incurred "to avoid a hypothetical future harm—an election defeat." *Id.*, at 642. In doing so, the court noted that Congressman Bost had won the last election with 75% of the vote. *Ibid.* It also rejected petitioners' asserted "'competitive injury,'" reasoning that they "do not (and cannot) allege that the majority of the votes that will be received and counted after Election Day will break against them." *Id.*, at 643. Finally, it dismissed petitioners' asserted injury based on an inaccurate vote tally as unduly "speculative," because "the election is months away and the voting process has not even started." *Id.*, at 644. Judge Scudder dissented in part. In his view, Congressman Bost had standing based on the extra costs his campaign would incur to monitor the counting of late arriving ballots. We granted certiorari. 605 U. S. ___ (2025).

## II

Under Article III of the Constitution, plaintiffs must have a "personal stake" in a case to have standing to sue. *FDA* v. *Alliance for Hippocratic Medicine*, 602 U. S. 367, 379 (2024). They must, in other words, be able to answer a basic question: "'What's it to you?'" A. Scalia, The Doctrine of Standing as an Essential Element of the Separation of Powers, 17 Suffolk U. L. Rev. 881, 882 (1983). Congressman Bost has an obvious answer: He is a candidate for office. And a candidate has a personal stake in the rules that govern the counting of votes in his election.[3]

----

[3]Because only one plaintiff needs standing for a suit to proceed, we do not address whether Pollastrini and Sweeney have standing to sue as prospective Presidential electors. See *Biden* v. *Nebraska*, 600 U. S. 477, 489 (2023).

Opinion of the Court

### A

An unlawful election rule can injure a candidate in several ways. It might cause him to lose the election. It might require him to expend additional resources. Or it might decrease his vote share and damage his reputation. Respondents concede that each of these harms can be legally cognizable. But they contend that Congressman Bost failed to adequately plead any such harm here. We need not resolve whether respondents are right, because winning, and doing so as inexpensively and decisively as possible, are not a candidate's only interests in an election.[4]

To start, candidates also have an interest in a fair process. Candidates are not common competitors in the economic marketplace. They seek to represent the people. And their interest in that prize cannot be severed from their interest in the electoral process—a process "of the most fundamental significance under our constitutional structure." *Illinois Bd. of Elections* v. *Socialist Workers Party*, 440 U. S. 173, 184 (1979). Win or lose, candidates suffer when the process departs from the law. Thus, the long-shot and shoo-in alike would suffer harm if a State chose to conduct its election by, say, flipping a coin. The result of such an election would not reflect the will of the people, and the candidates would lose the opportunity to compete for the people's support. So too, similar harms would result from less dramatic departures—for example, if a State decided to discard a random 10% of cast votes. Whether these decisions help, hurt, or have no effect on a candidate's electoral prospects, they deprive the candidate of a fair process and an accurate result.

---

[4]Respondents do not dispute that Congressman Bost *pleaded* a distinct interest in the "election[] results [being] certified with [lawful] votes." App. to Pet. for Cert. 87a. They argue only that this interest is not legally cognizable. Because we disagree, we need not resolve the parties' pleading dispute.

Such harm to candidates is in no sense "common to all members of the public." *Lance* v. *Coffman*, 549 U. S. 437, 440 (2007) (*per curiam*) (internal quotation marks omitted). Voters, to be sure, also have a "general interest" in an accurate vote tally. *Ibid.* (internal quotation marks omitted). But a candidate's interest differs in kind. An unfair and inaccurate election plainly affects those who compete for the support of the people in a different way than it affects the people who lend their support. We have no occasion to theorize about the "significance of the[se] relative interests," contra, *post*, at 3 (JACKSON, J., dissenting), or the "sincer[ity]" with which they are held, *Carney* v. *Adams*, 592 U. S. 53, 59 (2020) (internal quotation marks omitted). What matters is that the harm candidates suffer is distinct from that suffered by the "people generally." *Massachusetts* v. *Mellon*, 262 U. S. 447, 488 (1923). Those who spend untold time and resources seeking to claim the right to voice the will of the people have "an undeniably different—and more particularized—interest" in knowing what that will is. *Hotze* v. *Hudspeth*, 16 F. 4th 1121, 1126 (CA5 2021) (Oldham, J., dissenting).

Rules that undermine the "integrity of the electoral process" also undermine the winner's political legitimacy. *Crawford* v. *Marion County Election Bd.*, 553 U. S. 181, 197 (2008) (opinion of Stevens, J.). The counting of unlawful votes—or discarding of lawful ones—erodes public confidence that the election results reflect the people's will. And when public confidence in the election results falters, public confidence in the elected representative follows. To the representative, that loss of legitimacy—or its diminution—is a concrete harm. "[R]eputational harms," as a general matter, are classic Article III injuries. *TransUnion LLC* v. *Ramirez*, 594 U. S. 413, 425 (2021) (citing *Meese* v. *Keene*, 481 U. S. 465, 473 (1987)). But they are particularly concrete for those whose very jobs depend on the support of the people.

Opinion of the Court

Candidates, in short, are not "mere bystanders" in their own elections. *Diamond Alternative Energy, LLC* v. *EPA*, 606 U. S. 100, 110 (2025). They have an obvious personal stake in how the result is determined and regarded. Departures from the preordained rules cause them particularized and concrete harm.[5] The same is true of competitors in other contests. Each runner in a 100-meter dash, for example, would suffer if the race were unexpectedly extended to 105 meters. See Tr. of Oral Arg. 90. Whether a particular runner expects to finish strong or fall off the pace in the final five meters, all would be deprived of the chance to compete for the prize that the rules define. The fastest to run 105 meters has not won the 100-meter dash. And in much the same way, an unlawful extension of vote counting deprives candidates of the opportunity to compete for election under the Constitution and laws of the United States.

### B

Respondents and the dissent dismiss these harms, which plainly affect candidates in a "personal and individual way," as generalized grievances. *Spokeo, Inc.* v. *Robins*, 578 U. S. 330, 339 (2016) (internal quotation marks omitted). And they suggest that in order to have standing, plaintiff-candidates must show some substantial risk that a rule will cause them to lose the election, prevent them from achieving a legally significant vote threshold, or damage their reputation or finances. Brief for Respondents 25–26; *post*, at 9. That approach finds no support in Article III's case or controversy requirement or our case law interpreting that

---

[5] Contrary to the concurrence's suggestion, *post*, at 4 (BARRETT, J., concurring in judgment), such harm is far "more particularized and more concrete than the mere assertion that something unlawful benefited [a] competitor." *Already, LLC* v. *Nike, Inc.*, 568 U. S. 85, 99 (2013). And it bears little resemblance to the specific injury alleged in *Already*: a risk of being sued by a company that had issued an "unconditional and irrevocable" covenant not to sue. *Id.*, at 93.

requirement. And it is as practically untenable as it is un-democratic.

Premising standing on a candidate's risk of election loss or failure to achieve a certain vote threshold could channel many election disputes to shortly before election day—or worse, after. Only then will many candidates be able to predict with any certainty that a rule will be outcome de-terminative. And only then will they be able to produce the "manner and degree of evidence required," particularly at later "stages of the litigation," to establish standing. *Lujan* v. *Defenders of Wildlife*, 504 U. S. 555, 561 (1992).

Yet "[t]his Court has repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election." *Republican National Committee* v. *Democratic National Committee*, 589 U. S. 423, 424 (2020) (*per curiam*). Such late-breaking, court-ordered rule changes can "result in voter confusion and consequent in-centive to remain away from the polls," and thus undermine the "[c]onfidence in the integrity of our electoral processes . . . essential to the functioning of our participatory democ-racy." *Purcell* v. *Gonzalez*, 549 U. S. 1, 4–5 (2006) (*per cu-riam*); see also *Republican Party of Pennsylvania* v. *Degraffenreid*, 592 U. S. \_\_\_, \_\_\_–\_\_\_ (2021) (THOMAS, J., dissenting from denial of certiorari) (slip op., at 4–5). The democratic consequences can be even more dire if courts in-tervene only after votes have been counted. "Count first, and rule upon legality afterwards, is not a recipe for pro-ducing election results that have the public acceptance democratic stability requires." *Bush* v. *Gore*, 531 U. S. 1046, 1047 (2000) (Scalia, J., concurring in grant of stay).

Even if some candidates could muster evidence well be-fore election day that a rule will likely be outcome determi-native, respondents' and the dissent's approach would con-vert Article III judges into political prognosticators and "invite[] findings on matters as to which neither judges nor anyone else can have any confidence." *Rucho* v. *Common*

Opinion of the Court

*Cause*, 588 U. S. 684, 711 (2019) (internal quotation marks omitted). As a number of prominent historical figures can attest, not least among them Charles Evans Hughes and Thomas Dewey, "accurately predicting electoral outcomes is not" a "simple" endeavor. *Id.*, at 712. And if the prognosticators themselves lack the "political clairvoyance" to predict the winner *after* all votes have been cast, then surely judges are poorly positioned to assess whether a candidate's risk of loss, months earlier, is substantial. *Diamond Alternative Energy*, 606 U. S., at 123; see also *Vieth* v. *Jubelirer*, 541 U. S. 267, 287, n. 8 (2004) (plurality opinion). The limits of federal courts' jurisdiction do not rest upon such "unstable ground outside judicial expertise." *Rucho*, 588 U. S., at 713.

Nor would requiring candidates to plead a substantial risk of harm to their vote share leave courts on any surer footing. Such an approach would force judges to assess whether an election rule is likely to disadvantage a particular candidate. And at least as respondents suggest, judges must then also ensure that any disadvantage is linked to reputational or financial harm.[6]

Judges are no better qualified to make such determinations than they are to assess a candidate's likelihood of winning or losing. Even if they could do so, this approach would still channel many disputes into postelection litigation. To bring a preelection suit, a candidate would have to plead

———————

[6] Respondents at times appear to suggest that "[a] candidate may have standing if she demonstrates that an election rule disadvantages her relative to a competitor," even absent proof of reputational or financial harm or a risk that she will lose the election. Brief for Respondents 26; see also Tr. of Oral Arg. 94. Yet it is far from clear why a slight but certain competitive disadvantage would qualify as an injury in fact but requiring a candidate to compete in an unfair election would not. Indeed, the harm a candidate would suffer from winning 60% of the vote, instead of 61%, seems less salient than the harm she would suffer if she instead won 62% because of an unlawful rule, and the public believed she had received an unfair advantage.

Opinion of the Court

and prove that voters who take advantage of the challenged rule will favor his rivals.  Doing so while campaigning for those same voters' support is not just awkward, but politically dangerous.  Particularly for new election rules, it may require divulging information about vulnerabilities that rival candidates could exploit.  Faced with that prospect, many candidates are sure to wait until after votes are counted to sue.

Adding monetary harm to the equation, as the concurrence proposes, would change none of this.  *Post*, at 2–3 (BARRETT, J., concurring in judgment).  Plaintiffs cannot "manufacture standing by voluntarily" incurring costs. *Federal Election Comm'n* v. *Ted Cruz for Senate*, 596 U. S. 289, 297 (2022).  They must incur those costs to "mitigate or avoid" a "'substantial risk'" of some independent harm. *Clapper* v. *Amnesty Int'l USA*, 568 U. S. 398, 414, n. 5 (2013).  Acknowledging as much, the concurrence ultimately speculates that it is "reasonably probable" Congressman Bost's election will be at risk because of discrepancies in late-arriving ballots.  *Post*, at 3.  Such conjecture— beyond finding little support in the pleadings—carries all the concerns we have explained.  And the concurrence's approach introduces a new one: Apparently, a candidate who pays poll watchers a penny would have standing, while one who relies on volunteers would not.

Nothing about Article III requires this result.  Candidates have a concrete and particularized interest in the rules that govern the counting of votes in their elections, regardless whether those rules harm their electoral prospects or increase the cost of their campaigns.  Their interest extends to the integrity of the election—and the

Opinion of the Court

democratic process by which they earn or lose the support of the people they seek to represent.[7]

\*    \*    \*

"Courts sometimes make standing law more complicated than it needs to be." *Thole* v. *U. S. Bank N. A.*, 590 U. S. 538, 547 (2020). We decline respondents' invitation to do so here. As a candidate for office, Congressman Bost has standing to challenge the rules that govern the counting of votes in his election.

The judgment of the United States Court of Appeals for the Seventh Circuit is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

---

[7] We do not share the dissent's concern that our recognition of this commonsense reality will "open[] the floodgates" to candidate-led challenges to ballot "format." *Post*, at 11–12. Indeed, the dissent itself suggests that courts already "'often decide ballot-design cases,'" pointing to a case in which a court concluded that candidates *did* have standing to challenge "'the form of election ballots.'" *Post*, at 12, n. 5 (quoting *Kim* v. *Hanlon*, 99 F. 4th 140, 147, 153 (CA3 2024)). To the extent the dissent's concern is that federal courts will be inundated with more trivial "format" challenges, *post*, at 12, to things like "ballot font and typeface," Brief for District of Columbia et al. as *Amici Curiae* 20, it is neither clear why candidates would waste their resources in this way nor on what basis in federal law such suits could be brought. In any event, we address today only candidates' standing to challenge rules that, like Illinois's, govern the counting of votes in their elections.

# SUPREME COURT OF THE UNITED STATES

————

No. 24–568

————

## MICHAEL J. BOST, ET AL., PETITIONERS v. ILLINOIS STATE BOARD OF ELECTIONS, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

[January 14, 2026]

JUSTICE BARRETT, with whom JUSTICE KAGAN joins, concurring in the judgment.

While I agree with the Court that Congressman Bost has standing, I disagree with its reasoning. In my view, Congressman Bost has standing because he has suffered a traditional pocketbook injury, not because of his status as a candidate.

## I

The Constitution limits federal courts to deciding "Cases" and "Controversies." Art. III, §2. To satisfy this requirement, a plaintiff must show (among other things) that he has suffered an actual injury—put colloquially, he must be able to answer the basic question "'What's it to you?'" *Ante*, at 3. We give content to that maxim by requiring a plaintiff to show a "concrete, particularized, and actual or imminent" injury. *Clapper* v. *Amnesty Int'l USA*, 568 U. S. 398, 409 (2013) (internal quotation marks omitted). A "particularized" injury is a harm affecting a plaintiff "in a personal and individual way," not a "generalized grievance" shared by the public. *Spokeo, Inc.* v. *Robins*, 578 U. S. 330, 339, and n. 7 (2016) (internal quotation marks omitted). A "concrete" injury is a nonabstract harm of the type "that has traditionally been regarded as providing a basis for a lawsuit in English or American courts." *Id.*, at 340–341. And an "actual

BARRETT, J., concurring in judgment

or imminent" injury is one that is "certainly impending" rather than "speculative." *Clapper*, 568 U. S., at 401.

A plaintiff must establish standing at the time of filing and maintain it throughout litigation. *Carney* v. *Adams*, 592 U. S. 53, 59 (2020). He must support each element of standing "with the manner and degree of evidence required at the successive stages of the litigation." *Lujan* v. *Defenders of Wildlife*, 504 U. S. 555, 561 (1992). At the pleading stage, "general factual allegations of injury resulting from the defendant's conduct may suffice." *Ibid.*; see *Spokeo*, 578 U. S., at 338 (a complaint must "'clearly . . . allege facts demonstrating'" standing).

Pocketbook harm is a traditional Article III injury. *Tyler* v. *Hennepin County*, 598 U. S. 631, 636 (2023). That is so not only when a law directly imposes costs on a plaintiff, see, *e.g.*, *McGowan* v. *Maryland*, 366 U. S. 420, 430–431 (1961) (profits lost from Sunday-closing law), but also when a plaintiff "reasonably incur[s] costs to mitigate or avoid" the "'substantial risk'" of a harm caused by a statute, *Clapper*, 568 U. S., at 414, n. 5 (collecting cases). For instance, in *Monsanto Co.* v. *Geertson Seed Farms*, farmers of conventional alfalfa sought injunctive relief against a rule deregulating (and thus permitting) the planting of genetically modified alfalfa. 561 U. S. 139, 153–154 (2010). The farmers "established a reasonable probability that their organic and conventional alfalfa crops will be infected with the engineered gene" through cross-contamination. *Id.*, at 153 (internal quotation marks omitted). And because the farmers took costly preventative measures to "minimize the likelihood of potential contamination," they suffered an Article III injury. *Id.*, at 154–155; see also *Virginia* v. *American Booksellers Assn., Inc.*, 484 U. S. 383, 392 (1988) (finding standing where regulated booksellers must incur compliance costs or risk prosecution).

Like the farmers in *Monsanto*, Congressman Bost alleges that he will "reasonably incur costs to mitigate or avoid" the

BARRETT, J., concurring in judgment

"'substantial risk'" of harm caused by the challenged stat-
ute. *Clapper*, 568 U. S., at 414, n. 5. He claims that Illi-
nois's ballot-receipt deadline will increase the number of
late-arriving ballots, which often "have discrepancies (e.g.,
insufficient information, missing signatures, dates, or post-
marks) that need to be resolved." App. to Pet. for Cert. 66a.
Invalid ballots, he says, will put his election at risk and
damage his reputation. To avoid these reasonably probable
harms, his campaign "has spent, and will spend, money,
time, and resources to monitor and respond as needed to
ballots received by state election officials after the national
Election Day." *Id*., at 65a. If poll watchers are not present
to monitor ballot counting, county officials could "accep[t]
possibly deficient ballots in bulk." *Id*., at 67a. Accordingly,
it is standard practice for campaigns to send poll watchers
to monitor ballot counting to ensure that any discrepancies
are resolved appropriately. See Brief for League of Women
Voters et al. as *Amici Curiae* 20 (calling it "political mal-
practice" for candidates not to monitor ballot counting in
their races). Because Congressman Bost's expenditures
mitigate a substantial risk of harm, he has pleaded Article
III injury.*

## II

Rather than take this straightforward path, the Court
charts a novel one: To challenge "the rules that govern the
counting of votes in his election," a candidate need only al-
lege that he is in fact a candidate in that election. *Ante*, at
3. The Court makes no attempt to demonstrate that the
bare fact of facing changed vote-counting rules is a tradi-
tionally recognized harm. See *TransUnion LLC* v. *Ramirez*,

———————

*JUSTICE JACKSON says it is not reasonably probable that Congressman
Bost will suffer any injury, *post* at 14 (dissenting opinion), implicitly re-
jecting the view that it is reasonable to employ poll watchers to monitor
for discrepancies. But on a motion to dismiss, we credit Congressman
Bost's factual allegations and draw all inferences in his favor.

594 U. S. 413, 424–425 (2021). Nor does it grapple with *Already, LLC* v. *Nike, Inc.*, which holds that a plaintiff cannot show an Article III injury by claiming only that an allegedly unlawful practice benefits a competitor without any showing of harm to himself. 568 U. S. 85, 99 (2013). By holding that a candidate always has an interest in challenging vote-counting rules, even if those rules do not impose a competitive disadvantage on him, the Court today relieves candidates of having to show any real harm. See *ante*, at 4. Candidates are apparently entitled to this extraordinarily forgiving rule because they are "not common competitors in the economic marketplace." *Ibid.*

I cannot join the Court's creation of a bespoke standing rule for candidates. Elections are important, but so are many things in life. We have always held candidates to the same standards as any other litigant. See, *e.g.*, *Davis* v. *Federal Election Comm'n*, 554 U. S. 724, 733–734 (2008) (applying ordinary standing analysis to candidate challenging financial disclosure requirements); *Wittman* v. *Personhuballah*, 578 U. S. 539, 545 (2016) (applying ordinary standing analysis to legislators running for reelection who challenged redistricting plan); *Carney*, 592 U. S., at 59–60 (requiring a would-be candidate to show concrete intention to seek office to challenge partisan-balance rule). And we have repeatedly rejected requests to create special standing rules for particular litigants. See, *e.g.*, *Raines* v. *Byrd*, 521 U. S. 811, 821, 830 (1997) (legislator standing); *Arizona Christian School Tuition Organization* v. *Winn*, 563 U. S. 125, 134 (2011) (taxpayer standing); *Lujan*, 504 U. S., at 566–567 (animal-enthusiast standing); *FDA* v. *Alliance for Hippocratic Medicine*, 602 U. S. 367, 392–393 (2024) (doctor standing). I see no reason to afford candidates favored status.

Nor do the practical realities of running for office warrant special treatment for candidates. As Congressman Bost concedes, "candidates could probably articulate their injury

BARRETT, J., concurring in judgment

in terms of a pocketbook injury" "in many election law cases." Brief for Petitioners 21. So in addition to being un-moored from precedent, the Court's broader rule is unnec-essary on Congressman Bost's own telling.

\*    \*    \*

We need not deviate from established standing principles to resolve this case in Congressman Bost's favor. I respect-fully concur only in the judgment.

Cite as: 607 U. S. ____ (2026)    1

JACKSON, J., dissenting

# SUPREME COURT OF THE UNITED STATES

_____

No. 24–568

_____

## MICHAEL J. BOST, ET AL., PETITIONERS _v._ ILLINOIS STATE BOARD OF ELECTIONS, ET AL.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

[January 14, 2026]

JUSTICE JACKSON, with whom JUSTICE SOTOMAYOR joins, dissenting.

Under our standing precedents, this is an easy case. Article III requires plaintiffs to assert and establish an "injury in fact"—_i.e.,_ the "invasion of a legally protected interest" that is both "concrete and particularized" and "actual or imminent." _Lujan_ v. _Defenders of Wildlife_, 504 U. S. 555, 560 (1992) (internal quotation marks omitted). Congressman Bost has failed to allege that the election-related law he seeks to challenge has caused him to suffer any injury that satisfies those requirements.

A majority of the Court nevertheless concludes that Bost has standing to sue based solely on his status as a candidate for office. The Court thereby subtly shifts from our longstanding actual-injury rule to a presumption that certain kinds of plaintiffs are sufficiently aggrieved to satisfy Article III standing, regardless of whether they will experience any particularized harm. In my view, this dubious departure from settled law disregards both the equal treatment of litigants and judicial restraint.

JUSTICE BARRETT rightly rejects today's bespoke candidate-standing rule. See _ante,_ at 4 (opinion concurring in judgment). Yet her pocketbook theory would allow political candidates to spend their way past Article III's injury-in-fact requirement, despite our clear admonition that

JACKSON, J., dissenting

plaintiffs "cannot manufacture standing by choosing to make expenditures based on hypothetical future harm that is not certainly impending." *Clapper* v. *Amnesty Int'l USA*, 568 U. S. 398, 402 (2013).

In the end, I would not allow Bost's suit to move forward on grounds that we have deemed insufficient to establish Article III standing for other plaintiffs. Because I believe that political candidates can and should be held to the same actual-injury requirements as other litigants, I respectfully dissent.

## I

Any litigant who invokes the judicial power of the federal courts under Article III "must establish that he has a 'personal stake' in the alleged dispute, and that the alleged injury suffered is particularized as to him." *Raines* v. *Byrd*, 521 U. S. 811, 819 (1997). Today, however, the Court essentially pronounces that this foundational principle no longer applies to candidates for elected office. It declares that all candidates have standing to challenge election regulations in light of their interest in a "fair process." *Ante,* at 4. No matter that, in a democratic society like ours, the interest in a fair electoral process is common to all members of the voting public. The Court thus ignores a core constitutional requirement while unnecessarily thrusting the Judiciary into the political arena.

## A

The majority's primary failing is its refusal to recognize that the alleged injury it identifies—the suffering that results from an unfair electoral process—is not particular to candidate-plaintiffs. The importance of the particularity requirement cannot be overstated, for it is this requirement that "prevents the judicial process from becoming no more than a vehicle for the vindication of the value interests of concerned bystanders." *United States* v. *Students*

JACKSON, J., dissenting

*Challenging Regulatory Agency Procedures (SCRAP)*, 412 U. S. 669, 687 (1973). Such a result is incompatible with our constitutional design, which recognizes that "'abstract questions of wide public significance'" are "most appropriately addressed in the representative branches." *Valley Forge Christian College* v. *Americans United for Separation of Church and State, Inc.*, 454 U. S. 464, 475 (1982) (quoting *Warth* v. *Seldin*, 422 U. S. 490, 500 (1975)). In other words, the particularity requirement ensures that the Judiciary stays in its proper lane, leaving to the people's representatives the prerogative to decide questions of broad importance in the absence of a litigant with a "direct stake in the outcome." *Sierra Club* v. *Morton*, 405 U. S. 727, 740 (1972). As such, litigants without a direct stake—*i.e.*, those who assert no more than "generalized grievances about the conduct of government"—cannot satisfy the "case or controversy aspect of standing." *Valley Forge*, 454 U. S., at 479 (internal quotation marks omitted).

Today's decision all but ignores the particularity requirement and the democracy-preserving function that it serves. This case, the Court says, involves "[a]n unlawful election rule," which necessarily injures candidates' "interest in a fair process." *Ante,* at 4. But, even assuming that Illinois's rule is unlawful (as we must for standing purposes), the Court makes no real attempt to explain how that injury is particular to candidates; to the contrary, it acknowledges that voters, too, have a stake in a fair electoral process. See *ante*, at 5. Yet the Court insists that a candidate's interest is "undeniably different" from that of a voter's, because it is the candidate—and not the voter—who "compete[s]" in an election. *Ibid.*

That assessment gets the significance of the relative interests exactly backward. A public office is a public trust, and an election for that office is the ultimate expression of the will of the people, not a mere competition to be won or lost. In the Court's telling, though, elections are a glorified

4          BOST *v*. ILLINOIS STATE BD. OF ELECTIONS

JACKSON, J., dissenting

national pastime—the competitors' success is the main objective, and voters are mere bystanders who simply "lend their support." *Ibid.* This depiction drastically devalues the role elections play in a democratic society.[1]

The Court similarly misrepresents the harm that occurs when unlawful election rules "erod[e] public confidence [in] the election results." *Ibid.* To be sure, a tainted election can hurt a candidate if it undermines the public's perception of that officeholder's legitimacy and harms his reputation in the process (assuming he makes that allegation).[2] But voters suffer too—and arguably even more so—when their fellow citizens lose confidence in the results of an election. Indeed, the same loss of faith the majority counts as injurious to candidates could be a fatal blow to the public's interest in democratic governance.[3]

Batting away these foundational truths, the Court finds "no occasion to theorize" about the relative significance of voters' and candidates' shared interest in free and fair elections. *Ibid.* But it is the Court's own analysis—*i.e.*, its

––––––––––

[1] Lest we forget: In a democracy, elections are not mere candidate-centered bouts; rather, they determine the fate of the community. Elections, after all, are the mechanism through which We the People (exercising our collective will) decide who gets to represent us. In a government of the people, by the people, and for the people, "those who compete" in an election, *ante,* at 5, are ultimately vying to become public servants—not simply winners of a game. Thus, it is misleading to suggest that those who "claim the right to voice the will of the people," *ibid.,* have an exclusive interest in electoral fairness. To the contrary, those "who lend their support" as voters, *ibid.,* are the primary stakeholders.

[2] Here, Congressman Bost has not alleged that Illinois's ballot-receipt deadline will undermine the public's perception of the legitimacy of any future win.

[3] "[I]f a State chose to conduct its election by, say, flipping a coin," what is lost is not just a candidate's "opportunity to compete for the people's support." *Ante,* at 4. Another injurious consequence would be the lack of any incentive to vote, leading to both the elimination of democratic participation and the election of candidates who have no reason to operate for the public good—in short, the destruction of democracy.

JACKSON, J., dissenting

purported distinction between the interests of candidates and voters in fair election outcomes—that raises the comparative question, not mine.

In any event, I agree that we need not "theorize" about the significance of these interests, for one thing is indisputably clear: Our democracy was founded on the "self-evident" truth that a government is legitimate only insofar as it derives its "just powers from the consent of the governed." Declaration of Independence ¶2. Candidates come and go, but the voters' collective interest in the "right to elect legislators in a free and unimpaired fashion" is enduring and indispensable. *Reynolds* v. *Sims*, 377 U. S. 533, 562 (1964). Against this backdrop, the Court's effort to isolate and elevate a candidate's "distinct" interest in electoral integrity, *ante,* at 5, falls flat.

For today's standing purposes, the key realization is that, in a democracy, the (existential) interest in fair and accurate elections is common to *all* members of the voting public. I acknowledge that "[t]hose who spend untold time and resources seeking to claim the right to voice the will of the people," *ibid.*—candidates—have a particularized interest *in getting the job*. That is precisely why candidates do have Article III standing if an unlawful election rule creates a substantial risk of harm to that interest (the risk of an election loss). But when what is at stake is the overall fairness of the electoral process, it is the people's shared interest in democracy itself (and not just the candidate's job prospects) that hangs in the balance.

## B

The Court's standing analysis elides all this by employing the commonsense intuition that, "[w]in or lose, candidates suffer when the process departs from the law." *Ante,* at 4. But how is that a particularized injury? Anyone and everyone who is governed by law is similarly harmed by any departure from the law's requirements. Moreover, this Court

JACKSON, J., dissenting

has repeatedly instructed that litigants "may not sue based only on an 'asserted right to have the Government act in accordance with law.'" *FDA* v. *Alliance for Hippocratic Medicine*, 602 U. S. 367, 381 (2024) (quoting *Allen* v. *Wright*, 468 U. S. 737, 754 (1984)); see also *Massachusetts* v. *Mellon*, 262 U. S. 447, 488 (1923) (rejecting theory that taxpayers have standing to challenge an allegedly unlawful government action requiring the use of public funds because "[t]he party who invokes the [judicial] power must be able to show . . . that he has sustained or is immediately in danger of sustaining some direct injury. . . , and not merely that he suffers in some indefinite way in common with people generally").

Here, the generalized nature of the "fair process" harm is indisputable: If Illinois's vote-count rule is unlawful, *all* participants in the electoral process—not only candidates for office but also every voter who has cast a ballot in the election—would be deprived "of a fair process and an accurate result." *Ante,* at 4. But, as this Court has time and again explained, such an assertion of injury "amount[s] to little more than [an] attemp[t] 'to employ a federal court as a forum in which to air . . . generalized grievances about the conduct of government.'" *Valley Forge*, 454 U. S., at 483 (omission in original) (quoting *Flast* v. *Cohen*, 392 U. S. 83, 106 (1968)).

Indeed, our standing precedents make crystal clear that, absent a showing of particularized harm, these sorts of fair-process grievances must be resolved through the political branches. For it is in those branches "where democratic debate can occur and a wide variety of interests and views can be weighed." *Alliance for Hippocratic Medicine*, 602 U. S., at 380. By contrast, the exercise of judicial power, "which can so profoundly affect the lives, liberty, and property of those to whom it extends," is a "tool of last resort," to be invoked only "when the question is raised by a party whose

JACKSON, J., dissenting

interests entitle him to raise it." *Valley Forge*, 454 U. S., at 473–474 (internal quotation marks omitted).

Finding no support for a nonparticularized "fair process" harm in either our precedents or the practices of the lower courts, the Court pivots to an analogy. It suggests that, as a candidate running for office who has been told that votes will continue to be counted after election day, Bost is no different from a competitor in a 100-meter dash whose race is "unexpectedly extended to 105 meters." *Ante*, at 6. According to the majority, each runner in the newly announced 105-meter race would obviously suffer, regardless of whether he "expects to finish strong." *Ibid.* But whether any given runner is harmed by this rule change depends on a number of factors particular to each competitor, none of which the majority deigns to identify. And, indeed, it is far from obvious that a runner with a track record like Bost's— who expects to win both races based on sound statistical analyses of his current and past performance—would have the injury that begets Article III standing to involve the Judiciary in this rule-change dispute.

Despite the imprecision of its analysis, the Court *is* clear about one thing today: Pinpointing the actual harm to candidates for elected office is no longer necessary for standing purposes. Its remarkable holding jettisons the injury-in-fact requirement entirely. Forget injury; political candidates need only have "a concrete and particularized *interest* in the rules that govern the counting of votes in their elections, regardless whether those rules harm their electoral prospects or increase the cost of their campaigns." *Ante*, at 9 (emphasis added). As JUSTICE BARRETT explains, see *ante*, at 4 (opinion concurring in judgment), this harm-free Article III standing rule finds no support in our precedents.[4]

---

[4] The Government, participating as an *amicus* in support of petitioners, also suggests that our typical Article III standing requirements do not apply here, though for a different reason than the Court. In its view, we can presume that Bost has identified an injury in fact because he is

JACKSON, J., dissenting

## C

Perhaps sensing the weakness of its novel, harm-free standing analysis, the Court resorts to policy arguments to bolster it. It worries that requiring candidates to establish that they might lose the election will "channel" lawsuits "to shortly before election day—or worse, after." *Ante,* at 7. "Only then," the Court says, will a candidate really know whether an election regulation has impacted his race. *Ibid.* And, worse still, a candidate trying to make such a showing could find himself in the "awkward" position of having to "plead and prove that voters who take advantage of the challenged rule will favor his rivals." *Ante,* at 8–9.

The relevance of these practical concerns is unclear. We have traditionally viewed Article III standing as an "irreducible" constitutional minimum, "not merely a troublesome hurdle to be overcome." *Valley Forge*, 454 U. S., at 472, 476. As such, Article III's "essential and unchanging" constitutional mandates do not ordinarily yield to our policy judgment about when it would be most convenient for courts to hear particular kinds of suits. *Alliance for Hippocratic Medicine*, 602 U. S., at 380 (internal quotation marks omitted).

---

the "direct object" of Illinois's ballot-receipt deadline. Brief for United States as *Amicus Curiae* 21. To be sure, when a plaintiff is the direct "object" of "government action or inaction," there "is ordinarily little question that the action or inaction has caused him injury." *Lujan* v. *Defenders of Wildlife*, 504 U. S. 555, 561–562 (1992). But Bost is not a direct object of the Illinois rule at issue. The rule regulates the conduct of voters and election officials, dictating how and when ballots are cast and counted. See Ill. Comp. Stat., ch. 10, §5/19–8(c) (West Supp. 2025) ("Each vote by mail voter's ballot that is mailed to an election authority and postmarked no later than election day, but that is received . . . before the close of the period for counting provisional ballots cast at that election, . . . shall be counted"). And we have recently reaffirmed that, "when (as here) a plaintiff challenges the government's 'unlawful regulation (or lack of regulation) of *someone else*,'" standing "'is ordinarily substantially more difficult to establish.'" *FDA* v. *Alliance for Hippocratic Medicine*, 602 U. S. 367, 382 (2024) (quoting *Lujan*, 504 U. S., at 562).

JACKSON, J., dissenting

In any event, under our usual standing rules, a candidate (and our democracy) need not be put in the awkward position of waiting until the eve of an election or predicting an electoral loss with 100% accuracy. Our cases recognize that a litigant who bases standing on "[a]n allegation of future injury" need only assert a "substantial *risk* that the harm will occur." *Susan B. Anthony List* v. *Driehaus*, 573 U. S. 149, 158 (2014) (emphasis added; internal quotation marks omitted). The substantial-risk standard is not especially exacting; it demands more than mere conjecture, but it does not require plaintiffs to prove that the alleged future harm is "literally certain" to occur. *Clapper*, 568 U. S., at 414, n. 5.

Accordingly, at the motion-to-dismiss stage, a candidate need only plausibly allege that the challenged regulation creates a substantial risk of an election loss—he need not predict with certainty that the rule will cause him to lose. See, *e.g.*, *Texas Democratic Party* v. *Benkiser*, 459 F. 3d 582, 587 (CA5 2006) (concluding that a candidate who alleged that governmental action "threaten[ed] his election prospects" had established standing). Alternatively, a candidate whose win is more secure could allege a substantial risk of some other concrete and particularized harm stemming from the challenged rule's application, such as an existing or imminent financial or reputational injury. Cf. *Federal Election Comm'n* v. *Ted Cruz for Senate*, 596 U. S. 289, 296 (2022) (recognizing a winning candidate's $10,000 expenditure as a "pocketbook harm" that "constitute[d] an injury in fact"); *Meese* v. *Keene*, 481 U. S. 465, 473–474 (1987) (finding standing where a candidate had "alleged and demonstrated" that a challenged disclosure rule would, among other harms, "adversely affect his reputation in the community").

Though it may be more difficult for candidates to satisfy the "substantial risk" standard at later stages of litigation, it is nowhere near impossible. It does not require a

candidate to prove that the challenged rule guarantees his loss; it simply requires him to marshal enough evidence from which a court could conclude that the challenged rule presents a significant threat to his victory, his pocketbook, or his reputation.

As we have recognized in other contexts, that sort of evidence may include an evaluation of the facts on the ground and statistical analyses. See, *e.g.*, *Department of Commerce* v. *New York*, 588 U. S. 752, 767–768 (2019) (concluding that States had standing to challenge the inclusion of a citizenship question on the census, in light of statistical evidence "establish[ing] that noncitizen households have historically responded to the census at lower rates" and "that if noncitizen households [were] undercounted by as little as 2%" those States would "lose out on federal funds"). In the electoral arena, preelection polling will often provide a relevant data set. Candidates could also rely on historical data about how a particular rule has affected those who have run similar campaigns in the past. And the relative advantages or disadvantages of various electoral processes can be scrutinized by the kinds of experts who are routinely hired to make these sorts of assessments. See, *e.g.*, *Meese*, 481 U. S., at 473–474 (finding standing where a candidate submitted "detailed affidavits, including one describing the results of an opinion poll and another containing the views of an experienced political analyst" to show that a challenged disclosure requirement "would substantially harm his chances for reelection" (footnote omitted)).

The Court's suggestion that it is beyond a judge's competency to evaluate whether an election rule causes a substantial risk of electoral loss, *ante,* at 7–9, is therefore both puzzling and unfounded. A "substantial risk" of future harm has been the Article III imminent-injury standard for decades. See *Clapper*, 568 U. S., at 414–415, n. 5 (collecting cases applying this standard). And federal courts, including this one, have routinely applied that standard in a

variety of circumstances—essentially whenever a plaintiff maintains that state action is likely to harm him in the future. See, *e.g.*, *Murthy* v. *Missouri*, 603 U. S. 43, 57–58 (2024) (First Amendment challenge related to social media content moderation); *Department of Commerce*, 588 U. S., at 766–767 (Administrative Procedure Act challenge to changes to the census); *Monsanto Co.* v. *Geertson Seed Farms*, 561 U. S. 139, 153–155 (2010) (environmental challenge to regulations of genetically modified crops).

In short, our precedents establish that *certainty* of future harm is not the benchmark, as the majority suggests. *Ante,* at 7. Rather, all that is required is a plausible allegation (eventually followed by proof) of a substantial *risk* of future injury.

Bost fails to clear even that low bar. At most, he alleges that he "risk[s] injury *if* untimely and illegal ballots cause [him] to lose [his] election" or "reduc[e]" his "margin of victory" in a way that harms his reputation. App. to Pet. for Cert. 68a–69a (emphasis added). But his complaint and supplemental declaration include no—zero—allegations to support an inference that such risk exists, or is at all substantial, in his own case; for example, he never alleges that untimely ballots are more likely to break against him and in favor of his opponent. Indeed, Bost appears to have disclaimed the need to include any such allegations before the Court of Appeals, where he argued that his "stated injury is not based on a risk of losing the election" and that "[n]either a change to his electoral fortunes nor any other effect is necessary to afford him standing." Brief for Plaintiffs-Appellants in No. 23–2644 (CA7), p. 19. The Court today accepts that unprecedented contention, which flies in the face of both the particularity requirement and the substantial-risk standard.

Alarmingly, today's ruling also has far-reaching implications beyond Bost's election, since dispensing with our usual standing requirements opens the floodgates to

exactly the type of troubling election-related litigation the Court purportedly wants to avoid. For example, under the Court's new harm-free candidate-standing rule, an electoral candidate who loses in a landslide can apparently still file a disruptive legal action in federal court after the election is over. All he must do is assert that an election rule somehow deprived him of a fair process—even if that rule played no role in the election's outcome or otherwise caused him harm. That possibility is especially concerning given the host of election-related regulations that States must promulgate when exercising their constitutional duty to set the "Times, Places, and Manner of holding Elections." Art. I, §4, cl. 1. States regulate everything from a ballot's chain of custody to its format—all of which the majority would permit candidates to challenge in court without offering any theory of how such rules harm them personally. See Brief for District of Columbia et al. as *Amici Curiae* 16–22 (describing the myriad state regulations at risk under Bost's broad theory of standing).[5]

It is impossible to square this outcome with the practical concerns the Court identifies. See, *e.g., ante,* at 7 (emphasizing that "'federal courts should ordinarily not alter the election rules on the eve of an election'" (quoting *Republican National Committee* v. *Democratic National Committee,* 589 U. S. 423, 424 (2020) (*per curiam*))). Ironically, then, it is the Court's new and generous candidate-standing rule that invites late-breaking judicial intervention into the

———————

[5] The Court's suggestion that these sorts of challenges are unlikely, *ante,* at 10, n. 7, is belied by recent experience. See, *e.g., League of Women Voters of Fla. Inc.* v. *Florida Secretary of State,* 66 F. 4th 905, 929 (CA11 2023) (considering a challenge to a "drop-box provision" that governed "the chain of custody of the ballot" (internal quotation marks omitted)); *Kim* v. *Hanlon,* 99 F. 4th 140, 147, 153 (CA3 2024) (noting that "[c]ourts often decide ballot-design cases" in considering a challenge to "the form of election ballots" in the State of New Jersey). Without a harm-based standing rule for candidates, these kinds of challenges will undoubtedly become even more common.

JACKSON, J., dissenting

political process in a manner that is "as practically untenable as it is undemocratic." *Ante,* at 7.

## II

While more tethered to our standing precedents, JUSTICE BARRETT's pocketbook-injury theory is also insufficient to support Bost's standing. This is because it is well settled—in light of our decision in *Clapper* v. *Amnesty Int'l USA*, 568 U. S. 398—that plaintiffs "cannot manufacture standing by choosing to make expenditures based on hypothetical future harm that is not certainly impending." *Id.*, at 402. Bost's allegations establish only a hypothetical future harm, even when crediting them as true and drawing all reasonable inferences in his favor.

In *Clapper*, we held that a group of attorneys and human-rights organizations lacked standing to challenge a provision of the Foreign Intelligence Surveillance Act (FISA) "authorizing the surveillance of individuals who are not 'United States persons' and are reasonably believed to be located outside the United States." *Id.*, at 401 (footnote omitted) (quoting 50 U. S. C. §1881a). The attorneys and organizations premised their standing argument on the possibility that their clients would be surveilled under FISA. 568 U. S., at 406. That possibility, they said, required them to take "costly and burdensome measures" to protect their privacy, including avoiding "certain e-mail and phone conversations" and traveling to their clients "so that they [could] have in-person conversations." *Id.*, at 415. Yet the attorneys and organizations "ha[d] no actual knowledge" of the Government's surveillance practices under FISA. *Id.*, at 411. They "merely speculate[d] and ma[de] assumptions about whether their communications" would be targeted. *Ibid.* As a result, the measures they took to avoid surveillance could not satisfy Article III's requirements. *Id.*, at 416. Or, put differently, they could not "manufacture standing merely by inflicting harm on

JACKSON, J., dissenting

themselves based on their fears of hypothetical future harm that [was] not certainly impending." *Ibid.*

Bost's alleged pocketbook injury is no different. He fears that Illinois's ballot-receipt deadline will allow the State to count illegal votes, which in turn might injure him by costing him an election or at least resulting in a diminished margin of victory that somehow damages his reputation. Brief for Petitioners 18. He has therefore hired poll watchers to monitor the State's vote counting for an additional two weeks. But, in the absence of any allegation establishing that he actually faces a substantial risk of losing the election or having his margin of victory diminished in a meaningful way, Bost has taken those precautions based on the mere (and by all accounts remote) possibility that such harms will otherwise materialize. At bottom, then, Bost fears a "hypothetical future harm that is not certainly impending." 568 U. S., at 416. So any additional expenses Bost incurs to ward off that harm is not a proper basis for standing. *Ibid.*

Bost nevertheless insists that his case is distinct from *Clapper* because he *knows* that the State will apply its 14-day ballot-receipt deadline in his next election. That fact, he says, sets him apart from the attorneys and human-rights organizations in *Clapper*, who could not prove that the Federal Government would invoke FISA against them or their clients. Stated differently, Bost *is* certain that the State will apply the ballot-receipt deadline, whereas the *Clapper* plaintiffs could only speculate as to FISA's future application.

This contention misunderstands *Clapper*'s standing rule and how it applied in that case. In *Clapper*, the harm the plaintiffs feared (unlawful surveillance) would occur at the precise moment that FISA was invoked against them or their clients. And because the asserted injury stemmed directly from the application of the challenged regulation, the risk of future harm was tied directly to the risk of FISA's

JACKSON, J., dissenting

future application to the plaintiffs. It mattered, then, that the possibility of FISA's application was only speculative.

Bost's feared injury—the one he seeks to spend his way out of—is different in this respect, but it is no less speculative. The harm Bost fears does *not* stem from the mere (certain) application of the State's 14-day ballot-receipt deadline. Rather, what triggers Bost's spending is fear of a lost election or the diminution of his reputation—*i.e.*, the possible downstream effects of the challenged election rule. Thus, even though the rule's application is certain, the feared harm is not; Bost has only speculated as to the possibility that this future, downstream harm will occur.

This means that Bost's pocketbook injury is similar in all relevant respects to that presented by the plaintiffs in *Clapper*: He is spending money to ward off speculative future injury. His case differs from *Clapper* only insofar as the source of the harm he is seeking to alleviate is not the (uncertain) application of the regulation itself, but the (uncertain) effects of that regulation. In other words, both Bost and the plaintiffs in *Clapper* spent money to mitigate a risk of injury that was only theoretical, not substantial. And neither can leverage unnecessary expenditures into Article III standing.

Our decision in *Monsanto Co.* v. *Geertson Seed Farms*, 561 U. S. 139, is not to the contrary. There, we held that farmers who "established a reasonable probability" that genetically modified alfalfa seeds would cross-contaminate their organic alfalfa had standing based on the costly measures they had taken to protect their crops. *Id.*, at 153–155 (internal quotation marks omitted).

The key phrase from our *Monsanto* opinion is "reasonable probability." The farmers did not simply point to a hypothetical possibility of cross-contamination. Instead, their allegations established that their fear of future harm was *reasonable*. In particular, the farmers explained that modified alfalfa seeds were actually "'being planted in all the

Jackson, J., dissenting

major alfalfa seed production areas with little regard to con-
tamination to non-GMO seed production fields.'" *Id.*, at
154, n. 3. The farmers also emphasized "'the compact geo-
graphic area of the prime alfalfa seed producing areas and
the fact that pollen is distributed by bees that have large
natural range of activity.'" *Ibid.* Accordingly, they *reason-
ably* predicted that "'the genetic contamination of the [mod-
ified] seed [would] rapidly spread through the seed growing
regions.'" *Ibid.*

Bost's allegations, by comparison, fall well short of
demonstrating a reasonable probability of future harm ab-
sent costly mitigation efforts. He alleges only that he
"risk[s] injury if untimely and illegal ballots cause [him] to
lose" or diminish his "margin of victory," leading "to the
public perception that [his] constituents have concerns
about [his] job performance." App. to Pet. for Cert. 68a–
69a. Examined closely, Bost's averment is that, if the vote
counting continues, he *could* receive fewer votes, which
*could* cause him to lose the election or *could* damage his
reputation among voters and donors. No other allegations
make this harmful outcome likely or otherwise substantiate
the risk that any of these potential problems might actually
occur.

Justice Barrett nevertheless suggests that the forgiv-
ing standard for motions to dismiss is enough to get Bost
over the line. See *ante,* at 3, n. (opinion concurring in judg-
ment). But that standard cannot benefit a plaintiff like
Bost, who is "armed with nothing more than conclusions."
*Ashcroft* v. *Iqbal*, 556 U. S. 662, 678–679 (2009).[6] Bost's

─────────

[6] I do not reject the view that it is reasonable to employ poll watchers
to monitor discrepancies in the vote count as a general matter. See *ante,*
at 3, n. (Barrett, J., opinion concurring in judgment). But a proper Ar-
ticle III standing analysis requires us to answer a different question:
whether it was reasonable *for this particular plaintiff* to voluntarily in-
cur such costs under the circumstances presented in his case. At the
motion-to-dismiss stage, we are only obligated to credit the plausible

complaint identifies only a "speculative chain of possibilities," and, as such, his allegations are insufficient to establish a reasonable probability of future harm. *Clapper*, 568 U. S., at 414.[7]

In an ironic twist, the majority correctly rejects JUSTICE BARRETT's pocketbook-injury theory analysis due to its speculative nature. It rightly acknowledges that a plaintiff who relies on costs to establish standing "must incur those costs to 'mitigate or avoid' a 'substantial risk' of some independent harm." *Ante,* at 9 (quoting *Clapper,* 568 U. S., at 414, n. 5). And it recognizes that the independent harm Bost asserts—"discrepancies in late-arriving ballots"— amounts to "conjecture," with "little support in the pleadings." *Ante,* at 9. But rather than follow that observation where it leads, the majority crafts a new candidate-only standing rule, ignoring the patently speculative nature of Bost's harm based on Bost's more generalized "interest in a fair process." *Ante,* at 4.

With respect to the majority's harm-free, fair-process standing theory, JUSTICE BARRETT has the better of *that* argument. She correctly observes that the majority's

───────────

assertions of fact the plaintiff makes to support that inference. We do not have to accept Bost's bald contention that he has to hire poll watchers in light of Illinois's rule (or make the inference that it is reasonable for him to do so during the upcoming election); indeed, in my view, accepting that conclusory contention abdicates our responsibility to actually evaluate the sufficiency of the plaintiff's allegations.

[7] Bost's concern that his reputation might be damaged even if he wins—due to a diminished margin of victory, see Brief for Petitioners 18—is especially difficult to fathom, much less designate as plausible. I suppose it is possible that voters and donors will think less of Bost as an official if he wins by 74% of the vote instead of 75%, regardless of his performance while in office. See 114 F. 4th 634, 642 (CA7 2024) (case below) (observing that Bost won the 2022 election with 75% of the vote). But that result is neither obvious nor intuitive. In fact, without more specific allegations, one might just as easily speculate that a closer race would *benefit* Bost, as it could generate more donations and enthusiasm among his core supporters.

JACKSON, J., dissenting

conclusion relieves Bost "of having to show any real harm" and fails to hold him to the same standards that we apply to all other litigants. *Ante,* at 4 (opinion concurring in judgment). But, given the weaknesses of Bost's allegations, JUSTICE BARRETT's standing theory would also unjustly benefit Bost, by permitting him to voluntarily spend his way into a federal forum absent any reasonable assertion that the challenged rule (as opposed to his own unsubstantiated fears and spending proclivities) has caused him to suffer an injury in fact.

### III

Forty-some years ago, in *Los Angeles* v. *Lyons*, 461 U. S. 95 (1983), this Court considered whether a plaintiff had standing to challenge the Los Angeles Police Department's repeated use of life-threatening chokeholds on civilians who posed no threat of violence. *Id.*, at 105. The plaintiff in that case, Adolph Lyons, suffered such a chokehold at the hands of police, "rendering him unconscious and causing damage to his larynx." *Id.*, at 97–98. Fearing that he would again be subjected to a life-threatening chokehold, Lyons filed a lawsuit seeking an injunction that would bar the future use of that technique against civilians who posed no risk to officer safety. *Id.*, at 98.

We rejected Lyons's legal action on standing grounds, holding that he had failed to establish a "real and immediate threat" of future harm. *Id.*, at 105. None of Lyons's appeals to fairness or common sense sufficed to persuade a majority of this Court that he had Article III standing. It did not matter, for instance, that Lyons had almost died from an illegal chokehold only five months prior to filing his complaint. See *ibid.* Nor did it matter that "no less than 16 persons ha[d] died following the use of a chokehold by an LAPD police officer" in the preceding decade. *Id.*, at 115–116 (Marshall, J., dissenting). Because those "odds" did not suggest a substantial risk of harm to Lyons in the future,

JACKSON, J., dissenting

we said, he was not entitled to sue for injunctive relief. *Id.*, at 108 (majority opinion) (internal quotation marks omitted). So, despite the grievous wrong and physical harm that Lyons (and others like him) had suffered, we "decline[d] the invitation to slight the preconditions" of Article III. *Id.*, at 112.[8]

If only the *Lyons* Court had seen fit to create the sort of harm-free, status-based standing rule that the majority adopts today. The majority's reasoning—leading to today's holding that "[c]andidates have a concrete and particularized interest in the rules that govern the counting of votes in their elections, regardless whether those rules harm their electoral prospects or increase the cost of their campaigns," *ante,* at 9—would have been useful to Lyons. Lyons was a Los Angeles resident who had been unfairly targeted by police violence in the past and who wished to move freely about in the community. Armed with today's decision, Lyons might have successfully relied upon that status to claim a "concrete and particularized interest" in the rules that governed police officers' encounters with certain community residents, regardless of whether such police practices would have harmed him in the future.

───────────

[8]Contemporary commentators predicted that our decision in *Lyons* would close the door to "a broad range of analogous lawsuits" aimed at systemic misconduct and abuse on the part of law enforcement. R. Fallon, Of Justiciability, Remedies, and Public Law Litigation: Notes on the Jurisprudence of Lyons, 59 N. Y. U. L. Rev. 1, 71–72 (1984). That prediction proved accurate. Today, courts routinely rely on *Lyons* to deny plaintiffs standing to seek injunctions against future police behavior. See, *e.g.*, *J. W. ex rel. Tammy Williams* v. *Birmingham Bd. of Educ.*, 904 F. 3d 1248, 1267 (CA11 2018) (*per curiam*); *Shain* v. *Ellison*, 356 F. 3d 211, 216 (CA2 2004); *Whitfield* v. *Ridgeland*, 876 F. Supp. 2d 779, 787–788 (SD Miss. 2012); see also *Noem* v. *Vasquez Perdomo*, 606 U. S. ___, ___ (2025) (KAVANAUGH, J., concurring) (slip op., at 4) (concluding that, under *Lyons*, Latino plaintiffs who were "stopped for immigration questioning allegedly without reasonable suspicion of unlawful presence" lacked standing to seek an injunction).

JACKSON, J., dissenting

But the *Lyons* standing rule focused on actual injury: We emphasized that a plaintiff must assert (and, ultimately, prove) that the allegedly unlawful practice risks injuring him in a concrete and particularized manner in the future. The bare assertion of an interest in general fairness, absent the showing of any real and immediate harm, is apparently cognizable only if asserted by candidates for office.

\*    \*    \*

I am all for simplifying our standing law.  See *ante,* at 10. But I am against doing so selectively; either Article III standing requires an actual or imminent injury in fact that is particularized to the plaintiff, or it does not.  Bost has plainly failed to allege facts that support an inference of standing under our established precedents.  By carving out a bespoke rule for candidate-plaintiffs—granting them standing "to challenge the rules that govern the counting of votes," simply and solely because they are "candidate[s]" for office, *ibid.*—the Court now complicates and destabilizes both our standing law and America's electoral processes.