**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.*, | |
| Plaintiffs, | |
| v. | Civil Action No. 25-0946 (CKK) |
| EXECUTIVE OFFICE OF THE PRESIDENT, *et al.*, | |
| Defendants, | |
| *and* | |
| REPUBLICAN NATIONAL COMMITTEE, | |
| Defendant-Intervenor. | |

| | |
|---|---|
| DEMOCRATIC NATIONAL COMMITTEE, *et al.*, | |
| Plaintiffs, | |
| v. | Civil Action No. 25-0952 (CKK) |
| DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*, | |
| Defendants, | |
| *and* | |
| REPUBLICAN NATIONAL COMMITTEE, | |
| Defendant-Intervenor. | |

| | |
|---|---|
| LEAGUE OF WOMEN VOTERS EDUCATION FUND, *et al.*, | |
| Plaintiffs, | |
| v. | Civil Action No. 25-0955 (CKK) |
| DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*, | |
| Defendants, | |
| *and* | |
| REPUBLICAN NATIONAL COMMITTEE, | |
| Defendant-Intervenor. | |

**MEMORANDUM OPINION**
(January 30, 2026)

1

These consolidated cases are about the limits of the President's power to dictate the rules of federal elections.  The Framers of our Constitution recognized that power over election rules could be abused, either to destroy the national government or to disempower the people from acting as a check on their elected representatives.  *See, e.g.*, The Federalist No. 59 (A. Hamilton); Federal Farmer No. 3.  Accordingly, they entrusted this power to the parts of our government that they believed would be most responsive to the will of the people: first to the States, and then, in some instances, to Congress.  *See* U.S. Const. art. I, § 2, cl. 1; U.S. Const. art. I, § 4, cl. 1. They assigned no role at all to the President.  Put simply, our Constitution does not allow the President to impose unilateral changes to federal election procedures.

Upholding our Constitution's separation of powers in the election context is a matter of substantial importance.  The Supreme Court long ago recognized that the right to vote is a "fundamental political right" because it is "preservative of all rights."  *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886).  Our Constitution's careful allocation of power over election regulation helps to preserve that bedrock right.

Now pending before this Court are several pending cross-motions for summary judgment implicating these important principles.  Plaintiffs mount a variety of challenges to Executive Order No. 14,248, in which the President has purported to direct several changes to federal election procedures.  Upon consideration of the parties' submissions,[1] the relevant legal

---

[1] The Court's consideration has focused on the following documents, including the attachments and exhibits thereto:

- The Federal Defendants' Memorandum in Support of Motion for Partial Summary Judgment ("Federal Defs.' Mem."), Dkt. No. 177-1;
- The Republican National Committee's Cross-Summary Judgment Brief on Remaining Claims ("Def.-Intervenor's Mem."), Dkt. No. 176-1;
- The LULAC Plaintiffs' Memorandum in Support of Cross-Motion for Partial Summary Judgment and Response in Opposition to Defendants' and RNC's Motions for Summary Judgment ("LULAC Pls.' Mem."), Dkt. No. 194-1;

authority, and the entire record, the Court shall **GRANT IN PART**, **DENY IN PART**, and **DEFER IN PART** each of the parties' motions and shall **DISMISS** certain claims in part. Because the record in these cases continues to evolve, many of these denials and dismissals shall be without prejudice. The Court shall **DECLARE** that two provisions of the Executive Order— both purporting to impose new requirements for verifying the U.S. citizenship of people registering to vote or applying to receive absentee ballots—are inconsistent with the constitutional separation of powers and cannot lawfully be implemented. The Court shall **PERMANENTLY ENJOIN** the relevant Defendants from taking any action to implement or give effect to those provisions. The Court shall also **DECLARE** that, in the course of implementing provisions of the Executive Order that call for federal agencies to access and share sensitive personal data, the Federal Defendants must strictly comply with the requirements of the Privacy Act, 5 U.S.C. § 552a. Finally, the Court shall direct the parties to propose a schedule for further proceedings.

---

- The Democratic Party Plaintiffs' Combined Opposition to Defendants' Motions for Summary Judgment on All Remaining Claims and Cross Motion for Partial Summary Judgment (Phase II) ("Dem. Pls.' Mem."), Dkt. No. 196-1, and the accompanying Declaration of Aria C. Branch ("Branch Decl."), Dkt. No. 198;
- The Federal Defendants' Response in Opposition to Plaintiffs' Cross-Motions for Summary Judgment and Reply in Support of Defendants' Motion for Partial Summary Judgment ("Fed. Defs.' Reply & Opp'n"), Dkt. No. 213;
- The Republican National Committee's Opposition to Plaintiffs' Phase II Cross Motions and Reply Brief in Support of Summary Judgment on Plaintiffs' Remaining Claims ("Def.-Intervenor's Reply & Opp'n"), Dkt. No. 210;
- The LULAC Plaintiffs' Reply Memorandum in Support of the LULAC Plaintiffs' Cross-Motion for Summary Judgment ("LULAC Pls.' Reply"), Dkt. No. 219;
- The Democratic Party Plaintiffs' Reply in Support of Phase II Cross-Motion for Summary Judgment ("Dem. Pls.' Reply"), Dkt. No. 220;
- The Federal Defendants' Supplemental Memorandum ("Fed. Defs.' Suppl."), Dkt. No. 226; and
- The Democratic Party Plaintiffs' Supplemental Memorandum ("Dem. Pls.' Suppl."), Dkt. No. 232.

The Court has also considered the parties' arguments at the preliminary injunction hearing held on April 17, 2025. *See* Tr. of Hr'g on Mots. for Preliminary Injunctions ("Tr. of P.I. Hr'g"), Dkt. No. 100. In an exercise of its discretion, the Court concludes that an additional oral argument is not necessary to the resolution of the issues presented in the pending motions. *See* LCvR 7(f).

**EXECUTIVE SUMMARY** ................................................................................................. **6**

**I. BACKGROUND**........................................................................................................... **11**

   **A.**   **Constitutional and Statutory Framework** .......................................................... **11**

       1.   The Constitution on Voter Qualifications and Election Procedures ....................... 11

           a.   Voter Qualifications ...................................................................................... 11

           b.   Election Procedures....................................................................................... 12

           c.   Historical Context ......................................................................................... 14

       2.   The National Voter Registration Act ..................................................................... 15

       3.   The Help America Vote Act ................................................................................... 17

       4.   The Uniformed and Overseas Citizens Absentee Voting Act................................. 21

       5.   The Federal Election Day Statutes ........................................................................ 22

       6.   The Privacy Act..................................................................................................... 22

   **B.**   **Facts and Proceedings** ..................................................................................... **24**

       1.   Executive Order No. 14,248.................................................................................. 24

       2.   The Systematic Alien Verification for Entitlements Program ................................ 26

       3.   Parties ................................................................................................................... 27

           a.   The LULAC Plaintiffs................................................................................... 28

           b.   The Democratic Party Plaintiffs.................................................................... 31

       4.   Proceedings ........................................................................................................... 33

       5.   Parallel Proceedings .............................................................................................. 36

**II. LEGAL STANDARD** ................................................................................................ **37**

**III. ANALYSIS**................................................................................................................ **38**

   **A.**   **Threshold Issues** .............................................................................................. **38**

       1.   Standing................................................................................................................. 38

       2.   Ripeness ................................................................................................................ 42

       3.   Mootness............................................................................................................... 44

       4.   Statutory and non-statutory rights of action .......................................................... 45

           a.   Statutory review under the Administrative Procedure Act ............................ 46

           b.   Non-statutory rights of action ...................................................................... 46

       5.   The *Purcell* principle............................................................................................ 50

   **B.**   **Section 2(d): Requiring Agencies to "Assess Citizenship" before Providing the Federal Form to "Enrollees of Public Assistance Programs"** .................................. **52**

       1.   The Democratic Party Plaintiffs have standing to challenge Section 2(d). ............. 54

2.    The Democratic Party Plaintiffs have an equitable right of action to challenge Section 2(d) on constitutional separation-of-powers grounds.............................. 58

3.    Section 2(d) is inconsistent with the constitutional separation of powers. ............. 59

    a.    Section 2(d) is contrary to the NVRA............................................................. 61

    b.    The President lacks any constitutional authority to support the directive in Section 2(d). ..................................................................................................... 63

4.    A declaratory judgment and permanent injunction against implementation of Section 2(d) are appropriate remedies for the constitutional separation-of-powers violation................................................................................................................... 64

5.    Because Plaintiffs have not shown final agency action implementing Section 2(d), the Court shall grant Defendants' motion for summary judgment on their APA claims regarding this provision. ..................................................................... 68

6.    Further factual development is necessary to resolve the Democratic Party Plaintiffs' remaining claims regarding Section 2(d). ............................................. 69

**C.   Section 3(d): Requiring Documentary Proof of Citizenship on the Federal Post Card Application ........................................................................................................ 70**

1.    Plaintiffs have standing to challenge the implementation of Section 3(d)............. 71

    a.    The LULAC Plaintiffs have standing. ............................................................. 72

    b.    The Democratic Party Plaintiffs have standing................................................ 73

2.    Plaintiffs have an equitable right of action to challenge the implementation of Section 3(d) on constitutional separation-of-powers grounds................................. 76

3.    Section 3(d) is inconsistent with the constitutional separation of powers. ............. 77

    a.    Section 3(d) is contrary to UOCAVA............................................................. 77

    b.    The President lacks any constitutional authority to support the directive in Section 3(d). ..................................................................................................... 83

4.    A declaratory judgment and permanent injunction against implementation of Section 3(d) is the appropriate remedy. .................................................................. 84

5.    Because Plaintiffs have not shown final agency action implementing Section 3(d), the Court shall grant Defendants' motion for summary judgment on their APA claims regarding this provision. ..................................................................... 86

**D.   Section 4(a): Conditioning Funding to States on Use of the Federal Form, Including any Documentary Proof of Citizenship Requirement ............................. 86**

**E.   Section 7(a): Directing the Attorney General to "Enforce" the Election Day Statutes "Against" States That Count Ballots Received After Election Day ......... 88**

**F.   Section 7(b): Directing the EAC to "Condition" Funding to States on Not Counting Ballots Received After Election Day ........................................................ 93**

**G.   Sections 2(b) and 3(a): Requiring Agencies to Share Data on Voter Eligibility ..... 94**

1.    The Democratic Party Plaintiffs have standing to challenge Sections 2(b) and 3(a). .................................................................................................................. 96

2.    The Democratic Party Plaintiffs may pursue injunctive relief under the APA to redress prospective violations of the Privacy Act. ................................................. 99

3.    The Democratic Party Plaintiffs' request for an injunction against recent changes to the SAVE Program is moot, but they are entitled to narrower declaratory relief. ................................................................................................................... 102

4.    The remaining aspects of the Democratic Party Plaintiffs' claims regarding Section 2(b) and 3(a) may proceed....................................................................... 108

**IV. CONCLUSION** ............................................................................................................ **108**

\*    \*    \*

## EXECUTIVE SUMMARY

In Executive Order No. 14,248, President Donald J. Trump directed several federal agencies and officers to make a variety of changes to the administration of federal elections. Plaintiffs in these consolidated cases challenge many of the President's directives on constitutional and statutory grounds, arguing that they exceed his lawful authority. Plaintiffs also challenge agency actions taken in response to the Executive Order that relate to the protection and use of sensitive personal information held in federal databases.

This Court recently resolved Plaintiffs' claims regarding Section 2(a) of the Executive Order, permanently enjoining certain Defendants from implementing that provision's instruction to the Election Assistance Commission ("EAC") to "take appropriate action" to require documentary proof of U.S. citizenship on an important federal mail voter registration form (the "Federal Form"). *See* Order, Dkt. No. 217.

This Memorandum Opinion and the accompanying Order resolve the parties' cross-motions for summary judgment on each of Plaintiffs' remaining claims, focusing on "purely

legal" arguments for which the parties contend further discovery is not necessary. *See* Scheduling Order, Dkt. No. 141, at 3.

**Section I** of this Memorandum Opinion sets out the constitutional and statutory context for Plaintiffs' claims, describes the Executive Order and certain actions taken in response to it, introduces the relevant parties, and recounts the procedural history of these consolidated cases.

**Section II** states the legal standard for summary judgment and the criteria for granting declaratory and permanent injunctive relief.

**Section III.A** introduces several justiciability doctrines that the Court later applies throughout its analysis: standing, ripeness, mootness, rights (or "causes") of action, and the *Purcell* principle.

**Section III.B** addresses Plaintiffs' challenges to Section 2(d) of the Executive Order, which directs certain heads of federal agencies to "assess citizenship" before providing the Federal Form to "enrollees of public assistance programs."

The Court concludes that this instruction exceeds the President's lawful authority. When Congress enacted the National Voter Registration Act ("NVRA"), it imposed a mandatory duty on certain agencies to provide the Federal Form to recipients of their services. Congress also specified that voter eligibility should be verified by attestation under penalty of perjury on the Federal Form itself, implicitly rejecting any other form of assessment or "pre-screening." Section 2(d)'s directive to "assess citizenship" before providing the Federal Form to certain people is therefore contrary to the will of Congress as expressed in the NVRA. Accordingly, it can be sustained only by a strong showing that the President has sufficient constitutional authority over the subject matter. But the President has no such power; our Constitution vests the authority to regulate federal elections in Congress and the States alone.

The Court therefore concludes that Section 2(d) is inconsistent with the constitutional separation of powers and cannot lawfully be implemented. Accordingly, the Court shall grant partial summary judgment to Plaintiffs on their separation-of-powers claims regarding Section 2(d) and award a declaratory judgment and enter a permanent injunction in their favor.

Because Plaintiffs' parallel APA claims regarding Section 2(d) do not challenge final agency action, the Court shall grant partial summary judgment in Defendants' favor on those claims, without precluding appropriate further action if new facts or circumstances arise that should alter the Court's analysis. The Court also defers ruling on Plaintiffs' undue-burden challenges to Section 2(d), which would benefit from further factual development.

**Section III.C** addresses Plaintiffs' challenges to Section 3(d), which directs the Secretary of Defense to add a documentary-proof-of-citizenship requirement to the "Federal Post Card Application," a voter registration and ballot request form used by military and overseas voters.

The Court concludes that the directive in Section 3(d) exceeds the President's lawful authority. Applying the presumption that Congress "intends to make major policy decisions itself, not leave those decisions to agencies," the Court concludes that the Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA") does not authorize the Executive Branch to add a documentary proof of citizenship requirement to the Federal Post Card Application. *See West Virginia v. EPA*, 597 U.S. 697, 723 (2022). Instead, UOCAVA manifests the contrary intent of Congress that the Federal Post Card Application should be a straightforward, easy-to-use form and should *not* require documentary proof of citizenship. Because the Elections Clause assigns sole responsibility for election regulation to Congress and the States, and because the Court cannot assume that Congress has delegated this important power to the Executive Branch

8

without a clear statement to that effect, the President lacks the authority to direct the addition of a documentary-proof-of-citizenship requirement by executive order.

Therefore, the Court concludes that Section 3(d) is inconsistent with the constitutional separation of powers, that it cannot lawfully be implemented, and that Plaintiffs are entitled to partial summary judgment, a declaratory judgment, and a permanent injunction.

Finally, because Plaintiffs' parallel APA claims regarding Section 3(d) do not challenge final agency action, the Court shall grant partial summary judgment in Defendants' favor on those claims, without precluding appropriate further action if new facts or circumstances arise.

**Section III.D** addresses Section 4(a) of the Executive Order, which directs the Election Assistance Commission ("EAC") to condition certain funding to States on their acceptance and use of an important federal mail voter registration form, "including any requirement for documentary proof of United States citizenship adopted pursuant to" Section 2(a) of the Executive Order. Because the EAC is permanently enjoined from implementing Section 2(a)'s directive to add a documentary-proof-of-citizenship requirement and Plaintiffs have not shown that the remainder of Section 4(a) presents any imminent risk of harm to their interests, their claims regarding Section 4(a) are not ripe. Therefore, on the present record and without precluding further action if an imminent risk of harm should arise, the Court shall grant partial summary judgment in Defendant's favor on Plaintiffs' claims regarding this provision.

**Sections III.E** and **III.F** address Sections 7(a) and 7(b) of the Executive Order, which purport to direct the Attorney General and the EAC to take certain actions against States that count mail-in ballots that are received after Election Day. Because any harm to Plaintiffs' interest in these provisions depends either on how States respond to future action by the Attorney General or the EAC or on the indirect effects of a legal uncertainty that this Court cannot resolve,

Plaintiffs have not established an imminent injury that is redressable by a favorable decision from this Court. Plaintiffs therefore lack standing and a ripe claim to challenge these provisions. Accordingly, on the present record and without precluding further action if an imminent risk of redressable harm should arise, Court shall grant partial summary judgment in Defendant's favor on Plaintiffs' claims regarding Sections 7(a) and 7(b), without reaching the merits of the parties' arguments about whether the federal Election Day Statutes, 2 U.S.C. § 7 and 3 U.S.C. § 1, allow the counting of mail-in ballots received after Election Day. *Cf. Watson v. Republican Nat'l Comm.*, No. 24-1260, 146 S. Ct. 355 (2025) (mem.) (granting certiorari to decide this issue).

**Section III.G** addresses Plaintiffs' claims regarding Sections 2(b) and 3(a) of the Executive Order, both of which relate to data sharing among Federal and State agencies. The Court focuses primarily on Plaintiffs' Privacy Act challenge to recent actions that the Department of Homeland Security ("DHS") and the Social Security Administration ("SSA") have taken to implement those provisions. The Court concludes that Plaintiffs' request for injunctive relief in connection with this challenge is moot because DHS and SSA have now complied with the Privacy Act procedure for establishing a new "routine use" that covers the data sharing at issue, leaving Plaintiffs without any forward-looking injury that would be redressable by an injunction. However, the Court concludes that Plaintiffs are entitled to limited declaratory relief in connection with their claims regarding Sections 2(b) and 3(a), and the remainder of Plaintiffs' claims would benefit from further factual development. Accordingly, the Court shall award limited declaratory relief, grant partial summary judgment in Defendants' favor on Plaintiffs' claims regarding DHS and SSA's recent actions to implement Sections 2(b) and 3(a), and defer ruling on the remainder of Plaintiffs' challenges. The Court shall direct the parties to propose a schedule for further proceedings on the remaining challenges.

# I. BACKGROUND

## A.    Constitutional and Statutory Framework

In two prior opinions in these consolidated cases, the Court set out the details of the constitutional and statutory framework underlying Plaintiffs' various claims.  *See League of United Latin Am. Citizens v. Exec. Off. of the President* ("*LULAC I*"), 780 F. Supp. 3d 135, 156–66 (D.D.C. 2025) (CKK) (resolving motions for preliminary injunctions); *League of United Latin Am. Citizens v. Exec. Off. of the President* ("*LULAC II*"), Nos. 25-cv-0946, 25-cv-0952, 25-cv-0955 (consolidated), --- F. Supp. 3d. ----, 2025 WL 3042704, at *2–7 (D.D.C. Oct. 31, 2025) (resolving cross-motions for summary judgment regarding Section 2(a)).  Here, the Court summarizes the aspects of that framework that are most relevant to the resolution of the remaining cross-motions for summary judgment.

### 1.    The Constitution on Voter Qualifications and Election Procedures

The Constitution addresses two types of power over federal elections: first, the power to determine who is qualified to vote, and second, the power to regulate federal election procedures.  In both spheres, the Constitution vests authority first in the States.  In matters of election procedures, the Constitution assigns Congress the power to preempt State regulations.  The Constitution assigns no direct role to the President in either domain.

#### a.    *Voter Qualifications*

The Constitution empowers the States alone to decide who is qualified to vote in federal elections.  The Voter Qualifications Clause provides that Members of the U.S. House of Representatives are to be elected by voters who "have the Qualifications requisite for Electors of

the most numerous Branch of the State Legislature." U.S. Const. art. I, § 2, cl. 1.[2] The Seventeenth Amendment likewise provides that voters for U.S. Senators from each State "shall have the qualifications requisite for electors of the most numerous branch of the State legislatures." U.S. Const. amend. XVII. Because each State decides who is eligible to vote for its own state legislators, the Constitution allows the States to decide who may vote for members of the U.S. House of Representatives and Senate as well.

The Constitution provides more directly for State control over the qualifications for voters in Presidential elections. The President is elected by vote of the Electoral College. *See* U.S. Const. amend. XII. The Electors Clause empowers each State to appoint Electors to the Electoral College "in such Manner as the Legislature thereof may direct." U.S. Const. art. II, § 1, cl. 2. Each State now directs that its Electors be appointed by popular vote of qualified voters. *See Chiafalo v. Washington*, 591 U.S. 578, 584–85 (2020).

Although the States determine the requirements for voter eligibility, the Constitution imposes some limits on their discretion to do so. *E.g.*, U.S. Const. amend. XIX ("The right of citizens of the United States to vote shall not be denied or abridged . . . on account of sex.").

        b.    *Election Procedures*

When it comes to the procedural conduct of federal elections, the Constitution grants broad regulatory authority to the States but reserves final, supervisory authority to Congress.

Starting with the States' power, the Elections Clause provides that the "Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof." U.S. Const. art. I, § 4, cl. 1. "The Clause's substantive scope is broad." *Arizona v. Inter Tribal Council of Arizona, Inc.* ("*ITCA*"), 570 U.S. 1, 8 (2013). The

---

[2] Article I of the Constitution refers to voters in congressional elections as "Electors." Article II uses the same term to refer to different people: the Members of the Electoral College.

terms "Times, Places, and Manner" are "comprehensive words" that "embrace authority to provide a complete code for congressional elections." *Smiley v. Holm*, 285 U.S. 355, 366 (1932). By default, the Constitution tasks States with regulating, among other things, voter registration, *see id.*, recounts, *Roudebush v. Hartke*, 405 U.S. 15 (1972), primaries, *United States v. Classic*, 313 U.S. 299 (1941), and the form and content of ballots, *see Munro v. Socialist Workers Party*, 479 U.S. 189 (1986).

However, this grant of authority to the States is only "a default provision." *Foster v. Love*, 522 U.S. 67, 69 (1997). Under the Elections Clause, the States prescribe regulations in the first instance, "but the Congress may at any time by Law make or alter such Regulations." U.S. Const. art. I, § 4, cl. 1.[3] Put differently, the Elections Clause "grants Congress 'the power to override state regulations' by establishing uniform rules for federal elections, binding on the States." *Foster*, 522 U.S at 69 (quoting *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 832–33 (1995)).

Congress's Elections Clause power to establish federal election rules is supreme over, but coextensive with, the States' own regulatory power under the same clause. *See Ex parte Siebold*, 100 U.S. 371, 384–85 (1879). For that reason, determining voter qualifications "forms no part of the power to be conferred upon the national government" by the Elections Clause. *ITCA*, 570 U.S. at 17 (quoting The Federalist No. 60, at 371 (A. Hamilton) (C. Rossiter ed. 1961)). That power flows from the Voter Qualifications Clause and the Seventeenth Amendment alone. "[N]othing in th[ose] provisions lends itself to the view that voting qualifications in federal elections are to be set by Congress." *Id.* at 16 (quoting *Oregon v. Mitchell*, 400 U.S. 112, 210

---

[3] The Elections Clause excepts from Congress's supervisory authority the power to determine "the Places of chusing Senators." U.S. Const. art. I, § 4, cl. 1 (spelling as in original). The Seventeenth Amendment, which dictates that Senators be popularly elected rather than chosen by state legislatures, moots this exception. *See* U.S. Const. amend. XVII.

(1970) (Harlan, J., concurring in part)).  The precise boundary between Congress's regulatory authority and the States' authority to determine voter eligibility is contested, but not relevant here.  *See id.* at 25–36 (Thomas, J. dissenting).

Although the Elections Clause power—whether exercised by the States or Congress—is sweeping, it has limits.  Most notably, it cannot be used to effectuate "the abridgment of fundamental rights."  *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 217 (1986); *accord Burdick v. Takushi*, 504 U.S. 428, 433 (1992).

The provisions that the Court has reviewed so far focus on congressional elections, but similar reasoning extends to presidential elections.  The Electors Clause empowers States to determine the "Manner" of electing the President, but unlike the Elections Clause, it does not explicitly reserve supervisory authority to Congress.  U.S. Const. art. II, § 1, cl. 2.[4]  Nevertheless, whether as a matter of practice[5] or as a function of the Necessary and Proper Clause,[6] "the broad power given to Congress over congressional elections has been extended to presidential elections."  *Voting Rts. Coal. v. Wilson*, 60 F.3d 1411, 1414 (9th Cir. 1995).  Throughout this Opinion, the Court refers to the Elections Clause with this context in mind.

### c.    *Historical Context*

As the Court has explained in prior opinions, the Constitution's allocation of authority over federal elections reflects carefully considered compromises among the Framers.  *See*

---

[4] The Electoral Votes Clause directs that "Congress may determine the *Time* of chusing the Electors."  U.S. Const. art. II, § 1, cl. 4 (emphasis added) (spelling as in original).  This power is self-evidently narrower than the authority to prescribe "[t]he Times, *Places and Manner*" of congressional elections that is granted to the States and to Congress by the Elections Clause.  *See* U.S. Const. art. I, § 4, cl. 1 (emphasis added).

[5] Congressional and presidential elections occur simultaneously.  2 U.S.C. § 7; 3 U.S.C. § 1.  As a result, regulations of the former effectively regulate the latter.  *Cf. Ex parte Coy*, 127 U.S. 731, 751–52 (1888) (holding that Congress's power to ensure the integrity of federal elections extends to concurrent state elections).

[6] *See Burroughs v. United States*, 290 U.S. 534, 545–48 (1934); *Buckley v. Valeo*, 424 U.S. 1, 90 (1976) (per curiam).

*LULAC I*, 780 F. Supp. 3d at 158–59; *LULAC II*, 2025 WL 3042704, at *3–4.  Federalists worried that giving the States exclusive control over election procedure could fatally weaken the national government by allowing the States to prevent federal elections altogether.  *See, e.g.*, The Federalist No. 59 (A. Hamilton).  Meanwhile, Antifederalists were concerned that allowing Congress to control the procedure for election of its own members would allow Congress to insulate itself from electoral accountability and accumulate power at the expense of the more popularly responsive States.  *See, e.g.*, Federal Farmer No. 3.  The Framers ultimately struck a balance, "submitt[ing] the regulation of elections for the federal government, in the first instance," to the States, while "reserv[ing] to [Congress] a right to interpose" regulations of its own when the need arose.  The Federalist No. 59 (A. Hamilton).

The President is conspicuously absent from this legal and historical context.  In fact, the Framers do not appear to have given any serious consideration to granting the President the power to regulate federal elections:

> [T]here were only three ways in which this power could have been reasonably modified and disposed: that it must either have been lodged wholly in the national legislature, or wholly in the State legislatures, or primarily in the latter and ultimately in the former.

The Federalist No. 59.[7]

### 2.    The National Voter Registration Act

In 1993, Congress exercised its Elections Clause authority to regulate federal elections by enacting the National Voter Registration Act ("NVRA"), Pub. L. No. 103-31, 107 Stat. 77 (codified, as amended, at 52 U.S.C. §§ 20501–20511).  Congress's stated purposes in enacting the NVRA included "establish[ing] procedures that will increase the number of eligible citizens

---

[7] *See also* Debate in Massachusetts Ratifying Convention, *in* 2 *The Founders' Constitution* 255 (P. Kurland & R. Lerner eds., 1987) ("I know of but two bodies wherein [the power to regulate federal elections] can be lodged—the legislatures of the several states, and the general Congress." (statement of Caleb Strong)).

who register to vote in elections for Federal office," helping officials at all levels of government implement the Act's requirements "in a manner that enhances the participation of eligible citizens as voters in elections for federal office," "protect[ing] the integrity of the electoral process," and ensuring the maintenance of "accurate and correct voter registration rolls." *See Id.* § 2(b), 107 Stat. 77 (1993) (codified at 52 U.S.C. § 20501(b)).

The NVRA established a baseline set of voter registration procedures for federal elections that every State must implement, alongside "any other method of voter registration provided for under State law." 52 U.S.C. § 20503(a). For example, the NVRA requires that States allow people to apply for voter registration when applying for drivers' licenses. *See id.* § 20503(a)(1). The NVRA also requires each State to "accept and use" a standard federal "mail voter registration form" (the "Federal Form"). *Id.* § 20505(a)(1).

The Federal Form consists of three components: an application (the portion of the Federal Form that a would-be voter must fill out); general instructions for completing the application; and appended state-specific instructions. *See* 11 C.F.R. § 9428.3. The NVRA sets strict limits on the contents of the Federal Form. Most relevantly, the application section:

> may require only such identifying information (including the signature of the applicant) and other information (including data relating to previous registration by the applicant), as is necessary to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process.

52 U.S.C. § 20508(b)(1). The state-specific instructions must "specif[y] each eligibility requirement (including citizenship)" set by state law. *Id.* § 20508(b)(2)(A). And the application must verify an applicant's eligibility under state law through an "attestation that the applicant meets each such requirement[s]" that "requires the signature of the applicant, under penalty of perjury." *Id.* §§ 20508(b)(2)(B)–(C). The Federal Form "may not include any requirement for notarization or other formal authentication." *Id.* § 20508(b)(3).

The Conference Committee on the bill that became the NVRA considered and rejected an amendment proposed in the Senate that would have expressly allowed States to "requir[e] presentation of documentation relating to citizenship of an applicant for voter registration." *See* H.R. Rep. No. 103–66, at 23 (1993) (Conf. Rep.).  The Conference Committee concluded that such an amendment was "not necessary or consistent with the purposes of this Act" and "could be interpreted by States to permit registration requirements that could effectively eliminate, or seriously interfere with, the mail registration program of the Act."  *Id.*

Congress initially assigned responsibility for maintaining the Federal Form and developing regulations for its use to the Federal Election Commission ("FEC"), a federal agency that Congress created as an independent, bipartisan commission.  *See* Pub. L. No. 103-31 § 6(a), 107 Stat. 77, 79 (1993) (codified at 52 U.S.C. § 20505(a)(1)); *id.* § 9(a), 107 Stat. 77, 87 (1993) (codified, as amended, at 52 U.S.C. § 20508(a)); *see also* 52 U.S.C. § 30106(a) (establishing the FEC).

3.    The Help America Vote Act

In 2002, Congress enacted the Help America Vote Act ("HAVA"), Pub. L. No. 107-252, 116 Stat. 1666, partly in response to the election administration challenges that arose during the Presidential election in 2000.  *See* H.R. Rep. 107-329, at 32 (2001).  HAVA made several changes to federal election law, including creating a new independent agency to set standards and share best practices related to some aspects of federal elections.  *See* Pub. L. No. 107-252, Title II, § 201, 116 Stat. 1666, 1673 (codified at 52 U.S.C. § 20921).

HAVA created a new "independent entity" in the Executive Branch called the Election Assistance Commission ("EAC").  Pub. L. No. 107-252, Title II, § 201, 116 Stat. 1666, 1673 (2002) (codified at 52 U.S.C. § 20921).  The Act established the EAC as an advisory body "serv[ing] as a national clearinghouse and resource for the compilation of information and

review of procedures with respect to the administration of Federal elections." *Id.* § 202, 116 Stat. 1666, 1673–74 (codified at 52 U.S.C. § 20922).

The EAC is composed of four Members nominated by the President with the advice and consent of the Senate. *See* 52 U.S.C. § 20923(a)(1). Each Member must "have experience with or expertise in election administration or the study of elections." *Id.* § 20923(a)(3). Members serve staggered four-year terms in two groups, such that two vacancies arise on the EAC every two years in the normal course. *See id.* §§ 20923(b)(1)–(2). After their four-year terms expire, Members may be reappointed to serve one additional term. *Id.* § 20923(b)(1). And Members elect among themselves a chair and vice chair, who each serve a one-year term in that role that cannot be renewed during their four-year term as Members. *Id.* § 20923(c).

Congress designed the EAC to be both partisan (*i.e.*, explicitly linked to political parties) and bipartisan (*i.e.*, balanced equally between the two major political parties). *See* H.R. Rep. 107-329, at 59 (2001) (describing the EAC as a "four-member, bipartisan commission"). But that design comes to fruition somewhat indirectly. For example, before the President nominates a potential Member, the Majority and Minority Leaders of both the House and Senate "shall each submit to the President a candidate recommendation" for the position "affiliated with the political party of the Member of Congress involved." 52 U.S.C. § 20923(a)(2). This recommendation is a recommendation only; HAVA does not explicitly require that the President nominate the person so recommended. *See id.*

But other provisions of the statute implicitly require partisan balancing. For example, when the first four Members were nominated, two Members had to serve shortened two-year terms to achieve Congress's desired staggered-term structure. Congress required that "not more than one" of the Members relegated to these abbreviated terms "be affiliated with the same

political party." 52 U.S.C. § 20923(b)(2)(A). When Members select their chair and vice chair, they are similarly restricted: "[T]he chair and vice chair may not be affiliated with the same political party." *Id.* § 20923(c)(1). Because the chair and vice chair may serve in that role for only one year of their four-year term, and because there are only two political parties whose members have occupied the roles of Majority and Minority Leader of the House and Senate since HAVA's enactment, compliance with this provision necessarily requires that the President cannot nominate more than two Members from his own political party to the EAC.

By statute, the EAC may not take "[a]ny action" under the chapter of HAVA related to standards and funding for voting system improvements without "the approval of at least three of its members." 52 U.S.C. § 20928. In practice, this requirement ensures that the EAC may only take actions under this chapter that have bipartisan support.

HAVA reassigned responsibility for maintaining the Federal Form from the FEC to the newly-created EAC. Pub. L. No. 107-252, Title VIII, § 802, 116 Stat. 1666, 1726 (2002); *see* 52 U.S.C. § 20508(a). The EAC is therefore responsible for "develop[ing]" the Federal Form "in consultation with the chief election officers of the States," 52 U.S.C. § 20508(a)(2), reporting to Congress periodically on the NVRA's "impact . . . on the administration of elections for Federal office," *id.* § 20508(a)(3), and prescribing any regulations that are "necessary to carry out" those duties, *id.* § 20508(a)(1). The EAC also must "provide information to the States" about each State's responsibilities under the NVRA. *Id.* § 20508(a)(4).

Congress also provided in HAVA that the EAC lacks any rulemaking authority, "except to the extent permitted under" the section of the NVRA allowing rulemaking regarding the contents of the Federal Form and periodic reports to Congress on the impact of the NVRA. 52 U.S.C. § 20929; *see* 52 U.S.C. § 20508(a); *see also* H.R. Rep. No. 107-730, at 69 (2002) (Conf.

Rep.) (explaining that HAVA "[p]rohibits" the EAC "from imposing any rule, regulation, or taking any action that imposes requirements on State or local governments except as permitted under the [NVRA]").  Exercising this limited rulemaking authority, the EAC may alter the Federal Form by promulgating regulations through notice-and-comment rulemaking.  *See* 52 U.S.C. § 20929; *cf. Final Rules: National Voter Registration Act of 1993*, 59 Fed. Reg. 32,311 (June 23, 1994) (implementing regulations promulgated by the EAC's predecessor in this role, the FEC).

The EAC's rulemaking process is as follows.  If the EAC decides that a change to the Federal Form is necessary, it must develop that change as a proposed rule, which must be approved by at least three EAC Members.  52 U.S.C. § 20928.  Once the EAC has approved a proposed rule, it must comply with the Administrative Procedure Act by issuing a notice of proposed rulemaking and receiving public comments.  5 U.S.C. § 553.  The EAC must also "consult[] with the chief election officers of the States" regarding its proposed changes to the Federal Form.  52 U.S.C. § 20508(a)(2).  Once the EAC has received feedback from the public and the States, it must consider revisions to its proposed rule, and any revisions must again be approved by at least three EAC Members.  *See* 5 U.S.C. § 553(c); 52 U.S.C. § 20928.  Following any revisions, the EAC then promulgates the finalized rule amending the Federal Form.  *See* 5 U.S.C. § 553(c).

Finally, the Federal Form is a "collection of information" subject to the requirements of the Paperwork Reduction Act.  44 U.S.C. § 3502(3).  As a result, the EAC must conduct certain internal administrative reviews and provide an additional public comment period.  *See id.* § 3506(c).  The EAC must also submit the collection of information for approval by the Office of Information and Regulatory Affairs within the Office of Management and Budget.  *See id.*

§ 3507(a)(2).  But because the EAC is an "independent regulatory agency . . . administered by 2 or more members of a commission," it "may by majority vote void" any disapproval of its collection of information by OIRA.  *Id.* § 3507(f)(1).

4.    The Uniformed and Overseas Citizens Absentee Voting Act

In 1986, Congress enacted the Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA"), Pub. L. No. 99-410, 100 Stat. 924 (codified as amended at 52 U.S.C. §§ 20301–20311).

UOCAVA guarantees the right "to use absentee registration procedures and to vote by absentee ballot" in federal elections to three categories of qualified voters: uniformed servicemembers and merchant mariners temporarily absent from their place of residence in the United States due to active duty or service in the merchant marine, spouses and family members of uniformed servicemembers and merchant mariners who are similarly absent due to their qualifying family member's active duty or service, and United States citizens residing overseas. 52 U.S.C. § 20302(a)(1).  UOCAVA's provisions apply to individuals who are "qualified to vote" in their "place of residence" in the United States or "the last place in which [they were] domiciled before leaving the United States."  *Id.* § 20310(a)(1), (5).

UOCAVA requires States to accept an "official post card form" from qualified individuals in these categories that contains both an application to register to vote and an application for an absentee ballot.  52 U.S.C. §§ 20301(b)(2), 20302(a)(4).  The content of this "post card form," commonly called the Federal Post Card Application, is "prescribe[d]" by the head of an executive department designated by the President and must contain "both an absentee voter registration application and an absentee ballot application."  *Id.* § 20301(b)(2).  UOCAVA requires the President's designee to "prescribe a standard oath for use with" the Federal Post Card Application, which must "affirm[] that a material misstatement of fact in the completion of

[the form] may constitute grounds for a conviction for perjury." *Id.* § 20301(b)(7). States must accept and process the Federal Post Card Application, and they may not refuse to do so based on an applicant's failure to comply with State requirements regarding notarization or the use of certain types of paper or envelopes. *Id.* § 20301(i).

### 5. The Federal Election Day Statutes

Two federal statutes specify the date of the federal Election Day. 2 U.S.C. § 7 provides that "[t]he Tuesday next after the 1st Monday in November, in every even numbered year, is established as the day for the election" of Members of Congress. 3 U.S.C. § 1 provides that "[t]he electors of President and Vice President shall be appointed, in each State, on election day, in accordance with the laws of the State enacted prior to election day." Neither statute expressly prescribes any particular procedures for States to use when receiving and counting ballots in federal elections, and neither statute expressly provides for an enforcement mechanism.

### 6. The Privacy Act

The Privacy Act of 1974, 5 U.S.C. § 522a, "was designed to provide individuals with more control over the gathering, dissemination, and accuracy of agency information about themselves." *Greentree v. U.S. Customs Serv.*, 674 F.2d 74, 76 (D.C. Cir. 1982). To that end, the Act imposes burdens on federal agencies and creates rights for individuals when those agencies collect, maintain, use, or disseminate individuals' personal information.

The Privacy Act's requirements apply to "record[s]" and "system[s] of records." A "record" is "any item, collection, or grouping of information about an individual that is maintained by an agency." 5 U.S.C. § 552a(a)(4). A "system of records" is a "group of any records under the control of any agency from which information is retrieved by the name of the individual or by some identifying number, symbol, or other identifying particular." *Id.* § 552a(a)(5).

Many of the Privacy Act's provisions focus on ensuring that records are accurate.  *See All. for Retired Ams. v. Bessent*, 770 F. Supp. 3d 79, 87 (D.D.C. 2025) (CKK).  However, as relevant here, the Act also limits federal agencies' ability to share records about individuals:

> No agency shall disclose any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains, unless [an enumerated exception applies].

5 U.S.C. § 552a(b).

The Act allows intra-agency sharing of protected records on a need-to-know basis.  That is, an agency may disclose a record "to those officers and employees of the agency which maintains the record who have a need for the record in the performance of their duties." 5 U.S.C. § 552a(b)(1).

The Act imposes stricter limits on sharing information between agencies or outside the Federal Government.  For example, an agency may disclose a record to "another agency or to an instrumentality of any governmental jurisdiction . . . for a civil or criminal law enforcement activity," but only upon a "written request to the agency which maintains the record specifying the particular portion desired and the law enforcement activity for which the record is sought." 5 U.S.C. § 552a(b)(7).

An agency may also share a record "for a routine use."  5 U.S.C. § 552a(b)(3).  A routine use is the use of a record "for a purpose which is compatible with the purpose for which it was collected."  *Id.* § 552a(a)(7).  An agency cannot invent new routine uses on the fly; instead, when an agency establishes or revises a system of records, it must "publish in the Federal Register" a notice containing a list of "each routine use of the records contained in the system, including the categories of users and the purpose of such use."  *Id.* § 552a(e)(4)(D).  If system of records notice ("SORN") announces "any new use or intended use of the information in the system," the

agency must give notice to the public at least 30 days in advance and "provide an opportunity for interested persons to submit written data, views, or arguments" about the new routine use.  *Id.* § 552a(e)(11).  If the agency proposes to make a "significant change" to a system of records, it must also provide "adequate advance notice" to two specified congressional committees and the Office of Management and Budget ("OMB") "to permit an evaluation of the probable or potential effect of such proposal on the privacy or other rights of individuals." *Id.* § 552a(r).

The Privacy Act does not specify a remedy for violations of its nondisclosure rules. Instead, the Act includes a catch-all remedial provision providing that, when an agency's violation of the Act has "an adverse effect on an individual," the individual may bring a civil action against the agency in federal district court.  5 U.S.C. § 552a(g)(1)(D).  If the disclosure "was intentional or willful," the individual may recover attorney's fees and the greater of their actual damages or $1,000.  *Id.* § 522a(g)(4).

### B.    Facts and Proceedings

#### 1.    Executive Order No. 14,248

On March 25, 2025, President Donald J. Trump signed an Executive Order entitled "Preserving and Protecting the Integrity of American Elections."  Exec. Order No. 14,248, 90 Fed. Reg. 14005 (Mar. 25, 2025).  The Executive Order directs a variety of federal officials to take actions that the President proffers will help ensure that federal elections are "honest and worthy of the public trust."  *Id.* § 1.  As relevant here:

Section 2(a) of the Executive Order directs the EAC to "take appropriate action" within 30 days "to require" people registering to vote using the Federal Form to submit "documentary proof of United States citizenship."  *Id.* § 2(a).  This Court has permanently enjoined the EAC and other Defendants from taking any action to implement or give effect to this provision.  *See LULAC II*, 2025 WL 3042704, at *38; Order, Dkt. No. 217.

Section 2(b) directs the heads of various federal agencies, including the Department of Homeland Security ("DHS"), to take action to "identify unqualified voters registered in the States" by sharing information in various federal databases with State officials and the U.S. DOGE Service ("USDS," also called "DOGE"). *Id.* § 2(b). Similarly, Section 3(a) directs the Commissioner of Social Security to "take all appropriate action" to make various federal databases available to "all State and local election officials engaged in verifying" voter eligibility. *Id.* § 3(a).

Section 2(d) directs the heads of federal agencies designated as voter registration agencies under the NVRA to "assess citizenship" before providing the Federal Form to "enrollees of public assistance programs." *Id.* § 2(d).

Section 3(d) directs the Secretary of Defense to "update" the Federal Post Card Application to require "documentary proof of United States citizenship" and "proof of eligibility to vote in elections in the State in which the voter is attempting to vote." *Id.* § 3(d).[8]

Section 4(a) directs the EAC to "take all appropriate action to cease providing Federal funds to States that do not comply with" the requirement to "accept and use" the Federal Form, including "any requirement for documentary proof of United States citizenship adopted pursuant to" Section 2(a) of the Executive Order. *Id.* § 4(a).[9]

---

[8] The Executive Order uses the title "Secretary of Defense," which is the statutory title of the head of the Department of Defense. *See* Exec. Order No. 14,248; 10 U.S.C. § 113(a)(1) ("There is a Secretary of Defense, who is the head of the Department of Defense, appointed from civilian life by the President, by and with the consent of the Senate."). As of September 5, 2025, the Secretary uses the secondary title "Secretary of War" in many official contexts. *See Restoring the United States Department of War*, Exec. Order No. 14,347, 90 Fed. Reg. 43893 (Sept. 5, 2025). For consistency with the text of the Executive Order at issue and the parties' presentations in this case, the Court shall use the title "Secretary of Defense" in this Memorandum Opinion and the accompanying Order. *See* Federal Defs.' Mem., Dkt. No. 177-1, at 7, 30, 32 (using the title "Secretary of Defense"); Federal Defs.' Reply & Opp'n, Dkt. No. 213, at 20, 26 (same).

[9] The Democratic Party Plaintiffs initially challenged other parts of Section 4, but they stipulated to the dismissal of those claims without prejudice on August 17, 2025. *See* Joint Stipulation of Partial Dismissal Pursuant to Rule 41, Dkt. No. 193. Although the D.C. Circuit has not yet addressed the issue, multiple circuits have held that Federal

Section 7(a) directs the Attorney General to "enforce" two federal statutes, 2 U.S.C. § 7 and 3 U.S.C. § 1, "against States" that count ballots received after Election Day in federal elections.  Exec. Order 14,248 § 7(a).

Section 7(b) directs the EAC to "condition any available funding to a State on that State's compliance with" a rule requiring that States only count ballots received on or before Election Day, subject to limited exceptions for certain ballots cast by servicemembers and other Americans living abroad, *id.* § 7(b).

The Executive Order also contains a standard "saving clause," which provides that the order "shall be implemented consistent with applicable law."  *Id.* § 7(b); *see Common Cause v. Trump*, 506 F. Supp. 3d 39, 47–53 & n.8 (D.D.C. 2020) (three-judge panel) (discussing an identical saving clause in another executive order).

### 2.    The Systematic Alien Verification for Entitlements Program

In response to Sections 2(b) and 3(a) of Executive Order No. 14,248, the Department of Homeland Security ("DHS") implemented several changes to its Systematic Alien Verification for Entitlements ("SAVE") program.  *See* Federal Defs.' Interrog. Resps. ("Defs.' Resps."), Dkt. No. 177-3, at 7, 13–14.  SAVE is an online service that allows "registered federal, state, territorial, tribal, and local government agencies to verify immigration status and U.S. citizenship of applicants seeking benefits or licenses."  *SAVE*, U.S. Department of Homeland Security,

---

Rule of Civil Procedure 41(a) allows for the stipulated dismissal only of entire actions, not individual claims.  *See, e.g.*, *Bailey v. Shell W. E&P, Inc.*, 609 F.3d 710, 720 (5th Cir. 2010); *Perry v. Schumacher Grp. of Louisiana*, 891 F.3d 954, 958 (11th Cir. 2018); *see also Loma Linda Kidney Ctr. v. Azar*, No. 15-cv-1717, 2018 WL 993000, at *3 (D.D.C. Feb. 21, 2018) (collecting additional cases and reaching the same conclusion), *aff'd*, 755 F. App'x 7 (D.C. Cir. 2018).  Consistent with "what appears to be the prevailing approach" to such stipulations, this Court shall construe the parties' stipulation as a consent motion for leave to amend the Democratic Party Plaintiffs' Complaint to strike their claims regarding other provisions of Section 4.  *See Loma Linda*, 2018 WL 993000, at *4. Accordingly, the Court shall **GRANT** the Democratic Party Plaintiffs' constructive motion for leave to amend their Complaint to strike their claims regarding other provisions of Section 4 and **DENY AS MOOT** the Federal Defendants' and Defendant-Intervenor's Motions for Summary Judgment as to those claims.

https://perma.cc/Z82D-SK7N; *see also* Defs.' Resps. at 7.  To implement the Executive Order's directives about sharing citizenship data with State and local election officials, DHS eliminated fees for State and local government users and implemented a variety of technical changes that made it easier for users to perform bulk searches for information about large numbers of individuals. *See* Defs.' Resps. at 13–14.  The Social Security Administration ("SSA") also began allowing DHS to access and query a Social Security database known as "Numident" to help "verify[] individuals' citizenship and immigration status for voter verification and other authorized inquiries." *Id.* at 7.

### 3.    Parties

Days after the President issued Executive Order No. 14,248, three groups of Plaintiffs filed suit in this District seeking injunctive and declaratory relief against various executive officers and agencies to block implementation of provisions of the President's Executive Order. *See* Compl., Dkt. No. 1 (Case No. 25-cv-0946), ¶ 1 & at 49; Compl., Dkt. No. 1 (Case No. 25-cv-0952), ¶ 4, at 68–69 & Ex. A; Compl., Dkt. No. 1 (Case No. 25-cv-0955), ¶ 1 & at 33.

Two of the groups of Plaintiffs in these actions consist of nonpartisan, not-for-profit organizations.  The first group to file includes the League of United Latin American Citizens ("LULAC"), the Secure Families Initiative, and the Arizona Students' Association (collectively, the "LULAC Plaintiffs"), and the second group includes the League of Women Voters Education Fund, the League of Women Voters of the United States, the League of Women Voters of Arizona, the Hispanic Federation, the National Association for the Advancement of Colored People ("NAACP"), OCA – Asian Pacific American Advocates, and Asian and Pacific Islander American Vote (collectively, the "League Plaintiffs").  Compl., Dkt. No. 1 (Case No. 25-cv-0946), ¶¶ 7–21; Compl., Dkt. No. 1 (Case No. 25-cv-0955), ¶¶ 11–22.

The other group of Plaintiffs includes several national organizations affiliated with the Democratic Party—the Democratic National Committee (DNC), Democratic Governors Association (DGA), Democratic Senatorial Campaign Committee (DSCC), and Democratic Congressional Campaign Committee (DCCC)—as well as the individual leaders of the Democratic Caucuses in the U.S. Senate and the U.S. House of Representatives, U.S. Senate Minority Leader Charles E. Schumer and U.S. House of Representatives Minority Leader Hakeem S. Jeffries.  Compl., Dkt. No. 1 (Case No. 25-cv-0952), ¶¶ 9, 12–17.  The Court will refer to these parties collectively as the "Democratic Party Plaintiffs."

a.    *The LULAC Plaintiffs*

The LULAC Plaintiffs are membership organizations with members and supporters throughout the Nation.[10]  Two of these organizations—LULAC and the Secure Families Initiative—assert specific interests in helping eligible citizens, including eligible members of the military and their eligible family members, to register and vote in federal elections.[11]  Toward that end, these organizations run voter education and outreach programs designed to serve military families, including programs that encourage the use of the Federal Post Card Application to register to vote and request absentee ballots in federal elections.[12]  Some members

---

[10] *See, e.g.*, Decl. of Juan Proaño ("Proaño Decl."), Dkt. No. 194-5, ¶ 2 (stating that Plaintiff LULAC is a "nationwide" organization with "more than 400 councils and over 500,000 members"); Decl. of Brandi Jones ("Jones Decl."), Dkt. No. 194-4, ¶ 5 (stating that Plaintiff Secure Families Initiative has "over 44,000 members").

[11] *See* Proaño Decl. ¶ 11 (LULAC); Jones Decl. ¶ 6 (Secure Families Initiative); *see also* Suppl. Decl. of Kyle Nitschke ("Nitschke Decl."), Dkt. No. 145-15, ¶ 3 (Arizona Students' Association).

[12] *See* Proaño Decl. ¶¶ 11, 21–22 (LULAC); Jones Decl. ¶¶ 19–20 (Secure Families Initiative).

of LULAC and the Secure Families Initiative already use and rely upon the Federal Post Card Application for these purposes.[13]

Members of LULAC and the Secure Families Initiative also experience situations that may make it difficult or impossible for them to provide documentary proof of citizenship when registering to vote and requesting absentee ballots.[14]  For example, some members may not have a U.S. passport because of the expense and administrative burden of obtaining one.[15]  Others may have obtained U.S. passports but not be able to provide them at the time that they need to register to vote or request an absentee ballot, whether because they relocated on short notice under conditions that did not require them to carry their passports, because they lack reliable access to the internet or other resources necessary to make and submit copies of their passports, or because their passports were lost or stolen during a move or other travel.[16]  Some members also face security threats while outside the United States that cause them to be wary of sending sensitive personal information, including documentary proof of citizenship, in the mail.[17]  Still others are not willing to provide documentary proof of citizenship, even if they have it, because they fear that doing so may attract attention to family members who are not citizens.[18]

---

[13] *See* Proaño Decl. ¶ 13 (LULAC); Decl. of Luis Reyna (Reyna Decl.), Dkt. No. 194-6, ¶ 18 (LULAC Veterans of Southern California Council); Jones Decl. ¶ 21 (Secure Families Initiative).

[14] *See, e.g.*, Proaño Decl. ¶¶ 14–20 (LULAC); Reyna Decl. ¶ 18 (LULAC Veterans of Southern California Council); Jones Decl. ¶¶ 22–35 (Secure Families Initiative).

[15] *See* Jones Decl. ¶¶ 23–24 (Secure Families Initiative).

[16] *See* Proaño Decl. ¶¶ 15–16 (LULAC); Jones Decl. ¶¶ 23–31 (Secure Families Initiative).

[17] *See* Jones Decl. ¶¶ 32–33 (Secure Families Initiative).

[18] *See* Proaño Decl. ¶ 17–18 (LULAC).

LULAC and the Secure Families Initiative also have members who depend on voting by mail to cast their ballots in federal elections.[19]  Some of these members specifically rely on laws in their States that allow the counting of ballots received by mail after Election Day, provided that the ballots are voted and mailed on or before Election Day.[20]  For example, some members of LULAC and the Secure Families Initiative vote by mail because they or their family members are deployed or stationed abroad, away at school, or otherwise far from home during elections.[21]  Others vote by mail because their work hours make it difficult to vote in person.[22]  Still others vote by mail because they are more likely to experience voter intimidation if they vote in person.[23]  Some members have mobility challenges that limit their ability to return their ballots by other means.[24]  Some members also experience significant delays or other issues in the delivery of their mail.[25]  Some members who rely on voting by mail often submit their ballots close in time to Election Day, either because mobility challenges or other issues make it difficult

---

[19] *See* Proaño Decl. ¶¶ 27–38 (LULAC); Reyna Decl. ¶¶ 16, 20 (LULAC Veterans of Southern California Council); Decl. of Irma C. Gonzalez ("Gonzalez Decl."), Dkt. No. 194-7, ¶¶ 5, 7–12 (LULAC San Benito County Council); Decl. of James Fukuda ("Fukuda Decl."), Dkt. No. 194-8, ¶¶ 12–13, 17, 26 (LULAC Weehawken Council); Decl. of Ana Orellana ("Orellana Decl."), Dkt. No. 194-9, ¶ 5 (LULAC Stockton Council); Decl. of Felix Rivera ("Rivera Decl."), Dkt. No. 194-10, ¶¶ 8, 14–15 (LULAC Alaska Council); Jones Decl. ¶ 41 (Secure Families Initiative).

[20] *See, e.g.*, Proaño Decl. ¶¶ 37–38 (LULAC); Reyna Decl. ¶¶ 17, 21 (LULAC Veterans of Southern California Council); Gonzalez Decl. ¶¶ 12, 15 (LULAC San Benito County Council); Orellana Decl. ¶ 11 (LULAC Stockton Council); Jones Decl. ¶¶ 45–46 (Secure Families Initiative).

[21] *See, e.g.*, Reyna Decl. ¶ 17 (LULAC Veterans of Southern California Council); Fukuda Decl. ¶ 26 (LULAC Weehawken Council); Orellana Decl. ¶ 8–9 (LULAC Stockton Council); Rivera Decl. ¶¶ 13–14 (LULAC Alaska Council); Jones Decl. ¶¶ 41, 44 (Secure Families Initiative).

[22] *See, e.g.*, Orellana Decl. ¶¶ 12, 14 (LULAC Stockton Council).

[23] *See* Orellana Decl. ¶¶ 19–20 (LULAC Stockton Council).

[24] *See, e.g.*, Reyna Decl. ¶ 21 (LULAC Veterans of Southern California Council); Gonzalez Decl. ¶¶ 8–10, 12 (LULAC San Benito County Council); Fukuda Decl. ¶¶ 15–17 (LULAC Weehawken Council).

[25] *See, e.g.*, Proaño Decl. ¶ 34 (LULAC); Reyna Decl. ¶ 17 (LULAC Veterans of Southern California Council); Gonzalez Decl. ¶¶ 11, 14–15 (LULAC San Benito County Council); Orellana Decl. ¶¶ 10, 16–18 (LULAC Stockton Council); Jones Decl. ¶¶ 42–44 (Secure Families Initiative).

for them to mail their ballots earlier, or because they prefer to receive as much information as possible about the candidates and issues on the ballot before casting their votes by mail.[26]

Some of LULAC's members are eligible to vote in North Dakota, which changed its ballot-receipt deadline in response to the Executive Order.[27]  Some of these members previously relied on the North Dakota's prior practice of counting ballots that were voted and mailed on or before Election Day but received within a certain time thereafter.[28]

Finally, some LULAC and Secure Families Initiative members rely on State "ballot cure" programs to resolve technical issues with their mail-in ballots shortly after Election Day.[29]

b.    *The Democratic Party Plaintiffs*

Each of the Democratic Party Plaintiffs asserts an interest in fair, lawful competition for federal elective office, including fair opportunities to register and turn out eligible voters who are likely to support Democratic candidates.[30]  Like the LULAC Plaintiffs, the Democratic Party

---

[26] *See, e.g.*, Gonzalez Decl. ¶¶ 13, 16 (LULAC San Benito County Council); Fukuda Decl. ¶¶ 13, 15, 17 (LULAC Weehawken Council); Orellana Decl. ¶¶ 11, 13, 15 (LULAC Stockston Council); Rivera Decl. ¶ 9 (LULAC Alaska Council).

[27] *See* Proaño Decl. ¶¶ 30–31.

[28] *Id.* ¶ 30.

[29] *See, e.g.*, Gonzalez Decl. ¶¶ 18–22 (LULAC San Benito County Council).

[30] *See, e.g.*, Second Decl. of Liberty Schneider ("Schneider Decl."), Dkt. No. 198-3, ¶¶ 4, 7–8, 15, 24, 33–34 (DNC); Second Decl. of Jillian Edelman ("Edelman Decl."), Dkt. No. 198-4, ¶¶ 3, 5–6, 15, 21, 30–31 (DGA); Second Decl. of Lillie Snyder Boss ("Boss Decl."), Dkt. No. 198-5, ¶¶ 3, 5–7, 17, 23, 33–34 (DSCC); Second Decl. of Erik Ruselowski, Dkt. No. 198-6, ¶¶ 4, 6–8, 16, 22, 32–33 (DCCC); Second Decl. of Hakeem S. Jeffries ("Jeffries Decl."), Dkt. No. 198-1, ¶¶ 3–4, 7, 11–12, 17–21; Second Decl. of Charles E. Schumer ("Schumer Decl."), Dkt. No. 198-2, ¶¶ 3–4, 8, 11–12, 17–21.

Plaintiffs operate voter registration programs throughout the Nation.[31]  Some of the Democratic Party Plaintiffs are active in voter registration and turnout efforts in every State.[32]

Two of the Democratic Party Plaintiffs—U.S. House of Representatives Minority Leader Hakeem Jeffries and U.S. Senate Minority Leader Charles Schumer—are active candidates for federal elective office.[33]

The Democratic Party Plaintiffs collectively represent millions of eligible voters throughout the United States, including many who vote by mail and who use and rely on the Federal Post Card Application.[34]  Because of mail delays and other challenges, some of these voters specifically rely on laws in their States that allow the counting of ballots received by mail after Election Day, provided that the ballots are voted and mailed on or before Election Day.[35] Some of these voters would be unable to register to vote or would be dissuaded from voting if they were required to provide documentary proof of citizenship to do so, whether because they do not have passports or other qualifying documentation, because they live overseas and would have difficulty securely submitting the required documentation, or because they have had name

---

[31] *See, e.g.*, Schneider Decl. ¶¶ 4, 15 (DNC); Edelman Decl. ¶¶ 6, 15 (DGA); Boss Decl. ¶¶ 3, 17 (DSCC); Ruselowski Decl. ¶¶ 4, 16 (DCCC).

[32] *See, e.g.*, Schneider Decl. ¶¶ 6, 15, 28 (stating that Plaintiff DNC "is actively planning, preparing, budgeting, and strategizing for the rapidly approaching 2026 midterm elections in all 50 states," "maintains a website that provides voters in all fifty states with the information they need to register to vote and check their registrations," and "supports candidates throughout the country and thus has large constituencies in every state"); Boss Decl. ¶ 28 (stating that Plaintiff DSCC also "supports candidates throughout the country and thus has large constituencies in every state"); Ruselowski Decl. ¶ 27 (stating the same for Plaintiff DCCC).

[33] *See* Jeffries Decl. ¶ 3; Schumer Decl. ¶ 3.

[34] *See, e.g.*, Schneider Decl. ¶¶ 5, 10, 14–17 (DNC); Edelman Decl. ¶¶ 3, 2 Jeffries Decl. ¶¶ 2, 7, 9, 11–12; Schumer Decl. ¶¶ 2, 7, 9, 11–12; Decl. of Bahareh Aziz ("Azizi Decl."), Dkt. No. 198-7, ¶¶ 3–5; Decl. of Rachel E. Nelson ("Nelson Decl."), Dkt. No. 198-8, ¶¶ 3, 6; Decl. of Judy Bryant ("Bryant Decl."), Dkt. No. 198-9, ¶¶ 3–4; Decl. of Ada Shen ("Shen Decl."), Dkt No. 198-10, ¶¶ 7–8; Decl. of Gene Scott Phillips ("Phillips Decl."), Dkt. No. 198-12, ¶¶ 3–4.

[35] *See, e.g.*, Azizi Decl. ¶¶ 7, 9; Nelson Decl. ¶¶ 6–7, 10–11; Bryant Decl. ¶ 6; Shen Decl. ¶ 16; Phillips Decl. ¶¶ 3–4

changes—for example, due to marriage—and their legal names no longer match the names on their citizenship documents.[36]

Some of these eligible voters have also expressed concerns about improper access to their personal information by federal officials, including employees of DHS and USDS (also called "DOGE").[37]  Because eligible voters' concerns about improper access to their information make it more difficult for the Democratic Party Plaintiffs to register and turn out those voters, these concerns have led the Democratic Party Plaintiffs to expend additional resources on educating and assisting voters.[38]

### 4.    Proceedings

On April 1, 2025, the Clerk of the Court randomly assigned the Democratic Party Plaintiffs' case to this Court pursuant to Local Rule of Civil Procedure 40.3(a).  The Nonpartisan Plaintiffs' cases were later assigned to this Court as "related case[s]" pursuant to Local Rule of Civil Procedure 40.5(c).  These three cases are "related" because they "grow out of the same event or transaction"—the issuance of Executive Order No. 14,248, 90 Fed. Reg. 14005 (Mar. 25, 2025)—and "involve common issues of fact" related to the effect of that Executive Order. *See* LCvR 40.5(a)(3).

Given the extensive commonalities among the factual and legal issues among the three cases, this Court directed the Democratic Party Plaintiffs to meet and confer with the parties in

---

[36] *See, e.g.*, Azizi Decl. ¶ 5 (challenges submitting documents securely from overseas); Shen Decl. ¶¶ 11, 15 (same); Boss Decl. ¶ 21 (name changes)

[37] *See* Jeffries Decl. ¶ 16; Schumer Decl. ¶ 16; Schneider Decl. ¶¶ 27, 31 (DNC); Edelman Decl. ¶¶ 24, 28 (DGA); Boss ¶¶ 27, 31 (DSCC); Ruselowski Decl. ¶¶ 26, 30 (DCCC); Bryant Decl. ¶¶ 8–9; Decl. of Kaitlin Cagle ("Cagle Decl."), Dkt. No. 198-11, ¶¶ 9–11.

[38] *See* Jeffries Decl. ¶ 17; Schumer Decl. ¶ 17; Schneider Decl. ¶¶ 27–32 (DNC); Edelman Decl. ¶¶ 24–29 (DGA); Boss ¶¶ 27–32 (DSCC); Ruselowski Decl. ¶¶ 26–31 (DCCC).

all three related cases to determine each parties' position on whether the cases should be consolidated and, if appropriate, file a motion to consolidate the cases. *See* Order, Dkt. No. 15 (Case No. 25-cv-0952); *see also* Fed. R. Civ. P 42(a)(2) (allowing consolidation of multiple civil cases presenting "a common question of law or fact"). The Democratic Party Plaintiffs then filed a motion to consolidate the cases, with the consent of all parties. *See* Mot. to Consolidate Cases, Dkt. No. 16 (Case No. 25-cv-0952). This Court granted the motion and consolidated the three cases, directing the parties to consolidate their briefing "to the greatest extent practicable," while recognizing that some aligned parties may need to "request different relief" from one another. *See* Mem. Op. & Order, Dkt. No. 20 (Case No. 25-cv-0952), at 4–5.

Shortly thereafter, the LULAC Plaintiffs and League Plaintiffs requested that the Court set an expedited schedule for briefing on motions for preliminary injunction. *See* Emergency Mot. for Clarification of the Consolidation Order and to Expedite Hearing and Briefing, Dkt. No. 30. These Plaintiffs also requested leave to file briefs separately from the Democratic Party Plaintiffs, given their nonpartisan status and differing interests in these cases. *See id.* The Court granted both requests and ordered all Plaintiffs to file their motions for preliminary injunctions on or before April 7, the Defendants to file any responses to those motions on or before April 14, and the Plaintiffs to file any replies in support of their motions on or before April 16.[39] *See* Order, Dkt. No. 31. On April 17, the Court held a hearing on the Plaintiffs' motions with all parties present. *See generally* Tr. of Preliminary Injunction Hr'g ("Tr."), Dkt. No. 100.

This Court granted Plaintiffs' motions in part and preliminarily enjoined the implementation of two provisions of the Executive Order: Section 2(a), which directs the EAC to

---

[39] The Court denied without prejudice a subsequent request from the LULAC Plaintiffs to alter this briefing schedule as to the LULAC Plaintiffs' and Democratic Party Plaintiffs' claims regarding Section 7 of the Executive Order, which the LULAC Plaintiffs suggested could be briefed on a longer schedule. *See* Min. Order (Apr. 10, 2025).

modify the Federal Form to require applicants to provide documentary proof of U.S. citizenship, and Section 2(d), which directs the heads of certain federal agencies to "assess citizenship" before providing the Federal Form "to enrollees of public assistance programs." *LULAC I*, 780 F. Supp. 3d at 226; Order, Dkt. No. 103. The Democratic Party Plaintiffs also moved for injunctions against three other provisions of the Executive Order, but the Court denied those requests. *See LULAC I*, 780 F. Supp. 3d at 226 (denying the Democratic Party Plaintiffs' motion as to Sections 2(b), 7(a), and 7(b)).

The Republican National Committee ("RNC") later moved to intervene as a Defendant in the consolidated cases. Mot. to Intervene, Dkt. No. 125. The Court granted the RNC's motion in part, allowing it to intervene as a Defendant against all Plaintiffs' claims for relief from implementation of certain sections of Executive Order No. 14,248. *See* Mem. Op. & Order, Dkt. No. 135 (granting intervention as to Sections 2(a), 2(b), 2(d), 3(a), and 7(a)).

After the Court resolved Plaintiffs' motions for preliminary relief and the RNC's motion to intervene, it established a phased schedule for summary judgment briefing. *See* Scheduling Order, Dkt. No. 141.

In the first phase of briefing, the parties filed cross-motions for summary judgment on Plaintiffs' claims regarding Section 2(a) of the Executive Order, which the parties agreed could be resolved without discovery.

This Court granted Plaintiffs' motions for summary judgment on their constitutional separation-of-powers claims regarding Section 2(a), entered partial final judgment in Plaintiffs' favor on those claims, and issued a permanent injunction barring the relevant Defendants from implementing that provision. *See LULAC II*, 2025 WL 3042704, at *38; Order, Dkt. No. 217.

Finally, after an opportunity for limited discovery through written interrogatories, the Federal Defendants, the LULAC Plaintiffs, and the Democratic Party Plaintiffs each filed cross-motions for summary judgment, addressing the remainder of Plaintiffs' challenges to the Executive Order's directives. *See* Federal Defs.' Mot., Dkt. No. 177; Def.-Intervenor's Mot., Dkt. No. 176; LULAC Pls.' Mot., Dkt. No. 194; Dem. Pls.' Mot., Dkt. No. 196.

Soon after the parties finished the initial round of briefing on their cross-motions for summary judgment regarding Plaintiffs' remaining claims, the Federal Defendants notified the Court that two federal agencies have issued new system of records notices ("SORNs") that are relevant to the resolution of the Democratic Party Plaintiffs' Privacy Act claim regarding changes to the use of DHS's SAVE Program and SSA's Numident system adopted in response to Sections 2(b) and 3(a) of the Executive Order. *See* Federal Defs.' Notice of Factual Developments, Dkt. No. 222. At the Court's direction, the parties submitted supplemental memoranda regarding this development. *See* Federal Defs.' Suppl., Dkt No. 226; Dem. Pls. Suppl., Dkt. No. 232.

The parties' cross-motions for summary judgment are now ripe for decision.

5.    Parallel Proceedings

In parallel with these consolidated cases, two groups of States filed related challenges to Executive Order No. 14,248 in other Districts: one in the U.S. District Court for the District of Massachusetts, which was assigned to Judge Denise J. Casper, and one in the U.S. District Court for the Western District of Washington, which was assigned to Judge John H. Chun. *See California v. Trump*, No. 25-cv-10810 (D. Mass. filed Apr. 3, 2025); *Washington v. Trump*, No. 2:25-cv-0602, (W.D. Wash. filed Apr. 4, 2025).

Both Judge Casper and Judge Chun have now preliminarily or permanently enjoined the implementation of many provisions of the Executive Order with respect to the plaintiff States.

*See California v. Trump* ("*California I*"), 786 F. Supp. 3d 359, 396–97 (D. Mass. 2025) (preliminarily enjoining the implementation of Sections 2(a), 2(d), 3(d), 7(a), and 7(b)); *Washington v. Trump*, No. 2:25-cv-0602, --- F. Supp. 3d ----, 2026 WL 73866, at *39 (W.D. Wash. Jan. 9, 2026) (permanently enjoining the implementation of Sections 2(a), 4(a), 4(b), and aspects of Section 7); *see also California v. Trump* ("*California II*"), No. 25-CV-10810, --- F. Supp. 3d ----, 2025 WL 2663106, at *13 (D. Mass. Sept. 17, 2025) (denying motion to dismiss).

## II. LEGAL STANDARD

A moving party is entitled to summary judgment when it "shows that there is no genuine dispute as to any material fact" and that it is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

The Declaratory Judgment Act allows a court, "[i]n a case of actual controversy within its jurisdiction," to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). Whether to issue a declaratory judgment under this provision "always rests within the sound discretion of the court." *President v. Vance*, 627 F.2d 353, 365 n.76 (D.C. Cir. 1980). Among the factors that courts in this Circuit consider when deciding whether to grant a declaratory judgment are (1) "whether the judgment will serve a useful purpose in clarifying the legal relations at issue" and (2) "whether the judgment will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *See Glenn v. Thomas Fortune Fay*, 222 F. Supp. 3d 31, 36 (D.D.C. 2016) (RCL) (citing *Vance*, 627 F.2d at 364 n.76).

To obtain a permanent injunction, a plaintiff must make four showings. *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156–57 (2010). First, "the prevailing party must demonstrate that it actually 'has suffered,' or is 'likely to suffer irreparable harm'" in the absence of an injunction. *In re Fed. Bureau of Prisons' Execution Protocol Cases*, 980 F.3d 123, 137

(D.C. Cir. 2020) (first quoting *Monsanto*, 561 U.S. at 156–57; and then quoting *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008)).  Second, the moving party must show "that remedies available at law, such as monetary damages, are inadequate to compensate for that injury." *Monsanto*, 561 U.S. at 156–57 (quoting *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)).  Third, the moving party must show that, "considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted."  *Id.* (quoting *eBay*, 547 U.S. at 391).  Fourth, and finally, the moving party must show "that the public interest would not be disserved by a permanent injunction." *Id.* (quoting *eBay*, 547 U.S. at 391).  "[W]hen the Government is the opposing party," as it is in this case, the balance-of-hardships and public-interest factors "merge," and courts address those factors together.  *Nken v. Holder*, 556 U.S. 418, 435 (2009); *Singh v. Berger*, 56 F.4th 88, 107 (D.C. Cir. 2022).

### III. ANALYSIS

#### A.    Threshold Issues

Before turning to the merits of the individual claims at issue, the Court introduces several threshold issues of justiciability that apply to multiple claims.

##### 1.    Standing

Federal courts are courts of limited jurisdiction.  *See Murthy v. Missouri*, 603 U.S. 43, 56–57 (2024); U.S. Const. art. III, § 2, cl. 1.  One necessary condition for a claim to come within this Court's limited subject-matter jurisdiction is that the plaintiff must have standing to advance the claim.  *Attias v. Carefirst, Inc.*, 865 F.3d 620, 624 (D.C. Cir. 2017).  To have standing, the plaintiff must have suffered an "injury in fact" that is "concrete and particularized," "actual or imminent," and "fairly . . . trace[able] to the challenged action of the defendant," which "likely" will be "redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (alterations in original) (first quoting *Allen v. Wright*, 468 U.S. 737, 756 (1984); then

quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990); and then quoting *Simon v. Eastern Ky. Welfare Rights Organization*, 426 U.S. 26, 41–42 (1976)).

A party must have standing "for each claim that [it] press[es] and for each form of relief that [it] seek[s]." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021). For a plaintiff to have standing to pursue "forward-looking" relief such as an injunction, the plaintiff must "face 'a real and immediate threat of repeated injury.'" *Murthy*, 603 U.S. at 58 (quoting *O'Shea v. Littleton*, 414 U.S. 488 (1974)). The party asserting standing must show that each of these requirements is satisfied "with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561.

Most of the Plaintiffs in these cases are organizations, rather than individuals. As the Court has explained at some length in prior opinions in this case, there are two ways that organizations can have standing to sue in federal court. *See LULAC I*, 780 F. Supp. 3d at 178–82; *LULAC II*, 2025 WL 3042704, at *11–14; *Abigail All. for Better Access to Developmental Drugs v. Eschenbach*, 469 F.3d 129, 132 (D.C. Cir. 2006). First, an organization can have standing "on its own behalf," which is called "organizational standing." *Abigail All.*, 469 F.3d at 132 (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378–79 (1982); and *Warth v. Seldin*, 422 U.S. 490, 511 (1975)). Second, an organization can have standing to advance a claim "on behalf of its members," which is called "associational standing." *Id.* (citing *United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 553 (1996); and *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)); *Elec. Priv. Info. Ctr. v. United States Dep't of Com.* ("*EPIC*"), 928 F.3d 95, 101 (D.C. Cir. 2019).

A party can show organizational standing by making "the same showing required of individuals: an actual or threatened injury in fact that is fairly traceable to the defendant's

allegedly unlawful conduct and likely to be redressed by a favorable court decision." *Am. Anti-Vivisection Soc'y v. United States Dep't of Agric.*, 946 F.3d 615, 618 (D.C. Cir. 2020) (first quoting *Abigail All.*, 469 F.3d at 132; and then quoting *Am. Soc'y for the Prevention of Cruelty to Animals v. Feld Entertainment, Inc.*, 659 F.3d 13, 24 (D.C. Cir. 2011)). "To demonstrate injury in fact, an organization must allege a 'concrete and demonstrable injury to the organization's activities' that is 'more than simply a setback to the organization's abstract social interests.'" *Id.* (quoting *Havens*, 455 U.S. at 379). However, because a party cannot "spend its way into standing," mere "issue-advocacy" activities are not sufficient to support organizational standing. *See Alliance for Hippocratic Medicine*, 602 U.S. at 395–96. However, organizations can have standing to challenge practices that directly interfere with their core activities, such as direct services programs. *See Food and Drug Administration v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 394–96 (2024); *Equal Rights Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1141–42 & n.4 (D.C. Cir. 2011).

Regardless of whether an organization has standing to pursue a claim on its own behalf, it may have associational standing to sue on behalf of its members. This path to standing is always available to a "voluntary membership organization with identifiable members" that "represents [its members] in good faith." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 201 (2023). An organization not meeting that description may also have associational standing, but to do so, it "must have" at least "the 'indicia of a traditional membership association.'" *Viasat, Inc. v. FCC*, 47 F.4th 769, 781 (D.C. Cir. 2022) (quoting *Sorenson Commc'ns v. FCC*, 897 F.3d 214, 225 (D.C. Cir. 2018)); *see also Hunt*, 432 U.S. at 343. If these threshold requirements are satisfied, an organization may establish that it associational standing by showing that "(a) its members would otherwise have standing to sue in

their own right; (b) the interests [the organization] seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt*, 432 U.S. at 343; *EIPIC*, 928 F.3d at 101.

Some of the Democratic Party Plaintiffs also assert "political-competitor" standing, which refers to a political candidate or party's standing to challenge the "illegal structuring of a competitive environment" in which "rival parties defend their concrete interests." *Shays v. Fed. Election Comm'n*, 414 F.3d 76, 85–87 (D.C. Cir. 2005).[40]  This type of standing is relevant primarily when a plaintiff challenges an improper benefit to a competitor: although parties usually lack standing to challenge benefits to others, political-competitor standing—like the analogous doctrine of economic-competitor standing—recognizes that certain benefits predictably inflict concrete harms on the head-to-head competitors of their beneficiaries. *See id.*

Political candidates' standing to challenge unlawful rules shaping the "competitive environment" for elections derives from the principle that "parties defending concrete interests" suffer a cognizable harm when they are denied fair opportunities to protect those interests. *Shays*, 414 F.3d at 87.  In the election context, as in other regulated arenas, the D.C. Circuit has recognized that "regulated litigants suffer legal injury when agencies set the rules of the game in violation of statutory directives." *Id.* at 85.

---

[40] *See also, e.g.*, *Mecinas v. Hobbs*, 30 F.4th 890, 898 (9th Cir. 2022) ("If an allegedly unlawful election regulation makes the competitive landscape worse for a candidate or that candidate's party than it would otherwise be if the regulation were declared unlawful, those injured parties have the requisite concrete, non-generalized harm to confer standing."); *Texas Democratic Party v. Benkiser*, 459 F.3d 582, 587 (5th Cir. 2006) (recognizing political party's associational standing "on behalf of its candidate" to challenge action that allegedly "threaten[ed] [the candidate's] election prospects and campaign coffers"); *Fulani v. League of Women Voters Educ. Fund*, 882 F.2d 621, 626 (2d Cir. 1989) (recognizing standing to challenge the exclusion of a candidate from a political debate, which "palpably impaired [the candidate's] ability to compete on an equal footing with other significant presidential candidates").

In a recent decision, the Supreme Court endorsed an expansive view of political-competitor standing, holding that a political candidate always has standing to challenge vote-counting procedures, regardless of whether those procedures "help, hurt, or have no effect on" the candidate's electoral fortunes or the cost of the candidate's campaign.  *See Bost v. Illinois State Bd. of Elections*, No. 24-568, --- S. Ct. ----, 2026 WL 96707, at *3, *5 (U.S. Jan. 14, 2026).

Because political-competitor standing in this Circuit has historically been based on political candidates' underlying interest in the "retention of elected office," *see Shays*, 414 F.3d at 85, it is available primarily to candidates with "concrete plans to run for office in the future," *see Nader v. Fed. Election Comm'n*, 725 F.3d 226, 229 (D.C. Cir. 2013).[41]  At least one other court in this District has also concluded that the "party affiliate" of active candidates for political office may also have political-competitor standing.  *See Nat. L. Party of U.S. v. F.E.C.*, 111 F. Supp. 2d 33, 47 (D.D.C. 2000) (ESH).  By contrast, courts in this Circuit have declined to extend political-competitor standing to political action committees, reasoning that such organizations do not "compete" in elections in the relevant sense.  *See Gottlieb v. Fed. Election Comm'n*, 143 F.3d 618, 621 (D.C. Cir. 1998); *AB PAC v. Fed. Election Comm'n*, No. 22-cv-2139, 2023 WL 4560803, at *4 (D.D.C. July 17, 2023) (TJK).

2.    Ripeness

The justiciability doctrine of ripeness, which aims to prevent premature judicial intervention in abstract or ill-defined controversies, has both a constitutional component and a prudential component.[42]  *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003).

---

[41] The Supreme Court's recent decision in *Bost* may lead courts in this Circuit to take a more expansive view of political-competitor standing in the future.  *See Bost*, 2026 WL 96707, at *3 (concluding that candidates' interest in winning elective office "cannot be severed from their interest in the electoral process" and that candidates always "suffer when the process departs from the law").

[42] The Supreme Court has cast doubt on the enduring vitality of the prudential ripeness doctrine. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 167 (2014).  At least one member of the D.C. Circuit has done the same.

In a case like this one that involves a pre-enforcement challenge to executive action, "[c]onstitutional ripeness 'is subsumed into the Article III requirement of standing, which requires a [plaintiff to show] an injury-in-fact that is "imminent" or "certainly impending."'" *POET Biorefining, LLC v. EPA*, 970 F.3d 392, 403 (D.C. Cir. 2020) (quoting *Am. Petrol. Inst. v. EPA*, 683 F.3d 382, 386 (D.C. Cir. 2012)).

The prudential component of ripeness requires courts to balance two competing considerations. *See Abbott Lab'ys v. Gardner*, 387 U.S. 136, 149 (1967). On the one hand, courts must weigh institutional reasons for deferring review, such as a need for further factual development or an indication that the challenged action is merely tentative, rather than final. *Id.* On the other hand, courts must assess the hardship that would result from delaying review. *Id.*

As this Court previously explained, the prudential ripeness of a challenge to an executive order can be analyzed in part by analogy to the distinction bfetween "legislative rules" and "guidance" in the administrative law context. *See LULAC I*, 780 F. Supp. 3d at 174–75. Legislative rules, which purport to create binding obligations, may be subject to pre-enforcement review. *See Nat'l Min. Ass'n v. McCarthy*, 758 F.3d 243, 251–52 (D.C. Cir. 2014) (Kavanaugh, J.). However, pre-enforcement review is not available when an agency issues non-binding guidance. *Id.* Similarly, executive actions that purport to create binding obligations or "dictate particular outcomes" may be prudentially ripe for pre-implementation review, while directions from the President that merely provide general direction and "do not have any independent operative legal effect" may not be subject to such review. *See Am. Fed'n of Gov't Emps., AFL-*

---

*See Indus. Energy Consumers of Am. v. FERC*, 125 F.4th 1156, 1163–67 (D.C. Cir. 2025) (Henderson, J., concurring). However, neither court has definitively abandoned prudential ripeness, and this Court cannot do so on its own.

*CIO v. Trump*, 318 F. Supp. 3d 370, 437 (D.D.C. 2018) (KBJ), *rev'd on other grounds*, 929 F.3d 748 (D.C. Cir. 2019).

Consistent with these principles, both the Supreme Court and a recent three-judge panel in this District have held that a challenge to an executive order was prudentially unripe when the order at issue did not require a particular substantive outcome. *See Trump v. New York*, 592 U.S. 125, 132 (2020); *Common Cause v. Trump*, 506 F. Supp. 3d 39, 45–53 (D.D.C. 2020) (three-judge panel) (Katsas, J.). The order at issue in those cases announced a policy of excluding aliens from census apportionment "to the maximum extent feasible and consistent with the discretion delegated to the executive branch." *See Presidential Memorandum: Excluding Illegal Aliens from the Apportionment Base Following the 2020 Census* § 2, 85 Fed. Reg. 44,679, 44,680 (July 21, 2020). It also directed the Secretary of Commerce "to provide information permitting the President" to effectuate that policy. *Id.* Both the Supreme Court and a three-judge panel in this District concluded that this order was unfit for judicial review because it left significant uncertainty about how, and to what extent, the articulated policy would be implemented. *Trump*, 592 U.S. at 132; *Common Cause*, 506 F. Supp. 3d at 47–53.

In sum, ripeness doctrine requires this Court to assess not only the basic requirements of standing—namely, whether Plaintiffs have shown threatened injuries that are "imminent" or "certainly impending"—but also whether institutional reasons for deferring review outweigh the hardship that would result from postponing any available relief. Those considerations weigh against judicial review of an executive order if the order does not direct a particular substantive outcome and there is significant uncertainty about how the order will be implemented.

### 3.    Mootness

Because the power of Article III courts extends only to actual "Cases" and "Controversies," federal courts lack jurisdiction to decide claims that have been mooted by

44

subsequent developments.  *See Flast v. Cohen*, 392 U.S. 83, 95 (1968).  "A case becomes moot—and therefore no longer a "Case" or "Controversy" for purposes of Article III—'when the issues presented are no longer "live" or the parties lack a legally cognizable interest in the outcome.'" *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) (quoting *Murphy v. Hunt*, 455 U.S. 478, 481 (1982) (per curiam).  Courts analyze mootness on a claim-by-claim basis.  *See Coal. of Airline Pilots Associations v. FAA*, 370 F.3d 1184, 1189–90 (D.C. Cir. 2004).

"Corrective action by an agency is one type of subsequent development that can moot a previously justiciable issue."  *Nat. Res. Def. Council, Inc. v. U.S. Nuclear Regul. Comm'n*, 680 F.2d 810, 814 (D.C. Cir. 1982).  Unless an exception applies, a case is "plainly moot" when the challenged action has been superseded by subsequent agency action.  *Alaska v. United States Dep't of Agric.*, 17 F.4th 1224, 1226 (D.C. Cir. 2021) (quoting *Freeport-McMoRan Oil & Gas Co. v. FERC*, 962 F.2d 45, 46 (D.C. Cir. 1992)).  Although a defendant's "voluntary cessation" of a challenged practice ordinarily does not moot a case, that exception to the general rules of mootness "'has no play' when the agency did not act 'in order to avoid litigation.'"  *Id.* (quoting *Am. Bar Ass'n v. FTC*, 636 F.3d 641, 648 (D.C. Cir. 2011)).  Similarly, although a practice that is "capable of repetition, yet evading review" may be challenged notwithstanding the ordinary rules of mootness, an agency's decision to change course generally falls outside this exception because if the agency repeats the challenged conduct in the future, its action will be subject to review at that time.  *See Nat'l Wildlife Fed'n v. Hodel*, 839 F.2d 694, 742 (D.C. Cir. 1988) (quoting *Southern Pacific Terminal Co. v. ICC*, 219 U.S. 498, 515 (1911)).

4.    Statutory and non-statutory rights of action

To proceed in federal court, a plaintiff must be "a member of the class of litigants that may, as a matter of law, appropriately invoke the power of the court"—a concept often shorthanded by stating that the plaintiff must have a "cause of action."  *See Davis v. Passman*,

442 U.S. 228, 236–41 & n.18 (1979).  *But see* Samuel L. Bray & Paul B. Miller, *Getting into Equity*, 97 Notre Dame L. Rev. 1763, 1776 (2022) ("It is a mistake, or at least conducive of a mistake, to refer to 'causes of action' in equity.").

a.    *Statutory review under the Administrative Procedure Act*

In many cases, the plaintiff's right to seek judicial intervention arises from a statute. Most often, in cases challenging action by the Executive Branch, that statute is the Administrative Procedure Act ("APA").  *See* 5 U.S.C. § 704.  Judicial review under the APA is available only in challenges to "final agency action for which there is no other adequate remedy in a court."  *Id.*

Because "the President is not an agency within the meaning of" the APA, the issuance of an executive order is not a final agency action that is reviewable within the APA framework. *Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992).  Therefore, the APA does not afford a statutory right to direct judicial relief from a Presidential executive order.  *See LULAC II*, 2025 WL 3042704, at *23.

Furthermore, an executive order that has not yet been implemented is not "final agency action," and such an order is therefore not ripe for review in an APA suit against any other federal defendant.  *See* 5 U.S.C. § 704.

b.    *Non-statutory rights of action*

Lacking a statutory right of action for several of their claims, Plaintiffs must show that they are entitled to judicial intervention on non-statutory, equitable grounds.

If a plaintiff's claim is based on a defendant's alleged a violation of a federal statute, the availability of equitable relief to enforce compliance with the statute in the absence of a statutory cause of action—often called *ultra vires* review—is "extremely limited" in scope.  *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 721–22 (D.C. Cir. 2022) (quoting *Griffith v. Fed.*

*Lab. Rels. Auth.*, 842 F.2d 487, 493 (D.C. Cir. 1988)).  To prevail on such a claim, "the plaintiff must establish three things: '(i) the statutory preclusion of review is implied rather than express; (ii) there is no alternative procedure for review of the statutory claim; and (iii) the agency plainly acts in excess of its delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory.'"  *Id.* at 722 (quoting *DCH Reg'l Med. Ctr. v. Azar*, 925 F.3d 503, 509 (D.C. Cir. 2019)).  The requirement of showing a legal error is "especially demanding" and requires an error that is "'so extreme that one may view it as jurisdictional or nearly so.'"  *Id.* (quoting *Griffith*, 842 F.2d at 492).

As these demanding requirements suggest, an equitable *ultra vires* claim arising directly from an alleged violation of a statute "rarely succeeds."  *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681 (2025).  Accordingly, the Federal Defendants argue persuasively that *ultra vires* review is not available in this case to redress alleged statutory violations by federal agencies.  *See* Fed. Defs.' Mem., Dkt. No. 16–17

However, plaintiffs have broader latitude when seeking equitable relief from a *constitutional* violation, rather than a statutory one.  "[W]henever a separation-of-powers violation occurs, any aggrieved party with standing may file a constitutional challenge."  *Collins v. Yellen*, 594 U.S. 220, 245 (2021).  The D.C. Circuit has recognized that federal courts' power to "enjoin unconstitutional acts by the [G]overnment" is "inherent in the Constitution itself."  *Hubbard v. U.S. E.P.A. Adm'r*, 809 F.2d 1, 11 n.15 (D.C. Cir. 1986).  Accordingly, an aggrieved party may seek equitable relief from unconstitutional Government action by proceeding "directly under the Constitution," regardless of whether that party has an express statutory cause of action or has satisfied the strictures that apply to *ultra vires* review of statutory claims.  *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010); *see*

*also Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 190 (D.C. Cir. 2006) (noting that a "direct cause of action" under the Constitution may be "inferred," even in the absence of a statutory entitlement to judicial relief).

Given the significant differences between the scope of review available for equitable claims alleging statutory violations as opposed to constitutional violations, the Court begins by determining "whether the underlying claim is properly characterized as statutory or constitutional." *See Glob. Health Council v. Trump*, 153 F.4th 1, 14 (D.C. Cir. 2025) (amended). As the D.C. Circuit recently explained, the "framework for resolving that question" comes from the Supreme Court's decision in *Dalton v. Specter*, 511 U.S. 462 (1994). *See Glob. Health Council*, 153 F.4th at 14.

This Court recently recounted the details of the *Dalton* decision in its summary judgment ruling on Plaintiffs' claims regarding Section 2(a) of the Executive Order at issue in these consolidated cases. *See LULAC II*, 2025 WL 3042704, at *24. In brief, *Dalton* involved a challenge to the Executive Branch's decision to close certain military bases. *See* 511 U.S. at 464–68. In the decision under review, the United States Court of Appeals for the Third Circuit concluded that the President had acted in violation of constitutional separation-of-powers principles by closing the bases without adhering to procedural requirements that Congress had set by statute. *See id.* at 466–68. The Supreme Court reversed, noting that the statute on which the Executive Branch relied to close the bases had explicitly granted the President the authority to close bases. *Id.* at 469–72. Therefore, the Court concluded that the plaintiffs' challenge amounted only to a claim that the President had "exceeded his authority" under the relevant statute, making the claim statutory—rather than constitutional—in nature. *Id.* at 477–78.

48

Finally, the Court concluded that because the relevant statute committed decision-making "to the discretion of the President," judicial review was "not available." *Id.* at 474, 478,

Two recent panel decisions of the D.C. Circuit have applied *Dalton* to analyze the proper scope of equitable review of Executive Branch action. In *Global Health Council v. Trump*, 153 F.4th 1, 14 (D.C. Cir. 2025) (amended), a panel concluded that plaintiffs were not entitled to proceed with equitable claims based on asserted violations of the Constitution because, under *Dalton*, the plaintiffs' claims were best characterized as statutory, not constitutional. A separate panel reached a similar conclusion in a now-vacated decision in another recent case, *National Treasury Employees Union v. Vought* ("*NTEU*"), in which the D.C. Circuit has granted a petition for *en banc* review. *See*, 149 F.4th 762, 790–94 (D.C. Cir. 2025), *reh'g en banc granted, opinion vacated,* No. 25-5091, 2025 WL 3659406 (D.C. Cir. Dec. 17, 2025).

Although the panel's analysis of the *Dalton* decision in *Global Health Council* may ultimately be superseded by the *en banc* court's decision in *NTEU*, this Court is bound to follow the panel's decision in *Global Health Council* unless and until it is abrogated or overruled. *See Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484 (1989) (noting that when a precedential decision "has direct application in a case," lower federal courts must "follow the case which directly controls" and leave to higher courts "the prerogative of overruling [their] own decisions").

Nonetheless, as this Court has already held, the separation-of-powers claims at issue in these consolidated cases are readily distinguishable from the claims at issue in both *Dalton* and *Global Health Council*. *See LULAC II*, 2025 WL 3042704, at *25. Unlike the base-closure statute at issue in *Dalton*, the statutes at issue in these consolidated cases assign no relevant role to the President. *Cf. Dalton*, 511 U.S. at 469–72 (noting "the importance of [the President's] role

in the base closure process" prescribed by statute).  And unlike in *Global Health Council*, the theories of relief on which Plaintiffs rely in these consolidated cases are not "predicated on underlying statutory violations," *cf. Global Health Council*, 153 F.4th at 17, or on whether any purported statutory duties were "mandatory," *cf. Global Health Council v. Trump*, No. 25-5097, 2025 WL 2709437, at *1 (D.C. Cir. Aug. 28, 2025) (Katsas, J., concurring in the denial of rehearing *en banc*).[43]  Instead, Plaintiffs' separation-of-powers claims arise directly from specific provisions of the Constitution.  Their argument is that the President has wrongly exercised powers that the Constitution vests in Congress and the States alone.  As this Court recently explained, that argument "is a charge that the President has acted unconstitutionally, not merely that he has 'acted in excess of his statutory authority.'"  *LULAC II*, 2025 WL 3042704, at *25 (quoting *Dalton*, 511 U.S. at 472).

In sum, although this Court is mindful of the limits on non-statutory, equitable review of actions taken by the Executive Branch, those limits are no impediment to claims that arise "directly under the Constitution," including claims that the President has overstepped the constitutional separation of powers by purporting to exercise powers vested in Congress and the States.  *See Free Enter. Fund*, 561 U.S. at 491 n.2; *LULAC II*, 2025 WL 3042704, at *25.

### 5.    The *Purcell* principle

The Supreme Court has "repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election."  *Republican National Committee v. Democratic National Committee*, 589 U.S. 423, 424 (2020) (per curiam).  The purpose of this directive, which is known as the "*Purcell* principle," is to avoid "voter

---

[43] *See also Global Health Council*, 153 F.4th at 9–10 (noting that the plaintiffs in *Global Health Council* alleged that the defendants had violated the 2024 Appropriations Act, the Impoundment Control Act, and the Anti-Deficiency Act by impounding funds Congress had appropriated for foreign assistance).

confusion" and to ensure that federal courts do not undermine "[c]onfidence in the integrity of our electoral processes," which is "essential to the functioning of our participatory democracy." *Purcell v. Gonzalez*, 549 U.S. 1, 4–5 (2006) (per curiam).

The Supreme Court has taken a broad view of what constitutes the "eve of an election" in this context. *See, e.g.*, *Abbott v. League of United Latin Am. Citizens*, No. 25A608, 607 U.S. ----, 2025 WL 3484863, at *1 (U.S. Dec. 4, 2025) (granting a stay of an injunction that would affect a primary election taking place 15 weeks later, in part because the district court had "violated" this principle by "improperly insert[ing] itself into an active primary campaign"). This Court shall therefore assume, without deciding, that the present moment falls on the "eve" of a relevant election, triggering the principle against lower court interventions that alter election rules.

Nonetheless, for many of the same reasons that this Court explained at the preliminary injunction stage of these consolidated cases, the *Purcell* principle does not necessarily weigh against granting the relief that Plaintiffs seek. *See LULAC I*, 780 F. Supp. 3d at 219–20.

*First*, and most importantly, the relief to which Plaintiffs are entitled in these consolidated cases would not alter the status quo. A primary function of the *Purcell* principle is to avoid unfairness and voter confusion by discouraging court-imposed rule changes in the immediate run-up to an election. *See Merrill v. Milligan*, 142 S. Ct. 879, 880–81 (2022) (Kavanaugh, J., concurring in grant of applications for stays). Here, most of the relief that Plaintiffs seek would not change any election rules. On the contrary, most of the requested relief would *prevent* the Executive Branch from forcing late-breaking changes to State election procedures. Moreover, most of the challenged directives from the President have not yet been implemented—whether because the Executive Branch has decided to postpone implementation or because the relevant provisions of the Executive Order have been enjoined by other courts.

Put simply, enjoining the implementation of the relevant provisions of the Executive Order would not alter the status quo for federal election rules.

*Second*, Plaintiffs in these consolidated cases have not unduly delayed bringing their claims before the Court. On the contrary, they brought suit promptly after the issuance of the Executive Order, and they expeditiously sought and obtained preliminary relief. *See LULAC I*, 780 F. Supp. 3d at 226–28. The equitable considerations that sometimes weigh against granting relief to dilatory plaintiffs therefore do not apply in these cases.

*Third*, unlike the typical case in which the *Purcell* principle is successfully invoked, none of the parties in these cases who may be subject to injunctions or other equitable remedies are State agencies or officials. Plaintiffs are not seeking to enlist this Court's assistance to assert federal power over the conduct of a State election. Instead, they are urging one Branch of the Federal Government to act as a check on another coordinate Branch. Therefore, the important federalism concerns animating the *Purcell* principle do not weigh against granting relief here.

*Fourth*, and finally, as it has done at each stage of these consolidated cases, this Court has heeded *Purcell*'s command that lower courts must explain their reasoning when issuing orders affecting the conduct of elections. *See Purcell*, 549 U.S. at 5.

In sum, the *Purcell* principle does not weigh against granting appropriate relief in these consolidated cases.

\*       \*       \*

With these threshold issues and frameworks in mind, the Court turns to the merits.

**B.    Section 2(d): Requiring Agencies to "Assess Citizenship" before Providing the Federal Form to "Enrollees of Public Assistance Programs"**

The Federal Defendants and the RNC as Defendant-Intervenor each move for summary judgment on the Democratic Party Plaintiffs' claims regarding Section 2(d) of the Executive

Order, which purports to impose new requirements on federal agencies that provide the Federal Form to individuals who use their services. *See* Fed. Defs.' Mem. at 16–17, 27–30; Def.-Intervenor's Mot. at 3, 8–13. The Democratic Party Plaintiffs cross-move for summary judgment and seek both a declaratory judgment and a permanent injunction barring several federal agencies and officials from implementing Section 2(d). *See* Dem. Pls.' Mot. at 4–13, 60.

Section 2(d) provides:

> The head of each Federal voter registration executive department or agency (agency) under the National Voter Registration Act, 52 [§] U.S.C. 20506(a), shall assess citizenship prior to providing a Federal voter registration form to enrollees of public assistance programs.

Exec. Order No. 14,248, 90 Fed. Reg. 14005 (Mar. 25, 2025), § 2(d).

This Court preliminarily enjoined the implementation of Section 2(d), concluding that the Democratic Party Plaintiffs were likely to succeed on the merits of a statutory challenge to the provision and that they had met each of the other requirements for preliminary relief. *See LULAC I*, 780 F. Supp. 3d at 206–12. For similar reasons, the Court shall now **GRANT** summary judgment in the Democratic Party Plaintiffs' favor on their constitutional separation-of-powers challenge to Section 2(d), **DECLARE** that Section 2(d) is inconsistent with the constitutional separation of powers, and **PERMANENTLY ENJOIN** the implementation of that provision.

Meanwhile, because the Democratic Party Plaintiffs have not shown final agency action implementing Section 2(d), the Court shall **GRANT** summary judgment in Defendants' favor on the Democratic Party Plaintiffs' APA claims regarding this provision. The Court shall **DEFER RULING** on the Democratic Party Plaintiffs' remaining claims regarding Section 2(d), which would benefit from further factual development.

1.    The Democratic Party Plaintiffs have standing to challenge Section 2(d).

As the Court concluded at the preliminary injunction stage, the Democratic Party Plaintiffs have standing to challenge Section 2(d) because of its effect on their voter registration efforts, their members' ability to register and vote in federal elections, and their ability to compete for federal elective office.  *See LULAC I*, 780 F. Supp. 3d at 207–10.

*First*, the DNC, DGA, DSCC, and DCCC have organizational standing to challenge Section 2(d) because limiting eligible voters' access to the Federal Form at federal voter registration agencies would require these organizations to invest additional resources in registering eligible voters who are likely to support Democratic candidates, forcing them to divert resources from other time-sensitive, election-related activities in service of their mission of electing Democratic candidates.  The implementation of Section 2(d) would therefore hinder these Plaintiffs' "core business activities."  *See All. for Hippocratic Med.*, 602 U.S. at 395. Further, because Section 2(d) purports to direct the heads of federal agencies to begin implementing its provisions immediately, the injury to the Plaintiffs' organizational interests is "sufficiently imminent and substantial" to satisfy the injury-in-fact requirement and support their standing to seek "forward-looking" injunctive relief against the implementation of that provision.  *See TransUnion*, 594 U.S. at 435.  These Plaintiffs' injuries are "fairly . . . trace[able] to" Section 2(d) of the Executive Order and would "likely" be "redressed by a favorable decision" from this Court enjoining the implementation of that provision.  *See Lujan*, 504 U.S. at 560.  Accordingly, the DNC, DGA, DSCC, and DCCC have organizational standing to challenge Section 2(d).

*Second*, as an alternative basis for standing, the DNC has associational standing to challenge Section 2(d) on behalf of its members—registered Democratic voters—who may be denied statutorily required opportunities to update or renew their voter registrations at federal

offices if Section 2(d) is implemented.  In order to have associational standing on behalf of these members, the DNC must show that "(a) its members would otherwise have standing to sue in their own right; (b) the interests [the DNC] seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt*, 432 U.S. at 343; *EPIC*, 928 F.3d at 101.

The DNC's members would have standing to challenge the provision at issue here. Specifically, they would have standing to challenge the denial of a procedural right guaranteed by statute (the right to receive the Federal Form from State-designated voter registration agencies) because Congress created that right to protect a separate concrete, substantive interest (the right to register and vote in federal elections). *See* 52 U.S.C. § 20506(a)(4), (a)(6); *see also Lujan*, 504 U.S. at 572 & n.7.

The Supreme Court has recognized that "procedural rights" like the one that the DNC asserts on behalf of its members here are entitled to "special" treatment in the Article III standing analysis: A person may assert a procedural right that protects an underlying concrete interest "without meeting all the normal standards for redressability and immediacy." *Lujan*, 504 U.S. at 572 n.7; *see also Sierra Club v. Perry*, 373 F. Supp. 3d 128, 140 (D.D.C. 2019) (EGS). However, the "chain of causation between the alleged procedural violation and the concrete interest" must not be purely "speculative." *Ctr. for L. & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1159 (D.C. Cir. 2005).

Here, the DNC has shown that its members would have standing to challenge Section 2(d) because that provision orders the heads of federal agencies to disregard their statutory right to receive the Federal Form at offices of State-designated voter registration agencies. *Compare* Exec. Order No. 14,248 § 2(d), *with* 52 U.S.C. § 20506(a)(4), (a)(6).

Plaintiffs' underlying interest in registering and voting in federal elections "free of arbitrary impairment by state action" has long been recognized as "concrete" for purposes of Article III standing.  *See, e.g.*, *Baker v. Carr*, 369 U.S. 186, 207–08 (1962); *see also TransUnion*, 594 U.S. at 425 (recognizing that "intangible harms" with "a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts" or "specified by the Constitution itself" can be "concrete" injuries that support Article III standing).   And the connection between the procedural right that Plaintiffs seek to enforce—their members' right to receive the Federal Form—and their members' underlying concrete interest is far from "speculative." *Cf. Ctr. for L. & Educ.*, 396 F.3d at 1159.  An eligible voter who receives the Federal Form from a voter registration agency as required by law can secure the voter's underlying concrete interest—the right to participate in federal elections with an up-to-date voter registration—by simply filling out the one-page form and returning it to the agency.  *See* 52 U.S.C. § 20506(a)(4)(A)(iii) (providing that voter registration agencies must "[a]ccept[] . . . completed voter registration application forms for transmittal to the appropriate State election official").

Finally, the members' procedural injury is "fairly . . . trace[able] to" Section 2(d) of the Executive Order and would "likely" be "redressed by" an injunction prohibiting the implementation of that section. *See Lujan*, 504 U.S. at 560, 112 S.Ct. 2130. Accordingly, the DNC's individual members would have standing to challenge Section 2(d) in their own right.

The DNC also satisfies the remaining requirements for associational standing to challenge Section 2(d) on behalf of its members: Its challenge to Section 2(d) is germane to its mission of helping to elect Democrats by registering and turning out voters, and its individual members' participation is not necessary to the resolution of any issue in these consolidated

cases.  *See Hunt*, 432 U.S. at 343; *EPIC*, 928 F.3d at 101.  Therefore, the DNC has associational standing to challenge Section 2(d) on behalf of its members.

 *Third*, as a further alternative basis for standing, several of the Democratic Party Plaintiffs have political-competitor standing on the grounds that the implementation of Section 2(d) would amount to the "illegal structuring of a competitive environment" in which "rival parties defend their concrete interests." *Shays*, 414 F.3d at 85–87; *see also Bost*, 2026 WL 96707, at *3 (recognizing that all political candidates "have an interest in a fair process").  Specifically, Plaintiffs Jeffries and Schumer have political-competitor standing to challenge Section 2(d) based on their active candidacies for reelection to federal office, which will be hampered if some of their supporters are denied statutorily required opportunities to register to vote or update their voter registration at federal offices.  This competitive burden is heightened by the fact that enrollees of public assistance programs—the only people for whom Section 2(d) directs federal agencies to "assess citizenship"—are both more likely to support Democratic candidates and less likely to have documentary proof of citizenship than other voters, even if they are eligible to vote.  As with the burden on other Democratic Party Plaintiffs' organizational interests and the interests of the DNC's individual members, the competitive burden that Plaintiff Jeffries and Plaintiff Schumer challenge is both "fairly . . . trace[able] to" Section 2(d) and "likely" to be "redressed by a favorable decision" from this Court enjoining the implementation of that section.  *See Lujan*, 504 U.S. at 560.  Finally, because a "party affiliate" of an active candidate may also exercise political-competitor standing, *see Nat. L. Party*, 111 F. Supp. 2d at 47, the Democratic Party Plaintiffs affiliated with Plaintiffs Jeffries and Schumer and other active Democratic candidates throughout the country have standing to raise the same challenge.

Contrary to the Federal Defendants' arguments, these injuries are not too speculative to support Article III standing.  In Section 2(d), the President has issued an unambiguous, mandatory command: agency heads "*shall* assess citizenship *prior to* providing" the Federal Form to certain individuals.  Exec. Order No. 14,248 § 2(d) (emphasis added).  The Executive Order does include a standard saving clause, which provides that the order "shall be implemented consistent with applicable law."  *Id.* § 11(b).  However, because Section 2(d) is clear and "unambiguously commands action," the Executive Order's saving clause "does not and cannot override its meaning."  *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1240 (9th Cir. 2018).  Executive orders, like statutes, "cannot be held to destroy themselves through saving clauses."  *Common Cause*, 506 F. Supp. 3d at 53 n.8 (quoting *FTC v. Credit Bureau Ctr., LLC*, 937 F.3d 765, 755 (7th Cir. 2019)).  Plaintiffs' threatened injuries are concrete and directly traceable to Section 2(d)'s clear command, and a favorable decision from this Court would provide meaningful redress.

In sum, the Democratic Party Plaintiffs have standing to challenge the implementation of Section 2(d) of Executive Order No. 14,248.

> 2.    The Democratic Party Plaintiffs have an equitable right of action to challenge Section 2(d) on constitutional separation-of-powers grounds.

Next, the Court must consider whether the Democratic Party Plaintiffs are among "the class of litigants that may, as a matter of law, appropriately invoke the power of the court" to challenge Section 2(d).  *See Davis*, 442 U.S. at 239 n.18.  The Federal Defendants argue that the Democratic Party Plaintiffs lack a viable cause of action to challenge Section 2(d) because they lack a ripe APA claim against any agency, they cannot bring an APA claim against the President directly, and the fact that they will have a "meaningful and adequate opportunity" to challenge any unlawful agency action under the APA at a later point precludes them from bringing an

equitable *ultra vires* claim.  Federal Defs.' Mem. at 16–17 (quoting *Nuclear Regul. Comm'n*, 605 U.S. at 681).  This Court disagrees.

The Democratic Party Plaintiffs have an equitable right of action "directly under the Constitution" to challenge Section 2(d) on the grounds that it contravenes the constitutional separation of powers.  *See Free Enter. Fund*, 561 U.S. at 491 n.2.  Plaintiffs are not challenging the wrongful "exercise" of the President's discretion under a statute; instead, their argument is that the relevant statute "delegates no authority to the President" over the subject matter at issue. *See Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1331–32 (D.C. Cir. 1996) (distinguishing *Dalton*, 511 U.S. 462).  They argue that, by acting in the total absence of authority from Congress in a domain that the Constitution assigns to Congress and the States, the President has overstepped the constitutional separation of powers.  *See* Dem. Pls.' Mem. at 7–13.  The Democratic Party Plaintiffs have an equitable right of action to raise this constitutional challenge in federal court, notwithstanding the absence of a viable APA claim or *ultra vires* challenge to an agency's compliance with a statute.  *See Collins*, 594 U.S. at 245 ("[W]henever a separation-of-powers violation occurs, any aggrieved party with standing may file a constitutional challenge.").

Assured of its jurisdiction and Plaintiffs' right to proceed with their separation-of-powers challenge to Section 2(d) of the Executive Order, the Court turns to the merits of that challenge.

3.    Section 2(d) is inconsistent with the constitutional separation of powers.

The NVRA provides that each State-designated voter registration agency, including several federal agencies that are Defendants here, "shall" make the Federal Form available and provide it "with each application" for "service or assistance" unless the applicant declines "in writing" to register to vote.  52 U.S.C. § 20506(a)(4)(A)(i), (6)(A).  This mandatory duty imposed by Congress leaves no discretion for Executive Branch agencies to "assess citizenship prior to providing" the Federal Form to "enrollees of public assistance programs," as

Section 2(d) of the Executive Order purports to require. Because there is no statutory authority for the Executive Order's attempt to impose such a requirement, because regulating federal election procedures is the exclusive province of Congress and the States, and because the President's directive in Section 2(d) is contrary to the manifest will of Congress, as expressed in the text, structure, and context of the NVRA, Section 2(d) is inconsistent with our Constitution's separation of powers. It cannot lawfully be implemented.

In our constitutional order, the President can neither make law nor rewrite the law that Congress has enacted. Accordingly, it is "black letter law" that "'[t]he President's power, if any, to issue [an executive] order must stem either from an act of Congress or from the Constitution itself'" *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 188–89 (1999) (indirectly quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952)); *see also Youngstown*, 343 U.S. at 587 ("In the framework of our Constitution, the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker.").

As this Court has explained at some length in two prior opinions in these consolidated cases, the President's power is "at its lowest ebb" when he seeks to alter federal election regulations to require new methods of proving voter eligibility. *Youngstown*, 343 U.S. at 639 (Jackson, J., concurring); *see LULAC I*, 780 F. Supp. 3d at 195–96; *LULAC II*, 2025 WL 3042704, at *27. When "the President takes measures incompatible with the expressed or implied will of Congress . . . he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter." *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 10 (2015) (quoting *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring)). Under those circumstances, the President's actions "must be scrutinized with caution, for what is at stake is the equilibrium established by our constitutional system." *Youngstown*, 343 U.S. at 639

(Jackson, J., concurring).  For the reasons that follow, the Court concludes that Section 2(d) cannot withstand this scrutiny.

a.    <i>Section 2(d) is contrary to the NVRA.</i>

Imposing a mandatory citizenship assessment for certain users of the Federal Form is "incompatible with the expressed or implied will of Congress."  *See Zivotofsky*, 576 U.S. at 10. Congress has consistently exercised its constitutional authority to prescribe means of voter registration in which applicants confirm their qualifications by attesting to them under penalty of perjury, not by providing documentary proof.  *See, e.g.*, 52 U.S.C. § 20506(a)(6).  The NVRA expressly provides that the Federal Form "may not include any requirement for notarization or other formal authentication." 52 U.S.C. § 20508(b)(3).  In fact, during Congress's deliberations on the bill that became the NVRA, the Conference Committee considered and rejected a proposed amendment that would have allowed States to supplement the Federal Form with a requirement that prospective voters must present proof of citizenship.  *See* H.R. Rep. No. 103–66, at 23 (1993) (Conf. Rep.).  The Conference Committee concluded that such a requirement was "not necessary or consistent with the purposes of" the NVRA.  *Id.*  And in the specific context of voter registration agencies, Congress was unambiguous:  The NVRA provides that each State-designated voter registration agency "shall" make this Form available and provide it "with each application" for "service or assistance" unless the applicant declines "in writing" to register to vote.  52 U.S.C. § 20506(a)(4)(A)(i), (6)(A)(i).  The President's attempt in Section 2(d) to alter this scheme by adding a citizenship assessment requirement for certain users of the Federal Form is contrary to the NVRA and the manifest intent of Congress.

The RNC, as Defendant-Intervenor, argues that Section 2(d) is not contrary to the NVRA because separate statutes already contemplate that federal public assistance agencies, including some federal voter registration agencies, will inquire into the citizenship or immigration status of

enrollees in federal benefits programs. *See* Def.-Intervenor's Mem. at 8–11 (citing 8 U.S.C. §§ 1611, 1642(a)(1)–(2)). The RNC argues that Section 2(d) therefore imposes "nothing more than a sequencing requirement." *Id.* at 9. Under the RNC's theory, federal voter registration agencies will "assess citizenship" of applicants for their services eventually, so there is nothing wrong with taking that step "prior to providing" the Federal Form to those applicants. *See id.* (quoting Exec. Order No. 14,248 § 2(d)).

The RNC's argument fails to persuade because, as this Court has previously noted, the NVRA imposes a mandatory duty to provide the Federal Form to "*[a]pplicants* for public assistance programs," not "*recipients* of public assistance." *LULAC I*, 780 F. Supp. 3d at 210 (emphasis in original). Accordingly, agencies have no discretion to apply their own programs' eligibility criteria when deciding which applicants should receive the Federal Form. The NVRA mandates that agencies "shall" provide the Federal Form to each and every applicant, "unless the applicant, in writing, declines to register to vote." 52 U.S.C. § 20506(a)(6)(A).

Notwithstanding this clear directive, the RNC argues that agencies must be allowed to perform some "pre-screening" of applicants before sharing the Federal Form because, otherwise, the NVRA might require an agency to give the Form to an applicant who "answered 'no' to the question 'would you like to apply to register to vote here today?'" or "openly declare[d] that she is a non-citizen ineligible to register to vote." *See* Def.-Intervenor's Mem. at 9–10.

Fortunately, Congress anticipated these kinds of situations, and the NVRA gives clear direction to agencies about their responsibilities and the appropriate procedures. If an applicant declines to register to vote, the agency must ensure that the applicant provides that decision "in writing." 52 U.S.C. § 20506(a)(6)(A). If the applicant does so, the agency is not required to provide a copy of the Federal Form. *Id.* In every other situation—including when an applicant

declares that she is ineligible to register to vote—the NVRA mandates that the agency "shall" provide the Federal Form to the applicant. *See id.* These provisions manifest Congress's judgment that, because the Federal Form itself "specifies each eligibility requirement (including citizenship)" and "requires the signature of the applicant, under penalty of perjury," attesting "that the applicant meets each such requirement," agencies need not and should not conduct any pre-screening of applicants before providing the Federal Form. *See id.* § 20508(b)(2).

> b.    *The President lacks any constitutional authority to support the directive in Section 2(d).*

Because the NVRA manifests congressional intent that is contrary to the President's directive in Section 2(d) of the Executive Order, that directive can only be sustained by reference to the President's "own constitutional powers minus any constitutional powers of Congress over the matter." *See Zivotofsky*, 576 U.S. at 10. To sustain the lawfulness of the provision, the Federal Defendants must show that the President has powers that are "both 'exclusive' and 'conclusive' on the issue." *Id.* (quoting *Youngstown*, 343 U.S. at 637–38 (Jackson, J., concurring)). They cannot make any such showing. The President has no relevant constitutional power on which to rely, and Congress's countervailing power under the Elections Clause is "broad" and "comprehensive." *See ITCA*, 570 U.S. at 8; U.S. Const. art. I, § 4, cl. 1.

The Federal Defendants briefly attempt to ground Section 2(d) in the President's authority to direct the activities of the Executive Branch, but this attempt is unpersuasive. *See* Fed. Defs.' Mot. at 28. No matter how broadly one reads either the Executive Vesting Clause or the Take Care Clause, the President's power to supervise and control Executive Branch officials does not authorize him or his subordinates to intrude on the exclusive powers of Congress and the States, including the power to regulate federal elections. Subordinate officers subject to the President's supervision generally must follow the President's directives, but only "to the extent

allowed by the law" as embodied in the Constitution or enacted by Congress. *See Bldg. & Const. Trades Dep't, AFL-CIO v. Allbaugh*, 295 F.3d 28, 32 (D.C. Cir. 2002). Each Branch of our Federal Government must neither "arrogate power to itself" nor "impair another in the performance of its constitutional duties." *Free Enter. Fund*, 561 U.S. at 500 (quoting *Loving v. United States,* 517 U.S. 748, 757 (1996)). Because the President's directive to agency heads to "assess citizenship" before providing the Federal Form to certain prospective voters is contrary to the NVRA and intrudes upon Congress's constitutional authority to regulate federal elections, the President's supervisory authority over the Executive Branch cannot sustain that directive.

*    *    *

In sum, as this Court held at the preliminary injunction stage, the NVRA "leaves no role for agencies to 'assess citizenship,' and the President lacks any lawful authority to contravene the NVRA by requiring agencies to do so." *LULAC I*, 780 F. Supp. 3d at 211 (quoting Exec. Order No. 14,248 § 2(d)). Section 2(d) is inconsistent with the constitutional separation of powers and cannot lawfully be implemented.

<ol start="4">
<li>A declaratory judgment and permanent injunction against implementation of Section 2(d) are appropriate remedies for the constitutional separation-of-powers violation.</li>
</ol>

Having determined that Section 2(d) cannot lawfully be implemented, the Court turns to the issue of remedies. The Democratic Party Plaintiffs seek both a declaratory judgment and a permanent injunction barring the relevant Federal Defendants from enforcing Section 2(d). *See* Dem. Pls.' Mem. at 60. For the reasons that follow, this Court agrees that both a declaratory judgment and a permanent injunction are appropriate remedies.

A declaratory judgment is warranted because it will both "serve a useful purpose in clarifying the legal relations at issue" and "afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding"—namely, uncertainty about whether and to what

64

extent Section 2(d) of the Executive Order may lawfully be implemented.  *See Glenn*, 222 F. Supp. 3d at 36.  The Court shall therefore **GRANT** the Democratic Party Plaintiffs' request for a declaratory judgment and **DECLARE** that Section 2(d) is inconsistent with the constitutional separation of powers.

A permanent injunction against the implementation of Section 2(d) is also warranted.  To be entitled to a permanent injunction, Plaintiffs must prevail on the merits and show (1) that they are likely to suffer irreparable harm in the absence of an injunction, (2) "that remedies available at law, such as monetary damages, are inadequate" as redress for that irreparable harm (3) "that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted," and (4) "that the public interest would not be disserved by a permanent injunction." *Monsanto*, 561 U.S. at 156–57; *In re Execution Protocol Cases*, 980 F.3d at 137.  Any injunction must also comport with the limits on the equitable authority that Congress has granted to the federal courts, including the principle that equitable relief should be "party-specific."  *See Trump v. CASA, Inc.*, 606 U.S. 831, 841–44 (2025).  The Democratic Party Plaintiffs have made each of the necessary showings and are entitled to a permanent injunction in their favor.

None of the Defendants seriously contests any of the permanent-injunction factors other than the Democratic Party Plaintiffs' success on the merits.  *See* Fed. Defs.' Reply & Opp'n, Dkt. No. 213, at 41–42 (arguing only that Plaintiffs' claims should be dismissed for lack of jurisdiction and that the Executive Order's directives are lawful); *see generally* Def.-Intervenor's Reply & Opp'n, Dkt. No. 210, at 1–2 (arguing only that the Court should grant summary judgment in Defendants' favor).

The Court shall therefore address the relevant factors only briefly.  The Democratic Party Plaintiffs have carried their burden of showing that Section 2(d) would irreparably harm them in

the absence of an injunction because, as the Court explained at the preliminary injunction stage, the Court "cannot provide a 'do-over' or any other meaningful form of redress for lost competitive opportunities to register and mobilize voters in the inherently time-limited environment of an election cycle." *LULAC I*, 780 F. Supp. 3d at 211 (citing *League of Women Voters of the United States v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016)).   Remedies at law, including monetary damages, would be manifestly inadequate to compensate Plaintiffs for both their lost electoral opportunities and their separation-of-powers injuries.  *See id.*; *cf. O'Donnell Const. Co. v. District of Columbia*, 963 F.2d 420, 429 (D.C. Cir. 1992) (concluding that damages were inadequate to redress an injury to a party's "right to a legally valid procurement process" and any complete relief therefore "must be equitable").  Finally, because agencies have no legitimate interest in the perpetuation of unlawful practices and because the public interest "favors permitting as many qualified voters to vote as possible," both the balance of hardships and the public interest weigh in favor of granting a permanent injunction.  *See Newby*, 838 F.3d at 12.  As the Court explained at the preliminary injunction stage, "although there is a strong public interest in 'preserving the integrity of [the] election process,' the present record does not show that an injunction against Section 2(d) would disserve that interest."  *LULAC I*, 780 F. Supp. 3d at 211 (alteration in original) (quoting *Newby*, 838 F.3d at 13).  Congress weighed the relevant election-integrity considerations when it enacted the NVRA, and this Court shall not upset its judgment about the proper balance between ensuring voter access and preventing unlawful participation.  In sum, all the requirements for a permanent injunction are satisfied.

The only remaining issue is the proper scope of the injunction.  Permanent injunctions, like all equitable relief, must be "party-specific."  *See CASA*, 606 U.S. at 841–44.  Federal courts like this one "do not exercise general oversight of the Executive Branch," but rather "resolve

cases and controversies consistent with the authority Congress has given them." *Id.* at 861. Accordingly, equitable relief must be both "limited to the inadequacy that produced the injury in fact that the [Plaintiffs have] established," *Gill v. Whitford*, 585 U.S. 48, 68 (quoting *Lewis v. Casey*, 518 U.S. 343, 357 (1996)), and not "more burdensome [to the Defendants] than necessary" to provide complete redress to the Plaintiffs, *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). In short, this Court must take care that any injunction is not "broader than necessary to provide complete relief to each plaintiff with standing to sue." *CASA*, 606 U.S. at 861.

Enjoining the proper named Defendants from implementing Section 2(d) is a party-specific remedy that is consistent with these principles. For the reasons the Court has explained, Section 2(d) is inconsistent with the constitutional separation of powers and cannot lawfully be implemented. If the named Defendants were to implement Section 2(d), the Democratic Party Plaintiffs—including Plaintiffs that operate in every State throughout the Nation—would be irreparably harmed. Accordingly, the only adequate and appropriate injunction is one barring the relevant Defendants from implementing Section 2(d).

Although this injunction reaches the relevant Defendants throughout the Nation, it is not an improper "universal" injunction. *Cf. CASA*, 606 U.S. at 861. Instead, it is a proper, party-specific and benefits non-parties "only incidentally." *See id.* at 851; *see also Trump v. Hawaii*, 585 U.S. 667, 717 (2018) (Thomas, J., concurring). Like the permanent injunction this Court issued against the implementation of Section 2(a), an injunction barring the proper named Defendants from implementing Section 2(d) is no broader than necessary to provide complete relief to the prevailing Plaintiffs before the Court. *See LULAC II*, 2025 WL 3042704, at *36. Awarding narrower relief—for example, by "enjoining the named Defendants from implementing [the relevant provision] only in certain States, under certain circumstances, or with

respect to certain categories of individuals"—would not fully redress the threatened injuries that entitle the Democratic Party Plaintiffs to relief. *See id.*; *see also CASA*, 606 U.S. at 863 (Thomas, J., concurring) (noting that "equitable remedies historically operated on a plaintiff-specific basis"); *id.* at 868 (Kavanaugh, J., concurring) (noting that district courts crafting equitable injunctions "may award only plaintiff-specific relief"). To award complete relief, the Court has "only one feasible option," which is to enjoin the implementation of Section 2(d) in full. *See CASA*, 606 U.S. at 851–52; *see also LULAC II*, 2025 WL 3042704, at *36 (explaining that just an injunction is "consistent with longstanding equitable tradition").

For all these reasons, the Court shall **PERMANENTLY ENJOIN** the relevant Federal Defendants from taking any action to implement or give effect to that Section 2(d) of Executive Order No. 14,248.

> 5.    Because Plaintiffs have not shown final agency action implementing Section 2(d), the Court shall grant Defendants' motion for summary judgment on their APA claims regarding this provision.

The Court agrees with the Federal Defendants that, on the present record, the Democratic Party Plaintiffs' APA claims regarding Section 2(d) of the Executive Order cannot succeed because Plaintiffs have not shown that any proper Defendant has yet taken "final agency action" in response to Section 2(d). The Court shall therefore **GRANT** summary judgment in Defendants' favor as to these claims.

Final agency action is a prerequisite to a successful APA claim. 5 U.S.C. § 704. Agency action is "final" and judicially reviewable under the APA when it "mark[s] the 'consummation' of the agency's decisionmaking process" and is an action "by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (first quoting *Chicago & Southern Air Lines, Inc. v. Waterman S.S. Corp.*, 333

U.S. 103, 113 (1948); and then quoting *Port of Boston Marine Terminal Assn. v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71 (1970)).

Here, because Plaintiffs have not shown that any of the agency Defendants have taken action to implement Section 2(d), there is no final agency action on which a successful APA claim can proceed. Accordingly, the Court shall **GRANT** the Federal Defendants' motions for summary judgment on these claims. This disposition is based on the present record and shall not preclude appropriate further action if new facts or circumstances arise that should alter the Court's analysis.

6.    <u>Further factual development is necessary to resolve the Democratic Party Plaintiffs' remaining claims regarding Section 2(d).</u>

Finally, the Court shall **DENY WITHOUT PREJUDICE** the Federal Defendants' and Defendant-Intervenor's motions for summary judgment regarding the Democratic Party Plaintiffs' undue-burden claims regarding Section 2(d) because those claims cannot properly be resolved on the merits without additional discovery. *See* Fed. R. Civ. P. 56(d).

At this stage of these consolidated cases, the Court has allowed only limited discovery, and it has directed the parties to focus their motions and briefing on "purely legal" arguments that they contend can be resolved without discovery. *See* Scheduling Order, Dkt. No. 141, at 3.

The Court agrees with the Democratic Party Plaintiffs that their undue burden claims raise significant questions of fact and are appropriately resolved only after an opportunity for more extensive discovery. Regardless of whether the Democratic Party Plaintiffs' undue-burden claims are assessed under the *Anderson-Burdick* framework or within the generally applicable Equal Protection Clause framework,[44] deciding their merits would require a "fact-intensive"

---

[44] The Democratic Party Plaintiffs state that it is an open question in this Circuit whether the *Anderson-Burdick* framework applies to claims like their challenge to Section 2(d). *See* Dem. Pls.' Mem. at 59 n.21. The D.C. Circuit

inquiry into the actual effects of the challenged practices on eligible voters' ability to exercise their rights.  *See Gill v. Scholz*, 962 F.3d 360, 365 (7th Cir. 2020).

Accordingly, these claims are not appropriate for summary judgment at this stage of the proceeding, at which the Court and the parties have focused on "purely legal" arguments for which discovery is not necessary.  *See* Scheduling Order, Dkt. No. 141, at 3.  The Court shall therefore **DENY WITHOUT PREJUDICE** the Defendants' motions for summary judgment on the Democratic Party Plaintiffs' undue-burden claims, which the Court shall **DEFER** to the next phase of proceedings in this case.

### C.    Section 3(d): Requiring Documentary Proof of Citizenship on the Federal Post Card Application

Next, the Federal Defendants move for summary judgment on Plaintiffs' claims regarding Section 3(d) of the Executive Order, which purports to require the Secretary of Defense to add a documentary proof of citizenship requirement to the Federal Post Card Application for military and overseas voters.  *See* Fed. Defs.' Mem. at 7–8, 16–21, 30–33.  Both the LULAC Plaintiffs and the Democratic Party Plaintiffs cross-move for summary judgment and seek both a declaratory judgment and a permanent injunction barring the Secretary of Defense from implementing Section 3(d).  *See* LULAC Pls.' Mot. at 9–15, 24–33, 45; Dem. Pls.' Mot. at 13–22, 60.

Section 3(d) provides:

The Secretary of Defense shall update the Federal Post Card Application, pursuant to the Uniformed and Overseas Citizens Absentee Voting Act, 52 [§] U.S.C. 20301, to require:

---

and other courts in this District have applied that framework to similar claims.  *See, e.g.*, *Libertarian Party v. D.C. Bd. of Elections & Ethics*, 682 F.3d 72, 73 (D.C. Cir. 2012); *Vote Forward v. DeJoy*, 490 F. Supp. 3d 110, 121–28 (D.D.C. 2020) (EGS).

(i) documentary proof of United States citizenship, as defined by [S]ection 2(a)(ii) of [the Executive Order]; and

(ii) proof of eligibility to vote in elections in the State in which the voter is attempting to vote.

Exec. Order No. 14,248, 90 Fed. Reg. 14005 (Mar. 25, 2025), § 3(d).

Section 3(d) has many commonalities with Section 2(a), which this Court permanently enjoined on constitutional separation-of-powers grounds. For similar reasons, the Court shall now **GRANT** summary judgment in Plaintiffs' favor on their constitutional separation-of-powers challenge to Section 3(d) and **PERMANENTLY ENJOIN** the implementation of that provision.

Meanwhile, because Plaintiffs have not shown final agency action implementing Section 3(d), the Court shall **GRANT** summary judgment in Defendants' favor on the Democratic Party Plaintiffs' related APA claims challenging that provision.

1. <u>Plaintiffs have standing to challenge the implementation of Section 3(d).</u>

Because Plaintiffs must have Article III standing "for each claim that they press and for each form of relief that they seek," the Court returns to the question of standing. *See TransUnion*, 594 U.S. at 431. The factual basis for Plaintiffs' standing to challenge the implementation of Section 3(d) overlaps significantly with the basis for their standing to obtain preliminary and permanent injunctions against the implementation of Section 2(a), which purported to impose a similar documentary-proof-of-citizenship requirement on the Federal Form. *See LULAC I*, 780 F. Supp. 3d at 188–94; *LULAC II*, 2025 WL 3042704, at *14–18. It also overlaps in part with the basis for the Democratic Party Plaintiffs' standing to challenge Section 2(d), which the Court addressed in the preceding section. *See supra* Section III.B.1. In short, all Plaintiffs have standing because Section 3(d) directly burdens eligible citizens' ability to register and vote in federal elections.

a.    *The LULAC Plaintiffs have standing.*

The LULAC Plaintiffs have both organizational and associational standing to challenge the implementation of Section 3(d) based on the effects that it would have on their mission to encourage political participation and on their members' ability to register and vote in federal elections.

*First*, the LULAC Plaintiffs have organizational standing to challenge the implementation of Section 3(d) because that provision would directly interfere with their core activities, including providing voter registration services throughout the Nation and to eligible U.S. citizens living abroad.  Each of the LULAC Plaintiffs has introduced evidence that registering eligible voters for federal elections is a core part of its mission.  The D.C. Circuit has squarely held that implementing a documentary-proof-of-citizenship requirement would "unquestionably make it more difficult for [organizations like the LULAC Plaintiffs] to accomplish their primary mission[s] of registering voters." *Newby*, 838 F.3d at 9.

The burden that a documentary-proof-of-citizenship requirement would impose on the LULAC Plaintiffs would be "far more than simply a setback to [their] abstract social interests." *See All. for Hippocratic Med.*, 602 U.S. at 394 (quoting *Havens*, 455 U.S. at 379). Instead, it would directly impede the organizations' efforts to register eligible voters, which is among their "core business activities." *Id.* at 395.  A documentary-proof-of-citizenship requirement for the Federal Post Card Application would also require the LULAC Plaintiffs to invest additional resources in training their staff and volunteers, both to understand the new requirement and to handle the sensitive personal information contained in passports and other documents listed in the Executive Order as acceptable proof of citizenship.

Section 3(d) would also make existing voter registration efforts less effective.  For example, voter registration efforts that encourage eligible voters to register and request absentee

ballots by submitting the Federal Post Card Application will be less effective if the Secretary of Defense adds a documentary-proof-of-citizenship requirement because many people who are eligible to use the Application do not have access to their passport or other citizenship documents or cannot readily provide copies of those documents with their applications. This loss of effectiveness would interfere with the LULAC Plaintiffs' voter-registration missions and force them to invest resources in additional voter-registration services to achieve their missions. *See Newby*, 838 F.3d at 9. For all these reasons, the LULAC Plaintiffs have organizational standing to challenge the Executive Order's directive to the Secretary of Defense to act to "require" documentary proof of citizenship from users of the Federal Post Card Application.

*Second*, and in the alternative, two of the LULAC Plaintiffs—LULAC and the Secure Families Initiative—have associational standing to challenge Section 3(d) of the Executive Order because that provision would directly harm the concrete interests of their individual members in registering to vote, receiving absentee ballots, and having their votes counted in upcoming federal elections. These organizations' individual members would have standing to challenge Section 3(a) in their own names, that challenge is germane to the organizations' purposes, and the individual members' participation is not required to resolve any issue in these consolidated cases. Therefore, the LULAC Plaintiffs challenging Section 3(d) on behalf of their individual members have associational standing to advance that challenge. *See Hunt*, 432 U.S. at 343; *EPIC*, 928 F.3d at 101.

b.    *The Democratic Party Plaintiffs have standing.*

The Democratic Party Plaintiffs have organizational, associational, and political-competitor standing to challenge Section 3(d).

*First*, many of the Democratic Party Plaintiffs have organizational standing to challenge this provision based on its effect on their ability to register new voters as members and

supporters of the Democratic Party, which they do in service of their mission of electing Democratic candidates to office throughout the country.  The DNC, DGA, DSCC, and DCCC have each shown that the implementation of Section 2(a) would make it more difficult for them to register voters who are likely to support Democratic candidates, leading them to divert additional resources toward further voter registration efforts.  These expenditures of resources would trade off directly against investments in other time-sensitive, election-related activities that the organizations would otherwise make, including developing and paying to distribute political advertisements in competitive races.  As is true of the LULAC Plaintiffs, the burden that Section 3(d) would impose on the Democratic Party Plaintiffs is therefore "far more than simply a setback to [their] abstract social interests." *See All. for Hippocratic Med.*, 602 U.S. at 394 (quoting *Havens*, 455 U.S. at 379).  This burden would directly impair the Democratic Party Plaintiffs' "core business activities" of registering and turning out supporters of Democratic candidates to elect those candidates to office. *Id.* at 395.  Therefore, the implementation of Section 3(d) would inflict a concrete harm on the DNC, DGA, DSCC, and DCCC, and those Plaintiffs have organizational standing to challenge it.

*Second*, as an alternative basis for standing, the DNC has associational standing to challenge the implementation of Section 3(d).  The DNC counts among its members each of the many voters across the country who are registered as Democrats.  Many of these individuals lack documentary proof of citizenship that would satisfy Section 3(d)'s requirements or would have difficulty accessing and providing that documentary proof to register to vote and request an absentee ballot if they move to a new address or otherwise need to renew their registrations.  The implementation of Section 3(d) would therefore hinder these members' ability to register to vote, inflicting a cognizable harm that is directly traceable to the Executive Order.  *See Mi Familia*

*Vota*, 129 F.4th at 709.  These members would have standing to challenge Section 3(d) in their own names.  The challenge to Section 3(d) is germane to the Democratic Party Plaintiffs' missions of helping to elect Democrats by registering and turning out voters.  And individuals members' participation is not necessary to the resolution of any issue in this case.  Accordingly, the Democratic Party Plaintiffs have associational standing to raise the same challenge. *See Hunt*, 432 U.S. at 343; *EPIC*, 928 F.3d at 101.

*Third*, and finally, as a further alternative basis for standing, several of the Democratic Party Plaintiffs have shown political-competitor standing on the theory that Section 3(d) would cause the "illegal structuring of a competitive environment" in which "rival parties defend their concrete interests."  *Shays*, 414 F.3d at 85–87; *see also Bost*, 2026 WL 96707, at *3 (recognizing that all political candidates "have an interest in a fair process").  Two of the Democratic Party Plaintiffs—Plaintiff Jeffries and Plaintiff Schumer—have made clear showings of political-competitor standing to challenge Section 3(d) of the Executive Order based on their active candidacies for reelection to federal office.  Jeffries and Schumer each aver that some of their constituents and likely supporters may be unable to register to vote or may be dissuaded from registering if Section 3(d) is implemented because, although they are eligible to vote, they lack easy access to documentary proof of citizenship or the ability to submit it along with the Federal Post Card Application.  Accordingly, implementing Section 3(d) would alter the "competitive environment" in which Plaintiffs Jeffries and Schumer compete for elective office.  *See Shays*, 414 F.3d at 87.  Plaintiffs Jeffries and Schumer therefore have political-competitor standing to challenge this provision. Finally, because a "party affiliate" of an active candidate may also exercise political-competitor standing, *see Nat. L. Party*, 111 F. Supp. 2d at 47, the Democratic

75

Party Plaintiffs affiliated with Plaintiffs Jeffries and Schumer and other active Democratic candidates throughout the country have standing to raise the same challenge.

*    *    *

Finally, as with Section 2(d), the Court is unpersuaded by the Federal Defendants' arguments that Plaintiffs' threatened injuries from the implementation of Section 3(d) are too speculative to support Article III standing.   Section 3(d), like Section 2(d), contains an unambiguous command: the Secretary of Defense "*shall* update the Federal Post Card Application" to require documentary proof of citizenship.   Exec. Order No. 14,248 § 3(d) (emphasis added).   The Executive Order's saving clause "does not and cannot override" the meaning of this clear command.   *City & Cnty. of San Francisco*, 897 F.3d at 1240.   Accordingly, Plaintiffs' threatened injuries are concrete, directly traceable to Section 3(d), and redressable by a favorable decision from this court enjoining the implementation of that section.   *See Lujan*, 504 U.S. at 560–61.

In sum, both the LULAC Plaintiffs and the Democratic Party Plaintiffs have multiple independent bases for Article III standing to challenge the implementation of Section 3(d), and this Court has jurisdiction over those claims.

> 2.    Plaintiffs have an equitable right of action to challenge the implementation of Section 3(d) on constitutional separation-of-powers grounds.

The Federal Defendants next argue that Plaintiffs lack a viable cause of action to challenge Section 3(d).   *See* Fed. Defs.' Mem. at 16–17.   This argument is unsuccessful.

As with Plaintiffs' challenges to Section 2(a) and 2(d), Plaintiffs have an equitable right of action to raise a constitutional separation-of-powers challenge to Section 3(d).[45]   This right

---

[45] Because the parties have fully briefed the merits of this non-statutory separation-of-powers challenge, the Court grants the Democratic Party Plaintiffs' request to construe Count I of their Complaint as having been constructively

arises "directly under the Constitution" and is not subject to the strictures of the APA or an *ultra vires* challenge to an agency's compliance with a statute. *See Free Enter. Fund*, 561 U.S. at 491 n.2; *see also Collins*, 594 U.S. at 245 ("[W]henever a separation-of-powers violation occurs, any aggrieved party with standing may file a constitutional challenge."). Because Plaintiffs are directly aggrieved by the constitutional separation-of-powers violation that they allege is inherent in Section 3(d), they are among "the class of litigants that may, as a matter of law, appropriately invoke the power of the court" to challenge that provision. *See Davis*, 442 U.S. at 239 n.18.

### 3. Section 3(d) is inconsistent with the constitutional separation of powers.

Turning to the merits, the Court agrees with Plaintiffs that Section 3(d) of the Executive Order oversteps the constitutional separation of powers. Because Section 3(d)'s directive to add a documentary-proof-of-citizenship requirement to the Federal Post Card Application is contrary to the express will of Congress as articulated in UOCAVA, because there is neither statutory nor constitutional authority for Section 3(d)'s instruction, and because our Constitution entrusts matters of election regulation exclusively to Congress and the States, Section 3(d) cannot lawfully be implemented.

#### a. *Section 3(d) is contrary to UOCAVA.*

Returning to the *Youngstown* framework, the Court begins by asking whether the directive in Section 3(d) is "incompatible with the expressed or implied will of Congress."

---

amended to add a non-statutory separation-of-powers challenge to Section 3(d) of the Executive Order. *See* Dem. Pls.' Mem. at 20. *See Turner v. Shinseki*, 824 F. Supp. 2d 99, 122 n.23 (D.D.C. 2011) (RBW). Although the Federal Defendants object to this amendment, *see* Fed. Defs.' Reply & Opp'n at 4 n.4, it will cause them no prejudice because the LULAC Plaintiffs have raised the exact same challenge, and the parties have fully argued its merits in their consolidated briefing. Under the circumstances, requiring a further round of briefing on a motion for leave to amend the Democratic Party Plaintiffs' Complaint would serve no substantive purpose and would merely delay adjudication on the merits. *See* Fed. R. Civ. P. 15(a)(2) (providing that courts "should freely give leave" to amend a complaint "when justice so requires").

*Zivotofsky*, 576 U.S. at 10 (quoting *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring)).  If it is, then the President's power is again at its "lowest ebb," and the President "can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter."  *Id.*  For the reasons that follow, the Court concludes that the President's authority is, in fact, at its "lowest ebb" here.  *See id.*

> i.     *Requiring documentary proof of citizenship on the Federal Post Card Application would be incompatible with other provisions of UOCAVA.*

Adding a documentary-proof-of-citizenship requirement to the Federal Post Card Application is plainly incompatible with the will of Congress, as expressed in UOCAVA.  *See Zivotofsky*, 576 U.S. at 10.  Several features of the Act support this conclusion.

*First*, like the NVRA, UOCAVA provides that voter eligibility is to be verified by sworn affirmation, not by documentary proof.  *See* 52 U.S.C. § 20301(b)(7).  Specifically, UOCAVA requires that applicants using the Federal Post Card Application must attest to a "standard oath" in which they "affirm[] that a material misstatement of fact in the completion of [the Application] may constitute grounds for a conviction for perjury."  *Id.*  UOCAVA also expressly bars States from refusing to accept or process an otherwise-valid Federal Post Card Application for failure to comply with notarization requirements.  *Id.* § 20302(i)(1).  These provisions show that Congress made deliberate choices about how voter eligibility should be verified in connection with the Federal Post Card Application, favoring self-certification by voters over burdensome documentation requirements.

*Second*, the very language that UOCAVA uses to describe the form at issue—"an official *post card* form"—is strong evidence that Congress did not intend to authorize the addition of extraneous requirements that would require attaching documentation to the form.  *See* 52 U.S.C. § 20301(b)(2).  Although the current Federal Post Card Application is not literally a

standard-size postcard—it is formatted as a single, two-sided sheet of letter-sized paper that is designed to be folded in half for mailing[46]—its streamlined design is consistent with the ordinary understanding of the statutory phrase "post card."  That term clearly connotes a simple mail piece designed to be sent without an envelope.  *See California I*, 786 F. Supp. 3d at 383 (citing *Postcard*, Miriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/postcard [https://perma.cc/928W-2DU3]).  A form requiring attachments would depart significantly from that ordinary meaning.  Because courts "presum[e] that each word Congress uses is there for a reason," Congress's use of the term "post card" cuts strongly against the notion that UOCAVA allows the Executive Branch to amend the Federal Post Card Application to require documentary proof of citizenship.  *See Advoc. Health Care Network v. Stapleton*, 581 U.S. 468, 477 (2017).

*Third*, Congress enacted UOCAVA in direct response to the "severe difficulties" that military and overseas voters have historically faced when attempting to exercise their fundamental right to vote.  *See United States v. Alabama*, 778 F.3d 926, 928 (11th Cir. 2015).  The clear purpose of the Act—making it easier for eligible Americans to vote while serving their country overseas or otherwise living outside the United States—belies the notion that Congress would agree to the addition of a burdensome documentary-proof-of-citizenship requirement.  *See* H.R. Rep. No. 99-765, at 5 (1986).  Such a requirement might prevent eligible voters from using the Federal Post Card Application to register to vote and request absentee ballots, directly undercutting UOCAVA's purpose.

For all of these reasons, Section 3(d)'s directive to add a documentary proof of citizenship requirement to the Federal Post Card Application would contravene the will of Congress, as clearly expressed in UOCAVA.

---

[46] *See* Federal Post Card Application, https://perma.cc/WZM3-8PTL.

ii.    *The statutory duty to "prescribe" the contents of the Federal Post Card Application does not confer the power to add a documentary-proof-of-citizenship requirement.*

The Federal Defendants argue that Section 3(d)'s directive to add a documentary-proof-of-citizenship requirement to the Federal Post Card Application is lawful because UOCAVA authorizes the President's designee to "prescribe" the form of the Application, and nothing in the statute expressly limits his ability to "prescribe" new document requirements. Fed. Defs.' Mem. at 30. The Federal Defendants also broadly assert that imposing a documentary-proof-of-citizenship requirement on the Application is consistent with UOCAVA because UOCAVA voters must be "qualified to vote," and "[b]eing 'qualified to vote' necessarily requires U.S. citizenship under federal law." *Id.* at 30–31 (quoting 52 U.S.C. § 20310(1), (5)).

These arguments fail to persuade. The Federal Defendants' arguments in support of Section 3(d) mistakenly assume that when enacting UOCAVA, Congress casually delegated a substantial swath of its own constitutional responsibility to regulate federal elections by directing an unspecified "Presidential designee" to "prescribe an official post card form." *See* 52 U.S.C. § 20301(b)(2). The statutory text cannot support such a broad interpretation of the power that Congress has delegated to the Executive Branch.

Contrary to the Federal Defendants' arguments, the better interpretation of this provision is that the duty to "prescribe" the content of the Federal Post Card Application assigns an essentially ministerial duty to the President's designee. *See* 52 U.S.C. § 20301(b)(3). Under familiar rules of statutory interpretation, this provision cannot reasonably be read to allow the President's designee to add a documentary-proof-of-citizenship requirement to the Federal Post Card Application. And in the absence of statutory authorization, neither the President nor his designee has any authority to impose such a requirement.

As the Supreme Court has often emphasized, Congress does not "hide elephants in mouseholes." *Whitman v. Am. Trucking Associations*, 531 U.S. 457, 468 (2001). That maxim of statutory interpretation is particularly relevant when the Executive Branch purports to exercise far-reaching powers on the theory that Congress has delegated its authority over an important topic. Courts "presume that Congress intends to make major policy decisions itself, not leave those decisions to agencies." *West Virginia v. EPA*, 597 U.S. 697, 723 (2022). Accordingly, courts "expect Congress to speak clearly if it wishes to assign to an agency decisions of vast 'economic and political significance.'" *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 147 (2000)).

Because Congress's exclusive power under the Elections Clause to preempt State laws by dictating the substantive content of federal voter registration forms is plainly a matter of "vast" significance to our political system, Congress must speak clearly if it intends to delegate any part of that power to the Executive Branch. *See West Virginia*, 597 U.S. at 723. UOCAVA's direction to "prescribe" a form falls well short of a clear statement of intent to delegate such an important power. In the absence of such a statement, the Court shall not assume that Congress has delegated its Elections Clause powers and handed total control of the substantive details of the Federal Post Card Application over to the Executive Branch.

Finally, considerations of federalism and the vertical separation of powers further undercut the Federal Defendants' sweeping interpretation of the delegated power to "prescribe" the contents of the Federal Post Card Application. The Federal Defendants suggest that requiring documentary proof of citizenship is a proper exercise of delegated authority from Congress under UOCAVA because that Act applies only to those who are "qualified to vote," and "[b]eing 'qualified to vote' necessarily requires U.S. citizenship *under federal law*." Fed.

Defs.' Mem. at   30–31 (emphasis added) (quoting 52 U.S.C. § 20310(1), (5), and citing 18 U.S.C. §§ 611, 1015(f)).   This argument implicitly invokes the President's duty to "take Care that the Laws be faithfully executed."   *See* U.S. Const. art. II, § 3.   However, it rests on a mistaken premise.

Our Constitution provides that only the States—not Congress, and certainly not the President—may decide who is qualified to vote in federal elections.   *See* U.S. Const. art. I, § 2, cl. 1; U.S. Const. amend. XVII.   As the Supreme Court has made clear, setting standards for voter qualifications "forms no part of the power to be conferred upon the national government" by the Elections Clause.   *ITCA*, 570 U.S. at 17 (quoting The Federalist No. 60).

Accordingly, there is reason to doubt the constitutionality and enforceability of any purported *federal* prohibition on voting by noncitizens that the Federal Defendants argue is properly upheld or enforced by Section 3(d).   As the Court has explained, our Constitution provides that *States*, rather than Congress, decide who is eligible to vote.   *See supra* Section I.A.1.a.   Although 18 U.S.C. § 611 purports to prohibit voting by "any alien" as a matter of federal criminal law, it does not appear that any court has decided whether this federal prohibition is consistent with the Voter Qualifications Clause and the Seventeenth Amendment. *Cf.* U.S. Const. art. I, § 2, cl. 1; U.S. Const. amend. XVII.   By contrast, *States* clearly may—and do—exercise their own constitutional prerogatives to impose such prohibitions.   *See, e.g.*, *ITCA*, 570 U.S. at 6.   The federal prohibition in 18 U.S.C. § 1015(f) on making "any false statement or claim" of U.S. citizenship "in order to register to vote or to vote" in any election, subject to certain exceptions, reinforces these State prohibitions.

Any nominal federal prohibition on voting by non-citizens therefore cannot support the conclusion that UOCAVA's direction to "prescribe" the content of the Federal Post Card

Application amounts to a broad delegation of authority allowing the Executive Branch to establish new voter qualifications or methods of verifying citizenship.  Because the power to determine voter qualifications is not among the powers "conferred upon the national government," Congress cannot have granted any such power to the Executive Branch when it enacted UOCAVA, and the Executive Branch cannot exercise such power in the name of enforcing existing federal law.  *See ITCA*, 570 U.S. at 17.  Instead, any delegation of power over the Federal Post Card Application in UOCAVA can be sustained only as an exercise of Congress's Elections Clause power to preempt State laws about election procedures.  *See* U.S. Const. art. I, § 4, cl. 1.  But for all the reasons the Court has already described, UOCAVA's narrow authorization to "prescribe" the content of the Federal Post Card Application does not delegate Congress's Elections Clause power to require new means of verifying citizenship.

In sum, the duty to "prescribe" the content of the Federal Post Card Application does not authorize the President or his designee to add a documentary proof of citizenship to the Application.

b.    *The President lacks any constitutional authority to support the directive in Section 3(d).*

As the Court explained in the preceding section, the text and context of UOCAVA show that Section 3(d)'s directive to require documentary proof of citizenship on the Federal Post Card Application is manifestly contrary to the will of Congress, and the Act's provision that a designee of the President may "prescribe" the content of the Application does not authorize the imposition of any such requirement.  Section 3(d) can therefore be sustained only if the Federal Defendants can show that the President has powers that are "both 'exclusive' and 'conclusive' on the issue."  *See Zivotofsky*, 576 U.S. at 10 (quoting *Youngstown*, 343 U.S. at 637–38 (Jackson, J., concurring)).  The President has no such powers.

83

As the Court has explained, under our Constitution, the power to regulate federal election procedures rests exclusively with the States and with Congress. *See supra* Sections I.A.1, III.B.3.b; U.S. Const. art. I, § 4, cl. 1. The Federal Defendants have not identified any viable source of constitutional authority for the President's directive in Section 3(d), let alone one that could overcome the "broad" and "comprehensive" powers of Congress in this area to sustain unilateral action by the Executive Branch. *See ITCA*, 570 U.S. at 8.

In the absence of either statutory or constitutional authority, the President's directive in Section 3(d) is inconsistent with the constitutional separation of powers, and it cannot lawfully be implemented.

4. <u>A declaratory judgment and permanent injunction against implementation of Section 3(d) is the appropriate remedy.</u>

Having concluded that Section 3(d) of the Executive Order cannot lawfully be implemented, the Court returns to the issue of remedies. Plaintiffs seek both a declaratory judgment and a permanent injunction barring the relevant Federal Defendants from enforcing Section 3(d). *See* LULAC Pls.' Mem. at 45; Dem. Pls.' Mem. at 60. For substantially the same reasons the Court granted permanent relief against the implementation of Section 2(d), *see supra* Section III.B.4, the Court agrees that both a declaratory judgment and a permanent injunction against the implementation of Section 3(d) are appropriate remedies.

A declaratory judgment regarding the lawfulness of Section 3(d) is warranted. Such a judgment will "serve a useful purpose in clarifying the legal relations at issue" and "afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding"—namely, uncertainty about whether and to what extent the provision may lawfully be implemented. *See Glenn*, 222 F. Supp. 3d at 36. The Court shall therefore **GRANT** Plaintiffs' request for a

declaratory judgment and **DECLARE** that Section 3(d) is inconsistent with the constitutional separation of powers.

A permanent injunction is also warranted. Section 3(d) would irreparably harm Plaintiffs' interests in the absence of an injunction because, in the inherently time-constrained context of an election cycle, the Court cannot provide meaningful redress for lost opportunities to participate and compete for elective office. *See LULAC I*, 780 F. Supp. 3d at 211 (citing *Newby*, 838 F.3d at 9). Remedies at law will not suffice to compensate Plaintiffs for their lost opportunities or for their separation-of-powers injuries. *See id.* Finally, because agencies have no legitimate interest in the perpetuation of unlawful practices and because the public interest "favors permitting as many qualified voters to vote as possible," both the balance of hardships and the public interest weigh in favor of granting a permanent injunction. *See Newby*, 838 F.3d at 12. In sum, all the requirements for a permanent injunction are satisfied.

As the Court has already concluded with respect to Sections 2(a) and 2(d) of the Executive Order, the appropriate "party-specific" remedy for Plaintiffs' threatened injury from Section 3(d) is an injunction that bars the relevant Defendants from implementing that provision anywhere in the Nation. Because there is only one Federal Post Card Application, any attempt to craft a narrower remedy would significantly disrupt the uniform administration of the absentee voting system that Congress established in UOCAVA. And because several Plaintiffs operate throughout the Nation, a narrower injunction would not afford them complete relief.

For all these reasons, the Court shall **PERMANENTLY ENJOIN** the relevant Federal Defendants from taking any action to implement or give effect to that Section 3(d) of Executive Order No. 14,248.

5.    Because Plaintiffs have not shown final agency action implementing Section 3(d), the Court shall grant Defendants' motion for summary judgment on their APA claims regarding this provision.

Finally, as was true of the Democratic Party Plaintiffs' challenges to Section 2(d), the Court agrees with the Federal Defendants that, on the present record, Plaintiffs' APA claims regarding Section 3(d) of the Executive Order cannot succeed because Plaintiffs have not shown that any proper Defendant has yet taken "final agency action" in response to Section 3(d).  *See* 5 U.S.C. § 704; *see also supra* Section III.B.5.  In the absence of final agency action, Plaintiffs' APA claims cannot succeed.  The Court shall therefore **GRANT** the Federal Defendants' motions for summary judgment on these claims.  This disposition is based on the present record and shall not preclude appropriate further action if new facts or circumstances arise that should alter the Court's analysis.

### D.    Section 4(a): Conditioning Funding to States on Use of the Federal Form, Including any Documentary Proof of Citizenship Requirement

The Federal Defendants next move for summary judgment on the Democratic Party Plaintiffs' claims regarding Section 4(a) of the Executive Order, which purports to condition certain federal funding to States on their use of the Federal Form, including any documentary proof of citizenship requirement added to the Form pursuant to Section 2(a) of the Executive Order.  *See* Fed. Defs.' Mem. at 33–34, 45.  The Democratic Party Plaintiffs cross-move for summary judgment and seek both a declaratory judgment and a permanent injunction barring the relevant Defendants from implementing Section 4(a).  *See* Dem. Pls.' Mot. at 40–41, 60.

Section 4(a) provides:

The Election Assistance Commission shall, pursuant to 52 U.S.C. [§§] 21003(b)(3) and 21142(c) and consistent with applicable law, take all appropriate action to cease providing Federal funds to States that do not comply with the Federal laws set forth in 52 U.S.C. [§] 21145, including the requirement in 52 U.S.C. [§] 20505(a)(1) that States accept and use the national mail voter registration form issued pursuant to 52 U.S.C. [§] 20508(a)(1), including any

> requirement for documentary proof of United States citizenship adopted pursuant
> to section 2(a)(ii) of [the Executive Order].

Exec. Order No. 14,248, 90 Fed. Reg. 14005 (Mar. 25, 2025), § 4(a).

The Democratic Party Plaintiffs' challenge to Section 4(a) is not ripe for this Court's review. The Democratic Party Plaintiffs argue persuasively that there would be deep separation-of-powers problems with cutting off funds to States based on their failure to implement a documentary-proof-of-citizenship requirement imposed unlawfully by the President. *See* Dem. Pls.' Mem. at 40–41. However, this Court has already permanently enjoined the implementation of of such a requirement. *See LULAC II*, 2025 WL 3042704, at *38; Order, Dkt. No. 217. Federal courts in two other Districts have issued similar injunctions. *See California v. Trump*, 786 F. Supp. 3d 359, 396 (D. Mass. 2025) (preliminary injunction); *Washington v. Trump*, No. 2:25-cv-00602-JHC, 2026 WL 73866, at *39 (W.D. Wash. Jan. 9, 2026) (permanent injunction). Accordingly, the implementation of Section 4(a) does not present any imminent risk of harm to the Democratic Party Plaintiffs. Apart from its effort to coerce States to adopt the now-enjoined documentary-proof-of-citizenship requirement described in Section 2(a) of the Executive Order, Section 4(a) merely reiterates existing law regarding conditions on HAVA funding to States. *See* 52 U.S.C. § 21003(a) (conditioning funds on certification of compliance with several requirements, including the NVRA's requirement to "accept and use" the Federal Form).

If Section 2(a) were to go into effect, then the Democratic Party Plaintiffs would have a stronger case that their asserted injury from the implementation of Section 4(a)'s funding condition is "imminent" or "certainly impending." *See POET Biorefining*, 970 F.3d at 403. However, on the present record, their challenge to Section 4(a) is neither constitutionally nor prudentially ripe. The challenge is not constitutionally ripe because, in the absence of any documentary-proof-of-citizenship requirement, Section 4(a)'s requirement to use the Federal

Form does not inflict any "certainly impending" injury, either to Plaintiffs' electoral interests or to separation-of-powers principles. *See id.* Similarly, the challenge is not prudentially ripe because there is no indication that deferring review pending further factual developments regarding the contours of any documentary-proof-of-citizenship requirement and associated funding conditions would cause undue hardship the Democratic Party Plaintiffs. *See Abbott Lab'ys*, 387 U.S. at 149. So long as the Court's ruling regarding the documentary-proof-of-citizenship requirement in Section 2(a) remains in force, the threatened injury to the Democratic Party Plaintiffs' interests will not arise.

In sum, because the Executive Branch has not adopted the documentary-proof-of-citizenship requirement at the core of the Democratic Party Plaintiffs' challenge to Section 4(a) and is permanently enjoined from doing so, the Court shall **GRANT** the Federal Defendants' Motion for Summary Judgment and the Defendant-Intervenor's Motion for Summary Judgment for lack of ripeness, and the Court shall **DENY** the Democratic Party Plaintiffs' Cross-Motion for Summary Judgment. This disposition is based on the present record and shall not preclude appropriate further action if new facts or circumstances arise that should alter the Court's analysis.

### E.    Section 7(a): Directing the Attorney General to "Enforce" the Election Day Statutes "Against" States That Count Ballots Received After Election Day

The Federal Defendants and the RNC as Defendant-Intervenor each move for summary judgment on Plaintiffs' claims regarding Section 7(a) of the Executive Order, which directs the Attorney General to "enforce" the Election Day Statutes "against" States that apply their own laws to count ballots received after Election Day. *See* Fed. Defs.' Mot. at 12–14, 39–45; Def.-Intervenor's Mot. at 14–24. The LULAC Plaintiffs and the Democratic Party Plaintiffs each

cross-move for summary judgment and a permanent injunction barring the Attorney General from implementing Section 7(a).  *See* LULAC Pls.' Mot. at 45; Dem. Pls.' Mot. at 60.

Section 7(a) provides:

> The Attorney General shall take all necessary action to enforce 2 U.S.C. [§] 7 and 3 U.S.C. [§] 1 against States that violate these provisions by including absentee or mail-in ballots received after Election Day in the final tabulation of votes for the appointment of Presidential electors and the election of members of the United States Senate and House of Representatives.

Exec. Order No. 14,248, 90 Fed. Reg. 14005 (Mar. 25, 2025), § 7(a).  This provision seeks to secure States' compliance with a contested interpretation of the Election Day Statutes that the U.S. Court of Appeals for the Fifth Circuit recently adopted in *Republican National Committee v. Wetzel*, 120 F.4th 200 (5th Cir. 2024).  *See* Exec. Order No. 14,248 § 1 (citing the *Wetzel* decision).  The Supreme Court has granted certiorari to review the Fifth Circuit's resolution of this important interpretive question, and a decision on the merits is expected later this year.  *See Watson v. Republican Nat'l Comm.*, No. 24-1260, 146 S. Ct. 355 (2025) (mem.).

The LULAC Plaintiffs' and Democratic Party Plaintiffs' challenges to Section 7(a) are not ripe for this Court's review, and in the current posture of this case, neither group of Plaintiffs has standing to challenge them.  To have standing and a constitutionally ripe claim, Plaintiffs must show—among other things—that they face an "imminent" or "certainly impending" injury that is likely to be redressed by a favorable judicial decision.  *See POET Biorefining*, 970 F.3d at 403; *Bennett*, 520 U.S. at 167.  Neither the LULAC Plaintiffs nor the Democratic Party Plaintiffs have made these showings.

The interests that Plaintiffs seek to protect by challenging Section 7(a) are certainly real and cognizable.  For example, as the Supreme Court recently made clear, political candidates like Plaintiff Jeffries and Plaintiff Schumer always have cognizable, personal interests in the rules that govern the counting of votes in their elections.  *See Bost*, 2026 WL 96707, at *3–4.

The LULAC Plaintiffs also have cognizable interests in ensuring that their members' validly cast ballots are counted in accordance with State law.  *See Newby*, 838 F.3d at 9.

However, on the present record, Plaintiffs have not carried their burden of showing either that Section 7(a) presents an imminent threat to their cognizable interests or that a favorable decision from this Court would alleviate that threat.

A key obstacle to Plaintiffs' facial challenge to Section 7(a) is that it is not clear what it means to "enforce" the Election Day Statutes "against States."  As this Court has already observed, that phrasing could encompass a wide range of activities, from sending letters to States to encourage voluntary compliance, to filing enforcement actions seeking to coerce compliance by judicial order.[47]  Some of these activities are clearly lawful and would affect Plaintiffs' interests, if at all, only by persuading States to enact changes to their own ballot-receipt deadlines.

Accordingly, because the Court must assume that the Attorney General will heed the "requirement of lawful implementation," it cannot conclude that implementation of Section 7(a) will imminently harm Plaintiffs in a manner redressable by a favorable decision in this case.  *See Common Cause*, 506 F. Supp. 3d at 49; *see also Allbaugh*, 295 F.3d at 34; Exec. Order No. 14,248 § 11(b) (providing that the Executive Order "shall be implemented consistent with applicable law").

Instead, the Court must consider the possibility that the Attorney General may choose to implement Section 7(a) solely by attempting to persuade States to adopt the President's

---

[47] At the hearing on Plaintiffs' motions for preliminary injunctions, the Federal Defendants argued that the Attorney General could "enforce" the Election Day statutes by initiating civil or criminal enforcement actions.  *See* Tr. of P.I. Hr'g, Dkt. No. 100, at 87:12–13, 89:5–6.  As the Court previously observed, it is not clear that civil or criminal enforcement actions are available to "enforce" the Election Day Statutes, which neither define any criminal offenses nor contain any express cause of action for civil enforcement.  *See LULAC I*, 780 F. Supp. 3d at 213.

interpretation of the Election Day Statutes. In response, some States, left unpersuaded, may choose to leave their ballot-receipt deadlines in place. Similarly, even if the Attorney General attempts to "enforce" the Election Day Statutes by filing civil actions against States, some States may oppose and successfully defend against those challenges.

Given these possibilities, Plaintiffs' asserted injuries are not "imminent" or "certainly impending." *See POET Biorefining*, 970 F.3d at 403. Because Plaintiffs' asserted injuries would flow primarily from States' decisions, rather than from the Attorney General's own actions, it is also far from clear that any such injuries would be redressable by a favorable decision.

Meanwhile, any injury to Plaintiffs flowing directly from the Executive Order or the Attorney General's implementation of it—for example, resulting from increased voter confusion or uncertainty about future State election rules—is not within the Court's power to redress. *See LULAC I*, 780 F. Supp. 3d at 215–19. Although confusion and uncertainty are real and substantial burdens, this Court cannot effectively alleviate those burdens in this case. The Supreme Court is expected to issue a decision later this year that will authoritatively resolve the central question of whether the Election Day Statutes preempt State laws allowing ballots received after Election Day to be counted. *See Watson*, 146 S. Ct. 355. Accordingly, any ruling from this Court that attempts to resolve that question will be superseded before the next Election Day, and any such ruling will do nothing to alleviate confusion or uncertainty about the rules that will apply this coming November. In short, this Court cannot provide meaningful redress for any confusion or uncertainty arising directly from Section 7(a).

As this Court noted at the preliminary injunction stage, "the most natural parties to seek an injunction against enforcement under Section 7(a) are the States themselves," not the private

Plaintiffs currently before this Court.[48]  *LULAC I*, 780 F. Supp. 3d at 214.  Two groups of States have now obtained such injunctions.  *See California*, 786 F. Supp. 3d at 397 (preliminary injunction); *Washington*, 2026 WL 73866, at *39 (permanent injunction).  Meanwhile, although Plaintiffs in this case lack standing and a ripe claim to challenge Section 7(a), they may have other recourse to defend their interests, including intervening in any future civil action to "enforce" the Election Day Statutes "against" States that count ballots received after Election Day.  If the Attorney General were to file such an action, Plaintiffs would have much stronger arguments about the imminence of the threat to their interests and the ripeness of their claims regarding Section 7(a).  Nothing in this Memorandum Opinion or the accompanying Order should be understood to foreclose that potential future course of action.

For all these reasons, the Court shall **GRANT** the Federal Defendants' motion for summary judgment on Plaintiffs' claims regarding Section 7(a) and **DENY** the LULAC Plaintiffs' and Democratic Party Plaintiffs' motions for summary judgment regarding that provision.  This disposition is based on the present record and shall not preclude appropriate further action if new facts or circumstances arise that should alter the Court's analysis.

---

[48] The Democratic Party Plaintiffs note that the Supreme Court's recent decision in *Diamond Alternative Energy, LLC v. EPA*, 145 S. Ct. 2121 (2025), reinforces existing precedents that have recognized Article III standing for plaintiffs whose injuries flow from the predictable effects a defendant's actions will have on third parties.  *See* Dem. Pls.' Mem. at 25.  The Democratic Party Plaintiffs suggest that this recent decision should lead the Court to reconsider its conclusion that the States are the proper parties to seek an injunction against Section 7(a).  *See id.* However, the Court's analysis on this point at the preliminary injunction stage rested not on the limits of Article III standing, but instead on principles of equitable jurisdiction and remedies.  *See LULAC I*, 780 F. Supp. 3d at 214 (citing *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015), and *Ex parte Young*, 209 U.S. 123, 155–56 (1908)).  Meanwhile, the Court's conclusion in this Memorandum Opinion rests on issues of imminence and redressability, rather than traceability.  Accordingly, the Supreme Court's recent decision in *Diamond Alternative Energy* does not alter this Court's conclusion.

F.    **Section 7(b): Directing the EAC to "Condition" Funding to States on Not Counting Ballots Received After Election Day**

Next, the Federal Defendants move for summary judgment on the Democratic Party Plaintiffs' claims regarding Section 7(b) of the Executive Order, which directs the EAC to "condition" certain funding to States on their adherence to the President's interpretation of the Election Day Statutes.  *See* Fed. Defs.' Mem. at 14–15, 45.  The Democratic Party Plaintiffs cross-move for summary judgment and a permanent injunction barring the relevant Defendants from implementing Section 7(b).  *See* Dem. Pls.' Mem. at 31–38; 60.

Section 7(b) provides:

Consistent with 52 U.S.C. [§] 21001(b) and other applicable law, the Election Assistance Commission shall condition any available funding to a State on that State's compliance with the requirement in 52 U.S.C. [§] 21081(a)(6) that each State adopt uniform and nondiscriminatory standards within that State that define what constitutes a vote and what will be counted as a vote, including that, as prescribed in 2 U.S.C. [§] 7 and 3 U.S.C. [§] 1, there be a uniform and nondiscriminatory ballot receipt deadline of Election Day for all methods of voting, excluding ballots cast in accordance with 52 U.S.C. [§] 20301 *et seq.,* after which no additional votes may be cast.

Exec. Order No. 14,248, 90 Fed. Reg. 14005 (Mar. 25, 2025), § 7(b).

For substantially the same reasons the Court laid out in its discussion of Plaintiffs' claims regarding Section 7(a), this Court concludes that the Democratic Party Plaintiffs' claims regarding Section 7(b) are not yet ripe for this Court's review, and on the present record, the Democratic Party Plaintiffs lack standing to challenge Section 7(b).

On the present record, Democratic Party Plaintiffs cannot show that the threat of losing federal funding under Section 7(b) will imminently induce States to change their ballot-receipt deadlines.  Indeed, instead of changing their own deadlines, two groups of States have already sought and secured injunctions against the implementation of Section 7(b).  *See California*, 786 F. Supp. 3d at 397 (preliminary injunction); *Washington*, 2026 WL 73866, at *39 (permanent

injunction).   Therefore, any threatened injury arising from changes to State ballot-receipt deadlines in response to Section 7(b) is currently too speculative to support Plaintiffs' Article III standing and this Court's jurisdiction.  *See LULAC I*, 780 F. Supp. 3d at 215–19.

Meanwhile, the direct injuries from the implementation of Section 7(b) that the Democratic Party Plaintiffs assert, including voter confusion and uncertainties that directly harm their interests in recruiting candidates, planning campaigns, and turning out voters, are not redressable by a favorable decision from this Court.  As the Court explained in the preceding section, the Supreme Court is expected to decide the proper interpretation and implications of the Election Day Statutes later this year.  *See Watson*, 146 S. Ct. 355.  Because that forthcoming ruling is expected before the next Election Day, no remedy from this Court can dispel the confusion and uncertainty about ballot-receipt deadlines that the Democratic Party Plaintiffs have identified.

In sum, the Democratic Party Plaintiffs have not established that they have standing or a constitutionally ripe claim to challenge Section 7(b).  The Court shall therefore **GRANT** Defendants' motion for summary judgment on the Democratic Party Plaintiffs' claims regarding Section 7(b) and **DENY** the Democratic Party Plaintiffs' cross-motion regarding those claims. This disposition is based on the present record and shall not preclude appropriate further action if new facts or circumstances arise that should alter the Court's analysis.

### G.    Sections 2(b) and 3(a): Requiring Agencies to Share Data on Voter Eligibility

Finally, the Federal Defendants move for summary judgment on the Democratic Party Plaintiffs' claims regarding Sections 2(b) and 3(a) of the Executive Order.  *See* Fed. Defs.' Mem. at 21–26, 45.  The Democratic Party Plaintiffs cross-move for partial summary judgment and a permanent injunction barring DHS, USDS (or "DOGE"), and SSA from implementing certain changes to the DHS's Systematic Alien Verification for Entitlements ("SAVE") program based

on Sections 2(b) and 3(a).  *See* Dem. Pls.' Mem. at 41–56, 60.  However, the Democratic Party

Plaintiffs urge the Court to reserve ruling on the remainder of their challenge to Sections 2(b)

and 3(a), which they argue cannot be resolved without further proceedings.  *See id.*

Section 2(b) provides:

To identify unqualified voters registered in the States:

    (i)    the Secretary of Homeland Security shall, consistent with applicable law, ensure that State and local officials have, without the requirement of the payment of a fee, access to appropriate systems for verifying the citizenship or immigration status of individuals registering to vote or who are already registered;

    (ii)    the Secretary of State shall take all lawful and appropriate action to make available information from relevant databases to State and local election officials engaged in verifying the citizenship of individuals registering to vote or who are already registered; and

    (iii)    the Department of Homeland Security, in coordination with the DOGE Administrator, shall review each State's publicly available voter registration list and available records concerning voter list maintenance activities as required by 52 U.S.C. [§] 20507, alongside Federal immigration databases and State records requested, including through subpoena where necessary and authorized by law, for consistency with Federal requirements.

Exec. Order No. 14,248, 90 Fed. Reg. 14005 (Mar. 25, 2025), § 2(b).

Section 3(a) provides:

The Commissioner of Social Security shall take all appropriate action to make available the Social Security Number Verification Service, the Death Master File, and any other Federal databases containing relevant information to all State and local election officials engaged in verifying the eligibility of individuals registering to vote or who are already registered. In determining and taking such action, the Commissioner of Social Security shall ensure compliance with applicable privacy and data security laws and regulations.

Exec. Order No. 14,248, 90 Fed. Reg. 14005 (Mar. 25, 2025), § 3(a).

In response to these provisions, DHS has already implemented several changes to its

SAVE program.  *See* Defs.' Resps. at 7, 13–14.  DHS eliminated fees for State and local

government users and implemented a variety of technical changes that made it easier for users to perform bulk searches for information about large numbers of individuals. *See* Defs.' Resps. at 13–14. The SSA also began allowing DHS to access and query a Social Security database known as "Numident" to help "verify[] individuals' citizenship and immigration status for voter verification and other authorized inquiries." *Id.* at 7.

The Federal Defendants raise several threshold arguments to the Democratic Party Plaintiffs' challenges to Sections 2(b) and 3(a), including that Plaintiffs lack standing, that the relevant statutes foreclose the relief they seek, and that their claims are either moot or not yet ripe. For the reasons that follow, the Court concludes that one aspect of the Democratic Party Plaintiffs' claim is now moot, but other aspects may proceed, including to allow further discovery and the production of an administrative record, if appropriate.

1. The Democratic Party Plaintiffs have standing to challenge Sections 2(b) and 3(a).

The Democratic Party Plaintiffs have made a sufficient showing of standing to withstand the Federal Defendants' motion for summary judgment on their claims regarding Sections 2(b) and 3(a). These provisions directly implicate the Democratic Party Plaintiffs' interests in registering and turning out voters who might be dissuaded from participating by the Federal Defendants' handling of their personal information,[49] their members' interests in registering to vote and voting without fear of misuse of that information,[50] and their candidates' interests in competing for elective office without the burden of "illegal structuring of [the] competitive

---

[49] *See* Jeffries Decl. ¶¶ 16–17; Schumer Decl. ¶¶ 16–17; Schneider Decl. ¶¶ 27–32 (DNC); Edelman Decl. ¶¶ 24–29 (DGA); Boss ¶¶ 27–32 (DSCC); Ruselowski Decl. ¶¶ 26–31 (DCCC).

[50] *See, e.g.*, Bryant Decl. ¶¶ 8–9; Cagle Decl., ¶¶ 9–11.

environment."[51]  *Shays*, 414 F.3d at 85–87; *see also Bost*, 2026 WL 96707, at *3.  The effects of these provisions are fairly traceable to the Executive Order and to the Federal Defendants' implementation of its provisions, and a favorable decision from this court granting injunctive relief would redress any future injuries that may arise from that implementation.  *See*

Contrary to the Federal Defendants' arguments, the Privacy Act violations that Plaintiffs allege are not mere injuries "in law" that are divorced from cognizable injuries "in fact."  *Cf.* Fed. Defs.' Mem. at 6 (quoting *TransUnion*, 594 U.S. at 427).  The harms resulting from the alleged Privacy Act violations at issue here have a "close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts," including the harm traditionally redressable in a suit for intrusion upon seclusion.  *TransUnion*, 594 U.S. at 425.

The fact that the APA and the Privacy Act allow for civil actions under circumstances that would not have entitled plaintiffs to recovery at common law does not defeat Plaintiffs' claim to standing.  Courts must focus on whether the underlying harms have a "close relationship" to harms that have traditionally been cognizable in American courts, not on whether there is an element-by-element match to a common-law tort.  *TransUnion*, 594 U.S. at 425; *cf. New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 30 (2022) (explaining that courts conducting a history-and-tradition analysis under the Second Amendment must seek a "historical *analogue*, not a historical *twin*").  For example, intrusion upon seclusion traditionally required a "highly offensive" invasion of privacy.  *Pileggi v. Washington Newspaper Publ'g Co., LLC*, 146 F.4th 1219, 1229 (D.C. Cir. 2025) (quoting Restatement (Second) of Torts § 652B (A.L.I. 1977)).  However, the question of whether a particular intrusion is "*highly*" offensive "goes to the degree of harm, not the injury's recognition at common law, and so does not affect

---

[51] *See, e.g.*, Jeffries Decl. ¶ 17; Schumer Decl. ¶ 17.

the concreteness of the . . . injury under Article III." *Id.* "So long as Congress alters the degree of harm and not the kind of harm, congressional action can make an injury concrete" for purposes of the Article III standing analysis. *Id.* at 1227.

Here, this Court is of the opinion that the alleged harm at the root of Plaintiffs' individual members' and constituents' injuries—the wrongful sharing of sensitive information—bears a close relationship to the harms traditionally redressable through suits for intrusion upon seclusion and breach of confidence. *See Pileggi*, 146 F.4th at 1227–29 (discussing intrusion upon seclusion); *Jeffries v. Volume Servs. Am., Inc.*, 928 F.3d 1059, 1064 (D.C. Cir. 2019) (discussing breach of confidence). That harm is sufficiently concrete to support Article III standing.

Some of the Democratic Party Plaintiffs have associational standing to seek redress for this alleged injury. The Democratic Party Plaintiffs have shown that the alleged harm to voters' privacy interests affects at least some of their members' and constituents' willingness to register to vote and participate in federal elections. *See* Dem. Pls.' Mem. at 48–49. Specifically, they have produced declarations from individual members who are reluctant to register to vote or update their voter registration because they expect that if they do so, their personal information will be shared with multiple federal and State agencies, where they fear it may not be adequately protected.[52] These individuals' privacy interest is therefore germane to Plaintiffs' organizational missions of registering and turning out voters to support Democratic Party candidates. *See Hunt*, 432 U.S. at 343. Finally, it is undisputed that there is no need for individual members' participation in these cases, which seek only forward-looking equitable relief. *See id.* Accordingly, the Democratic Party Plaintiffs have associational standing to challenge the implementation of Sections 2(b) and 3(a) on behalf of their members.

---

[52] *See* Bryant Decl. ¶¶ 8–9; Cagle Decl., ¶¶ 9–11.

Because the privacy harms that Sections 2(b) and 3(a) allegedly inflict on the Democratic Party Plaintiffs' members and other voters will predictably make some voters reluctant to register and participate in federal elections, the Democratic Party Plaintiffs also have standing in their own right as organizations and political competitors. When assessing standing, courts may consider "the predictable effect of Government action on the decisions of third parties." *Department of Commerce v. New York*, 588 U.S. 752, 767–78 (2019). Here, the Democratic Party Plaintiffs have introduced unrebutted evidence that the challenged policies will negatively affect some of their members' propensity to register to vote and maintain their registrations.[53] That effect directly burdens Plaintiffs' "core business activities" of registering, persuading, and mobilizing voters to support Democratic Party candidates for elective office. *All. for Hippocratic Med.*, 602 U.S. at 395. It also directly affects the "structuring of [the] competitive environment" in which Democratic candidates compete for elective office. *Shays*, 414 F.3d at 85–87; *see also Bost*, 2026 WL 96707, at \*3. Accordingly, the Democratic Party Plaintiffs have both organizational and political-competitor standing to challenge the implementation of Sections 2(a) and 3(b).

In sum, the Democratic Party Plaintiffs have established Article III standing to challenge Sections 2(a) and 3(b) on multiple grounds: associational standing, organizational standing, and political-competitor standing. This Court therefore has jurisdiction to consider their challenges.

      2.    <u>The Democratic Party Plaintiffs may pursue injunctive relief under the APA to redress prospective violations of the Privacy Act.</u>

The Federal Defendants next argue that Plaintiffs cannot obtain injunctive relief from prospective violations of the Privacy Act because the Privacy Act provides a "reticulated

---

[53] *See* Jeffries Decl. ¶¶ 16–17; Schumer Decl. ¶¶ 16–17; Schneider Decl. ¶¶ 27–32 (DNC); Edelman Decl. ¶¶ 24–29 (DGA); Boss ¶¶ 27–32 (DSCC); Ruselowski Decl. ¶¶ 26–31 (DCCC); Bryant Decl. ¶¶ 8–9; Cagle Decl., ¶¶ 9–11.

scheme" of adequate alternative remedies and implicitly forbids such relief. *See* Federal Defs.'
Mem. at 17–19. Defendants are correct that injunctive relief under the APA "will rarely be
appropriate" to remedy an alleged Privacy Act violation because the Privacy Act provides for
damages remedies and certain kinds of injunctive relief that are often exclusive of remedies
under the APA. *See Am. Fed'n of Lab. & Cong. of Indus. Organizations v. Dep't of Lab.*, 778 F.
Supp. 3d 56, 79–81 (D.D.C. 2025) (JDB). However, the type of actions and resulting injuries
alleged by the Democratic Party Plaintiffs here present the "rare case" in which an APA
injunction is necessary to prevent imminent harm that cannot be remedied through the limited
forms of injunctive relief available under the Privacy Act. *See id.* Accordingly, this Court is of
the opinion that the Privacy Act's remedial scheme does not implicitly foreclose this relief,
Plaintiffs may pursue such relief in an action under the APA.

This Court is mindful that the availability of injunctive relief under the APA in
circumstances similar to those presented here is an unsettled question with which other courts are
actively wrestling. *See, e.g.*, *Am. Fed'n of Tchrs. v. Bessent*, 152 F.4th 162, 175–76 (4th Cir.
2025) (analyzing the issue but reserving ruling, noting that while the Supreme Court and the
Fourth Circuit have implied in dicta that the Privacy Act does not preclude such suits, "it appears
that no court of appeals has opined directly on the question").

Although this issue reached the Supreme Court in an application for interim relief last
year, the resolution of that application did not provide meaningful guidance to lower courts. The
availability of injunctive relief under the APA to remedy an alleged Privacy Act violation was
one of many issues presented in a case in which the Supreme Court granted a stay of a
preliminary injunction last June. *See Soc. Sec. Admin. v. Am. Fed'n of State, Cnty., & Mun.
Emps.*, 145 S. Ct. 1626 (2025) (mem.) (per curiam). However, the Court's three-paragraph *per*

*curiam* opinion accompanying the grant of the stay did not analyze the APA-injunction issue or provide any direct guidance to lower courts. *See id.* Although the Supreme Court's resolution of this application for a stay must "inform" this Court's "exercise [of] its equitable discretion in like cases," this Court does not discern any guidance from the brief *per curiam* opinion that would aid in the resolution of this issue. *See Trump v. Boyle*, 145 S. Ct. 2653, 2654 (2025). The Supreme Court's decision to grant the application for a stay could have rested on several possible grounds. Because the *per curiam* opinion does not identify the dispositive issue or issues, this Court cannot determine how the Supreme Court would have resolved the issue of whether injunctive relief is available under the APA to remedy an alleged Privacy Act violation.

In the absence of controlling precedent or an emerging consensus in recent decisions from the courts of appeals, this Court is of the opinion that claims for injunctive relief under the APA arising from an alleged imminent threat of a future Privacy Act violation should be allowed to proceed. That conclusion is consistent with the "basic presumption of judicial review" embodied in the APA. *See Abbott Lab'ys*, 387 U.S. at 140. It comports with the Supreme Court's recent conclusion that the Privacy Act's remedial scheme does not preclude parallel remedies under the Fair Credit Reporting Act. *See Dep't Agric. Rural Dev. Rural Housing Serv. v. Kirtz*, 601 U.S. 42, 63 (2024) (describing the two statutory schemes as "complementary"). And it is also consistent with prior decisions of the Supreme Court and the D.C. Circuit that have appeared to assume—without directly deciding—that such relief is available. *See Doe v. Chao*, 540 U.S. 614, 619 n.1 (2004); *Doe v. Stephens*, 851 F.2d 1457, 1463 (D.C. Cir. 1988).

Finally, this Court agrees with the Democratic Party Plaintiffs that there is "final agency action" on which an APA claim can proceed, at least to the extent that DHS, SSA, or other Federal Defendants have shared data across agencies or outside the Federal Government.

101

Although new uses of records *within* a federal agency may not be reviewable final agency action, the sharing sensitive records with others *outside* the agency is "final" because it clearly represents the "consummation" of the agency's decision-making process and is an action "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett*, 520 U.S. at 178; *see Venetian Casino Resort, L.L.C. v. E.E.O.C.*, 530 F.3d 925, 931 (D.C. Cir. 2008).

For all these reasons, this Court concludes that Plaintiffs may pursue injunctive relief under the APA for alleged violations of the Privacy Act in the implementation of Sections 2(b) and 3(a) of the Executive Order.

3.     <u>The Democratic Party Plaintiffs' request for an injunction against recent changes to the SAVE Program is moot, but they are entitled to narrower declaratory relief.</u>

In their cross-motion for summary judgment, the Democratic Party Plaintiffs challenge DHS's recent changes to the SAVE program, arguing that the new data-sharing practices violate the Privacy Act.  Dem. Pls. Mem. at 42–58.  Specifically, the Democratic Party Plaintiffs contend that the changes amount to an unlawful use of the SAVE system, which they contend DHS historically used only for queries related to non-U.S. citizens, naturalized U.S. citizens, and certain U.S. citizens born outside the United States to parents who are U.S. citizens.  *Id.* at 42–43 (citing System of Records Notice, 85 Fed. Reg. 31798, 31800–01 (May 27, 2020)).  They also argue that the Numident database, which DHS has now linked to SAVE, is neither intended nor suitable for verifying citizenship, in part because it contains inaccurate information about individuals that SSA does not correct unless affected individuals contact it directly to request an update.  Dem. Pls.' Mem. at 44.  The Democratic Party Plaintiffs argue that the new uses of these systems violate the Privacy Act.  *Id.* at 42–44.

DHS and SSA did not initially provide any notice or opportunity for public comment regarding these new uses of the SAVE and Numident systems.  *See* Federal Defs.' Mem. at 22–26.  Instead, the Federal Defendants argue that these new uses were consistent with the Privacy Act because they were covered by existing "routine uses" of the systems that had been identified in previously published system of records notices ("SORNs") for SAVE and Numident.  *See id.*; *see also* 5 U.S.C. § 552a(a)(7), (b)(3), (e)(4)(D) (providing that an agency may disclose records protected under the Privacy Act for a "routine use" that is identified in a system of records notice, so long as the agency provides at least 30 days' notice and opportunity for public comment on "any new use or intended use" of the affected records).

Soon after briefing on the parties' cross-motions for summary judgment concluded, the Federal Defendants notified this Court that DHS and SSA had issued new SORNs relating to the use of SAVE and Numident.  *See* Federal Defs.' Notice of Factual Developments, Dkt. No. 222.

The new SORN for SAVE provides that it is a "routine use" of SAVE to share data with SSA "and other federal, state, tribal, territorial, local, governments and other authorized entities to assist user agencies [to] determine U.S. citizenship and immigration status of an individual." 90 Fed. Reg. 48948, 48954 (Oct. 31, 2025).  It also provides that SAVE includes SSA data.  *See id.*  This routine use became effective on December 1, 2025.  *See id.* at 48949.

The new SORN for Numident provides that it is a "routine use" of Numident to share data with DHS "regarding the citizenship and immigration status, lawful or unlawful, pursuant to 8 U.S.C. § 1373," a statute regarding information-sharing between federal agencies about individuals' immigration status.  90 Fed. Reg. 50879, 50883 (Nov. 12, 2025).  This routine use became effective on December 12, 2025.  *See id.* at 50880.

The recent publication of new SORNs for SAVE and Numident has mooted the Democratic Party Plaintiffs' Privacy Act-based request for injunctive relief against recent changes to those systems based on Sections 2(b) and 3(a) of the Executive Order.  The essence of the Privacy Act claim at issue here was that DHS and SSA were engaged in uses of SAVE and Numident that fell outside the parameters of any existing routine use or other allowed exception to the Privacy Act's protections.  *See* Dem. Pls.' Mem. at 53–56.  Now that the agencies have published new SORNs describing routine uses that cover the challenged data-sharing practices and those new routine uses have gone into effect, the Democratic Party Plaintiffs' allegations and evidence do not show imminent threat of unlawful action leading to irreparable harm that would support an injunction.  *See id.*  In the absence of such a showing, their claim for injunctive relief against the relevant changes to SAVE and Numident based on the Privacy Act is moot.

The Democratic Party Plaintiffs argue that their claims regarding SAVE and Numident fall within the "voluntary cessation" and "capable of repetition, yet evading review" exceptions to the mootness doctrine, but these arguments are unsuccessful.

Under the "voluntary cessation" exception to the general rules of mootness, "a defendant claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 190 (2000). However, this exception "has no play" if the agency did not act "to avoid litigation."  *Alaska*, 17 F.4th at 1226 (D.C. Cir. 2021) (quoting *Am. Bar Ass'n*, 636 F.3d at 648).

Under the "capable of repetition, yet evading review" exception, a case is not moot if "(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be

subjected to the same action again." *Pharmachemie B.V. v. Barr Lab'ys, Inc.*, 276 F.3d 627, 633 (D.C. Cir. 2002) (quoting *Weinstein v. Bradford,* 423 U.S. 147 (1975)).

Here, the Federal Defendants have carried their burden of showing that the narrow conduct challenged in Plaintiffs' motion for summary judgment is not reasonably likely to recur. The alleged conduct at issue—engaging in specific new uses of SAVE and Numident that do not fall within any established exception to the Privacy Act, including the exception for a validly published "routine use"—will not recur because the Federal Defendants have now published, and presumably will not rescind, new SORNs containing routine uses that directly cover the challenged applications of both SAVE and Numident.

Even if the challenged conduct did somehow recur—for example, if the Federal Defendants *do* rescind each "routine use" that covers the data sharing at issue, yet persist in using SAVE and Numident systems in the manner that Plaintiffs challenge—that conduct would not evade review. The Democratic Party Plaintiffs remain free to challenge any future unlawful uses of or changes to the SAVE and Numident systems, and this Court will award appropriate relief from any final agency actions that are contrary to law. *See* 5 U.S.C. §§ 704, 706.

In sum, because the Federal Defendants have now adopted a "routine use" that covers the challenged uses of data, they no longer have "a legally cognizable interest in the outcome" of their procedural claims under the Privacy Act seeking injunctive relief against the recent changes to the SAVE and Numident systems, and those claims are moot. *See Already, LLC*, 568 U.S. at 91 (quoting *Murphy*, 455 U.S. at 481).

This Court shall therefore **DENY IN PART** the Democratic Party Plaintiffs' Cross-Motion for Summary Judgment as to the Democratic Party Plaintiffs' procedural claims

regarding changes to the SAVE program already made based on Sections 2(b) and 3(a) of the Executive Order and **DISMISS** the relevant part of their claim for injunctive relief as **MOOT**.

However, the Court shall **GRANT** the Democratic Party Plaintiffs' narrower request for declaratory relief. *See Del Monte Fresh Produce Co. v. United States*, 570 F.3d 316, 321 (D.C. Cir. 2009) (explaining that a request for "declaratory relief as to an ongoing policy" may proceed even if a parallel request for an injunction is moot,). Specifically, the Court shall **DECLARE** that, in the course of implementing Sections 2(b) and 3(a), the Federal Defendants must strictly adhere to the mandates of the Privacy Act, including its requirement that agencies provide at least 30 days' notice and opportunity for comment for any new or intended "routine use" of information stored in an agency's system of records. *See* 5 U.S.C. § 552a(e)(4)(D), (e)(11).

Plaintiffs have made each of the necessary showings to obtain this declaratory relief. First, Plaintiffs have standing to challenge Sections 2(b) and 3(a) based on those provisions' future effect on Plaintiffs' members' interests, their own organizational interests, and their interest in fair competition for political office. *See supra* Section III.G.1. Second, because no further factual development is necessary to clarify Defendants' straightforward legal obligation to comply with the Privacy Act, Plaintiffs' request is ripe. Third, declaratory relief will both "serve a useful purpose in clarifying the legal relations at issue" and "afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *See Glenn*, 222 F. Supp. 3d at 36. Specifically, because the present record suggests that the Federal Defendants have not yet completed their efforts to implement Sections 2(b) and 3(a), a declaratory judgment will remove any doubt about the Federal Defendant's Privacy Act obligations as they carry out their "ongoing program" of implementing the Executive Order. *See Del Monte*, 570 F.3d at 321.

*     *     *

The Court's resolution of Plaintiffs' request for injunctive relief should not be misunderstood as an endorsement or encouragement of the manner in which the Federal Defendants have gone about implementing Sections 2(b) and 3(a) of the Executive Order.  The Privacy Act's notice-and-comment provisions are designed to ensure that individuals have opportunities to learn about and comment on new uses of their sensitive information *before* those uses begin.[54]  It is flatly inconsistent with the text, structure, and purpose of the Privacy Act for an agency to initiate a major new data-sharing program affecting the sensitive data of millions of Americans, then validate that program as a "routine use" months after it has begun.  Although the absence of an imminent *future* Privacy Act violation precludes the Court from granting the injunctive relief that the Democratic Party Plaintiffs seek regarding the recent changes to the SAVE program, the Court has serious concerns that DHS and SSA may each have been violating the Privacy Act in significant ways right up until the recently published SORNs took effect.  However, in the absence of a claim for damages or other retrospective relief, the Court need not—and does not—finally resolve the issue of whether such a violation may have occurred.

The Court also does not resolve the issue of whether the Federal Defendants' conduct in implementing the recent changes to SAVE and Numident is, as Plaintiffs allege, part of an ongoing policy or pattern of systematically disregarding or circumventing the Privacy Act's notice requirements.  *See* Dem. Pls.' Suppl. at 5–6.  If the record developed through further

---

[54] The Court notes with grave concern that one of the Federal Defendants in this case—the Social Security Administration—recently admitted that last year, members of its "DOGE Team" used unauthorized third-party systems to handle and share sensitive data stored in the agency's databases.  *See* Notice of Corrections to the Record, *Am. Fed'n of State, Cnty., & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*, No. 1:25-cv-0596-ELH, Dkt. No. 197 (D. Md. Jan. 16, 2026).  This disclosure underscores the importance of the Privacy Act's procedural protections, which allow individuals to comment on proposed uses of their data that could expose them to new risks.  One such risk is the increased threat of misuse that arises when agencies centralize data and make it accessible to greater numbers of users, as DHS and SSA have done through their changes to SAVE and Numident.  *See id.*  Another important risk when agencies centralize data is the possibility that false, incomplete, outdated, or otherwise unreliable information will be imported from one system into another.  *See* Dem. Pls. Mem. at 49.

107

proceedings in this case shows that such an ongoing policy or pattern exists, the Court may grant appropriate prospective relief on that basis.

        4.    <u>The remaining aspects of the Democratic Party Plaintiffs' claims regarding Section 2(b) and 3(a) may proceed.</u>

Finally, neither party is entitled to summary judgment on the remaining aspects of the Democratic Party Plaintiffs' claims regarding Sections 2(b) and 3(a), each of which require further factual development to resolve. It appears to the Court that these claims, which turn on specific details about how the Federal Defendants will maintain and use personal information in various agency databases in the course of implementing Sections 2(b) and 3(a), cannot be resolved without further discovery and the production of an administrative record. The Democratic Party Plaintiffs have standing to proceed with these claims, and this Court agrees that they may pursue them under the APA. *See supra* Sections III.G.1–2. The Court shall therefore **DENY WITHOUT PREJUDICE** the Defendants' motions for summary judgment on these claims, which the Court shall **DEFER** to the next phase of proceedings in this case. The Court shall direct the parties to propose a schedule for further proceedings on these claims.

## IV. CONCLUSION

For the foregoing reasons, the Court shall **GRANT IN PART**, **DENY IN PART**, and **DEFER IN PART** the Federal Defendants' [177] Motion for Partial Summary Judgment, the Defendant-Intervenor's [176] Motion for Partial Summary Judgment, the LULAC Plaintiffs' [194] Motion for Partial Summary Judgment, and the Democratic Party Plaintiffs' [196] Motion for Partial Summary Judgment.

The Court shall **GRANT** partial summary judgment in Plaintiffs' favor on their constitutional separation-of-powers claims regarding Section 2(d) of the Executive Order, which directs certain agency heads to "assess citizenship" before providing a federal voter registration

form to "enrollees of public assistance programs."  The Court shall also **GRANT** partial summary judgment in Plaintiffs' favor as to Section 3(d) of the Executive Order, which directs the Secretary of Defense to update a federal absentee voter registration and ballot request form to require documentary proof of citizenship.  The Court shall **DECLARE** that Sections 2(d) and 3(d) cannot lawfully be implemented and **PERMANENTLY ENJOIN** the appropriate Defendants from taking any action to implement or give effect to them.  The Court shall also **DECLARE** that, in the course of implementing Section 2(b) and 3(a) of the Executive Order, which relate to the sharing of data by federal agencies, the Federal Defendants must strictly comply with the mandates of the Privacy Act, including its requirement that agencies provide at least 30 days' notice and opportunity for comment for any new or intended "routine use" of information stored in an agency's system of records.  *See* 5 U.S.C. § 552a(e)(4)(D), (e)(11).

The Court shall **GRANT** partial summary judgment in Defendants' favor on Plaintiffs' claims regarding Sections 4(a), 7(a), and 7(b) of the Executive Order because the Plaintiffs have not established that those claims are ripe for this Court's review.  The Court shall **GRANT IN PART** Defendants' motions for summary judgment on Plaintiffs' Administrative Procedure Act ("APA") claims regarding Section 2(d) and 3(d) and **DISMISS** those claims because Plaintiffs have not shown final agency action.  The Court shall also **DISMISS** Plaintiffs' request for injunctive relief regarding changes to the Department of Homeland Security's Systematic Alien Verification for Entitlements ("SAVE") Program that were adopted in response to Sections 2(b) and 3(a) of the Executive Order, which is **MOOT** because of intervening actions by the Department of Homeland Security and the Social Security Administration.

The Court shall **DENY** Defendants' motion for summary judgment as to Plaintiffs' remaining claims regarding Section 2(b), 2(d), and 3(a) of the Executive Order, each of which

would benefit from further factual development.  Accordingly, the Court shall direct the parties to propose a schedule for further proceedings on these remaining claims.

Each of these dispositions is based on the present record and shall not preclude appropriate further action if new facts or circumstances arise that should alter the Court's analysis of any claim or request for relief.  Because further proceedings may be necessary to resolve Plaintiffs' remaining claims, some of which have a close nexus to claims resolved in this Memorandum Opinion and the accompanying Order, the Court shall not enter final judgment on any claim at this time.  *See* Fed. R. Civ. P. 54(b).

Nothing in this Memorandum Opinion or the accompanying Order shall prevent the named Defendants from taking any lawful action pursuant to their own statutory authorities.

An appropriate Order accompanies this Memorandum Opinion.


**Dated:**  January 30, 2026

COLLEEN KOLLAR-KOTELLY
United States District Judge

110